## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## (EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
|       Plaintiff, | ) | |
| v. | ) | |
| | ) | 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
|       Defendants. | ) | |
| _____ | ) | |

### Complaint And Jury Demand

Lisa Calvente alleges the following for her complaint against Salma Ghanem and DePaul University:

### The Parties

1.      Lisa Calvente ("Dr. Calvente") resides in Cook County, Illinois. At all times relevant to this complaint, Dr. Calvente was a tenure–track assistant professor of Intercultural Communication and Performance Studies within the College of Communication (the "College") at DePaul University ("DePaul" or the "University"). Dr. Calvente is an American of African, Latinx, and Asian descent.

2.      Salma Ghanem ("Dr. Ghanem") is the former dean of the College of Communication at DePaul, the former acting provost of DePaul, and the current interim provost of DePaul. Dr. Ghanem maintains an office in Cook County, Illinois and, on information and belief, is also a resident of Cook County, Illinois.

3.      DePaul is a not–for–profit corporation and is the largest Catholic university in the United States. At all times relevant to this complaint, DePaul employed over five hundred people

and was an employer as defined in 42 U.S.C. §2000e(b). DePaul's principal place of business is in Chicago, Cook County, Illinois.

## Jurisdiction and Venue

4.     This Court has jurisdiction over Dr. Ghanem and DePaul because each of them committed the acts and omissions that are the subject of this litigation in Cook County, Illinois, which is in this district. Alternatively, this Court has jurisdiction over the defendants because they are (on information and belief) both residents of Cook County, Illinois, which is in this district.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) because Dr. Ghanem and DePaul are residents of this district. Alternatively, venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts and omissions giving rise to this litigation occurred in this district.

6.     This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331 because Counts I and III allege a violation of 42 U.S.C. §1981 and Counts II and IV allege a violation of 42 U.S.C. §2000e, *et. seq.* This Court has jurisdiction over the state law claim alleged in Count V pursuant to 28 U.S.C. §1367 because that claim is so related to the federal claims that it forms the basis for the same case or controversy.

## Factual Allegations

7.     This litigation seeks redress for significant abuses by Dr. Ghanem and DePaul University that were alternatively (i) in retaliation for Dr. Calvente's complaints about racism within the College of Communication, and (ii) motivated by Dr. Calvente's race, which abuses culminated in the denial of Dr. Calvente's application for tenure and promotion from assistant professor to associate professor.

8. Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. She was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States, a topic that scholarly research has described as impossible to teach to undergraduate students without causing discomfort. Dr. Calvente joined DePaul's faculty at the start of the 2011/2012 academic year.

**The process for obtaining tenure at DePaul.**

9. As is the case in many other universities in the United States, the grant of tenure at DePaul "creates the presumption of continuing employment . . . ." (DePaul University Faculty Handbook dated July 1, 2018 (the "Handbook") §3.1, a copy of which is attached as Exhibit 1.) Indeed, the Handbook describes the rights and responsibilities of faculty at DePaul and also articulates the terms and conditions of faculty employment. In addition, the Handbook permits local academic units to articulate more specific guidelines with respect to their requirements for tenure and promotion so long as those guidelines are consistent with the Handbook.

10. Chapter 3 of the Handbook articulates a multi–step process for evaluating a faculty member's application for tenure. As the first step, tenured faculty members of the local academic unit (in Dr. Calvente's case, the College) vote on the candidate's application for tenure. Then, the file is then sent to the University Board of Promotion and Tenure (the "UBPT"), which is comprised of seven tenured faculty members from across the University. The UBPT then makes an independent review of the tenure file and takes an independent vote to grant or deny tenure. However, as a practical matter, the recommendation of the UBPT is rarely different from that of the local academic unit. After the UBPT vote, the tenure file goes to the University provost for a

final decision on the grant or the denial of tenure. Because section 3.5.6.3 of the Handbook requires the provost to overturn the decision of the UBPT "[o]nly in rare instances and for compelling reasons," the decision of the UBPT to grant or deny tenure is typically final.

11.     The standards evaluating candidates for tenure and promotion are articulated in Chapter 3 of the Handbook. As section 3.4.2 of the Handbook states, faculty are to be evaluated based on teaching and learning (collectively "teaching") (Handbook §3.4.2.1); scholarship, research, or other creative activities (collectively "research") (*id.* at §3.4.2.2); and service (*id.* at §3.4.2.3). Expressly prohibited in evaluating a candidate's tenure application—both under Chapter 6 of the Handbook and also under state and federal law—are a faculty member's race or her opposition to racism within her academic unit or the broader University.

12.     A candidate who is unsuccessful in her application for tenure at DePaul is offered a one-year terminal contract that starts the at the beginning of the academic year following the denial. That candidate is then dismissed from faculty at the end of the terminal contract.

13.     Prior to a faculty member's formal application for tenure, that faculty member is periodically and formally reviewed by the tenured faculty, or a subset thereof, in her academic unit. (Section 3.3.3.1 of the Handbook refers to these as probationary reviews.) The purpose of these probationary reviews is to report on the faculty member's progress towards tenure and to determine whether the faculty member will be renewed. Accordingly, the untenured faculty member is reviewed based on her teaching, research, and service to her academic unit and the University. In the College, the Personnel Committee (a subset of the tenured faculty) conducts these reviews every two years.

14. Probationary reviews are among the only methods of terminating the employment of a tenure–line faculty member. The other methods of terminating a tenure–line faculty member's employment include (i) the denial of tenure following a tenure–line faculty member's application for tenure and promotion, and (ii) the process articulated in Chapter 4 of the Handbook.

**Dr. Calvente's probationary reviews.**

15. Dr. Calvente received her probationary reviews in the winter of 2013, in March 2015, and in November 2017. Although the Personnel Committee lodged no objection to Dr. Calvente in 2013, it is extremely rare for a tenure–track professor at DePaul to be recommended for non–renewal after one review cycle. In both 2015 and 2017, following changes in its composition, the Personnel Committee recommended Dr. Calvente's contract not be renewed.

16. The March 7, 2015 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 2.

17. The Personnel Committee's March 2015 evaluation was problematic for several reasons. First, with respect to Dr. Calvente's teaching, the evaluation (willfully) ignored the (i) supermajority majority of her qualitative student evaluations, which praised Dr. Calvente's teaching, and (ii) her quantitative scores, which surpassed the average scores for all College faculty in several areas. Indeed, the Personnel Committee's review of Dr. Calvente's teaching was so inconsistent with her file, that a January 15, 2020 report from an independent (*i.e.*, not affiliated with the College) Faculty Appeals Committee opined that it approached a "willful distortion." (*See infra* paragraph 31.) The Personnel Committee, however, did not so unfairly evaluate white faculty during their probationary reviews.

18. Notwithstanding the Personnel Committee's March 2015 recommendation, the then–dean of the College, Dr. Ghanem, reappointed Dr. Calvente to the College's faculty.

19.     Following the Personnel Committee's 2015 recommendation of non-renewal, Dr. Calvente filed a complaint with DePaul's Office of Institutional Diversity and Equity ("OIDE") in June 2015. (As per then-current University policy, OIDE was tasked with investigating claims of discrimination or harassment on the basis of status protected by federal, state, or local law.) The complaint highlighted, among other issues, that tenured faculty at the College (i) ignored the majority of both Dr. Calvente's qualitative and quantitative teaching evaluations that state that she is an excellent instructor, which evaluations were not ignored for white tenure-track teachers, (ii) ignored her evaluation scores, which surpassed all of the faculty averages in various areas, which it did not do for white tenure-track teachers, (iii) focused on the super minority of qualitative evaluations labeling her as hostile, which it did not do for white tenure-track teachers, and (iv) that her mistreatment was similar to mistreatment suffered by another (former) faculty of color in the College, Lisa Pecot-Hebert, who was ultimately forced out of the College.

20.     OIDE ultimately closed its investigation into Dr. Calvente's June 2015 complaint on July 6, 2016, finding insufficient evidence of a violation of the University's Anti-Discrimination and Anti-Harassment Policy and Procedures.

21.     On November 17, 2017, the Personnel Committee again recommended that Dr. Calvente's contract not be renewed, again citing alleged deficiencies with Dr. Calvente's teaching and her record of service. With respect to Dr. Calvente's teaching, the Personnel Committee again emphasized the qualitative experience of a super-minority (2.5% during academic year 2017) of students who reported feeling uncomfortable in Dr. Calvente's class due to the manner in which Dr. Calvente taught race and American racism, and it again ignored that (i) Dr. Calvente's quanti-

tative scores were superior to most of her colleagues within the College, and (ii) the supermajority of Dr. Calvente's qualitative scores were very positive.

22.     The November 17, 2017 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 3.

23.     Notwithstanding the Personnel Committee's November 2017 recommendation, Dr. Ghanem reappointed Dr. Calvente to the College's faculty.

**Sydney Dillard is tenured and promoted while Dr. Calvente is given a terminal contract.**

24.     In the fall of 2018, Dr. Calvente and Dr. Sydney Dillard (an untenured member of the College's faculty and an American of African Descent) presented a joint complaint to Dr. Ghanem concerning patterns of racial harassment, bullying, marginalization, and microaggressions within the College. This fall 2018 meeting was the first claim of racism and racial harassment that Dr. Calvente made directly to Dr. Ghanem.

25.     Consistent with then–current DePaul policy concerning complaints of discrimination, Dr. Ghanem forwarded the concerns raised by Dr. Calvente and Dr. Dillard to DePaul's office of Human Resources ("HR"). On information and belief, it was widely known within the College that (i) Dr. Dillard and Dr. Calvente complained about racism within the College to Dr. Ghanem, and (ii) HR would be investigating these complaints.

26.     HR attempted to schedule a meeting with both Dr. Calvente and Dr. Dillard to discuss their concerns. Dr. Calvente, Dr. Dillard, and a representative from HR ultimately set a meeting for November 20, 2018; however, Dr. Dillard never showed up for the meeting as she withdrew her complaint at some unspecified time.

27.     Both Dr. Calvente and Dr. Dillard applied for tenure and promotion from assistant professor to associate professor during 2018/2019 academic year. Moreover, Dr. Calvente's

tenure dossier was *at least as strong* as Dr. Dillard's in the areas of research and service, and stronger than Dr. Dillard's in the area of teaching. Nevertheless, the vote by the College faculty on Dr. Calvente's tenure application was 19–2 against the grant of tenure. (A copy of the dean's summary of the College's vote on Dr. Calvente's application is attached as Exhibit 4.) With respect to Dr. Dillard's application, the College recommended that she receive tenure. Dr. Ghanem—who had been since been appointed to serve as acting provost (*see infra* ¶29)—then tenured Dr. Dillard.

28.     Following the College's vote on Dr. Calvente's tenure application, the UBPT conducted its independent review of the file. And after that review, the UBPT (which, at the time, had one member from the College, Bruno Teboul, on it) recommended that Dr. Calvente receive tenure by a vote of 4–3. On information and belief, had Dr. Teboul abstained from voting, as he would have been required to do at many other universities, the vote would have been 4–2 in Dr. Calvente's favor. (A copy of the UBPT's recommendation is attached as Exhibit 5.)

29.     In October 2018, Dr. Ghanem was elevated to the position of Acting Provost of DePaul. This promotion meant that Dr. Ghanem—who had been dean of the College for much of Dr. Calvente's professional life—would decide whether Dr. Calvente would remain employed at DePaul. Ultimately, Dr. Ghanem sided with her former colleagues and refused to grant tenure to Dr. Calvente *even though* Dr. Calvente's file was at least as strong as that of a professor who complained about discrimination within Dr. Ghanem's academic unit and who then retracted that complaint. Following her decision to deny tenure to Dr. Calvente, Dr. Ghanem wrote that Dr. Calvente would receive a terminal contract and that her last day as faculty member at DePaul would be June 30, 2020. (A copy of Dr. Ghanem's letter denying Dr. Calvente's application for tenure and promotion is attached as Exhibit 6.)

*An independent Faculty Appeals Committee recommends that Dr. Calvente be awarded tenure.*

30.     Chapter 5 of the Handbook permits a faculty member to appeal the denial of her tenure application. Accordingly, following Dr. Ghanem's decision to deny her application, Dr. Calvente appealed to the Faculty Committee on Appeals, which appointed three faculty unaffiliated with the College to serve as an Appeals Board.

31.     After preliminarily investigation, the Appeals Board dismissed two of Dr. Calvente's grounds for appeal and investigated a third ground for appeal. Ultimately, the Appeals Board issued a thirty-four page report to the President of DePaul (copy attached as Exhibit 7) explaining how (i) Dr. Calvente was evaluated unfairly at multiple points in 2015 and 2017, and (ii) these unfair evaluations were material to the ultimate denial of tenure.

32.     It is unusual for an Appeals Board at DePaul to recommend the overturning of the provost's decision to deny tenure. However, notwithstanding the Appeals Board's report and recommendation, DePaul ultimately decided against the award of tenure to Dr. Calvente, and her employment at DePaul will end on June 30, 2020.

## COUNT I
*(Violation of 42 U.S.C. §1981–retaliation against DePaul and Dr. Ghanem)*

33.     Paragraphs 1–32 are re-alleged and incorporated as if fully set forth herein.

34.     By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

35. Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the "but for" factor that caused Dr. Ghanem and DePaul to terminate her employment.

36. As a result of the denial of tenure and promotion, and as a result of the upcoming termination of her employment, Dr. Calvente has been denied, and will be denied opportunities to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

37. In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

<u>**COUNT II**</u>
*(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq.–retaliation against DePaul)*

38. Paragraphs 1–32 are re-alleged and incorporated as if fully set forth herein.

39. By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

40. Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the motivating factor that caused DePaul to terminate her employment.

41. As a result of the denial of tenure and promotion, and as a result of the upcoming termination of her employment, Dr. Calvente has been denied, and will be denied opportunities

to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

42.     In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

## COUNT III
*(Violation of 42 U.S.C. §1981–racial discrimination against DePaul and Dr. Ghanem)*

43.     Paragraphs 1–32 are re-alleged and incorporated as if fully set forth herein.

44.     By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

45.     Dr. Calvente's race was the "but for" cause in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

46.     As a result of DePaul's and Dr. Ghanem's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to an award of compensatory damages.

47.     In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

## COUNT IV
*(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq.–race discrimination against DePaul)*

48.     Paragraphs 1–32 are re-alleged and incorporated as if fully set forth herein.

49.     By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

50.     Dr. Calvente's race was the motivating factor in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

51.     As a result of DePaul's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of DePaul's actions, thereby entitling her to an award of compensatory damages.

52.     In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

## COUNT V
*(Breach of contract against DePaul)*

53.     Paragraphs 1–32 are re-alleged and incorporated as if fully set forth herein.

54. Through the Handbook and other documents referenced therein, DePaul defined the procedures and criteria for tenure and promotion, and thereby created the terms and conditions of an employment contract between it and Dr. Calvente.

55. By accepting her appointment as a tenure track faculty member at DePaul, Dr. Calvente and DePaul agreed that her applications for tenure and promotion were to be governed by the Handbook's tenure criteria and procedures.

56. The Handbook requires that a candidate for tenure and promotion be given fair consideration and evaluation in the areas of teaching, research, and service at all levels.

57. The Handbook further requires that tenure and promotion decisions not be based on racial discrimination or based on retaliation for complaining about racial discrimination.

58. In denying Dr. Calvente's applications for tenure and for promotion, the University failed to evaluate Dr. Calvente fairly by, among other things, (i) willfully distorting her record with respect to her teaching, and (ii) failing to provide clear and consistent guidance concerning expectations for service during formal reviews.

59. Further, in denying Dr. Calvente's applications for tenure and for promotion, the University (i) failed to treat her in the same manner as similarly situated persons who did not complain about racial harassment within the College, and (ii) failed to treat her in the same manner as similarly situated persons who were not of mixed race.

60. DePaul's denial of Dr. Calvente's applications for tenure and promotion breached its contract with her.

61. As a result of DePaul's decision to deny Dr. Calvente's applications for tenure and promotion, Dr. Calvente has suffered damages including lost wages and benefits.

WHEREFORE, Dr. Calvente respectfully prays that this Court:

A.      Order DePaul and Dr. Ghanem to pay compensatory damages including lost wages and for emotional distress;

B.      Order DePaul and Dr. Ghanem to pay punitive damages in an amount sufficient to punish it and to deter others from acting in a similar manner;

C.      Order DePaul and Dr. Ghanem to pay pre-judgment interest;

D.      Order DePaul and Dr. Ghanem to pay costs;

E.      Order DePaul and Dr. Ghanem to pay her attorney's fees;

F.      Order DePaul to grant her the rank of associate professor;

G.      Order DePaul to reinstate her employment or, in the alternative, to order front pay in lieu of reinstatement; and

H.      Award any other relief that the Court deems just and/or equitable.

## Jury Demand

Dr. Calvente demands trial by jury on all issues so triable.

Respectfully submitted,                     /s/ Fitzgerald T. Bramwell
June 8, 2020                                Fitzgerald T. Bramwell
                                            **Law Offices of Fitzgerald Bramwell**
                                            225 West Washington, Suite 2200
                                            Chicago, Illinois 60606
                                            312-924-2884 (voice)
                                            bramwell@fitzgeraldbramwell.com

14

# Exhibit 1

July 1, 2018

# CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN GOVERNANCE

1.1 Principles of Governance ................................................................................................ 2

1.2 Governance Structure.................................................................................................... 2

    1.2.1 Primary Responsibilities of the Faculty ................................................................... 3

    1.2.2 Participatory Responsibilities.................................................................................. 3

1.3 The Faculty Council and Its Delegated Authority ........................................................ 4

    1.3.1 Members of the Faculty Council .............................................................................. 4

    1.3.2 Officers of the Faculty Council ............................................................................... 5

    1.3.3 Meetings of the Council ........................................................................................... 6

    1.3.4 Notice to the Faculty of Council Meetings .............................................................. 6

    1.3.5 Conduct of Meetings ................................................................................................ 6

    1.3.6 Communication of Decisions ................................................................................... 6

    1.3.7 Responsibility to the Faculty ................................................................................... 7

    1.3.8 Conduct of Meetings of the Council of the Whole ................................................... 7

1.4 Committees of the Faculty Council ............................................................................... 7

    1.4.1 General Duties of Committees .................................................................................. 8

    1.4.2 Standing Committees of the Faculty Council............................................................ 8

    1.4.3 University Committees with Faculty Representation................................................. 9

1.5 Amendment of the Faculty Handbook ......................................................................... 10

1

July 1, 2018

# CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN GOVERNANCE

## 1.1 Principles of Governance

Within general university norms and specific regulations of the Board of Trustees and the university President, faculty members participate in governance on an institution-wide basis and in the particular academic units with which they are affiliated.

Faculty initiative and participation in governance are a vital part of academic life. Moreover, the general well-being of the university is dependent on the time and talents the faculty contribute in the roles of decision makers and consultants.

Faculty participate in all areas of university governance. They have primary responsibilities over academic and scholarly activities, faculty personnel matters, and education interests and policies. They have participatory or advisory responsibilities in other areas.

Full-time faculty members who are not on special appointment are expected to participate in governance as a normal faculty obligation. Consequently, only for sufficiently serious reasons may they refuse appointments or active service on various committees or in their departments. Part-time faculty members and full-time faculty members on special appointment may be invited to participate in certain governance processes to the extent that their time and other responsibilities permit.

As a general rule, full-time faculty members are entitled to participate and vote in decisions made in the academic departments, schools, and colleges with which they are affiliated. Some matters before a department, school, or college such as promotion and tenure, may be restricted to the deliberation of a limited number of faculty.

## 1.2 Governance Structure

The faculty of DePaul University shall bear its share of responsibility of shared governance according to the following principles.

1. DePaul University is a community sharing a common interest in the welfare of the institution.
2. DePaul is a university community which has adopted this country's tradition of collegial governance. The university's own philosophy encourages faculty and staff to be concerned with university-wide issues, to prevent barriers from separating different divisions of the university, and otherwise to work for a type of unity that the term "community" implies.
3. As a corporation, the university has a formal structure of governance described principally by its Charter and Bylaws. The latter document assigns certain responsibilities and authority to the Board of Trustees and to particular officers of the university, but it assumes that much of the authority will be shared by a process of delegation.

July 1, 2018

4. For the university to be well governed, the diverse interests and perspectives of faculty, staff, students, and administration must be considered and incorporated in a timely fashion in the decision making processes of the institution.

5. By tradition and training, the faculty are expected to make judgments about the academic integrity of the curriculum and the professional requirements of faculty status. Therefore, curriculum, academic programs, and faculty status questions shall be considered primary responsibilities of the faculty. It is understood that in order to carry out these responsibilities, the faculty will work closely with the academic administrators and the officers of the university. They will also seek the advice of students, part-time faculty, and staff. While the President and the Board of Trustees have the authority to reverse the decision of the faculty regarding their primary responsibilities, it is expected that they would do so only in exceptional circumstances and would communicate the reasons to the faculty.

6. Faculty governance regarding academic programs, curriculum, and faculty status regularly takes place through departments, programs, colleges, and schools. Primary governance of those bodies shall reside within the bodies. Some institutional mechanism is required for university faculty to make decisions on all educational matters and policies regarding faculty status which concern more than one college or school or which are otherwise of general interest.

7. Needed, too, is a mechanism for the university faculty to make recommendations to the president and the provost regarding matters outside the primary responsibilities of the faculty.

The Faculty Council has been established to ensure full and equal participation of faculty in university governance.

### 1.2.1   Primary Responsibilities of the Faculty

The faculty is vested with primary governance responsibility of academic and scholarly activities and faculty personnel matters within the university, including the following:

1. Curriculum matters, including establishment, dissolution, and substantial changes of degree programs; and reorganization of the general university academic structure.
2. Academic freedom, including rights and responsibilities.
3. Standards and procedures concerning faculty promotion, tenure, appointments, retention, and performance.
4. Adjudication of grievance and disputes in all matters involving a faculty member or members.
5. Standards and procedures concerning instruction.
6. Regulations regarding attendance, examinations, grading, scholastic standing, honors, and general admission and graduation standards.
7. Matters pertaining to research, and to scholarly and creative activities.
8. Academic principles underlying the academic calendar.
9. In general, any educational interests and policies.

### 1.2.2   Participatory Responsibilities

The faculty will advise or otherwise participate regularly with the administration and other appropriate bodies in university matters including the following:

3

July 1, 2018

1.  Establishment of university priorities.
2.  Formulation of policy with regard to allocation and utilization of the university's human, physical and fiscal resources and the principles underlying the development of the budget.
3.  Oversight of administrators, establishment or dissolution of administrative offices, and major changes in administrative structure.
4.  Establishment of policies for the regulation of inter-collegiate athletes.
5.  Recommendation of candidates for honorary degrees.
6.  The establishment or elimination of colleges, schools, or local academic unit.
7.  Conducting of commencement exercises and honors convocations.
8.  Other matters inseparably associated with traditional faculty responsibilities.
9.  Any matters of interest to the faculty or pertaining to the university and its purpose.

## 1.3 The Faculty Council and Its Delegated Authority

The authority of the faculty to carry out its responsibilities for university-wide issues is delegated to the Faculty Council, except when a meeting of the Council of the Whole is held at the call of the university president, the provost, the Faculty Council, or on written petition to the Faculty Council by at least fifty full-time members of the faculty.

For the purposes of this Council's representation, the university's regular full-time faculty consists of all tenure-line and term faculty and excludes the president, the provost, the university's vice presidents, the deans of the colleges or schools, and other faculty members whose roles in the judgment of the President of the Faculty Council, are predominantly administrative.

### *1.3.1 Members of the Faculty Council*

All colleges shall have representation on Faculty Council. The overall size of Faculty Council, the number of seats for members and alternates, and the distribution of those seats by college shall be determined by Faculty Council according to its bylaws.

Members shall be elected by the full-time faculty of the various colleges and schools respectively. The term for a regularly elected member of Faculty Council shall be from September 1st of the calendar year in which he or she is elected until August 31st of the calendar year in which his or her term expires. Each calendar year, unit elections for the regular seats and alternate seats held by members whose terms expire in that year shall take place on or after April 1st and by a date that will allow the results to be reported to the chair of the Committee on Committees for presentation at the June meeting of the Council. Members elected at that time shall begin their terms on September 1st of that year.

Council members shall hold office for three years with staggered terms so that one-third of the membership is eligible for election each year. The office of a Council member shall become vacant on incapacity, resignation, or the absence of said council member from the meeting of the Council for four consecutive months. The college dean shall call a special election to fill an existing vacancy.

July 1, 2018

Alternate members shall hold office for one-year terms.  In the event of an anticipated absence of a council member from a Council meeting, the council member shall designate an alternate to participate in his/her stead with full rights of a Council member.

The Faculty Council Committee on Committees shall review the composition of Faculty Council membership by February 29th of every leap year and make a recommendation to Faculty Council during the subsequent March meeting to maintain or adjust the composition of membership to take effect for the coming academic year.

### 1.3.2    Officers of the Faculty Council

The Council shall elect a president as presiding officer, a vice president, and a secretary from among its elected members. These officers may be from any school or college.  An additional officer shall be the chair of the Committee on Committees, who shall be elected from among the COC members themselves, subject to the approval of Council.

The Council president shall represent Council in university business that Council deems appropriate.  She or he shall call the monthly meetings of Council, preside over Faculty Council Executive Committee meetings, and otherwise organize the business of Council in consultation with the other officers.  The Council president does not vote on Council resolutions except to break a tie vote or to create a tie vote.  In the case of secret ballot, the president may vote on all matters on the secret ballot.

The vice president shall represent Council in university business deemed appropriate or in instances in which the president is unable to attend.  The vice president shall be the working liaison between Council and specific standing committees as designated by the president and shall organize the Faculty Council Executive Committee meetings.

The secretary shall keep the minutes at the Council meetings, monitor the website, maintain the archival records of Council, and report findings or decisions of Council to the appropriate administrative bodies for action.

The chair of the Committee on Committees shall organize the appointment of faculty (subject to Council's approval) to all faculty slots on university and Council committees.  She or he shall maintain the records of current and previous faculty appointments, oversee the process of Council elections in the various colleges, and perform other organizational duties as designated by the president and the Faculty Council Executive Committee.

The duties of Faculty Council officers are further specified in Faculty Council's bylaws.

The president, vice president and secretary of the Council shall be elected at each June meeting.  It is not precluded, but it is also not an assumption, that the vice president will necessarily succeed the president.  Terms for all officers are one year, subject to re-election.  The president and vice president must collectively represent at least two (2) colleges or schools.  Should any officer be unable to fulfill her or his

July 1, 2018

term, the Committee on Committees shall determine by next Council meeting a proper process for
succession.

### 1.3.3    Meetings of the Council

The Council shall generally meet on the first Wednesday of each month during the academic year
(September through June, inclusively), and as needed at the call of the president of the university, the
provost, the Faculty Council president, or at the call of the majority of the Council members.  Minutes of
each meeting shall be posted promptly on the FC website by the Council secretary.

At least five days before every meeting, the Council secretary shall send to Council members notice of the
forthcoming Council meeting, together with documents pertaining to the agenda of the meeting, including
the text of any proposed legislation.

### 1.3.4    Notice to the Faculty of Council Meetings

The Council secretary shall post to Council's website and send notice and agenda of each meeting of the
Council to all faculty members, together with documents pertaining to the agenda of the meeting,
including the text of any proposed legislation.

### 1.3.5    Conduct of Meetings

The presence of 50% or more of the voting eligible members of the Faculty Council shall constitute a
quorum of the Council.

Decisions are to be made by majority vote of the Council members present, provided that the votes in
favor of a resolution shall number more than one-third of the voting eligible members.

All faculty members may attend meetings of the Council, excluding executive sessions.  Chairs of
committees of the Faculty Council may offer motions and speak on behalf of their committees.

The Council may, by decision of the president or a majority of the Council members present, permit other
persons not on the Council to speak on agenda items.

An executive session may be called by the president of the Faculty Council at his/her discretion, which
may be overruled by a majority of the Faculty Council members present.  Sessions dealing with matters
involving the right to privacy of individuals normally shall be executive sessions.  Executive sessions
may be used for obtaining information and for deliberation; but final policy decisions shall be made in
open Faculty Council meetings.

### 1.3.6    Communication of Decisions

1 All decisions and recommendations of the Faculty Council shall be forwarded to the president of the
2 university (or the provost as designee) for approval.
3
4 In the event the president of the university (or the provost as designee) disapproves any Faculty Council
5 decision or recommendation, the president (or provost as designee) shall communicate the reasons to the
6 Faculty Council.
7

### 1.3.7    Responsibility to the Faculty

9
10 The Council secretary shall regularly send a summary of Council's actions to the provost and post to
11 Council's website all records of actions and responses from the university president (or provost as
12 designee).
13
14 At the request of a majority of voting members present at a Faculty Council meeting, but no fewer than
15 one-third of Council's total voting membership, any matter must be submitted to the faculty for
16 consideration.  The Council shall establish the manner by which the faculty shall vote by mail, electronic
17 ballot or otherwise on any such matter.  A vote by the majority of the full-time faculty members of the
18 university shall be binding on the Faculty Council.
19

### 1.3.8    Conduct of Meetings of the Council of the Whole

21
22 Twenty-five (25) percent of full-time faculty members shall constitute a quorum of the Council of the
23 Whole.  Meetings of the Council of the Whole shall be chaired by the president of the Faculty Council.
24 Decisions of the Council of the Whole shall be made by a majority of the full-time faculty members
25 present, subject to ratification by a vote of the majority of all full-time faculty members in a special mail
26 or electronic ballot.
27

### 1.4 Committees of the Faculty Council

29
30 The Faculty Council is empowered to establish committees of the Faculty Council.  The Faculty Council
31 appoints the members of the Committee on Committees from among the members of Faculty Council.
32
33 Membership on other Faculty Council committees is not limited to Faculty Council members.  The
34 Faculty Council shall prescribe the terms of office for members of all committees.  In the case of standing
35 committees, the terms of office shall normally be staggered to permit a reasonable degree of continuity.
36
37 The Faculty Council shall prescribe the duration of any ad hoc committees. Any standing or ad hoc
38 committee which fails to meet or does not otherwise act or file a report for a period of one year shall be
39 discontinued automatically.
40
41 Each committee of the Faculty Council shall select its own chair.  With the approval of the Committee on
42 Committees, each committee may appoint subcommittees from its own members or from among other
43 members of the full time and part time faculty and such members of the administration, staff, and students
44 as shall be helpful in its deliberations.

The standing rules and operating procedures for Faculty Council committees and subcommittees are further specified in Council's bylaws.

### 1.4.1 General Duties of Committees

Committees shall recommend to the Faculty Council new policies and changes in policies in their areas of responsibility.

They shall receive and consider proposals in their areas of responsibility from the Faculty Council, the administration, Student Government Association, staff, and other relevant sources. Committees shall present their recommendations to the Faculty Council.  In their deliberations, committees and subcommittees shall seek advice, information, or materials from other members of the university community.

They shall review annually sections of the Faculty Handbook pertaining to their areas of concern and make recommendations for revision.

They shall meet frequently and maintain liaison with appropriate committees and groups established by the academic units, the Student Government Association, the Staff Council, and other university constituencies.

### 1.4.2 Standing Committees of the Faculty Council

Currently the Faculty Council has fifteen (15) standing committees. Committee charges are detailed in Council's bylaws:

- Committee on Academic Policy (CAP)
- Committee on Committees (COC)
- Committee on Contingent Faculty (CCF)
- Committee on Online Learning (COOL)
- Committee on Curriculum and Programs (CCP)
- Committee on Learning and Teaching (COLT)
- Committee on Research Policy (CORP)
- Committee on the Status of Faculty (SOF)
- Faculty Committee on Appeals (FCA)
- Faculty Council Budget Committee (FCBC)
- Faculty Council Executive Committee (FCEC)
- Faculty Council Handbook Committee (FCHC)
- Liberal Studies Council (LSC)
- Physical Environment Committee (PEC)
- Promotion and Tenure Policy Committee (PTPC)

July 1, 2018

1  ### *1.4.3    University Committees with Faculty Representation*
2
3  University committees dealing with matters in which the faculty have governance responsibility or
4  interest shall have faculty representation.  Faculty representatives on such committees shall be responsive
5  to the Faculty Council to the extent appropriate.
6
7  To the extent that any boards or committees not under the auspices of the Faculty Council address areas
8  of primary faculty responsibility and report directly to the university president or other university officers,
9  those boards or committees shall be subject to the policies of the Faculty Council and to review by the
10  Faculty Council.
11
12  Faculty are represented on the following university committees and boards:
13
14  - 403(b) Investment and Plan Administrative Committee
15  - Academic Advising Award Committee
16  - Academic Affairs Committee - Board of Trustees
17  - Academic Integrity Board
18  - Academic Integrity Student Consultants
19  - Academic Program Review Committee
20  - All University Judicial Board
21  - Campus Recreation Advisory Committee
22  - Campus Violence Prevention Committee
23  - Committee on Conflict of Interest in Sponsored Programs
24  - Comprehensive Internationalization Committee
25  - Continuing and Professional Education
26  - Faculty Grievance and Appeals Panel
27  - Fair Business Practices Committee
28  - Grade Challenge Review Board
29  - Institutional Biosafety Committee (IBC)
30  - Issues Review Board (for staff grievances)
31  - Library Review Board
32  - Public Service Council
33  - Quality of Instruction Council
34  - Strategic Resource Allocation Committee
35  - Student Activity Fee Board
36  - Student Welfare Taskforce
37  - Teaching Learning and Technology Committee
38  - Tuition Pricing Committee
39  - University Athletic Board
40  - University Benefits and Compensation Committee
41  - University Board on Faculty Promotion and Tenure
42  - University Institutional Animal Care and Use Committee

July 1, 2018

- University Institutional Review Board for the Protection of Human Subjects (IRB)
- University Research Council
- University-wide Honors Program Committee

## 1.5 Amendment of the Faculty Handbook

The Faculty Handbook may be amended by the faculty.  Changes to the Faculty Handbook take effect when accepted by the university president.

The Faculty Handbook may be amended in either of two ways:

1. By the affirmative vote of least sixty percent (60%) of the members of the Faculty Council present at the meeting, provided that those votes represent at least 50% of the total Faculty Council membership; or
2. By submission of a proposed amendment over the signature of 10% of the regular full-time faculty as a whole for ratification. The Committee on Committees will then task a committee to oversee a referendum within 14 days.  The amendment will be approved if a majority of the full-time faculty cast referendum ballots and if at least two-thirds of the faculty members casting ballots vote in favor of the amendment.

10

1  **CHAPTER 2. RECRUITMENT, APPOINTMENT, AND**
2  **CATEGORIES OF FACULTY**
3

4  2.1 Recruitment Policies .................................................................................................... 2

5  2.2 Initial Academic Appointments .................................................................................... 3

6  2.2.1 General Criteria and Policies ................................................................................ 3

7  2.2.2 Hiring With Tenure upon Initial Appointment .................................................... 4

8  2.3 Full-Time Faculty Appointments .................................................................................. 5

9  2.3.1 Tenure-line Faculty .............................................................................................. 5

10  2.3.2. Term Faculty ...................................................................................................... 6

11  2.3.2.1. Definitions and Scope ................................................................................. 6

12  2.3.2.2 Term Faculty Ranks ..................................................................................... 7

13  2.3.2.3 Functional Titles .......................................................................................... 7

14  2.3.2.4 Responsibilities and Participation in Governance ....................................... 8

15  2.3.2.5 Hiring and Contracts .................................................................................... 8

16  2.3.2.6 Reappointment and Termination .................................................................. 8

17  2.3.3 Special Appointments .......................................................................................... 9

18  2.3.4 Annual Performance Review .............................................................................. 10

19  2.4 Adjunct Faculty Appointments ................................................................................... 11

20  2.4.1 General Principles .............................................................................................. 11

21  2.4.2 Retired Faculty .................................................................................................. 11

22  2.4.3 Professors Emeriti and Emeritae ....................................................................... 12

23  2.5 Other Instruction-Related Positions ........................................................................... 12

24  2.5.1 Academic Support Appointments ...................................................................... 12

25  2.5.2 Graduate Assistants and Fellows ....................................................................... 12

26  2.6 Change of Affiliation or Status .................................................................................. 12

27  2.6.1 Change of Affiliation ......................................................................................... 12

28  2.6.2 Change of Status ................................................................................................ 13

29  2.7 Summer Session Appointments .................................................................................. 13

30  2.8 Orientation of Faculty ................................................................................................ 14

31  2.9 Annual Reporting ....................................................................................................... 14

July 1, 2018

# CHAPTER 2. RECRUITMENT, APPOINTMENT, AND CATEGORIES OF FACULTY

This chapter defines categories of faculty and sets out DePaul University's policies for recruitment, appointment, and review of faculty members. It also addresses change of faculty affiliation or status and summer session appointments. As stated in Section 1.1 of this Handbook, the faculty as a whole is vested with primary governance responsibility for academic and scholarly activities and faculty personnel matters within the university. As a general rule, full-time faculty members (both tenure-line and term) are entitled to participate and vote in decisions made in the academic programs, departments, schools, and colleges with which they are affiliated. However, some matters including faculty hiring, tenure, promotion, and review are restricted exclusively to tenure-line faculty.

## 2.1 Recruitment Policies

Academic deans, local academic unit officers, and academic program directors have responsibility for initiating the process for faculty appointments, with the exception of the position of dean.

Consultation with the tenure-line faculty of the local academic unit, as defined by the unit's written policies, is required for the appointment of all full-time faculty and local academic unit officers. Only in rare instances and for compelling reasons will an appointment be made over the expressed opposition of the local academic unit faculty. In such circumstance, the dean shall, in writing, inform the local academic unit of the specific reasons for overturning the judgment of the faculty.

Faculty involved in the search process are individually accountable for following the university's equal employment opportunity policies.

DePaul University provides equal employment opportunities to all employees and applicants for employment. As an Equal Opportunity Employer, DePaul does not discriminate or permit discrimination on the basis of race, color, religion, national origin, age, disability, sexual orientation, gender identity, military or veteran status, genetic information, marital status, parental status, ancestry, source of income, or any other classes protected by local, state, and federal law.

In order to provide for the most diverse and highest quality faculty, DePaul is committed to searches conducted in the broadest possible markets.

Entry-level hiring for tenure-line positions presumes a national search. A national search is defined by the practices of the disciplinary or interdisciplinary field and generally includes advertisements as customary in the discipline, recruitment at national conventions, and similar wide outreach.

In limited cases the requirements for a national search may be waived if a scholar of exceptional merit has already been identified as a target of opportunity hire, particularly if that scholar would enhance DePaul's diversity profile or bring difficult to find expertise to the University.

A local academic unit's written request to waive the search requirement for an academic appointment must be approved by its tenure-line faculty. The request must convince the dean and the provost that the candidate is fully qualified for the position. Evidence of the

July 1, 2018

1  candidate's significant accomplishments and a rigorous review of the candidate's qualifications in
2  teaching, research and other creative activities, and service are expected in the subsequent
3  preparation of the appointment recommendation.

4  **2.2 Initial Academic Appointments**

5  *2.2.1 General Criteria and Policies*
6
7  The faculty has a major responsibility for fulfilling the principal functions of the university:
8  teaching, scholarship, research and other creative activities, and service. DePaul appoints its
9  faculty on the basis of scholarly achievement and the promise of continuing academic growth,
10  competencies directly related to the university's academic goals and programs, and acceptance of
11  the principles as stated in the Employment Policies and Procedures section of this Handbook.
12
13  The principal criteria for initial appointment and promotion in academic rank are: quality of
14  teaching; scholarship, research or other creative activities; and service.
15
16  General university criteria are subject to further specification standards adopted by colleges,
17  schools and local academic units. Criteria, which are approved by and included in official
18  documents of the academic units, are as binding on the members of those units as are the general
19  university standards for which they provide explication. Should there be a difference between the
20  two sets of criteria, those of the university shall prevail.
21
22  Authority to appoint faculty rests with the university president. In practice, this authority is
23  regularly delegated to the provost, who carefully reviews the terms of the proposed faculty
24  contract before it is approved and issued. The review is to assure that the terms of the proposed
25  faculty contract are compatible with university policies, accepted academic standards, and
26  principles of equity with respect to other DePaul faculty members in comparable positions.
27
28  The Office of the Provost has overall responsibility for monitoring academic appointments. This
29  office establishes policies and procedures related to faculty employment that are compatible with
30  the general university guidelines. These guidelines assume, however, that most of the initial
31  responsibility for the selection process resides with academic deans, local academic officers, and
32  directors of academic offices.
33
34  Initial appointments are in contract form, each including:
35
36  1. Salary
37  2. Length of contractual service
38  3. Academic rank
39  4. Tenure status
40  5. Affiliation with an academic unit, that is, a particular college/school, academic department, or
41  academic program.
42
43  The offer letter to the faculty member includes specific terms, which are then incorporated into
44  the formal contract. The initial contract may be for one, two, or three years on the
45  recommendation of the academic dean and with the approval of the provost.
46
47  If the initial contract comes with tenure, it must meet the criteria of section 2.2.2 below. An initial
48  contract may not result from a Change of Status (2.6.2).

July 1, 2018

Two or more members of the same family may be given faculty appointments, even in the same college/school or local academic unit. However, such an appointment will not be made in a situation in which one member of the family holds an administrative position that requires a judgment on the other member's qualifications for appointment and salary. Similarly, after the initial appointment, one member of a family is not eligible for an administrative appointment in a unit of the university that would require the above-mentioned judgments on the qualification of another member of the family.

### 2.2.2 Hiring With Tenure upon Initial Appointment

The granting of tenure upon initial appointment shall be at the discretion of the local academic unit officer, the dean, and the provost, after a rigorous peer review by the local academic unit's tenured faculty. The personnel committee of the unit (or equivalent) shall conduct an evaluation of the candidate applying the unit's tenure and promotion guidelines (which themselves must be consistent with the university criteria) and shall report to the tenured faculty prior to the vote. All initial appointments with tenure must include a vote of the local academic unit tenured faculty with a recommendation for or against tenure.

The university hires a candidate with tenure upon initial appointment only if the individual satisfies one or more of the following criteria:

1. Prior academic achievement comparable to incoming rank at DePaul;
2. Extensive, relevant non-academic experience; or
3. Appointment to provost, dean or local academic unit officer positions.

Persons who are already full-time or part-time employees of DePaul University in any capacity (except "Visiting Faculty" as defined in Section 2.3.3) are not eligible for initial appointments with tenure under this section, but must instead be first appointed without tenure to the tenure-line faculty and subsequently evaluated under the tenure process outlined in Chapter 3 of this Faculty Handbook.

Faculty hired with tenure at the rank of Associate Professor or Professor upon initial appointment must have appropriate qualifications and prior experience. Only a candidate with an exceptional record may be appointed with tenure under this section if the candidate has not previously been granted tenure at another institution.

In order to appoint a new faculty member at the rank of full professor who has not previously held that rank at a recognized college or university, there must be an evaluation of the candidate's scholarly or creative record by the local academic unit's tenured faculty and a minimum of three outside experts who have been sent the appropriate materials. Selection of reviewers and the appropriate materials to submit to the reviewers follows the external review procedure described in Chapter 3.

In order to appoint with tenure a candidate whose experience is primarily nonacademic, the tenured faculty of the unit must include in the departmental vote and request for an appointment a written case for the strength of the candidate's non-academic experience.

Individuals under consideration for appointment to provost, dean, or local academic unit officer positions can be appointed with tenure. These candidates must have demonstrated scholarly and

4

July 1, 2018

academic credentials or extensive relevant experience. The administration initiates appointments with tenure to these positions. For dean or local academic unit officer positions, the provost, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure. When appointing a provost, the president, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure. When appointing a president, the Board of Trustees, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure. The university would normally provide an additional permanent position and funding to the local academic unit if and when the dean, provost or president returns to a faculty position.

## 2.3 Full-Time Faculty Appointments

All full-time faculty fall into three categories: tenure-line faculty, term faculty and special appointments.

### 2.3.1 Tenure-line Faculty

Tenure-line appointments may be at the rank of instructor awaiting terminal degree conferral, assistant professor, associate professor, or full professor. All tenure-line appointments shall involve an evaluation of the candidate's qualification based on the approved policies and procedures of the local academic unit, as well as a vote of the tenure-line faculty of the unit, except under circumstances stipulated in Section 2.2.2.

**Instructor Awaiting Terminal Degree Conferral**

Candidates who are hired into tenure-line positions but have not successfully completed all requirements for the terminal degree may be appointed to this rank with the stated expectation that, upon conferral of the degree, the faculty member will be appointed to a tenure-line position at the rank of assistant professor. Typically, the period of time as an instructor in this category would be one year, and only under rare and compelling circumstances should it exceed two years. Time in rank as instructor in this category may count towards tenure; the probationary period is determined by an agreement between the dean and the faculty member in the initial contract as assistant professor. The annual performance review process (Section 2.3.4) will be used to determine whether contract renewal for the next academic year is appropriate and desired. The tenure clock would start the September after the university receives confirmation of the candidate's terminal degree.

**Assistant Professor.** The doctorate or other terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and who give promise of continued academic development. The assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing scholarship, research, and/or other creative activities, and for service.

**Associate Professor.** In addition to the requirements for assistant professor, the candidate must demonstrate consistently effective teaching performance. The candidate should also show evidence of notable scholarship, research, and/or other creative activities, and service. For this rank, the candidate should show significant involvement in university activities at the local academic unit and beyond. This rank is reserved for those with recognized academic achievements.

July 1, 2018

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities, the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

**Tenure-line Joint Appointments**

A faculty member may receive a joint appointment or affiliation in two local academic units. For a joint appointment in two units, a candidate for initial appointment must be evaluated and recommended by the faculty of both local academic units. The criteria for determining eligibility for such a joint appointment are those for the usual initial appointment.

### 2.3.2. Term Faculty

**2.3.2.1. Definitions and Scope**

Term faculty positions are full-time, non-tenure-line, and do not lead to tenure.

The university uses term faculty positions to:
- Retain a cadre of effective and committed teachers who can provide instructional continuity;
- Maintain flexibility in allocating resources for faculty positions;
- Bring in outstanding individuals who will enrich the learning experience through their professional qualifications and experiences from careers outside academia;
- Provide additional time for scholarly pursuits of tenure-line faculty;
- Deal with exigent circumstances, such as replacing faculty on leave, filling vacancies that occur too late to conduct an appropriate search for a tenure-line faculty appointment, filling a vacancy resulting from an unsuccessful search for a tenure-line faculty member, or staffing a new and developing program;
- Teach in and administer programs that would be too time consuming for tenure-line faculty to oversee and/or require specialized skills or knowledge to run.

The university does not use term faculty positions to:

- Permanently replace a tenure-line position;
- Avoid adding new tenure-line positions when merited; or
- Provide a safe harbor for faculty whose tenure status is in jeopardy. (Section 2.6.2)

The percentage of term faculty in a local academic unit should not be more than 30% of the full-time faculty in that unit. Units may exceed 30% if approved by majority votes of the unit's tenure-line faculty and by the Faculty Council. Such exemptions are typically granted to: (i) units with new or developing programs; (ii) units whose primary instructional programs involve clinical and similar professional activities not usually covered by tenure-line faculty, and (iii) units whose primary instructional obligations are not typically met by tenure-line faculty due to extraordinary responsibility for service-level courses.

Term faculty may use the grievance and appeals processes set out in Chapter 5, except as delimited by Section 2.3.2.6.

6

July 1, 2018

**2.3.2.2 Term Faculty Ranks**

Term faculty may be appointed at the ranks of Instructor, Professional Lecturer, and Senior Professional Lecturer.

**Instructor:** A term faculty member without a terminal degree is usually hired at the rank of Instructor. Such faculty members are normally hired to satisfy short-term curricular needs and to provide support in staffing skills-oriented areas of the curriculum. The primary responsibility of instructors is teaching, and their duties usually do not involve service to the unit or other professional activities. Instructors may be called upon to carry out minor administrative functions to help support programmatic and teaching-related activities. The College of Law, in keeping with the general practice of law schools, may use the title Visiting Assistant Professor for individuals hired at the rank of Instructor.

**Professional Lecturer:** This rank is reserved for term faculty who satisfy one or more of the following criteria:

- Hold a terminal degree in their instruction area;
- Have satisfactorily taught at the rank of instructor for three years; or
- Possess professional qualifications and achievements equivalent to a terminal degree in the relevant field.

The primary responsibility of professional lecturers is teaching, and their duties include service to the unit and other professional activities deemed appropriate by the unit and the dean. Professional Lecturers may be called upon to carry out minor administrative functions to help support programmatic and teaching-related activities. An academic unit may also appoint to this rank those who have equivalent professional experience upon initial hiring. After five years of satisfactory service and upon a formal review by the unit, professional lecturers are eligible for promotion to the rank of Senior Professional Lecturer.

**Senior Professional Lecturer:** This rank recognizes the contributions of term faculty who have served at the rank of professional lecturer and have demonstrated superior performance as a teacher. Senior Professional Lecturers may be called upon to carry out minor administrative functions to help support programmatic and teaching-related activities. An academic unit may also appoint to this rank those who have equivalent professional experience upon initial hiring. After five years of satisfactory service and upon a formal review by the unit, professional lecturers are eligible for promotion to this rank.

An academic unit may also appoint to this rank an individual who, upon initial appointment, has equivalent professional experience. Senior professional lecturers have the same duties as professional lecturers.

**2.3.2.3 Functional Titles**

Colleges may confer upon term faculty members functional titles to reflect their particular status or role within the unit. The terms "Assistant Professor," "Associate Professor," and "Professor" must only be used with a modifier. Such titles will not affect the person's rank and should be set out explicitly in his or her contract. Functional titles should not be created on an ad hoc basis, but created and defined by each local academic unit to reflect its programs and special needs. The

7

titles themselves, but not individual appointments, shall be approved in writing by the unit faculty, the dean and the provost.

**2.3.2.4 Responsibilities and Participation in Governance**

The primary responsibility of term faculty will be teaching and, as such, term faculty appointments generally carry higher teaching loads than tenure-line appointments. However, term faculty also have a responsibility for continued professional development, for which the units must provide appropriate support. Continued professional development is a criterion for evaluation of term faculty.

Term faculty at the rank of professional lecturer or above may be involved in the typical service activities of faculty in the unit. These activities may include advising and the creation and supervision of the curriculum, based on the unit's written policies. Term faculty have the right to participate in faculty governance except in matters related to hiring, retention, promotion and tenure. The local academic unit officer should ensure a fair balance of the term faculty members' teaching load, service and administrative responsibilities, as well as the unit's expectations for continued professional development.

**2.3.2.5 Hiring and Contract Duration**

Term faculty members are initially hired on one- or two-year contracts.

An evaluation of the candidate's qualifications and input by faculty of the local academic unit, as specified in the unit's personnel policies, must precede the initial hiring of a term faculty member. In the absence of personnel policies regarding faculty input, hiring will require a vote of the unit's tenure-line faculty.

For initial appointment (and any subsequent reappointments), the duties of the term faculty member and evaluation criteria must be specified in writing and approved by the unit or its personnel committee.

Term faculty may be reappointed to one- or two-year terms as described in the following section. The specific peer review and evaluation process for each unit or college will be developed by the faculty and specified as part of the unit's personnel policies. There is no limit to the number of reappointments.

Upon the satisfactory completion of at least three years of service, a term faculty member will be eligible for, and may apply for, a longer-term contract ranging from three to five years, with specific length and duties determined based on the needs of the unit in consultation with unit faculty. The application will be reviewed according to Section 2.3.2.6. Long-term contracts may be renewed, with each renewal following the same formal review process used for the initial appointment to a long-term contract. If the candidate is reappointed without a long-term contract due to the candidate's performance, he or she may reapply after two additional consecutive years of service. If the candidate is reappointed without a long-term contract for any reason other than the candidate's performance, the candidate may reapply the following year.

**2.3.2.6 Reappointment and Termination**

Term faculty appointments carry no right of reappointment at the conclusion of a contract.

July 1, 2018

The dean or local academic unit officer shall give term faculty appropriate notice before a decision is made on reappointment. Term faculty may submit supporting materials for reappointment to the dean or the local academic unit officer, according to the unit's performance review process.

The dean or local academic unit officer shall give term faculty written notice of the decision for reappointment or non-reappointment by April 10. The faculty member may report failure to provide timely notice of the decision to the next level academic officer. That notice shall be provided within ten business days of the report of failure to provide timely notice.

Consideration of a long-term appointment for a term faculty member shall include an evaluation by the unit (based on the unit's written personnel policies), an opportunity for the candidate to submit supporting documentation, a vote of the unit's tenure-line faculty, and review by the dean and provost.

Non-reappointment of an instructor or professional lecturer shall involve input by the faculty of the local academic unit as specified in the unit's personnel policies. In the absence of such personnel policies regarding faculty input or review, the decision rests with the local academic unit officer. Non-reappointment of senior professional lecturers requires a formal review process by the unit.

Term faculty may not grieve the university decision's not to reappoint. Term faculty may appeal the university's decision not to reappoint only on the grounds of academic freedom violation or discriminatory practices prohibited by university policies or applicable federal, state, or local laws. Term faculty appeal procedures are detailed in Chapter 5.

### 2.3.3 Special Appointments

Special appointments may take the form of visiting faculty, research faculty (for example, post-doctoral fellows), and University Professors. These positions are so designated because the appointment has a definite time limitation or is an appointment whose continuation is directly connected to the faculty member's program.

During the period of the visit, the university may consider appointing faculty holding a special appointment for a tenure-line faculty appointment. Consideration for appointment with tenure must follow procedures in Section 2.2.2. Consideration for appointment into a tenure-line but untenured position must follow procedures in Section 2.3.1. The university's requirement for an outside search must be met, unless waived under the waiver standards of Section 2.1.

**University Professor**

The president may make special full-time university appointments. Such appointments are limited to (i) high-level administrative staff, the nature of whose responsibilities include supervision of academic policies or (ii) special honorific appointments in furtherance of the university's goals and mission. Special appointments are made by a formal contract which indicates the scope of responsibilities and limitations attached to the appointment.

9

July 1, 2018

Faculty appointed as university professor are not affiliated with any academic unit and may not participate in the governance, service, or educational activities of the unit except with the expressed consent of the tenure line faculty of the unit.

**Visiting Faculty**

Appointment as a visiting faculty member is reserved exclusively for faculty members who are employed by a home institution other than DePaul and retain that employment relationship during a full or part-time appointment at DePaul. The home institution of the visiting faculty member will ordinarily be another institution of higher education, but may be a foundation, a corporation or a government agency or other appropriate body. In rare cases, artists or scholars of national stature who do not have a home academic institution may be considered for visiting faculty positions.

Visiting faculty members may have the titles Visiting Assistant Professor, Visiting Associate Professor, or Visiting Professor. The qualifications for each rank are the same as for initial appointment of tenure-line faculty. Visiting faculty may be offered contracts not to exceed two years, with approval of the tenure-line faculty of the relevant unit and of the dean and provost.

The College of Law, in keeping with the general practice of law schools, may use the title Visiting Assistant Professor for individuals hired at the rank of Instructor.

**Research Faculty**

The university may grant a research faculty position to a person engaged primarily in scholarship or professional activities relevant to the work of the university. The local academic units recommend research faculty appointments and reappointments based on established policies and procedures of the unit, subject to the approval of the dean and the provost. These appointments may be at the rank of research assistant professor, research associate professor, or research professor, provided that the research faculty member possesses the educational and scholarship qualifications appropriate to the particular rank. The local academic unit will specify the nature and extent of the duties research faculty members in consultation with the director of the relevant center, institute, or group with which the research faculty member will be associated. The university will provide the description of duties in a letter of appointment. The research faculty should not expect employment beyond the contract period. These appointments carry no implication of, or credit towards, academic tenure.

Research faculty will normally have sources outside the university to fund their salaries, such as external grants or funds provided through other institutions. Exceptions will require the provost's written approval upon recommendation of the local academic unit. Research faculty receive resources and access to university facilities as determined by the local academic unit officer or the director of the center, institute, or group with which they have affiliated.

### 2.3.4 Annual Performance Review

All tenure-line and term faculty are reviewed annually. This annual process consists of a review and evaluation of performance during the preceding academic year based on the local academic unit's criteria and responsibilities. The review may serve one or more of the following purposes:

July 1, 2018

1. to provide an opportunity for feedback on performance during the preceding year, to communicate expectations, and to develop goals for the coming year;
2. to determine salary recommendations;
3. in the instance of term faculty and instructor awaiting terminal degree conferral, to determine whether contract renewal for the next academic year is appropriate and desired.

Reviews of performance are written processes implemented by the local academic unit officer or dean.

Salary recommendations, while part of the annual review process, may use criteria and considerations somewhat different from decisions on contract renewal or promotion and tenure. Salary decisions are made in accordance with university budget guidelines and usually are made at a different time during the academic calendar year. Salary decisions may result in a merit increase when budgets allow. Salary decisions may include increases for such things as equity and market adjustments. The academic dean of the respective college or school makes salary recommendations to the provost.

A faculty member with a formal faculty appointment in more than one academic unit shall be evaluated by the home unit and shall be evaluated independently by the second unit if it so chooses or if requested to do so by either the candidate or by the home unit.

## 2.4 Adjunct Faculty Appointments

An adjunct faculty appointment allows an individual to contribute to the instructional program of a local academic unit, center, or institute. Adjunct faculty are appointed on a course-by-course basis. The appointments are part-time and do not lead to tenure.

### 2.4.1 General Principles

The dean of a college appoints adjunct faculty to provide instruction in specific courses. Appointment of adjunct faculty should involve input by the local academic unit. The university is not obligated to reappoint adjunct faculty. Adjunct faculty may use the grievance process set out in Chapter 5.

### 2.4.2 Retired Faculty

A retired faculty member may be offered a limited faculty assignment with adjunct status. The usual reasons for offering such an assignment are:

1. the need of the college or local academic unit for the specific and unusual competencies of the retired faculty member and;
2. quality of teaching or other academic endeavors, with reference to current developments in the field.

The decision to offer a limited assignment to a retired faculty member rests principally with the academic dean, following local academic unit consultation. The dean shall submit his or her written decision to the provost for final approval.

11

July 1, 2018

1   *2.4.3 Professors Emeriti and Emeritae*
2
3   The university may bestow the title of Professor Emeritus or Professor Emerita upon retirement.
4   Those eligible for emeritus status are tenured faculty members who have contributed substantially
5   to the university's mission and who have ordinarily served at least seven years as a faculty
6   member. Exceptions to these criteria must be approved by the provost.
7
8   Prior to the individual's retirement, the tenured members of the local academic unit may
9   recommend the retiring faculty member for the honorary status of Professor Emeritus or
10  Professor Emerita by sending a letter to the dean describing the person's contributions. The dean
11  forwards his or her recommendation to the provost who, in turn, makes a recommendation to the
12  president, who then makes the final appointment.
13

14  **2.5 Other Instruction-Related Positions**

15  *2.5.1 Academic Support Appointments*
16
17  Members of the staff whose duties include teaching are not members of the full-time faculty.

18  *2.5.2 Graduate Assistants and Fellows*
19
20  Graduate assistants and graduate teaching fellows are appointed by the appropriate dean on the
21  recommendation of the local academic unit officer. They do not possess faculty status.
22  The appointment of a graduate assistant or graduate teaching fellow is subject to the approval by
23  the dean.
24

25  **2.6 Change of Affiliation or Status**

26  *2.6.1 Change of Affiliation*
27
28  With the written agreement of the faculty member, the faculty member's affiliation may be
29  changed to a different local academic unit. The contract will reflect the new affiliation.
30
31  Transfer of affiliation may be initiated by the faculty member, by the dean, or by the local
32  academic unit officer to which the transfer is proposed. Eligibility is determined by the same
33  criteria used for an initial faculty appointment.
34
35  The faculty member will normally retain the same rank following the transfer. In special
36  situations, the faculty and local academic unit officer in the accepting unit may require the faculty
37  member to accept a lower rank. In no instance may a faculty member receive a promotion
38  through a change of affiliation.
39
40  A tenured faculty member transferring to another unit retains tenure. An untenured faculty
41  member must complete the same number of probationary years as remained in the former unit.
42  The number of years of probationary service may be extended upon agreement with the faculty
43  member.
44

12

A member of a local academic unit may request an additional affiliation, resulting in a joint appointment. In such cases, the faculty, the dean, and the local academic unit officer in which the second appointment is to be made are responsible for evaluating and recommending the joint appointment. Joint appointments require the qualifications necessary for appointment at the tenure status and rank according to each unit's standards.

### *2.6.2 Change of Status*

Any change in rank or tenure is a change of status. All changes of status must follow established procedures. A change of status does not confer tenure, unless the process meets the tenure procedures in this Handbook.

A change of status occurs if a tenure-line faculty member is not renewed. Such a faculty member is not eligible for a full-time faculty position for a period of five years. Faculty members denied tenure shall never be eligible for any faculty appointment.

A change of status also occurs if a full-time or part-time faculty member who is not a tenure-line faculty member seeks to become a tenure-line faculty member. The change of status from non-tenure-line to tenure-line requires evidence of a national search or a request from the local academic unit's faculty for a waiver from a national search. A waiver request must come from a majority of the local academic unit's tenure-line faculty and be approved by the dean and the provost. The change of status from non-tenure-line to tenure-line also requires participation of the local academic unit's tenure-line faculty, including at least a majority vote of that faculty as determined by procedures laid out in the local academic unit guidelines and the Faculty Handbook.

## 2.7 Summer Session Appointments

The dean, after consultation with the local academic unit officers, and considering the resources and needs of the college, decides which courses, workshops or other programs will be offered in the summer sessions and which faculty members will conduct them. Faculty members with a ten-month contract may accept or decline courses offered to them during the summer. The university does not guarantee summer session appointments.

University policy regarding summer course assignments consists of the following principles:

1. Two courses running concurrently constitute a full load; the dean's explicit approval is required for any overload assignment.
2. Faculty members receiving full summer compensation from an external grant may not be assigned summer courses unless such instruction is among the terms of the grant. Faculty members receiving partial summer compensation from an external grant may have a partial summer course assignment, provided that the combined compensation does not exceed the amount they could receive for a full summer course load.
3. Within the bounds established by principles #1 and #2, assignments should be made on an equitable basis.

Within the standards set by general university policy, each college develops its own policy for determining the programs to be offered over the summer and for making summer session appointments.

July 1, 2018

1
2   For summer students enrolled for semester credit (4.5 quarter hours), faculty are expected to
3   assign additional work commensurate with the additional credit.
4
5   Full-time faculty members with ten-month contracts receive additional salary for teaching in the
6   summer. The rate of summer compensation is subject to periodic review involving the
7   participation of faculty members. Teaching in a summer session may be part of the normal
8   assignment of faculty members who have a 12-month contract, in which case no additional salary
9   is paid. Adjunct faculty members who teach in a summer session will receive the same
10   compensation as for a course offered during the academic year.
11

12 **2.8 Orientation of Faculty**

13
14   The Office of Academic Affairs offers a yearlong series of orientations for new full-time faculty,
15   including an introductory orientation at the beginning of each academic year. The Office of
16   Human Resources also offers frequent workshops describing personnel policies, benefits, and
17   general employee information. Colleges and academic units may offer additional academic
18   orientation.
19
20   Local academic units, colleges, and university offices are encouraged to provide comprehensive
21   orientation and ongoing development support for their term and adjunct faculty in order to
22   welcome and acculturate them to the DePaul community.

23 **2.9 Annual Reporting**

24
25   The provost will annually report to Faculty Council on the composition of the faculty including
26   tenure-line, term, and adjunct faculty; percentages of tenure-line, term, and adjunct faculty
27   appointments by academic units and colleges; current titles in use; and any other pertinent
28   information concerning faculty appointments. Academic deans shall report the same information
29   to their respective faculties annually.

July 1, 2018

1 **CHAPTER 3. PROMOTION AND TENURE STANDARDS AND**
2 **PROCEDURES**
3

4 3.1 Overview ................................................................................................ 4

5 3.2 Probationary Service ............................................................................ 4

6 3.2.1 Length of Probationary Period .......................................................... 4

7 3.2.1.1 Assistant Professors Credit for Prior Service ................................ 5

8 3.2.1.2 Associate or Full Professors Credit for Prior Service ................... 5

9 3.2.1.3 Non-tenure-line Full-Time Appointments .................................... 5

10 3.2.2 Leaves of Absence ............................................................................ 5

11 3.3 Types of Review for Tenure-Line Faculty ........................................... 5

12 3.3.1 Probationary Tenure-Line Reviews .................................................. 6

13 3.3.1.1 Formal Tenure-line Probationary Reviews .......................... 6

14 3.3.1.2 Informal Tenure-line Probationary Reviews ................................ 7

15 3.3.1.3 The Tenure Review ................................................................ 7

16 3.3.2 Promotion in Rank ............................................................................ 7

17 3.4. Criteria for Promotion and Tenure ...................................................... 7

18 3.4.1. Requirements by Rank ..................................................................... 7

19 3.4.2 University-wide Criteria ................................................................... 8

20 3.4.2.2 Scholarship, Research, or Other Creative Activities .................... 8

21 3.4.2.3 Service ......................................................................... 10

22 3.4.3 Local Academic Unit and College Guidelines ............................. 10

23 3.4.4 Institutional Considerations .................................................... 11

24 3.5 Process for Tenure and Promotion .................................................... 11

25 3.5.1 General Principles .......................................................................... 11

26 3.5.1.1 Common Processes ..................................................................... 11

27 3.5.1.2 Guidelines Specific to Multi-Unit Appointments ....................... 13

28 3.5.1.3 Guidelines for Evaluating Collaborative Work .......................... 14

29 3.5.2 Processes Common to All Evaluation Levels ............................... 14

30 3.5.2.1 Signing Statement ................................................................ 15

31 3.5.2.2 Minority Report .................................................................. 15

32 3.5.3 Local Academic Unit ..................................................................... 15

33 3.5.4 Local Academic Unit Is College ................................................ 16

1

1    3.5.4.1 Personnel Committee (optional) ................................................................... 16
2        3.5.4.2    Tenured Faculty of the College ........................................................ 16
3        3.5.4.3    Dean ................................................................................................. 16
4        3.5.4.4    Candidate Response to College Review ............................................ 16
5    3.5.5    Local Academic Unit Is Not College ......................................................... 17
6        3.5.5.1    Local Academic Unit Personnel Committee (Optional) ........................ 17
7        3.5.5.2    Tenured Faculty of the Local Academic Unit ...................................... 17
8        3.5.5.3    Local Unit Academic Officer (Unit Chair or Director) ........................ 17
9        3.5.5.4    Candidate Response to Local Academic Unit Review .......................... 17
10       3.5.5.5    College-Level Personnel Committee ................................................. 18
11       3.5.5.6    Dean ................................................................................................. 18
12   3.5.5.7 Candidate Response to College Review ................................................. 18
13   3.5.6    University Review .......................................................................................... 18
14   3.5.6.1 University Board on Promotion and Tenure ................................................. 18
15   3.5.6.2 Candidate Response to UBPT ....................................................................... 19
16   3.5.6.3 Provost Decision ........................................................................................... 19
17   3.5.7 Detailed Procedures ............................................................................................. 19
18       3.5.7.1    Committees ...................................................................................... 19
19       3.5.7.2    Local Academic Unit (Not College) Personnel Committees ................. 19
20       3.5.7.3    Tenured Faculty of the Local Academic Unit ...................................... 20
21       3.5.7.4    College Personnel Committees ........................................................ 20
22       3.5.7.5    University Board on Promotion and Tenure ......................................... 20
23   3.6    Materials ......................................................................................................... 21
24   3.6.1 Dossier .................................................................................................................. 21
25   3.6.1.1 Items Supplied By Candidate ....................................................................... 21
26   3.6.1.2 Items Supplied By Academic Unit and College ............................................ 21
27   3.6.1.3 Additions to the Dossier ............................................................................... 22
28   3.6.2 External Letters ................................................................................................... 22
29       3.6.2.1    Authors of External Letters ............................................................. 23
30       3.6.2.2    External Letter Contents .................................................................. 23
31       3.6.2.3    Confidentiality of External Letters .................................................... 23
32       3.6.2.4    Suggested Sample Letter .................................................................. 23
33   3.6.3 Student Input ...................................................................................................... 24
34       3.6.3.1 Student Input Instrument .............................................................................. 24

2

July 1, 2018

1          3.6.3.2 Evaluation and Submission of Student Input Data ....................................... 25
2     3.7     Appeal ............................................................................................................. 25
3     3.8 Schedule for Informal and Formal Reviews ............................................................ 26
4     3.9     Schedule for Promotion and Tenure .................................................................... 27
5
6

July 1, 2018

# CHAPTER 3.  PROMOTION AND TENURE STANDARDS AND PROCEDURES

## 3.1     Overview

Faculty members contribute to DePaul University as the primary creators of a vibrant academic community. The university seeks to foster an environment that provides professors with enriching opportunities to guide students, pursue scholarship and creative activities, and advance the institution's well-being.

DePaul honors and rewards faculty members for their professional achievements. It maintains a system of faculty evaluation that relies heavily on the views of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal, promotion, and tenure.

Tenure is the foundation of academic freedom and the quality of the university.  It is neither an end in itself nor a privilege exempting the individual from the obligation to make future contributions. It is, rather, a status that society recognizes as promoting the common good. Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. Tenure creates the presumption of continuing employment, unless the university, using established procedures and faculty guidance, proves that countervailing circumstances exist.

This chapter sets out DePaul University's standards and procedures for evaluating its tenure-line faculty.

## 3.2     Probationary Service

The probationary period is defined as the candidate's time of continuous service in full-time tenure track at DePaul, at the end of which the tenure decision is made. During the probationary period, a tenure-line faculty member undergoes annual formal or informal evaluations for contract renewal or nonrenewal. In the final year of probationary service, the faculty member may apply for tenure and promotion. An unsuccessful candidate for tenure will not be offered a contract renewal, but will be offered a terminal contract of one year for the academic year following the academic year in which the faculty member applied for tenure.

### 3.2.1 Length of Probationary Period

The maximum probationary period is six years excluding certain types of leaves that suspend the clock as described in Section 3.2.2. The probationary period may be reduced by agreement based on full-time prior academic service. The initial tenure-line contract must state any agreed-upon credit for prior service.

4

July 1, 2018

**3.2.1.1 Assistant Professors Credit for Prior Service**

A prospective faculty member recruited to DePaul as an assistant professor may have previously held a full-time faculty appointment at another college or university. The length of the probationary period at DePaul may be reduced by one, two, or three years, upon agreement of the individual and the university at the time of appointment. The initial faculty contract must state any agreed-upon credit for prior service.

**3.2.1.2 Associate or Full Professors Credit for Prior Service**

A prospective faculty member recruited to DePaul as an associate or full professor may receive an appointment without tenure. Upon agreement of the individual and the university at the time of appointment, one, two, three, or four years of prior full-time faculty service at another college or university may be credited to the probationary period at DePaul. The faculty member's initial contract must reflect the agreed-upon amount of credit for prior service and the review schedule. Regardless of the amount of credit, the individual will not be evaluated for tenure without having had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.

**3.2.1.3 Non-tenure-line Full-Time Appointments**

As a general norm, the years a faculty member has spent at DePaul University in a non-tenure-line full-time appointment (e.g., instructor or visiting professor) do not count toward the probationary period. If a faculty member's status changes to a tenure-line appointment, the individual and the university may agree to credit one or more years of special appointments toward the probationary period. The faculty member's initial contract for a tenure-line full-time appointment must reflect the agreed-upon amount of credit for the prior service at DePaul. Regardless of the amount of credit, the individual will not be evaluated for tenure without having had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.

*3.2.2 Leaves of Absence*

A leave of one quarter or longer may interrupt the faculty member's probationary period.

If an untenured tenure-line faculty member takes a leave as defined by DePaul policies, including family or medical leave, research leave, teaching leave, or military service leave, the year during which the leave occurs is normally not considered as a year of probationary service, and the leave does not break the required continuity of full-time service. If the candidate, however, wishes for the leave not to affect the length of the probationary period, he or she must notify the dean in writing within six months upon return from the leave.
Faculty sometimes request and are granted a personal leave that does not fall into any of the categories covered in the prior paragraph. If a candidate takes such a leave, the provost makes the decision on how the leave affects the probationary period.  (Section 6.7.)

**3.3     Types of Review for Tenure-Line Faculty**

July 1, 2018

### *3.3.1 Probationary Tenure-Line Reviews*

During the probationary period, the probationary tenure-line faculty member will be subject to annual probationary reviews conducted by the faculty member's local academic unit. In colleges with departments, the local academic unit is, in colleges with departments, the department or similar body. In other colleges, it is the lowest-level body conducting reviews for tenure and promotion.

Probationary reviews serve three major purposes:

1.      To assess the faculty member's progress toward promotion and/or tenure, measuring the individual against the established criteria

2.      To provide clear and consistent guidance and develop priorities for the faculty member toward fully satisfying the criteria, and

3.      To recommend for or against renewal.

Three types of probationary reviews apply to tenure-line faculty who are untenured: informal, formal, and the tenure review.  Each evaluation leads to a decision for renewal or nonrenewal (see also Section 4.2).

The dean normally makes a recommendation on annual renewal and nonrenewal. If the dean does not concur in the recommendation of a local academic unit, the dean shares his or her recommendation with the local academic unit. The local academic unit may appeal the dean's recommendation to the provost.  In such cases, the dean and the department or unit provide the provost with written reasons for their respective positions. The provost makes the final decision and reports it to the candidate. A faculty member who is not renewed may file an appeal. (Chapter 5)

A formal review must precede a decision in year five to issue a terminal contract. In case of nonrenewal, the candidate is not eligible to apply for tenure or promotion.

**3.3.1.1  Formal Tenure-line Probationary Reviews**

A formal probationary review is designed to prepare a faculty member for the tenure process and to document areas that need the faculty member's attention. In a formal review, the local academic unit considers the candidate's personal statement and CV, evidence of scholarship or documentation of creative activity, student evaluations, evidence of service, and other materials specified by policies of the local academic unit or college.

Each local academic unit or its personnel committee conducts a formal review of untenured tenure-line faculty no less often than every two years. The tenured faculty of the local academic unit then vote by separate secret ballots on (1) adequate progress toward tenure and (2) renewal. The faculty prepare a report that clearly details areas of strength and areas for improvement. The report is explicit about the faculty member's progress towards tenure. Copies of this report are forwarded to the candidate and the dean. The dean writes a separate letter to the provost with a recommendation regarding renewal or nonrenewal. If a formal review raises serious concerns about the candidate's potential for attaining promotion or tenure, the local academic unit faculty, local academic unit officer, or dean may mandate that the next year's annual review be formal.

July 1, 2018

**3.3.1.2 Informal Tenure-line Probationary Reviews**

The purpose of an informal review is to recommend for or against contract renewal and to address progress towards tenure in review periods when a formal review is not conducted.

In years in which a formal review is not conducted, the chair, dean, or, where applicable, appropriate committee conducts an informal review of the faculty member, according to processes specified in local academic unit or college policies, that results in a written recommendation to the provost, with a copy to the candidate.

**3.3.1.3  The Tenure Review**

The tenure review is the final review during the probationary period. It begins with the candidate's tenure application and concludes with the provost's decision to grant or deny tenure. It is a formal review involving university-wide consideration under detailed procedures. It includes solicitation of opinions from external reviewers and from students. The tenure review examines the faculty member's accomplishments and assesses the likelihood of future accomplishments.

Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission.

***3.3.2 Promotion in Rank***

Ordinarily, an assistant professor applies for tenure and promotion simultaneously. The candidate receives either both promotion to associate professor and tenure or neither promotion nor tenure. Only an associate professor may apply for promotion for full professor.

A faculty member ordinarily serves three to six years in a given rank before promotion. See Section 3.5.1.1 (m) for details.

There is no limit to the number of times a faculty member may apply for promotion to full professor. In the event of a denial of promotion, the faculty member may not re-apply for promotion in the year immediately following the denial.

**3.4.    Criteria for Promotion and Tenure**

***3.4.1.   Requirements by Rank***

**Assistant Professor.** The doctorate or terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and who give promise of continued academic development. The assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing scholarship, research, and/or other creative activities, and for service.

July 1, 2018

**Associate Professor.** In addition to the requirements for assistant professor, the candidate must demonstrate consistently effective teaching performance. The candidate should also show evidence of notable scholarship, research, and/or other creative activities, and service. For this rank, the candidate should show significant involvement in university activities at the local academic unit and beyond. This rank is reserved for those with recognized academic achievements.

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities – the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

### 3.4.2    *University-wide Criteria*

DePaul University appoints, retains, promotes, tenures, and rewards faculty who best help the university fulfill its mission, as articulated in the university's Mission Statement and Faculty Handbook. The principal criteria for tenure and advancement in academic rank are: teaching and learning; scholarship, research, or other creative activities; and service. In evaluating faculty for promotion or tenure, local academic units specify more detailed guidelines that provide unit- and discipline-specific articulations of the university-wide criteria (Section 3.4.3.)

**3.4.2.1  Teaching and Learning**

Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion, and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers. Effective teaching involves:

- Command of material
- Effective communication of subject matter
- Development and articulation of appropriate and thorough learning objectives for each course taught
- Delivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience
- Probing and fair methods of evaluating students
- Success in bringing students to an acceptable level of performance and in challenging them to grow intellectually and morally

Instructional activities outside the classroom, such as course development (individual or collaborative), academic advisement, accessibility to students, supervision of independent study, and contributions to meeting departmental instructional needs, are also relevant.

**3.4.2.2  Scholarship, Research, or Other Creative Activities**

Throughout their professional lives, all tenure-line faculty members should engage in scholarship, research, or other creative activities. Each requires disseminating the results of completed projects in academic and artistic arenas outside DePaul.

July 1, 2018

1   The university evaluates untenured tenure-line faculty based on their total output of work.
2
3   Scholarship, while including research, is a broader concept. Research traditionally refers to
4   discovery using the disciplinary methodologies for investigation and production of new
5   knowledge in the humanities, social and natural sciences, and mathematics. Research is usually
6   shared through presentations at professional meetings and academic publications.  Scholarship is
7   a broader term encompassing the four separate but overlapping functions of a quality faculty
8   member: discovery, integration, application, and teaching.
9
10  • Original discovery advances knowledge within the context of a disciplinary or
11    multi-disciplinary field and practice, contributing significantly to knowledge and
12    the intellectual life of the university. Research falls into the category of
13    discovery.
14  • Integration develops knowledge through cross- and multi-disciplinary
15    investigations, allowing new fields of inquiry to develop.
16  • The application of knowledge uses research findings in responsible ways to
17    address contemporary societal problems through interaction with the larger
18    community.
19  • The study of teaching experiences leads to the development of better pedagogical
20    methods and tools.
21
22  Creative activities refer to activities other than scholarship. Creative activities result in products
23  in the fine arts, such as the visual arts, the literary arts, and the performing arts, and their
24  combinations and supportive activities.  These can also be addressed as objects of scholarship
25  through any of the four functions listed above.
26
27  Evidence of research, scholarship, or creative activities should include, at a minimum:
28  • A current and complete curriculum vitae
29  • Copies of the project results where feasible
30  • If applicable, documentation sufficient to substantiate the candidate's
31    contributions to collaborative projects, as specified in the local academic unit
32    guidelines
33  • Assessment of the contributions by professional peers and other experts in the
34    field
35  • Self-assessment concerning scholarly or creative growth and development
36
37  The University evaluates research, scholarship, and creative activities in light of their:
38  • Originality
39  • Contribution to knowledge
40  • Conceptual or artistic sophistication
41  • Intellectual rigor or artistic skills
42  • Effective application of knowledge to address human problems or needs
43  • Effective communication of knowledge to audiences beyond the classroom
44
45  Scholarship or creative activities that cannot be evaluated by these criteria will not be considered
46  for promotion and tenure. An academic unit may evaluate oral presentations or creative activities
47  by various means including (but not limited to) listening to recordings, examining drafts, or
48  soliciting the views of other scholars (including other members of the DePaul faculty) who were
49  in attendance.
50

9

July 1, 2018

Activities conducted solely within the candidate's classes, or designed merely to keep a candidate abreast of scholarly development in a field, are considered in evaluating the candidate's teaching, not in evaluating his or her contributions in scholarship, research, or other creative activities.

### 3.4.2.3  Service

Service consists of documented activities that

- Benefit the university and its academic units, professional associations, the community, or the broader public
- Are consistent with the university's mission
- Clearly benefit from the expertise of the faculty member -- either the specialized expertise of the faculty member's field or the professional skills possessed by all members of the faculty

Service may be provided to the university, the profession, and the community. The amount and nature of service are correlated with academic rank.

University service consists of contributions to the enhancement of the institution's internal processes and its relationships with external bodies. All faculty members must serve in their local academic unit (unless assigned to a position such as associate dean that precludes such service).

Professional service consists of contributions to the organizations or associations of the faculty member's academic discipline or the professoriate. Professional service may have a component of scholarship or creative activities.

Community service activities contribute to the public welfare outside the institution, consistent with the Vincentian tradition of DePaul University. Activities consistent with a faculty member's expertise but that could be done by someone without that expertise do not qualify as community service. In some instances, it will not be obvious whether an activity counts as community service. In those cases, it is the responsibility of the candidate to make the case demonstrating that the activity qualifies as service as the term is used here.

### 3.4.3   Local Academic Unit and College Guidelines

Local academic units and colleges have the responsibility to adopt written guidelines and policies for tenure-line faculty evaluation. These guidelines have two purposes: (1) they provide unit- or college-specific articulations of university-wide criteria based on the professional discipline, field, or interdisciplinary area, including collaborative work, as applicable; and (2) they describe unit- or college-specific procedures and processes used for promotion and tenure. The guidelines must be consistent with the university's criteria and procedures specified in this Faculty Handbook. In the absence of approved unit or college guidelines, the guidelines of the higher level will apply.

The faculty of the local academic unit bear the primary responsibility for developing and amending guidelines. Guidelines should include at least these elements:

Criteria

a)  Statement of discipline-specific articulations for university-wide criteria and expectations for teaching, research and creative activities, and service

July 1, 2018

      b)   Specification of standards for different forms of scholarship within the discipline
           (or interdisciplinary field)

      Process
      a)   Uniform policies detailing the process used for evaluations
      b)   Composition of the personnel committee, if any
      c)   Policies on remote participation in meetings
      d)   Explanation of participation by, or exclusion of, faculty who are unavailable at
           the time of the evaluation for reasons such as illness or leaves of absence.
           (Reviewers allowed to participate must have read the dossier in advance.)
      e)   Guidance on whether reviewers must have attained at least the rank that the
           candidate seeks
      f)   Process for amending guidelines

College guidelines should reflect the input of their constituent academic units, where applicable.

The University Board on Promotion and Tenure reviews changes in the guidelines prepared by local academic units and colleges. The UBPT determines whether the guidelines are clear and consonant with the general university-wide criteria and procedures for promotion and tenure. If the UBPT finds local academic unit or college guidelines to be unclear or inconsistent with university requirements, it will inform the local academic unit or college in writing with the expectation that the guidelines will be revised. In the absence of guidelines or if the guidelines have not been approved by the UBPT, the guidelines of the higher level will be used.

Approved guidelines included in official documents of academic units are binding, as are the university-wide criteria and processes.  Should there be inconsistencies in the guidelines and criteria of different evaluation levels, those of the higher level prevail.

### *3.4.4   Institutional Considerations*

Merit is not the sole consideration for professional advancement at DePaul University. Institutional need also plays a role in the renewal and tenure of untenured faculty. In planning the number and qualifications of faculty to meet future needs and the resources required to support the faculty, the university may – after consultation with the faculty – limit the number or proportion of tenured positions in the university or in any of its academic units. In such instances, tenure would not be granted regardless of the faculty member's qualifications and length of service. The university will notify affected faculty members promptly upon the adoption of any such limitation.

## 3.5      Process for Tenure and Promotion

### *3.5.1 General Principles*

The following general principles guide promotion and tenure reviews:

**3.5.1.1 Common Processes**

July 1, 2018

a) There are normally three levels of evaluation prior to the final decision of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university.

b) An individual faculty member may vote or advocate for or against a candidate only at one level in the review process. Members of UBPT must vote only on the UBPT. In units where the local academic unit is not the college, college policy must specify whether college personnel committee members vote at the college or the local academic unit level. However, members of a local academic unit personnel committee may fully participate and vote in both the personnel committee's evaluation and the local academic unit evaluation.

c) All votes are by secret ballot and the numerical results are recorded. A tie vote will be interpreted as a recommendation against renewal or against an award of tenure or promotion.

d) Candidates receive the written reports and vote counts at each step in the process promptly as those materials become available. Candidates receive external letters with information identifying the reviewer redacted.

e) Candidates receive copies of any additions to a dossier.

f) Each level of evaluation is substantive and judges the candidate on the merits according to the university's criteria and the guidelines of that level of review. In addition to substantive review, reviewers after the initial level consider the method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic unit. Relevant issues include matters of stringency, consistency among candidates, and fairness, as well as the implications the decision may have at the college, school, or university level.

g) All individuals participating in the process at any stage must respect its confidentiality. They must not reveal votes, the names or views of referees, the contents of discussions, or the contents of the dossier to anyone. Intentional or continuing breaches of confidentiality are considered to be serious violations of professional ethics. Local academic units and colleges must take appropriate steps to maintain confidentiality, including during the physical preparation of the dossier and dossier storage. It is unwise to make a broad electronic distribution of the dossier; instead password-protected web sites can be used. All documentation will be retained in accordance with the Records Management policy.

h) Faculty members should always avoid conflicts of interest in evaluating individual faculty members for appointment, renewal, tenure, or promotion. The university expects the provost, deans, local academic unit administrators, and all other internal faculty reviewers to acknowledge such conflicts openly and to abstain from participation whenever conflicts arise.

i) Faculty members receive tenure only upon affirmative award by DePaul University. Each year, eligible tenure-line faculty may apply for tenure and/or promotion. By April 1, the Office of Academic Affairs will notify eligible faculty in writing of the deadline for submitting an application for promotion and tenure or promotion for the

12

July 1, 2018

following year. The faculty member must submit his or her request to the local academic unit officer, academic dean, and the Office of Academic Affairs by the stated deadline, typically May 1.

j)  Requests for tenure submitted before the year of eligibility will not be accepted. If a faculty member eligible for tenure consideration fails to apply by the application deadline he or she forfeits the opportunity for tenure consideration and receives a terminal contract of no more than one year's duration.

k)  Failure to meet the application deadline for promotion to full professor postpones consideration until the next academic year. There is no limit to the number of times a faculty member may apply for promotion to full professor, except that a candidate may not re-apply in the year immediately following a decision denying promotion.

l)  The provost will acknowledge receipt of applications for promotion, for tenure, or for promotion and tenure, no later than May 15. For candidates with tenure who are seeking promotion to full professor, the provost will advise all candidates of the right to withdraw an application for promotion at any time, without prejudice to future applications.

m)  Faculty members are normally expected to serve a minimum of three to six years, depending on the practice of their college, in a given rank before promotion to the next rank.  Exceptions to the norm are allowed only when the dean and, if one exists, college personnel committee, certify that the candidate's extraordinary performance, under departmental, school, and college guidelines, warrants early application for promotion.

n)  Candidates may continue through all stages of evaluation, regardless of a negative recommendation at any stage.

## 3.5.1.2 Guidelines Specific to Multi-Unit Appointments

a)  If a faculty member has a formal appointment in more than one academic unit, the home academic unit specified in the appointment letter evaluates the candidate.  The second unit evaluates the candidate if it so chooses, or if requested to do so by either the candidate or the home unit. The second unit conducts an independent evaluation and makes a recommendation based on the candidate's responsibilities in that unit. The second unit may review the reference letters and student input from the home academic unit. The report of the second unit will be forwarded to the home unit for its consideration and inclusion in the dossier.

b)  A faculty member who changes formal appointments during the period under evaluation shall be evaluated by both academic units. Either unit may, upon request, have access to the other unit's documentation. Each academic unit sends the candidate's supporting documents and the unit's evaluation to the next higher level unit.

c)  A faculty member with a formal appointment in only one department or local academic unit may have formally assigned duties in one or more other units. In

13

July 1, 2018

evaluating the faculty member, the home unit shall invite the other units to submit evaluations, which the home unit will include with its evaluation. At each stage in the review process, the evaluations will receive weight in the approximate portion of the workload assignment to each entity. Ultimately, the recommendation to the next level of review rests with the home academic unit.

### 3.5.1.3 Guidelines for Evaluating Collaborative Work

Collaborative activities within and across units are valued at DePaul. If collaborative work is submitted as part of the dossier, it must be evaluated as part of tenure and promotion review. Individual contributions to collaborative work should be described specifically by the candidate and documented by team members. Evaluators should consider that collaborative work may be especially labor-intensive, may be disseminated in non-traditional forms, and may blur the conventional distinctions between research and teaching and service. Local Academic Units should specify in their guidelines the processes and policies governing the evaluation and weight of collaborative work in the tenure and promotion review.

### *3.5.2    Processes Common to All Evaluation Levels*

At all levels of evaluation the following processes must be followed:

a)  Additions to the dossier may be made in accordance with the guidelines in this chapter.

b)  The reviewing body's numerical vote must be reported to all subsequent levels.

c)  All documents considered at each level must be passed on to subsequent levels. The candidate has access to all documents being considered, but the candidate's copies of the external reviewer letters must have the reviewer's identifying information redacted.

d)  The local academic unit officer (e.g., department chair) or academic dean, as applicable, informs the candidate of the decision, numerical vote, and all grounds for the decision before transmitting the dossier to the next level.

e)  All decisions or recommendations shall be reported promptly to the academic administrator of the prior level, along with the reasons for any recommendations differing from the prior level's recommendation.

f)  All tenured faculty members of a candidate's local academic unit, members of the college personnel committee, and members of the UBPT are permitted and expected to vote by a secret ballot at a meeting in which the candidate's application is reviewed and discussed, exempting those faculty who may be unable to participate due to approved leaves of absence. Under no circumstances may a vote be cast through a proxy at any level in the retention, promotion or tenure process. However, faculty in absentia may vote only if they use technology that permits simultaneous participation in the review meeting and conveyance of their secret ballot at the time

14

of the vote. Moreover, faculty who vote in absentia are required to have reviewed a candidate's materials before the academic unit's official vote. Only those faculty having a valid excuse as defined in the unit guidelines may attend and vote using technology. Likewise, no faculty member is permitted to add his or her vote or change his or her vote after the votes have been tallied.

g) The report on a recommendation shall fully discuss both strengths and weaknesses in the record so as to provide an explanation for positive and negative votes. All faculty participating in the decision will read the final report of the unit's recommendation and sign one of two forms. One form indicates that the faculty member agrees that the report accurately describes the discussion of the unit. The other form indicates that the report does not accurately describe the unit's discussion. The faculty member's signature does not reflect his or her vote. Faculty who sign the form indicating inaccuracy of the report must provide a signed statement, known as a signing statement, explaining why they believe the report does not accurately describe the discussion. In the event a faculty member is unwilling or unable to sign one of the two forms, the report will go forward with an explanation from the person responsible for gathering the signatures.

### 3.5.2.1 Signing Statement

A faculty member who believes that an evaluation level report did not accurately reflect the discussion during deliberation for promotion or tenure must prepare a signing statement. The signing statement explains the individual's disagreement with the report's characterization of the meeting. It is restricted to how the evaluating unit or committee report allegedly mischaracterized the discussion. The statement may not present information or opinions about the candidate beyond those offered during the meeting. It need not indicate the author's position on the candidacy.

Signing statements must be shared with both the candidate and all faculty members of the unit or committee who were involved in the discussion at issue.  Signing statements are due five business days after the recommendation goes to the next level.

### 3.5.2.2 Minority Report

An allegation that an evaluating unit violated its guidelines, criteria, or processes, or those of the university, takes the form of a minority report.

A minority report is restricted to how the evaluating unit or committee violated guidelines, process, or criteria. It may not present information or opinion about the candidate beyond that offered during the meeting.

Minority reports must be shared with both the candidate and all faculty members of the unit or committee. The deadline for the minority report is five business days after the recommendation goes to the next level. The evaluating unit or committee has five business days to respond to the minority report. These documents must be added to the dossier for subsequent levels of review.

### *3.5.3 Local Academic Unit*

July 1, 2018

The local academic unit is the unit that conducts the first level of review in the promotion and tenure process. Some colleges are the local academic unit. In other colleges, the local academic unit might be a school, a department, or a program. A college may have departments that do not function as local academic units. For example, in the 2012-2013 academic year, the following colleges functioned as local academic units: College of Communication, College of Law, School of Music, The Theatre School, and The School for New Learning.

### 3.5.4   Local Academic Unit Is College

When the local academic unit is the college, the two levels of review are the college and the university. The college must follow uniform, written guidelines describing the evaluation process. Participation in the tenure and promotion review process is limited to tenured faculty.

**3.5.4.1 Personnel Committee (optional)**

A local academic unit may choose to convene a personnel committee consisting of a subset of the tenured faculty of the unit, excluding the dean. The committee must have at least three members. The personnel committee, if one exists, evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The personnel committee vote cannot be used in lieu of any full tenured faculty vote.

**3.5.4.2 Tenured Faculty of the College**

The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and provides a report for the dossier. This report may adapt or adopt a personnel committee's report, but it must reflect the unit's discussion. Unit guidelines may limit the right to vote on a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's personnel committee vote in the evaluation by the unit's tenured faculty.

**3.5.4.3 Dean**

The approved procedures of the local academic unit must stipulate whether the dean may attend the meeting of the tenured faculty of the college in the two-level process. If the dean attends, he or she may participate but not advocate or vote. The dean writes a separate report for the dossier expressing his or her evaluation.

**3.5.4.4 Candidate Response to College Review**

After the dean provides the candidate with all reports from the college review, the candidate has the option to write a response which will be placed in the dossier for review by the UBPT. The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT. The hearing must be scheduled to provide the candidate with at least five business days to respond to the report. A response may address only the candidate's issues or concerns with the college-level reports.

The next evaluation level is the university level.

16

July 1, 2018

1  ### 3.5.5  Local Academic Unit Is Not College
2
3  If the local academic unit is not the college, it is typically a department, school, or program
4  subordinate to a college.  The three levels of review are: local academic unit, college, and
5  university. Each level of review must follow uniform, written guidelines describing the evaluation
6  process. If there is an insufficient number of tenured faculty available in the local academic unit,
7  the dean may appoint tenured faculty from related academic units to the review process.
8  Participation in the tenure and promotion review process is limited to tenured faculty.
9

10 **3.5.5.1  Local Academic Unit Personnel Committee (Optional)**
11
12 A local academic unit may choose to convene a personnel committee consisting of a subset of the
13 tenured faculty of the unit. The committee must have at least three members. The local academic
14 unit officer may not be a member but may attend.  The personnel committee, if one exists,
15 evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The
16 personnel committee vote cannot be used in lieu of a vote by the unit's entire tenured faculty.

17

18 **3.5.5.2  Tenured Faculty of the Local Academic Unit**
19
20 The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and
21 provides a report for the dossier. This report may adapt or adopt a personnel committee's report
22 but must reflect the unit's discussion. Units may establish written procedures limiting the vote on
23 a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's
24 personnel committee vote as part of the evaluation by the unit's tenured faculty. If the local
25 academic unit has fewer than five eligible tenured faculty members, the dean, after consultation
26 with members of the unit, will appoint tenured faculty of the appropriate rank to the evaluation
27 committee from related academic units.
28

29 **3.5.5.3  Local Unit Academic Officer (Unit Chair or Director)**
30
31 The local unit academic officer may participate in the discussion by tenured faculty of the unit,
32 but will not vote on or advocate for or against the candidate's promotion or tenure. The unit
33 academic officer will write a separate report for the dossier expressing his or her evaluation.
34

35 **3.5.5.4  Candidate Response to Local Academic Unit Review**
36
37 After the local academic unit officer provides the candidate with all reports from the review, the
38 candidate has the option to write a response which will be places in the dossier for all subsequent
39 levels of review.  The response, if any, must be submitted to the dean and the local academic unit
40 officer at least two business days prior to the prior to the scheduled date of the candidate's
41 hearing by the college personnel committee. The hearing must be scheduled to provide the
42 candidate with at least five business days to respond to the report.  A response may address only
43 the candidate's issues or concerns with the local academic unit's reports.
44

July 1, 2018

**3.5.5.5  College-Level Personnel Committee**

In colleges with a college-level personnel committee, this committee conducts a separate evaluation of the candidate, votes by secret ballot, and writes a report for the dossier. The college personnel committee is a subset of the tenured faculty from the college with broad representation from different units within the college. The minimum number of members on any college personnel committee is five. Only tenure-line faculty may vote in membership elections for those committees that are elected. The college-level committee must have representation from tenured faculty at the rank of full professor. Members of the college personnel committee who voted at the local academic unit may not vote at the college level.  If so specified in the college's guidelines, the dean may participate in the meeting of the college personnel committee, but may not vote or advocate for or against a candidate. The report of the college personnel committee is provided to the dean of the college. There is no college-wide tenured faculty vote.

**3.5.5.6  Dean**

The dean provides a separate evaluation of the candidate for the dossier.

**3.5.5.7 Candidate Response to College Review**

After the dean provides the candidate with all reports from the review, the candidate has the option to write a response which will be placed in the dossier for the UBPT.  The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT.  The hearing must be scheduled to provide the candidate at least five business days to respond to the report.  A response may address only the candidate's issues or concerns with the college's reports.

The next evaluation level is the university review.

*3.5.6    University Review*

**3.5.6.1 University Board on Promotion and Tenure**

The University Board on Promotion and Tenure (UBPT) evaluates the candidate, votes by secret ballot on tenure, promotion, or both and provides a written report summarizing the basis of its recommendation, including the vote count. In evaluating the candidate, the UBPT takes the following steps:

    a.  Reviews the full dossier.

    b.  Conducts a hearing, with five of the seven appointed faculty members constituting a quorum. The provost is expected to be present when a candidate is being reviewed. In exceptional circumstances, a designee may attend in the provost's absence.  The candidate, the local academic unit officer (when applicable), and the college dean are expected to appear before the UBPT.

    c.  Conducts a substantive review applying current university-wide standards and criteria for tenure and promotion.

18

   d.   Examines the application of lower-level guidelines to the candidate.

   e.   Prepares its recommendation, which it shares with the candidate and the provost.

**3.5.6.2 Candidate Response to UBPT**

The candidate has the option to write a response to the UBPT evaluation which will be added to the file and sent to the provost for his or her consideration. A response must focus only on issues or concerns the candidate may have with the UBPT report. The deadline for this response appears in the calendar.

**3.5.6.3 Provost Decision**

The provost makes the final decision on tenure or promotion. Only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by the UBPT.

If the provost's decision differs from the UBPT recommendation, the provost must prepare a written explanation of the decision and provide it to the UBPT, the candidate, the dean, and the local unit academic officer (if different from the dean).

### *3.5.7 Detailed Procedures*

**3.5.7.1 Committees**

The following rules apply to the various committees conducting reviews for tenure and promotion.

Only tenured faculty may sit on any committee evaluating a faculty member for tenure or promotion at any level of evaluation; only tenure-line faculty may vote in membership elections for those committees that are elected.

Except where otherwise provided in this chapter, a local academic unit or college may adopt written standards for its evaluative committees that address tenure and promotion. The standards may address, among other topics:
- Committee membership
- Criteria for chairing the committee
- Rank and status of faculty who may elect members of the committee
- Rank of members who may vote on promotion to full professor
- Term length for committee membership
- Process for election of the committee chair

**3.5.7.2 Local Academic Unit (Not College) Personnel Committees**

Members must be tenured and at least associate rank. The committee must have at least three members. The tenure-line faculty of the local academic unit elect the personnel committee, and the personnel committee elects its chairperson. The local academic unit academic officer may not

July 1, 2018

be a member of this committee. The officer may participate in committee meetings but shall not advocate for or against the candidate or vote.

### 3.5.7.3  Tenured Faculty of the Local Academic Unit

All and only tenured faculty of at least associate rank are expected to participate in votes for tenure and promotion at the local academic unit level.  For promotion to full professor, the local academic unit may limit votes to full professors. If the local academic unit has fewer than five eligible tenured faculty members, the dean, after consultation with members of the unit, will appoint tenured faculty of the appropriate rank to the evaluation committee from related academic units.

The tenured faculty of the local academic unit elect a chair to conduct these promotion and tenure meetings and to organize the reports.  The chairperson may not be the local academic unit academic officer.  If the local academic unit is not the college, the local academic unit officer may participate at promotion and tenure meetings but shall not vote or advocate for or against the candidate.  If the local academic unit is the college, college procedures should stipulate whether the dean may attend the meeting of the tenured faculty.  If the dean attends, he or she may participate but not advocate or vote for or against the candidate.

### 3.5.7.4  College Personnel Committees

Only tenured faculty may serve on a college personnel committee. College guidelines may limit the membership to full professors.  College guidelines should also address how to convene an adequate number of full professors for deciding promotion to full professor.  The minimum number of members on any college personnel committee is five.  Terms are three years and are staggered.  The committee members elect a chairperson for a one-year term.  The chairperson conducts meetings of the committee and organizes the committee's reports.  The dean shall not be the chairperson of the committee.  The dean may participate in college personnel committee meetings but shall not vote or advocate for or against a candidate.

### 3.5.7.5  University Board on Promotion and Tenure

The UBPT members must be tenured full professors.  Associate deans, deans, and local academic unit officers (e.g., department chairs) are ineligible to serve.  The seven members of the UBPT serve as representatives of disciplines across the university, not as representatives of their colleges.  Members are selected by open nominations and self-nominations across colleges, reviewed by Faculty Council Committee on Committees, and interviewed and elected by Faculty Council.  Terms are for three years and are staggered.  The UBPT members elect a chairperson annually. The provost or his or her designee is expected to be present at all UBPT meetings where candidates are reviewed; he or she shall not vote or advocate for or against any candidate.

The UBPT has two additional responsibilities. First, it reviews changes to evaluation guidelines, criteria and procedures developed by local academic units, departments, schools, and colleges for clarity and consonance with university-wide criteria. Second, at the conclusion of each year's proceedings, the UBPT shares any recommendations it may have with the provost regarding the board's future functioning.

20

July 1, 2018

The provost and the chair of the UBPT refer any policy matter raised by UBPT members to the Faculty Council; the provost also makes available to the full faculty an annual statistical summary of the university's final tenure and promotion decisions.

## 3.6    Materials

### *3.6.1 Dossier*

**3.6.1.1 Items Supplied By Candidate**

A candidate for promotion and/or tenure supplies the following materials:

- Complete professional curriculum vitae, paginated with the candidate's name on each page
- A statement of up to 3,000 words in which the candidate emphasizes those achievements or qualifications to which evaluators should particularly attend
- Evidence of collaborative work, if applicable
- Evidence of teaching effectiveness beyond course evaluations and peer reviews, including, at a minimum, selected syllabi, course assignments, and exams
- Evidence of service, including, at a minimum, description of individual contributions and supporting documentation such as letters from committee chairs
- Other evidence he or she may wish to submit, e.g., awards and special recognitions
- A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities

**3.6.1.2 Items Supplied By Academic Unit and College**

The local academic unit and college committee add the following materials to the dossier:

- Local academic unit and college guidelines
- The written recommendation(s) from the reviews conducted at each level, including signature forms
- Signing statements and minority reports, if any
- Candidate responses, if any
- Data obtained by the college through the student input instrument
- Documentation that substantiates according to the local academic unit guidelines, and with sufficient detail, the faculty member's contributions to any collaborative work submitted in the Dossier.
- For tenure, an evaluation of the candidate's scholarship, research, and/or other creative activities by at least two external experts
- For promotion to full professor, an evaluation of the candidate's scholarship, research, and/or other creative activities by a minimum of three external experts
- For tenure decisions, all teaching evaluations for all courses. For promotion, all teaching evaluations while in current rank
- Internal peer reviews of teaching, if any

July 1, 2018

Review is limited to these items, unless the local academic unit approves any additions to the dossier. Unsolicited material will not be added to the dossier.

**3.6.1.3 Additions to the Dossier**

Because of the length of the review process, it is possible that a candidate's record may change significantly or that other information pertinent to a case may come to light during the course of the review.

After the initial submission of the dossier to the local academic unit, the candidate may request the addition of new information to the dossier at any level of the review process prior to the final vote by the UBPT. The request for additions to the dossier must be made to the local unit academic officer and must include supporting documentation to verify the accuracy of the new information. The local academic unit officer must rule on the request within five business days of receiving it.

The local unit academic officer will determine whether the new information should be added to the dossier based on one or more of the following criteria:

- The new information constitutes an update to the status of scholarly or creative work already mentioned in the dossier.
- The new information constitutes a significant development, such as the announcement of a major award or recognition, related to the candidate's work already reported in the dossier.
- The new information is not related to work previously reported in the dossier but, in the judgment of the local unit academic officer, may have significant impact on the outcome of the case.

The local academic unit officer of the originating unit must formally transmit all new material approved for addition to the dossier directly to the level at which the case is currently under review and include with the new material an explanation of the reasons for the addition and at what level of review the new information became available. The entity currently reviewing the case should add these new items to the candidate's dossier, evaluate them along with the rest of the dossier, and provide them to subsequent levels of review.

The local academic unit officer shall also supply copies of the explanatory memorandum to the candidate and to the individual in charge of each level already completed at the time the material is added.

*3.6.2 External Letters*

By June 1, candidates must submit to the local academic unit officers their CV and selected publications/documentation of creative activities for transmittal to external reviewers. Local academic units should identify an initial list of potential external reviewers by June 15. Local academic units will ask external reviewers to prepare letters over the summer for receipt prior to candidate review in the fall.

22

July 1, 2018

**3.6.2.1  Authors of External Letters**

Local academic units should obtain letters from persons whose judgment is respected in the candidate's field of expertise and who can provide an impartial assessment of the candidate's scholarship or creative activities. The candidate may nominate external reviewers. The local academic unit may select from the candidate's nominations or from other sources. When identifying external reviewers, candidates and committees should take into account both the objectivity of the reviewer and the reviewer's rank, reputation, and stature. The local academic unit has full discretion in selecting external reviewers.

If a candidate has done collaborative work, a separate set of letters can be solicited and submitted from collaborators in addition to, but not as a substitute for, the external review letters. The university's letters to collaborators should request that they describe the division of labor and nature of the collaborative effort.

**3.6.2.2  External Letter Contents**

The solicitation letter to a potential reviewer should be neutral, asking only for an objective assessment of the candidate's research or creative activities and requesting that the reviewer eschew advocacy for or against tenure and promotion. The solicitation letter should also ask the reviewer to explain the nature of the reviewer's relationship to the candidate.  The letter should ask the evaluator to cover the following general ground:

- the nature of the evaluator's professional interactions with the candidate
- the quality of the candidate's work
- the impact of the candidate's work

Readers will disregard any portions of an external letter advocating for or against tenure and promotion.

**3.6.2.3  Confidentiality of External Letters**

Under Illinois state law, a candidate may see the contents of his or her personnel file, with an exception applicable to external review letters. To ensure that reviewers provide fully candid assessments, the university protects the identity of the external reviewers. Therefore, any citations of the external review letters in department or chair reports and the reports of subsequent reviewing levels must be redacted, eliminating any and all information that would identify the reviewer to the candidate.  Local academic units must also ensure that external review letters given to the candidates are redacted to protect the authors' identities.

**3.6.2.4  Suggested Sample Letter**

Dear Dr. AA:

As you are a recognized authority in your field, I am writing to request your assistance.  Dr. BB is due to be reviewed for promotion to Associate Professor in academic year YYYY-YYYY.  I solicit your evaluation of the research [creative activities] of Dr. BB.  Please only evaluate the candidate's research or creative activities and refrain from rendering a judgment on whether the

July 1, 2018

candidate should be promoted or tenured.  Your identity will be kept confidential to the extent legally practicable.

In particular, please address the following:

- the quality of the publications or creative activities of the candidate
- the impact of the candidate's work
- the quality of the journals in which the candidate has published
- the nature of your professional interaction with the candidate, if applicable, and
- comments, should you have any, of the candidate's collaboration with other scholars in the field.

To assist in your evaluation, I am enclosing the following information: Dr. BB's latest curriculum vitae; the three papers or book manuscript listed below, selected by Dr. BB; and a brief summary of the department's [local academic unit's] promotion criteria.

Although Illinois state law allows employees to view their personnel files, there is an exception for external review letters.  Any information that would identify you will be redacted from all documents seen by the candidate.

I realize that this information is rather extensive and will require considerable effort on your part to review.  Your assistance in helping us evaluate Dr. BB's credentials will be greatly appreciated and will constitute an important element in the overall evaluation.  I would be very grateful if you could respond to us in writing no later than [DATE].  If possible, kindly send your reply, along with a copy of your most recent CV, electronically to ........@depaul.edu as an attachment.


Sincerely,
DD
Chair
Personnel Committee
[Name of Dept. and Unit]
Enclosures: [List the selected works]


### 3.6.3 Student Input

Student input must be part of a candidate's dossier. Committees will acquire student input from course evaluations and information collected through an instrument such as a survey. The college will design the instrument with student input. The instrument will generally solicit opinions from one or more of the following groups: alumni, past students who have taken a class from the candidate, student advisees, or students who have been supervised by the candidate in research projects or independent study.

### 3.6.3.1 Student Input Instrument

Each college personnel committee, or in the absence of a college-level committee, the local unit personnel committee, shall have an instrument for collecting data from students, a process of gathering data, and a template for reporting the results.  These elements must be created by a

July 1, 2018

1  committee of at least two students (preferably including both graduate and undergraduate) and at
2  least two tenured faculty members.
3
4  The instrument will be used to gather additional data from students beyond the standard course
5  evaluations. The report should clearly specify:
6
7  • the type of methodology used for data collection and analysis
8  • the targeted groups  surveyed, and
9  • the questions asked of survey participants.
10
11  The college personnel committee must approve the instrument, process, report template and any
12  subsequent modifications. Before approval, the college personnel committee should solicit and
13  consider input from the college's local academic units.

14  **3.6.3.2 Evaluation and Submission of Student Input Data**
15
16  The college bears responsibility for data collection. A student review committee then analyzes
17  data collected via this process for each promotion and tenure candidate, as well as aggregate
18  information on course evaluations provided by the unit. The student review committee consists of
19  up to three students, none of whom is currently enrolled in a class with the candidate under
20  review. After analyzing the collected data, the review committee provides a written report, along
21  with all the raw data, to the personnel committee of the local academic unit and to the candidate.
22  The student input data becomes part of the candidate's dossier. The personnel committee may
23  request a meeting with a representative from the student review committee, if the committee
24  deems it necessary.
25
26  Once student representatives furnish their report to the local academic unit, they do not appear
27  before subsequent evaluative bodies. The student report will be forwarded with other promotion
28  and tenure materials to each review level.
29

30  **3.7    Appeal**
31
32  *Appeal procedures for a tenure-line faculty member who has been reviewed for tenure,*
33  *promotion, or promotion and tenure by the University Board on Promotion and Tenure*
34  *are found in Chapter 5 Section 5.1.2.3.*
35
36

25

July 1, 2018

1   **3.8 Schedule for Informal and Formal Reviews**
2
3

| PROBATIONARY REVIEWS FOR TENURE-LINE FACULTY WITH SIX-YEAR PROBATIONARY PERIOD* | | | |
|---|---|---|---|
| **Year at DePaul** | **Timing and Contract Year** | **Type of Review** | **Notice to Faculty Member of Renewal or Nonrenewal** |
| 1st | Winter quarter of first year at DePaul, for Year 2 contract renewal | May be informal or formal | March 1 |
| 2nd | Fall quarter of second year at DePaul, for Year 3 contract renewal | One of these 2 reviews must be formal; the other may be informal or formal. | December 15 |
| | Spring quarter of second year at DePaul, for Year 4 contract renewal | | June 30 |
| 3rd | During third year at DePaul, with timing per college's schedule, for Year 5 contract renewal | May be informal or formal | June 30 |
| 4th | During fourth year at DePaul, with timing per college's schedule, for Year 6 contract renewal | Formal | June 30 |
| 5th | During fifth year at DePaul, with timing per college's schedule, for year 7 contract renewal | May be informal or formal. Must be formal if non-reappointment is realistic possibility. | June 30 |
| 6th | Sixth Year at DePaul, with timing per Faculty Handbook calendar | Promotion and Tenure Review | June 30 |

4   *The contract renewal schedule for tenure-line faculty who come in with years of credit
5   towards tenure is the same as for other tenure-line faculty, but the year of the promotion
6   and tenure review varies. The initial faculty contract stipulates the year of the promotion
7   and tenure review.

26

July 1, 2018

**3.9     Schedule for Promotion and Tenure**

*3.9.1 University Promotion and Tenure Schedule*

The following is the suggested schedule for the university promotion and tenure process. Whenever possible, the university will abide by the proposed timetable.  Any changes to this calendar must provide at least the allotted time period for candidate responses, minority reports, and signing statements.

**April 1**
Letter of notification as to the eligibility to apply for promotion and tenure sent to the faculty member from the provost

**May 1**
Letter requesting consideration for promotion and/or tenure submitted by the faculty member to the provost, the academic dean, and the head of the academic unit

**May 15**
Provost acknowledges receipt of applications for promotion, for tenure, or for promotion and tenure.

**June 1**
Candidate provides CV and selected publications/documentation of creative activities to local academic unit officers for submission to external reviewers

**June 15**
Local academic unit identifies an initial list of potential external reviewers

**First day of fall quarter**
Candidate's complete materials due to the local academic unit

**January 15**
Report from the academic unit submitted to the academic dean and to the candidate.

**January 31**
Report from the academic dean and the academic unit of the following colleges and schools submitted to the Office of Academic Affairs and to the candidate

• College of Communication
• College of Computing and Digital Media
• College of Law
• School of Music
• School for New Learning
• The Theatre School

**March 1**
Reports from the academic deans of the College of Commerce and the College of Education and all relevant materials submitted to the Office of Academic Affairs and to the candidate

**March 15**

27

July 1, 2018

1   Reports from the academic deans of the College of Liberal Arts & Social Sciences and the
2   College of Science and Health and all relevant materials submitted to the Office of Academic
3   Affairs and to the candidate.
4
5   **Winter/Spring Quarter**
6   University Board on Faculty Promotion and Tenure meets with faculty candidates
7
8   **Five business days from the last UBPT meeting but no later than May 15**
9   UBPT reports due to candidates
10
11  **Two weeks from the date UBPT reports are sent to candidates**
12  Optional candidate response due to UBPT
13  UBPT report and all relevant materials for all candidates submitted to provost
14
15  **June 15**
16  Decision of the university provost
17  Notification to candidate of the provost's decision follows in a timely fashion
18
19

July 1, 2018

# CHAPTER 4.  DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

4.1 Overview ............................................................................................................ 3

4.2 Nonrenewal of Non-Tenured Tenure Line Faculty ....................................... 3

4.3 Tenured Faculty ............................................................................................... 5

4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct ................. 5

    4.4.1 Misconduct ................................................................................................ 5

    4.4.2 Categories of Disciplinary Sanctions: ..................................................... 6

    4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty: .. 6

    4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty ........................................................................................................ 7

        4.4.4.1 Initiation of a formal hearing ......................................................... 7

        4.4.4.2 Rules and procedures for the Hearing Committee ......................... 7

    4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major Sanctions Against a Tenure-Line Faculty Member ......................................... 9

4.5 Emergency Suspension ................................................................................... 9

4.6 Termination Due to Financial Exigency ...................................................... 10

    4.6.1 Financial Exigency ................................................................................. 10

    4.6.2 Provost Statement .................................................................................. 10

    4.6.3 Financial Exigency Committee ............................................................. 11

    4.6.4 Retrenchment Committee ...................................................................... 12

    4.6.5 Termination Committee(s) ..................................................................... 13

    4.6.6 University Obligations upon Termination of Tenured Faculty ............... 14

    4.6.7 Appeal of Termination .......................................................................... 15

4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit or Program ...................................................... 15

    4.7.1 Step 1 ..................................................................................................... 16

    4.7.2 Step 2 ..................................................................................................... 16

    4.7.3 Step 3 ..................................................................................................... 16

    4.7.4 Step 4 ..................................................................................................... 17

    4.7.5 Step 5 ..................................................................................................... 17

    4.7.6 University Obligations upon Termination of Tenured Faculty ............... 18

    4.7.7 Appeal of Termination .......................................................................... 19

4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months ............................................................................................................... 19

July 1, 2018

1   4.9 Resignation ................................................................................................ 20

2   4.10 Retirement ............................................................................................... 20

3

July 1, 2018

# CHAPTER 4. DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

## 4.1 Overview

This chapter summarizes the policies and processes to be followed in disciplinary cases involving faculty as well as those governing the termination of faculty members. Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions. Tenured faculty may be dismissed only under provisions set out in this Handbook.

The term "appointment" refers to the initial contract issued to all faculty. The terms "reappointment" and "non-reappointment" apply to full-time non-tenure line faculty (see Chapter 2). The terms "renewal" and "nonrenewal" apply to non-tenured tenure-line faculty.

Reviews and decisions for appointment, reappointment, renewal, promotion, and tenure are separate actions. Appointment does not guarantee reappointment or renewal, nor does appointment at any rank confer tenure, except where specifically provided in the contract. Promotion at any time from any rank to any other rank does not confer tenure.

## 4.2 Nonrenewal of Non-Tenured Tenure Line Faculty

When deciding whether to renew the contract of a non-tenured tenure-line faculty member the university follows two general principles:

1. To select, given available resources, faculty members who will best contribute to its distinctive goals and academic mission. Consequently, the university has the authority and discretion, within the limits of academic freedom, to determine which non-tenured tenure-line faculty members will be retained.

2. To have no reasonable doubt as to the faculty member's qualifications for tenure before it reaches a favorable decision on the renewal that results in tenure. The quality of academic programs and therefore the good of the university require careful selectivity in renewal based on the individual faculty member's qualifications and the needs of the university. Anything that undermines the selective process erodes tenure and quality.

Non-tenured tenure-line faculty members are subject to an annual probationary review (see Chapter 3). Renewal decisions are made in conjunction with the annual probationary review. Although there is no guarantee of renewal, non-tenured tenure line faculty are entitled to consideration for renewal. Nonrenewal decisions must be based on criteria as described in this Faculty Handbook, and selected from those listed below:

1. Teaching and learning;

2. Scholarship, research, or other creative activities;

3. Service;

4. Professional advancement, such as the completion of a terminal degree or certificate. This criterion is especially applicable when there is a particular interest or a previous understanding with the faculty member regarding this advancement;

3

July 1, 2018

5. Responsible participation in university processes and activities that are generally considered faculty responsibilities;

6. Change in academic program, such as:

   o termination or reduction in size of the academic program to which a faculty member is assigned;

   o change in an area of specialization or in emphasis in a program;

7. Financial conditions of the university as a whole or in any particular part, requiring reduction in the size of the faculty;

8. Professional and ethical conduct.

Nonrenewal may rest on a single criterion or a combination of several criteria, reflecting the faculty member's role in the academic unit and the needs of the university. The rationale for the renewal decision must be explained and supported with evidence and with reference to the appropriate criteria.

The dean and the faculty of the local academic unit must follow the procedures specified in Chapter 3 in making renewal recommendations. Every faculty member in an academic unit is entitled to be judged according to consistent criteria and documentation. Conflicts of interest must be avoided in all faculty evaluations. Any judgment based on a faculty member's ideological and political positions is a violation of academic freedom.

As detailed in Chapter 3, the local academic unit normally makes a recommendation on annual renewal and nonrenewal. If the dean does not concur in the recommendation of a local academic unit, the dean shares his or her recommendation with the local academic unit. The local academic unit may appeal the dean's recommendation to the provost. In such cases, the dean and the local academic unit must provide the provost with written reasons for their respective positions. The provost makes the final decision and reports it to the candidate. A faculty member who is not renewed may file an appeal. (See Chapter 5.)

The non-tenured tenure-line faculty member is entitled to:

(a) an opportunity to submit materials supporting renewal. The non-tenured tenure-line faculty member will be notified at least 28 calendar days before the local academic unit's review. The candidate must submit supporting materials to the local academic unit officer at least 14 calendar days prior to the local academic unit review;

(b) written notification of the decision on renewal. The notification must include the reasons for the decision. A notification to renew should include an assessment of the faculty member's qualifications, noting those conditions which should be fulfilled for future renewal or tenure. A notification of nonrenewal must include the reasons for the decision, the faculty member's appeal rights, and the procedures for such appeals as described in Chapter 5.

The university follows the AAUP guidelines for notice of renewal. Notice of nonrenewal, or of intention not to recommend renewal, should be given in writing in accordance with the following standards and the calendar specified in Chapter 3.

4

July 1, 2018

1. On or before March 1 of the first academic year of service, if the appointment expires at the end of that year; or, if a one year appointment terminates during an academic year, at least three (3) months in advance of its termination.

2. On or before December 15 of the second academic year of service, if the appointment expires at the end of that year; or, if an initial two year appointment terminates during an academic year, at least six (6) months in advance of its termination.

3. At least twelve (12) months before the expiration of an appointment after two (2) or more years in the institution. Notices of reappointments and contract renewal are based on the university's annual budget cycle.

Notification by these dates shall constitute sufficient notification for not offering another contract even though appeal and subsequent review might mean that the final decision is rendered less than a year before the end of the final contract.

A non-tenured tenure-line faculty member informed that his or her contract is not to be renewed may appeal the decision not to renew.  See Chapter 5, Appeals and Grievances.

## 4.3 Tenured Faculty

Tenure creates the presumption of continuing employment. Tenured faculty may be dismissed only under provisions set out in this handbook. Tenured faculty are not renewed annually.

## 4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct

### 4.4.1 Misconduct

The university's response to allegations of faculty misconduct may vary according to the nature of the misconduct, its seriousness, its impact on the university's reputation or the well-being of other members of the university community, and any prior record of misconduct by the faculty member. Disciplinary sanctions may apply to any full-time faculty member, including, but not limited to, all tenure-line faculty.  Faculty members who hold administrative appointments are subject to these provisions with respect to their role as faculty members.

Misconduct includes, but is not limited to, violations of university policies, including the Faculty Handbook and anti-discrimination and anti-harassment policies; violations of academic or scholarly integrity; a pattern or practice of failing to meet university contractual obligations; or a pattern of extreme intimidation and aggression towards other members of the university community.

Disciplinary proceedings are reserved for situations that warrant the imposition of a major or a minor sanction. Inadequate performance in teaching, scholarship/research/creative activities, or service that does not rise to the level of misconduct must be dealt with during the standard processes for faculty review and/or reappointment/renewal.

All procedures are to be carried out as expeditiously as is reasonably possible. All time guidelines in this section refer only to calendar or business days within regular academic terms — Fall, Winter, and Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums.

5

July 1, 2018

*4.4.2 Categories of Disciplinary Sanctions:*

- **Minor sanctions**: sanctions short of suspension or dismissal
- **Major sanctions**: suspension or dismissal

***4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty:***

1. The dean initiates an investigation of alleged faculty misconduct, except in situations where initiation of disciplinary action is based on OIDE findings, in which case the dean will work in consultation with OIDE.
2. The dean should attempt to resolve the issue through an informal process resulting in both parties agreeing with the outcome.
3. If informal resolution fails, the dean will present the faculty member with a statement of charges. The faculty member will be provided an opportunity to submit a rebuttal within two weeks of the presentation of the statement of charges. If the faculty member perceives that the dean has a conflict of interest, he or she may simultaneously request in writing that the dean appoint a designee. The dean may deny the request with written reasons.
4. After the statement of charges is presented, either party may invite a DePaul colleague to act as an advisor. The advisor may attend but not participate in any meeting related to the case. Within four weeks of the presentation of the charges, the dean or the designee will conduct a detailed review of the charges and the rebuttal, if any, and prepare a report.
5. The faculty member may examine the report and any evidence referenced in the report and will be given two weeks to provide a final statement before a decision is reached.
6. In all cases, the burden of proof is with the dean and a recommendation for sanctions must be supported by a preponderance of evidence.
7. The dean shall make a decision within eight weeks of the presentation of the charges. This decision may be one of the following: (1) to dismiss the case; (2) to impose a minor sanction; or (3) to refer the case to the provost for major sanctions.

The dean shall file with the office of the provost the statement of charges, the faculty member's rebuttal, the report, the final statement by the faculty member and the dean's own written decision. The office of the provost shall maintain this information

**In cases involving minor sanctions:**
The dean makes the decision on the sanctions to be imposed. The faculty member may grieve the decision according to the grievance procedures of Chapter 5. To the extent possible, the dean and the provost will not release any information about the sanctions.

**In cases involving major sanctions:**
If the dean's written decision includes a recommendation for major sanctions, the provost (or designee) will conduct a detailed review of the charges and any evidence provided by the parties at the college level. The provost (or designee) may interview the parties or consult additional experts and request additional evidence from the parties.

The provost will make a decision within ten weeks of the presentation of the statement of the charges.

The provost's decision will be one of the following:

July 1, 2018

1. dismiss the case; or
2. issue a minor sanction; or
3. (**in the case of term faculty only**) impose a major sanction without a formal hearing (in this case, the term faculty member has the right to appeal to the Faculty Committee on Appeals according to procedures in Chapter 5); or
4. (**in the case of tenure-line of faculty**) refer the case for a formal faculty hearing with a recommendation for a major sanction (see below for detailed procedure).

### *4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty*

**4.4.4.1 Initiation of a formal hearing**

1. The provost will notify the faculty member of the intent to refer the case for a formal faculty hearing with a recommendation for a major sanction. The faculty member may waive the right to the hearing and choose to have the case decided by the provost. In that case, the provost's decision will be final and may not be appealed or grieved further. Otherwise, the provost will initiate a request for a formal Hearing Committee and appoint a designee to serve as complainant ("university representative") in the disciplinary proceeding. If a conflict of interest is perceived, the faculty member may request, with justification, a different university representative which can be denied by the provost with written reasons.
2. The university representative must file a detailed statement of charges with the Faculty Council President, a copy of which will simultaneously be provided to the faculty member.
3. The faculty member will have four weeks to submit a written response to the charges once they have been filed with Faculty Council.
4. The university representative will forward the following information to the Hearing Committee: (a) the statement of charges; (b) the response; (c) a list of individuals who may have pertinent information about the case; (d) and the records of any earlier investigations or decisions.
5. The burden of proof rests with the university. The charges against the faculty member must be established by a preponderance of evidence.

**4.4.4.2 Rules and procedures for the Hearing Committee**

1. The Hearing Committee will be comprised of three tenured faculty members selected in the following manner: Faculty Council shall identify a panel of nine tenured faculty members not affiliated with the college or school of the faculty member. Faculty Council, in conjunction with both parties will develop a process for interviewing the nine selected faculty members. In alternating fashion, with the university going first, each party excludes three members from the panel. The remaining members of the panel constitute the Hearing Committee. The committee shall select its own chair.
2. The Hearing Committee shall not disclose the evidentiary record, including deliberations and findings, except to those with a legitimate need to know.
3. The Hearing Committee may attempt an informal resolution of the case before proceeding to a formal hearing. If it cannot resolve the matter informally, then it will schedule a formal hearing.
4. The university will assume all costs directly incurred by the Hearing Committee.
5. The Hearing Committee will conduct a prehearing meeting with the faculty member and the university representative to clarify the issues, stipulate facts, finalize the list of

7

July 1, 2018

individuals who may have information relevant to the hearing, provide for the exchange of documentary or other information, and identify other appropriate objectives to make the hearing fair, effective, and expeditious. The committee will provide both parties with a written record of its decisions.

6. The chair of the Hearing Committee will notify all concerned parties of the time and location of the hearing. Notice of the hearing must be in writing and made at least two weeks prior to the hearing. Time extension or rescheduling requests by the faculty member or the university representative may be granted by the chair for good reason.

7. At any time before the start of the hearing, the faculty member may choose not to participate in person but may choose to submit a written response to the specific charges. In the event the faculty member does not participate in person he or she may still deny the charges or assert that the charges do not support a finding for a major sanction.

8. The hearing will proceed in the absence of either the faculty member or the university representative who fails to appear at the hearing after receiving notification. Only circumstances that are beyond a party's control and that prevent a party's attendance at the hearing will constitute good reason to reschedule the hearing. The Hearing Committee will make the determination as to whether there is good reason for the absence.

9. The Hearing Committee (on its own or at the request of either party) may invite persons from inside or outside the university to give testimony relevant to the matter. University personnel will make every effort to cooperate with the committee in securing witnesses and making evidence available. The parties shall have the right to cross-examine all witnesses.

10. The faculty member may receive the assistance of counsel of her or his choosing and at her or his cost. If the faculty member employs an attorney for the hearing, and the decision is not for a major sanction, the University will reimburse the faculty member for at least one-half of the reasonable legal expenses, the precise proportion to be decided by the Hearing Committee, depending on the degree to which the University case has merit.

11. All hearings are closed to the public. The Hearing Committee, at its sole discretion, may remove participants in the hearing who disrupt the process.

12. The hearing will be transcribed. At the conclusion of the hearing, the parties shall have unrestricted access to the full evidentiary record and a copy of the complete transcript. The parties will be given a reasonable period of time, specified by the committee, to examine this record. After examining the record, the faculty member and the university may file closing statements, copies of which will be provided by the chair to the other parties.

13. Subsequent to filing the closing statements, the Hearing Committee will deliberate in a closed session.

14. The findings of the Hearing Committee may be only one of the following: (1) adequate cause for dismissal, (2) adequate cause for suspension, (3) adequate cause for a minor sanction, or (4) adequate cause has not been established for major or minor sanctions. If the finding is for a sanction other than dismissal, the Hearing Committee shall include in its report recommendations for appropriate sanctions.

15. The findings and the decision of the Hearing Committee on appropriate sanctions must be supported by a majority vote and be specified in a written report. The chair of the Hearing Committee will submit the report to the provost and the faculty member.

16. The provost (or president if the provost has a conflict of interest) may either accept the decision of the Hearing Committee or resubmit this decision to the committee with specific objections. In the latter case, the committee will then reconsider only points to which the provost has objections, receiving new evidence if necessary. After its

July 1, 2018

reconsideration, the Hearing Committee will deliver its final decision to the provost (or president if the provost has a conflict).

### 4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major Sanctions Against a Tenure-Line Faculty Member

In cases involving major sanctions against tenure-line faculty either party (the provost/president on behalf of the university or the faculty member) has the right to appeal a decision by the Hearing Committee to an Appeals Board.

Grounds for appeal could be one or more of the following:
1. Procedural violations that compromised the ability of a party to present arguments or evidence or to do so in a timely manner; procedural violations that compromised the committee's consideration of the evidence and arguments presented;
2. Failure of the committee to apply appropriate standards under which the charges were brought and under which the charges should have been considered; failure of the committee to consider relevant evidence actually presented;
3. Arbitrary decisions of the committee that could not reasonably follow under the standards applied and given the evidence presented.

Makeup of the Appeals Board:
1. Two deans (excluding the dean involved in the case) selected by the Council of Deans.
2. Two faculty members (without a conflict of interest in the case) selected by the Faculty Council from among the twelve members of the Faculty Committee on Appeals.
3. One additional member selected jointly by the president of the university and the president of Faculty Council.

The Appeals Board may take one of the following actions:
1. Accept the decision of the Hearing Committee; or
2. Send back the matter to the Hearing Committee with specific recommendations for additional actions or changes. This action should be taken if the Appeals Board believes that the decision was influenced by the procedural or standards violations, but those violations can be remedied by the Hearing Committee. In this case the Hearing Committee shall take appropriate action taking into account the Appeals Board's recommendations and issue a revised report with a final decision; or
3. Reject the Hearing Committee's decision and conduct a new hearing. This action may only be taken if the Appeals Board can demonstrate that no reasonable decision-maker could have arrived at the conclusion of the Hearing Committee based on the facts presented, or the procedural violations were so egregious that they compromised the integrity of the process. Should the Appeals Board initiate such a rehearing, it must issue a written opinion with its findings regarding the deficiencies in the Hearing Committee decision before commencing its rehearing. In conducting a rehearing the Appeals Board will follow the same operating procedures required of the Hearing Committee.

In all three cases, there is no further appeal from this decision within the university.

### 4.5 Emergency Suspension

9

1   In an emergency where potentially serious harm must be prevented and immediate action must be
2   taken before initiating the disciplinary procedures set out in this chapter, the provost may suspend
3   a faculty member. The provost shall inform the faculty member in writing of the terms of the
4   suspension. Within a reasonable timeframe of issuing the written notice, the provost shall either
5   lift the suspension or initiate the formal disciplinary procedures. The suspension will not continue
6   beyond the time required to remove the actual or potential harm, ordinarily not beyond the
7   academic year.
8
9   A faculty member may grieve a suspension under this section only if the dean declines to initiate
10  formal disciplinary procedures. SEE CHAPTER 5 APPEALS AND GRIEVANCES.
11
12  The faculty member suspended from active service to the university will receive full
13  compensation during the suspension until the time of justifiable dismissal for misconduct.

14  **4.6 Termination Due to Financial Exigency**

15  *4.6.1 Financial Exigency*
16
17  Termination of an appointment with tenure may occur due to financial exigency of the
18  university.  Financial exigency is a financial crisis that fundamentally compromises the
19  academic integrity of the institution as a whole. The crisis usually results from substantial
20  and recurring financial deficits that cannot be offset by prudent use of the university's
21  reserves.
22
23  Prior to declaring exigency, the university president, provost, and executive vice
24  president will retrench operations in all areas before taking steps that could lead to the
25  termination of tenured faculty. These retrenchments will be made up to the point where
26  there would be a danger of seriously jeopardizing the academic quality or the essential
27  operations of the university.
28
29  With the exception of the work of the identified committees, all of the steps specified
30  below in Subsections 4.6.2 thru 4.6.7 (inclusive) must be initiated, conducted, and
31  completed within the regular academic year calendar – from the opening date of regular
32  day and evening Autumn quarter classes to the date of the last final exam in Spring
33  quarter. Any steps that remain uncompleted at the close of business on the date of the last
34  final exam in Spring quarter shall be suspended until the following autumn quarter
35  commences.
36

37  *4.6.2 Provost Statement*
38
39  The provost shall issue a formal statement to the president of the Faculty Council and the
40  president of the Staff Council, indicating and providing documentary support of the
41  existence of financial exigency.  The statement will address the following points:
42
43  1. Evidence of financial exigency and the need for serious retrenchments involving the
44      termination of tenured faculty;

July 1, 2018

1    2. Evidence in support of assumptions underlying projections of future revenues and
2        costs;
3    3. Dollar amount and distribution of the retrenchments that have been made or can be
4        made in all parts of the university without terminating tenured faculty appointments,
5        including possible administrative salary reductions; and
6    4. Dollar amount of decrease in expenditures to be realized in colleges that will result in
7        the termination of tenured faculty appointment(s).
8

9    *4.6.3 Financial Exigency Committee*
10

11    The statement by the provost shall be reviewed by a Financial Exigency Committee to
12    determine whether there is sufficient evidence to declare financial exigency. The
13    committee shall consist of four tenured faculty members (none of whom hold
14    administrative appointments at the level of Associate Dean or above), one staff member,
15    one student, one representative of the Board of Trustees, the executive vice president and
16    the provost (ex officio). The committee will select one of its members to act as chair.
17    Faculty Council will appoint the faculty members; Staff Council will select the staff
18    member; Student Government Association will select the student member; and the Board
19    of Trustees will select its representative. Members of the committee may be chosen from
20    any area of the university. The executive vice president shall convene the committee
21    within two weeks upon receipt of the statement from the provost.
22

23    Within two weeks of request, the university shall provide the Financial Exigency
24    Committee with all university data necessary to evaluate the provost's statement. This
25    data must include (1) records of current and past operations and financial position, and
26    (2) projections of future operations and financial position.  When necessary, the
27    committee may also invite faculty, staff, or other knowledgeable persons to provide
28    information. The committee shall keep a formal record of its deliberations and votes
29    within 30 days of receipt of the requested financial information, the committee will
30    evaluate the financial data, and vote on whether a condition of financial exigency exists
31    that requires the termination of tenured faculty. The committee will issue a report. If the
32    committee finds that financial exigency exists, its report on financial reductions shall
33    consider the university's complete set of financial statements, not simply revenues and
34    costs.  The committee shall carefully consider whether and how the university's real
35    estate and other assets might be sold, refinanced or otherwise reallocated.

36    If the committee concludes that such financial exigency exists, the report must include
37    the amount of reduction needed (1) in the areas of academic affairs that are not part of the
38    schools and colleges, and (2) in the colleges and schools. If the committee concludes that
39    no such financial exigency exists, the report must include a rationale for this conclusion.
40
41    The report of this committee will be sent to the Faculty Council, Staff Council, and the
42    Student Government Association for review and comment. All comments are due to the
43    Financial Exigency Committee within 30 days of receipt.  The Financial Exigency
44    Committee will send its report and any comments from the councils and SGA to the
45    university president for final decision.

July 1, 2018

1
2

### 4.6.4 Retrenchment Committee

In the event that the president of the university concludes that financial exigency exists, the provost will prepare a proposal indicating the specific methods for dealing with the financial exigency, including (1) the amount of the financial reductions outside of the schools and colleges, (2) the amount of financial reductions within each school and college, (3) the nature and timing of the retrenchments, and (4) the effects of these retrenchments on specific academic programs.

This proposal will be submitted to a Retrenchment Committee consisting of three tenured faculty members (none of whom hold administrative appointments at the level of Associate Dean or above) appointed directly by the Faculty Council, one college dean chosen by the Dean's Council, and the provost. The committee will select one of its members to act as chair. The three tenured faculty members must be chosen from different colleges within the university.  Members of the committee must understand and agree that they do not represent their academic units. They must take into account the seriousness of the situation and make decisions based on the best long-term interests of the university.

The provost shall also submit the proposal to the dean of each affected school or college who, after consulting with his/her faculty, may present a written recommendation to the Retrenchment Committee as to how the required reduction could be achieved.

Before the Retrenchment Committee reaches any decision, it must provide the affected faculty and staff the recommendations and the opportunity to respond in writing to the provost's and deans' recommendations. The Retrenchment Committee will also convene a meeting open to all tenured faculty, at which it will consult the faculty and respond to their concerns. The provost's recommendation, as well as any dean's recommendation, must be made available to the tenured faculty no less than two weeks before the open meeting.

To achieve the specified amount of financial reduction, the Retrenchment Committee will make a final decision that states:

1. The dollar amount of reduction required of each school or college, other than by termination of full-time faculty;
2. The dollar amount of reduction in each college through the termination of full-time faculty; and
3. A list of academic units financially capable of absorbing faculty transfers/affiliation from other units including an estimate of the number of tenured positions that could be accommodated in each.

12

July 1, 2018

1   The Retrenchment Committee shall send its final decision to the provost, the deans of
2   affected colleges and schools, the president of Faculty Council, the president of Staff
3   Council, and the president of the Student Government Association.

4   *4.6.5 Termination Committee(s)*
5
6   Based on the decision of the Retrenchment Committee, Faculty Council shall constitute a
7   Termination Committee for each college that must terminate faculty due to the
8   retrenchment. Each Termination Committee shall consist of three tenured faculty
9   members appointed directly by Faculty Council; the members shall be drawn from
10  outside the affected college and shall not be affiliated with the programs or departments
11  in which retrenchments have been mandated. Faculty members who hold administrative
12  appointments at the level of associate dean or above are ineligible to serve. The
13  Committee shall select one of its own members as chair.

14  The chair of each Termination Committee shall call for the dean of the affected college to
15  consult with local academic unit officers and then submit to the Termination Committee a
16  proposal specifying which faculty will be terminated. If a college is to be phased out or if
17  colleges are to be merged, the provost shall submit the proposal after consultation with
18  the local academic unit officers and relevant deans.

19  Faculty from affected units will be given the opportunity to submit written statements,
20  including CVs and other relevant materials that discuss their qualifications and the
21  rationale for their retention.

22  The dean or provost, in making his or her proposals for termination, and the Termination
23  Committee, in evaluating the proposals, are to decide according to the following criteria
24  and in this order of priority:
25
26      1. Program viability: faculty required for a viable academic program may be
27         retained if the program itself is not to be phased out. Quality of faculty
28         performance may be considered in evaluating whether a faculty member is
29         required for a viable academic program. In extraordinary circumstances, where a
30         serious distortion of the academic program would otherwise result, one or more
31         non-tenured faculty members may be retained. Materials submitted by the
32         affected faculty member(s) must be considered by the Termination Committee
33         along with other relevant material.
34      2. Tenure: tenured faculty are to be retained over non-tenured faculty; and
35      3. Seniority: more senior faculty are to be retained over less senior faculty. Seniority
36         is defined first by rank and second by years in rank.
37
38  In evaluating the proposals and the application of the above criteria, the Termination
39  Committee will comply with the university's equal employment opportunity policies and
40  procedures.
41

13

July 1, 2018

1   The Termination Committee(s) will submit their recommendations to the provost, the
2   deans of the affected units, the department chairs or program heads, and the president of
3   the Faculty Council.
4
5   The provost makes the final determination on termination. Only in rare instances and for
6   compelling reasons will the provost overturn a recommendation made by the Termination
7   Committee. If the provost's decision differs from the recommendation, the provost must
8   prepare a written explanation and provide it to the deans of the affected units, the
9   department chairs or program heads, and the president of the Faculty Council.
10

11  **_4.6.6 University Obligations upon Termination of Tenured Faculty_**
12

13  1.  If a tenured faculty member designated for termination believes he or she is
14      qualified to be transferred, he or she must identify at least one local academic unit
15      or college which was identified by the retrenchment committee as capable of
16      absorbing faculty transfers. The affected faculty member will have the
17      opportunity to submit a written statement regarding his or her fitness to serve as a
18      tenured faculty member in each of the identified units. The faculty member is
19      entitled to attach to his or her written statement any relevant documents or
20      materials. The faculty member may describe any additional training that might be
21      appropriate. The faculty member has the right to access all relevant available
22      information within the university to assist in identifying the units in which he or
23      she would be qualified to serve and to assist in preparing the written statement.
24
25      If the faculty member designated for termination requests a transfer, the local
26      academic unit officer of each of the identified units
27      a)  Must call a meeting of all the eligible faculty of that unit to vote on the
28          transfer of the faculty member to that unit,
29      b)  Must circulate, prior to that meeting, to all such eligible faculty, on a
30          confidential basis, the faculty member's written statement,
31      c)  Must provide an opportunity for the faculty member to make an oral
32          presentation to the eligible faculty of the unit and to answer questions,
33      d)  Must hold a vote of eligible faculty when a quorum is present. A majority vote
34          of the eligible tenured faculty in attendance is necessary and sufficient to
35          accept the faculty member.
36
37      Should more than one unit accept the faculty member, the faculty member must select
38      one. Upon the faculty member's selection of a unit for transfer, the provost will take
39      necessary steps to effectuate the transfer.
40
41  2.  Should no unit accept the faculty member, then the terminated faculty member shall
42      be entitled to no less than twelve months' notice of termination or a payment equal to
43      the faculty member's contract salary and benefits for an equal length of time. A
44      faculty member who has been tenured at the university for fifteen years or more of
45      continuous tenured service shall be entitled to a minimum of twenty-four months'

14

July 1, 2018

1  notice of termination or a payment equal to the faculty member's contract salary and
2  benefits for an equal length of time.
3

4  3.  The university is obligated not to approve new full-time faculty hires in a terminated
5      faculty member's areas of expertise (defined as courses that the faculty member has
6      either previously taught or is qualified and willing to teach) within a three-year period
7      unless the terminated faculty member has been offered reinstatement with reasonable
8      time in which to accept or decline. Within this three-year period after retrenchment
9      and termination, no more than three additional quarter-length or two semester-length
10     course sections per year may be offered by adjunct or term faculty within the
11     terminated faculty member's areas of expertise. In instances where the University
12     finds compelling need to offer more than three additional quarter-length or two
13     semester-length course sections per year in a terminated faculty member's areas of
14     expertise through the use of adjunct or term faculty, the provost will bring a proposal
15     to Faculty Council for its approval.
16

17  4.  The university is obligated not to approve additional full-time faculty positions
18     outside of terminated faculty members' areas of expertise, including in other
19     academic programs or units of the university over a three-year period except in
20     extraordinary circumstances where such faculty appointments are needed to sustain
21     growth or maintain academic programs. In such instances, the provost will bring a
22     proposal to Faculty Council for its review. Only in rare instances and for compelling
23     reasons will the provost overturn the recommendations of Faculty Council.
24

25  *4.6.7 Appeal of Termination*
26

27  A tenured faculty member notified of termination because of financial exigency has a
28  right to appeal to a faculty committee regarding the selection of the area and type of
29  retrenchment and selection of specific faculty appointments to be terminated.  See
30  Chapter 5.

31  **4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial**
32  **Reduction of an Academic Unit or Program**

33

34  The university may discontinue or substantially reduce an academic unit or program. Such
35  decisions must be based on educational concerns and the institution's overall educational mission.
36  If a proposal for discontinuance or substantial reduction involves curricular change but not
37  termination of tenured faculty, it shall be vetted according to Faculty Council's regular policies
38  and procedures. If the proposal does involve termination of tenured faculty, then the following
39  steps must be followed instead.
40

41  All of the specified steps must take place during the normal academic year.
42

July 1, 2018

### *4.7.1 Step 1*

The dean of the college responsible for the academic unit in question or the provost shall submit a formal proposal ("the Proposal") to the Faculty Council. The dean or provost shall also share the Proposal with the faculty of the unit(s) affected by the proposed changes.

The Proposal should address the following:

1. The extent and scope of the discontinuance or substantial reduction of the academic unit or program, including the number of faculty to be terminated and the nature of the curricular change, if any;
2. Justification and rationale for the proposed reduction or discontinuance of the academic unit or program (including criteria typically used to evaluate the discontinuance or substantial reduction of programs);
3. Justification and rationale for the termination of faculty as a result of the discontinuance or substantial reduction of the academic unit or program;
4. Explanation of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, aligns with the university's academic priorities and educational mission;
5. Description of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, will affect the academic quality of the institution;
6. Description of the specific steps to be taken in restructuring or phasing out the unit and a proposed timeline (e.g., merging with another unit, shrinking or discontinuing a particular program within or across units).

### *4.7.2 Step 2*

Faculty Council shall constitute a Review Committee of five tenured faculty members to evaluate the Proposal and prepare a report and recommendations for the Faculty Council. No member of the Review Committee may be from a unit to be affected by the discontinuance or substantial reduction. The Review Committee shall submit the Proposal and its report to the Faculty Council and to the tenure-line faculty members attached to any unit directly affected by the proposed reductions or eliminations. The tenured faculty members also have a right to submit, individually and/or as a group, a statement to Faculty Council. This statement must be submitted, within twenty calendar days of the receipt of the documents, to Faculty Council.

### *4.7.3 Step 3*

Faculty Council, after receiving the report of the Review Committee and statements from tenured faculty members at the Faculty Council meeting, will vote on the Proposal within two months. All votes on discontinuance or substantial reduction must be conducted by secret ballot. If Faculty Council accepts the Proposal from the dean/provost, it will forward its decision to the university president.

If Faculty Council rejects the Proposal, it will provide its reasons and rationale and make specific recommendations for revision to the dean/provost. It may also request a meeting with dean/provost in order to discuss its concerns and make its reservations clear. The dean/provost may then revise the Proposal in light of these recommendations and resubmit the Proposal to Faculty Council for its final vote.

July 1, 2018

1  ### 4.7.4 Step 4
2  If Faculty Council accepts the Proposal, it will forward its decision to the university president and
3  full-time faculty members of all affected units or programs. The tenure-line faculty members
4  attached to any unit directly affected by the proposed reductions or eliminations have a right to
5  the records used in the deliberation process. The tenured faculty members also have a right to
6  submit, individually or as a group, within twenty calendar days of the Faculty Council decision, a
7  statement to the university president explaining a position contrary to that decision.
8
9  The university president shall not make a decision without considering the statements submitted
10  by the tenured faculty members affected by proposed discontinuance or substantial reduction. The
11  university president shall either accept the Proposal or, under exceptional circumstances, revise
12  the Proposal and resubmit to Faculty Council for a vote within thirty calendar days of notification
13  of the Faculty Council decision.
14
15  Faculty Council will make the final decision on the Proposal.

16  ### 4.7.5 Step 5
17  Should the Proposal be accepted by the university president, Faculty Council, within fifteen
18  calendar days, shall constitute a Termination Committee of three tenured faculty members; the
19  members shall be drawn from outside the affected college and shall not be affiliated with the
20  affected academic units or programs. Faculty members who hold administrative appointments at
21  the level of associate dean or above are ineligible to serve. The Termination Committee shall
22  select one of its own members as chair.
23
24  Within fifteen calendar days of the president's decision, the dean of the affected college, in
25  consultation with local academic unit officers, will submit to the Termination Committee a
26  proposal ("Termination Proposal") specifying which faculty affiliated with the affected program
27  or unit will be terminated. If a college is to be eliminated or if colleges are to be merged, the
28  provost shall consult with the local academic unit officers and relevant deans and then submit the
29  Termination Proposal to the Termination Committee.
30
31  The tenured faculty members from affected units will be given the opportunity to submit written
32  statements, including CVs and other relevant materials that discuss their qualifications and the
33  rationale for their retention to the Termination Committee.
34
35  The dean or provost, in making his or her Termination Proposal, and the Termination Committee,
36  in evaluating the Termination Proposal, are to decide according to the following criteria and in
37  this order of priority:
38
39  1.  Program viability: faculty required for a viable academic program may be retained if the
40      program itself is not to be phased out. Quality of faculty performance may be considered
41      in evaluating whether a faculty member is required for a viable academic program. In
42      extraordinary circumstances, where a serious distortion of the academic program would
43      otherwise result, one or more non-tenured faculty members may be retained. In such
44      circumstances the Termination Committee must explain why a particular faculty
45      member's expertise is no longer needed. Materials submitted by the affected faculty
46      member(s) must be considered by the Termination Committee along with other relevant
47      material.
48  2.  Tenure: tenured faculty are to be retained over non-tenured faculty; and

17

July 1, 2018

3. Seniority: more senior faculty are to be retained over less senior faculty. Seniority is defined first by rank and second by years in rank.

In evaluating the Termination Proposal and the application of the above criteria, the Termination Committee will comply with the university's equal employment opportunity policies and procedures.

The Termination Committee, within thirty calendar days of receiving the Termination Proposal, will submit its recommendations to the provost, the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

The provost makes the final determination on termination. Only in rare instances and for compelling reasons will the provost overturn a recommendation made by the Termination Committee. If the provost's decision differs from the recommendation, the provost must prepare a written explanation and provide it to the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

### 4.7.6 University Obligations upon Termination of Tenured Faculty

1. If a tenured faculty member designated for termination believes he or she is qualified to be transferred, he or she must identify at least one local academic unit or college. The affected faculty member will have the opportunity to submit a written statement regarding his or her fitness to serve as a tenured faculty member in each of the identified units. The faculty member is entitled to attach to his or her written statement any relevant documents or materials. The faculty member may describe any additional training that might be appropriate. The faculty member has the right to access all relevant available information within the university to assist in identifying the units in which he or she would be qualified to serve and to assist in preparing the written statement. Within thirty calendar days of receipt of the information from the university, the faculty member must submit a request for transfer to each of the identified units.

   If the faculty member designated for termination requests a transfer, the provost must inform the local academic unit officers of each of the identified units. Within forty five calendar days of the provost's notification, the local academic unit officers of the identified units;
   a) Must call a meeting of all the eligible faculty of that unit to vote on the transfer of the faculty member to that unit;
   b) Must circulate, prior to that meeting, to all such eligible faculty, on a confidential basis, the faculty member's written statement;
   c) Must provide an opportunity for the faculty member to make an oral presentation to the eligible faculty of the unit and to answer questions;
   d) Must hold a vote of eligible faculty when a quorum is present. A majority vote of the eligible tenured faculty in attendance is necessary and sufficient to accept the faculty member.

   Should more than one unit accept the faculty member, the faculty member must select one. Upon the faculty member's selection of a unit for transfer, the provost will take necessary steps to effectuate the transfer.

18

July 1, 2018

2. Should no unit accept the faculty member, the university will make every effort to place the faculty member concerned in another suitable university position for which the person is qualified. If placement in another university position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered.

3. If no position is available within the institution, with or without retraining, or if the faculty member chooses not to pursue another position within the university, the tenured faculty member's appointment will be terminated. The terminated tenured faculty member shall be entitled to a severance payment equal to twenty-four months' contract salary and benefits.

4. The university is obligated not to approve new full-time faculty hires in a terminated faculty member's areas of expertise (defined as courses that the faculty member has either previously taught or is qualified and willing to teach in any academic unit) within a three-year period unless the terminated faculty member has been offered reinstatement with reasonable time in which to accept or decline. Within this three-year period, no more than three additional quarter-length or two semester-length course sections per year may be offered by tenured or non-tenured faculty within that faculty member's areas of expertise. In instances where the university finds compelling need to offer more than three additional quarter-length or two semester-length course sections per year in a terminated faculty member's areas of expertise through the use of tenured or non-tenured faculty, the provost will bring a proposal to Faculty Council for its approval.

### 4.7.7 Appeal of Termination

A tenured faculty member notified of termination because of discontinuance or substantial reduction of an academic unit or program has the right to appeal to a faculty committee regarding the selection of his or her specific faculty appointment for termination. See Chapter 5.

## 4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months

If illness or disability prevents a faculty member from performing his or her university obligations and duties, the faculty member may request a medical leave under the university's Family and Medical Leave Act policy and the Sick Pay, Short and Long Term Disability policy. All medical leaves are subject to the policies and procedures of the applicable leave and benefit programs, including physician certification of illness or disability and ability to return to work. Information about university leave and benefit programs are described at the Human Resources website.

A tenured faculty member who goes on approved Long Term Disability leave may resume his or her university position at any time within thirty-six consecutive months of the first day of Short Term Disability leave if the faculty member is able to fulfill his or her university obligations and duties, with or without reasonable accommodation. If, after the thirty-six month period, the tenured faculty member remains unable to fulfill his or her university obligations and duties, with or without a reasonable accommodation, the tenured appointment may be terminated.

If a faculty member's appointment is terminated under this section and he or she thereafter becomes able to return to work and resume the obligations and duties of a tenured faculty member, and the faculty member's former appointment is vacant, he or she will be returned to the

19

July 1, 2018

1   former appointment at the same rank.  If the former appointment is no longer available and there
2   is a vacant faculty appointment for which he or she is qualified, the university will give the
3   former faculty member's application strong consideration.  Such a faculty member, if appointed,
4   shall be appointed at his or her prior rank and at the salary associated with the vacant faculty
5   appointment.
6
7   A tenured faculty member whose appointment is terminated under this section may appeal the
8   termination. See Chapter 5.
9

10   **4.9 Resignation**
11
12   A faculty member who wishes to resign shall do so by submitting a written notice of resignation
13   to the dean and local academic unit officer with a proposed effective date.
14

15   **4.10 Retirement**
16
17   A faculty member who wishes to retire shall do so by submitting a written notice of retirement to
18   the dean and local academic unit officer with a proposed effective date. DePaul University has no
19   mandatory retirement age for faculty.

1 # CHAPTER 5. APPEALS AND GRIEVANCES
2

3  5.1 Appeals ............................................................................................................ 2
4      5.1.1 Appeals Committee and General Process ................................................ 2
5          5.1.1.1   Faculty Committee on Appeals.......................................................... 2
6          5.1.1.2   Notification of Intent.......................................................................... 2
7          5.1.1.3   Preliminary Review ........................................................................... 3
8          5.1.1.4   Investigation and Determination........................................................ 3
9          5.1.1.5  Modified Procedures When Academic Freedom Violation is Alleged (Term
10      Faculty)  3
11          5.1.1.6  Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line
12      Faculty)  4
13      5.1.2  Tenure-Line Faculty Appeals ................................................................. 6
14          5.1.2.1    Nonrenewal of Untenured Tenure-Line Faculty  Prior to the Tenure Decision ..... 6
15          5.1.2.2   Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary
16      Period Contract for Reasons Other than Misconduct........................................... 7
17          5.1.2.3  Denial of Promotion or Tenure .......................................................... 8
18          5.1.2.4  Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six
19      Months   9
20          5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency ................................. 10
21          5.1.2.6  Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of
22      an Academic Unit ................................................................................... 11
23          5.1.3.2    Non-Reappointment of Term Faculty.................................................. 14
24      5.1.4  Other Faculty ........................................................................................ 14
25  5.2  Grievances.......................................................................................................... 16
26      5.2.1  Definition ............................................................................................. 16
27      5.2.2  Procedures for Faculty Grievances ........................................................ 17
28          5.2.2.1 Administrative Grievance  Process ..................................................... 17
29          5.2.2.2  Grievance Board Procedures................................................................ 18
30      5.3.  Right to Review Personnel Records ........................................................ 19
31

# CHAPTER 5.  APPEALS AND GRIEVANCES

Appeal procedures are limited to: dismissal or nonrenewal of contract for tenure-line faculty; denial of tenure and promotion for tenure-line faculty; dismissal during the contract term for term faculty, and non-reappointment of term faculty.

Grievance procedures are available to all faculty for issues other than denial of promotion and tenure, dismissal, nonrenewal and non-reappointment.  A grievance is a written complaint concerning a decision made by a person with authority in the University.  The grievance must be filed by the individual adversely affected by the decision.

## 5.1 Appeals

Appeals are to be conducted in accordance with the procedures specified below.  Each procedure is specific to the type of appeal.

### 5.1.1 Appeals Committee and General Process

The faculty member bears the burden of proof. Failure by the faculty member to submit requested materials within designated deadlines shall constitute a failure to meet the burden of proof. The standard of proof is preponderance of the evidence.

#### 5.1.1.1  Faculty Committee on Appeals

The Faculty Committee on Appeals is a standing committee of the Faculty Council. It comprises twelve tenured faculty members selected by the Faculty Council through the usual committee selection process. If the committee finds that, in a given case, a member has either a conflict of interest or the appearance of one, the committee will exclude the member from participation.   Grounds for recusal include serving in the appellant's local academic unit, participating in evaluation of the appellant, or having a significant personal relationship with the appellant.

The Faculty Committee on Appeals will assign three of its members to serve as an Appeals Board to hear a case.

If the appellant raises an allegation of discrimination, the Appeals Board must refer the discrimination allegation to University EEO Resources which, in coordination with the Appeals Board, will conduct an investigation and submit a report to the Appeals Board in a timely manner.

#### 5.1.1.2  Notification of Intent

A faculty member begins an appeal by filing a written notice of intent to appeal with the president of Faculty Council who will forward the notice to the chair of the Faculty Committee on Appeals. The notice must specify the grounds for appeal. The appellant may not add or change appeal grounds after submitting the notice of intent to appeal.

July 1, 2018

### 5.1.1.3  Preliminary Review

When a faculty member appeals, the Appeals Board will conduct a preliminary review to determine whether the allegations as stated in the appeal, if fully substantiated after investigation, could reasonably be found to establish one or more of the grounds for appeal. If one of the grounds is discrimination, the Appeals Board must consult with the Office of Employee Engagement and Equal Employment Opportunity or the Title IX Coordinator, as appropriate ("University EEO Resources")before making a determination on that ground. Each ground appealed requires a separate determination as to whether the appeal will go forward on that ground.  If, after the preliminary review, the Appeals Board determines that an appeal should go forward on one or more grounds, it will then investigate the faculty member's allegations.

If the Appeals Board decides by a majority that an appeal does not satisfy the criteria, the Appeals Board will forward its recommendation to the appropriate academic officer (either the provost or the president), with a copy to the faculty member and the lower-level academic officers. The recommendation must state the reasons for not considering the appeal. The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

The Appeals Board transactions are confidential and not open to persons other than those explicitly invited to participate. Written minutes shall be kept of its meetings which shall be available only to the appropriate academic officer (either the provost or the president).

### 5.1.1.4  Investigation and Determination

If an appeal moves forward, the Appeals Board may request interviews with, and materials from, the faculty member, the dean, and any evaluating committee. The Appeals Board may take any reasonable action that it deems appropriate or helpful to its deliberations.  In every case the Appeals Board must interview the author of any report that recommended against renewal or promotion and tenure and any academic officer who recommended dismissal.  The Appeals Board is charged only with reviewing the basis of the appeal; it does not perform an independent evaluation of the faculty member's qualifications. Each ground appealed requires a separate determination.

### 5.1.1.5  Modified Procedures When Academic Freedom Violation is Alleged (Term Faculty)

A term faculty member's allegation of an academic freedom violation is serious, not to be made or received lightly.

The university has no obligation to reappoint term faculty members beyond the terms of their contracts.

If a term faculty member alleges a violation of academic freedom, the Appeals Board will conduct a preliminary review as described in Section 5.1.1.3. If the Appeals Board concludes that the appeal does not satisfy the criteria for a violation of academic freedom, the faculty member will have the option to submit a written response to the report which must be provided to the provost and the Appeals Board for inclusion in the appeal record. The provost may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

July 1, 2018

If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining term faculty member a written statement indicating the basis for the academic freedom allegation. The Appeals Board shall receive from the faculty member's dean a written statement of the reason(s) for the challenged decision and/or a statement of the procedures followed in reaching the challenged decision. The dean must submit these items to the Appeals Board within ten business days after the chair of the Appeals Board requests them. The Appeals Board will afford the term faculty member and the dean the opportunity to respond in writing and may also request further information.

For the Appeals Board to conclude that the challenged decision violated the faculty member's academic freedom, a majority of the Board must find that the violation was the causal basis for non-reappointment or termination.

The Appeals Board will prepare a written analysis and conclusion regarding the allegation of an academic freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the provost for final decision, with copies to the faculty member and dean.

**5.1.1.6  Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line Faculty)**

A tenure-line faculty member's allegation of an academic freedom violation is serious, not to be made or received lightly.

The university has no obligation to renew the contracts of untenured tenure-line faculty members. Tenured faculty have the right to a continuous appointment except as provided in Chapter 4 of the Faculty Handbook.

If a tenure-line faculty member alleges a violation of academic freedom, the Appeals Board will conduct a preliminary review on this ground. If the Appeals Board decides by a majority that an appeal does not satisfy the criteria for a violation of academic freedom, the Appeals Board will forward its recommendation to the appropriate academic officer (either the provost or the president), with a copy to the faculty member and the lower-level academic officers. The recommendation must state the reasons for not considering the appeal. The faculty member will have the option to submit a written response to the report which must be provided to the appropriate academic officer (either the provost or the president) and the Appeals Board for inclusion in the appeal record.
The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining faculty member a written statement indicating the basis for the allegation of an academic freedom violation. The Appeals Board shall receive from the faculty member's dean or provost, where applicable, a written statement of the reason(s) for the challenged decision and/or a statement of the procedures followed in reaching and reviewing the challenged decision. The dean or provost must submit these items to the Appeals Board within ten business days after the request by the chair of the Appeals Board.

Upon receipt of the written statements, the Appeals Board will conduct a formal hearing in order to make a recommendation on the alleged academic freedom violation.

The two parties have the following prerogatives in the formal hearing:

4

July 1, 2018

1.    To obtain in advance of the hearing a list of witnesses the other party intends to call;

2.    Upon written request, to inspect before the formal hearing all documents that the Appeals Board in its prehearing meetings has collected and deemed relevant to its deliberations, in a manner determined by the Appeals Board (provided that the Appeals Board shall require both parties to keep the contents in strict confidence);

3.    To select an academic advisor or counsel of their own choosing, provided that advisor or counsel may not participate in the hearing but may be present;

4.    To cross examine witnesses;

5.    To have sufficient time to prepare evidence and to have adjournments upon the valid claim of unforeseen occurrences during the hearing.

The faculty member has the following additional prerogatives in the formal hearing:

1.    To decline to testify, without prejudice, at the hearing without restricting the prerogative of supporting evidence;

2.    To invite a representative of a responsible educational association as an observer to the hearing.

The responsibilities and prerogatives of the hearing Appeals Board in conducting its procedures are:

1.    It has the right to all the information and documents it needs, without being obligated by strict rules of legal evidence and legal procedures, exercising due precaution not to divulge the contents of documents normally considered confidential;

2.    It may conduct prehearing meetings to clarify issues and otherwise provide for an effective and efficient hearing;

3.    It may take whatever time is required for a fair and complete hearing, while avoiding unnecessary delays;

4.    It may formulate its own additional rules of procedure not contrary to the procedures of this document;

5.    It shall keep a verbatim record of the hearings, which shall be available to the parties without cost.

The university will assume all costs directly incurred by the hearing Appeals Board. If the faculty member employs an attorney for the hearing, and the appeal is upheld, the university will reimburse the faculty member for at least one-half of the reasonable legal expenses incurred during the formal hearing, the precise proportion to be decided by the Appeals Board.

During the process of the hearing, neither party may make public statements about the proceedings. The Appeals Board may make public statements regarding the status of the proceedings.

In order for the Appeals Board to come to the conclusion that the challenged decision violated the faculty member's academic freedom, a majority of the Appeals Board must find that the violation was the causal basis for the challenged decision.

5

July 1, 2018

The Appeals Board will prepare a written analysis and conclusion regarding the alleged academic freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the provost or president, as appropriate, for final decision, with copies to the faculty member and dean.

### *5.1.2 Tenure-Line Faculty Appeals*

Untenured tenure-line faculty may appeal:

1. Nonrenewal prior to the tenure decision (Section 5.1.2.1)

2. Dismissal during the contract period prior to tenure (Section 5.1.2.2)

3. Denial of promotion or tenure (Section 5.1.2.3)

Appeals Board recommendations on appeals for denials of promotion and tenure go to the president for final decision. Appeals Board recommendations on other types of appeals for untenured tenure line faculty go to the provost for final decision.

Tenured faculty may appeal:

1. Termination due to Medical Disability or for Medical Reasons (Section 5.1.2.4)

2. Termination due to Financial Exigency (Section 5.1.2.5)

3. Termination due to Discontinuance or Substantial Reduction of an Academic Unit (Section 5.1.2.6)

4. Denial of Promotion (Section 5.1.2.3)

Tenured faculty may not appeal suspension or termination for misconduct but have the right to pre-dismissal and pre-suspension hearings as described in Chapter 4.

Appeals Board recommendations on appeals go to the provost or president, as specified in the applicable section, for final decision.

### 5.1.2.1 Nonrenewal of Untenured Tenure-Line Faculty Prior to the Tenure Decision

Grounds for Appeal

An untenured tenure-line faculty member may appeal the decision not to renew his or her probationary period contract. The appeal must be based on one or more of the following grounds:

1. The nonrenewal violated the faculty member's academic freedom.

2. The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

3. The nonrenewal was the result of discriminatory practices prohibited by

July 1, 2018

university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to renewing the faculty member's contract. The provost's decision is final.

Calendar for the Appeals Process

By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the president of Faculty Council. By the first day of fall term of the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the provost no later than January 15. The provost must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.2 Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary Period Contract for Reasons Other than Misconduct**

Untenured tenure line faculty have no right of appeal under this section in cases in which they have had a hearing under section 4.4

Grounds for Appeal

An untenured tenure-line faculty member may appeal dismissal during the term of a probationary period contract. The appeal must be based on one or more of the following grounds:

1. The dismissal violated the faculty member's academic freedom.

2. The process by which the decision to dismiss was made applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

July 1, 2018

3.    The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for this appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review. The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.3 Denial of Promotion or Tenure**

**Grounds for Appeal**

A faculty member may appeal the decision to deny an application for tenure or promotion. The appeal must be based on one or more of the following grounds:

1.    The decision violated the faculty member's academic freedom.

2.    The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

3.      The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the president. The faculty member will have the option to submit to the president a written response to the report.

**Final Decision**

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member, the provost, and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to awarding tenure or promotion. The president's decision is final.

**Calendar for the Appeals Process**

By June 30, the faculty member must state his or her intent to appeal in writing to the president and the president of Faculty Council. By the first day of fall term of the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the president, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the president no later than January 15. The president must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.4  Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months**

Grounds for Appeal

A tenured faculty member may appeal termination under Chapter 4, Section 4.8. The appeal must be based on one or more of the following grounds:

1.      The termination violated the faculty member's academic freedom.

2.      The process by which the decision to terminate was made applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3.      The termination was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

July 1, 2018

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At the preliminary review, the Appeals Board  must establish a clear timeline for the  appeal and distribute it to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the president within 30 business days of the preliminary review.  The president must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

### 5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency

Grounds for Appeal

A tenured faculty member notified of termination because of financial exigency has a right to appeal. The appeal must be based on one or more of the following grounds:

1.  The selection of the area and type of retrenchment was not in accordance with the procedures set out in Chapter 4, Section 4.6.

2. The selection of specific faculty appointments to be terminated was not in accordance with the procedures set out in Chapter 4, Section 4.6.

3. The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

July 1, 2018

4. The university failed to meet its obligations as specified in Section 4.6.6 of the Faculty Handbook. A unit's vote not to accept the faculty member may be appealed only for failure to satisfy one or more of the criteria listed in section 4.6.6 (1)(a-d).

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit his or her supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the president within 30 business days of the preliminary review. The president must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.6  Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit**

Grounds for Appeal

A tenured faculty member notified of termination because of discontinuance or substantial reduction of an academic unit or program has the right to appeal the selection of his or her specific faculty appointment for termination. The appeal must be based on one or more of the following grounds:

1.      The selection of specific faculty appointments to be terminated was not in accordance with the procedures set out in Chapter 4, Section 4.7.

2.      The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

3.      The university failed to meet its obligations as specified in Section 4.7.6 of the Faculty Handbook.  A unit's vote not to accept the faculty member may be appealed only for failure to satisfy one or more of the criteria listed in Section 4.7.6 (1)(a-d).

4.      The termination decision violated the faculty member's academic freedom.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the termination, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate,  University EEO Resources.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

### 5.1.3 Term Faculty Appeals

Term faculty are limited to appeals of: (1) major sanctions during the contract term, and (2) non-reappointment on the grounds of a violation of academic freedom or discrimination in violation of university policies or federal, state, and local laws.

**5.1.3.1  Major Sanctions within the Contract Period**

July 1, 2018

**Grounds for Appeal**

The appeal must be based on one or more of the following grounds:

1. The major sanction violated the faculty member's academic freedom.

2. The process by which the major sanction was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the major sanction was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the term faculty member and the dean. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the term faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review. The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

July 1, 2018

**5.1.3.2  Non-Reappointment of Term Faculty**

Grounds for Appeal

A term faculty member may appeal the decision not to reappoint him or her. The appeal must be based on one or both of the following grounds:

1.      The non-reappointment violated the faculty member's academic freedom.

2.      The non-reappointment was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to renewing the faculty member's contract. The provost's decision is final.

Calendar for the Appeals Process

By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the president of Faculty Council. By the first day of fall term in the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for the case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate,  University EEO Resources.

The Appeals Board must send its final written recommendation to the provost no later than January 15. The provost must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

*5.1.4  Adjunct Faculty Appeals*

Adjunct faculty are limited to appeals of suspension or dismissal during the contract period.  The contract period is defined in the adjunct faculty's letter of appointment and is defined on a course by course basis. .

**5.1.4.1  Suspension or Dismissal During the Contract Period**

July 1, 2018

Grounds for Appeal

The appeal must be based on one or more of the following grounds:

1. The suspension or dismissal violated the faculty member's academic freedom.

2. The process by which the suspension or dismissal was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the suspension or dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

As outlined in Section 5.1.1.1, the Appeals Board will included three tenured faculty members. For an adjunct faculty appeal, the Faculty Committee on Appeals will select an adjunct faculty member who will act as a non-voting consultant to the Appeals Board. The role of the consultant will be to provide expertise on issues that uniquely affect adjunct faculty.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation. The Appeals Board shall submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The preliminary review will follow the process described in the Faculty Handbook Section 5.1.1.3. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the adjunct faculty member and the dean. If the provost grants the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. If the appeal is granted, the adjunct faculty member will be paid the amount due under the original contract appointment. The provost's decision is final.

Calendar for the Appeals Process

Due to the timing of adjunct faculty appointments, which frequently occur on a term-by-term basis, an expedited appeals process is necessary.

Within 5 business days of being informed of the suspension or dismissal, the adjunct faculty member must write to the provost and the president of Faculty Council, stating the adjunct's intent to appeal. Within 10 business days of submitting the written notice of intent to appeal, the adjunct faculty member will submit his or her supporting documentation. Within 5 business days of receipt of this documentation, the chair of the Faculty Committee on Appeals will convene the preliminary review by the Appeals Board.

The written recommendation from the Appeals Board must be completed and sent to the provost within 10 business days of the preliminary review. An allegation of discrimination will follow the timeline used in University EEO Resources. The provost must issue a final decision no later than 5 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously and reasonably as possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above are to be construed as maximums.

July 1, 2018

A failure by the affected adjunct faculty member to adhere to any time guidelines, except under extraordinary circumstance, shall result in forfeiture of all review rights. A failure by the Appeals Board or provost to adhere to any time guidelines, except under extraordinary circumstances, shall result in the adjunct faculty member being paid the amount due under the original contract appointment.

### 5.1.5 Other Faculty

Faculty with special appointments (as defined in 2.3.3) may not appeal reappointment or dismissal during their contract terms.

## 5.2 Grievances

Grievance procedures are available to all faculty (including all full-time and adjunct faculty) for issues other than denial of promotion and tenure, dismissal, nonrenewal, and non-reappointment. The grievance must be filed by the individual adversely affected by the decision.

Grievances are to be conducted in accordance with the procedures specified below.

### 5.2.1 Definition

A grievance is a written complaint concerning a decision made by a person with authority in the university. Grievances are limited strictly to the questioned decision and are open only to the persons directly and adversely affected by that decision. Grievances may not be used to question or change policy. A decision being grieved remains in effect unless the decision is suspended.

A decision is grievable if it meets all of the three following criteria:

1. It adversely affects the interests of an individual;
2. The affected individual is being treated differently from other persons of similar circumstances or the decision violates any policy of the university or the relevant academic unit; and

3. There is insufficient justification for the different treatment or the failure to comply with policy.

Specifically outside the scope of the grievance process are:

1. University policies.

2. Policy crafted by a deliberative faculty body.

3. Allegations of violations of the university's Anti-discrimination and Anti-harassment policy, which are handled by University EEO Resources.

Persons involved in the grievance process may share information concerning the process and substance of a grievance with other persons having a legitimate need for the information. Wider distribution creates potential risks to fairness and privacy. The grievance process is a key element of the university's shared governance. Deterioration of fairness and privacy, or even the perception of deterioration, would undermine the effectiveness of the university's faculty grievance process.

16

July 1, 2018

A tenured faculty member has the right to a formal grievance hearing after the fact if suspended by the provost without a prior hearing (Chapter 4, Section 4.4).

### 5.2.2 Procedures for Faculty Grievances

Prior to initiating a formal grievance, a faculty member should seek to resolve complaints with the individual who made the decision in question.

A formal grievance must be filed in writing with the faculty member's dean within 60 days after communication of the decision.

The grievance procedure has two steps:

> 1. Formal administrative grievance process
>
> 2. Faculty Grievance Board process

Faculty grievances begin with formal administrative process. This must be completed before the faculty member proceeds to the Faculty Grievance Board.

If a faculty member alleges discrimination at any point in a grievance, the dean or the Grievance Board must refer the grievance to University EEO Resources which, in consultation with the dean (if raised during the formal administrative process) or Grievance Board (if raised during the Grievance Board), will conduct an investigation and submit a report to the dean or Grievance Board in a timely manner.

### 5.2.2.1 Administrative Grievance Process

The dean of a college conducts the formal administrative grievance process. If the grievance challenges a decision of the faculty member's dean, the grievance will be heard by another dean selected by the provost with approval of the aggrieved faculty member.

Throughout the formal administrative grievance process, the burden of proof rests on the faculty member.

The faculty member must submit to the dean hearing the grievance a written statement explaining:

> 1. the precise nature of the grievance
>
> 2. information and evidence supporting the faculty member's position
>
> 3. a description of all informal attempts to resolve the complaint and the reasons why any proposed resolutions identified during the informal procedures were unsatisfactory to the faculty member, and
>
> 4. the remedies that the faculty member would consider satisfactory.

At the same time, the faculty member will provide a copy to the individual whose decision is being challenged. That individual may submit a written statement to the dean within ten business days of receipt of the faculty member's statement, with a copy to the faculty member.

July 1, 2018

The dean hearing the grievance provides a written report to the faculty member and the individual whose decision is being challenged within thirty calendar days after receiving their written statements. In the written report, the dean shall state the decision and what action, if any, is required to implement the decision.

Either party may appeal the dean's decision to the provost within ten business days of receiving the decision. The appeal must be in writing and supported by reasons for not accepting the dean's decision. The appealing party must provide the other party with a copy of the appeal to the provost. The provost may conduct another review and. will enter a written decision, within thirty calendar days after receipt of the appeal. The provost must send the written decision to both parties.

**5.2.2.2  Grievance Board Procedures**

If the faculty member who filed the grievance is unsatisfied with the provost's decision, he or she may, within ten business days of receiving the provost's decision, refer that decision to the judgment of faculty peers. The faculty member must submit a written request to the president of the Faculty Council to direct the Faculty Council Committee on Committees to select three tenured faculty members to serve as a Grievance Board. For a term or adjunct faculty grievance, the Committee on Committees will select a corresponding term or adjunct faculty member who will act as a non-voting consultant to the Grievance Board. The role of the consultant will be to provide expertise on issues that uniquely affect adjunct or term faculty. Faculty chosen for the Grievance Board may not serve in a grievant's local academic unit or have a significant personal relationship with the grievant. In cases brought to a Grievance Board, the burden of proof rests on the faculty member to establish that the administrative decision was unfair.

Within five business days of the establishment of the Grievance Board, the faculty member must submit to the Grievance Board and the provost a statement indicating the reasons why the decision of the provost is unfair. The provost may submit a response to the faculty member's statement within an additional five business days. The Grievance Board must request, and the provost must provide, the written record of the formal administrative process. New complaints, new evidence, and other new matters not addressed during the formal administrative process may not be introduced for the first time to the Grievance Board.

Preliminary Review

Upon receipt of the faculty member's grievance submission, the chair of the Grievance Board shall schedule the grievance for a preliminary review by the Grievance Board as soon as practicable. The Grievance Board has sole and unreviewable discretion whether to schedule the preliminary review meeting during the spring or summer break or wait until the university is back in regular session.

At the preliminary review meeting, the Grievance Board will determine:

1.     whether the grievance is timely;

2.     whether the matter grieved about is grievable under the procedures;

3.     whether the formal administrative grievance process has been followed; and

4.     whether the grievance materials submitted to the Grievance Board, if fully substantiated after investigation, could reasonably be found to satisfy the criteria set forth in this chapter.

18

1    If the Grievance Board decides by a simple majority that the grievance is not timely, is not grievable, did
2    not follow the formal administrative grievance process, or could not reasonably be found to satisfy the
3    criteria, the Grievance Board will forward its written decision to the provost, with a copy to the faculty
4    member. The decision must state the reasons for not considering the grievance.

5    Investigation and Review

6    If, after the preliminary review, the Grievance Board determines that the grievance warrants further
7    consideration, the Grievance Board will conduct a review. If, in the opinion of the Grievance Board, the
8    materials already submitted are not sufficient to make a determination, the Grievance Board may request
9    interviews with, or materials from, the faculty member or other individuals named in the grievance. The
10    Grievance Board may take any other reasonable actions that it deems appropriate or helpful to its
11    deliberations.
12
13
14    The Grievance Board will prepare a written report of its findings and recommendation, including the
15    majority and any minority views.  The Grievance Board will forward the report to the president, with
16    copies provided to the faculty member and the provost.
17
18    If a tenured faculty member has grieved over a sanction imposed on him or her and if the Grievance
19    Board declines to affirm the grievance, the faculty member may ask the president to make a final
20    determination. Otherwise, the decision of the Grievance Board is final.
21
22    If implementing the decision of the Grievance Board requires financial resources beyond what is usually
23    and customarily allocated to similarly situated faculty, the Grievance Board shall seek the approval of the
24    provost. If the provost does not approve the expenditure on the ground that sufficient resources are not
25    immediately available, the provost must provide in writing a reasonable timeline for implementing the
26    Grievance Board's decision or seek mutually agreed upon alternative ways to address the inequity or
27    remedy the unfair decision against the grievant.
28

29    ## 5.3.  Right to Review Personnel Records
30
31    Illinois law governs the right of employees to review their own personnel records. University policy
32    establishes the process for requesting such records.

July 1, 2018

# CHAPTER 6.  FACULTY RIGHTS AND RESPONSIBILITIES

6.1  Academic Freedom ................................................................................................ 3

6.2 Diversity Guidelines ............................................................................................. 3

6.3 Academic Support ................................................................................................. 3

6.3.1 Faculty Development and Research ................................................................. 3

6.3.2 Memberships .................................................................................................. 4

6.3.3 Travel Expenses ............................................................................................. 5

6.4 Faculty Responsibilities ........................................................................................ 5

6.4.1 Members of the Academic Profession ............................................................ 5

6.4.2 Members of DePaul University ...................................................................... 6

6.4.3 Teacher of Students ........................................................................................ 6

6.4.4 Academic Administrators ............................................................................... 6

6.5  Instructional Responsibilities .............................................................................. 7

6.5.1  Class Attendance ........................................................................................... 7

6.5.2 Class Cancellation .......................................................................................... 7

6.5.3  Inability to Meet a Class/Substitute Teaching ............................................... 7

6.5.4 Class Hours .................................................................................................... 8

6.5.5 Syllabus Requirements ................................................................................... 8

6.5.6  Course Examinations ..................................................................................... 8

6.5.7  Time for Submitting Final Grades ................................................................. 8

6.6 Workload ............................................................................................................... 8

6.6.1  Faculty Assignments ..................................................................................... 9

6.6.2  Responsibility for Assignments ..................................................................... 9

6.6.3  Teaching ........................................................................................................ 9

6.6.3.1 Full-time and Part-time Faculty ................................................................ 9

6.6.3.2  Administrators ........................................................................................... 9

6.6.3.3  Graduate Assistants and Fellows .............................................................. 10

6.6.3.4  Summer Session Assignments .................................................................. 10

6.6.4  Activities Outside the University .................................................................. 10

6.7 Leaves of Absence ................................................................................................ 11

July 1, 2018

1    6.8 Salaries ..................................................................................................... 12

2    6.9 Academic Policies ...................................................................................... 12

3    6.10 Establishing a New University Policy ....................................................... 12

4

July 1, 2018

# CHAPTER 6.  FACULTY RIGHTS AND RESPONSIBILITIES

DePaul University generally follows AAUP guidelines, except in instances where a policy is otherwise defined in this Handbook.

## 6.1  Academic Freedom

DePaul accords academic freedom a prominent position as an integral part of the university's scholarly and religious heritage. The university attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process. University precept and tradition protect this freedom from infringement. Not only the faculty but also students and other members of the university community enjoy this freedom as they participate in the various forms of open inquiry and debate, as for example, classroom presentation and discussion, research and publication, public statements made as a citizen in one's own name, and other forms of creative expression.

DePaul University is guided by the AAUP 1940 Statement of Principles on Academic Freedom and Tenure (with 1970 Interpretive Comments). However, the university expressly reserves the right to amend, alter, modify, and delete the same with the assent of the Faculty Council.

## 6.2 Diversity Guidelines

DePaul University has a long-standing commitment to ethnic and cultural diversity of its faculty, staff, and student body. As a university with a strong Catholic and Vincentian heritage, this commitment is particularly integral to our mission. It is also recognized that a multicultural experience is an essential part of DePaul.

Consistent with the Catholic and Vincentian heritage, DePaul University is committed to preserving an environment that respects the personal rights and dignity of each member of the community. Therefore, DePaul University does not tolerate harassment or discrimination, as, for example, set forth in the Anti-Discrimination and Anti-Harassment Policy and Procedures.

## 6.3 Academic Support

### 6.3.1 Faculty Development and Research

Since the university's mission statement places "highest priority on programs of instruction and learning." To further this objective, university sponsors a variety of professional development programs and awards recognizing outstanding achievement in teaching, scholarship, and/or creative activities, and service.  Development opportunities and awards include, among others:

- Paid faculty leaves
- University Excellence in Teaching Award
- Spirit of Inquiry Award

July 1, 2018

1   • Competitive instructional grants
2   • Summer stipends
3   • Departmental initiative grants
4   • Competitive research grants
5   • Research conference program.
6

7   The Office of Faculty Development & Research seeks to fulfill the university's commitment to
8   academic excellence by developing teacher/scholars at all academic career levels. The Office has
9   responsibility for programs, resources, and guidelines that support development, promotion, and
10  retention of talented and diverse faculty. Through the Office of Faculty Development &
11  Research, the provost provides internal grants to support faculty development initiatives and
12  sponsors awards to recognize outstanding faculty achievements.

13  The Office of Faculty Development and Research provides university-wide support for faculty
14  development through the Quality of Instruction Council (QIC), the University Research Council
15  (URC), and the Public Service Council (PSC). The Associate Vice President for the Office of
16  Faculty Development and Research chairs the three councils, which are composed of faculty and
17  academic administrators.

18  The Office also sponsors other opportunities, including new faculty orientation, tenure and paid-
19  leave workshops, and select international faculty language immersion programs. All programs
20  are intentionally competitive in nature to ensure the best use of available funds and to encourage
21  the development of proposal-writing skills. Applications regularly exceed available funding, and
22  applicants are encouraged to submit well-crafted projects that advance their scholarly objectives.

23  Faculty grants, awards, stipends, and leaves are peer reviewed by one of three academic councils.
24  The Associate Vice President for Faculty Development & Research chairs all three academic
25  councils. Council members are appointed by Faculty Council. The University Research Council
26  (URC) reviews and awards research grants, leaves, and the Spirit of Inquiry Awards. The Quality
27  of Instruction Council (QIC) reviews and awards instructional grants and leaves and the
28  Excellence in Teaching Awards. The Public Service Council (PSC) reviews and awards
29  instructional and research grants related to service learning courses and university-community
30  research projects. The PSC also reviews Excellence in Public Service Awards.

31  A more complete listing of professional development initiatives and guidelines can be found at
32  the Office of Faculty Development and Research.
33

34  *6.3.2 Memberships*
35

36  Although professional membership fees are the responsibility of individual faculty, the university
37  may reimburse individual a full-time faculty member up to $50.00 per membership for up to three
38  professional organizations per year, provided that the faculty member pays the first $25 of each
39  fee. The university does not pay for memberships in private clubs except with the president's
40  approval.
41

4

July 1, 2018

1    *6.3.3 Travel Expenses*
2
3    The university provides each academic unit with a travel budget to support faculty participation in
4    meetings of learned societies. Top priority for travel support belongs to the faculty member who
5    presents a paper, serves on a panel, acts as an officer of the society, represents the university (on
6    the authority or request of the chair or dean) in recruiting faculty, or serves in another official
7    capacity. Travel support is provided only from travel funds within the budget of the academic unit
8    and upon approval of the chair or dean, who is responsible for distributing travel funds among the
9    faculty who travel in an official role. Depending on the amount of money available in the travel
10   budget and the demands for these funds, the faculty members may receive partial or no support.
11
12   Travel compensation may be given for national or regional meetings. For meetings in the
13   metropolitan Chicago area, support is limited to incidentals such as registration fees. In all
14   instances, the university reimburses actual expenses for allowable items.

15   Faculty who attend meetings without taking one of the active roles listed above are usually
16   expected to cover their own expenses. However, if travel funds remain in the budget, the chair or
17   dean may approve support for not more than half of the travel expenses. Faculty members are
18   encouraged to plan travel as far in advance as possible and to keep chairs and deans advised to
19   these plans before budgets are prepared. For specific procedures, forms and guidelines, see the
20   Office of Financial Affairs.
21

22   **6.4 Faculty Responsibilities**
23
24   Membership in the academic profession, in professional societies and associations of higher
25   education, and in DePaul University entails special responsibilities. The more important of these
26   responsibilities are summarized here as a code of professional ethics. They are subject to
27   amendment from time to time through appropriate university action. Failure to comply with these
28   responsibilities renders a faculty member liable to appropriate sanction within the procedural
29   safeguards and provision for peer judgment.
30

31   *6.4.1 Members of the Academic Profession*
32
33   As a member of the academic profession, the faculty member has these obligations:
34

35     1.  To seek truth; to improve scholarly competencies for this purpose; to engage in
36        productive scholarship, research or other creative activities; and to uphold the scholarly
37        standards of one's academic discipline.
38     2.  To practice intellectual honesty; to acknowledge academic debts to others; and to
39        exercise impartiality in passing professional judgments on colleagues.
40     3.  To respect the rights of other persons to hold and express different intellectual positions;
41        and to protect the rights, well-being, and privacy of persons involved in scientific inquiry.
42     4.  To be accurate in making public statements in one's own name and to be mindful that in
43        making such statements the public may judge the faculty member's profession and
44        institution from these statements.

July 1, 2018

### 6.4.2 Members of DePaul University

As members of DePaul University, the faculty member has these obligations:

1. To respect the religious character of the university and the religious beliefs of persons affiliated with the university.
2. To adhere to non-discriminatory norms in [interacting with other university personnel].
3. To preserve confidentiality in personnel and administrative deliberations when confidentiality is explicitly required.
4. To avoid unauthorized use of university resources or facilities for personal, commercial, or political purposes.
5. To assume a fair share of faculty responsibilities for university governance and to accept and fulfill committee appointments and other responsibilities associated with faculty status.
6. To comply with duly approved regulations and procedures.
7. To attend general university commencements and convocations.

### 6.4.3 Teacher of Students

As a teacher, a faculty member has these obligations:

1. To present to students subject matter compatible with course descriptions appearing in official university bulletins and catalogues; to avoid significant intrusion of material unrelated to the course; and to meet classes and hold examinations as scheduled.
2. To evaluate students only on the basis of academic performance and to evaluate their work without undue or unexcused delay.
3. To hold office hours, to be available to students enrolled in the faculty member's courses, and to serve as a faculty advisor to other students according to the policies of the academic unit.
4. To avoid any exploitation of students for personal advantage or any coercion of the judgment or conscience of students.

### 6.4.4 Academic Administrators

A member of the faculty who holds an administrative position has these obligations:

1. To establish adequate means of communication for matters that materially affect the members of the particular academic unit and to be reasonably available for the faculty and staff of the unit.

July 1, 2018

2. To provide opportunity for joint planning and effort where appropriate and to set up and apply the structures necessary for joint action.
3. To make personnel decisions impartially; to give responses as soon as circumstances allow; and to give reasons for refusing a request if asked to do so by the person refused unless the disclosure of the reason would breach confidentiality.
4. To remain current with developments in higher education related to the sphere of the particular administrative position.

## 6.5  Instructional Responsibilities

At times it is important for faculty to convey messages to students through announcements made in class. Instructors' cooperation in making these announcements is appreciated.

### 6.5.1  Class Attendance

Instructors are expected to take attendance during the first week of class and again after receipt of an "update" roster (approximately the fifth week of class). This helps academic officers to identify and correct errors before grade sheets are printed. Individual faculty have the prerogative to establish course attendance guidelines. These should be stated in the course syllabus.

### 6.5.2 Class Cancellation

It is imperative that instructors meet classes for each scheduled class. In the event that an instructor is unable to attend a class because of illness or unplanned absence, he/she must inform the local academic unit officer at the first opportunity. The local academic unit officer will then make arrangements to provide continued student learning during the instructor's absence.

### 6.5.3  Inability to Meet a Class/Substitute Teaching

A faculty member who is unable to meet a class is responsible for seeing that students are not thereby deprived of learning opportunities. This responsibility may be met by scheduling the necessary number of make-up classes at a time convenient to the students, requesting the assignment of a substitute instructor, or making other appropriate arrangements. In all instances of absence, the faculty member must inform the local academic unit officer of the facts regarding the absence, the reasons for it, and the measures taken to provide the students with the requisite learning experiences. The local academic unit officer may require the faculty member to provide this information in writing.

If a class is to be cancelled, the instructor shall inform the students beforehand, if at all possible. When the students have not been informed, the local academic unit officer will attempt to let the students know that the class has been cancelled, particularly an evening class attended predominantly by part-time students.

July 1, 2018

1   *6.5.4 Class Hours*
2
3   It is essential that students have a minimum of three hours of contact time per week with their
4   instructor in each four quarter hour course. Faculty members are expected to conduct class for the
5   full period and to begin and end at scheduled times.
6

7   *6.5.5 Syllabus Requirements*
8
9   All faculty are required to prepare written course syllabi for each course they teach at DePaul. At
10  a minimum, syllabi should contain the following information:
11
12      1.  A rationale for the course stated in the context of the aims of the local academic unit;
13      2.  A statement on the types of instruction (i.e., lecture; lecture-discussion; lab; etc.);
14      3.  Specific materials required for the course (books, pamphlets, library materials, etc.);
15      4.  Proposed major and minor topics to be covered in the course;
16      5.  Specific required readings, and written and oral assignments (inclusion of tentative dates
17          for such assignments is desirable);
18      6.  Specific descriptions of the criteria and methods  to be used by the instructor in
19          evaluating students' academic performance, such as the nature of quizzes and
20          examinations;
21      7.  Statement on plagiarism; and,
22      8.  Instructor's office number and office hours for the term in which the course is being
23          offered.

24  Each faculty member must, by the first class session, make available to each student a copy of the
25  syllabus that satisfies the guidelines outlined above. A copy must be submitted to the college or
26  school.
27

28  *6.5.6  Course Examinations*
29
30  In all courses at the midpoint of the quarter, students will be informed of their achievement to
31  date. Normally courses conclude with a final examination. To provide additional flexibility for
32  faculty members, a formal mid-term or final examination is not required if the instructor has other
33  comparable ways of evaluating student achievement.
34

35  *6.5.7  Time for Submitting Final Grades*
36
37  As a matter of administrative policy, all final grades are to be submitted within five business days
38  of the last examination in all academic units of the university, except for the College of Law,
39  which follows a different calendar.
40

41  **6.6 Workload**
42

8

July 1, 2018

### 6.6.1  Faculty Assignments

Formal assignments comprise only part of a faculty member's academic life. As professionals, faculty members are expected to engage in many activities that are not official duties, particularly those that contribute to the good of the public and the university, their academic discipline, and their own professional development.

### 6.6.2  Responsibility for Assignments

The local academic unit officer makes faculty assignments, subject to approval by the dean.

### 6.6.3  Teaching

**6.6.3.1 Full-time and Part-time Faculty**

The primary function of DePaul University is instruction; hence, teaching constitutes the majority of faculty assignments.  The normal teaching load is nine full courses per academic year, usually three per quarter. Exceptions may arise if, for example, the established policy of a given academic unit or a particular faculty contract specifies the contrary. This load may be reduced if particular faculty courses place especially extensive demands on faculty time or if faculty members receive formal assignment in other functions.  Only in exceptional instances is a faculty member asked to teach more than a normal load. In such instances, the faculty member receives additional compensation not less than the salary paid to a part-time faculty member for teaching a comparable course.

A teaching assignment may include student advisement, which requires that faculty members keep a sufficient number of regularly scheduled office hours at times that are of mutual convenience and appropriate for the needs of the students. A teaching assignment also entails services normally associated with faculty status and responsibilities. Supervision of independent study is entirely voluntary and is not calculated as part of the teaching load. Faculty receive no pay for supervising independent study.  However, supervision of independent study is considered as an element of faculty performance in evaluations for salary adjustment, contract renewal, and tenure or promotion.

Faculty assignments to off-campus instruction generally are incorporated into the regular teaching load, warranting no additional compensation. Part-time faculty may be assigned to off-campus instruction on the same basis as on-campus assignments.

**6.6.3.2 Administrators**

Administrators may have teaching assignments; however, they normally are not entitled to additional compensation for teaching. Administrators or staff personnel whose responsibilities do not include teaching, and who almost invariably do not have faculty status, may, in special instances, be assigned to teach a course. This teaching assignment is normally considered an

July 1, 2018

integral part of the person's responsibilities for which the university provides no additional compensation.

Should another higher education institution invite an administrator to teach a course, he or she would be under the same restrictions applicable to faculty teaching outside the university.

Administrative personnel who have faculty status may receive a teaching assignment during the summer session. As the university considers the assignment to replace some administrative functions during this period, the administrator is not entitled to additional compensation.

**6.6.3.3  Graduate Assistants and Fellows**

Assignment of full responsibility of teaching a course is limited to persons who have full-time or part-time faculty appointments in the university. In exceptional cases a graduate assistant may be given such an assignment if the graduate assistant is in a doctoral program and has already successfully completed the Master's degree or its equivalent.

**6.6.3.4  Summer Session Assignments**

Faculty members with 10-month contracts may accept or decline courses offered to them during the summer.

*6.6.4  Activities Outside the University*

Faculty members are encouraged to pursue activities outside the university that contribute to DePaul's mission, including social, civic, and religious activities, and service to one's professions and professional associations. However, because a full-time faculty appointment implies a full commitment to DePaul University, outside activities must conform to the following limits:

1. They must not interfere with the faculty member's commitment to the full academic life of the university, including teaching, research, student advisement, governance, and related responsibilities.
2. During the regular academic year, the faculty member must give precedence to university responsibilities.
3. Two additional limits apply to outside activities for which the faculty member receives remuneration:

   - They must be professional activities that contribute to the professional development of the faculty member or provide expertise to the community; and

   - Over the course of a year, they must not exceed the equivalent of one day per work week.

10

July 1, 2018

4. The faculty member will arrange privately for whatever support services his or her outside activities may require. Only with prior approval of the dean may a faculty member enlist the services of university personnel or employ university supplies and equipment for outside activities.

5. Each January, faculty members must submit an annual report on their work-related activities with any outside firm, agency, or institution if they (i) serve on a continuing basis as a consultant or in a similar role; (ii) are continuing members or officers of the outside entity, or (iii) normally provide services for the outside entity at least once a week, even if for less than a full day. The report goes to the dean, with a copy to the local academic unit officer in colleges organized into departments.

6. The faculty member is primarily responsible for determining whether outside activities are compatible with the responsibilities of a faculty member. Nevertheless, the dean must ultimately decide whether a faculty member's outside activities conform to the limits enumerated above. Deans may place specific restrictions on outside activities in order to satisfy policy requirements.

7. Teaching at another higher education institution while under contract at DePaul is permitted only in those specific instances for which the dean has given written approval.

8. Material violation of this policy is considered a violation of the faculty contract and could be cause for abrogation of contract and termination of tenure in accordance with the policies and procedures in Chapter 4.

## 6.7 Leaves of Absence

Leaves of absence may be granted for advanced study and research, a temporary position elsewhere compatible with one held at DePaul, medical need or disability in accordance with university policy, or personal reasons. The duration of a leave may be a full academic year or one or more terms. Only in exceptional cases will a leave be granted for more than one year.

Non-medical leaves are generally granted without salary. For other types of leave, the salary is reduced by one-third for each quarter of leave; for faculty of the College of Law, salary is reduced by one-half for each semester of leave.

University sponsored paid leaves are available through the Quality of Instruction Council and the University Research Council. These types of leaves have their own unique policies and procedures. For further details, please see the guidelines and applications forms for the Quality of Instruction Council and University Research Council.

A request for a full year of leave should be submitted in writing on or before January 15 of the preceding academic year. A request for leave for an academic term should be submitted in writing no later than the beginning of the term preceding the one for which leave is sought.

The local academic unit officer, the college dean, and the provost must approve a leave. They consider, among other factors, the effect of the faculty member's absence on the department or college and the possibility of finding a qualified replacement on a temporary basis. In granting leaves, the university accords priority to projects that will contribute to the faculty member's

11

1   professional development and to projects for which the faculty member has obtained funding
2   from external sources. The university does not normally grant simultaneous leaves to more than
3   one faculty member of an academic unit.

4
5   University policies and procedures on renewal and termination apply to faculty on leave.

6   Information regarding the continuation of employee benefits during a leave is available in the
7   Office of Human Resources and should be confirmed prior to the start of the leave.

8   If a college or department sponsors a separate leave program, a faculty member can obtain details
9   through the college or departmental office.

10 **6.8 Salaries**

11
12   The university makes decisions regarding salary in accordance with its budget guidelines.
13   Normally, salary decisions result in a merit increase and, when budgets permit, may include
14   increases for such things as equity and market adjustments. The salary recommendation is made
15   by the college dean.

16
17   Full-time faculty are paid on a biweekly basis in twenty-six payments per fiscal year. Part-time
18   faculty are paid biweekly during each quarter in which they are teaching (usually five pay periods
19   per quarter). During summer sessions, faculty are paid in two or three equal payments per
20   summer session. The Payroll Department determines payroll dates.

21

22 **6.9 Academic Policies**

23

24   In fulfillment of its governance role as defined in section 1.2.1 of the Faculty Handbook: Primary
25   Responsibilities of the Faculty, Faculty Council has its own proper guidelines to govern the
26   creation of academic policies, leading to approval of proposed policies and policy revisions by
27   the President.

28   After approval of policies and procedures that fall within Faculty Council's areas of
29   responsibility, the documents should be integrated into the university's online policy and
30   procedures manual. While the President and the Board of Trustees have authority to reverse
31   faculty decisions that fall within areas of primary faculty responsibility, the university expects
32   that they would do so only in exceptional circumstances and would communicate the reasons to
33   the faculty.

34 **6.10 Establishing a New University Policy**

35   Except with respect to the establishment of academic policies under Faculty Council authority,
36   the Office of the Secretary coordinates the establishment, archiving, revision, approval, and
37   publication of all university policies and procedures.

38   Details on academic policy and process appear on the University Policies and Procedures web
39   site.
40

# Exhibit 2

**COLLEGE OF COMMUNICATION RECOMMENDATION OF CONTINUATION OR TERMINATION OF UNTENURED FACULTY CONTRACT**

TO: Salma Ghanem, Dean, College of Communication

FROM: Personnel Committee, College of Communication

DATE: March 7, 2015

SUBJECT: College Recommendation on Lisa Calvente

**FACULTY MEMBER'S RANK:** ASSISTANT PROFESSOR

**START DATE OF TENURE-TRACK CONTRACT:** 2011-2012

**CREDIT FOR PRIOR TEACHING:** NONE

**PROBATIONARY YEAR AT DEPAUL**: FOURTH[1]

**HIGHEST ACADEMIC DEGREE RECEIVED**: Ph.D

**PERSONNEL COMMITTEE RECOMMENDATION:** TERMINATION
VOTES IN FAVOR OF RETENTION          1
VOTES AGAINST RETENTION              6

PERSONNEL COMMITTEE RECOMMENDATION REGARDING PROGRESS TOWARD TENURE:
YES: 0      NO: 7      In Teaching
YES: 0      NO: 7      In Research
YES: 5      NO: 2      In Service


**TENURED FACULTY SUPPORT FOR RECOMMENDATION:**
VOTES IN FAVOR
VOTES AGAINST

TENURED FACULTY SUPPORT FOR RECOMMENDATION REGARDING PROGRESS TOWARD TENURE:

**COLLEGE RECOMMENDATION AND RATIONALE:**
Based on a thorough review of her credentials in the areas of teaching, research, and service, the Personnel Committee and the tenured faculty of the College of Communication recommend that Lisa Calvente's contract not be renewed.  The Personnel Committee finds that Lisa is making poor progress towards tenure in the area

---

[1] We are awaiting confirmation about whether this is the third or fourth year of Lisa's probationary period.

of teaching, poor progress towards tenure in the area of research, and fair to good progress towards tenure in the area of service.

**TEACHING**

In order to assess the effectiveness of Lisa's teaching, the Personnel Committee examined undergraduate and graduate course materials, peer observation reports and teaching evaluations from the past two years. Additional information about Lisa's teaching was solicited from past course enrollees through the Personnel Committee student representative. Finally, members of the Committee discussed teaching with Lisa in an interview setting.

Since arriving at DePaul, Lisa has taught six graduate level (or undergraduate cross listed) courses and five undergraduate courses, six of which were new offerings for the college. Her courses regularly engage the cross section of cultural studies, race, media, and performance theory, serving a range of needs for the college and university—most directly the Organizational and Multicultural MA program, the undergraduate intercultural major, and the Liberal Studies Sophomore Seminar on multiculturalism. In her 2013 formal review, Lisa's teaching was evaluated as good/very good, marking several developing strengths, while noting specific concerns about course organization and the reference to students feeling intimidated in the student representative report.

Previous problems identified in teaching have grown more significant since the last review period, eliciting very strong concerns regarding Lisa's approach to general student learning, her commitment to each DePaul student, and the classroom environment she fosters. In terms of quantitative measures, Lisa's evaluations have been consistently strong, routinely keeping in close range to the college's very high numbers. Qualitatively, however, Lisa's course evaluations indicate a range of recurrent and somewhat polarizing themes. Evaluations suggest that a strong number of students appreciate the rigor and demands of her courses, while other students experience the course climate to be intimidating and unwelcoming to diverse opinion and perspective. One student from her Winter 2014 INTC 308 course raved, "I've taken many classes with Dr. Calvente, and if I could, I would load my course schedule with nothing but her classes. She pushes students to think critically in ways that are rarely demanded of undergraduate students. Just when I've thought I completely grasped a concept, Dr. Calvente would reveal that I've just scratched the surface." These types of highly enthusiastic statements make appearances in many of her course evaluations, although there is an additional trend that suggests some students struggle to find their voices and feel diminished in her courses. In the same Winter 2014 INTC 308 course, another student wrote that the "Instructor often made students feel inferior. She rolled her eyes at some questions asked and often misunderstood students concerns. Students eventually became afraid to speak at all in fear of ridicule."

While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200). As these are required courses for many students, the academic interests of the students in these courses is likely more diverse and varied. In her Fall 2014 CMN 103 course, several students note the helpfulness of the course for encouraging them to see the world from more critical perspectives. However, many students also made reference to the negative classroom climate, suggesting it lacked encouragement, felt intimidating, was experienced as silencing, and was perceived as "hostile." One student commented, "Dr. Calvente was insistent on students dropping the class on the first day and was shocked when student's hadn't the second day." In the personnel interview, Lisa was asked about those students who might feel disenfranchised from the class, and she replied "Most students drop. I advise them to drop." The committee was deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class, suggesting all DePaul students are not wanted in our classrooms. Lisa disagreed, stating, "Telling them to drop is honest." The personnel committee does not have access to an instructor's drop rates, and so there is not a quantitative number to detail what is meant when she says "most students drop." When asked to clarify this approach in a required college core course, where many of our students have demanding work and course schedules that limit their flexibility and require they enroll in a specific class offered on a particular day or time, she explained, "If it's scary, they should drop. I say go to another class. I have a lot of colleagues you can take this class from." In response to student feedback about intimidation, the committee asked if there were parts of her teaching she felt she needed to work on. She did say she might email students who were not participating in class, but clarified, "Are you asking me, do I want them all in my class? No, not really." Referencing her students in response to questions about how she seeks to support students who are struggling or seem disenfranchised, Lisa replied, "They have to approach me. That is their job. It's not my job."

Students across several of her courses made continual reference to the high standards Dr. Calvente requires of students. Some students found the workload to be manageable and were excited by the challenge. Others firmly believed that the readings were too advanced, and too much in quantity, for the class to process and engage. For example, more than one student in the Qualitative Methods course from Spring 2014 felt the class was constantly behind and was always playing catch-up. It is important to contextualize that some of these responses are likely a product of undergraduate/graduate crosslisted classes.

In his observation of her cross-listed course  (Social) Death, Citizenship and the Media, Associate Professor Daniel Makagon noted "almost every student spoke and approached the discussion with the confidence that they could talk through the issues. Lisa might push them, but she gave them the room to figure out the ideas and their responses to the issues." Both Professors Makagon and Winchatz noted Lisa's strategic use of silence in the classroom. Winchatz explained, "After Lisa asked a question, she was clearly comfortable with sitting in silence until the students had

processed what she was asking and were ready to share. The students seemed to be used to this approach as well. " Both reviewers, however, did note the course was, at points, difficult to follow, and suggested Lisa could better assist the class with more deliberate transitions, paraphrasing of ideas, and clarity of structure throughout the course. In the student report, this opportunity for greater clarity, time management, and structure was also reiterated, along with a reference to previous mentioned concerns about climate—what the student representative called "the pattern of intimidation." When asked to clarify an example of this pattern he mentioned the rolling of eyes and Dr. Calvente's dismissal of a student question with "why don't you know this?" He stated, however, that based on his interpretation of the data, that "if the students survive the atmosphere, they do well."

For the vast majority of her courses Lisa did not provide materials beyond the course syllabus. Her syllabi do a very good job setting forth rules, policies and instructor expectations, yet she might take some steps to further distinguish the content of her courses from one another. As an example, her course INTC 230 and her course LSP 200 have a tremendous amount of overlap in assignment structure and design, including the focus on "Bastard Out of Carolina" for several weeks in the course. Additionally, the theoretical readings comprise the majority of the content listed in the course schedule, regardless of course level, and are often used to define the class time (as opposed to a topic, theme, objective, or an activity). By identifying the theme or topic of the day, as well as the objectives, the clarity of structure might be more apparent to help frame student expectations. This is reiterated in the student report and student evaluations, where there was a recurrent theme of suggesting more explicit clarity of goals and content. Furthermore, especially for the 100 and 200 level classes, a more intentional balance between theoretical source texts and disciplinary texts from the field of intercultural communication might help some of the students who are struggling with the density of the readings and an understanding of the course.

After the review of her materials, reports, evaluations, and her interview, the Personnel Committee found that her teaching is fair and that she is making poor progress toward tenure in this area.

**RESEARCH**
Since Lisa's last review, in the Winter of 2013, she has published one co-authored essay (with Guadalupe García), titled "The City Speaks: Dis/articulating Revolutionary Havana, Cuba and Global Belonging" in the journal *Cultural Studies* (Calvente is listed as first author). The essay is a visual exploration and analysis of the city of Havana, examining how the performative notions of revolution are present in the city's landscape. She also presented work at the Critical Ethnic Studies Association Conference in 2013, CUNY-Baruch College in 2014, and Crossroads Association for Cultural Studies Conference in 2014. At the time of her last formal review, Lisa had published one book review. For the current fourth year review, the Personnel Committee evaluated Lisa's total publication record since

arriving at DePaul: one book review and one co-authored peer reviewed journal article.

Looking forward, Lisa reports several projects in various stages of development. Lisa has plans to co-write an introduction and conclusion for a book she is co-editing. In addition, Lisa is the solo author of an essay under review at *Cultural Studies.* Although these materials cannot be considered for this review period, looking toward her future productivity, Lisa has stated that the book contract is signed and the article is currently listed on her CV and in her personal statement as a revise and resubmit. Although the committee requested on two occasions via email prior to the Personnel Committee interview that Lisa provide a signed book contract and an editorial communication (e.g. email or letter from Cultural Studies) formally requesting a revise and resubmit of her article manuscript, the committee was not provided with the requested documentation of the status of either of these projects in time for the review.

In her 2013 review, her research was determined as satisfactory from the faculty, and the personnel committee strongly recommended diversifying her publication strategies alongside the ongoing pursuit of her solo book contract. The book project and proposal is not reported to have made any significant progress (with two completed chapters), yet the successful publication of her co-authored essay and the article under review indicate that she has been more active in moving her previous conference papers towards publication.

Lisa is scheduled for flex time for the current 2014-15 academic year, wherein she is teaching three courses in the fall and winter, in order to focus her time on research in the spring. This is in addition to a year-long leave she has successfully applied for through the URC for the 2015-16 academic year, which will be co-funded through her successful application for a Woodrow Wilson Junior Faculty Grant Award. According to the grant application, "The objective of the fellowship program is to aid the scholarly research and intellectual growth of junior faculty (men and women) and improve their chances for success as tenured university scholars by offering support for twelve months of research and writing." Thus, Lisa has secured substantial time to focus solely on research in the next fifteen months. There is concern about the amount of time invested and the choices made regarding the research projects she is pursuing, as her current research output fails to demonstrate sufficient progress or a successful balance of energies in the move towards tenure. In addition, given the shortage of research she has fostered to publication, devoting time and energies to a co-edited book project is cause for additional concern. It is believed that Lisa has not made the necessary progress needed towards tenure and would be better served by continuing to focus greater time and energies on shepherding her conference presentations and the research from her ongoing book project to peer reviewed journals, preferably diversifying her CV with solo authored works in a greater range of journal outlets.
The Personnel Committee agrees that her research is fair and that she is making poor progress toward tenure in this area.

**SERVICE**

During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College-wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs. She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of *Cultural Studies* since 2012 and *Text and Performance Quarterly* since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.

The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.

<u>Conclusion</u>

Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal.

# Exhibit 3

**COLLEGE OF COMMUNICATION RECOMMENDATION**

**OF CONTINUATION OR TERMINATION OF UNTENURED FACULTY CONTRACT**


TO:            Salma Ghanem, Dean, College of Communication

FROM:          Personnel Committee, College of Communication

DATE:          November 17, 2017

SUBJECT:       College Recommendation on Lisa B. Y. Calvente


FACULTY MEMBER'S RANK:              Assistant Professor

DATE OF FIRST CONTRACT:             Fall 2011

PROBATIONARY YEAR AT DEPAUL:        Third Review, Fifth Year

HIGHEST ACADEMIC DEGREE RECEIVED:   Ph.D.

TENURED FACULTY RECOMMENDATION:     Termination

            VOTES IN FAVOR OF RETENTION     8
            VOTES AGAINST RETENTION         13

TENURED FACULTY EVALUATION:         Progress Toward Tenure

YES:  4          NO:  17      in Teaching
YES:  15         NO:  6       in Research
YES:  4          NO:  17      in Service


COLLEGE RECOMMENDATION AND RATIONALE

        The tenured faculty of the College of Communication voted to recommend that Dr. Lisa Calvente's contract not be renewed (13 No to 8 Yes). The recommendation is based upon a thorough review of Lisa's credentials in the areas of teaching, research, and service. The College Personnel Committee finds Lisa's teaching in this review period to be **very good** and she is making **very good/fair** progress toward tenure in the area of teaching; Lisa's scholarship to be **excellent** in this review period and she is making **very good/fair** progress toward tenure in the area of research; Lisa's service record to be **very good** over this review period and she is making **fair** progress toward tenure in the area of service. Fifteen of 21 voting members of the tenured faculty agree that Lisa is making satisfactory progress toward tenure in the area of research, while 17 of 21 voting members of the tenured faculty believe Lisa is not making satisfactory progress toward tenure in the areas of teaching and service, respectively.

**TEACHING**

      In order to assess the effectiveness of Lisa's teaching, the College Personnel Committee examined her undergraduate and graduate course materials (syllabi, assignments, quizzes, and a sample precis) since her previous review, student teaching evaluations, two peer observation reports, and a report produced by the Personnel Committee's student representative, summarizing survey data solicited from past enrollees in Lisa's courses. Members of the Personnel Committee also discussed teaching with Lisa in an interview setting.

      Since arriving at DePaul, Lisa has taught 14 different or modified courses, comprising 3 graduate, 7 undergraduate, and 4 cross-listed classes. Since her the last review in Winter 2015, she has taught 6 different courses at both levels with a strong focus on race, intercultural communication, and performance, including 3 sections of CMN 103-*Intercultural Communication* (a core undergraduate course); 2 sections of INTC 367-*Performance for Social Change*; 1 section of CMNS 230-*Performance, Communication, & the Body*; and1 section of CMNS 501-*Communication in Cultural Contexts*. Lisa has also developed and taught 2 special topics classes –(*Social) Death, Citizenship, & the Media* and *Communicating Health, Race, and Reproductive Rights*– both are cross-listed within our college and with other units/programs. In reviewing Lisa's course materials, the Personnel Committee identifies both areas of strength and those that require continued improvement. The syllabi for these courses are well organized and each covers in-depth content. She includes clear course objectives, course policies, and learning assessments. Her assignments range across many formats; including, quizzes, in-class discussions, presentations, reading themes and questions to essays, written reports, performances, and community-based service learning. These activities are detailed in assignment worksheets in 2 of Lisa's classes (CMN 103 and CMN 230). For the remaining 4 classes, the Personnel Committee only has access to her course syllabi, which provide descriptions of pertinent activities and differential expectations for undergraduate and graduate students in cross-listed classes.

      Lisa's teaching and her classroom environment were, overall, positively evaluated by her colleagues in peer observation reports. During a visit to the CMNS 230 (*Performance, Creativity, & the Body*) class in Spring 2017, Dr. Jay Baglia was impressed by the high level of mutual support and camaraderie of the students in this class. "This is something that doesn't happen by magic or is the result of a serendipitous collection of students who happen to like each other; this is the result of a cultivated atmosphere as informed by the instructor," he stated. These comments are echoed by Dr. Leah E. Bryant, who reported that the supportiveness of the learning environment of the class was "extraordinary." Both Bryant and Baglia took notes of Lisa's candor in providing her students with feedback, which "unpacks their performance" and offers "rationale," by linking it to pertinent readings of the day. According to the peer observers, although the classroom climate was highly interactive, Lisa could consider ways to better engage quiet students in the class discussion, which largely involved some active contributors.

      In her personal statement, Lisa expresses her desire to create "an enriching, knowledge-inciting and knowledge-producing atmosphere at DePaul." Lisa wants her students to feel that "they are critical, productive thinkers with access to agency and the ability to make change in the world." Learning opportunities are created by the critical production of knowledge that combines theory and practice, past and present, classroom activities and experiences gained from community engagement. As part of such efforts, Lisa has co-written (with her students) and directed 2 performances for her class activities since 2015. At both the graduate and undergraduate levels, Lisa has pushed her students' "comfort level" and left a strong impact on

them. Several students found her classes to be "challenging," but "rewarding," "eye-opening," and "mind-blowing." A student in her CMN 103 (Winter 2015) wrote: "It is an excellent course. It really opened my eyes to the world and was really among the best courses I've selected at this university." Graduate students came away from her courses having "learned and explored a lot" (CMNS 501, Spring 2017) and "grown" as critical thinkers (CMNS 509, Fall 2016). Lisa was described as a "very knowledgeable" and "very intelligent" professor, who "has an obvious passion for what she teaches." Quantitatively, teaching evaluations demonstrate Lisa's strong command of the subject matter (from 4.9 to 5), her high level of preparedness (from 4.8 to 5), her ability to stimulate interest in the subject (from 4.6 to 5). Ratings of the overall quality of courses were in the 4.2-4.9 range and overall teaching effectiveness in the 4.1-5.0 range. Lisa consistently received 4 or above on most other measures. There were a few instances where she scored above 3.5 but under 4 on items gauging class time use, careful response, and increased knowledge or skills. In student evaluations of *Communicating Health, Race, and Reproductive Rights* (Fall 2016), which only contain 5 common university measures as the course was assigned to Critical Ethnic Studies, Lisa scored between 4.5 and 4.9.

The survey of Lisa's past students, conducted in September 2017, further confirms the key attributes of her teaching. In quantitative terms, for all five survey questions, she scored between 4.52 and 4.83 on a 5-point scale. Students ranked her command of course content and her ability to engage them in making connections between course content and lived experience on top, followed by teaching methods, overall assessment, and then an environment of respectful interactions. Students consistently addressed Lisa's high expectations, expert knowledge, and her investment in stimulating critical thinking. "She has a strong command of the subject material and holds her class to a high standard," one surveyed student wrote. "She is able to get to the root of people's arguments to better explain them, especially when talking about complicated or touchy subjects in *Intercultural Communication*. She does a good job of asking questions and asking people to substantiate their stances/opinions." According to another student, "there were times when I disagreed with her or a classmate, and I felt comfortable (respectfully) expressing that disagreement and wrestling with the thought process." When the survey asked about their most memorable moments with Lisa, some mentioned Lisa's supportiveness and accessibility.

Lisa's instruction has been recognized in both the ENGAGE Teaching and Mentorship for Social Justice Award and her second nomination for the Excellence in Teaching Award in 2015. Lisa was previously nominated for this teaching award in 2014.

At the interview, the Personnel Committee commended Lisa's positive growth in teaching over the past two years, although Lisa said that she had not changed anything significantly in her curriculum or teaching strategies, beyond updating discussion and lectures with current events and experimenting with techniques to engage quiet students in discussion, which worked for some but did not for others. Although Lisa has proven to be an impactful teacher, our analysis of the student representative report, teaching evaluations, peer observations, and course materials since 2015 has shown a range of areas that require continued improvement. Many of the needed changes had been identified in the last review (2015) as improvements "which would need to occur before she is capable of receiving tenure." When asked in the interview if Lisa had made any of these changes, she stated that she would have to agree with them and she stated that she did not. Therefore, her earlier statement that she had not made any changes to her teaching indicated she dismissed the changes that were called for in her previous formal review. Looking at evidence independently from the prior review periods, however, we found similar pedagogical issues reflected in the qualitative data for this period, which run

parallel to Lisa's solid teaching performance in other areas captured by quantitative measures. We believe it is problematic that Lisa has ignored these long-standing issues and that the developmental recommendations shared in previous reports of the Personnel Committee and the tenured faculty seem at least partially dismissed by her.

The Personnel Committee would like to see further substantive steps taken by Lisa in responding to problems identified in students' responses to her teaching:

-References to students feeling "intimidated" or "uncomfortable" still showed up in this review cycle, though at low frequency. In her personal statement and at the interview, Lisa attributed this phenomenon to the sensitive nature of the discussions of race in her classes and of her being a minority faculty member studying race and racism. In order to address this issue, she relied on "honesty and candor," which "can be at times shocking or off-putting." In a careful review of student comments, the Personnel Committee believes that the instances of negative feedback highlighted a communication issue rather than students' discomfort with course content or Lisa's pedagogical approach. Several students appreciated her directness and the way she challenged and pushed them to think critically about difficult topics. Yet, even those who felt "comfortable" took note of Lisa having a "very firm set of ideas" and an "expressive" way of communicating, which can sometimes "thwart conversation" or create "heated tension," thereby making some students less ready to talk in class. A student in her CMN 103 class (Spring 2017) offered an insightful observation: "The course is great but you [Lisa] certainly come on a little strong. I didn't mind it but it's possible some people didn't feel comfortable opening up because of it." Our students are diverse in several ways. Students who possess higher levels of understanding and communicating complexity are more likely to thrive. Meanwhile, this communication style might not invite students who are less outspoken or are still exploring their voice and ideas to grow intellectually. Lisa wrote: "My goal for every class is to interrogate ways in which marginalized and often silenced voices can talk back to, and act against, social inequality and political oppression." If we were to teach students to speak up and resist, we would lead by example. In the classroom, the instructor –regardless of race, gender, or origin– represents authority. The way the instructor communicates conveys power. Unnecessary, strong verbal and non-verbal cues from the instructor can serve to discourage those students who struggle, thereby creating a barrier to students' learning.

- For 4 out of 6 classes Lisa taught in the current review period, the Personnel Committee was not provided teaching materials beyond course syllabi. Although the syllabi include descriptions of assignments and instructor expectations, we believe that having specific instructions and grading rubrics or at least grading criteria for all assignments would add clarity to student learning assessment. Some students in CMN 103 (Winter 2015, Fall 2016), for example, found the writing inquiry descriptions and prompts "slightly vague in regards to what is expected" and suggested that Lisa could have discussed writing assignments in more detail in class. Writing in her observation report, Dr. Bryant detected "a bit of confusion about the specifics" of the workshop assignment in her CMNS 230 class and "it might be helpful to provide a handout, or blurb on the board, that provided specific outcomes for the workshop (or what is expected of the students)." In addition, it is a requirement in our college to develop separate syllabi (and not just separate expectations or assignments) for undergraduate and graduate students in order to communicate clearly distinct expectations in cross-listed courses.

- A recurring suggestion for improvement from the students centers on time management in Lisa's classes. In every quarter of this review period, students reported a pattern of going over time, running behind, and rushing toward the end. Consequently, important discussions were not

addressed or clearly explained, and class activities got pushed, all of which affected student learning. According to one student in the survey report, "our final exam period ended about one hour after class ended. I understand Dr. Calvente does not keep a close eye on time but this is excessive; you cannot expect students to stay in class until after 10:00 p.m. just because you did not leave enough time for individual presentations." In his observation report, Dr. Baglia also expressed a desire for "more signposting, more awareness that time is a factor in any classroom." Students often feel anxious as time kicks in and they expect from Lisa a better organized, more stringent schedule. By the same token, some in her CMNS 230 stated that the professor should "take into account the time it takes for the students to prepare for a performance as well as the time it takes to perform." In some instances, they reportedly had only one week to complete a performance.

- On a related point, several students suggested that Lisa could be more selective in assigning textbooks/readings in her classes. That way, more valuable time would be dedicated to the most important content. According to course syllabi, Lisa often required 3 or 4 books for non-performance classes. In her performance courses, she listed 2 for INTC 367 and none for CMNS 230. The Personnel Committee urges Lisa to also consider open educational resources (OERs) as an option when adopting multiple textbooks for a class.

- A common theme in student feedback underscores the need for visual aids and a wider range of media Lisa could employ in the classroom. This was also one of the changes required from her last formal review, to alter her pedagogical techniques beyond seminar-style. A combination of multiple teaching methods will better accommodate different needs and learning styles, thereby helping retain attention, facilitate information processing, and enhance overall student learning. The all-discussion format of seminar-style courses makes it difficult for students to retain material or to focus for longer class periods. A graduate student (CMNS 501, Spring 2017) wrote: "I am a visual learner, and I need variety; other graduate classes I have taken have accommodated a variety of learning styles including in-class activities, dissecting a video/cultural text it through discussion, PowerPoint lecture, watching films, attending on-campus events, etc. I had a hard time focusing on a discussion for 3.25 hours week after week with no variety in how a topic was being approached. Again, I think Dr. Calvente has a wealth of knowledge to provide, but I could have gotten more out of the course if it was presented in ways that appeal to a variety of learning styles." The incorporation of various instructional tools serves to make complex concepts and dense readings more accessible and explanatory to students at the introductory level. This is also applicable to performances classes, where students could spend time watching videos of performance artists. At the interview, Lisa said she did not use PowerPoint because she runs graduate classes as seminars and her students in undergraduate courses created PowerPoint slides for their own presentations. In CMN 103, Lisa screened 2 films, but she did not use video in performance classes due to student workload and time constraints.

In sum, all evidence suggests that Lisa's teaching in this review period is **very good**, and that Lisa is making **very good/fair** progress toward tenure in the area of teaching.

**RESEARCH**

Lisa's scholarship centers on race and social justice on a local and global scale. Within this research area, she primarily draws on critical race frameworks and employs ethnographic methods developed by cultural studies and performance scholars.

Before her arrival at DePaul, Lisa had published 1 book chapter and 2 encyclopedia

entries. In previous review periods, she produced 1 co-authored journal article and 1 book review. Her research record prior to the current review raised concerns about her ability to produce the quality and range of work necessary to achieve tenure.

The past 2 years mark a sharp turn in Lisa's research productivity with 2 journal articles (1 solo-authored, 1 co-authored) and an edited book in which she wrote the introduction and co-wrote a chapter. In 2015, Lisa was selected as a recipient of the Woodrow Wilson Foundation Career Enhancement Fellowship for Junior Faculty ($31,500) to pursue her research. A review of her most recent publications and other projects in progress indicates that Lisa has developed a coherent line of scholarly work.

In early 2017, Lisa published a solo article titled, "From the Rotten Apple to the State of Empire: Neoliberalism, hip hop, and New York City's crisis" (*Souls: A Critical Journal of Black Politics, Culture, & Society*). This article analyzes how hip hop in New York City in the 1990s became a focal point of urban racial and class crisis through media representation and argues that hip hop culture arose from the particular context of neoliberalism. It highlights how the representation of hip hop culture served as the scapegoat for the death of young peoples of the black Diaspora.

Lisa is the first author of another journal article she co-wrote with Josh Smicker, "Crisis subjectivities: Resilient, recuperable, and abject subjects in the new hard times" (*Social Identities: Journal for the Study of Race, Nation, & Cultur*e, 2017). This article examines media representations through films, television shows, news stories, and popular sociopolitical accounts to identify three main types of crisis subjectivities (or embodiments of economic and political crises.) According to the authors, in the logics of postracism and postfeminism, civil rights and feminist movements achieved their goals. Yet these advancements only addressed limited elements of the ongoing crises. They have not addressed the deep-rooted structural inequalities.

Lisa and Guadalupe García are co-editors of "*Imprints of Revolution: Visual Representations of Resistance*" (Rowman & Littlefield International, 2016), a book comprising case studies contributed by 9 other scholars. This volume highlights the power of visual images in communicating and articulating revolutions and revolutionary moments at different parts of the world. As the primary editor of the collective work, Lisa authored "Introduction: Decolonizing revolution through visual articulations," which provides historical context and offers an overview of the case studies included in the volume. She also co-wrote with García a chapter in this book, "Image in revolution: Articulating visual arts and becoming Cuban," which analyzes how visual arts plays a significant role in Havana's urban space through political transitions, hardships, and economic recovery in Cuba. This chapter flowed out of a journal article Lisa co-authored in the previous review period (2014) as a result of archival research and ethnographic stay in Havana and ethnographic work at the J. Paul Getty Museum in Los Angeles.

Beside these publications, in the past 2 years, Lisa has presented 6 refereed research papers at international and national conferences (Association for Caribbean Historians, National Communication Association). On several occasions, she has also appeared on research panels or invited presentations.

Looking forward, Lisa has 4 research projects in different stages of development, most of which are linked to her Woodrow Wilson Foundation fellowship, DePaul University Research Council (URC) Grant, and URC Paid Leave award. These consist of a solo-authored book manuscript (in progress since 2012 with no publisher contract as of yet), 2 co-authored book chapters (under contract), and a co-authored journal article (abstract under review). At the

interview, Lisa said she planned to update the status of her book chapters, secure her book contract by May 2018, and submit 2 solo-authored manuscripts to journals in Fall 2018.

The Personnel Committee is impressed with Lisa's research productivity in the last two years. We strongly recommend that Lisa further push her publication rate, particularly with more journal articles, to make up for slower output in prior years, considering the limited amount of time left on the move to tenure. We discussed with Lisa the different ways in which publications will be viewed at the time of presenting a case for tenure, based on whether the manuscript is under contract versus in page proofs or published, with greater weight being given to those publications that are actually published. We also emphasized the wisdom of taking into account the time it can take for reviews, revisions, and so on.

Overall, the Personnel Committee agrees that Lisa's scholarship in this review period is **excellent** and she is making **very good/fair** progress toward tenure in the area of research.

**SERVICE**

In the previous review period, Lisa's contributions within the College of Communication were linked to her work as a member of the Contingent Faculty Review Board and the Local Review Board, an event leader of the symposium on violence, a thesis committee chair/undergraduate senior thesis advisor, and a comprehensive exam writer. At the university level, she served as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program and contributed to the Office of Multicultural Student Success in the Men of Color Initiative, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/Global and Transnational Programs. In her service to the academy, Lisa reviewed manuscripts for 2 journals as part of their editorial board (*Cultural Studies*, *Text and Performance Quarterly*) and papers for her national organization's conferences. In the current review, Lisa continued several of her existing services and took on some others.

At the college level, Lisa has joined the Term Faculty Review Committee since Spring 2015 (and has begun her actual service since the 2016-2017 academic year due to her research leave). Associate Dean Alexandra Murphy appreciated her valuable, hard work as well as her insights into the candidate's strengths and areas for improvement. She continued her role as part of the Local Review Board until Fall 2016, when this service was terminated due to new IRB procedures. Under this service, Lisa reviewed 2 IRB applications. Since 2015, she has chaired 2 graduate thesis and project committees, advised a master's project, and administered comprehensive exam questions. In Fall 2016, Lisa volunteered to help Dr. Lucy Lu in reviewing the syllabi for CMN 103 that non-tenure/tenure track faculty used for Intercultural Communication to ensure quality control. She also participated in some faculty searches and attended the graduation foundation course, college meetings and other events, such as award ceremonies and alumni receptions.

At the university level, Lisa has collaborated actively across programs at DePaul. She has both expertise and passion for interdisciplinary work across colleges. Lisa has been an affiliated faculty of the African and Black Diaspora Studies Program (ABD) since 2012 and a member of the ADB Advisory Committee since 2015. According to ADB Program Director, Amor Kohli, she has served actively and thoughtfully and been invested in the broader culture and activity of ABD. Since 2016, Lisa has become an affiliate to the Critical Ethnic Studies MA program (CES) in the College of Liberal Arts and Social Sciences. CES Director Laura Kina expressed her appreciation for Lisa's commitment as an invaluable member, who has impacted CES students in a number of ways. Lisa has continued her existing role as an affiliate to the Latino Studies

Program (LALS) and has been part of Liberal Studies Council Survey Review Subcommittee, which (according to Director of Liberal Studies John Shanahan) drafted recommendations based on the General Education Task Force report and feedback from colleges in spring 2017. LALS Chair, Lourdes Torres, acknowledged Lisa's contributions over the past 5 years, including her participation in a tenure-track hire in the past year. In addition, Lisa has reached out to the Women and Gender Studies Graduate Program to offer her service in mentoring their students.

Lisa's service record extends to the academy and the community. As part of the editorial board of 2 journals (*Text & Performance Quarterly* and *Cultural Studies*), she has reviewed approximately one manuscript per year for each journal. In 2016, Lisa reviewed the 7th edition of James Neuliep's *Intercultural communication: A contextual approach* (Sage). She has also been active at conferences as a paper reviewer, panelist, respondent/discussant, and a member of the Welcome Team. Lisa's community service includes her commitment to the Chicago Alliance against Racist and Political Repression (CAARPR), where she has also created community-based service learning for her students. In addition, Lisa has volunteered at the Juvenile Justice Program to help troubled youths at the Organization for the North East (ONE) community center.

At the interview, Lisa spoke of her willingness to take on committee work and her decision to engage in cross-college outreach efforts as part of the Vincentian mission. While we commend Lisa's dedicated service, there is room for improvement. The Personnel Committee emphasized to Lisa the need to take a more visible and significant role within her unit and at the college. Her service record at this advanced stage of her probationary period remains quite modest, considering the typical load for her peers. At the university level, there are several opportunities where Lisa could make even greater impacts by serving on university teams, committees, or task forces. The documentation of her service, as well as the construction of her vita and personal statement, would benefit from a clearer organization. According to the college's tenure and promotion guidelines, candidates use the AAUP's format for the c.v. to maintain college uniformity. The committee suggests Lisa attend tenure review workshops, which will continue to reinforce expectations and best practices in drafting personal statements, and preparing and organizing review and promotion materials.

In sum, the Personnel Committee finds that Lisa's service record to be **very good** over this review period, and she is making **fair** progress toward tenure in the area of service.

TENURED FACULTY RECOMMENDATION:

The Tenured Faculty of the College of Communication met on November 17, 2017 and voted against retention and contract renewal (13 No to 8 Yes). Ten of 21 voting members endorsed the Personnel Committee's recommendation in the areas of teaching and research, agreeing that Lisa was making **very good/fair** progress toward tenure in these areas. Eleven members concurred with the Personnel Committee's evaluation that Lisa was making **fair** progress toward tenure in the area of service. Three abstained from ranking Lisa's performance in each area. The remaining members were split on their votes, which dissent from the Personnel Committee's recommendation in either direction. Specifically, in the area of teaching, 4 members of the tenured faculty believed Lisa was making **very good** progress toward tenure, 3 voted **fair**, and 1 voted **unsatisfactory**. In the area of research, 6 members of the tenured faculty found Lisa was making **very good progress** toward tenure, while 2 voted **fair**. In the area of service, 5 members of the tenured faculty believed Lisa was making **very good/fair** progress toward tenure, while 2 voted **unsatisfactory**. According to the College Tenure and Promotion

Criteria, by the time of the second formal review, no ranking should be below **very good**; and additional reviews should demonstrate the clear promise of meeting the requirements listed for the tenure review, by which a faculty member's performance should be **excellent** in at least two of three areas, and **very good** in the third.

Teaching:

The faculty agreed that there is a significant number of positive student comments about Lisa's teaching and that several of her qualitative and quantitative evaluations portray a highly impactful and passionate professor. This is recognized in the ENGAGE Teaching and Mentorship for Social Justice Award and Lisa's two nominations for the QIC Excellence in Teaching Award. Meanwhile, the discussion highlighted serious concerns about long-standing pedagogical issues and about Lisa's ability to incorporate constructive criticism into teaching practices. According to four members of the tenured faculty, the positive comments outweigh the negative ones in student evaluations of Lisa's teaching, though she could do better to respond to developmental feedback. However, the majority of voting members raised questions about her pedagogical style and whether it adheres to Vincentian core values. They also took issue with a lack of willingness to acknowledge and/or to address outstanding problems repeatedly emphasized as areas that require changes from her first formal review (2013), through the second review (2015), and into the current review period. When the Personnel Committee asked Lisa to reflect on continued development in pedagogy, she stated that she had not changed anything significantly in her curriculum or teaching strategies and expressed a dismissive view of recommendations previously shared by the tenured faculty.

A major theme in qualitative comments throughout Lisa's teaching career at DePaul pertains to students feeling "intimidated" or "uncomfortable" in her classroom. In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations. This phenomenon was also reported in the student survey. In her personal statement and at the interview, Lisa attributed student comments about the intimidating, uncomfortable, or hostile atmosphere to the sensitive nature of the race discourse as well as to her being a minority faculty teaching race content. In a subsequent email, Lisa recounted her efforts to address this matter by communicating to students a grading policy that is based strictly upon "their critical reflection and application of the content to their everyday lives"; reaching out and meeting with students who seem "quiet, resistant, or apprehensive" to discuss their feelings and their work; and allowing students to submit drafts/outlines and to rewrite papers. The tenured faculty discussed the challenges in the discussion of race in the current political context, as well as its implications for classroom dynamics, and emphasized that it was possible to teach challenging coursework related to race and social justice while maintaining an environment of safety for all students.

Some tenured faculty members noted that many College of Communication faculty members teach courses that critically engage racism, ethnocentrism, sexism, and classism and the same comments about feeling "intimidated" or "uncomfortable" do not appear in those teaching evaluations. Moreover, the pattern of sustained comments about classroom environment raise concerns about Lisa's reflexivity about the links between teaching methods and course content. That is, the first comments appeared in the 2013 student report. At that time, the Personnel Committee read the comments as being about course content since there was not a sustained record of student feedback about intimidation or feeling uncomfortable. Since that time, the tenured faculty has seen recurring comments about this issue. For the faculty members

who find such comments to be a major reason for non-renewal, there is a point at which the student responses reflect a problematic pattern that should have been addressed through forms of pedagogy that can invite students to critically examine a range of social injustices. Finally, some faculty members who were most troubled by the student evaluations raised questions about Lisa's responses to the student feedback. Lisa notes in her personal statement that such feedback reflects racism among students; however, this response assumes that only Caucasian students are writing about feeling "intimidated" or "uncomfortable."

While Lisa's teaching demonstrates her commitment to pushing her students' comfort level to grow as critical thinkers, several members of the faculty expressed grave concerns about her ability to foster a classroom that reinforces DePaul's teaching philosophy of Vincentian personalism. Lisa tends to assign dense theoretical course materials for her classes, including those at the introductory level (e.g., Marx, Foucault, and Gramsci in CMN 103). This approach might be appropriate for students with higher levels of understanding and articulating complexity, but less so for those who need support to grow intellectually. Moreover, developmental feedback, including that from students who were comfortable with the learning experience, documents cases in which Lisa's "very firm set of ideals" as well as her way of communicating led some students to feel discouraged, judged, or even marginalized. Peer observation reports in all review periods since 2013 have documented the pattern of one select group of few students being allowed to over-contribute and a lack of strategies to invite and include less confident students in class discussions. It is noteworthy that Lisa's reputed dismissive communication style manifested in contexts other than the discussion of race in Lisa's classes. A student in CMNS 501 (Spring 2017) reported: "In the first day of class, Dr. Calvente said she didn't know how many of us were going to grad school. We all looked around at each other and said to her, 'Did you mean to say PhD? We are all in a master's program here?' Her response was, 'Oh, I don't consider a master's program to be graduate school.' I took serious issue with this comment. If Dr. Calvente does not believe that our MA education is at a graduate level, then she should not teach here. This is an unacceptable comment to make toward students at any level of their education. First impressions matter, as a professor within the department of communications[sic], Dr. Calvente should be aware of how she is communicating." DePaul has a diverse student body and we place high values on inclusion. According to several voting members, it is both a responsibility and a requirement for faculty members to create a welcoming classroom climate based upon acceptance and respect for all kinds of students, particularly those who need intellectual and emotional support to grow.

It was noted that Lisa has continued to ignore the agreement among the intercultural communication faculty on what topics should be covered in core classes (i.e., CMN 103 and CMNS 501). Lisa's course content tends to have a strong focus on race, gender, and class, leaving out several important concepts, theories, and perspectives within the discipline. This concern had been raised and conveyed to Lisa in the last review period. When the question of consistency was raised during the Personnel Committee meeting, Lisa responded that she met the learning objectives for the courses, while electing to cover different topics and use different course material. While the need to support academic freedom was mentioned during the tenured faculty discussion, several members spoke of the specific requirement to use appropriate course materials that aid common learning outcomes and curricular consistency set forth by the program.

In its report, the Personnel Committee documented student feedback describing a lack of clarity when it comes to assignments and assessments of learning outcomes. This was

corroborated by the absence of teaching materials (specific instructions, grading rubrics/criteria for assignments) beyond course syllabi in 4 out of 6 courses Lisa taught in this review period. In cross-listed classes, Lisa has not met the requirement to develop separate syllabi to clearly communicate different expectations for undergraduate and graduate students. In addition, peer observation reports since her first review have reiterated a lack of structure and/or direction during class sessions, which could be aided by overviews, transitions, summaries, or handouts/directions. Members of the tenured faculty noted that developmental recommendations regarding this long-standing matter have not been adequately addressed by Lisa.

The tenured faculty also discussed student comments on and peer observations of Lisa's classroom time management, which is a recurring theme from the last review. These concerns range from important content not being covered, cutting discussions and class activities, to students not having enough time to complete their work. While several textbooks and readings were required, students often rushed to complete the books. Overall, Lisa's inattention to classroom time management led some students to feel that their time and investment into learning were not respected.

Lisa's heavy reliance on a seminar style in instruction has been repeatedly emphasized as an area that requires changes since her first formal review in 2013. It is noted in the discussion that concerns raised by students and the tenured faculty's suggestions for Lisa to accommodate the variety of students' learning needs through the plurality of teaching methods and strategies had not been heeded.

If Lisa is retained, the tenured faculty would need to see significant changes and improvements in her teaching practices as has already been outlined in her 2013 and 2015 reviews. These changes would need to be apparent in teaching materials, student reports, and peer observations. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul:

- Foster a welcoming classroom, based upon Vincentian personalism, respect, and acceptance for all types of students.
- Refrain from using unnecessary, strong verbal and non-verbal cues that undermine students' learning, create tension, or marginalize those who need support to explore their voice and ideas.
- Use appropriate strategies to manage class participation and to engage less confident students.
- Adopt the handbook enacted by her unit regarding topics that should be covered in intercultural communication core courses.
- Develop separate syllabi for undergraduate and graduate students in cross-listed classes
- Develop specific instructions/directions, clear grading rubrics/criteria for all assignments and class activities for all courses.
- Tighten in-class instructional delivery by providing overviews, transitions, summaries.
- Use signposting and adopt an explicit schedule for discussions and activities in order to make the most out of class time.
- Assign an appropriate volume of readings and allow reasonable time for students to complete assignments.
- Engage students with more varied teaching methods in class in order to accommodate the plurality of students' learning needs and style, including the use

of interactive, small group discussions, peer-focused activities, multiple media, lecture slides/outlines and handouts.

Research:

The tenured faculty commended Lisa on a significant body of work produced in this review period. A cumulative assessment of Lisa's progress toward tenure in the area of research was discussed. While some voting members believed her trajectory toward tenure in this area was **very good**, some others noted the extended timeline for research-focused productivity during her probationary period (e.g., the Woodrow Wilson fellowship provided Lisa additional funding away from teaching to focus solely on research) and redundancy between the book chapter "Image in Revolution" in her edited book and her prior journal publication ("The City Speaks," *Cultural Studies*, 2014). Upon further review, it was determined that the book chapter was *not* a reprint of the 2014 journal article. The tenured faculty agreed that the introduction chapter was part of Lisa's edited book and should not be listed as a separate book chapter. In addition, members of the tenured faculty emphasized the clear distinction between "under contract" and "forthcoming" works with the latter requiring evidence of their final acceptance (i.e., final manuscript –with all required revisions completed– has been accepted, returned to the press, and finally approved for publication). The tenured faculty further discussed how public performances of creative work are evaluated on the basis of their engagement outside of the classroom, scholarly reviews, grants, and awards relating to the work.

Service:

The majority of the tenured faculty found Lisa's progress toward tenure in the area of service **unsatisfactory**. Voting members recounted instances where service contributions listed in Lisa's document do not reflect substantial accomplishments. In addition, Lisa has been noticeably absent as a college representative at several required, university-wide events such as graduation and convocation. The tenured faculty endorsed the Personnel Committee's assessment that her service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers. It was emphasized at the discussion that, according to the College Tenure and Promotion Criteria, faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college.

If Lisa is retained, the tenured faculty would need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul.

# Exhibit 4





**College of Communication**
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-8600
FAX: 312/362-8620
communication.depaul.edu

January 9, 2019

Dear Members of the University Board on Promotion and Tenure:

The College of Communication personnel committee and the tenured faculty conducted a formal review of Dr. Lisa Calvente's application for tenure and promotion to associate professor. Dr. Calvente was evaluated by the personnel committee and her record was found to be "very good" in the areas of teaching, research, and service. The tenured faculty vote was 19 against and 2 in favor of tenure and promotion to associate professor.

Based on my own review of the application materials including the candidate narrative and supplemental materials and appendices, I agree with the recommendation of the tenured faculty against awarding Dr. Calvente tenure and promotion to associate professor. The College of Communication standard for tenure and promotion to associate professor is very clear. A candidate should achieve at least two ratings of "excellent" and no rating lower than "very good" in the areas of teaching, research and service. To overturn this nearly unanimous vote would require me to challenge the personnel and tenured faculty evaluation and move at least two of the three categories to "excellent" or to disregard the College's standards for tenure and promotion. In this case, neither action is appropriate. I find the College's evaluation of Dr. Calvente's probationary performance as "very good" in each of the three categories to be fair and consistent with the evaluation standards in the college. This is a difficult decision; Dr. Calvente's record has strengths that are detailed in the personnel and tenured faculty review. However, there are also significant concerns in each of the categories of evaluation.

TEACHING
As demonstrated in the review materials, Dr. Calvente has many strengths as an instructor and has made some valuable contributions in the classroom and to the curriculum. Dr. Calvente has taught 14 different courses (seven new preparations) across undergraduate and graduate levels, for the College of Communication, liberal studies, Critical Ethnic Studies, and Women and Gender Studies—a number consistent with untenured faculty in the College of Communication. Dr. Calvente is seen by students and peers as highly knowledgeable, passionate, and organized. Her courses often address some of the most difficult topics for students to discuss—race, social inequality, and social justice. As she mentioned in her narrative, her goal is to push her students to take a "critical lens" to interrogate the ways that marginalized voices can resist, talk back, and shift dominant social discourses. She has done this by combining theory with practice both in the

classroom and through service-learning and community engagement. She has taught performance studies courses that draw upon an innovative performance-based pedagogy that requires students to think critically about the world around them and then to embody and critique these interpretations by performing them. One of her courses, Performance for Social Change demonstrates her commitment to and value of community and student engagement. Students work with Chicago nonprofits to explore the intersection of race, racism, and human rights in the prison industrial complex. The course culminates with a public performance, created by the students, that speaks to the injustices of the prison industrial complex and offers hope for solidarity and social change.

While there are many positive aspects to Dr. Calvente's teaching, there were also areas that were identified in past formal reviews that needed to be improved to reach a rating of "excellent." Some of these were refinements in teaching, such as varying her teaching practices to accommodate diverse learning styles, including more visual prompts to help students better track complex material, and implementing organizational and time management strategies. In her 2018 appendix, Dr. Calvente lists some of these suggestions with her own comments on how she has responded (or not) to each. For some, she accepted the advice of personnel such as providing more verbal transitions, summaries and overviews during class lectures and discussions. For others, she questioned either the relevance or the fairness of the recommendations. For example, she rejected the suggested best practice to add more visuals to class sessions to help students with diverse learning styles meet the necessary requirements for the courses. She stated that she prefers a more traditional seminar structure to promote active listening as a necessary skill for students to develop and because it counters a western style of visual learning. Further, Dr. Calvente was asked to adhere to the course guide created by her unit and to include required topics in intercultural communication core classes such as CMN 103: Intercultural Communication. This is an overview course that is designed to cover a multitude of theories and perspectives—an introduction to the field of intercultural communication. Dr. Calvente's approach is to teach it exclusively through a critical theory lens. Prior formal reviews requested that she follow the guidelines and incorporate multiple theoretical approaches to intercultural communication. In her appendix, Dr. Calvente misrepresented the focus of this critique as requiring an approved textbook. She also states that her course was approved by the course supervisor, Dr. Lucy Lu. Dr. Lu emphasized in the personnel review meeting that she informed Dr. Calvente that there is no textbook requirement, but that the multitude of theories and topics must still be covered in the course for approval.

An additional concern raised in prior formal review documents beginning in 2015 and referenced in each subsequent review deals with recurring student comments about feeling intimidated and/or uncomfortable in the classroom. As noted by both students and peer observers, the topics addressed in Dr. Calvente's courses can lead to challenging class conversations that can be emotionally difficult. In her narrative, Dr. Calvente states that her pedagogical approach enables students to "articulate their own positions on racism and other forms of marginalization freely and early on in the course" so that she can address these issues and student concerns. Looking at teaching evaluations, for many of her students, this approach has worked. She has been described by students as honest, respectful, and genuine. There have been, however, a number of students for whom this is not working and who have voiced strong concerns that Dr. Calvente is

intimidating and dismissive in the classroom setting, particularly if they (or other students) are seen as disagreeing with her.

As recently as Fall 2018, two complaints against Dr. Calvente were brought to the College Office that reflect the types of negative comments seen in the evaluations. In separate statements, two male students stated that during a critique of their group performance, Dr. Calvente called them "sexist and misogynist" several times in front of the class and in a follow-up email to the entire class. When they disagreed with the critique, they said that Dr. Calvente was very visibly angry. One student said she kept "death glaring at us." One of the students said that as "an Arab, brown-skinned man, it was as if my reality does not matter. The professor is a person of power." The student continued, "I left Saudi Arabia to avoid this kind of thinking and education. I was not disrespecting her authority, I was disagreeing with an idea." To be fair, I want to share that Dr. Calvente also filed an incident report through the Dean of Students Office that claimed the male students were very disruptive in the class and disrespectful to her and the female student in their group. And, both the male students admitted to getting angry during the discussion. From a follow-up conversation I had about the incident with Dr. Calvente, I believe she may have been trying to use the incident as a teachable moment related to the course content, but the male students came away feeling alienated and attacked. One dropped the class claiming his mental health was worth more than the tuition he would lose. The other stayed in the class, but said he was scared to participate again. I typically wouldn't go into detail on a student complaint for a tenure and promotion case. And, there are very clearly two sides to this story. I share this recent event because it provides a window into the type of polarizing comments that have shown up in Dr. Calvente's teaching evaluations.

In her narrative, Dr. Calvente states that the negative responses are intensified since she is a U.S. born woman of color leading a discussion on race and racism. I agree that her embodied experience of difference as an instructor cannot and should not be ignored. It is difficult to know, however, if this is the only reason some students respond negatively to her teaching style. The question becomes, then, what can be done to reach these students. In this way, the concern surrounding Dr. Calvente's teaching is less about the existence of the negative comments, and more about how Dr. Calvente has chosen to respond (or not respond) to them. When the comments were brought to her attention in an earlier formal review (2015), the personnel committee initiated a conversation about how she could potentially reach these students. Rather than reflect on how she might more effectively engage and teach the students who were feeling alienated, she offered one solution: students could drop the course if they didn't like her teaching. In a later formal review (2017), when issues of student discomfort were again raised by the college personnel committee (comprised of a completely different set of elected tenured faculty than the 2015 review), Dr. Calvente dismissed the concerns. She stated that for her to act upon the recommendations, she would have to agree with them. In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations. In her 2018 appendix, Dr. Calvente takes time to do her own calculations by student (not course) to show that by that date 20 students had expressed concerns about the classroom environment. In the judgment of the tenured faculty, this number and the content of the comments is not acceptable, particularly when a faculty member is resistant to adapt her teaching in response.

Again, I want to emphasize, for the majority of her students, Dr. Calvente provides a positive, and for some an extraordinary experience. She has made efforts to improve some aspects of her teaching. To be an "excellent" teacher at an institution such as DePaul, however, requires a commitment and an effort to try to reach all students—even those who may (possibly unfairly) view you or your course content negatively. This is the conundrum of this case. Taken together, these concerns justify the evaluation of "very good" as a fair assessment of her teaching and consistent with other cases in the college.

RESEARCH

Dr. Calvente's research is also evaluated as "very good." Prior to DePaul, she published one book chapter and two encyclopedia entries. Since arriving at DePaul in 2011, she published three peer-reviewed articles, one peer-reviewed book chapter, an edited book in which she wrote the introduction and co-wrote another chapter, and a book review. Her most productive publication period has been the last two years of her probationary period after she received a year-long fellowship through the Woodrow Wilson Career Enhancement Fellowship for Junior Faculty.

There are commendable qualities to Dr. Calvente's scholarship. It is grounded in her commitment to social justice, in particular race and racism as manifested in local and global contexts. Her work is interdisciplinary, drawing on areas of cultural studies, critical race theory, and performance theory. She has studied a wide range of events and experiences as showcased in published pieces on representations of blackness and immigration, visual significance of flags during the Haitian Revolution and Pan-African decolonization. Her recent work on the hip hop culture in New York City led one external reviewer to say that her ability to track "the intersections of neoliberalism, rising racism, increasing structural oppression, with the emergence and persistent of hope *and love* [emphasis theirs]—is rare and important." Dr. Calvente carefully contextualizes these contemporary manifestations of race and culture in broader histories of black oppression while also connecting local experiences of racism with the larger, more global effects of neoliberalism and structural oppression.

While her topic areas are significant and timely, both the tenured faculty and two of the external reviewers stated a desire to see more work published during the probationary period for a more notable impact. In earlier formal reviews, the personnel committee advised Dr. Calvente to publish peer-reviewed articles to strengthen her tenure case. The College of Communication guidelines clearly state that edited books do not carry the same weight as peer reviewed articles published in academic journals. Dr. Calvente also references a book-length manuscript that has been in process for a number of years. There is no way to assess the quality or significance of this project at this stage. While there are some publisher emails signaling interest after seeing her initial query letter, the candidate's dossier did not include a sample book chapter or a completed manuscript. The guidelines also clearly explain that a book manuscript must be accepted by a press, in final form, and in the publication pipeline in order for it to count toward tenure.

Beginning in 2017, Dr. Calvente listed three student performances on her CV as unpublished scholarship. According to her narrative, she co-authored these performances with her students and also served as director. The College of Communication guidelines for tenure and promotion do allow for public performances to count as creative scholarship. Dr. Calvente's students did offer a public performance at the end of each class. However, the performances themselves

served as a final assignment for each course. Based on the information provided by Dr. Calvente, a review of the submitted performance video, and the College guidelines, the College of Communication personnel committee appropriately categorized these performances as teaching, not research. This determination is in alignment with the University Faculty Handbook which states that "activities conducted solely within the candidate's classes…are considered in evaluating the candidate's teaching, not in evaluating his or her contributions in scholarship."

Therefore, based on the quality and quantity of Dr. Calvente's research, she is appropriately ranked as "very good" in this area.

SERVICE
In the area of service, Dr. Calvente is also ranked as "very good" by her peers. Dr. Calvente has participated in service obligations at the program, college, and university levels. Most of the service that Dr. Calvente has provided at the program and college levels has been in ad hoc, short-term capacities. For example, she helped review syllabi for CMN 103, helped solicit feedback from college advisors on proposed curricular "pathways" for communication studies, and has been a representative at student open houses and presented student awards. Also, of note is her participation on a term faculty hiring committee and her work advising students in the Latino Media and Communication program. Dr. Calvente also lists other smaller activities such as guest speaking in the graduate foundations course and participating in various meetings as service. The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee. The committee reviews term faculty on a two-year rotation including peer observations and writing and editing documents. Dr. Calvente has been an active and valuable member of this committee for the past two years. To receive an "excellent" rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period.

Dr. Calvente has provided other college-level service outside of the College of Communication where she has served as an affiliate faculty member for several different programs in the College of Liberal Arts and Social Sciences including the African and Black Diaspora Studies Program, the Latino Studies Program (where she also served on a tenure-track hiring committee), and the Critical Ethnic Studies MA program. She is a member of the Women's Center Advisory Board. Her service in these areas is described as conscientious, invaluable, and collaborative. Dr. Calvente has started building a record of service at the university level. In the past year, she has been a member of the General Education Task Force Report Review, the Council on Community Engagement, and participated in the WPI Project-Based Learning workshop.

The College of Communication is a small college that must spread service obligations across a fewer number of tenure-track faculty than many other colleges. Therefore, in the College of Communication, candidates ranked as "excellent" in service have provided much more ongoing, substantial committee work, particularly within the College of Communication and at the university level where we have requirements for representation on a number of committees. The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review. This is not to say that the service contributions provided by Dr. Calvente have not been valuable; she is aptly rated as "very good."

In the end, I believe that Dr. Calvente's performance in the areas of teaching, research, and service has been fairly evaluated as "very good." She exhibits strengths in all three areas. But, there are also significant areas in her performance to date that must be stronger to reach the levels required for tenure and promotion. Again, the College of Communication guidelines for tenure and promotion to associate professor include an expectation that at least two of the three areas of performance are ranked "excellent" with no category below "very good." Dr. Calvente has been given clear feedback through formal reviews over the years with the hope of improving these ratings. A vote of 19-2 against tenure and promotion is a significant statement. To overturn this, I would need to see flaws in the reasoning of the tenured faculty and/or make an argument that at least two of the areas reach the level of excellent. Based on what is presented in the dossier at this time, I cannot make that case.

Sincerely,

Alexandra Murphy
Professor and Acting Dean
College of Communication
Vincent de Paul Professor

# Exhibit 5





**University Board on Promotion and Tenure**
1 East Jackson Boulevard,
Chicago, Illinois  60604-2287

**TO:**     Salma Ghanem, Acting Provost

**FROM:**   University Board on Promotion and Tenure

**DATE:**   May 10, 2019

**Re:**     Lisa Calvente's Application for Promotion to Associate Professor with Tenure

---

The 2018-2019 University Board on Promotion and Tenure met on Friday, March 8, 2019, to consider Lisa Calvente's application for promotion to Associate Professor with tenure.  Dr. Calvente joined DePaul as an Assistant Professor in 2011; her tenure application was deferred two years due to an approved leave during AY 2012-13 and a URC research leave during AY 2015-16.  Professor Calvente holds a PhD from University of North Carolina at Chapel Hill.

**Board Members Present**:  Ruth Gannon Cook (School for New Learning); Nila Hofman (College of Liberal Arts and Social Sciences); Xiaoping Jia (College of Computing and Digital Media); Gregory Mark (College of Law); Thomas Miller (School of Music); Sandra Shelton (College of Business); Bruno Teboul (College of Communication)

**Board Members Absent**:  None

**Vote Summary:**
*College of Communication tenured faculty*:  2 – 19 (Support – Oppose)
*College of Communication Acting Dean recommendation*:  Does not support
*University Board*:  4 – 3 (Support – Oppose)

A majority of the University Board on Promotion and Tenure disagreed with the majority of the tenured faculty of the College of Communication and the Acting Dean of the College of Communication, and found that Dr. Calvente has met the criteria for promotion to Associate Professor with tenure.

In terms of teaching, the Board agreed with the unit's largely positive assessment of Dr. Calvente's overall teaching performance, with a majority of the Board finding that Dr. Calvente's teaching, as evidenced by consistently high student evaluations, a strong student

report, and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook.

The Board considered each of the principal teaching concerns raised in the unit level review.

*Concerns that Dr. Calvente created a 'harsh, uncomfortable atmosphere for her students', and that her students felt intimidated in her classroom.* A majority of the Board recognized that while these are serious concerns, the negative responses to Dr. Calvente's teaching represented a very small minority of her students. The Board was encouraged to notice a significant improvement in the recent years, although negative feelings have still been occasionally expressed by a small number of students. The Board encourages Dr. Calvente to experiment and innovate with different and/or mixed pedagogy to accommodate students with different learning styles, to be open to different perspectives, and to attempt to reach all of her student audience in the future.

*Concerns that Dr. Calvente's CMN 103 was not meeting the needs of the College by not following curriculum guidelines.* The faculty report indicated that Dr. Calvente ignored the curriculum guidelines of CMN 103 agreed upon by the faculty. However, the additional documents provided by Dr. Calvente in her response to the College's decision included an email from a senior faculty member confirming that the syllabus of CMN 103 designed by Dr. Calvente was appropriate. A majority of the Board believed that this evidence suggested that the concerns with not following the curriculum guidelines could very well result from a misunderstanding between parties regarding the expectations. The Board encourages Dr. Calvente to recognize the importance of incorporating the feedback and suggestions from her colleagues into her core courses, and to align CMN 103 with applicable guidelines. The Board was pleased to learn from Dr. Calvente in the interview with the Board that she would be more than happy to meet with area faculty to ensure that the content in CMN 103 conforms to the course guidelines and learning goals.

A minority of the Board members shared the degree of concern expressed by the faculty and the Dean that some of Dr. Calvente's students felt intimidated and/or uncomfortable in her classroom. These Board members felt that while the number of students with negative feelings represented a small minority, negative responses are still evident and an important part of the record, with the impact on some of the students being severe. To Board members, these negative responses cannot be entirely attributed to the subject matter of the courses Dr. Calvente has taught, since there are other instructors who have taught similarly challenging subject matter without the volume and severity of negative responses we have seen in Dr. Calvente's case. Further, these concerns are indications that there is room for improvement in Dr. Calvente's teaching, and the unit's assessment of Dr. Calvente's teaching being short of *excellent* is justified. The Board encourages Dr. Calvente to learn from her peers who successfully teach similarly challenging classes and to continue to explore ways to make all students feel welcome and respected in her classroom regardless of their individual ideology and viewpoints.

In terms of scholarship, the Board recognized that in the categories valued most by the unit, Dr. Calvente's total body of work consists of, at minimum, 3 peer-reviewed articles and 3 peer-reviewed book chapters during the probationary period, in additional to 6 papers in international conferences and 10 presentations in national conferences. A majority of Board members

considered these works alone, without counting Dr. Calvente's editorial role in her co-edited book and the public performances by her students, represent a sufficient volume to warrant promotion and tenure. The significance and quality of her work were praised by the external reviewers and echoed by the faculty in the unit report. Based on this evidence, a majority of the Board found Dr. Calvente's scholarship to have met the minimum standard of *notable* in the Faculty Handbook. The Board encourages Dr. Calvente to continue her research trajectory with more quantity and quality in peer-reviewed articles, and to establish a sustained research stream with notable contributions to her field.

Some members of the Board shared the concerns by one of the external reviewers that the total volume of scholarly work completed by Dr. Calvente is "slim" and that Dr. Calvente failed to meet the unit's expectation to complete her book project following 2 pre-tenure research leaves (URC and Woodrow Wilson Career Enhancement Fellowship for Junior Faculty). With these concerns, a minority of the Board considered that the unit's assessment of Dr. Calvente's scholarship being short of *excellent* was justified.

In terms of service, some of the Board members shared the concerns of the faculty that a large portion of Dr. Calvente's service was outside her home unit. However, the Board agreed that Dr. Calvente's overall service contribution was sufficiently strong to meet the criteria for service in the Faculty Handbook. The Board encourages Dr. Calvente to continue to build on her service record, in her home unit, as well as at the college and university levels.

The Board recognizes that a local unit may define local standards at a greater level of specificity and higher expectations in quantity and quality than what is stipulated in the Faculty Handbook. The unit's aspiration to excellence by requiring two of the three areas to be excellent is appropriate and indeed commendable. Given the unit's aspiration to excellence and the concerns in teaching and scholarship in Dr. Calvente's case, the dissenting members of the Board were not convinced that Dr. Calvente has met the aspiration for *excellence* set by the unit in either teaching or scholarship, nor do they find sufficient ground to overturn the judgement of an overwhelming majority of the faculty and the Dean.

The Board congratulates Dr. Calvente on her accomplishments during her probationary period and looks forward to a record of sustained excellence in teaching, research, and service in the years to come.

This recommendation accurately reflects the University Board on Promotion and Tenure's discussion of Lisa Calvente's application for promotion to Associate Professor with tenure.

Gregory Mark
*Professor of Law*
*College of Law*

Ruth Gannon Cook
*Professor*
*School for New Learning*

Ginger Hofman
*Professor of Anthropology*
*College of Liberal Arts and Social Sciences*

Xiaoping Jia
*Professor of Computer Science and Software Engineering*
*College of Computing and Digital Media*

Thomas Miller
*Professor of Sound Recording Technology*
*School of Music*

Sandra Shelton
*Professor of Accountancy*
*Driehaus College of Business*

J. C. Bruno Teboul
*Professor of Organizational and Multicultural Communication*
*College of Communication*

# Exhibit 6





**Office of the Provost**
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-1330
FAX: 312/362-8874

June 10, 2019

Lisa Calvente
6748 N. Glenwood Ave.
Chicago IL 60626

Dear Professor Calvente,

I regret to inform you that I have decided that you will not be granted tenure and promotion to Associate Professor. This decision is in agreement with a significant majority of your tenured colleagues in Communication, with the Acting Dean of the College of Communication, and with three of the seven members of the University Board on Promotion and Tenure (UBPT). My decision regarding your application for promotion and tenure is based on my review of your dossier (including your response to the college reports) and my attendance at the UBPT hearing on your case.

The College of Communication guidelines indicate that, for tenure and promotion to Associate Professor, the College "expects excellence in at least two areas, with the third being rated at least very good." The College recommendation on your application for tenure and promotion evaluates your record as "very good" in the three areas of teaching, research, and service, and reports a 2-19 vote recommending against your tenure and promotion. The Acting Dean agreed with these evaluations and, accordingly, has also recommended against your promotion. In its turn, and with your response to the college reports in hand, the UBPT evaluated your record, paying particular attention to the issues where there had been disagreement. Although the UBPT recommendation report did not dispute the tenured faculty's and acting dean's evaluation of your record as "very good," it notes that the Board's dissenting members (3 out of 7) did consider the College of Communication's above guidelines in making their decision on the case.

There is every evidence of careful review of this case at all levels. Exercising professional judgment, experienced faculty colleagues have evaluated your work. Per the handbook, before granting tenure, "the university should have *no reasonable doubt* about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission" (emphasis mine). The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised

by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority.

As noted in the college and dean's reports and as acknowledged by you in your response, the concerns that have been raised in this tenure review have been raised in earlier probationary reviews. Given this, I would like to clarify my own earlier role in the consideration of your case, as Dean of the College of Communication during your 2015 and 2017 formal reviews. In the conclusion to your response to the college reports, you referred obliquely to my "assessments" during those earlier reviews. It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure." I had noted some improvement between formal reviews and wanted to give you the opportunity to address the remaining stated areas of concern in all three areas to meet the standards of the college by the time of your tenure review. In my letters of renewal in 2015 and again in 2017, I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation of your colleagues.

This denial of tenure means that the 2019-2020 academic year will constitute your terminal year of employment at DePaul University, with an effective termination date of June 30, 2020. I am grateful for your years of service to DePaul University and the College of Communication. I wish you the best in your future endeavors.

Sincerely,

Salma Ghanem, Acting Provost

cc:     Lexa Murphy, Acting Dean, College of Communication

# Exhibit 7

**Faculty Appeals Board Report to the President of DePaul University**

Date: 01/15/20

To: A. Gabriel Esteban [President DePaul University]

From: Faculty Appeals Board [Brian Boeck, Jose Liberti and Bridget Tenner]

CC: Lisa B.Y. Calvente [Appellant].

**Executive Summary**

The Board finds that the Appellant was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion.

Regarding ground (2) for appeal *"The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision"* the board unanimously decided that the documentation meets the criteria for a successful appeal.

Regarding ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws"* the board unanimously decided that the documentation does not meet the criteria for a successful appeal.

Though the majority of allegations advanced in the Appellant's appeal could not be substantiated by our investigation, three avenues of investigation were central to our determination. The Board considers two serious allegations to be both substantiated and material to the decision to deny tenure and promotion: 1. deviations from procedures in the evaluation of teaching, 2. deviations from procedures by failing to provide clear and consistent guidance regarding service in formal reviews (as mandated in FH 3.3.1). Regarding a third serious allegation, the Board could not substantiate a conflict of interest with respect to the Provost's final decision. Though it believes that the Provost acted in good faith, serious concerns remain about how the 2015 and 2017 formal reviews were weighted in the Provost's final decision. The Board finds that both reviews contain

misrepresentations related to teaching that were never corrected or addressed in spite of multiple attempts by the Appellant to draw attention to them.

**Summary of Board Investigation**

In accordance with Chapter 5 of the Faculty Handbook (FH) The Faculty Committee on Appeals (FCA) received the appeal of Lisa Calvente (hereafter the Appellant) who was denied tenure and promotion. The FCA selected a three member board (hereafter the Board) consisting of the above-named faculty members to hear the appeal and make its recommendation to the president.

Before the Board even received the Appellant's appeal documentation, it began receiving communications from concerned individuals from outside of DePaul University. The Board considers the Appellant's disclosing of the names of the Board members to individuals outside the university to be a serious breach of confidentiality under Faculty Handbook 6.4.2.

Section 5.1.2.3 of the Faculty Handbook states "*A faculty member may appeal the decision to deny an application for tenure and promotion. The appeal must be based on one or more of the following grounds:*
1. *The decision violated the faculty member's academic freedom.*
2. *The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.*
3. *The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.*"

The Appellant argued in "Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" [hereafter the Appeal] that all three grounds for appeal existed and were material to the Interim Provost's decision to deny tenure. The Board met for three hours to discuss this documentation on 9/27/19 and engaged in additional consultations in subsequent weeks.

In *Memorandum: Preliminary Review of Dr. Lisa B.Y. Calvente Appeal of Tenure and Promotion* dated 9/27/19 the Board outlined to A. Gabriel Esteban [President of DePaul University] its determination that the Memorandum of Appeal and Supporting Documentation did not satisfy the criteria for ground (1) violation of academic freedom. The vote was 3-0 in favor of not proceeding with investigation of this ground for appeal. The memorandum also outlined a timeline for investigating ground (2) for appeal "*The evaluation of the*

*candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision,"* and ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws."*

The Board conducted a thorough investigation as mandated by Faculty Handbook 5.1.1.4. This investigation commenced with a careful and extensive review of the documentation submitted by the appellant ("Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" consisting of 17 pages and attachment "Supplementary Documentation" consisting of 133 pages of documentation) as well as documentation from the University EEO office.

The Board consulted with Stephanie Smith, Chief Human Resources Officer regarding claims of discrimination/retaliation, solicited information from three faculty members with knowledge of the case, questioned the authors of reports that recommended against renewal or promotion, and reviewed clarifications and additional documentation from both the appellant and the College of Communication [hereafter the College]. The Board sent the Appellant, Lisa Calvente, a dozen initial questions and three additional requests for documentation or clarification. The Board sent Alexandra (Lexa) Murphy, Acting Dean, College of Communication [hereafter Dean], 11 initial questions, 23 follow-up questions and two requests for additional documentation. The Board sent Interim Provost, Salma Ghanem [hereafter Provost], 3 initial questions and 28 follow up questions. It received timely and helpful responses to all of its queries.

The Board also solicited and carefully scrutinized three groups of additional evidence. It reviewed the Appellant's Student Evaluations of Teaching, both quantitative/statistical and open-ended student comments and responses, for all classes offered at DePaul through the 2017 formal review. It reviewed all letters from the Appellant's tenure dossier documenting her service. It reviewed anonymized (all faculty names removed) copies of the service sections of the CVs of all candidates for tenure from the College of Communication who were ranked by the College Personnel Committee as "excellent" in service within the previous ten years.

This evidence and documentation was comprehensively discussed by the Board on November 7, 2019 and subsequent occasions.

NOTE: Italics will be used when quoting directly from the documentation reviewed by the Board.

**Ground for Appeal II. Procedural Violations**

<u>Appellant's Allegations Regarding the Provost</u>

In section one of the appeal the Appellant advances three major allegations regarding procedural violations by the Provost. (Discrimination/Retaliation allegations interspersed on pages 1-15 of the appeal will be addressed below in the section devoted to ground for appeal three).

1 (A, page 2 of appeal) the Appellant alleges that the tenure decision by the Provost failed to provide a "compelling reason" for overturning the recommendation of the UBPT.

2 (B, page 5 of appeal) the Appellant alleges that the tenure decision by the Provost, violated the University's conflict of interest policies.

3. (a, page 3 of appeal) the Appellant alleges that the tenure decision by the Provost relied upon concerns articulated by the College during formal and informal reviews, and violates the University's criteria with regard to tenure and promotion procedures by failing to allow for university-wide consideration of her tenure case.

<u>The Board's Findings</u>

Regarding allegation one, the Board finds that the Provost (in the decision letter to the Appellant dated June 10, 2019) did provide multiple reasons for overturning the recommendation of the UBPT.

In discussions about whether those reasons were compelling, the Board devoted particular attention to Dr. Ghanem's statement in the letter to the Appellant dated June 10, 2019:

*"The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority."*

This statement appears to imply that there exists a specific proportion of positive votes by the UBPT which would have sufficiently answered the concerns raised by faculty members in the College. Dr. Ghanem's response to the Board, however, reiterated her agreement with the evaluation of the UBPT board members who did not assess the Appellant's work as excellent in teaching and research. The UBPT recommendation dated May 10, 2019 clearly conveys the reasons advanced by the dissenting minority.

The Board discussed whether or not the reasons provided by the Provost for tenure denial meet the Faculty Handbook's [3.5.6.3] threshold for providing compelling reasons in a written explanation. The Board also focused its investigation on determining the extent to which student comments about 'intimidating and dismissive' behaviors (discussed below) influenced the Provost's tenure decision. The results of that investigation inform the Board's findings regarding other allegations discussed below. The Board does not find that the Provost violated Section 3.5.6.3 of the Faculty Handbook, though it does find that flawed personnel documentation informed the Provost's reasoning. The Appellant's case was one of only 3 (out of 47) in which earlier formal or probationary reviews conducted at the unit or college level were specifically referred to or cited in the Provost's letter of decision regarding tenure/promotion.

Regarding allegation two, the Board finds that the tenure decision by the Provost did not violate the University's conflict of interest policies. The Board notes that the appeal did not provide sufficient, specific evidence to substantiate the claim of a conflict of interest. Nor did the Appellant refer to relevant sections of the University Code of Conduct, which explain or define 'conflict of interest.'

The Appellant asserts that Dr. Ghanem should have recused herself from consideration of her tenure case. On Page 6 of the appeal the appellant states: "*Dr. Ghanem's decision not to recuse herself from my case constitutes a clear conflict of interest*." The Board disagrees and notes, for reasons further outlined below, that the specific facts of this case would not mandate a recusal according to Faculty Handbook [3.5.1.1.h] or university policy. Moreover, a recusal would potentially have made an unprecedented case even more procedurally complicated, since Faculty Handbook Chapter 5 provides no clear guidance for handling an appeal in such circumstances.

The preponderance of evidence submitted to the Board demonstrates that the Provost acted in good faith and objectively evaluated the Appellant's performance based on the evidence provided by the Appellant and the College.

Regarding allegation three, the Board finds that the Provost did assign undue weight to concerns, particularly those about teaching, articulated by the College during earlier, pre-tenure formal and informal reviews.

In its deliberations regarding allegation three, the Board was particularly concerned by the unique aspects of this particular case. It finds that Provost Ghanem formally occupied two distinct roles in the handling of the Appellant's tenure case within the same academic year [as a result of the fact that the Provost started the academic year as Dean of the College of Communication]. Dr. Ghanem states that she did not occupy two distinct roles because she "*did not weigh in at all as dean on Dr. Calvente's tenure and promotion review or*

*that of any of her Communication colleagues who went up in AY 2018-2019.*" However, in the opinion of the Board, the sudden transition of Dr. Ghanem to a new leadership role in the university created a situation which was unprecedented in recent university practice. In her newly assumed role as Acting Provost, Dr. Ghanem was significantly more familiar with Dr. Calvente's case, as presented through the problematic lens of College personnel documentation, than with other tenure cases she considered as Provost in AY 2018-2019. The undue weight assigned to concerns articulated in College personnel documentation was therefore material to the Provost's decision.

In its consideration of evidence regarding allegation three, the Board found that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal. Faculty Handbook Section 3.3.1.3 clearly specifies that the tenure review is a university-wide consideration.

On page 4 of the appeal the Appellant alleges that the College had a disproportionate say in her tenure process, in violation of university-wide consideration. She states: "*Dr. Salma Ghanem, in her role as Interim Provost (then Acting Provost) of the University articulates concerns that would have been appropriate to her previous role as Dean of the College of Communication. In the position of Interim Provost, and by privileging College concerns, Dr. Salma Ghanem violates the requirements of university-wide consideration.*"

The Board finds that the UBPT conducted a substantive review applying current university-wide standards and criteria as stipulated by Faculty Handbook Section 3.5.6.1.c.

The preponderance of evidence examined by the Board substantiates the Appellant's allegation that the Provost's reasons for overturning the recommendation of the UBPT assigned greater weight to college concerns than university-wide criteria.


Appellant's Allegations Regarding Bruno Teboul, faculty of College of Communication and member of the UBPT.

In section one of the appeal the Appellant advances an allegation regarding procedural violations by a member of the College who served on the UBPT.

On page 6, marked as 'b.' , the Appellant alleges a violation of conflict of interest policies by a member of the College during her formal and informal reviews and during her UBPT review.

The Appellant states:

*"The composition of the UBPT also included a faculty member of the College, Dr. Bruno Teboul. While the UBPT voted to recommend tenure, the Interim Provost's letter overturning the UBPT recommendation cited the "slim majority" of the vote as a reason for the negative outcome. This further suggests a conflict of interest that should have been explicitly acknowledged per the Faculty Handbook."*

### The Board's Findings

The Board questioned Dr. Teboul. It deems his response, which outlined his adherence to the requirements of the Faculty Handbook Section 3.5.1.1.b, to be credible.

Regarding this allegation, the Board finds that the evidence does not substantiate the claim of conflict of interest.

### Appellant's Allegations Regarding Contract Year In College Pre-Tenure Review

In section one of the appeal the Appellant advances two allegations regarding procedural violations with respect to determining contract year in College pre-tenure reviews.

1 (C, Page 6 of the appeal) The Appellant alleges that the College failed to follow University policies and procedures in the evaluation of scholarship, teaching and service appropriate to Contract Year.

2 (a, Page 7 of the appeal) The Appellant alleges a violation of Section 3.2.2 of the Faculty Handbook with regards to leaves of absence.

### The Board's Findings

Regarding allegation one, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Regarding allegation two, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Based on a careful evaluation of the evidence, the Board determined that any minor, unintentional errors or procedural uncertainties about contract year resulting from leave(s) of absence would not have required a reassessment of the entire file during pre-

tenure reviews.

<u>Appellant's Allegations that the College Violated Policies in the Evaluation of Scholarship.</u>

In section one of the appeal the Appellant advances two major allegations that the College violated policies for the evaluation of scholarship.

1 (on page 9, 11) the Appellant alleges that the College violated Faculty Handbook Section 3.5.2.c, which reads: *"All documents considered at each level must be passed on to subsequent levels,"* by failing to send out all of her public performances to external reviewers for evaluation.

2 (on page 9, 11) the Appellant alleges that the College violated its own criteria for evaluating scholarship and university policies by not counting her public performances as scholarship.

The Board focused its investigation on two particular statements in the appeal.

On page 9 of the appeal, the Appellant states: "*It came to my attention **after** my external letters had been submitted to the College, that in fact the **College had violated University procedure and failed to transmit my dossier to external reviewers.** [emphasis in bold Appellant's] The College did not notify me of this occurrence; rather, one of my external letter writers noted the omissions of the materials in their letter, and this came to my attention after Acting Dean of the College Alexandra Murphy sent me copies of the letters*."

The Board notes that there is a major difference between failing to transmit an entire dossier and failing to transmit or reclassifying individual items.

On page 11 of the appeal, the Appellant states: "*The College's failure to acknowledge my public performances, which involved community partners and students, and were not restricted to the classroom, violates both University policy and College criteria where the evaluation of scholarship is concerned. Moreover, I was hired in the College as a race and performance scholar. The College's failure to send out my performances for evaluation and its discounting constitutes a violation of College and University Guidelines. Furthermore, Section 3.5.2 of the Faculty Handbook provides that "At all levels of evaluation the following processes must be followed...c) **All documents considered at each level must be passed on to subsequent levels**"* [emphasis in bold Appellant's]. *The College's failure to send out my performances to the*

*external reviewers for evaluation is also in direct violation of this aspect of the University's policies. It's impact, given that the Interim Provost used the College's ranking of "very good" for my scholarship in order to substantiate her decision to overturn the UBPT recommendation, had a direct and negative effect in the outcome of my tenure application.*"

To investigate the Appellant's claims, the Board requested additional clarification from the Appellant about how the performances were documented.

Faculty Handbook Section 3.6.1.1. includes among 'Items Supplied by the Candidate' the following statement: "*A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities.*" Faculty Handbook Section 3.5.1.3 provides guidelines for evaluating collaborative work. Therefore the Board determined that it was the candidate's responsibility to record and properly document her contributions to any performances that would be included in the tenure dossier. It also determined that the format in which the performances were documented would be crucial to its investigation.

<u>Additional Information Uncovered During Investigation</u>

**Extract** from the Appellant's response to the Board dated September 22, 2019.

**Board question:** Pages 10-11 discusses how public performances were evaluated. Please provide a specific description of how each performance was documented at the time of the performance and the specific formats in which a record of each performance was preserved.

**Appellant's response:** *As part of my pedagogical approach that comes from participatory performance/theater, I require all aspects of the documenting and advertising the public performance to come from the students. Each time one of these performances are held the students are responsible for recording it because part of the agenda is for the students to find agency and accountability in these performances. As such each performance was recorded differently. In 2013, the performance was recorded by the now defunct technology services team in the college. In 2015, a friend of a student in the performance recorded it, and provided a Youtube link to the performance. In 2016, the performance was not digitally recorded so in lieu of the actual performance, I provided a letter from Rubén Álvarez Silva, who attended the event and was my advisory contact from the Steans Center for that particular course. I also provided the advertisement from the students for the performance. In 2019, a student asked her co-worker from the College of Computing and Digital Media to film the performance. Helen Damon Moore, who attended the event, from the Steans Center also had a photographer archive the performance.*

**Board question:** How was each performance documented in the dossier?

**Appellant's response:** *During each review period that followed a performance, I provided the College with documentation of the performance based on the method of documentation specific to that particular piece. In my tenure dossier, this took the form of 1) web links to the performances 2) letters from those who attended and screened the performances 3) any relevant advertisements. Because each performance has both a scholarly as well as pedagogical component, the method of documentation and advertising changes according to the will of the student participants and community partners with whom I collaborate to stage these performances. Some performances were filmed, while others were not. All, however, were documented in my dossier according to College and University guidelines.*

**End of Extract.**

The Board also questioned Dean Murphy about the submission of the Dossier.

Extract from Dean's response dated September 23, 2019.

**Board question:** Who sent out Lisa Calvente's dossier? On what date was the dossier transmitted to external reviewers? Were any items in the dossier not transmitted to external reviewers?

**Dean's response:** *I sent out the dossier to the selected external reviewers. Two dossiers were sent on 6/25/18 and a third was sent on 7/10/18. A YouTube link to a class-based performance was not included.*

**Board question:** If any dossier items were not transmitted to external reviews, what were those items, who made the decision not to transmit items, and what was the rationale for this decision?

**Dean's response:** *As noted above, a link to a class-based performance was not included in the dossier sent to the external reviewers. The link was embedded in the list of the citations of the articles being sent out and was missed in the compilation of the items.*

**Board question:** Regarding the transmission of Lisa Calvente's dossier to external reviewers, on what date did you become aware of allegations that the complete dossier was not sent out to external reviewers? Is it correct that according to College guidelines the complete dossier should be transmitted to external reviewers? Please provide all

documentation and correspondence relating to this issue. [Board note: such documentation was provided and reviewed].

**Dean's response:** *On October 18th, Lisa Calvente let us (me and Hai Tran, the chair of the personnel committee) know of her concern that the performance link was not sent out. There is nothing in the college guidelines that designates that the entire dossier must be sent to the external reviewers. I have included the email correspondence related to this conversation. You will see in these exchanges, that since there was still time in the review process, I offered to rectify the situation by sending out the performance link to the reviewers. However, in looking at the link, I realized that it was a YouTube video with no context or explanation for the performance. Therefore, I asked Lisa to provide information about the performance that could be sent to the reviewers. My rationale was that there would be no way for the reviewers to make any assessment of her work on this without knowing how much she contributed to the scripting and staging of the performance (versus her students), when and where it was performed, and how many times. These are part of the norms established by the National Communication Association Performance Studies Division (NCAPSD) to help with the evaluation of creative performances as scholarship. None of this was provided by Lisa Calvente for this (or any of the) performances.*

**End of Extract.**

Dean Murphy also provided to the Board copies of email correspondence with the appellant regarding the performances and dossier dated October 18, 23, and 24, 2018.

The Board's Findings

Regarding allegation one, the Board finds that a minor procedural error occurred, but also finds that this error was not material to the outcome of the tenure case. Dean Murphy acknowledged that one YouTube video was not provided to external reviewers and sought to rectify the situation by proposing to transmit it to reviewers in late October 2018. The College's email correspondence with the Appellant demonstrates that the Appellant elected not to send the YouTube video or additional contextual explanation to external reviewers in late October 2018.

Regarding allegation one, the Board finds that if the Appellant intended to rely on the public performances as key examples of scholarship/creative activities in her tenure dossier, the Appellant should have taken more proactive steps to document those activities and solicit timely evaluations of them from other scholars and DePaul faculty members as suggested by Faculty Handbook Section 3.4.2.2, which states: "*An academic unit may evaluate oral presentations or creative activities by various means including (but not limited to) listening to recordings, examining drafts, or soliciting the views of other scholars*

*(including other members of the DePaul faculty) who were in attendance*."

Regarding allegation two, the Board finds that the College did not violate its own criteria for scholarship by not counting public performances, which involved students and were documented by students, primarily as scholarship.

Regarding allegation two, the claim that the Appellant was "*hired in the College as a race and performance scholar*" could not be substantiated by the Board. The original job advertisement for the College position in 'Intercultural Communication and Performance Studies' did not specify any explicit expectations for giving public performances.

Regarding allegation two, the Board finds that since the UBPT recommendation dated May 10, 2019 did not dispute the College's evaluation of the public performances, any claim regarding violation of policies or Faculty Handbook Section 3.4.2.2 cannot be substantiated.

<u>Allegations Relating to the 2015 Formal Review</u>

In section one (page 12, 13) and section three (page 17) of the appeal, the Appellant advances an allegation that starting in 2015 the College violated the Faculty Handbook Section 3.4.2.1 by engaging in unfair and unsystematic evaluation of her teaching.

The Appellant alleges on pages 2, 6, 8, 15, and 17 that the 2015 formal review initiated a pattern of misrepresentation of student comments in assessment of her teaching.

Faculty Handbook Section 3.4.2.1 states: "*Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers.*"

Faculty Handbook Section 4.1 states: "*Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions.*"

In support of her argument that a pattern of misrepresentation began in 2015 and was material to the outcome of the tenure case, the Appellant demonstrates through citation that the Provost (page 3) referenced the 2015 formal review in her tenure decision. The Appellant also demonstrates through citation (page 12) that a prominent reference to "intimidating or dismissive" classroom behaviors also appears in the Dean's

recommendation.

Additional Information Uncovered During Investigation

The Board investigated whether or not a pattern of misrepresentation could be traced backed to the 2015 formal review. It notes that the 2015 formal review introduced phrasing about 'intimidating' classroom behaviors that recurs in subsequent personnel documentation (including College tenure deliberations).

The Board compared the College 2015 formal review's claims about patterns in student comments to the underlying evidence. The Board was disturbed to discover that the 2015 formal review provided a highly selective, negative presentation of patterns in student comments, the review downplayed (almost to the point of willful distortion) positive aspects of the candidate's teaching, and several statements in the review did not provide a fully accurate representation of actual proportions and patterns in the evidence. In fact a major summary claim of the review – "*While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200).*"– could not be substantiated by examining the underlying evidence. The personnel committee seems to have cherry-picked negative comments (often unrepresentative ones) and made no serious effort to correlate the negative comments with negative comments qualified in a positive way in question 22 (how the class could be improved) and positive comments in question 21 (how the class was helpful). Many more students had an overall positive experience of intellectual growth than are reflected in this selective representation. Frequent student comments about the Appellant's courses promoting critical thinking and/or being challenging in a good way were either downplayed or ignored. Upon reviewing all of the student evaluations considered in the 2015 formal review, the Board discovered that although there are small numbers of explicit student comments in teaching evaluations conducted over several quarters mentioning an intimidating or uncomfortable classroom environment, the College did to some extent misrepresent the patterns and proportions of such comments.

The Board also notes that a long discussion of "*Concerns of students feeling intimidated and/or uncomfortable*" preceded the College's negative tenure vote. The earlier formal reviews were considered a main reason for discounting the positive improvements noted in the 2018 Personnel Committee report because it "*did not adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable in Lisa's classroom.*" The College recommendation regarding tenure states: "*Nevertheless, the tenured faculty expressed an overarching concern that the narrative* [Board Note: in the Personnel

committee report] *underplayed the shortcomings in Lisa's teaching record that warranted the Very Good rating, and by focusing mainly on recent evaluations, it did not fully reflect the history of the case.*"

<u>The Board's Findings</u>

The preponderance of evidence demonstrates that the 2015 formal review initiated a pattern of College misrepresentation of student comments in teaching evaluations.

The preponderance of evidence makes it probable that the College violated the Faculty Handbook's provisions on fair and systematic evaluation.

The Board finds that misrepresentations in the flawed 2015 formal review were material to the outcome of the tenure case, because the College elected to emphasize the history of the case as a major rationale for its vote to deny tenure in fall 2018.

<u>Allegations Relating to the Evaluation of Teaching in the 2017 Formal Review</u>

In Section I.D of the appeal, the Appellant advances the allegation that "*the Provost and College failed to follow University and College Policies and Procedures with respect to the evaluation of Scholarship, Teaching and Service.*"

2 (b, page 11 of the appeal) the Appellant charges that the evaluation of her teaching violated University and College policies and procedures.

<u>Additional Information Uncovered During Investigation</u>

Regarding the teaching allegation related to the 2017 formal review, the Board finds that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal.

The Appellant attributes College concerns about her teaching to her chosen methods of "challenging" the students in her courses. The College, on the other hand, characterizes particular, alleged incidents as "intimidating" to students, which would likely fall

outside of the University's policy describing "*challenging [students] to grow intellectually and morally*" as part of effective teaching [Faculty Handbook Section 3.4.2.1].

The Appellant also references a 2016 Faculty Council proposal to phase out the use of Student Evaluations in faculty personnel decisions. A detailed review of Faculty Council Minutes did not indicate that this resolution was ever passed or implemented.

The Appellant argues that the Dean's statement that "*at least one comment that referenced intimidating or dismissive behavior was seen in 55% of her course evaluations,*" citing a statistic that appeared in the Appellant's 2017 Formal Review, is incorrect and was used inappropriately.

In email correspondence between the Appellant and Hai Long Tran, Dr. Tran explained the 55% calculation in her 2017 Formal Review:

*Here is the full sentence: "In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." In the "Appendixes to Tenure and Promotion Review Statement," you used a different method of quantification with a different time frame. Therefore, if your findings were not consistent with the percentage in the personnel document, it doesn't mean that the number in the review report was incorrect. Anyway, this is not part of your T&P review and we just wanted to mention it here to clarify.)*

Email from Hai Long Tran to Lisa Calvente

Friday, November 02, 2018 12:22 PM

*"In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." The sentence is self-explanatory. We followed the college T&P guideline and identified pertinent mentions in each course evaluation to see if they were recurring across course evaluations.*

Email from Hai Long Tran to Lisa Calvente

Monday, November 05, 2018 1:59 PM

In contrast, the College's promotion and tenure recommendation submitted to the Dean characterized a notably different atmosphere.

*References to an intimidating, harsh, uncomfortable atmosphere for students' ability to speak their mind was reduced to one isolated class among five sets of OTEs in the past year available for review. Both peer observers assessed Lisa's classroom environment to be open and safe. "It was instructive to witness how Dr. Calvente corrects students' misperceptions unambiguously while*

*maintaining an atmosphere of safety," Dr. Foster noted after her visit to Lisa's Spring 2018 Intercultural Communication class.*

College of Communication Recommendation for Tenure and Promotion to Associate
Professor
November 16, 2018

Despite this 2018 observation, and despite Dr. Tran's claim that the 2017 Formal Review "*is not part of your T&P review*," the 55% statistic was cited in the Appellant's promotion and tenure recommendation letter written by the Dean to the University Board on Promotion and Tenure.

*In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations.*

Letter from Alexandra Murphy to the University Board on Promotion and Tenure
January 9, 2019

The Board questioned the Dean for specific information about this citation and statistic, and received the following response.

*I relied on the [2017 Formal Review] personnel committee's assessment of these comments. I asked the author of that report to provide the original analysis (attached to this response).*

Email from Alexandra Murphy to the Board
Tuesday, November 5, 2019 7:10 PM

The Board reviewed the relevant course evaluations, together with the analysis used in the 2017 Formal Review calculation, as provided by the College. Of 218 total comments in the evaluations of these nine courses, seven comments had been flagged in the 2017 Formal Review. These seven were spread across five of the Appellant's nine courses, and it was from this five and nine that the statistic "*more than 55 percent (5 out of 9)*" was obtained. Moreover, two of the seven comments did not express negativity on behalf of the respondent, but were instead written in a sort of hearsay or observational perspective about the experiences of others. The inclusion of these two comments in the analysis is open to question, since anyone directly impacted would have had their own opportunity to provide feedback about the course. Those two comments are included below, with emphasis added by the Board in bold.

**I personally do not feel this way**, *but other students conveyed to me that they were often uncomfortable with Calvente's teaching style. One student remarked that the "looks" she would give in class were "revealing," and made some students uncomfortable to share. In addition, similar to a lot of students in this class, I do believe Dr. Calvente has a very firm set of ideals. I do*

*not think introduction of new material or theory would necessarily change them. Therefore, there was often a lot of heated tension that went unnoticed between some students and the professor. Perhaps a less "expressive" way of articulating what Dr. Calvente thought may have eased some of the tension.* **I however am only conveying opinions from other students.**
*Fall 2016 CMNS 509/CMNS 308/HTHC 523: Topic in Intercultural Communication*

*The course is great but you certainly come on a little strong***. I didn't mind it but it's possible some people didn't feel comfortable** *opening up because of it.*
*Spring 2017 CMN 103: Intercultural Communication*

While reading through the 218 comments, the Board was struck by the preponderance of praise and appreciation for the Appellant and for the courses that she taught. These appeared in evaluations of all nine courses under consideration.

The 2017 Formal Review's selective reading of these course evaluations gives a misrepresentative characterization of the Appellant's teaching effectiveness, and does not account for the full range of qualitative comments that she received. Moreover, this is a crucial issue in the Appellant's tenure case because the statistic from that Review was cited in her promotion and tenure documentation.

The Board notes that the 2017 College Tenured Faculty Recommendation, resulting from a meeting held on November 17, 2017, called qualitative comments pertaining to students feeling 'intimidated' or 'uncomfortable' a 'major theme in her teaching' and cited the 55 percent statistic in support of this conclusion. This clearly indicates that undue weight was assigned to the flawed statistical conclusion. In addition, the report includes the following statement: "*For the faculty members who find such comments to be a major reason for non-renewal, there is a point at which the student responses reflect a problematic pattern that should have been addressed through forms of pedagogy that can invite students to critically examine a range of social injustices*." Crucially, this is the only specific reference to non-renewal in the 2017 College discussion.


The Board's Findings

The preponderance of evidence demonstrates that the College placed undue weight upon the flawed 2017 formal review in its tenure evaluation.

The board finds that misrepresentations in the flawed 2017 formal review were material to the outcome of the tenure case, because the College and Dean elected to emphasize

the history of the case as a major rationale for the College vote to deny tenure in fall 2018.

Appellant's Allegations Regarding Evaluation of Service

1 (c, page 14 appeal) alleges that the College violated university policy in the evaluation of her service.

Section 3.5.1.1 of the Faculty Handbook states: "*There are normally three levels of evaluation prior to the final decisions of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university*."

The Appellant states: "*The College, in its argument that my service was deficient in providing service to my unit in the College, violates University policy that states that in the absence of departmental or school structures the local academic unit is the College. Therefore, the assessment of my service as not meeting the requirements for "excellence" is not in accordance with University policy.*

*Furthermore, because it is always difficult to ascertain, assign, and weigh the value of Service, I have compared my record of service to the dossiers of colleagues in the College who have shared their information with me. Dr. Maria DeMoya, Dr. Sydney Dillard, and before his departure from the College, Dr. Lou Rutigliano, have consistently fared better in their rankings. During my reviews, I have been told to exercise more in-unit service; the University, however, makes no distinction between service in the College of Communication and Service in the College's specific units.*"

The Board's Investigation

The Board's conducted its own investigation and requested additional materials for review in addition to the items in the Appellant's original dossier and supporting documentation. To analyze the service expectations and contributions to the home unit and university, the Board questioned the Appellant, Dean Murphy and Provost Ghanem. The University Board Promotion and Tenure report dated May 10, 2019 provides only limited insights about its discussions of service.

"*In terms of service, some of the Board members shared the concerns of the faculty that a large portion of Dr. Calvente's service was outside her home unit. However, the Board agreed that Dr. Calvente's overall service contribution was sufficiently strong to meet the criteria for service in*

*the Faculty Handbook. The Board encourages Dr. Calvente to continue to build on her service record, in her home unit, as well as at the college and university levels.*" [UBPT Report p. 3]

The Board found the statement of the UBPT not quite precise as to the service contribution of the Appellant, so the Board decided to provide more extensive documentation and juxtaposed it with the Board's discussions of that evidence.

The material in both formal reviews that took place in 2015 and 2017 and an informal review from a letter of recommendation of Dr. Alexandra Murphy in 2016 provides support to the Board's finding that the Appellant received unclear guidelines about making progress towards tenure and promotion.

<u>2015 Formal Review and Board Discussion</u>

The following is a complete excerpt of the Service section of the College formal review dated March 7, 2015, with incorrect contract year noted [page 6] in the dossier of the Appellant:

"*During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs.*

*She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of Cultural Studies since 2012 and Text and Performance Quarterly since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.*

*The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.*

*Conclusion*
*Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal."*

The Board discussed that in this document the Appellant's service is considered fair to good and that she is making fair to good progress towards tenure in the area of service. The service contribution appears to have been in good standing, since the recommendation of termination of the contract is based in teaching and research, and not on service.

The Board notes that there is no mention in this report that the Appellant should increase visibility in serving in the home unit. The report mentions that two personnel committee members indicated that the Appellant was not making satisfactory progress toward tenure in service, but there is no guidance about specific roles or committees which would provide constructive feedback to provide the Appellant a service path moving forward, to achieve tenure.

<u>2017 Formal Review and Board Discussion</u>

The following is a complete excerpt from the *Service* section of College's Recommendation of Continuation or Termination of Untenured Faculty Contract, dated November 2017, page 7 and 8:

*"In the previous review period, Lisa's contributions within the College of Communication were linked to her work as a member of the Contingent Faculty Review Board and the Local Review Board, an event leader of the symposium on violence, a thesis committee chair/undergraduate senior thesis advisor, and a comprehensive exam writer. At the university level, she served as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program and contributed to the Office of Multicultural Student Success in the Men of Color Initiative, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/Global and Transnational Programs. In her service to the academy, Lisa reviewed manuscripts for 2 journals as part of their editorial board (Cultural Studies, Text and Performance Quarterly) and papers for her national organization's conferences. In the current review, Lisa continued several of her existing services and took on some others.*

At the college level, Lisa has joined the Term Faculty Review Committee since Spring 2015 (and has begun her actual service since the 2016-2017 academic year due to her research leave). Associate Dean Alexandra Murphy appreciated her valuable, hard work as well as her insights into the candidate's strengths and areas for improvement. She continued her role as part of the Local Review Board until Fall 2016, when this service was terminated due to new IRB procedures. Under this service, Lisa reviewed 2 IRB applications. Since 2015, she has chaired 2 graduate thesis and project committees, advised a master's project, and administered comprehensive exam questions. In Fall 2016, Lisa volunteered to help Dr. Lucy Lu in reviewing the syllabi for CMN 103 that non-tenure/tenure track faculty used for Intercultural Communication to ensure quality control. She also participated in some faculty searches and attended the graduation foundation course, college meetings and other events, such as award ceremonies and alumni receptions.

At the university level, Lisa has collaborated actively across programs at DePaul. She has both expertise and passion for interdisciplinary work across colleges. Lisa has been an affiliated faculty of the African and Black Diaspora Studies Program (ABD) since 2012 and a member of the ADB Advisory Committee since 2015. According to ADB Program Director, Amor Kohli, she has served actively and thoughtfully and been invested in the broader culture and activity of ABD. Since 2016, Lisa has become an affiliate to the Critical Ethnic Studies MA program (CES) in the College of Liberal Arts and Social Sciences. CES Director Laura Kina expressed her appreciation for Lisa's commitment as an invaluable member, who has impacted CES students in a number of ways. Lisa has continued her existing role as an affiliate to the Latino Studies Program (LALS) and has been part of Liberal Studies Council Survey Review Subcommittee, which (according to Director of Liberal Studies John Shanahan) drafted recommendations based on the General Education Task Force report and feedback from colleges in spring 2017. LALS Chair, Lourdes Torres, acknowledged Lisa's contributions over the past 5 years, including her participation in a tenure-track hire in the past year. In addition, Lisa has reached out to the Women and Gender Studies Graduate Program to offer her service in mentoring their students.

Lisa's service record extends to the academy and the community. As part of the editorial board of 2 journals (Text & Performance Quarterly and Cultural Studies), she has reviewed approximately one manuscript per year for each journal. In 2016, Lisa reviewed the 7th edition of James Neuliep's Intercultural communication: A contextual approach (Sage). She has also been active at conferences as a paper reviewer, panelist, respondent/discussant, and a member of the Welcome Team. Lisa's community service includes her commitment to the Chicago Alliance against Racist and Political Repression (CAARPR), where she has also created community-based service learning for her students. In addition, Lisa has volunteered at the Juvenile Justice Program to help troubled youths at the Organization for the North East (ONE) community center.

At the interview, Lisa spoke of her willingness to take on committee work and her decision to engage in cross-college outreach efforts as part of the Vincentian mission. While we commend Lisa's dedicated service, there is room for improvement. The Personnel Committee emphasized to Lisa the need to take a more visible and significant role within her unit and at the college. **Her service record at this advanced stage of her probationary period remains quite modest, considering the typical load for her peers.** [bold emphasis is this Board's]

At the university level, there are several opportunities where Lisa could make even greater impacts by serving on university teams, committees, or task forces. The documentation of her service, as well as the construction of her vita and personal statement, would benefit from a clearer organization. According to the college's tenure and promotion guidelines, candidates use the AAUP's format for the c.v. to maintain college uniformity. The committee suggests Lisa attend tenure review workshops, which will continue to reinforce expectations and best practices in drafting personal statements, and preparing and organizing review and promotion materials.

**In sum, the Personnel Committee finds that Lisa's service record to be very good over this review period, and she is making fair progress toward tenure in the area of service.**" [bold emphasis is the Board's]

In this same report, the tenured faculty recommendation regarding the Appellant's service is the following: [p.12]

"The majority of the tenured faculty found Lisa's progress toward tenure in the area of service **unsatisfactory**. [Emphasis in the document] Voting members recounted instances where service contributions listed in Lisa's document do not reflect substantial accomplishments. In addition, Lisa has been noticeably absent as a college representative at several required, university-wide events such as graduation and convocation. The tenured faculty endorsed the Personnel Committee's assessment that her service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers. It was emphasized at the discussion that, according to the College Tenure and Promotion Criteria, faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college. If Lisa is retained, the tenured faculty would need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul."

The Board discussed the fact that there is inconsistency and a lack of guidelines provided to the Appellant in this report. For example, the Personal Committee mentions that the Appellant's service record was very good over this review period and adds that the

Appellant is making fair progress towards tenure in the areas of service. Additionally, the College Recommendation and Rationale section in page 1 of the same report states: *"Lisa's service record to be **very good** over this review period and she is making fair progress toward tenure in the area of service."* Nevertheless, the tenured faculty assessment is unsatisfactory regarding progress towards service. The Board finds that there is not a clear elucidation of how in page 1, 7 and 8 the Appellant's review is very good but in page 12 becomes unsatisfactory. One member of the Board noted that this often occurs in local unit personnel deliberations, but noted a problem of incongruity between inconsistencies in this document and then-Dean Ghanem's recommendation to the appellant. In a letter dated December 13, 2017 regarding 2017 formal review, then-Dean Ghanem wrote: *"In order to be considered for promotion and tenure in the College of Communication, I stress that you follow all the recommendations of both the Personnel Committee and the tenured faculty outlined in the formal review document dated November 17, 2017 regarding teaching, research and service."*

The Board discussed guidance by senior colleagues, as demonstrated in documentation provided by the Appellant, with members unable to clearly determine what is weighted more or less or what is considered as 'meaningful' for local unit level service. The insertion of attending graduation and convocation into the document was also discussed with some members finding it strange that the tenured faculty mention those alongside time-intensive Personnel Committee work. To some members of the Board this insertion seemed to be a pretextual, insertion into the record of a minor example of the Appellant's alleged non-compliance with the Faculty Handbook.

The Board noted that in this second formal review, the Appellant is recommended to concentrate her efforts in service at the local-home unit level according to the College Tenure and Promotion Criteria. Surprisingly to some on the Board, the Appellant is simultaneously recommended to expand her service record at the university level where the Appellant could have greater impacts by serving on university teams. On this point the senior colleagues also recommended greater volunteering for university committees. The report mentions in two places in the excerpts quoted *"the typical load of her peers."* This provides expectations that the Appellant is compared to an optimal or typical level of service rather than College Criteria. The Board does not find this argument compelling for a Personnel Committee assessment. The formal review should have noted exactly what is missing in the Appellant's service dossier, rather than vaguely refer to a typical load.

<u>Documents Created by the Dean and Board Discussion</u>

The Board engaged in discussion of what some members considered the contradictory and inconsistent documentation presented to the Board: a letter the Dean documenting service, dated August 14, 2016 which starkly differs from the recommendation she wrote as Dean, as discussed below.
This is an extract from the 2016 letter:

*"I want to thank you for the service that you have provided over the past several year within the College of Communication and for DePaul University. Since your hire in Fall of 2011, you have contributed to the service life of the college in a number of ways. During your first year, you participated in the Graduate Program Task Force to brainstorm ideas for the first-year seminar. This initial work evolved into the creation of the Foundations in Graduate Studies course, a new required course for all Communication and Media Studies students. You spoke with the students as a guest speaker within this course in Fall of 2014. You were an event leader for our College's Symposium entitled, "Making Meaning of Violence." For this event, you created a panel on race, violence, and activism and facilitated a fascinating roundtable session with senior scholars and activists who specialize on issues of social justice, youth activism and violence.*

*The following year, when I was serving as your program chair, I needed to find someone to serve on the Liberal Studies Council task force on Personal Transformation and Responsibility and Global and Transnational Programs. I thought you were a perfect fit and was very happy you took on this role. You also served on the College level Local Review Board for two year where you reviewed applications for Institutional Review Board approval for research from College of Communication faculty.*

*You have stepped up to aid the college in a number of ways involving personnel including serving on a faculty search committee for a term faculty member in intercultural communication in Spring 2012 and a junior faculty representative on the personnel committee for two formal reviews in January 2014. The personnel committee is a time-intensive committee that requires a detailed read of candidate materials, participating in meetings, and crafting and reviewing recommendation letters. Most recently, in terms of personnel, you have been a member of the Term Faculty Review Committee from (appointed in Spring 2015, but due to research leave, active member from Fall 2016 to present). Again, this is a very time-intensive committee that involves peer reviews of all term faculty.*

*Again, thank you for the valuable contributions you have provided in terms of service for the past several years as an assistant professor."*

The Board discussed the tenor of this letter, which is thankful for the Appellant's involvement at both the Department and College, home academic unit level, and praises the Appellant's work on a time-intensive committee like a Personnel Committee. The Board questioned the Dean about this and compared the responses provided by the Dean to the two earlier documents.

In her letter to the UBPT, dated January 9, 2019, the Dean seems in certain places to be contradicting the 2016 informal assessment and rationalizing after the fact the decision of colleagues. This is an excerpt of that recommendation:

*"In the area of service, Dr. Calvente is also ranked as "very good" by her peers. Dr. Calvente has participated in service obligations at the program, college, and university levels. Most of the service that Dr. Calvente has provided at the program and college levels has been in ad hoc, short-term capacities. For example, she helped review syllabi for CMN 103, helped solicit feedback from college advisors on proposed curricular "pathways" for communication studies, and has been a representative at student open houses and presented student awards. Also, of note is her participation on a term faculty hiring committee and her work advising students in the Latino Media and Communication program. Dr. Calvente also lists other smaller activities such as guest speaking in the graduate foundations course and participating in various meetings as service. The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee. The committee reviews term faculty on a two-year rotation including peer observations and writing and editing documents. Dr. Calvente has been an active and valuable member of this committee for the past two years. To receive an "excellent" rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period.*

*Dr. Calvente has provided other college-level service outside of the College of Communication where she has served as an affiliate faculty member for several different programs in the College of Liberal Arts and Social Sciences including the African and Black Diaspora Studies Program, the Latino Studies Program (where she also served on a tenure-track hiring committee), and the Critical Ethnic Studies MA program. She is a member of the Women's Center Advisory Board. Her service in these areas is described as conscientious, invaluable, and collaborative. Dr. Calvente has started building a record of service at the university level. In the past year, she has been a member of the General Education Task Force Report Review, the Council on Community Engagement, and participated in the WPI Project-Based Learning workshop.*

*The College of Communication is a small college that must spread service obligations across a fewer number of tenure-track faculty than many other colleges. Therefore, in the College of Communication, candidates ranked as "excellent" in service have provided much more ongoing,*

*substantial committee work, particularly within the College of Communication and at the university level where we have requirements for representation on a number of committees. The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review. This is not to say that the service contributions provided by Dr. Calvente have not been valuable; she is aptly rated as "very good."*

The Board discussed contradictory and imprecise statements in this part of the letter. Dean Murphy mentions that the Appellant was advised to significantly increase her service to the College in more 'meaningful' ways in each prior formal review. A careful review of the 2015 formal review shows that there is no recommendation about **'meaningful'** service. In fact, the report mentions that the Appellant is making a good contribution towards tenure in the area of services. The Board concurs that such statements occur in the 2017 review.

The Board discussed whether the Appellant was informed in any of the 2015 and 2017 formal reviews what is 'relevant' or 'substantial' or 'meaningful' committee work. The Board could not determine from any of the documentation provided in the original dossier, investigation and supporting documentation regarding what is defined to be meaningful or less meaningful committee work. The Appellant was never guided as to which were the committees she should be participating in order to achieve tenure.

More concerning is the informal review assessment from Murphy in March 2016 praising the Appellant's substantive and time-intensive Personnel Committee work, which sent the signal that expectations were being met.

In its investigation, the Board questioned the Appellant, Dr. Lisa Calvente, Dean Murphy and Provost Ghanem regarding the service contributions. The Board requested that the Appellant provide additional documentation referred to in a letter to Isabel Diaz dated November 29, 2018.

In that letter the Appellant stated on page 8:

*"Personnel has specifically pointed out that my in-unit service is lacking; however, I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition. I can provide email documentation to that effect."*

The appellant provided that documentation. The Board also requested any additional evidence that could substantiate the following statement that appeared in the November 29, 2018 letter:

"*I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition.*"

The Board received the following additional documentation from the Appellant:

- Email between Dr. Willard, Dr. Baglia, and the Appellant for the cancelled search
- Email between Dr. Willard and the appellant to volunteer for search committee
- Email between Dr. Lu, Dr. Willard and the appellant
- Standard for Chair election process sent by Acting Dean Murphy, Monday, October 21, 2019
- Email from Acting Dean Murphy

From the analysis of this additional documentation the Board concludes that:

1. The Appellant has volunteered for in-unit service that has been available to her. An example of this statement is that the Appellant volunteered to help Dr. Lucy Lu, in being the course-keeper for the core course of their unit.

2. The Appellant served on committees that were suggested by the Dean Murphy when she was the Chair of the Department. These committees are highlighted in the the 2016 general service letter.

3. The Appellant volunteered to participate as member of a faculty search committee in the Fall of 2014, which was cancelled due to the lack of a line for the appellant's unit.

4. In academic year 2016-2017, the Appellant volunteered to participate in a Faculty Search Committee in the Fall of 2016, but the Chair at time, Dr. Willard did not choose the appellant.

The Board also discussed whether the Appellant received enough opportunities during her probationary period to increase her in-unit service exposure. The discussion emphasized that the Board's investigation uncovered additional evidence which suggests that the Appellant volunteered for additional in-unit services but was not selected.

The Board also questioned the Dean about the Appellant's service activities. The Dean explained this particular case to the Board.

**Board question:** Would it be correct to state that on more than one occasion Dr. Calvente volunteered for in-unit service obligations but was not chosen to serve by senior colleagues?

**Dean's response:** *"I am only aware of one occasion when Dr. Calvente reached out to her program chair, Daniel Makagon to volunteer for college and university committee assignments in the 2017. She sent her request after the call for committees had been out for **a while** [Board's emphasis in bold] and the college level committees had already been filled. Dr. Makagon suggested she contact the faculty council representative on the committee on committees to see if there were any remaining openings."*

The Dean did not provide any College documentation to show that the Appellant refused to participate in any service assignment recommended or requested of her by the unit.

After comparing the service records of faculty from the past 10 years in the College who were rated as "excellent," the Board cannot find any clear and compelling substantive delineation of "meaningful" and "relevant" service. If a faculty member is expected to participate in a specific standing College committee (e.g. curriculum, assessment, program review, summer research committee.) during the probationary period, it should clearly be communicated in the formal reviews.

The Board also questioned the Dean about guidance to the Appellant in terms of her progress towards promotion and tenure under service:

**Board question:** Your recommendation to the UBPT dated January 9, 2019 states: "The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review." What did you mean precisely by "more meaningful ways"? Were specific assignments ever proposed?

**Dean's response:** *"The personnel committee and the tenured faculty consistently recommended in prior formal reviews that Dr. Calvente increase her service contributions. While there may be many lines under service on the vita, the personnel committee and the tenured faculty recognized that much of what is listed are smaller, ad hoc presentations in classes or attending the annual award brunch and presenting a student with an award (expectations for all our faculty). In another example, the Security Concerns Group listed on Dr. Calvente's CV consisted of one meeting when interested faculty were invited to come discuss security concerns in the building. Looking at her CV at the time of her 2018 tenure and promotion review, under the heading of College of Communication, the only substantive committee on which she served is the Non-Tenure Track Review Committee (now called the Term Faculty Review Committee)."*

The Dean uses the word "consistently," but the 2015 formal review does not consistently recommend that the Appellant increase her service contributions. The Board also finds contradicting evidence by unequally weighting services in an ad-hoc or unsystematic way.

The Board sought to understand why the Dean commended the Appellant's services to the unit and College in August 2016, not expressing concerns she may have had and would express in early 2019.

**Board question:** Why did not you express those same concerns in the letter you wrote in August 2016 commending Dr. Calvente's services to the unit and college?

**Dean's response: "***Dr. Calvente asked me to write a letter of support that detailed the service that she had done up to that point. I did not see my role at that time to position this service against that of her peers. As I note in my tenure recommendation, I appreciate the work that she has done. But, in context and in comparison, with what is typical across the college, and given the consistent feedback she was given in formal reviews, I agreed it was not enough to be rated as "excellent" in service*.***"

The Board discussed this response. Some members found this response insufficient for understanding the reasons why Dr. Alexandra Murphy provided two diverging assessments in different documents. One Board member found that the statement "*I did not see my role at that time to position this service against that of her peers.*" creates false expectations. Another Board member emphasized the different purposes of the two documents and differing guidelines about expectations for them in the Faculty Handbook. The Board discussed the possible reasons for not positioning the appellant's service against that of her peers at that time when Dr. Murphy was commending the appellant.

One Board member concluded that Dr. Murphy did not give precise signals in her 2016 letter and should have raised the issues she raised in the 2019 letter. Another Board member found that the 2016 letter conformed to what that member would expect from a letter documenting service rather than a recommendation evaluating service.

Overall, the Board is uncertain as to whether the home academic unit provided enough support for the Appellant to excel in the area of service at the home level. Given the other problems with the local unit formal reviews discussed in other sections, the Appellant's pursuit of opportunities outside the College which would result in letters from individuals who had not voted against her case seems justified.

The Board determined that the Appellant received inconsistent guidance in informal reviews


<u>The Board's Findings</u>

The Board finds that the Appellant's service was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion to the Associate Professor rank on the grounds of 'unsatisfactory' service to both the home academic unit and university.

The Board finds that there were considerable and material deviations from procedures by the home unit (i.e., the College of Communication) in failing to provide the Appellant with clear and consistent guidance regarding service in formal reviews as mandated in the Faculty Handbook Section 3.3.1.

The preponderance of evidence supports the claim that the Appellant did volunteer for additional service assignments in the College, but that these substantive service assignments did not materialize due to factors beyond her control, as outlined in points 1-4 above.

**Ground for Appeal III. Discriminatory Practice/Retaliation**

<u>Discrimination/Retaliation</u>

Because the appeal links reporting and contacts with Isabel Diaz of the EEO office to claims of retaliation, the Board requested that a different member of HR staff be assigned to review claims of discrimination and retaliation.  Starting on September 16, 2019, the board engaged in ongoing consultations with Dr. Stephanie Smith, Vice President for HR, about the appeal as required by Faculty Handbook Section 5.1.1.1.  The results of Dr. Smith's investigation – it discovered nothing material that supports claims of discrimination or retaliation – were communicated to the Board on December 19, 2019.


<u>Appellant's Allegations Regarding Discrimination</u>


In section three of the appeal the Appellant advances two major allegations regarding

discrimination.

1 (A, Page 12, 17 in the appeal) the Appellant alleges that College personnel documentation contains 'racially insensitive caricatures and stereotypes.'

2 (page 17) the Appellant alleges a pattern of discriminatory practices in the evaluation of her teaching that violates federal policies regarding non-discrimination against members of protected classes.

The Board's Findings

Regarding allegation one, the Board finds that the College did not include racially insensitive caricatures and stereotypes in personnel documentation. The Board notes that the appeal did not provide any specific references to racially insensitive terms, caricatures, or stereotypes. The Board's careful review of College personnel documentation and student evaluations did not uncover any statements that would substantiate a claim of racial discrimination.

Regarding allegation two, the Board finds that allegations that the College violated federal policies regarding non-discrimination could not be substantiated. The appeal did not provide specific information, evidence or statements to substantiate the claim of discrimination on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability or genetic information.

Appellant's Allegations Regarding Retaliation by Provost.

In section three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the Provost engaged in retaliation against her for filing EEO claims against the College.

The Appellant states on page 17 "*In Section I.B.a., I enumerate the University violations that also constitute retaliatory acts, including by Interest [sic] Provost Dr. Salam Ghanem. These acts should be investigated as retaliatory and therefore discriminatory practices*."

The Appellant makes her own contacts with DePaul EEO officials key to the claim of retaliation, writing on pages 5-6:

"By the time I submitted my tenure application to the College, however, then-Dean Ghanem had become aware that I had asked that the Office of Institutional Diversity and Equity (OIED) investigate my claims against the College, and specifically members of the Personnel Committee, of violating DePaul University's Anti-Discrimination and Anti-Harassment Policy and Procedures. In November of 2018, I wrote a letter detailing the retaliatory actions against me by the College and members of the senior faculty (attached). I also reported these retaliatory practices to the Equal Employment Opportunity Commission (EEOC), and I have since met with the EEOC.

I submitted my application for tenure and promotion after Dr. Ghanem had overturned the previous contract nonrenewal recommendations of the College. By the time I submitted my tenure and promotion application, I had also reached out to various non-tenured members of the faculty in the College, as well as reached out and met with several members of the tenured University faculty, in order to discuss my path towards tenure and to compare our respective dossiers. Dr. Ghanem was aware that these meetings were taking place. Not only did I never lie about these occurrences, I openly discussed my experiences in the College and looked to Dr. Ghanem as the Dean of the College to help address these growing concerns. These discussions also included other, tenure-track, junior women of color faculty from the College, who shared similar experiences as my own and similar concerns around the manner in which the College evaluated faculty of color in formal and informal reviews. These included Dr. Maria DeMoya and Dr. Sydney Dillard. I should also note the Diversity Advocate of the College's, Dr. Maria DeMoya, has substantiated my concerns formally.

During one particular meeting with Dr. Ghanem to discuss my tenure dossier and the conflict that surrounded my case in the College (which took place after then-Dean Ghanem had overturned the recommendation for contract nonrenewal from the College but before I filed my application for tenure), Dr. Ghanmen commented on Dr. Vincent Cicchirillo's contract nonrenewal decision by the College. Dr. Ghanem implied that I was responsible for rumors circulating in the University that suggested that Dr. Cicchirillo had been terminated in order that Dean Ghanem would have just cause for later terminating women faculty of color. I admitted to Dr. Ghanem that I had written in support of Vincent Cicchirillo's appeals case, and I verbally disclosed the content of my letter."

In view of the serious nature of this allegation, the Board in coordination with Dr. Smith investigated these claims by questioning the Provost and other witnesses. It also closely examined extensive documentation related to EEO claims, including the Appellant's email communications with the Employee Engagement and EEO Unit, with Dr. Ghanem, and the Appellant's letter to the Board regarding Dr. Cichirrillo's appeal.

<u>The Board's Findings.</u>

The Board's investigation did not substantiate the claim that the Provost engaged in retaliation against the appellant for filing EEO claims against the College.

The Board's investigation also uncovered several imprecise or misleading statements on pages 5-6 of the appeal cited above.

The Board finds that the Appellant's allegations were never "substantiated formally" by Dr. Maria DeMoya, Diversity Advocate for the College of Communication.

The Board finds that the Appellant never followed up with a request for additional information from Isabel Diaz and that the case was closed in early 2019 due to the Appellant's failure to respond to EEO requests.

The Board finds that the Appellant's characterizations of her meetings with Dr. Ghanem in the appeal document cannot be substantiated by the recollections of Dr. Ghanem or the Appellant's EEO correspondence in the days/weeks after the meeting which took place on October 10, 2018.

The Board finds that phrases such as "Dean Ghanem had become aware" and "Dr. Ghanem was aware" are not fully consistent with the facts contained in the email correspondence between the Appellant and Dr. Ghanem, and the Appellant and Barbara Schaffer. The preponderance of evidence demonstrates that then-Dean Ghanem acted appropriately in referring the Appellant's concerns to appropriate university officials.


<u>Allegations of Retaliation by the College of Communication</u>

In sections three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the College took no action to address retaliatory actions reported to Isabel Diaz.

On page 6, the Appellant states: "*These reviews by the College, since 2015, have included members of the Personnel Committee that OIDE investigated for violating University policies with respect to discriminatory practices. I later reported retaliatory actions by my senior colleagues in the College to Isabel Diaz, currently the Director of Employment Engagement and Equal Opportunity at DePaul. In the College, no actions were taken to address this situation.*"

<u>The Board's Finding</u>

The Board finds that the preponderance of evidence does not substantiate the Appellant's claim.