**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | Judge John Robert Blakey |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**COMBINED MOTION FOR SUMMARY JUDGMENT**

---

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ..................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................. 2

   A. Plaintiff's Recruitment by DePaul. ...................................................................... 2

   B. The Tenure Process at DePaul. ............................................................................ 3

   C. Plaintiff's Probationary Period and Recurring Internal Complaints. .................. 4

      1. First Formal Review ...................................................................................... 4

      2. Second Formal Review .................................................................................. 5

      3. Plaintiff Complains About Her 2015 Review ............................................... 6

      4. Third Formal Review .................................................................................... 6

   D. Plaintiff Scrambles to Ready for her Tenure Application. .................................. 7

   E. Plaintiff's Tenure Review. ................................................................................... 9

   F. Plaintiff's Tenure Appeal .................................................................................... 12

III. ARGUMENT ...................................................................................................... 13

   A. Plaintiff Cannot Establish Either Of Her Two Race Discrimination Claims .................... 14

      1. Plaintiff is not qualified for tenure under DePaul's criteria. ......................... 14

      2. No similarly situated individual was treated more favorably than Plaintiff. ............... 16

      3. Plaintiff has no evidence of pretext. ............................................................. 19

   B. Plaintiff's Section 1981 Race Discrimination Claims Fail. ................................ 23

   C. Plaintiff Cannot Establish a Claim of Retaliation Against DePaul or Dr. Ghanem .......... 24

   D. There is No Evidence That DePaul Breached Any Contract With Plaintiff ..................... 27

IV. CONCLUSION ................................................................................................... 30

LEGAL\55228207\2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrego v. Wilkie*,
   907 F.3d 1004 (7th Cir. 2018) ..............................................................................17

*Adelman-Reyes v. St. Xavier Univ.*,
   500 F.3d 662 (7th Cir. 2007) ..................................................................... *passim*

*Adelman-Reyes v. St. Xavier Univ.*,
   No. 05 C 3269, 2006 WL 1155989 (N.D. Ill. Apr. 28, 2006), aff'd, 500 F.3d
   662 (7th Cir. 2007)................................................................................................28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..............................................................................................13

*Baines v. Walgreen Co.*,
   863 F.3d 656 (7th Cir. 2017) ................................................................................24

*Blasdel v. Nw. Univ.*,
   687 F.3d 813 (7th Cir. 2012) .........................................................................15, 16

*Boss v. Castro*,
   816 F.3d 910 (7th Cir. 2016) ................................................................................20

*Brogan v. Chicago School Report Bd. of Trustees*,
   Case No. 01 C 4216, 2003 WL 21212606 (N.D. Ill. May 22, 2003)....................22

*Burrell v. City of Mattoon*,
   378 F.3d 642 (7th Cir. 2004) ................................................................................27

*Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*,
   851 F.3d 690 (7th Cir. 2017) ................................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................13

*Colburn v. Trustees of Indiana University*,
   973 F.2d 581 (7th Cir.1992) ................................................................................15

*Cole v. Bd. of Trustees of N. Illinois Univ.*,
   838 F.3d 888 (7th Cir. 2016) .........................................................................20, 22

*Comcast Corp. v. National Ass's of African American-Owned Media*,
   __ U.S. __, 140 S. Ct. 1009 (2020)................................................................14, 23

*Cowan v. Glenbrook Sec. Services, Inc.*,
  123 F.3d 438 (7th Cir. 1997) ................................................23

*Dass v. Chicago Bd. of Educ.*,
  675 F.3d 1060 (7th Cir. 2012) ................................................19

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*,
  846 F.3d 216 (7th Cir. 2017) ................................................13

*Farrell v. Butler Univ.*,
  421 F.3d 609 (7th Cir. 2005) ................................................14, 15, 20

*Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*,
  860 F.3d 494 (7th Cir. 2017) ................................................20

*Goswami v. DePaul Univ.*,
  8 F. Supp. 3d 1019 (N.D. Ill. 2014) ................................................21

*Gupta v. Board of Regents of University of Wisconsin System*,
  63 F.App'x. 925 (7th Cir.2003) ................................................21, 22

*Harris v. Adler Sch. of Pro. Psychology*, 309 Ill. App. 3d 856, 861, 723 N.E.2d
  717, 721 (1st Dist. 1999) ................................................28

*Haynes v. Indiana Univ.*,
  902 F.3d 724 (7th Cir. 2018) ................................................15

*Hughes v. Derwinski*,
  967 F.2d 1168 (7th Cir.1992) ................................................25

*Jackson v. Hammer*, 274 Ill. App. 3d 59, 63-64, 653 N.E.2d 809, 813-14 (4th
  Dist. 1995) ................................................30

*Jiminez v. Mary Washington College*,
  57 F.3d 369 (4th Cir.1995) ................................................15

*Kuhn v. Ball State Univ.*,
  78 F.3d 330 (7th Cir. 1996) ................................................15

*Kunda v. Muhlenberg College*,
  621 F.2d 532 (3d Cir.1980) ................................................15

*Lim v. Trs. of Ind. Univ.*,
  297 F.3d 575 (7th Cir. 2002) ................................................15

*Magnus v. St. Mark United Methodist Church*,
  688 F.3d 331 (7th Cir.2012) ................................................21

iii

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................................13, 19

*Monroe v. Columbia Coll. Chicago*,
  855 F. App'x 284 (7th Cir. 2021), cert. denied, No. 21-135, 2021 WL 4733339
  (U.S. Oct. 12, 2021) ...........................................................................................................27

*Montgomery v. DePaul Univ.*,
  No. 10 C 78, 2012 WL 3903784 (N.D. Ill. Sept. 7, 2012)....................................16, 27, 28, 29

*Namenwirth v. Bd. Of Regents of Univ. of Wisconsin Sys.*,
  769 F.2d 1235 (7th Cir. 1985) .................................................................................15, 16, 17

*Nelson v. Idleburg, et al.*,
  No. 18 CV 2839, 2020 WL 2061555 (N.D. Ill. April 29, 2020) .....................................23, 24

*O'Leary v. Accretive Health, Inc*.,
  657 F.3d 625 (7th Cir. 2011) ........................................................................................21

*Ortiz v. Werner Enterprises, Inc.*,
  834 F.3d 760 (7th Cir. 2016) ........................................................................................13

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985)....................................................................................................15

*Sandefur v. Dart*,
  979 F.3d 1145 (7th Cir. 2020) ......................................................................................13

*Seye v. Trustees of Indiana Univ.*,
  830 F.App'x 778 (7th Cir. 2020) ...................................................................................15

*Snipes v. IDOC*,
  291 F.3d 460 (7th Cir. 2002) .....................................................................................17, 18

*Sun v. Bd. of Trs. of Univ. of Ill.*,
  473 F.3d 799 (7th Cir. 2007) .................................................................................14, 15, 16

*Theidon v. Harvard University*,
  948 F.3d 477 (1st Cir. 2020).......................................................................................22, 23

*Thrash v. Miami Univ.*,
  549 F.App'x 511 (6th Cir. 2014) ....................................................................................15

*Turner v. The Saloon, Ltd.*,
  595 F.3d 679 (7th Cir. 2010) ......................................................................................25, 26

*United States v. Ramirez*,
  675 F.3d 634, 636 (7th Cir.2011) ....................................................................................21

iv

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013)................................................................................................24

*Vanasco v. Nat'l-Louis Univ.*,
    137 F.3d 962 (7th Cir. 1998) ..............................................................14, 15, 20

*Zahorik v. Cornell Univ.*,
    729 F.2d 85 (2d Cir. 1984).................................................................................15

**Statutes**

42 U.S.C. §2000e "Title VII" ................................................................1, 14, 23

42 U.S.C. §1981 "Section 1981" .........................................................................14

**Other Authorities**

Fed. R. Civ. P. 56(a) .............................................................................................13

Rule 56.1(a)(3).........................................................................................................2

## I.    **INTRODUCTION**

After years of ignoring constructive feedback about how to be a more productive scholar (failing to publish the book she worked on for at least seven years, or more articles instead), a more effective teacher (at least 20 students complained about her unwelcoming classroom environment) and a better contributor to her unit (serving on just one substantive committee in her College), Plaintiff Lisa Calvente, an Assistant Professor in Defendant DePaul University's College of Communication (the "College"), was denied tenure. Plaintiff disagrees with this decision, believing instead that her race/ethnicity (Black, Asian, Latina), or the fact she was "outspoken on racism," to be the real reasons she was denied tenure.[1] The facts show otherwise.

The uncontroverted record shows that at every step of the way of the multi-level tenure review – during which Plaintiff availed herself of all the procedural protections built into the process – faculty peers engaged in a careful evaluation of Plaintiff's application for tenure and promotion, relying on their academic judgment. Although Plaintiff's record possessed many strengths, in the specialized judgment of 24 of her 30 faculty evaluators, her "very good" record fell short of the "excellent" qualifications required for tenure.

Under long-standing precedent in the Seventh Circuit, tenure decisions should not be disturbed absent "clear evidence" of discrimination. Plaintiff can point to no such evidence. To be sure, in the very same year that Plaintiff was considered for tenure, the same set of faculty decisionmakers recommended the award of tenure to a Black faculty member from the College. Dr. Ghanem, the Acting Provost at the time, granted tenure to that Black faculty member – who

---

[1]Plaintiff brings the following five counts: (1) retaliation in violation of 42 U.S.C. §1981 ("Section 1981") against DePaul and Dr. Salma Ghanem, the former Dean of the College of Communication and the Interim Provost when the tenure decision was made; (2) retaliation in violation of 42 U.S.C. §2000e ("Title VII") against DePaul; (3) racial discrimination against DePaul and Dr. Ghanem in violation of Section 1981; (4) race discrimination against DePaul in violation of Title VII; and (5) breach of contract against DePaul.

also complained of discrimination – along with every other Asian and Black candidate up for tenure at DePaul that year. Those facts dispel any inference of race discrimination or retaliation. As such, and because Plaintiff also cannot establish a breach of contract, judgment is warranted on all of Plaintiff's claims.

## II.    FACTUAL BACKGROUND[2]

### A.    *Plaintiff's Recruitment by DePaul.*

DePaul is the largest Catholic University in the United States. (SOF ¶3.) Plaintiff, who identifies as ethnically Latina and racially Black[3] and Asian, is a critical race scholar in the communication field. (SOF ¶¶4, 30-32.) Dr. ⬛⬛⬛, a faculty member in DePaul's College of Communication ("College"), was familiar with Plaintiff's work. (SOF ¶30.) In 2011, Dr. ⬛⬛ encouraged Plaintiff to apply for a non-tenure track faculty position in the College. (*Id.*) During the application process, Plaintiff presented her research agenda, describing it as ethnographic work based on race, racism, and coloniality. (SOF ¶¶31-32.) As Plaintiff acknowledged, there was no confusion among the faculty about her research. (SOF ¶32.) Plaintiff also told faculty during the application process that she was working on turning her dissertation into a manuscript. (*Id.*) Enthusiastic about her work, the College converted the opening to a tenure track position and offered Plaintiff the job, making her eligible for tenure consideration at the end of her probationary period, provided she received positive annual reviews and contract extensions. (SOF ¶33.) Plaintiff accepted the offer, and began working as an Assistant Professor in the Fall of 2011. (*Id.*) Dr. Salma

---

[2] These facts are a summary of those set forth in Defendants' Combined Rule 56.1(a)(3) Statement of Undisputed Fact filed concurrently herewith. References to that Statement will be made as (SOF ¶ ___.) For purposes of summary judgment only, Defendants assume Plaintiff's alleged facts to be true, but reserves the right to contest all such facts not otherwise admitted should the motion be denied.
[3] Plaintiff variously describes her racial identity as Black and Black Diasporic. (SOF ¶¶ 4, 76, 145, 146.) Plaintiff distinguishes her ethnic identity (Latina) as being of American national origin, as compared to her foreign-national Hispanic colleagues. (SOF ¶4.) Plaintiff's Complaint asserts no claims for national origin discrimination.

2

Ghanem (who identifies as "Middle-Eastern, predominantly") began serving Dean of the College in 2014. (SOF ¶6.)

**B.**    ***The Tenure Process at DePaul.***

Tenure is not guaranteed to a faculty member who may be eligible for its consideration. (SOF ¶14.) The pre-tenure period at DePaul, known as the probationary period, is typically six years. (SOF ¶11.) During this period, faculty members undergo faculty-driven "formal reviews" of their progress in the areas of teaching, research and service, which are "designed to prepare faculty for the tenure process and to document areas that need the faculty member's attention." (SOF ¶¶11-13.) This review is governed by procedures in the Faculty Handbook and the College's Criteria for Tenure and Promotion ("College Guidelines"). (SOF ¶¶11-12, 15.) In the College, formal reviews begin with a Personnel Committee, made up of a subset of tenured faculty, who consider the candidate's CV, personal statement, quantitative and qualitative student evaluations, and interview responses, among other materials. (SOF ¶¶37-39.) After the Personnel Committee drafts its assessment, which the candidate can rebut and edit for factual accuracy, the full body of tenured faculty in the College deliberate and ultimately vote on the candidate's progress toward tenure and on a recommendation to renew (or not) the candidate's contract. (*Id.*) Plaintiff's faculty reviewers in the College included, variously over time, Black, Hispanic, Asian and Caucasian individuals. (SOF ¶¶40, 45, 62, 101.)

In the final probationary year, the faculty member may apply and be considered for tenure. (SOF ¶14.) The tenure review for faculty in the College follows the formal review process, beginning with the Personnel Committee's review of the candidate's dossier followed by an interview with the candidate. (SOF ¶¶15-16, 101-113.) The Personnel Committee then sends its draft report to the candidate for fact-checking and rebuttal, before the full tenured faculty in the College meet and deliberate. (*Id.*) To be recommended for tenure, a faculty member in the College

3

must have two areas of the three performance metrics (teaching, research and service) rated "excellent" and the third no lower than "very good." (SOF ¶22.) The College faculty's vote tally and recommendation then goes to the Dean, who conducts her own assessment of the case, which the candidate can rebut. (SOF ¶15-16, 114-20.)

The dossier, College faculty report, Dean's report and any candidate rebuttals are then transmitted to the University Board on Promotion and Tenure ("UBPT"), a 7-member committee made up of tenured faculty from a variety of colleges across the University. (SOF ¶¶15-17, 121-28.) The UBPT conducts its own review, taking into consideration the "method and care of the application of the approved [College G]uidelines," and interviews both the candidate and the Dean before voting on the case. (*Id.*) The UBPT's vote and written assessment, along with all the materials from the lower level reviews are transmitted to the Provost for her assessment. (SOF ¶¶129-30.) Although the Provost can "overturn" the UBPT recommendation, she can do so rarely and only for "compelling reasons." (SOF ¶18, 130.) A candidate who receives a negative decision can appeal, but not on substantive grounds. (SOF ¶¶19-20, 142.)

### C. *Plaintiff's Probationary Period and Recurring Internal Complaints.*

As an Assistant Professor, Plaintiff taught Intercultural Communication (CMN 103), an entry level core course required of all communication majors. (SOF ¶35.) She also taught performance-based courses, where students' final projects are a graded live performance. (*Id.*)

1. **First Formal Review:** Plaintiff underwent her first formal review in 2013. (SOF ¶¶39-44.) At the time, Plaintiff's faculty reviewers unanimously recommended her contract renewal, and concluded that she was making "**good/very good**" progress toward tenure in teaching, "**satisfactory**" progress in research (she had published just one book review) and "**very good**" progress in service. (SOF ¶44.) They did, however, note areas for improvement in teaching, based on some students reporting feeling intimidated or needing clarity in CMN 103; and in

4

research, given that she had only two chapters of her manuscript completed. (SOF ¶¶41-42.) Her reviewers provided recommendations in these areas, including sending the two chapters of her manuscript to publishers to gauge interest or focusing on journal articles instead. (*Id*.) These problems, however, persisted.

2.     **Second Formal Review:** In her 2015 formal review, the reviewers noted that while her quantitative student scores were high, some students still reported feeling unwelcome in her classes, complaining about Plaintiff being "rude," "yelling," "rolling her eyes," and "belittling" and "reprimanding" them, particularly in CMN 103. (SOF ¶¶45-49, 54.) Her faculty reviewers[4] asked her to reflect on the comments and consider how she might reach these students consistent with DePaul's Catholic mission. (*Id*.) Plaintiff objected, telling her reviewers that she did not want those students in her class and that they should drop it.[5] (*Id*.)

Based on these persisting complaints and her unwillingness to take any action to remedy them, her faculty reviewers rated her as making "**poor**" progress toward tenure in teaching. (SOF ¶¶48-49, 52, 54.) They also rated her research as "**poor**," noting that her total publication record in the first three years of her probationary period – one book review and one co-authored peer reviewed journal article – was insufficient. (SOF ¶¶50, 52, 55.) They were particularly bothered by the lack of any progress on her manuscript. (SOF ¶50.) They concluded she was making "**fair to good**" progress in service, although some believed Plaintiff was "overselling" the nature of her service. (SOF ¶¶51, 52, 56.) By a vote of 13 to 5, the tenured faculty recommended her contract not be renewed, yet provided concrete recommendations on how to turn things around if retained. (SOF ¶56.)

---

[4]Dr. ▮▮▮▮, who recruited Plaintiff in 2011, was a member of the 2015 Personnel Committee. (SOF ¶45.)
[5]Plaintiff availed herself of the opportunity to both fact-check the Personnel Committee report and to provide a rebuttal to the full tenured faculty in the College. (SOF ¶53.)

3.     **Plaintiff Complains About Her 2015 Review**: After notifying Dr. Ghanem of her intention to file a complaint, Plaintiff complained to DePaul's Office of Institutional Diversity and Equity ("OIDE") that the Personnel Committee had engaged in race and gender discrimination in conducting her formal review.[6] (SOF ¶¶57, 59-61.) Although Dr. Ghanem agreed with the tenured faculty that Plaintiff needed to improve, she nonetheless decided to renew Plaintiff's contract, believing that Plaintiff could fulfill her stated intentions to do so. (SOF ¶¶57-58.) Plaintiff admits Dr. Ghanem explicitly warned her to follow her colleagues' recommendations and that to progress she needed to show marked improvement, which she believed Plaintiff capable of. (SOF ¶58.) Dr. Ghanem also agreed to help Plaintiff prepare for her 2017 formal review. (SOF ¶¶57, 63.)

4.     **Third Formal Review:** By her the time of her final probationary review in 2017, Plaintiff still had not published her manuscript, but was able to increase her output with journal articles while on research leave. (SOF ¶¶62-67, 72, 92.) The newly elected Personnel Committee rated her progress toward tenure in research as "**very good/fair**," but also recommended she continue to "push" her publication rate. (SOF ¶¶62, 66-67.) They also rated her progress in teaching as "**very good/fair**," given her high numerical scores on student evaluations, and noting a "low[er] frequency" in student complaints despite her assertion that she "had not changed anything significantly in her curriculum or teaching strategies[.]" (SOF ¶¶66-67.) Nevertheless, her reviewers expressed concern about the "longstanding," though less frequent, negative feedback from students regarding the classroom environment, which she had dismissed.[7] (SOF ¶66.) They also expressed concern that she was serving on only one committee in the College over the review

---

[6] OIDE conducted a thorough investigation, and did not find evidence of discrimination. (SOF ¶¶60-61.)
[7] Again, Plaintiff availed herself of the opportunities to fact-check the Personnel Committee report and submit a rebuttal. (SOF ¶¶69, 71.) Specifically, Plaintiff asked the Chair of the Personnel Committee, Dr. ▮▮▮▮ (Asian), to quantify negative student comments. He then analyzed aggregate data collected in the nine courses she taught during the review period (2015-2017), finding at least one such student comment in five of the nine courses (55%) and included that figure in the review. (SOF ¶¶69-70.)

6

period, but otherwise did not have substantial or meaningful service to the College, and thus concluded that her progress toward tenure in service was "**fair**." (SOF ¶¶66-67.) The Personnel Committee recommended that she increase her service to the College, and the full tenured faculty agreed and further recommended University committee service as well. (SOF ¶66, 72.) As it did not appear that Plaintiff had acknowledged the deficiencies in her performance, much less attempted to address them, by a vote of 13-8, a majority of the tenured faculty in the College voted against renewal. (SOF ¶72.) Dr. Ghanem again rejected that recommendation, giving Plaintiff one more opportunity to prepare her case for tenure the following year.[8] (SOF ¶73.)

Around the same time, the same College peer reviewers also voted to recommend the non-renewal of another faculty member, Dr. ████████ (Caucasian) based on his teaching and service record. (SOF ¶77.) After Dr. Ghanem accepted that recommendation and notified him of his termination, Dr. ████ appealed. (SOF ¶77-78.) Plaintiff submitted a letter to his appeal board reviewers, stating that she believed the College Personnel Committee was using Dr. ████ as a pawn to justify terminating faculty of color, like herself.[9] (SOF ¶79.) In her letter to Dr. ████'s appeals committee, she did not accuse Dr. Ghanem of engaging in discriminatory conduct. (*Id.*) Dr. ████'s appeal was unsuccessful and Dr. Ghanem's decision not to renew his contract stood. (SOF ¶80.)

### D. *Plaintiff Scrambles to Ready for her Tenure Application.*

In January 2018, only months before her tenure application was due, Plaintiff asked her Chair and Dean for help identifying committee assignments at the College and University levels.

---

[8]Thereafter, Plaintiff met with Dr. Ghanem, during which time stated that she wanted to file another complaint but complained that doing so was time-consuming. Dr. Ghanem told her it was her decision, but allegedly told her to wait to do so. Nevertheless, Dr. Ghanem notified OIDE of Plaintiff's concern after their meeting, and OIDE contacted Plaintiff, who did not respond. (SOF ¶74-75.)
[9]The appeals board sent Plaintiff's letter to OIDE, and she again refused to pursue her allegations with OIDE when they contacted her. (SOF ¶79.)

(SOF ¶87.) Between January and May 2018 she finally took the advice given to her in 2013 and started shopping the two chapters of her manuscript to publishers. (SOF ¶88.) She requested that a collaborator of hers on community-based initiatives at DePaul, Ruben Alvarez Silva, write a letter describing a student performance he attended, to include in her dossier. (SOF ¶89.) Plaintiff also conducted her own analysis of the volume of student complaints, looking at individual student comments including the words "hostile," "intimidating," "uncomfortable," "nervous" and "afraid," and noting at least 20 students between 2011 and 2017 made such complaints about her.[10] (SOF ¶95-96.) These complaints also occurred outside of the student evaluation survey – which were not captured in her analysis – and included complaints made by Black students. (SOF ¶¶76, 86, 96-97.)

When Plaintiff submitted her tenure dossier, she still had not completed her manuscript or obtained a contract for it. (SOF ¶¶92, 98.) Her research record consisted of one co-edited book; the introduction to that co-edited book; co-authorship of a chapter in that co-edited book; three peer-reviewed journal articles; and one book review. (*Id.*) She listed the co-edited book on her CV under the header "Books" even though it was a co-edited book, which under the College Guidelines is weighted less.[11] (SOF ¶¶26, 92.) She also asked her reviewers to consider three of her students' performances as part of her scholarship, including a video recording of one performance which was not contextualized in any way and was not accompanied by any peer analysis.[12] (SOF ¶93.)

---

[10]Plaintiff admitted this number was understated because her keyword methodology for identifying such complaints did not include the words "rude," "belittling," "reprimand," "bark," or "yell." (SOF ¶¶95-96.)
[11]She also separately listed the introduction and one chapter to the co-edited book in another section on her CV. (SOF ¶92.)
[12]Plaintiff had notified then-Associate Dean Alexandra Murphy (Caucasian) that she wanted this video to be distributed to her external reviewers for analysis, but Dr. Murphy inadvertently failed to do that. (SOF ¶99.) When Plaintiff notified Dr. Murphy of the error, she immediately offered to send it out to those reviewers, but Plaintiff declined, asking instead if she could have two other reviewers weigh in on the performance. (SOF ¶¶99-100.)Dr. Murphy agreed and Plaintiff's dossier was amended to include a letter from a collaborator on community service projects and another letter from Dr. ███████, with whom

Plaintiff also included "Appendices" to her personal statement, setting forth her student complaint calculations, and her 2015 and 2017 formal reviews. (SOF ¶¶94-95.) Prior reviews are not included in the dossier as a matter of course. (SOF ¶21.)

On October 10, 2018, after submitting her dossier, but before meeting with the Personnel Committee, Plaintiff and her colleague Dr. ████ (Black) (who was also up for tenure), met with Dr. Ghanem to raise concerns of racial hostility from their faculty peers.[13] (SOF ¶¶82, 92, 99, 102.) Plaintiff admits that she did not accuse Dr. Ghanem of discrimination or retaliation during the meeting. (SOF ¶82.) But, she contends, after Dr. Ghanem stated that she had heard a rumor that she terminated Dr. ████ so that she could justify terminating faculty of color, Plaintiff told her that she wrote a letter to the appeals committee on his case. (*Id*.) According to Dr. Ghanem, she understood the rumor to be about the College faculty's alleged conduct, not her own. (*Id*.) Dr. Ghanem immediately called and emailed OIDE to report the concerns relayed to her by Drs. ████ and Calvente.[14] (SOF ¶83.) Around this time, Dr. Ghanem moved into the role of Acting Provost, and Dr. Murphy was elevated to Acting Dean of the College. (SOF ¶¶6-7.)

### E. *Plaintiff's Tenure Review.*

In her tenure interview with the College's Personnel Committee, Plaintiff warned that "retaliation is illegal." (SOF ¶102.) She also explained how she had addressed a complaint from a Black student about her use of the "n-word" in class. (SOF ¶¶76, 102.) Plaintiff's reviewers carefully deliberated on her file, and rated her performance in each of the three categories as "**very good**." (SOF ¶¶21-28, 103-13.) In teaching, the reviewers reported on her "positive growth" in the

---

Plaintiff collaborated at Northwestern. These letters spoke primarily to the teaching aspect of these performances. (SOF ¶100.)

[13] In June of 2018, Plaintiff and Dr. ████ submitted an anonymous complaint to OIDE. (SOF ¶¶ 81-82.)

[14] Plaintiff and Dr. ████ both met with OIDE thereafter, but independently. (SOF ¶¶84-85.) After her meeting with OIDE in November 2018, Plaintiff failed to provide additional information and stopped communicating with OIDE. (SOF ¶85.)

prior areas of concern, but were concerned with Plaintiff's pattern of dismissing peer recommendations, especially related to the classroom environment and with respect to the dense materials she taught in an introductory level course. (SOF ¶¶103, 107-08.) Her reviewers noted Plaintiff's scholarship (including her accounting of the co-edited book as three separate pieces) and her "coherent, unique research agenda," but were concerned about the ongoing lack of progress on the book she had been working on since she arrived at DePaul. (SOF ¶¶25-27, 103, 109, 110.) They also declined to consider her student performances as scholarship, rather than teaching, because she did not adequately document her role in the productions (through peer review or otherwise), and because the performances were part of classroom work for which students were graded. (SOF ¶¶25, 27, 111.) Finally, while Plaintiff provided service to other academic units and the community, and had short-term service in the College, she had only one ongoing committee assignment in the College, though College guidelines require tenure candidate to focus on service to the College. (SOF ¶¶28, 104, 112.) On the whole, Plaintiff's record was commendable; but it fell short of the "excellent" rating needed for at least two categories to achieve lifetime employment. (SOF ¶¶22 104-13.) By a vote of 19-2, the College faculty recommended against the award of tenure. (SOF ¶113.)

Acting Dean Murphy then evaluated the case. (SOF ¶¶114-20.) In adopting the College faculty's recommendation, she wrote, "to overturn a nearly unanimous vote would require me to challenge the personnel and tenured faculty evaluation and move at least two of the three categories to 'excellent' or to disregard the College's standards for tenure and promotion. In this case, neither action is appropriate." (SOF ¶114.) In her lengthy report, Dr. Murphy extolled Plaintiff's many positive accomplishments and attributes. (SOF ¶¶115-20.) While she acknowledged that Plaintiff disagreed with concerns about CMN 103 and with the quantification of some of the student

complaints, she also noted that Plaintiff's own calculation of 20 complaints represented a number and content that was simply unacceptable in the academic judgment of her peers.[15] (SOF ¶¶116-17.) However, she noted that the concerns about Plaintiff's teaching was "less about the existence of the negative comments, and more about how [Plaintiff] has chosen to respond (or not respond) to them." (SOF ¶116.) She also agreed that because her service to the College was mostly in "ad hoc, short-term capacities" and that because she lacked a "sufficient volume of notable published work," those areas were appropriately evaluated as "very good" rather than "excellent." (SOF ¶119.)

After receiving notice from the College on her case, Plaintiff presented a rebuttal for consideration by the UBPT. (SOF ¶121.) In her rebuttal, she accused her colleagues of discriminatory and retaliatory intent, but expressly excluded Dr. Ghanem from being among those with such animus, writing that Dr. Ghanem could not be expected to "bear the burden of shifting a climate that took decades to create." (*Id.*) By a one-vote margin (4-3), the UBPT recommended Plaintiff for tenure. (SOF ¶¶122-28.) In doing so, the slim majority did not change any of her ratings to "excellent" and they also noted that in every category she still needed to demonstrate improvement. (SOF ¶¶124-26.) Dr. ███, a tenured faculty member in the College sitting on the UBPT,[16] voted in her favor, but described her case as "razor thin." (SOF ¶128.) Dr. Ghanem conducted the next level of review as Acting Provost. (SOF ¶¶129-30.) After performing a substantive review, she rejected the UBPT's recommendation, stating that she agreed with the UBPT's minority view and therefore could not grant tenure under the requirement that the

---

[15]Dean Murphy provided a "window" into these concerns by describing an incident involving two students who had personally complained, while Plaintiff's tenure case was pending, that Plaintiff had accused them of "misogynist acts" in front of the entire class. (SOF ¶¶ 86, 116.) The nature of the concerns justified inclusion of this incident in her tenure report.
[16]Dr. ███ did not deliberate on her case at the College level. (SOF ¶ 106.)

University "have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (*Id.*) At the same time, Dr. Ghanem awarded tenure to two other College candidates: Dr. ███ (Black) and Dr. ███████ (Caucasian), both of whom received unanimous support at every level of review. (SOF ¶149.)

### F.    *Plaintiff's Tenure Appeal.*

Plaintiff appealed her denial of tenure to a Faculty Appeals Board ("FAB") on all available grounds: academic freedom; discrimination; and procedural violations. (SOF ¶¶131-34.) The FAB dismissed the academic freedom and discrimination allegations in the appeal. (SOF ¶¶135-37.) They also dismissed most of the alleged procedural violations, including the allegation that Dr. Ghanem did not have a compelling reason to overturn the UBPT's recommendation. But the FAB concluded that (a) the College unfairly misrepresented student comments in her teaching evaluations; (b) Plaintiff received "inconsistent" guidance regarding service expectations; and (c) Dr. Ghanem assigned "undue weight" to the College's concerns. (SOF ¶¶138-39.) They recommended to the President that her case be reconsidered. (SOF ¶139.) President Esteban (Asian) declined the invitation, finding that the FAB overstepped its charge by engaging in a merits-based review of the case, substituting its own evaluation for that of her faculty reviewers. (SOF ¶¶140-44) In regards to the FAB's finding on teaching, he wrote, in pertinent part:

> the dossier shows full transparency, context, and ample discussion around the issue of student comments in teaching evaluations. These types of discussions and the application of sound academic judgment, informed by experience, are foundational to the tenure review process. It is through these debates — at every level — that the university determines whether or not there is any reasonable doubt about the faculty member's qualifications and continued capacity to contribute . . . The record reflects a holistic review of your teaching, which took into account more than just the student concerns about feeling intimidated and/or uncomfortable in the classroom. The College Report also highlighted other areas requiring improvement, including concerns about clarity in assignments and assessments of learning outcomes, time management, use of textbooks/readings, and incorporation of visual

12

aids and multiple media . . . The College Report acknowledged improvement in some of these areas . . . However, the College Report's description of the faculty meeting reflected general concern among the tenured faculty that you resisted developmental recommendations . . . Against this backdrop, the Appeals Board has no authority to substitute its own interpretation of the meaning and weight that should be attributed to the various factors that go into teaching evaluations.

(SOF ¶142.) With respect to the FAB's findings of purportedly inconsistent guidance regarding service expectations, Dr. Esteban wrote:

Evolving recommendations over the course of your probationary period and differing opinions amongst the reviewing faculty does not mean that the process – during the probationary period or the tenure review – was unfair, inconsistent, or procedurally flawed. Rather, I would argue that it demonstrates that the process functioned as it should.

(SOF ¶143.) Plaintiff's tenure denial thus stood. (SOF ¶140.)

## III. ARGUMENT

Despite being told repeatedly that her failure to address certain performance issues could adversely impact a tenure decision, Plaintiff chose to ignore this advice until it was too late. Now, with tenure denied, Plaintiff asserts she was the victim of unlawful discrimination and retaliation due to her complaints about "racial discrimination, harassment, and marginalization within the College." She accuses the tenured faculty in the College, the Dean of the College and the Provost of discrimination and retaliation. And though the Faculty Handbook makes no promise of tenure, she tries to argue that "breach" of certain provisions in the Handbook nevertheless entitle her to tenure. Plaintiff has not adduced any evidence creating a material issue of fact on these claims.[17]

---

[17]Summary judgment should be granted where, as here, the record, construing all reasonable inferences in Plaintiff's favor, shows there are no genuine issues of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under the Seventh Circuit's "*Ortiz* standard," summary judgment is appropriate if, when all the evidence "considered as a whole," would not permit a reasonable factfinder to conclude that Plaintiff's race caused the tenure denial. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Even after *Ortiz*, the Seventh Circuit has recognized that the familiar *McDonnell Douglas* framework remains a method of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual

A.    _**Plaintiff Cannot Establish Either Of Her Two Race Discrimination Claims.**_

Plaintiff asserts racial discrimination against DePaul under Title VII (Count IV). She also alleges race discrimination against DePaul and Dr. Ghanem under Section 1981 (Count III). Plaintiff has no evidence to support either claim.[18] To establish her discrimination claims, Plaintiff must first show: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for tenure; (3) [s]he was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007). Plaintiff cannot establish the second or fourth prongs of her *prima facie* case.

1.    **Plaintiff is not qualified for tenure under DePaul's criteria.**

Under the published College Guidelines, to qualify for tenure, a candidate must be rated as "excellent" in at least two of the three core categories of teaching, research, and service, with the third being rated at least "very good." (SOF ¶22.) As the Seventh Circuit has observed, "tenure decisions are often based on the distinction between competent and superior achievement." *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998). Courts have long recognized the "nuanced nature" of tenure decisions and have been reticent to "second-guess the expert decisions of faculty committees." *Sun*, 473 F.3d at 815. Scholars, not courts, "are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005); *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007). As the U.S. Supreme Court has made clear, "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should

---

patterns found in discrimination cases." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Sandefur v. Dart*, 979 F.3d 1145, 1155 (7th Cir. 2020).

[18]Under Title VII, Plaintiff must prove that her race/ethnicity was a "motivating factor" for the decision. 42 U.S.C. §2000e-2(m). Under Section 1981, race/ethnicity-based discrimination must have been the determinative, "but for" reason for the tenure denial. *Comcast Corp. v. National Ass's of African American-Owned Media*, __ U.S. __, 140 S. Ct. 1009, 1019 (2020).

show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).[19]

Under that longstanding precedent, Plaintiff cannot demonstrate she was "qualified for tenure." On the contrary, the uncontroverted evidence shows that Plaintiff's performance fell below DePaul's legitimate and well-publicized expectations for becoming a tenured member of the faculty. Indeed, the College faculty – by a vote of 19-2 – cited numerous nondiscriminatory reasons for their conclusion that while her case was "very good" it was not "excellent." (SOF ¶¶101-13.) Five out of the nine higher-level reviewers (the Dean, three members of the UBPT and Dr. Ghanem) reached the same conclusion at the College faculty, leaving only 6 out of the total 30 reviewers concluding otherwise. (SOF ¶¶114-30.) To be sure, even the four majority members of the UBPT who voted in her favor, found that Plaintiff still needed to show improvement in teaching, research and service and further noted that the College's expectation of excellence was both commendable and appropriate. (SOF ¶¶124-26.) At every step of the multi-level review, tenured faculty at DePaul weighed both the strengths and weaknesses of Plaintiff's tenure

---

[19]In case after case, the Seventh Circuit and the other Courts of Appeals have refused "to review the merits of tenure decisions … in the absence of clear discrimination. [They] have ... recognized that scholars are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Adelman–Reyes*, 500 F.3d at 667; *see also Seye v. Trustees of Indiana Univ.*, 830 F.App'x 778, 781 (7th Cir. 2020); *Haynes v. Indiana Univ.*, 902 F.3d 724, 733–34 (7th Cir. 2018); *Blasdel v. Nw. Univ.*, 687 F.3d 813, 815 (7th Cir. 2012) ("practical considerations make a challenge to the denial of tenure at the college or university level an uphill fight – notably the absence of fixed, objective criteria for tenure at that level") (citing cases); *Sun*, 473 F.3d at 814 (granting summary judgment where multiple reviewers determined that the applicant lacked the qualifications for tenure); *Lim v. Trs. of Ind. Univ.*, 297 F.3d 575 (7th Cir. 2002); *Vanasco*, 137 F.3d at 968 (granting summary judgment where tenure denial was based on the written views of two committees); *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332-33 (7th Cir. 1996); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 589 (7th Cir.1992); *Namenwirth v. Bd. Of Regents of Univ. of Wisconsin Sys.*, 769 F.2d 1235, 1242 (7th Cir. 1985); *Thrash v. Miami Univ.*, 549 F.App'x 511, 521 (6th Cir. 2014); *Farrell*, 421 F.3d at 616; *Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir.1995); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984); *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980).

application. (SOF ¶¶101-30.) Despite having admirable achievements, Plaintiff's faculty peers found that Plaintiff failed to meet the exacting requirements of demonstrated "excellence." (*Id.*)

Plaintiff disagrees, and demands this Court substitute its own assessment of her performance for that of her faculty reviewers. This Court would not be alone in rejecting this request to second-guess the "opinions of academics that serve not only as experts on qualifications but also as decision-makers in the tenure process." *See Namenwirth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 769 F.2d 1235, 1242 (7th Cir. 1985); *see also* cases cited in n.17. While Plaintiff might believe the distinction between a rating of "very good" and "excellent" is too subjective to deny tenure, DePaul's written tenure requirements say otherwise. And, in any event, assessing performance based on these parameters is well within the prerogative of the academic freedom reserved to University faculty. *Sun*, 473 F.3d at 815; *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012); *Adelman-Reyes*, 500 F.3d at 662. That the ultimate decision fell on the negative side of what one reviewer described as a "razor thin" line is demonstrative of a deliberative process during which faculty exercising their professional judgment "may well come to different conclusions when confronted with voluminous and nuanced information about a colleague's overall capacity to make a long-term institutional contribution." *Montgomery v. DePaul Univ.*, No. 10 C 78, 2012 WL 3903784, at *5 (N.D. Ill. Sept. 7, 2012). Consequently, Plaintiff simply cannot show that she was "qualified for tenure" and therefore cannot meet her initial burden of proof.

### 2. No similarly situated individual was treated more favorably than Plaintiff.

Plaintiff asserts that similarly situated individuals outside of her protected class were awarded tenure while she was not. This argument conveniently ignores the individuals *within* her protected class who were awarded tenure in the same year: Dr. ███ (Black) from the College – who was reviewed by the exact same set of 30 faculty reviewers as Plaintiff – along with all five

16

of the other Black and Asian faculty members from other colleges at DePaul for whom Dr. Ghanem awarded tenure. (SOF ¶157.) It also ignores that one Caucasian faculty member, Dr. ███████, was terminated before he could even apply for tenure, based on his teaching and service record.[20] SOF ¶¶77-80.)

Neither of the two Caucasian individuals Plaintiff points to are similarly situated. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (noting comparator must be "similar enough" to "eliminate confounding variables") (quotations omitted). In tenure review cases, "where it is a matter of comparing qualification against qualification, the plaintiff is *bound to lose.*" *Namenwirth,* 769 F.2d at 1243 ("Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments."). For example, Plaintiff first points to ███████, also from the College, asserting that her teaching was objectively better than Dr. ████'s teaching. She also points to student complaints in Dr. ████'s qualitative student evaluations, and claims that since the same faculty reviewers from the College, up through the Provost, evaluated their applications, the fact that Dr. ████ was promoted and she was not could only be due to racial bias. But, in the nuanced nature of tenure review cases, there are always "variables" that "meaningfully distinguish" among the applications. *Namenwirth,* 769 F.2d at 1243; *Snipes v. IDOC*, 291 F.3d 460, 463 (7th Cir. 2002).

Here, Dr. ████ arrived at DePaul in 2016, just two years before going up for tenure (and having achieved tenure at her prior institution). (SOF ¶150-51.) And, while it is undisputed that Plaintiff had higher quantitative scores on her student evaluations (in distinct, incomparable courses) (*id.*), their respective responses to the *qualitative* comments are incomparable. After years

---

[20]Plaintiff's conspiratorial and absurd proposition that the tenured faculty, the Dean and the Provost – professors who have spent their careers reaching the highest levels in academia – would torpedo the career of a Caucasian faculty member just so they could fire her a year later (but award tenure to another Black faculty member) is so patently unsupported as to not warrant consideration.

of receiving recommendations from her faculty reviewers and against the explicit advice of Dr. Ghanem, Plaintiff resisted modifying her approach in any meaningful way, telling her reviewers she didn't want those students in her classes. (*Compare* SOF ¶¶41, 48, 49, 52, 54, 57, 63, 66, 67, 69-72 *with* SOF ¶¶151-52.) As such, the complaints persisted up until the time she went up for tenure, and beyond. (*Id.*, *see also* SOF ¶¶76, 86, 95.)

By contrast, Dr. █████ accepted and incorporated the feedback from students and colleagues, and developed concrete plans for addressing the concerns in the short time preceding her tenure review. (SOF ¶¶150-51.) Even so, Dr. █████ was not rated better in this category; both were rated "very good" in teaching – recognizing the strengths and weaknesses in both of their teaching records. (SOF ¶¶103, 151.) Importantly, Plaintiff's sole focus on teaching ignores the other two categories under review. Dr. █████'s significant publication record (8 publications in 2 years compared to Plaintiff's 7 in 6 years) and service record were both rated as "excellent," as compared to Plaintiff's "very good" in both categories. (*Id.*) The two are not similarly situated.

Plaintiff's attempt to compare herself to █████ (Caucasian) is also misplaced. Dr. █████ was a faculty member in the College of Science and Health, **not** the College of Communication. (SOF ¶¶153-54.) As such, he was reviewed by different faculty under different college guidelines before the case went to UBPT. And, even though there were some problematic student evaluations in his file, his faculty colleagues had only six months prior formally assessed him – in a unanimous 8-0 vote to renew his contract – as meeting the expectations for progress toward tenure in teaching under his college's guidelines. (SOF ¶153.) Given that his reviewers had just unanimously assessed him as on track for tenure, and that both his Department Chair and Dean recommended tenure, Dr. Ghanem rejected the UBPT's recommendation to deny him tenure based on this issue. (*Id.*) This is quite distinct from Plaintiff's case where she was told for years leading

18

up to her tenure review that she was not progressing satisfactorily in the area of teaching and needed to improve.[21] (*Compare* SOF ¶¶41, 48, 49, 52, 54, 57, 63, 66, 67, 69-72 *with* SOF ¶¶153-54.) Plaintiff simply cannot show that a similarly situated individual not in her protected class was treated differently.

### 3. Plaintiff has no evidence of pretext.

Assuming Plaintiff could establish a *prima facie* case (which she cannot), the burden shifts to DePaul to articulate legitimate, non-discriminatory and non-retaliatory reasons for its action. This is a burden of articulation not persuasion – the reasons set forth at each level of review are presumptively valid. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). DePaul has clearly articulated a legitimate, nondiscriminatory reason for its decision not to offer Plaintiff tenure, namely, her failure to achieve the requisite excellence for lifetime employment. As such, the burden shifts to Plaintiff to prove that DePaul's articulated reason is pretextual and the real reason is unlawful discrimination. *See Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012). It is not enough for Plaintiff to show she was simply evaluated unfairly or that her reviewers were "mistaken" in their assessment of her, rather, Plaintiff must point to "clear evidence" that she was denied tenure *because of* her race. *Adelman-Reyes*, 500 F.3d at 667; *Dass*, 675 F.3d at 1068.

Anticipating the Court's reluctance to weigh into the merits of the tenure decision, Plaintiff points to three categories of evidence in an effort to show race-based "sabotage" or "over-scrutiny":

---

[21]The following academic year, 2019-2020, Dr. Ghanem again rejected the tenure recommendations made by the UBPT for two faculty members outside the College, one Latina and one Caucasian. In both cases, she disagreed with the UBPT's view that their research record did not warrant tenure. Teaching was not at issue in either case. But Dr. ▮▮▮▮ (Caucasian) had 15 publications and Dr. ▮▮▮▮ had 10, compared to Plaintiff's 7. These numbers alone make the cases non-comparable. Dr. ▮▮▮▮'s inclusion in Plaintiff's protected class, and her *grant* of tenure by Dr. Ghanem, demonstrates the absence of racial/ethnic bias. (SOF ¶¶155-56.)

(a) her subjective disagreement with the assessment of her case; (b) an administrative error; and (c) stray remarks. None of this evidence establishes pretext.

a.  Plaintiff's Subjective Disagreement is Immaterial

Plaintiff's subjective belief about her own performance gets her nowhere. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("a plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact" in a discrimination case). This is particularly so when, as here, the decision involves highly individualized assessment of teaching skills, scholarship activities and College service, made by other tenured professors well-versed in the tenure requirements specific to the College and to DePaul. *Farrell*, 421 F.3d at 616; *Vanasco*, 137 F.3d at 968.It is not enough for Plaintiff to substantively disagree with her less than excellent ratings – she must offer clear evidence of racial bias. *Adelman-Reyes*, 500 F.3d at 667. This she cannot do.

Plaintiff contends: that her faculty reviewers overstated the volume of student complaints about her classroom environment (though by her own accounting there were at least 20 such complaints, an admittedly understated figure, and which Plaintiff believed were unfounded and not worthy of her attention[22] (SOF ¶¶48, 53, 70, 95-96, 131-34); that her methodology and course materials in CMN 103 was unfairly assessed because her syllabus had been approved SOF ¶¶35, 107-08, 115, 122, 125, 131-34); and that her students' class performances (on which they were graded) should have been evaluated as scholarship rather than teaching. (SOF ¶¶27, 36, 46, 64, 71, 90-93, 99-

---

[22]Plaintiff contends that the students complaints were the result of "structural racism" (arguing that "intimidating" and "hostile" are euphemisms directed at her race, even though some complaints were raised by Black students) and appears to argue that to acknowledge them in any way would be discriminatory. The Seventh Circuit has rejected her argument, holding that "student behavior falls outside the ambit of Title VII." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017). Moreover, courts in the Seventh Circuit have rejected the invitation to rely on facially innocuous words as evidence of unlawful animus. *See, e.g., Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 897 (7th Cir. 2016) (refusing to extrapolate racial animus from race-neutral statements). Even so, she has no basis to graft those allegedly racist student views onto her faculty reviewers because they did not characterize Plaintiff in any racially offensive fashion, but rather questioned whether her approach in the classroom was consistent with the teaching mission at DePaul.

100, 104-05, 107, 111, 121, 133, 138.) But the record is replete with evidence providing legitimate rationales for these conclusions. (SOF ¶¶40-130.) It is undisputed that over the six years of her probationary period her faculty reviewers painstakingly deliberated and assessed her record against well-published standards, and provided her with feedback that would make her record stronger on the very points she argues are pretextual. (SOF ¶¶15-28, 40-76.) They admittedly pointed out the strengths in her record along the way (*id.*), assessed ratings that improved markedly between 2015 (when she received two "poor" ratings) to 2018 (when she received across the board "very good" ratings (*compare* SOF ¶52 with ¶73), and, in the case of Dr. Ghanem, expressly told her that she believed that Plaintiff could address the shortcomings identified over time provided she follow the advice of her peers. (SOF ¶103.) On this record no reasonable juror could find shifting reasoning that would allow an inference of pretext.

But even assuming Plaintiff is correct, and that the faculty reviewers erred in reviewing her record, she has not adduced a shred of evidence demonstrating that any single one of her reviewers – let alone all 24 of them – did not honestly believe that Plaintiff failed to meet the standard of excellence in teaching, research and service, as is required for lifetime employment. The "question of right and wrong plays no role in this and like cases." *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (7th Cir.2012); *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) ("The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."); *Gupta v. Board of Regents of University of Wisconsin System*, 63 F.App'x. 925, 928 (7th Cir.2003)[23] ("To prove discrimination, Gupta must show more than that he was a qualified tenure candidate or even

---

[23] *Goswami v. DePaul Univ.*, 8 F. Supp. 3d 1019, 1035 (N.D. Ill. 2014) (noting that nonprecedential decisions "ought not be overlooked as unpublished decisions can 'offer helpful guidance.'") (citing *United States v. Ramirez*, 675 F.3d 634, 636 (7th Cir.2011)).

that the defendants' reason for denying him tenure was 'mistaken, ill-considered, or foolish. He must show that the defendants' reason was a lie."); *Brogan v. Chicago School Report Bd. of Trustees*, Case No. 01 C 4216, 2003 WL 21212606 at *5 (N.D. Ill. May 22, 2003) (plaintiff's subjective view that student complaints about his harassing and intimidating behavior were unfounded did not create a material issue of fact, even if employer's honest belief was mistaken).The law gives institutions of higher learning, like other employers, the right to be wrong, and grievously so. *Gupta*, 63 F.App'x. at 928. Plaintiff fails to provide any evidence that the rationale for tenure denial – even is wrong – was designed to cover up "lies" about Plaintiff's record.

### b. A Single Administrative Error Is Not Evidence of Pretext

It is undisputed that Dr. Murphy failed to include a link to a video recording of one a student performance from one of Plaintiff's classes to external reviewers, as Plaintiff had requested. (SOF ¶90, 98-99.) But a race-neutral error is not evidence of pretext. *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 901 (7th Cir. 2016) (innocuous events being connected to race only insofar as they happened to a person of color is not enough to raise a genuine factual dispute). To be sure, the First Circuit Court of Appeals recently rejected this very same argument in *Theidon v. Harvard University*, 948 F.3d 477, 497-500 (1st Cir. 2020). Like here, Harvard officials failed to include certain items of scholarship in its requests for external reviews of the plaintiff's research on tenure review. *Id*. While noting the error was "less than ideal," it held that it was not evidence of unlawful bias. *Id*. Similarly, Dr. Murphy's administrative mistake is not evidence of unlawful bias, particularly given that she immediately set out to rectify it, adopting Plaintiff's proposal for addressing the omission, and the link was not functional in any event. (SOF ¶¶99-100, 104.)

### c. Stray Remarks Are Not Evidence of Pretext.

Finally, Plaintiff points to two comments made by her colleagues, Dr. █████ and Dr. █████, during her first year of employment in 2011, claiming they are evidence of racial animus. (SOF

¶¶147-48.) Specifically, Plaintiff alleges that after her hire but before she started in 2011, DePaul faculty member Dr. ███ allegedly told a reprehensible joke with a racial epithet, and another DePaul faculty member, Dr. ████, allegedly made a racially insensitive comment about communities in the South and West sides of Chicago. (*Id.*) Even assuming these comments were uttered seven years prior to the 19-2 College tenured faculty vote recommending against tenure, they do not amount to evidence of discrimination in a tenure case, especially since the decision made closest in time to these remarks was a *unanimous* recommendation in 2013 to renew her contract. Courts have long held that stray racial remarks are insufficient to establish a claim under Title VII. *Cowan v. Glenbrook Sec. Services, Inc.*, 123 F.3d 438, 444 (7th Cir. 1997).

### B.     *Plaintiff's Section 1981 Race Discrimination Claims Fail.*

Under Section 1981, race/ethnicity-based discrimination must have been the determinative, "but for" reason for the tenure denial. *Comcast*, 140 S. Ct. at 1019. The analysis above makes clear there is no evidence of a motivating factor of race discrimination in Plaintiff's tenure case, let alone evidence that "but for" Plaintiff's race, Plaintiff's colleagues in the College or Dr. Ghanem (mixed-race) would not have denied her tenure. *Nelson v. Idleburg, et al.*, No. 18 CV 2839, 2020 WL 2061555, at *9 (N.D. Ill. April 29, 2020) ("Given that [plaintiff] cannot succeed on his race claims under Title VII … he cannot succeed on his race claim under the more stringent standard required for Section 1981.").

On the contrary, specifically as it relates to Dr. Ghanem, by all accounts, she supported Plaintiff throughout her probationary period, even offering to help her with her personal statement and other submissions. (SOF ¶¶57-58, 68, 73-75, 83-84.) Dr. Ghanem also, *on two separate occasions*, rejected the College's recommendation that Plaintiff's contract be terminated. (SOF ¶¶75, 84.) This is hardly the conduct one would expect if, as Plaintiff claims, Dr. Ghanem was intent on discriminating her because of her race. Just as importantly in the year Plaintiff went up

23

for tenure, there were six candidates that identify as Black or Asian, in addition to Plaintiff. (SOF ¶¶149, 157.) Dr. Ghanem granted tenure to all of those candidates, including Dr. ███ from the College, undercutting any claim that she harbors racial animus, let alone that race was the "but for" basis for Dr. Ghanem's decision. (*Id.*) In short, Dr. Ghanem gave Plaintiff every opportunity to make her case for tenure, and Plaintiff has no evidence that Dr. Ghanem did not hold an honest belief that Plaintiff failed to meet the requisite qualifications for tenure at the time she went up.

The same is true for the tenured faculty and Dean Murphy for the reasons already set forth in Section III.A. Moreover, the tenured faculty knew of Plaintiff's race (and "outspoken" research agenda) at the time of her hire and when they unanimously renewed her contract in 2013 (SOF ¶¶ 31-33, 40-44); they recommended the non-renewal of a Caucasian faculty member (Dr. ███) SOF ¶¶77-80); and then unanimously recommended a Black faculty member (Dr. ███) for tenure. (SOF ¶149.) These facts make clear that race was not the "but for" cause of their assessment of Plaintiff's tenure case.

### C. *Plaintiff Cannot Establish a Claim of Retaliation Against DePaul or Dr. Ghanem*

There is no dispute that Plaintiff engaged in protected activity, but she cannot causally connect those complaints to her tenure denial because she cannot show that her complaints were the "but for" cause of the decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (applying "but for" standard in Title VII retaliation claims); *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (applying "but-for" standard for Section 1981 retaliation claims).

As noted earlier, Plaintiff's tenure evaluation was subjected to multiple levels of careful review, and tenured faculty at DePaul articulated numerous legitimate non-discriminatory, non-retaliatory reasons in support of their tenure denial. (SOF ¶¶101-30.) Plaintiff admits that from the beginning of her employment—even before Plaintiff's first formal probationary review in 2013, which resulted in a unanimous vote to renew her contract— Plaintiff was very vocal about where

she stood on issues of race, as well as the racism she perceived in the College. (SOF ¶33.) *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (positive evaluation after plaintiff initially complained suggested decision maker was not motivated by complaints). Further, Plaintiff admits that after she filed an internal complaint of discrimination in 2015, her performance was rated higher in her formal probationary review in 2017 (her teaching and research ratings improved from "poor" in 2015 to "very good/fair" in 2017), and more members of the tenured faculty voted in favor of Plaintiff's retention than had before she complained. (*Compare* ¶¶52, 55 *with* ¶¶67, 72.) Simply put, and as set forth at length *supra*, Plaintiff has no evidence that her complaints of discrimination had any negative impact on her formal evaluations or on her tenure denial.

Plaintiff's claim implicating Dr. Ghanem's conduct likewise fails. Plaintiff's sole evidence for her allegation against Dr. Ghanem relates to a lengthy and wide-ranging meeting Plaintiff and Dr. ███ had in October 2018 with Dr. Ghanem. Nothing about the discussion in the October 2018[24] meeting with Dr. ███ and Dr. Ghanem, where Plaintiff disclosed that she had written a letter in Dr. ███'s appeal (SOF ¶82), raises a dispute of material fact about whether Plaintiff can meet the "but for" causation standard. While Plaintiff claims Dr. Ghanem "ushered them out" when the topic came up, it is undisputed that Plaintiff did not accuse Dr. Ghanem of discrimination or retaliation in the meeting, and Dr. Ghanem did not believe that Plaintiff was so accusing her. (*Id.*) Dr. Ghanem's viewpoint is supported by the "letter" Plaintiff actually wrote in Dr. ███'s case, and is even further supported by Plaintiff's rebuttal to the College's recommendations in her own tenure case that she submitted to the UBPT on her own behalf. (SOF

---

[24]The 8-month time period between her meeting with Dr. Ghanem and her tenure denial does also dooms her claim. *See e.g,, Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (granting summary judgment on plaintiff's retaliation claim and stating, "[w]hile the six-month gap does not preclude [plaintiff's] claim as a matter of law, it does substantially weaken it."); *Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir.1992) (four months was too long).

LEGAL\55228207\2

¶¶79, 121.) In both documents, Plaintiff takes issue with her faculty reviewers in the College and even calls Dr. Ghanem out as someone who has the burden of changing the College's culture – not someone who is fostering it. (*Id.*) To be sure, the first time Plaintiff ever directly accused Dr. Ghanem of improper conduct is in her appeal to the FAB *after* Dr. Ghanem denied her tenure. (*Compare* SOF ¶¶ 79, 121 *with* ¶¶133-34 .)

Plaintiff's contention that Dr. Ghanem would have granted her tenure but for the letter she had written in Dr. ████████'s appeal is further undercut by the support she provided Plaintiff throughout her probationary period: Dr. Ghanem helped Plaintiff with her formal reviews (SOF ¶68), and had twice rejected recommendations to terminate Plaintiff earlier, while also telling her that in order to be considered for tenure she had to "provide evidence" that she incorporated the recommendations of her peer reviewers in the College. (SOF ¶¶58, 73.) It cannot be disputed that Plaintiff had fair warning, even from Dr. Ghanem, that she needed to improve significantly to be granted tenure. (SOF ¶¶41-43, 48-52, 53-58, 66-67, 70-73.) In addition to providing Plaintiff with that support, she took Plaintiff's complaints seriously. It is undisputed that she met with Plaintiff several times, carefully listening to her concerns about disparate treatment including during meeting with Dr. ████ that lasted more than two hours (SOF ¶¶57, 68, 74, 82, 83); and had twice reported Plaintiff's concerns to OIDE *including during the very meeting where Dr. ████████ was being discussed.* (SOF ¶¶75, 83.) Had Dr. Ghanem developed retaliatory intent during that meeting, it is hard to image that she would have escalated Plaintiff's complaints to the OIDE.

Moreover, Dr. ████ also complained of discrimination, in the meeting and to OIDE, but was granted tenure by Dr. Ghanem in the same tenure cycle. (SOF ¶¶80-83, 84, 148.) Notably, this was after Dr. ████ also brought up Dr. ████████'s case during the October 2018 meeting, during which Dr. Ghanem also escalated Dr. ████'s concerns to OIDE. (SOF ¶82.) Based on

these undisputed facts, there is no evidence of a "but for" connection between Plaintiff's complaints of discrimination and tenure denial.

### D. *There is No Evidence That DePaul Breached Any Contract With Plaintiff*

In her last claim, Plaintiff alleges that DePaul breached its Faculty Handbook when it denied her tenure. In Illinois, an actionable breach of contract claim requires a plaintiff show: (1) the existence of a contract;[25] (2) plaintiff's performance under the contract; (3) the defendant's breach; and (4) resulting injury from the breach. *Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004); *Montgomery v. DePaul University*, Case No. 10 C 78, 2012 WL 3903784, *13-14 (N.D. Ill. Sept. 7, 2012) (affirming dismissal of breach of contract on summary judgment in tenure denial case based on lack of breach).

It is undisputed that tenure is not guaranteed at DePaul, and is only granted when, in the academic judgment of peer faculty, there is "no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (SOF ¶14.) It is also undisputed that Plaintiff participated in the multi-level process for tenure laid out in the Faculty Handbook, to the fullest extent, including through appeal to the President the University. (SOF ¶¶14-28, 101-145.) Plaintiff cannot identify a single missed step or failure in process, and she has admitted that she was heard at every step of the way, presenting written and verbal reports on her case, submitting rebuttals to reviewer reports and votes, including "appendices" to her dossier – though not expressly permitted under the Handbook – and even obtaining permission to amend her dossier over time. (SOF ¶¶94,99-100, 102, 104, 121, 123, 131-34.) Plaintiff's disagreement with the outcome of the application of published criteria to her record does not amount to a breach. *See, e.g. Monroe v. Columbia Coll. Chicago*,

---

[25]For summary judgment purposes, DePaul assumes the Faculty Handbook is a contract.

855 F. App'x 284, 291 (7th Cir. 2021), cert. denied, No. 21-135, 2021 WL 4733339 (U.S. Oct. 12, 2021) (no breach where there was no evidence the college abandoned its criteria for tenure); *Adelman-Reyes v. St. Xavier Univ.*, No. 05 C 3269, 2006 WL 1155989, at \*7 (N.D. Ill. Apr. 28, 2006), aff'd, 500 F.3d 662 (7th Cir. 2007) ("Saint Xavier has not breached any contractual obligations in regard to the performance reviews simply because Adelman-Reyes does not agree with the content of the reviews.").

In spite of receiving full process and without citing to specific provisions of the Handbook she contends were breached, Plaintiff dresses her discrimination claim up in new clothing, claiming that the decision to deny her tenure violated Handbook requirements that she "be given fair consideration and evaluation in the areas of teaching, research, and service at all levels" and that "tenure and promotion decisions not be based on racial discrimination or based on retaliation for complaining about racial discrimination." (Dkt. No. 1, ¶¶56-59.) Apart from the fact that Plaintiff has no evidence of discriminatory decisionmaking as set forth at length, *supra*, Illinois law does not recognize an independent contractual obligation based on handbook statements relating to "fair treatment" and "nondiscrimination." *See Harris v. Adler Sch. of Pro. Psychology*, 309 Ill. App. 3d 856, 861, 723 N.E.2d 717, 721 (1st Dist. 1999).

Attempting to identify a specific and independent contractual obligation, Plaintiff points to Section 3.5.6.3 of the Handbook which allows the provost to overturn the decision of the UBPT "[o]nly in rare instances and for compelling reasons." (SOF ¶18.) Plaintiff appears to argue breach of that provision either because Dr. Ghanem's reason for denying her tenure was not "compelling" enough, or that the absence of the phrase "compelling reason" in her tenure denial letter somehow means she failed to provide one as required by the Handbook. Assuming that this clause creates a contractual obligation, Plaintiff is wrong on both fronts, and *Montgomery v. DePaul,* 2012 WL

28

3903784 at *13-15, is directly on point. In that case, involving a prior version of DePaul's Faculty Handbook, the UBPT rejected the department and dean's recommendations and voted to deny tenure to the plaintiff. *Id*. In an effort to state a claim for breach of contract, the plaintiff argued that the UBPT's failure to explicitly make a written finding of "significant deficiencies" in the lower level review breached the handbook provision allowing the UBPT to apply its own substantive criteria "only in cases where lower level decisions are judged to be deficient in significant respects." *Id*. at 14. Rejecting that argument, Judge Feinerman wrote:

> The provision cannot reasonably be read to require that the UBPT announce an explicit finding that the lower levels' applications of the tenure criteria were "deficient in significant respects" before coming to a contrary decision; if the UBPT rejects a lower level's decision, that alone makes clear that the UBPT thought the lower level's decision was significantly deficient.

Id. at *14. That axiom is equally applicable here. First, nothing in Section 3.5.6.3 requires an "announcement" of the "compelling reason," and Dr. Ghanem's rejection of the UPBT's recommendation "alone makes clear" that she thought she had such reason. *Id*. Nevertheless, in her letter, Dr. Ghanem provides justification for her decision to deny Plaintiff tenure, and explains her "compelling reasons" even if she does not label them as such. (SOF ¶¶18, 129-30.) While Plaintiff may feel that such rationale is not "compelling" enough, the FAB accepted it as so, demonstrating that faculty decisionmakers interpret the "compelling" language as subject to the Provost's discretion, in her academic judgment. (SOF ¶138.) Indeed, reading the "compelling" language in concert with Handbook as a whole, as the law requires, it is obvious that Dr. Ghanem's compelling reason for denying tenure was that in her "academic judgment" she had "reasonable doubt" about Plaintiff's "demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." *Montgomery,* 2012 WL 3903784 at *15. There is no confusion about that compelling finding, as Dr. Ghanem explicitly quotes that "no reasonable

doubt" Handbook language in her tenure denial letter. (SOF ¶130.) There is no evidence of a breach.

Finally, Plaintiff also appears to argue that DePaul breached Section 3.3.1 of the Handbook, which provides that one "major purpose" of pre-tenure probationary reviews is to "provide clear and consistent guidance and develop priorities for the faculty member." (SOF ¶12.) Specifically, Plaintiff claims that her faculty reviewers failed to comply with this stated "purpose" as it related to expectations around service obligations, in part because her service record was rated lower in 2017 than it was in 2015. Apart from the fact that Plaintiff has admitted that performance records can change over time (SOF ¶13), this statement of purpose cannot fairly be characterized as a standalone contractual obligation, the breach of which would independently result in the denial of tenure. To be sure, whether Plaintiff was given consistent guidance on service obligations pre-tenure or not, she was still required to meet the criteria for tenure which also included excellence in teaching and research. *Jackson v. Hammer*, 274 Ill. App. 3d 59, 63-64, 653 N.E.2d 809, 813-14 (4th Dist. 1995)(to prevail on a breach of contract claim, plaintiff must establish "that there was a wrongful act and that a loss or damages resulted directly from it."). Thus Plaintiff has no claim for breach of contract on this Handbook provision either, and summary judgment on Count V should be granted to DePaul.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that there are no material disputes of fact, and the undisputed evidence shows that Defendants are entitled to summary judgment on all of Plaintiff's claims.

Respectfully submitted,

By: */s/ Anneliese Wermuth*
            Attorney for Defendants, Salma Ghanem and
            DePaul University

30

Anneliese Wermuth (#6270970)
Nandini K. Sane
Cozen O'Connor
123 N. Wacker Drive, Ste. 1800
Chicago, IL 60606
Telephone:     312/474-7876
Email: awermuth@cozen.com
Email: nsane@cozen.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 19, 2021 she electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois using the ECF system, which will send notification of such filing to the following counsel of record:

> Fitzgerald T. Bramwell
> Law Offices of Fitzgerald Bramwell
> 77 West Wacker Drive, Suite 4500
> Chicago, IL 60601
> bramwell@fitzgeraldbramwell.com

> *s/ Anneliese Wermuth*
> Anneliese Wermuth

31