## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | Judge John Robert Blakey |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' COMBINED RULE 56.1(a)(3)
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants, Salma Ghanem ("Dr. Ghanem") and DePaul University ("DePaul" or "University"), by their attorneys, Cozen O'Connor, and pursuant to Local Rule 56.1(a)(3), submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment, representing that there are no genuine issues as to these facts and that, taken together, they entitle Defendants to judgment as a matter of law. The portions of the record cited as support for these facts are appended hereto, with an index.[1]

## I.  JURISDICTION AND VENUE

1.  This Court has jurisdiction of this matter under 28 U.S.C. §§ 1331 and 1367. (**Tab A**, Answer at ¶ 6.)

2.  The allegations of the Complaint involve events occurring within the venue of this Court. (**Tab A**, Answer at ¶ 5.)

---

[1] Defendants accept these facts as true for purposes of this Motion, but reserve the right to contest any facts should this Motion be denied.

II.    **THE PARTIES**

3.    Located in Chicago, DePaul is the largest Catholic university in the United States. (**Tab A**, Answer at ¶ 3; **Tab B**, Deposition of Lisa Calvente (hereinafter "Calvente Dep.") at 27:23-28:1.) DePaul was founded by the Vincentians. (**Tab B**, Calvente Dep. at 28:2-3; **Tab C**, Deposition of Gabriel Esteban (hereinafter "Esteban Dep.") at 18:5-17; **Tab D**, Ex. 1 to Declaration of Lucy Rinehart (hereinafter "Rinehart Decl."), p. 000094 at ¶ 6.2.)

4.    Plaintiff Lisa Calvente ("Plaintiff") is a former tenure-track Assistant Professor in DePaul's College of Communication's ("College"), in the Communication Studies program. (**Tab A**, Answer at ¶ 1; **Tab E**, Deposition of Alexandra Murphy (hereinafter "**Tab E**, Murphy Dep.") at 45:20-22.) Plaintiff identifies as Vietnamese and Puerto Rican, ethnically Latina, and racially Black and Asian. (**Tab B**, Calvente Dep. at 12:22-24.) Her national origin is American. (**Tab B**, Calvente Dep. at 114:20-21.) She does not identify as Black American, but rather as a part of the Black diaspora. (**Tab B**, Calvente Dep. at 14:20-24.) Additionally, Plaintiff identifies as a Latina, rather than Latin American, because she is U.S. born. (**Tab B**, Calvente Dep. at 114:15-116:13.)

5.    DePaul's College of Communication is small, based on the size of faculty and students. (**Tab E**, Murphy Dep. at 40:20-41:1.) There are approximately 34 tenure-track faculty in the College. (**Tab E**, Murphy Dep. at 41:10-14.) The College does not have departments, but is instead organized around program areas: Communication Studies; Public Relations and Advertising; Journalism; and Media and Cinema Studies. (**Tab E**, Murphy Dep. at 43:12-20.)  A Program Chair serves as the point person or leader for each program. (**Tab E**, Murphy Dep. at 49:21-50:5.)

6.    Dr. Ghanem is the Provost of the University. (**Tab D**, Rinehart Decl. at ¶ 4.) Dr.

Ghanem is half Egyptian and half Dutch, and identifies as Middle Eastern predominately and not as Caucasian. (**Tab F**, Deposition of Salma Ghanem (hereinafter "**Tab F**, Ghanem Dep.") at 112:18-19, 153:3-9.) Dr. Ghanem was the Dean of the College in August 2014, a role she held until October 2018, when she was appointed Acting Provost. (**Tab F**, Ghanem Dep. at 16:16-18, 29:9-10; **Tab D**, Rinehart Decl. at ¶ 4.) Dr. Ghanem was later appointed Interim Provost in July 2019 and Provost in May 2021. (**Tab F**, Ghanem Dep. at 19:24-20:2; **Tab D**, Rinehart Decl. at ¶ 4.)

7.      Dr. Alexandra Murphy is the Interim Dean of the College. (**Tab D**, Murphy Decl. at ¶¶ 3-4.) Prior to this, Dr. Murphy served as Associate Dean at the College between 2013 and 2018, before serving as Acting Dean beginning in October 2018 and then Interim Dean beginning in July 2021. (**Tab D**, Murphy Decl. at ¶ 4; **Tab E**, Murphy Dep**.** at 34:19-35:9, 46:24-3.) Dr. Murphy is Caucasian. (**Tab G**, Declaration of Isabel Diaz (hereinafter "Diaz Decl.") at ¶ 7; **Tab E**, Murphy Dep. at 19:5.)

8.      Dr. Gabriel Esteban is the President of the University. (**Tab C,** Esteban Dep. at 4:28-20; **Tab D**, Rinehart Decl. at ¶ 5.) He has served in this role since 2017. (**Tab C,** Esteban Dep. at 4:21-24, 15:11-15; **Tab D**, Rinehart Decl. at ¶ 5.) Dr. Esteban's race is Asian. (**Tab G**, Diaz Decl. at ¶ 7.)

### III.    DEPAUL'S EVAUALTIVE PROCEDURES APPLICABLE TO TENURE TRACK FACULTY FOR RENEWAL, PROMOTION & TENURE

9.      DePaul has a Faculty Handbook that sets forth its principles of shared governance with its faculty, and also governs the evaluation of faculty, including the process by which tenure track faculty can be considered for promotion and tenure. (**Tab A**, Answer at ¶ 9; **Tab D**, Ex. 1 to Rinehart Decl., p. 00002-00003, 00020, 00028 at ¶¶ 1.1, 1.2, 1.2.1, 2.3.4, 3.1; **Tab F**, Ghanem Dep. at 60:6-10; **Tab C,** Esteban Dep. 39:19-23.)

3

10.     The Faculty Handbook assigns faculty members the primary responsibility over faculty personnel matters. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00002 at ¶ 1.1.) DePaul's system of faculty evaluation "relies heavily on the view of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal, promotion, and tenure." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1; **Tab C,** Esteban Dep. at 67:14-22.)

11.     According to the Faculty Handbook, tenure-line faculty at DePaul spend up to six years during their probationary appointment before obtaining eligibility for tenure.  (**Tab B**, Calvente Dep. 26:7-9, 42:15-19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028-00029 at ¶¶ 3.2.1 and 3.2.2.) Certain types of leave can extend that timeline, such as family or medical leave and research leave. (**Tab B**, Calvente Dep. 42:10-13, 206:3-18; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028-00029 at ¶¶ 3.2.1 and 3.2.2.) During the probationary period, a tenure-line faculty member undergoes annual formal or informal evaluations for contract renewal. (**Tab B**, Calvente Dep. 41:12-24; **Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.2.)

12.     Section 3.3.1 and Section 3.3.1.1 of the Faculty Handbook explains that:

Probationary reviews serve three major purposes: (1) To assess the faculty member's progress toward promotion and/or tenure, measuring the individual against the established criteria; (2) To provide clear and consistent guidance and develop priorities for the faculty member toward fully satisfying the criteria, and (3) To recommend for or against renewal …

A formal probationary review is designed to prepare a faculty member for the tenure process and to document areas that need the faculty member's attention. In a formal review, the local academic unit considers the candidate's personal statement and CV, evidence of scholarship or documentation of creative activity, student evaluations, evidence of service and other materials specified by the local academic unit or college. Each local academic unit or its personnel committee conducts a formal review of untenured tenure-line faculty no less often than every two years. The tenured faculty of the local academic unit then vote by separate secret ballots on (1) adequate progress toward tenure and (2) renewal. The faculty prepare a report that clearly details areas of strength and areas for improvement. The report is explicit about the faculty member's progress towards tenure. Copies of this report are forwarded to the candidate and the dean. The dean writes a separate letter to the provost with a recommendation regarding renewal or

nonrenewal. If a formal review raises serious concerns about the candidate's potential for attaining promotion or tenure, the local academic unit faculty, local academic unit officer, or dean may mandate that the next year's annual review be formal.

(**Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶¶ 3.3.1, 3.3.1.1; **Tab C,** Esteban Dep. 97:4-23.)

Formal reviews are conducted by the full group of tenured faculty, led by a smaller subset known as the Personnel Committee. (**Tab B**, Calvente Dep. 48:22-52:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811-000813; **Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶ 3.3.1.1.) Formal reviews must occur at least every two years. (**Tab B**, Ex. 94 to Calvente Dep. at p. 000811; **Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶ 3.3.1.1.)

13.     During the formal review process, a candidate receives guidance in both the written reviews and in the conversations that happen with the candidates. (**Tab E**, Murphy Dep. at 152:19-23.) During a candidate's probationary period, their record of teaching, service, and research can change, and it can get better or it can be judged as getting worse. (**Tab B**, Calvente Dep. 252:7-19.)

14.     In the final year of probationary service, the faculty member may apply for tenure and promotion. (**Tab B**, Calvente Dep. 42:1-19; **Tab D**, Ex. 1 to Rinehart Decl., ¶ 3.2.) The granting of tenure creates a presumption of continuing employment. (**Tab A**, Answer at ¶ 9; **Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1.) According to DePaul's Faculty Handbook " [t]enure is the foundation of academic freedom and the quality of the university. It is neither an end in itself nor a privilege exempting the individual from the obligation to make future contributions. It is, rather, a status that society recognizes as promoting the common good Before granting tenure, the [U]niversity should have no reasonable doubt about a faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1; **Tab F**, Ghanem Dep. at 45:10-

46:2.)

15.     DePaul's Faculty Handbook establishes criteria for faculty members to be evaluated for promotion and tenure. (**Tab A**, Answer at ¶ 11; **Tab D**, Ex. 1 to Rinehart Decl., p.00031-00035 at ¶ 3.4; **Tab F**, Ghanem Dep. 44:4-13.) As outlined in the Faculty Handbook, the University's principal criteria for promotion and tenure are the quality of the candidate's (1) teaching, (2) scholarship, research, and other creative activities, and (3) service to the University. (**Tab A**, Answer at ¶ 11; **Tab B**, Calvente Dep. at 163:10-17, 232:23-233:2, 300:16-18; **Tab D**, Ex. 1 to Rinehart Decl., p. 000032 at ¶ 3.4.2; **Tab E**, Murphy Dep. at 126:18-21, 149:25-150:1; **Tab H**, Deposition of ██████ ██████ (hereinafter "████ Dep.") at 16:16-24, 37:9-11.) The Faculty Handbook also explains that each local academic unit also provides its own, more detailed guidelines that provide unit- and discipline-specific articulations of the university-wide criteria. (**Tab D**, Ex. 1 to Rinehart Decl., p. 000032 at ¶ 3.4.2; **Tab C,** Esteban Dep. at 100:20-101:4.) Accordingly, the College publishes its own Criteria for Promotion and Tenure (for brevity, "College Guidelines"). (**Tab B**, Calvente Dep. at 48:2-15; **Tab B**, Ex. 94 to Calvente Dep., p. 000798; **Tab E**, Murphy Dep. at 17:17-23; **Tab F**, Ghanem Dep. 46:3-6.)

16.     The Faculty Handbook establishes a multi-level tenure-review process that involves a substantive review at each level. (**Tab A**, Answer at ¶ 10; **Tab B**, Calvente Dep. at 152:1-5; **Tab F,** Ghanem Dep. at 32:10-13; **Tab C,** Esteban Dep. at 40:2-22; **Tab E**, Murphy Dep. at 130:9-19.) In units without departments, like the College, there are normally two levels of evaluation prior to the final decision of the Provost: the local academic unit (the College and its Dean), and the University, as conducted by the University Board on Promotion and Tenure ("UBPT"), which is comprised of seven faculty representatives from disciplines across the

University. (**Tab A**, Answer at ¶ 10; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000035-00044 at ¶¶ 3.5.1.1, 3.5.4., 3.5.5, 3.5.5.6; 3.5.6; 3.5.6.1, 3.5.7.5; **Tab E**, Murphy Dep. at 54:5-60:9; **Tab F**, Ghanem Dep. 47:10-48:l4.)

17.     Reviewers after the initial level of review are required to "consider the method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic unit." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(f).) In addition to reviewing the dossier and the reports from the local academic unit, the UBPT interviews the candidate and the Dean. (**Tab B**, Calvente Dep. 150:9-19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000042-000043 at ¶ 3.5.6.1; **Tab F**, Ghanem Dep. at 80:15-81:23; **Tab E**, Murphy Dep. at 54:5-55:21.) The Provost attends those interviews as an observer, not a participant. (**Tab B**, Calvente Dep. 150:9-19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000042-000043 at ¶ 3.5.6.1; **Tab F**, Ghanem Dep. at 81:12-23.) An individual faculty member may vote or advocate for or against a candidate only at one level in the review process. (Tab **B**, Calvente Dep. 152:2-5; T**ab D**, Ex. 1 to Rinehart Decl., pp. 000036 at ¶ 3.5.1.1(b).) A tie vote will be interpreted as a recommendation against an award of tenure or promotion. (**Tab B**, Calvente Dep. 153:20-154:20; **Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(c).)

18.     At the final level of review, at which the Provost makes the decision on tenure, the Faculty Handbook instructs that "only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by the UBPT." (**Tab A**, Answer at ¶ 10; **Tab D**, Ex. 1 to Rinehart Decl., p. 000043 at ¶ 3.5.6.3; **Tab F**, Ghanem Dep. at 51:8-10.) There are at least two bases to overturn the UBPT: if the Provost's assessment of the dossier is different than the UBPT's assessment and if there are "procedural grounds." (**Tab F**, Ghanem Dep. at 51:11-54:18, 55:5-17.)

19.     If the University denies tenure to a candidate, she has the right to appeal the University's decision on three grounds: (a) the decision violated academic freedom; (b) the evaluation deviated from Handbook procedures; or (c) the decision was the result of discriminatory practices. (**Tab A**, Answer at ¶ 30; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080-00081 at ¶ 5.1.2.3; **Tab C,** Esteban Dep. at 62:3-12.)

20.     According to the Faculty Handbook, if a faculty member appeals the University's decision to deny tenure, the Faculty Committee on Appeals convenes a Faculty Appeals Board of three of its members to investigate and submit its findings in a report to the President. (**Tab A**, Answer at ¶ 30; **Tab B**, Calvente Dep. 170:12-17; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080-00081 at ¶ 5.1.2.3; **Tab C,** Esteban Dep. at 40:21-41:16, 61:13-62:2.) The Faculty Appeals Board is charged only with reviewing the basis of the appeal; it does not perform an independent evaluation of the faculty member's qualifications. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00075 ¶ 5.1.1.4; **Tab C,** Esteban Dep. at 62:17-20; 89:10-15.) The Handbook states that, the University President, after evaluating the Faculty Appeals Board's findings, renders a final decision on the appeal. (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00080-00081 at ¶ 5.1.2.3; **Tab C,** Esteban Dep. at 62:21-63:3, 65:24-66:4.)

## IV.    <u>TENURE REQUIREMENTS</u>

21.     By the first day of the fall quarter in the academic year in which the candidate is up for tenure, a candidate's complete materials are due to the local academic unit. (**Tab B**, Ex. 94 to Calvente Dep., p. 000825; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00045-00046 and 00051 at ¶¶ 3.6.1, 3.6.1.1, 3.9.) Among the items listed in the Faculty Handbook, the materials supplied by the candidate include at a minimum a professional curriculum vitae ("CV"), a statement of up to 3,000 words in which the candidate emphasizes those achievements or qualifications to which evaluators

should particularly attend, evidence of teaching effectiveness, evidence of service, and a "single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities.". (**Tab D**, Ex. 1 to Rinehart Decl., p.00045 at ¶ 3.6.1.1.) The College is required to supply, among other things, all teaching evaluations for all courses. (**Tab D**, Ex. 1 to Rinehart Decl., p.00045 at ¶ 3.6.1.2.) The Faculty Handbook does not require a candidate's prior formal reviews to be included in the tenure dossier, and states that "request for additions to the dossier must be made to the local unit academic officer." (**Tab B**, Calvente Dep. at 82:23-83:11, 104:4-105:5; **Tab D**, Ex. 1 to Rinehart Decl., pp.00045-00046 at ¶¶ 3.6.1.1, 3.6.1.2 3.6.1.3.) In 2017, the College Guidelines stated the candidate should use the American Association of University Professor's ("AAUP") format for the CV to maintain College uniformity. (**Tab B**, Calvente Dep. at 113:9-15; **Tab B**, Ex. 94 to Calvente Dep., p. 000820.)

22.    According to the College Guidelines, faculty performance in the areas of teaching, research and service is assessed as "excellent," "very good," "fair," or "unsatisfactory." (**Tab B**, Calvente Dep. at 145:8-12; **Tab B**, Ex. 94 to Calvente Dep., p. 000812; **Tab E**, Murphy Dep. at 151:6-10.) To qualify for tenure, "[t]he College expects excellence in at least two areas, with the third being rated at least very good." (T**ab B**, Ex. 94 to Calvente Dep. at p. 000817; **Tab B**, Calvente Dep. at 145:8-12; **Tab E**, Murphy Dep. at 203:13-204:9; **Tab C,** Esteban Dep. at 100:2-13.)

### A.    Teaching Criteria

23.    Faculty at DePaul are expected to teach in the Vincentian tradition. (**Tab B**, Calvente Dep. at 26:18-23, 28:4-15, 105:14-106:2; **Tab D**, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.2.) The Faculty Handbook sets forth "Faculty Rights and Responsibilities in Chapter 6. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00094.)  The Faculty Handbook provision on academic freedom in this

chapter states that DePaul "attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process." (**Tab B**, Calvente Dep. at 105:14-106:2; **Tab D**, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.1.) The Faculty Handbook explains that this academic freedom is enjoyed not only by faculty but "also students … as they participate in the various forms of open inquiry and debate, as for example, classroom presentation and discussion[.]" (**Tab D**, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.1.) Effective teaching involves, among other criteria, "[d]elivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience." (**Tab D**, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.1.)

24.     According to the College Guidelines, teaching effectiveness is defined as a "command of materials, effective communication of subject matter, appropriateness and thoroughness in the creation and execution of course objectives, analysis of course content, course organization, course presentation, methods of evaluating student performance, commitment to challenging students to grow intellectually, and working to foster a classroom that reinforces values inherent in the University mission." (**Tab B**, Ex. 94 to Calvente Dep., p. 000798.) In the evaluation of teaching effectiveness, the College Guidelines list six primary sources of data: (1) Personnel Committee Reports; (2) peer classroom evaluation reports; (3) contextual factors specific to each course; (4) quantitative feedback on student evaluations; (5) qualitative feedback on student evaluations; and (6) student reports. (**Tab B**, Ex. 94 to Calvente Dep., pp. 000798-000801; **Tab E**, Murphy Dep. at 158:8-14, 176:5-22.)

**B.     Criteria for Research**

25.     The Faculty Handbook provides that "all tenure-line faculty members should

10

engage in scholarship, research, or other creative activities." (**Tab D**, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.2.) According to the Faculty Handbook and the College Guidelines, faculty members should be able to demonstrate success at completing projects and disseminating the results of these projects in academic and artistic arenas beyond DePaul." (**Tab B**, Ex. 94 to Calvente Dep., pp. 000801; **Tab D**, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.2.)

26. The College Guidelines enumerate the relative value of scholarly work, beginning with the most highly valued, based on relative importance and relevance, and concluding with less-weighted forms of scholarly production: (1) books evaluated by an academic or popular press (most-valued); (2) peer-reviewed journal articles; (3) edited books evaluated in peer review process; (4) book chapter evaluated by the quality of the press; (5) public performances of creative work; (6) invited chapters and articles in books; (7) encyclopedia articles; (8) book reviews; (9) awards and grants; (10) original work created for the purpose of public and community engagement; (11) conference papers; and (12) conference panels (least-valued). (**Tab B**, Ex. 94 to Calvente Dep., pp. 000802-000804; **Tab B**, Calvente Dep. 77:11-15.) Edited books and books are not given the same weight. (**Tab B**, Calvente Dep. 77:11-15; **Tab B**, Ex. 94 to Calvente Dep., pp. 000802-000804; **Tab E**, Murphy Dep. 153:13-154:2.)

27. As with other forms of scholarship, evidence of creative activities should include, at a minimum, "assessment of the contribution by professional peers and other experts in the field and self-assessment concerning scholarly or creative growth and development." (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00032-00033 at ¶ 3.4.2.2.) The Faculty Handbook provides that it does not credit classroom activities, including performances "conducted solely within the candidate's classes" as scholarship or research, but as teaching. (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00034 at ¶ 3.4.2.2.) Additionally, the College Guidelines provide that "[p]ublic performances of creative

work are evaluated on the basis of their engagement with communities and publics outside the classroom, and are also measured on the basis of scholarly reviews, and grants and awards relating to the work." (**Tab B**, Calvente Dep. 140:14-142:16; **Tab B**, Ex. 94 to Calvente Dep., p. 000803.)

C.     <u>Criteria for Service</u>

28.     Although the Faculty Handbook recognizes that "[s]ervice may be provided to the university, the profession, and the community" it also requires that "[a]ll faculty members must serve in their local academic unit[.]" (**Tab D**, Ex. 1 to Rinehart Decl., p. 00034 at ¶ 3.4.2.3; **Tab E**, Murphy Dep. 156:5-6; **Tab H**, ▮▮▮ Dep. 39:15-24.) The College Guidelines reinforce this requirement, requiring that "[a]ll faculty members are expected to participate in the governance and intellectual life of the college and the university, and all service should be documented." (**Tab B**, Ex. 94 to Calvente Dep. at pp 000808-000809.) The College Guidelines state that faculty members "should request letters from committee chairs, editors, community partners, and other liaisons who can speak to the quality and quantity of service." (**Tab B**, Ex. 94 to Calvente Dep. at 000808.) The College Guidelines state that "[f]aculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the [C]ollege" and the guidelines list examples of track/program and college service, professional service, and community service. (**Tab B**, Ex. 94 to Calvente Dep. at 000810; **Tab E**, Murphy Dep. 154:3-157:7; **Tab H**, ▮▮▮ Dep. 39:15-2.) Faculty members who apply for tenure "are encouraged to take leadership roles in track/program committees after the first year of their probationary period." (**Tab B**, Ex. 94 to Calvente Dep. at p. 000810.) In assessing service, the College considers whether it is a "one-off committee or … a particular meeting that someone might be in versus a longer term and a task driven committee." (**Tab E**, Murphy Dep. at 154:3-11; **Tab F**, Ghanem Dep. 168:10-16.) Each summer, the College distributes a "call" to faculty, identifying

vacancies and openings within College committees for which faculty can step up for. (**Tab E**, Murphy Dep. at 156:23-157:4.)

## V.    PLAINTIFF'S RECRUITMENT AND HIRE BY DEPAUL

29.    Plaintiff obtained her Ph.D. in 2008 from University of North Carolina at Chapel Hill in the area of Communications Studies. (**Tab B**, Calvente Dep. at 44:18-22; **Tab B**, Ex. 115 to Calvente Dep. at p. 000876.) Before joining DePaul, Plaintiff was working on turning her dissertation into a manuscript for potential publication. (**Tab B**, Calvente Dep. at 45:1-46:10.)

30.    In 2010 or 2011, DePaul advertised to fill a renewable non-tenure-track position in the College. (**Tab B**, Calvente Dep. at 19:12-14.) When Plaintiff initially saw the job posting, she was not planning to apply. (**Tab B**, Calvente Dep. at 19:8-21:5.) Plaintiff was a visiting instructor at Northwestern University at the time, and she was not interested in moving from Northwestern to DePaul as a visiting assistant professor. (**Tab B**, Calvente Dep. at 19:8-21:5.) However, when she later mentioned the position to Dr. ████ ████ a faculty member in the College at DePaul whom Plaintiff knew from graduate school, Dr. ████ told her "some things could be worked out" about the appointment type. (**Tab B**, Calvente Dep. at 20:8-22:1, 307:2-3; **Tab E**, Murphy Dep. at 46:21-23.) Dr. ████ was familiar with Plaintiff's areas of expertise at the time he encouraged her to apply. (**Tab B**, Calvente Dep. at 21:17-22:3.)

31.    Following her discussion with Dr. ████ Plaintiff applied for the position. (**Tab B**, Calvente Dep. at 20:6-22:3.) As a part of her application process, Plaintiff gave a job talk and a teaching session, both of which centered on black diaspora, race, and racism. (**Tab B**, Calvente Dep. at 22:4-12.) During this process, she met with Dr. Murphy, Dr. ████ Dr. ████ ████ Dr. ████ ████ among other faculty in the College. (**Tab B**, Calvente Dep. at 22:15-23:13.)

32.    During her job talk, Plaintiff explained that her research focused on ethnographic

work based on race, racism, and coloniality. (**Tab B**, Calvente Dep. at 23:14-24.) Among other work, at the time of her interview she presented the "theoretical framework" and one chapter of a manuscript from her dissertation. (**Tab B**, Calvente Dep. at 45:14-46:10.) According to Plaintiff, approximately one fourth of the College faculty was present for her job talk. (**Tab B**, Calvente Dep. at 22:15-23:6.) Plaintiff stated that her job talk was also recorded so that faculty who did not attend in person could observe it. (**Tab B**, Calvente Dep. at 22:15-23:6.) Plaintiff testified that there was no confusion about her research area. (**Tab B**, Calvente Dep. at 23:22-24.)

33. Plaintiff told the Dean at the time that she was not interested in a one year contract. (**Tab B**, Calvente Dep. at 24:4-10.) Plaintiff stated there was enough enthusiasm among the faculty to bring her on a tenure track basis. (**Tab B**, Calvente Dep. at 24:4-10.) On June 2, 2011, Plaintiff received an offer from DePaul for a tenure-track Assistant Professor position, with a six-year probationary period, making her eligible for tenure consideration in 2016-2017, "assuming positive annual evaluations and contract extensions[.]" (**Tab B**, Calvente Dep. at 24:4-26:16; **Tab B**, Exs. 10 and 11 to Calvente Dep.) Plaintiff accepted the position. (**Tab B**, Calvente Dep. at 27:8-18; **Tab B**, Ex. 11 to Calvente Dep. at p. 001898.) From the beginning of her employment, Plaintiff admittedly was "very vocal" and "outspoken" about where she stood on issues of race, as well as the racism she perceived in the College. (**Tab B**, Calvente Dep. at 304:11-305:12.)

34. Due to leaves of absence taken by Plaintiff, DePaul twice extended Plaintiff's tenure clock, such that she needed to apply for tenure in the 2018-2019 academic year. (**Tab B**, Calvente Dep. at 42:7-13, 206:3-18; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028-00029 at ¶¶ 3.2.1 and 3.2.2.) Specifically, during academic year 3012-2013, Plaintiff gave birth to her daughter and she asked for and received a one-year extension on her clock. (**Tab B**, Calvente Dep. at 42:7-13, 206:13-18; **Tab B**, Ex. 186A to Calvente Dep. at p. LC002200; **Tab D**, Ex. 1 to Rinehart Decl.,

pp. 00028-00029 at ¶¶ 3.2.1 and 3.2.2.) During the 2015-2016 academic year, Plaintiff was awarded a Woodrow Wilson Foundation Career Enhancement Fellowship for Junior Faculty ("Woodrow Wilson Fellowship"), and she took a leave of absence during this year to focus on her research, which also extended her tenure clock. (**Tab B**, Calvente Dep. at 42:7-13, 300:5-15; **Tab B**, Ex. 115 to Calvente Dep; **Tab E,** Murphy Dep. 203:6-9; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028-00029 at ¶¶ 3.2.1 and 3.2.2.)

35.     Plaintiff taught Intercultural Communication 103, "CMN 103," an entry-level core course that multiple faculty taught. (**Tab B**, Calvente Dep. at 29:21-30:15; **Tab E**, Murphy Dep. 149:7-15.) As a core course, any student seeking a major in the College was required to take this course. (**Tab B**, Calvente Dep. at 30:11-12; **Tab E**, Murphy Dep. at 149:10-11.) This course was designed to familiarize students with the concepts and theories of intercultural communication. (**Tab B**, Calvente Dep. at 32:19-33:4.) Plaintiff did not use a textbook in this course, but rather used complex materials from texts, articles, chapters, and film. (**Tab B**, Calvente Dep. at 33:15-34:3.) For the most part, Plaintiff used material for CMN 103 that was more complex than what other faculty in the College used to teach the course. (**Tab B**, Calvente Dep. at 302:17-23.) Plaintiff's syllabus for this course was approved by the course-keeper in 2016. (**Tab B**, Calvente Dep. at 159:21-160:4; **Tab B**, Ex. 213 to Calvente Dep. at 23282-23286; **Tab B**, Ex. 186A to Calvente Dep. at p. LC0002209; **Tab B**, Ex. 215 to Calvente Dep. at p. 023087; **Tab H**, ████ Dep. 67:12-21.)

36.     Plaintiff also taught a higher level (INTC or CMS 367) course entitled "Performance for Social Change." (**Tab B**, Calvente Dep. at 34:4-7; **Tab B**, Ex. 33 to Calvente Dep.) According to Plaintiff's syllabus for this course, she accorded 18% weight to the student's final performance, which was the greatest weight accorded to any assignment in the course. (**Tab**

**B**, Calvente Dep. at 36:3-37:2; **Tab B**, Ex. 33 to Calvente Dep. at 3298-3299.) According to the syllabus, for the final performance, students were graded on scripting, adaptation, stage movement, blocking and stage creativity. (**Tab B**, Calvente Dep. at 40:9-14; **Tab B**, Ex. 33 to Calvente Dep. at 3301.) The final performance took place on campus, and members of the community could attend. (**Tab B**, Calvente Dep. 40:24-41:11.)

## VI. PLAINTIFF'S FORMAL REVIEWS AND DISCRIMINATION COMPLAINTS PRIOR TO TENURE APPLICATION

37. For purposes of conducting a formal review in the College, a subset of the tenured faculty, called the Personnel Committee, conducts the initial evaluation of the candidate's teaching, research, and service materials, including a personal statement prepared by the candidate. (**Tab B**, Calvente Dep. at 46:11-47:16, 49:6-53:10; **Tab B**, Ex. 94 to Calvente Dep. at 811-816; **Tab D**, Ex. 1 to Rinehart Decl., p. 00030 at ¶ 3.3.1.1; **Tab F**, Ghanem Dep. at 32:20-33:3.) The Personnel Committee's formal review includes an in-person interview with the candidate to discuss the areas of evaluation. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000811; **Tab B**, Calvente Dep. at 49:24-50:3; **Tab F**, Ghanem Dep. at 34:20-23.) The Personnel Committee prepares a report for consideration by the full group of tenured faculty in the College. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000812; **Tab B**, Calvente Dep. at 49:24-51:6.) The report contains the Personnel Committee's evaluation of: (1) the candidate's performance within the designated formal review period and (2) a cumulative assessment of whether or not the candidate is making adequate progress toward tenure in each of the areas of teaching, research and service. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000811.)

38. After the Personnel Committee prepares a draft report, and before the report goes to the full tenured faculty for consideration, the faculty member under review is given a copy and has the opportunity to correct factual inaccuracies to the Personnel Committee's report and can

submit a rebuttal to the tenured faculty. (**Tab B**, Calvente Dep. 49:6-53:10, 121:7-124:21; **Tab B**, Ex. 94 to Calvente Dep. at p. 000816.) Once finalized, the Personnel Committee's report is presented to the College tenured faculty, along with any rebuttal from the candidate, for a discussion and vote. (**Tab B**, Calvente Dep. at 49:6-53:10; 51:6-10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811-000812, 000816.) After deliberating, the tenured faculty may include an addendum to the Personnel Committee's report that summarizes the discussion among tenured faculty about the faculty member's work and progress toward tenure. (**Tab B**, Calvente Dep. at 52:6-53:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811-000812; **Tab E**, Murphy Dep. at 148:12-17.) The tenured faculty also make a recommendation to the dean for or against contract renewal, and will also list an anonymous tally of tenured faculty members' votes. (**Tab B**, Calvente Dep. at 52:6-53:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000812-000814.) Copies of the Personnel Committee and tenured faculty's report are forwarded to the candidate and the dean, and the dean can either adopt the results of these deliberations or reject the recommendation. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000812-000816; **Tab D**, Ex. 1 to Rinehart Decl., p.00030 at ¶ 3.3.1; **Tab F**, Ghanem Dep. at 127:17-128:2.)

39.     Between her hire and application for tenure, Plaintiff underwent three formal probationary reviews in 2013, 2015, and 2017. (**Tab B**, Calvente Dep. at 42:1-6, 72:7-10, 81:14-17; **Tab B**, 19, 50, 108 to Calvente Dep.)

A.     **Plaintiff's 2013 Review**

40.     In 2013, the College's Personnel Committee was comprised of the following tenured faculty: ▮▮▮ ▮▮▮ (Caucasian), ▮▮▮ ▮▮▮ (Caucasian), ▮▮▮ ▮▮▮ (Black), ▮▮▮▮▮ (Asian), and ▮▮▮ ▮▮▮ (Caucasian). (**Tab B**, Calvente Dep. 10:19-11:5; **Tab J**, Murphy Decl. at ¶ 7; **Tab G**, Diaz Decl. at ¶ 7.)

41.     In their 2013 formal review report on the criteria of teaching, the Personnel Committee noted that an "[a]nalysis of Lisa's teaching credentials surfaced numerous strengths. Lisa is a valued colleague in the intercultural area[.]" (**Tab B**, Ex. 19 to Calvente Dep. at p. 000241.) In addition to identifying those "numerous strengths," the Personnel Committee stated in their report:

> Lisa's first quarter teaching CMN 103, Intercultural Communication (Autumn 2011), was less successful than other courses she has taught at DePaul. Only three of twenty responses rated 4 on a 5-point scale, with five of the responses falling below 3. Qualitative feedback raised concerns about lack of clarity during class sessions, not enough interactive discussion-based learning, the need for PowerPoint/lecture note outlines to help students follow Lisa's lectures, and greater clarity regarding the evaluation of assignments. For example, one student noted that the "[i]nstructor was very unclear in all areas, I never really understood what was going on." And another student wrote "Not just a straight lecture. Give us something to look at and something to interact with. Standing up and talking for an hour and a half does NOT keep the attention of students, give us at LEAST a power point to look at." … the report prepared by the Personnel Committee student representative highlights that some students feel intimidated in the class [presumably by course content, not by Lisa herself given the high numerical responses to Lisa's accessibility in instructor evaluations], which made the students reluctant to ask questions in class.

(**Tab B**, Ex. 19 to Calvente Dep. at pp. at 000242-000243.) The Personnel Committee noted that Plaintiff had demonstrated "self-reflexivity" and characterized as "impressive" her "quick response to an early setback." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000243.) Consequently, the Personnel Committee rated Plaintiff as "making good/very good progress during this review period toward tenure in the area of teaching." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000243.) The Personnel Committee also made recommendations to Plaintiff regarding her teaching:

> The Personnel Committee asked Lisa to consider diversifying the types of discussion that take shape in her classes. As it stands, she uses a nice mix of lecture/mini-lecture, large group discussion, and student presentations. However, as one peer reviewer notes, students who feel less confident in their understanding of dense theoretical course materials might also feel less confident participating in these types of class discussions. … Mixing in some small group discussion, peer-focused in class-activities, and even drawing from some of her rich performative

exercises used in performance classes to inform in-class work in nonperformance classes might offer alternative options for students to reflect on course materials, represent how they have internalized course concepts, and make use of important cultural communication theories in their everyday lives.

(**Tab B**, Ex. 19 to Calvente Dep. at pp. 000242-000243.)

42.    With respect to research, the Personnel Committee noted that since joining DePaul Plaintiff had published one book review, had presented one co-authored paper and a solo-authored paper at a conference, and had "several projects in different states of development in the publication cycle." (**Tab B**, Ex. 19 to Calvente Dep. at pp. 000243-000244.) The Personnel Committee wrote in their report that Plaintiff informed them that she had completed two chapters of her manuscript. (**Tab B**, Calvente Dep. at 72:7-76:4; **Tab B**, Ex. 19 to Calvente Dep. at p. 000243-000244.) In their report, the Personnel Committee documented their discussion regarding publishing strategies, writing

> [f]irst, rather than continuing to completely revise the dissertation into a final book manuscript that would then be submitted to publishers, the Personnel Committee asked Lisa to consider developing a book proposal and submitting that proposal along with the two chapters she has already revised (per her personal statement) to gauge interest from publishers. If a publisher offers a contract or asks to see more work, this will allow Lisa to assess how she wants to proceed with the manuscript given publisher feedback. If responses are less favorable, Lisa might re-consider this project as a series of journal articles.

(**Tab B**, Calvente Dep. at 74:5-13; **Tab B**, Ex. 19 to Calvente Dep. at 000244.) According to Plaintiff, the option of focusing on articles was also verbally addressed by one of the Personnel Committee members:

> [V]erbally, ████ ██████ who was part of that personnel review stated that -- and he gave ██████████████ as an example, and he stated that I can submit articles, chapters, et cetera, and then work on the book if I wanted to continue working on what he said an award-winning book, which is what ████████████ did, and she finished publishing her book after tenure. So he used her as an example to state, okay, well, maybe you should be looking at chapters and articles.



(**Tab B**, Calvente Dep. at 74:13-24.) In their report, the Personnel Committee noted that:

The concern is that her dissertation was completed in 2008. Only two chapters have been revised at this point. If Lisa continues revising the entire manuscript, and does not find a publisher for the manuscript, she is not maximizing her research time. Moreover, such an approach limits the diversity of research outlets in which she can publish her work.

(**Tab B**, Ex. 19 to Calvente Dep. at 000243-000244.) Ultimately, the Personnel Committee reported that Plaintiff's progress towards research was satisfactory for someone undergoing an early review, and recommended that moving forward, Plaintiff would "need to devote more attention to diversifying strategies for seeing her work published." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000244.)

43. Finally, the Personnel Committee stated that Plaintiff's service record was very good for a first review period, noting her contribution to a search committee that successfully hired a visiting Intercultural Communication colleague, a task force formed to create a new introductory course for the Organizational and Multicultural MA program, and her outside work in the community, including her work with the ONE Juvenile Justice Program. (**Tab B**, Ex. 19 to Calvente Dep. at p. 000244.)

44. On March 1, 2013, the Personnel Committee (by a vote of 6-0) and the tenured faculty (by a vote of 16-0) unanimously voted to recommend that DePaul renew her contract. (**Tab B**, Calvente Dep. at 72:7-15; **Tab B**, Ex. 19 to Calvente Dep. at p. 000240.) In its report, the Personnel Committee stated Plaintiff was making "good/very good" progress toward tenure in teaching, "satisfactory progress" in research, and "very good" progress in service. (**Tab B**, Ex. 19 to Calvente Dep. at p. 000240.)

**B.** **Plaintiff's 2015 Review**

45. In 2015, the Personnel Committee was composed of Chair, Dr. ███ ███ (Caucasian), ███ ███ (Caucasian), ███████ (Caucasian), ███ ███

(Caucasian), ████████ (Caucasian), and ████████████ (Caucasian). (**Tab B**, Calvente Dep. 10:19-11:5; **Tab J**, Murphy Decl. at ¶ 8; **Tab G**, Diaz Decl. at ¶ 7.)

46.     In her 2015 personal statement, Plaintiff described her students' performances as an aspect of her teaching, and did not include discussion of those performances in her statement regarding her research. (**Tab B**, Calvente Dep. at 47:2-16, 49:6-16, 224:6-24; **Tab B**, Ex. 31 to Calvente Dep. p. 000917-000919.) At the time of her 2015 formal probationary review, Plaintiff had still not completed her manuscript and had not sent out any chapters to gauge interest. (**Tab B**, Calvente Dep. 70:19-71:19, 224:6-225:6.)

47.     After the interview with Plaintiff, the Personnel Committee prepared its written report and recommendations. (**Tab B**, Calvente Dep. at 188:10-20, 189:12-190:19, 193:9-14; **Tab B**, Ex. 186A to Calvente Dep. at LC0002213-2219.) Initially, the Personnel Committee was under the erroneous impression that Plaintiff was in her fourth year of her probationary period. (**Tab B**, Ex. 186A to Calvente Dep. at LC002213.)

48.     With respect to teaching, the Personnel Committee noted that Plaintiff's student evaluations for the review period were "consistently strong" quantitatively. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002215.) The Committee also reported that:

> Qualitatively, however, Lisa's course evaluations indicate a range of recurrent and somewhat polarizing themes. Evaluations suggest that a strong number of students appreciate the rigor and demands of her courses, while other students experience the course climate to be intimidating and unwelcoming to diverse opinion and perspective. One student from her Winter 2014 INTC 308 course states, 'I've taken many classes with Dr. Calvente, and if I could, I would load my course schedule with nothing but her classes. She pushes students to think critically in ways that are rarely demanded of undergraduate students. Just when I've thought I completely grasped a concept, Dr. Calvente would reveal that I've just scratched the surface.' These types of highly enthusiastic statements make appearances in many of her course evaluations, although there is an additional trend that suggests some students struggle to find their voices and feel diminished in her courses. In the same Winter 2014 INTC 308 course, another student wrote that the 'Instructor often made students feel inferior. She rolled her eyes at some questions asked and often

misunderstood students concerns. Students eventually became afraid to speak at all in fear of ridicule.' While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200). As these are required courses for many students, the academic interests of the students in these courses is likely more diverse and varied. In her Fall 2014 CMN 103 course, several students note the helpfulness of the course for encouraging them to see the world from more critical perspectives. However, many students also made reference to the negative classroom climate, suggesting it lacked encouragement, felt intimidating, was experienced as silencing, and was perceived as 'hostile.' One student commented, 'Dr. Calvente was insistent on students dropping the class on the first day and was shocked when student's hadn't the second day.'

(**Tab B**, Ex. 186A to Calvente Dep.at pp. 002215-002216.) The Personnel Committee asked

Plaintiff about these comments in her interview, as documented in their report:

In the personnel interview, Lisa was asked about those students who might feel disenfranchised from the class, and she replied 'Most students drop. I advise them to drop.' The committee was deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class, suggesting all DePaul students are not wanted in our classrooms. Lisa disagreed, stating, 'Telling them to drop is honest.' The personnel committee does not have access to an instructor's drop rates, and so there is not a quantitative number to detail what is meant when she says 'most students drop.' When asked to clarify this approach in a required college core course, where many of our students have demanding work and course schedules that limit their flexibility and require they enroll in a specific class offered on a particular day or time, she explained, 'If it's scary, they should drop. I say go to another class. I have a lot of colleagues you can take this class from.' In response to student feedback about intimidation, the committee asked if there were parts of her teaching she felt she needed to work on. She did say she might email students who were not participating in class, but clarified, 'Are you asking me, do I want them all in my class? No, not really.' Referencing her students in response to questions about how she seeks to support students who are struggling or seem disenfranchised, Lisa replied, 'They have to approach me. That is their job. It's not my job.'

(**Tab B**, Ex. 186A to Calvente Dep.at p. 002216.)

49.     In their report, the Personnel Committee offered Plaintiff recommendations on her

course content, and stated:

For the vast majority of her courses Lisa did not provide materials beyond the course syllabus. Her syllabi do a very good job setting forth rules, policies and

instructor expectations, yet she might take some steps to further distinguish the content of her courses from one another. As an example, her course INTC 230 and her course LSP 200 have a tremendous amount of overlap in assignment structure and design, including the focus on "Bastard Out of Carolina" for several weeks in the course. Additionally, the theoretical readings comprise the majority of the content listed in the course schedule, regardless of course level, and are often used to define the class time (as opposed to a topic, theme, objective, or an activity). By identifying the theme or topic of the day, as well as the objectives, the clarity of structure might be more apparent to help frame student expectations. This is reiterated in the student report and student evaluations, where there was a recurrent theme of suggesting more explicit clarity of goals and content. Furthermore, especially for the 100 and 200 level classes, a more intentional balance between theoretical source texts and disciplinary texts from the field of intercultural communication might help some of the students who are struggling with the density of the readings and an understanding of the course.

(**Tab B**, Ex. 186A to Calvente Dep. at p. 002217.)

50. With respect to Plaintiff's research, the Personnel Committee reported its assessment that Plaintiff was making poor progress. (**Tab B**, Ex. 186A to Calvente Dep. at pp. 002218.) The Personnel Committee reported that:

[T]he Personnel Committee evaluated Lisa's total publication record since arriving at DePaul: one book review and one co-authored peer reviewed journal article . . . In her 2013 review, her research was determined as satisfactory from the faculty, and the personnel committee strongly recommended diversifying her publication strategies alongside the ongoing pursuit of her solo book contract. The book project and proposal is not reported to have made any significant progress (with two completed chapters), yet the successful publication of her co-authored essay and the article under review indicate that she has been more active in moving her previous conference papers towards publication. Lisa is scheduled for flex time for the current 2014-15 academic year, wherein she is teaching three courses in the fall and winter, in order to focus her time on research in the spring. This is in addition to a year-long leave she has successfully applied for through the URC for the 2015-16 academic year, which will be co-funded through her successful application for a Woodrow Wilson Foundation Junior Faculty Grant Award. According to the grant application, 'The objective of the fellowship program is to aid the scholarly research and intellectual growth of junior faculty (men and women) and improve their chances for success as tenured university scholars by offering support for twelve months of research and writing.' Thus, Lisa has secured substantial time to focus solely on research in the next fifteen months. There is concern about the amount of time invested and the choices made regarding the research projects she is pursuing, as her current research output fails to demonstrate sufficient progress or a successful balance of energies in the move towards tenure. In addition, given the shortage of research she has fostered to publication, devoting time and energies

> to a co-edited book project is cause for additional concern. It is believed that Lisa has not made the necessary progress needed towards tenure and would be better served by continuing to focus greater time and energies on shepherding her conference presentations and the research from her ongoing book project to peer reviewed journals, preferably diversifying her CV with solo authored works in a greater range of journal outlets.

(**Tab B**, Ex. 186A to Calvente Dep. at pp. 002217-00218.)

51.    With respect to service, the Personnel Committee stated Plaintiff was making fair to good progress, noting her service on the College Non-Tenure Track Review Committees and the Local Review Board. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002219.) The Personnel Committee also noted her other contributions to the College, the University and the Profession. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002219.)

52.    Ultimately, the Personnel Committee concluded that Plaintiff was making "poor" progress toward tenure in the area of teaching, "poor" progress toward tenure in the area of research, and "fair to good" progress in the area of service. (**Tab B**, Ex. 186A to Calvente Dep. at pp. 002214-002215.)

53.    Plaintiff was given a draft of the Personnel Committee's March 7, 2015 preliminary report for her review, and Plaintiff had the chance to correct inaccuracies in the report. (**Tab B**, Calvente Dep. 50:7-52:10, 81:18-82:6; **Tab B**, Ex. 186A to Calvente Dep. at pp. 002213-002219.) Plaintiff submitted corrections to the report but did not correct the description of statements attributed to her in the candidate interview regarding encouraging students to drop class. (**Tab B**, Calvente Dep. at 81:18-82:6; **Tab B**, Ex. 186 A to Calvente Dep. at 002213-022119.) In addition to the corrections, Plaintiff submitted a rebuttal to the Personnel Committee report for review by the larger group of tenured faculty. (**Tab B**, Calvente Dep. 81:18-82:6.) In her rebuttal, as quoted in the 2015 Formal Review, Plaintiff wrote:

> The 'hostility' in my evaluations is the result of the structural racism and the normalization of whiteness within the academy that unfairly scrutinizes faculty of color, primarily

24

women, wo do not reinforce the stands and norms of white (male) supremacy. (**Tab B**, Ex. 50 to Calvente Dep. at p. 029085.)

54.     The tenured faculty met to discuss Plaintiff's formal review. (**Tab B**, Ex. 50 to Calvente Dep. at 29084.) In their addendum to the Personnel Committee's report, the tenured faculty stated "most of us believe that [Plaintiff's] positive quantitative and qualitative comments do not outweigh the severity of the problems that have arisen regarding [Plaintiff's] teaching style and the manner in which she addresses some students." (**Tab B**, Ex. 50 to Calvente Dep. at 29085.) The tenured faculty identified at least 11 aspects of Lisa's teaching that they would have to see change before she could achieve tenure expectations, listing those items explicitly in the final review. (**Tab B**, Ex. 50 to Calvente Dep. at 29085-29086.)

55.     With respect to research, tenured faculty "acknowledge[d] that [Plaintiff was] in her third probationary year with a year leave awarded for [the following] year. At the same time, based on the limited amount of research published since arriving at DePaul, the tenured faculty expressed grave concerns regarding her ability to produce the necessary peer-reviewed, quality research necessary to achieve tenure at DePaul." (**Tab B**, Ex. 50 to Calvente Dep. at 29086.)

56.     With respect to service, the tenured faculty stated Plaintiff's overall service did not comprise of "substantial accomplishments," and noted that some faculty felt Plaintiff was "overselling" the nature of her service accomplishments." (**Tab B**, Ex. 50 to Calvente Dep. at p. 029086.) Ultimately, the tenured faculty recommended non-retention by a 13-5 vote. (**Tab B**, Ex. 50 to Calvente Dep. at p. 029086.)

57.     On March 30, 2015, Plaintiff met with Dr. Ghanem, who was Dean of the College at the time. (**Tab B**, Calvente Dep: 221:14-222:10; **Tab B**, Ex. 51 to Calvente Dep. p. 007067-7068; **Tab F**, Ghanem Dep. at 111:16-112:9, 122:5-124:4.) Plaintiff stated that during the meeting, Dr. Ghanem told her she was an extraordinary teacher, that her quantitative scores were excellent,

and that there were only "freckles" of negative evaluations. (**Tab B**, Calvente Dep. 222:1-9.) Dr. Ghanem told Plaintiff that for her next review she would need to include an outline of how she had addressed the issues brought up in her 2015 review, and she would need to show a marked improvement in the qualitative area. (Ex. 51 to Calvente Dep. at p. 07067; **Tab B**, Calvente Dep. 222:20-223:4.) Dr. Ghanem also offered to review Plaintiff's 2017 personal statement, as a way of providing her support and guidance. (**Tab B**, Calvente Dep. 223:13-224:2; **Tab F**, Ghanem Dep. at 33:8-34:5, 124.) During the meeting, Plaintiff told Dr. Ghanem she was planning to file an internal complaint of discrimination. (**Tab B**, Calvente Dep. 227:16-228:8; **Tab F**, Ghanem Dep. at 122:5-7.)

58.     On April 2, 2015, Dr. Ghanem rejected the College's recommendation. (**Tab B**, Calvente Dep. at 218:24-219:5, 221:14-224:2; **Tab B**, Ex. 51 to Calvente Dep. at p. 07067-07068, **Tab F**, Ghanem Dep. at 125:4-15.) Dr. Ghanem felt that Plaintiff was a passionate teacher and that she had potential, and while there were areas Plaintiff needed to address, she believed Plaintiff could address them. (**Tab F**, Ghanem Dep. at 125:4-15; **Tab B**, Ex. 51 to Calvente Dep. at p. 07067-07068.) In her letter to Plaintiff, Dr. Ghanem wrote:

> Based on our discussion on March 30, 2015 in which you explained your teaching philosophy and the efforts you make and will continue to make to be inclusive and welcoming to the students, I do not accept the College's recommendation for non-renewal. … You have a lot of work ahead of you and I wish you success in your next review.

(**Tab B**, Ex. 51 to Calvente Dep. at p. 007067; **Tab B**, Calvente Dep. at 221:2-223:24; **Tab F**, Ghanem Dep. 125:4-126:8.)

### C.     Plaintiff's First Complaint of Discrimination to OIDE

59.     On April 16, 2015, Plaintiff called DePaul's Office of Institutional Diversity and Equity ("OIDE") and raised an internal complaint of discrimination. (**Tab B**, Calvente Dep. at 225:7-15, 230:9-12; **Tab B**, Ex. 57 to Calvente Dep. at p. 28600; **Tab G**, Diaz Decl. at ¶ 4; **Tab**

**G**, Ex. 1 to Diaz Decl.) In the complaint, Plaintiff alleged that her race and gender played a role in votes by the Personnel Committee against her retention. (**Tab B**, Ex. 57 to Calvente Dep. at p. 28600; **Tab B**, Calvente Dep. at 225:7-15, 230:9-12; **Tab G**, Diaz Decl. at ¶ 4; **Tab G**, Ex. 1 to Diaz Decl.)

60.     OIDE conducted an investigation into Plaintiff's complaint and found no violations of the policies on discrimination or harassment. (**Tab B**, Calvente Dep. at 229:23-232:11; **Tab B**, Ex. 78 to Calvente Dep. at p. 27531; **Tab G**, Diaz Decl. at ¶ 4; **Tab G**, Ex. 1 to Diaz Decl. at p. 006967.) Specifically, OIDE interviewed fifteen individuals, including Plaintiff and every member of the Personnel Committee, Dean Murphy, Dr. Ghanem, a student representative, and other current and former faculty members, and reviewed emails, formal review documents, student and faculty assessments, and comparator information. (**Tab G**, Ex. 1 to Diaz Decl. at p. 6968; **Tab G**, Diaz Decl. at ¶ 4; **Tab F**, Ghanem Dep. 72:2-73:4; **Tab E**, Murphy Dep. at 143:21-145:9.) OIDE concluded that there was no evidence of discrimination and that "the crux of the decision by the faculty rested upon [Plaintiff's] attitudes and responses towards the committee's attempts to address what they perceived as weaknesses in her tenure case and her refusal to listen to or take constructive criticism in both her interview with the Personnel Committee and her written response to the tenure document, her poor progress in scholarship, and her fair to good service." (**Tab G**, Ex. 1 to Diaz Decl. at p. 6969; **Tab G**, Diaz Decl. at ¶ 4; **Tab B**, Ex. 78 to Calvente Dep; **Tab B**, Calvente Dep. at 231:4-232:6.)

61.     On July 6, 2016, OIDE presented Plaintiff with its findings and explained to her that DePaul's policy prohibited retaliation. (**Tab B**, Calvente Dep. at 231:4-232:6; **Tab B**, Ex. 78 to Calvente Dep. at p. 027531.) Plaintiff did not pursue any further relief at the time. (**Tab B**, Calvente Dep. at 232:7-11.)

### D.   **Plaintiff's 2017 Review**

62.     In 2017, a newly elected Personnel Committee conducted Plaintiff's formal review. (**Tab B**, Calvente Dep. at 249:10-16; **Tab E**, Murphy Decl. at ¶¶ 6-7.) The Personnel Committee consisted of Chair, ███ ███ (Asian), ██████████ (Caucasian), ████████ (Caucasian), ███ ████████ (Caucasian), and █████████ (Caucasian). (**Tab J**, Murphy Decl. at ¶7; **Tab G**, Diaz Decl. at ¶ 7; **Tab B**, Calvente 10:23-11:4, 243:20-24.)

63.     For her 2017 formal review, Plaintiff requested Dr. Ghanem help her with her personal statement. (**Tab B**, Calvente Dep. 232:12-237:12; **Tab F**, Ghanem Dep. 123:10-124:4, 33:8-34:19.) The two met, during which time Dr. Ghanem provided her with feedback, some of which Plaintiff accepted and incorporated. ((**Tab B**, Calvente Dep. 232:12-237:12; **Tab F**, Ghanem Dep. 123:10-124:4, 33:8-34:19.) During this meeting, Dr. Ghanem told Plaintiff that it was her presentation in the interview, more than her written submission, that was the problem for Personnel Committee in 2015. (**Tab B**, Calvente Dep. at 233:12-21.)

64.     In 2017, Plaintiff's personal statement for the first time identified her students' performances as an aspect of her research. (**Tab B**, Calvente Dep. at 239:12-240:6; **Tab B**, Ex. 85 to Calvente Dep. at p. 000921-000925.) This was not done at Dr. Ghanem's suggestion. (**Tab B**, Calvente Dep. at 239:20-240:6.)

65.     Plaintiff was interviewed by the Personnel Committee, and Plaintiff subsequently received a draft of the Personnel Committee's preliminary report on November 9, 2017. (**Tab B**, Ex. 102 to Calvente Dep. at 025782, 025784; **Tab B**, Calvente Dep. at 243:20-24.)

66.     The Personnel Committee draft reported its assessment that Plaintiff continued to have strong quantitative student evaluation scores, but stated that "[r]eferences to students feeling intimidated or 'uncomfortable' still showed up in this review cycle, though at low frequency" and

stated "it is problematic that [Plaintiff] has ignored these long-standing issues and that the developmental recommendations shared in previous reports . . . seem at least partially dismissed by her." (**Tab B**, Ex. 102 to Calvente Dep. at p. 025786.) The draft did not include any quantification of those issues. (**Tab B**, Calvente Dep. at 243:20-244:8; **Tab B**, Ex. 102 to Calvente Dep.) The Personnel Committee also noted that in their interview with her, Plaintiff said that she had not changed anything significantly in her curriculum or teaching strategies, beyond updating discussion and lectures with current events and experimenting with techniques to engage quiet students in discussion, which worked for some but did not for others. (**Tab B**, Ex. 102 to Calvente Dep. at 25785.) With respect to research, the Personnel Committee stated it was "impressed with [Plaintiff's] research productivity in the last two years," and noted her participation in the Woodrow Wilson Fellowship. (**Tab B**, Ex. 102 to Calvente Dep. at 025788-025789.) The Committee "strongly recommended that [Plaintiff] further push her publication rate, particularly with more journal articles, to make up for slower output in prior years." (**Tab B**, Ex. 102 to Calvente Dep.025789.) While acknowledging that Plaintiff made some contributions in the area of service, the Committee "emphasized to [Plaintiff] the need to take a more visible and significant role within her unit and at the [C]ollege." (**Tab B**, Ex. 102 to Calvente Dep.at 25790.) As of this time, the only substantive College-level committee on which Plaintiff was participating was the Term Faculty Review Committee, as the Local Review Board was terminated in the fall of 2016 due to new Institutional Review Board procedures. (**Tab B**, Calvente Dep. 253:12-254:1; **Tab B**, Ex. 102 to Calvente Dep. at 025789; **Tab E**, Ex. 1 to Murphy Dep. at 014633; .) Plaintiff testified that she "replaced" that Local Review Board work in the College with additional service to the College, but could not identify the service. (Calvente Dep. 253:12-254:1.)

67.     The Personnel Committee rated Plaintiff as making "very good/fair" progress

toward tenure in the area of teaching, "very good/fair" progress toward tenure in the area of research and "fair" progress toward tenure in the area of service. (**Tab B**, Calvente Dep. at 240:11-14; **Tab B**, Ex. 102 to Calvente Dep. at p. 025783.)

68.     After receiving the Personnel Committee's draft report, Plaintiff met with Dr. Ghanem regarding her 2017 review. (**Tab B**, Calvente Dep. at 249:10-250:14; **Tab F**, Ghanem Dep. at 132:7-136:21, 146:7-18; **Tab B**, Ex. 112 to Calvente Dep.) Dr. Ghanem helped Plaintiff prepare questions for the Personnel Committee regarding their report. (**Tab B**, Calvente Dep. at 249:10-250:14; **Tab B**, Ex. 109 to Calvente Dep.) Plaintiff testified that she felt that Dr. Ghanem was trying to help her. (**Tab B**, Calvente Dep. at 250:13-14.)

69.     In response to the Personnel Committee's 2017 preliminary report, Plaintiff submitted corrections. (**Tab B**, Calvente Dep. 240:15-20; **Tab B**, Ex. 109 to Calvente Dep. at 025719-025720.) Plaintiff also asked the Chair of the Personnel Committee questions, including:

> Is it also possible to quantify these qualitative evaluations that state "these long-standing issues?" In other words, personnel states that these comments are less frequent (p.4) but it is not clear how less: 50% of the evaluations, 10 out of 25, etc.

(**Tab B**, Calvente Dep. at 245:5-8; **Tab B**, Ex. 109 to Calvente Dep. . at 025719-025720; **Tab E**, Murphy Dep. at 238:3-5.)

70.     Accordingly, the Personnel Committee revised its report, stating:

> A major theme in qualitative comments throughout Lisa's teaching career at DePaul pertains to students feeling "intimidated" or "uncomfortable" in her classroom. In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations.

(**Tab B**, Ex. 108 to Calvente Dep. at p. 000261.) Plaintiff testified that she believes the figure was inaccurate, and that she did not understand the 55% figure to mean that in five out of nine courses she taught during that review period students had reported feeling "intimidated" or "uncomfortable." (**Tab B**, Calvente Dep. at 246:3-248:10; **Tab B**, Ex. 108 to Calvente Dep. at p.

000261.) Plaintiff admitted that she taught more than nine students. (**Tab B**, Calvente Dep. 247:16-19.)

71.     Plaintiff asked the Chair of the Personnel Committee if her email containing her questions and corrections could be submitted to the tenured faculty so that her issues could be raised at the meeting, and he agreed to do forward it to the tenured faculty. (**Tab B**, Ex. 109 to Calvente Dep. at 2517-2518.)

72.     On November 17, 2017, by a vote of 13-8, the tenured faculty recommended that Plaintiff's contract be terminated. (**Tab B**, Calvente Dep. 240:11-14; **Tab B**, Ex. 108 to Calvente Dep., p. 000253.) In their addendum to the Personnel Committee report, the tenured faculty raised questions about Plaintiff's teaching style, whether it adhered to Vincentian core values, and again addressed issues relating to Plaintiff's dense course content in lower level classes and heavy reliance on a seminar style instruction. (**Tab B**, Ex. 108 to Calvente Dep at 000261-000263.) The tenured faculty noted that,

> [i]f Lisa is retained, the tenured faculty would need to see significant changes and improvements in her teaching practices as has already been outlined in her 2013 and 2015 reviews. These changes would need to be apparent in teaching materials, student reports, and peer observations.

(**Tab B**, Ex. 108 to Calvente Dep., at 000263.) With respect to research, the tenured faculty stated:

> While some voting members believed her trajectory toward tenure in this area was **very good,** some others noted the extended timeline for research-focused productivity during her probationary period (e.g., the Woodrow Wilson fellowship provided Lisa additional funding away from teaching to focus solely on research) and redundancy between the book chapter "Image in Revolution" in her edited book and her prior journal publication ("The City Speaks," *Cultural Studies,* 2014). Upon further review, it was determined that the book chapter was *not* a reprint of the 2014 journal article. The tenured faculty agreed that the introduction chapter was part of Lisa's edited book and should not be listed as a separate book chapter. In addition, members of the tenured faculty emphasized the clear distinction between "under contract" and "forthcoming" works with the latter requiring evidence of their final acceptance (i.e., final manuscript –with all required revisions completed– has been accepted, returned to the press, and finally approved for publication). The tenured faculty further discussed how public performances of creative work are evaluated

on the basis of their engagement outside of the classroom, scholarly reviews, grants, and awards relating to the work.

(**Tab B**, Ex. 108 to Calvente Dep., at 000264.) With respect to service, tenured faculty recounted instances where "service contributions listed in [Plaintiff's] document did not reflect substantial accomplishments," and stated that her "service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers." (**Tab B**, Ex. 108 to Calvente Dep., at 000264.)) Tenured faculty members further stated:

> It was emphasized at the discussion that, according to the College Tenure and Promotion Criteria, faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college. If Lisa is retained, the tenured faculty would need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul.

(**Tab B**, Ex. 108 to Calvente Dep., at 000264.).)

73.     On December 13, 2017, for the second time, Dr. Ghanem rejected the Personnel Committee's recommendation for nonrenewal, informing Plaintiff "I am not accepting their recommendation … because of the improvement you demonstrated during the last review period." (**Tab B**, Calvente Dep. 255:10-12; **Tab F**, Ex. 7 to Ghanem Dep. at 026015; **Tab F**, Ghanem Dep. at 127-28.) In her letter, Dr. Ghanem explained to Plaintiff that she would need to score "excellent" in at least two core criteria for tenure, with none of the three below the rating of "very good." (**Tab B**, Ex. 111 to Calvente Dep;  **Tab B**, Calvente Dep. 255:1-12; **Tab F**, Ex. 7 to Ghanem Dep. at 026016.) Dr. Ghanem added, "In order to be considered for promotion and tenure in the College of Communication, I stress that you follow all the recommendations of both the Personnel Committee and the tenured faculty outlined in the formal review document dated November 17, 2017 regarding teaching, research and service. Developmental recommendations by your

colleagues should not and cannot be dismissed. You would need to provide evidence in the documents that you provide in Fall 2018 for your tenure review that you have incorporated the recommendations" (**Tab B**, Ex. 111 to Calvente Dep;  **Tab B**, Calvente Dep. 255:1-12; **Tab F**, Ex. 7 to Ghanem Dep. at 026016.)

74.     After receiving Dean Ghanem's reappointment letter, Plaintiff asked for another meeting with her. (**Tab B**, Calvente Dep. at 255:10-256:8; **Tab B**, Exs. 112 and 123 to Calvente Dep.) Plaintiff believed the Personnel Committee was retaliating against her because service was the only area that seemed good enough for tenure in 2015, but in 2017, her service no longer was good enough, even though she felt she added service to her dossier. (**Tab B**, Calvente Dep. at 250:19-3.) During the meeting, Plaintiff cried, stated that she wanted to file another complaint but complained that doing so was time-consuming. (**Tab B**, Calvente Dep. at 255:13-258:9; **Tab F**, Ghanem Dep. at 146:7-18.)  According to Plaintiff, Dr. Ghanem told her she should wait to file a claim until after tenure. (**Tab B**, Calvente Dep. 256:21-258:3; **Tab F**, Ghanem Dep. at 77:10-23.)

75.     Following the meeting, Dr. Ghanem notified OIDE that Plaintiff had expressed concerns regarding retaliation in connection with her 2017 formal review. (**Tab B**, Ex. 123 to Calvente Dep.; **Tab B**, Calvente Dep. at 262:21-263:15;**ab F**, Ghanem Dep. at 73:14-21.) OIDE later reached out to Plaintiff, and asked to set up a meeting, but Plaintiff chose not to take any further action at the time. (**Tab B**, Calvente Dep. at 262:7-266:13.)

76.     Sometime after her 2017 formal review, during the 2017-2018 academic year, a Black student complained to Dean Murphy about Plaintiff using the "n-word" in class. (T**ab B**, Calvente Dep. 15:2-22, 109:12-23, 111:14-19.) Plaintiff stated the student did not know she identified as part of the Black diaspora. (**Tab B**, Calvente Dep. 109:12-23,)

E. **Plaintiff's Subsequent Complaints of Discrimination**

77.     At the same time that Plaintiff underwent a formal review in 2017, Plaintiff's colleague ██████ ████ (Caucasian) also underwent a pre-tenure formal review. (**Tab B**, Calvente Dep. at 263:17-266:13; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Rinehart Decl. ¶ 15; **Tab F**, Ghanem Dep. at 143:22-144:2, 165:8-13.) The College's tenured faculty recommended the termination of his contract. (**Tab B**, Calvente Dep. at 263:17-264:9; **Tab D**, Rinehart Decl. ¶ 15; **Tab D**, Ex. 8 to Rinehart Decl.; **Tab F**, Ghanem Dep. at 155:17-20.) Dr. Ghanem accepted the College's recommendation for Dr. ████ nonrenewal. (**Tab B**, Calvente Dep. at 264:12-14; **Tab F**, Ghanem Dep. at 163:3-165:22; **Tab D**, Rinehart Decl. ¶ 15; **Tab D**, Ex. 8 to Rinehart Decl.) Dr. Ghanem described his teaching and service as "abysmal." (**Tab F**, Ghanem Dep**.** at 163:3-4.)

78.     Dr. ████ appealed Dr. Ghanem's decision to the Faculty Appeals Board, and submitted a copy of Plaintiff's formal evaluation and Dean Ghanem's letter reappointing her in connection therewith. (**Tab B**, Calvente Dep. at 263:17-264:17; **Tab B**, Ex. 132 to Calvente Dep. at Calvente-DePaul 007100; **Tab F**, Ghanem Dep. at 163:17-21.)

79.     On February 2, 2018, the Faculty Appeals Board contacted Plaintiff in connection to Dr. ████ appeal. (**Tab B**, Calvente Dep. at 265:7-12; **Tab B**, Ex. 132 to Calvente Dep. at p. 007100.) Plaintiff explained that while she did not believe that Dr. ████ was discriminated against, she believed that Dr. ████ was non-renewed to justify discrimination against herself (whom she described as "the only Latina") and ████ ████ (who she described as the "only Black American tenure line faculty member in our college."). (**Tab B**, Calvente Dep. at 265:16-21; **Tab B**, Ex. 132 to Calvente Dep. at p. 07095.) In her written report to the Faculty Appeals Board, Plaintiff articulated her concern that she had been "unfairly sanctioned" by the

Personnel Committee. (**Tab B**, Ex. 132 to Calvente Dep. at p. 07095.) In her statement to the Faculty Appeals Board, Plaintiff did not complain about Dr. Ghanem's conduct. (**Tab B**, Ex. 132 to Calvente Dep. at pp. 7094-7098.) The Faculty Appeals Board notified the OIDE of Plaintiff's complaint, but Plaintiff declined to meet with the OIDE at the time. (**Tab B**, Calvente Dep. at 265:7-266:13.)

80.     In March 2018, then-Provost Marten denBoer upheld Dean Ghanem's acceptance of the College's recommendation to not renew Dr. ▮▮▮▮▮▮ contract. (Tab D, Rinehart Decl. ¶ 23.)

81.     On June 2, 2018, Plaintiff, along with her colleague, Dr. ▮▮▮▮▮ filed an anonymous complaint via email to OIDE to express their concerns about a racially hostile environment within the College. (**Tab B**, Calvente Dep. at 266:14-21; **Tab B**, Ex. 144 to Calvente Dep.; **Tab I**, ▮▮▮▮ Dep. at 65:9-24.) Plaintiff testified that it was Dr. ▮▮▮▮ idea to file an anonymous complaint and that Plaintiff agreed to join in the complaint with her. (**Tab B**, Calvente Dep. at 266:22-267:2; **Tab I**, ▮▮▮▮ Dep. at 66:1-67:2.) On June 7, 2018, OIDE responded to the anonymous email seeking additional information, and Dr. ▮▮▮▮ prepared a response. (**Tab B**, Calvente Dep. at 269:20-270:10**Tab B**, Ex. 145 to Calvente Dep.) Plaintiff testified that she was not involved preparing the response or in any of the subsequent communications with the OIDE in relation to the anonymous complaint, but that Dr. ▮▮▮▮ provided her with the information over the phone. (**Tab B**, Calvente Dep. at 270:4-6; 273:21-24.)

82.     On October 10, 2018, Plaintiff and Dr. ▮▮▮▮ met with Dr. Ghanem in person to discuss their concerns about their perceived racial hostile environment in the College. (**Tab B**, Calvente Dep. at 270:21-273:7, 274:1-24; **Tab B**, Ex. 173 to Calvente Dep; **Tab F**, Ghanem Dep. at 78:7-22;**Tab I**, ▮▮▮▮ Dep. at 151:9-152:7, 154:15-19.) Plaintiff testified that Dr. Ghanem

listened to them, and that she even went over her time slot so she could stay with them and hear their complaints. (**Tab B**, Calvente Dep. at 271:7-15; **Tab I**, ███ Dep. at 110:2-18.) According to Plaintiff, Dr. ███ brought up Dr. ███ name during the meeting, but Dr. Ghanem cut her off. (**Tab B**, Calvente Dep. 271:22-272:10.) According to Plaintiff, Dr. Ghanem stated that she heard a rumor that she terminated Dr. ███ contract so that she could terminate women of color. (**Tab B**, Calvente Dep. at 271:24-272:10.) Plaintiff told Dr. Ghanem that she wrote a letter on behalf of Dr. ███ (**Tab B**, Calvente Dep. at 271:22-272:14, 277:2-16.) Plaintiff claims Dr. Ghanem's demeanor changed when Dr. ███ name was brought up, and she "ushered [them] out and said that [they] were going to continue this at another time." (**Tab B**, Calvente Dep. 298:24-299:11.) Plaintiff admitted that in the meeting she did not accuse Dr. Ghanem of being discriminatory or retaliatory towards her. (**Tab B**, Calvente Dep. 271:16-24.) Dr. Ghanem testified "Well, I'm not sure that the rumor was about me, [it] was more that the college did that to justify their recommendation, their negative recommendation of -- of Lisa. I don't believe the rumor was that I am the one who did that." (**Tab F,** Ghanem Dep. 155:6-21, 159:6-10.)

83.     Before the meeting ended, Dr. Ghanem contacted OIDE over the phone and left a message regarding the concerns raised by Plaintiff and Dr. ███ and again followed up with OIDE by email after the meeting. (**Tab B**, Calvente Dep. at 272:16-274:24; **Tab B**, Ex. 173 to Calvente Dep.; **Tab I**, ███ Dep. at 151:9-152:7, 154:14-23.) Plaintiff testified that Dr. Ghanem told them that she wanted to continue the conversation, and that they should schedule another meeting with her. (**Tab B**, Calvente Dep. at 272:16-273:4.)

84.     After Dr. Ghanem's report to OIDE, Dr. ███ and Plaintiff scheduled to meet with OIDE together in November. (**Tab B**, Calvente at 272:16-275:24. **Tab I**, ███ Dep. at 119:6-120:2, 154:14-155:3.) Plaintiff met with Schaffer and Isabel Diaz, the Director of Employee

Engagement and Equal Employment Opportunity, as scheduled, at which time Ms. Schaffer told Plaintiff that Dr. ███ "withdrew her complaint." (**Tab B**, Calvente 275:3-276:23.) During her deposition, Dr. ███ testified that she subsequently decided to pursue her complaint alone, without Plaintiff, and that she met with Schaffer in November or early December 2018 for that purpose. (**Tab I**, ███ Dep. 119:6-120:2; 146:7-23; 154:24-155:3, 153:20-154:1; **Tab I**, Ex. 1 to ███ Dep.) OIDE closed Dr. ███ complaint on July 5, 2019. (**Tab G**, Diaz Decl. ¶ 6.)

85.     After Plaintiff's meeting with OIDE in November, OIDE contacted Plaintiff regarding her allegations of discrimination and retaliation, and Plaintiff said she would provide additional documents. (**Tab B**, Calvente Dep. at 278:20-284:11; **Tab B**, Ex. 211 to Calvente Dep.) Plaintiff did not follow up with the OIDE regarding her claims. (**Tab B**, Calvente Dep. 284:2-11.)

86.     During the week ending October 19, 2018, two students lodged a complaint against Plaintiff to Dr. Murphy. (**Tab E,** Murphy Dep. at 182:10-186:8; **Tab E,** Exs. 7 and 11 at p. 17319-17320 to Murphy Dep.) Plaintiff sent an email to her class describing the students' behavior as "examples of misogynist acts that play out in local and familiar settings like the classroom." (**Tab J**, Ex. 3 to Murphy Decl.; **Tab E,** Murphy Dep. at 182:10-186:8; **Tab E,** Ex. 11 to Murphy Dep. at p. 17319-17320.) Plaintiff reported the students' conduct to the University, stating "three of the four members of the last group did not receive their criticism well and [one student] angrily left class stating "This is bullshit." (**Tab J**, Ex. 3 to Murphy Decl. at 017390; **Tab E,** Exs. 7 and 11 to Murphy Dep. at p. 17319-17320.) Dr. Murphy testified that during her twenty years of teaching and administrative work at DePaul, she had never experienced the level of intense emotion as she did when meeting with those two students. (**Tab E,** Murphy Dep. at 185:2-8, 186:6-8.) Dr. Murphy reached out to Plaintiff to discuss it, acknowledging that "I am sure there is way more to the story than what I heard." (**Tab B**, Calvente Dep. at 306:21-307:1; **Tab E**, Ex. 7 to Murphy Dep.; **Tab**

**E**, Murphy Dep. 185:2-186:8.) Dr. Murphy told Plaintiff one of the two students dropped her course, and "the other was feeling extremely uncomfortable and isolated" but could not drop the course because his financial aid package. Murphy asked Plaintiff to reach out to the student staying in her class to try and meet with him, but Murphy was disappointed to learn from the student that Plaintiff had not done so. (**Tab E,** Murphy Dep. at 182:10-186:8; **Tab E,** Exs. 7 and 11 at p. 17319-17320 to Murphy Dep.)

## VII.    PLAINTIFF SCRAMBLES TO IMPROVE HER RECORD FOR TENURE

87.    On January 16, 2018, Plaintiff emailed her then-Program Chair, ██████ ████████, and Dr. Murphy to inquire "[i]n accordance to my last personnel request, I wanted to know if you can assist me in joining a university/college committee." (**Tab J**, Murphy Decl. ¶ 4; **Tab J**, Exs. 1 and 2 to Murphy Decl.). Dr. ████████ specifically advised, "I would add that doing some things in the College would be good beyond your current work with the term personnel committee (e.g., searches if any others happen this year and other substantives options – Lexa would know more about openings that might be tied to leaves since many of those are filled in the first week of Autumn quarter)." (**Tab J**, Ex. 1 to Murphy Decl.) Dr. Murphy referred Plaintiff to ████████ stating he was the "faculty council representative . . . [and] [h]e is the person to put your name forward for any available university committees." (**Tab J**, Ex. 2 to Murphy Decl.) Dr. ████████ subsequently advised Plaintiff regarding a service opportunity in the Community Engagement Committee, and Plaintiff replied to Dr. ████████ stating, "I have already sent my materials to Paul [for potential participation in the University's "Council of Community Engagement"] and, yes, college service would be good as well." (**Tab J**, Exs. 1 and 2 to Murphy Decl.)

88.    Between January and May 2018, Plaintiff for the first time began sending proposals to publishers to gauge interest in publishing her manuscript. (**Tab B**, Calvente Dep. at

68:15-71:19; **Tab B**, Ex. 141 to Calvente Dep.)

89.     On August 9, 2018, Plaintiff emailed the ███████████ of DePaul's Steans Center, ████████████ who had collaborated with her on community-based initiatives, and had attended the Fall 2016 public performance of the "culmination of [her] students' work" in her CMNS 367 Performance for Social Change course. (**Tab B**, Calvente Dep. at 62:5-64:24; **Tab B**, Ex. 153A to Calvente Dep.) In her email, Plaintiff requested that Mr. ███ submit a letter on her behalf to speak to "the quality of [their] co-creative performance, [her] guidance and directorship, as seen in the result of the performance, and the fact that it was a performance open to the public." (**Tab B**, Calvente Dep. at 62:5-65:14, 67:10-68:14; **Tab B**, Ex. 153A to Calvente Dep.) Plaintiff also asked Mr. ███ to describe his interpretation of the impact the work has for the students, the organization and the public. (**Tab B**, Calvente Dep. at 62:5-65:14, 67:10-68:14; **Tab B**, Ex. 153A to Calvente Dep*.)* Plaintiff requested he provide this letter by September 10, 2018 and explained her materials for Personnel Review were due on the 17th of the same month. (**Tab B**, Calvente Dep. at 62:5-65:14, 67:10-68:14; **Tab B**, Ex. 153A to Calvente Dep) However, Plaintiff did not submit a letter from Mr. ███ in September 2018 along with her tenure dossier. (**Tab B**, Calvente Dep. at 62:5-65:14, 67:10-68:14*.*)

## VIII.   PLAINTIFF APPLIES FOR TENURE

90.     In the spring of 2018, Plaintiff notified the Office of Academic Affairs that she intended to go up for tenure in the fall, as required by the Faculty Handbook. (**Tab B**, Calvente Dep. at 53:13-21; **Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(i).) Prior to submitting her full dossier, Plaintiff had to provide a list of proposed external reviewers and identify the research she wanted those external reviewers to analyze. (**Tab B**, Calvente Dep. at 53:22-54:5; **Tab B**, Ex. 94 to Calvente Dep. at p. 000807; **Tab D**, Ex. 1 to Rinehart Decl., p. 000046 at ¶ 3.6.2.)

Plaintiff requested these proposed external reviewers evaluate four publications: two of the publications were from a single edited book, including an introduction; one was a published article from 2017; and the last item was a forthcoming work that had not yet been published. (**Tab B**, Calvente Dep. at 55:18-564; **Tab B**, Ex. 143 to Calvente Dep.) Along with her publications, Plaintiff also included a link to a 30-minute student performance on YouTube from the final project in her 2015 performance studies class for evaluators to review. (**Tab B**, Calvente Dep. at 55:13-57:12; **Tab B**, Ex. 143 to Calvente Dep.)

91.     On August 29, 2018, after Plaintiff requested Dean Murphy prepare a letter describing her service in the College up until that point, Dean Murphy provided a letter discussing Plaintiff's work on the Term Faculty Review Committee. . (**Tab E**, Ex. 11 at p. 017318 and Ex. 21 to Murphy Dep.; **Tab E,** Murphy Dep. 201:21-202:9.) This was "the one substantive committee" in the College on which Plaintiff participated between 2017 and the time of her tenure review. ( **Tab B**, Calvente Dep. 253:12-254:1; **Tab B**, Ex. 206 to Calvente Dep. at 23551**; Tab E**, Ex. 1 to Murphy Dep. at 014633;**Tab E**, Murphy Dep. 154:3-11, 201:21-202:9.)

92.     In September 2018, Plaintiff submitted her tenure application and accompanying materials. (**Tab D**, Rinehart Decl. at ¶ 10; **Tab B**, Calvente Dep. at 64:14-13, 80:13-16.) In her CV, Plaintiff categorized her scholarly productivity as "Published Works" and "Non-Published Works." (**Tab B**, Ex. 115 to Calvente Dep. at p. 00876-00878.) Under the Published Works section, under the sub-header "Books," she listed a book entitled "Imprints of Revolution: Visual representations of Resistance," for which she was a co-editor. (**Tab B**, Calvente Dep. at 77-78; **Tab B**, Ex. 115 to Calvente Dep. at 00876-00878.) Under the sub-heading "Peer Review Chapters" on her CV, Plaintiff again listed her co-edited book, "Imprints of Revolution," and identified her introduction to the book and one chapter she co-authored with the co-editor. (**Tab B**, Calvente

Dep. at 76:10-79:15; **Tab B**, Ex. 115 to Calvente Dep. at p. 00877.) In addition to that co-edited book, she listed three peer-reviewed articles and one additional peer-reviewed chapter. (**Tab B**, Ex. 115 to Calvente Dep. at p. 00877.) All other entries under "Published Works" predated her time at DePaul. (**Tab B**, Ex. 115 to Calvente Dep. at p. 00876-00877; **Tab B**, Calvente Dep. at 24:4-26:16.) Under the title "Non-Published Works," Plaintiff listed three student performances from 2013, 2015 and 2016. (**Tab B**, Calvente Dep. at 76:10-79:15; **Tab B**, Ex. 115 to Calvente Dep.) Her CV did not include her manuscript, which, still had not been published. (**Tab B**, Calvente Dep. at 76:10-79:15, 85:4-24,106:4-107:21-; **Tab B**, Ex. 115 to Calvente Dep.)

93.     Her submission also included a link to a staged student performance that was not functional. (**Tab B**, Calvente Dep. 97:4-10.) The recording of the student performance included no introduction from Plaintiff or talk back. (**Tab B**, Calvente Dep. at 56:18-59:5; **Tab B**, Ex. 115 to Calvente Dep.) Plaintiff did not include any write up contextualizing the manner in which she contributed to the performance. (**Tab B**, Calvente Dep. at 56:18-59:5.) Plaintiff admitted that although there is a way to have public performances be peer reviewed, she did not submit any peer review materials relating to the public performances in her dossier. (**Tab B**, Calvente Dep. at 56:18-59:5.)

94.     Along with her submission, Plaintiff prepared a personal statement and included a document she called "Appendices to Tenure and Promotion Review Statement," which included her 2015 and 2017 formal reviews and her responses to those reviews. (**Tab B**, Calvente Dep. at 79:16-83:10; **Tab B**, Ex. 186A to Calvente Dep.)

95.     In these Appendices, Plaintiff provided a rebuttal to the Personnel Committee's contention that there was a pattern of student complaints regarding intimidation, and in particular disputing the 55% calculation in her 2017 formal review. (**Tab B**, Calvente Dep. at 80:13-83:10,

197:7-208:19; **Tab B**, Ex. 186A to Calvente Dep.) Plaintiff conducted her own analysis of qualitative student feedback from academic year 2011-2012 through academic year 2017-2018, using a key word search function to identify instances of student use of the words "hostile, intimidating, uncomfortable, afraid and nervous." (**Tab B**, Calvente Dep. at 208:8-209:8; **Tab B**, Ex. 186A to Calvente Dep at p. 2203-2205.) Using that approach Plaintiff identified 20 students who raised or expressed sentiments of feeling intimidated or uncomfortable in her classes between 2011 and 2017. (**Tab B**, Calvente Dep. at 198:6-200:2; **Tab B**, Ex. 186A to Calvente Dep at p. 2203-2205.) Plaintiff does not dispute that students complained about feeling uncomfortable in her classroom. (**Tab B**, Calvente Dep. 197:7-11.)

96. In conducting her analysis, Plaintiff did not use the terms "rude," "belittling," "reprimand," "bark," or "yell." (**Tab B**, Calvente Dep. at 208:3-209:8.) In one CMN 103 class she taught in the Spring of 2013, students made the following remarks:

- Student 469562 wrote "she created a horrible environment where she would yell at students for voicing their opinion or answering a question" and also wrote that the course could be improved by "not barking your opinions at students." (**Tab B**, Calvente Dep. at 210:6-16.)

- Likewise, Student 476267 wrote "getting a different instructor who allowed us to think critically without being scared of being belittled or reprimanded when she did not agree with us." (**Tab B**, Calvente Dep. at 211:9-17.)

- Student 492152, who wrote, "when students answer she was sometimes rude, especially if the student did not reply correctly." (**Tab B**, Calvente Dep. at 211:18-23.)

97. Plaintiff admits her former student, Simone Williams (Black), told her that she felt

belittled when Plaintiff told her in front of the class that her answer was "wrong." (**Tab B**, Calvente Dep. at 212:8-20.)

98.    In the last paragraph of her personal statement, Plaintiff included a discussion about her solo authored manuscript and indicated she had received an advanced contract from Northwestern University Press. (**Tab B**, Calvente Dep. at 83:23-85:18; **Tab B**, Ex. 186A to Calvente Dep at p. 2200.) Plaintiff said this offer was made to her over the phone, and she did not take it. (**Tab B**, Calvente Dep. at 83:23-85:18.) As of the date of her deposition on February 19, 2021, the book had not yet been published. (**Tab B**, Calvente Dep. at 83:23-85:18.)

99.    On October 18, 2018, the day before Plaintiff's meeting with the Personnel Committee, Plaintiff learned that the performance link she submitted for external review had not been included with the materials sent to the external reviewers. (**Tab B**, Calvente Dep. 85:19-90:6, 96:7-97:10; **Tab B**, Ex. 175 to Calvente Dep.) Plaintiff reached out to Dean Murphy to address the issue, who responded within the hour acknowledging her mistake. (**Tab B**, Calvente Dep. at 89:5-9; **Tab B**, Ex. 175 to Calvente Dep.) Dean Murphy offered to rectify the situation by sending out the performance link to the reviewers. (**Tab B**, Calvente Dep. at 96:7-13.) Plaintiff rejected this proposal as unacceptable. (**Tab B**, Calvente Dep. at 96:7-13.)

100.    Plaintiff and Dean Murphy reached an agreement that she would allow additional reviewers to submit letters on Plaintiff's behalf, to contextualize the student performances, and that those letters would be included in her dossier along with the performance. (**Tab B**, Calvente Dep. at 58:11-22, 96:14-97:6, 125:17-128:5.) Plaintiff solicited letters from Dr. ███ ████ a professor Plaintiff had worked with at Northwestern, and Mr. ████ ██████████ of the Steans Center. (**Tab B**, Calvente Dep. at 96:20-24.) These letters were added to Plaintiff's tenure dossier. (**Tab B**, Calvente Dep. 149:11-20; **Tab B**, Ex. 210 to Calvente Dep.) In her letter, Dr.

█████ explained she understood "the question pertaining to [Plaintiff's] performances relates to its relevance to the classroom," and she described watching the student performances and noted how impressed she was by the students' research, time, attention, and practice, as well as their use of rhetorical communication and symbolic movement. (**Tab B**, Calvente Dep. 65:19-67:20; **Tab B**, Ex. 210 to Calvente Dep. at p. 023429-023430.) Dr. █████ further noted she was impressed by the "joy these students experienced under the leadership and guidance of their teacher." (**Tab B**, Ex. 210 to Calvente Dep at 23430.) Mr. █████ in his undated letter, expressed praise for the CMNS 367 course Plaintiff had created, and explained that as an audience member to one of Plaintiff's performances, he "felt immense gratitude for Prof. Calvente's guidance and directorship of the project." (**Tab B**, Ex. 210 to Calvente Dep at 23428.)

## IX.  EVAULATION OF PLAINTIFF'S TENURE APPLICATION

### A.  Personnel Committee and College Tenured Faculty Recommend Against Tenure and Promotion

101.  After Plaintiff submitted her tenure application, the College, led by the Personnel Committee, performed the first level of review of Plaintiff's tenure and promotion evaluation. (**Tab B**, Calvente Dep. at 145:5-7; **Tab B**, Ex. 185 to Calvente Dep. at 23436; **Tab D**, Ex. 1 to Rinehart Decl., p. 00040 at ¶ 3.5.4.1.) At this time, the Personnel Committee was chaired by █████ ████ (Asian) and also included █████████ (Latina), █████████ (Caucasian); █████████ (Caucasian), █████ █████ (Caucasian), and █████████ (Caucasian.) (**Tab G**, Diaz Decl. at ¶ 7; **Tab B**, Calvente Dep. 10:19-11:5; **Tab E,** Murphy Dep. at 132:8-16.) Plaintiff claims these individuals were aware that Plaintiff made prior complaints of race discrimination. (**Tab B**, Calvente Dep. 101:2-15.)

102.  As a part of their assessment, the Personnel Committee interviewed Plaintiff in October 2018. (**Tab B**, Calvente Dep. at 97:11-100:13; **Tab B**, Ex. 185 to Calvente Dep. at 23437;

**Tab E**, Murphy Dep. at 227:24-228:22.) During this interview, Plaintiff made an opening statement in which she told the Personnel Committee that retaliation was illegal, although she did not accuse anyone of retaliation at that time. (**Tab B**, Calvente Dep. at 97:11-100:13.) During the interview Plaintiff was asked to speak about how she had been reflective in her teaching, and Plaintiff provided one example of how she tried to address comfort around the use of racial slurs in her hip hop course. (**Tab B**, Ex. 185 and 193 to Calvente Dep. at 23442; **Tab B**, Calvente Dep. at 121:4-124:17.)

103. After Plaintiff's interview with the Personnel Committee, the Personnel Committee prepared a report and rated Plaintiff as "very good" in each of the three core criteria. (**Tab B**, Ex. 185 to Calvente Dep.; **Tab B**, Calvente Dep. 144:22-146:17.) With respect to teaching, the Personnel Committee stated, "Lisa teaches with authority and with a high level of preparedness." (**Tab B**, Ex. 203 to Calvente Dep. at 23610; **Tab B**, Calvente Dep. 144:19-145:7.) The Personnel Committee noted that "many students responded well to Lisa's approach," but also noted "a couple of areas that remain unaddressed and require continued improvement" from Plaintiff. (**Tab B**, Ex. 203 to Calvente Dep. at 23611-23613.) The Personnel Committee also described statements Plaintiff made regarding her teaching in the interview, stating:

> [a]s an example of adapting to student feedback, Lisa described an instance when a student reported feeling uncomfortable with the use of racial slurs from primary sources. Lisa responded by setting new rules in the subsequent offering of this course to ensure safety.

(**Tab B**, Ex. 203 to Calvente Dep. at 23612-13.) With respect to research, the Personnel Committee stated, "[a] thorough review of [Plaintiff's] scholarship shows a coherent, unique research agenda," but noted they were "concerned about [Plaintiff's] inability to bring [her] manuscript to publication despite the opportunities she has been given. (**Tab B**, Ex. 203 to Calvente Dep. at 23614.) With respect to service, the Personnel Committee stated their assessment was "weighed in consideration

45

of her stated need to build cross-college connections," and noted the College Guidelines provide that faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college. (**Tab B**, Ex. 203 to Calvente Dep. at 23620.)

104. On October 31, 2018, Plaintiff was provided with a draft report and asked to identify any typos or "factual inaccuracies." (**Tab B**, Calvente Dep. at 121:4-124:17; **Tab B**, Ex. 185 to Calvente Dep. at p. 023435.) Plaintiff responded, identifying one factual inaccuracy, in which she disagreed that she had ever described her book manuscript as being completed and submitted to various publishers during her prior reviews. (**Tab B**, Calvente Dep. at 123:1-125:16; **Tab B**, Ex. 193 to Calvente Dep. at p. 00063-00064.) Dr. ▆▆ acknowledged that the wording on the one correction she raised was confusing and he proposed a correction. **Tab B**, Calvente Dep. at 123:1-125:16; **Tab B**, Ex. 193 to Calvente Dep. at p. 00062-00063.) In addition to her correction, Plaintiff also asked three questions. (**Tab B**, Calvente Dep. at 123:1-125:16; **Tab B**, Ex. 193 to Calvente Dep. at p. 00063-00064.) Specifically, Plaintiff asked: (1) why there was not a more robust reference to the missing performance link, and why it was only mentioned in a footnote on the personnel committee's report; (2) why a broken link in Plaintiff's submission was not addressed with her in earlier reviews; and (3) why her performances were not evaluated as a part of her scholarship. (**Tab B**, Ex. 193 to Calvente Dep. at p. 00063-00064.) Dr. ▆▆ responded to Plaintiff's questions, noting the rationale for the footnote, providing an explanation for why the link would now be broken, and stating it was ultimately the candidate's responsibility to ensure all links are functional, and providing a summary of the criteria they used in their assessment. (**Tab B**, Ex. 193 to Calvente Dep. at p. 00062-00063.) Dr. ▆▆ also told her that if she found his responses inadequate, she could prepare a formal response that would be provided to the other full

group of tenured faculty reviewers. (**Tab B**, Calvente Dep. 147:5-14; **Tab B**, Ex. 193 to Calvente Dep. at p. 023435.) Because the link was broken, Plaintiff asked Dean Murphy if she could add a DVD copy of the performance to her dossier for tenure and promotion review, and Dean Murphy agreed. (**Tab B**, Calvente Dep. 126:7-128:5; **Tab B**, Ex. 196 to Calvente Dep. at p. 023631-23635.)

105.    On November 16, 2018, the tenured faculty met. (**Tab B**, Ex. 203 to Calvente Dep. at 23620.) During the tenured faculty's deliberations Dean Murphy and Dr. ███ were present, but did not vote or substantively participate in the deliberations. (**Tab E**, Murphy Dep. 148-150:4-11; **Tab H**, ███ Dep. 61:3-20; **Tab B**, Ex. 203 to Calvente Dep. at 23620.)

106.    In their addendum to the report, tenured faculty wrote:

[T]he Personnel Committee report did not adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable in Lisa's classroom. While the Personnel Committee reported improved performance in the 2017-2018 academic year, as evidenced through a reduction of pertinent mentions in student evaluations, as well as peer observations of an open and safe atmosphere in Lisa's Spring 2018 CMN 103 Intercultural Communication class, some faculty members emphasized a long history of sustained negative feedback, which appears in every review period … Those who identified this issue as a troubling pattern argued that the Vincentian focus on social justice could be matched with a Vincentian personalism that seeks to engage students in a critical reflection on race, ethnicity, racism, and ethnocentrism through invitational dialogue. The repeated recommendations to vary pedagogical practices offered in Lisa's formal reviews and peer observations foreground this "invitational" approach to teaching and learning that other faculty members adopt when teaching critical content. But the tenured faculty noted that Lisa has not adapted her teaching to incorporate these best teaching practices.

(**Tab B**, Ex. 203 to Calvente Dep. at 23622.)

107.    Tenured faculty further wrote there was a

pattern of recommendations that Lisa opted to dismiss during her time at DePaul, many of which are documented in the 2015 and 2017 Personnel Committee reports that Lisa included in her dossier (see 2018 "Appendixes" to Tenure and Promotion Review Statement). It was noted that developmental feedback was intended to improve the quality of Lisa's teaching for all students and reduce the likelihood that students would feel disenfranchised in her classes. Voting members discussed two areas of special concern regarding Lisa's unwillingness to meet the needs of the

College: ignoring the common learning outcomes in CMN 103 Intercultural Communication and resistance to reflective practice, both of which represent outstanding problems that negatively affect student learning experiences.

(**Tab B**, Ex. 203 to Calvente Dep. at 23623.)

108.    Additionally, multiple voting members of the faculty discussed whether she was adhering to the common learning outcomes and curricular consistency in the core CMN 103 course (**Tab B**, Ex. 203 to Calvente Dep. at 23623-023624.) Specifically, in their report, the tenured faculty wrote that multiple voting members found that Plaintiff "largely ignored the agreement among the intercultural communication faculty on what topics should be covered in CMN 103," and reiterated their concern that the dense reading materials was less appropriate for an introductory course. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623.) The report noted Plaintiff's disagreement with that assessment, reporting that she "emphasized that she is fulfilling the learning goals outlined in the course-keeper guide for the class." (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623.)

109.    With respect to Plaintiff's research, the College tenured faculty wrote:

Consideration was given during the tenured faculty meeting of how to evaluate Lisa's co-edited book, and how work from edited books has been counted and evaluated for prior Tenure and Promotion candidates in the College. The voting members agreed that introductions, transitional statements between sections, and summary conclusions are expected and customary elements within the scope of editing and publishing a book. Therefore, such writing should not be counted as separate publications. The voting members also agreed that chapters other than an introduction, conclusion, or transitional statements authored and contributed to the collected work by an editor should be counted as a publication. In short, some tenured faculty felt Lisa did not accurately represent the volume of her research.

(**Tab B**, Ex. 203 to Calvente Dep. at 23624.)

110.    Her faculty reviewers also noted Plaintiff's plan to finish a book manuscript that she had written about in her 2013, 2015, 2017, and 2018 personal statements, writing "the Personnel Committee has been concerned about Lisa's inability to bring this manuscript to

publication despite the opportunities she has been given." (**Tab B**, Ex. 203 to Calvente Dep. at 23626-23627.) Reviewers noted that despite research leaves and flexible time, at the time of the tenure review, Plaintiff had yet to finish the project. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623 at 23627.)

111.    Additionally, faculty members noted while the involvement of students in performances did not in and of itself disqualify a work from being considered scholarship, in Plaintiff's case, the students in Plaintiff's class were fulfilling a final project assignment that would also be graded by Plaintiff. (**Tab B**, Ex. 203 to Calvente Dep. at 23625-23626.) The faculty also discussed whether additional documentation and contextual framing might change the categorization of these performances from teaching-related activities to scholarship. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23626.) The faculty members explained their decision to count the performances as teaching-related activity rather than research. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23626; **Tab E**, Murphy Dep. at 225:18-226:9.) Additionally, some evaluators, including one external reviewer, commented that her record of scholarship was "slim." (**Tab B**, Ex. 203 to Calvente Dep. at 23627.)

112.    In their report, tenured faculty identified the view by some members of the faculty that Plaintiff continued to 'oversell' her service accomplishments by listing some items that were standard expectations of all faculty on, or by listing attendance at a single meeting as service. (**Tab B**, Ex. 203 to Calvente Dep. at 23627.) Additionally, the College noted that a candidate's primary service should be in in her own program, and in her own College. (**Tab B**, Ex. 203 to Calvente Dep. at 23628.) Faculty reviewers remarked that much of Plaintiff's service was to departments in other colleges. (**Tab B**, Ex. 203 to Calvente Dep. at 23628.) Finally, reviewers stated that Plaintiff lacked documentation for several items that she listed as community service. (**Tab B**, Ex. 203 to

Calvente Dep. at 23628.)

113.    Ultimately, by a vote of 19-2, the tenured faculty of the College found that Plaintiff

did not meet the standards for tenure and promotion. (**Tab B**, Ex. 203 to Calvente Dep. at 23609;

**Tab B**, Calvente Dep. 145:1-16.)

**B.      Dean Murphy Agrees with College's Recommendation Against Tenure and Promotion**

114.    After receiving the College's report, Dean Murphy agreed with the College's

recommendation for tenure denial, and prepared a report to the UBPT. (**Tab B**, Calvente Dep.

147:3-4, 149:2-5; **Tab E**, Ex. 1 to Murphy Dep.; **Tab E**, Murphy Dep. 20:10-20.) In her report,

Dean Murphy explained:

> A vote of 19-2 against tenure and promotion is a significant statement. To overturn
> this, I would need to see flaws in the reasoning of the tenured faculty and/or make
> an argument that at least two areas reach the level of excellent. Based on what is
> presented in the dossier at this time, I cannot make that case.

(**Tab E,** Ex. 1 to Murphy Dep. at 14634.)

115.     With respect to teaching, Dean Murphy noted that Plaintiff had many strengths as

an instructor and made valuable contributions in the classroom and to the curriculum. (**Tab E**, Ex.

1 to Murphy Dep. at 14629.) However, Dean Murphy explained that

> [w]hile there are many positive aspects to Dr. Calvente's teaching, there were also
> areas that were identified in past formal reviews that needed to be improved to reach
> a rating of "excellent." . . . For some, she accepted the advice of personnel such as
> providing more verbal transitions, summaries and overviews during class lectures
> and discussions. For others, she questioned either the relevance or the fairness of
> the recommendations. For example, she rejected the suggested best practice to add
> more visuals to class sessions to help students with diverse learning styles meet the
> necessary requirements for the courses. She stated that she prefers a more
> traditional seminar structure to promote active listening as a necessary skill for
> students to develop and because it counters a western style of visual learning.
> Further, Dr. Calvente was asked to adhere to the course guide created by her unit
> and to include required topics in intercultural communication core classes such as
> CMN 103: Intercultural Communication. This is an overview course that is
> designed to cover a multitude of theories and perspectives an introduction to the
> field of intercultural communication. Dr. Calvente's approach is to teach it

exclusively through a critical theory lens. Prior formal reviews requested that she follow the guidelines and incorporate multiple theoretical approaches to intercultural communication. In her appendix, Dr. Calvente misrepresented the focus of this critique as requiring an approved textbook. She also states that her course was approved by the course supervisor, Dr. █████. Dr. █ emphasized in the personnel review meeting that she informed Dr. Calvente that there is no textbook requirement, but that the multitude of theories and topics must still be covered in the course for approval.

**(Tab E**, Ex. 1 to Murphy Dep. at 14630*.)*

116.    In her report, Dean Murphy addressed the

recurring student comments about feeling intimidated and/or uncomfortable in the classroom. As noted by both students and peer observers, the topics addressed in Dr. Calvente's courses can lead to challenging class conversations that can be emotionally difficult. In her narrative, Dr. Calvente states that her pedagogical approach enables students to "articulate their own positions on racism and other forms of marginalization freely and early on in the course" so that she can address these issues and student concerns. Looking at teaching evaluations, for many of her students, this approach has worked. She has been described by students as honest, respectful, and genuine. There have been, however, a number of students for whom this is not working and who have voiced strong concerns that Dr. Calvente is intimidating and dismissive in the classroom setting, particularly if they (or other students) are seen as disagreeing with her. As recently as Fall 2018, two complaints against Dr. Calvente were brought to the College Office that reflect the types of negative comments seen in the evaluations. In separate statements, two male students stated that during a critique of their group performance, Dr. Calvente called them "sexist and misogynist" several times in front of the class and in a follow-up email to the entire class. When they disagreed with the critique, they said that Dr. Calvente was very visibly angry . . . One dropped the class claiming his mental health was worth more than the tuition he would lose. The other stayed in the class, but said he was scared to participate again. I typically wouldn't go into detail on a student complaint for a tenure and promotion case. And, there are very clearly two sides to this story. I share this recent event because it provides a window into the type of polarizing comments that have shown up in Dr. Calvente's teaching evaluations.

**(Tab E**, Ex. 1 to Murphy Dep. at 14630-14631.) Dr. Murphy further noted that "the concern surrounding Dr. Calvente's teaching is less about the existence of the negative comments, and more about how Dr. Calvente has chosen to respond (or not respond) to them." (**Tab E**, Ex. 1 to Murphy Dep. at 14631.)

117.    Dr. Murphy writes:

In the 2017 formal review, the personnel committee claimed that at least one comment that

referenced intimidating and dismissive behavior was seen in 55% of her course evaluations. In her 2018 appendix, Dr. Calvente takes time to do her own calculation by student (not course) to show that by that date 20 students had express concerns about the classroom environment. In the judgment of the tenured faculty, this number and the content of comments is not acceptable, particularly when a faculty member is resistant to adapt her teaching in response.

(**Tab E**, Ex. 1 to Murphy Dep. at 14631.)

118. In evaluating Plaintiff's research, Dean Murphy stated there were "commendable qualities to Dr. Plaintiff's scholarship." (**Tab E,** Ex. 1 to Murphy Dep. at 14632.) Even so, she simply lacked a sufficient volume of notable published work. (**Tab E,** Ex. 1 to Murphy Dep. at 14632.) Specifically,

[s]ince arriving at DePaul in 2011, she published three peer-reviewed articles, one peer-reviewed book chapter, an edited book in which she wrote the introduction and co-wrote another chapter, and a book review.

(**Tab E,** Ex. 1 to Murphy Dep. at 14632.)

119. Finally, Dean Murphy stated in her letter that she agreed with the College's rating of "Very Good" for Plaintiff's service. (**Tab E,** Ex. 1 to Murphy Dep. at 14633.) With respect to service to the College and the program level, she described Plaintiff's services as "ad hoc, short-term capacities . . . The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee . . . To receive an 'excellent' rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period." (**Tab E,** Ex. 1 to Murphy Dep. at 14633-14634.)

120. In her letter, Dean Murphy explained it was "a difficult decision; [Plaintiff's] record has strengths that are detailed in the personnel and tenured faculty review. However, there are also significant concerns in each of the categories of evaluation." (**Tab E,** Ex. 1 to Murphy Dep. at 14629.) Dean Murphy stated the College's evaluation of Plaintiff as "very good" in each of the

three categories was fair and consistent with the evaluation standards in the College. (**Tab E,** Ex. 1 to Murphy Dep. at 14634.)

121.    In response to the College's reports, Plaintiff submitted to the UPBT an 8-page, single-spaced response, with an additional 22-page Appendix. (**Tab B**, Calvente Dep. 149:6-150:8; **Tab B**, Ex. 213 to Calvente Dep.) In her response, Plaintiff raised six areas of concern: purported misrepresentation of student evaluations; discounting of research productivity, particularly as it related to her students' performances and her co-edited book; purported discount of service, which she attributes to unfair placement or assignments; "impact of bias in the College of Communication" which she attributes to her "senior colleagues" the purported miscounting of her probationary year in 2015 as it related to her parental leave; and an escalation in "bullying and discriminatory behavior" in reaction to Dr. Ghanem's refusal on two occasions to adopt the recommendation to non-renew her in 2015 and 2017. (**Tab B**, Ex. 213 to Calvente Dep.) In the response, Plaintiff does not suggest that either Dr. ▮▮▮▮ or Dr. Ghanem should recuse themselves from consideration of her case. (**Tab B**, Ex. 213 to Calvente Dep.) Likewise, she does not complain that Dr. Ghanem was among the group of faculty in the College who treated her unfairly, instead claiming that she was purportedly hired to address the "culture" in the College, but that "one person alone cannot bear the burden of shifting a climate that took decades to create." (**Tab B**, Ex. 213 to Calvente Dep.)

## C.    UBPT Narrowly Recommends Tenure and Promotion

122.    The UBPT next evaluated Plaintiff. (**Tab B,** Calvente Dep. 150:9-11; **Tab F,** Ghanem Dep. 47:10-48:l0; **Tab A**, Answer at ¶ 10.) At the time Plaintiff went up for tenure, the UBPT members were ▮▮▮▮▮▮▮ (Caucasian), ▮▮▮ ▮▮▮ (Caucasian), ▮▮▮▮▮▮▮▮ (Caucasian), ▮▮▮▮▮▮ (Caucasian), ▮▮▮▮▮▮ (Asian), ▮▮▮▮▮▮ (Caucasian), and

███████████ (Black). (**Tab G**, Diaz Decl. at ¶ 7; **Tab E**, Murphy Dep. at 60:7-62:14; **Tab D**, Rinehart Decl. at ¶ 13.)

123.    On March 8, 2019, Plaintiff interviewed with the UBPT committee. (**Tab B**, Calvente Dep. at 150:9-151:3; **Tab E**, Murphy Dep. at 58:15-60:6.) Dr. Ghanem was present during Plaintiff's interview, sitting in the back, but she did not ask Plaintiff any questions. (**Tab B**, Calvente Dep. 150:15-19; **Tab F**, Ghanem Dep. 80:22-82:16.) During the interview, Plaintiff told the UBPT that she would be happy to adhere to any guidelines relating to CMN 103. (**Tab B**, Calvente Dep. at 150:9-51:3; **Tab B**, Ex. 215 to Calvente Dep.)

124.    The UBPT voted 4-3 in favor of granting tenure and promotion. (**Tab B**, Ex. 215 to Calvente Dep. at p. 2.) The UBPT did not change any of the ratings from very good to excellent. (**Tab B**, Calvente Dep. at 15:20-156:1.) While the UBPT noted there were concerns at some of the feedback from students regarding Plaintiff's teaching style, a majority of the UBPT concluded that negative reviews represented a small minority of students. (**Tab B**, Ex. 215 to Calvente Dep. at 3.) The UBPT nevertheless "encourage[d] Dr. Calvente to experiment and innovate with different and/or mixed pedagogy to accommodate students with different learning styles to be open to different perspectives, and to attempt to reach all of her student audience in the future." (**Tab B**, Ex. 215 to Calvente Dep. at 4; **Tab B**, Calvente Dep. at 156:3-19.)

125.    On the topic of her approach to CMN 103, a majority of the UBPT was persuaded by an email she included in her response to the College's decision on tenure, showing that a senior faculty member confirmed that her syllabus for the course was appropriate. (**Tab B**, Ex. 215 to Calvente Dep. at 23087; **Tab B**, Ex. 213 to Calvente Dep. at 23282-23286; **Tab B**, Ex. 186A to Calvente Dep. at LC0002209; ███████ Dep. 67:12-21.) According to the majority, this email suggested that "the concerns with not following the curriculum guidelines could very well result

from a misunderstanding between parties regarding the expectations." (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) The Board encouraged her "to recognize the importance of incorporating the feedback and suggestions from her colleagues into her core courses and to align CMN 103 with appropriate guidelines." (**Tab B** Ex. 215 to Calvente Dep. at 23087.)

126. When reviewing Plaintiff's scholarship, the majority UBPT concluded Plaintiff "met the minimum standard of *notable* in the Faculty Handbook." (**Tab B**, Ex. 215 to Calvente Dep. at 3.) The UBPT encouraged her to continue with research trajectory with more quantity and quality peer-reviewed articles. (**Tab B**, Ex. 215 to Calvente Dep. at 4-5; **Tab B**, Calvente Dep. at 160:15-161:162:9.) The UBPT stated the College's aspiration to excellence was appropriate and commendable. (**Tab B**, Ex. 215 to Calvente Dep. at 5; **Tab B**, Calvente Dep. at 162:11-163:8.)

127. The minority of the UBPT members "shared the degree of concern expressed by the faculty and the Dean that some of Dr. Calvente's students felt intimidated and/or uncomfortable in her classroom. (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) In describing the minority members' concern, the report stated:

> To Board members, these negative responses cannot be entirely attributed to the subject matter of the courses Dr. Calvente has taught, since there are other instructors who have taught similarly challenging subject matter without the volume and severity of negative responses we have seen in Dr. Calvente's case. Further, these concerns are indications that there is room for improvement in Dr. Calvente's teaching, and the unit's assessment of Dr. Calvente's teaching being short of *excellent* is justified.

(**Tab B**, Ex. 215 to Calvente Dep. at 23087.) Additionally, the minority shared the concerns, which were noted by one of the external reviewers, that the total volume of scholarly work completed by Plaintiff is "slim" and that Plaintiff failed to meet the College's expectation to complete her book project. (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) The minority also shared concerns of the College's tenured faculty that a large portion of Dr. Calvente's service was outside her home unit.

(**Tab B**, Ex. 215 to Calvente Dep. at 23087.)

128.    One of the members on the UBPT was Dr. ██████ a faculty member in the College. (**Tab B**, Calvente Dep. 151:17-152:1.) Dr. ██████ voted in favor of awarding tenure to Plaintiff. (**Tab B**, Calvente Dep.  at 152:12-16; **Tab H**, ██████ Dep. at 67:2-24.).) If he had abstained, the UBPT vote (a 3-3 tie) would have come out against her. (**Tab B**, Calvente Dep. 151:4-155:20; **Tab D**, Ex. 1 to Rinehart Decl., p. 00036 at ¶ 3.5.1.1(c).) Dr. ██████ testified that although he voted in favor of granting tenure and promotion to Plaintiff, it was a "razor-thin" decision for him and that Plaintiff's case was "not a slam dunk by any means." (**Tab H**, ██████ Dep. at 38:24-39:14.) Dr. ██████ explained that with respect to teaching, UBPT members expressed concerns about the reports of student intimidation, how the curriculum in Communications 103 was taught, and to a lesser extent, how Plaintiff used multimedia in her classes. (**Tab H**, ██████ Dep. at 37:19-38:3.) With respect to Plaintiff's research, there was some discussion about whether Plaintiff was "double-dipping" and whether some of the student performances Plaintiff submitted could appropriately be categorized as "research." (**Tab H**, ██████ Dep. at 68:17-69:2.) Dr. ██████ also noted that Plaintiff "could have been a little bit clearer" in her resume and noted "her publication record was hard to untangle." (**Tab H**, ██████ Dep. at 38:24-39:14.) With respect to service, Dr. ██████ felt that Plaintiff's contributions were a little bit weaker and not where they needed to be at the College level. (**Tab H**, ██████ Dep. 39:15-24.) Dr. ██████ felt Plaintiff had done enough to warrant tenure, but he believed it was a close case and different aspects of the case were more salient to some reviewers than others. (**Tab H**, ██████ Dep. at 67:2-24.)

### D.    Provost Decides Against Promotion and Tenure

129.    On June 10, 2019, Dr. Ghanem, who was serving as the Acting Provost at the time, reviewed the recommendations from the College, Dean Murphy, and the UBPT, as well as

Plaintiff's dossier (including Plaintiff's response to the College's report), and concluded that there

was "every evidence of careful review of this case at all levels." (**Tab B**, Ex. 217 to Calvente Dep.;

**Tab B**, Calvente 168:21-169:3; **Tab D**, Rinehart Decl. at ¶ 4; **Tab F**, Ghanem Dep. 84:11-89:5.)

In her letter to Plaintiff denying tenure, Dr. Ghanem wrote, "although the UBPT recommendation

report did not dispute the tenured faculty's and acting dean's evaluation of your record as 'very

good,' it notes that the Board's dissenting members (3 out of 7) did consider the College of

Communication's above guidelines in making their decision on the case." (**Tab B**, Ex. 217 to

Calvente Dep.) Dr. Ghanem later explained that she agreed with the minority view of the UBPT.

(**Tab B**, Ex. 217 to Calvente Dep.; **Tab F**, Ghanem Dep. at 38:2-8; 51:8-54:18; **Tab F**, Ex. 22 to

Ghanem Dep. at p. 7157.)

130.    In her letter to Plaintiff, Dr. Ghanem wrote:

There is every evidence of careful review of this case at all levels … Per the handbook, before granting tenure, "the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission" (emphasis mine). The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues, concerns which led them to vote against promotion and tenure by an overwhelming majority. As noted in the college and dean's reports and as acknowledged by you in your response, the concerns that have been raised in this tenure review have been raised in earlier probationary reviews. Given this, I would like to clarify my own earlier role in the consideration of your case, as Dean of the College of Communication during your 2015 and 2017 formal reviews. In the conclusion to your response to the college reports, you referred obliquely to my "assessments" during those earlier reviews. It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure." I had noted some improvement between formal reviews and wanted to give you the opportunity to address the remaining stated areas of concern in all three areas to meet the standards of the college by the time of your tenure review. In my letters of renewal in 2015 and again in 2017, I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation

of your colleagues.

(**Tab B**, Ex. 217 to Calvente Dep. at 23033-23034.)

## X.   PLAINTIFF'S APPEAL OF TENURE DECISION

131.    Plaintiff timely appealed DePaul's tenure denial on all available grounds, arguing that her adverse tenure decision should be reversed based on violations of academic freedom, violations of procedure, and discrimination. (**Tab B**, Calvente Dep. at 169:21-170:4, 177:3-7; **Tab B**, Ex. 219 to Calvente Dep.) She submitted a 17-page, single-spaced appeal. (**Tab B**, Ex. 219 to Calvente Dep.)

132.    First, Plaintiff alleged the College's concerns regarding her teaching violated the standards of academic freedom set forth by the AAUP because they effectively prevented her from having the freedom to discuss race in her classes, which Plaintiff alleges she was hired to do. (**Tab B**, Ex. 219 to Calvente Dep; **Tab B**, Calvente Dep. at 177:3-7.) Additionally, Plaintiff argued that the tenured faculty's evaluation of her teaching based on use or lack of certain instruments, such as visual aids, which Plaintiff does not find to be important, violated her right to teach in the manner appropriate to her pedagogical philosophy. (**Tab B**, Ex. 219 to Calvente Dep.; **Tab B**, Calvente Dep. at 177:3-7.)

133.    Additionally, Plaintiff alleged there were numerous procedural violations with respect to her tenure decision that violated the Faculty Handbook and/or College Guidelines, including her belief that: (1) Dr. Ghanem failed to provide a "compelling reason" for overturning the UBPT's recommendation, (2) Dr. Ghanem had a conflict of interest when she weighed in on her tenure decision given her current and prior roles within the College, (3) Dr. ▬▬▬ should have abstained from participating in the UBPT because he was a tenured member of the College faculty, (4) the College faculty unfairly scrutinized her teaching, research, and service, did not appropriately take into account her leaves of absence, misrepresented her teaching, provided

inconsistent guidance and failed to send her complete dossier out to external reviewers, and (5) Dr. Ghanem improperly relied upon Plaintiff's formal and informal performance reviews in her tenure decision. (**Tab B**, Ex. 219 to Calvente Dep.; **Tab B**, Calvente Dep. 151:4-14.)

134.    Finally, Plaintiff argued her tenure decision should be reversed because the College faculty's evaluation of her teaching was allegedly discriminatory in that it was based on caricatures and stereotypes which portrayed her as harsh and intimidating. (**Tab B**, Ex. 219 to Calvente Dep. at 5621-5622.)

135.    The Faculty Appeals Board for her case was ███████ (Caucasian), ███████ (Latino), and ███████ (Caucasian.) (**Tab C**, Ex. 6 to Esteban Dep. at p. 155; **Tab G**, Diaz Decl. at ¶ 7.)

136.    The Faculty Appeals Board conducted an investigation which it described as a careful and extensive review of the 250 pages of documentation submitted by Plaintiff, as well a review of documentation from the University EEO office, consultation with Chief Human Resources Officer Stephanie Smith, and dozens of responses to questions and follow-up questions from Plaintiff, Dean Murphy, and Dr. Ghanem. (**Tab C**, Ex. 6 to Esteban Dep. at p. 156.)

### A.    Faculty Appeals Board Recommends Reconsideration

137.    After conducting an investigation, the Faculty Appeals Board could not substantiate Plaintiff's appeal based on alleged violations of academic freedom. (**Tab C**, Ex. 6 to Esteban Dep. at 8290-8291; **Tab B**, Calvente Dep. 172:6-183:18.) The Faculty Appeals Board also could not substantiate Plaintiff's appeal based on alleged discrimination and retaliation. (**Tab C**, Ex. 6 to Esteban Dep. at 8318-8322; **Tab B**, Calvente Dep. 172:6-183:18.) In their report, the Faculty Appeals Board stated:

> The Board finds that the allegations that the College violated federal policies regarding non-discrimination could not be substantiated. The appeal did not

provide specific information, evidence or statements to substantiate a claim of discrimination on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability or genetic information.

(**Tab C**, Ex. 6 to Esteban Dep. at 187.) Additionally, the Board "did not substantiate [Plaintiff's] claim that [Dr. Ghanem] engaged in retaliation against [Plaintiff] for filing EEO claims against the College." (**Tab C**, Ex. 6 to Esteban Dep. at 8321.)

138.    With respect to Plaintiff's claim of procedural violations, the Faculty Appeals Board could not substantiate the allegation that Drs. Ghanem and ███ engaged in a conflict of interest and should have recused themselves from reviewing her case; the allegation that Dr. Ghanem failed to provide a compelling reason for her decision to reject the UBPT majority recommendation; the allegations that the College failed to consider her contract year in her 2015 review; and the counting of her public performances as scholarship, including the related failure to send a performance link to external reviewers. (**Tab C**, Ex. 6 to Esteban Dep. at 155-188.)

139.    However, the Board stated it found that the College unfairly misrepresented student comments in her teaching evaluations. (**Tab C**, Ex. 6 to Esteban Dep. at 168.) The Faculty Appeals Board also concluded that she was provided with "inconsistent" guidance regarding service because her 2017 review encouraged her to both increase her College-level service and her University service, and because Dr. Murphy submitted a service letter detailing her service on a single committee in the College. (**Tab C**, Ex. 6 to Esteban Dep 183-184.) The Faculty Appeals Board also stated it was their belief that Dr. Ghanem assigned undue weight to the College's concerns rather than University-wide criteria. (**Tab C**, Ex. 6 to Esteban Dep at 159.) Accordingly, the Faculty Appeals Board recommended Plaintiff's tenure application be reconsidered. (*Id.*)

## B.    President Affirms Decision to Deny Plaintiff Tenure and Promotion

140.    As the final arbiter of the appeal process, the University President A. Gabriel

Esteban (Asian) testified that he reviewed Plaintiff's record along with the reconsideration request from the Faculty Appeals Board, and stated that he found no material procedural irregularities warranting reversal of the denial of tenure. (**Tab C,** Esteban Dep. 55:7-57:2, 143:12-144:1; **Tab B**, Ex. 231 to Calvente Dep. at 21842; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080-00081 at ¶ 5.1.2.3.)

141.    The President's role is not to evaluate the merits of the candidate's case for tenure or to substitute his judgment for that of the lower levels. (**Tab C,** Esteban Dep. at 100:2-13, 89:10-15.) Rather his review is limited to whether processes and procedures were followed. (**Tab C,** Esteban Dep. at 100:2-13.) In Plaintiff's case, Dr. Esteban disagreed with the Faculty Appeals Board's substantiation of the three procedural violations alleged by Plaintiff, concluding the Faculty Appeals Board went beyond its narrow charge and undertook an independent evaluation of the merits of Plaintiff's teaching and service. (**Tab C,** Esteban Dep. at 148:10-149:15; 105:8-107:9; **Tab B**, Ex. 231 to Calvente Dep.).

142.    Specifically, in his letter to Plaintiff, Dr. Esteban affirmed the decision to deny Plaintiff tenure, and stated that Plaintiff had the full benefit of a faculty-run process with multiple checks and balances over preceding levels of review, and that the multi-tiered process worked as it was intended. (**Tab B**, Ex. 231 to Calvente Dep. at 21842; **Tab C,** Esteban Dep. 181:19-182:3.) Dr. Esteban noted in his letter that the dossier:

> the dossier shows full transparency, context, and ample discussion around the issue of student comments in teaching evaluations. These types of discussions and the application of sound academic judgment, informed by experience, are foundational to the tenure review process. It is through these debates — at every level — that the university determines whether or not there is any reasonable doubt about the faculty member's qualifications and continued capacity to contribute … The record reflects a holistic review of your teaching, which took into account more than just the student concerns about feeling intimidated and/or uncomfortable in the classroom. The College Report also highlighted other areas requiring improvement, including concerns about clarity in assignments and assessments of learning;

outcomes, time management, use of textbooks/readings, and incorporation of visual aids and multiple media … The College Report acknowledged improvement in some of these areas … However, the College Report's description of the faculty meeting reflected general concern among the tenured faculty that you resisted developmental recommendations … Against this backdrop, the Appeals Board has no authority to substitute its own interpretation of the meaning and weight that should be attributed to the various factors that go into teaching evaluations.

(**Tab B**, Ex. 231 to Calvente Dep. at 21847.) Dr. Esteban further stated the College Report was "replete with positive quotes from peer reviewers and students," and stated that the faculty "grappled with and debated the issues of student concern" with "very robust discussion" of the positives and negatives of her teaching, and that the Dean's letter "acknowleg[ed] that [Plaintiff's] approach worked for some students and not others." (*Id*. at 21845-21847; **Tab C,** Esteban Dep. at 109-113, 118.) Dr. Esteban stated that by providing a full and representative range of student opinions regarding Plaintiff's teaching, he believed Plaintiff's dossier "show[ed] full transparency, context, and ample discussion around the issue of student comments in teaching evaluations." (**Tab B**, Ex. 231 to Calvente Dep. at 21847.) "[E]ven if the college, the Acting Dean and/or the UBPT misunderstood the volume and severity of student concerns" that is not a material procedural violation. (**Tab C,** Esteban Dep. at 127:14-128:15.)

143.    In his report, Dr. Esteban also noted that:

Evolving recommendations over the course of your probationary period and differing opinions amongst the reviewing faculty does not mean that the process -- during the probationary period or the tenure review -- was unfair, inconsistent, or procedurally flawed. Rather, I would argue that it demonstrates that the process functioned as it should.

(**Tab B**, Ex. 231 to Calvente Dep. at 21850.)

144.    Finally, in his report, Dr. Esteban disagreed with the Board's concern that the Dr. Ghanem gave too much weight to the College's evaluation as compared with the UBPT's evaluation, writing, "[a]fter first concluding that the Interim Provost had reiterated her agreement

with the UBPT minority members and had acted in good faith and objectively, the Appeals Board then leaps to the unsupported conclusion that the Interim Provost assigned greater weight to college concerns than university-wide criteria. … Four of the seven UBPT members reviewed the promotion and tenure application and were satisfied that the requirements at every level were met. That the Interim Provost was not in the end similarly satisfied is not, in and of itself, evidence of an over-emphasis on college concerns." (**Tab B**, Ex. 231 to Calvente Dep. at 21850-51.) Dr. Esteban stated that "it is not enough to make an argument that tenure could have been granted." (**Tab B**, Ex. 231 to Calvente Dep. at p. 21851. Dr. Esteban stated that the procedures outlined by the Handbook were designed for precisely this kind of close decision. (**Tab B**, Ex. 231 to Calvente Dep. at p. 21850.)

145. Having exhausted internal recourse, Plaintiff filed a Charge of Discrimination on August 16, 2019 and her Complaint on June 8, 2020. (**Tab B**, Calvente Dep. 117:1-199:21.) In her Charge, Plaintiff lists her race as "Asian and Black" and her national origin as "Hispanic." (**Tab B**, Calvente Dep. 117:1-199:21.) In her complaint, Plaintiff states her national origin is "American of African, Latinx, and Asian descent" not "Hispanic." (Pl. Compl. at ¶ 1.)

## XI.  RACE BASED COMMENTS AND RACE BASED ALLEGATIONS

146. Plaintiff alleges she was discriminated against by the Personnel Committees between 2015 and 2018, her former chairs (Dr. Murphy, Dr. ██████ Dr. ██████ and Dr. Ghanem. (**Tab B**, Calvente Dep. at 10:15-12:12.) At the time of her deposition, Plaintiff could not recall the names of all the people she believed discriminated or retaliated against her, referring to them simply as her "senior colleagues" in the College. (**Tab B**, Calvente Dep. at 10:15-12:12.) Plaintiff alleges her senior colleagues discriminated and retaliated against her because she is a "Black Diasporic Asian American Latina" and teaches topics on racism. (**Tab B**, Calvente Dep. at

185:20-186:6.) Plaintiff contends it is a combination of her race and the subject matter she teaches that has resulted in her colleagues allegedly treating her unfairly. (**Tab B**, Calvente Dep. at 185:20-186:6.)

147.    Plaintiff alleges that when she was hired in 2011, but before she started working at DePaul, she was invited to a brunch at a colleague's friend's home, where Dr. ▮▮ made a joke in which the punch line involved the word "nigger." (**Tab B**, Calvente Dep. at 16:10-17:17.) Plaintiff testified that the time the joke was made, she immediately told Dr. ▮▮ the joke was unacceptable, and both she and Dr. ▮▮ reported the incident to Dean Murphy. (**Tab B**, Calvente Dep. at 16:10-17:17.)

148.    Plaintiff alleges that during her first year, academic year 2011-2012, Dr. ▮▮ made a racially insensitive comment about communities in the South and West side of Chicago, and Plaintiff immediately addressed this comment with Dr. ▮▮ and Dean Murphy. (**Tab B**, Calvente Dep. at 91:9-93:24; 108:10-19; **Tab E**, Murphy Dep. at 214, 226-27.) In the spring of 2018, Dean Murphy proposed Dr. ▮▮ act as a peer reviewer for Plaintiff. (**Tab B**, Calvente Dep. at 91:9-93:24; 108:10-19; **Tab E**, Murphy Dep. at 214, 226-27.) When Plaintiff objected to Dr. ▮▮ serving in this role, Dean Murphy immediately reassigned the role to another faculty member. (**Tab B**, Calvente Dep. 92:2-95:5.)

## XII.    ALLEGED COMPARATORS

149.    In the 2018-2019 tenure review cycle, three candidates from the College of Communication were up for tenure: Plaintiff; Dr. ▮▮ (Black); and ▮▮ (Caucasian). (**Tab E**, Murphy Dep. at 18:19-19:14, 55; **Tab G**, Diaz Decl. at ¶ 7.) Drs. ▮▮ and ▮▮ were granted tenure after unanimously favorable votes at every level of review. (**Tab D**, Rinehart Decl. ¶17.) Dr. ▮▮ did not file internal complaints of discrimination. (**Tab F**, Ghanem at

65:3-9; **Tab G**, Diaz Decl. ¶ 5.)

150. Dr. ████████ started at DePaul University in the Fall of 2016, after having already achieved tenure at the Western University of Illinois. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 010106; **Tab E**, Murphy Dep. 238:24-239:7.) Dr. ████████ was credited with three years of service, and, as described by the Personnel Committee, "only had a short time at DePaul . . . before going up for tenure review." (**Tab D**, Ex. 2 to Rinehart Decl. at pp. 010106, 010110.) In her two probationary years at DePaul, she produced 8 publications. (**Tab D**, Ex. 2 to Rinehart Decl. at 10111-12.) In her two probationary years at DePaul, she taught 10 distinct courses. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) Three of these were classes she created, and two more were new course preparations. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) In her transition from a semester system to a quarter system, she had to redesign her courses. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) Prior to going up for tenure, Dr. ████████ had more cumulative quantitative teaching evaluations for the classes she taught at or below 4.0 out of a 5 point scale than did Plaintiff for the classes she taught. (**Tab F**, Ghanem Dep. at 97:2-100:5; **Tab F**, Exs. 26 and 28 to Ghanem Dep.; **Tab E**, Murphy Dep. 160:18-164:21; **Tab E**, Exs. 24 and 26 to Murphy Dep.) Dr. ████████ also had more cumulative quantitative teaching evaluations at or below 2.0, than did Plaintiff in their respective classes. (**Tab F**, Ghanem Dep. at 97:2-100:5; **Tab F**, Exs. 26 and 28 to Ghanem Dep.; **Tab E**, Murphy Dep. 160:18-164:21; **Tab E**, Exs. 24 and 26 to Murphy Dep.) Dr. ████████ also received some negative qualitative student feedback before going up for tenure, including:

- Student No. 1079956: Instructor can be insensitive at times towards students

- Student No. 1079963: The teacher can be rude and does not like answering questions

- Student No. 1023498: It's unfortunate that this course had a such a poor structure 4 since the content was both interesting and useful.

- Student No. 1034256: Much as I love learning about new concepts and relationship theory, I wouldn't want to take this course again if it were set up to be the same way.

- Students 1051054: I enjoyed the assigned readings, but I found it frustrating that in class discussion was often unrelated and/or difficult to apply to the theories

(**Tab E**, Murphy Dep. at 166:17-181:17; **Tab E**, Ex. 27 to Murphy Dep.) Dr. ███████ did not ask the Personnel Committee to quantify the number of negative student comments she received. (**Tab E**, Murphy Dep. at 236:17-238:5.) In her personal statement, Dr. ███████ acknowledged that she received some negative student feedback. (**Tab D**, Ex. 4 to Rinehart Decl. at 10141-42.) She presented specific plans for addressing the students' concerns. (**Tab D**, Ex. 4 to Rinehart Decl. at 10141-42.)

151.    In their report on Dr. ███████ tenure case, the Personnel Committee noted areas where Dr. ███████ teaching scores were lower than the College average, and stated that an area Dr. ███████ had struggled was the consistent requests from students for clearer directions on assignments and assessment expectation. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10141-10142; **Tab F,** Exs. 26, 27 to Ghanem Dep.) In her tenure review, the Personnel Committee noted that Dr. ███████ shorter clock "put her in a precarious position because she had little time to improve" before going up for tenure review. (**Tab D**, Ex. 2 to Rinehart Decl. at 10110.) The Personnel Committee noted that during her interview, Dr. ███████ reflected upon the challenge of adapting her teaching style for the DePaul learning environment and the little time she had to improve. (**Tab D**, Ex. 2 to Rinehart Decl. at 10110-10111.) The Personnel Committee wrote:

> However, we have confidence that ███████ teaching will strengthen over time: it has improved over the two years she has been here and she is making a concerted effort to quickly adapt to DePaul's curriculum and students. As mentioned earlier, ███ is engaging in efforts to further develop and strengthen her teaching here at DePaul. She completed DOTS training; attended the Teaching, Learning and Assessment Spring Conference; and she has registered for and is attending workshops toward the Teaching and Learning Certificate Program. ███ has exhibited a strong willingness to acclimate her teaching style to DePaul and meet the learning needs of the students at both the undergraduate and graduate level.

(**Tab D**, Ex. 4 to Rinehart Decl. at 10111.) The Personnel Committee rated her teaching as "Very

Good" and her research and service as "Excellent." (**Tab D**, Ex. 2 to Rinehart Decl. at 10105.) On November 16, 2018, the tenured faculty at the College by a vote of 21-0 unanimously recommended Dr. ▉▉▉ for tenure and promotion. (**Tab D**, Ex. 2 to Rinehart Decl. at 10105; **Tab B**, Calvente Dep. at 186:24-187:17; **Tab F**, Ghanem Dep. 98:14-16.) Dean Murphy and the UBPT (unanimously) also recommended tenure. (**Tab D**, Ex. 2 to Rinehart Decl. at 10123-10125, 10371-10372.) Dr. Ghanem awarded Dr. ▉▉▉ tenure. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 010373.)

152.    Prior to going up for tenure, Dr. ▉▉▉ had more cumulative quantitative teaching evaluations at or below 4.0 out of a 5 point scale for the classes she taught than did Plaintiff for the classes she taught.  (**Tab E**, Murphy Dep. 163:2-164:21; Exs. 24 and 25 to **Tab E**, Murphy Dep.) Dr. ▉▉▉ also had more cumulative quantitative teaching evaluations at or below 2.0, than did Plaintiff in their respective classes. (**Tab E**, Murphy Dep. 163:2-164:21; Exs. 24 and 25 to **Tab E**, Murphy Dep) Dr. ▉▉▉ was required to undergo two additional teaching evaluations. (**Tab D**, Ex. 3 to Rinehart Decl.) In Dr. ▉▉▉ tenure review, the Personnel Committee wrote:

> In previous review periods, the Tenured Faculty commented on some lower scores on ▉▉▉ course evaluations; however, in both her previous teaching report (Winter 2018) and during the period of this formal review, ▉▉▉ teaching evaluations demonstrate a strong upward trajectory and high scores on almost every measure … Although some older formal reviews of ▉▉▉ teaching have identified some issues in the areas of organization/structure, course materials, articulation of clear expectations, and courses — marking more weakness in her face-to-face courses than online courses, an additional formal teaching review in Winter of 2018 and a thorough review of ▉▉▉ instructional materials through Summer of 2018 demonstrate that ▉▉▉ conscientiously took action to address those concerns. In her October 2018 interview with the Personnel Committee, ▉▉▉ noted the importance of DePaul's Vincentian mission when redeveloping her classes: her comfort level expressing herself to the students and making the classroom more inclusive has helped her become one of the college's most valuable instructors.

(**Tab B**, Calvente Dep. 116:2-4; **Tab D**, Ex. 3 to Rinehart Decl at 8630; **Tab I**, ▉▉▉ Dep. at

41:9-10; **Tab E,** Murphy Dep. 19:6-7.) The Personnel Committee rated her teaching as "Excellent" and on November 16, 2018, the tenured faculty by a vote of 20-0 (with 1 abstention) recommended tenure and promotion for Dr. ███ (**Tab D**, Ex. 3 to Rinehart Decl. at 8626.) Dean Murphy, the UBPT (by a unanimous vote), and Dr. Ghanem all agreed with this recommendation and Dr. ███ was awarded tenure. (**Tab D**, Ex. 3 to Rinehart Decl. at 9322.)

153.    In 2019, Dr. Ghanem rejected the UBPT's recommendation in the case of ███ ███ (Caucasian), and awarded him tenure. (**Tab F**, Ghanem Dep. 54:11-55:4, 102:17-106:13; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 4 to Rinehart Decl. at 37298-37299.) In 2020, Dr. Ghanem rejected the UPBT's recommendation on two occasions, granting tenure to Dr. ███ ███ (Latina) and ███ (Caucasian), awarding them both tenure. **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 5 to Rinehart Decl. at 36927-36928; **Tab D**, Ex. 6 to Rinehart Decl. at 38092-38093.) Dr. Ghanem is not aware of Drs. ███ or ███ filing internal or external complaints of discrimination. (**Tab F**, Ghanem Dep. at 67:18-21, 69:9-12.)

154.    In 2019, Dr. ███ was a faculty member in the College of Science and Health who was up for tenure during the academic year 2018-2019. (**Tab D**, Rinehart Decl. ¶ 20; **Tab D**, Ex. 5 to Rinehart Decl.; **Tab F**, Ghanem Dep. 54:11-55:4, 102:17-106:13.) During Dr. ███ June 1, 2018 pre-tenure formal review, Dr. ███ department voted unanimously, in a 8-0 vote, to extend Dr. ███ contract, stating Dr. ███ showed "evidence of improving himself as a teacher," that he was making "good progress in establish[ing] his research program," and that he "contribut[ed] service at all levels at the university." That Fall, Dr. ███ went up for tenure. At the unit level, both his Department and his College's Personnel Committees narrowly recommended against tenure (4-4 in the Department and 4-2-1 (recusal) in the College). Both his Department Chair and his Dean recommended tenure. (**Tab D**, Ex. 5 to Rinehart Decl at 036979.)

The UBPT, with a 6-1 vote, recommended against tenure, noting a pattern of negative student reviews. (**Tab F**, Ghanem Dep. at 102:3-106:13; Ex. 27 to **Tab F**, Ghanem Dep.) On June 10, 2019, Dr. Ghanem rejected the UBPT's recommendation, and awarded Dr. ███ tenure and promotion. (**Tab F**, Ghanem Dep. at 106:3-13.). Dr. Ghanem explained that she rejected the UBPT's recommendation against tenure because less than six months prior to the commencement of his tenure case, Dr. ███ had received a performance review that had unanimously indicated everything was excellent and his department's tenure review report referenced that he "either meets or exceeds" the department's teaching expectations. (**Tab F**, Ghanem Dep. at 54:11-55:4, 106:3-13; **Tab F,** Exhibit 1 to Ghanem Dep.) Accordingly, Dr. Ghanem felt that reversal of the UBPT's recommendation was warranted on procedural grounds. (**Tab F**, Ghanem Dep. at 54:11-55:4, 106:3-13.)

155.    Dr. ███ is a Caucasian faculty member in in the College of Science and Health, Department of Mathematical Science who was up for tenure during the academic year 2019-2020. (**Tab D**, Rinehart Decl. ¶ 22; **Tab D**, Ex. 6 to Rinehart Decl ; **Tab F**, Ghanem Dep. 68:1-10; **Tab G**, Diaz Decl. at ¶ 7.) Dr. ███ had 15 publications at the time of tenure. (**Tab D**, Ex. 7 to Rinehart Decl at 37303-37304.) Dr. ███ was recommended for tenure by all previous levels of review, including at the college level and dean level reviews. (**Tab D**, Ex. 6 to Rinehart Decl.) However, the UBPT, with a 1-6 vote, recommended against tenure related to concerns about his research not being sufficiently theoretical or methodological and as being the product of collaboration with students. (**Tab D**, Rinehart Decl. at ¶ 7; **Tab D**, Ex. 6 to Rinehart Decl at 38086.) Dr. Ghanem rejected the UBPT's recommendation and granted tenure to Dr. ███ stating she agreed with all prior level of reviews and concluding that his scholarly output "clearly met the criteria outlines in the Department of Mathematical Sciences guidelines." (**Tab D**, Ex. 6 to

Rinehart Decl. at 38092; **Tab F**, Ghanem Dep. 67:22-69:12; **Tab F**, Ex. 24 to Ghanem Dep.)

156.    Dr. ▮▮▮▮ ▮▮▮▮ is a Latina faculty member in the College of Science and Health School of Nursing who was up for tenure during the academic year 2018-2019. (**Tab D**, Rinehart Decl. at ¶ 21; **Tab D**, Ex. 5 to Rinehart Decl.) Dr. ▮▮▮▮ had 10 peer-reviewed articles at the time of tenure. (**Tab D**, Ex. 5 to Rinehart Decl. at 34661-34663, 36923.) Prior to the UBPT's review, Dr. ▮▮▮▮ was unanimously recommended for tenure at all levels of review, including by the tenure and promotion committee at the School of Nursing, the Interim Director, the College of Science and Health Personnel Committee, and the Interim Dean. (**Tab D**, Ex. 5 to Rinehart Decl.at 36927-36928.) On May 8, 2020, the UBPT by a 3-4 vote recommended against tenure. (**Tab D**, Ex. 5 to Rinehart Decl. at 36918-36920.) On June 5, 2020, Dr. Ghanem rejected the UBPT's recommendation and awarded Dr. ▮▮▮▮ tenure, stating she concurred with all prior levels of review. (**Tab D**, Ex. 5 to Rinehart Decl. at 36927-36928.)

157.    During the 2018-2019 academic year, Dr. ▮▮▮▮ along with five other Black and Asian faculty members from other colleges at DePaul were awarded tenure by Dr. Ghanem. (**Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Rinehart Decl. at ¶ 14.) Plaintiff was the sole candidate to be denied tenure in 2019. (**Tab D**, Rinehart Decl. at ¶ 14.)


Dated: November 19, 2021


                              Respectfully submitted,

                              By: */s/ Anneliese Wermuth*
                                     Attorney for Defendants, Salma Ghanem and
                                     DePaul University

Anneliese Wermuth (#6270970)
Nandini K. Sane
Cozen O'Connor
123 N. Wacker Drive, Ste. 1800
Chicago, IL 60606
Telephone:     312/474-7876
Email: awermuth@cozen.com
Email: nsane@cozen.com

*Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on November 19, 2021, she electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois using the ECF system, which will send notification of such filing to the following counsel of record:

Fitzgerald T. Bramwell
Law Offices of Fitzgerald Bramwell
225 West Washington Street, Ste. 2200
Chicago, IL 60606
bramwell@fitzgeraldbramwell.com


s/ *Anneliese Wermuth*
Anneliese Wermuth