| | |
|---|---|
| **From**: | Murphy, Alexandra [AMURPHY1@depaul.edu] |
| on behalf of | Murphy, Alexandra <AMURPHY1@depaul.edu> [AMURPHY1@depaul.edu] |
| **Sent**: | 11/6/2019 1:10:44 AM |
| **To**: | ███████████████████████ |
| **Subject**: | Re: Request for Additional Documentation from the Faculty Appeals Board |

Hi 

I have attached most of the documents that you requested. I am afraid I am having trouble with my office scanner. So, I need to try to scan the redacted emails related to the student complaints when I get home. I wanted to get the rest of it sent to you before I leave the office.

I did the best I could to respond to your questions within a pretty short time frame. Please let me know if you need me to expand or clarify anything.

All my best,
Lexa.

**From:** ███████████████████████

**Date:** Tuesday, November 5, 2019 at 10:32 AM

**To:** Alexandra Murphy <AMURPHY1@depaul.edu>

**Subject:** Re: Request for Additional Documentation from the Faculty Appeals Board

Dear Lexa,

Thank you for the update. The board's next meeting is Thursday, so if you have a few items you can't complete today, tomorrow would still be an option.

Thanks,

███████

**From:** Murphy, Alexandra

**Sent:** Tuesday, November 5, 2019 10:13:11 AM

**To:** ███████████

**Subject:** Re: Request for Additional Documentation from the Faculty Appeals Board

Hi ███████

I will have all my responses to you by today. I had to go out of town last week for two days, so I haven't had as much time to work on this as I had hoped.

Calvente-DePaul 017321

All my best,
Lexa.

**From:** ████████████████████████
**Date:** Tuesday, October 29, 2019 at 5:17 AM
**To:** Alexandra Murphy <AMURPHY1@depaul.edu>
**Subject:** Re: Request for Additional Documentation from the Faculty Appeals Board

Dear Lexa,

Thank you for your reply. Attached please find a list of questions from the faculty appeals board.

Although it would be helpful for us to have your responses before our next meeting (November 7), we understand that these final weeks of the quarter will be very busy and that may not be possible. Please inform us if that time frame does not work for your schedule.

Thanks,

████████

**From:** Murphy, Alexandra
**Sent:** Monday, October 28, 2019 2:32:35 PM
**To:** ████████
**Subject:** Re: Request for Additional Documentation from the Faculty Appeals Board

Hi ████████

Just letting you know I received this message and will get to work on providing this documentation as soon as possible.

All my best,
Lexa.

**From:** ████████████████████████
**Date:** Monday, October 28, 2019 at 11:36 AM
**To:** Alexandra Murphy <AMURPHY1@depaul.edu>
**Subject:** Request for Additional Documentation from the Faculty Appeals Board

Calvente-DePaul 017322

Dear Dean Murphy,

As you know, the faculty appeals board is still investigating Lisa Calvente's appeal based on grounds 2 and 3 in

Section 5.1.2.3 of the Faculty Handbook, which states "A faculty member may appeal the decision to deny an application for tenure and promotion. The appeal must be based on one or more of the following grounds:

1. The decision violated the faculty member's academic freedom.
2. The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.
3. The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws."

The board requests the following documentation:

(1) Please provide the board with anonymized (all faculty names removed) copies of the service sections of the CV's of all candidates for tenure from the College of Communication who have been ranked by the College Personnel Committee as "excellent" in service within the previous ten years.

(2) Please provide the board with anonymized (i.e. all student names removed) copies of all documentation in your possession related to the fall 2018 student complaints mentioned in your recommendation to the UBPT dated January 9, 2019.

The board requests that you provide (2) as soon as possible and that you provide (1) by November 4.

The board will also send you a list of questions in a few days.

In the event that this documentation does not reach the board by November 6, the board will move forward with its determination and recommendation to the President on the basis of existing documentation provided by the appellant and the University EEO office.

The board very much appreciates your contribution to this crucial faculty governance responsibility.

Sincerely,

Calvente-DePaul 017323

Dr.

Faculty Appeals Board

Calvente-DePaul 017324

October 15, 2018.

[Student A] came to my office to discuss a recent problematic encounter in his performance course with Dr. Lisa Calvente. He left a message on the College of Communication voicemail and also tried to contact Dr. ████████████ (chair of Communication Studies). The following is a summary of his experience and does not include the professor's perspective.

He started by saying he had never been treated with so much unprofessionalism and felt very attacked after a recent performance the Thursday prior. He claimed he had not slept in four days, was feeling traumatized and was terrified to go back to class.

The students were given a performance assignment to perform a "real experience" to not act and not present a fiction. He believed he and his group members "nailed it" and was very proud of the performance scenes they created and performed. There were four group members, one female and three male. One of the males is from Saudi Arabia, all other members of the group are White.

After the performance, several class members complimented the group. Dr. Calvente then stated that the group did not meet the criteria of the assignment. He is still unclear how that is the case. The group members tried to explain what they were trying to do in the performance. Dr. Calvente got visibly angry. She kept "death glaring" at us. She was looking at us with the "biggest scowl on her face." She claimed the male group members were examples of sexism and misogyny. ████ believed that when the rest of the class wasn't agreeing, it "ratcheted up her anger." She kept telling us that we were sexist and misogynists. [Student A] was shocked and angry that he was being publicly called a sexist and a misogynist. It was 3:00 (the class ending time) and he said that Dr. Calvente was still going strong. Finally, at 3:07, [the student] had to leave for his next class and he started to gather his belongings. He also gathered up the props he had brought into the class. He left the class and at the door he muttered under his breath, "this is bullshit." He says he regrets saying this, but he was so shocked and angry that it just came out. Dr. Calvente and the class heard this response.

Another member of the group, [Student B] wrote on behalf of the group to meet with Dr. Calvente to discuss what had happened at the Thursday class. The email appears respectful and acknowledges that the class ended in an unpleasant way and that they would like to speak with her about what happened and clarify any misunderstandings. They were told that they could not meet as a group, that office hours are only one-on-one meetings because grades would be discussed. The group did not understand this because it is a group grade and they didn't necessarily intend on talking about grades.

Dr. Calvente sent an email to the class, again, publicly calling the group members sexist and misogynist. And, said that they would be continuing this conversation at Tuesday's class. [Student A] said he was "terrified to go to class."

I counseled him to contact Dr. Calvente, apologize for the comment, and talk to her about how he was feeling. In the end, he did not feel comfortable doing this. He went to class on Tuesday and came to speak with me afterward. He said he felt "continually alienated" in the class. He was "shaking inside." He said, "As a white male, I am scared to say anything, scared to question anything." He has decided that for his "mental well-being," he needs to drop the class: "my mental health is worth the $2500 in tuition I will lose."

October 18, 2018.

I met with [Student B]. He expressed similar concerns as [Student A]. He summarized the main performance scenes that the group created. He is still very unclear as to what Dr. Calvente means by "they are fictions and not reality." She told them that "everything that happened in the scene was a fabrication of reality—you did not meet the assignment criteria." He said that as an Arab, brown skinned man, he thought he was expressing his reality. She asked him to give an example and he said that he didn't feel comfortable being vulnerable as an Arab man in a class of people he didn't know well to give an example of what recently happened to him at DePaul (this was a sexism example). He gave an example from Saudi Arabia. He was told again that it was a fabrication. He said he felt that his entire experience was not being acknowledged or validated. I have not gotten Dr. Calvente version of this, so it is very likely that she has valid points about the assignment criteria. But, the students are not understanding this. [Student B] corroborated the events from the Thursday class and the accusations made by Dr. Calvente of sexism and misogyny in front of the class. He also said that they picked up all their props and that it was after the class time was over when [Student A] left the room. He admitted that he was upset and he showed it. He was mad because "it was as if my reality does not matter, the professor is a person of power." He felt completely at a loss and was frustrated that his perspective was not being heard. In his mind, the performance scenes were sensitive and accurate to society. He believed that she got mad at them because we didn't give agreement to her argument. And, as students, they did not feel validated or appreciated for their work. At the end of class, [Student A] asked, "was there anything good in the performance?" She responded, "yes, but.." and then continued to critique it.

I asked [Student B] what he was hoping to accomplish or have happen. He said, "I want a healthy environment for me to disagree with an idea that is brought up in the class. On Tuesday, she [Dr. Calvente] said, 'I am the teacher.' 'I am the authority.'" He said, "I left Saudi Arabia to avoid this kind of thinking and education. He said, "I was not disrespecting her authority. I was disagreeing with an idea." He said he wants an environment where he is not humiliated and that he can feel safe while getting educated."

October 23, 2018
When I spoke to Dr. Calvente about the incident, she explained that the students had completely missed the point of the performance exercise. She said the male students were disruptive in the class and interrupted both her and a female student who was in their group. She was also frustrated that at the end of class the male students left without helping with the

props, leaving just her and the female student to clean up (the male students said they took the props they brought). She explained that after the class, the female student from the group emailed her to tell her that she was hesitant to come to the next class because the male students in the group were pressuring her to agree with them and attend a group meeting with Dr. Calvente. Dr. Calvente assured her that there would be no group meeting (for the reasons stated above). Dr. Calvente also filed an incident report with the Dean of Students Office about the male students and what she believed was very disruptive classroom behavior. I let her know that the male student who remained in the class was feeling extremely uncomfortable and isolated. I asked what she might do to help him better understand the course material, the assignment, and the critique. She said that the responsibility was on him and that he would need to fully participate to expect a good grade. I asked if she would reach out to him and she said she would.

**DePaul University**
**Incident Reporting Form**

*Submitted on October 15, 2018 at 2:28:33 pm CDT*

| | |
|---|---|
| Nature: | **General Conduct Report** |
| Urgency: | **Normal** |
| Incident Date and Time: | **2018-10-11  2:45 PM** |
| Incident Location: | **Other 14 East Jackson Lower Level room 102** |

Reported by

| | |
|---|---|
| Name: | **Lisa Calvente** |
| Title: | **Assistant Professor** |
| Email: | **lcalvent@depaul.edu** |
| Phone: | **3123627992** |
| Address: | **College of Communication, 14 East Jackson Suite 1832** |
| | **[Authenticated as LCALVENT]** |

Involved Parties

| | |
|---|---|
| ████████████ | |
| Student of concern | Male |
| ████████████ | |
| Alleged | Male |
| ████████████ | |
| Alleged | Male |

Questions

Please provide a detailed description of the incident/concern using specific concise, objective language (who, what, where, when, why and how).
**I teach a performance-based course in the College of Communication, CMNS 230, and on Thursday, October 11, my students performed their first graded performance.  Four groups performed in total and part of the performance process is to provide feedback at the conclusion of the performance.  The three of the four members of the last group did not receive their criticism very well and ████████████ angrily left class stating "This is bullshit." This occurred during the "talk back" session and students and I were still speaking. This incident was disrespectful and disrupted the end of my class.**

**The two other students in the group left after immediately after we concluded and the last student was left to clean up after her group.  I emailed the class addressing their behavior and stated that it would be addressed in class tomorrow (10/16).  Just yesterday, however, I received an email from the only female student in the group stating that the other 3 members were contacting her during group chat and she did not want to attend class because they were being overwhelming. The email is pasted below:**

**Hey,**
**I just wanted to let you know that I'm probably not going to come to class on Tuesday. The guys in my group are still really upset about the critique. They were planning on meeting with you before class at some point and are not happy about the fact that I don't want to go because they think "it would help our side". I just feel like it is so unnecessary, because I didn't see a problem with the critique and understood the point you were getting at about the scene. It's giving me a lot of anxiety to have to deal with them right now and I don't know if I feel comfortable having that discussion. They are just being a little overwhelming in the group chat right now and I don't really know what to do.**
**sorry,**
**[female student]**

Calvente-DePaul 017390

I responded that I was deeply sorry that she had to deal with what started to seem like harassment from group members in a group that she is no longer a part of (as the syllabus illustrates, once the staged performance concludes they are no longer group members). I supported her feelings by stating that it seemed from her email, that the members in her former group were using "group chat" in uninviting ways and their behavior was interfering with her learning and class experience. I encouraged her to attend class and that class continued to be a safe space and discussion would not be about her but behaviors of misogyny, performance pedagogy, and audience reception. I told her that we should meet to talk in person and assured her that there will be no group meeting because office meetings between professor and student are one on one and a meeting that they suggest will violate the confidentiality relationship of such meetings especially since they want to discuss a graded assignment.

Her and I met today and I informed her that I would be reporting the other group members' behavior but would not use her name. She told me that the three students wanted to meet with me as a group and were pressuring her to accompany them. She told me that she did not agree with them but they kept insisting. They then included her name in the email and she had to ask them to remove it. They told her that they were victims of misandry, they deserve an apology from me, and their case was stronger if she would accompany them.

I only provide this as context however and want to center on the disruption of my class and the three male group members' use of group chat to pressure the other student to do something she did not want to do to the point of her feeling like she did not want to attend class.

Your DePaul Affiliation (if applicable):
**faculty**

*Pending IR #00003297*

*Submitted from 140.192.237.156 and routed to █████████████ (Dean of Students). Processed by routing rule #1.*

Questions Prepared by the Appeals Board for Alexandra Murphy

**Please see my responses in bold below.**
**Teaching**

1.Would it be correct to state that the majority of tenured faculty in the College of Communication decided in 2015 that student comments about 'intimidating and dismissive' behaviors should be assigned greater weight in the assessment of teaching than more numerous, positive qualitative and quantitative evidence?  If the answer is no, what is the correct understanding?

**I don't believe it is a matter of assigning greater weight to the number of comments (positive versus negative). The issue was more about the content of the comments and Dr. Calvente's response to those comments that raised concerns.**

2.Would it be correct to state that student comments about Dr. Calvente's 'intimidating and dismissive' behaviors in the classroom were viewed by the College of Communication faculty as a major reason for the vote for non-renewal in 2017?  If the answer is no, what was the major reason for the vote in favor of non-renewal?

**No. The rationale for the non-contract renewal votes is reflected in the 2017 formal review document. As the document shows, the issues cut across the areas of teaching, research, and service. Our T&P guidelines (approved by UBPT) stipulate that:**

> *By the time of the second formal review (typically the fourth probationary year), the faculty member should have at least one area ranked as excellent with the clear promise of moving at least one of the remaining areas to excellent within the time prior to tenure. No ranking should be below very good during this review.  By the tenure review a faculty member's performance should be excellent in at least two of three areas, and very good in the third. In the event that a faculty member's tenure clock is stopped during the probationary period or a faculty member has received a questionable prior review, additional formal reviews may be required. A faculty member's performance in these additional reviews must demonstrate improvement beyond the first formal review with the clear promise of meeting the requirements listed for the second formal and tenure reviews listed above.*

**In Lisa's case, for the evaluation of progress toward tenure, while there were varied votes in all areas, there were no votes of excellent in any of the three categories. In fact, the service ranking was rated as unsatisfactory by the majority of tenured faculty. The**

**research, while ranked as excellent by the personnel committee for the review period, was ranked as very good/fair for progress toward tenure. This was supported by the tenured faculty votes. Even with teaching, the issues of concern went beyond the negative comments. As noted in the formal review document, concerns were raised about Dr. Calvente's dismissal of repeated requests and recommendations to diversify her teaching practices, to be more inclusive of varied learning styles, and to include a wider range of theories and perspectives in the core intercultural communication course.**

3.Would it be correct to state that as a result of the 2017 formal review the College of Communication articulated an expectation that Dr. Calvente receive ZERO student comments about an intimidating learning environment in qualitative comments/open responses in student teaching evaluations? If the answer is no, what were the college's specific expectations regarding such comments?

**I have never seen or heard any expectation that there would be zero comments about an intimidating learning environment. I believe the college's expectation was a combination of wanting to see fewer comments appearing and that there would be a recognition/acknowledge on the part of Dr. Calvente that the comments were of concern and should be addressed.**

4.Your recommendation to the UBPT dated January 9, 2019 states: "In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations." This statement clearly derives from the following statement in the 2017 formal review - "*A major theme in qualitative comments throughout Lisa's teaching career at DePaul pertains to students feeling "intimidated" or "uncomfortable" in her classroom. In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations.*" Please reexamine the underlying evidence for this claim – the student evaluations from 2016-2017 - and respond to the following question: Which specific student comments (by quarter, class and six digit unique number) do you consider to be indicative of 'intimidating and dismissive behavior'?

**I relied on the personnel committee's assessment of these comments. I asked the author of that report to provide the original analysis (attached to this response).**

5.To provide context for the 55% statistic, would it not be correct to also state that a majority of the same students who had concerns also highlighted positive aspects of Dr. Calvente's teaching?

**I don't know that it is a majority. But, as highlighted in all review documents, there**

Calvente-DePaul 017393

**are many positive aspects to Dr. Calvente's teaching that are indicated in student comments. I think the point of the personnel committee and the tenured faculty is that the positive comments do not negate the importance of addressing continued comments of concern, particularly when they are viewed as repeatedly dismissed by the faculty member as important or as anything that might be changed in her own approach to teaching.**

6. How would you answer an allegation that college personnel documentation pertaining to Dr. Calvente's case displays a clear and consistent pattern of overemphasizing negative student comments?

**I don't believe that negative comments have been overemphasized. Due to the content of the comments, they needed to be addressed. While they are not the majority of comments and may not even reflect the majority of student experiences (at least of those filling out the student evaluations), they are still reflective of some student experiences and merit attention and discussion.**

7. How would you answer an allegation that college personnel documentation pertaining to Dr. Calvente's case displays a clear and consistent pattern of ignoring and downplaying positive student comments about Dr. Calvente's teaching?

**Looking at all the formal review and tenure and promotion documents, there are numerous examples of positive student comments highlighted. I don't see that they were ignored or downplayed in any way. In looking at the 2018 tenure and promotion review alone, there are entire paragraphs that provide examples of very positive qualities as well as student comments. My own letter highlights positive aspects of her teaching as well and summarizes it with the following:**

> *Again, I want to emphasize, for the majority of her students, Dr. Calvente provides a positive, and for some an extraordinary experience. She has made efforts to improve some aspects of her teaching. To be an "excellent" teacher at an institution such as DePaul, however, requires a commitment and an effort to try to reach all students— even those who may (possibly unfairly) view you or your course content negatively. This is the conundrum of this case. Taken together, these concerns justify the evaluation of "very good" as a fair assessment of her teaching and consistent with other cases in the college.*

8. How would you answer an allegation that college personnel documentation pertaining to Dr. Calvente's case displays a clear and consistent pattern of giving voice to exceptional student comments that are unrepresentative of other comments for the same class?

**I believe that it is precisely because the comments are exceptional, in content and tone, that they are given voice. Again, while they might not reflect all student experiences, they are still reflective of some student experiences and merit attention and discussion.**

9.To what extent were perceptions of student drop rates in Dr. Calvente's classes – an issue referenced in the 2015 formal review – a subject of informal and formal discussions in the College of Communication? Is there any documentation in the files of the Dean's office that specifically raises this issue? If yes, please provide the board with this documentation.

**The comment in the 2015 formal review is a response to a student comment: "Dr. Calvente was insistent on students dropping the class on the first day and was shocked when students hadn't the second day." And, when the personnel committee asked Dr. Calvente in the interview about students who might feel disenfranchised from the class, she replied, "Most students drop. I advise them to drop" (see 2015 formal review). The College, however, does not systematically track drop rates and it was not a factor in any subsequent formal reviews. I am not aware of it being a factor in any informal conversations about her teaching.**

**Discrimination/Retaliation**

10.Would it be correct to state that prior to the submission of her tenure application Dr. Calvente never raised any concerns about the objectivity of your evaluations of her performance as a junior faculty member? If not please elaborate.

**To my knowledge, this is correct.**

11.Were you aware that Dr. Calvente reported concerns about discrimination and retaliation to University officials outside of the College of Communication during her probationary period? If yes, did this fact influence your recommendation to the UBPT?

**I was made aware that a university claim against the personnel committee was filed after the 2015 formal review. This knowledge did not, in any way, influence my recommendation to the UBPT.**

12.Would it be correct to state that during the entire time of Salma Ghanem's appointment as Dean of Communication Dr. Calvente never raised any concerns about the objectivity of Dean Ghanem's evaluations of her performance as a junior faculty member? If not please elaborate.

**To my knowledge, this is correct.**

13.Were you aware that in October 2018, only days before Salma Ghanem began her appointment as interim Provost, Dr. Calvente reported to her concerns about discrimination and disparate treatment of faculty of color in the College of Communication?

**I was aware that she spoke with Dr. Ghanem about some concerns. I was not given the details of the conversation.**

14.Is it correct to state that you never received any notifications about any open EEO investigations and that you were never subsequently interviewed or notified about any open EEO claims regarding discrimination or retaliation?

**This is correct. Although, I have just recently (in the last week) received notice of an open EEO claim.**

15.Are you aware of any occasions in which Dr. Calvente's race or ethnicity were mentioned as a factor in personnel deliberations?  If yes, please provide a detailed explanation.

**As far as I am aware, Dr. Calvente's race and ethnicity were only discussed during personnel deliberations when relevant to discussing her own pedagogical positioning as a woman of color teaching about race and ethnicity. All of these conversations are highlighted in the formal reviews with an attempt to capture the perspectives shared in the discussions. For example, as noted in the 2018 tenure review:**

> *Dr. Calvente attributed the negative student comments referring to feeling intimidated or silenced to the sensitive nature of the race-related conversations in her classes as well as to her being a minority faculty teaching race content…Many voting members expressly agreed that her identity as a woman of color teaching content that engages race and racism from a critical perspective will influence how students respond to the content and to Lisa as their instructor…However, some faculty members noted that Lisa misrepresents the college-wide teaching context: other women of color teach courses that approach issues of race, ethnicity, and gender from a critical perspective; LGBTQ faculty members teach courses about LGBTQ content that also can be considered uncomfortable for students. But the same issue of intimidation and discomfort is not raised in their teaching evaluations.*

**Service**

16.Would it be correct to state that on more than one occasion Dr. Calvente volunteered for in-unit service obligations but was not chosen to serve by senior colleagues?

**I am only aware of one occasion when Dr. Calvente reached out to her program chair, ████████████ to volunteer for college and university committee assignments in the 2017. She sent her request after the call for committees had been out for a while and the college level committees had already been filled. Dr.████████ suggested she contact the faculty council representative on the committee on committees to see if there were any remaining openings.**

17.Is there any documentation in the files of the unit or Dean's office that outlines specific cases when Dr. Calvente refused to participate in a service assignment recommended or requested to her by her unit?

**I am not aware of her refusing service when asked.**

18.Is there any documentation in the files of the unit or Dean's office that outlines specific cases when Dr. Calvente volunteered for service but another faculty member was selected instead?

**I don't have any knowledge of this happening. I do know that she was selected over other interested faculty members to be on the Term Faculty Review Committee.**

19.How are decisions about unit level service made in the College of Communication? Are nominations solicited in open meetings? Are positions elected or appointed by dean or the chair of the unit?

**Unit level service is typically assigned after an open call for volunteers from the program chair or during faculty meetings. The personnel committee (college level) is the only elected committee. Open calls are also given out by our committee on committee representative for faculty council committees. Each summer, all committees, at the college and university level, are sent out, openings are highlighted, and faculty are encouraged to volunteer.**

20.In the November 2017 formal review the personnel committee states: "The tenured faculty endorsed the Personnel Committee's assessment that her service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers." Please provide a detailed explanation of the "typical load" for a faculty member undergoing their third, formal probationary review.

We are a small college. As such, we have high needs and expectations for service contributions. The November 2017 formal review was a third probationary review. So, it was only one year prior to tenure. As requested, I have attached the service records of faculty from the past 10 years. At this time, we would expect a faculty member to have participated on several standing college committees (e.g. curriculum, assessment, program review, summer research committee, etc.). Often, they have chaired these committees. They may have also participated and/or chaired ad hoc committees and task forces (e.g. short-term solutions, curricular development). These are committees that meet more than once and have long-term charges. Some faculty have been track coordinators for college programs and even graduate directors. As a small college, we also have needs for faculty to serve on university level committees. Many of our faculty by the advanced stage of a probationary period have served on substantive university level committees such as URC, PSC, QIC, faculty council, Liberal Studies domain committees, LSC, and a variety of faculty council appointed committees.

21. Your recommendation to the UBPT dated January 9, 2019 states: "The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review." What did you mean precisely by "more meaningful ways"? Were specific assignments ever proposed?

The personnel committee and the tenured faculty consistently recommended in prior formal reviews that Dr. Calvente increase her service contributions. While there may be many lines under service on the vita, the personnel committee and the tenured faculty recognized that much of what is listed are smaller, ad hoc presentations in classes or attending the annual award brunch and presenting a student with an award (expectations for all our faculty). In another example, the Security Concerns Group listed on Dr. Calvente's CV consisted of one meeting when interested faculty were invited to come discuss security concerns in the building. Looking at her CV at the time of her 2018 tenure and promotion review, under the heading of College of Communication, the only substantive committee on which she served is the Non-Tenure Track Review Committee (now called the Term Faculty Review Committee).

As the chair of the Term Faculty Review Committee, I wanted to help Dr. Calvente build her service record, so I recommended that she join the committee. I established the committee in spring of 2015, when we had one short orientation meeting. Dr. Calvente was on leave for the 2015-16 academic year. Rather than replace her, I held her spot on the committee and asked someone to fill in for that year. So, while her vita lists her as on the committee from Spring 2015 on, she was an active participant in 2017-2018 and continued on this committee until Winter 2019.

Calvente-DePaul 017398

22. Why did not you express those same concerns in the letter you wrote in August 2016 commending Dr. Calvente's services to the unit and college?

**Dr. Calvente asked me to write a letter of support that detailed the service that she had done up to that point. I did not see my role at that time to position this service against that of her peers. As I note in my tenure recommendation, I appreciate the work that she has done. But, in context and in comparison, with what is typical across the college, and given the consistent feedback she was given in formal reviews, I agreed it was not enough to be rated as "excellent" in service.**

### Fall 2018 Student Complaints

Please feel free to comment on the section of Dr. Calvente's Response to College Reports, which specifically addresses your representation of the fall 2018 complaints: "Dean Murphy disregards the details of a report made to the Dean of Students which consisted of an email from the only female student in their group, who was harassed by these three male students when they contacted her outside of class to the point where she no longer wanted to come to class. Dean Murphy disregards the quantitative evaluation scores of this course which ranged between a 4.09 and a 4.73--some of my lowest scores--and the overwhelming positive qualitative evaluations. One detailing these events, for instance, states, "the professor was incredible when handling the situation when regarding the topic. The topic had to deal with certain students being sexist, racist, and not letting other students speak. She handled the situation professionally without attacking the students and I felt it was one of the most interesting parts of my entire college career" [student evaluation # 1126176]. I received two negative evaluations for this class, out of eleven, with a 65% response rate. Finally, Dean Murphy disregards my own assessment of the situation as the Professor, my explanation to her that I do not call any student, or person, misogynist, and how the Assistant Dean of Students, who handled this report, also identified these students' behavior as "toxic masculinity." Contrary to Acting Dean Murphy's account, the two students did actually participate in the class with my guidance and support and I continued to work with each of them on their remaining performances, including individual assignments, to ensure their success. Acting Dean Murphy had access to all of this information yet used her appointed administrative positions as Associate Dean and Acting Dean to continue to misrepresent me and depict me in such an egregious manner, an act that is highly offensive, racially insensitive, and noteworthy for its unprofessionalism."

**My decision to include the student complaints from Fall 2018 was not made lightly. In my**

Calvente-DePaul 017399

20 years of teaching and administrative work at DePaul, I have never experienced the level of intense emotion as I did when meeting with these two students. I did my best to characterize the main concerns from the students' perspective and to acknowledge that Dr. Calvente had a different read of the situation. I have provided you with the lengthier summary of the meetings with the students, Dr. Calvente, as well as student emails.

First, Dr. Calvente accuses me of disregarding the details of the report to the Dean of Students. I reference that she submitted this report and note that she characterized the students as disruptive and disrespectful to her and a female student. The report was submitted by Dr. Calvente, not the female student. The characterization of the male students "harassing" the female student was made by Dr. Calvente, not the female student. As part of our conversations (and unrelated to the incident report because the male students were not aware this was filed), the male students showed me a screen shot from the female student stating that she was not offended in the class discussion (attached in supporting documents). So, without having heard from the female student directly, I didn't feel I could go into a lot of detail on that student's experience. You will also see from my October 2018 summary of the complaint that I left out a lot of detail from the male students who were complaining as well. I tried to capture the essence of their concerns and to note that Dr. Calvente had a different read of the situation as concisely as possible.

Related to this, Dr. Calvente also claims that I disregarded her own assessment of the situation. However, I do include in the letter that she believed the male students were disruptive and disrespectful. I also try to give some perspective by saying she may have been calling the students out as "sexists and misogynist" as a teachable moment related to the course content. This is something I suggested to both the students and to her when we met. I also explained that the male students did not perceive it this way and came away from the experience feeling targeted, uncomfortable, and isolated. They only knew that a professor called them misogynists and then refused to meet with them to discuss what happened.

Dr. Calvente also states that I ignored the positive student evaluations from the class. I did not ignore them. Before they were even made available to me, I was instructed by Academic Affairs not to include them because they were not part of the official dossier for tenure and promotion. Moreover, they are not relevant to the student complaints. I was not trying to make the point that the majority of students had this experience, I was giving voice to the two students who felt so under attack that they needed to come and seek help from someone in the College office.

Dr. Calvente claims that contrary to my account, the two students did participate in the class with her guidance. You will see in the complaint summary, that in my discussion with Dr. Calvente, I let her know that one of the male students had dropped the course. So only one of the students remained in the class. I told her that the other was feeling extremely uncomfortable and isolated. He could not drop the course because of his financial aid package. When I asked if there was something she could do to help draw him back into the course and to help him better understand the course material, the assignment, and the critique, she said it was his responsibility and that he would need to fully participate to get a good grade. At that point, he had canceled a meeting he had requested with her because

she would only meet one on one and he said he was too uncomfortable to do that. Since he was staying in the class, I asked her to reach out to him to try to meet and help him understand and she said she would. I followed up with the remaining student in early January to see how the class went and to see if Dr. Calvente ever reached out to him. He said he did pass the class. But, I was disappointed to learn that Dr. Calvente did not reach out to him as she had promised (see attached email from student).

As I stated in my recommendation letter, I decided to include these student complaints because they were formal complaints that provided additional context for understanding prior student comments in evaluations and the college decision about Dr. Calvente's teaching. This decision was based less on the number of negative versus positive comments and more on how Dr. Calvente has chosen to respond (or not respond) to negative student experiences voiced in regards to her classes. While the male students might have struggled with understanding the course assignment or approaches, it was the content and manner of her feedback that seemed to be the most problematic and alienating for them. Rather than reaching out to try to help them grasp a new perspective and way of thinking, she repeatedly characterized them as misogynists (in class and email) and this closed off the possibility for learning.

**From:** ███████████████
on behalf of ███████████████
**Sent:** 11/6/2019 1:13:46 PM
**To:** ███████████████████████
**Subject:** Dean of Communicaton Message 2 of 2
**Attachments:** Student complaint emails.pdf

---

**From:** Murphy, Alexandra
**Sent:** Tuesday, November 5, 2019 8:26 PM
**To:** ████████
**Subject:** Re: Request for Additional Documentation from the Faculty Appeals Board

Hi 

My scanner at home worked! Attached please find emails about the student complaints.

Again, please let me know if I am missing any information.

All my best,
Lexa.

Confidential

**Subject:** Re: [Ext] Re: Complaint letter CMN 230
**Date:** Thursday, January 10, 2019 at 7:14:11 PM Central Standard Time
**From:** ▮▮▮▮▮▮▮▮▮
**To:** Murphy, Alexandra

Hello Professor,

The professor did not reach back to me besides the first time when she refused to meet with us as a group and wanted to meet individually. I responded to her that time that I did not feel comfortable meeting her one to one. to state the facts, I was the one who reached out to her the first time not herself. please let me know if there is anything else you want me to clarify.

Warm regards,

▮▮▮▮▮▮▮

---

**From:** Murphy, Alexandra <AMURPHY1@depaul.edu>
**Sent:** Thursday, January 10, 2019 8:08 PM
**To:** ▮▮▮▮▮▮
**Subject:** Re: [Ext] Re: Complaint letter CMN 230

Hi ▮▮▮▮▮

I am so happy to hear that the class ended ok. Can you tell me if Dr. Calvente ever reached out to meet with you to talk about what had happened?

Best,
Lexa.

Sent from my iPad

On Jan 10, 2019, at 6:10 PM, ▮▮▮▮▮▮▮▮▮▮▮ wrote:

> Hello Professor,
>
> Thankfully I did pass without problem. I am thankful for your efforts to help me and my other friends. I would kindly ask you to keep my complaint letter to be used for any future complaint by other students if the same action is repeated. Thank you again and have a wonderful day.
>
> Warm regards,
>
> ▮▮▮▮▮▮▮

---

**From:** Murphy, Alexandra <AMURPHY1@depaul.edu>
**Sent:** Thursday, January 10, 2019 3:37 PM
**To:** ▮▮▮▮▮▮
**Subject:** Re: Complaint letter CMN 230

**Page 1 of 2**

Confidential

Calvente-DePaul 017403

Hi 

I wanted to follow-up with you to see how the rest of the class went with Dr. Calvente?

All my best,
Lexa.

**From:** ████████████████████████
**Date:** Monday, October 29, 2018 at 1:36 PM
**To:** Alexandra Murphy <<u>AMURPHY1@depaul.edu</u>>
**Subject:** Complaint letter CMN 230

Hello Professor,

I have received your email regarding your meeting with professor Lisa, and I am thankful for your effort to solve our issue. I have decided to stay in the class since withdrawing might impact my scholarship and would cause me some trouble at this time. However, I am attaching a letter regarding what happened in order to have records of the situation in case another student complain in the future, or my grades were impacted by what happened.

Warm regards,

████████████████

Confidential



weilku
complaint



Student #

**October 29, 2018**

Dr. Alexandra G. Murphy, Dean,
Collage of Communication
DePaul University

**Re:     Student Complaint**
         **Professor Lisa B. Y. Calvente, CMNS 230**

Dear Dr. Alexandra G. Murphy,

I am writing this letter to express my concerns regarding a course taught this quarter by
Professor Lisa B. Y. Calvente, CMNS 230: Performance, Communication, and the Body, and to
request your intervention in resolving these issues.

On October 11, 2018, I the writer of this letter,                        and
made our first performance titled "DePaul's Paradox" that we were assigned to do under
"Staged Performance One: Everyday Performances at DePaul University" (*See*, attached
document). The performance was inspired by our interpretations of the readings assigned for the
class as they related to our campus and our own experiences with space, gender, sexuality, race,
and ethnicity.

One of our performance scenes touched on a sensitive topic in our society in the present day,
misogyny. The scene started with each of the group members repeating the word empowerment,
the male members of the group jumped off the stage facing the only female member the group
stating "we live in a culture, where the false universal of 'man' has been presupposed as
coextensive with humanness itself." The male members of the group were on the floor kneeling
while listening to her statement. The moment she finished, the male members clapped and gave
her a compliment. After that the male members of the group turned around, got close to each
other, and said few misogynist statements such as "who gave women the right to speak" and
"don't listen to her." After that the female member of the group stood behind the male members
of the group and said "those who fail to do their gender right are regularly punished." The scene
then ended.

The scene's intention was to show the true image of misogyny in society and how men who
participate in such acts fake their support of women empowerment and only speak their truth
when they get together behind doors. After we finished our performance, we set on the stage
to receive the comments of the professor and our classmates. One female student
complemented the powerful message of that scene and a few other comments followed until

Calvente-DePaul 017405

professor Calvente said that the scene was a fabrication of reality. She argued that the scene represented our idea of misogyny but was not coming from reality. Also, that we did not follow the assignment criteria since we have to make scenes inspired by our reality. I raised my hand and argued that misogyny is not something I heard or read about but something that I interacted with personally in real life. My peer ████ also argued that the fact that the professor is a women might lead her to not interact with such acts but that does not mean that as men we have not witnessed it in our day to day lives. The professor insisted on her argument that our scene was a fabrication of reality. At this moment, the situation got a bit intense in the classroom. The conversation went back and forth. Each side did not agree on the other's point of view. We as students did not feel that our hard work was validated or appreciated and the professor insisted to keep going with her argument. The class ends promptly at 3:00 and the professor continued to try to convince us that our scene was a fabrication of reality. At this point my peer ████ asked the professor "is there anything at all that was good in our performance?" At this point, I expected the professor to end the argument and address our strength and weaknesses. However, she kept going with her argument. From my perspective, the professor's tone showed anger since we did not agree with her perspective or as she called it later "constructive criticism." Now it had passed 3:00 and most of the class had left. So we started to gather our things since each of us has something to do after the class. The professor finally realized that and ended her argument. We left the class feeling very uncomfortable. She later claimed that one of us stormed out and said "this is bullshit" but personally I did not hear it. I met few classmates outside the class and they were shocked of the conversation escalated that way. Few of them commented that the professor acted out of anger. Few hours later, the professor sent an email to all the class list stating:

I want to also take this opportunity to directly address our final dialogue on the last performance today. While I understand that many of you may not be accustomed to constructive criticism in a classroom setting, this does not allow any of you to act out in ways that are disrespectful to your professor and your classmates. The assignment was very clear in what students were expected to do and not do and acting out fictive scripts was directly addressed in the handout, which of all of you received two weeks before your original performance date. In addition to this you had an extension on rehearsal because I listened to your requests and wanted you all to have the time that you felt you needed. Dialogue is a primary part of performance as your readings have also highlighted. I expect the classroom to be a space of mutual respect and active listening in order for dialogue to occur. This means having a dialogue on possible errors in order to improve those errors for your next two graded performances. This does not mean actively resisting what your professor highlights and interrupting. This does not mean silencing the only female member of your group when she attempts to respond, and leaving her, other classmates, and myself (all of whom happen to women) to clean up the props left behind after class. And, this absolutely does not mean storming off and stating that "This is bullshit." For the latter, I expect an explanation. Finally, I want to directly highlight that these are in fact examples of misogynist acts that play out in local and familiar settings like the classroom and we can all learn from this experience by having real dialogue on Tuesday. So, for Tuesday, we will pick up on these events and tie it to our readings and performance pedagogy. We will also cover Dolan and touch on Madison. On another note, I wanted to remind all of you that the syllabus for the course clearly states our university policy on classroom behavior and ANY behavior of disrespect in the classroom will NOT be tolerated and is in direct violation of the student code of conduct and the university code of conduct. I will be happy to discuss this further individually or in class on Tuesday.

In her email she continued to argue that the scene was fictive and did not take our reality in consideration. She also implied that the male members of the group were misogynist and that we did not allow the female member of the group to speak. When we were on the stage, each of us

spoke when they had the chance and we did not notice that we silenced the female member of the group. Later on we texted her asking if we have offended or interrupted her, she replied "Yeah I wasn't offended or anything i think she (the professor) just didn't like how y'all interrupted me idk this is wild." The professor stated "and leaving her (female member of the group), other classmates, and myself (all of whom happen to women) to clean up the props left behind after class." Each member of the group brought their personal things and left with them. Nothing was left behind but the things that were brought by█████████████ the female member of the group.

I sent the professor an email to meet with her as a group saying:

Hello professor,

Thursday ended in an unpleasant way. As a group, we have worked hard to make a performance that speaks our reality. There may have been miscommunication or misunderstanding that led to what happened. We would like to arrange for a meeting before the class on Tuesday to go over what happened in person so we can explain ourselves as a group. Your office hour is from 12-1 but not all of us can make it at that time so can we meet at 11?

Warm regards,

The professor rejected my request saying:

Dear █████ I will be happy to speak with you before class, however there will be no group meeting. Office meetings between professor and student are one on one. A meeting that you suggest will violate the confidentiality relationship of such meetings especially since you want to discuss a graded assignment and a talk back session which includes a specific reaction that will be part of the grading process. With this said, I teach during the time that you suggest and I have a meeting with another student at noon (during my office hours). I am available Tuesday at 9:30 and I am also available at 12:45. These two are half hour time slots so if you feel like you need more time I can check my flexibility tomorrow to meet. Please send me your schedule this evening especially for tomorrow so I can plan accordingly.

I agreed to meet with her individually but thinking it through, I did not feel comfortable to meet her one-on-one so I notified her.

On Tuesday, October 16, 2018, I attended the class hoping things will be resolved professionally without any further escalation. My hopes were met with disappointment. The professor talked about sexism and how it is rooted in society to the point that people do not acknowledge it. She focused on persuading the class that what happened in the previous class was an example of that. She stated that the actions of the group were misogynist and were exercised against her as a female professor. Even though the theory in itself is correct when it comes to institutionalized social norms, it does not mean that we can be attacked as an example of it, that put us in an attacked position. I felt humiliated and attacked in her class since all that she was doing is an attempt to win the situation not solve the issue. I participated and said, the reaction that was given by us as a group was not because we were misogynist or sexist, it was because our realities as men differ from the reality of the professor. That does not mean that our reality is fictive since it did not match the reality of the professor. The tension occurred because our realities were called upon as fictional and based on that we disagreed with the professor. In addition to that I said, the previous performances received a complete overview of their performance. However, in our case, the professor did not say anything regarding our performance and instead, she criticized a concept of our performance. From these two perspectives, the group did not receive validation for their hard work, and male members' reality was called fictitious. She answered my response with a critique of how close I am to perceive the truth.

The professor has wronged my other group members and me without any attempt to solve the issue but to escalate it and try to prove that we are wrong. My learning environment has been compromised, and my dignity has been attacked in front of the class.

Unfortunately, I do not have time to fight this case and keep up with its time and phycological impact on my personal life. Therefore, I would like the dean to add this document to the professor record for any future cases with other students in the future. Also use it in case my grade is impacted by this interaction

I will be happy to answer any questions you might have. Thank you for taking time to review my request.

Sincerely,

███████████

Encl:
- Assignment form
- Email exchanges with Professor Lisa  B. Y. Calvente

Confidential

Calvente-DePaul 017409

**Re: Meeting with the performance group.**

████████

Tue 10/16/2018, 12:37 AM
To: Calvente, Lisa <LCALVENT@depaul.edu>

Dear professor,

After thinking it through, I don't feel comfortable meeting one to one before the class.

See you in class tomorrow,
Warm regards,
████████████████

On Oct 14, 2018, at 11:41 PM, ████████████████████████ wrote:

Sure, will be there at that time.

Warm regards,
████████████████

On Oct 14, 2018, at 7:49 PM, Calvente, Lisa <LCALVENT@depaul.edu> wrote:

████████████

Since you thought is was necessary to explain any perceived "miscommunication" during the talk back session of your group performance before class on Tuesday and you cannot meet with me anytime tomorrow between 9:30 and 9 PM, I am afraid we will have to take the available time on Tuesday that works for you and I at 9:30 AM. While I understand that you think 30 minutes is not enough time, we can take this meeting as a starting point of your explanation. We can address everything else as a class group in class and schedule another appointment if you see fit afterwards.

See you Tuesday morning at 9:30. My office suite is 1842 in the same building as our class.

Dr. Calvente

Lisa B.Y. Calvente, Ph.D.
Assistant Professor, College of Communication
Affiliations: Critical Ethnic Studies, African and Black Diaspora Studies, Latin American and Latino Studies
DePaul University
14 East Jackson Boulevard, Suite 1832
Chicago, IL 60604
Telephone: 312-362-7992
Fax: 312-362-8620
Email: lcalvent@depaul.edu

Lisa B. Y. Calvente is co-editor of the collection,
*Imprints of Revolution: Visual Representations of Resistance* (Rowman & Littlefield Intl., 2016).

From: ████████████████
Sent: Sunday, October 14, 2018 7:14 PM
To: Calvente, Lisa
Subject: Re: Meeting with the performance group.

Dear professor,

Even though I believe that meeting with you as a group will make things clearer and deliver a better statue of understanding, I am okay to do it individually as well. Tomorrow, unfortunately, I have classes and work from 10 am to 9 pm. I can do anytime before 9:30 am tomorrow if you can. I can do Tuesday from any time in the morning until 11:50 but I do not think that 30 minutes is enough to go over what happened. Let me know when it works best for you and I will be there.

Confidential

Calvente-DePaul 017410

Warm regards,

███████

**From:** Calvente, Lisa <LCALVENT@depaul.edu>
**Sent:** Sunday, October 14, 2018 7:13 PM
████████████████████

**Subject:** RE: Meeting with the performance group.
████

I will be happy to speak with you before class, however there will be no group meeting. Office meetings between professor and student are one on one. A meeting that you suggest will violate the confidentiality relationship of such meetings especially since you want to discuss a graded assignment and a talk back session which includes a specific reaction that will be part of the grading process. With this said, I teach during the time that you suggest and I have a meeting with another student at noon (during my office hours). I am available Tuesday at 9:30 and I am also available at 12:45. These two are half hour time slots so if you feel like you need more time I can check my flexibility tomorrow to meet. Please send me your schedule this evening especially for tomorrow so I can plan accordingly.

Dr. Calvente

Lisa B.Y. Calvente, Ph.D.
Assistant Professor, College of Communication
Affiliations: Critical Ethnic Studies, African and Black Diaspora Studies, Latin American and Latino Studies
DePaul University
14 East Jackson Boulevard, Suite 1832
Chicago, IL 60604
Telephone: 312-362-7992
Fax: 312-362-8620
Email: lcalvent@depaul.edu

Lisa B.Y. Calvente is co-editor of the collection,
*Imprints of Revolution: Visual Representations of Resistance* (Rowman & Littlefield Intl., 2016).

**From:** ████████████████████████████████████████████████
**Sent:** Sunday, October 14, 2018 4:48 PM
**To:** Lisa Calvente
**C█** ██████████████████████
**Subject:** Meeting with the performance group.

Hello professor,

Thursday ended in an unpleasant way. As a group, we have worked hard to make a performance that speaks our reality. There may have been miscommunication or misunderstanding that led to what happened. We would like to arrange for a meeting before the class on Tuesday to go over what happened in person so we can explain ourselves as a group. Your office hour is from 12-1 but not all of us can make it at that time so can we meet at 11?

Warm regards,

███████

Confidential

**Tuesday, November 5, 2019 at 5:27:52 PM Central Standard Time**

| | |
|---|---|
| **Subject:** | Performance Studies |
| **Date:** | Monday, October 15, 2018 at 4:56:42 PM Central Daylight Time |
| **From:** | |
| **To:** | Murphy, Alexandra |

*Student A*

**Attachments:** image1.jpeg, ATT00001.txt

Good Evening Dr. Murphy,

I would just like to express my appreciation for your time and patience with me this afternoon. I am working on getting in touch with the other group members and typing up a summary of the incident. Following this email I will forward you the email from Professor Calvente addressed to the entire class in addition to our groups brief communication with her. Attached is a screen grab from the female student from my group where she indicated that she wasn't offended by this instance as the professor indicated.

Thank you again,

**Page 1 of 1**

Confidential

Calvente-DePaul 017411

Calvente-DePaul 017412

LG

Yeah guys I wasn't offended or anything i think she just didn't like how y'all interrupted me but idk this is wild

Confidential

Sent from my iPhone

Begin forwarded message:

> **From:** "Lisa Calvente" <LCALVENT@mail.d2l.depaul.edu>
> **Date:** October 11, 2018 at 6:32:10 PM CDT
> **Subject: Next Staged Performance and Classroom Behavior**
> **Reply-To:** "Lisa Calvente" <LCALVENT@mail.d2l.depaul.edu>
>
> Dear Students,
>
> I have attached the worksheet for your next performance. Please read it carefully and we will go over it for the next class. It is also under course content on D2L.
>
> I want to also take this opportunity to directly address our final dialogue on the last performance today. While I understand that many of you may not be accustomed to constructive criticism in a classroom setting, this does not allow any of you to act out in ways that are disrespectful to your professor and your classmates. The assignment was very clear in what students were expected to do and not do and acting out fictive scripts was directly addressed in the handout, which of all of you received two weeks before your original performance date. In addition to this you had an extension on rehearsal because I listened to your requests and wanted you all to have the time that you felt you needed.
>
> Dialogue is a primary part of performance as your readings have also highlighted. I expect the classroom to be a space of mutual respect and active listening in order for dialogue to occur. This means having a dialogue on possible errors in order to improve those errors for your next two graded performances. This does not mean actively resisting what your professor highlights and interrupting. This does not mean silencing the only female member of your group when she attempts to respond, and leaving her, other classmates, and myself (all of whom happen to women) to clean up the props left behind after class. And, this absolutely does not mean storming off and stating that "This is bullshit." For the latter, I expect an explanation.
>
> Finally, I want to directly highlight that these are in fact examples of misogynist acts that play out in local and familiar settings like the classroom and we can all learn from this experience by having real dialogue on Tuesday. So, for Tuesday, we will pick up on these events and tie it to our readings and performance pedagogy. We will also cover Dolan and touch on Madison.
>
> On another note, I wanted to remind all of you that the syllabus for the course clearly states our university policy on classroom behavior and ANY behavior of disrespect in the classroom will NOT be tolerated and is in direct violation of the student code of conduct and the university code of conduct.
>
> I will be happy to discuss this further individually or in class on Tuesday.
>
> Have a great weekend!
>
> Dr. Calvente
>
> <Second Staged Performance CMNS 230 Fall 2018.docx>

Confidential

Calvente-DePaul 017413

## Staged Performance One: Everyday Performances at DePaul University

The first performance is a group performance that will be staged for the class and will focus on front stage/back stage and/or official AND/OR mapped/unofficial narrative performances of everyday life at DePaul. Your performances are scheduled for **Tuesday, October 9**. You will have one in-class rehearsal to prepare for your performance on **Thursday, October 4. All other preparation must be done outside of the classroom.** This performance should be influenced by the readings from Schechner to Dolan and must incorporate the techniques you have learned from our in-class workshops. Please keep in mind that performance is not theater so please do not script a performance that emphasizes acting. Follow the sheet on the techniques from Epic Theatre and the workshop exercises in class.

Each group should pick a theme that can tie together your interpretations of the readings as it is related to our campus and your own experiences with space, gender, sexuality, race, ethnicity, and/or class. You should then organize images that will tell a story that focuses on the theme you have chosen. Feel free to use your free-writes/thoughts on your names to "fill in the blanks" for your staged performance.

You are expected to perform ALL performances with costume, props, music, or any specials your performance requires. Each group must incorporate images and movement: techniques directly taken from the workshops. You are also expected to integrate course concepts and demonstrate your grasp of these concepts.

Your performance is expected to be CRITICAL (critical thinking, challenging your assumptions is a prerequisite to this course) and you will be graded on a scale from 1 to 5 in the following categories: (1) memorization and concentration (2) Scripting and adaptation (3) stage movement and blocking (4) innovation and creativity. The group performance is <u>five to seven minutes</u>.

**Reminder:** Written reports and performance programs are due on the day of your performance PRIOR to when you perform. Each group will submit one written report, which are a <u>minimum</u> of three pages.

**Written Reports:** consist of

1. **an analysis of key concepts/theme you are enacting in your performance:** how did you choose this theme? How is it significant to your readings and performance theories in particular?
2. **an explanation of how these concepts further illuminate specific passages in your readings:** how does your performed theme/concepts further the passages in the readings your have chosen?
3. **a description of your performance process that culminated in particular performance technique and image choices in staging chosen theme:** how did the particular techniques illuminate your theme? How did it limit your theme?
4. **a discussion of your purpose or what you wish your audience to "gain" from your performance:** what message to you want to convey to your audience? What were the performance "specials" you used to help you achieve this goal?

**Performance Programs:** <u>Must be distributed to the class</u> (one for each student and the professor) and they will consist of:

1. the title of your performance
2. the cast list
3. the reading selections
4. interesting quotes from your rehearsals
5. the purpose of your performance

## GROUPS

| ONE | TWO | THREE | FOUR |
|-----|-----|-------|------|
| | | | |

Confidential

Calvente-DePaul 017414