IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
| Defendants. | ) | |
| _____ | ) | |

**Lisa Calvente's Response And Objection To Defendants' Motion To
Strike Dr. Zaeske's Report And Testimony**

Lisa Calvente ("Dr. Calevnte") responds and objects to the Defendants' Motion To Strike Dr. Zaeske's Report And Testimony (the "Motion") (Docket No. 60). In support of this response, Dr. Calvente states as follows:

**Facts and Procedural History**

The College of Communication (the "College") at DePaul University ("DePaul" or the "University") is a small school. (Murphy Dep. 40:20–41:1, copy attached as Exhibit A.) For the better part of the last decade, Dr. Calvente was a tenure–track faculty member at the College. And during her time there, Dr. Calvente made few friends due to her advocacy for racial justice, which included (i) multiple complaints to administrators about racially charged conduct by tenured faculty (including one incident where a faculty member used the N–word as a punchline), (ii) multiple formal complaints to DePaul's Office of Institutional Diversity and Equity ("OIDE"), and (iii) a meeting with the then dean, Salma Ghanem ("Dr. Ghanem"), where Dr. Calvente was so bold as to accuse Dr. Ghanem of playing racial politics with another professor's career.

Ultimately, and as this Court knows, Dr. Calvente did not receive tenure at DePaul despite a recommendation from an independent University board (the "UBPT") tasked with conducting an

independent review (*i.e.*, a review untainted by any of the passions that might have existed at the College) of Dr. Calvente's dossier. The question in this litigation is why Dr. Calvente failed to obtain tenure when the UBPT's recommendation should be rejected only in rare instances and for compelling reasons. Some of the evidence that Dr. Ghanem violated the civil rights laws includes her decision to grant tenure to white faculty members who had no record of complaining about discrimination and who the UBPT recommended not receive tenure by a vote of 6–1. But just as important is what happened next in Dr. Calvente's career.

The academy has a culture and hierarchy markedly different than that of the typical American workplace. (*See infra* page 10.) Failing to earn tenure at a school like DePaul, a Research 2 University[1] of lower rank, should have been the death knell for Dr. Calvente's career as an academic. (*See* Zaeske Dep. 129:1–7 ("I mean tenure denial or non–renewal is kind of a kiss of death. It is very, very hard to be hired at another institution much less a higher one than the—higher ranked and higher in prestige and higher in publishing expectations than one has been denied tenure at"), copy attached as Exhibit B.) However, after being unemployed for only a few months, Dr. Calvente was able to obtain a tenure–track job at the University of North Carolina–Chapel Hill ("UNC"), a highly ranked and highly regarded Research 1 university. That Dr. Calvente could obtain such a position after being denied tenure at DePaul suggests *something* improper happened during Dr. Calvente's tenure and promotion process.

Knowing that the culture of the academy is outside the realm of experience of most potential jurors, Dr. Susan Zaeske, a well–respected tenured full professor and administrator at the University of Wisconsin–Madison ("UW"), agreed to testify to what those in the academy would already know:

---

[1]     The Carnegie Commission on Higher Education classifies universities according to their research output with Research 1 universities being more competitive and seen as better than Research 2 universities.

a professor who was not good enough to earn tenure at DePaul should not have been able to obtain

a tenure-track job at UNC (which has higher standards for obtaining tenure).[2] (Zaeske Dep. 70:13–

20 ("for an individual to be denied tenure at an R2 institution and to be hired at an R1 institution

is highly irregular, and that the irregularity of it points to something having gone astray in the process

by which the individual would be non-renewed at an institution with lesser standards and then

hired at an institution with higher standards.").) Why? Because being denied tenure at a school like

DePaul carries a taint that makes it very difficult to get hired anywhere else. (*Id.* at 134:22–135:16.)

As Dr. Zaeske explained, "[i]n order to get hired as an institution like UNC or UW Madison

or Indiana or whatever [R1 institution], you have to pretty much show that your chances of tenure

are very, very high, and that you have a strong record of publication that is going to be tenurable.

Otherwise you are not going to be hired." (*Id.* at 82:21–83:3.) Why is it so important that a professor

be tenurable at the time of hiring? Dr. Zaeske explained this, too: "It is right now because . . . budgets

are so tight that institutions cannot make mistakes in hiring because if you do not—if someone does

not get tenure or is not tenured or non-renewed, then a department will lose its chance, probably

lose its chance to hire again for a long time." (*Id.* at 187:10–17.) Thus, "[t]he R1s, and certainly the

public schools like UNC, . . . they hire to tenure."[3] (*Id.* at 188:3–6.) Moreover, it is "difficult to get

jobs at R1 institutions" like UNC. (*Id.* at 193:2–3.) There is a "huge pool of applicants," and a

candidate has to stand out within that pool to get hired into a tenure track position. (*Id.* at 193:5–

14.)

---

[2]     Dr. Zaeske has agreed to testify without compensation except for her reasonable expenses. (Zaeske Dep. 30:23–32:8.)

[3]     The one exception to this rule is that ivy-league institutions do not hire to tenure, and that it is not unusual for a tenure-track professor who is denied tenure at an ivy league school to obtain a tenure-track job at another R1 institution. (Zaeske 50:21–52:8.)

Given the foregoing, what is Dr. Zaeske's conclusion? That *something* highly unusual must have happened to Dr. Calvente at DePaul. Dr. Zaeske does not opine that it was racism or retaliation that caused Dr. Ghanem to reject the UBPT's recommendation. (To offer such an opinion would be improper under the current law of evidence.) Nor does she opine that Dr. Calvente should have received tenure at DePaul. (To offer such an opinion would push the envelope of the current law of evidence.) So why is her testimony important? Because if *something* highly irregular happened during Dr. Calvente's case, it (i) bolsters Dr. Calvente's argument that the denial of her application was a pretext for retaliation or for discrimination, and (ii) diminishes the defendants' defenses that Dr. Calvente's application was denied on the merits.

## Argument

A court may permit a party to introduce expert testimony under Rule 702 of the Federal Rules of Evidence "if technical or specialized knowledge 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 843 (N.D. Ill. 2018) (Blakey, J.) *citing* Fed. R. Evid. 702. Before permitting a party to introduce expert testimony, the district court must serve as a gatekeeper to ensure that the "expert testimony 'is not only relevant, but reliable.'" *Id. quoting Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). However, the question of whether the expert is credible or whether her theories are correct presents a question of fact for the jury. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.").

District courts are afforded great latitude in determining both how to measure the reliability of a proposed expert witness. *Uncommon, LLC*, 305 F. Supp. 3d at 843 *quoting United States v. Pansier*,

576 F.3d 726, 736 (7th Cir. 2009) (affirming admission of expert on cite drafts). Although relevant factors in determining reliability *may* include testing, peer review, error rates, and acceptance by the relevant expert community, the overall standard for determining reliability is necessarily flexible, and an expert may be qualified to render an opinion based on her experience alone. *See Tudor v. Se. Okla. State Univ.*, No. 18-6102, slip. op. at 15, (10th Cir. Sep. 13, 2021) (English professor who participated in over 100 promotion deliberations qualified to opine on tenure standards) (copy attached as Exhibit C). *See also Kuhmo Tire Co. v. Carmichael*, 526 U.S. at 148-49 ("Experts of all kinds tie observations to conclusions through . . . 'general truths derived from . . . specialized experience.' . . . whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own'") (first ellipses added, all other ellipses and brackets in the original).

The case of *Tudor* is a prime exemplar of a court admitting non-scientific expert testimony in a tenure denial case. At issue in *Tudor* was whether the district court abused its discretion in permitting an expert to testify about (i) the tenure application process generally, and (ii) what strong and weak tenure applications look like in the field of English. *Tudor*, No. 18-6102 *slip op.* at 15. Holding that the district court did not abuse its discretion, the *Tudor* court explained first that the expert's methodology was "rooted in his experience as an English professor having participated in over 100 promotion deliberations." *Id.* Therefore, "it was reasonable for the district court to conclude that [the expert] was qualified to explain the tenure process and to recognize strong and weak applications[.]" *Id.* The Tenth Circuit also affirmed that the expert's testimony would be helpful to the jury because "[m]any laypeople are likely unfamiliar with the tenure process[.]" *Id.*

The case of *Siring v. Or. State Bd. Of Higher Educ.*, 927 F. Supp. 2d 1069 (D. Or. 2013) offers another example of a court admitting non-scientific expert testimony in a tenure denial case. In *Siring*, a former faculty member sought to introduce expert testimony to educate the jury about tenure track review, and the evaluation and termination process in the University of Oregon system. *Siring*, 927 F. Supp. 2d at 1071. The plaintiff's proposed expert, a 40-year veteran of the University of Oregon system who held various administrative posts (none of which appeared to include a deanship or associate deanship), sought to testify as to the usual practice in tenure cases at the University of Oregon. *Id.* at 1071, 1074. Denying the *Daubert* motion, the *Siring* court held that the expert's professional experience "as a faculty member and member of personnel committees, many professional appointments relating to educational policy and management, and extensive scholarly activities and publications in relevant research areas qualif[ed] [her] to opine about tenure-track faculty evaluation and review policies and procedures in general and the specific evaluation and review of [the plaintiff]." *Id.* at 1074.

## A.  Dr. Zaeske is competent to testify about hiring practices in the academy.

Dr. Zaeske has served as the associate dean of the Arts and Humanities Division—which constitutes 16 separate departments and separate 25 centers—in the College of Letters and Science at UW since 2011. (Zaeske Dep. 36:20-37:20.) Thus, for the past decade, Dr. Zaeske has been involved with the hiring of *every* candidate who comes to Arts and Humanities at UW. (*Id.* at 41:12-42:22.) Indeed, a candidate cannot even schedule an interview within any of the 16 departments or 25 centers in the Arts and Humanities Division without Dr. Zaeske's approval. (*Id.* at 41:23-42:1.) In her twenty-five years in the academy—including nearly two thirds of that time as an associate dean, a department chair, or director—Dr. Zaeske has easily reviewed the files of hundreds of people looking to be hired at UW. (*Id.* at 196:9-13. *See also* Zaeske CV at page 1.) Moreover, Dr. Zaeske has

hired away professors at other Research 1 institutions. (*Id.* at 192:16–17.) Dr. Zaeske has also provided an extensive resume and background information showing that she has precisely the knowledge to enable her to offer reliable and useful non-scientific expert testimony. Her qualifications are not materially different than the qualifications of the experts in *Tudor* and in *Siring*. Accordingly, the Court should permit her to testify at trial.

Notwithstanding the foregoing, the defendants complain that Dr. Zaeske's opinion is not supported by rigorous statistical studies as to what happens to faculty who are denied tenure. But experts like Dr. Zaeske, whose expertise and opinions are based principally on education and experience, do not have algorithms, double-blind studies, statistical analyses, peer-reviewed articles, or other test results to offer as indica of reliability. And in the context of this case, it is not surprising as statistical studies as to what happens to candidates who are denied tenure at schools like DePaul simply do not exist. (*See* Zaeske Dep. 129:20–130:2, 200:5–24.) Nevertheless, Dr. Zaeske attempted to find information to corroborate what she (and everyone else in the academy) knows based on her decade of experience serving as a gatekeeper for the hiring of tenure-track faculty at UW. Dr. Zaeske did this by looking for case studies in periodicals trusted by members of the academy, including case studies published in the Chronicle of Higher Education, the most well-read industry publication in higher education. (*See id.* at 199:5–20.)

The defendants also complain that Dr. Zaeske did not review Dr. Calvente's tenure dossier. However, this argument comes with particularly bad grace as Dr. Zaeske was not engaged to say that Dr. Calvente deserved tenure at DePaul. (Dr. Calvente relies on DePaul's UBPT as well as the fact that she obtained a tenure track position at a superior institution to demonstrate this.) Rather, she relies on Dr. Zaeske to help a jury understand how the academy works, why it is so unusual for her

to have obtained a tenure–track job at UNC given what happened to her at DePaul, and the prospects for faculty who fail to obtain tenure at a school like DePaul.

The defendants next complain that Dr. Zaeske did not interview anyone at UNC or review DePaul's university–wide tenure guidelines. However, Dr. Zaeske *did* review the tenure guidelines from the College of Communication, which incorporate the DePaul university–wide tenure guidelines. Dr. Zaeske also reviewed the tenure guidelines from UNC and explained (in excruciating detail) that they are more rigorous than the tenure requirements at DePaul. (*See id.* at 201:1–203:9.) How are UNC's standards more rigorous? Dr. Zaeske explained that, by their plain language, a candidate for tenure at DePaul in the College of Communication must demonstrate excellence in two of the three categories of teaching, research, and service.[4] (*Id.*) At UNC, however, a candidate must demonstrate excellence in teaching and research, and that service will not help a candidate obtain tenure at UNC. (*Id.*) Dr. Zaeske then compared the requirements at UNC versus the requirements at DePaul to conclude that it is even harder to obtain tenure at UNC than it is to obtain tenure at DePaul. And given that schools like UNC hire to tenure, Dr. Calvente's ability to obtain a tenure–track job at UNC (which requires excellence in *both* teaching and research) further demonstrates that something strange happened at DePaul (where it is possible to obtain tenure merely by demonstrating excellence in teaching *or* excellence in research).

In addition, the defendants complain that Dr. Zaeske does not understand how the Carnegie Commission determines which schools are Research 1 schools and which schools are Research 2 schools. However, they do not explain why this is a problem. Dr. Zaeske *did* explain that Research 1

---

[4] Service is "doing something to contribute to the overall life of the university, whether it's the student life, operational life, academic life, and it's doing something that someone else doesn't have to do. So there's tasks and functions that need to happen." (Murphy Dep. 155:1–7.)

schools are more highly regarded in the academy, and that they have higher expectations for research and for teaching. (Zaeske Dep. 94:10–95:2.) That Dr. Zaeske does not know the proverbial math does not take away from her understanding of the culture of the academy or the importance of the Carnegie Commission's rankings.

Finally, the defendants complain that Dr. Zaeske "assigned 'prestige'" to each of DePaul and UNC. (Motion at page 6.) Dr. Zaeske did no such thing. Rather, she stated what those in the academy know so well—schools that are ranked as Research 1 schools are more highly regarded than Research 2 schools. Dr. Zaeske assigned nothing; to the extent "prestige" was assigned, it was assigned by her industry. By way of analogy, BigLaw firms (which start their junior attorneys at the top of the market with respect to salary) often prefer to hire candidates who clerked for federal district court judges over those who clerked for state trial court judges.[5] Given this dynamic, to say that a clerkship with a federal district court judge is seen in legal circles as more prestigious than a clerkship with a state court trial judge is not to "assign prestige." To the extent "prestige" has been assigned, it has been assigned by the market.

To the extent that the Motion is based on mere disagreement with Dr. Zaeske's opinions, the defendants had the ability to engage their own expert to rebut the conclusions of Dr. Zaeske. However, they chose not to do so, even though DePaul is a university with access to (i) hundreds of its own professors and administrators who could (presumably) rebut Dr. Zaeske if her analysis was

---

[5]     Covington & Burling, LLP, for example, offers a $50,000 bonus for one year of clerking for a federal judge or the highest court in any state. It does not appear to offer any bonus for clerking for a trial level state court. https://www.cov.com/en/careers/lawyers/judicial-clerks. For avoidance of doubt, neither Dr. Calvente nor the undersigned counsel means to disparage (i) the value of a clerkship in any court, or (ii) any court, state or federal. Rather, the point is simply that different clerkships are viewed differently. Just so in the academy—R1 schools are viewed differently than R2 schools.

flawed, and (ii) a broad network of administrators and professors at other schools who could (presumably) rebut Dr. Zaeske's testimony if it were incorrect. (*See* Exhibit D.) Notwithstanding the foregoing, and assuming *arguendo* that Dr. Zaeske is incorrect in some way, shape, or form, the defendants will be able to expose any flaws in her reasoning during cross examination. The mere fact that the defendants would have asked Dr. Zaeske to read more materials if she were their witness does not mean that Dr. Zaeske is not competent to testify.

**B.      Dr. Zaeske's testimony will be helpful to the jury.**

Courts have held that the inner workings of the academy are outside the experience of the average juror. *See Tudor*, No. 18–6102, slip. op. at 14–16; *Siring*, 927 F. Supp. 2d at 1076. Just so here: Dr. Zaeske's testimony is critical because she is an independent witness who can help a jury understand (i) how hiring within the academy works, and (ii) why Dr. Calvente's ability to obtain a tenure track job at UNC is so unusual given that she was denied tenure at DePaul.

**C.      Dr. Zaeske's testimony is relevant.**

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence. *See* Fed. R. Evid. 401. Circumstantial evidence of discrimination or retaliation can include conduct that is so suspicious or incongruous that it gives rise to an inference that the stated reason for an adverse employment action is pretextual. *See, e.g., Hobgood*, *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) ("[w]here an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation"). *See also Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment as jury could "find the explanation [for the termination] to be so ludicrous that [the employer] is not to be believed"); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312,

315 (7th Cir. 2011) (". . . an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination").

In this case, Dr. Calvente failed to obtain tenure at a lower ranked school with lower tenure standards, but was able to obtain a tenure-track position at a more prestigious school with higher tenure standards. By way of analogy, that Dr. Calvente failed to obtain tenure at DePaul but obtained a tenure-track position at UNC is the functional equivalent of a football player who gets cut from his college team only to obtain a spot on an NFL roster the very next season. When such things happen, it gives rise to an inference that *something* highly questionable occurred. Dr. Zaeske is the witness who can explain all of this to the jury.

Notwithstanding the foregoing, the defendants complain that Dr. Zaeske's testimony is worthless because she does not opine that the *something* that occurred at DePaul was racism or retaliation. But this argument comes with particularly bad grace because it would require Dr. Zaeske to testify as to Dr. Ghanem's motive. And courts have held that expert witnesses may not testify to motive. *Cf. DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (expert "could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound from which the jury might infer that money was the real reason; but he could not testify as an expert that GM had a particular motive") (cleaned up).

The defendants also cry that Dr. Zaeske's opinion is allegedly worthless because she never read Dr. Calvente's application for tenure. However, and again, Dr. Zaeske was not engaged to opine as to the merits of Dr. Calvente's file. Why? Because courts have strongly advised litigants against asking them to re-evaluate a candidate's tenure file. *See, e.g., Blasdel v. Nw. Univ.*, 687 F.3d 813, 815–

818 (7th Cir. 2012).[6] Why, then, would Dr. Zaeske read and opine on Dr. Calvente's file knowing that the defendants would attack her for doing so. *Cf. id.*

<u>Conclusion</u>

Dr. Zaeske's opinions and testimony address the customs of the academy, which are outside the experience of the average juror. Her testimony will help jurors understand the significance of obtaining a tenure track job at all, let alone the significant of obtaining one at a very highly-regarded university after having been denied tenure at a less well-regarded institution. Dr. Zaeske *does not* tell the jury that Dr. Calvente deserves tenure; nor does she opine on Dr. Ghanem's state of mind. Because Dr. Zaeske is qualified as an expert based on her quarter century in the academy—including a decade as a person who hires tenure-track faculty at one of this country's great university systems— the Court should permit her to testify.

Respectfully submitted,
December 23, 2021

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com

---

[6]     DePaul, of course, knows this as the attorney who currently represents it was the attorney of record in *Blasdel*. Thus, it is truly strange that DePaul would complain that Dr. Zaeske never evaluated Dr. Calvente's tenure dossier when, given the UBPT's recommendation that Dr. Calvente receive tenure, the contents of Dr. Calvente's tenure dossier have limited value in answering the question of whether Dr. Ghanem terminated Dr. Calvente in violation of the civil rights laws.

## Certificate of Service

The undersigned, an attorney, certifies that on December 23, 2021, he caused the foregoing Lisa Calvente's Response And Objection To Defendants' Motion To Strike Dr. Zaeske's Report And Testimony to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Anneliese Wermuth, Esq.
Cozen O'Connor, P.C.
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
awermuth@cozen.com
*Counsel for Defendants*

*/s/ Fitzgerald T. Bramwell*
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312–924–2884 (voice)
bramwell@fitzgeraldbramwell.com

# Exhibit A

Page 38

1    MR. BRAMWELL: Q The area of study has grown very
2 quickly. Can you help unpack that, please?
3    A   When I started in 1998 I believe we had about
4 400 majors, 500 majors, and we had only one degree that
5 we offered, that was a general communications degree that
6 only had like maybe one journalism class, that type of
7 thing.
8       We fast forward to today, we have about 1300
9 majors, and we offer about 8 undergraduate degrees, and
10 so the amount of students that were interested in the
11 studies grew very quickly during that time.
12    Q   And when you say we have 1300 majors, you're
13 talking about DePaul?
14    A   The College of Communications at DePaul.
15    Q   No. You -- now I'm wholly -- help me -- again,
16 I'm chuckling a little bit, not derisively. I'm laughing
17 at my own confusion here.
18       If I understood, earlier I think you mentioned
19 the college -- that communication became its own college
20 during your -- during the time of your employment.
21       You need to speak up.
22    A   Right.
23    Q   That was in 2011 approximately?
24    A   I believe so. Yes. 2010.
25    Q   The exact date isn't critical for purposes of

Page 39

1 this communication. I'm just trying to understand. So
2 there were four different majors within the College of
3 Communications or 400 majors at DePaul University?
4    A   4 --
5    MS. WERMUTH: One quick second. Objection. Vague.
6 Confusing. Compound.
7       Go ahead, Lexa.
8    MR. BRAMWELL: Q Lexa, only you need to understand
9 the question.
10    A   There were about 400 when I started in the
11 communication program. There were probably about 600 to
12 800 by the time we became a college. Once we were a
13 college we had about 2,000 graduate majors. We're now
14 covering 1400.
15    Q   1400 majors just out of communication alone?
16    A   Yes.
17    Q   Wow. And does the College of Communication
18 offer courses that you have to take if you want to
19 graduate from DePaul? And -- that question actually
20 probably should draw an objection. That was not a
21 well-done question.
22       Let's say I want to major in chemistry at
23 DePaul. Okay?
24    A   Uh-huh.
25    Q   Do I have to take any courses at -- within your

Page 40

1 college?
2    A   No.
3    Q   So I only have to take courses in your college
4 if I want to get a degree within some sort of
5 communication field?
6    A   If you want to get a degree in our college,
7 then you have to take our core courses and the
8 requirements they have.
9    Q   So if I want to graduate with a degree in
10 economics, I don't ever have to set foot in the College
11 of Communications?
12    A   It depends, because I believe there are some
13 programs that require within their program to take a
14 communication course. I think computer and digital
15 media, some of their programs require students to take
16 our business and professional communication course. I
17 believe accounting has it as an option, but maybe not a
18 requirement, but it would depend on their degree. It
19 wouldn't be us deciding that.
20    Q   Would you characterize the College of
21 Communications as a small college?
22    A   Yes.
23    Q   And -- why?
24    A   Just based on size.
25    Q   Size of what?

Page 41

1    A   Size of faculty and size of students.
2    Q   Okay. Approximately how many students are in
3 the College of Communications year to year?
4    A   Right now again we're hovering at about 1400.
5    Q   And how many faculty?
6    A   We have 52 full-time positions.
7    Q   Okay. And those are all tenure positions or
8 tenure track positions?
9    A   No.
10    Q   Okay. How many tenure or tenure track faculty
11 do you have?
12    A   I'm giving bit of an estimate because I don't
13 have the numbers in front of me, but I believe 34,
14 something like that.
15    Q   Okay. And what constitutes the rest?
16    A   Term faculty.
17    Q   Those are what, adjuncts, lecturers? Help me
18 out. I know every school does it -- every university
19 every university does it differently -- every college
20 does it differently. Help me out. How do you do it?
21    A   We do it the way the university does it which
22 is the term faculty line is a nontenured track but
23 full-time position.
24    Q   Okay. There are lecturers, there are adjunct,
25 what are they?

11 (Pages 38 - 41)

Page 154

1 establishing for that candidate where they -- where they
2 fall.
3    Q   What about for service, how does one measure
4 whether someone is excellent versus just very good?
5    A   Similarly I think they'll book at both the
6 number of activities that someone has done in terms of
7 their service contributions and then also look at how
8 substantive is that in terms of what the contributions
9 are. So is it a one-off committee or is it a particular
10 meeting that someone might be in versus a longer term and
11 a task driven committee.
12    Q   Are there any objective metrics in this
13 respect?
14    A   We don't have that you have to serve on X
15 number of committees, no.
16    Q   The answer is no. There are no quantitative
17 metrics with respect to research?
18    A   No.
19    Q   And no quantitative metrics with respect to
20 service?
21    A   No.
22    Q   How many service hours need to be performed to
23 go -- to be excellent in service?
24    A   We don't go into that kind of detail in terms
25 of legislating a certain number of hours.

Page 155

1    Q   What is service?
2    A   To me I think service to the university is
3 doing something to contribute to the overall life of the
4 university, whether it's the student life, operational
5 life, academic life, and it's doing something that
6 someone else doesn't have to do. So there's tasks and
7 functions that need to happen.
8    Q   Like what?
9    A   So let's say you're on an assessment committee,
10 an assessment committee needs to do program assessment,
11 it's very time intensive, and so you may have four or
12 five people on that committee. So while you're doing
13 that, you're serving the college and making sure that
14 that task is done, and it's something that it's a
15 mandatory kind of thing, it has to happen so you're doing
16 that it means someone else doesn't have to.
17    Q   Yeah. Okay. I understand that. So service is
18 any work -- and it will draw an objection from misstating
19 your testimony -- but the question if I can get you to
20 clarify, service is any work that helps the university,
21 the college, both?
22    A   Service can be broad --
23    MS. WERMUTH: I didn't know if you were done, Jerry.
24 I didn't want to interrupt.
25    I will object to the form of the question. I

Page 156

1 will object insofar as it mischaracterized her testimony
2 and/or assumes facts not of record.
3    MR. BRAMWELL: Q We live with the objection and you
4 can answer.
5    A   Service can occur at local college and
6 university levels and community level.
7    Q   Community level. So that's outside of DePaul?
8    A   Uh-huh.
9    Q   It doesn't show up on the transcript.
10    A   Yes.
11    Q   Working the soup kitchen could qualify as
12 service?
13    A   Not according to our guidelines. Our
14 guidelines specify that you should be -- the service to
15 the community, it is drawn upon your knowledge base as an
16 academic.
17    Q   Okay. So, for example, you know, communicating
18 to minority communities that the COVID vaccine is a good
19 thing to get, that could be service?
20    A   That could be considered service.
21    Q   Okay. How does one obtain service
22 opportunities?
23    A   There's a variety of different ways that people
24 can get service opportunities. Most formally in our
25 college -- every summer we have a comprehensive list of

40 (Pages 154 - 157)

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


LISA CALVENTE,                      )
                                    )
     PLAINTIFF,                     )
                                    )
VS.                                 ) NO. 1:20-CV-03366
                                    )
SALMA GHANEM AND DEPAUL             )
UNIVERSITY,                         )
                                    )
     DEFENDANTS.                    )



        The Zoom webconference discovery

deposition of DOCTOR SUSAN ZAESKE taken by Gina

Marie Zangara, C.S.R., on July 8th, 2021, at the

hour of 10:02 a.m.

Page 2

1    APPEARANCES REMOTELY VIA ZOOM:
2
3         LAW OFFICES OF FITZGERALD BRAMWELL
          BY MR. FITZGERALD T. BRAMWELL
          225 West Washington Street
4         Chicago, Illinois 60606
          (312) 924-2884
5         bramwell@fitzgeraldbramwell.com
          appeared on behalf of the Plaintiff;
6
7         COZEN O'CONNOR
          BY MR. ANNELIESE WERMUTH
8         123 North Wacker Drive, Suite 1800
          Chicago, Illinois 60606
9         (312) 474-7900
          Awermuth@cozen.com
10        Appeared on behalf of the Defendants.
11
12   ALSO PRESENT: KATHRYN STIEBER
                   LISA CALVENTE
13
14                 I N D E X
15
16   WITNESS:                      PAGE:
17   DOCTOR SUSAN ZAESKE
18        Examination by Ms. Wermuth      5, 206
          Examination by Mr. Bramwell   181, 207
19
20
21
22
23
24

Page 3

1
2
     EXHIBITS MARKED:                    PAGE:
3
4    EXHIBIT 1      SUBPOENA              12
5    EXHIBIT 2      ZAESKE CV            32
6    EXHIBIT 3      ZAESKE REPORT        66
7    EXHIBIT 3.1    CARNEGIE            107
8    EXHIBIT 3.2    DEPAUL CRITERIA     143
9    EXHIBIT 3.3    UNC CRITERIA         73
10   EXHIBIT 4      CALVENTE OFFER LETTER 60
11   EXHIBIT 5      LC4086-90            61
12   EXHIBIT 7      CARNEGIE            100
13   EXHIBIT 11     CARNEGIE            114
14   EXHIBIT 14     WASHINGTON POST     115
15   EXHIBIT 15     JOBS AFTER DENIAL   135
16   EXHIBIT 16     LIFE AFTER DENIAL   132
17   EXHIBIT 21     TEMPLATE            140
18   EXHIBIT 22     INSIDE HIGHER ED    118
19   EXHIBIT 23     CHRONICLE OF HIGHER ED 130
20
21
22
23
24

Page 4

1    COURT REPORTER: All parties are
2 aware that the witness will be sworn in remotely.
3 The parties agree not to challenge the validity
4 of any oath administered by the court reporter,
5 even if the court reporter is not physically
6 present with the witness and not a notary public
7 in the state where the witness resides.
8         Here begins the webconference
9 deposition of Doctor Susan Zaeske in the matter
10 of Lisa Calvente versus Salma Ghanem and DePaul
11 University.
12         Today's date is July 8th, 2021
13 and the time is 10:02 a.m. My name is Gina
14 Zangara of Thompson Court Reporters. Beginning
15 with the noticing party, will the parties
16 introduce themselves, state whom they represent
17 and stipulate to the swearing in of the witness
18 remotely.
19    MS. WERMUTH: This is Anna Wermuth.
20 I represent DePaul University and Doctor Ghanem.
21    MR. BRAMWELL: Good morning. This
22 is Jerry Bramwell, B R A M W E L L, representing
23 Doctor Calvente.
24         (Witness so sworn)

Page 5

1    DOCTOR SUSAN ZAESKE:
2 CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST
3 DULY SWORN, WAS EXAMINED UNDER OATH AND TESTIFIED
4 AS FOLLOWS:
5         EXAMINATION
6    BY MS. WERMUTH:
7    Q. Good morning, Doctor Zaeske. I had the
8 presence of mind to ask Mr. Bramwell how to
9 pronounce your name, so hopefully I am doing that
10 correctly.
11    A. Wonderful. Thank you.
12    Q. Okay, good. Do you prefer that I refer
13 to you as Doctor Zaeske then throughout this
14 deposition?
15    A. That would be great.
16    Q. Okay, terrific. I will do that. You
17 are welcome to call me Anna if you need to refer
18 to me, okay?
19    A. Thank you.
20    Q. Can you please, as we are getting
21 started here, state your full name for the
22 record?
23    A. My full name is Susan Zaeske.
24    Q. Can you spell your last name for us?

Page 6

1    A.   Spelled Z as in zebra, A, E as in
2  elephant, S as in Sam, K, E as in elephant.
3    Q.   Doctor Zaeske, have you ever had your
4  deposition taken before?
5    A.   No, I have not.
6    Q.   Okay.  So I'm going to go over just a
7  couple of what I'm going to call groundrules, and
8  you know, this is not intended to be a marathon
9  today.  So number one, if you need a break, just
10  let me know, okay, and I'll try to accommodate
11  that.  We are human.  We need water.  We need
12  food.  We need bathroom breaks.  So feel free to
13  let me know when you need to take a break.  Okay?
14    A.   Thank you.
15    Q.   And I'll try to accommodate your request
16  as quickly as possible.  One of the really
17  important things about today is that we get a
18  clean record, which means it is important that we
19  don't speak over one another.  I personally tend
20  to be slow in my presentation, and I pause, so it
21  will -- it is conceivable that you will start
22  answering before I am done asking a question.
23  That's also human.  It is what we do when we are
24  communicating with one another.

Page 7

1              And so I will just let you
2  know if I'm not done with my question, okay?  And
3  that helps the court reporter because it's hard
4  for her to take down what I am saying if you are
5  also talking at the same time.  Is that fair?
6    A.   Absolutely.
7    Q.   Okay.  And in the reverse, I'm going to
8  do my best to allow you to fully finish your
9  answer before I start talking, okay?  And if you
10  have not finished your answer, will you please
11  let me know?
12    A.   Certainly.
13    Q.   Thank you.  It is also, I think in terms
14  of getting a clear record, it is important that
15  your answers are verbal.  So we often communicate
16  as someone who is a scholar in communication
17  probably knows through verbal cues.  Because we
18  are going to have a black and white transcript,
19  the court reporter can't take down uh-huhs or
20  nods of the head, okay?  So it will be important
21  for your answers to be verbal.  Does that make
22  sense to you?
23    A.   Yes.
24    Q.   Okay.  Terrific.  And then the last

Page 8

1  thing I'll add here is I do not pretend to be a
2  paragon of clarity.  I'm just an employment
3  lawyer.  So if there is something I ask you that
4  you don't understand, please let me know that,
5  and I'll do my best to ask a question that you
6  can answer and that you do understand.  Is that
7  fair?
8    A.   Thank you.  Yes, I'll do that.
9    Q.   Okay.  Terrific, good.  So we are just
10  going to jump in now.  I'm going to start asking
11  you some questions.  As you know, I represent
12  DePaul University.  So Doctor Zaeske, I hate to
13  ask these questions, but I need to do so.  Are
14  you on any medication today that could impair
15  your ability to testify accurately and honestly?
16    A.   No, I am not.
17    Q.   Thank you.  Have you consumed any drugs
18  or alcohol in the last 24 hours?
19    A.   No, I have not.
20    Q.   Thank you.  Where are you physically
21  sitting today, Doctor Zaeske?
22    A.   I'm sitting in my home office.  Do you
23  want my address in Madison?
24    Q.   No, that's okay.  I'm just trying to

Page 9

1  understand if you were on campus, if you were at
2  home today.  We are in this new world of doing
3  things remotely, so I just needed to know where
4  you were.
5    A.   Yes.
6    Q.   Is there anyone in the room with you?
7    A.   No, there is not.
8    Q.   Will you let us know if someone enters
9  the room?
10    A.   Certainly, yes.
11    Q.   Thank you.  And do you have any
12  documents or materials with you today?
13    A.   No.
14    Q.   Okay.  Did Mr. Bramwell send to you
15  yesterday a packet of potential exhibits for
16  today's deposition?
17    A.   I think he sent them yesterday.  I
18  checked my Gmail this morning.  So I don't know
19  what time they arrived.
20    Q.   Okay.  Would you be able to access those
21  exhibits today if I ask you to?
22    A.   Yes.
23    Q.   Okay.  Thank you.  Other than the screen
24  that you are using to sort of make eye contact

Page 10

1   with all of us, do you have other screens with
2   materials up that you are looking at?
3       A.   None.  There is a computer sitting
4   behind me, but it is closed.
5       Q.   Fair enough, fair enough.  So you are
6   not in a position right now to be able to be
7   looking at any materials on your computer?
8       A.   No.
9       Q.   Do you have a cell phone with you?
10      A.   I do have a cell phone.
11      Q.   Okay.  Do you agree that you will not
12  use it to communicate or review materials during
13  the course of the deposition?
14      A.   Yes.  I can agree to that, certainly.
15      Q.   Thank you.  Did you do anything to
16  prepare for your deposition today, Doctor Zaeske?
17      A.   I reread the report that I sent to the
18  Court, I guess, or to all of you to remember, you
19  know, what I had said.  And I also reviewed some
20  of the -- Jerry gave me some ideas of what
21  happens like at this moment, in this setting.  So
22  I looked at those notes too.
23      Q.   Okay.  When you say notes, are those
24  like handwritten notes?

Page 11

1       A.   They were -- yeah.  They were notes that
2   I took about what a deposition is about.
3       Q.   I understand.  So you had a meeting with
4   Mr. Bramwell during which time you took some
5   notes?
6       A.   Yep.
7       Q.   Okay.  And when did that meeting take
8   place?
9       A.   That meeting took place about 2 weeks
10  ago.
11      Q.   And that was the last time you met with
12  Mr. Bramwell?
13      A.   Yep.  I think both of us have been on
14  respective vacations since then.
15      Q.   Understood, understood.  And did that
16  meeting take place in person?
17      A.   No.  Via Zoom.
18      Q.   Thank you.  And how long did the 2 of
19  you meet?
20      A.   I think about 30 minutes.
21      Q.   Did you -- let me ask you this.  If you
22  could please open the file with the exhibits.
23  Are you able to look at that and look at the
24  camera at the same time?

Page 12

1       A.   Yeah.
2       Q.   Okay.
3       A.   So this is a message I got yesterday.
4   It came from Jerry yesterday.
5       Q.   Okay.  I have tried to have these
6   premarked with numbers.  So if you could please
7   look at Exhibit Number 1?
8       A.   I'll get there.  Here it is.  Subpoena?
9       Q.   Correct.  And by the way, forgive me.
10  My camera is in front of me, but my exhibits are
11  to the right of me, so I am occasionally going to
12  be turning my head.  I apologize for that.  Yes,
13  so Exhibit 1, you recognize that document?
14      A.   Yes.  Hold on.  There it is.  Yes.
15      Q.   Okay.  And you recognize that as the
16  subpoena that was served on you for documents?
17  Is that your understanding?
18      A.   Correct, right.
19      Q.   And you did receive a copy of the
20  subpoena?
21      A.   Yes.
22      Q.   Can you turn to the last page, the
23  Exhibit A to the subpoena?
24      A.   Yes.

Page 13

1       Q.   Did you provide Mr. Bramwell with
2   documents that were responsive to every single
3   category listed on Exhibit A?
4       A.   Yes.
5       Q.   So all of the materials that you sent to
6   Mr. Bramwell, you have no reason to believe they
7   were not sent to me?
8       A.   Yes.
9       Q.   Okay.  So you were mentioning as we were
10  talking about your preparation that you reviewed
11  the report.  So you did prepare a report in
12  connection with this matter, correct?
13      A.   Correct.
14      Q.   When were you first contacted about a
15  possible engagement as an expert in this case?
16      A.   It was in -- I just remember it was in
17  the Spring.  I don't know what month.  March,
18  April.
19      Q.   Okay.  Who contacted you?
20      A.   Jerry did.
21      Q.   Did Mr. Bramwell provide you -- strike
22  that.  Did you talk to Doctor Calvente about this
23  engagement?
24      A.   I first heard from Jerry, and he

Page 14

1  contacted me several times, and I gave it some
2  thought about whether I wanted to do this, and
3  then I decided that I would. And then after that
4  I think I was then -- then I was introduced to
5  Doctor Calvente on a Zoom call.
6     Q.  Okay. So you have met with Doctor
7  Calvente?
8     A.  Yeah, at that one time.
9     Q.  Okay. Do you recall when that meeting
10 was?
11    A.  Again, it was probably in I think maybe
12 April.
13    Q.  Was Mr. Bramwell on that -- in that
14 meeting with you and Doctor Calvente?
15    A.  Yes. He was in that meeting with us.
16    Q.  Thank you. Now, did Mr. Bramwell or
17 Doctor Calvente provide you with any facts, data,
18 documents that you considered in forming your
19 opinion in your report?
20    A.  What I was provided was sort of a
21 timeline of what had happened.
22    Q.  Verbal timeline or written timeline?
23    A.  A verbal, like a verbal explanation
24 of -- I don't know if timeline is the right word,

Page 15

1  but a sequence of events.
2     Q.  Who provided that timeline to you?
3     A.  Jerry provided me in requesting my --
4  you know, to consider the idea of serving as an
5  expert witness, Jerry explained what had occurred
6  or you know the -- like a tenure denial and then
7  some -- I guess some appeals, and then that was
8  reiterated when we met with Calvente.
9     Q.  How long was the meeting where Doctor
10 Calvente attended?
11    A.  I think probably about 45 minutes.
12    Q.  Did you take notes from the meetings
13 with Mr. Bramwell and/or Doctor Calvente?
14    A.  I took notes from the meetings with Mr.
15 Bramwell because I needed to know what this
16 involved. Not from -- I don't think I took notes
17 from -- I didn't take notes. I mean there wasn't
18 really much more to learn with Calvente.
19    Q.  Okay. And did you provide those notes
20 to Mr. Bramwell in connection with the subpoena?
21    A.  I did not.
22    Q.  All right. So I will make a request
23 here for those notes, and we can address that at
24 the conclusion of the deposition. Okay. Other

Page 16

1  than a timeline or sort of factual summary,
2  Doctor Zaeske, did Mr. Bramwell or Doctor
3  Calvente provide you with any other documents or
4  facts related to the issues involved in the
5  litigation?
6        MR. BRAMWELL: I'm sorry. I had a
7  hiccup. Can I ask the court reporter to read
8  back that question?
9        (Question read)
10        THE WITNESS: No.
11 BY MS. WERMUTH:
12    Q.  You received no documents from Mr.
13 Bramwell or Doctor Calvente?
14    A.  I did not, no.
15    Q.  How did you happen to obtain a copy of
16 the DePaul College of Communication Tenure and
17 Promotion Guidelines?
18    A.  So I asked for that subsequent to the
19 meeting. I thought your last question was about
20 during the meeting that we had together. I did
21 not receive any documents from him at that time.
22 But once I did agree to serve as an expert
23 witness, then I asked for a copy of the DePaul
24 standards or criteria for tenure.

Page 17

1     Q.  Okay. So -- okay. And if my question
2  wasn't clear, let me just -- I'll ask the
3  question this way. In connection with your
4  engagement as an expert in this litigation, were
5  you provided with any facts or documents from
6  Doctor Calvente or Mr. Bramwell?
7        MR. BRAMWELL: I'm just going to
8  object to the grounds that the expert witness
9  report that was prepared is the best evidence of
10 this. Go ahead.
11        THE WITNESS: So am I to answer
12 this question?
13 BY MS. WERMUTH:
14    Q.  Yes.
15        MR. BRAMWELL: Yes.
16        THE WITNESS: I received no
17 documents from Calvente. I requested the
18 document -- in order to make a comparison of the
19 UNC guidelines for tenure with the DePaul
20 guidelines for tenure, I requested through Jerry
21 a copy of the DePaul guidelines for tenure, and I
22 was provided with a copy of them. And that is
23 the only document besides the subpoena, and I
24 think a -- I had to sign a confidentiality

Page 18

1  statement. I think that was another document.
2  That was the other document. But those would
3  have been the only 2.
4  BY MS. WERMUTH:
5    Q. Okay. And let me just ask you with
6  respect to what you have described as the DePaul
7  standards or guidelines, is it your understanding
8  that what you received were the standards or
9  guidelines published by the College of
10  Communication at DePaul?
11   A. Yes.
12   Q. Now, your report -- strike that. In
13  connection with the subpoena response, I also
14  received from Mr. Bramwell documents related to
15  the offer that Doctor Calvente received from the
16  University of North Carolina. Did you review
17  those offer letter documents in connection with
18  preparing your report?
19   A. I know that she was sent a letter of
20  offer, and I knew the date of the offer, but I
21  didn't review the offer.
22   Q. Okay. So you were not provided with a
23  copy of the offer?
24   A. I was not provided a copy of the offer.

Page 19

1    Q. Okay. Any other documents that you were
2  provided by Mr. Bramwell in connection with your
3  engagement?
4    A. None.
5    Q. Did Mr. Bramwell provide you with any
6  assumptions that you relied upon in making your
7  opinion or forming your opinion?
8    A. No. I mean my -- my -- I have been
9  asked to do something that is very narrow and
10  there was really no exchange about anything other
11  than essentially a comparison between UNC and
12  DePaul.
13   Q. Okay. Do you know Doctor Calvente?
14   A. The first time I ever learned her name
15  was when I got a message from Attorney Bramwell.
16  And the first time I ever met her was in that
17  Zoom meeting. So I didn't know her at all.
18   Q. You were not familiar with her as a
19  scholar prior to this?
20   A. Not at all.
21   Q. Okay. Have you reviewed the lawsuit or
22  what we call the complaint in this matter?
23   A. I don't think I -- I don't know that I
24  have seen the whole complaint. I think maybe I

Page 20

1  did -- Jerry -- I don't know. I don't know that
2  I have seen that.
3    Q. Okay.
4    A. I would have to check, to be honest, to
5  check the email if I saw that early on when I
6  first agreed to do this.
7    Q. Okay. So at some point it will be
8  helpful for you to check to see if you did
9  receive other documents including legal pleadings
10  and the like. That would be helpful for us to
11  know if you received those documents and reviewed
12  them in forming your opinion, okay?
13   A. Yes.
14   Q. Thank you. Did you review the
15  protective order that was entered in this case?
16   A. I don't even know what a protective
17  order is, so I'm sure I didn't review that, that
18  I know.
19   Q. Thank you. Are you aware generally of
20  the nature of the claims asserted by Doctor
21  Calvente?
22   A. I'm not -- well, I suspect she is not
23  happy that she was denied tenure. I have no real
24  understanding of what the reasons were for the

Page 21

1  tenure denial or what the arguments against it
2  are.
3    Q. Okay. So just to be clear, you don't
4  know the nature of the legal claims that Doctor
5  Calvente is asserting against DePaul University?
6    A. I do not.
7    Q. Do you know Doctor Calvente's race?
8    A. I have no idea.
9    Q. Okay. Do you know her ethnicity?
10   A. I have no idea.
11   Q. Did you review her CV in connection with
12  preparing your report?
13   A. I have never seen her CV.
14   Q. Did you -- I know you had a meeting with
15  her. Did you interview her and take notes of
16  that meeting with her in connection with that
17  event?
18   A. No. I didn't talk to her about the --
19  in connection with which event? With the tenure
20  denial or --
21   Q. I'm sorry. In connection with your
22  engagement as an expert, did you interview her or
23  take notes of your meeting with her?
24   A. No, I did not. I didn't interview her.

Page 22

1  I think the idea was just so she would know who I
2  am. I wasn't even, to be honest, exactly sure --
3  I was surprised that she was at the meeting.
4      Q. Understood. Do you know how you were
5  identified by Doctor Calvente or Mr. Bramwell as
6  a potential expert?
7      A. No, I really don't. I mean I have a
8  sense that because -- and this happens to me a
9  lot, is that, you know, I'm at a top ranked
10  research institution, and I have an
11  administrative title and a lot of experience in
12  administration. So I get called in a lot to do
13  -- this is my first expert witness, but I do a
14  lot of tenure case writing for institutions in
15  the field because they need letterhead. They
16  need a letterhead like UW Madison. They need an
17  experienced administrator, and I am. And they
18  need someone who is an accomplished scholar.
19          So I'm sort of -- I don't
20  want to say a target, but I get called on to do
21  stuff like that. So I'm visible in the field.
22  So that's sort of what I thought, but I don't
23  know. I don't really know.
24      Q. That's fair. Thank you. So -- and we

Page 23

1  are going to come back to your experience in a
2  minute. We are going to take a look at your CV.
3  But can you tell me when you just said that you
4  do a lot of, I think what you said was tenure
5  case writing where somebody needs a letterhead?
6      A. Right.
7      Q. What do you mean by that? What is
8  tenure case writing?
9      A. So when -- I'll give you an example. So
10  the University of Illinois, let's say, is putting
11  someone up for tenure, okay, and they have to
12  make sure that as an R1 institution, as a strong
13  research institution, that they have external
14  reviewers because all tenure cases have to be
15  sent out for review by external referees, and
16  they have to be referees that are from equally or
17  more prestigious institutions with equal or
18  better records of publication, research awards,
19  teaching awards, and so on.
20          So a lot of times
21  institutions, particularly if they need someone
22  with a strong letterhead like UW Madison, and if
23  they need a woman to write for them, will ask me
24  to be a writer, because there are only so many

Page 24

1  people with strong letterhead in the field of
2  communications with many years of experience,
3  with strong research records. And it helps to
4  have an administrative record. There is a dearth
5  of people like that.
6          So I'm asked to do that
7  by, you know, Penn State, Indiana, UNC, and other
8  particularly Big 10 institutions, which is where
9  communication has its strongest foothold as a
10  field.
11      Q. Okay. So when you referred to tenure
12  case writing, you are talking about serving as an
13  external referee on tenure cases at other
14  institutions?
15      A. That's right.
16      Q. Okay. Thank you. Do you know when
17  Doctor Calvente obtained her PhD?
18      A. No. I have no idea.
19      Q. Do you know which institution conferred
20  her doctoral degree?
21      A. I think it was UNC.
22      Q. How did you come to learn that?
23      A. When -- well, in the course of -- what I
24  did was I looked at UNC, the website for UNC when

Page 25

1  I was looking for the tenure guidelines, and I
2  could see the -- I could see records of folks who
3  had graduated from there, and it was mentioned
4  there.
5      Q. Is that material that you relied on in
6  forming your opinion?
7      A. Actually the only reason -- let's see.
8  Well, it was interesting to me that UNC would
9  hire one of its own because that's really
10  unusual. So that would have been the only
11  impact.
12      Q. Okay. So do you still have the web page
13  that you looked at that showed her as being a
14  graduate of the institution?
15      A. I don't know if I have it anywhere, but
16  I can look for it.
17      Q. You can obtain it? Okay.
18          MR. BRAMWELL: Ms. Wermuth, if it
19  will help, we will stipulate to the fact that
20  Doctor Calvente obtained her PhD from UNC.
21          MS. WERMUTH: That's not what I'm
22  asking. I'm trying to understand what Doctor
23  Zaeske reviewed.
24          MR. BRAMWELL: Never mind. I'll

Page 26

1  shut up.  Never mind.  Sorry.  I was trying to
2  help.  Never mind.
3          MS. WERMUTH:  I'm trying to
4  understand what Doctor Zaeske knows, how she
5  learned it, and what material she relied on.
6          MR. BRAMWELL:  I get it.  I'm not
7  trying to interfere.  I thought that was the
8  direction you were going.  Never mind.
9  BY MS. WERMUTH:
10     Q.  Do you know, Doctor Zaeske, about any
11  academic positions that Doctor Calvente held
12  prior to being hired into a tenure track job at
13  DePaul?
14     A.  No, I do not.
15     Q.  Did you know when she was hired at
16  DePaul?
17     A.  I don't, though I can imagine it has --
18  it must have been in the last 7 years.
19     Q.  And you say that because of the timing
20  for a case for tenure to be up for review?
21     A.  Right.
22     Q.  Okay.  Do you know anything about the
23  nature of the search that DePaul undertook at the
24  time of Doctor Calvente's hire?

Page 27

1     A.  No.
2     Q.  Do you know anything about the position
3  that was posted that she responded to at DePaul
4  University?
5     A.  No.
6     Q.  Are you familiar with her research
7  concentration?
8     A.  No.
9     Q.  Did you review her tenure dossier?
10     A.  No.
11     Q.  Are you familiar with her publication
12  record as it existed in academic year 2018, 2019?
13     A.  No.
14     Q.  Are you familiar with her service record
15  at DePaul?
16     A.  No.
17     Q.  Are you familiar with her teaching
18  record at DePaul?
19     A.  No.
20     Q.  Did you review the College of
21  Communications' recommendation on her tenure
22  case?
23     A.  No.
24     Q.  Did you review DePaul University's --

Page 28

1  the Dean of DePaul University's College of
2  Communication, did you review her recommendation?
3     A.  No.
4     Q.  On her tenure case?
5     A.  No.
6     Q.  Did you review the University Board on
7  Promotion and Tenure, that recommendation?
8     A.  No.
9     Q.  Did you review the Provost's decision?
10     A.  No.
11     Q.  Did you review the Appeal Board's
12  recommendation?
13     A.  No.
14     Q.  Did you review the President's decision?
15     A.  No.
16     Q.  You were aware, however, that she
17  appealed her tenure denial?
18     A.  Yes.
19     Q.  And those were facts that were supplied
20  to you by Mr. Bramwell?
21     A.  Yes.
22     Q.  Okay.  And you were aware that the
23  President then weighed in on her case?
24     A.  Yes.

Page 29

1     Q.  Okay.  And that was a fact that Mr.
2  Bramwell provided to you?
3     A.  Yes.
4     Q.  Okay.  And do you know prior to her
5  appeal at what level in the tenure review she was
6  -- at what levels -- I'm sorry.  I'm going to
7  strike that whole question.  Do you know at any
8  level what the recommendation was for Doctor
9  Calvente for or against tenure?
10     A.  No.  I really don't -- yeah.  I don't
11  really know -- I just know there were appeals and
12  she was at the end denied.
13     Q.  Have you reviewed any media, newspaper
14  articles, social media, petitions related to
15  Doctor Calvente's tenure denial?
16     A.  No.
17     Q.  Now, after you were engaged and in
18  connection with preparing your report, did you
19  review Federal Rule of Civil Procedure 26A2?
20     A.  I did not.
21     Q.  Do you understand that under the federal
22  rules your report must contain a complete
23  statement of all opinions you intend to express
24  in this case?

Page 30

1    A.  Could you please restate the question?
2    Q.  Sure.  There are rules that govern civil
3  practice in federal courts.  Do you understand,
4  Doctor Zaeske, that your written report under
5  those rules must contain a complete statement of
6  all opinions you intend to express?
7    A.  Yes.
8    Q.  Okay.  So you understand that any
9  opinion that you intend to make in this case is
10  to be contained in your written report?
11    A.  Right.
12    Q.  Okay.  Thank you.  And do you also
13  understand that your written report must contain
14  all the facts and the data that you considered in
15  forming your opinion?
16    A.  Yes.
17    Q.  And you understand that any exhibits
18  that would be used to summarize your opinion are
19  also to be included in your report?
20    A.  Yes.
21        MR. BRAMWELL:  Objection, vague.
22  BY MS. WERMUTH:
23    Q.  Now, I notice that in the materials
24  served on us in connection with the disclosure of

Page 31

1  you as an expert that you indicated you're not
2  being compensated for your opinion; is that
3  correct?
4    A.  That's correct.
5    Q.  So you received no compensation for the
6  preparation of the report?
7    A.  Correct.
8    Q.  Are you being compensated for your time
9  today appearing at this deposition?
10    A.  I am not.
11    Q.  Okay.  Okay.  And will you be
12  compensated for your testimony at trial if this
13  case proceeds to trial?
14    A.  I will not.
15    Q.  Okay.  And why is it that you decided
16  not to charge for your services as an expert?
17    A.  I saw it as similar to the work that I
18  mentioned earlier as, you know, a tenure
19  reviewer, so a service to the discipline.  That's
20  basically the reason.  And frankly, I was kind of
21  interested.  I never have gone through this
22  process before.  I just wanted to see what it
23  involves as an expert witness.
24    Q.  Are you charging for costs incurred?

Page 32

1    A.  I thought we were going to be meeting in
2  person in Chicago, and I would have wanted to be
3  compensated for mileage and hotel or something
4  like that.  But since that's not -- since we are
5  on Zoom, I am not.
6    Q.  Okay.  So you have not incurred any
7  costs to date?
8    A.  None.
9    Q.  All right.  So if you would, Doctor
10  Zaeske, pull up your CV, I would like to talk to
11  you about your background.
12    A.  Certainly.  Is that one of the exhibits?
13    Q.  Exhibit 2 in the packet.
14    A.  Okay.  Alrighty.
15    Q.  Okay.  I would like to start with your
16  education, which is at the bottom of page 1 and
17  top of page 2.  It looks to me as though you
18  received your Bachelor's, your Master's, and your
19  PhD from the University of Wisconsin Madison?
20    A.  Yes.
21    Q.  Okay.  And the Master's, is that like a
22  -- was that a required terminal degree, or were
23  you not thinking about being in a PhD program at
24  the time, or tell me about the Master's?

Page 33

1    A.  It is simply required to go into the --
2  to finish the PhD.  It wasn't terminal.  It was a
3  -- you know, you had to fulfill it to continue on
4  to the doctoral program.
5    Q.  Understood.  Okay.  So when were you
6  accepted into the doctoral program?
7    A.  It would have been in Spring of '89 when
8  I graduated as a Bachelor's -- with my Bachelor's
9  degree.
10    Q.  So you then entered the PhD program in
11  the Fall of 1989?
12    A.  That's right.
13    Q.  Thank you.  And then the Master's was
14  just part of what you had to do towards
15  completion of the doctoral program?
16    A.  Right.
17    Q.  So you had to take qualifying exams at
18  that point?
19    A.  That's right, yes.
20    Q.  And then you very quickly, I guess even
21  before your PhD was conferred, you were hired by
22  UW Madison in a tenure line position; is that
23  correct?
24    A.  That's right.

Page 34

1    Q.  How did that come to be given that you
2  had not yet obtained the PhD?
3    A.  So a number of things happened.  One was
4  that the rhetoric area of my department, we had a
5  number of unexpected retirements in the
6  department.  And then actually 2 of the -- 2 of
7  the faculty were non-renewed in their fourth
8  year.  So then they -- then they left.
9              I had gone on the job
10  market, and I had received offers from 2 other R1
11  institutions, as well as Wisconsin.  So I proved
12  that I could -- that I was marketable because I
13  had a number of things published, and I won
14  awards and things like that.  So my -- because
15  there was a lack of faculty in the department, I
16  had a heavier load even as a grad student, but
17  especially as a beginning professor, which
18  delayed my time in completing my dissertation.  I
19  didn't end up defending my dissertation until
20  Spring of 1997, even though I had -- my tenure
21  clock began ticking in the Fall of 1996.
22    Q.  I see.  And it appears that you were
23  promoted to associate professor 6 years later in
24  2002?

Page 35

1    A.  Right.
2    Q.  And so -- and was that a promotion that
3  came with tenure?
4    A.  Yes.
5    Q.  So you were promoted and tenured in
6  2002?
7    A.  Right.
8    Q.  So did you go up early for promotion and
9  tenure?
10    A.  Yeah, I ended up going early even though
11  I -- even though my tenure clock was ticking.
12    Q.  Okay.  And you became full professor
13  then in 2007; is that correct?
14    A.  Yes.
15    Q.  And the Department of Communication Arts
16  sits in what academic unit?
17    A.  It is in the College of Letters and
18  Science.
19    Q.  And the College of Letters and Science,
20  is that part of a division, part of just the
21  greater academic environment?  Can you explain to
22  me sort of the hierarchy?
23    A.  Sure, certainly.  So the University of
24  Wisconsin Madison has 13 schools and colleges,

Page 36

1  and then there are a number of other divisions.
2  But there are 13 schools and colleges.  The
3  College of Letters and Science by far the
4  largest, taking up half the faculty on campus,
5  and you know, it is about half the campus and
6  half the departments and majors and so on.  So it
7  has got about 45 departments in it.
8              And the College of Letters
9  and Science -- excuse me.  The Department of
10  Communication Arts is one of the roughly 45
11  departments in the College of Letters and
12  Science.  And the Department of Communication
13  Arts has 4 areas of graduate study and 2 areas of
14  undergraduate study.  I'm happy to say what those
15  are if you want.
16    Q.  No, that's fine.  I appreciate that.
17  Thank you.  I'm trying to get a sense of the
18  structure of the university.
19    A.  Right.
20    Q.  Because I see reference to division of
21  the arts, arts and humanities, and I'm trying to
22  understand what those units are and how they are
23  related or not to the College of Letters and
24  Science which houses the Department of

Page 37

1  Communications?
2    A.  Right.  All right.  So the -- so we have
3  the whole university, 13 schools of college --
4  all the university.  This is like a funnel,
5  right?  So there are 13 schools and colleges.  L
6  and S is one of those schools and colleges, but
7  it is a huge one.  Comm Arts is one of the
8  roughly 45 departments.  But the college for
9  administrative purposes is divided into 4
10  sections.  I'll just say sections, okay.
11              So there is the Arts and
12  Humanities -- it's actually a division.  The Arts
13  and Humanities Division.  I'm the Associate Dean
14  of the Arts and Humanities Division.  I have 16
15  departments and about 25 centers and institutes
16  that I administer in my job as Associate Dean for
17  Arts and Humanities.  Comm Arts is not one of
18  those ironically.  Even though I was the chair of
19  that department, I'm not the Associate Dean for
20  that unit.  It is not in my portfolio.
21              Another division is the
22  Social Science division.  That's Political
23  Science, Sociology, Comm Arts, so on.  There is
24  the Mathematical, Natural and Biological Sciences

Page 38

1  Division, Physics, Math, Biology, so on. And
2  then there is the Computer Data Information
3  Sciences Division. So there are 4 divisions of
4  the college. So that's L and S.
5            And then to make things
6  even more complicated, I'm sorry to say, Anna, is
7  the Division of the Arts. And I was called in to
8  be an Interim Director of the Division of the
9  Arts for the last 2 and a half years. And that
10 is a division -- it doesn't have tenure lines or
11 curriculum in it. It's a part of the university
12 that provides an umbrella organization for the
13 arts because the arts are siloed in 3 separate
14 schools and colleges.
15   Q. Got it. Okay. I think I have it. So
16 let me ask a couple of follow-up questions. So
17 the College of, is it called Letters and
18 Sciences?
19   A. It is just Letters and Science.
20   Q. So you have the College of Letters and
21 Science which has divisions underneath it, which
22 then has departments underneath the divisions or
23 housed within? Do I have that sort of shell game
24 --

Page 39

1   A. Right.
2   Q. And separately there is this Division of
3  the Arts where it doesn't sit in one of the
4  colleges. It is sort of its own unit. And it
5  doesn't offer a course of study or curriculum or
6  degrees?
7   A. Correct, right.
8   Q. Okay. Thank you. That's super helpful.
9  So it looks like you were -- had leadership roles
10 in the Department of Communication Arts from 2006
11 to 2011 being Associate Chair and then Department
12 Chair?
13   A. Yes.
14   Q. Okay. And then after that you became
15 Associate Dean for Advancement in the College of
16 Letters and Science; is that right?
17   A. That's right. But I just want to
18 explain that I became -- I assumed 2 Associate
19 Dean roles in the College of Letters and Science
20 at the same time.
21   Q. I see that.
22   A. And then one has continued, and then one
23 has -- I built this office of communication and
24 development and fundraising. Then it has got too

Page 40

1  big, and then I stepped off of that Associate
2  Dean role. So I had those concurrently for a
3  while until 2018.
4   Q. I see. So the Associate Dean for
5  Advancement is a fundraising sort of type of a
6  role, right?
7   A. Yeah, fundraising communications.
8   Q. And then Associate Dean for Arts and
9  Humanities was the sort of academic position?
10   A. Is, yes.
11   Q. So you still have that position now?
12   A. That's correct.
13   Q. Are you still currently among the
14 faculty in the communication -- or Department of
15 Communication Arts?
16   A. I am still -- I still hold a
17 professorship in that department, but I have not
18 been participating in departmental governance
19 since 2011. So I don't sit on the executive
20 committee, and I don't vote, you know. I don't
21 vote. I really don't know what is going on in
22 terms of departmental politics. I do not have an
23 office. I haven't had an office there since
24 2011.

Page 41

1   Q. So let me ask you that question.
2  Beginning in 2011, you then no longer
3  participated in governance in the Department of
4  Communication Arts?
5   A. Yes, correct.
6   Q. So that would include participation in
7  tenure cases?
8   A. Right.
9   Q. Okay. And that would include
10 participation in hiring decisions as well?
11   A. Correct.
12   Q. Okay. And so did you in your role as
13 Associate Dean for Arts and Humanities in the
14 College of Letters and Science have any role in
15 tenure cases at a different level?
16   A. Yes. So my role -- I have a lot of
17 roles in tenure cases and in hiring. So every
18 single person who is brought in for a campus
19 interview in Arts and Humanities, or if it is
20 Social Sciences, if there is some Humanities,
21 they are related to Humanities, or their work is
22 in Humanities, I meet with them and interview
23 them. I have to actually approve requests for
24 campus interviews before they are even allowed to

Page 42

1 interview.
2 So then I interview -- I
3 interview them. Departments make their hiring
4 requests to me, and then I have to decide whether
5 I want to advance it. And then I advance it to
6 the Dean and to what is called the Senior Staff
7 of the college. And every Monday, we discuss
8 hiring during the hiring season. And then all of
9 the Associate Deans weigh in on hiring. So I
10 weigh in on hiring biologists and computer
11 scientists and mathematicians, political
12 scientists, as well as English professors, and
13 Comm Arts professors, and history and so on.
14 And then I'm responsible
15 for overseeing the annual review process for all
16 of the Humanities and Arts faculty, and sometimes
17 this crosses over into the Social Sciences. That
18 means reviewing all of their annual reviews and
19 making a recommendation to the Dean as to whether
20 they should be reappointed or not. And then I'm
21 also responsible for overseeing and mentoring of
22 our probationary faculty.
23 Q. I would imagine in connection with the
24 annual review process that you do not uniformly

Page 43

1 recommend or approve renewals?
2 A. I have non-renewed 2 faculty in the last
3 3 months.
4 Q. Tenure line?
5 A. Correct. We only have -- we only have
6 -- if you're faculty, you're tenure staff. We do
7 not -- it is not tenure.
8 Q. Okay. So you don't have like a
9 nontenure cadre of teachers?
10 A. Yes, we have a nontenure cadre of
11 teachers, but they are not called faculty or
12 professor.
13 Q. I understand. Okay. So in this -- just
14 in this past review cycle, you non-renewed 2
15 faculty members?
16 A. Right.
17 Q. Meaning that in your estimation, they
18 were not ultimately going to be capable of
19 contributing to the academic environment at the
20 university at the level that the university
21 expected?
22 A. Correct.
23 Q. So these were 2 probationary faculty
24 pre-tenure?

Page 44

1 A. Yes.
2 Q. Okay. Were you involved in the hire of
3 those 2 individuals that you just non-renewed?
4 A. I was involved in the one, in one of
5 them. It was during a time when I was Associate
6 Dean. The other was hired before I became
7 Associate Dean.
8 Q. Okay. And I'm assuming that at the time
9 that you were involved in the hiring of the one,
10 that you did anticipate that that individual
11 would meet the criteria ultimately for tenure?
12 A. Right. That was -- I mean the whole
13 purpose when I meet with candidates is to assess
14 their tenurability. That's my job.
15 Q. And sometimes you get that right and
16 sometimes you don't get that right?
17 A. Yes.
18 Q. Okay. And then how are you involved in
19 tenure decisions in your role as Associate Dean
20 for Arts and Humanities?
21 A. So UW Madison is a very -- sorry. There
22 is a giant garbage truck going by.
23 Q. I can't hear it, but I understand why it
24 is distracting. I have a lot of noise outside my

Page 45

1 window.
2 A. Okay. It is gone. UW Madison has a
3 strong shared governance ethic, practice. So we
4 have what is called the divisional committees,
5 and those are committees of faculty who review
6 the tenure dossiers and they make decisions. So
7 major decisions about tenure are made in
8 departmental executive committees and divisional
9 committees.
10 Deans and Associate Deans,
11 and even the Provost tend to be involved in --
12 only when there is like a tie, you know, a tie or
13 there is not a clear decision made. And there is
14 rarely major intervention, right? But you know,
15 like in these cases that I mentioned, you know, I
16 made it clear in my review of the annual review
17 letters that the department was not strict enough
18 in its warnings to the faculty member, and that
19 they were not meeting expectations, the
20 expectations of the college.
21 So my -- as an Associate
22 Dean and then in conjunction with the Dean, the
23 interventions come at those annual review times,
24 right? But it is very difficult -- the major

Page 46

1  decisions again are made by the executive
2  committee and the divisional committee.
3      Q.  Okay.  And so then is there an approval
4  process for the Dean and the Provost, or does the
5  decision stop with the divisional committee
6  unless there is something unusual about the case?
7      A.  It goes -- so the divisional committee,
8  technically it is a recommendation to the Dean,
9  but the Dean rarely overturns the divisional
10  committee recommendation, but he or she can.  And
11  then the Dean makes a recommendation to either
12  the -- I think the Provost.  It is either the
13  Provost or the Chancellor.  And then it goes to
14  the Board of Regents.
15      Q.  Right, as a public institution?
16      A.  Right.
17      Q.  Okay.  So when you say the divisional
18  committee's recommendation goes to the Dean,
19  that's not you, correct?
20      A.  Correct.  It is the overall Dean of the
21  College.  So I'm the Associate Dean of one of the
22  divisions of the college, but there is the Dean
23  that is, you know, over the whole college.
24      Q.  I understand.  Okay.  I understand.  So

Page 47

1  it sounds to me, you can tell me if I'm wrong,
2  that your involvement in connection with the
3  advancement of probationary faculty really takes
4  place at the review -- the probationary review
5  period; is that right?
6      A.  Right.
7      Q.  Okay.  Okay.  Now, it sounds to me that
8  you are a proponent of faculty governance?
9      A.  Yes.
10      Q.  Okay.  And you would probably then agree
11  with me that the peer review process that is
12  attendant to tenure is an important process?
13      A.  Yes.
14      Q.  Okay.  And that -- I'm assuming that you
15  understand that that review is largely
16  qualitative?
17      A.  I think it is qualitative, but there are
18  clear criteria and clear expectations.
19      Q.  Okay.  But you would agree that the
20  decisionmaking process involves the exercise of
21  academic judgment?
22      A.  Absolutely.
23      Q.  By peers?
24      A.  Yes.

Page 48

1      Q.  And that -- and it sounds to me like at
2  least at your process, your institution, where
3  you have been your entire academic career, that
4  many faculty participate in the decisionmaking
5  process?
6      A.  Yes.
7      Q.  And because there are so many individual
8  assessments involved, it is at least conceivable
9  that there will be different opinions along the
10  review process?
11      A.  Yes.
12      Q.  I'm assuming you would also agree that
13  the grant of tenure is a privilege?
14      A.  Absolutely.
15      Q.  Not a right or an entitlement?
16      A.  Exactly.
17      Q.  Okay.  And you would probably agree with
18  me that is probably among the most important
19  decisions that a college or university makes?
20      A.  Yes.
21      Q.  And because it's a critical decision,
22  the institution should be absolutely sure that
23  the case warrants tenure?
24          MR. BRAMWELL:  Objection to the

Page 49

1  extent that you are asking about -- you're
2  deviating from the criteria.  Go ahead.
3  BY MS. WERMUTH:
4      Q.  You can answer.
5      A.  I'm sorry.  Now I lost what the question
6  was.
7          MS. WERMUTH:  I'm sorry.  Gina, can
8  you read that back for Doctor Zaeske, please?
9          (Question read.)
10          THE WITNESS:  Yes, absolutely.
11  BY MS. WERMUTH:
12      Q.  So another way to say that would be if
13  there is any doubt about a case, tenure should be
14  denied?
15          MR. BRAMWELL:  Objection to the
16  extent that it is vague and best evidence.  Go
17  ahead.
18          THE WITNESS:  If there is any
19  doubt?  It makes it sound like a murder case.  I
20  think yes.
21  BY MS. WERMUTH:
22      Q.  Have you ever voted to deny tenure?
23      A.  Yes.
24      Q.  To a probationary faculty member?

Page 50

1    A.  Yes.
2    Q.  More than once?
3    A.  Well, so I was the -- another thing that
4  is on my CV is I was the chair of the divisional
5  committee.  I served on it for 3 years, and I
6  chaired it.  So during that time I voted against
7  tenuring people.  And I also, as I mentioned, you
8  know, just in the last -- so I didn't have a vote
9  in these 2 non-renewals.  One was a non-tenure,
10  one was a non-renewal just this last year.  I
11  essentially drove the non-tenuring and
12  non-renewing of at least 4 other faculty members
13  in the last 5 years.
14    Q.  How many?  Did you say 4 in addition to
15  the 2 you already mentioned?
16    A.  Let me just -- let me think.  Let's say
17  3 for sure.
18    Q.  In addition to the 2 you already
19  mentioned?
20    A.  Right.  So a total of 5.
21    Q.  Thank you.  Have you ever in connection
22  with your hiring responsibilities been presented
23  with a candidate who has been denied tenure at
24  another institution?

Page 51

1    A.  Yes.  Just in the last 3 years, we hired
2  a philosopher who had been denied tenure at Yale.
3    Q.  Any others you can think of?
4    A.  I'm trying to think of any.  I'm sure
5  there are some.  I can't think of any right at
6  the moment.
7    Q.  Okay.
8    A.  Oh, yeah.  Actually I can think of
9  another one.  Also Yale.
10    Q.  So you can think of 2 candidates that UW
11  Wisconsin hired who had been denied tenure at
12  Yale?
13    A.  Right.
14    Q.  Okay.  Yale is an R1 school?
15    A.  Well, not only is Yale an R1, but it is
16  an Ivy.  And Ivy's routinely -- you know, you are
17  kind of like -- you know that if you accept an
18  assistant professorship at an Ivy that your
19  chances of actually being tenured there are slim,
20  and that you are going to have to likely go
21  elsewhere, but it happens -- it happens over and
22  over.  So it is not actually that unusual.
23        It would be unusual for
24  another Ivy to hire someone who was not tenured

Page 52

1  by a Ivy, but it is not unusual for a public
2  institution to hire someone who was not tenured
3  by an Ivy.
4    Q.  Can you think of any candidates that at
5  least disclosed to you, any candidates from a
6  non-Ivy school, that disclosed in the hiring
7  process that they had been denied tenure?
8    A.  No.
9    Q.  Okay.  So the only 2 you can think of
10  were the 2 from Yale?
11    A.  Yes.
12    Q.  Are you familiar with the concept of
13  credit for years?
14    A.  Sure.
15    Q.  Okay.  And what do you understand that
16  to be?
17    A.  So what I think you mean by credit for
18  years would be if someone -- this is how it goes
19  at UW Madison.  If you have served in a tenure
20  track position at another institution for a
21  number of years, then when you begin your
22  appointment here, you can be given credit on your
23  tenure clock for those years served.  And that
24  has to be an agreement with the individual, the

Page 53

1  department chair, and the Associate Dean, and the
2  Dean for that credit.
3        It does not -- if you are
4  just serving as a post-doc or something like
5  that, it doesn't warrant that kind of credit.  It
6  has to be in the tenure track.
7    Q.  Understood.  And that would mean that
8  the individual would be eligible for tenure -- so
9  if UW Madison were to hire someone who was in a
10  tenure line position at another institution and
11  credit them for some number of years of service,
12  they can go up for tenure earlier than the
13  unusual timeline?
14    A.  Yes.
15    Q.  You see that as a job benefit?
16    A.  Well, it cuts both ways, and, you know,
17  people negotiate it differently.  Some people,
18  and again I especially expect this in the
19  post-pandemic, are anxious about meeting the
20  tenure requirements.  They want the longest
21  tenure clock possible, and they do not want
22  credit for -- it is not considered credit.  It is
23  actually considered debit.  And so they don't ask
24  for that.

Page 54

1    And some are so confident
2  that they are going to get tenure, and what they
3  are most anxious about is not being tenured and
4  promoted and getting a salary increase and
5  getting a title change because they are confident
6  that they are going to get their -- usually it's
7  their book out, and then they want to be
8  promoted.  So they look for credit and a shorter
9  clock.  So it goes both ways.
10    Q.  Understood.  And has -- so UW
11  Madison does in fact engage in this practice of
12  occasionally awarding years of credit?
13    A.  Right.  But again, it has to be
14  negotiated and agreed upon by sort of all
15  parties, because sometimes people have, you know,
16  maybe more ambitious or positive assessments of
17  their ability to get tenured than their
18  department -- you know, they just don't know how
19  hard it can be.  So they might want to have 3
20  years, and it is only a maximum of 3 years, but
21  we say no, we want you to take the full tenure
22  clock, and if you are able to, we will put you up
23  earlier.
24    I mean that can be -- it

Page 55

1  can break the negotiations when you are trying to
2  recruit someone.  But we wouldn't want to bring
3  someone in on a short clock, and then they not
4  get tenure, because that's a waste of investment.
5    Q.  Understood.  Okay.  Can we go back to
6  Exhibit 2?  Do you still have that in front of
7  you, Doctor Zaeske?
8    A.  Yes.
9    Q.  So I would like to look at your
10  research?
11    A.  Sure.
12    Q.  Which I think begins on page 2; is that
13  right?
14    A.  Yes.
15    Q.  Okay.  So it appears to me that you have
16  one book, one manuscript, right?
17    A.  Yes.
18    Q.  And that was published just after you
19  obtained tenure it appears to me?
20    A.  Right.
21    Q.  It was probably forthcoming at the time
22  of your tenure?
23    A.  Yes, yeah.
24    Q.  And then what follows are articles, book

Page 56

1  chapters, and reference work entries?
2    A.  Yes.
3    Q.  And it looks like your most current --
4  these are all peer reviewed?
5    A.  Yes.  Well, yeah.  Well, I don't know
6  that anything I have done is not peer reviewed.
7  Right.
8    Q.  Okay.  So it looks like your most recent
9  peer reviewed publication then was from 2014?
10    A.  That's right.
11    Q.  Okay.  You do have some works in
12  progress I see?
13    A.  Yes.
14    Q.  Understood.  Okay.  So tell me what your
15  area of research is?
16    A.  So in the field of -- so I'm in the --
17  I'm in the field of communication, but I am also
18  -- you know, my book was published basically in a
19  history series, and I have a number of reprints
20  in history.  So I operate in history to a certain
21  degree.  I operate in political science.  Some of
22  those publications, particularly about
23  petitioning, are in -- and also conference papers
24  that I have given are in political science.

Page 57

1    But in the area of -- in
2  the communication field, I'm known at a
3  rhetorician, the field of rhetoric, or rhetoric
4  and public culture.  And I tend to do very
5  historical -- very historical work in the 19th
6  century.  So I don't know if you want more than
7  that.
8    Q.  No, that's helpful.  I appreciate that.
9  So let me just ask you some questions about -- I
10  mean obviously you have been in administration
11  for some period of time.  You have been involved
12  as you described for us in hiring practices, in
13  tenure practices.  But just to be clear, you have
14  not published in the area of good or bad tenure
15  processes?
16    A.  I have not published papers on good or
17  bad tenure processes, no.
18    Q.  Okay.  And you have not published any
19  peer reviewed papers on the topic of academic
20  governance?
21    A.  No.
22    Q.  Okay.  And you have not -- well, let me
23  ask you this.  You don't cite any literature in
24  your report that is peer reviewed publications on

Page 58

1  the topics of tenure or faculty governance; is
2  that fair?
3     A.  Yes.  That is fair.  No, I did not.
4     Q.  Okay.  Thank you.  And with respect to
5  studying or researching the topic of tenure
6  denial and where faculty go once they have been
7  denied tenure, you have not performed personally
8  any studies on that topic; is that right?
9     A.  No, I have not.
10    Q.  Okay.  And you don't cite any peer
11 reviewed literature in your report on that topic;
12 is that right?
13    A.  That's correct.
14    Q.  Okay.  Are you familiar with any peer
15 reviewed studies on any of the topics we just
16 discussed?  Tenure processes, faculty governance,
17 tenure denial cases?
18    A.  You know, I think I have read some in
19 passing in the past, but I did not delve deeply
20 into those.  I mean I have more than a decade of
21 experience of doing this stuff at a huge
22 university, so I don't really think it is
23 necessary.
24    Q.  Okay.  And I'm just asking for purposes

Page 59

1  of your report preparation.  You didn't -- to the
2  extent you were aware of any peer reviewed
3  literature on those topics, you did not rely on
4  that literature in forming your opinion?
5     A.  No, no.
6         MS. WERMUTH:  By the way I just
7  noticed that Kathy Stieber joined us.  She is the
8  General Counsel of DePaul University.  I just
9  wanted folks to know who that was and why she was
10 here.
11    Q.  Okay.  So when I received materials from
12 Mr. Bramwell in connection with the response to
13 the subpoena, I received a copy of Doctor
14 Calvente's offer letter from the University of
15 North Carolina.  So when I received that, I had
16 understood that that was something you relied on.
17 But I just want to be clear, you did not review
18 her physical offer letter from the University of
19 North Carolina?
20    A.  What I remember is seeing the date of
21 the offer letter because I asked whether she
22 truly had -- because I went to the website for
23 UNC, and there was -- she wasn't on the website.
24 So I said is she really -- does she really have

Page 60

1  an offer?
2         And I believe that I saw
3  the -- just that there was a letter and there was
4  a -- that it was dated.  I don't remember that I
5  -- I mean maybe I received the letter.  I have to
6  say I don't remember.
7     Q.  Okay.  Let me go back to the concept of
8  credit, years credit for service.  When would you
9  typically see something like that?  Where there
10 was a long period of service in a tenure line
11 position, is that where you would typically see
12 credit for service?
13    A.  So you would get credit for service if
14 there is a period of time on the tenure clock at
15 a comparable institution.  So where you have
16 students who are -- you know, similar in the
17 teaching experience that is going to be similar,
18 and, you know, similar research expectations.
19    Q.  Okay.  And you don't know how much time
20 Doctor Calvente spent at DePaul University?  Do I
21 understand that correctly?
22    A.  No.  Yeah.
23    Q.  So I'm going to ask you to look at
24 Exhibit 4 from the documents that we sent to Mr.

Page 61

1  Bramwell yesterday.
2     A.  Okay.
3     Q.  So does this refresh your memory as to
4  whether or not you actually received a copy of
5  this letter in connection with the materials
6  provided to you for purposes of preparing your
7  report?
8     A.  I have to -- I just simply don't -- I
9  simply don't remember because my goal was to know
10 whether or not she had received the offer, and
11 you know, what -- I didn't even remember the date
12 here.  March 8th.
13    Q.  Okay.  So you just don't recall one way
14 or the other?
15    A.  I honestly don't.  I'm sorry.
16    Q.  Okay.  So can I have you look at Exhibit
17 5 from the packet of materials that was sent?
18    A.  Certainly.  Okay.
19    Q.  In looking at that, does that refresh
20 your memory as to whether or not you saw these
21 materials?
22    A.  So this is an email.  No.  I have never
23 seen this.
24    Q.  Okay.  So if you scroll down to the

Page 62

1  bottom where there is an attachment, is that
2  something you recall reviewing in connection with
3  preparing your report?
4      A.  No.
5      Q.  Okay.  And I'm looking at the last 2
6  pages.  So the pages -- do you see there is a
7  little marking in the lower right where it starts
8  with LC?
9      A.  Yes.
10     Q.  I'm looking at 4089 and 4090.
11     A.  I have not --
12     Q.  Okay.
13     A.  I have not seen this.
14     Q.  Okay.  Did you make assumptions, any
15  assumptions about the nature of the offer that
16  Doctor Calvente received?
17     A.  None.  Again, I just wanted to know
18  whether she had truly been offered a position or
19  not, and the specifics of it, you know.  I didn't
20  think about or know about it.
21     Q.  Okay.  So you didn't think about whether
22  the offer was for the position of assistant
23  professor?
24     A.  Well, I asked whether it was a tenure

Page 63

1  track position, and it was confirmed to me that
2  she received an appointment for a tenure track
3  position.  I just can't remember whether Jerry
4  confirmed that -- that a letter of offer had been
5  sent, and if he did that verbally, or if I was
6  sent a copy of the letter, because I have no -- I
7  honestly just don't remember anything beyond the
8  fact that she received an offer for a tenure
9  track position.
10     Q.  Okay.
11     A.  I don't even know when she is starting.
12     Q.  Okay.  And you also then don't know what
13  the term of her appointment is, the length of it
14  for example?
15     A.  No.
16     Q.  Okay.
17     A.  Well, if it is a tenure track position,
18  it is a -- she has the opportunity to get tenure,
19  and it would be an ongoing position, if that's
20  what you mean by term of it.  If it is only a 2
21  year position or something like that, it is not a
22  tenure track position.  Then it would be an
23  adjunct position.
24     Q.  Well, let me ask you this.  We will look

Page 64

1  at the UNC guidelines about terms for
2  probationary faculty in a moment, because that is
3  something you reviewed, right, the UNC guidelines
4  on promotion?
5      A.  Yes.
6      Q.  Okay.  So do you know -- were you
7  provided with any information about whether UNC
8  had advertised or posted for the position that
9  Doctor Calvente was offered?
10     A.  No.  I don't know how they did their
11  hiring process.
12     Q.  Okay.  And so you don't know, for
13  example, whether there were multiple positions
14  open in the Department of Communications?
15     A.  No, I don't.
16     Q.  Okay.  And you don't know for example if
17  the position was created specifically for Doctor
18  Calvente?
19     A.  I don't know.
20     Q.  Okay.  And you don't know whether there
21  was a competitive search for the position?
22     A.  I don't know.
23     Q.  And you don't know how many candidates,
24  if it were a competitive search, how many

Page 65

1  candidates may have also applied for the
2  position?
3      A.  No.  I have no idea.  And I think -- I
4  don't even know if that's public knowledge.
5      Q.  Okay.  But that's not something that you
6  investigated, correct?
7      A.  No, I don't know.
8      Q.  Okay.  So you didn't interview anyone at
9  the University of North Carolina I'm assuming?
10     A.  No.
11     Q.  And did you review any materials that
12  Doctor Calvente submitted to the University of
13  North Carolina in connection with the potential
14  for hire there?
15     A.  No.
16     Q.  Do you know whether she notified the
17  University of North Carolina that she had been
18  denied tenure?
19     A.  I have no idea.
20     Q.  Do you know whether she was credited for
21  any years of service at the University of North
22  Carolina?
23     A.  I don't know.
24     Q.  Do you know if Doctor Calvente was

Page 66

1  provided with the opportunity to have her case
2  reviewed for tenure upon hire at the University
3  of North Carolina?
4      A.  I don't know.
5      Q.  You would imagine that the University of
6  North Carolina can do that, correct?
7      A.  That they -- an institution would --
8  yes, they would have the prerogative to hire with
9  tenure.
10     Q.  Okay.  And does the absence of that
11  process here mean that they did not view her file
12  as being tenurable in the moment?
13     A.  I would imagine that would be the case
14  because she is not at a peer institution.
15     Q.  All right.  Let's take a look at your
16  report, which is Exhibit 3 in the packet that was
17  sent to you?
18     A.  Okay.
19     Q.  Do you recognize that document, Doctor
20  Zaeske?
21     A.  Yes.
22     Q.  And what do you recognize it to be?
23     A.  The expert witness report that I
24  prepared for this case.

Page 67

1      Q.  And on the final page, that is your
2  signature?
3      A.  Yes.
4      Q.  Give me just a moment.  I'm sorry.  I'm
5  having a little technical difficulty in this
6  moment.  Can we take a super quick break so I can
7  try to resolve this technical difficulty?
8      MR. BRAMWELL:  Sure.
9      THE WITNESS:  Certainly.
10     MS. WERMUTH:  Jerry, what do you
11  want?  5 minutes, 10 minutes?
12     MR. BRAMWELL:  5 minutes is fine.
13  Come back at 11:24?
14     MS. WERMUTH:  Perfect.  Thank you.
15     (Off the record at 11:21 to 11:26)
16     MS. WERMUTH:  Gina, we will go back
17  on the record.
18     Q.  Doctor Zaeske, we were talking a little
19  bit about the search process at UNC in connection
20  with the offer made to Doctor Calvente.  And I
21  would like to point you to the second page of
22  your report, the second full paragraph, the big
23  one.  About 4 lines down you say -- well, 3 lines
24  down, "Calvente's record was of such excellence

Page 68

1  that it rose to the top of the application pool
2  in the fierce competition for a tenure track job
3  at an R1 university."  Do you see that?
4      A.  Uh-huh.
5      MR. BRAMWELL:  I'm going to object
6  because that misstates the entire sentence.
7  BY MS. WERMUTH:
8      Q.  Did the portion of the sentence I read,
9  is that consistent with what you wrote, Doctor
10  Zaeske?
11     A.  Let me just make sure I see it in the
12  context of the overall paragraph.
13     Q.  Sure.
14     A.  So Calvente's -- my understanding is
15  this is your question.  Did I write "Calvente's
16  record was of such excellence that it rose to the
17  top of the application pool in a fierce
18  competition for a tenure track job at an R1
19  university"?  Yes.  That is what I wrote.
20     Q.  And what is the basis for that
21  statement?
22     A.  That is -- so search processes at
23  universities, whether they are -- I mean the
24  usual process is that there is a -- you know, a

Page 69

1  posting.  Applications come in, and they are
2  reviewed.  And getting a position at an R1
3  university, there are very few because of --
4  there is a lot -- especially the past few years
5  because there have been hiring freezes.  So there
6  is a fierce competition for positions.
7      And this is true whether
8  you are doing a full and open search or even if
9  you are doing -- I mean there are many ways of
10  doing searches.  One is the open and posted
11  search, and then there is also targeted searches.
12  Institutions can do targeted searches.  But there
13  is a fierce competition to be the target of a
14  targeted search.  You have to rise to the top to
15  be recruited in that way.
16     Q.  But to be clear, you do not know
17  anything about the search process for the
18  position that was offered to Doctor Calvente in
19  March of this year?
20     A.  No.  But I know how search processes are
21  conducted.
22     Q.  Right.  But you don't know how it was
23  conducted in this particular instance?
24     A.  I do not, no.

Page 70

1    MR. BRAMWELL: Objection, asked and
2 answered.
3 BY MS. WERMUTH:
4    Q. And you don't know what the applicant
5 pool looked like in connection with the job that
6 was offered to Doctor Calvente?
7    A. Not per se. But again, to be hired at
8 an institution like UNC, it would have to be a
9 strong -- it would have to be a strong pool.
10    Q. Can you identify the opinion that you
11 are offering in this case?
12    A. Yes. So the -- so the opinion that I'm
13 offering is that for an individual to be denied
14 tenure at an R2 institution and to be hired at an
15 R1 institution is highly irregular, and that the
16 irregularity of it points to something having
17 gone astray in the process by which the
18 individual would be non-renewed at an institution
19 with lesser standards and then hired at an
20 institution with higher standards.
21    Q. So the underpinnings of your opinion
22 then are -- well, strike that. Let me just
23 clarify your opinion. On page 1 of your report,
24 the first paragraph is your statement of opinion?

Page 71

1    A. That's right.
2    Q. And the last sentence provides "that a
3 more prestigious institution with higher tenure
4 expectations than DePaul has invested in hiring
5 Calvente because they assess her as tenurable
6 renders DePaul's decision to deny her tenure
7 highly questionable."
8    A. Correct.
9    Q. Would you say that's the summation of
10 your opinion?
11    A. Yes.
12    Q. When you use the phrase highly
13 questionable, or I think on page 5 you say calls
14 into question, what do you mean by that?
15    A. It seems that the -- the justification
16 for doing that is unclear. It is questionable.
17 Again, where a higher, more prestigious
18 institution with higher tenure expectations would
19 assess the record as strong, and that a lesser
20 institution or less prestigious institution with
21 less stringent tenure practices would assess it
22 as weak, it makes no sense.
23    Q. Now, you testified a moment ago that in
24 your view, something went astray in the tenure

Page 72

1 process at DePaul University. Did I fairly
2 summarize what you testified to a moment ago?
3    A. Yes. The conclusion -- yes, because the
4 conclusion makes no sense. Something happened.
5    Q. Okay. But you are not opining in your
6 report on what that something is, correct?
7    A. Yes. I have no idea what it is.
8    Q. Okay. And are you familiar with Title 7
9 of the Civil Rights Act of 1964?
10    A. In passing. Not you know -- I haven't
11 read it recently.
12    Q. Okay. You don't have any specialized
13 training or expertise in that law?
14    A. No.
15    Q. Okay. And same question with respect to
16 Section 1981 of the Civil Rights Act?
17    A. No.
18    Q. No specialized training or experience or
19 expertise?
20    A. No.
21    Q. Okay. So you understand that Doctor
22 Calvente was appointed to the rank of assistant
23 professor at UNC?
24    A. The tenure track position, right.

Page 73

1    Q. Right. At the rank of assistant
2 professor?
3    A. I don't know what -- I don't know what
4 rank she was appointed at.
5    Q. Okay. You do understand it is an
6 initial appointment though, correct?
7    A. Yes.
8    Q. So now you had attached to your report
9 as Exhibit 3 to your report UNC -- hang on one
10 second. Let me make sure I have the title right.
11 UNC College of Arts and Sciences Department of
12 Communication Policies on Faculty Personnel
13 Actions. Do you see that?
14    A. Yes.
15    Q. It is attached as Exhibit 3 to your
16 report. I think it has like a number 3.3 on it
17 or some such?
18    A. Yes.
19    Q. Okay. How did you obtain this document?
20    A. I Googled it.
21    Q. So you didn't reach out to anyone at
22 UNC's Department of Communication?
23    A. No. I found it online so I didn't have
24 to contact them.

Page 74

1  Q.  Okay.
2  A.  I was delighted to see that it was dated
3 March of 2021.
4  Q.  Right.  Do you know -- you were
5 delighted to see that because of why?
6  A.  Because otherwise I would have to either
7 ask Jerry to ask them, I guess, or I would have
8 to ask them.  So I didn't have to contact them.
9  Q.  And do you know like the exact date in
10 March that this was published?
11  A.  No, I do not.
12  Q.  Okay.  So you don't know if it comes
13 before or after the offer made to Doctor
14 Calvente?
15  A.  I do not.
16  Q.  Okay.  Now, I see on pages 1 and 2 of
17 this document that there are reference to a
18 variety of other university publications that
19 Exhibit 3.3 is subject to, and those publications
20 are lettered A through G.  Do you see that?
21  A.  Right, yes.
22  Q.  Okay.  And just above that list of
23 publications the policy reads "the department's
24 policies are subject to those set forth in the

Page 75

1 following university publications".  Do you see
2 that?
3  A.  Yep.
4  Q.  Okay.  Did you then -- it looks like
5 these are hyperlinks.  Did you go and obtain
6 copies of all these other documents?
7  A.  Yes.  So I read those because it is very
8 common and the same at UW Madison.  You have --
9 you have overall university tenure expectations
10 that govern all the divisions of knowledge, again
11 whether it is neuroscience or classics.  So
12 that's to make sure there is consistency at the
13 highest level of the institution.  And then you
14 have them usually by the division of knowledge.
15 And then you have them specific to a given
16 department or a college of, you know, let's say
17 in terms of the -- something smaller like our --
18 like a smaller college, like the communications
19 at DePaul or human ecology at UW Madison.
20     So it makes sense that the
21 departmental level, the departmental level has to
22 reflect the overall standards of the institution
23 so it all floats down.  But you also have to look
24 up to make sure there is consistency.  So knowing

Page 76

1 that, that's what I did.
2  Q.  So to answer my question, you did in
3 fact pull all of those?
4  A.  Yes.
5  Q.  Is there any reason you didn't provide
6 those to Mr. Bramwell in connection with the
7 subpoena?
8  A.  Because they are hyperlinked in the
9 document.
10  Q.  So is it your position that anything
11 hyperlinked in any of the documents you provided
12 to me or to Mr. Bramwell to provide to me are
13 documents that you reviewed?
14  A.  Yeah, especially in this situation.  I
15 mean it is part of the document -- what the
16 College of Arts and Sciences and the Department
17 of Communication are relying on, and what they
18 are saying are their procedures are the
19 procedures of the institution, which are
20 hyperlinked in this document.  So those
21 hyperlinks are part of this document, and then
22 this document itself.
23  Q.  So my question is this.  There are a
24 number of documents that were provided to me by

Page 77

1 Mr. Bramwell in connection with the subpoena.
2 Many of those documents, some are articles, some
3 are publications from universities, have
4 hyperlinks in them.  My question is to you, in
5 every single document that was provided to me by
6 Mr. Bramwell that has a hyperlink in it, am I to
7 assume that you then clicked on all those
8 hyperlinks?
9     And whether it was from
10 the U.S. News and World Report or whether it was
11 from the Chronicle of Higher Education, or
12 whether it was from one of these policy
13 documents, am I to assume that everywhere there
14 has been a hyperlink in a document provided to
15 me, that you reviewed and relied on that
16 information in forming your opinion?
17     MR. BRAMWELL:  I'm going to object
18 to that question as vague and compound.  If you
19 have questions about a specific document, please
20 ask that.  But the way you have asked your
21 question is unanswerable by anyone.
22     MS. WERMUTH:  Okay.  You're
23 coaching the witness.
24     MR. BRAMWELL:  I'm not coaching the

Page 78

1  witness. Absolutely not.
2  BY MS. WERMUTH:
3     Q. Okay. You can answer.
4     A. I would assume that you clicked on these
5  links. That you know that I clicked on these
6  links in this document because the policy of the
7  department incorporates the policy of the
8  institution. I don't know about the other
9  documents -- I can't remember about the other
10 documents. I can't -- I don't know. I mean I
11 can't remember every little link in the -- you
12 know, in the various articles.
13    Q. Do you have a file that you created in
14 connection with your preparation of this report,
15 whether it's an electronic file or physical file
16 or both?
17    A. Just the downloads of the -- actually I
18 think I just sent the links. I just sent the
19 links. And then I think Jerry forwarded them on
20 to you.
21    Q. So my question is do you have a physical
22 or electronic file that you have maintained in
23 connection with your engagement as an expert in
24 this case?

Page 79

1     A. Yes. I mean I have downloaded the
2  various documents that were sent to me and the
3  report. So yes.
4     Q. So your file contains what? Just so I'm
5  clear.
6     A. Well, it contains my report. It
7  contains the subpoena. Probably some of the
8  articles that I downloaded. I don't know. I
9  would have to look.
10    Q. Is there anything in this document,
11 Exhibit 3.3, that you -- strike that. Is there
12 anything in your report that relies upon the
13 hyperlinks at A, B, C, D, E, F, or G, on pages 2
14 -- 1 and 2 of Exhibit 3 to your report?
15    A. I do not think so. The only -- let me
16 just -- no. All the quotations and all the
17 assessments of what the standards were for --
18 for tenure are from this document itself.
19    Q. I'm going to ask you to look at Exhibit
20 4 again, please?
21    A. Okay.
22    Q. So this is the offer letter that Mr.
23 Bramwell sent to me in connection with the
24 subpoena response. So I'm going to point you to

Page 80

1  just a couple of pieces of information on here.
2  In the first paragraph, I think you will note
3  that she was being recommended for appointment as
4  assistant professor. Do you see that?
5     A. Yes.
6     Q. And then if you look at the second
7  paragraph, she -- Doctor Calvente is notified
8  that the tenure track assistant professor
9  appointment will be for a term of 4 years. Do
10 you see that?
11    A. Yes.
12    Q. With the possibility of reappointment
13 for 3 more years. Do you see that?
14    A. Yes.
15    Q. All right. So please go back to Exhibit
16 3.3 which are the UNC guidelines, if you would?
17    A. Okay.
18    Q. All right. And if you would go with me
19 please to page 7. Let me know when you are
20 there.
21    A. Yes.
22    Q. Okay. There is a section roman numeral
23 3, entitled criteria for specific personnel
24 actions. Do you see that?

Page 81

1     A. Yes.
2     Q. And so for example, if you scroll down
3  to the next page, item C is associate professor
4  personnel actions, right?
5     A. Right.
6     Q. And then if you scroll back up to B, you
7  have assistant professor personnel actions?
8     A. Right.
9     Q. When you look at section 3B, it says
10 that the rank of assistant professor denotes a
11 tenure track position. Do you see that?
12    A. Yes.
13    Q. And it says like we saw in the letter
14 with an initial appointment for 4 years. Do you
15 see that?
16    A. Yes.
17    Q. Along with the possibility of
18 reappointment for 3 additional years. Do you see
19 that?
20    A. Yes.
21    Q. And along with a review for the
22 conferral of tenure and promotion?
23    A. Yes.
24    Q. So at the time -- well, then if you go

Page 82

1  on to B-1, so we are now at roman numeral 3, B-1,
2  the college sets forth the standards for an
3  initial appointment to assistant professor,
4  right?
5      A.  Yes.
6      Q.  Which is what Doctor Calvente received
7  an offer of right?
8      A.  Right.
9      Q.  Okay.  So she didn't receive an offer of
10  reappointment, right?
11     A.  Yes.
12     Q.  Okay.  And so the standard at this point
13  in time for initial appointment is the clear
14  promise of excellence in teaching and
15  scholarship.  Do you see that?
16     A.  Yes.
17     Q.  So at the point of time of an initial
18  appointment to assistant professor, the
19  individual need not yet have established a record
20  of excellence or achievement of excellent, right?
21     A.  In order to get hired as an institution
22  like UNC or UW Madison or Indiana or whatever,
23  you have to pretty much show that your chances of
24  tenure are very, very high, and that you have a

Page 83

1  strong record of publication that is going to be
2  tenurable.  Otherwise you are not going to be
3  hired.
4      Q.  Okay.  But here is my question, right?
5  You relied on the UNC College of Communication
6  Guidelines in forming your opinion, correct?
7      A.  Right.
8      Q.  Okay.
9      A.  Well -- yes, right.
10     Q.  Okay.  In fact you do a comparison of
11  those guidelines against DePaul's guidelines,
12  right?
13     A.  Right.
14     Q.  According to UNC's own guidelines, the
15  individual who is being appointed as an assistant
16  professor in connection with an initial
17  appointment has to show promise of excellence,
18  right?  That's what the guidelines state?
19         MR. BRAMWELL:  Objection, asked and
20  answered.
21  BY MS. WERMUTH:
22     Q.  I'm sorry.  What was your answer?
23     A.  They have to show -- they have to
24  demonstrate tenurability, that they are

Page 84

1  tenurable.
2      Q.  Here is what the guideline states --
3         MR. BRAMWELL:  The best evidence --
4  I'm just going to object.
5         MS. WERMUTH:  You are interrupting.
6  I didn't even finish my question, Jerry.
7         MR. BRAMWELL:  I can't hear
8  anything when you address me as Jerry.  The best
9  evidence of the guidelines is the guidelines.  So
10  go ahead.
11        MS. WERMUTH:  Okay.  It is clear on
12  the record that Mr. Bramwell interrupted me
13  before my question was finished.  It is clear on
14  the record that he is coaching the witness by
15  providing answers.  And I'm going to ask the
16  question, and i expect that I'll get an answer to
17  the question.
18     Q.  I'm talking now, Doctor Zaeske, just
19  about what the guidelines provide, right?  So
20  according to UNC's College of Communication
21  Guidelines, as written in the document attached
22  to your report, the initial appointment of
23  assistant professor requires the promise of
24  excellence in teaching and scholarship, correct?

Page 85

1         MR. BRAMWELL:  Objection, best
2  evidence.
3  BY MS. WERMUTH:
4      Q.  You can answer.
5      A.  So what you look for is that the --
6  there is a record of accomplishment in research
7  and teaching and to some degree outreach that is
8  going to project into tenurability, to getting
9  tenure.
10     Q.  I'm asking you what the guidelines
11  provide in writing --
12     A.  Right.
13     Q.  -- to a newly appointed assistant
14  professor, that the standards are such that there
15  is -- that the appointment requires the promise
16  of excellence in teaching and scholarship.  Is
17  that correct or is that not correct?
18        MR. BRAMWELL:  Objection, best
19  evidence.  Best evidence.  Ms. Wermuth, we have
20  been through this now 3 times.  You have asked
21  the question 3 times.  The best evidence is the
22  document.  Nobody is arguing as to what the
23  document says.  The document is the document.
24  Please move along.

Page 86

1    MS. WERMUTH: I'm not -- I am
2 entitled to an answer to the question. I
3 continue to object to your coaching the witness
4 on how to answer the question --
5    MR. BRAMWELL: I am not coaching
6 the witness.
7    MS. WERMUTH: Let me finish. I
8 allowed you. I have not yet received an answer
9 as to whether or not this is what the guidelines
10 that Doctor Zaeske relied on in her report
11 actually provide. What she keeps telling me is
12 what the institution would do. I'm not asking
13 that question. I'm asking what the guidelines
14 that she relied on provide. That's my question.
15    MR. BRAMWELL: I'm not coaching the
16 witness -- are you finished?
17    MS. WERMUTH: Yes.
18    MR. BRAMWELL: Okay. I am not
19 coaching the witness. I object to that
20 characterization. I find it offensive. If you
21 believe I'm coaching the witness, I'll invite you
22 to call the Judge. His telephone number is
23 312-435-6054, at least according to his website.
24 I'm not coaching the witness. You have asked the

Page 87

1 question multiple times. The witness has
2 answered to the best of her ability.
3    Nobody is arguing as to
4 what -- you have the document in front of you.
5 She is answering your question. If you don't
6 like the answer, ask another question, ask it
7 another way. But you are now at the point where
8 you are starting to badger.
9    MS. WERMUTH: I'm entitled to an
10 answer to a very specific question.
11    Q. Let me ask you this, Doctor Zaeske. You
12 relied on the UNC College of Communication
13 Guidelines in forming your opinion, did you not?
14    A. Yes.
15    Q. And in fact, you quote several sections
16 of the guidelines specifically in your report,
17 correct?
18    A. Yes.
19    Q. You do not quote from the Section 3-B-1.
20 Am I right about that?
21    A. I don't know because I would have to
22 look through my whole report to see if I quoted
23 from that section or not.
24    Q. Okay. So you're -- am I incorrect when

Page 88

1 I state that the guidelines that you relied on in
2 your report from UNC provide that an initial
3 appointment of assistant professor requires the
4 clear promise of excellence in teaching and
5 research?
6    MR. BRAMWELL: Objection, asked and
7 answered, and objection, best evidence.
8 BY MS. WERMUTH:
9    Q. You can answer.
10    A. The document itself states "the
11 standards for initial appointment are the clear
12 promise of excellence in teaching and
13 scholarship," and etcetera. I think the key
14 thing to understand is what is meant by clear
15 promise and what that -- of excellence, and what
16 that looks like in practice.
17    Q. Okay. But you don't refer to that --
18 well, strike that. You didn't interview anybody
19 at the University of North Carolina, correct?
20    A. No.
21    Q. Okay. And looking at Section 3-B, again
22 the tenure track position of assistant professor
23 comes with the possibility of reappointment,
24 correct?

Page 89

1    A. Yes. That's a standard -- that's
2 standard.
3    Q. Okay. Meaning that it is not guaranteed
4 that you will be reappointed, correct?
5    A. Correct.
6    Q. And it is not guaranteed that you will
7 achieve tenure either, correct?
8    A. Correct.
9    Q. In fact, you testified earlier today
10 that just in the last couple of months, you
11 non-renewed probationary faculty -- 2
12 probationary faculty because even though you
13 believed they had the promise of excellence at
14 the time of their hire, they did not achieve the
15 standards of the University of Wisconsin,
16 correct?
17    A. That's correct.
18    Q. All right. Now, if you go to page 8?
19    A. Page 8?
20    Q. Yes. Scroll to the next page.
21    MR. BRAMWELL: Page 8 of what, Ms.
22 Wermuth?
23    MS. WERMUTH: I'm sorry. Thank you
24 for asking that question. The UNC Department of

Page 90

1  Communication Promotion and Tenure Guidelines,
2  3.3.
3         MR. BRAMWELL:  Okay, thanks.
4  BY MS. WERMUTH:
5     Q.  So the same document we were looking at,
6  just the following page, Doctor.  Are you with
7  me?
8     A.  Yep.
9     Q.  Okay.  So at UNC, a faculty member could
10  come in from another institution with an initial
11  appointment at the rank of associate professor;
12  is that right?
13         MR. BRAMWELL:  Objection, best
14  evidence.
15         THE WITNESS:  It is true at any
16  institution.
17  BY MS. WERMUTH:
18     Q.  Okay.  But these guidelines provide
19  that, correct?
20     A.  Yes.
21         MR. BRAMWELL:  Asked and answered.
22  Best evidence.
23  BY MS. WERMUTH:
24     Q.  So -- and that could come without

Page 91

1  tenure, right?  You could be appointed to
2  initially at UNC to associate professor without
3  tenure, according to these guidelines?
4     A.  I don't know that to be the case.  It
5  certainly -- that's not the case at my
6  institution, and at most strong research
7  institutions, because tenure and rank are not
8  desegregated.
9     Q.  But let's look at what --
10         MR. BRAMWELL:  I'm sorry.  Were you
11  finished with your answer?
12         THE WITNESS:  Yes.
13  BY MS. WERMUTH:
14     Q.  So looking at Exhibit 3.3, section C,
15  the first sentence says "initial appointment at a
16  rank of associate professor may be with or
17  without tenure."  Do you see that?
18     A.  Right.
19     Q.  So according to UNC's College of
20  Communication, they can bring in and appoint a
21  faculty member at the rank of associate professor
22  without tenure?
23         MR. BRAMWELL:  Objection, best
24  evidence.

Page 92

1         THE WITNESS:  Correct.
2  BY MS. WERMUTH:
3     Q.  And that was not what was offered to
4  Doctor Calvente, correct?
5     A.  Apparently based on the letter that you
6  showed me.
7     Q.  And in that same section, that first
8  paragraph under Subsection C, the last sentence
9  of the first paragraph indicates this.  "A
10  recommendation for promotion and/or tenure by the
11  department chair requires a careful assessment
12  informed by outside references about the
13  qualifications of the candidate and the
14  professional judgment of the assembled full
15  professors.  The professional judgment of the
16  tenured associate professors is also considered."
17  Do you see that?
18     A.  Yes.
19     Q.  So even in the College of Communication
20  at the University of North Carolina, there is a
21  peer review process for tenure, correct?
22     A.  Yes.
23     Q.  Okay.  And that peer review process
24  requires careful assessment, correct?

Page 93

1     A.  Yes.
2     Q.  By people within and outside of the
3  institution, correct?
4     A.  Yes.
5     Q.  So there is no guarantee at the time of
6  hire that an individual will in fact be tenured
7  at the University of North Carolina, correct?
8     A.  That's correct.
9     Q.  Okay.  Okay.  Now, at several points in
10  your report, Doctor Zaeske, you make assertions
11  about the job prospects of faculty denied tenure
12  at what you refer to at R2 schools?
13     A.  R2 schools, yes.
14     Q.  So we have been talking about R1 and R2
15  today, but I don't think for the record we have
16  clarified what that means.  So let's take a
17  moment to do that, okay?  What is -- when you say
18  R1 and R2, what are you referring to?
19     A.  Actually I think in the report I do
20  pretty clearly explain what that is -- what those
21  are and how those categories are determined, and
22  then I provided an exhibit that provides a
23  listing, as I recall.  So I think those are
24  pretty clearly defined.  But R1 --

Page 94

1    Q.  But --
2         MR. BRAMWELL:  I'm sorry, Ms.
3  Wermuth.  Do not cut my expert off as she is
4  speaking.
5         MS. WERMUTH:  I'm sorry, Jerry.
6         MR. BRAMWELL:  I'm sorry.  I can't
7  hear anything when you address me by my first
8  name.
9  BY MS. WERMUTH:
10    Q.  Please finish your answer, Doctor
11  Zaeske.
12    A.  So Exhibit 1 is R1 and R2 Carnegie
13  Classifications.  I'm just looking at my report.
14  So those were provided.  And then there is a
15  section in the report where I explain the
16  difference.  But the bottomline is that R1
17  institutions have higher expectations and higher
18  -- for research, and also really for teaching
19  standards, though there is usually less teaching.
20  And then they have more research expenditures and
21  tend to be more prestigious institutions in the
22  United States.
23              R2 institutions have
24  lesser research expectations, generally have

Page 95

1  higher teaching loads, and tend to be less
2  prestigious institutions in the United States.
3  And then I provided a list of those from the --
4  this is the Carnegie Classifications.
5    Q.  So here is my question.  You and I have
6  been using R1 and R2 throughout the course of the
7  deposition.  So my question was for purposes of
8  the deposition, we need to clarify what we are --
9  what we mean when we use those classifications or
10  when we use those terms, R1 and R2.
11              So let me ask you this.
12  You just said R2 institutions are less
13  prestigious than R1 institutions.  Are you
14  telling me that you think Dartmouth is a less
15  prestigious university than the University of
16  North Carolina?
17    A.  Well, Dartmouth has been reclassified in
18  the R1, if that's what you're getting at.  It was
19  demoted to an R2.  It was considered a loss of
20  prestige by Dartmouth.  Then they increased their
21  research expenditures, and they are back in the
22  R1 classification.  So it was absolutely
23  considered a loss of prestige for Dartmouth.
24    Q.  My question is when Dartmouth was an R2

Page 96

1  classification, did you understand that to be a
2  less prestigious institution than the University
3  of North Carolina?
4    A.  Yes.
5    Q.  Okay.  So the Carnegie Classifications,
6  that's what we are talking about when we refer to
7  R1 and R2?
8    A.  Correct.
9    Q.  Who administers the Carnegie
10  Classifications?
11    A.  They had been administered in the past
12  by Carnegie, but now they are administered
13  through the university of -- through a part of
14  the education school at the University of
15  Indiana.
16    Q.  And what is the methodology that the
17  University of Indiana uses -- I think it is
18  actually Indiana University, uses to classify
19  schools under the Carnegie Classifications?
20    A.  They have a number of criteria, but the
21  major one has to do with research expenditures,
22  or in other words, the amount of money generated
23  by research, by research grants, and spent on
24  research.  That's the major -- that's the major

Page 97

1  metric that's used.
2    Q.  Okay.  So one of the metrics is how much
3  the institution actually spends on research,
4  right?
5    A.  Right.
6    Q.  Another metric is how many research
7  doctorates are conferred?
8    A.  Right.
9    Q.  Another metric is the number of
10  non-faculty research staff at the institution,
11  correct?
12    A.  Right.
13    Q.  Those are the metrics that are used; is
14  that right?
15    A.  Right.
16    Q.  Okay.  So Carnegie does not measure
17  volume of scholarly output, correct?
18    A.  I don't think they -- no.  No.  They
19  don't do that per se like academic analytics or a
20  product like that.
21    Q.  So they don't measure the quality of the
22  scholarly output either?
23    A.  I would say not directly, but indirectly
24  once -- the ability to get particularly Federal

Page 98

1  grants is a measure of the quality of the
2  research.
3     Q.  Okay.  But we are talking about R1 and
4  R2 classifications, right?  So when Indiana
5  University is pulling data every 3 years to come
6  up with who -- which institution is ranking
7  where, it is not looking at the quality of
8  scholarly output, correct?
9         MR. BRAMWELL:  Objection, asked and
10  answered.
11         THE WITNESS:  Yes.  As I said,
12  there is an indirect measure by -- in order to
13  get an NIH, NSF, ACLS grant, you have to have
14  high quality scholarship, and they are peer
15  reviewed, and it is competitive, and quality is
16  assessed in that way.  So those are measures of
17  quality.
18  BY MS. WERMUTH:
19     Q.  Are the researchers at Indiana
20  University who compute the data for purposes of
21  the Carnegie Classifications looking at the
22  content and substance of grants, grant awards, or
23  scholarly output?
24         MR. BRAMWELL:  Objection,

Page 99

1  foundation, and objection, asked and answered.
2         THE WITNESS:  So they are not
3  looking directly, but they are looking at the
4  success of those grants in generating dollars.
5  BY MS. WERMUTH:
6     Q.  Okay.  Carnegie does not measure
7  educational outcomes for students, correct?
8     A.  Correct.
9     Q.  All right.  So I would like to look at
10  your report again, not the exhibit, but going to
11  page 1 of your report, and the paragraph that
12  reads basis for opinion as a header.  Tell me
13  when you are there.
14         MR. BRAMWELL:  I'm sorry.  Can you
15  help me with the page, Ms. Wermuth?
16         MS. WERMUTH:  Page 1
17         MR. BRAMWELL:  Page 1.  Thank you.
18         THE WITNESS:  Okay.
19  BY MS. WERMUTH:
20     Q.  Are you there?
21     A.  Yes.
22     Q.  Okay.  Great.  So that big paragraph at
23  the bottom of the second half of the page.  About
24  halfway down, there is a sentence that begins "R2

Page 100

1  universities have high research activity."  Do
2  you see that?
3     A.  Page 2 --
4     Q.  No.  Page 1.
5     A.  Page 1.  Sorry.
6     Q.  Second paragraph, halfway down that
7  second paragraph, the sentence --
8     A.  Right, okay.  Yeah, yeah.
9     Q.  You are with me?
10     A.  Yes, yes.
11     Q.  So it says "R2 universities have high
12  research activity, but they expect professors to
13  be teachers first."  Do you see that?
14     A.  Yes.
15     Q.  What is the source -- well, strike that.
16  Would you look please at Exhibit 7 in the -- let
17  me just make sure I have the right exhibit.
18  Yeah.  Exhibit 7 in the packet that was sent
19  yesterday.
20     A.  Yes.
21     Q.  Okay.  This was material that was
22  produced to me in connection with the subpoena
23  served on you, okay?  So this is something that
24  you looked at in preparing the report?

Page 101

1     A.  Yes.
2     Q.  Is there anything in here that says R2
3  universities expect their professors to be
4  teachers first?
5     A.  Well, I don't know about this article
6  per se -- well, first of all, look, these
7  articles are, you know, I wanted you to see that
8  my professional knowledge is not -- it's not just
9  me.  So there are other sources that are saying
10  this.
11         But either in this article
12  or others that I have provided, it is clear that,
13  and it is stated directly that at R2
14  institutions, the teaching load -- what we mean
15  when we say here expected to be a teacher first,
16  your teaching load might be 4-4, 4 courses a
17  semester in the Fall and Spring, or sometimes
18  they are on quarter systems, or whatever, or 3-3.
19  Whereas at an R1 institution, you are considered
20  and you are asked to be a researcher first.  So
21  your teaching load is going to be something like
22  2-2 or even 2-1 or 1-1 because teaching --
23  because research is first.  That's what is meant.
24     Q.  So I have a couple of follow-up

Page 102

1  questions. First of all, do you know what Doctor
2  Calvente's expected teaching load will be at the
3  University of North Carolina?
4      A. No, I don't.
5      Q. Do you know what her teaching load was
6  at DePaul University?
7      A. No.
8      Q. So you referred to Exhibit 7 as an
9  article, but let me just clarify for the record
10  what I think this is. This is a download from
11  the website where the Carnegie Classifications
12  are described. Am I right about that?
13      A. That's right.
14      Q. So this is a publication from the folks
15  who do the Carnegie Classifications, correct?
16      A. Correct.
17      Q. So it is not really an article?
18      A. Right.
19      Q. Okay. Fair enough. And am I correct
20  though that there is nothing in how Carnegie
21  describes their descriptions of classifications
22  or methodology that indicates that an R2 school
23  requires -- I'm sorry, expects professors to be
24  teachers first?

Page 103

1      A. No. They are not focused on that.
2      Q. Okay. And then if you would look at
3  Exhibit 8 in the packet sent to you last night?
4      A. Yes.
5      Q. Okay. Can you tell me what this is?
6      A. It looks like the Carnegie
7  Classification for DePaul.
8      Q. And this is something that you looked at
9  in preparing your opinion?
10      A. Probably I did, yes. I don't remember.
11      Q. Okay. I'll just represent that it was
12  produced to me by Mr. Bramwell in connection with
13  the subpoena served on you, okay?
14      A. Okay.
15      Q. So in looking at this document, I see
16  that it is -- I'm looking at the second page of
17  it.
18      A. Uh-huh.
19      Q. And there is like a chart that says
20  classification and then category with 2 columns.
21  Do you see that?
22      A. Right.
23      Q. Okay. And so under the column that says
24  classification, there is a line for basic. Do

Page 104

1  you see that?
2      A. Yes.
3      Q. And it says doctoral -- category is
4  doctoral universities high research activity?
5      A. Yes.
6      Q. So high research activity is R2?
7      A. Right.
8      Q. Very high is R1?
9      A. Yes.
10      Q. But nevertheless, high research
11  activity, correct?
12      A. Yes, but -- yes. The differences are
13  significant.
14      Q. Okay. There doesn't -- I don't see
15  anything in here that suggests that this is an
16  institution that expects professors to be
17  teachers first. Do you see anything in here that
18  says that?
19          MR. BRAMWELL: Objection, best
20  evidence. Go ahead.
21          THE WITNESS: I don't know how it
22  compares to the other -- well, the Carnegie
23  classifications, the IU classifications, again,
24  they are about research.

Page 105

1  BY MS. WERMUTH:
2      Q. Right. Thank you. And then when you
3  look at the undergraduate profile on this page,
4  do you see that?
5      A. Yes.
6      Q. It says 4 year, full-time, selective,
7  higher transfer-in. Do you see that?
8      A. Yes.
9      Q. So it is categorized as a selective
10  undergraduate profile, right?
11      A. Yes.
12      Q. Meaning the students are high quality?
13  It is a selective institution?
14          MR. BRAMWELL: Objection, form.
15  Objection, foundation. Objection, assumes facts
16  not in evidence.
17  BY MS. WERMUTH:
18      Q. You can answer.
19      A. So I don't know how the other
20  institutions -- I mean it might be the same
21  arguably as the research where there is high
22  research activity and very high research
23  activity. It might be selective or very
24  selective. So I don't know.

Page 106

1    Q.  You don't know.  Okay.  Can you look at
2  Exhibit 6, please?
3    A.  Do we know how many doctorates DePaul
4  produces every year?
5    Q.  Do you know the answer to that question?
6    A.  I don't know, but I think that's a good
7  question.
8    Q.  It is not something you looked up for
9  purposes of forming your opinion, correct?
10    A.  Yeah, but you are making me think that
11  it would have been a good thing.  You want me to
12  look at number 9?
13    Q.  No.  Number 6, please.
14    A.  News and announcements?
15    Q.  Yes.  This is another download from the
16  Carnegie Classifications website?
17    A.  Right.
18    Q.  This was produced to me by Mr. Bramwell
19  in connection with the response to the subpoena.
20  I'm just curious how did this document -- how did
21  you rely on this in forming your opinion?
22    A.  I think I wanted to know the -- how
23  recent the classifications had been updated and
24  also to establish that, you know, I thought the

Page 107

1  statement that said the Carnegie classification
2  has been the leading framework, so on, was
3  explanatory and helpful.
4    Q.  Well, it says "it has been the leading
5  framework for recognizing and describing
6  institutional diversity in the U.S. higher
7  education for the past 4 and a half decades."  So
8  what about that sentence helped you form the
9  basis of your opinion?
10        MR. BRAMWELL:  Objection as to
11  form.  Objection as to format.  Objection as to
12  misstates her testimony.  Objection, assumes
13  facts not in evidence.
14        THE WITNESS:  So the bottomline is
15  I wanted to show that I was looking at updated
16  information.
17  BY MS. WERMUTH:
18    Q.  Okay.  So let's take a look then, you
19  said that -- so this is Exhibit 3.1.  You said
20  that you attached to your report the listing of
21  R1 and R2 research classifications.  Is that
22  right?
23    A.  Right.  Correct.
24    Q.  Are you with me there?

Page 108

1    A.  Yes, correct.  Yes.
2    Q.  So where -- so this was produced to me
3  as -- it was attached to your report as a Word
4  document.  So is this a document that you
5  personally created?
6    A.  I think I might have just block copied
7  it and dropped it into a Word doc, because I
8  couldn't figure out otherwise how to get it
9  preserved in a document form.
10    Q.  Where did you find this?
11    A.  I think -- isn't the URL right on there?
12    Q.  I don't see it.  Can you tell me where
13  you see it?
14    A.  Exhibit 3?
15    Q.  Point 1.
16    A.  Okay.  I guess I did not include the
17  URL, but I think I took it from the website of
18  the -- the IU website.
19    Q.  Okay.  Can you confirm for me that
20  everything in the left column is an R1 school and
21  everything in the right column is an R2 school?
22    A.  I trust the source that I have used, so
23  yes.
24    Q.  Okay.  And that would follow through all

Page 109

1  of the pages?  So page 2, page 3, page 4,
2  everything on the left side of the sheet is R1
3  and everything on the right side of the sheet is
4  R2, correct?
5    A.  Yes.
6    Q.  Now, earlier we had talked about Yale
7  being an R1 school.  I don't see Yale -- oh,
8  wait.  I see it as an R2 school on page 3.  Is
9  that consistent with your knowledge of --
10    A.  Actually earlier you said Yale was an R1
11  school, and I said no, Yale is an Ivy League
12  school.
13    Q.  Okay.  So you -- it is your
14  understanding that Yale is not an R1 school?
15    A.  I find that surprising, but apparently.
16    Q.  What about are you familiar with the
17  University of Chicago?
18    A.  Yes.
19    Q.  And according to the document that you
20  produced, the University of Chicago also is an R2
21  school?
22    A.  Surprising.
23        MR. BRAMWELL:  I'm sorry, Ms.
24  Wermuth.  I apologize.  What page?

Page 110

1    MS. WERMUTH: 2. It is not
2  numbered. It is at the very top of the right
3  column.
4    MR. BRAMWELL: I'm sorry. I see
5  it.
6  BY MS. WERMUTH:
7    Q. Do you think that's accurate, Doctor
8  Zaeske?
9    A. I think it is surprising, but I don't
10 know why it would be wrong on this list. I don't
11 see Chicago.
12   Q. Page 2?
13   A. Is it under University of Chicago?
14   Q. Correct.
15       MR. BRAMWELL: It may be easier to
16 share your screen.
17 BY MS. WERMUTH:
18   Q. Go to the second page of the document.
19 Don't look alphabetically. For whatever reason
20 these are not in alphabetical order.
21   A. Okay. That's probably why. Oh yes,
22 yes, I do see it. That is strange.
23   Q. Are you familiar with Northwestern
24 University?

Page 111

1    A. Certainly.
2    Q. Do you see Northwestern appearing under
3  the R1 or R2 list on that document that you
4  provided?
5    A. I do not.
6    Q. So according then to your theory since
7  Northwestern is not an R1 nor an R2 school, it
8  would be less prestigious than DePaul University
9  which is an R2 school? Is that fair?
10   A. I would not agree with that.
11   Q. And okay. Isn't your theory premised on
12 R2 schools being less prestigious than R1
13 schools?
14   A. Well, you are making a leap in logic
15 here from the inclusivity of a list to what my
16 argument is. You know, there is -- I'm surprised
17 that Northwestern is not on this list, and I
18 don't know -- I don't know why, and I can't
19 explain that. But that doesn't mean that I
20 wouldn't -- I mean if we looked at the research
21 expenditures of Northwestern and the number of
22 doctorates produced and compared that to DePaul,
23 I think we would have data to indicate that there
24 is a prestige difference there.

Page 112

1    Q. Based on research dollars?
2    A. Based on research dollars.
3    Q. Even though Northwestern doesn't show up
4  on your list of R1 or R2 schools?
5        MR. BRAMWELL: Objection to the
6  characterization of it as her list.
7        THE WITNESS: Yeah. It is this
8  list.
9  BY MS. WERMUTH:
10   Q. Well, this is a list that you said that
11 you cut and pasted, right?
12   A. From a website, yeah. I will find out
13 what the source was.
14   Q. Yeah. I'm going to ask for that URL
15 because I'm not sure that this is an accurate
16 document.
17       MR. BRAMWELL: Are you accusing my
18 client -- not my client. Are you accusing my
19 expert of producing inaccurate information, Ms.
20 Wermuth?
21       MS. WERMUTH: With Yale and
22 University of Chicago being listed as R2 and
23 Northwestern being excluded, I think if I went on
24 the Carnegie Classification website and looked at

Page 113

1  their data spreadsheets, I think I would see
2  something different. That's what I'm saying.
3  I'm not saying it is intentional. I don't know
4  the source of this document. That's why I'm
5  asking these questions. I'm not accusing anyone
6  of anything. I'm trying to ask questions about
7  documents that were produced to me in response to
8  a subpoena that were allegedly relied upon by the
9  expert in preparing her opinion. That's what I'm
10 asking, Jerry.
11       MR. BRAMWELL: I'm sorry, Anna. I
12 have asked you multiple times to give me the
13 courtesy --
14       MS. WERMUTH: Mr. Bramwell.
15       MR. BRAMWELL: Thank you.
16       MS. WERMUTH: You can call me Anna
17 any time. I'm not offended.
18   Q. Go ahead, Doctor.
19   A. So this listing really was just to
20 provide a sense of what these -- what R1 and R2,
21 you know, classifications look like. They did
22 not I would say inform my decision. I mean it is
23 really about the general understanding of an R1
24 and R2 institution as opposed to the overall

Page 114

1  inclusivity of a list.
2      Q.  But you did attach it to your report,
3  Doctor?
4      A.  Yes.
5      Q.  All right.  I just want to finish out
6  some discussion about the Carnegie
7  Classifications.  So if you would please look at
8  Exhibit 11?
9      A.  Okay.
10     Q.  Okay.  This is the publication that you
11 list among the facts and data considered in
12 forming your opinion in your report.  Okay?
13     A.  Right.
14     Q.  What is this publication?  I can't
15 really tell from what was provided to me.
16     A.  It is a center that -- you know, a lot
17 of institutions have centers that focus on
18 educational -- educational studies and
19 educational politics and educational policies, I
20 should say.  And this is a publication by an
21 expert in higher ed about the Carnegie.
22     Q.  Okay.  And do you know what school the
23 James G. Martin Center for Academic Renewal is
24 associated with?

Page 115

1      A.  I cannot recall.
2      Q.  This is not a peer reviewed paper,
3  correct?
4      A.  No.  It is in an industry journal or an
5  industry, you may call it a magazine as opposed
6  to a journal.
7      Q.  You would agree with me that this author
8  actually points out the problems with relying on
9  the Carnegie Classifications?
10     A.  Yes.
11     Q.  And then Exhibit 14, if you can look at
12 that with me, please?
13     A.  Okay.
14     Q.  This is another article that was listed
15 among the facts and data considered by you in
16 preparing your report.  Are you familiar with
17 this article?
18     A.  Yes.
19     Q.  And this is an article from the
20 Washington Post, right?  So that's a newspaper?
21     A.  Correct.
22     Q.  So this is a news article about
23 Dartmouth falling out of the R1 classification?
24     A.  Right.  It is excellent evidence of the

Page 116

1  importance of the Carnegie Classifications in the
2  prestige of an institution.
3      Q.  You call a newspaper article excellent
4  evidence of what?  I'm sorry.
5      A.  So the prestige of an institution which
6  drives the -- so there is multiple ways that
7  there is prestige of institutions.  There is
8  prestige within the academic community itself,
9  and there is also the prestige with potential --
10 with alumni and also with potential applicants to
11 an institution, right?  And when Dartmouth fell
12 out of the Carnegie R1's, there was, you know,
13 ripples.  There were ripples in the academic
14 community.  There were ripples among alumni.
15 There were concerns in the institution about
16 enrollments.  There were concerns about whether
17 or not a Dartmouth degree was as worthwhile as it
18 has been in the past.
19            So this is an article that
20 just illustrates that even in public, in the
21 lighter public opinion, that this change in the
22 Carnegie ranking was -- it is a big deal.
23     Q.  Are you familiar with Kevin Kinser?
24     A.  No I'm not.

Page 117

1      Q.  Well, according to Kevin Kinser who is
2  quoted in this article in the first page, and
3  according to the article, which, again, is a news
4  article, "he is an associate professor of
5  Educational Administration and Policy Studies at
6  the State University of New York at Albany.  He
7  is on the advisory board of the Carnegie
8  Initiative.  He is quoted as saying "the label
9  should not be viewed as ranking or rating, but
10 merely a description based on data."  Yes?
11     A.  Well, he said it should not be viewed,
12 but that's because it is viewed.
13     Q.  He goes on to say that "For Dartmouth or
14 any other school to fall out of R1 category
15 shouldn't be considered some deficiency in the
16 institution."  Do you see that?
17     A.  Right.  He needed to say that.
18     Q.  The basis for your statement?
19     A.  Well, I can tell you right now I am
20 hiring a professor away from Dartmouth who
21 doesn't want to be there because it doesn't have
22 graduate education, and it is really focused on
23 undergraduate education, and it is not a strong
24 research institution.  It is back in the R1, but

Page 118

1  it is on the edge.
2      Q.  Do you know where Dartmouth ranks under
3  U.S. News World and Report as compared to
4  University of North Carolina?
5      A.  They are different -- well, there are
6  many different rankings in U.S. News and World
7  Report.  Dartmouth is known as a very -- as a
8  very good undergraduate school.  It is not a
9  great place if you are a researcher.
10     Q.  But you did rely on U.S. News World and
11 Report general rankings, right, for purposes of
12 forming your opinion?  In those general rankings,
13 do you know where Dartmouth falls as compared to
14 UNC?
15     A.  I do not.
16     Q.  So I think just to make sure this is
17 clear on the record, the Washington Post article
18 is not a peer reviewed publication, right?
19     A.  It is not, which I think is irrelevant.
20     Q.  Okay.  Okay.  Exhibit 22, please?
21     A.  Exhibit 22?
22     Q.  Yes.
23     A.  Okay.
24     Q.  All right.  So this article is from

Page 119

1  Inside Higher Ed.  Do you see that?
2      A.  Yes.
3      Q.  Which again is just sort of like an
4  industry magazine type, right?  It is not a peer
5  reviewed publication?
6      A.  Right.
7      Q.  Okay.  And this article seems to be
8  explaining that there is a new sort of
9  professional doctoral categorization that
10 Carnegie will be using, correct?
11     A.  Right.
12     Q.  Okay.  And according to this article,
13 this new category will mean that a small handful
14 of universities will move up to R1 designation?
15     A.  Right.
16     Q.  All right.  So let's go back to Exhibit
17 3, your report.  And by the way, I know it is
18 12:30.  I'm happy to keep going, but I'm happy to
19 break if folks need 15, 20, 30 minutes.  Gina, I
20 know your fingers are working hard.  So if folks
21 need a break, I'm happy to take a break.  Just
22 tell me if now is the right time and how much
23 time people would like.
24             THE WITNESS:  I'm doing fine.  It

Page 120

1  depends on what others say.
2          MS. WERMUTH:  Gina, do you need a
3  break?
4          COURT REPORTER:  If I could have
5  like 15 minutes, that would be perfect.
6          MR. BRAMWELL:  Since we are at the
7  noon hour, and the court reporter obviously is
8  the most important person in the room, did you
9  want to take a half hour for lunch?  Is that
10 enough time, Doctor Zaeske?
11         THE WITNESS:  Yes, that's fine.
12 (Break taken from 12:32 to 1:03)
13 BY MS. WERMUTH:
14     Q.  So Doctor Zaeske, I'll just remind you
15 that even though we broke, you are still under
16 oath.  You understand that?
17     A.  Thank you, yes.
18     Q.  Okay.  So we were going to start or
19 return to your report.  So if you would go to
20 Exhibit 3 with me for a moment, I would
21 appreciate that.
22     A.  Yes.
23     Q.  Couple of things I just wanted to ask
24 you about on page 1 in the second paragraph, near

Page 121

1  the end.  So there is a sentence about a third of
2  the way up from the bottom that begins with
3  "moreover, as a member of the advisory board of
4  the Carnegie Initiative."  Do you see that?
5      A.  Yes.
6      Q.  And then you go on to say that this
7  person explained that R1 institutions are
8  considered to be, and then there is a quotation
9  marks, "the pinnacle of higher education".  So it
10 looks like that is a quote, but I don't see
11 attribution here.  So I don't know who this
12 person is and where this statement was made.  Do
13 you have that information?
14     A.  Right.  So it is a quote, and it is in
15 one of the articles that I cited in the -- in the
16 list of documents and data considered here.  I an
17 could back and let you know if it is in the
18 Mendenhall or the Anderson.  It is probably one
19 or the other of those.
20     Q.  Or perhaps in the Washington Post
21 article?
22     A.  Or perhaps in that one, yeah.
23     Q.  All right.  And then you go on to talk
24 about rankings by College Factual and rankings by

Page 122

1  U.S. News and World Report.  Do you see that?
2      A.  Yes.
3      Q.  So what is College Factual?
4      A.  So these -- okay.  So these are commonly
5  -- both U.S. News and World Report and College
6  Factual are rankings of institutions that are
7  highly available to the public, as opposed to
8  let's say the NRC rankings, which are rankings of
9  doctoral institutions and doctoral programs, or
10  academic analytics, which are more available to
11  academic administrators and academics.
12              So I provided these
13  frankly because I thought they would be more
14  accessible to the court.
15      Q.  Okay.  So you chose to use the
16  publically available ones as opposed to the
17  sources that are used in the academic community?
18      A.  Right.
19      Q.  Okay.
20      A.  Well, also DePaul doesn't have a
21  doctoral program in communications, so it
22  wouldn't even be considered.  It wouldn't even be
23  included, so it is not possible to use that.
24      Q.  Okay.  And so as you testified earlier,

Page 123

1  U.S. News and World Report has a variety of
2  different types of rankings, right?
3      A.  Yes.
4      Q.  For your proposition here, UNC is ranked
5  28 as compared to DePaul's 124, what ranking
6  group were you looking at?
7      A.  So I was looking at the rankings of --
8  well, as it says "U.S. News and World Report
9  ranking of colleges offering a communications
10  major".  So I'm not looking at the overall
11  ranking of DePaul and the overall ranking of UNC.
12  I'm looking at the ranking of them within
13  institutions that offer a communication major.
14      Q.  Okay.  And do you know the methodology
15  that U.S. News and World Report uses to make the
16  rankings it makes or publishes the rankings it
17  makes?
18      A.  So it makes a number of different
19  rankings as I mentioned.  So its overall
20  institutional rankings, there are many things
21  included in overall rankings of institutions.  It
22  has to do with number of -- it has to do with
23  number of applications to attend the institution
24  and number of students admitted.  It has to do

Page 124

1  with -- it does have to do with research and
2  ranking of research programs.  It also includes
3  things such as number of living alumni who have
4  made contributions to an institution.  You know,
5  so there are a lot of different factors that U.S.
6  News and World Report include in their
7  assessment.
8              And you know, it's largely
9  reputational, as opposed to again, like the NRC,
10  or academic analytics, which is -- these really
11  look at the number of articles and books
12  published and the venues in which they are
13  published and the number of awards that are
14  garnered through research and so on.  So it is a
15  very different kind of ranking.
16      Q.  Right.  So there is a fair amount of
17  subjectivity, you call it reputational, but
18  subjectivity that goes into that particular
19  ranking?
20      A.  I would disagree with that.  It is not
21  about subjectivity.  It is about using different
22  metrics for making an assessment.  They are
23  measuring different things.
24      Q.  Okay.  Including things like feedback

Page 125

1  from folks who use the service, right?
2      A.  Feedback from folks who use which
3  service?
4      Q.  The ranking service.
5      A.  You mean the U.S. News and World Report
6  rankings?  Oh, you mean feedback about the
7  institutions themselves?
8      Q.  Well, when I -- so do you know whether
9  or not the U.S. News and World Report uses -- I
10  should say employs user feedback in its ranking
11  methodology?
12      A.  I don't know.
13      Q.  Okay.  Do you know whether it uses
14  discussions with schools in its ranking
15  methodology?
16      A.  I'm not aware.
17      Q.  Okay.  Now, there are a number, Doctor
18  Zaeske, a number of places in your report where
19  you talk about the job prospects for faculty
20  denied tenure from Carnegie Classification R2
21  schools, correct?
22      A.  Yes.
23      Q.  Okay.  So for example, on page 1 in the
24  first paragraph, you say "professors who are

Page 126

1 denied tenure at R2 universities such as DePaul
2 almost never are hired at R1 universities such as
3 UNC because their record has been assessed as
4 untenurable." Do you see that?
5    A. Yes.
6    Q. You go on to say "faculty denied tenure
7 at R2 universities typically find employment at
8 institutions with less rigorous tenure standards
9 such as community colleges, technical schools,
10 and high schools, or they leave the academy". So
11 for those 2 sentences that I just read, can you
12 tell me the source of your data here?
13    A. Sure. So I am speaking from
14 professional experience and a number of examples
15 that I know from both R2 and R1s. But then I
16 also, you know, provided -- I thought it would be
17 helpful to see that it is not just me talking
18 from my experience, so provided a number of
19 articles that backed up that claim that talked
20 about experience of individuals who were denied
21 tenure at R2 and R1 universities.
22    Q. Okay. So you are talking about some of
23 the feature stories that you attached to your
24 report or referenced in your report; is that

Page 127

1 right?
2    A. Right.
3    Q. Which are primarily anecdotal stories
4 from individuals who actually experienced tenure
5 denial, right?
6    A. Right.
7    Q. Some of those articles don't say whether
8 or not the individual was denied tenure at an R2
9 school. Would you agree with that?
10    A. Right.
11    Q. And many say that tenure denial helped
12 them actually find the career that they
13 preferred, right?
14    A. Right, right, which was not at an R1
15 institution.
16    Q. Okay. Although for those who went to
17 other institutions into tenure track positions,
18 in those articles, I didn't see one article where
19 that happened and the individual identified
20 whether the school they were denied tenure at or
21 the school where they landed was an R1 or an R2;
22 am I correct on --
23       MR. BRAMWELL: Objection.
24       MS. WERMUTH: I didn't finish the

Page 128

1 question.
2    Q. Or am I misreading those?
3       MR. BRAMWELL: Objection as to
4 vague, and objection, Counsel was testifying.
5 BY MS. WERMUTH:
6    Q. Did I misread any of those articles?
7    A. So all the articles that I provided, and
8 all the articles that I found, were examples of
9 individuals who had been denied tenure at R1 or
10 R2 institutions, and they were unable to be hired
11 at an R1 institution, and I think none of them,
12 as I recall, were hired into tenure track
13 positions.
14       And yes, there was the one
15 article by -- her last name -- either her first
16 name or last name was Grace, talked about finding
17 out that she was happier at a non -- in a
18 non-tenure track job, though she was continuing
19 to strive for a tenure job position. But I can
20 -- you know, I have at least a handful if not
21 more examples of individuals who were denied
22 tenure even at an R1 institution and have not
23 been able to find tenure track positions at R2s
24 or anywhere.

Page 129

1       I mean tenure denial or
2 non-renewal is kind of a kiss of death. It is
3 very, very hard to be hired at another
4 institution much less a higher one than the --
5 higher ranked and higher in prestige and higher
6 in publishing expectations than one has been
7 denied tenure at.
8    Q. So I just want to be clear then because
9 you make some assertions that say things like
10 "almost never", "almost never are hired at R1
11 universities". "They typically find employment
12 at institutions with less rigorous tenure". "Very
13 rarely able to land". Generally move to lower
14 ranked universities".
15       I just want to make clear
16 that those assertions are not based on any
17 statistics or data that you have either compiled
18 or reviewed in connection with preparing your
19 report?
20    A. So first of all, the conclusion is based
21 on my experience and the examples I have seen,
22 and then examples I was available to find. And
23 these happen to be anecdotal because I could find
24 no data on post-employment after tenure denial.

Page 130

1  So you know, I certainly looked for statistics on
2  that, but it is not out there.
3     Q.  Okay.  So I would like to look at the
4  articles that you cited though because I'm
5  struggling -- well, let me ask you this.  Can you
6  look at Exhibit 23, please?
7     A.  Okay.
8     Q.  Can you tell me if there is anything in
9  this -- well, strike that.  This is an article
10  that comes from the Chronicle of Higher
11  Education, right?
12     A.  Yes.
13     Q.  Which again is not a peer reviewed
14  publication, correct?
15     A.  That is correct.
16     Q.  Okay.  And I don't see anything -- so if
17  I'm wrong, please tell me, because I would like
18  to know.  Is there anything in here that talks
19  about what is the fate of an individual -- or I'm
20  sorry, what is the fate of a faculty member who
21  is denied tenure at an R2 school?
22     A.  I would have to take a moment to, you
23  know, look at it conclusively.  And this, you
24  know, goes back to your question about, you know,

Page 131

1  the language -- you know, I'm careful in what I'm
2  going to say yes or no to.  So I'm not going to
3  make a sweeping statement in my report like in
4  all cases, someone who is denied tenure is going
5  to do this or that.  I'm going to say typically
6  or almost always or whatever.
7            So I think that's
8  responsible because we don't -- it is not helpful
9  to speak in universals.  I can't know every
10  single case.  But in most cases, or typically
11  that is what has happened.  And you just asked me
12  to, you know, make a very precise statement about
13  something that I would have to look at closely,
14  which I'm happy to do, but I would need a little
15  time here to read it through.
16            MR. BRAMWELL:  And we will count
17  that against your time.
18  BY MS. WERMUTH:
19     Q.  Well, look, we can -- you can take the
20  opportunity -- I just want to make sure I
21  understand.  I mean I know that you read this.
22  You cite this article as something that you relied on
23  or considered in forming your opinion.  And so
24  your opinion is that it is very rare for folks,

Page 132

1  for faculty denied tenure at an R2 to get hired
2  at an R1.  And I want to make sure I understand
3  where -- what your source data is.  And I don't
4  know if this article is source data for that
5  specific proposition.
6     A.  All right.  So this is an article about
7  -- so the mindset and moving on from, appealing,
8  and doing the next thing, and what a person might
9  do after getting tenure denial.  So there aren't
10  a lot of articles or data out there about what
11  people do after tenure denial, so I looked at
12  what I could find.  I was asked to provide you
13  with information or documentation of what I
14  looked at, and I looked at this, so I have
15  provided it.
16     Q.  Would you agree that this Exhibit 23 is
17  really more of like an advice column?
18     A.  I think it is about sharing experiences
19  and yeah, and some guidance.
20     Q.  Okay.  Can you look at Exhibit 16?
21            MR. BRAMWELL:  I'm sorry.  1, 5 or
22  1, 6?
23            MS. WERMUTH:  1, 6.
24            THE WITNESS:  Okay.

Page 133

1  BY MS. WERMUTH:
2     Q.  This is another article that you relied
3  on in forming your opinion.  Do I understand that
4  correctly?
5     A.  Yes.
6     Q.  Okay.  And this is also from the
7  Chronicle of Higher Education, correct?
8     A.  Correct.
9     Q.  And as I understand it, Peter Ellenbogen
10  is a pseudonym of someone that doesn't otherwise
11  want to be identified.  Do you understand that as
12  well?
13     A.  Yes.
14     Q.  According to Peter's story, he was
15  denied tenure at a private institution and then
16  did find a tenure line job at a public
17  institution, right?
18     A.  You know, again, I would have to look at
19  it for a minute here because there were a lot of
20  articles.  Well, I don't think it is a tenure
21  track position.  "I now work at a public
22  university."  I'm not sure it is a tenure track
23  position.
24     Q.  Okay.  So it is not clear one way or the

Page 134

1 other if he obtained a tenure track position,
2 right?
3    A.  Right.  It is not clear.  And in fact, I
4 think a key thing here is that he indicates "I
5 had no illusion that the administration would
6 rubberstamp the decision to hire a faculty member
7 who had been denied tenure by a university that
8 rarely does so".
9    Q.  That's his personal experience, right?
10    A.  Right.
11    Q.  And we don't know if his tenure denial
12 was from an R2 school, correct?
13    A.  Right.  And if it was from an R1 school,
14 even more so the case.
15    Q.  But from this article, we can't tell
16 what type of institution he was denied tenure
17 from, correct?
18    A.  Correct.
19    Q.  And we can't tell what type of
20 institution he found subsequent employment with,
21 correct?
22    A.  Right.  But the point is that whether
23 one is denied tenure from an R1 or an R2
24 institution, it carries a taint, and it makes it

Page 135

1 very hard to get hired.  So again, in the absence
2 of, you know, like statistical data, what I'm
3 providing is first of all, I have 11 years of
4 experience or more than that even, if I include
5 being a department chair, with cases like this.
6 And we are looking at available anecdotal
7 information, a number of case studies that have
8 been provided.
9         You see basically a
10 restatement of my assessment that once you are
11 denied tenure whether it is by an R1 or R2
12 institution, it is very difficult to get a job.
13 You carry that, like this guy said.  He was
14 afraid that he would not get hired.  And even,
15 you know, spoke it out loud to the dean that he
16 was a hiring risk, because he was.
17         MS. WERMUTH:  Gina, can you read my
18 question back, please?
19         (Previous question read).
20         THE WITNESS:  Correct.
21 BY MS. WERMUTH:
22    Q.  Okay.  That was my question.  Thank you.
23 Exhibit 15, please?
24    A.  15, right?

Page 136

1    Q.  Yes.  1, 5.  Thank you.
2    A.  All right.  Thank you.  All right.
3    Q.  What is this article?
4    A.  What is this article?
5    Q.  Yeah.  What is Chron?
6    A.  Again, it is a higher ed -- it is a
7 higher ed publication.  It is like -- it is not
8 the same as the Chronicle, but it is similar to
9 the Chronicle.  It is an industry publication.
10    Q.  Are you sure?
11         MR. BRAMWELL:  I'm sorry.  What?
12         MS. WERMUTH:  I'm just asking if
13 she is sure.
14         THE WITNESS:  It is an industry
15 publication.
16 BY MS. WERMUTH:
17    Q.  It is not the Houston Chronicle
18 newspaper?
19    A.  Well, the Houston Chronicle newspaper
20 does a section like many newspapers about hiring
21 and college, and it usually coincides with the
22 applications cycle for undergraduate students.
23 But it's a report, it is a higher ed report, that
24 is specific to, you know, to universities.

Page 137

1    Q.  And what is the name of this report that
2 the Houston Chronicle publishes?
3         MR. BRAMWELL:  I'm sorry,
4 objection.  It has not been identified as an
5 article published by the Houston Chronicle.
6 BY MS. WERMUTH:
7    Q.  You can answer.
8    A.  So it is an article about higher
9 education in a section, like the New York Times
10 does a section about higher education usually in,
11 I think it is in the Spring.  The Post does one.
12 The Houston Chronicle does one.  The LA Times
13 does one.
14         So it is -- usually they
15 have reporters who have expertise in higher
16 education put together these sections.
17    Q.  Okay.  So is this from the Houston
18 Chronicle?
19    A.  It is a higher education section, and it
20 is published by the Chronicle.
21    Q.  The Houston Chronicle?
22    A.  It is a publication that is devoted to
23 higher education.
24    Q.  I'm sorry.  When you say it is the

Page 138

1 Chronicle, the Houston Chronicle? Are we talking
2 about the same publication?
3    A. Yes.
4    Q. And do you know this author, Robin
5 Elizabeth Margolis?
6    A. I do not.
7    Q. Do you know if she is a specialist in
8 higher education reporting?
9    A. I do not.
10    Q. Now, you also referred in your report to
11 a manuscript Presumed Incompetent. Mr. Bramwell
12 was gracious enough to send me a copy of the
13 book, but it is a book, and so I'm curious about
14 what portions of the book you relied upon in
15 reaching your conclusions?
16    A. So there is one -- so you can see these
17 articles, what I'm trying to do is share with you
18 a number of cases and case studies. And it is
19 fine that they are -- they are individual
20 anecdotes, some of them published in the
21 Chronicle of Higher Ed, some of them published in
22 other publications, in which people tell their
23 individual stories about what has -- what
24 happened to them after they were denied tenure.

Page 139

1 So there is a chapter in that, I think the editor
2 is Neiman (phonetic) I think.
3          Okay. So there is a
4 chapter in that book that I just mentioned by, I
5 think it is Grace Park, and it is about like what
6 I -- what happened after my tenure denial. So
7 because I was looking for, you know, information,
8 whether it is statistical data or individual case
9 studies of people who had been denied tenure and
10 what they did, the chapter on my tenure denial
11 came up in my search.
12          So that is the -- so then
13 I used that book, but I used just the my tenure
14 denial chapter because that is what was germane
15 to the -- to what I was looking at. I believe
16 that's the one in which the individual said that
17 after tenure denial, she was -- she had a really
18 hard time -- and I think even at the time of the
19 publication of that book, was still trying to get
20 a stable job, a tenure track job, or even an
21 adjunct job that lasted more than a year or more
22 than a short term period.
23          But she did say that even
24 though she did not have job stability and many of

Page 140

1 the things that she had as a tenure track faculty
2 member, so felt like in many ways better. She
3 felt better about what she was doing.
4    Q. Okay. So I'm looking at the book and
5 there is a chapter in Section 5, Chapter 26,
6 called My Tenure Denial by Grace Park. Is that
7 the chapter you are referring to?
8    A. Yes.
9    Q. So that's another anecdotal story about
10 her tenure denial and moving on from that?
11    A. Right, correct.
12    Q. Okay. I would like to turn to Exhibit
13 3.3. We have looked at this before. We are
14 coming back to it. These are the UNC College of
15 Communication guidelines?
16    A. Okay.
17    Q. And interestingly, and I have to ask
18 this question. So I got that copy in connection
19 with your report. So it was attached as an
20 exhibit to your report. In response to the
21 subpoena I sent to you, Mr. Bramwell also sent me
22 Exhibit 21. Will you take a look at that?
23    A. Okay.
24    Q. And this document has the title -- I'm

Page 141

1 sorry. Let me start over. This PDF file has a
2 title that says Template Task Force Personnel
3 Procedures Corrected 4.26
4 (00058788-3).docs-communication 1-1. Do you see
5 that?
6          MR. BRAMWELL: I'm sorry, I don't.
7 I apologize. We are looking at 22?
8          MS. WERMUTH: 21.
9          MR. BRAMWELL: Oh, I'm sorry. That
10 would explain my confusion.
11          THE WITNESS: Yes.
12 BY MS. WERMUTH:
13    Q. So that is the title of the PDF file as
14 it looked when it was sent to me by Mr. Bramwell.
15 Do you understand what that document title is?
16 Is that something that -- let me just strike
17 that. Did you title this particular document
18 with that title?
19    A. I did not.
20    Q. Okay.
21    A. I don't even know what those numbers --
22 I don't know what those numbers are.
23    Q. Okay, okay. So you don't know what this
24 reference to corrected 4.26 is?

Page 142

1    A.  No.
2    Q.  So this is not the document that you
3  relied on in forming your opinion?
4    A.  So what you are trying to do is point
5  out a difference between 21 and 3.3?  Is that it?
6    Q.  I'm not trying to do that.  I'm trying
7  to find out -- both of these documents were
8  produced to me in connection with the subpoena.
9    A.  Right.
10    Q.  So I don't understand -- I'm trying to
11  understand what the 2 documents are.  One was
12  attached to your report.  So I'm assuming you
13  relied on the one attached to your report,
14  correct?
15    A.  Yes.  I mean I don't know that there is
16  a difference between the 2.  So it's hard for me
17  to know without looking at them closely.
18    Q.  Yeah.  I haven't asked that question.
19  I'm just wondering like if you know what this
20  document with this title Template Task Force
21  Personnel Procedures -- like is that a document
22  you ever seen before?
23    A.  I have not seen that document title
24  before.

Page 143

1    Q.  Okay.  So would it be safe to use
2  Exhibit 3.3, which was attached to your report as
3  the UNC College of Communication -- I'm sorry,
4  Department of Communication Promotion Guidelines?
5    A.  Yes.
6    Q.  Okay.  Thank you.  I won't look at 21
7  anymore.
8    A.  Okay.
9    Q.  Okay.  So we are going to go back to
10  Exhibit 3.3 then.  I just needed clarification on
11  what that other document was because I don't
12  think we know.  Okay.  Actually let me go quickly
13  -- I'm sorry to do this to you, to Exhibit 3.2
14  which are the DePaul guidelines?
15    A.  Okay.
16    Q.  I'm sorry.  I should say the DePaul
17  College of Communication Guidelines?
18    A.  Alrighty.
19    Q.  And to be clear, these were -- these
20  were not guidelines that you sourced on your own
21  on the internet like you did with UNC?
22    A.  Correct.
23    Q.  These were provided to you by Mr.
24  Bramwell?

Page 144

1    A.  Yes.
2    Q.  And I see that there is like bates
3  labeling confidential at the bottom of the page,
4  and then there is this other labeling that says
5  Calvente-DePaul with some numbers that follow.
6  Do you see that?
7    A.  Yes.
8    Q.  And you said you signed a
9  confidentiality order?
10    A.  Yes.
11    Q.  Or I'm sorry, a confidentiality
12  agreement?
13    A.  Yes.
14    Q.  And can you tell me what that requires
15  of you?
16    A.  That I don't talk about this case with
17  anyone.  I can talk about it with Jerry -- well,
18  you.
19    Q.  Understood.  Thank you.  Okay.  Now, I
20  see here on Exhibit 3.2 in the first paragraph,
21  in the middle of it, it says "the standards set
22  forth are consistent with the current university
23  faculty handbook in making tenure and promotion
24  recommendations."  Do you see that?

Page 145

1    A.  Yes.
2    Q.  Did you, like you did with the UNC
3  guidelines, did you reference DePaul University's
4  faculty handbook?
5    A.  I don't know that I was able to find the
6  DePaul faculty handbook.  So it wasn't right in
7  the document, so I did not.
8    Q.  Okay.  All right.  And I'm sorry because
9  we are going to be -- and I will leave it to you
10  to figure out how you want to manage this, but we
11  are going to be looking at your report, DePaul
12  College of Communication Guidelines, and UNC
13  Guidelines sort of variously.  I am going to be
14  jumping from document to document.  It is going
15  to be a little clunky.  Bear with me.  I only can
16  get one up at a time myself.  I just wanted to
17  give you fair warning.
18        I would like you to go
19  back to your report for the moment.
20    A.  Okay.
21    Q.  And to look at page 3.
22    A.  Okay.
23    Q.  So in the first half of this page, tell
24  me if I'm wrong, you compare what you refer to as

Page 146

1  2 parallel provisions or sections of UNC's
2  College of -- Department of Communication
3  Guidelines and DePaul's College of Communication
4  Guidelines?
5     A.  Yes.
6     Q.  And you say, it is your premise, I
7  believe, that UNC's Department of Communication
8  tenure expectations are more demanding than
9  DePaul's.  Is that right?
10    A.  Yes.
11    Q.  You say that that is apparent just on
12  the face of the 2 documents, the 2 policy
13  guidances, right?
14    A.  Yes.
15    Q.  And you refer specifically to a
16  provision in the DePaul guidelines on page 4
17  where the criteria of scholarship is elaborated
18  upon, right?
19    A.  Uh-huh.
20    Q.  Yes?
21    A.  Yes.
22    Q.  Okay.  And you point specifically to
23  this -- these 2 sentences, "scholarship, research
24  and/or creative activities are expected of each

Page 147

1  faculty member within the College of
2  Communication.  Faculty members should be able to
3  demonstrate success at completing projects and
4  disseminating the results of these projects in
5  academic and artistic arenas beyond DePaul."  Do
6  you see that?
7     A.  Yes.
8     Q.  You would agree with me that completing
9  and disseminating projects beyond DePaul is a way
10  of saying getting published or producing
11  scholarship?  You would agree with that?
12    A.  It is a way -- it is a base minimum of
13  completing, yes, completing scholarship -- you
14  could be -- they could be published in the
15  Washington Post or the Houston Chronicle.  It
16  doesn't talk about excellence, or, you know, like
17  the UNC talks about a programmatic, for example,
18  and it uses the expectation of excellence, which
19  is absent in the DePaul criteria.
20    Q.  Okay.  So hang on.  So my first question
21  was would you agree that completing projects and
22  disseminating them beyond DePaul is another way
23  of saying producing scholarship?  That's my only
24  question.  I didn't ask you about excellence.  I

Page 148

1  just want to know would you say that completing
2  and disseminating outside of DePaul is another
3  way of saying producing scholarship?
4         MR. BRAMWELL:  Objection, beyond
5  the scope of the expert retention.  Go ahead.
6         THE WITNESS:  So as I said before,
7  one could complete a project and disseminate it
8  outside of DePaul, but it could be a pamphlet
9  that is thrown into the lake.  I mean
10  disseminating it beyond DePaul, it's a very --
11  frankly it was very unusual, but it doesn't
12  necessarily mean it is scholarly.  It just means
13  it is done and it appears somewhere other than in
14  internal communications.
15  BY MS. WERMUTH:
16    Q.  Well, except that the guidelines do go
17  on to identify the types of acceptable
18  production, correct?
19    A.  That's true.
20    Q.  It doesn't say that you can get tenure
21  if you complete a pamphlet and throw it in the
22  lake, does it?
23    A.  It does not.
24    Q.  Right.  It doesn't say you can get

Page 149

1  tenured if you write an article for the
2  Washington Post, right?
3         MR. BRAMWELL:  I'm going to object
4  to this line of questioning on best evidence
5  grounds.
6  BY MS. WERMUTH:
7     Q.  You can answer.
8     A.  That's a very -- that's a very freighted
9  question given recent developments in higher ed
10  about publication in newspaper and so on.  But it
11  does not say that.
12    Q.  You again say there is no reference to
13  excellence in this particular provision.  Is that
14  right?  In DePaul's guidelines, right?
15    A.  Correct.
16    Q.  Okay.  Now, I would like for you to look
17  at UNC's guidelines, which is 3.3?
18    A.  Yes.
19    Q.  Go to page 4.  This is the part that you
20  cite regarding expectations for research for
21  tenure and promotion, right?
22    A.  Correct.
23    Q.  All right.  And so when you look at page
24  4, the general standards, which precedes that

Page 150

1  same -- precedes the section on research, right?
2     A.  Yes.
3     Q.  Are you with me?  Okay.  According to
4  the general standards, there is basically 3
5  categories of criteria that are considered,
6  right?
7     A.  Yes.
8     Q.  The first being research or scholarship,
9  yes?
10    A.  Yes.
11    Q.  The second being teaching, correct?
12    A.  Yes.
13    Q.  And the third being service, right?
14    A.  Yes.
15    Q.  And so with respect to these 3
16  categories, UNC requires excellence in 2 of them,
17  right, research and teaching?
18    A.  Right.
19    Q.  And not necessarily excellence in
20  service, right?
21    A.  Well, they say service is not a
22  substitute for excellence in research and
23  excellence in teaching, but you know, service to
24  the department, the university committee, and

Page 151

1  state, it is not going to be the thing that an
2  individual does not get tenure, based on that if
3  they are strong in the other 2 areas.  But
4  strength in service, you know, whether UNC or
5  other R1 institutions is certainly an
6  expectation.
7     Q.  So here is my question.  You point to
8  the absence of the word excellence in the one
9  piece of DePaul's criteria that you quote in your
10  report, right, as meaning they don't require
11  excellence, right?  Yes?
12    A.  No.  I think there is an overall lack of
13  expectation of excellence articulated in the
14  DePaul criteria.
15    Q.  We will come back to that.  You mention
16  on page 3 of your report the provision of
17  DePaul's guidelines, College of Communication
18  Guidelines, right, and say -- and you point --
19  you quote that because there is an absence of a
20  requirement of excellence articulated in that
21  provision, right?
22    A.  In research.
23    Q.  In research, right, okay.  So would you
24  agree with me that there is no specific reference

Page 152

1  to excellence in section C on page 4 of UNC's
2  guidelines under general standards?
3     A.  I would not agree.  The word appears
4  twice.  Excellence appears twice.  And what it
5  says, what it says is, you know, this is again
6  standard at research institutions, your work
7  effort and the way you're assessed in your tenure
8  is basically 60 percent on your research, 40
9  percent, 30 or 40 percent on your teaching, and
10  then like 10 percent on your service.
11            So what it says is you
12  can't be just excellent on service because it is
13  not the key thing.  They expect excellence in
14  research and teaching.  And service, you know,
15  excellence is important or it is key, but it
16  doesn't count as much.  It is not going to carry
17  the day.  And that's why it mentions excellence
18  twice in that point.
19    Q.  So okay.  I have a couple of questions
20  here.  So what this provision C in the first
21  sentence says is that service is a further
22  additional consideration in the overall
23  assessment, right?
24    A.  Yes.

Page 153

1     Q.  But is not a substitute for excellence
2  in the other 2 areas?
3     A.  Right.
4     Q.  Okay.  And by the way, when you just
5  gave me this breakdown of 60, 30, 10, there is
6  nothing in these guidelines that provide for that
7  sort of waiting.  Would you agree with me?
8     A.  They are not -- well, I think that there
9  are -- the percentages aren't baked in there, but
10  it is how it is basically understood because it
11  has to do with your teaching load and the amount
12  of time that you have available for research, and
13  therefore you have only, you know, 2-2 or a 2-1.
14  And sometimes letter of appointment include those
15  percentages.  Sometimes tenure documents at R1
16  institutions actually tell the tenure reviewer
17  what the breakdown is.  It's usually again, it's
18  like 60 percent research, 60, 30, 10.  It is a
19  very common breakdown.
20    Q.  UNC's guidelines do not provide that
21  breakdown, correct?
22    A.  They do not.
23    Q.  All right.  Can you go to Exhibit 3.2
24  which is the DePaul College of Communication

Page 154

1 Tenure and Promotion Guidelines?
2    A.  Okay.
3    Q.  And could you go to page 16, please --
4 well, strike that.  Go to page -- first, let's go
5 to page 4.
6    A.  Okay.
7    Q.  Okay.  And so page 4, under the piece
8 that says criteria for scholarship research
9 and/or creative activities, do you see that
10 section?
11    A.  Right.
12    Q.  And that first paragraph is what you
13 quote from for purposes of your report, correct?
14    A.  Yes.
15    Q.  Okay.  And then you will see that the
16 section actually goes on for 6 pages or so,
17 correct?
18    A.  Right.
19    Q.  So it goes on to identify, for example,
20 on page 5, that scholarship is original
21 discovery.  It is integration of the development
22 of knowledge.  It is the application of
23 knowledge.  Do you see that?
24    A.  Yes.

Page 155

1    Q.  And it goes on to say that scholarship
2 is going to be evaluated on its originality,
3 right?
4    A.  Uh-huh.
5    Q.  It's contribution to knowledge, right?
6    A.  Yes.
7    Q.  Its conceptual sophistication, right?
8 Its intellectual river, correct?
9    A.  Right.
10       MR. BRAMWELL:  Objection, best
11 evidence.
12 BY MS. WERMUTH:
13    Q.  Its application of knowledge to address
14 world problems or human problems, yes?
15    A.  Yes.
16    Q.  And then it goes on to identify the
17 types of scholarship that is considered, correct?
18    A.  Yes.
19    Q.  And so the section on research goes on
20 for 6 pages?
21    A.  Yes.
22    Q.  Okay.  Now, if you would go to page 16
23 with me for a moment.  So this section -- I'm
24 sorry.  I'm going to take you to page 14 so we

Page 156

1 know what section we are in.  So this is the
2 section of the guidelines relating to formal
3 review, personnel committee reports, and voting.
4 Do you see that?
5    A.  Yes.
6    Q.  So now we are in a portion of that
7 guidelines that puts some meat on the bones with
8 respect to process.  Would you agree?
9    A.  Yes.
10       MR. BRAMWELL:  Objection to the
11 characterization of meat on the bones.
12 BY MS. WERMUTH:
13    Q.  That was a yes?
14    A.  This section is about formal review.
15    Q.  Well, it goes beyond formal review.
16 Let's look at page 16.
17    A.  I'm at 16.
18    Q.  Okay.  And the last sentence on that
19 page, could you read that, please?
20    A.  The last sentence, "no ranking should be
21 below very good during this review, but the
22 tenure review -- by the tenure review of faculty
23 members performance should be excellent in at
24 least 2 of these areas, and very good in the

Page 157

1 third.
2    Q.  So there is a requirement of excellence
3 in at least 2 categories at the of tenure under
4 DePaul's guidelines, yes?
5    A.  "No ranking should be below very good.
6    Q.  So --
7       MR. BRAMWELL:  I'm sorry.  My
8 witness is still speaking, Ms. Wermuth.
9       MS. WERMUTH:  I'm just asking about
10 the last sentence.
11       MR. BRAMWELL:  She is still
12 speaking.
13 BY MS. WERMUTH:
14    Q.  Please proceed.
15    A.  The last sentence says by the tenure
16 review.  So by the end of the tenure review,
17 there is an expectation of excellence.  That's
18 still -- okay.  So yes, at the end of the tenure
19 whereas at UNC there is an expectation in hiring
20 that there is evidence of excellence.  Clear
21 promise which means clear evidence of excellence
22 throughout.
23       So you know, you are
24 asking these very precise questions, but the main

Page 158

1  point still stands. That there is a much higher
2  expectation of excellence throughout the hiring
3  and annual review and tenure process at UNC. It
4  also -- there is a requirement for a programmatic
5  -- a program of research that interrogates
6  enduring and significant questions.
7      Q.  I don't see anything in the UNC
8  guidelines that talks about interrogation of
9  enduring and significant questions. Can you
10  point me to that, please?
11     A.  Yeah. It is right at the beginning. It
12  talks about the -- it is on page 4. You see
13  general standards is at the top of the page.
14  Standards of Research. "The Department of
15  Communications expects its faculty to be actively
16  involved throughout their careers in achieving
17  scholarly research excellence and/or its
18  equivalent form in creative artistic activity.
19  The Department of Communications requires
20  sustained, programmatic, that is scholarship that
21  coheres around and investigates thematically one
22  or more clearly defined research problematics,
23  production of scholarship." And then so on.
24          So it is about -- so

Page 159

1  that's a big thing that you look at when you are
2  hiring someone and then when you are coaching
3  them to -- when you are mentoring them toward
4  tenure and in the tenure process is whether they
5  have a programmatic coherent program of research,
6  or whether it is just a bunch of articles on
7  different topics, boutique topics of their
8  interests scattered around.
9          So that's why it is really
10  important.
11         MS. WERMUTH: Gina, can you read my
12  question back, please?
13         THE WITNESS: Your question was
14  does --
15         MS. WERMUTH: Hang on one second.
16         MR. BRAMWELL: Do not cut my
17  witness off.
18         MS. WERMUTH: When the court
19  reporter has received an instruction, she cannot
20  take down the record. I wanted the witness to
21  stop talking so we can get what she had to say on
22  the record. Because I had asked Gina a question,
23  we needed to all stop talking because Gina cannot
24  go back and read my question if somebody is

Page 160

1  talking.
2      Q.  Doctor Zaeske, I do want to hear what
3  you have to say. In this moment though, I need
4  the court reporter to read my question back.
5      (Question read back)
6  BY MS. WERMUTH:
7      Q.  I was asking you whether there was a
8  reference to enduring and significant questions
9  being interrogated in the guidelines. Do I
10  understand you are pointing me to this language
11  on page 4 in response?
12     A.  Right. The language I pointed to was
13  sustained and programmatic.
14     Q.  Okay. Returning to page 3 of your
15  report, Doctor Zaeske.
16     A.  Okay.
17     Q.  I think what you're saying at the bottom
18  of page 3 -- well, strike that. Why don't you
19  tell me what distinction you are trying to make
20  where you start with "another important point of
21  comparison," through the bottom of the page?
22         MR. BRAMWELL: I'm sorry. Where
23  are you? Oh, I'm looking at the wrong document.
24  My apologies.

Page 161

1          MS. WERMUTH: Page 3 of the report.
2  Actually strike that question.
3      Q.  So at the top of page 4, so your
4  analysis which follows the quoted sections, let
5  me take you there.
6      A.  Okay.
7      Q.  So you -- at the bottom of page 3, you
8  quote distinct sections from each of the
9  guidelines, right?
10     A.  Yes.
11     Q.  Okay. And then at the top of page 4,
12  you provide that "DePaul expects only teaching
13  effectiveness where UNC expects proven
14  excellence, right?
15     A.  Yes.
16     Q.  And again, this is at the tenure review
17  stage that UNC expects proven excellence in
18  teaching?
19     A.  Yes.
20     Q.  Okay. Now, you will agree with me that
21  UNC also though in its guidelines describes the
22  teaching requirement as teaching effectiveness?
23     A.  UNC uses language about teaching
24  effectiveness, yes.

Page 162

1    Q.  Right.  Okay.  And as we pointed out,
2  DePaul at the time of tenure review requires
3  excellence in 2 of the 3 criteria, right?
4    A.  Right.
5    Q.  And one of that criteria is teaching,
6  right?
7    A.  Right.
8    Q.  Okay.  One of those criterion I should
9  have said.  That's singular.
10    A.  Yes.
11    Q.  So let's look at page 5 of 3.3, which
12  are the UNC guidelines.
13    A.  Page 5 of the UNC guidelines, right?
14    Q.  Yes.  I think that's the right page.
15  Give me a minute.
16    A.  That's standards of teaching is point B.
17    Q.  Yeah, hang on.  Let me make sure that's
18  where I want to take you.  No.  I'm sorry.  Page
19  9.
20    A.  I'm there.
21    Q.  This is specifically in connection with
22  the guidelines for promotion -- with promotion to
23  associate professor with tenure, right?
24    A.  I believe so, yes.

Page 163

1    Q.  Okay.  So if you look at page 8, you
2  would see that.  It is Subsection C, associate
3  professor.
4    A.  Okay.
5    Q.  So on page 9, so I guess we are at
6  Subsection big C, little b, on page 9.
7    A.  "Demonstrated commitment to"?
8    Q.  Correct.  So this is the requirement of
9  -- "demonstrated commitment to and achievement of
10  teaching excellence at the time of tenure,"
11  right?
12    A.  Right.
13    Q.  And then it goes on in this paragraph to
14  explain what a demonstration of teaching
15  excellence includes, right?
16    A.  Right.
17    Q.  Okay.  So according to this document,
18  "teaching excellence includes the development and
19  teaching of a range of courses at the
20  undergraduate and graduate levels," right?
21    A.  Uh-huh.
22    Q.  Yes?
23    A.  Yes.
24    Q.  Okay.  Sorry.  We need verbal answers.

Page 164

1    A.  Yeah.  I understand.  Sorry.
2    Q.  "Strong instructor evaluations from both
3  students and peer observers"?
4    A.  Yes.
5    Q.  "And where appropriate, the publication
6  of pedagogical material"?
7    A.  Yes.
8    Q.  So that's how UNC defines teaching
9  excellence, right?
10    A.  I would say that those are some
11  examples.  You know, when it says includes, you
12  know, it would probably be like includes but is
13  not limited to.  There are other ways of
14  demonstrating pedagogical excellence.
15    Q.  But these are the ones that get
16  published?
17    A.  You mean in the guidelines?
18    Q.  Yeah.
19    A.  Right.
20    Q.  So in the document that the up and
21  coming probationary faculty member sees and is
22  going to rely on, right, those are the criteria
23  set forth?  Those are the examples of how to
24  achieve teaching excellence?

Page 165

1    A.  Those are -- they are examples.
2    Q.  Okay.  All right.  So now, if we go to
3  DePaul's guidelines, Exhibit 2.2?
4        MR. BRAMWELL:  3.2?
5        MS. WERMUTH:  I'm sorry.  3.2.
6  Thank you.
7        MR. BRAMWELL:  No worries.
8        MS. WERMUTH:  Let me figure out
9  what page.  Oh, page 1, look at that.
10    Q.  So on page 1, there is a section called
11  Criteria for Teaching.  Do you see that?
12    A.  Oh, sorry, yes.  I see it.
13    Q.  All right.  And then there is a -- there
14  is the first sentence, and then there is the
15  second sentence which gives examples of what
16  teaching effectiveness is at DePaul, right?
17    A.  Right.
18    Q.  Okay.  And there is a variety of
19  examples given, but I would like to direct your
20  attention to the sentence that begins with
21  "additionally".  So it is 3 lines up from the
22  bottom of the page?
23    A.  Uh-huh.
24    Q.  Okay.  So it says "additionally,

Page 166

1  teaching is assessed by considering the range of
2  courses taught by the faculty member," right?
3      A.  Uh-huh.
4          MR. BRAMWELL:  Objection, best
5  evidence.
6  BY MS. WERMUTH:
7      Q.  I'm sorry.  Your answer was?  Because we
8  need verbal.
9      A.  You asked me if I see what you are
10  referring to, and yes, I do.
11     Q.  And that's similar to at least one of
12  the examples that UNC gives for excellence?
13     A.  No.  Again, I don't see these as -- I
14  don't see these as similar.  First, I note as you
15  did that teaching is listed first, which is a
16  confirmation that R2 institutions place teaching
17  first and not research.  And that's a difference
18  in the standards of -- for tenure standards.
19         So that's one thing.  And
20  then, you know, the list of things here that are
21  considered, I think a number of them are assumed
22  that the person wouldn't be in a classroom in a
23  place like UNC.  Like command of materials.  Why
24  would you put someone in a classroom if they are

Page 167

1  not in command of materials.
2          So I see a different, you
3  know, there is -- it's a different level.  There
4  is a different level here.  And the other thing
5  is that there are -- the graduate -- there is a
6  very strong -- there are multiple graduate
7  programs at UNC, and I'm not aware of -- I don't
8  think there are graduate programs or strong
9  graduate programs at DePaul.
10         So the faculty members at
11  DePaul are not engaging in graduate education and
12  growing doctorally trained communication
13  scholars.
14     Q.  Well, there is reference in this very
15  paragraph to the very last 2 words,
16  "supervision", and on to the next page, "of
17  graduate thesis projects and graduate student
18  teaching", right?
19     A.  Yes.  But I said a doctoral program.  I
20  don't think it is a doctoral program.  It may be
21  a professional program at DePaul in a Master's,
22  but I don't think that they have a PhD in
23  communication.
24     Q.  Did you in doing your analysis here,

Page 168

1  looking at one document from the College of
2  Communications at DePaul and looking at a variety
3  of documents from the University of North
4  Carolina, did you look at all at like DePaul's
5  mission statement?  Did you give any
6  consideration to DePaul's mission?
7      A.  I think I looked on the website, but I
8  don't see how that is relevant, because the point
9  is to compare the criteria by which someone would
10  be hired, you know, and what the expectations
11  were, and if -- I mean DePaul has more of a, as I
12  understand it, sort of a mission that is sort of
13  like a teaching mission and serving a community.
14  That is different from the research mission of an
15  R1 institution.
16     Q.  So going back to your report, page 4 of
17  Exhibit 3?
18     A.  Yes.
19     Q.  Okay.  The second full paragraph which
20  begins with "there are also significant
21  differences."  Do you see that?
22     A.  Yes.
23     Q.  And then the second sentence there says
24  "the DePaul policy document on tenure and

Page 169

1  promotion provides no explanation of what an
2  assistant professor is expected to do in terms of
3  research in order to gain tenure."
4      A.  Yes.
5      Q.  Okay.  And you stand by that statement?
6      A.  Yes.
7      Q.  So when I take you back to Exhibit 3.2,
8  and I take you to page 5?
9      A.  Uh-huh.
10     Q.  Are you there?
11     A.  Yes.
12     Q.  Do you then take the position that
13  telling faculty in the College of Communication
14  at DePaul that their scholarship must be
15  original, must contribute to knowledge, must be
16  conceptually sophisticated, must be
17  intellectually rigorous, that that provides no
18  guidance to the faculty member as to what they
19  need to do in terms of research?  Is that your
20  position?
21         MR. BRAMWELL:  Objection, misstates
22  the report.  Go ahead.
23         THE WITNESS:  Yes, that is my
24  position.  It is not clear what the faculty

Page 170

1  member is supposed to do. By contrast, the UNC
2  document provides like, you know, depending on
3  the subdiscipline of each -- you know, they have
4  multiple subdisciplines in their department.
5  It's a department, not a whole college.
6            So what is it that DePaul
7  wants the probationary faculty member to do?
8  Like this is the core of mentoring individuals to
9  tenure. They want to know what is it that you
10  want me to do? So originality, what does that
11  mean? Or contributing to knowledge? Or having
12  intellectual rigor? Or applying a theory or
13  something? So do you want me to write a book?
14  Do you want me to write 16 articles? Do you want
15  me to do a play or multiple plays, or you know,
16  make a feature length film, short films?
17            So usually tenure
18  requirements actually have some articulation of
19  like the actual product or products that are
20  expected by the faculty member, the probationary
21  faculty member, in order to obtain tenure. And
22  my point is simply that UNC says what is expected
23  for research and teaching, but particularly
24  focusing on research. I could not find that. I

Page 171

1  could not find that in the DePaul criteria.
2    Q.  When you look at page 6 of the document
3  that we are looking at where it lists at length
4  for 2 pages the types of outlets and where --
5  what people should do, publish a book, publish
6  peer review journal articles, publish edited
7  books, and so on. So you're saying that this
8  doesn't give -- that this is the absence of
9  articulation of what sort of products the scholar
10  is expected to produce?
11    A.  Yes, I'm saying that. Because what this
12  page says is if books are produced, they are
13  evaluated in this way. If peer reviewed articles
14  are produced, they are evaluated this way. If
15  edited books are produced -- that's different
16  from saying what is it that you're expected to
17  produce to get tenure at DePaul.
18    Q.  So in looking then at page 4 of your
19  report, back to Exhibit 3?
20    A.  I'm there.
21    Q.  Sorry to go back and forth.
22    A.  That's okay. I'm there.
23    Q.  You quote from the UNC guidelines, page
24  8 of the UNC guidelines, the publication of a

Page 172

1  single authored monograph. Do you see that.
2    A.  Yep.
3    Q.  And just above that you say "most
4  relevant to this case is the following
5  enumeration of publication expectations for
6  probationary faculty in communication at UNC."
7  Do you see that?
8    A.  Yes.
9    Q.  Why do you say that this particular
10  passage is most relevant to this case?
11            MR. BRAMWELL: Objection, misstates
12  the report.
13            THE WITNESS: So in the paragraph
14  above, I say "there are also significant
15  differences in the specific criteria," and then I
16  mention something. And then I just -- you know,
17  there are a number of things that I mention. But
18  what I wanted to point out specifically was just
19  specifically was this lack of publication
20  expectations.
21            To me, that seemed like a
22  huge difference between the level of like
23  excellence in research and the -- I mean, and
24  this is common. It's a common difference between

Page 173

1  R1 and R2 institutions. At R1 institutions, you
2  are expected to publish a single authored
3  monograph with a highly respective academic press
4  and at least 3 substantial articles in peer
5  reviewed journals and to have significant
6  progress on a second monograph for tenure.
7            That is sort of the basic
8  thing across the board, whether it is UNC,
9  Wisconsin, Indiana, Minnesota, or wherever. And
10  that is very different than most, if not all R2
11  institutions, where you can be tenured without
12  writing a book. That's the big difference. You
13  can be tenured without writing a book, or writing
14  a book that is published by like a trade press or
15  a much lesser press, or having articles in
16  journals that are not highly cited, that don't
17  have a high citation, or don't have a high
18  rejection rate.
19  BY MS. WERMUTH:
20    Q.  So here was my question. On page 4 of
21  your report you write this sentence. "Most
22  relevant to this case is the following
23  enumeration of publication expectations for
24  probationary faculty in communication at UNC."

Page 174

1  And then you quote a passage. Why is that
2  particular passage most relevant to this case?
3     A.  Again, because the significant
4  difference between an R1 institution and how you
5  hire, and who you are going to hire, and how you
6  tenure people, is the ability to produce a single
7  authored monograph that is -- as well as the peer
8  reviewed essays. That is really very different
9  from how you hire folks at R2 institutions and
10 how they are tenured at R2 institutions.
11          That expectation of, you
12 know, publishing at -- publishing with a major
13 academic press a single authored book and then
14 having another one well underway just doesn't
15 exist at R2s.
16    Q.  You do see from the DePaul guidelines
17 that the greatest weight is given to a single
18 authored monograph at tenure review, right?
19    A.  I don't think it said that.
20    Q.  Okay.
21    A.  That was -- it had a list of all the
22 different -- like different ways one could
23 disseminate research, and then it said how it was
24 evaluated. But again, as you see here with UNC,

Page 175

1  and again this is a really standard way of R1
2  saying it, it is a single authored book, at least
3  3 peer reviewed articles of substantial length in
4  a prestigious journal, and then evidence of
5  progress on a second book.
6          It is a mantra. It is
7  like practically tattooed on the forehead of a
8  probationary faculty member.
9     Q.  But the UNC guidelines don't say at
10 least 3 articles of substantial length in
11 addition to the book. In fact, the UNC
12 guidelines say this is not a quantitative --
13 there is no quantitative algorithm that we apply
14 to tenure cases?
15          MR. BRAMWELL: Objection to best
16 evidence, and objection, Counsel is testifying.
17          THE WITNESS: But as I quoted in my
18 report, "the publication of a single authored
19 monograph with a highly regarded university or
20 academic press is required. The monograph stands
21 at the centerpiece of the candidate's tenure and
22 promotion file, accompanied by a number of peer
23 reviewed essays and/or book chapters." And then
24 it says the monograph has to be original and has

Page 176

1  to be different from the dissertation.
2          So that is what I said.
3  So you know, a number of peer reviewed essays or
4  book chapters. 3 is usually the number that is
5  expected if it's of substantial length, peer
6  reviewed. And that can be sort of nuanced if you
7  book chapters that may be even longer than
8  articles. So it goes back and forth. And that's
9  why it is not a clear algorithm.
10 BY MS. WERMUTH:
11    Q.  You had one book that came after your
12 tenure review, right?
13    A.  My -- the book that was published was
14 fully under contract and forthcoming before I
15 went up for tenure.
16    Q.  But you didn't have a second one in the
17 works at that time?
18    A.  No. I did. And it formed the basis of
19 one of the articles that I published that was
20 included in my tenure dossier, and I included a
21 full outline of the book. And then I was awarded
22 a year-long fellowship at Harvard to work on the
23 book.
24    Q.  A second book?

Page 177

1     A.  Yes, a second book.
2     Q.  What is your second book? I didn't see
3  it in your CV.
4     A.  I didn't publish the book because I got
5  sucked into administration.
6     Q.  I see. Fair enough. Was your book work
7  from your dissertation?
8     A.  The book that was the basis of my tenure
9  dossier?
10    Q.  Yes.
11    A.  So it was -- my dissertation was the
12 basis of that -- of that book. What you
13 typically need to do -- not typically. It's
14 absolutely required. You can't get credit, like
15 double credit for the same thing, right? So you
16 get the PhD based on one piece of work, the
17 dissertation. And then tenure committees
18 particularly at the -- beyond the department,
19 they look very carefully to see how much
20 difference there is between the dissertation and
21 the book manuscript.
22          So I did a tremendous
23 amount of additional research and wrote
24 additional chapters, which again, you know, I

Page 178

1  certainly had to report the differences in
2  percentages, like how many new chapters do you
3  have, and what percentage difference is each
4  chapter than the dissertation, so you don't get
5  credit twice for the same piece of work.
6      Q.  Understood.  Understood.  And you then
7  completed that book in the 5 or 6 years post
8  conferral of the PhD?
9      A.  That's right.
10     Q.  Which is would you say about what you
11  would expect a faculty member to do for a single
12  authored monograph?
13     A.  Absolutely, especially for the first
14  book.  You know, sometimes the second book, if it
15  is more ambitious, and it involves a lot of
16  international travel, that might take more than 5
17  years, and you are not under the tenure gun.
18     Q.  Now, the last point I think you make in
19  your report in terms of comparison of the 2 sets
20  of guidelines is that UNC expects continuing
21  achievements and DePaul does not, right?
22     A.  Yes.
23     Q.  Now, if you look at the DePaul
24  guidelines, Exhibit 3.2?

Page 179

1      A.  Okay.
2      Q.  Page 20.  In the paragraph, Tenure and
3  Promotion to Associate Professor.  Are you with
4  me?
5      A.  Yes.
6      Q.  The middle of that paragraph, there is a
7  sentence that begins "the candidate must
8  demonstrate."  Do you see that?
9      A.  Yep.
10        MR. BRAMWELL:  I'm sorry.  Can you
11  help me out here?
12        MS. WERMUTH:  Sure.  Page 20, first
13  paragraph, which is a big one.  Right in the
14  middle --
15        MR. BRAMWELL:  Got it.  Got it.
16  BY MS. WERMUTH:
17     Q.  "Continued capacity to contribute to
18  DePaul's mission of academic excellence."  Do you
19  see that?
20     A.  Yes.
21     Q.  So there is an expectation at DePaul for
22  continued excellent contributions, yes?
23        MR. BRAMWELL:  Objection.
24        THE WITNESS:  Again, it is not

Page 180

1  foregrounded in a way that UNC is, and again,
2  research institutions, they hire -- they hire
3  fast racehorses.  They are supposed to continue
4  to race and race and race and to be productive.
5  I mean -- I mean it is interesting that it says
6  continued capacity to contribute.  That's very
7  sort of back off, back off, in a way that you see
8  at, you know, in UNC and in other R1s,
9  expectation of productivity throughout the
10  career.
11     Q.  So when you say racehorses, you are
12  talking about faculty who demonstrate capacity to
13  churn out a high level of high quality
14  scholarship?  Is that what you mean by racehorse?
15     A.  Yeah.
16     Q.  Would you say that working -- like
17  working on a book, but not having it published
18  within the first 10 years, is that person a
19  racehorse?
20     A.  It depends on -- again, like what the --
21  if someone is doing a study that, you know,
22  involves multiple languages, or you know, has
23  just a tremendous number of archives, and has,
24  let's say, run into difficulties, that would --

Page 181

1  so that could be a qualification.  But you would
2  expect research productivity, yeah, a book to be
3  published within 7 years.
4        MS. WERMUTH:  Okay.  All right.  If
5  we can take a quick break, I may have just a
6  couple of follow-up questions.  Can we do that?
7        MR. BRAMWELL:  Sure.  Come back at
8  what time?  2:27, 2:28?
9        MS. WERMUTH:  How about 2:30?
10        MR. BRAMWELL:  2:30, okay.
11     (Off the record at 2:24 to 2:33)
12        MS. WERMUTH:  So back on the
13  record.  At this point in time, I have no further
14  questions for you.
15        MR. BRAMWELL:  I have a few.  And
16  first of all, I just received a text that you
17  might not be able to see me.  Is my video on?
18        THE WITNESS:  I can see.
19            EXAMINATION
20        BY MR. BRAMWELL:
21     Q.  Doctor Zaeske, just a few questions
22  based on the questions that Ms. Wermuth asked
23  you.  I understand before we went on break, Ms.
24  Wermuth, and I won't get the question exactly

Page 182

1 right, but she asked you something like if you
2 would be expected to publish a book within 10
3 years. Am I understanding that question
4 correctly?
5   A.  I think the question was is it
6 reasonable to expect publication of a book within
7 10 years I think of -- well, I answered it both
8 in terms of being an assistant professor and
9 being a post-tenure. But publishing a book,
10 let's say the first book on the tenure track, R1
11 institutions, you know, balance the research,
12 teaching obligation to give lesser teaching in
13 order that faculty can focus on publication.
14             So it is the expectation
15 that a book would be published within, you know,
16 the -- within the tenure window, certainly within
17 10 years. If someone has a higher teaching load,
18 which is often and usually the case at R1s --
19 excuse me, at R2 universities, then they would
20 have less time available for doing research
21 because the focus is on teaching. And then
22 taking more than, you know, 10 years or more to
23 publish a book would be reasonable because you
24 don't -- you have a much heavier teaching load

Page 183

1 and you don't have as much time for research.
2   Q.  All right. Remember that Ms. Wermuth
3 asked you some questions about various schools
4 and where they fell in the Carnegie
5 Classifications?
6   A.  Yes.
7   Q.  I'm going to share my screen, or at
8 least I'm going to try to share my screen. I'm
9 sorry. Let me just turn this phone off. Doctor
10 Zaeske, I hope I have done this correctly. I
11 have pulled up a website called
12 Carnegieclassifications.IU.EDU/lookup/lookup.PHP.
13 Is that what is showing up on your screen?
14   A.  Yes.
15   Q.  Are you familiar with this website?
16   A.  Yes.
17   Q.  How are you familiar with it?
18   A.  Well, I looked at it when I was, you
19 know, trying to explain what Carnegie -- explain
20 to others in a more general sense what the
21 Carnegie Classifications are, for the report, for
22 the report for this proceeding.
23   Q.  Now, does this website permit you to
24 enter in an institution's name and determine

Page 184

1 whether they are R1s or R2s?
2   A.  Yes, that's what it does.
3   Q.  This is a website that is easy to
4 access?
5   A.  Yes.
6   Q.  And you as an academic would rely on
7 this website in determining what is an R1 and
8 what is not an R1 -- strike that. You as an
9 academic would use this website to determine what
10 is an R1 and what is an R2?
11   A.  Right, yes, correct.
12   Q.  I think that Ms. Wermuth asked you about
13 Yale being an R1?
14   A.  Yes.
15   Q.  I search -- I put Yale into a search by
16 institution name. Is that how you would
17 determine --
18   A.  Yes.
19   Q.  So if I put Yale in, I see now a web
20 page that goes -- shows me an institution Yale
21 University with a hyperlink?
22   A.  Yes.
23   Q.  If I click on that hyperlink, would this
24 give me -- would this take me to a page that

Page 185

1 shows me the Carnegie Classification for Yale?
2   A.  Right. This is similar to another one
3 that was in my report.
4   Q.  Now, this shows Yale as an R1. Would
5 you agree that Yale is an R1?
6   A.  Yes.
7   Q.  Let's start over. Ms. Wermuth asked you
8 about Northwestern University; is that right?
9   A.  Yes.
10   Q.  If I type Northwestern, there is a bunch
11 of things that pop up. One of them is
12 Northwestern University in Evanston, Illinois?
13   A.  Yes.
14   Q.  If I click on that hyperlink, what does
15 it say its Carnegie Classification is?
16   A.  Very high, R1.
17   Q.  That means it is an R1?
18   A.  Yes.
19   Q.  Let's start over again. We also have
20 the University of Chicago?
21   A.  Yes.
22   Q.  We got the University of Chicago, a
23 private not-for-profit institution in Chicago,
24 Illinois?

Page 186

1    A.  Yes.
2    Q.  Click on the hyperlink.  Does that say
3 what its Carnegie Classification is?
4    A.  Yes, very high, R1.  That makes it an
5 R1.
6    Q.  If we were to use this website that I
7 pulled up earlier that I just showed you, would
8 that tell you what is an R1 and R2?
9    A.  Yes, it would.
10    Q.  Just for fun, let's click on DePaul.
11 When I type DePaul in, I see DePaul University.
12 And I click on that, what does it show?
13    A.  High research activity, so that's R2.
14    Q.  Okay.  Ms. Wermuth asked you some
15 questions, which at least I interpreted as
16 suggesting that she may believe that UNC hired
17 Doctor Calvente as a favor to her.  Now, she
18 doesn't need to say whether she believes that or
19 not.  That's how I interpreted those questions.
20 Do you have an opinion as to whether UNC hired
21 Doctor Calvente as a favor to her?
22          MS. WERMUTH:  Objection to the form
23 of the question.  The narrative portion in
24 particular that preceded the question ought to be

Page 187

1 stricken as narrative and argument.  And I object
2 to form.
3          MR. BRAMWELL:  You can file any
4 motion you want to strike.
5    Q.  Doctor Zaeske, feel free to answer.
6    A.  So I -- you know, I won't opine -- I
7 really try not to -- I'm not opining on anything
8 on the tenure denial or the hiring.  But what I
9 can say is general -- how things work, how things
10 work in higher ed.  All right.  It is right now
11 because, and really always, and certainly in the
12 last 10 years, budgets are so tight that
13 institutions cannot make mistakes in hiring
14 because if you do not -- if someone does not get
15 tenure or is not tenured or non-renewed, then a
16 department will lose its chance, probably lose
17 its chance to hire again for a long time.
18          Also a tremendous amount
19 of money is invested in getting research programs
20 started up, even in the humanities, you know,
21 much less like in the lab sciences.  And also it
22 affects morale.  It takes a tremendous amount of
23 time to mentor.  So other than those Ivy's that I
24 mentioned in my report, like Harvard, Yale, and

Page 188

1 Princeton, all 3 of them in particular, they hire
2 not to tenure.
3          `The R1s, and certainly the
4 public schools like UNC, and even Northwestern,
5 it isn't public, but even at Northwestern, they
6 hire to tenure.  They would not take -- they
7 would not just do someone a favor.  They have to
8 hire people that have a clear record of
9 productivity established that shows that they
10 will -- that they will be able to gain tenure.
11 And again, that's the key thing that you look at
12 when you are -- as a department when you are
13 interviewing people before you extend them an
14 over, the deans look at it.
15          And you know, I'll just
16 also add this as personal experience.  You know,
17 when I was asked about my CV, again, you said it
18 is okay to call you Anna.
19          MS. WERMUTH:  Of course.
20          THE WITNESS:  When Anna asked me
21 about my CV, you noted my degrees are from UW
22 Madison.  It was very unusual that I was hired at
23 the institution where I earned by PhD, and I had
24 to pass a higher bar to be hired, and I had to

Page 189

1 meet higher expectations to be hired.  So for
2 example, I had to have offers from 2 other R1
3 institutions on the table to show the dean when I
4 was hired at Wisconsin to convince them that my
5 department wasn't just trying to hire me because
6 I was one of their own.
7          They also -- 2 of my
8 faculty had been non-renewed and then 2 retired,
9 so there was no fear of duplicating, you know,
10 like I was duplicating my existing faculty.  So
11 you know, there had to be other circumstances.
12 And finally the dean said you have to go
13 somewhere else at some point, you know, fairly
14 early in your career, which drove me to go to
15 Harvard.  You know, it is one of the reasons to
16 get an idea of what another school was like.
17          So I'm saying that
18 institutions that end up hiring their own don't
19 do it lightly.  The other thing is it is also
20 different if you hire someone who has been away
21 for a number of years.  So this year, I have an
22 example, we are hiring a historian who has been
23 at the University of Iowa for 5 or 6 years, and
24 we felt that it was okay to hire him at UW

Page 190

1    Madison. But the thing was he had put some space
2    between his time as a graduate student here and
3    the time he would be a faculty member.
4                So those are all
5    considerations, but it is not done lightly. It
6    is not considered an ideal practice. So it would
7    have to be -- there would have to be good reason.
8    But beyond that, I will not opine.
9    BY MR. BRAMWELL:
10       Q.  All right. Ms. Wermuth spoke a little
11   bit about years of credit. Do you recall that
12   line of questioning?
13       A.  Yes.
14       Q.  Okay. Would you give years of credit at
15   the University of Wisconsin if the faculty member
16   that you were seeking to hire came from DePaul?
17       A.  No. We do not -- if someone has tenure
18   service -- years of tenure at an institution of,
19   you know, like an R1, because we are an R1, we
20   would give them -- we would give them years of
21   credit. We would not give years of credit for an
22   R2, and especially not, you know, we certainly
23   wouldn't give 3 years. Maybe one, but maybe not.
24               So no. And I'll tell you

Page 191

1    right now, faculty members are asking for more
2    years, and we have automatic -- on their tenure
3    clock. And during the pandemic, we have an
4    across the board if someone asks for a year or
5    even 2 years extension on the tenure clock, we
6    have been granting it. So institutions are
7    lengthening the tenure clock right now. They are
8    not shortening the tenure clock.
9                And again, we don't -- we
10   also would not really give a lot of credence to
11   teaching evaluations at an institution that is so
12   different from UW Madison. Like if someone were
13   teaching at Carlton College, small liberal arts
14   school, it is so different. It is so different
15   than teaching at UW Madison. So the teaching
16   evaluations that they brought in would only be so
17   predictive, and we would expect a lot more data
18   to be gathered, you know, with our students.
19       Q.  All right. Who are University of
20   Wisconsin's peer schools? Would you consider
21   North Carolina a peer school?
22           MS. WERMUTH:  Objection, relevance.
23           THE WITNESS:  I mean it's an R1.
24   BY MR. BRAMWELL:

Page 192

1        Q.  You touched on this a little bit, but
2    can you provide a little more color as to why you
3    need to be able to demonstrate tenurability to be
4    hired at an R1?
5        A.  You just don't hire people that you
6    don't think are going to make it through the
7    process. You have to be convinced that they are
8    -- that they are going to meet the criteria for
9    tenure. And that means there has to be a strong
10   body of publication, and it's usually like -- you
11   know, it is much easier to see and to assess
12   publication -- publication record and the
13   likelihood of continuing a publication record
14   than it is to assess teaching, unless it is at a
15   peer institution.
16               So if I'm hiring someone
17   away from Iowa like we just did. We hired this
18   fellow away from Iowa. He won teaching awards at
19   Iowa. There is not that much difference down the
20   road, at the R1 down the road. But the key thing
21   is that we have to see indicators of things that
22   have already been accomplished. You know, we
23   hire graduate students who already have book
24   manuscripts that are finished, right, and who

Page 193

1    have, you know, multiple articles published. So
2    there has to be -- and that's because it is so
3    difficult to get jobs at R1 institutions. It is
4    so competitive.
5                And that's another reason
6    why -- you know, the institutions like UNC, they
7    have a huge pool of people to hire from because
8    hiring particularly in the humanities, and you
9    know, communication sort of sits between
10   humanities and social sciences, but really both,
11   there has been so little hiring. So it is a very
12   competitive, a very competitive pool. It is very
13   hard to get hired. That's why you have to stand
14   out with your record.
15       Q.  Okay. I believe Ms. Wermuth asked you
16   if there was a qualitative aspect to the tenure
17   process, and I think your answer was yes. Am I
18   remembering that correctly?
19       A.  Yes.
20       Q.  Is there also a quantitative element?
21       A.  Yes. Even again in humanities and
22   certainly in the social sciences and the
23   biological and mathematical and physical
24   sciences, there are qualitative. So most tenure

Page 194

1  cases in humanities, and I think, you know,
2  Calvente is in humanities. I haven't seen the
3  CV. It is the one book by a prestigious press
4  and then evidence of, you know, significant work
5  on, and a concept for the second book. And then
6  they look at articles, all right.
7           So one of the first things
8  is you look at the number of articles. So that's
9  a quantitative. So then the next thing you look
10  at after the number of articles is how long are
11  the articles. Are they 3 pages long? 5 pages
12  long? That's kind of nothing frankly unless you
13  are a philosopher. Are they more substantial
14  like 20 pages long or even 40 pages long?
15           Then the next thing you
16  look at is the rejection rate of the journals.
17  These are included in the tenure dossier, in the
18  report written up by the department. So does
19  everyone get published in the journal that the
20  prospective -- that the probationary faculty
21  member has published in, or is it really hard to
22  get published? You know, what you want to do is
23  you want to publish in journals, peer reviewed
24  journals that are really, really hard to get,

Page 195

1  that the acceptance rate is 1 percent, 1 or 2
2  percent. Those are the most prestigious. So we
3  check those.
4           The other thing they will
5  check is the citation -- the citation rating of
6  an individual faculty member. That's how many
7  times the book or articles that they have in
8  publication has been cited by other scholars. So
9  that's data. Sometimes institutions use a thing,
10  it is a product, it has a vendor, it is called
11  academic analytics. That records all the
12  publications of a faculty member and also their
13  awards, the awards they get, whether they are
14  like a book award or a grant award or a
15  fellowship award.
16           So those are all, you
17  know, in answer to your question, that's data,
18  numerical data, quantitative data.
19    Q.  And that's for generally obtaining
20  tenure at an R1?
21    A.  That's correct.
22    Q.  Okay. You would expect an institution
23  in all of your years in academia and
24  administration, you would expect an institution

Page 196

1  to follow its own, abide by its own policies and
2  procedures, correct?
3    A.  Yes.
4           MS. WERMUTH: Objection to the
5  question on relevance grounds. This goes beyond
6  her opinion, which she has clearly identified her
7  sole opinion in the report.
8  BY MR. BRAMWELL:
9    Q.  And when you evaluate a -- you have
10  obviously evaluated would you say hundreds of
11  files for people looking to be hired and looking
12  to obtain tenure?
13    A.  Yes.
14           MS. WERMUTH: Objection, relevance.
15  BY MR. BRAMWELL:
16    Q.  And do you ever deviate from your
17  institution's policies and procedures?
18           MS. WERMUTH: Objection, relevance.
19           THE WITNESS: No, I would be in a
20  world of hurt if I did that. I do not.
21  BY MR. BRAMWELL:
22    Q.  Why would you be in a world of hurt?
23    A.  Because shared governance is so strong
24  here. Another thing is if I were to do that,

Page 197

1  let's say when I was on an executive committee in
2  my department, other people would argue against
3  it, and probably call me out for violating
4  faculty policies and procedures. So that would
5  have been at that level.
6           On the divisional
7  committee, we would have other members of the
8  committee would be sort of policing -- policing
9  one another. And then as an Associate Dean,
10  there would be oversight by the Dean and the
11  other Associate Deans, and also the other faculty
12  members, like if there -- I have been grieved. I
13  have been grieved several times, and I have had
14  these cases appealed, you know. We have gone
15  through appeals that go out to many levels.
16           I think it is much better
17  to stick to the faculty policies and procedures
18  than to violate them and end up having to go
19  through a very lengthy appeal process, and also
20  to lose the confidence of colleagues because
21  you're violating faculty policies and procedures.
22    Q.  Ms. Wermuth asked you some questions
23  about some journals that you referenced. I just
24  want to go through them fairly quickly. You are

Page 198

1  an academic and administrator, correct?
2      A.  Correct.
3      Q.  Do academics and administrators pay
4  attention to the Carnegie rankings?
5      A.  Yes.
6          MS. WERMUTH:  Objection, vague.
7  BY MR. BRAMWELL:
8      Q.  Same question with respect to the U.S.
9  News and World Report rankings?
10         MS. WERMUTH:  Objection,
11  foundation, vague.
12         THE WITNESS:  So I can tell you
13  that routinely the Chancellor and the Provost,
14  Department Chairs, and Deans, University
15  Communications, and Alumni Publications, and
16  local newspapers publish the various rankings,
17  including, you know, of the -- how UW Madison and
18  its programs fair in those rankings, you know, in
19  world rankings as well as U.S. News.
20  BY MR. BRAMWELL:
21     Q.  Do you ever have discussions with
22  colleagues of other universities about U.S. News
23  and World Report rankings?
24     A.  I think I have had -- yeah, I think, you

Page 199

1  know, in general.  But actually to be honest we
2  talk about NRC rankings more because that's the
3  hard core -- but those are just for graduate
4  programs, doctoral programs.
5      Q.  What about the Chronicle of Higher
6  Education?  What is that and do faculty and
7  administrators generally care about it?
8          MS. WERMUTH:  Objection, relevance,
9  foundation.
10  BY MR. BRAMWELL:
11     Q.  You can answer.
12     A.  So the Chronicle of Higher Education is
13  the most well read publication of the, you know,
14  higher ed as an industry.  It is the most well
15  read industry publication.  I can tell you in the
16  Dean's reception area it sits right there.  It
17  sits in the Provost's reception area.  I haven't
18  been in the Chancellor's that much recently, but
19  it is highly read by academic administrators and
20  faculty too.
21     Q.  Ms. Wermuth asked you about anecdotal
22  evidence.  Is that another way of saying a case
23  study?
24         MS. WERMUTH:  Objection to the form

Page 200

1  of the question.  Misstates my question and is
2  argumentative.
3  BY MR. BRAMWELL:
4      Q.  You can answer.
5      A.  Okay.  So what I -- I did rephrase the
6  anecdotal evidence into case studies because as I
7  mentioned, I did try to find statistical data on,
8  you know, how many faculty are non-renewed or
9  non-tenured and what happens to them after that,
10  and I did not find that.  So what I tried to do
11  is find examples of what happens.
12         So I know -- I have a
13  number of cases, you know.  I can give you some
14  examples if you wish of people who have not been
15  tenured at this R1 institution and what they
16  ended up doing.  But I also wanted to find case
17  studies and examples of people that tell their
18  story and say what they have been doing and
19  consequences for their employability and what
20  happened after they were denied tenure.  And I
21  think that that's hopeful for folks to see those
22  case studies, in addition to the, you know, years
23  of experience that I bring in in all the cases
24  that I'm aware of.

Page 201

1      Q.  Ms. Wermuth asked you, she spent a lot
2  of time on Exhibit 3.2, if you remember?
3      A.  Yes.
4          MS. WERMUTH:  Objection to the
5  narrative of the question.
6  BY MR. BRAMWELL:
7      Q.  I'm just going to pull it up here to
8  page 16.  I'm going to highlight the last
9  sentence.  You see that up there?
10     A.  Yes.
11     Q.  And the last sentence reads "by the
12  tenure review, a faculty member's performance
13  should be excellent in at least 2 of 3 areas and
14  very good in a third."  Do you see that there?
15     A.  Yes.
16     Q.  And the 3 areas are teaching, research,
17  and service?
18     A.  Yes.
19     Q.  So I would have thought this would have
20  been obvious, but since you got a lot of
21  questions on it, maybe I'll just delve into it a
22  little bit.  This tells you that you can receive
23  tenure at DePaul without excellence in research,
24  correct?

Page 202

1        MS. WERMUTH: I'm going to object
2 to the form of the question, and I really object
3 to the way Counsel is characterizing my
4 examination which is uncivil and unprofessional
5 and argumentative.
6 BY MR. BRAMWELL:
7    Q.  You can answer.
8    A.  I'm going to just answer based on what I
9 have seen here. This sentence says that you can
10 get tenure if 2 areas are excellent and a third
11 is very good.
12    Q.  Right. So you don't need to demonstrate
13 excellence -- you don't need to demonstrate
14 excellence in research to obtain tenure at
15 DePaul?
16    A.  It does not say that you do.
17    Q.  You don't need to demonstrate excellence
18 in teaching to obtain tenure at DePaul?
19        MS. WERMUTH: Objection, misstates
20 the record of evidence.
21 BY MR. BRAMWELL:
22    Q.  You can answer.
23    A.  So this sentence just says you have to
24 be excellent in 2 of 3 areas. So one you don't

Page 203

1 have to be excellent in. It could be teaching,
2 it could be research, it could be service, based
3 on what is said here.
4    Q.  And at North Carolina, you need to
5 demonstrate excellence in both teaching and
6 research, right?
7    A.  Right. And then it says that service
8 won't get you there. Service won't get you
9 tenure.
10    Q.  Looking at -- let's see if I can find it
11 here. Here it is. Remember when Ms. Wermuth
12 showed you on page 7 of Exhibit 3.3, I think
13 there was a lot of time spent discussing the
14 clear promise of excellence in teaching and
15 scholarship and/or equivalent creative artistic
16 activity and completion of all requirements for
17 the doctorate or other terminal degree.
18        MS. WERMUTH: I'm going to object
19 to the form the question, especially insofar as
20 it mischaracterizes the examination and
21 improperly characterizes the examination.
22 BY MR. BRAMWELL:
23    Q.  So Doctor Zaeske, what does this
24 sentence mean to you with respect to what it

Page 204

1 takes to be hired at UNC?
2    A.  And I said this a few minutes ago, and
3 that is, you know, clear promise means there is a
4 record, a clear record of publication and
5 scholarly productivity that shows that the person
6 is tenurable, and they are not going to be hired
7 at a place like Wisconsin or UNC without showing
8 that they are highly productive because they are
9 not going to get tenure.
10        And also as I said, right
11 now there is so much competition for positions
12 that in order to stand out, you have to be highly
13 productive. You have to show that you -- that
14 you're going to generate a lot of articles and
15 enough articles for sure to get tenure, and that
16 you have strong promise of finishing that book.
17 You are turning the dissertation into a book and
18 getting it published, and that you even have --
19 usually when I'm talking to people I'm
20 interviewing, I ask them where do you think --
21 what are their presses that they want to get
22 published with? If they tell me they are going
23 to get published at Rutledge or something like
24 that, I'm going to think no, this is not a good

Page 205

1 candidate. I want to see them getting published
2 at a university press, a prestigious university
3 press.
4        Then I ask them what they
5 are going to be -- what they are likely to work
6 on as their second project. This is even as they
7 are interviewing, you know, for an assistant
8 professorship. So they have to clearly
9 demonstrate that they have -- that they know what
10 it takes, that they have progressed
11 significantly, they have stuff in the pipeline,
12 and that they are tenurable. That's what is
13 meant by clear promise.
14    Q.  Okay. Anything else you would like to
15 share with us this afternoon?
16        MS. WERMUTH: Objection to the form
17 of the question.
18 BY MR. BRAMWELL:
19    Q.  You can answer.
20    A.  I think that's it.
21        MR. BRAMWELL: All right. I'll
22 pass you back to Ms. Wermuth and see if she has
23 anything else.
24        MS. WERMUTH: I do.

Page 206

1    FURTHER EXAMINATION
2        BY MS. WERMUTH:
3    Q.  Doctor Zaeske, Mr. Bramwell took you
4 through the website at the Indiana University
5 Carnegie Classification?
6    A.  Right.
7    Q.  In that exercise, the 2 of you
8 demonstrated that Yale is in fact an R1
9 institution, right?
10   A.  Right.
11   Q.  And the 2 of you demonstrated that
12 University of Chicago is in fact an R1
13 institution, right?
14   A.  Right.
15   Q.  And the 2 of you demonstrated that
16 Northwestern University is in fact an R1
17 institution, right?
18   A.  Correct.
19   Q.  Okay.  So that would then tell us that
20 the exhibit that you attached as Exhibit 1 to
21 your report, Exhibit 3.1, is an inaccurate
22 listing; is that fair?
23   A.  It is, yes.
24   Q.  Thank you.  Just to close this out, you

Page 207

1 have not reviewed Doctor Calvente's record of
2 scholarship, correct?
3    A.  No.
4        MS. WERMUTH:  I have nothing
5 further.
6        MR. BRAMWELL:  Just one other
7 thing.
8    FURTHER EXAMINATION
9        BY MR. BRAMWELL:
10   Q.  You know that University of North
11 Carolina Chapel Hill is an R1?
12   A.  Yes.
13       MR. BRAMWELL:  Okay.  That's it.
14 We will reserve signature.
15
16 (Off the record at 3:07 p.m.)
17
18
19
20
21
22
23
24

Page 208

1 STATE OF ILLINOIS  )
                     )  SS.
2 COUNTY OF McHENRY  )
3
4
5     I, GINA MARIE ZANGARA, C.S.R., do hereby
  certify that DOCTOR SUSAN ZAESKE was by me first
6 duly sworn, to testify the truth, the whole
  truth, and nothing but the truth, and that the
7 above deposition, pages 4 through 207, inclusive,
  was recorded by me and reduced to typewriting by
8 me.
9     I FURTHER CERTIFY that the foregoing
  transcript of the said deposition is a true and
10 correct transcript of the testimony given by the
  said witness at the time and place specified
11 hereinbefore.
12    I FURTHER CERTIFY that I am not a relative
  or employee or attorney for counsel of any of the
13 parties, nor a relative or employee of such
  attorney or counsel, or financially interested
14 directly or indirectly in this action.
15    IN WITNESS WHEREOF, I have hereunto set my
  hand at Crystal Lake, Illinois, this 20th day of
16 July, 2021.
17
18
19    Gina Marie Zangara
       Certified Shorthand Reporter
20     McHenry County, IL
       CSR License No. 084-003242.
21
22
23
24

Page 209

1            ERRATA SHEET
2 Deposition of DOCTOR SUSAN ZAESKE on 7-8-21
3   Page        Line         Correction
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

# Exhibit C

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**September 13, 2021**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

---

DR. RACHEL TUDOR,

     Plaintiff - Appellant/Cross-Appellee,

v.

SOUTHEASTERN OKLAHOMA STATE
UNIVERSITY; THE  REGIONAL
UNIVERSITY SYSTEM OF
OKLAHOMA,

     Defendants - Appellees/Cross-
     Appellants.

-------------------------------

NATIONAL WOMEN'S LAW CENTER;
A BETTER BALANCE; ALLIANCE FOR
A JUST SOCIETY; AMERICAN
ASSOCIATION OF UNIVERSITY
WOMEN; AMERICAN FEDERATION
OF TEACHERS; ATLANTA WOMEN
FOR EQUALITY, CALIFORNIA
WOMEN LAWYERS; COLORADO
WOMEN'S BAR ASSOCIATION;
COLORADO ORGANIZATION FOR
LATINA OPPORTUNITY AND
REPRODUCTIVE RIGHTS; DC
COALITION AGAINST DOMESTIC
VIOLENCE, END RAPE ON CAMPUS;
GENDER JUSTICE; GIRLS FOR
GENDER EQUITY; IF/WHEN/HOW:
LAWYERING FOR REPRODUCTIVE
JUSTICE; IN OUR OWN VOICE:
NATIONAL BLACK WOMEN'S
REPRODUCTIVE JUSTICE AGENDA;

Nos. 18-6102 & 18-6165

LAWYERS CLUB OF SAN DIEGO;
LEGAL AID AT WORK; LEGAL
VOICE; NATIONAL ASIAN PACIFIC
AMERICAN WOMEN'S FORUM;
NATIONAL CRITTENTON; NATIONAL
EMPLOYMENT LAWYERS
ASSOCIATION; NATIONAL LGBTQ
TASK FORCE; NATIONAL NETWORK
OF ABORTION FUNDS; NATIONAL
ORGANIZATION FOR WOMEN
FOUNDATION; NATIONAL
PARTNERSHIP FOR WOMEN &
FAMILIES; NATIONAL WOMEN'S
POLITICAL CAUCUS; OKLAHOMA
COALITION FOR REPRODUCTIVE
JUSTICE; SARGENT SHRIVER
NATIONAL CENTER ON POVERTY
LAW; SISTERREACH; THE WOMEN'S
LAW CENTER OF MARYLAND;
WOMEN'S LAW PROJECT; WOMEN'S
BAR ASSOCIATION OF THE DISTRICT
OF COLUMBIA; LAMBDA LEGAL
DEFENSE & EDUCATION FUND, INC.,

      Amici Curiae.

---

**Appeals from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:15-CV-00324-C)**

---

Jillian T. Weiss, Law Office of Jillian T. Weiss, P.C., Brooklyn, New York (Ezra Ishmael Young, Law Office of Ezra Young, Brooklyn, New York; Brittany M. Novotny, National Litigation Law Group PLLC, Oklahoma City, Oklahoma; Marie Eisela Galindo, Law Office of Marie E. Galindo, Lubbock, Texas, on the briefs), for Plaintiff-Appellant.

Zachary West, Assistant Solicitor General (Andy N. Ferguson, Staff Attorney, with him on the briefs), Office of Attorney General, Oklahoma City, Oklahoma, for Defendants-Appellees.

Erica C. Lai, Cohen & Gresser LLP, Washington, D.C. (Emily Martin and Sunu P. Chandy, National Women's Law Center, Washington, D.C.; Melissa H. Maxman and

Danielle C. Morello, Cohen & Gresser LLP, Washington, D.C.; Danielle E. Perlman, Cohen & Gresser LLP, New York, New York, with her on the brief), for Amici Curiae National Women's Law Center, et al.

Gregory R. Nevins, Lambda Legal Defense and Education Fund Inc., Atlanta, Georgia, for Amicus Curiae Lambda Legal.

_____

Before **HARTZ**, **EBEL**, and **McHUGH** Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

Dr. Rachel Tudor sued her former employer, Southeastern Oklahoma State University, under Title VII, claiming discrimination on the basis of sex, retaliation, and a hostile work environment after Southeastern denied her tenure, denied her the opportunity to reapply for tenure, and ultimately terminated her from the university. A jury found in favor of Dr. Tudor on her discrimination and retaliation claims and awarded her damages. The district court then applied the Title VII statutory cap to reduce the jury's award, denied Dr. Tudor reinstatement, and awarded front pay.

Both parties appeal. Southeastern challenges evidentiary rulings and the jury verdict. Dr. Tudor, on the other hand, attacks several of the court's post-verdict rulings, challenging the district court's denial of reinstatement, calculation of front pay, and application of the statutory damages cap.

We reject Southeastern's challenges. But, regarding Dr. Tudor's appeal, we hold that there was error both in denying reinstatement and in calculating front pay, although there was no error in applying the Title VII damages cap. Exercising

jurisdiction under 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part and REMAND for further proceedings.

## I.   BACKGROUND[1]

### A.   General Background

Dr. Tudor is a transgender woman who is a dual citizen of the United States and Chickasaw Nation.  She earned a Ph.D. in English from the University of Oklahoma in 2000.  In 2004, Dr. Tudor began working at Southeastern Oklahoma State University as a tenure-track assistant professor in the English, Humanities, and Languages Department ("English Department").  Southeastern is part of the Regional University System of Oklahoma (RUSO), the other defendant in this case.

When Dr. Tudor started teaching at Southeastern, she presented as a male. Approximately three years later, in the spring of 2007, however, Dr. Tudor informed Southeastern's Human Resources Office that she planned to transition from male to female over the summer.  She returned to teaching in the next semester now presenting as a woman, Rachel Tudor.

### B.   Tenure Applications

Southeastern's tenure application process involves review of the applicant's portfolio by a faculty committee, the department chair, the college dean, and the vice

---

[1] Because the jury found in favor of Dr. Tudor on her discrimination and retaliation claims and because Southeastern challenges the sufficiency of the evidence to support that verdict, we recount the facts that were presented to the jury at trial in the light most favorable to Dr. Tudor.  Webco Indus., Inc. v. Thermatool Corp., 278 F.3d 1120, 1128 (10th Cir. 2002).

president of academic affairs.  Each entity issues a recommendation to the university president, who then makes the final tenure determination and seeks approval from the RUSO governing board.  To obtain tenure, then, Dr. Tudor needed to receive a favorable recommendation from: (1) a tenure committee comprised of five faculty members; (2) the then English Department Chair, John Mischo; (3) the then Arts and Sciences dean, Lucretia Scoufos; (4) the then vice president for academic affairs, Doug McMillan; (5) the then university president, Larry Minks; and (6) RUSO's governing board.  RUSO's governing board generally approves the recommendation given by the university president.  Southeastern's tenure-application process assesses applicants for excellence in three areas: scholarship, service, and teaching.

### 1.    Application for Tenure in 2008

In fall 2008, Dr. Tudor submitted her tenure portfolio to a faculty committee, the first level of review in the application process.  The committee voted against tenure, and Dr. Tudor withdrew the application.

### 2.    Application for Tenure in 2009-10

In fall 2009, Dr. Tudor again applied for tenure, providing evidence of all three above criteria—teaching, scholarship, and service—in her portfolio.  For example, her portfolio contained a regional conference presentation, two articles accepted for publication in peer-reviewed journals, a poetry book, and service on multiple committees at Southeastern.

The five-faculty-member tenure committee recommended Dr. Tudor receive tenure by a 4-to-1 vote (Dr. Randy Prus, who would only later become the

department chair, voting against). Dr. Mischo, the then department chair, also recommended tenure. Despite the faculty committee's and department chair's approval, Dean Scoufos, Vice President McMillan, and President Minks recommended denial of tenure. Dr. Tudor and one of her colleagues later testified that they had never heard of the administration denying an applicant tenure after the faculty committee recommended granting it.

Before receiving President Minks's denial, Dr. Tudor met with Dean Scoufos, who told her that if she withdrew her current application, she could reapply for tenure in the future. Ultimately, Dr. Tudor did not withdraw her application, and President Minks denied it. After Dr. Tudor filed grievances with the faculty appellate committee regarding the lack of any explanation for the denial, Vice President McMillan identified President Minks's rationale as based on deficiencies in scholarship and service.

In August 2010, Dr. Tudor filed discrimination complaints with the faculty appellate committee, Southeastern's affirmative-action officer, and the U.S. Department of Education, which referred the complaint to the Equal Employment Opportunity Commission (EEOC).

### 3.    Application for Tenure in 2010-11

In fall 2010, believing she could reapply for tenure, Dr. Tudor again submitted her tenure application, updated to account for her recent work. In October 2010, after the new department chair, Dr. Prus, had already begun assembling Dr. Tudor's tenure review committee, Dr. Prus and Dr. Tudor received a memo from Vice

6

President McMillan in which he stated that Southeastern's academic policies and procedures manual did <u>not</u> specifically proscribe a subsequent tenure application after a denial but also that the administration would not allow Dr. Tudor's reapplication for tenure in the subsequent year following denial "in the best interests of the university." (Tudor R. vol. 5 at 229.)[2]

Being prevented from reapplying in her seventh year at Southeastern was highly problematic for Dr. Tudor because "[t]enure-track faculty are only given seven years to be granted tenure or else [they're] fired." (Tudor R. Vol. 6 at 114.) Despite the policy manual language, Dr. Tudor, who served on the faculty senate's faculty policies and procedures committee, had never heard of a rule precluding a sixth- or seventh-year faculty member from reapplying for tenure after a denial.

Dr. Tudor again appealed to the faculty appellate committee, which determined that the rules permitted Dr. Tudor to reapply. After an unprecedented impasse between the faculty appellate committee and President Minks's designee, President Minks ultimately decided that Dr. Tudor could not reapply in March 2011. The faculty senate asked him to reverse the decision, but he declined. As a result, Dr. Tudor's employment contract with Southeastern expired, and Southeastern did not renew it. Dr. Tudor left Southeastern in spring 2011.

---

[2] Southeastern's academic policy manual stated specifically that faculty could apply for tenure in their "fifth, sixth, <u>or</u> seventh year" (as opposed to saying they could apply in their fifth, sixth, <u>and</u> seventh years). (Tudor R. vol. 5 at 188 (emphasis added).)

Based on the reapplication denial, Dr. Tudor filed a discrimination and retaliation complaint with the EEOC, which referred it to the U.S. Department of Justice (DOJ).

## C.    Collin College Position

Fourteen months after leaving Southeastern, Dr. Tudor obtained an English teaching position on an untenured, one-year contract basis at Collin College, a two-year community college in Texas.  After Dr. Tudor taught at Collin College for four years, that college declined to renew Dr. Tudor's contract, citing negative evaluations and poor-quality teaching.  She has since looked for work but has remained unemployed.

## D.    DOJ Complaint

The DOJ filed a complaint against Southeastern in March 2015, alleging sex discrimination and retaliation in violation of Title VII.  Dr. Tudor intervened in this action with her own complaint in May 2015, bringing claims of discrimination, retaliation, and hostile work environment.  In August 2017, Southeastern and the DOJ settled, resulting in the dismissal of the DOJ complaint.  As part of the Southeastern/DOJ Settlement Agreement, Southeastern agreed to certain policy changes aimed at reducing discrimination at the university.

## E.    Trial and Judgment

The litigation between Dr. Tudor and Southeastern proceeded.  After the district court rejected Southeastern's motion for summary judgment and various other pre-trial motions, including a motion to exclude the testimony of Dr. Tudor's tenure

expert, Dr. Parker, the parties tried the case before a jury.  At the close of evidence, both parties made oral motions for judgment as a matter of law, which the court denied.

The jury found in Dr. Tudor's favor on her discrimination and retaliation claims, but in Southeastern's favor on Dr. Tudor's hostile work environment claim. Using the court's general verdict form (to which neither party objected), the jury awarded Dr. Tudor a lump sum of $1.165 million in damages, encompassing both backpay and compensation for physical or mental distress.

After the verdict, the district court requested additional briefing from the parties on the equitable issues of reinstatement and front pay.  Dr. Tudor filed a motion for reinstatement, but the district court denied that request.  She then moved for reconsideration and, in the alternative, requested $2,032,789.51 in front pay.  The district court declined reconsideration and awarded Dr. Tudor $60,040.77 in front pay.  Dr. Tudor lastly moved for reconsideration of the front pay award, which the court denied.

Finally, the court requested briefing on the jury award and the Title VII damages cap.  It ultimately applied that $300,000 cap to the $1.165 million jury award, resulting in an award of $360,040.77.  This amount reflected $60,040.77 that the court attributed to uncapped backpay and $300,000 in capped compensatory damages.

The court entered judgment and Dr. Tudor timely appealed.  Southeastern then renewed its motion for judgment as a matter of law and moved for a new trial.  The

district court rejected Southeastern's motions as untimely and, alternatively, denied them on the merits.  Southeastern timely appealed.

## II.    DISCUSSION

We consider first Southeastern's appeal challenging evidentiary rulings and the jury verdict, before turning to Dr. Tudor's more substantive appeal addressing post-verdict rulings.

### A.    Southeastern's Cross-Appeal

Southeastern challenges the district court's decision to deny its motion to exclude Dr. Tudor's tenure expert, Dr. Parker, its motion for summary judgment, and its motion for judgment as a matter of law.  None of these challenges have merit, and we affirm in each instance.  Before turning to Southeastern's claims, we first discuss the impact of the Supreme Court's recent decision in Bostock v. Clayton County, 140 S. Ct. 1731 (2020).

#### 1.    **Bostock** Arguments

While these appeals were pending, the Supreme Court decided Bostock and the parties here submitted additional briefing on that case.  We apply Bostock in resolving this appeal.  See SEC v. Mick Stack Assocs., Inc., 675 F.2d 1148, 1149 (10th Cir. 1982).

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  One of the issues in Bostock was whether transgender discrimination constitutes Title VII

10

discrimination on the basis of sex.  140 S. Ct. at 1737.  The Supreme Court

determined that "it is impossible to discriminate against a person for being

homosexual or transgender without discriminating against that individual based on

sex" because "to discriminate on these grounds requires an employer to intentionally

treat individual employees differently because of their sex."  Id. at 1741–42.  The

Court thus held that Title VII "prohibit[s employers] from firing employees on the

basis of homosexuality or transgender status."  Id. at 1753.

   Bostock overrules this Court's previous holdings in Etsitty v. Utah Transit

Authority, 502 F.3d 1215 (10th Cir. 2007), that transgender persons "are not a

protected class under Title VII," that "discrimination against a [transgender person]

based on the person's status as a [transgender person] is not discrimination because

of sex under Title VII," and that a defendant "may not claim protection under Title

VII based upon her [transgender status] per se."  Id. at 1220, 1221, 1224.  As a result,

Etsitty is no longer valid precedent to the extent that it conflicts with Bostock.

United States v. Brooks, 751 F.3d 1204, 1209 (10th Cir. 2014).

   In the wake of Bostock, it is now clear that transgender discrimination, like

that complained of by Dr. Tudor, is discrimination "because of sex" prohibited under

Title VII.  Accordingly, Southeastern concedes that Bostock invalidates its arguments

in reliance on Etsitty that transgender discrimination is not enough alone to make out

a Title VII violation.  (SE Supp. Br. 2.)[3]  We now turn to Southeastern's arguments

that remain cognizable.[4]

## 2.    Tenure Expert

Southeastern first challenges the district court's denial of its motion to exclude

the testimony of Dr. Tudor's tenure expert, Dr. Parker, arguing that the district court

abandoned its gatekeeping role and that, even if the court performed this role, it

should have excluded the expert testimony as unreliable, subjective, and

methodologically unsound.  Dr. Tudor disputed Southeastern's argument on its

merits, but also argued that Southeastern waived this challenge.

This Court reviews de novo whether the district court performed its

gatekeeping role.  Adamscheck v. Am. Fam. Mut. Ins. Co., 818 F.3d 576, 586 (10th

Cir. 2016).  If the district court performed its gatekeeping role, this Court reviews the

---

[3] The parties also debate whether Bostock overrules DePaula v. Easter Seals El
Mirador, 859 F.3d 957 (10th Cir. 2017).  This is because Bostock held that Title VII
incorporates the "simple and traditional standard of but-for causation," 140 S. Ct. at
1739 (internal quotation marks omitted), whereas DePaula held that a plaintiff must
prove the alleged discrimination was a "primary factor" in the defendant's adverse
employment action, 859 F.3d at 970.  The Bostock Court also observed, however,
that Congress has allowed a Title VII claim to succeed if sex was a "motivating
factor" in the decision, recognizing that the but-for standard is a "viable, if no longer
exclusive, path to relief under Title VII."  140 S. Ct. at 1739–40 (citing 42 U.S.C. §
2000e-2(m)).  Because the jury was instructed on the motivating factor standard,
which remains intact, this aspect of the case is unaffected by Bostock, and we decline
to address Bostock's impact on DePaula.

[4] Even after Bostock, Southeastern contends that Dr. Tudor impermissibly
brought her case as a female instead of as a male.  We do not see the relevance of the
male/female distinction here. While this may have been relevant to establishing a
claim of sex discrimination pre-Bostock, there is no question now that Dr. Tudor's
transgender claims are cognizable.  The label given to Dr. Tudor's sex does not
change the character of the discrimination based on her transgender identity.

decision to admit Dr. Parker's testimony for abuse of discretion. United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009). We assume without deciding that Southeastern did not waive its challenge to Dr. Parker's expert testimony because, in any event, we affirm on the merits, concluding that the district court sufficiently performed its gatekeeping role, if minimally, and did not abuse its discretion when it permitted Dr. Parker to testify.[5]

### a.    Legal Background

Rule 702 requires an expert witness to be qualified by "knowledge, skill, experience, training, or education," and an expert witness's testimony must be helpful to the trier of fact, based on sufficient facts, and the result of "reliable principles and methods." Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593–95 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). The district court, as gatekeeper, is therefore responsible for ensuring expert testimony is reliable and relevant. Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003). To perform its gatekeeping role, the district court must make specific findings on the record so that this Court can determine if it carefully reviewed the objected-to expert testimony under the correct standard. Adamscheck, 818 F.3d at 586.

---

[5] Dr. Tudor also argued that this challenge should not be reviewed on the merits because Southeastern's appendix was not sufficient, but Southeastern was granted permission to supplement its appendix with its reply brief (the fourth brief in this case), curing the previous omissions.

### b.    Gatekeeping Role

In this case, the district court rejected Southeastern's challenges to Dr.

Parker's testimony—that it was unreliable, inherently subjective, lacking in expertise,

irrelevant, and unhelpful to the jury—in a four-page order.  Although that order

includes minimal specificity and detail, we conclude that the gatekeeping role was

satisfied.

In performing its gatekeeping role, the district court referenced Rule 702,

reviewed the arguments on both sides, and provided some (albeit brief) explanation.

Cf. Adamscheck, 818 F.3d at 587–88 (court failed gatekeeping role when it made off-

the-cuff decision to exclude based on one sentence by the opposition); Goebel v. Denver

& Rio Grande W. R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000) (court failed

gatekeeping role when there was no statement on the record indicating a Daubert analysis

was performed).  Where, as here, an expert's methodology is not complex, technical,

or highly specialized, a less detailed district court ruling is sufficient.  See

Storagecraft Tech. Corp. v. Kirby, 744 F.3d 1183, 1190 (10th Cir. 2014).  Dr.

Parker's methodology involved comparing Dr. Tudor's tenure application to those of

successful applicants; this method is straightforward.  On these particular facts, a

lengthy Daubert ruling was not required, and the district court's order was minimally

sufficient to satisfy this Court that the district court performed its gatekeeping role

under Rule 702.

### c.    Abuse of Discretion

The district court did not abuse its discretion when it denied Southeastern's motion and permitted Dr. Parker to testify.  Dr. Parker's methodology was rooted in his experience as an English professor having participated in over 100 promotion deliberations.  It is well established that expert testimony can be based on such experience.  Fed. R. Evid. 702 (listing experience as one of the ways in which an expert can be qualified).  As a result, it was reasonable for the district court to conclude that Dr. Parker was qualified to explain the tenure application process and to recognize strong and weak applications in the field of English, as well as for the court to conclude that Dr. Parker's method of comparison was reliable.[6] Southeastern's arguments that Dr. Parker was unqualified because he had no experience in the specific areas of English studied by the applicants, nor any experience working at Southeastern or in Oklahoma, are unconvincing.

It was also reasonable for the district court to conclude that Dr. Parker's testimony would be relevant and helpful to the jury.  Many laypeople are likely unfamiliar with the tenure process, and a comparison of Dr. Tudor's application to those of successful applicants could shed light on whether Southeastern's reasons for the tenure denial—lack of scholarship and service—were disingenuous.

---

[6] Although Dr. Parker had access to only a partial reconstruction of Dr. Tudor's 2009-10 tenure portfolio, it was not unreasonable for the district court to determine that the hundreds of pages of documents reviewed by Dr. Parker related to Dr. Tudor's application provided him with an adequate foundation.

Finally, we decline to follow the district court and out-of-circuit caselaw that Southeastern cites to support excluding the testimony of tenure experts as irrelevant and unreliable on the grounds that tenure decisions are inherently subjective.  (SE Br. 32 (collecting cases).)  These cases do not render the district court's decision here manifestly unreasonable because the court was not bound by them.[7]  Further, Dr. Parker did not create his own, personal standards for tenure qualification but rather relied upon, for example, Southeastern's criteria for tenure and promotion, and general standards for judging scholarship in the field.

To the extent that Southeastern had valid concerns regarding Dr. Parker's methodology, such as sample size and failure to consider denied applications, these were appropriate topics for cross-examination.  See Daubert, 509 U.S. at 596. District courts are given "broad discretion" in expert witness determinations, Dodge, 328 F.3d at 1223, and we cannot say that the district court abused that discretion in this case.

### 3.    Summary Judgment

Next, because a jury trial has already occurred, we reject Southeastern's challenge to the district court's denial of its motion for summary judgment.  Ortiz v.

---

[7] In addition, this Court is unwilling to find that tenure experts are categorically unreliable.  Title VII plaintiffs may have few or no other methods to refute defendants' proffered reasons for a tenure denial.  See Carlile v. S. Routt Sch. Dist. RE-3J, 739 F.2d 1496, 1500 (10th Cir. 1984) ("Despite the fact that courts are reluctant to review the merits of tenure decisions, such decisions are not exempt under Title VII.  Plaintiffs seeking to show discriminatory purposes in tenure or reappointment decisions ought to have available the means of challenging such decisions.").

Jordan, 562 U.S. 180, 184 (2011) ("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion.").[8]  Even if we did consider Southeastern's challenge, it has no merit in light of Bostock, 140 S. Ct. 1731.

### 4.    Judgment as a Matter of Law

Southeastern lastly appeals the district court's denial of its motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) and (b).  This Court reviews the district court's Rule 50(b) ruling de novo.  Mountain Dudes v. Split Rock Holdings, Inc., 946 F.3d 1122, 1129 (10th Cir. 2019).  The district court dismissed Southeastern's 50(b) motion as untimely and, alternatively, denied it on the merits.  Dr. Tudor also argues on appeal that the 50(b) motion was not preserved.  Because we reject Southeastern's challenge on the merits, concluding that the jury verdict is supported by the evidence, we can assume without deciding that its renewed motion for judgment as a matter of law was both timely and preserved.

"Judgment as a matter of law under Rule 50 'is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.'"  Mountain Dudes, 946 F.3d at 1129 (quoting In re Cox Enters., Inc., 871 F.3d 1093, 1096 (10th Cir. 2017)).  This Court

---

[8] There might be an exception to Ortiz's rule barring an appeal of the denial of summary judgment after trial when there are no material facts in dispute and the issue is purely legal.  Copar Pumice Co., Inc. v. Morris, 639 F.3d 1025, 1031 (10th Cir. 2011).  We decline to resolve this issue because, like in Morris, there undoubtedly exist factual disputes in this case, and the legal questions have been resolved by Bostock.

does not make credibility determinations or weigh the evidence, and the evidence

must be viewed in the light most favorable to the nonmoving party.  Id. at 1130.

Southeastern contends that the district court erroneously denied its Rule 50(b)

motion because the jury verdict in favor of Dr. Tudor on her claims of discrimination

and retaliation was not supported by sufficient evidence.  After careful review of the

complete evidence in the light most favorable to Dr. Tudor, we conclude that it was

clearly sufficient for a jury to find by a preponderance of the evidence that Dr. Tudor

was denied tenure in 2009-10, as well as denied the opportunity to reapply in 2010-

11, on the basis of sex, and that Southeastern refused to allow her to reapply in 2010-

11 in retaliation for her Title VII complaints.[9]  In part, we rely on statements from

Dean Scoufos about Dr. Tudor's appearance; Vice President McMillan's statements

about Dr. Tudor's lifestyle and his recommendation that Dr. Tudor should be

summarily fired when he learned she was transgender; Affirmative Action Officer

Stubbefield's sarcastic reference to Dr. Tudor's new identity; Dr. Parker's expert

testimony that Dr. Tudor was more qualified than other professors in Dr. Tudor's

same department who were granted tenure; Dr. Cotter-Lynch's testimony about Dr.

Tudor's qualifications; Dr. Mischo's and Dr. Spencer's testimony that Dr. Tudor's

portfolio was "sufficient" for tenure (Tudor R. vol. 7 at 158, 210); Dr. Tudor's, Dr.

Mischo's and Dr. Cotter-Lynch's testimony that they had never heard of a rule

---

[9] The Court has carefully reviewed all the evidence but is not repeating all of it here in detail, simply to avoid unnecessarily extending this opinion since the parties are fully aware of the evidence.

barring tenure reapplication after a denial; the close temporal relationship between

Dr. Tudor's protected activity and the denial of the opportunity for her to reapply for

tenure; as well as evidence mentioned earlier in this opinion.

Southeastern asserts that "President Minks was the relevant decision-maker,"

and Dr. Tudor failed to present any evidence that he discriminated against Dr. Tudor

when he denied her tenure.  (SE Br. 45–46.)  Dr. Tudor does not dispute President

Minks is the ultimate decisionmaker; instead, she invokes the "cat's-paw" theory of

recovery.  "Under a cat's-paw theory of recovery (also known as 'subordinate bias'

or 'rubber stamp' theory), an employer who acts without discriminatory intent can be

liable for a subordinate's discriminatory animus if the employer uncritically relies on

the biased subordinate's reports and recommendations in deciding to take adverse

employment action."  Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 (10th Cir.

2015).  Here, Dr. Tudor contends she presented evidence from which a jury could

conclude that President Minks rubberstamped Vice President McMillan's decisions,

and the latter's decisions were based on discriminatory animus.  (Tudor Reply 71–

72.)

Evidence supporting this theory includes that President Minks delegated the

responsibility to Vice President McMillan to provide the administration's official

rationale for Dr. Tudor's tenure denial in 2009-10, and he did the same for the

administration's official decision to bar her tenure reapplication in 2010-11.  (Id. at

72 (citing Tudor R. vol. 6 at 31 (President Minks's letter in which he informs Dr.

Tudor that he "delegated the responsibility to Dr. McMillan for providing you with

the reasons for my denial" of tenure in 2009); Tudor R. vol. 5 at 229 (Vice President

McMillan's letter to Dr. Tudor in which he states that he (i.e., Vice President

McMillan) made the "decision as acting chief academic officer that your

application/request and portfolio will not be accepted for review for the 2010-2011

academic year")).)  Moreover, Dr. Knapp, who sat on all three of the faculty

appellate committees that heard Dr. Tudor's grievances, testified that "[i]t seemed

that the application was stopping with Dr. McMillan."  (Tudor R. vol. 8 at 29–30.)

Further, evidence was presented at trial that Vice President McMillan told Dr. Tudor

he would recommend that President Minks deny her tenure.  (SE Br. 9 (citing Tr. vol.

1 at 64–65; SE App. vol. 3 at 806).)  Vice President McMillan's negative

recommendation was followed by President Minks's denial, even though the faculty

committee who reviewed Dr. Tudor's portfolio had voted 4-to-1 in favor of granting

her tenure.

Southeastern also contends Dr. Tudor did not raise the cat's paw theory below,

and the jury was not instructed on it, so it is waived.  (SE Reply 22.)  But by

Southeastern's own repeated and very explicit admissions, this was precisely the

theory Dr. Tudor presented to the jury.  Southeastern asserts: Dr. Tudor's "theory at

trial was that the discrimination and retaliation originated with [Vice President]

McMillan. During closing, [Dr. Tudor's] attorney claimed that '[a]ll of this, it all

went back to Doug McMillan' and that '[Vice President] McMillan pulled the puppet

strings to push Rachel out of that university.'"  (SE Br. 20 (emphases added) (quoting

Tr. vol. 5 at 837, 841); see also id. at 46 (stating Dr. Tudor's "entire theory of the

case was that the true culprit was [Vice President] McMillan").)  The cases Southeastern cites are all clearly distinguishable from the facts in the case before us.

For all these reasons, we affirm the district court's denial of Southeastern's renewed motion for judgment as a matter of law.

## B.    Dr. Tudor's Appeal

We now turn to Dr. Tudor's appeal, which challenges several of the district court's post-verdict remedy holdings.  Dr. Tudor appeals the district court's denial of her request for reinstatement, the district court's front pay award, and its application of the Title VII statutory cap on damages to the jury award.  We affirm the district court's application of the Title VII damages cap, but we reverse the denial of reinstatement and its front pay rulings.  We remand to the district court for a recalculation of the front pay award and for an order requiring Dr. Tudor's reinstatement with tenure.

### 1.    Reinstatement

After prevailing at trial, Dr. Tudor requested reinstatement with tenure.  The district court denied that request, finding that "reinstatement is simply not feasible in this case."  (Tudor R. vol. 4 at 128.)  This Court reviews the district court's decision to deny reinstatement for abuse of discretion.  Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1176 (10th Cir. 2003).  We reverse, concluding on this record that Dr. Tudor is entitled to reinstatement with tenure.

#### a.    Legal Background

Under Title VII,

> [i]f the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).  "[R]einstatement is the preferred remedy and should be ordered whenever it is appropriate . . . ." Abuan, 353 F.3d at 1176 (emphasis added). This clear preference for reinstatement fulfills Title VII's purpose of providing make-whole relief to victims of employment discrimination, and the district court's discretion to fashion relief is confined by this purpose.  Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975) ("It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination."); Zisumbo v. Ogden Reg'l Med. Ctr., 801 F.3d 1185, 1203 (10th Cir. 2015) (observing that the court's exercise of discretion to fashion remedies under Title VII "must be tied to Title VII's twin purposes of" preventing discrimination and making victims whole).

A court's inquiry into whether reinstatement is appropriate after a jury verdict of discrimination and retaliation in plaintiff's favor therefore does not take place on a level playing field.  Instead, courts must start with the strong preference for reinstatement, and then ask if the defendant has overcome this presumption by establishing the existence of extreme hostility between the parties.  See EEOC v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d 1166, 1173 (10th Cir. 1985) (remanding ADEA case where district court awarded front pay without explaining in the first instance why reinstatement was

22

inappropriate).  Because some hostility will inevitably be present in every case, we emphasize that the hostility must be extreme to defeat the preference for reinstatement: "Reinstatement may not be appropriate . . . when the employer has exhibited such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible."  Id. at 1172 (emphasis added) (ADEA); see also McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1145 (10th Cir. 2006) (Title VII).

To clarify, this test does not require complete harmony among the plaintiff, the employer, and other employees—a certain amount of hostility and friction among workers is to be tolerated and expected, especially following litigation.  That there is some hostility, then, will not be enough to justify a denial of the preferred remedy of reinstatement.  Put another way, the extreme hostility test is not a measure of affection between an employee, employer, and colleagues.  The fondness, or lack thereof, that they feel for one another does not necessarily correlate with their ability to work together. There are plenty of workarounds and solutions making reinstatement possible in cases where some animosity exists, such as a remote office, a new supervisor, or a clear set of workplace guidelines.  And, as discussed further below, some positions such as higher education teaching and scholarship are inherently fairly insulated from the adverse sentiments of colleagues.  Courts must look beyond ill feeling and instead address simply whether a productive working relationship would still be possible, and they must do so through the lens of a strong preference for reinstatement.  See Bingman v. Natkin & Co., 937 F.2d 553, 558 (10th Cir. 1991) (reinstatement should be granted in "all but special instances of unusual work place hostility").

23

The extreme hostility inquiry is not prone to a mechanistic approach of keywords or checklists. It instead requires the court to review the specific factual situation before it and ask if the relationship can be made productive and workable for the plaintiff-employee to return to the work environment.

In addition, the extreme hostility test is an objective one, wherein the district court assesses how the working relationship could function in practice under workable safeguards and parameters. Were it otherwise, the test would be rendered unworkable because the parties would essentially be given veto power to prevent reinstatement simply based on their own, subjective views about future hostility. In other words, if the subjective feelings of the employee or employer were controlling, the "extreme hostility" exception would swallow the rule preferencing reinstatement. See Jackson v. City of Albuquerque, 890 F.2d 225, 234 (10th Cir. 1989) (in the § 1983 context, stating, "Unless we are willing to withhold full relief from all or most successful plaintiffs in discharge cases, and we are not, we cannot allow actual or expected ill-feeling alone to justify nonreinstatement" (quoting Allen v. Autauga Cnty. Bd. of Educ., 685 F.2d 1302, 1306 (11th Cir. 1982))); Fester v. Farmer Bros. Co., 49 F. App'x 785, 794 (10th Cir. 2002) (unpublished) (citing the extreme hostility test and affirming the district court's grant of reinstatement despite defendant arguing that extreme hostility existed).[10]

---

[10] This is not to say that subjective feelings are irrelevant. They can serve as helpful evidence in applying the objective test and should be considered alongside all other circumstances. See, e.g., Abuan, 353 F.3d at 1177–78 (in addition to objective evidence of extreme hostility between the parties, plaintiff's distrust of the employer suggested that a working relationship was impossible); Jackson, 890 F.2d at 234 (that
(continued)

Because this is a civil case, we apply a preponderance of the evidence standard, asking if it is more likely than not that extreme hostility would make a productive working relationship impossible—not just difficult or imperfect.  Century Sur. Co. v. Shayona Inv., LLC, 840 F.3d 1175, 1177 (10th Cir. 2016).

One other factor we consider is whether the extreme hostility argument is being asserted by the plaintiff or defendant.  Often, as in this case, the defendant is a large institution that should have sufficient resources to eliminate or otherwise ameliorate any hostility on its side toward the plaintiff.  And when, as here, the plaintiff affirmatively seeks reinstatement, we can typically assume that the plaintiff is not asserting she would confront extreme hostility after reinstatement.

In summary, the extreme hostility defense faces a significant presumption in favor of reinstatement.  Under the facts before us, it was manifestly unreasonable for the district court to conclude that extreme hostility made a productive working relationship between Dr. Tudor and Southeastern impossible.  The evidence here so clearly weighs against a finding of extreme hostility that this case is one of those rare instances where we must conclude that it was an abuse of discretion to deny Dr. Tudor's request for reinstatement with tenure.

---

the plaintiff had "always sought reinstatement to his former position" was one factor in the court's decision that reinstatement was appropriate despite other evidence of hostility among the parties).  Subjective evidence will be more important in some cases than in others.  For example, subjective feelings should not control when the objective evidence clearly points in the opposite direction.  See Bingman, 937 F.3d 553 (affirming reinstatement despite the fact that plaintiff, who had misgivings and concerns about returning to work, preferred front pay because other evidence showed that the parties were on good terms).

### b.    Factual Application

Although the extreme hostility test considers the perspectives of both the employer and the employee, in this case we need not spend much time examining Dr. Tudor's viewpoint because she has unequivocally stated that she "desire[s] to be reinstated as an Associate Professor with tenure" at Southeastern.  (Tudor R. vol. 4 at 186.)  As there is no evidence that this desire is not genuine, we take her at her word, which clearly weighs in favor of the preferred remedy of reinstatement.  See Jackson, 890 F.2d at 234 (reversing denial of reinstatement in part because the plaintiff had "always sought reinstatement to his former position").  The only issue in contention, then, is whether Southeastern has established that extreme hostility would make it impossible for it to reestablish a productive working relationship with Dr. Tudor.

Southeastern fails to establish extreme hostility, for two primary reasons: 1) Southeastern's evidence in favor of finding extreme hostility is insufficient on its own; and 2) regardless, the unique circumstances presented here (discussed below) point squarely towards a low likelihood of extreme hostility, far outweighing the evidence to the contrary.

### i.    Evidence in favor of extreme hostility

Southeastern attempted to prove extreme hostility in this case by pointing to 1) hostility within the litigation context, and 2) a statement by Dr. Prus, the current English Department chair, that some people in the department did not want Dr. Tudor to return. Both are insufficient.

To start, Southeastern cites examples of hostility during the course of the litigation, including Dr. Tudor engaging in what Southeastern contends were unfair litigation practices, such as releasing expedited trial transcripts online and leaking settlement discussion emails. But evidence of litigation hostility falls far short of demonstrating the requisite extreme hostility.

As an initial matter, litigation-based animosity will be present in nearly every case, and thus, if it alone could establish extreme hostility, the clear preference for reinstatement would be rendered meaningless in practice. See EEOC v. Century Broad. Corp., 957 F.2d 1446, 1462 (7th Cir. 1992) ("'[H]ostility common to litigation [should] not become an excuse to avoid ordering reinstatement on a general basis.' If 'hostility common to litigation' would justify a denial of reinstatement, reinstatement would cease to be a remedy except in cases where the defendant felt like reinstating the plaintiff." (second alteration in original) (citation omitted) (quoting Coston v. Plitt Theatres, Inc., 831 F.2d 1321, 1331 (7th Cir. 1987), vacated on other grounds, 486 U.S. 1020 (1988))).

Further, hostility within the litigation context does little to demonstrate the likelihood of hostility in the entirely different work-environment context. In litigation, for example, much of the communication is filtered by lawyers and takes place in the courtroom, where hostility is commonplace, rather than in the classroom or office. We accordingly give the litigation-hostility evidence in this case little weight. Cf. Abuan, 353 F.3d at 1178 (affirming denial of reinstatement when, among other things, hostility occurred outside the confines of litigation, including between plaintiff's counsel and defendant executives in his neighborhood); Jackson, 890 F.2d at 231 (reversing the denial

of reinstatement despite serious litigation hostilities, including derogatory language in the courtroom, the burglary of plaintiff's files from his attorney's office, negative newspaper comments made by defendant after trial, and threatened prosecution by the defendant of parties related to the settlement negotiations).

In addition to evidence of litigation hostility, Southeastern proffers the testimony of Dr. Prus, the current English Department chair, as evidence that reinstatement is infeasible. Dr. Prus testified at trial that he did not "think it would be a good thing for [the English] department if Dr. Tudor came back to work there now," nor did he think it would be a good thing for the students or for the university. (Tudor R. vol. 8 at 6.) Dr. Prus further testified that he spoke with his colleagues and they were "split at best" about the possibility of Dr. Tudor's return, with a few "who would object to it for a variety of reasons." (Id. at 9.) In a post-trial declaration, he elaborated that "at least half of the faculty oppose Dr. Rachel Tudor's possible return to work" at Southeastern and thus reinstatement would be "detrimental to department functioning and collegiality." (SE App. vol. 2 at 479.)[11]

In substance, Dr. Prus's testimony simply says that some (unnamed) individuals do not want Dr. Tudor to return, not that she would necessarily face extreme hostility from those individuals if she were to return. This distinction matters. Co-workers who dislike one another work professionally in the same environment all the time. Without

---

[11] To the extent that Dr. Prus's testimony presents a hearsay problem, we do not address it because Dr. Tudor did not adequately raise the issue. (Tudor Reply 15–16 (stating that Dr. Prus's statements are hearsay without providing any explanation other than one citation).)

28

additional, supporting evidence that it would be impossible for those who oppose Dr.

Tudor's reinstatement to work productively in the same department as her, Dr. Prus's

conclusory statement that department functioning would be negatively affected falls far

short of establishing extreme hostility.  There is also no evidence regarding how or why

students and the university would be negatively impacted by Dr. Tudor's return, despite

what Dr. Prus claimed.  If one person speculating in a general and conclusory manner

could be enough to establish extreme hostility, defendant-employers could avoid

reinstatement—and therefore prevent successful plaintiffs from obtaining make-whole

relief—with ease.

    As a matter of law, these facts do not constitute the extreme hostility needed to

overcome the law's preference for reinstatement.  And even if we did find them

persuasive, they are outweighed by the contrary evidence discussed below.


### ii.    Evidence in favor of reinstatement

    Not only do the shortcomings in the evidence above demonstrate that Southeastern

has provided little proof that extreme hostility will be likely, other evidence affirmatively

demonstrates why it is, in fact, not likely.  This evidence includes: 1) Southeastern's

Settlement Agreement with the DOJ, 2) the fact that almost all primary antagonists have

left Southeastern, and 3) the insulated nature of tenured professorships.  The district

court's observation below that "Plaintiff's only evidence in favor of reinstatement was

the testimony of Dr. Meg Cotter-Lynch" overlooks the realities present in this case.

(Tudor R. vol. 4 at 129.)

First, Southeastern previously entered into a Settlement Agreement with the DOJ, resolving the Title VII Complaint filed by the United States in relation to the same facts of this case. In that settlement, Southeastern agreed to hold mandatory Title VII training and implement policy changes, among other things, in order to reduce discrimination. These procedural changes target the very discrimination faced by Dr. Tudor and make it less likely to reoccur. This is a powerful indicator that Dr. Tudor's return to work at Southeastern is feasible.

Next, almost all the primary antagonists in this case have left Southeastern. Jackson, 890 F.2d at 232 (reversing denial of reinstatement in part because "most of those making complaint against plaintiff are no longer employed by [the defendant]"). President Minks, Vice President McMillan, and Dean Scoufos—all the administrators who denied Dr. Tudor tenure and denied her the opportunity to reapply for tenure—are no longer at Southeastern. Additional administrators who handled Dr. Tudor's complaints also no longer work at Southeastern, including Charles Babb, the general counsel; Claire Stubblefield, the affirmative action officer; and Cathy Conway, the human resources director.

The only potential antagonist still remaining is Dr. Prus, the current English Department chair, who has made it clear that he opposes Dr. Tudor's reinstatement.[12]

---

[12] In its briefing, Southeastern additionally argues that Dr. Bryon Clark, who Dr. Tudor testified "made up new rules" against her, remained at Southeastern as the Vice President for Academic Affairs. (SE Br. 60 (quoting Tudor R. vol. 6 at 124).) This Court, however, takes judicial notice that Dr. Clark has since retired. Dr. Bryon Clark Retiring After 30 Years at Southeastern, Se. Okla. State Univ. (Apr. 23, 2020),
(continued)

But Dr. Prus never participated in any of the Title VII violations and was even called by

Dr. Tudor to testify at trial.  Even though he voted against tenure while serving on Dr.

Tudor's faculty committee in 2009-10, he testified that he stood by the committee's

decision to grant it, and that he thought Dr. Tudor's 2010-11 tenure application would

have merited tenure.  This behavior suggests that Dr. Prus would be able to set his

personal feelings or reservations aside and work with Dr. Tudor in a productive and

professional manner.

Third, the structure and nature of a tenured professorship insulates such professors

from ordinary hostilities among contemporaries.  In other words, a tenured university

professor holds an insular position that can effectively operate without the need for

extensive collaboration with colleagues or school administrators.  Indeed, tenure was

designed to promote academic freedom by insulating professors from conflicting

opinions.  In a small, team-focused, or cooperative workplace, we might worry more

about hostility among coworkers.  Here, however, we give less weight to hostility from

Dr. Tudor's colleagues who will need to interact with her on only a minimal basis.  While

Southeastern counters that, even if Dr. Tudor will not need to interact frequently with

coworkers, she will certainly interact with students, there is no evidence that Dr. Tudor

will not be able to maintain positive relationships with her students, who were not

involved in and indeed may not even know about her prior dispute with the university.

---

https://www.se.edu/2020/04/dr-bryon-clark-retiring-after-30-years-at-southeastern;
U.S. v. Burch, 169 F.3d 666, 671 (10th Cir. 1999) ("Judicial notice may be taken at
any time, including on appeal.").

Ultimately, whether reinstatement is appropriate and feasible in this case is not a close question, but even if it were, the clear preference for reinstatement serves as an additional weight on the scale, tipping it further in favor of reinstatement. Thus, starting with this presumption and considering Southeastern's almost complete lack of evidence demonstrating extreme hostility—made even more unpersuasive by the countervailing evidence in favor of reinstatement—it was an abuse of discretion for the district court to deny Dr. Tudor reinstatement. We reverse and grant Dr. Tudor reinstatement at Southeastern with tenure.

### c.    Southeastern's Objections to Reinstatement with Tenure

Southeastern advances several objections to reinstatement that are worth addressing, particularly given that Dr. Tudor's reinstatement is with tenure, creating a long-term relationship between the parties. Most significantly, Southeastern raises concerns about this Court's involvement in its academic decisions and educational processes. This Court is not a school board and we agree with Southeastern that courts should not make education decisions. Villanueva v. Wellesley Coll., 930 F.2d 124, 129 (1st Cir. 1991) ("[I]t is not the function of the courts to sit as 'super-tenure' committees."). We therefore do not take lightly our decision to grant Dr. Tudor reinstatement with tenure.

This is not, however, a situation where we are giving Dr. Tudor something that she would not have earned absent Southeastern's unlawful discrimination. To the contrary, in addition to requiring that the discrimination be a motivating factor in the employment decisions, the jury instructions directed the jury that, as to Dr. Tudor's claim of

32

discrimination based on her tenure denial in 2009-10, "[i]n order to succeed on the

discrimination claim, [Dr. Tudor] must persuade you by a preponderance of the evidence

that were it not for gender discrimination, she would have been granted tenure in 2009-

10." (Tudor R. vol. 2 at 49, 55–56.)  And, so instructed, the jury came back with a

verdict for Dr. Tudor on that claim.  (Id. at 71.)[13]  Thus, as to the 2009-10 academic year,

we have a jury finding that Dr. Tudor would have been granted tenure had she not been

discriminated against.

        Given the jury verdict in favor of Dr. Tudor, it is established—and we cannot now

question—that Dr. Tudor would have been granted tenure in 2009-10 absent the

discrimination.  Thus, in granting Dr. Tudor reinstatement with tenure, we do not serve as

a super-tenure committee making academic decisions for Southeastern.  We are instead

restoring Dr. Tudor to the position she would have been in had Southeastern not engaged

in prohibited discrimination against her.  Such an approach is consistent with the

purposes of Title VII and the familiar functions of the judiciary.  See Brousard-Norcross

v. Augustana Coll. Ass'n, 935 F.2d 974, 975–76 (8th Cir. 1991) ("While Title VII

unquestionably applies to tenure decisions, judicial review of such decisions is limited to

whether the tenure decision was based on a prohibited factor."); Jiminez v. Mary

Washington Coll., 57 F.3d 369, 377 (4th Cir. 1995) ("Our review [of tenure decisions] is

---

        [13] As to Dr. Tudor's claim of discrimination based on the reapplication denial in
2010-11, the jury instructions stated that Dr. Tudor must persuade the jury by a
preponderance of the evidence that "were it not for gender discrimination, she would
have been granted . . . the opportunity to re-apply for tenure in 2010-11." (Id. at 55–56.)
The jury found for Dr. Tudor on this second discrimination claim. (Id. at 72.)

narrow, being limited to determining 'whether the appointment or promotion was denied because of a discriminatory reason.'" (quoting <u>Smith v. Univ. of N.C.</u>, 632 F.2d 316, 346 (4th Cir. 1980))).

Southeastern appears to be arguing for a special rule of deference to educators, but illegal decisions by educational institutions do not enjoy special sanctity.  In fact, Congress specifically removed the previous Title VII exemption for educational institutions in 1972, making them unquestionably subject to Title VII's general prohibitions.  Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103, codified at 42 U.S.C. § 2000e-1 (1988); <u>Univ. of Penn. v. EEOC</u>, 493 U.S. 182, 190 (1990) ("The effect of the elimination of this exemption was to expose tenure determinations to the same enforcement procedures applicable to other employment decisions.").

The jury found discrimination in this case, and we have already determined that that verdict is clearly supported by sufficient evidence.  We cannot now abandon our obligation to provide Dr. Tudor with the make-whole relief to which she is entitled under Title VII solely because Southeastern is an educational institution.  <u>See</u> <u>Kunda v. Muhlenberg Coll.</u>, 621 F.2d 532, 550 (3d Cir. 1980) ("The fact that the discrimination in this case took place in an academic rather than commercial setting does not permit the court to abdicate its responsibility to insure the award of a meaningful remedy.").  Not only that, but a tenure decision is often the most important point in a professor's career. It would not make sense for courts to subject such a significant determination to less scrutiny than other, less important education decisions.

34

Finally, Southeastern argues that it would be improper for this Court to grant Dr. Tudor reinstatement with tenure because it has concerns about her scholarship and teaching and believes she is not qualified. For the reasons already discussed, this argument is foreclosed by the jury verdict. The jury found that Dr. Tudor would have received tenure in 2009-10 if not for the discrimination.

*          *          *

For all these reasons, we reverse the district court's denial of reinstatement, holding that Dr. Tudor is entitled to reinstatement with tenure.

## 2.    Front Pay

Although we grant Dr. Tudor reinstatement, she is also entitled to monetary damages for the period that she would have worked at Southeastern as a tenured professor had she been granted tenure when she applied in 2009-10 until the time of her reinstatement (subject, of course, to mitigation obligations and cutoffs). Front pay and reinstatement are not mutually exclusive, as the Supreme Court made clear in Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001) (defining front pay as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement" (emphasis added)). In other words, even when reinstatement is granted, front pay should also be awarded until that reinstatement can be accomplished.

Dr. Tudor challenges the district court's award of $60,040.77 in front pay as insufficient and erroneously calculated. Although Dr. Tudor's claim that she is entitled to front pay for her remaining work-life expectancy will now be mooted by

35

the grant of reinstatement, we still analyze the district court's front pay award as it relates to Dr. Tudor's entitlement to front pay from the time of judgment until she is, in fact, reinstated with tenure.

We review the district court's front pay award for an abuse of discretion. Abuan, 353 F.3d at 1177. In so doing, we agree with Dr. Tudor that the amount used by the court as the front pay annual compensation rate was verifiably incorrect and that her untenured position at Collin College was not substantially equivalent to a tenured professorship at Southeastern. We reverse the district court's $60,040.77 front pay award and remand for a recalculation consistent with this opinion.

### a.    Legal Background

#### i.    Front Pay Timeline

Dr. Tudor's arguments relate only to front pay, but, in addressing the start of front pay eligibility, we must consider the time period covered by both front pay and backpay because those awards represent compensation for lost wages over a continuum of time; the only meaningful difference between the two is the time period for which they are awarded. See Pollard, 532 U.S. at 849. We endeavor to clarify the line between back and front pay because the district court's calculation, which used a period of time from the backpay period as a basis to select a reasonable length of time for the front pay award, was confusing on this point and should be clarified.[14]

---

[14] In its front pay order, the court initially seemed to grant front pay for the fourteen-month time frame occurring during the backpay period between when Dr. Tudor was terminated from Southeastern and when she obtained employment at
(continued)

Backpay starts at the time of deprivation and ends when the evidence is submitted to the factfinder at the close of trial. Zisumbo, 801 F.3d at 1203. Front pay, on the other hand, typically begins at the time of judgment. Pollard, 532 U.S. at 846. Here, however, the case was submitted to the jury in November 2017, but the court did not enter judgment until June 2018. The law is clear that front pay begins at judgment, id., yet the Tenth Circuit has stated that courts must strive to provide make-whole relief. Zisumbo, 801 F.3d at 1203. Therefore, in a case where there is a gap between when backpay ends and front pay begins, as here, it is the district court's responsibility under its equitable power and discretion to add an additional amount to the front pay award beginning at the close of evidence when backpay ceased, to account for that gap.

In this case, where reinstatement has been granted, front pay ends at the time of reinstatement. Pollard, 532 U.S. at 846. Both awards, however, are subject to earlier termination based on, for example, failing to mitigate damages or obtaining substantially equivalent employment. Ford Motor Co. v. EEOC, 458 U.S. 219, 231–32, 236 (1982).

---

Collin College. The Court later clarified that it "is aware that front pay is an award for future damages, not compensation for the period between the end of employment and the trial." (Tudor R. vol. 5 at 80.) The front pay award, then, did not actually compensate for lost wages prior to trial, but instead used the fourteen-month period during which Dr. Tudor previously found work at Collin College as an objective measure of when she could reasonably be predicted to find reemployment in the future.

37

### ii.    Front Pay Calculation

The Tenth Circuit has identified several factors to be considered in

determining a front pay award:

> (1) work life expectancy, (2) salary and benefits at the time
> of termination, (3) any potential increase in salary through
> regular promotions and cost of living adjustment, (4) the
> reasonable availability of other work opportunities, (5) the
> period within which the plaintiff may become re-employed
> with reasonable efforts, and (6) methods to discount any
> award to net present value.

McInnis, 458 F.3d at 1146 (numbers added) (quoting Whittington v. Nordam Grp.

Inc., 429 F.3d 986, 1000–01 (10th Cir. 2005)).  Although the district court has

discretion to calculate front pay based on these factors, Whittington, 429 F.3d at

1000, it must do so with the aim to make plaintiffs whole without creating a windfall.

Carter v. Sedgwick County, 36 F.3d 952, 957 (10th Cir. 1994).  After considering

these factors and calculating an appropriate amount of compensation, courts must

then subtract any mitigation that reasonably could be obtained.  See Davoll v. Webb,

194 F.3d 1116, 1143 (10th Cir. 1999).

In this case, the district court considered two factors to be determinative: the

reasonable availability of other work opportunities, and the period within which Dr.

Tudor could become re-employed with reasonable efforts.  In light of these factors,

the court limited Dr. Tudor's eligibility for front pay to fourteen months, because that

was how long it took Dr. Tudor to obtain a teaching job at Collin College after

leaving Southeastern.  Based on Dr. Tudor's previous ability to find work within

fourteen months, the district court predicted that, moving forward, she could do so again.

However, for a potential reemployment opportunity to terminate Southeastern's front pay obligations entirely—as opposed merely to mitigating the amount of front pay owed—it must be "substantially equivalent" to the withheld position.  Ford Motor Co., 458 U.S. at 236.  We emphasize that the test is one of substantial equivalence.  Some courts have morphed this test into a tougher standard, holding that two jobs are substantially equivalent if they offer "virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status."  Sellers v. Delgado Cmty. Coll., 839 F.2d 1132, 1138 (5th Cir. 1988).[15] We, too, consider the same factors listed by those circuits, but we do not adopt the narrower "virtually identical" standard.  Virtual identity is an unrealistic expectation—almost no two jobs will be virtually identical—and it is unfaithful to the original, and less exacting, "substantially equivalent" language to which we adhere.

In considering whether substantially equivalent job opportunities are reasonably available, courts should first and foremost consider compensation.  See McInnis, 458 F.3d at 1146 (reversing denial of front pay where plaintiff "ha[d] absolutely no prospects of attaining a pay level equivalent to the pay she received"

---

[15] See also Rasimas v. Mich. Dep't of Mental Health, 714 F.2d 614, 624 (6th Cir. 1983); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1203 (7th Cir. 1989). Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527 (11th Cir. 1991), superseded by statute on other grounds, Pub. L. No. 102-166, 105 Stat. 1071.

while working for the defendant).  Although economic factors will often predominate, other, noneconomic factors must also be considered and will vary in type and importance from case to case.  See Davoll, 194 F.3d at 1145 ("Because the purpose of front pay is to make each plaintiff whole, the district court must look at the individualized circumstances of each plaintiff.").  Here, relevant factors in addition to compensation include availability of tenure and promotion, academic opportunities, prestige, job responsibilities, subject matter taught, and so on—we do not intend to be exhaustive.  Courts must consider and balance the wide variety of factors relevant to the particular job at issue, comparing the positions as a whole.

### b.    Analysis

The district court found Dr. Tudor's yearly compensation at Southeastern to be $51,463.52 (a figure that appears in Dr. Tudor's compensation table (Tudor Mot. for Front Pay Ex. 8 ("Ex. 8") at 6 (Tudor R. vol. 4 at 221))).  Extending that compensation over a fourteen-month period (the time frame in which the court expected Dr. Tudor to find a new job), the district court arrived at its $60,040.77 front pay award.  In reviewing, and ultimately reversing, the district court's front pay calculation, we consider both the $51,463.52 amount utilized as the front pay annual compensation as well as the fourteen-month period for which it provided that compensation.

### i.    Annual Compensation Amount

The district court's front pay award was premised upon an annual compensation of $51,463.52. This figure is clearly erroneous, and it was reversible error to rely on it.[16]

It is true that the district court's $51,463.52 figure comes from Dr. Tudor's own compensation table submitted to the district court with her motion for front pay. (Ex. 8 at 6.) But that table makes clear that this amount represents Dr. Tudor's total compensation (salary and benefits) had she been employed at Southeastern with tenure for only a roughly 8.5-month period between November 20, 2017—the close of trial—and July 31, 2018. (Id.) The $51,463.52 amount is thus a prorated compensation only over that 8.5-month period, and construing it as a yearly compensation, as the district court did, was clearly erroneous. (Id.) This is made even more obvious when comparing the first line of the table, containing the $51,463.52 figure, to the lines immediately following in the same chart, in which Dr. Tudor's annual compensation jumps sharply up to $75,164.16—undoubtedly because

---

[16] Dr. Tudor has adequately raised and preserved her argument that the $51,463.52 salary was erroneous. First, she brought the error to the district court's attention below in her motion for reconsideration of front pay. (Tudor R. vol. 5 at 53 ("[T]he $51,463.52 figure, which the front pay order identifies as Tudor's 'yearly compensation,' is actually the pro-rated projected 2017-18 term salary over a 253-day period . . . not annual salary.").) After this motion was denied and the district court entered judgment, Dr. Tudor again adequately raised this argument before this Court on appeal. (Tudor Br. 30–31, 58 ("It appears that the [$51,463.52] rate's genesis is a misreading of Dr. Tudor's front pay calculation table. The court mistook the . . . pro-rated figures to be full year earnings . . . .").)

on this very next line an entire year of salary and benefits had Dr. Tudor not been wrongfully denied tenure are being accounted for.  (Id.)

Below, in denying Dr. Tudor's motion for reconsideration of front pay, the district court responded that "the evidence presented to the Court does not support [Dr. Tudor's] current argument" for a higher annual compensation, citing to a stipulation made by Dr. Tudor.  (Tudor R. vol. 5 at 81.)  That stipulation, contained in an affidavit submitted by Dr. Tudor with her motion for front pay, reads: "During the last year of my employment at Southeastern, I was paid approximately $51,279 in salary."  (Tudor R. vol. 4 at 194 ¶ 6.)  The district court therefore pointed to evidence that it thought supported an annual compensation of around $51,000 and stated that, given the use of the term "approximately," it "elected to use the slightly higher salary listed" in Dr. Tudor's compensation table—the $51,463.52 figure.  (Tudor R. vol. 5 at 81.)

It was clear error to rely on Dr. Tudor's stipulation to justify the selection of a $51,463.52 annual compensation amount in light of this documtary evidence.  As Dr. Tudor makes clear in her stipulation—and as the district court also explicitly recognizes in its denial of reconsideration—the $51,279 stipulated-to figure represented the salary Dr. Tudor earned in her last year working at Southeastern (2010-11).  That salary, then, was an inappropriate comparison to the compensation in Dr. Tudor's table for three reasons: 1) the stipulation refers only to salary, whereas the compensation in Dr. Tudor's table accounts for both salary and benefits combined; 2) the stipulation refers to Dr. Tudor's untenured salary while she was last

employed at Southeastern, whereas Dr. Tudor's table accounts for the tenure

promotion the jury found she should have earned, (Tudor R. vol. 4 at 171 ("Tudor's

front pay base salary and benefits should be calculated as if Tudor had not been

denied tenure and promotion <u>rather</u> than based upon what Tudor was paid at the time

of her termination in May 2011.")); and 3) the stipulation refers to Dr. Tudor's salary

in 2010-11, whereas the table calculates the salary Dr. Tudor would have earned in

2017-18 and beyond, including, presumably, taking into account raises in those

intervening years, (<u>id.</u> at 217 (showing that Dr. Tudor's salary calculation added

amounts for degree, rank, and <u>experience</u> to her but-for compensation)).  Confusing

the prorated $51,463.52 figure in Dr. Tudor's table (representing the tenured

compensation—including benefits—<u>she would have received</u> at Southeastern for only 8.5

months of the 2017-18 academic year had she been granted tenure earlier in 2009-10)

with the $51,279 figure in Dr. Tudor's stipulation (representing the untenured annual

salary—not including benefits—that Dr. Tudor <u>actually received</u> in her last year working

at Southeastern in 2010-11), was therefore comparing apples to oranges.

Although Dr. Tudor does not disavow her stipulation on appeal, she does not

have to.  The stipulation was accurate.  The problem here lies not in the stipulation

itself but in applying the stipulated-to salary to a very different scenario. That the two

numbers are nearly the same is a mere coincidence.  Dr. Tudor's table and her

stipulation were clearly noncomparable.

Accordingly, it was an abuse of discretion to rely on a clearly erroneous

annual compensation rate and, further, by justifying the use of that rate with a

stipulation that plainly referred to completely different circumstances. We next consider the district court's decision to terminate front pay after fourteen months. In doing so, we assume that Dr. Tudor's annual compensation at Southeastern would have been much higher than what the district court found below.[17]

## ii.    Front Pay Cutoff

The district court held that Dr. Tudor was entitled to front pay (at the erroneous $51,463.52 yearly rate) for a period of fourteen months given its prediction that Dr. Tudor could reasonably obtain "similar employment" within that time. (Tudor R. vol. 5 at 48.) The court based this prediction on Dr. Tudor's ability to successfully obtain a teaching position at Collin College within fourteen months after her termination from Southeastern.

In determining that the fourteen-month period should represent the time in which Dr. Tudor could reasonably be expected to find new, substantially equivalent employment—cutting off front pay entirely—the district court relied on the fact that Dr. Tudor's "pay at that college exceeded what she had made at Southeastern." (Id. at 47.) Dr. Tudor's salary at Collin College ranged between $51,184 and $58,022 (after yearly raises) during her time there. This was higher than Dr. Tudor's Southeastern salary as erroneously calculated below. Given our findings above,

---

[17] We leave this ultimate calculation to the district court on remand but observe for the purposes of comparing Southeastern to Collin College in the following section that Dr. Tudor's actual yearly compensation at Southeastern from November 20, 2017, to November 20, 2018, had she not been denied tenure would have been closer to $74,000.

44

however, the Southeastern and Collin College earnings are not comparable. The salary Dr. Tudor should have been earning at Southeastern had she not wrongfully been denied tenure at the beginning of the front pay period (around $67,000 after deducting benefits from her total compensation) was about 30 percent higher than Dr. Tudor's starting salary at Collin College and about 15 percent higher than her highest salary at Collin College—even without accounting for raises at Southeastern during that same four-year period. That is not a substantially equivalent salary.

Salary aside, the district court also did not adequately consider significant noneconomic differences between the two positions, most notably that Collin College did not offer tenure and that it was a two-year community college as compared to a four-year public university. In its front pay order, there was no acknowledgement of these differences. Rather, the order only mentioned that both positions involved teaching college-level English and (erroneously) that Dr. Tudor earned more at Collin College. It was error to fail to consider the entirety of the circumstances and omitted notable differences from its analysis. Indeed, in the academic context, we think the availability or lack of tenure is significant, as tenure is arguably the most important point in a professor's career.

Looking at the two positions as a whole, we are convinced that, as a matter of law, Dr. Tudor's positions at Southeastern and Collin College were not substantially equivalent. Collin College paid less than Southeastern, did not offer tenure, and, as a two-year community college, lacked a similar level of prestige and academic opportunities. It was thus an abuse of discretion in calculating front pay, to use the

45

fourteen-month period until Dr. Tudor obtained an untenured teaching position at Collin College as a benchmark for the time in which she could be expected to obtain other substantially equivalent employment in the future, because the Collin College position was not substantially equivalent to a tenured teaching position at Southeastern.

To be sure, although not substantially equivalent, the Collin College position—and any other position Dr. Tudor might reasonably obtain—remains relevant to mitigation on remand.  EEOC v. Sandia Corp., 639 F.2d 600, 627 (10th Cir. 1980); Davoll, 194 F.3d at 1143.  We leave it to the district court to calculate an appropriate length of front pay on remand aided by the guidance in this opinion.

*          *          *

We review the district court's front pay award "with considerable deference," Abuan, 353 F.3d at 1177, yet we are again certain that this is one of those rare instances in which we find clear error in the calculation, to Dr. Tudor's prejudice, resulting in a manifestly unreasonable front pay award.  Title VII's command, as stated by this Court, is clear: make victims of discrimination whole.  Carter, 36 F.3d at 957.  This error resulted in a front pay award that has not made Dr. Tudor whole in this case.  Accordingly, we reverse the $60,040.77 front pay award and remand for the district court to recalculate front pay consistent with this opinion including the annual compensations amount, the cutoff date and any other matters in mitigation.  In recalculating front pay on remand, additional evidence may be helpful to the district

court.  We leave it to the court's discretion to decide whether to reopen the record or
to hold the parties to the record already created.

### 3.    Title VII Statutory Cap

Dr. Tudor lastly challenges the district court's application of the Title VII
statutory damages cap to the $1.165 million in damages awarded by the jury, which
resulted in a reduced award for damages of $360,040.77 ($300,000 in capped
compensatory damages and $60,040.77 in uncapped back pay).  Dr. Tudor argues that
Southeastern waived the cap, or else that the district court's application of the cap
violated the Seventh Amendment's Reexamination Clause.  We find no waiver.  We
review de novo whether the district court's application of the cap violated the
Seventh Amendment, Patton v. TIC United Corp., 77 F.3d 1235, 1245 (10th Cir.
1996), and we find no Seventh Amendment violation.  Accordingly, we affirm.

### a.    Legal Background

The Title VII statutory cap limits "the sum of the amount of compensatory
damages awarded . . . for future pecuniary losses, emotional pain, suffering,
inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary
losses" to $300,000 for a company the size of Southeastern.  42 U.S.C. § 1981a(a)(1),
(b)(3)(D).  The statute excludes from the cap "backpay, interest on backpay, or any
other type of relief authorized under section 706(g) of the Civil Rights Act of 1964."
Id. § 1981a(b)(2).  In addition to the explicit exclusion of backpay, it is well
established by Supreme Court and Tenth Circuit precedent that the Title VII cap also

47

does not apply to front pay. <u>Pollard</u>, 532 U.S. at 852 ("[F]ront pay is excluded from the statutory cap."); <u>Medlock v. Ortho Biotech, Inc.</u>, 164 F.3d 545, 556 (10th Cir. 1999).

### b.    Waiver

Dr. Tudor first argues that Southeastern waived the cap because it failed to plead it in its answer. But the parties stipulated in their joint pretrial report that "[b]ased on the number of Defendants' total employees, the $300,000 damage cap at 42 U.S.C. § 1981a(b)(3)(D) applies to this case." (SE App. vol. 2 at 335.) This stipulation controls over the pleadings. <u>Wilson v. Muckala</u>, 303 F.3d 1207, 1215 (10th Cir. 2002). The Title VII cap was in effect.[18]

### c.    Reexamination Clause

Dr. Tudor next argues that the district court's application of the cap violated the Seventh Amendment's Reexamination Clause. The Reexamination Clause states that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend.

---

[18] Dr. Tudor also argues that the cap should not apply because Southeastern did not object to the general jury verdict form, which made it impossible for the district court to know for certain how much of the jury's award was intended for the capped compensatory damages as opposed to uncapped backpay. <u>See</u> <u>Pals v. Schepel Buick & GMC Truck, Inc.</u>, 220 F.3d 495, 499–501 (7th Cir. 2000) (refusing to apply Title VII's damages cap where the defendant-employer failed to object to similar jury verdict form). But Dr. Tudor also failed to raise the ambiguity of the verdict form below, and this precludes her from making this argument now. <u>See</u> <u>Okland Oil Co. v. Conoco Inc.</u>, 144 F.3d 1308, 1319 (10th Cir. 1998) ("[A] party who fails to bring to the trial court's attention . . . ambiguities . . . may not seek to take advantage of such ambiguities on appeal.") We are not bound by <u>Pals</u>' contrary result, and regardless <u>Pals</u> is distinguishable, because the record shows that Dr. Tudor was aware of the cap at trial.

VII.  Because the district court's application of the damages cap did not violate the
Seventh Amendment, we affirm.

### i.    Background

The jury awarded Dr. Tudor $1.165 million in damages.  This amount
potentially included compensation for backpay as well as physical or mental distress,
including "mental anguish, emotional pain and suffering, inconvenience, loss of
enjoyment of life, damage to professional reputation, or other non-pecuniary losses."
(Tudor R. vol. 2 at 61–62 (jury instructions).)  Because of the way the verdict form
was structured—asking only for a single number representing "the amount of
damages to which Plaintiff is entitled to compensate her for her injuries"—it is
impossible to know what amount should be attributed to each category of damages.
(Id. at 72 (verdict form).)  This created problems because the backpay award is
indisputably not subject to the $300,000 cap, whereas the remainder of the damages
encompassed by the jury award is.

After finding that the Title VII cap applied, the district court resolved this
tension by attempting to separate the backpay award from the remainder of the total
damages award.  Although it had no way of knowing how much the jury attributed to
backpay, the court calculated the highest amount of backpay damages that it believed
the jury could have reasonably awarded, $60,040.77, observing that it was "not

persuaded" that even that amount had been given based on the evidence.[19]  (Tudor R. vol. 5 at 82.)  Having calculated the amount of backpay, the court set aside that uncapped amount ($60,040.77) and applied the $300,000 cap to the remaining $1,104,959.23 in capped compensatory damages, resulting in a total jury award of $360,040.77—$300,000 in capped compensatory damages and $60,040.77 in backpay.

It is clearly established that the application of a statutory damages cap to a jury award does not violate the Reexamination Clause.  Est. of Sisk v. Manzanares, 270 F. Supp. 2d 1265, 1277–78 (D. Kan. 2003); Schmidt v. Ramsey, 860 F.3d 1038, 1045 (8th Cir. 2017).  The Title VII cap is no exception.  See, e.g., Madison v. IBP, Inc., 257 F.3d 780, 804 (8th Cir. 2001), vacated on other grounds, 536 U.S. 919 (2002); Hemmings v. Tidyman's, Inc., 285 F.3d 1174, 1201–02 (9th Cir. 2002).

Dr. Tudor's Seventh Amendment argument, however, is based not merely on the district court's decision to apply a cap to the jury award, but on that court's decision to determine what portion of the jury award could be attributed to backpay not subject to the cap.  She argues that because the jury award was ambiguous as to capped versus uncapped damages, the court was not permitted to apply the cap, as the

---

[19] This backpay award presumably suffers from the same inaccuracies as the identical front pay award, but we do not address them here nor remand for a recalculation of backpay because regarding backpay Dr. Tudor challenges only the constitutionality of the district court's allocation between capped and uncapped damages, not the numerical calculation involved in that allocation.

entire $1.165 million could theoretically have been intended as uncapped damages. That presents a novel question under the Seventh Amendment.

### ii.     Analysis

We conclude that the district court constitutionally applied the Title VII cap when it allocated $60,040.77 of the jury award to backpay and capped the remainder of the award at $300,000.  In attempting to prove a Seventh Amendment violation, Dr. Tudor argues that, in a mixed damages award like this one with a single, unallocated amount of damages, where it is impossible to tell what amounts are capped versus uncapped, the district court cannot constitutionally apply the cap at all since in doing so it necessarily and impermissibly reexamines uncapped damages. She cites no cases in support.

Here, the jury was not asked to allocate its damages award between uncapped and capped damages and did not make any specific finding as to backpay.  As a result, there existed no decision by the jury in the first instance for the court to reexamine when it allocated the award between capped and uncapped damages.  See Cap. Traction Co. v. Hof, 174 U.S. 1, 13 (1899) ("[W]hen a trial by jury has been had in an action at law, . . . the facts there tried and decided cannot be re-examined in any court of the United States." (emphasis added)).  The jury decided only total damages, and a portion of this figure was subject to a constitutional statutory cap.  After determining the highest amount the jury could have reasonably awarded in uncapped damages—something the jury did not itself decide as part of the verdict—the court

51

permissibly applied the cap to the remainder. Dr. Tudor's reexamination argument therefore misses the mark.

Backpay is viewed as equitable relief in a Title VII case to be decided by the judge, Albemarle Paper Co., 422 U.S. at 416 (stating that the court's discretion to award backpay is "equitable in nature"); Whatley v. Skaggs Cos., 707 F.2d 1129, 1138 (10th Cir. 1983) ("Title 42 U.S.C. § 2000e–5(g) leaves to the discretion of the trial court the amount of back pay to be awarded a successful plaintiff in an employment discrimination action."), unless the parties have consented otherwise, Pals, 220 F.3d at 501 ("[A]n issue may be tried to the jury 'with the consent of both parties' even if the issue is 'not triable of right by a jury.'" (quoting Fed. R. Civ. P. 39(c))). Although there was no objection in this case to submitting backpay to the jury, in fact the jury did not make any specific findings of backpay, as already discussed. Instead, it issued only a general damages award. Thus, there can be no doubt about the judge's ultimate authority to allocate what portion of this damages award should be considered backpay because this determination falls within her equitable authority to decide backpay and it does not conflict with any express jury finding. See Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 913 (10th Cir. 2004).

In addition, our conclusion makes sense when considering the reality that judges constitutionally adjust or even reverse jury verdicts in other contexts.

Remittitur[20] and judgment as a matter of law are two well-established examples.

Prager v. Campbell Cnty. Mem'l Hosp., 731 F.3d 1046, 1061 n.8 (10th Cir. 2013)

(remittiturs are constitutional); Neely v. Martin K. Eby Const. Co., 386 U.S. 317, 321

(1967) (Rule 50(b) is constitutional).  In fact, Dr. Tudor's Reexamination Clause

argument seems more akin to a typical remittitur challenge that the district court

abused its discretion in reducing the jury award by the amount that it did (in this

case, allocating $60,040.77 to backpay when it could have theoretically determined

the entire award was attributable to backpay).  See Prager, 731 F.3d at 1061 ("We

review the trial court's decision regarding remittitur for an allegedly excessive

damages award for an abuse of discretion." (quoting Palmer v. City of Monticello, 31

F.3d 1499, 1508 (10th Cir. 1994))).[21]  Learning from the remittitur context, Dr. Tudor

could have challenged—but didn't—the district court's calculation of backpay as an

abuse of discretion, arguing for a higher amount to be allocated to uncapped

---

[20] Dr. Tudor refers to the district court's application of the cap as a remittitur, but she seems to do so only in the sense that the district court reduced the damages award as part of its application of the damages cap.  Rather than "substitute[] its own evaluation of the evidence regarding damages for the jury's factual findings"—a remittitur—the district court simply "determine[ed] that the law does not permit the [jury] award" as per the statutory cap.  Cartel Asset Mgmt. v. Ocwen Fin. Corp., 249 F. App'x 63, 80–81 (10th Cir. 2007) (unpublished) (quoting Corpus v. Bennett, 430 F.3d 912, 917 (8th Cir. 2005)).

[21] While our analogy between remittiturs and the district court's application of the cap is admittedly imperfect because, in order to be consistent with the Seventh Amendment, judges must offer plaintiffs the choice between remittitur and a new trial, Sloan v. State Farm Mut. Auto. Ins. Co., 360 F.3d 1220, 1225 (10th Cir. 2004), there is nonetheless no doubt that remittitur represents a similar instance in which a judge may permissibly examine the jury verdict.  Whether the plaintiff chooses remittitur or a new trial, the original jury award will not stand.

damages, rather than challenging the constitutional application of the cap under the Seventh Amendment.[22]

It is worth emphasizing that while it is common practice to leave the backpay calculation to the jury, 2 Kent Spriggs, Representing Plaintiffs in Title VII Actions § 30.03 (2d ed. 2004), Title VII clearly identifies backpay as equitable relief.  42 U.S.C. § 2000e-5(g)(1).  That backpay is a form of equitable relief, traditionally under the judge's discretion, supports our conclusion that the district court's own calculation of backpay and subsequent application of the cap under these circumstances, where the jury did not explicitly find backpay, was constitutional. See Zisumbo, 801 F.3d at 1203 (observing that "[d]istrict courts possess considerable discretion to devise appropriate remedies for Title VII violations" in the context of reviewing district court's backpay calculation); see also Galloway v. United States, 319 U.S. 372, 392 (1943) ("[T]he [Seventh] Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details.").

The court was careful to give the jury award its full effect by setting aside the highest amount of uncapped damages that it believed was possible for the jury to have intended prior to applying the Title VII cap.  Given the constitutionality of statutory caps, that the jury made no specific determination of uncapped damages, and the wide discretion afforded courts in equitable damages decisions, we hold that

---

[22] The availability of such a challenge will prevent arbitrary or clearly erroneous allocations between capped and uncapped damages.

the district court's application of the cap to the jury award after setting aside backpay damages was constitutional. We reject Dr. Tudor's final challenge and affirm the jury award of $360,040.77.

## C.    Attorneys' Fees

Dr. Tudor requested attorneys' fees if she prevails in this appeal. Title VII allows this Court, in its discretion, to grant a prevailing party's application for reasonable attorneys' fees. 42 U.S.C. § 2000e-5(k); see also Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 417 (1978). We find that Dr. Tudor is the prevailing party below and on both appeals. We therefore remand for the district court to calculate and award Dr. Tudor attorneys' fees at both the district and appellate levels.

## III.    CONCLUSION

For these reasons, we AFFIRM the district court's ruling on each issue in Southeastern's cross-appeal. As to Dr. Tudor's appeal, we AFFIRM the damages cap ruling but REVERSE the district court's reinstatement and front pay rulings. Finally, we REMAND to the district court for an order determining the terms and conditions of Dr. Tudor's reinstatement, a recalculation of the front pay award consistent with this opinion, and a determination of attorneys' fees to which Dr. Tudor is entitled.

# Exhibit D

**Jerry Bramwell <bramwell@fitzgeraldbramwell.com>**

---

## Calvente

**Wermuth, Anna** <awermuth@cozen.com>                    Thu, Aug 26, 2021 at 10:16 AM
To: Jerry Bramwell <bramwell@fitzgeraldbramwell.com>
Cc: "Sane, Nandini" <NSane@cozen.com>

Hi Jerry –

I see our rebuttal disclosure is due today; I just wanted to let you know we are not disclosing a rebuttal expert.

Thanks.

Anna



**Anna Wermuth**
**Vice Chair, Labor & Employment Department | Cozen O'Connor**
123 North Wacker Drive, Suite 1800 | Chicago, IL 60606
P: 312-474-7876 M: 312-545-4725 F: 312-878-2023
Email | Bio | LinkedIn | Map | cozen.com