**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

| | | |
|---|---|---|
| Lisa Calvente | ) | |
|       Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
|       Defendants. | ) | |
| _____ | ) | |

**<u>Response And Objection To Defendants' Combined Motion For Summary Judgment</u>**

# Table of Contents

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

Executive Summary ......................................................................................................... 1

Facts .................................................................................................................................. 3

    A.   TENURE AT DEPAUL. ........................................................................................... 4
        1.   *Pre–tenure reviews at the College.* ................................................................ 4
        2.   *The standard for obtaining tenure at DePaul.* .............................................. 4
        3.   *Applying for tenure.* ..................................................................................... 5
            a.   The review in the candidate's academic unit. .................................... 5
            b.   The review by the UBPT. ................................................................... 6
            c.   Appeal of an adverse decision. .......................................................... 7
    B.   DR. CALVENTE'S PRE–TENURE REVIEWS AND HER RELATIONSHIP WITH DR. GHANEM. .......... 8
        1.   *Dr. Calvente's second pre–tenure review by the College and her complaint to DePaul's Office of Institutional Diversity and Equity.* ....................................................... 8
        2.   *Dr. Calvente's third pre–tenure review by the College and her complaint to DePaul's Office of Institutional Diversity and Equity.* ....................................................... 8
        3.   *Dr. Calvente accuses Dr. Ghanem of racism in not renewing a white faculty member in the College immediately prior to submitting her application for tenure.* ....................... 9
    C.   LISA CALVENTE IS RECOMMENDED TO RECEIVE TENURE BY THE UBPT BY A VOTE OF 4–3 AND IS DENIED TENURE BY SALMA GHANEM, THE SAME PERSON TO WHOM SHE COMPLAINED ABOUT DISCRIMINATION AND WHO SHE ACCUSED OF PLAYING RACIAL POLITICS TO HARM ANOTHER PROFESSOR'S CAREER. .................................................................. 10
    D.   DR. GHANEM GRANTS TENURE TO ▮▮▮▮▮, A WHITE TENURE–TRACK FACULTY WITH NO HISTORY OF COMPLAINING ABOUT DISCRIMINATION, WHOSE DEPARTMENT AND COLLEGE BOTH RECOMMENDED HE NOT RECEIVE TENURE, AND WHO THE UBPT RECOMMENDED NOT RECEIVE TENURE BY A VOTE OF 1–6. ....................................................... 11

Standard of Review ...................................................................................................... 12

Argument ...................................................................................................................... 13

    A.   DR. GHANEM RETALIATED AGAINST DR. CALVENTE FOR (I) WRITING A LETTER IN SUPPORT OF A WHITE FACULTY MEMBER THAT ACCUSED DR. GHANEM OF ENGAGING IN RACISM WHEN TERMINATING DR. ▮▮▮▮▮ AND (II) CONTINUING TO COMPLAIN ABOUT RACISM IN VIOLATION OF HER INSTRUCTION TO CEASE THIS ACTIVITY. ...................................... 14
        1.   *Dr. Calvente suffered an adverse job action.* ............................................ 16
        2.   *Dr. Calvente engaged in protected activity.* ............................................. 16
        3.   *The causal connection between Dr. Calvente's advocacy for Dr. ▮▮▮▮▮ and the denial of her application for tenure is obvious based on (i) Dr. Ghanem's disparate treatment of her versus Dr. ▮▮▮▮ and (ii) Dr. Ghanem's dubious explanation for the disparate treatment.* ................................ 17
    B.   DR. GHANEM DISCRIMINATED AGAINST DR. CALVENTE BY REFUSING TO GRANT HER APPLICATION FOR TENURE. ......................................................................... 24

C.   DePaul breached its contract with Dr. Calvente by denying her application for tenure. ............................................................................................................................28

1.   It is a breach of Dr. Calvente's contract with DePaul for Dr. Ghanem to reject the UBPT's recommendation merely because she disagreed with it. ..............................................29

2.   It is a breach of Dr. Calvente's contract with DePaul for Dr. Ghanem to reject the UBPT's recommendation due to racial or retaliatory animus. .................................................29

Conclusion ..................................................................................................................................29

## Table of Authorities

*Cases*

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573 (7th Cir. 2003) ....................................19

*Berry v. Chicago Transp. Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) .....................................................23

*Brandon v. Anesthesia Pain Mgt.*, 277 F.3d 936 (7th Cir. 2002) ..........................................................4

*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) ........................................................................16

*Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) .....................22

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) ................................................................ 4, 15, 17

*Comcast Corp. v. Nat'l Ass'n of African Am. Owned Media*, 140 S. Ct. 1009 (2020)....................15, 24

*Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994) ..............................................................16

*Diaz v. Kraft Foods Global, Inc.*, 653 F. 3d 582, 587 (7th Cir. 2011) .................................... 20, 21, 27

*Goswami v. DePaul Univ.*, No. 12–cv–7167, slip. op., 2015 WL 251304 (N.D. Ill. Jan. 20, 2015) ...................................................................................................................................13, 27

*Haynes v. Indiana Univ.*, 902 F.3d 724 (7th Cir. 2018)......................................................................13

*Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013)............................................................15

*Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013)..........................................................15

*Humphries v. COBCS West, Inc.*, 474 F. 3d 387 (7th Cir. 2007)....................................13, 16, 21–22

*Joll v. Valparasio Community Schools*, 953 F.3d. 923 (7th Cir. 2020) ............................... 15, 18, 19, 26

*Kotoklo v. Karpinski* ........................................................................................................................23

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312 (7th Cir.2011) ......................................................20

ii

*Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859 (D.C. Cir. 2019) ..........................................13

*McKinney v. Office of the Sheriff of Whitley County*, 866 F.3d 803 (7th Cir. 2017) ...........................27

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)....................................................13, 15

*Razor Capital v. Antaal*, 2012 Ill. App. (2d) 110904 ......................................................................27

*Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712 (7th Cir. 2005)................................................15, 26

*Sun v. Bd. Of Trs. Of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007) ........................................23, 24

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) .......................................... 14–15, 23

### Statutes and Rules

Fed. R. Civ. P. 56 ..................................................................................................................................12

42 U.S.C. §1981 ....................................................................................................................................14

42, U.S.C. §2000e, Title VII of the Civil Rights Act of 1964 ......................................................14, 16

Lisa Calvente ("Dr. Calvente") responds and objects to the Defendants' Combined Motion For Summary Judgment, filed at Docket No. 45 (the "Motion"), as follows:

<u>**Executive Summary**</u>

This is a case about Salman Ghanem's ("Dr. Ghanem") and DePaul University's ("DePaul" or the "University") retaliatory and discriminatory decision to deny Dr. Calvente's application for tenure. During her eight years at DePaul, Dr. Calvente was openly critical of her academic unit, the College of Communication (the "College"), accusing both it and the University of racism. (*E.g.,* DePaul SOF ¶¶33, 59, 84–85.)[1] In response and retaliation, the tenured faculty in the College twice recommended that Dr. Calvente's contract be terminated before she was even evaluated for tenure. (DePaul SOF ¶¶56, 72.) Dr. Ghanem, then the dean of the College, saved Dr. Calvente from termination on both occasions, rejecting the faculty's recommendation to terminate her employment. (DePaul SOF ¶¶58, 73.)

After saving Dr. Calvente's job for the second time in 2017, Dr. Ghanem told Dr. Calvente to stop complaining about discrimination and to refrain from continuing to file charges with DePaul's Office of Institutional Diversity and Equity ("OIDE"). (Calvente SOF ¶22.) For a brief time, Dr. Calvente abided Dr. Ghanem's instructions, and Dr. Calvente chose not to proceed with a complaint of discrimination with OIDE following the faculty's second recommendation that her employment be terminated. (Calvente SOF ¶¶22–23.) However, Dr. Calvente's compliance with Dr. Ghanem's instruction was short lived. (Calvente SOF ¶¶25–26.)

---

[1]     Dr. Calvente cites the to the defendants' memorandum of law, filed at Docket Nos. 46 and 65, as "Br.__." She cites to her Response To Defendants' Statement of Material Facts as "DePaul SOF __" and to her Statement of Additional Material Facts Pursuant To Local Rule 56.1(b)(3) as "Calvente SOF __."

On October 10, 2018, during the tenure process, Dr. Calvente and another faculty member ███████████████████████████, met with Dr. Ghanem to discuss issues of racial favoritism at the College. (Calvente SOF ¶25–26; DePaul SOF ¶149.) During that conversation, the subject of a white tenure–track professor ("Dr. █████████ who Dr. Ghanem terminated before he was able to apply for tenure and promotion, came up. (Calvente SOF ¶¶24–25.) Dr. Ghanem said that she had heard a rumor that she terminated Dr. █████████ so that she could later fire women of color with impunity. (Calvente SOF ¶25.) Dr. Calvente's response? She told Dr. Ghanem that she wrote a letter in support of Dr. ████████ that made this point. (Calvente SOF ¶26.) The conversation then abruptly ended, Dr. Ghanem ushered Dr. Calvente out of her office, and Dr. Calvente and Dr. Ghanem never again had a meaningful conversation. (Calvente SOF ¶¶26, 28.)

A few short weeks later, Dr. Ghanem became acting provost of DePaul, meaning that she became the ultimate arbiter as to who would receive tenure. (*E.g.,* DePaul SOF ¶¶6, 16.) With respect to Dr. Calvente's application, the University Board of Promotion and Tenure (the "UBPT") recommended that she receive tenure. (*E.g.,* DePaul SOF ¶124.) And although DePaul's rules are clear that the UBPT's recommendation should be rejected only in rare instances and for compelling reasons, Dr. Ghanem rejected the UBPT's recommendation and denied Dr. Calvente's application for tenure. (*E.g.,* DePaul SOF ¶124; Calvente SOF ¶9.) This decision was bad in and of itself; however, the very next cycle, Dr. Ghanem granted tenure to white candidates who never complained about discrimination and were recommended not to receive tenure by a UBPT vote of 6–1. (DePaul SOF ¶¶153.) Thus, Occom's Razor suggests that Dr. Ghanem's rejection of Dr. Calvente's application was motivated by illegal considerations and not its merits.

2

<u>**Facts**</u>

Dr. Calvente, an American of African, Latinx, and Asian descent, was a tenure–track assistant professor of Intercultural Communication and Performance Studies within the College of Communication (the "College") at DePaul University ("DePaul" or the "University"). (Calvente SOF ¶1.) Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. (Calvente SOF ¶1.) She was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States. (Calvente SOF ¶1.) Dr. Calvente joined DePaul's faculty at the start of the 2011/2012 academic year. (DePaul SOF ¶33.) Her employment terminated at the end of the 2019/2020 academic year, following the denial of her application for tenure and the conclusion of her terminal contract. (Calvente SOF ¶¶1–2.)

Dr. Calvente is currently a tenure–track assistant professor at the University of North Carolina–Chapel Hill ("UNC"), a university that is both (i) more prestigious, and (ii) has a higher standard for tenure than DePaul. (Calvente SOF ¶3.) It is the general rule in the academy that an institution will not hire a professor into a tenure–track position unless the institution believes that the professor will ultimately earn tenure. (Calvente SOF ¶¶3–5.) Moreover, it is unusual for a professor who has been denied tenure at a school like DePaul to ever obtain a tenure–track position again, let alone a tenure track position at a school with the reputation of UNC. (Calvente SOF ¶¶3–5.) Thus, that Dr. Calvente was able to continue with her academic career further indicates that something very strange happened during her application for tenure at DePaul. (Calvente SOF ¶¶3–5.)

3

A.     **Tenure at DePaul.**

DePaul's faculty handbook (the "Handbook") describes the rights and responsibilities of faculty at DePaul, and articulates the terms and conditions of employment of the faculty. (*E.g.,* DePaul SOF ¶¶9, 15.) Tenure-track faculty at DePaul enjoy more protections than the typical American worker in that they are not employees at will.[2] (Calvente SOF ¶6.) Rather, tenure-track faculty may be terminated involuntarily *only* in accordance with the Handbook. (Calvente SOF ¶6.) Reasons for terminating tenure track faculty include the faculty member failing to (i) make adequate progress towards tenure following a pre-tenure review, or (ii) earn tenure. (Calvente SOF ¶6.) Thus, there are very limited times during a tenure-track professor's career where the University may terminate her involuntarily. (*See* Calvente SOF ¶6.)

1.     **Pre-tenure reviews at the College.**

The Handbook states that untenured but tenure-track professors are evaluated every year to ensure they are making adequate progress towards tenure. (DePaul SOF ¶11.) These reviews can be formal or informal. (*Id.*) As a practical matter, formal reviews are conducted every two years in the College. (*Id.* at ¶¶12–13.)

2.     **The standard for obtaining tenure at DePaul.**

Tenure is a status awarded by the University and not by any individual college. (DePaul SOF ¶19.) By its plain language, the Handbook states that tenure should be awarded **only** where the University "has no reasonable doubt about the faculty member's demonstrated qualifications and

---

[2]     *Cf. Brandon v. Anesthesia Pain Mgt.,* 277 F.3d 936, 940 (7th Cir. 2002) ("Illinois is an at-will employment state, which means that in general an employee can be discharged at any time for any reason or none at all. . . . Nevertheless, there are exceptions to that rule: one obvious one is that a forbidden characteristic such as race cannot be the reason for the actions of someone counting as an 'employer.'").

continued capacity to contribute to DePaul's distinctive goals and academic mission." (DePaul SOF ¶14.) This standard applies to every candidate who is applying for tenure. (*Id.*)

### 3. Applying for tenure.

At DePaul, the process for obtaining tenure differs slightly depending on the structure of a candidate's local academic unit. (DePaul SOF ¶16; Calvente SOF ¶7.) Ultimately, however, the UBPT, a University-wide committee, votes on a candidate's application for tenure and promotion and then sends its recommendation to the provost. (DePaul SOF ¶16.) The provost makes the final determination as to whether a candidate should receive tenure and promotion from assistant professor to associate professor; however, DePaul's rules are very clear that the provost should reject the UBPT's recommendation only in rare instances and for compelling reasons. (Calvente SOF ¶10.) What does that mean? It means that the provost may not simply reject the UBPT's recommendation because she disagrees with it. (Calvente SOF ¶¶9–10.) Rather, to reject the recommendation of the UBPT—which represents the voice of the faculty—the Provost should find that the UBPT's recommendation was groundless. (Calvente SOF ¶10.) In other words, to reject the UBPT, the provost must find that (i) doubt existed where the Board found none, or (ii) where the Board expressed its doubt, the Provost found that the Board's reasons for doubt were completely unfounded. (Calvente SOF ¶10.)

### a. The review in the candidate's academic unit.

In the College, which does not have separate departments, the first step in the tenure process is an evaluation of the candidate's file by the tenured faculty.[3] (Calvente SOF ¶7.) After the tenured

---

[3] To be more precise, first the Personnel Committee evaluates the candidate; then the candidate has an opportunity to respond to the Personnel Committee's report; and then the tenured faculty as a whole vote. (Calvente SOF ¶7.)

faculty vote, the dean makes a separate recommendation as to whether the candidate should receive tenure. (Calvente SOF ¶7.) After the faculty votes and the dean makes her recommendation, the candidate's file—including her complete dossier, the vote of the tenured faculty, the candidate's response to the vote of the tenured faculty, and the recommendation of the dean—is sent to the UBPT. (Calvente SOF ¶7.)

In an academic unit that has separate departments (for example, the College of Science and Health), the tenured faculty of the department first evaluates the candidate's file and, following the department's evaluation, the department chair makes a recommendation as to whether the candidate should receive tenure. (Calvente SOF ¶8.) Next, the tenured faculty of the college (or a separate committee thereof) evaluates the file and, following the college's evaluation, the dean of the college makes a recommendation as to whether the candidate should receive tenure. (Calvente SOF ¶8.) After these processes, the candidate's file—including his complete dossier, the votes of the faculty in the department, the votes of the faculty in the college, any responses by the candidate to the votes in the local academic unit, and the recommendations of the department chair and the dean—go to the UBPT. (Calvente SOF ¶8.)

b.    The review by the UBPT.

The UBPT is a seven-member committee comprised of tenured faculty from across various colleges at DePaul. (DePaul SOF ¶16.) Members of the UBPT are appointed by Faculty Council, which is the unit that represents the voice of faculty at DePaul with respect to shared governance.[4]

---

[4]      Shared governance is a structure where faculty input is taken in terms of different decisions at the University, including tenure. (Calvente SOF ¶13.) The principle of shared governance acknowledges that faculty has a significant role in the operation of the University, including the appointment, tenuring, and promotion of faculty. (Calvente SOF ¶13.) While the provost has a faculty appointment, she is not considered to be faculty when considering shared governance. (Calvente SOF ¶13.)

(Calvente SOF ¶12.) Upon receipt, UBPT reviews the file. (DePaul SOF ¶17.) The UBPT then (i) meets to discuss the candidate, (ii) interviews the candidate, (iii) interviews the dean and (if appropriate) the department chair, (iv) discusses the candidate again, and then (v) votes on the candidate's application for tenure and prepares a report that articulates its recommendation. (DePaul SOF ¶17.) The provost is present for (i) the UBPT's interviews with the candidate, the dean, and the department chair, and (ii) the UBPT's discussion about each candidate's file. (DePaul SOF ¶17.) However, the provost does not participate in the any of the interviews or in the UBPT's discussions about the candidate. (DePaul SOF ¶17.) After the UBPT completes its work, the candidate's file—including the UBPT's recommendation and all of the materials that the UBPT reviewed—goes to the provost who has the final say on who receives tenure. (*E.g.,* DePaul SOF ¶¶6, 16.)

c.     **Appeal of an adverse decision.**

A candidate who does not receive tenure may appeal the provost's decision to a University-wide appeals board. (DePaul SOF ¶19.) The scope of review of the appeal's board is limited to evaluating whether a professor's academic freedom was violated, whether University or local academic unit guidelines or procedures were violated, or whether the faculty member was the victim of discrimination. (DePaul SOF ¶19.) After the appeals committee evaluates the file and makes a recommendation, the University President makes a final decision as to the remedy for an aggrieved faculty member, which remedy *may* include (but does not have to include) the grant of tenure. (DePaul SOF ¶19.) As a practical matter, few faculty take advantage of the appeals process, with the current University president having only heard one or two appeals from a provost's decision to deny tenure. (Calvente SOF ¶14.)

**B.    Dr. Calvente's pre-tenure reviews and her relationship with Dr. Ghanem.**

    **1.    Dr. Calvente's second pre-tenure review by the College and her complaint to De-Paul's Office of Institutional Diversity and Equity.**

The faculty at the College conducted a formal review of Dr. Calvente in March 2015, recommending that Dr. Ghanem not renew her contract. (DePaul SOF ¶58.) During this review, the faculty found that Dr. Calvente was making adequate progress towards tenure with respect to her service, but not with respect to her teaching or her research. (Calvente SOF ¶18.) This recommendation devastated Dr. Calvente who saw (and continues to see) it as a manifestation of structural racism at DePaul and as retaliation for her outspokenness on issues of race within the College and the University. (DePaul SOF ¶53.) Accordingly, Dr. Calvente responded by filing a complaint with OIDE, the office tasked with investigating complaints of discrimination at DePaul. (DePaul SOF ¶59.) Ultimately, Dr. Ghanem did not accept the faculty's recommendation, and she renewed Dr. Calvente's contract. (DePaul SOF ¶58.) At around this time, Dr. Ghanem opined that Dr. Calvente was "an extraordinary teacher" and that her Woodrow Wilson Fellowship was a "huge deal." (Calvente SOF ¶19.)

    **2.    Dr. Calvente's third pre-tenure review by the College and her complaint to De-Paul's Office of Institutional Diversity and Equity.**

The tenured faculty in the College also recommended that Dr. Ghanem not renew Dr. Calvente's contract in 2017. (DePaul SOF ¶73.) In this review, the faculty found that Dr. Calvente was making adequate progress towards tenure in the area of research, but inadequate progress towards tenure in the areas of teaching and service. (Calvente SOF ¶20.) This, of course, was odd, because Dr. Calvente increased her service following her 2015 review, which opined that she was making adequate progress in the area of service. (Calvente SOF ¶¶18, 21.) However, Dr. Ghanem again rejected the faculty's recommendation and renewed Dr. Calvente's contract. (DePaul SOF ¶73.)

8

About a month after this November 2017 review, Dr. Calvente met with Dr. Ghanem to discuss the faculty's recommendation. (Calvente SOF ¶22.) During that meeting, Dr. Calvente told Dr. Ghanem that she was again a victim of discrimination. At Dr. Calvente's request, Dr. Ghanem called OIDE to report Dr. Calvente's complaint. (Calvente SOF ¶22.) However, Dr. Ghanem also told Dr. Calvente not to (i) proceed with OIDE, or (ii) worry about the review because the then provost already knew about her file. (Calvente SOF ¶22.) Accordingly, and based on Dr. Ghanem's instructions, Dr. Calvente chose not to proceed with her OIDE complaint based on her 2017 review. (Calvente SOF ¶¶22–23.)

### 3. Dr. Calvente accuses Dr. Ghanem of racism in not renewing a white faculty member in the College immediately prior to submitting her application for tenure.

In October 2018, following a department meeting in the College, Dr. Calvente, Dr. ███ and Dr. Ghanem met in Dr. Ghanem's office to discuss the racially charged atmosphere in the College. (DePaul SOF ¶82.) During that meeting, someone mentioned Dr. Ghanem's decision to terminate Dr. ███ a white tenure track professor who Dr. Ghanem terminated before he applied for tenure. (Calvente SOF ¶¶24–25.) Dr. Ghanem said that she did not want to discuss Dr. ███ situation; however, Dr. Ghanem did let slip that she heard a rumor that she terminated Dr. ███ so that she could later fire women of color with impunity. (Calvente SOF ¶25.) Dr. Calvente's response? She told Dr. Ghanem that she wrote a letter on Dr. ███ behalf that made this very point. (Calvente SOF ¶¶25–26.) The meeting ended immediately thereafter, with Dr. Ghanem shooing Dr. Calvente and Dr. Dillard from her office, and never again meeting with them to continue to discuss—let alone attempt to resolve—the racially poisonous atmosphere in the College. (Calvente SOF ¶¶26, 28.)

C. **Lisa Calvente is recommended to receive tenure by the UBPT by a vote of 4–3 and is denied tenure by Salma Ghanem, the same person to whom she continued to complain about discrimination and who she accused of playing racial politics to harm another professor's career.**

Dr. Calvente was qualified for tenure. How do we know? Because the UBPT told us so. (Calvente SOF ¶¶29–31.) In no uncertain terms, the UBPT examined Dr. Calvente's file and found that "Dr. Calvente's teaching, as evidenced by consistently high student evaluations, a strong student report, and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook." (Calvente SOF ¶29.) The UBPT also examined Dr. Calvente's research and scholarly contributions and found that her "total body of work consists of, at minimum, 3 peer-reviewed articles and 3 peer-reviewed book chapters during the probationary period, in additional to 6 papers in international conferences and 10 presentations in national conferences," and that the "significance and quality of her work were praised by [her] external reviewers and echoed by the faculty in the unit report." (Calvente SOF ¶30.) Thus, the UBPT found Dr. Calvente's "scholarship to have met the minimum standard of notable in the Faculty Handbook." (Calvente SOF ¶30.) And with respect to her service, the UBPT found Dr. Calvente's overall contribution to be "sufficiently strong to meet the criteria for service in the Faculty Handbook." (Calvente SOF ¶31.)

Notwithstanding the UBPT's recommendation that Dr. Calvente receive tenure, Dr. Ghanem rejected the recommendation. (Calvente SOF ¶32.) In so doing, Dr. Ghanem wrote that Dr. Calvente received a careful review at all levels and that experienced faculty had evaluated her work. (Calvente SOF ¶32.) She also wrote that she did not consider the UBPT's 4–3 vote to outweigh the alleged concerns raised at the College level (Calvente SOF ¶32), even though Dr. Ghanem acknowledged that the evaluation of the UBPT was more important than the evaluation at the College (Calvente SOF ¶9). Thus, Dr. Ghanem defied the UBPT and denied Dr. Calvente's application,

10

notwithstanding that Dr. Ghanem had previously (i) opined that Dr. Calvente was an extraordinary teacher, (ii) advised Dr. Calvente not to complain to OIDE because the then-provost knew about her upcoming tenure case, and (iii) told Dr. Calvente that she would be fine for tenure. (Calvente SOF ¶¶19, 22, 28–32.)

**D.** **Dr. Ghanem grants tenure to ███████████, a white tenure-track faculty with no history of complaining about discrimination, whose department and college both recommended he not receive tenure, and who the UBPT recommended not receive tenure by a vote of 1–6.**

Dr. ███████████ was a tenure-track faculty member in DePaul's College of Science and Health who applied for tenure and promotion during the 2018/2019 academic year. (DePaul SOF ¶154.) Dr. ██████ race is white (DePaul SOF¶153) and, according to Dr. Ghanem, he had no record of complaining about discrimination within his academic unit or the broader University (Calvente SOF ¶34). Like all candidates for tenure at DePaul, (i) Dr. ██████ had to show a certain level of proficiency in teaching, research, and service, and (ii) the University had to have no reasonable doubt as to Dr. ██████ qualifications. (DePaul SOF ¶¶14, 15.) Both the faculty in Dr. ██████ department and the faculty within Dr. ██████ college recommended that he not receive tenure. (DePaul SOF ¶154.) And the UBPT was near unanimous in recommending that Dr. ██████ not receive tenure, voting 1–6 against Dr. ██████ application. (Calvente SOF ¶35.)

In evaluating Dr. ██████ application, the UBPT first noted significant concerns with Dr. ██████ teaching, including that (i) Dr. ██████ teaching evaluations were frequently below three on a five-point scale, (ii) there was a pattern in Dr. ██████ evaluations that showed an inability to communicate with the majority of his students, (iii) forty to fifty percent of Dr. ██████ students rated Dr. ██████ ability to communicate subject matter as inadequate, and (iv) the regular recurrence of student concerns with communicating his expectations for performance, the criteria by

which performance is to be evaluated, and the timeliness of his feedback to students, raised questions about the consistent effectiveness of Dr. ███ teaching. (Calvente SOF ¶35.)

In continuing to evaluate Dr. ███ application for promotion, the UBPT noted significant concerns about Dr. ███ scholarship, including the quantity of the work, the consistency of the work, and the quality of the work. (Calvente SOF ¶36.) More specifically, the UBPT noted that Dr. ███ scholarship appeared limited to multi-authored pieces and that the UBPT was not provided with information concerning Dr. ███ contributions to those multi-authored pieces. (Calvente SOF ¶36.)

Dr. Ghanem acknowledges that Dr. ███ (like his former colleague, Dr. Calvente) received a careful review at all levels. (Calvente SOF ¶¶32, 37.) Dr. Ghanem also acknowledges that experienced faculty evaluated Dr. ███ work. (Calvente SOF ¶¶32, 37.) And Dr. Ghanem acknowledges that the UBPT voted overwhelmingly against Dr. ███ application for tenure, and that both Dr. ███ department and his college voted against him. (Calvente SOF ¶35. *See also* DePaul SOF ¶154.) In light of these facts, how can Dr. Ghanem (or anyone else) say that the University had "no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission"? ███████████████ ████████████████████████████████████████████████████ ███. (Calvente SOF ¶¶37–39.) However, Dr. Ghanem did not write that she believed there to be procedural anomalies when granting tenure to Dr. ███ (Calvente SOF ¶38.) Rather, she wrote that Dr. ███ deserved tenure based on the merits of his application. (Calvente SOF ¶38.)

## Standard of Review

Summary judgment is appropriate *only* if the facts show that there are no genuine issues for trial and, thus, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. In

making this determination, the Court reviews all of the evidence in the light most favorable to the non-moving party. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 762 (7th Cir. 2016) (reversing district court's grant of summary judgment). In deciding on a motion for summary judgment, the Court's must resist the temptation to act as a juror or to weigh the evidence. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012) (reversing motion for summary judgment). Rather, the Court's role is to determine whether there are disputes that may only be resolved at trial. *See id.*

## Argument

The civil rights laws apply to employment in the academy on the same terms that they apply to employment in any other sector of the economy. *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 864–65 (D.C. Cir. 2019) (university not entitled to special deference where in a case where the fundamental question is whether it acted in good faith). *See also Haynes v. Indiana Univ.*, 902 F.3d 724, 733 (7th Cir. 2018) (question in tenure denial case is whether plaintiff can demonstrate her race caused adverse action) *citing Ortiz,* 834 F.3d at 765; *Goswami v. DePaul Univ.*, No. 12–cv–7167, slip. op. at pages 2–3, 2015 WL 251304 at *1 (N.D. Ill. Jan. 20, 2015) (denying DePaul's motion for summary judgment in a tenure denial case).

In the typical denial–of–tenure case, it can be difficult to prove a violation of the civil rights laws because tenure decisions often involve several independent layers of review and the tenure decision is often made by committee. *Cf. Haynes*, 834 F.3d at 734. In this case, however, DePaul makes one person the proverbial decider on every application for tenure—the provost, Dr. Ghanem. (*E.g.,* DePaul SOF ¶¶6, 16.) Thus, this is not a case where Dr. Calvente is focused merely on "allegations of chicanery during the University's review of [her] tenure application" (although Dr. Calvente believes, and the University appeals board acknowledged (*see* Calvente SOF¶33), that chicanery occurred). *Cf. Haynes* 834 F.3d at 734. Rather, Dr. Calvente's case focuses on Dr. Ghanem's

reasons for overruling the UBPT, a University-committee that speaks for the faculty and whose judgment should only be rejected in rare instances and for compelling reasons. (Calvente SOF ¶¶10-13.) In other words, given the manner in which DePaul structures its tenure process and given Dr. Ghanem's outsized role in it, Dr. Calvente's denial of tenure case is little different than a garden-variety discrimination/retaliation case.

Notwithstanding all of the foregoing, Dr. Ghanem and DePaul spend the majority of their brief arguing (i) about the allegedly thorough review that Dr. Calvente received within the College, and (ii) that Dr. Calvente cannot ask this Court to substitute its judgment for the judgment of the scholars who reviewed her work. Thus, Dr. Ghanem and DePaul set up and knock down a strawman. Dr. Calvente does not ask the Court to re-evaluate her tenure file (which she did not attach as an exhibit to her complaint, and which she has not attached as an exhibit to any of her summary judgment papers). Rather, Dr. Calvente asks the Court to do what it does well: she asks the Court to review the record developed during discovery and determine whether a jury could find Dr. Ghanem—the decider on Dr. Calvente's application for tenure—acted with discriminatory or retaliatory animus in connection with her application.

**A.**     **Dr. Ghanem retaliated against Dr. Calvente for (i) writing a letter in support of a white faculty member that accused Dr. Ghanem of engaging in racism when terminating Dr. ▆▆▆▆▆▆▆ and (ii) continuing to complain about racism in violation of her instruction to cease this activity.**

An employee may prove retaliation by showing (1) she engaged in protected activity, (2) a materially adverse action taken by her employer, and (3) a causal connection between the two. *Humphries v. COBCS West, Inc.*, 474 F. 3d 387, 404 (7th Cir. 2007) (applying same elements to claims

under Title VII as to 42 U.S.C. §1981.[5] An employee may demonstrate a causal connection between her protected activity and the adverse employment action solely through circumstantial evidence. *Coleman v. Donahue*, 667 F.3d 835, 859 (7th Cir. 2012) (reversing motion for summary judgment). *See also Joll v. Valparasio Community Schools*, 953 F.3d. 923, 929–30 (7th Cir. 2020) ("[e]mployers long ago taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written"); *Ortiz*, 834 F.3d at 765 (recognizing that few people admit firing someone in violation of the civil rights laws).

Circumstantial evidence of retaliation that is sufficient to prove a causal connection can include (i) disparate treatment of similarly situated employees, (ii) an employer's failure to follow its own policies and procedures, including a marked deviation from standard practice, and (iii) explanations for conduct that are so suspicious that they give rise to an inference of discrimination or retaliation. *Coleman*, 667 F.3d at 858, 860 (selective enforcement of company policy can establish pretext); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment as jury could "find the explanation [for the termination] to be so ludicrous that [the employer] is not to be believed"); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (reversing order granting summary judgment and explaining that "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext"); *Joll*, 953 F.3d. at 931 (reversing summary judgment, explaining that deviation from standard practices can establish pretext) (collecting cases); *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (reversing motion for summary judgment, explaining that departure from established policy can establish pretext).

---

[5]     To prove retaliation under Title VII or 42 U.S.C. §1981, a plaintiff-employee must demonstrate that her protected activity was the but–for cause for the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Comcast Corp. v. Nat'l Ass'n of African Am. Owned Media*, 140 S. Ct. 1009, 1019 (2020).

### 1. Dr. Calvente suffered an adverse job action.

Although not addressed in the Motion, there is no legitimate dispute that Dr. Ghanem's and DePaul's decision to deny Dr. Calvente's application for tenure and to offer her a terminal contract was an adverse employment decision. *E.g. Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) (civil rights laws cover adverse actions including termination of employment and the failure to promote).

### 2. Dr. Calvente engaged in protected activity.

There is also no legitimate dispute that Dr. Calvente engaged in protected activity by both (i) advocating for Dr. ███████ by stating that Dr. Ghanem did not renew his contract for reasons of racial politics, and (ii) lodging serial complaints about racial discrimination within the College. *See* 42 U.S.C. §2000e-3 (it is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter . . . ."); *Humphries*, 474 F. 3d at 403 ("a plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981"); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (protected activity includes complaining about harassment). Indeed, Dr. Calvente's record of engaging in protected activity is so strong that the defendants do not even try to attack it. (*See* Br. at page 24.) Rather, the defendants save all their ammunition for the argument that there was allegedly no causal connection between Dr. Calvente's protected activity and Dr. Ghanem's decision to deny her application for tenure and terminate her employment. As discussed *infra*, the defendants are wrong.

3.    The causal connection between Dr. Calvente's advocacy for Dr. ███ and the denial of her application for tenure is obvious based on (i) Dr. Ghanem's disparate treatment of Dr. Calvente versus Dr. ███ and (ii) Dr. Ghanem's dubious explanation for the disparate treatment.[6]

Both Dr. ███ and Dr. Calvente were required to meet the same standard for obtaining tenure: before granting tenure, the University must have "no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (DePaul SOF ¶14.) Thus, Dr. ███ and Dr. Calvente are similarly situated for purposes of the civil rights laws. *See Coleman*, 667 F.3d at 841 (the critical issue in determining whether employees are similarly situated is whether they were subject to the same employment policies). Dr. ███ file, however, was objectively worse than Dr. Calvente's file. What, then, accounts for the difference in treatment? Occom's Razor says it was Dr. Calvente's (i) serial complaints of racial discrimination, and/or (ii) decision to oppose Dr. Ghanem's decision to terminate Dr. ███ by accusing Dr. Ghanem of playing racial politics with Dr. ███ employment.

Why was Dr. ███ file objectively worse than Dr. Calvente's file? With respect to Dr. ███ (i) his department said he should not receive tenure, (ii) his college said that he should not receive tenure, and (iii) the UBPT overwhelmingly stated that he should not receive tenure. (DePaul SOF ¶154; Calvente SOF ¶¶35–36.) In Dr. Calvente's case, however, the UBPT (whose membership included a member of the College) recommended that Dr. Calvente receive tenure. (DePaul SOF ¶¶6, 16, 128.) Given that DePaul weighs the UBPT's opinion more heavily than the opinion of the local academic unit (Calvente SOF ¶9), and (ii) Dr. Calvente received a recommendation from the

---

[6]    There is another professor—███—who was also voted down 1–6 by the UBPT but who Dr. Ghanem tenured anyway. Space considerations prevent Dr. Calvente from conducting a fulsome analysis of Dr. ███ case; however, the Court may note that Dr. Ghanem tenured him despite there being doubt—as evidenced by the UBPT's strong rejection of his application—as to Dr. ███ qualifications. (DePaul SOF ¶¶153, 155.)

UBPT (DePaul SOF ¶124), Dr. Ghanem should have treated Dr. Calvente and Dr. ███ similarly. Notwithstanding the foregoing, Dr. Ghanem awarded tenure to Dr. ███ and refused to award tenure to Dr. Calvente. (Calvente SOF ¶32, 38.) Again, what is the material difference between Dr. ███ and Dr. Calvente (besides the fact that Dr. Calvente had the objectively superior file)? Dr. Calvente not only lodged serial complaints of discrimination, but she had also recently accused Dr. Ghanem of playing racial politics in connection with Dr. ███ employment. (*E.g.*, DePaul SOF ¶¶33, 59, 84–85; Calvente SOF ¶¶24–26, 28.) Thus, Dr. Calvente has made a sufficient showing of causation to survive Dr. Ghanem's and DePaul's dispositive motion. *E.g., Coleman,* 667 F.3d at 859 (disparate treatment of similarly situated persons is evidence of causation).

Dr. Ghanem treated Dr. Calvente differently from Dr. ███ in one other critical way. According to DePaul's very clear policies, a provost should reject the UBPT's recommendation only in rare instances and for compelling reasons. (Calvente SOF ¶10.) Yet despite this clear mandate, Dr. Ghanem defied UBPT and rejected its recommendation that Dr. Calvente receive tenure. (Calvente SOF ¶¶10, 32.) This deviation from standard practice is also sufficiently suspicious to demonstrate pretext. *See, e.g., Joll,* 953 F.3d. at 931 (deviation from standard practice can establish pretext). But when considered in light of her decision to tenure Dr. ███ Dr. Ghanem's decision to reject the UBPT's recommendation on Dr. Calvente's application is even more suspect. Why? Because, again, the standard for obtaining tenure at DePaul is that the University have no reasonable doubt as to the candidate's qualifications. (DePaul SOF ¶14.) And three levels of faculty review for Dr. ███—including his department, his college, and the UBPT—all stated that Dr. ███ *should not* receive lifetime employment. (DePaul SOF ¶154.) Yet despite universal faculty condemnation for Dr. ███ application, Dr. Ghanem tenured him anyway. (Calvente SOF ¶¶35–39.)

Finally, Dr. Ghanem previously stated that Dr. Calvente was "an extraordinary teacher," told Dr. Calvente that she would be fine for tenure, and told Dr. Calvente to wait to file any more complaints with OIDE until after she obtained tenure. (Calvente SOF ¶¶19, 22.) So what caused Dr. Ghanem's change of heart? Nothing in the record suggests that Dr. Calvente somehow lost her ability to teach. Moreover, Dr. Ghanem's instruction that Dr. Calvente refrain from lodging additional complaints of discrimination until after she receives tenure suggests that Dr. Ghanem believed Dr. Calvente's would be successful when she applied for tenure. Thus, the inference becomes even stronger that it was Dr. Calvente's continued advocacy for racial justice (including her advocacy for Dr. ████ that caused Dr. Ghanem to deny her application.

Notwithstanding the foregoing, the defendants attempt to justify Dr. Ghanem's behavior by claiming that Dr. ████ is not similarly situated to Dr. Calvente because Dr. ████ was allegedly denied certain procedural protections. There are at least three problems with this line of argument. First, Dr. Ghanem acknowledged that Dr. ████ received a careful review at all levels and that experienced faculty colleagues evaluated his work. (Calvente SOF ¶37.) And in granting Dr. ████ application for tenure, Dr. Ghanem wrote that her decision was based on Dr. ████ alleged "achievements in scholarship, teaching, and service, and in expectation of [his] continued service to [DePaul's] students, the university, and [his] field." (Calvente SOF ¶38.) It is only when she is haled into this Court that Dr. Ghanem attempts to spin her decision to claim that she granted tenure to Dr. ████ for alleged "procedural" reasons. (*Compare* Calvente SOF ¶38 *with* Calvente SOF ¶39.) Thus, by her own words, Dr. Ghanem has undercut her attempt to distinguish Dr. ████ case from Dr. Calvente's case. *See also Joll*, 953 F.3d at 942 ("One can reasonably infer pretext from an

employer's shifting or inconsistent explanations for the challenged employment decision") *quoting*

*Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (collecting cases).

Second, the scholars that reviewed Dr. ███ application overwhelmingly opposed it. (Cal-
vente SOF ¶¶35–37.) Thus, how can Dr. Ghanem claim that Dr. ███ has met the standard for

tenure at DePaul, which requires that there be no reasonable doubt as to Dr. ███ qualifications

and capacity to contribute to DePaul's distinctive goals and academic mission? (DePaul SOF ¶14.)

Again, in light of her admissions that Dr. ███ received a fair evaluation by his colleagues and that

experienced faculty evaluated Dr. ███ record (Calvente SOF ¶¶35–37), Dr. Ghanem's attempt

to justify her decision to approve Dr. ███ application reeks of pretext. *Loudermilk v. Best Pallet*

*Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (". . . an employer who advances a fishy reason takes

the risk that disbelief of the reason will support an inference that it is a pretext for discrimination").

Third, even assuming *arguendo* that Dr. ███ did not receive adequate process, nothing in

DePaul's Handbook permits a provost to reject the UBPT's reasoned decision on procedural

grounds. (Calvente SOF ¶15.) Rather, by its plain language, DePaul's Handbook permits an *appeals*

*committee* (*i.e.*, not the provost) to recommend a decision be rejected because "the evaluation of the

candidate [during the tenure or promotion process] deviated from procedures in the Faculty Hand-

book or in college or local academic unit guidelines, and the deviation was material to the final

decision." (Calvente SOF ¶15.) The decision as to whether procedures were violated belongs to the

University President, and it is the University President who has the discretion to fashion an appro-

priate remedy, which is not necessarily to award tenure to the candidate. (Calvente SOF ¶15.)

Dr. Ghanem and DePaul also argue that Dr. Ghanem did not retaliate against Dr. Calvente

by pointing to Dr. Ghanem's decision to grant tenure to tenure ███████████ who

received tenure the same year that Dr. Calvente unsuccessfully sought that status. (Br. at page 16.) But the Seventh Circuit has soundly rejected the argument that the defendants are advancing. *See Diaz v. Kraft Foods Global, Inc.*, 653 F. 3d 582, 587 (7th Cir. 2011) (reversing award of summary judgment and holding "Title VII would have little force if an employer could defeat a claim of discrimination by treating a single member of the protected class in accordance with the law"). Retaliation against even one person who engaged in protected activity violates the statute, no matter how well other employees are treated. *Cf. id.* at 588.

In addition, █████████ is not an appropriate comparator. Why? Because even though █████ was at the October 2018 meeting where Dr. Calvente accused Dr. Ghanem of playing racial politics in connection with Dr. █████████ employment, nothing in the record suggests that Dr. █████ made the same accusation. Indeed, Dr. █████ actively attempted to avoid making public complaints about discrimination. (Calvente SOF ¶40.) Thus, unlike Dr. Calvente who affirmatively pressed charges of discrimination after Dr. Ghanem told her not to (Calvente SOF ¶22), Dr. █████ did not engage in any similar conduct (Calvente SOF ¶40).

The defendants next claim that Dr. Calvente never accused Dr. Ghanem of being discriminatory or retaliatory *to her* during the October 2018 meeting. (Br. at pages 9, 25.) But this is a red herring. As discussed *supra*, the law of retaliation protects a party based on *any* complaint of discrimination, including complaints lodged on behalf of another person. *See Humphries*, 474 F. 3d at 403 ("a plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981"). During the October 2018 meeting, Dr. Calvente told Dr. Ghanem that she advocated for the rights of Dr. █████████ and she told Dr. Ghanem how she advocated for the rights of Dr. █████████ (Calvente SOF ¶¶24–

26.) In turn, Dr. Ghanem ushered Dr. Calvente from her office, the two never had another meaningful conversation, and Dr. Ghanem subsequently rejected the UBPT's recommendation that Dr. Calvente receive tenure. (Calvente SOF ¶¶26, 28.) If this does not demonstrate retaliation, what does? *E.g., Humphries*, 474 F. 3d at 403 ("a plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981").[7]

Finally, the defendants claim that the approximately eight months between the October 10, 2018 conversation and Dr. Ghanem's denial of Dr. Calvente's application for tenure "dooms her claim." (Br. at page 25, n.24.) In support of this argument, the defendants cite *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) ("[w]hile the six-month gap [between protected activity and the adverse action] does not preclude Burton's claim as a matter of law, it does substantially weaken it"). But this argument is a red-herring because Dr. Calvente does not rely on suspicious timing to make her case.[8] Rather, she points to the fact that a white professor, who (i) had no record of complaining about discrimination, (ii) enjoyed a careful review at all levels, (iii)

---

[7]    In a footnote, the defendants deride Dr. Calvente's allegedly "conspiratorial and absurd proposition that the tenured faculty, the Dean and the Provost—professors who have spent their careers reaching the highest levels in academia—would torpedo the career of a Caucasian faculty member just so they could fire her a year later (but award tenure to another Black faculty member) is so patently unsupported as to not warrant consideration." (Br. at page 17, n.20.) Thus, the defendants distort the record and take gratuitous shots at Dr. Calvente. At the time Dr. Calvente wrote a letter stating Dr. Ghanem's motivations for "torpedo[ing]" Dr. ███ career, she did not know that Dr. ███ would ultimately obtain tenure. But given the willful distortion of Dr. Calvente's record by the College's faculty during her pre-tenure reviews (Calvente SOF ¶¶19, 20-22, 33), and given Dr. Ghanem's attempt to torpedo Dr. Calvente's career for reasons sounding in racism and retaliation (Calvente SOF ¶32-39), Dr. Calvente's statement that Dr. ███ ███ employment was affected by racial politics is not so far-fetched as the defendants would have the Court believe.

[8]    To be fair, however, the first opportunity that Dr. Ghanem had to retaliate against Dr. Calvente was in evaluating Dr. Calvente's application for tenure. After all, tenure-track faculty are not employees at will and they can be terminated at only at very specific times and only on very specific occasions.

had experienced faculty evaluate his work, and (iv) was actually voted down by his department, his college, and the UBPT received tenure. (*Cf.* Calvente SOF ¶¶34–39.) Indeed, this is exactly the sort of evidence that *Burton* says will support an inference of retaliation. *Burton*, 851 F.3d at 697.

It is anticipated that Dr. Ghanem and DePaul will complain about Dr. Calvente's articulation of what occurred by claiming that it is "self-serving." As the Seventh Circuit has explained, however, a non-moving party's testimony is sufficient on its own to defeat a motion for summary judgment. *E.g., Berry v. Chicago Transp. Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("It is worth pointing out here that we long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving'"). Thus, any such reply by the defendants would not only come with bad grace, but it would be in derogation of the law of summary judgment. *See id.*

Finally, given the weight of the evidence that Dr. Ghanem retaliated against Dr. Calvente, it is anticipated that the defendants will (i) attempt to retract their admission that Dr. Calvente engaged in protected activity, (ii) cry that Dr. Calvente did not really engage in protected activity, and (iii) point to an email where Dr. Calvente wrote that she did not believe that Dr. ███ was being discriminated against. (*Cf.* DePaul SOF ¶79.) But such an argument would also come with bad grace. Why? First, Dr. Calvente told Dr. Ghanem that she (Dr. Calvente) wrote a letter stating that Dr. Ghanem terminated Dr. ███ so she (Dr. Ghanem) could later terminate faculty of color. (Calvente SOF ¶25.) This is a textbook claim of discrimination even if Dr. Calvente did not use those words. Second, and more importantly, a plaintiff need not advise an employer that she believed "that discrimination has occurred in so many words." *Kotoklo v. Karpinski*, No. 20–cv–635, slip. op. at page 28 (N.D. Ill. Sept. 30, 2021) (denying motion for summary judgment). Rather, the

plaintiff need "only have taken some step in opposition to a form of discrimination that the statute prohibits." *Id.* Again, this is exactly what Dr. Calvente did, and it is what she told Dr. Ghanem that she did.

In this case, Dr. Calvente (i) opposed discrimination by writing an email on Dr. ███████ behalf claiming that Dr. ████████ got caught in the crossfire of racial politics, and (ii) told Dr. Ghanem that she wrote "the letter" stating that Dr. Ghanem refused to renew Dr. ████████ contract for reasons of racial politics. This is enough for Dr. Calvente to have engaged in protected activity within the meaning of the civil rights laws.

**B.  Dr. Ghanem discriminated against Dr. Calvente by refusing to grant her application for tenure.**

As the defendants acknowledge, to establish a *prima facie* case of discrimination in a denial of tenure case, Dr. Calvente is required to show "(1) [s]he is a member of a protected class; (2) [s]he was qualified for tenure; (3) [s]he was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure." (Br. at page 14 *citing quoting Sun v. Bd. Of Trs. Of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007).)[9] The unique circumstances of this case make this an easy showing. As an initial matter, there is no legitimate dispute that Dr. Calvente was a member of a protected class or that she was denied tenure. Rather, the dispute exists with respect to items two and four of the *Sun* test. (*See* Br. at page 14.)

---

[9]     To prove discrimination under Title VII, a plaintiff–employee must demonstrate that racial discrimination was a motivating factor for the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. at 535. To prove discrimination under 42 U.S.C. §1981, a plaintiff–employee must demonstrate that racial discrimination was the but–for cause of the adverse action. *Comcast Corp. v. Nat'l Ass'n of African Am. Owned Media*, 140 S. Ct. 1009, 1019 (2020).

In this case, Dr. Calvente, a professor of color, was unquestionably qualified for tenure. How do we know? Because the UBPT told us so.[10] In no uncertain terms, the UBPT examined Dr. Calvente's file and found that Dr. Calvente's "consistently high student evaluations, a strong student report, and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook." (Calvente SOF ¶29.) The UBPT also examined Dr. Calvente's work and that her "total body of work consists of, at minimum, 3 peer-reviewed articles and 3 peer-reviewed book chapters during the probationary period, in additional to 6 papers in international conferences and 10 presentations in national conferences," and that the "significance and quality of her work were praised by [her] external reviewers and echoed by the faculty in the unit report." (Calvente SOF ¶29.) Thus, the UBPT found her "scholarship to have met the minimum standard of *notable* in the Faculty Handbook." (Calvente SOF ¶30.) And with respect to her service, the UBPT found Dr. Calvente's overall contribution to be sufficiently "strong to meet the criteria for service in the Faculty Handbook." (Calvente SOF ¶31.)

The UBPT's determination should have been the end of the matter as the provost should reject UBPT decisions *only* in rare instances and for compelling reasons. (Calvente SOF ¶10.) Again, rare instances and for compelling reasons means that the provost must find that the UBPT recommendation was manifestly one that was groundless—that doubt existed where the UBPT, whose opinion outweighs the opinions of the local academic unit, found none. (Calvente SOF ¶10.) Thus, Dr. Calvente has met the second element of then *Sun* test.

---

[10]     We also know that Dr. Calvente was qualified for tenure at DePaul because UNC told us so. (Calvente SOF ¶¶3–5.) That is, UNC would not have hired Dr. Calvente into a tenure track job unless it was convinced she could meet the standard for tenure, which is higher than DePaul's standard for tenure. (Calvente SOF ¶¶3–5.)

Contrast Dr. Ghanem's treatment of Dr. Calvente with her treatment of Dr. ███ a white professor. Dr. ███ was unquestionably *not* qualified for tenure. (Calvente SOF ¶¶34–39; DePaul SOF ¶153.) How do we know? Because Dr. ███ department, his college, and the UBPT all told us so: (i) Dr. ███ teaching evaluations were frequently below three on a five-point scale, (ii) there was a pattern in Dr. ███ evaluations that showed an inability to communicate with the majority of his students, (iii) forty to fifty percent of Dr. ███ students rated Dr. ███ ability to communicate subject matter as inadequate, and (iv) the regular recurrence of student concerns with communicating his expectations for performance, the criteria by which performance is to be evaluated, and the timeliness of his feedback to students, raises questions about the consistent effectiveness of Dr. ███ teaching. (Calvente SOF ¶35.) Moreover, the UBPT noted significant concerns about Dr. ███ scholarship, including the quantity of his work, the (in)consistency of his work, and the quality of his work. (Calvente SOF ¶36.)

Despite all of the documented deficiencies in Dr. ███ file, Dr. Ghanem *granted* tenure to him. (DePaul SOF ¶155.) But under the "no reasonable doubt" standard articulated in the Handbook, Dr. Ghanem should have only rejected the UBPT's decision if it was completely unfounded. (Calvente SOF ¶10.) Thus, Dr. Calvente has met the fourth element of the *Sun* test.

Given that Dr. Calvente has established a *prime facie* case, the defendants may attempt to defeat her claim by articulating a legitimate non-discriminatory reason for denying her application for tenure. *Sun*, 473 F.3d at 814. Dr. Calvente may then show that the defendants' stated reasons are nothing more than pre-text for discrimination. In this case, Dr. Ghanem and DePaul do not articulate a legitimate reason for Dr. Ghanem to have rejected the UBPT's recommendation. Nor can Dr. Ghanem articulate a legitimate reason for her decision because there is none.

Even if Dr. Ghanem had articulated a legitimate reason for rejecting the UBPT's decision, there is plenty of evidence to demonstrate pretext. First, Dr. Ghanem failed to follow DePaul's own policies and procedures by rejecting the UBPT's recommendation for no legitimate reason as acknowledged by the Handbook. *See Rudin*, 420 F.3d at 727 (reversing summary judgment and explaining that "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext"). *See also Joll*, 953 F.3d. at 931 (reversing summary judgment and explaining that deviation from standard practices can establish pretext) (collecting cases). Second, Dr. Ghanem treated Dr. ███ a white professor, materially better than she treated Dr. Calvente, a multi-ethnic professor of color.

Notwithstanding all of the foregoing, the defendants claim that Dr. Ghanem could not have discriminated against Dr. Calvente because she twice before recommended that Dr. Calvente's contract be renewed following faculty opposition. (Br. at page 26.) This argument neglects to account for Dr. Ghanem's subsequent instruction as to how Dr. Calvente ought to behave as a woman of color. (*See* Calvente SOF ¶22.) Specifically, after the second occasion that the faculty recommended Dr. Calvente's contract not be renewed, Dr. Ghanem told Dr. Calvente to stop complaining about discrimination. In essence, Dr. Ghanem communicated to Dr. Calvente that good minorities accept racial harassment and microaggressions, and that Dr. Calvente should comport herself accordingly. Thus, at the very least, it is a question for a jury as to how much weight to give Dr. Ghanem's prior decisions not to terminate Dr. Calvente. *See McKinney v. Office of the Sheriff of Whitley County*, 866 F.3d 803, 814 (7th Cir. 2017) (common actor defense is not a conclusive presumption but a factor to be weighed by the trier of fact).

The defendants also argue that Dr. Ghanem's decision to grant tenure to other black profes-

sors, including Dr. ██████ is evidence that she did not discriminate based on race in Dr. Calvente's

case. (Br. at page 16.) However, as discussed *supra,* not only is Dr. ██████ a poor comparator, but

the mere fact that Dr. Ghanem did not deny Dr. ██████ application for tenure does not mean that

discrimination did not play a part in her decision to deny Dr. Calvente's application for tenure. *E.g.,*

*Diaz,* 653 F. 3d at 587.

## C.     DePaul breached its contract with Dr. Calvente by denying her application for tenure.

The elements for a breach-of-contract claim are as follows: a valid and enforceable contract,

performance by the plaintiff, breach by the defendant, and resultant damages. *E.g., Razor Capital v.*

*Antaal,* 2012 Ill. App. (2d) 110904 at ¶30. In this case, DePaul acknowledges that the Handbook

constitutes a contract between it and Dr. Calvente, and that this Handbook articulates the terms

and conditions by which Dr. Calvente is to be evaluated for tenure. This, of course, is consistent

with what the courts in this district have found. *See Goswami,* No. 12-cv-7167, slip. op. at page 16,

2015 WL 251304 at *8 (N.D. Ill. Jan. 20, 2015) ("The evidence suggesting that the procedures to

review plaintiff's performance were not in keeping with the Faculty Handbook means that summary

judgment on plaintiff's contract claim is inappropriate").

It is undisputed that Dr. Calvente performed her responsibilities as a faculty member during

her time at DePaul (*see, e.g.,* Calvente SOF ¶1) and that Dr. Calvente suffered damages in that she

was unemployed for a year following her terminal year at DePaul (*see, e.g.,* Calvente SOF ¶2). In their

motion for summary judgment, the defendants focus solely on one element—breach by them. Dis-

tilled to its essence, and notwithstanding the record evidence to the contrary, the defendants cry

that (i) Dr. Calvente had the opportunity to be heard at every step during the tenure process, (ii)

that Dr. Calvente enjoyed processes that were not strictly permitted by the Handbook, and (iii) Dr.

Calvente's entire complaint is simply one of sour grapes. (*See* Br. at page 27.) Thus, the defendants continue to misstate the issue.

Dr. Calvente's claim for breach–of–contract is based on the following two breaches by De-Paul: (1) under the Handbook, Dr. Ghanem should not have denied Dr. Calvente's application for tenure absent compelling reason, and (2) under the Handbook, Dr. Ghanem should not have retaliated against Dr. Calvente because Dr. Calvente complained that Dr. Ghanem did not renew Dr. █████ contract for reasons of racial politics.

1. **It is a breach of Dr. Calvente's contract with DePaul for Dr. Ghanem to reject the UBPT's recommendation unless she demonstrated it was manifestly groundless.**

With respect to DePaul's first breach of the Handbook Dr. Ghanem should only have rejected the UBPT's recommendation if it was manifestly groundless. (Calvente SOF ¶10.) Dr. Ghanem did not demonstrate that the UBPT's recommendation was manifestly groundless. Thus, Dr. Calvente has demonstrated a breach of contract by DePaul.

2. **It is a breach of Dr. Calvente's contract with DePaul for Dr. Ghanem to reject the UBPT's recommendation due to racial or retaliatory animus.**

With respect to DePaul's second breach of the Handbook (Dr. Ghanem's retaliation against Dr. Calvente for accusing Dr. Ghanem of playing racial politics), Dr. Calvente was entitled to a process not tainted by discrimination or by retaliatory animus. (Calvente SOF ¶16.) As discussed, Dr. Ghanem's decision was so tainted. Thus, Dr. Calvente has demonstrated a second breach of contract by DePaul.

<u>Conclusion</u>

Distilled to its essence, the defendants claim that the Court should now terminate this litigation because to do otherwise would cause the Court to substitute its judgment for the reasoned judgment of the faculty at DePaul. This argument is ironic, given that it is Dr. Ghanem who (1)

rejected the reasoned judgment of the UBPT (which speaks for the faculty at DePaul) in violation of the civil rights laws, and (2) is now seeking to avoid answering for her conduct before a jury. The undisputed facts remain as follows: (i) the UBPT, a committee appointed by faculty council whose opinion is entitled to significant deference, recommended that Dr. Calvente receive tenure, (ii) Dr. Ghanem, whom Dr. Calvente had accused of playing racial politics, rejected the UBPT's recommendation, and (iii) Dr. Ghanem tenured white professors who had never complained about discrimination at DePaul despite those professors having an objectively worse file than Dr. Calvente's file. On these facts, Dr. Ghanem has only herself to blame for being party to litigation. Had she not so violated the civil rights laws, the parties would not be in court today.

On the undisputed facts, the record does not support the defendants' request for summary judgment. Rather, the record shows that Dr. Ghanem was unable to resist the temptation to avenge herself on a faculty member who (i) continued to complain about discrimination after being instructed not to, and (ii) accused her of playing racial politics with another man's career. And in case there was any doubt about Dr. Ghanem's motive, simply look at the way Dr. Ghanem treated Dr. ███.

WHEREFORE, Dr. Calvente respectfully requests that the Court deny the Motion and that it grant her any additional relief that is just, equitable, or appropriate.

Respectfully submitted,
December 23, 2021

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com

**<u>Certificate of Service</u>**

The undersigned, an attorney, certifies that on December 23, 2021, he caused the foregoing

Response And Objection To Defendants' Combined Motion For Summary Judgment to be elec-

tronically filed with the Clerk of the Court for the United States District Court for the Northern

District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through

CM/ECF on the following counsel of record:

Anna Wermuth, Esq.
Cozen O'Connor, P.C.
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
awermuth@cozen.com
*Counsel for Defendants*

<u>/s/ Fitzgerald T. Bramwell</u>
Fitzgerald T. Bramwell
**LAW OFFICES OF FITZGERALD BRAMWELL**
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com