## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## (EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
|       Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
|       Defendants. | ) | |
| _____ | ) | |

### Lisa Calvente's Response To Defendants' Statement
### of Material Fact Pursuant To Local Rule 56.1(b)(2)

Lisa Calvente ("Dr. Calvente") responds and to the Defendants' Combined Rule 56.1(A)(3)

Statement Of [Allegedly] Undisputed Material Facts, filed at Docket No. 47, as follows:

1. This Court has jurisdiction of this matter under 28 U.S.C. §§ 1331 and 1367. (**Tab A**, Answer at ¶ 6.)

    <u>**Response:**</u>    Admit.

2. The allegations of the Complaint involve events occurring within the venue of this Court. (**Tab A**, Answer at ¶ 5.)

    <u>**Response:**</u>    Admit.

3. Located in Chicago, DePaul is the largest Catholic university in the United States. (**Tab A**, Answer at ¶ 3; **Tab B**, Deposition of Lisa Calvente (hereinafter "Calvente Dep.") at 27:23–28:1.) DePaul was founded by the Vincentians. (**Tab B**, Calvente Dep. at 28:2–3; **Tab C**, Deposition of Gabriel Esteban (hereinafter "Esteban Dep.") at 18:5–17; **Tab D**, Ex. 1 to Declaration of Lucy Rinehart (hereinafter "Rinehart Decl."), p. 000094 at ¶ 6.2.)

    <u>**Response:**</u>    Admit.

4.      Plaintiff Lisa Calvente ("Plaintiff") is a former tenure–track Assistant Professor in DePaul's College of Communication's ("College"), in the Communication Studies program. (**Tab A**, Answer at ¶ 1; **Tab E**, Deposition of Alexandra Murphy (hereinafter "**Tab E**, Murphy Dep.") at 45:20–22.) Plaintiff identifies as Vietnamese and Puerto Rican, ethnically Latina, and racially Black and Asian. (**Tab B**, Calvente Dep. at 12:22–24.) Her national origin is American. (**Tab B**, Calvente Dep. at 114:20–21.) She does not identify as Black American, but rather as a part of the Black diaspora. (**Tab B**, Calvente Dep. at 14:20–24.) Additionally, Plaintiff identifies as a Latina, rather than Latin American, because she is U.S. born. (**Tab B**, Calvente Dep. at 114:15–116:13.)

> **Response:**      Admit the first, second, third, and fifth sentences. Deny the fourth sentence. (Calvente Dec. ¶1, copy attached as Exhibit 1.)

5.      DePaul's College of Communication is small, based on the size of faculty and students. (**Tab E**, Murphy Dep. at 40:20–41:1.) There are approximately 34 tenure–track faculty in the College. (**Tab E**, Murphy Dep. at 41:10–14.) The College does not have departments, but is instead organized around program areas: Communication Studies; Public Relations and Advertising; Journalism; and Media and Cinema Studies. (**Tab E**, Murphy Dep. at 43:12–20.)  A Program Chair serves as the point person or leader for each program. (**Tab E**, Murphy Dep. at 49:21–50:5.)

> **Response:**      Admit.

6.      Dr. Ghanem is the Provost of the University. (**Tab D**, Rinehart Decl. at ¶ 4.) Dr. Ghanem is half Egyptian and half Dutch, and identifies as Middle Eastern predominately and not as Caucasian. (**Tab F**, Deposition of Salma Ghanem (hereinafter "**Tab F**, Ghanem Dep.") at 112:18–19, 153:3–9.) Dr. Ghanem was the Dean of the College in August 2014, a role she held until October 2018, when she was appointed Acting Provost. (**Tab F**, Ghanem Dep. at 16:16–18, 29:9–10;

**Tab D**, Rinehart Decl. at ¶ 4.) Dr. Ghanem was later appointed Interim Provost in July 2019 and Provost in May 2021. (**Tab F**, Ghanem Dep. at 19:24–20:2; **Tab D**, Rinehart Decl. at ¶ 4.).)

> **Response:**     Admit.

7.     Dr. Alexandra Murphy is the Interim Dean of the College. (**Tab D**, Murphy Decl. at ¶¶ 3–4.) Prior to this, Dr. Murphy served as Associate Dean at the College between 2013 and 2018, before serving as Acting Dean beginning in October 2018 and then Interim Dean beginning in July 2021. (**Tab D**, Murphy Decl. at ¶ 4; **Tab E**, Murphy Dep**.** at 34:19–35:9, 46:24–3.) Dr. Murphy is Caucasian. (**Tab G**, Declaration of Isabel Diaz (hereinafter "Diaz Decl.") at ¶ 7; **Tab E**, Murphy Dep. at 19:5.)

> **Response:**     Admit.

8.     Dr. Gabriel Esteban is the President of the University. (**Tab C,** Esteban Dep. at 4:28–20; **Tab D**, Rinehart Decl. at ¶ 5.) He has served in this role since 2017. (**Tab C,** Esteban Dep. at 4:21–24, 15:11–15; **Tab D**, Rinehart Decl. at ¶ 5.) Dr. Esteban's race is Asian. (**Tab G**, Diaz Decl. at ¶ 7.)

> **Response:**     Admit.

9.     DePaul has a Faculty Handbook that sets forth its principles of shared governance with its faculty, and also governs the evaluation of faculty, including the process by which tenure track faculty can be considered for promotion and tenure. (**Tab A**, Answer at ¶ 9; **Tab D**, Ex. 1 to Rinehart Decl., p. 00002–00003, 00020, 00028 at ¶¶ 1.1, 1.2, 1.2.1, 2.3.4, 3.1; **Tab F**, Ghanem Dep. at 60:6–10; **Tab C,** Esteban Dep. 39:19–23.)

> **Response:**     Admit.

10.     The Faculty Handbook assigns faculty members the primary responsibility over faculty personnel matters. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00002 at ¶ 1.1.) DePaul's system of faculty

evaluation "relies heavily on the view of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal, promotion, and tenure." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1; **Tab C,** Esteban Dep. at 67:14–22.)

>    **Response:**    Admit.

11.    According to the Faculty Handbook, tenure–line faculty at DePaul spend up to six years during their probationary appointment before obtaining eligibility for tenure. (**Tab B**, Calvente Dep. 26:7–9, 42:15–19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028–00029 at ¶¶ 3.2.1 and 3.2.2.) Certain types of leave can extend that timeline, such as family or medical leave and research leave. (**Tab B**, Calvente Dep. 42:10–13, 206:3–18; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028– 00029 at ¶¶ 3.2.1 and 3.2.2.) During the probationary period, a tenure–line faculty member undergoes annual formal or informal evaluations for contract renewal. (**Tab B**, Calvente Dep. 41:12–24; **Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.2.)

>    **Response:**    Admit.

12.    Section 3.3.1 and Section 3.3.1.1 of the Faculty Handbook explains that:

> Probationary reviews serve three major purposes: (1) To assess the faculty member's progress toward promotion and/or tenure, measuring the individual against the established criteria; (2) To provide clear and consistent guidance and develop priorities for the faculty member toward fully satisfying the criteria, and (3) To recommend for or against renewal ...

> A formal probationary review is designed to prepare a faculty member for the tenure process and to document areas that need the faculty member's attention. In a formal review, the local academic unit considers the candidate's personal statement and CV, evidence of scholarship or documentation of creative activity, student evaluations, evidence of service and other materials specified by the local academic unit or college. Each local academic unit or its personnel committee conducts a formal review of untenured tenure–line faculty no less often than every two years. The tenured faculty of the local academic unit then vote by separate secret ballots on (1) adequate progress toward tenure and (2) renewal. The faculty prepare a report that clearly details areas of strength and areas for improvement. The report is explicit about the faculty member's progress towards tenure. Copies of this report are forwarded to the

candidate and the dean. The dean writes a separate letter to the provost with a recommendation regarding renewal or nonrenewal. If a formal review raises serious concerns about the candidate's potential for attaining promotion or tenure, the local academic unit faculty, local academic unit officer, or dean may mandate that the next year's annual review be formal.

(**Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶¶ 3.3.1, 3.3.1.1; **Tab C,** Esteban Dep. 97:4–23.) Formal reviews are conducted by the full group of tenured faculty, led by a smaller subset known as the Personnel Committee. (**Tab B**, Calvente Dep. 48:22–52:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811–000813; **Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶ 3.3.1.1.) Formal reviews must occur at least every two years. (**Tab B**, Ex. 94 to Calvente Dep. at p. 000811; **Tab D**, Ex. 1 to Rinehart Decl., p. 000030 at ¶ 3.3.1.1.)

> **Response:**    Admit.

13.    During the formal review process, a candidate receives guidance in both the written reviews and in the conversations that happen with the candidates. (**Tab E**, Murphy Dep. at 152:19–23.) During a candidate's probationary period, their record of teaching, service, and research can change, and it can get better or it can be judged as getting worse. (**Tab B**, Calvente Dep. 252:7– 19.)

> **Response:**    Admit.

14.    In the final year of probationary service, the faculty member may apply for tenure and promotion. (**Tab B**, Calvente Dep. 42:1–19; **Tab D**, Ex. 1 to Rinehart Decl., ¶ 3.2.) The granting of tenure creates a presumption of continuing employment. (**Tab A**, Answer at ¶ 9; **Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1.) According to DePaul's Faculty Handbook "[t]enure is the foundation of academic freedom and the quality of the university. It is neither an end in itself nor a privilege exempting the individual from the obligation to make future contributions. It is, rather, a status that society recognizes as promoting the common good Before granting tenure, the [U]niversity should have no reasonable doubt about a faculty member's demonstrated qualifications and

continued capacity to contribute to DePaul's distinctive goals and academic mission." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000028 at ¶ 3.1; **Tab F**, Ghanem Dep. at 45:10–46:2.)

    <u>**Response:**</u>    Admit.

15.    DePaul's Faculty Handbook establishes criteria for faculty members to be evaluated for promotion and tenure. (**Tab A**, Answer at ¶ 11; **Tab D**, Ex. 1 to Rinehart Decl., p.00031–00035 at ¶ 3.4; **Tab F**, Ghanem Dep. 44:4–13.) As outlined in the Faculty Handbook, the University's principal criteria for promotion and tenure are the quality of the candidate's (1) teaching, (2) scholarship, research, and other creative activities, and (3) service to the University. (**Tab A**, Answer at ¶ 11; **Tab B**, Calvente Dep. at 163:10–17, 232:23–233:2, 300:16–18; **Tab D**, Ex. 1 to Rinehart Decl., p. 000032 at ¶ 3.4.2; **Tab E**, Murphy Dep. at 126:18–21, 149:25–150:1; **Tab H**, Deposition of ▮▮▮▮▮ (hereinafter "▮▮▮ Dep.") at 16:16–24, 37:9–11.) The Faculty Handbook also explains that each local academic unit also provides its own, more detailed guidelines that provide unit- and discipline-specific articulations of the university-wide criteria. (**Tab D**, Ex. 1 to Rinehart Decl., p. 000032 at ¶ 3.4.2; **Tab C,** Esteban Dep. at 100:20–101:4.) Accordingly, the College publishes its own Criteria for Promotion and Tenure (for brevity, "College Guidelines"). (**Tab B**, Calvente Dep. at 48:2–15; **Tab B**, Ex. 94 to Calvente Dep., p. 000798; **Tab E**, Murphy Dep. at 17:17–23; **Tab F**, Ghanem Dep. 46:3–6.)

    <u>**Response:**</u>    Admit.

16.    The Faculty Handbook establishes a multi-level tenure-review process that involves a substantive review at each level. (**Tab A**, Answer at ¶ 10; **Tab B**, Calvente Dep. at 152:1–5; **Tab F,** Ghanem Dep. at 32:10–13; **Tab C,** Esteban Dep. at 40:2–22; **Tab E**, Murphy Dep. at 130:9–19.) In units without departments, like the College, there are normally two levels of evaluation prior to the final decision of the Provost: the local academic unit (the College and its Dean), and the University,

as conducted by the University Board on Promotion and Tenure ("UBPT"), which is comprised of seven faculty representatives from disciplines across the University. (Tab A, Answer at ¶ 10; Tab D, Ex. 1 to Rinehart Decl., pp. 000035–00044 at ¶¶ 3.5.1.1, 3.5.4., 3.5.5, 3.5.5.6; 3.5.6; 3.5.6.1, 3.5.7.5; Tab E, Murphy Dep. at 54:5–60:9; Tab F, Ghanem Dep. 47:10–48:l4.)

**Response:** Admit

17. Reviewers after the initial level of review are required to "consider the method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic unit." (**Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(f).) In addition to reviewing the dossier and the reports from the local academic unit, the UBPT interviews the candidate and the Dean. (**Tab B**, Calvente Dep. 150:9–19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000042–000043 at ¶ 3.5.6.1; **Tab F**, Ghanem Dep. at 80:15–81:23; **Tab E**, Murphy Dep. at 54:5–55:21.) The Provost attends those interviews as an observer, not a participant. (**Tab B**, Calvente Dep. 150:9–19; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000042–000043 at ¶ 3.5.6.1; **Tab F**, Ghanem Dep. at 81:12–23.) An individual faculty member may vote or advocate for or against a candidate only at one level in the review process. (Tab **B**, Calvente Dep. 152:2–5; **Tab D**, Ex. 1 to Rinehart Decl., pp. 000036 at ¶ 3.5.1.1(b).) A tie vote will be interpreted as a recommendation against an award of tenure or promotion. (**Tab B**, Calvente Dep. 153:20–154:20; **Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(c).)

**Response:** Admit.

18. At the final level of review, at which the Provost makes the decision on tenure, the Faculty Handbook instructs that "only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by the UBPT." (**Tab A**, Answer at ¶ 10; **Tab D**, Ex. 1 to Rinehart Decl., p. 000043 at ¶ 3.5.6.3; **Tab F**, Ghanem Dep. at 51:8–10.) There are at

least two bases to overturn the UBPT: if the Provost's assessment of the dossier is different than the UBPT's assessment and if there are "procedural grounds." (**Tab F**, Ghanem Dep. at 51:11– 54:18, 55:5–17.)

> **Response:** Admit the first sentence. Deny the second sentence. (Ghanem Dep. 57:2– 58:8 and Exhibit 18 to Ghanem Dep. at page 2 (Bates labeled LC004069), copy attached as Exhibit 2.)

19.     If the University denies tenure to a candidate, she has the right to appeal the University's decision on three grounds: (a) the decision violated academic freedom; (b) the evaluation deviated from Handbook procedures; or (c) the decision was the result of discriminatory practices. (**Tab A**, Answer at ¶ 30; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080–00081 at ¶ 5.1.2.3; **Tab C**, Esteban Dep. at 62:3–12.)

> **Response:** Admit

20.     According to the Faculty Handbook, if a faculty member appeals the University's decision to deny tenure, the Faculty Committee on Appeals convenes a Faculty Appeals Board of three of its members to investigate and submit its findings in a report to the President. (**Tab A**, Answer at ¶ 30; **Tab B**, Calvente Dep. 170:12–17; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080– 00081 at ¶ 5.1.2.3; **Tab C**, Esteban Dep. at 40:21–41:16, 61:13–62:2.) The Faculty Appeals Board is charged only with reviewing the basis of the appeal; it does not perform an independent evaluation of the faculty member's qualifications. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00075 ¶ 5.1.1.4; **Tab C**, Esteban Dep. at 62:17–20; 89:10–15.) The Handbook states that, the University President, after evaluating the Faculty Appeals Board's findings, renders a final decision on the appeal. (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00080–00081 at ¶ 5.1.2.3; **Tab C**, Esteban Dep. at 62:21–63:3, 65:24– 66:4.)

> **Response:** Admit.

21.     By the first day of the fall quarter in the academic year in which the candidate is up for tenure, a candidate's complete materials are due to the local academic unit. (**Tab B**, Ex. 94 to Calvente Dep., p. 000825; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00045–00046 and 00051 at ¶¶ 3.6.1, 3.6.1.1, 3.9.) Among the items listed in the Faculty Handbook, the materials supplied by the candidate include at a minimum a professional curriculum vitae ("CV"), a statement of up to 3,000 words in which the candidate emphasizes those achievements or qualifications to which evaluators should particularly attend, evidence of teaching effectiveness, evidence of service, and a "single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities.". (Tab D, Ex. 1 to Rinehart Decl., p.00045 at ¶ 3.6.1.1.) The College is required to supply, among other things, all teaching evaluations for all courses. (Tab D, Ex. 1 to Rinehart Decl., p.00045 at ¶ 3.6.1.2.) The Faculty Handbook does not require a candidate's prior formal reviews to be included in the tenure dossier, and states that "request for additions to the dossier must be made to the local unit academic officer." (Tab B, Calvente Dep. at 82:23–83:11, 104:4–105:5; Tab D, Ex. 1 to Rinehart Decl., pp.00045–00046 at ¶¶ 3.6.1.1,3.6.1.2 3.6.1.3.) In 2017, the College Guidelines stated the candidate should use the American Association of University Professor's ("AAUP") format for the CV to maintain College uniformity. (Tab B, Calvente Dep. at 113:9–15; Tab B, Ex. 94 to Calvente Dep., p. 000820.)

> **Response:**     Admit that the 2017 College Guidelines stated the candidate should use the American Association of University Professor's ("AAUP") format for the CV to maintain College uniformity. Deny that there is such a thing as an AAUP format for the CV. (Calvente Dep. 110:10–18.)

22.     According to the College Guidelines, faculty performance in the areas of teaching, research and service is assessed as "excellent," "very good," "fair," or "unsatisfactory." (**Tab B**, Calvente Dep. at 145:8–12; **Tab B**, Ex. 94 to Calvente Dep., p. 000812; **Tab E**, Murphy Dep. at 151:6–

10.) To qualify for tenure, "[t]he College expects excellence in at least two areas, with the third being rated at least very good." (**Tab B**, Ex. 94 to Calvente Dep. at p. 000817; **Tab B**, Calvente Dep. at 145:8–12; **Tab E**, Murphy Dep. at 203:13–204:9; **Tab C,** Esteban Dep. at 100:2– 13.)

> **Response:**    Admit.

23.    Faculty at DePaul are expected to teach in the Vincentian tradition. (**Tab B**, Calvente Dep. at 26:18–23, 28:4–15, 105:14–106:2; **Tab D**, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.2.) The Faculty Handbook sets forth "Faculty Rights and Responsibilities in Chapter 6. (**Tab D**, Ex. 1 to Rinehart Decl., p. 00094.) The Faculty Handbook provision on academic freedom in this chapter states that DePaul "attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God–given dignity of individual persons and enhancing the academic process." (Tab B, Calvente Dep. at 105:14– 106:2; Tab D, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.1.) The Faculty Handbook explains that this academic freedom is enjoyed not only by faculty but "also students . . . as they participate in the various forms of open inquiry and debate, as for example, classroom presentation and discussion[.]" (Tab D, Ex. 1 to Rinehart Decl., p. 00094 at ¶ 6.1.) Effective teaching involves, among other criteria, "[d]elivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience." (Tab D, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.1.)

> **Response:**    Admit generally, but deny that effective teaching involves only "[d]elivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience." (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §3.4.2.1, copy attached as Exhibit 4.[1])

---

[1]    Dr. Calvente attaches only Exhibit 1 to Dr. Rinehart's declaration as that is the only exhibit necessary to respond to the defendants' statement pursuant to Rule 56.1 of this Court's local rules.

24.     According to the College Guidelines, teaching effectiveness is defined as a "command of materials, effective communication of subject matter, appropriateness and thoroughness in the creation and execution of course objectives, analysis of course content, course organization, course presentation, methods of evaluating student performance, commitment to challenging students to grow intellectually, and working to foster a classroom that reinforces values inherent in the University mission." (**Tab B**, Ex. 94 to Calvente Dep., p. 000798.) In the evaluation of teaching effectiveness, the College Guidelines list six primary sources of data: (1) Personnel Committee Reports; (2) peer classroom evaluation reports; (3) contextual factors specific to each course; (4) quantitative feedback on student evaluations; (5) qualitative feedback on student evaluations; and (6) student reports. (**Tab B**, Ex. 94 to Calvente Dep., pp. 000798– 000801; **Tab E**, Murphy Dep. at 158:8–14, 176:5–22.)

    **Response:**     Admit.

25.     The Faculty Handbook provides that "all tenure–line faculty members should engage in scholarship, research, or other creative activities." (Tab D, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.2.) According to the Faculty Handbook and the College Guidelines, faculty members should be able to demonstrate success at completing projects and disseminating the results of these projects in academic and artistic arenas beyond DePaul." (Tab B, Ex. 94 to Calvente Dep., pp. 000801; Tab D, Ex. 1 to Rinehart Decl., p. 00032 at 3.4.2.2.)

    **Response:**     Admit.

26.     The College Guidelines enumerate the relative value of scholarly work, beginning with the most highly valued, based on relative importance and relevance, and concluding with less–weighted forms of scholarly production: (1) books evaluated by an academic or popular press (most-valued); (2) peer–reviewed journal articles; (3) edited books evaluated in peer review process; (4)

book chapter evaluated by the quality of the press; (5) public performances of creative work; (6) invited chapters and articles in books; (7) encyclopedia articles; (8) book reviews; (9) awards and grants; (10) original work created for the purpose of public and community engagement; (11) conference papers; and (12) conference panels (least-valued). (**Tab B**, Ex. 94 to Calvente Dep., pp. 000802–000804; **Tab B**, Calvente Dep. 77:11–15.) Edited books and books are not given the same weight. (**Tab B**, Calvente Dep. 77:11–15; **Tab B**, Ex. 94 to Calvente Dep., pp. 000802–000804; **Tab E**, Murphy Dep. 153:13–154:2.)

**Response:**    Admit.

27.    As with other forms of scholarship, evidence of creative activities should include, at a minimum, "assessment of the contribution by professional peers and other experts in the field and self-assessment concerning scholarly or creative growth and development." (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00032–00033 at ¶ 3.4.2.2.) The Faculty Handbook provides that it does not credit classroom activities, including performances "conducted solely within the candidate's classes" as scholarship or research, but as teaching. (**Tab D**, Ex. 1 to Rinehart Decl., pp. 00034 at ¶ 3.4.2.2.) Additionally, the College Guidelines provide that "[p]ublic performances of creative work are evaluated on the basis of their engagement with communities and publics outside the classroom, and are also measured on the basis of scholarly reviews, and grants and awards relating to the work." (Tab B, Calvente Dep. 140:14–142:16; Tab B, Ex. 94 to Calvente Dep., p. 000803.)

**Response:**    Admit.

28.    Although the Faculty Handbook recognizes that "[s]ervice may be provided to the university, the profession, and the community" it also requires that "[a]ll faculty members must serve in their local academic unit[.]" (**Tab D**, Ex. 1 to Rinehart Decl., p. 00034 at ¶ 3.4.2.3; **Tab E**, Murphy Dep. 156:5–6; **Tab H**, ▮▮▮▮ Dep. 39:15–24.) The College Guidelines reinforce this requirement,

requiring that "[a]ll faculty members are expected to participate in the governance and intellectual life of the college and the university, and all service should be documented." (**Tab B**, Ex. 94 to Calvente Dep. at pp 000808–000809.) The College Guidelines state that faculty members "should request letters from committee chairs, editors, community partners, and other liaisons who can speak to the quality and quantity of service." (**Tab B**, Ex. 94 to Calvente Dep. at 000808.) The College Guidelines state that "[f]aculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the [C]ollege" and the guidelines list examples of track/program and college service, professional service, and community service. (**Tab B**, Ex. 94 to Calvente Dep. at 000810; **Tab E**, Murphy Dep. 154:3–157:7; **Tab H**, ███ Dep. 39:15–2.) Faculty members who apply for tenure "are encouraged to take leadership roles in track/program committees after the first year of their probationary period." (**Tab B**, Ex. 94 to Calvente Dep. at p. 000810.) In assessing service, the College considers whether it is a "one-off committee or . . . a particular meeting that someone might be in versus a longer term and a task driven committee." (**Tab E**, Murphy Dep. at 154:3–11; **Tab F**, Ghanem Dep. 168:10–16.) Each summer, the College distributes a "call" to faculty, identifying vacancies and openings within College committees for which faculty can step up for. (Tab E, Murphy Dep. at 156:23–157:4.)

> **Response:**    Admit the first sentence. Deny the second sentence based on the use of the verb "reinforce." (Ex. 94 to Calvente Dep. at pp 000808–000809.) Admit the third sentence. Admit the fourth sentence. Admit the fifth sentence. Deny the sixth sentence. (Ghanem Dep. 168:10–169:4; Murphy Dep. 154:22–156:20.) Admit the seventh sentence.

29.    Plaintiff obtained her Ph.D. in 2008 from University of North Carolina at Chapel Hill in the area of Communications Studies. (**Tab B**, Calvente Dep. at 44:18–22; **Tab B**, Ex. 115 to Calvente Dep. at p. 000876.) Before joining DePaul, Plaintiff was working on turning her dissertation into a manuscript for potential publication. (**Tab B**, Calvente Dep. at 45:1–46:10.)

**Response:**     Admit.

30.     In 2010 or 2011, DePaul advertised to fill a renewable non–tenure–track position in the College. (**Tab B**, Calvente Dep. at 19:12–14.) When Plaintiff initially saw the job posting, she was not planning to apply. (**Tab B**, Calvente Dep. at 19:8–21:5.) Plaintiff was a visiting instructor at Northwestern University at the time, and she was not interested in moving from Northwestern to DePaul as a visiting assistant professor. (**Tab B**, Calvente Dep. at 19:8–21:5.) However, when she later mentioned the position to Dr. ██████, a faculty member in the College at DePaul whom Plaintiff knew from graduate school, Dr. ████ told her "some things could be worked out" about the appointment type. (**Tab B**, Calvente Dep. at 20:8–22:1, 307:2–3; **Tab E**, Murphy Dep. at 46:21–23.) Dr. ████ was familiar with Plaintiff's areas of expertise at the time he encouraged her to apply. (**Tab B**, Calvente Dep. at 21:17–22:3.)

**Response:**     Admit.

31.     Following her discussion with Dr. ████ Plaintiff applied for the position. (**Tab B**, Calvente Dep. at 20:6–22:3.) As a part of her application process, Plaintiff gave a job talk and a teaching session, both of which centered on black diaspora, race, and racism. (**Tab B**, Calvente Dep. at 22:4–12.) During this process, she met with Dr. Murphy, Dr. ████ Dr. ██████████, Dr. ██████████, among other faculty in the College. (**Tab B**, Calvente Dep. at 22:15–23:13.)

**Response:**     Admit.

32.     During her job talk, Plaintiff explained that her research focused on ethnographic work based on race, racism, and coloniality. (**Tab B**, Calvente Dep. at 23:14–24.) Among other work, at the time of her interview she presented the "theoretical framework" and one chapter of a manuscript from her dissertation. (**Tab B**, Calvente Dep. at 45:14–46:10.) According to Plaintiff, approximately one fourth of the College faculty was present for her job talk. (**Tab B**, Calvente Dep.

at 22:15–23:6.) Plaintiff stated that her job talk was also recorded so that faculty who did not attend in person could observe it. (**Tab B**, Calvente Dep. at 22:15–23:6.) Plaintiff testified that there was no confusion about her research area. (**Tab B**, Calvente Dep. at 23:22–24.)

>    **Response**:      Admit.

33.      Plaintiff told the Dean at the time that she was not interested in a one year contract. (**Tab B**, Calvente Dep. at 24:4–10.) Plaintiff stated there was enough enthusiasm among the faculty to bring her on a tenure track basis. (**Tab B**, Calvente Dep. at 24:4–10.) On June 2, 2011, Plaintiff received an offer from DePaul for a tenure–track Assistant Professor position, with a six-year pro-bationary period, making her eligible for tenure consideration in 2016-2017, "assuming positive annual evaluations and contract extensions[.]" (**Tab B**, Calvente Dep. at 24:4–26:16; **Tab B**, Exs. 10 and 11 to Calvente Dep.) Plaintiff accepted the position. (**Tab B**, Calvente Dep. at 27:8– 18; **Tab B**, Ex. 11 to Calvente Dep. at p. 001898.) From the beginning of her employment, Plaintiff admit-tedly was "very vocal" and "outspoken" about where she stood on issues of race, as well as the racism she perceived in the College. (**Tab B**, Calvente Dep. at 304:11–305:12.)

>    **Response**:      Admit sentences one, two, three, and four. Deny sentence five to the extent
>                       it uses the qualifier "perceived." (Calvente Dep. 304:11–306:8.)

34.      Due to leaves of absence taken by Plaintiff, DePaul twice extended Plaintiff's tenure clock, such that she needed to apply for tenure in the 2018–2019 academic year. (**Tab B**, Calvente Dep. at 42:7–13, 206:3–18; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028–00029 at ¶¶ 3.2.1 and 3.2.2.) Specifically, during academic year 2012–2013, Plaintiff gave birth to her daughter and she asked for and received a one–year extension on her clock. (**Tab B**, Calvente Dep. at 42:7–13, 206:13–18; **Tab B**, Ex. 186A to Calvente Dep. at p. LC002200; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00028–00029 at ¶¶ 3.2.1 and 3.2.2.) During the 2015–2016 academic year, Plaintiff was awarded a Woodrow

15

Wilson Foundation Career Enhancement Fellowship for Junior Faculty ("Woodrow Wilson Fellowship"), and she took a leave of absence during this year to focus on her research, which also extended her tenure clock. (Tab B, Calvente Dep. at 42:7–13, 300:5–15; Tab B, Ex. 115 to Calvente Dep; Tab E, Murphy Dep. 203:6–9; Tab D, Ex. 1 to Rinehart Decl., pp. 00028–00029 at ¶¶ 3.2.1 and 3.2.2.)

> **Response:** Admit the first two sentences. Admit the three clauses of the third sentence and deny the fourth clause of the third sentence concerning the alleged extension of Dr. Calvente's tenure clock. (Calvente Dec. ¶11.)

35. Plaintiff taught Intercultural Communication 103, "CMN 103," an entry-level core course that multiple faculty taught. (**Tab B**, Calvente Dep. at 29:21–30:15; **Tab E**, Murphy Dep. 149:7–15.) As a core course, any student seeking a major in the College was required to take this course. (**Tab B**, Calvente Dep. at 30:11–12; **Tab E**, Murphy Dep. at 149:10–11.) This course was designed to familiarize students with the concepts and theories of intercultural communication. (**Tab B**, Calvente Dep. at 32:19–33:4.) Plaintiff did not use a textbook in this course, but rather used complex materials from texts, articles, chapters, and film. (**Tab B**, Calvente Dep. at 33:15–34:3.) For the most part, Plaintiff used material for CMN 103 that was more complex than what other faculty in the College used to teach the course. (**Tab B**, Calvente Dep. at 302:17–23.) Plaintiff's syllabus for this course was approved by the course-keeper in 2016. (**Tab B**, Calvente Dep. at 159:21–160:4; **Tab B**, Ex. 213 to Calvente Dep. at 23282–23286; **Tab B**, Ex. 186A to Calvente Dep. at p. LC0002209; **Tab B**, Ex. 215 to Calvente Dep. at p. 023087; **Tab H**, ▮ Dep. 67:12–21.)

> **Response:** Admit sentences one through four. Deny sentence five. (Calvente Dep. 302:17–23.) Deny sentence six. (Calvente Dec. at ¶10.)

36. Plaintiff also taught a higher level (INTC or CMS 367) course entitled "Performance for Social Change." (**Tab B**, Calvente Dep. at 34:4–7; **Tab B**, Ex. 33 to Calvente Dep.) According

to Plaintiff's syllabus for this course, she accorded 18% weight to the student's final performance, which was the greatest weight accorded to any assignment in the course. (**Tab B**, Calvente Dep. at 36:3–37:2; Tab B, Ex. 33 to Calvente Dep. at 3298–3299.) According to the syllabus, for the final performance, students were graded on scripting, adaptation, stage movement, blocking and stage creativity. (Tab B, Calvente Dep. at 40:9–14; Tab B, Ex. 33 to Calvente Dep. at 3301.) The final performance took place on campus, and members of the community could attend. (Tab B, Calvente Dep. 40:24–41:11.)

> **Response:**    Admit.

37.    For purposes of conducting a formal review in the College, a subset of the tenured faculty, called the Personnel Committee, conducts the initial evaluation of the candidate's teaching, research, and service materials, including a personal statement prepared by the candidate. (**Tab B**, Calvente Dep. at 46:11–47:16, 49:6–53:10; **Tab B**, Ex. 94 to Calvente Dep. at 811–816; **Tab D**, Ex. 1 to Rinehart Decl., p. 00030 at ¶ 3.3.1.1; **Tab F**, Ghanem Dep. at 32:20–33:3.) The Personnel Committee's formal review includes an in-person interview with the candidate to discuss the areas of evaluation. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000811; **Tab B**, Calvente Dep. at 49:24–50:3; **Tab F**, Ghanem Dep. at 34:20–23.) The Personnel Committee prepares a report for consideration by the full group of tenured faculty in the College. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000812; **Tab B**, Calvente Dep. at 49:24–51:6.) The report contains the Personnel Committee's evaluation of: (1) the candidate's performance within the designated formal review period and (2) a cumulative assessment of whether or not the candidate is making adequate progress toward tenure in each of the areas of teaching, research and service. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000811.)

> **Response:**    Admit.

38.     After the Personnel Committee prepares a draft report, and before the report goes to the full tenured faculty for consideration, the faculty member under review is given a copy and has the opportunity to correct factual inaccuracies to the Personnel Committee's report and can submit a rebuttal to the tenured faculty. (**Tab B**, Calvente Dep. 49:6–53:10, 121:7–124:21; **Tab B**, Ex. 94 to Calvente Dep. at p. 000816.) Once finalized, the Personnel Committee's report is presented to the College tenured faculty, along with any rebuttal from the candidate, for a discussion and vote. (**Tab B**, Calvente Dep. at 49:6–53:10; 51:6–10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811–000812, 000816.) After deliberating, the tenured faculty may include an addendum to the Personnel Committee's report that summarizes the discussion among tenured faculty about the faculty member's work and progress toward tenure. (**Tab B**, Calvente Dep. at 52:6–53:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000811–000812; **Tab E**, Murphy Dep. at 148:12–17.) The tenured faculty also make a recommendation to the dean for or against contract renewal, and will also list an anonymous tally of tenured faculty members' votes. (**Tab B**, Calvente Dep. at 52:6–53:10; **Tab B**, Ex. 94 to Calvente Dep. at pp. 000812–000814.) Copies of the Personnel Committee and tenured faculty's report are forwarded to the candidate and the dean, and the dean can either adopt the results of these deliberations or reject the recommendation. (**Tab B**, Ex. 94 to Calvente Dep. at pp. 000812–000816; **Tab D**, Ex. 1 to Rinehart Decl., p.00030 at ¶ 3.3.1; **Tab F**, Ghanem Dep. at 127:17–128:2.)

    **Response:**     Admit.

39.     Between her hire and application for tenure, Plaintiff underwent three formal probationary reviews in 2013, 2015, and 2017. (**Tab B**, Calvente Dep. at 42:1–6, 72:7–10, 81:14–17; **Tab B**, 19, 50, 108 to Calvente Dep.)

**Response:**     Admit.

40.     In 2013, the College's Personnel Committee was comprised of the following tenured faculty: ███████████████████████████████████████████████ ████████████████████████████ (Caucasian). (**Tab B**, Calvente Dep. 10:19–11:5; **Tab J**, Murphy Decl. at ¶ 7; **Tab G**, Diaz Decl. at ¶ 7.)

**Response:**     Admit.

41.     In their 2013 formal review report on the criteria of teaching, the Personnel Committee noted that an "[a]nalysis of Lisa's teaching credentials surfaced numerous strengths. Lisa is a valued colleague in the intercultural area[.]" (**Tab B**, Ex. 19 to Calvente Dep. at p. 000241.) In addition to identifying those "numerous strengths," the Personnel Committee stated in their report:

> Lisa's first quarter teaching CMN 103, Intercultural Communication (Autumn 2011), was less successful than other courses she has taught at DePaul. Only three of twenty responses rated 4 on a 5-point scale, with five of the responses falling below 3. Qualitative feedback raised concerns about lack of clarity during class sessions, not enough interactive discussion-based learning, the need for PowerPoint/lecture note outlines to help students follow Lisa's lectures, and greater clarity regarding the evaluation of assignments. For example, one student noted that the "[i]nstructor was very unclear in all areas, I never really understood what was going on." And another student wrote "Not just a straight lecture. Give us something to look at and something to interact with. Standing up and talking for an hour and a half does NOT keep the attention of students, give us at LEAST a power point to look at." ... the report prepared by the Personnel Committee student representative highlights that some students feel intimidated in the class [presumably by course content, not by Lisa herself given the high numerical responses to Lisa's accessibility in instructor evaluations], which made the students reluctant to ask questions in class.

(**Tab B**, Ex. 19 to Calvente Dep. at pp. at 000242–000243.) The Personnel Committee noted that Plaintiff had demonstrated "self-reflexivity" and characterized as "impressive" her "quick response to an early setback." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000243.) Consequently, the Personnel Committee rated Plaintiff as "making good/very good progress during this review period toward

tenure in the area of teaching." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000243.) The Personnel

Committee also made recommendations to Plaintiff regarding her teaching:

> The Personnel Committee asked Lisa to consider diversifying the types of discussion
> that take shape in her classes. As it stands, she uses a nice mix of lecture/mini-lec-
> ture, large group discussion, and student presentations. However, as one peer re-
> viewer notes, students who feel less confident in their understanding of dense theo-
> retical course materials might also feel less confident participating in these types of
> class discussions. . . . Mixing in some small group discussion, peer-focused in class-
> activities, and even drawing from some of her rich performative exercises used in
> performance classes to inform in-class work in nonperformance classes might offer
> alternative options for students to reflect on course materials, represent how they
> have internalized course concepts, and make use of important cultural communica-
> tion theories in their everyday lives.

(**Tab B**, Ex. 19 to Calvente Dep. at pp. 000242–000243.)

> **Response:** Admit sentences one, two, and three and the first block paragraph. Admit
> sentences four and five. Deny sentence six (which starts with "The Personnel
> Committee made recommendations . . .") do to the use of the word "recom-
> mendations." (Ex. 19 to Calvente Dep. at pp. 000242–000243.)

42.　　With respect to research, the Personnel Committee noted that since joining DePaul

Plaintiff had published one book review, had presented one co-authored paper and a solo-authored

paper at a conference, and had "several projects in different states of development in the publication

cycle." (**Tab B**, Ex. 19 to Calvente Dep. at pp. 000243–000244.) The Personnel Committee wrote

in their report that Plaintiff informed them that she had completed two chapters of her manuscript.

(**Tab B**, Calvente Dep. at 72:7–76:4; **Tab B**, Ex. 19 to Calvente Dep. at p. 000243–000244.) In their

report, the Personnel Committee documented their discussion regarding publishing strategies, writ-

ing

> [f]irst, rather than continuing to completely revise the dissertation into a final book
> manuscript that would then be submitted to publishers, the Personnel Committee
> asked Lisa to consider developing a book proposal and submitting that proposal
> along with the two chapters she has already revised (per her personal statement) to
> gauge interest from publishers. If a publisher offers a contract or asks to see more
> work, this will allow Lisa to assess how she wants to proceed with the manuscript

given publisher feedback. If responses are less favorable, Lisa might re-consider this project as a series of journal articles.

(**Tab B**, Calvente Dep. at 74:5–13; **Tab B**, Ex. 19 to Calvente Dep. at 000244.) According to Plaintiff, the option of focusing on articles was also verbally addressed by one of the Personnel Committee members:

> [V]erbally, ███████████ who was part of that personnel review stated that –– and he gave ███████████ as an example, and he stated that I can submit articles, chapters, et cetera, and then work on the book if I wanted to continue working on what he said an award-winning book, which is what ███████████ did, and she finished publishing her book after tenure. So he used her as an example to state, okay, well, maybe you should be looking at chapters and articles.

(**Tab B**, Calvente Dep. at 74:13–24.) In their report, the Personnel Committee noted that:

> The concern is that her dissertation was completed in 2008. Only two chapters have been revised at this point. If Lisa continues revising the entire manuscript, and does not find a publisher for the manuscript, she is not maximizing her research time. Moreover, such an approach limits the diversity of research outlets in which she can publish her work.

(**Tab B**, Ex. 19 to Calvente Dep. at 000243–000244.) Ultimately, the Personnel Committee reported that Plaintiff's progress towards research was satisfactory for someone undergoing an early review, and recommended that moving forward, Plaintiff would "need to devote more attention to diversifying strategies for seeing her work published." (**Tab B**, Ex. 19 to Calvente Dep. at p. 000244.)

**Response:**    Admit.

43.    Finally, the Personnel Committee stated that Plaintiff's service record was very good for a first review period, noting her contribution to a search committee that successfully hired a visiting Intercultural Communication colleague, a task force formed to create a new introductory course for the Organizational and Multicultural MA program, and her outside work in the community, including her work with the ONE Juvenile Justice Program. (**Tab B**, Ex. 19 to Calvente Dep. at p. 000244.)

21

**Response:**    Admit.

44.    On March 1, 2013, the Personnel Committee (by a vote of 6–0) and the tenured faculty (by a vote of 16–0) unanimously voted to recommend that DePaul renew her contract. (**Tab B**, Calvente Dep. at 72:7–15; **Tab B**, Ex. 19 to Calvente Dep. at p. 000240.) In its report, the Personnel Committee stated Plaintiff was making "good/very good" progress toward tenure in teaching, "satisfactory progress" in research, and "very good" progress in service. (**Tab B**, Ex. 19 to Calvente Dep. at p. 000240.)

**Response:**    Admit.

45.    In 2015, the Personnel Committee was composed of Chair, █████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ (**Tab B**, Calvente Dep. 10:19–11:5; **Tab J**, Murphy Decl. at ¶ 8; **Tab G**, Diaz Decl. at ¶ 7.)

**Response:**    Admit.

46.    In her 2015 personal statement, Plaintiff described her students' performances as an aspect of her teaching, and did not include discussion of those performances in her statement regarding her research. (**Tab B**, Calvente Dep. at 47:2–16, 49:6–16, 224:6–24; **Tab B**, Ex. 31 to Calvente Dep. p. 000917–000919.) At the time of her 2015 formal probationary review, Plaintiff had still not completed her manuscript and had not sent out any chapters to gauge interest. (**Tab B**, Calvente Dep. 70:19–71:19, 224:6–225:6.)

**Response:**    Admit.

47.    After the interview with Plaintiff, the Personnel Committee prepared its written report and recommendations. (**Tab B**, Calvente Dep. at 188:10–20, 189:12–190:19, 193:9–14; **Tab B**, Ex. 186A to Calvente Dep. at LC0002213–2219.) Initially, the Personnel Committee was under

the erroneous impression that Plaintiff was in her fourth year of her probationary period. (**Tab B**, Ex. 186A to Calvente Dep. at LC002213.)

> **Response:** Admit.

48. With respect to teaching, the Personnel Committee noted that Plaintiff's student evaluations for the review period were "consistently strong" quantitatively. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002215.) The Committee also reported that:

> Qualitatively, however, Lisa's course evaluations indicate a range of recurrent and somewhat polarizing themes. Evaluations suggest that a strong number of students appreciate the rigor and demands of her courses, while other students experience the course climate to be intimidating and unwelcoming to diverse opinion and perspective. One student from her Winter 2014 INTC 308 course states, 'I've taken many classes with Dr. Calvente, and if I could, I would load my course schedule with nothing but her classes. She pushes students to think critically in ways that are rarely demanded of undergraduate students. Just when I've thought I completely grasped a concept, Dr. Calvente would reveal that I've just scratched the surface.' These types of highly enthusiastic statements make appearances in many of her course evaluations, although there is an additional trend that suggests some students struggle to find their voices and feel diminished in her courses. In the same Winter 2014 INTC 308 course, another student wrote that the 'Instructor often made students feel inferior. She rolled her eyes at some questions asked and often misunderstood students concerns. Students eventually became afraid to speak at all in fear of ridicule.' While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200). As these are required courses for many students, the academic interests of the students in these courses is likely more diverse and varied. In her Fall 2014 CMN 103 course, several students note the helpfulness of the course for encouraging them to see the world from more critical perspectives. However, many students also made reference to the negative classroom climate, suggesting it lacked encouragement, felt intimidating, was experienced as silencing, and was perceived as 'hostile.' One student commented, 'Dr. Calvente was insistent on students dropping the class on the first day and was shocked when student's hadn't the second day.'

(**Tab B**, Ex. 186A to Calvente Dep.at pp. 002215–002216.) The Personnel Committee asked Plaintiff about these comments in her interview, as documented in their report:

> In the personnel interview, Lisa was asked about those students who might feel disenfranchised from the class, and she replied 'Most students drop. I advise them to

drop.' The committee was deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class, suggesting all DePaul students are not wanted in our classrooms. Lisa disagreed, stating, 'Telling them to drop is honest.' The personnel committee does not have access to an instructor's drop rates, and so there is not a quantitative number to detail what is meant when she says 'most students drop.' When asked to clarify this approach in a required college core course, where many of our students have demanding work and course schedules that limit their flexibility and require they enroll in a specific class offered on a particular day or time, she explained, 'If it's scary, they should drop. I say go to another class. I have a lot of colleagues you can take this class from.' In response to student feedback about intimidation, the committee asked if there were parts of her teaching she felt she needed to work on. She did say she might email students who were not participating in class, but clarified, 'Are you asking me, do I want them all in my class? No, not really.' Referencing her students in response to questions about how she seeks to support students who are struggling or seem disenfranchised, Lisa replied, 'They have to approach me. That is their job. It's not my job.'

(**Tab B**, Ex. 186A to Calvente Dep.at p. 002216.)

> **Response:**    Admit that the Personnel Committee's report is quoted, in part, in this statement. Deny that the Personnel Committee's report is accurate with respect to the alleged qualitative concerns raised about Dr. Calvente's teaching or that the report accurately reflects the thoughts of the Personnel Committee. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.)

49.    In their report, the Personnel Committee offered Plaintiff recommendations on her course content, and stated:

> For the vast majority of her courses Lisa did not provide materials beyond the course syllabus. Her syllabi do a very good job setting forth rules, policies and instructor expectations, yet she might take some steps to further distinguish the content of her courses from one another. As an example, her course INTC 230 and her course LSP 200 have a tremendous amount of overlap in assignment structure and design, including the focus on "Bastard Out of Carolina" for several weeks in the course. Additionally, the theoretical readings comprise the majority of the content listed in the course schedule, regardless of course level, and are often used to define the class time (as opposed to a topic, theme, objective, or an activity). By identifying the theme or topic of the day, as well as the objectives, the clarity of structure might be more apparent to help frame student expectations. This is reiterated in the student report and student evaluations, where there was a recurrent theme of suggesting more explicit clarity of goals and content. Furthermore, especially for the 100 and 200 level classes, a more intentional balance between theoretical source texts and disciplinary texts from the field of intercultural communication might help some of the students

who are struggling with the density of the readings and an understanding of the course.

(**Tab B**, Ex. 186A to Calvente Dep. at p. 002217.)

> **Response:**    Admit that the report is as stated. Deny the characterization of the report as "recommendations." (Ex. 186A to Calvente Dep. at p. 002217.)

50.    With respect to Plaintiff's research, the Personnel Committee reported its assessment that Plaintiff was making poor progress. (**Tab B**, Ex. 186A to Calvente Dep. at pp. 002218.) The Personnel Committee reported that:

> [T]he Personnel Committee evaluated Lisa's total publication record since arriving at DePaul: one book review and one co-authored peer reviewed journal article . . . In her 2013 review, her research was determined as satisfactory from the faculty, and the personnel committee strongly recommended diversifying her publication strategies alongside the ongoing pursuit of her solo book contract. The book project and proposal is not reported to have made any significant progress (with two completed chapters), yet the successful publication of her co-authored essay and the article under review indicate that she has been more active in moving her previous conference papers towards publication. Lisa is scheduled for flex time for the current 2014–15 academic year, wherein she is teaching three courses in the fall and winter, in order to focus her time on research in the spring. This is in addition to a year–long leave she has successfully applied for through the URC for the 2015–16 academic year, which will be co–funded through her successful application for a Woodrow Wilson Foundation Junior Faculty Grant Award. According to the grant application, 'The objective of the fellowship program is to aid the scholarly research and intellectual growth of junior faculty (men and women) and improve their chances for success as tenured university scholars by offering support for twelve months of research and writing.' Thus, Lisa has secured substantial time to focus solely on research in the next fifteen months. There is concern about the amount of time invested and the choices made regarding the research projects she is pursuing, as her current research output fails to demonstrate sufficient progress or a successful balance of energies in the move towards tenure. In addition, given the shortage of research she has fostered to publication, devoting time and energies to a co–edited book project is cause for additional concern. It is believed that Lisa has not made the necessary progress needed towards tenure and would be better served by continuing to focus greater time and energies on shepherding her conference presentations and the research from her ongoing book project to peer reviewed journals, preferably diversifying her CV with solo authored works in a greater range of journal outlets.

(**Tab B**, Ex. 186A to Calvente Dep. at pp. 002217–00218.)

**Response:**    Admit.

51.    With respect to service, the Personnel Committee stated Plaintiff was making fair to good progress, noting her service on the College Non–Tenure Track Review Committees and the Local Review Board. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002219.) The Personnel Committee also noted her other contributions to the College, the University and the Profession. (**Tab B**, Ex. 186A to Calvente Dep. at p. 002219.)

**Response:**    Admit.

52.    Ultimately, the Personnel Committee concluded that Plaintiff was making "poor" progress toward tenure in the area of teaching, "poor" progress toward tenure in the area of research, and "fair to good" progress in the area of service. (**Tab B**, Ex. 186A to Calvente Dep. at pp. 002214–002215.)

**Response:**    Admit.

53.    Plaintiff was given a draft of the Personnel Committee's March 7, 2015 preliminary report for her review, and Plaintiff had the chance to correct inaccuracies in the report. (**Tab B**, Calvente Dep. 50:7–52:10, 81:18–82:6; **Tab B**, Ex. 186A to Calvente Dep. at pp. 002213–002219.) Plaintiff submitted corrections to the report but did not correct the description of statements attributed to her in the candidate interview regarding encouraging students to drop class. (**Tab B**, Calvente Dep. at 81:18–82:6; **Tab B**, Ex. 186 A to Calvente Dep. at 002213–022119.) In addition to the corrections, Plaintiff submitted a rebuttal to the Personnel Committee report for review by the larger group of tenured faculty. (**Tab B**, Calvente Dep. 81:18–82:6.) In her rebuttal, as quoted in the 2015 Formal Review, Plaintiff wrote:

> The 'hostility' in my evaluations is the result of the structural racism and the normalization of whiteness within the academy that unfairly scrutinizes faculty of color, primarily women, wo do not reinforce the stands and norms of white (male) supremacy.

(**Tab B**, Ex. 50 to Calvente Dep. at p. 029085.)

> **Response:** Admit the first sentence to the extent that it says Dr. Calvente had a chance to review the personnel committee's draft report. Deny the first sentence to the extent that it says Dr. Calvente had the ability to make corrections. (Calvente Dep. 50:13–51:14.) Deny the second and third sentences to the extent that they state that it says Dr. Calvente made corrections. (Calvente Dep. 50:13–51:14.)

54. The tenured faculty met to discuss Plaintiff's formal review. (**Tab B**, Ex. 50 to Calvente Dep. at 29084.) In their addendum to the Personnel Committee's report, the tenured faculty stated "most of us believe that [Plaintiff's] positive quantitative and qualitative comments do not outweigh the severity of the problems that have arisen regarding [Plaintiff's] teaching style and the manner in which she addresses some students." (**Tab B**, Ex. 50 to Calvente Dep. at 29085.) The tenured faculty identified at least 11 aspects of Lisa's teaching that they would have to see change before she could achieve tenure expectations, listing those items explicitly in the final review. (**Tab B**, Ex. 50 to Calvente Dep. at 29085–29086.)

> **Response:** Admit the first sentence. Admit that the addendum to the Personnel Committee's report is accurately quoted in the second sentence, but deny that the second sentence accurately reflects the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Admit that the third sentence references an addendum that identifies eleven aspects of Dr. Calvente's teaching that the faculty claim to want to see changed, but deny that the list accurately reflects the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Object, strongly, to the defendants referring to Dr. Calvente as "Lisa" in the third sentence.

55. With respect to research, tenured faculty "acknowledge[d] that [Plaintiff was] in her third probationary year with a year leave awarded for [the following] year. At the same time, based on the limited amount of research published since arriving at DePaul, the tenured faculty expressed grave concerns regarding her ability to produce the necessary peer-reviewed, quality research necessary to achieve tenure at DePaul." (**Tab B**, Ex. 50 to Calvente Dep. at 29086.)

> **Response:** Admit.

27

56.     With respect to service, the tenured faculty stated Plaintiff's overall service did not comprise of "substantial accomplishments," and noted that some faculty felt Plaintiff was "overselling" the nature of her service accomplishments." (**Tab B**, Ex. 50 to Calvente Dep. at p. 029086.) Ultimately, the tenured faculty recommended non-retention by a 13-5 vote. (**Tab B**, Ex. 50 to Calvente Dep. at p. 029086.)

> **Response:**     Admit that the first sentence accurately states the report by the tenured faculty, but deny that the report accurately reflects the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 19–20.)

57.     On March 30, 2015, Plaintiff met with Dr. Ghanem, who was Dean of the College at the time. (**Tab B**, Calvente Dep: 221:14–222:10; **Tab B**, Ex. 51 to Calvente Dep. p. 007067–7068; **Tab F**, Ghanem Dep. at 111:16–112:9, 122:5–124:4.) Plaintiff stated that during the meeting, Dr. Ghanem told her she was an extraordinary teacher, that her quantitative scores were excellent, and that there were only "freckles" of negative evaluations. (**Tab B**, Calvente Dep. 222:1–9.) Dr. Ghanem told Plaintiff that for her next review she would need to include an outline of how she had addressed the issues brought up in her 2015 review, and she would need to show a marked improvement in the qualitative area. (Ex. 51 to Calvente Dep. at p. 07067; **Tab B**, Calvente Dep. 222:20–223:4.) Dr. Ghanem also offered to review Plaintiff's 2017 personal statement, as a way of providing her support and guidance. (**Tab B**, Calvente Dep. 223:13–224:2; **Tab F**, Ghanem Dep. at 33:8–34:5, 124.) During the meeting, Plaintiff told Dr. Ghanem she was planning to file an internal complaint of discrimination. (**Tab B**, Calvente Dep. 227:16–228:8; **Tab F**, Ghanem Dep. at 122:5–7.)

> **Response:**     Admit.

58.     On April 2, 2015, Dr. Ghanem rejected the College's recommendation. (**Tab B**, Calvente Dep. at 218:24–219:5, 221:14–224:2; **Tab B**, Ex. 51 to Calvente Dep. at p. 07067–07068, **Tab F**, Ghanem Dep. at 125:4–15.) Dr. Ghanem felt that Plaintiff was a passionate teacher and that

she had potential, and while there were areas Plaintiff needed to address, she believed Plaintiff could

address them. (**Tab F**, Ghanem Dep. at 125:4–15; **Tab B**, Ex. 51 to Calvente Dep. at p. 07067–

07068.) In her letter to Plaintiff, Dr. Ghanem wrote:

> Based on our discussion on March 30, 2015 in which you explained your teaching
> philosophy and the efforts you make and will continue to make to be inclusive and
> welcoming to the students, I do not accept the College's recommendation for non–
> renewal. . . . You have a lot of work ahead of you and I wish you success in your next
> review.

(**Tab B**, Ex. 51 to Calvente Dep. at p. 007067; **Tab B**, Calvente Dep. at 221:2–223:24; **Tab F**,

Ghanem Dep. 125:4–126:8.)

> **Response:**  Admit that this paragraph states some of Dr. Ghanem's feelings about Dr.
> Calvente in 2015, but deny that they state the entirety of Dr. Ghanem's feel-
> ings about Dr. Calvente in 2015. (Calvente Dep. 300:1–15.)

59.    On April 16, 2015, Plaintiff called DePaul's Office of Institutional Diversity and

Equity ("OIDE") and raised an internal complaint of discrimination. (**Tab B**, Calvente Dep. at

225:7–15, 230:9–12; **Tab B**, Ex. 57 to Calvente Dep. at p. 28600; **Tab G**, Diaz Decl. at ¶ 4; **Tab G**,

Ex. 1 to Diaz Decl.) In the complaint, Plaintiff alleged that her race and gender played a role in votes

by the Personnel Committee against her retention. (**Tab B**, Ex. 57 to Calvente Dep. at p. 28600;

**Tab B**, Calvente Dep. at 225:7–15, 230:9–12; **Tab G**, Diaz Decl. at ¶ 4; **Tab G**, Ex. 1 to Diaz Decl.)

> **Response:**  Admit.

60.    OIDE conducted an investigation into Plaintiff's complaint and found no violations

of the policies on discrimination or harassment. (**Tab B**, Calvente Dep. at 229:23–232:11; **Tab B**,

Ex. 78 to Calvente Dep. at p. 27531; **Tab G**, Diaz Decl. at ¶ 4; **Tab G**, Ex. 1 to Diaz Decl. at p.

006967.) Specifically, OIDE interviewed fifteen individuals, including Plaintiff and every member

of the Personnel Committee, Dean Murphy, Dr. Ghanem, a student representative, and other cur-

rent and former faculty members, and reviewed emails, formal review documents, student and

faculty assessments, and comparator information. (**Tab G**, Ex. 1 to Diaz Decl. at p. 6968; **Tab G**, Diaz Decl. at ¶ 4; **Tab F**, Ghanem Dep. 72:2–73:4; **Tab E**, Murphy Dep. at 143:21–145:9.) OIDE concluded that there was no evidence of discrimination and that "the crux of the decision by the faculty rested upon [Plaintiff's] attitudes and responses towards the committee's attempts to address what they perceived as weaknesses in her tenure case and her refusal to listen to or take constructive criticism in both her interview with the Personnel Committee and her written response to the tenure document, her poor progress in scholarship, and her fair to good service." (**Tab G**, Ex. 1 to Diaz Decl. at p. 6969; **Tab G**, Diaz Decl. at ¶ 4; **Tab B**, Ex. 78 to Calvente Dep; **Tab B**, Calvente Dep. at 231:4–232:6.)

> **Response:** Admit that this paragraph summarizes OIDE's findings. Deny that OIDE's findings were correct. (Calvente Dep. 50:17–51:1.)

61. On July 6, 2016, OIDE presented Plaintiff with its findings and explained to her that DePaul's policy prohibited retaliation. (**Tab B**, Calvente Dep. at 231:4–232:6; **Tab B**, Ex. 78 to Calvente Dep. at p. 027531.) Plaintiff did not pursue any further relief at the time. (**Tab B**, Calvente Dep. at 232:7–11.)

> **Response:** Admit.

62. In 2017, a newly elected Personnel Committee conducted Plaintiff's formal review. (**Tab B**, Calvente Dep. at 249:10–16; **Tab E**, Murphy Decl. at ¶¶ 6–7.) The Personnel Committee consisted of Chair, ████████████████████████████████ ████████████████████████████████ (**Tab J**, Murphy Decl. at ¶7; **Tab G**, Diaz Decl. at ¶ 7; **Tab B**, Calvente 10:23–11:4, 243:20–24.)

> **Response:** Admit.

63.     For her 2017 formal review, Plaintiff requested Dr. Ghanem help her with her personal statement. (**Tab B**, Calvente Dep. 232:12–237:12; **Tab F**, Ghanem Dep. 123:10–124:4, 33:8–34:19.) The two met, during which time Dr. Ghanem provided her with feedback, some of which Plaintiff accepted and incorporated. ((**Tab B**, Calvente Dep. 232:12–237:12; **Tab F**, Ghanem Dep. 123:10–124:4, 33:8–34:19.) During this meeting, Dr. Ghanem told Plaintiff that it was her presentation in the interview, more than her written submission, that was the problem for Personnel Committee in 2015. (**Tab B**, Calvente Dep. at 233:12–21.)

**Response:**     Admit.

64.     In 2017, Plaintiff's personal statement for the first time identified her students' performances as an aspect of her research. (**Tab B**, Calvente Dep. at 239:12–240:6; **Tab B**, Ex. 85 to Calvente Dep. at p. 000921–000925.) This was not done at Dr. Ghanem's suggestion. (**Tab B**, Calvente Dep. at 239:20–240:6.)

**Response:**     Admit.

65.     Plaintiff was interviewed by the Personnel Committee, and Plaintiff subsequently received a draft of the Personnel Committee's preliminary report on November 9, 2017. (**Tab B**, Ex. 102 to Calvente Dep. at 025782, 025784; **Tab B**, Calvente Dep. at 243:20–24.)

**Response:**     Admit.

66.     The Personnel Committee draft reported its assessment that Plaintiff continued to have strong quantitative student evaluation scores, but stated that "[r]eferences to students feeling intimidated or 'uncomfortable' still showed up in this review cycle, though at low frequency" and stated "it is problematic that [Plaintiff] has ignored these long-standing issues and that the developmental recommendations shared in previous reports . . . seem at least partially dismissed by her." (**Tab B**, Ex. 102 to Calvente Dep. at p. 025786.) The draft did not include any quantification of

those issues. (**Tab B**, Calvente Dep. at 243:20–244:8; **Tab B**, Ex. 102 to Calvente Dep.) The Personnel Committee also noted that in their interview with her, Plaintiff said that she had not changed anything significantly in her curriculum or teaching strategies, beyond updating discussion and lectures with current events and experimenting with techniques to engage quiet students in discussion, which worked for some but did not for others. (**Tab B**, Ex. 102 to Calvente Dep. at 25785.) With respect to research, the Personnel Committee stated it was "impressed with [Plaintiff's] research productivity in the last two years," and noted her participation in the Woodrow Wilson Fellowship. (**Tab B**, Ex. 102 to Calvente Dep. at 025788–025789.) The Committee "strongly recommended that [Plaintiff] further push her publication rate, particularly with more journal articles, to make up for slower output in prior years." (**Tab B**, Ex. 102 to Calvente Dep.025789.) While acknowledging that Plaintiff made some contributions in the area of service, the Committee "emphasized to [Plaintiff] the need to take a more visible and significant role within her unit and at the [C]ollege." (**Tab B**, Ex. 102 to Calvente Dep.at 25790.) As of this time, the only substantive College–level committee on which Plaintiff was participating was the Term Faculty Review Committee, as the Local Review Board was terminated in the fall of 2016 due to new Institutional Review Board procedures. (**Tab B**, Calvente Dep. 253:12–254:1; **Tab B**, Ex. 102 to Calvente Dep. at 025789; **Tab E**, Ex. 1 to Murphy Dep. at 014633; .) Plaintiff testified that she "replaced" that Local Review Board work in the College with additional service to the College, but could not identify the service. (Calvente Dep. 253:12–254:1.)

> **Response:** Admit that the first sentence accurately quotes, in part, the draft report. Deny that the draft report accurately reflects the thoughts of the Personnel Committee. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Admit the second sentence. Admit the third sentence. Admit the fourth sentence. Admit the fifth sentence. Admit the sixth sentence accurately quotes, in part, the draft report but deny that the draft report reflects the thoughts of the

Personnel Committee. (Answer at ¶31 and Exhibit 7 to Complaint at pages 19–20.) Admit the seventh sentence. Admit the first clause of the eighth sentence and deny the second clause of the eighth sentence. (Calvente Dec. ¶6.)

67.     The Personnel Committee rated Plaintiff as making "very good/fair" progress toward tenure in the area of teaching, "very good/fair" progress toward tenure in the area of research and "fair" progress toward tenure in the area of service. (**Tab B**, Calvente Dep. at 240:11–14; **Tab B**, Ex. 102 to Calvente Dep. at p. 025783.)

> **Response:**     Admit.

68.     After receiving the Personnel Committee's draft report, Plaintiff met with Dr. Ghanem regarding her 2017 review. (**Tab B**, Calvente Dep. at 249:10–250:14; **Tab F**, Ghanem Dep. at 132:7–136:21, 146:7–18; **Tab B**, Ex. 112 to Calvente Dep.) Dr. Ghanem helped Plaintiff prepare questions for the Personnel Committee regarding their report. (**Tab B**, Calvente Dep. at 249:10–250:14; **Tab B**, Ex. 109 to Calvente Dep.) Plaintiff testified that she felt that Dr. Ghanem was trying to help her. (**Tab B**, Calvente Dep. at 250:13–14.)

> **Response:**     Admit the first sentence. Deny the second sentence to the extent it uses the word "questions." (Calvente Dep. 250:13–14.) Deny the third sentence. (Calvente Dep. 250:13–14.)

69.     In response to the Personnel Committee's 2017 preliminary report, Plaintiff submitted corrections. (**Tab B**, Calvente Dep. 240:15–20; **Tab B**, Ex. 109 to Calvente Dep. at 025719–025720.) Plaintiff also asked the Chair of the Personnel Committee questions, including:

> Is it also possible to quantify these qualitative evaluations that state "these long-standing issues?" In other words, personnel states that these comments are less frequent (p.4) but it is not clear how less: 50% of the evaluations, 10 out of 25, etc.

(**Tab B**, Calvente Dep. at 245:5–8; **Tab B**, Ex. 109 to Calvente Dep. . at 025719–025720; **Tab E**, Murphy Dep. at 238:3–5.)

**Response:**   Deny the first sentence. (Calvente Dep. 50:13–51:14, 240:15–20.) Admit the second sentence.

70.   Accordingly, the Personnel Committee revised its report, stating:

A major theme in qualitative comments throughout Lisa's teaching career at DePaul pertains to students feeling "intimidated" or "uncomfortable" in her classroom. In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations.

(**Tab B**, Ex. 108 to Calvente Dep. at p. 000261.) Plaintiff testified that she believes the figure was inaccurate, and that she did not understand the 55% figure to mean that in five out of nine courses she taught during that review period students had reported feeling "intimidated" or "uncomfortable." (**Tab B**, Calvente Dep. at 246:3–248:10; **Tab B**, Ex. 108 to Calvente Dep. at p. 000261.) Plaintiff admitted that she taught more than nine students. (**Tab B**, Calvente Dep. 247:16–19.)

**Response:**   Admit the first sentence and block quote accurately quotes the personnel committee's revised report, but deny that first sentence and block quote accurately reflects the thoughts of the committee. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Admit the first clause of the second sentence, but deny the second clause of the second sentence. (Calvente Dep. at 246:3–248:10.) Admit the third sentence.

71.   Plaintiff asked the Chair of the Personnel Committee if her email containing her questions and corrections could be submitted to the tenured faculty so that her issues could be raised at the meeting, and he agreed to do forward it to the tenured faculty. (**Tab B**, Ex. 109 to Calvente Dep. at 2517–2518.)

**Response:**   Admit.

72.   On November 17, 2017, by a vote of 13–8, the tenured faculty recommended that Plaintiff's contract be terminated. (**Tab B**, Calvente Dep. 240:11–14; **Tab B**, Ex. 108 to Calvente Dep., p. 000253.) In their addendum to the Personnel Committee report, the tenured faculty raised questions about Plaintiff's teaching style, whether it adhered to Vincentian core values, and again

34

addressed issues relating to Plaintiff's dense course content in lower level classes and heavy reliance

on a seminar style instruction. (**Tab B**, Ex. 108 to Calvente Dep at 000261–000263.) The tenured

faculty noted that,

> [i]f Lisa is retained, the tenured faculty would need to see significant changes and
> improvements in her teaching practices as has already been outlined in her 2013 and
> 2015 reviews. These changes would need to be apparent in teaching materials, stu-
> dent reports, and peer observations.

(**Tab B**, Ex. 108 to Calvente Dep., at 000263.) With respect to research, the tenured faculty stated:

> While some voting members believed her trajectory toward tenure in this area was
> **very good,** some others noted the extended timeline for research–focused
> productivity during her probationary period (e.g., the Woodrow Wilson fellowship
> provided Lisa additional funding away from teaching to focus solely on research) and
> redundancy between the book chapter "Image in Revolution" in her edited book and
> her prior journal publication ("The City Speaks," *Cultural Studies,* 2014). Upon
> further review, it was determined that the book chapter was *not* a reprint of the 2014
> journal article. The tenured faculty agreed that the introduction chapter was part of
> Lisa's edited book and should not be listed as a separate book chapter. In addition,
> members of the tenured faculty emphasized the clear distinction between "under
> contract" and "forthcoming" works with the latter requiring evidence of their final
> acceptance (i.e., final manuscript –with all required revisions completed– has been
> accepted, returned to the press, and finally approved for publication). The tenured
> faculty further discussed how public performances of creative work are evaluated on
> the basis of their engagement outside of the classroom, scholarly reviews, grants, and
> awards relating to the work.

(**Tab B**, Ex. 108 to Calvente Dep., at 000264.) With respect to service, tenured faculty recounted

instances where "service contributions listed in [Plaintiff's] document did not reflect substantial ac-

complishments," and stated that her "service record at this advanced stage of her probationary period

was inadequate as compared with the typical load for her peers." (**Tab B**, Ex. 108 to Calvente Dep.,

at 000264.)) Tenured faculty members further stated:

> It was emphasized at the discussion that, according to the College Tenure and
> Promotion Criteria, faculty members who apply for tenure and promotion to
> associate professor should have their service focused primarily in their track/program
> and in the college. If Lisa is retained, the tenured faculty would need to see significant
> changes in her service as evidenced through a track record of substantial

35

contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul.

(**Tab B**, Ex. 108 to Calvente Dep., at 000264.).)

> **Response:**   Admit the first sentence. Admit that the second sentence summarizes some of the questions that were raised, but deny that the questions reflect the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Admit that the first block quote is an accurate quote from the 2017 report of the tenured faculty. Deny that the quote accurately reflects the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–18.) Admit the second sentence/second block quote. Admit that the fourth sentence (starting with "With respect to service . . .") accurately quotes a portion of the report of the tenured faculty but deny that the quotations accurately reflect the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 173–74.) With respect to the final block quote, admit that it is an accurate quote from the 2017 report of the tenured faculty. Deny that the quote accurately reflects the thoughts of the tenured faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 173–74.)

73.     On December 13, 2017, for the second time, Dr. Ghanem rejected the Personnel Committee's recommendation for nonrenewal, informing Plaintiff "I am not accepting their recommendation . . . because of the improvement you demonstrated during the last review period." (**Tab B**, Calvente Dep. 255:10–12; **Tab F**, Ex. 7 to Ghanem Dep. at 026015; **Tab F**, Ghanem Dep. at 127–28.) In her letter, Dr. Ghanem explained to Plaintiff that she would need to score "excellent" in at least two core criteria for tenure, with none of the three below the rating of "very good." (**Tab B**, Ex. 111 to Calvente Dep;  **Tab B**, Calvente Dep. 255:1–12; **Tab F**, Ex. 7 to Ghanem Dep. at 026016.) Dr. Ghanem added, "In order to be considered for promotion and tenure in the College of Communication, I stress that you follow all the recommendations of both the Personnel Committee and the tenured faculty outlined in the formal review document dated November 17, 2017 regarding teaching, research and service. Developmental recommendations by your colleagues

36

should not and cannot be dismissed. You would need to provide evidence in the documents that you provide in Fall 2018 for your tenure review that you have incorporated the recommendations" (**Tab B**, Ex. 111 to Calvente Dep.; **Tab B**, Calvente Dep. 255:1–12; **Tab F**, Ex. 7 to Ghanem Dep. at 026016.)

> **Response:** With respect to the first sentence, admit that Dr. Ghanem rejected the recommendation for non–renewal, but deny that it was solely the recommendation of the personnel committee and deny that Dr. Ghanem rejected the recommendation for non–renewal because of alleged improvement. (Ex. 108 to Calvente Dep., p. 000253. Calvente Dep. 256:21–258:3, 300:1–301:13.) Admit that Dr. Ghanem wrote the third sentence, but deny that the third sentence reflects Dr. Ghanem's thoughts concerning what Dr. Calvente would need to do to earn tenure. (Calvente Dep. 256:21–258:3, 300:1–301:13.)

74. After receiving Dean Ghanem's reappointment letter, Plaintiff asked for another meeting with her. (**Tab B**, Calvente Dep. at 255:10–256:8; **Tab B**, Exs. 112 and 123 to Calvente Dep.) Plaintiff believed the Personnel Committee was retaliating against her because service was the only area that seemed good enough for tenure in 2015, but in 2017, her service no longer was good enough, even though she felt she added service to her dossier. (**Tab B**, Calvente Dep. at 250:19–3.) During the meeting, Plaintiff cried, stated that she wanted to file another complaint but complained that doing so was time–consuming. (**Tab B**, Calvente Dep. at 255:13–258:9; **Tab F**, Ghanem Dep. at 146:7–18.) According to Plaintiff, Dr. Ghanem told her she should wait to file a claim until after tenure. (**Tab B**, Calvente Dep. 256:21–258:3; **Tab F**, Ghanem Dep. at 77:10–23.)

> **Response:** Admit the first sentence. Admit that the second sentence to the extent that Dr. Calvente believed that the Personnel Committee was retaliating against her. Deny that Dr. Calvente believed that the Personnel Committee was retaliating against her for reasons stated in paragraph 74. (Calvente Dep. 255:13–258:3.) Admit the third and fourth sentences.

75. Following the meeting, Dr. Ghanem notified OIDE that Plaintiff had expressed concerns regarding retaliation in connection with her 2017 formal review. (**Tab B**, Ex. 123 to Calvente

Dep.; **Tab B**, Calvente Dep. at 262:21–263:15; **Tab F**, Ghanem Dep. at 73:14–21.) OIDE later reached out to Plaintiff, and asked to set up a meeting, but Plaintiff chose not to take any further action at the time. (**Tab B**, Calvente Dep. at 262:7–266:13.)

> **Response:** Deny. (Calvente Dec. ¶8.)

76. Sometime after her 2017 formal review, during the 2017–2018 academic year, a Black student complained to Dean Murphy about Plaintiff using the "n-word" in class. (**Tab B**, Calvente Dep. 15:2–22, 109:12–23, 111:14–19.) Plaintiff stated the student did not know she identified as part of the Black diaspora. (**Tab B**, Calvente Dep. 109:12–23,)

> **Response:** Admit.

77. At the same time that Plaintiff underwent a formal review in 2017, Plaintiff's colleague ███████████ (Caucasian) also underwent a pre-tenure formal review. (**Tab B**, Calvente Dep. at 263:17–266:13; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Rinehart Decl. ¶ 15; **Tab F**, Ghanem Dep. at 143:22–144:2, 165:8–13.) The College's tenured faculty recommended the termination of his contract. (**Tab B**, Calvente Dep. at 263:17–264:9; **Tab D**, Rinehart Decl. ¶ 15; **Tab D**, Ex. 8 to Rinehart Decl.; **Tab F**, Ghanem Dep. at 155:17–20.) Dr. Ghanem accepted the College's recommendation for Dr. ████████ nonrenewal. (**Tab B**, Calvente Dep. at 264:12–14; **Tab F**, Ghanem Dep. at 163:3–165:22; **Tab D**, Rinehart Decl. ¶ 15; **Tab D**, Ex. 8 to Rinehart Decl.) Dr. Ghanem described his teaching and service as "abysmal." (**Tab F**, Ghanem Dep**.** at 163:3–4.)

> **Response:** Admit.

78. Dr. ████████ appealed Dr. Ghanem's decision to the Faculty Appeals Board, and submitted a copy of Plaintiff's formal evaluation and Dean Ghanem's letter reappointing her in connection therewith. (**Tab B**, Calvente Dep. at 263:17–264:17; **Tab B**, Ex. 132 to Calvente Dep. at Calvente–DePaul 007100; **Tab F**, Ghanem Dep. at 163:17–21.)

**Response:**     Admit.

79.     On February 2, 2018, the Faculty Appeals Board contacted Plaintiff in connection to Dr. ███████ appeal. (**Tab B**, Calvente Dep. at 265:7–12; **Tab B**, Ex. 132 to Calvente Dep. at p. 007100.) Plaintiff explained that while she did not believe that Dr. ███████ was discriminated against, she believed that Dr. ███████ was non–renewed to justify discrimination against herself (whom she described as "the only Latina") and ███████, (who she described as the "only Black American tenure line faculty member in our college."). (**Tab B**, Calvente Dep. at 265:16–21; **Tab B**, Ex. 132 to Calvente Dep. at p. 07095.) In her written report to the Faculty Appeals Board, Plaintiff articulated her concern that she had been "unfairly sanctioned" by the Personnel Committee. (**Tab B**, Ex. 132 to Calvente Dep. at p. 07095.) In her statement to the Faculty Appeals Board, Plaintiff did not complain about Dr. Ghanem's conduct. (**Tab B**, Ex. 132 to Calvente Dep. at pp. 7094–7098.) The Faculty Appeals Board notified the OIDE of Plaintiff's complaint, but Plaintiff declined to meet with the OIDE at the time. (**Tab B**, Calvente Dep. at 265:7–266:13.)

**Response:**     Admit.

80.     In March 2018, then–Provost Marten denBoer upheld Dean Ghanem's acceptance of the College's recommendation to not renew Dr. ███████ contract. (Tab D, Rinehart Decl. ¶ 23.)

**Response:**     Admit.

81.     On June 2, 2018, Plaintiff, along with her colleague, Dr. ███████ filed an anonymous complaint via email to OIDE to express their concerns about a racially hostile environment within the College. (**Tab B**, Calvente Dep. at 266:14–21; **Tab B**, Ex. 144 to Calvente Dep.; **Tab I**, Dillard Dep. at 65:9–24.) Plaintiff testified that it was Dr. Dillard's idea to file an anonymous complaint and that Plaintiff agreed to join in the complaint with her. (**Tab B**, Calvente Dep. at 266:22–267:2;

Tab I, ███ Dep. at 66:1–67:2.) On June 7, 2018, OIDE responded to the anonymous email seeking additional information, and Dr. ███ prepared a response. (**Tab B**, Calvente Dep. at 269:20–270:10**Tab B**, Ex. 145 to Calvente Dep.) Plaintiff testified that she was not involved preparing the response or in any of the subsequent communications with the OIDE in relation to the anonymous complaint, but that Dr. Dillard provided her with the information over the phone. (**Tab B**, Calvente Dep. at 270:4–6; 273:21–24.)

> **Response:**    Admit.

82.    On October 10, 2018, Plaintiff and Dr. ███ met with Dr. Ghanem in person to discuss their concerns about their perceived racial hostile environment in the College. (**Tab B**, Calvente Dep. at 270:21–273:7, 274:1–24; **Tab B**, Ex. 173 to Calvente Dep; **Tab F**, Ghanem Dep. at 78:7–22;**Tab I**, Dillard Dep. at 151:9–152:7, 154:15–19.) Plaintiff testified that Dr. Ghanem listened to them, and that she even went over her time slot so she could stay with them and hear their complaints. (**Tab B**, Calvente Dep. at 271:7–15; **Tab I**, ███ Dep. at 110:2–18.) According to Plaintiff, Dr. ███ brought up Dr. ███ name during the meeting, but Dr. Ghanem cut her off. (**Tab B**, Calvente Dep. 271:22–272:10.) According to Plaintiff, Dr. Ghanem stated that she heard a rumor that she terminated Dr. ███ contract so that she could terminate women of color. (**Tab B**, Calvente Dep. at 271:24–272:10.) Plaintiff told Dr. Ghanem that she wrote a letter on behalf of Dr. ███ (**Tab B**, Calvente Dep. at 271:22–272:14, 277:2–16.) Plaintiff claims Dr. Ghanem's demeanor changed when Dr. ███ name was brought up, and she "ushered [them] out and said that [they] were going to continue this at another time." (**Tab B**, Calvente Dep. 298:24–299:11.) Plaintiff admitted that in the meeting she did not accuse Dr. Ghanem of being discriminatory or retaliatory towards her. (**Tab B**, Calvente Dep. 271:16–24.) Dr. Ghanem testified "Well, I'm not sure that the rumor was about me, [it] was more that the college did that to justify

their recommendation, their negative recommendation of -- of Lisa. I don't believe the rumor was that I am the one who did that." (**Tab F,** Ghanem Dep. 155:6–21, 159:6–10.)

> **Response:**    Admit the first sentence. Admit the first clause of the second sentence and deny the second clause of the second sentence. (Calvente Dep. at 271:7–15.) Admit the third sentence. Admit the fourth sentence. Admit the fifth sentence. Admit the sixth sentence. Admit the seventh sentence. Admit the eight sentence accurately quotes Dr. Ghanem's deposition testimony but deny that Dr. Ghanem's deposition testimony reflects what Dr. Ghanem said in the meeting. (Calvente Dep. 271:24–272:10.)

83.    Before the meeting ended, Dr. Ghanem contacted OIDE over the phone and left a message regarding the concerns raised by Plaintiff and Dr. ▇▇▇▇ and again followed up with OIDE by email after the meeting. (**Tab B**, Calvente Dep. at 272:16–274:24; **Tab B**, Ex. 173 to Calvente Dep.; **Tab I,** ▇▇▇▇ Dep. at 151:9–152:7, 154:14–23.) Plaintiff testified that Dr. Ghanem told them that she wanted to continue the conversation, and that they should schedule another meeting with her. (**Tab B**, Calvente Dep. at 272:16–273:4.)

> **Response:**    Admit the first sentence. Admit that the second sentence accurately summarizes Dr. Calvente's testimony but deny that Dr. Ghanem wanted to continue the conversation. (Calvente Dec. ¶9.)

84.    After Dr. Ghanem's report to OIDE, Dr. ▇▇▇▇ and Plaintiff scheduled to meet with OIDE together in November. (**Tab B**, Calvente at 272:16–275:24. **Tab I**, ▇▇▇▇ Dep. at 119:6–120:2, 154:14–155:3.) Plaintiff met with Schaffer and Isabel Diaz, the Director of Employee Engagement and Equal Employment Opportunity, as scheduled, at which time Ms. Schaffer told Plaintiff that Dr. ▇▇▇▇ "withdrew her complaint." (**Tab B**, Calvente 275:3–276:23.) During her deposition, Dr. ▇▇▇▇ testified that she subsequently decided to pursue her complaint alone, without Plaintiff, and that she met with Schaffer in November or early December 2018 for that purpose. (**Tab I,** ▇▇▇▇ Dep. 119:6–120:2; 146:7–23; 154:24–155:3, 153:20–154:1; **Tab I**, Ex. 1 to ▇▇▇▇ Dep.) OIDE closed Dr. ▇▇▇▇ complaint on July 5, 2019. (**Tab G**, Diaz Decl. ¶ 6.)

**Response:** Admit.

85. After Plaintiff's meeting with OIDE in November, OIDE contacted Plaintiff regarding her allegations of discrimination and retaliation, and Plaintiff said she would provide additional documents. (**Tab B**, Calvente Dep. at 278:20–284:11; **Tab B**, Ex. 211 to Calvente Dep.) Plaintiff did not follow up with the OIDE regarding her claims. (**Tab B**, Calvente Dep. 284:2–11.)

> **Response:** Admit the first sentence. Deny the second sentence. (Calvente Dep. 284:2–6.)

86. During the week ending October 19, 2018, two students lodged a complaint against Plaintiff to Dr. Murphy. (**Tab E,** Murphy Dep. at 182:10–186:8; **Tab E,** Exs. 7 and 11 at p. 17319–17320 to Murphy Dep.) Plaintiff sent an email to her class describing the students' behavior as "examples of misogynist acts that play out in local and familiar settings like the classroom." (**Tab J**, Ex. 3 to Murphy Decl.; **Tab E,** Murphy Dep. at 182:10–186:8; **Tab E,** Ex. 11 to Murphy Dep. at p. 17319–17320.) Plaintiff reported the students' conduct to the University, stating "three of the four members of the last group did not receive their criticism well and [one student] angrily left class stating "This is bullshit." (**Tab J**, Ex. 3 to Murphy Decl. at 017390; **Tab E,** Exs. 7 and 11 to Murphy Dep. at p. 17319–17320.) Dr. Murphy testified that during her twenty years of teaching and administrative work at DePaul, she had never experienced the level of intense emotion as she did when meeting with those two students. (**Tab E,** Murphy Dep. at 185:2–8, 186:6–8.) Dr. Murphy reached out to Plaintiff to discuss it, acknowledging that "I am sure there is way more to the story than what I heard." (**Tab B**, Calvente Dep. at 306:21–307:1; **Tab E**, Ex. 7 to Murphy Dep.; **Tab E**, Murphy Dep. 185:2–186:8.) Dr. Murphy told Plaintiff one of the two students dropped her course, and "the other was feeling extremely uncomfortable and isolated" but could not drop the course because his financial aid package. Murphy asked Plaintiff to reach out to the student staying in her class to try

and meet with him, but Murphy was disappointed to learn from the student that Plaintiff had not done so. (**Tab E,** Murphy Dep. at 182:10–186:8; **Tab E,** Exs. 7 and 11 at p. 17319–17320 to Murphy Dep.)

> **Response:**     Admit the first through the sixth sentences. Deny the seventh sentence. (Calvente Dec. ¶12.)

87.     On January 16, 2018, Plaintiff emailed her then–Program Chair, ███████████, and Dr. Murphy to inquire "[i]n accordance to my last personnel request, I wanted to know if you can assist me in joining a university/college committee." (**Tab J**, Murphy Decl. ¶ 4; **Tab J**, Exs. 1 and 2 to Murphy Decl.). Dr. ██████ specifically advised, "I would add that doing some things in the College would be good beyond your current work with the term personnel committee (e.g., searches if any others happen this year and other substantives options – Lexa would know more about openings that might be tied to leaves since many of those are filled in the first week of Autumn quarter)." (**Tab J**, Ex. 1 to Murphy Decl.)  Dr. Murphy referred Plaintiff to ████████, stating he was the "faculty council representative . . . [and] [h]e is the person to put your name forward for any available university committees." (**Tab J**, Ex. 2 to Murphy Decl.)  Dr. █████ subsequently advised Plaintiff regarding a service opportunity in the Community Engagement Committee, and Plaintiff replied to Dr. ████████ stating, "I have already sent my materials to Paul [for potential participation in the University's "Council of Community Engagement"] and, yes, college service would be good as well." (**Tab J**, Exs. 1 and 2 to Murphy Decl.)

> **Response:**     Admit.

88.     Between January and May 2018, Plaintiff for the first time began sending proposals to publishers to gauge interest in publishing her manuscript. (**Tab B**, Calvente Dep. at 68:15–71:19; **Tab B**, Ex. 141 to Calvente Dep.)

**Response:**   Admit that Dr. Calvente began sending proposals to publishers between January and May 2018. Deny that it was the first time she sent proposals to publishers. (Calvente Dep. 71:1–3.)

89.   On August 9, 2018, Plaintiff emailed the ███████████ of DePaul's Steans Center, ███████████, who had collaborated with her on community-based initiatives, and had attended the Fall 2016 public performance of the "culmination of [her] students' work" in her CMNS 367 Performance for Social Change course. (**Tab B**, Calvente Dep. at 62:5–64:24; **Tab B**, Ex. 153A to Calvente Dep.) In her email, Plaintiff requested that Mr. ███ submit a letter on her behalf to speak to "the quality of [their] co-creative performance, [her] guidance and directorship, as seen in the result of the performance, and the fact that it was a performance open to the public." (**Tab B**, Calvente Dep. at 62:5–65:14, 67:10–68:14; **Tab B**, Ex. 153A to Calvente Dep.) Plaintiff also asked Mr. ███ to describe his interpretation of the impact the work has for the students, the organization and the public. (**Tab B**, Calvente Dep. at 62:5–65:14, 67:10–68:14; **Tab B**, Ex. 153A to Calvente Dep.) Plaintiff requested he provide this letter by September 10, 2018 and explained her materials for Personnel Review were due on the 17th of the same month. (**Tab B**, Calvente Dep. at 62:5–65:14, 67:10–68:14; **Tab B**, Ex. 153A to Calvente Dep) However, Plaintiff did not submit a letter from Mr. ███ in September 2018 along with her tenure dossier. (**Tab B**, Calvente Dep. at 62:5–65:14, 67:10–68:14.)

**Response:**   Admit.

90.   In the spring of 2018, Plaintiff notified the Office of Academic Affairs that she intended to go up for tenure in the fall, as required by the Faculty Handbook. (**Tab B**, Calvente Dep. at 53:13–21; **Tab D**, Ex. 1 to Rinehart Decl., p. 000036 at ¶ 3.5.1.1(i).) Prior to submitting her full dossier, Plaintiff had to provide a list of proposed external reviewers and identify the research she wanted those external reviewers to analyze. (**Tab B**, Calvente Dep. at 53:22–54:5; **Tab B**, Ex. 94 to

Calvente Dep. at p. 000807; **Tab D**, Ex. 1 to Rinehart Decl., p. 000046 at ¶ 3.6.2.) Plaintiff requested these proposed external reviewers evaluate four publications: two of the publications were from a single edited book, including an introduction; one was a published article from 2017; and the last item was a forthcoming work that had not yet been published. (**Tab B**, Calvente Dep. at 55:18–564; **Tab B**, Ex. 143 to Calvente Dep.) Along with her publications, Plaintiff also included a link to a 30-minute student performance on YouTube from the final project in her 2015 performance studies class for evaluators to review. (**Tab B**, Calvente Dep. at 55:13–57:12; **Tab B**, Ex. 143 to Calvente Dep.)

> **Response:**    Admit.

91.    On August 29, 2018, after Plaintiff requested Dean Murphy prepare a letter describing her service in the College up until that point, Dean Murphy provided a letter discussing Plaintiff's work on the Term Faculty Review Committee. (**Tab E**, Ex. 11 at p. 017318 and Ex. 21 to Murphy Dep.; **Tab E,** Murphy Dep. 201:21–202:9.) This was "the one substantive committee" in the College on which Plaintiff participated between 2017 and the time of her tenure review. ( **Tab B**, Calvente Dep. 253:12–254:1; **Tab B**, Ex. 206 to Calvente Dep. at 23551**; Tab E**, Ex. 1 to Murphy Dep. at 014633;**Tab E**, Murphy Dep. 154:3–11, 201:21–202:9.)

> **Response:**    Admit.

92.    In September 2018, Plaintiff submitted her tenure application and accompanying materials. (**Tab D**, Rinehart Decl. at ¶ 10; **Tab B**, Calvente Dep. at 64:14–13, 80:13–16.) In her CV, Plaintiff categorized her scholarly productivity as "Published Works" and "Non-Published Works." (**Tab B**, Ex. 115 to Calvente Dep. at p. 00876–00878.) Under the Published Works section, under the sub-header "Books," she listed a book entitled "Imprints of Revolution: Visual representations of Resistance," for which she was a co-editor. (**Tab B**, Calvente Dep. at 77–78; **Tab B**, Ex.

115 to Calvente Dep. at 00876–00878.) Under the sub-heading "Peer Review Chapters" on her CV, Plaintiff again listed her co-edited book, "Imprints of Revolution," and identified her introduction to the book and one chapter she co-authored with the co-editor. (**Tab B**, Calvente Dep. at 76:10–79:15; **Tab B**, Ex. 115 to Calvente Dep. at p. 00877.) In addition to that co-edited book, she listed three peer-reviewed articles and one additional peer-reviewed chapter. (**Tab B**, Ex. 115 to Calvente Dep. at p. 00877.) All other entries under "Published Works" predated her time at DePaul. (**Tab B**, Ex. 115 to Calvente Dep. at p. 00876–00877; **Tab B**, Calvente Dep. at 24:4–26:16.) Under the title "Non-Published Works," Plaintiff listed three student performances from 2013, 2015 and 2016. (**Tab B**, Calvente Dep. at 76:10–79:15; **Tab B**, Ex. 115 to Calvente Dep.) Her CV did not include her manuscript, which, still had not been published. (**Tab B**, Calvente Dep. at 76:10–79:15, 85:4–24,106:4–107:21–; **Tab B**, Ex. 115 to Calvente Dep.)

> **Response:**     Admit. Deny last sentence.  (Ex. 115 to Calvente Dep.)

93.     Her submission also included a link to a staged student performance that was not functional. (**Tab B**, Calvente Dep. 97:4–10.) The recording of the student performance included no introduction from Plaintiff or talk back. (**Tab B**, Calvente Dep. at 56:18–59:5; **Tab B**, Ex. 115 to Calvente Dep.) Plaintiff did not include any write up contextualizing the manner in which she contributed to the performance. (**Tab B**, Calvente Dep. at 56:18–59:5.) Plaintiff admitted that although there is a way to have public performances be peer reviewed, she did not submit any peer review materials relating to the public performances in her dossier. (**Tab B**, Calvente Dep. at 56:18–59:5.)

> **Response:**     Admit.

94.     Along with her submission, Plaintiff prepared a personal statement and included a document she called "Appendices to Tenure and Promotion Review Statement," which included

her 2015 and 2017 formal reviews and her responses to those reviews. (**Tab B**, Calvente Dep. at 79:16–83:10; **Tab B**, Ex. 186A to Calvente Dep.)

> **Response:** Admit.

95.    In these Appendices, Plaintiff provided a rebuttal to the Personnel Committee's contention that there was a pattern of student complaints regarding intimidation, and in particular disputing the 55% calculation in her 2017 formal review. (**Tab B**, Calvente Dep. at 80:13–83:10, 197:7–208:19; **Tab B**, Ex. 186A to Calvente Dep.) Plaintiff conducted her own analysis of qualitative student feedback from academic year 2011–2012 through academic year 2017–2018, using a key word search function to identify instances of student use of the words "hostile, intimidating, uncomfortable, afraid and nervous." (**Tab B**, Calvente Dep. at 208:8–209:8; **Tab B**, Ex. 186A to Calvente Dep at p. 2203–2205.) Using that approach Plaintiff identified 20 students who raised or expressed sentiments of feeling intimidated or uncomfortable in her classes between 2011 and 2017. (**Tab B**, Calvente Dep. at 198:6–200:2; **Tab B**, Ex. 186A to Calvente Dep at p. 2203–2205.) Plaintiff does not dispute that students complained about feeling uncomfortable in her classroom. (**Tab B**, Calvente Dep. 197:7–11.)

> **Response:** Admit.

96.    In conducting her analysis, Plaintiff did not use the terms "rude," "belittling," "reprimand," "bark," or "yell." (**Tab B**, Calvente Dep. at 208:3–209:8.) In one CMN 103 class she taught in the Spring of 2013, students made the following remarks:

- Student 469562 wrote "she created a horrible environment where she would yell at students for voicing their opinion or answering a question" and also wrote that the course could be improved by "not barking your opinions at students." (**Tab B**, Calvente Dep. at 210:6–16.)

- Likewise, Student 476267 wrote "getting a different instructor who allowed us to think critically without being scared of being belittled or reprimanded when she did not agree with us." (**Tab B**, Calvente Dep. at 211:9–17.)

- Student 492152, who wrote, "when students answer she was sometimes rude, especially if the student did not reply correctly." (**Tab B**, Calvente Dep. at 211:18–23.)

**Response:**    Admit.

97.    Plaintiff admits her former student, Simone Williams (Black), told her that she felt belittled when Plaintiff told her in front of the class that her answer was "wrong." (**Tab B**, Calvente Dep. at 212:8–20.)

**Response:**    Admit.

98.    In the last paragraph of her personal statement, Plaintiff included a discussion about her solo authored manuscript and indicated she had received an advanced contract from Northwestern University Press. (**Tab B**, Calvente Dep. at 83:23–85:18; **Tab B**, Ex. 186A to Calvente Dep at p. 2200.) Plaintiff said this offer was made to her over the phone, and she did not take it. (**Tab B**, Calvente Dep. at 83:23–85:18.) As of the date of her deposition on February 19, 2021, the book had not yet been published. (**Tab B**, Calvente Dep. at 83:23–85:18.)

**Response:**    Admit.

99.    On October 18, 2018, the day before Plaintiff's meeting with the Personnel Committee, Plaintiff learned that the performance link she submitted for external review had not been included with the materials sent to the external reviewers. (**Tab B**, Calvente Dep. 85:19–90:6, 96:7–97:10; **Tab B**, Ex. 175 to Calvente Dep.) Plaintiff reached out to Dean Murphy to address the issue, who responded within the hour acknowledging her mistake. (**Tab B**, Calvente Dep. at 89:5–9; **Tab B**, Ex. 175 to Calvente Dep.) Dean Murphy offered to rectify the situation by sending out the

performance link to the reviewers. (**Tab B**, Calvente Dep. at 96:7–13.) Plaintiff rejected this proposal as unacceptable. (**Tab B**, Calvente Dep. at 96:7–13.)

> **Response:**    Admit.

100.    Plaintiff and Dean Murphy reached an agreement that she would allow additional reviewers to submit letters on Plaintiff's behalf, to contextualize the student performances, and that those letters would be included in her dossier along with the performance. (**Tab B**, Calvente Dep. at 58:11–22, 96:14–97:6, 125:17–128:5.) Plaintiff solicited letters from Dr. ███████, a professor Plaintiff had worked with at Northwestern, and Mr. ██ ████████ of the Steans Center. (**Tab B**, Calvente Dep. at 96:20–24.) These letters were added to Plaintiff's tenure dossier. (**Tab B**, Calvente Dep. 149:11–20; **Tab B**, Ex. 210 to Calvente Dep.) In her letter, Dr. Madison explained she understood "the question pertaining to [Plaintiff's] performances relates to its relevance to the classroom," and she described watching the student performances and noted how impressed she was by the students' research, time, attention, and practice, as well as their use of rhetorical communication and symbolic movement. (**Tab B**, Calvente Dep. 65:19–67:20; **Tab B**, Ex. 210 to Calvente Dep. at p. 023429–023430.) Dr. ██████ further noted she was impressed by the "joy these students experienced under the leadership and guidance of their teacher." (**Tab B**, Ex. 210 to Calvente Dep at 23430.) Mr. ████ in his undated letter, expressed praise for the CMNS 367 course Plaintiff had created, and explained that as an audience member to one of Plaintiff's performances, he "felt immense gratitude for Prof. Calvente's guidance and directorship of the project." (**Tab B**, Ex. 210 to Calvente Dep at 23428.)

> **Response:**    Admit.

101.    After Plaintiff submitted her tenure application, the College, led by the Personnel Committee, performed the first level of review of Plaintiff's tenure and promotion evaluation. (**Tab**

**B**, Calvente Dep. at 145:5–7; **Tab B**, Ex. 185 to Calvente Dep. at 23436; **Tab D**, Ex. 1 to Rinehart Decl., p. 00040 at ¶ 3.5.4.1.) At this time, the Personnel Committee was chaired by ███████████

████████████████████████████████████████████████████████████

███████████████████████████████ (**Tab G**, Diaz Decl. at ¶ 7; **Tab B**, Calvente Dep. 10:19–11:5; **Tab E,** Murphy Dep. at 132:8–16.) Plaintiff claims these individuals were aware that Plaintiff made prior complaints of race discrimination. (**Tab B**, Calvente Dep. 101:2–15.)

    **Response:**    Admit.

    102.    As a part of their assessment, the Personnel Committee interviewed Plaintiff in October 2018. (**Tab B**, Calvente Dep. at 97:11–100:13; **Tab B**, Ex. 185 to Calvente Dep. at 23437; **Tab E**, Murphy Dep. at 227:24–228:22.) During this interview, Plaintiff made an opening statement in which she told the Personnel Committee that retaliation was illegal, although she did not accuse anyone of retaliation at that time. (**Tab B**, Calvente Dep. at 97:11–100:13.) During the interview Plaintiff was asked to speak about how she had been reflective in her teaching, and Plaintiff provided one example of how she tried to address comfort around the use of racial slurs in her hip hop course. (**Tab B**, Ex. 185 and 193 to Calvente Dep. at 23442; **Tab B**, Calvente Dep. at 121:4–124:17.)

    **Response:**    Admit.

    103.    After Plaintiff's interview with the Personnel Committee, the Personnel Committee prepared a report and rated Plaintiff as "very good" in each of the three core criteria. (**Tab B**, Ex. 185 to Calvente Dep.; **Tab B**, Calvente Dep. 144:22–146:17.) With respect to teaching, the Personnel Committee stated, "Lisa teaches with authority and with a high level of preparedness." (**Tab B**, Ex. 203 to Calvente Dep. at 23610; **Tab B**, Calvente Dep. 144:19–145:7.) The Personnel Committee noted that "many students responded well to Lisa's approach," but also noted "a couple of areas that remain unaddressed and require continued improvement" from Plaintiff. (**Tab B**, Ex. 203 to

Calvente Dep. at 23611–23613.) The Personnel Committee also described statements Plaintiff made

regarding her teaching in the interview, stating:

> [a]s an example of adapting to student feedback, Lisa described an instance when a
> student reported feeling uncomfortable with the use of racial slurs from primary
> sources. Lisa responded by setting new rules in the subsequent offering of this course
> to ensure safety.

(**Tab B**, Ex. 203 to Calvente Dep. at 23612–13.) With respect to research, the Personnel Committee

stated, "[a] thorough review of [Plaintiff's] scholarship shows a coherent, unique research agenda,"

but noted they were "concerned about [Plaintiff's] inability to bring [her] manuscript to publication

despite the opportunities she has been given. (**Tab B**, Ex. 203 to Calvente Dep. at 23614.) With

respect to service, the Personnel Committee stated their assessment was "weighed in consideration

of her stated need to build cross–college connections," and noted the College Guidelines provide

that faculty members who apply for tenure and promotion to associate professor should have their

service focused primarily in their track/program and in the college. (**Tab B**, Ex. 203 to Calvente

Dep. at 23620.)

> **Response:** Admit the first sentence. Admit the second, third, and fourth sentence and
> the block quote accurately quotes the report. Deny that the report accurately
> reflects the thoughts of the personnel committee. (Answer at ¶31 and Exhibit
> 7 to Complaint at pages 12–30.) Admit that the fifth sentence. Admit the
> sixth sentence accurately quotes the report. Deny that the report accurately
> reflects the thoughts of the personnel committee. (Answer at ¶31 and Exhibit
> 7 to Complaint at pages 12–30.)

104.    On October 31, 2018, Plaintiff was provided with a draft report and asked to identify

any typos or "factual inaccuracies." (**Tab B**, Calvente Dep. at 121:4–124:17; **Tab B**, Ex. 185 to Cal-

vente Dep. at p. 023435.) Plaintiff responded, identifying one factual inaccuracy, in which she disa-

greed that she had ever described her book manuscript as being completed and submitted to various

publishers during her prior reviews. (**Tab B**, Calvente Dep. at 123:1–125:16; **Tab B**, Ex. 193 to

Calvente Dep. at p. 00063–00064.) Dr. ███ acknowledged that the wording on the one correction she raised was confusing and he proposed a correction. **Tab B**, Calvente Dep. at 123:1–125:16; **Tab B**, Ex. 193 to Calvente Dep. at p. 00062–00063.) In addition to her correction, Plaintiff also asked three questions. (**Tab B**, Calvente Dep. at 123:1–125:16; **Tab B**, Ex. 193 to Calvente Dep. at p. 00063–00064.) Specifically, Plaintiff asked: (1) why there was not a more robust reference to the missing performance link, and why it was only mentioned in a footnote on the personnel committee's report; (2) why a broken link in Plaintiff's submission was not addressed with her in earlier reviews; and (3) why her performances were not evaluated as a part of her scholarship. (**Tab B**, Ex. 193 to Calvente Dep. at p. 00063–00064.) Dr. ███ responded to Plaintiff's questions, noting the rationale for the footnote, providing an explanation for why the link would now be broken, and stating it was ultimately the candidate's responsibility to ensure all links are functional, and providing a summary of the criteria they used in their assessment. (**Tab B**, Ex. 193 to Calvente Dep. at p. 00062–00063.) Dr. ███ also told her that if she found his responses inadequate, she could prepare a formal response that would be provided to the other full group of tenured faculty reviewers. (**Tab B**, Calvente Dep. 147:5–14; **Tab B**, Ex. 193 to Calvente Dep. at p. 023435.) Because the link was broken, Plaintiff asked Dean Murphy if she could add a DVD copy of the performance to her dossier for tenure and promotion review, and Dean Murphy agreed. (**Tab B**, Calvente Dep. 126:7–128:5; **Tab B**, Ex. 196 to Calvente Dep. at p. 023631–23635.)

    **Response:**    Admit.

    105.    On November 16, 2018, the tenured faculty met. (**Tab B**, Ex. 203 to Calvente Dep. at 23620.) During the tenured faculty's deliberations Dean Murphy and Dr. ███ were present, but did not vote or substantively participate in the deliberations. (**Tab E**, Murphy Dep. 148–150:4–11; **Tab H,** ███ Dep. 61:3–20; **Tab B**, Ex. 203 to Calvente Dep. at 23620.)

**Response:**     Admit.

106.    In their addendum to the report, tenured faculty wrote:

[T]he Personnel Committee report did not adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable in Lisa's classroom. While the Personnel Committee reported improved performance in the 2017–2018 academic year, as evidenced through a reduction of pertinent mentions in student evaluations, as well as peer observations of an open and safe atmosphere in Lisa's Spring 2018 CMN 103 Intercultural Communication class, some faculty members emphasized a long history of sustained negative feedback, which appears in every review period . . . Those who identified this issue as a troubling pattern argued that the Vincentian focus on social justice could be matched with a Vincentian personalism that seeks to engage students in a critical reflection on race, ethnicity, racism, and ethnocentrism through invitational dialogue. The repeated recommendations to vary pedagogical practices offered in Lisa's formal reviews and peer observations foreground this "invitational" approach to teaching and learning that other faculty members adopt when teaching critical content. But the tenured faculty noted that Lisa has not adapted her teaching to incorporate these best teaching practices.

(**Tab B**, Ex. 203 to Calvente Dep. at 23622.)

**Response:**     Admit that the report is accurately quoted. Deny that the report reflected the feelings of the faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

107.    Tenured faculty further wrote there was a

pattern of recommendations that Lisa opted to dismiss during her time at DePaul, many of which are documented in the 2015 and 2017 Personnel Committee reports that Lisa included in her dossier (see 2018 "Appendixes" to Tenure and Promotion Review Statement). It was noted that developmental feedback was intended to improve the quality of Lisa's teaching for all students and reduce the likelihood that students would feel disenfranchised in her classes. Voting members discussed two areas of special concern regarding Lisa's unwillingness to meet the needs of the College: ignoring the common learning outcomes in CMN 103 Intercultural Communication and resistance to reflective practice, both of which represent outstanding problems that negatively affect student learning experiences.

(**Tab B**, Ex. 203 to Calvente Dep. at 23623.)

**Response:**     Admit that the report is accurately quoted. Deny that the report reflected the feelings of the faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

108.     Additionally, multiple voting members of the faculty discussed whether she was adhering to the common learning outcomes and curricular consistency in the core CMN 103 course (**Tab B**, Ex. 203 to Calvente Dep. at 23623–023624.) Specifically, in their report, the tenured faculty wrote that multiple voting members found that Plaintiff "largely ignored the agreement among the intercultural communication faculty on what topics should be covered in CMN 103," and reiterated their concern that the dense reading materials was less appropriate for an introductory course. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623.) The report noted Plaintiff's disagreement with that assessment, reporting that she "emphasized that she is fulfilling the learning goals outlined in the course–keeper guide for the class." (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623.)

> **Response:**     Admit that the report is accurately quoted. Deny that the report reflected the feelings of the faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

109.     With respect to Plaintiff's research, the College tenured faculty wrote:

> Consideration was given during the tenured faculty meeting of how to evaluate Lisa's co-edited book, and how work from edited books has been counted and evaluated for prior Tenure and Promotion candidates in the College. The voting members agreed that introductions, transitional statements between sections, and summary conclusions are expected and customary elements within the scope of editing and publishing a book. Therefore, such writing should not be counted as separate publications. The voting members also agreed that chapters other than an introduction, conclusion, or transitional statements authored and contributed to the collected work by an editor should be counted as a publication. In short, some tenured faculty felt Lisa did not accurately represent the volume of her research.

(**Tab B**, Ex. 203 to Calvente Dep. at 23624.)

> **Response:**     Admit.

110.     Her faculty reviewers also noted Plaintiff's plan to finish a book manuscript that she had written about in her 2013, 2015, 2017, and 2018 personal statements, writing "the Personnel Committee has been concerned about Lisa's inability to bring this manuscript to publication despite

the opportunities she has been given." (**Tab B**, Ex. 203 to Calvente Dep. at 23626–23627.) Reviewers noted that despite research leaves and flexible time, at the time of the tenure review, Plaintiff had yet to finish the project. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23623 at 23627.)

**Response:**     Admit.

111.     Additionally, faculty members noted while the involvement of students in performances did not in and of itself disqualify a work from being considered scholarship, in Plaintiff's case, the students in Plaintiff's class were fulfilling a final project assignment that would also be graded by Plaintiff. (**Tab B**, Ex. 203 to Calvente Dep. at 23625–23626.) The faculty also discussed whether additional documentation and contextual framing might change the categorization of these performances from teaching–related activities to scholarship. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23626.) The faculty members explained their decision to count the performances as teaching-related activity rather than research. (**Tab B**, Ex. 203 to Calvente Dep. at. at 23626; **Tab E**, Murphy Dep. at 225:18–226:9.) Additionally, some evaluators, including one external reviewer, commented that her record of scholarship was "slim." (**Tab B**, Ex. 203 to Calvente Dep. at 23627.)

**Response:**     Admit.

112.     In their report, tenured faculty identified the view by some members of the faculty that Plaintiff continued to 'oversell' her service accomplishments by listing some items that were standard expectations of all faculty on, or by listing attendance at a single meeting as service. (**Tab B**, Ex. 203 to Calvente Dep. at 23627.) Additionally, the College noted that a candidate's primary service should be in in her own program, and in her own College. (**Tab B**, Ex. 203 to Calvente Dep. at 23628.) Faculty reviewers remarked that much of Plaintiff's service was to departments in other colleges. (**Tab B**, Ex. 203 to Calvente Dep. at 23628.) Finally, reviewers stated that Plaintiff lacked

documentation for several items that she listed as community service. (**Tab B**, Ex. 203 to Calvente

Dep. at 23628.)

> **Response:** Admit that the report is accurately quoted. Deny that the report reflected the feelings of the faculty. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

113. Ultimately, by a vote of 19–2, the tenured faculty of the College found that Plaintiff

did not meet the standards for tenure and promotion. (**Tab B**, Ex. 203 to Calvente Dep. at 23609;

**Tab B**, Calvente Dep. 145:1–16.)

> **Response:** Admit.

114. After receiving the College's report, Dean Murphy agreed with the College's recom-

mendation for tenure denial, and prepared a report to the UBPT. (**Tab B**, Calvente Dep. 147:3–4,

149:2–5; **Tab E**, Ex. 1 to Murphy Dep.; **Tab E**, Murphy Dep. 20:10–20.) In her report, Dean Murphy

explained:

> A vote of 19–2 against tenure and promotion is a significant statement. To overturn this, I would need to see flaws in the reasoning of the tenured faculty and/or make an argument that at least two areas reach the level of excellent. Based on what is presented in the dossier at this time, I cannot make that case.

(**Tab E,** Ex. 1 to Murphy Dep. at 14634.)

> **Response:** Admit.

115. With respect to teaching, Dean Murphy noted that Plaintiff had many strengths as

an instructor and made valuable contributions in the classroom and to the curriculum. (**Tab E**, Ex.

1 to Murphy Dep. at 14629.) However, Dean Murphy explained that

> [w]hile there are many positive aspects to Dr. Calvente's teaching, there were also areas that were identified in past formal reviews that needed to be improved to reach a rating of "excellent." . . . For some, she accepted the advice of personnel such as providing more verbal transitions, summaries and overviews during class lectures and discussions. For others, she questioned either the relevance or the fairness of the recommendations. For example, she rejected the suggested best practice to add more

visuals to class sessions to help students with diverse learning styles meet the necessary requirements for the courses. She stated that she prefers a more traditional seminar structure to promote active listening as a necessary skill for students to develop and because it counters a western style of visual learning. Further, Dr. Calvente was asked to adhere to the course guide created by her unit and to include required topics in intercultural communication core classes such as CMN 103: Intercultural Communication. This is an overview course that is designed to cover a multitude of theories and perspectives an introduction to the field of intercultural communication. Dr. Calvente's approach is to teach it exclusively through a critical theory lens. Prior formal reviews requested that she follow the guidelines and incorporate multiple theoretical approaches to intercultural communication. In her appendix, Dr. Calvente misrepresented the focus of this critique as requiring an approved textbook. She also states that her course was approved by the course supervisor, Dr. ████████ Dr. ██ emphasized in the personnel review meeting that she informed Dr. Calvente that there is no textbook requirement, but that the multitude of theories and topics must still be covered in the course for approval.

(**Tab E**, Ex. 1 to Murphy Dep. at 14630.)

> **Response:**    Admit.

> 116.    In her report, Dean Murphy addressed the

recurring student comments about feeling intimidated and/or uncomfortable in the classroom. As noted by both students and peer observers, the topics addressed in Dr. Calvente's courses can lead to challenging class conversations that can be emotionally difficult. In her narrative, Dr. Calvente states that her pedagogical approach enables students to "articulate their own positions on racism and other forms of marginalization freely and early on in the course" so that she can address these issues and student concerns. Looking at teaching evaluations, for many of her students, this approach has worked. She has been described by students as honest, respectful, and genuine. There have been, however, a number of students for whom this is not working and who have voiced strong concerns that Dr. Calvente is intimidating and dismissive in the classroom setting, particularly if they (or other students) are seen as disagreeing with her. As recently as Fall 2018, two complaints against Dr. Calvente were brought to the College Office that reflect the types of negative comments seen in the evaluations. In separate statements, two male students stated that during a critique of their group performance, Dr. Calvente called them "sexist and misogynist" several times in front of the class and in a follow-up email to the entire class. When they disagreed with the critique, they said that Dr. Calvente was very visibly angry . . . One dropped the class claiming his mental health was worth more than the tuition he would lose. The other stayed in the class, but said he was scared to participate again. I typically wouldn't go into detail on a student complaint for a tenure and promotion case. And, there are very clearly two sides to this story. I share this recent event because it provides a window into the type of polarizing comments that have shown up in Dr. Calvente's teaching evaluations.

(**Tab E**, Ex. 1 to Murphy Dep. at 14630–14631.) Dr. Murphy further noted that "the concern surrounding Dr. Calvente's teaching is less about the existence of the negative comments, and more about how Dr. Calvente has chosen to respond (or not respond) to them." (**Tab E**, Ex. 1 to Murphy Dep. at 14631.)

> <u>**Response:**</u>   Admit that the report is accurately quoted. Deny that the report reflected the feelings of Dr. Murphy. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

117.   Dr. Murphy writes:

> In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations. In her 2018 appendix, Dr. Calvente takes time to do her own calculation by student (not course) to show that by that date 20 students had express concerns about the classroom environment. In the judgment of the tenured faculty, this number and the content of comments is not acceptable, particularly when a faculty member is resistant to adapt her teaching in response.

(**Tab E**, Ex. 1 to Murphy Dep. at 14631.)

> <u>**Response:**</u>   Admit that the report is accurately quoted. Deny that the report reflected the feelings of Dr. Murphy or that the content of the personnel committee's report is accurate. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

118.   In evaluating Plaintiff's research, Dean Murphy stated there were "commendable qualities to Dr. Plaintiff's scholarship." (**Tab E,** Ex. 1 to Murphy Dep. at 14632.) Even so, she simply lacked a sufficient volume of notable published work. (**Tab E,** Ex. 1 to Murphy Dep. at 14632.) Specifically,

> [s]ince arriving at DePaul in 2011, she published three peer-reviewed articles, one peer-reviewed book chapter, an edited book in which she wrote the introduction and co-wrote another chapter, and a book review.

(**Tab E,** Ex. 1 to Murphy Dep. at 14632.)

> <u>**Response:**</u>   Admit.

119.    Finally, Dean Murphy stated in her letter that she agreed with the College's rating of "Very Good" for Plaintiff's service. (**Tab E,** Ex. 1 to Murphy Dep. at 14633.) With respect to service to the College and the program level, she described Plaintiff's services as "ad hoc, short–term capacities . . . The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee . . . To receive an 'excellent' rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period." (**Tab E,** Ex. 1 to Murphy Dep. at 14633–14634.)

> **<u>Response:</u>**    Admit that the report is accurately quoted. Deny that the report reflected the feelings of Dr. Murphy. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

120.    In her letter, Dean Murphy explained it was "a difficult decision; [Plaintiff's] record has strengths that are detailed in the personnel and tenured faculty review. However, there are also significant concerns in each of the categories of evaluation." (**Tab E,** Ex. 1 to Murphy Dep. at 14629.) Dean Murphy stated the College's evaluation of Plaintiff as "very good" in each of the three categories was fair and consistent with the evaluation standards in the College. (**Tab E,** Ex. 1 to Murphy Dep. at 14634.)

> **<u>Response:</u>**    Admit that the report is accurately quoted. Deny that the report reflected the feelings of Dr. Murphy. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

121.    In response to the College's reports, Plaintiff submitted to the UPBT an 8–page, single–spaced response, with an additional 22–page Appendix. (**Tab B**, Calvente Dep. 149:6–150:8; **Tab B**, Ex. 213 to Calvente Dep.) In her response, Plaintiff raised six areas of concern: purported misrepresentation of student evaluations; discounting of research productivity, particularly as it related to her students' performances and her co-edited book; purported discount of service, which

she attributes to unfair placement or assignments; "impact of bias in the College of Communication" which she attributes to her "senior colleagues" the purported miscounting of her probationary year in 2015 as it related to her parental leave; and an escalation in "bullying and discriminatory behavior" in reaction to Dr. Ghanem's refusal on two occasions to adopt the recommendation to non-renew her in 2015 and 2017. (**Tab B**, Ex. 213 to Calvente Dep.) In the response, Plaintiff does not suggest that either Dr. █████ or Dr. Ghanem should recuse themselves from consideration of her case. (**Tab B**, Ex. 213 to Calvente Dep.) Likewise, she does not complain that Dr. Ghanem was among the group of faculty in the College who treated her unfairly, instead claiming that she was purportedly hired to address the "culture" in the College, but that "one person alone cannot bear the burden of shifting a climate that took decades to create." (**Tab B**, Ex. 213 to Calvente Dep.)

**Response:**    Admit.

122.    The UBPT next evaluated Plaintiff. (**Tab B,** Calvente Dep. 150:9–11; **Tab F,** Ghanem Dep. 47:10–48:l0; **Tab A**, Answer at ¶ 10.) At the time Plaintiff went up for tenure, the UBPT members were ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████. (**Tab G**, Diaz Decl. at ¶ 7; **Tab E**, Murphy Dep. at 60:7–62:14; **Tab D**, Rinehart Decl. at ¶ 13.)

**Response:**    Admit.

123.    On March 8, 2019, Plaintiff interviewed with the UBPT committee. (**Tab B,** Calvente Dep. at 150:9–151:3; **Tab E**, Murphy Dep. at 58:15–60:6.) Dr. Ghanem was present during Plaintiff's interview, sitting in the back, but she did not ask Plaintiff any questions. (**Tab B**, Calvente Dep. 150:15–19; **Tab F**, Ghanem Dep. 80:22–82:16.) During the interview, Plaintiff told the UBPT

that she would be happy to adhere to any guidelines relating to CMN 103. (**Tab B**, Calvente Dep. at 150:9–51:3; **Tab B**, Ex. 215 to Calvente Dep.)

> **Response:**    Admit.

124.    The UBPT voted 4–3 in favor of granting tenure and promotion. (**Tab B**, Ex. 215 to Calvente Dep. at p. 2.) The UBPT did not change any of the ratings from very good to excellent. (**Tab B**, Calvente Dep. at 15:20–156:1.) While the UBPT noted there were concerns at some of the feedback from students regarding Plaintiff's teaching style, a majority of the UBPT concluded that negative reviews represented a small minority of students. (**Tab B**, Ex. 215 to Calvente Dep. at 3.) The UBPT nevertheless "encourage[d] Dr. Calvente to experiment and innovate with different and/or mixed pedagogy to accommodate students with different learning styles to be open to different perspectives, and to attempt to reach all of her student audience in the future." (**Tab B**, Ex. 215 to Calvente Dep. at 4; **Tab B**, Calvente Dep. at 156:3–19.)

> **Response:**    Admit.

125.    On the topic of her approach to CMN 103, a majority of the UBPT was persuaded by an email she included in her response to the College's decision on tenure, showing that a senior faculty member confirmed that her syllabus for the course was appropriate. (**Tab B**, Ex. 215 to Calvente Dep. at 23087; **Tab B**, Ex. 213 to Calvente Dep. at 23282–23286; **Tab B**, Ex. 186A to Calvente Dep. at LC0002209; ▮▮▮▮ Dep. 67:12–21.) According to the majority, this email suggested that "the concerns with not following the curriculum guidelines could very well result from a misunderstanding between parties regarding the expectations." (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) The Board encouraged her "to recognize the importance of incorporating the feedback and suggestions from her colleagues into her core courses and to align CMN 103 with appropriate guidelines." (**Tab B** Ex. 215 to Calvente Dep. at 23087.)

**Response:**      Deny the first and second sentence. (**Tab B**, Ex. 215 to Calvente Dep. at 23086–87.) Admit the third sentence.

126.      When reviewing Plaintiff's scholarship, the majority UBPT concluded Plaintiff "met the minimum standard of *notable* in the Faculty Handbook." (**Tab B**, Ex. 215 to Calvente Dep. at 3.) The UBPT encouraged her to continue with research trajectory with more quantity and quality peer–reviewed articles. (**Tab B**, Ex. 215 to Calvente Dep. at 4–5; **Tab B**, Calvente Dep. at 160:15–161:162:9.) The UBPT stated the College's aspiration to excellence was appropriate and commendable. (**Tab B**, Ex. 215 to Calvente Dep. at 5; **Tab B**, Calvente Dep. at 162:11–163:8.)

**Response:**      Admit.

127.      The minority of the UBPT members "shared the degree of concern expressed by the faculty and the Dean that some of Dr. Calvente's students felt intimidated and/or uncomfortable in her classroom. (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) In describing the minority members' concern, the report stated:

> To Board members, these negative responses cannot be entirely attributed to the subject matter of the courses Dr. Calvente has taught, since there are other instructors who have taught similarly challenging subject matter without the volume and severity of negative responses we have seen in Dr. Calvente's case. Further, these concerns are indications that there is room for improvement in Dr. Calvente's teaching, and the unit's assessment of Dr. Calvente's teaching being short of *excellent* is justified.

(**Tab B**, Ex. 215 to Calvente Dep. at 23087.) Additionally, the minority shared the concerns, which were noted by one of the external reviewers, that the total volume of scholarly work completed by Plaintiff is "slim" and that Plaintiff failed to meet the College's expectation to complete her book project. (**Tab B**, Ex. 215 to Calvente Dep. at 23087.) The minority also shared concerns of the College's tenured faculty that a large portion of Dr. Calvente's service was outside her home unit. (**Tab B**, Ex. 215 to Calvente Dep. at 23087.)

**Response:**     Admit.

128.     One of the members on the UBPT was Dr. ▮▮▮ a faculty member in the College. (**Tab B**, Calvente Dep. 151:17–152:1.) Dr. ▮▮▮ voted in favor of awarding tenure to Plaintiff. (**Tab B**, Calvente Dep. at 152:12–16; **Tab H**, ▮▮▮ Dep. at 67:2–24.).) If he had abstained, the UBPT vote (a 3–3 tie) would have come out against her. (**Tab B**, Calvente Dep. 151:4–155:20; **Tab D**, Ex. 1 to Rinehart Decl., p. 00036 at ¶ 3.5.1.1(c).) Dr. ▮▮▮ testified that although he voted in favor of granting tenure and promotion to Plaintiff, it was a "razor-thin" decision for him and that Plaintiff's case was "not a slam dunk by any means." (**Tab H**, ▮▮▮ Dep. at 38:24–39:14.) Dr. ▮▮▮ explained that with respect to teaching, UBPT members expressed concerns about the reports of student intimidation, how the curriculum in Communications 103 was taught, and to a lesser extent, how Plaintiff used multimedia in her classes. (**Tab H**, Teboul Dep. at 37:19–38:3.) With respect to Plaintiff's research, there was some discussion about whether Plaintiff was "double-dipping" and whether some of the student performances Plaintiff submitted could appropriately be categorized as "research." (**Tab H**, ▮▮▮ Dep. at 68:17–69:2.) Dr. ▮▮▮ also noted that Plaintiff "could have been a little bit clearer" in her resume and noted "her publication record was hard to untangle." (**Tab H**, ▮▮▮ Dep. at 38:24–39:14.) With respect to service, Dr. ▮▮▮ felt that Plaintiff's contributions were a little bit weaker and not where they needed to be at the College level. (**Tab H**, ▮▮▮ Dep. 39:15–24.) Dr. ▮▮▮ felt Plaintiff had done enough to warrant tenure, but he believed it was a close case and different aspects of the case were more salient to some reviewers than others. (**Tab H**, Teboul Dep. at 67:2–24.)

**Response:**     Admit.

129.     On June 10, 2019, Dr. Ghanem, who was serving as the Acting Provost at the time, reviewed the recommendations from the College, Dean Murphy, and the UBPT, as well as Plaintiff's

dossier (including Plaintiff's response to the College's report), and concluded that there was "every evidence of careful review of this case at all levels." (**Tab B**, Ex. 217 to Calvente Dep.; **Tab B**, Calvente 168:21–169:3; **Tab D**, Rinehart Decl. at ¶ 4; **Tab F**, Ghanem Dep. 84:11–89:5.) In her letter to Plaintiff denying tenure, Dr. Ghanem wrote, "although the UBPT recommendation report did not dispute the tenured faculty's and acting dean's evaluation of your record as 'very good,' it notes that the Board's dissenting members (3 out of 7) did consider the College of Communication's above guidelines in making their decision on the case." (**Tab B**, Ex. 217 to Calvente Dep.) Dr. Ghanem later explained that she agreed with the minority view of the UBPT. (**Tab B**, Ex. 217 to Calvente Dep.; **Tab F**, Ghanem Dep. at 38:2–8; 51:8–54:18; **Tab F**, Ex. 22 to Ghanem Dep. at p. 7157.)

> **Response:**    Admit.

130.    In her letter to Plaintiff, Dr. Ghanem wrote:

There is every evidence of careful review of this case at all levels ... Per the handbook, before granting tenure, "the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission" (emphasis mine). The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues, concerns which led them to vote against promotion and tenure by an overwhelming majority. As noted in the college and dean's reports and as acknowledged by you in your response, the concerns that have been raised in this tenure review have been raised in earlier probationary reviews. Given this, I would like to clarify my own earlier role in the consideration of your case, as Dean of the College of Communication during your 2015 and 2017 formal reviews. In the conclusion to your response to the college reports, you referred obliquely to my "assessments" during those earlier reviews. It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure." I had noted some improvement between formal reviews and wanted to give you the opportunity to address the remaining stated areas of concern in all three areas to meet the standards of the college by the time of your tenure review. In my letters of renewal in 2015 and again in 2017,

I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation of your colleagues.

(**Tab B**, Ex. 217 to Calvente Dep. at 23033–23034.)

> **Response:**  Admit that Dr. Ghanem's letter is accurately quoted. Deny that the letter reflects Dr. Ghanem's real reasons for terminating Dr. Calvente. (Calvente Dep. 221:14–222:10, 265:5–266:13, 271:22–273:4, 277:5–278:7, 300:1–301:3; Answer at ¶28 and Exhibit 5 to Complaint at pages 1–3; Answer at ¶29 and Exhibit 6 to Complaint; Ghanem Dep. Ghanem Dep. 66:13–67:16 and Exhibit 1 (Bates labeled DePaul–Calvente 013833–34); 67:18–21; Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95); Ghanem Dep. 105:16–106:1.)

131.  Plaintiff timely appealed DePaul's tenure denial on all available grounds, arguing that her adverse tenure decision should be reversed based on violations of academic freedom, violations of procedure, and discrimination. (**Tab B**, Calvente Dep. at 169:21–170:4, 177:3–7; **Tab B**, Ex. 219 to Calvente Dep.) She submitted a 17–page, single–spaced appeal. (**Tab B**, Ex. 219 to Calvente Dep.)

> **Response:**  Admit.

132.  First, Plaintiff alleged the College's concerns regarding her teaching violated the standards of academic freedom set forth by the AAUP because they effectively prevented her from having the freedom to discuss race in her classes, which Plaintiff alleges she was hired to do. (**Tab B**, Ex. 219 to Calvente Dep; **Tab B**, Calvente Dep. at 177:3–7.) Additionally, Plaintiff argued that the tenured faculty's evaluation of her teaching based on use or lack of certain instruments, such as visual aids, which Plaintiff does not find to be important, violated her right to teach in the manner appropriate to her pedagogical philosophy. (**Tab B**, Ex. 219 to Calvente Dep.; **Tab B**, Calvente Dep. at 177:3–7.)

> **Response:**  Admit.

133.     Additionally, Plaintiff alleged there were numerous procedural violations with respect to her tenure decision that violated the Faculty Handbook and/or College Guidelines, including her belief that: (1) Dr. Ghanem failed to provide a "compelling reason" for overturning the UBPT's recommendation, (2) Dr. Ghanem had a conflict of interest when she weighed in on her tenure decision given her current and prior roles within the College, (3) Dr. ███ should have abstained from participating in the UBPT because he was a tenured member of the College faculty, (4) the College faculty unfairly scrutinized her teaching, research, and service, did not appropriately take into account her leaves of absence, misrepresented her teaching, provided inconsistent guidance and failed to send her complete dossier out to external reviewers, and (5) Dr. Ghanem improperly relied upon Plaintiff's formal and informal performance reviews in her tenure decision. (**Tab B**, Ex. 219 to Calvente Dep.; **Tab B**, Calvente Dep. 151:4–14.)

**Response:**     Admit.

134.     Finally, Plaintiff argued her tenure decision should be reversed because the College faculty's evaluation of her teaching was allegedly discriminatory in that it was based on caricatures and stereotypes which portrayed her as harsh and intimidating. (**Tab B**, Ex. 219 to Calvente Dep. at 5621–5622.)

**Response:**     Admit.

135.     The Faculty Appeals Board for her case was ████████████████████████
████████████████████ (**Tab C**, Ex. 6 to Esteban Dep. at p. 155; **Tab G**, Diaz Decl. at ¶ 7.)

**Response:**     Admit.

136.     The Faculty Appeals Board conducted an investigation which it described as a careful and extensive review of the 250 pages of documentation submitted by Plaintiff, as well a review of

documentation from the University EEO office, consultation with Chief Human Resources Officer Stephanie Smith, and dozens of responses to questions and follow-up questions from Plaintiff, Dean Murphy, and Dr. Ghanem. (**Tab C**, Ex. 6 to Esteban Dep. at p. 156.)

> **Response:**     Admit.

137.     After conducting an investigation, the Faculty Appeals Board could not substantiate Plaintiff's appeal based on alleged violations of academic freedom. (**Tab C**, Ex. 6 to Esteban Dep. at 8290–8291; **Tab B**, Calvente Dep. 172:6–183:18.) The Faculty Appeals Board also could not substantiate Plaintiff's appeal based on alleged discrimination and retaliation. (**Tab C**, Ex. 6 to Esteban Dep. at 8318–8322; **Tab B**, Calvente Dep. 172:6–183:18.) In their report, the Faculty Appeals Board stated:

> The Board finds that the allegations that the College violated federal policies regarding non-discrimination could not be substantiated. The appeal did not provide specific information, evidence or statements to substantiate a claim of discrimination on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability or genetic information.

(**Tab C**, Ex. 6 to Esteban Dep. at 187.) Additionally, the Board "did not substantiate [Plaintiff's] claim that [Dr. Ghanem] engaged in retaliation against [Plaintiff] for filing EEO claims against the College." (**Tab C**, Ex. 6 to Esteban Dep. at 8321.)

> **Response:**     Admit.

138.     With respect to Plaintiff's claim of procedural violations, the Faculty Appeals Board could not substantiate the allegation that Drs. Ghanem and ███████ engaged in a conflict of interest and should have recused themselves from reviewing her case; the allegation that Dr. Ghanem failed to provide a compelling reason for her decision to reject the UBPT majority recommendation; the allegations that the College failed to consider her contract year in her 2015 review; and the counting

of her public performances as scholarship, including the related failure to send a performance link to external reviewers. (**Tab C**, Ex. 6 to Esteban Dep. at 155–188.)

> **Response:** Admit.

139. However, the Board stated it found that the College unfairly misrepresented student comments in her teaching evaluations. (**Tab C**, Ex. 6 to Esteban Dep. at 168.) The Faculty Appeals Board also concluded that she was provided with "inconsistent" guidance regarding service because her 2017 review encouraged her to both increase her College–level service and her University service, and because Dr. Murphy submitted a service letter detailing her service on a single committee in the College. (**Tab C**, Ex. 6 to Esteban Dep 183–184.) The Faculty Appeals Board also stated it was their belief that Dr. Ghanem assigned undue weight to the College's concerns rather than University-wide criteria. (**Tab C**, Ex. 6 to Esteban Dep at 159.) Accordingly, the Faculty Appeals Board recommended Plaintiff's tenure application be reconsidered. (*Id.*)

> **Response:** Admit.

140. As the final arbiter of the appeal process, the University President A. Gabriel Esteban (Asian) testified that he reviewed Plaintiff's record along with the reconsideration request from the Faculty Appeals Board, and stated that he found no material procedural irregularities warranting reversal of the denial of tenure. (**Tab C,** Esteban Dep. 55:7–57:2, 143:12–144:1; **Tab B**, Ex. 231 to Calvente Dep. at 21842; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 1 to Rinehart Decl., pp. 00080–00081 at ¶ 5.1.2.3.)

> **Response:** Admit.

141. The President's role is not to evaluate the merits of the candidate's case for tenure or to substitute his judgment for that of the lower levels. (**Tab C,** Esteban Dep. at 100:2–13, 89:10–15.) Rather his review is limited to whether processes and procedures were followed. (**Tab C,** Esteban

Dep. at 100:2–13.) In Plaintiff's case, Dr. Esteban disagreed with the Faculty Appeals Board's sub-stantiation of the three procedural violations alleged by Plaintiff, concluding the Faculty Appeals Board went beyond its narrow charge and undertook an independent evaluation of the merits of Plaintiff's teaching and service. (**Tab C,** Esteban Dep. at 148:10–149:15; 105:8–107:9; **Tab B**, Ex. 231 to Calvente Dep.).

>   **Response:**    Admit.

142.    Specifically, in his letter to Plaintiff, Dr. Esteban affirmed the decision to deny Plain-tiff tenure, and stated that Plaintiff had the full benefit of a faculty-run process with multiple checks and balances over preceding levels of review, and that the multi-tiered process worked as it was intended. (**Tab B**, Ex. 231 to Calvente Dep. at 21842; **Tab C,** Esteban Dep. 181:19–182:3.) Dr. Esteban noted in his letter that the dossier:

>   the dossier shows full transparency, context, and ample discussion around the issue of student comments in teaching evaluations. These types of discussions and the ap-plication of sound academic judgment, informed by experience, are foundational to the tenure review process. It is through these debates — at every level — that the uni-versity determines whether or not there is any reasonable doubt about the faculty member's qualifications and continued capacity to contribute ... The record reflects a holistic review of your teaching, which took into account more than just the student concerns about feeling intimidated and/or uncomfortable in the classroom. The Col-lege Report also highlighted other areas requiring improvement, including concerns about clarity in assignments and assessments of learning; outcomes, time manage-ment, use of textbooks/readings, and incorporation of visual aids and multiple me-dia ... The College Report acknowledged improvement in some of these areas ... However, the College Report's description of the faculty meeting reflected general concern among the tenured faculty that you resisted developmental recommenda-tions ... Against this backdrop, the Appeals Board has no authority to substitute its own interpretation of the meaning and weight that should be attributed to the vari-ous factors that go into teaching evaluations.

(**Tab B**, Ex. 231 to Calvente Dep. at 21847.) Dr. Esteban further stated the College Report was "replete with positive quotes from peer reviewers and students," and stated that the faculty "grappled with and debated the issues of student concern" with "very robust discussion" of the positives and

negatives of her teaching, and that the Dean's letter "acknowleg[ed] that [Plaintiff's] approach worked for some students and not others." (*Id.* at 21845–21847; **Tab C,** Esteban Dep. at 109–113, 118.) Dr. Esteban stated that by providing a full and representative range of student opinions regarding Plaintiff's teaching, he believed Plaintiff's dossier "show[ed] full transparency, context, and ample discussion around the issue of student comments in teaching evaluations." (**Tab B,** Ex. 231 to Calvente Dep. at 21847.) "[E]ven if the college, the Acting Dean and/or the UBPT misunderstood the volume and severity of student concerns" that is not a material procedural violation. (**Tab C,** Esteban Dep. at 127:14–128:15.)

> **Response:** Admit that Dr. Estaban's letter is accurately quoted. Deny the veracity of the content of Dr. Estaban's letter. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

143. In his report, Dr. Esteban also noted that:

> Evolving recommendations over the course of your probationary period and differing opinions amongst the reviewing faculty does not mean that the process –– during the probationary period or the tenure review –– was unfair, inconsistent, or procedurally flawed. Rather, I would argue that it demonstrates that the process functioned as it should.

(**Tab B**, Ex. 231 to Calvente Dep. at 21850.)

> **Response:** Admit that Dr. Estaban's letter is accurately quoted. Deny the veracity of the content of Dr. Estaban's letter. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

144. Finally, in his report, Dr. Esteban disagreed with the Board's concern that the Dr. Ghanem gave too much weight to the College's evaluation as compared with the UBPT's evaluation, writing, "[a]fter first concluding that the Interim Provost had reiterated her agreement with the UBPT minority members and had acted in good faith and objectively, the Appeals Board then leaps to the unsupported conclusion that the Interim Provost assigned greater weight to college concerns than university-wide criteria. . . . Four of the seven UBPT members reviewed the promotion and

tenure application and were satisfied that the requirements at every level were met. That the Interim Provost was not in the end similarly satisfied is not, in and of itself, evidence of an over-emphasis on college concerns." (**Tab B**, Ex. 231 to Calvente Dep. at 21850–51.) Dr. Esteban stated that "it is not enough to make an argument that tenure could have been granted." (**Tab B**, Ex. 231 to Calvente Dep. at p. 21851. Dr. Esteban stated that the procedures outlined by the Handbook were designed for precisely this kind of close decision. (**Tab B**, Ex. 231 to Calvente Dep. at p. 21850.)

> **Response:** Admit that Dr. Estaban's letter is accurately quoted. Deny the veracity of the content of Dr. Estaban's letter. (Answer at ¶31 and Exhibit 7 to Complaint at pages 12–30.)

145. Having exhausted internal recourse, Plaintiff filed a Charge of Discrimination on August 16, 2019 and her Complaint on June 8, 2020. (**Tab B**, Calvente Dep. 117:1–199:21.) In her Charge, Plaintiff lists her race as "Asian and Black" and her national origin as "Hispanic." (**Tab B**, Calvente Dep. 117:1–199:21.) In her complaint, Plaintiff states her national origin is "American of African, Latinx, and Asian descent" not "Hispanic." (Pl. Compl. at ¶ 1.)

> **Response:** Admit.

146. Plaintiff alleges she was discriminated against by the Personnel Committees between 2015 and 2018, her former chairs (Dr. Murphy, ████████████████), and Dr. Ghanem. (**Tab B**, Calvente Dep. at 10:15–12:12.) At the time of her deposition, Plaintiff could not recall the names of all the people she believed discriminated or retaliated against her, referring to them simply as her "senior colleagues" in the College. (**Tab B**, Calvente Dep. at 10:15–12:12.) Plaintiff alleges her senior colleagues discriminated and retaliated against her because she is a "Black Diasporic Asian American Latina" and teaches topics on racism. (**Tab B**, Calvente Dep. at 185:20–186:6.) Plaintiff contends it is a combination of her race and the subject matter she teaches that has resulted in her colleagues allegedly treating her unfairly. (**Tab B**, Calvente Dep. at 185:20–186:6.)

**Response:** Admit.

147. Plaintiff alleges that when she was hired in 2011, but before she started working at DePaul, she was invited to a brunch at a colleague's friend's home, where Dr. ███ made a joke in which the punch line involved the word "nigger." (**Tab B**, Calvente Dep. at 16:10–17:17.) Plaintiff testified that the time the joke was made, she immediately told Dr. ███ the joke was unacceptable, and both she and Dr. ███ reported the incident to Dean Murphy. (**Tab B**, Calvente Dep. at 16:10–17:17.)

**Response:** Admit.

148. Plaintiff alleges that during her first year, academic year 2011–2012, Dr. ███████ made a racially insensitive comment about communities in the South and West side of Chicago, and Plaintiff immediately addressed this comment with Dr. ███████ and Dean Murphy. (**Tab B**, Calvente Dep. at 91:9–93:24; 108:10–19; **Tab E**, Murphy Dep. at 214, 226–27.) In the spring of 2018, Dean Murphy proposed Dr. ██████ act as a peer reviewer for Plaintiff. (**Tab B**, Calvente Dep. at 91:9–93:24; 108:10–19; **Tab E**, Murphy Dep. at 214, 226–27.) When Plaintiff objected to Dr. ██████ serving in this role, Dean Murphy immediately reassigned the role to another faculty member. (**Tab B**, Calvente Dep. 92:2–95:5.)

**Response:** Admit.

149. In the 2018–2019 tenure review cycle, three candidates from the College of Communication were up for tenure: Plaintiff; ████████████████████████). (**Tab E**, Murphy Dep. at 18:19–19:14, 55; **Tab G**, Diaz Decl. at ¶ 7.) Drs. ██████████ were granted tenure after unanimously favorable votes at every level of review. (**Tab D**, Rinehart Decl. ¶17.) Dr. ██████ did not file internal complaints of discrimination. (**Tab F**, Ghanem at 65:3–9; **Tab G**, Diaz Decl. ¶ 5.)

**Response:**     Admit.

150.     Dr. ██████ started at DePaul University in the Fall of 2016, after having already achieved tenure at the Western University of Illinois. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 010106; **Tab E**, Murphy Dep. 238:24–239:7.) Dr. ██████ was credited with three years of service, and, as described by the Personnel Committee, "only had a short time at DePaul . . . before going up for tenure review." (**Tab D**, Ex. 2 to Rinehart Decl. at pp. 010106, 010110.) In her two probationary years at DePaul, she produced 8 publications. (**Tab D**, Ex. 2 to Rinehart Decl. at 10111–12.) In her two probationary years at DePaul, she taught 10 distinct courses. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) Three of these were classes she created, and two more were new course preparations. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) In her transition from a semester system to a quarter system, she had to redesign her courses. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10107.) Prior to going up for tenure, Dr. ██████ had more cumulative quantitative teaching evaluations for the classes she taught at or below 4.0 out of a 5 point scale than did Plaintiff for the classes she taught.  (**Tab F**, Ghanem Dep. at 97:2–100:5; **Tab F**, Exs. 26 and 28 to Ghanem Dep.; **Tab E**, Murphy Dep. 160:18–164:21; **Tab E**, Exs. 24 and 26 to Murphy Dep.) Dr. ██████ also had more cumulative quantitative teaching evaluations at or below 2.0, than did Plaintiff in their respective classes. (**Tab F**, Ghanem Dep. at 97:2–100:5; **Tab F**, Exs. 26 and 28 to Ghanem Dep.; **Tab E**, Murphy Dep. 160:18–164:21; **Tab E**, Exs. 24 and 26 to Murphy Dep.) Dr. ██████ also received some negative qualitative student feedback before going up for tenure, including:

- Student No. 1079956: Instructor can be insensitive at times towards students

- Student No. 1079963: The teacher can be rude and does not like answering questions

- Student No. 1023498: It's unfortunate that this course had a such a poor structure 4 since the content was both interesting and useful.

- Student No. 1034256: Much as I love learning about new concepts and relationship theory, I wouldn't want to take this course again if it were set up to be the same way.

- Students 1051054: I enjoyed the assigned readings, but I found it frustrating that in class discussion was often unrelated and/or difficult to apply to the theories

(**Tab E**, Murphy Dep. at 166:17–181:17; **Tab E**, Ex. 27 to Murphy Dep.) Dr. ████ did not ask the Personnel Committee to quantify the number of negative student comments she received. (**Tab E**, Murphy Dep. at 236:17–238:5.) In her personal statement, Dr. ████ acknowledged that she received some negative student feedback. (**Tab D**, Ex. 4 to Rinehart Decl. at 10141–42.) She presented specific plans for addressing the students' concerns. (**Tab D**, Ex. 4 to Rinehart Decl. at 10141–42.)

    **Response:**    Admit.

151.    In their report on Dr. ████ tenure case, the Personnel Committee noted areas where Dr. ████ teaching scores were lower than the College average, and stated that an area Dr. ████ had struggled was the consistent requests from students for clearer directions on assignments and assessment expectation. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 10141–10142; **Tab F**, Exs. 26, 27 to Ghanem Dep.) In her tenure review, the Personnel Committee noted that Dr. ████ shorter clock "put her in a precarious position because she had little time to improve" before going up for tenure review. (**Tab D**, Ex. 2 to Rinehart Decl. at 10110.) The Personnel Committee noted that during her interview, Dr. ████ reflected upon the challenge of adapting her teaching style for the DePaul learning environment and the little time she had to improve. (**Tab D**, Ex. 2 to Rinehart Decl. at 10110–10111.) The Personnel Committee wrote:

> However, we have confidence that ████ teaching will strengthen over time: it has improved over the two years she has been here and she is making a concerted effort to quickly adapt to DePaul's curriculum and students. As mentioned earlier, ████ is engaging in efforts to further develop and strengthen her teaching here at DePaul. She completed DOTS training; attended the Teaching, Learning and Assessment Spring Conference; and she has registered

74

for and is attending workshops toward the Teaching and Learning Certificate Program. █████ has exhibited a strong willingness to acclimate her teaching style to DePaul and meet the learning needs of the students at both the undergraduate and graduate level.

(**Tab D**, Ex. 4 to Rinehart Decl. at 10111.) The Personnel Committee rated her teaching as "Very Good" and her research and service as "Excellent." (**Tab D**, Ex. 2 to Rinehart Decl. at 10105.) On November 16, 2018, the tenured faculty at the College by a vote of 21–0 unanimously recommended Dr. █████ for tenure and promotion. (**Tab D**, Ex. 2 to Rinehart Decl. at 10105; **Tab B**, Calvente Dep. at 186:24–187:17; **Tab F**, Ghanem Dep. 98:14–16.) Dean Murphy and the UBPT (unanimously) also recommended tenure. (**Tab D**, Ex. 2 to Rinehart Decl. at 10123–10125, 10371–10372.) Dr. Ghanem awarded Dr. █████ tenure. (**Tab D**, Ex. 2 to Rinehart Decl. at p. 010373.)

> **Response:** Admit.

152. Prior to going up for tenure, Dr. █████ had more cumulative quantitative teaching evaluations at or below 4.0 out of a 5 point scale for the classes she taught than did Plaintiff for the classes she taught. (**Tab E**, Murphy Dep. 163:2–164:21; Exs. 24 and 25 to **Tab E**, Murphy Dep.) Dr. █████ also had more cumulative quantitative teaching evaluations at or below 2.0, than did Plaintiff in their respective classes. (**Tab E**, Murphy Dep. 163:2–164:21; Exs. 24 and 25 to **Tab E**, Murphy Dep) Dr. █████ was required to undergo two additional teaching evaluations. (**Tab D**, Ex. 3 to Rinehart Decl.) In Dr. █████ tenure review, the Personnel Committee wrote:

> In previous review periods, the Tenured Faculty commented on some lower scores on █████ course evaluations; however, in both her previous teaching report (Winter 2018) and during the period of this formal review, █████ teaching evaluations demonstrate a strong upward trajectory and high scores on almost every measure ... Although some older formal reviews of █████ teaching have identified some issues in the areas of organization/structure, course materials, articulation of clear expectations, and courses — marking more weakness in her face–to–face courses than online courses, an additional formal teaching review in Winter of 2018 and a thorough review of █████ instructional materials through Summer of 2018 demonstrate that █████ conscientiously took action to address those concerns. In her October 2018 interview with the Personnel Committee, █████ noted the importance of DePaul's

Vincentian mission when redeveloping her classes: her comfort level expressing her-self to the students and making the classroom more inclusive has helped her become one of the college's most valuable instructors.

(**Tab B**, Calvente Dep. 116:2–4; **Tab D**, Ex. 3 to Rinehart Decl at 8630; **Tab I**, ███ Dep. at 41:9–10; **Tab E,** Murphy Dep. 19:6–7.) The Personnel Committee rated her teaching as "Excellent" and on November 16, 2018, the tenured faculty by a vote of 20-0 (with 1 abstention) recommended tenure and promotion for Dr. Dillard. (**Tab D**, Ex. 3 to Rinehart Decl. at 8626.) Dean Murphy, the UBPT (by a unanimous vote), and Dr. Ghanem all agreed with this recommendation and Dr. ███ was awarded tenure. (**Tab D**, Ex. 3 to Rinehart Decl. at 9322.)

> **Response:**  Admit.

153.  In 2019, Dr. Ghanem rejected the UBPT's recommendation in the case of ███ ███, and awarded him tenure. (**Tab F**, Ghanem Dep. 54:11–55:4, 102:17–106:13; **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 4 to Rinehart Decl. at 37298–37299.) In 2020, Dr. Ghanem rejected the UPBT's recommendation on two occasions, granting tenure to ███ ███, awarding them both tenure. **Tab G**, Diaz Decl. at ¶ 7; **Tab D**, Ex. 5 to Rinehart Decl. at 36927–36928; **Tab D**, Ex. 6 to Rinehart Decl. at 38092–38093.) Dr. Ghanem is not aware of ███ filing internal or external complaints of discrimination. (**Tab F**, Ghanem Dep. at 67:18–21, 69:9–12.)

> **Response:**  Admit.

154.  In 2019, Dr. ███ was a faculty member in the College of Science and Health who was up for tenure during the academic year 2018-2019. (**Tab D**, Rinehart Decl. ¶ 20; **Tab D**, Ex. 5 to Rinehart Decl.; **Tab F**, Ghanem Dep. 54:11–55:4, 102:17–106:13.) During Dr. ███ June 1, 2018 pre-tenure formal review, Dr. ███ department voted unanimously, in a 8-0 vote, to extend Dr. ███ contract, stating Dr. ███ showed "evidence of improving himself

as a teacher," that he was making "good progress in establish[ing] his research program," and that he "contribut[ed] service at all levels at the university." That Fall, Dr. ███ went up for tenure. At the unit level, both his Department and his College's Personnel Committees narrowly recommended against tenure (4–4 in the Department and 4–2–1 (recusal) in the College). Both his Department Chair and his Dean recommended tenure. (**Tab D**, Ex. 5 to Rinehart Decl at 036979.) The UBPT, with a 6–1 vote, recommended against tenure, noting a pattern of negative student reviews. (**Tab F**, Ghanem Dep. at 102:3–106:13; Ex. 27 to **Tab F**, Ghanem Dep.) On June 10, 2019, Dr. Ghanem rejected the UBPT's recommendation, and awarded Dr. ███ tenure and promotion. (**Tab F**, Ghanem Dep. at 106:3–13.). Dr. Ghanem explained that she rejected the UBPT's recommendation against tenure because less than six months prior to the commencement of his tenure case, Dr. ███ had received a performance review that had unanimously indicated everything was excellent and his department's tenure review report referenced that he "either meets or exceeds" the department's teaching expectations. (**Tab F**, Ghanem Dep. at 54:11–55:4, 106:3–13; **Tab F,** Exhibit 1 to Ghanem Dep.) Accordingly, Dr. Ghanem felt that reversal of the UBPT's recommendation was warranted on procedural grounds. (**Tab F**, Ghanem Dep. at 54:11–55:4, 106:3–13.)

> **Response:**  Admit sentences one through six. Deny sentence seven. (Ghanem Dep. 66:13–67:16 and Exhibit 1 (Bates labeled DePaul-Calvente 013833–34.) Deny sentence eight. (Ghanem Dep. 66:13–67:16 and Exhibit 1 (Bates labeled DePaul-Calvente 013833–34.)

155. Dr. ███████ is a Caucasian faculty member in in the College of Science and Health, Department of Mathematical Science who was up for tenure during the academic year 2019–2020. (**Tab D**, Rinehart Decl. ¶ 22; **Tab D**, Ex. 6 to Rinehart Decl ; **Tab F**, Ghanem Dep. 68:1–10; **Tab G**, Diaz Decl. at ¶ 7.) Dr. ███ had 15 publications at the time of tenure. (**Tab D**, Ex. 7 to Rinehart Decl at 37303–37304.) Dr. ███ was recommended for tenure by all previous levels of

review, including at the college level and dean level reviews. (**Tab D**, Ex. 6 to Rinehart Decl.) However, the UBPT, with a 1–6 vote, recommended against tenure related to concerns about his research not being sufficiently theoretical or methodological and as being the product of collaboration with students. (**Tab D**, Rinehart Decl. at ¶ 7; **Tab D**, Ex. 6 to Rinehart Decl at 38086.) Dr. Ghanem rejected the UBPT's recommendation and granted tenure to Dr. ███ stating she agreed with all prior level of reviews and concluding that his scholarly output "clearly met the criteria outlines in the Department of Mathematical Sciences guidelines." (**Tab D**, Ex. 6 to Rinehart Decl. at 38092; **Tab F**, Ghanem Dep. 67:22–69:12; **Tab F**, Ex. 24 to Ghanem Dep.)

> **Response:**    Admit.

156.    Dr. ██████████ is a Latina faculty member in the College of Science and Health School of Nursing who was up for tenure during the academic year 2018-2019. (**Tab D**, Rinehart Decl. at ¶ 21; **Tab D**, Ex. 5 to Rinehart Decl.) Dr. Aquino, had 10 peer–reviewed articles at the time of tenure. (**Tab D**, Ex. 5 to Rinehart Decl. at 34661–34663, 36923.) Prior to the UBPT's review, Dr. ██████ was unanimously recommended for tenure at all levels of review, including by the tenure and promotion committee at the School of Nursing, the Interim Director, the College of Science and Health Personnel Committee, and the Interim Dean. (**Tab D**, Ex. 5 to Rinehart Decl.at 36927–36928.) On May 8, 2020, the UBPT by a 3–4 vote recommended against tenure. (**Tab D**, Ex. 5 to Rinehart Decl. at 36918–36920.) On June 5, 2020, Dr. Ghanem rejected the UBPT's recommendation and awarded Dr. ██████ tenure, stating she concurred with all prior levels of review. (**Tab D**, Ex. 5 to Rinehart Decl. at 36927–36928.)

> **Response:**    Admit.

157.    During the 2018–2019 academic year, Dr. ██████ along with five other Black and Asian faculty members from other colleges at DePaul were awarded tenure by Dr. Ghanem. (**Tab G**,

Diaz Decl. at ¶ 7; **Tab D**, Rinehart Decl. at ¶ 14.) Plaintiff was the sole candidate to be denied tenure

in 2019. (**Tab D**, Rinehart Decl. at ¶ 14.)

      <u>**Response:**</u>    Admit.

Respectfully submitted,                    <u>*/s/ Fitzgerald T. Bramwell*</u>

December 23, 2021                     Fitzgerald T. Bramwell

                                          **LAW OFFICES OF FITZGERALD BRAMWELL**

                                          77 West Wacker, Suite 4500

                                          Chicago, Illinois 60601

                                          312–924–2884 (voice)

                                          bramwell@fitzgeraldbramwell.com

**Certificate of Service**

The undersigned, an attorney, certifies that on December 23, 2021, he caused the foregoing Lisa Calvente's Response To Defendants' Statement of Material Fact Pursuant To Local Rule 56.1(b)(2) to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Anna Wermuth, Esq.
Cozen O'Connor, P.C.
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
awermuth@cozen.com
*Counsel for defendants*

*/s/ Fitzgerald T. Bramwell*
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com

# Index of Exhibits to Lisa Calvente's Response To Defendants' Statement of Material Fact Pursuant To Local Rule 56.1(b)(2)

Exhibit 1 ................................................................................ Declaration of Lisa Calvente

Exhibit 2 ...................................................... Portions of transcript of Ghanem deposition

Exhibit 3 ...................................................... Portions of transcript of Calvente deposition

Exhibit 4 ................................................................................ Declaration of Lucy Rinehart

Exhibit 5 ...................................................... Portions of transcript of Murphy deposition

Exhibit 6 .........................................................................................................................
.......... Defendants' Answers And Affirmative Defenses To Plaintiff's Complaint And Jury Demand

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

Lisa Calvente        )
     Plaintiff,     )
v.            )
            )  No. 20–cv–3366
Salma Ghanem, and     )
DePaul University      )
     Defendants.   )
_____)

### Declaration of Lisa Calvente

I, Lisa Calvente, being first duly sworn upon oath, depose and state that this declaration is made on personal knowledge. If sworn as a witness I could testify competently to the facts articulated herein:

1. I am an American of African, Latinix, and Asian descent, and I identify as such.

2. I am currently a tenure–track assistant professor in the Department of Communication in the College of Arts and Sciences at the University of North Carolina at Chapel Hill. I have been in this position since July 1, 2021.

3. My areas of research are the black diaspora, performance studies, and cultural studieswith a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice.

4. I am a former tenure–track professor at DePaul, and I was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States. My employment at DePaul ended at the end of the 2019/2020 academic year, following the denial of my application for tenure and the conclusion of my terminal contract.

5. After the termination of my employment at DePaul, I was unemployed from August 1, 2020 through June 30, 2021.

6. I increased my service to DePaul University and to my local academic unit, the College of Communication, between March 2015 and November 2017 review. In addition to my continued service as affiliated faculty in Latin American & Latino Studies, African and Black Diaspora Studies, and the African and Black Diaspora Studies Steering Committee, I became affiliated faculty of DePaul University's new graduate program in Critical Ethnic Studies and also became one of the College of Communication representatives for the Liberal Studies Council Survey Review Subcommittee. For the local unit, I was part of the Communication 103 Syllabi Review Task Force and was the faculty discussant in performance and cultural studies for Communication Studies 500: *Foundations in Graduate Communication Studies* taught by Professor Jay Baglia. I was also an active participant in determining awards for our unit for the Communication Graduation Ceremony where I presented our graduate studies award to Abigail Escatel, who worked under my supervision. These additions do not include the various professional and community service that I did during this time period as a representative of DePaul University.

7. I know a former tenure-track professor at DePaul named ███████████ █████o, and I wrote a letter in support of Dr. ██████████ appeal of Dr. Salma Ghanem's decision not to renew his faculty contract at DePaul. I know Dr. ██████████ race to be white.

8. During a meeting with Dr. Ghanem that occurred on or about December 16, 2017, I told Dr. Ghanem that I wanted to contact Barbara Schaffer in DePaul's Office of Institutional Diversity and Equity to file a complaint of discrimination in response to the non-renewal recommendation. Dr. Ghanem called Barbara Schaffer at my request, left her a message, and we

continued our meeting. Dr. Ghanem advised me during this meeting not to file another complaint with OIDE until after my tenure review.

9.      I never had another meaningful conversation with Dr. Ghanem after October 10, 2018.

10.      When I taught CMN103 at DePaul, I did not use a text book but instead used a series of materials from texts, articles, chapters, and film. No one ever disapproved of my use of these materials or my syllabus in this core course.

11.      During the 2015/2016 academic year, I took leave to focus on my research; however, this did not extend my tenure clock.

12.      I am aware of a situation where, during the week ending October 19, 2018, two students lodged a complaint with Alexandra Murphy against me, and that one of those students dropped my class while the other stayed in my class. Dr. Murphy never asked me to reach out to schedule a meeting with the student who stayed in my class.

FURTHER DECLARANT SAYETH NAUGHT

**Certification Pursuant to 28 U.S.C. §1746**

I have read the foregoing Declaration of Lisa Calvente and declare under penalty of perjury that the foregoing is true and correct.

_____

Lisa Calvente
December 18, 2021

# Exhibit 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4      LISA CALVENTE,                    )
                        Plaintiff;    )
5                                       )
                                        )
6                                       )
         -v-                    )No. 20 CV 3366
7                                       )
                                        )
8                                       )
                                        )
9      SALMA GHANEM and DEPAUL           )
       UNIVERSITY,                  )
10                     Defendants.    )

11

12      The Discovery Deposition of SALMA GHANEM, having

13   been called by the Plaintiff for examination, taken

14   before Beth Radtke, RPR, CRR, within and for the

15   State of Illinois, pursuant to the Federal Rules of

16   Civil Procedure, conducted via Zoom virtual

17   videoconference, commencing at the hour of 9:00 a.m.

18   on the 24th day of March, 2021.

19

20

21

22

23   Reported By Beth Radtke, RPR, CRR

24   License No. 084-004561

Page 2

```
1              APPEARANCES
2
3   LAW OFFICE OF FITZGERALD BRAMWELL
    By Mr. Fitzgerald T. Bramwell
4     225 West Washington Street
      Suite 2200
5     Chicago, Illinois 60606
      bramwell@fitzgeraldbramwell.com
6     (312)924-2884
      Appeared on behalf of the Plaintiff;
7
8   COZEN O'CONNOR, P.C.
    By Ms. Anna Wermuth
9     Ms. Nandini Sane
      123 North Wacker Drive
10    Suite 1800
      Chicago, Illinois 60606
11    awermuth@cozen.com
      nsane@cozen.com
12    Appeared on behalf of the Defendants.
13
    ALSO PRESENT:
14
    Ms. Kathryn Stieber, General counsel, DePaul
15  University
16  Ms. Lisa Calvente
17
                 *****
18
19
20
21
22
23
24
```

Page 3

```
1                INDEX
2
3   WITNESS                    PAGE
4   SALMA GHANEM
    Examination By Mr. Bramwell      4
5
6   EXHIBITS
7
    ████  ████████████████ ████
    █   ███████   ██████       ███
    █   ████████████  ██      ███
    █   █████████████  █      ████
    █   ████████████ ███
    █   ████████████       ████
    █   ██████████████  ████
    █   ███████  ████████
    █   █████████    ████████
    █   ████████  ███████████
    █   █████████████████████
    █   ████████ ████████  ████████
20  CERTIFIED QUESTION
21  Page 93  Line 15-18
22
                 *****
23
24
```

Page 4

```
1       (Witness sworn.)
2          SALMA GHANEM,
3   having been first duly sworn, was examined and
4   testified as follows:
5          EXAMINATION
6   BY MR. BRAMWELL:
7     Q.  Can you please introduce yourself for the
8   court reporter?
9     A.  My name is Salma Ghanem G-H-A-N-E-M.
10    Q.  So it's pronounced Ghanem?
11    A.  Yes.
12    Q.  Dr. Ghanem, I have a little bit of hearing
13  problems, so can I just ask you to keep your voice
14  up?
15    A.  I will try my best.
16    Q.  Okay, thank you.
17        So it's Salma, S-A-L-M-A?
18    A.  Correct.
19    Q.  Ghanem, G-H-A-N-E-M?
20    A.  Correct.
21    Q.  Dr. Ghanem, you've just taken an oath to
22  tell the truth, do you understand that?
23    A.  Yes, I do.
24    Q.  Have you ever been deposed before?
```

Page 5

```
1     A.  No, I have not.
2     Q.  I'll give you some ground rules then.
3         I'll ask you questions, you'll give me
4   answers that are true, complete, and accurate.  The
5   court reporter is taking down everything that we say,
6   therefore, we have to be careful not to talk over
7   each other.
8         Do you understand that?
9     A.  Yes, I do.
10    Q.  Okay.  That just means that when I ask a
11  question, please let me get my question out.  There
12  may or may not be an objection to the question.  Let
13  those objections come out, and then, you know, you
14  have to answer the question.
15        Is that understood?
16    A.  Yes, it is.
17    Q.  Okay.  I will try not to talk over your
18  answer.  If -- sometimes I do that; it's just because
19  I think you might be finished.  If you're not
20  finished, please let me know, say, hey, I'm not
21  finished, let me finish.
22        Are we agreed?
23    A.  Yes.  Yes.
24    Q.  Okay, good.
```

2 (Pages 2 - 5)



Page 54

1　But from your testimony so far, I understand
2　that the only reason -- the only compelling reason is
3　if you disagree with the UBPT's assessment of the
4　dossier. Are there other compelling reasons that
5　would lead you to overturn a UBPT recommendation?
6　　A. There was one instance --
7　　MS. WERMUTH: Hang on. Let me object.
8　Asked and answered, calls for speculation.
9　BY MR. BRAMWELL:
10　　Q. Go ahead.
11　██████████████████████
12　██████████████████████████
13　██████████████████████████
14　████████████████████████████
15　████████████████████████████
16　█████████████████████████
17　████████████████████
18　█████████████████
19　███████████████████
20　██████████████████████████
21　██████████████████████████
22　███████████████████
23　██████████
24　█████████████████

Page 55

1　████████████
2　██████████████
3　████████████████████████
5　　Q. Okay. Are there any other cases or any
6　other situations you can think of that might
7　constitute compelling reasons for overturning a UBPT
8　recommendation?
9　　MS. WERMUTH: Calls for speculation.
10　　Go ahead.
11　BY THE WITNESS:
12　██████████████████████████
13　████████████████████████████
14　████████████████████████████████
15　██████████████████████████
16　█████████████████████████
17　███████
18　BY MR. BRAMWELL:
19　　Q. Okay. So if you think somebody did not
20　receive proper procedure or if you disagree with the
21　reading of the dossier. Anything else?
22　　A. No.
23　　Q. Okay. During your time as provost, have you
24　ever lost faith in the UBPT as a whole?

Page 56

1　　MS. WERMUTH: Objection, vague, relevance.
2　BY THE WITNESS:
3　　A. No, I have not.
4　BY MR. BRAMWELL:
5　　Q. What about any of its members?
6　　MS. WERMUTH: Same objections.
7　BY THE WITNESS:
8　　A. No, I have not.
9　BY MR. BRAMWELL:
10　　Q. Okay. Could you ask a member of the UBPT to
11　resign?
12　　A. I don't know. I've never confronted that.
13　　THE WITNESS: Mr. Bramwell, could I have a
14　humanity break?
15　　MR. BRAMWELL: Absolutely. 10:25 come back?
16　　THE WITNESS: I don't need that long.
17　　MR. BRAMWELL: That's just a nice round
18　number.
19　　MS. WERMUTH: That's fine. Thank you.
20　　THE WITNESS: Okay, thank you.
21　　(A short break was taken.)
22　BY MR. BRAMWELL:
23　　Q. All right. So Dr. Ghanem -- did I pronounce
24　that correctly?

Page 57

1　　A. Yes.
2　　Q. Okay, good. I apologize, it's one of my
3　quirks, for whatever issues that exist, I always want
4　to make sure I get people's names correct.
5　　I have e-mailed you a document that's Bates
6　labeled LC-0004068 through 4076. Please let me know
7　when it arrives. This is Exhibit No. 18.
8　　A. Can you repeat the numbers again?
9　　Q. Sure, it's LC, as in Lima, Charlie, 0004068
10　through 4076.
11　　A. I received it.
12　　MR. BRAMWELL: Ms. Wermuth, have you
13　received it?
14　　MS. WERMUTH: Yes.
15　　MR. BRAMWELL: Okay, good.
16　BY MR. BRAMWELL:
17　　Q. Dr. Ghanem, what is this document?
18　　A. This is the required end-of-year report from
19　UBPT to me.
20　　Q. All right. Is it true, complete, and
21　accurate in all respects?
22　　A. Yes, with the exception of one thing that
23　they don't mention.
24　　Q. Okay. What is inaccurate about this

15 (Pages 54 - 57)

Page 58

1  document?
2      A.  They do not mention that the candidate can
3  write a rebuttal to the UBPT recommendation, which I
4  also look at when I'm making my deliberations.
5      Q.  Okay.  So you believe the document should
6  contain more information, but you don't disagree that
7  the document is what it purports to be?
8      A.  That is correct.
9      Q.  Okay.  When did ▇▇▇▇▇▇▇ join the UBPT,
10  if you know?
11  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
12  ▇
13      Q.  Did you have in role in ▇▇▇▇ becoming a
14  member of the UBPT?
15      A.  No, I did not.
16      Q.  Let's take a look at page 2 of Exhibit
17  No. 18.
18          Before we do that, though, do you know how
19  one gets on the UBPT?
20      MS. WERMUTH:  Let me -- hang on just a
21  minute.  I'm going to object to examination on this
22  record, or on this Exhibit 18 insofar as it was
23  improperly obtained outside of the formal discovery
24  procedures.

Page 59

1  BY MR. BRAMWELL:
2      Q.  Dr. Ghanem, I await your answer.
3      A.  Sorry, can you repeat the question?
4      MR. BRAMWELL:  Sure.  Madam Court Reporter,
5  could you please repeat it?
6          (Record read as follows:  Before we do that,
7          though, do you know how one gets on the
8          UBPT?)
9  BY THE WITNESS:
10      A.  It is through the faculty council.
11  BY MR. BRAMWELL:
12      Q.  Okay.  And what is faculty council?
13      A.  Faculty council is a body of faculty
14  composed of faculty from different colleges and
15  schools at the university.
16      Q.  What is faculty council's purpose?
17      A.  To ensure faculty governance and to review
18  -- there are certain aspects where faculty have
19  primary responsibility.
20      Q.  Okay.
21      A.  As outlined in the faculty handbook.
22      Q.  All right.  So faculty council -- is it fair
23  to say that faculty council is the unit that
24  represents faculty's voice with respect to shared

Page 60

1  governance at DePaul?
2      A.  Yes.
3      Q.  Okay.  And faculty council appoints members
4  of the UBPT?
5      A.  Yes.
6      Q.  And now shared governance, what is shared
7  governance?
8      A.  Shared governance is where faculty input is
9  taken in terms of different decisions at the
10  university.
11      Q.  Okay.  Now as the provost, are you
12  considered faculty?
13      A.  I have a faculty appointment, but no, I am
14  not considered faculty.
15      Q.  Okay.  So then the UBPT is appointed by
16  faculty council.  Did we get that correct?
17      A.  That is correct.
18      Q.  And the UBPT, then, is faculty's voice with
19  respect to who should be tenured and who should not
20  be tenured?
21      A.  Based on that committee, yes, but there are
22  also other committees where faculty voices are
23  included, such as the local academic unit.
24      Q.  Okay.  So you have committees at the local

Page 61

1  academic unit, and the only university-level unit is
2  the UBPT; is that right?
3      A.  That is correct.
4      Q.  Okay.  Now let's take a look at Exhibit
5  No. 18, please, the second page of this exhibit, if
6  we may.
7      A.  Is that number 4069?
8      Q.  Correct, Bates label 4069.
9      A.  Okay.
10      Q.  And I'm going to share my screen, in part
11  because it's easier, and in part because I still
12  think it's cool.
13          Have I shared my screen successfully?
14      A.  Yes, you have.
15      Q.  Okay.  I'm going to highlight a sentence
16  that's in the middle of the last paragraph.  The
17  sentence is as follows:
18  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22  ▇▇▇▇▇
23          Do you see that sentence?
24      A.  I do.

16 (Pages 58 - 61)





Page 66

1      A.  No, I did not.
2      Q.  Did you ever have any telephone
3  conversations with him?
4      A.  No, I did not.
5      Q.  And by the way, I mean in the same time
6  period.
7          Same time period, ever exchange e-mail with
8  him?
9      A.  Not that I recall, no.
10     Q.  Okay.  Ever communicate with somebody on his
11 behalf?
12     A.  Not that I recall, no.
13     Q.  Okay.  I'm going to send you a document that
14 I have marked as Exhibit No. 1.  Please let me know
15 when it arrives.  It's Bates labeled
16 Calvente-DePaul-013833 through 013834.
17         Please let me know when it arrives.
18     A.  I just received the e-mail.
19         MR. BRAMWELL:  Ms. Wermuth?
20         MS. WERMUTH:  Actually, now I have it.
21         MR. BRAMWELL:  Okay, fantastic.
22         THE WITNESS:  Can you repeat the number
23 again?
24

Page 67

1  BY MR. BRAMWELL:
2      Q.  Sure.  It's Calvente-DePaul-01383 through
3  013834.
4      A.  I have it.
5      Q.  Okay.  Did you write -- are you familiar
6  with this document?
7      A.  Yes, I am.
8      Q.  Did you write it?
9      A.  Yes, I did.
10     Q.  Is it true, complete, and accurate in all
11 respects?
12     A.  Yes, it is.
13     Q.  As you sit here today, do you agree with its
14 content?
15     A.  Yes, I do.
16     Q.  Would you change anything about it?
17     A.  No, I would not.
18

Page 68

1
4      Q.  The following year so, that would be
5  academic year '19/'20?
6      A.  I believe so, yes.
7      Q.  And I realize that was kind of an odd way to
8  phrase it.  It would be academic year 2019/2020,
9  correct?
10     A.  That is correct.
11     Q.  All right.  I'm sending you Exhibit No. 24.
12 Please let me know when it arrives.  It is Bates
13 labeled Calvente-DePaul-38092 through 38093.
14     A.  I just received Exhibit 24.
15     Q.  Okay.
16         MR. BRAMWELL:  Ms. Wermuth?
17         MS. WERMUTH:  I have it.
18 BY MR. BRAMWELL:
19     Q.  Okay.  Dr. Ghanem, are you familiar with
20 Exhibit No. 24?
21     A.  Let me review it real quickly.
22     Q.  Mm-hmm, take your time.
23     A.  Yes, I am.
24     Q.  How are you familiar with it?

Page 69

1
3      Q.  And is it true, complete, and accurate in
4  all respects?
5      A.  Yes.
6      Q.  As you sit here today, do you agree with its
7  content?
8      A.  Yes, I do.
9
13     Q.  Okay.  I'm sending you a document that I've
14 labeled as Exhibit No. 2.  This is a document that's
15 Bates labeled Calvente-DePaul-013836 through 013837.
16         Please let me know when it arrives.
17     A.  I just received an e-mail titled Exhibit 2.
18         MR. BRAMWELL:  Ms. Wermuth?
19         MS. WERMUTH:  Yes.
20 BY MR. BRAMWELL:
21     Q.  Okay.  Dr. Ghanem, are you familiar with
22 Exhibit No. 2?
23     A.  Let me review.
24         Yes, I am.

18 (Pages 66 - 69)



Page 102

3    Q.   Okay.  Let's take a look now at Exhibit
4    No. 27, if we may.
5        A.   You want me to open it?
6        Q.   Please.
7        A.   Okay.
8        Q.   Now are you familiar with this document?
9        A.   Yes, I am.
10       Q.   Okay.

14       Q.   So looking at -- I'd like you to go to
15   page 2, and I'll share my screen with you too.  That
16   might be easy.

Page 103

1        Q.   Okay.  And Exhibit No. 27, is it true,
2    complete, and accurate in all respects?
3        A.   Yes, I believe so.

Page 104

Page 105



Page 106

23  tenure, right?
24      A.  I believe so.

Page 107

3      Q.  I'm sending you a document that's been
4  marked as Exhibit No. 4.
5          Please let me know when it arrives, and you
6  may open it.  This is a document Bates labeled
7  Calvente-DePaul-013346 through 013443.
8          Has it arrived yet?
9      A.  I just got it.  Exhibit No. 4 you said?
10     Q.  That's correct.
11     A.  And you said it's okay to open it?
12     Q.  Please.
13     A.  Okay.
14     Q.  Are you familiar with this document?
15     A.  Let me review it.
16         Yes, I am.
17     Q.  Is it true, complete, and accurate in all
18  respects?
19     A.  Yes, it is.
20     Q.  Do you know how Dr. Calvente reacted when
21  she received word of the nonrenewal?
22     MS. WERMUTH:  Objection.
23
24  BY THE WITNESS:

Page 108

1      A.  No, I do not know how she reacted.
2  BY MR. BRAMWELL:
3      Q.  No?  Did you ever have a conversation with
4  her about this?
5      A.  I do not recall if we had a conversation
6  about this one.
7      Q.  Okay.  But you know that Dr. Calvente filed
8  a complaint with OIDE?
9      A.  I do.
10     Q.  Okay.  Do you believe Dr. Calvente should
11  have reacted differently after receiving this
12  recommendation?
13     MS. WERMUTH:  Objection to the form.
14         Go ahead.
15  BY THE WITNESS:
16     A.  I do not have an opinion in terms of how she
17  should have or not have reacted.
18  BY MR. BRAMWELL:
19     Q.  No?  No opinion at all?
20     A.  No, I think it is up to her to react the way
21  she deems fit.
22     Q.  If you were in Dr. Calvente's place as a
23  junior tenure track but untenured faculty and you
24  believed that personnel had recommended your

Page 109

1  nonrenewal for racially discriminatory reasons, would
2  you have responded by filing with OIDE?
3      MS. WERMUTH:  Objection, improper
4  hypothetical, calls for speculation.
5  BY THE WITNESS:
6      A.  Again, you're asking me to put myself in her
7  shoes, which is kind of impossible to do.  But if I
8  believed I was the recipient of discrimination, yes,
9  I would file.
10  BY MR. BRAMWELL:
11     Q.  Okay.
12     A.  That is her right to do so.
13     Q.  Okay.  Do you know if Dr. Calvente's
14  complaint was the subject of conversation by or among
15  members of the faculty?
16     A.  I do not know.
17     Q.  And so I just want to understand your
18  testimony correctly.  You don't recall whether you
19  had a conversation with Dr. Calvente -- I'm sorry, go
20  ahead.
21     A.  No, go ahead.
22     Q.  It looked like you were leaning in and about
23  to say --
24     A.  No, go ahead.

28 (Pages 106 - 109)

Page 166

1   They have the obligation to teach, to do research,
2   and to perform service; is that correct?
3       A.   That is correct.
4       Q.   Do they have other obligations?
5       A.   I would say all of their obligations would
6   fall under those categories.
7       Q.   Teaching, research, and service?
8       A.   Correct.
9       Q.   Okay.  How many class hours are junior
10  faculty expected to teach?
11      A.   Tenure track faculty are expected to teach
12  two classes every quarter.
13      Q.   Two classes every quarter, and that's what,
14  two hours per class?
15      A.   I think it is three hours per week.
16      Q.   Okay.
17      A.   Per class.
18      Q.   So they're supposed to teach six hours a
19  week then?
20      A.   That is correct.
21      Q.   Okay.  And that's in the College of Comm,
22  right?
23      A.   It is also in -- that is the standard for
24  all colleges, usually.

Page 167

1       Q.   Only six hours a week of teaching?
2       A.   Six hours a week of teaching does not mean
3   six hours a week of work.  There is a lot of work
4   that happens outside of the classroom.
5       Q.   Okay.  And that goes to teaching?
6       A.   A lot of it is prepping for the classes,
7   grading for the classes, as well as the work that
8   they spend on research and service.
9       Q.   Okay.  Well, I'm just asking about teaching
10  right now, and I'll get into research and service.
11          But on teaching, it's six hours of teaching,
12  so then -- or rather six hours actually in the
13  classroom.  About how much additional time, then, is
14  spent preparing and all those other things that go
15  into teaching?
16      A.   It depends on the classes that they're
17  teaching.  If it's the same class, if they're
18  different classes, how large the classes are, if it's
19  a new prep, if it's an old prep, if they're revamping
20  the classes.  That varies from faculty to faculty.
21      Q.   If there is a 40-hour workweek,
22  approximately how much time is a faculty member
23  supposed to be devoting to teaching?
24      A.   We do not have --

Page 168

1           MS. WERMUTH:  Hang on.
2           Objection, assumes facts not of record.
3   BY THE WITNESS:
4       A.   We do not have a formula that says how many
5   hours should be devoted to teaching.
6   BY MR. BRAMWELL:
7       Q.   Okay.  I assume, then, there's no formula
8   for research or service either?
9       A.   In terms of number of hours, no.
10      Q.   How does one differentiate between excellent
11  and merely very good in the area of service?
12      A.   It is a combination of quantity and quality
13  of work.  There are committees that don't require
14  that much work and there are committees that require
15  a lot of work, and it is -- so it varies in that
16  sense.
17      Q.   Are there any quantitative metrics with
18  respect to service?
19      A.   Not in the sense that it would have to be so
20  many committees or so many hours, no.
21      Q.   Are there quantitative metrics in other
22  senses?
23      A.   Can you repeat the question, please?
24          MR. BRAMWELL:  Madam Court Reporter?

Page 169

1           (Record read as follows:  Are there
2           quantitative metrics in other senses?)
3   BY THE WITNESS:
4       A.   No, there is not.
5   BY MR. BRAMWELL:
6       Q.   How does one obtain service opportunities?
7       A.   They can be in a variety of ways, either if
8   it is a college committee, there could be a call for
9   people to serve on different committees.  If there is
10  a university-wide committee, it would be a call by
11  faculty council to serve on committees, as well as
12  volunteering to participate in various events that
13  take place in the college.
14      Q.   Are there quantitative metrics with respect
15  to research?
16      A.   Again, it is a holistic approach, and it's a
17  combination of both quantity and quality.
18      Q.   Okay.  So how do I know if I'm excellent
19  versus merely very good?
20      A.   A lot of it will be through the formal
21  reviews would be one way of calibrating and knowing
22  where you are in terms of your progress.
23      Q.   Okay.  Formal review, that would be the
24  reviews with personnel?

43 (Pages 166 - 169)

Page 170

1   A.  With personnel and the -- the report by the
2   tenured faculty, correct.
3   Q.  Would you agree that the purpose of the
4   reviews by personnel, the reports by tenured faculty,
5   that the purpose of those --
6   A.  I cannot hear you.  I lost you for a moment.
7   Q.  Oh, I'm sorry.  I'm sorry, can you hear me
8   now?
9   A.  Yes, I can.
10  Q.  Okay.  I'm sorry.  I'll try to speak up a
11  little bit.
12      Would you agree that the purpose of the
13  interviews with personnel and the report of the
14  tenured faculty during the probationary reviews are
15  to tell the candidate what she needs to do to
16  successfully make a case for tenure?
17  A.  It has two parts:  One is exactly as you
18  outlined, and another one is an actual vote where
19  they believe if that candidate is making adequate
20  progress towards tenure.
21  Q.  Okay.
22  A.  And that is the recommendation for
23  reappointment or non-reappointment.  So it's both.
24  Q.  Okay.  Has anyone ever accused you of making

Page 171

1   an employment decision for discriminatory reasons?
2   A.  Not that I recall, no.
3   Q.  ████████ never did that?
4   A.  No.
5   Q.  Has anyone ever accused you of making an
6   employment decision for retaliatory reasons?
7   A.  No.
8   Q.  ████████ never did that?
9   A.  No.
10  Q.  Did anyone at Central Michigan ever accuse
11  you of discrimination or retaliation?
12  A.  No.
13  Q.  Have you ever been accused of academic
14  dishonesty?
15  A.  No, I have not.
16      MR. BRAMWELL:  I'd like a few minutes to
17  collect my thoughts, if you don't mind.  We can come
18  back, let's say, at 2:11.
19      MS. WERMUTH:  Okay.
20      (A short break was taken.)
21      MR. BRAMWELL:  I have nothing further at
22  this point, and I'll pass you to Ms. Wermuth.
23      MS. WERMUTH:  Oh, terrific, okay.  You know
24  what then?  I'm going to just request a very short

Page 172

1   break, so if we could come back at, like, 2:20, we
2   can hopefully finish up pretty quickly after that,
3   okay?
4       THE WITNESS:  Thank you.
5       (A short break was taken.)
6       MS. WERMUTH:  We have no -- we have no
7   questions.
8       We will reserve signature, Ms. Radtke.
9       MR. BRAMWELL:  We'll order regular delivery,
10  and I will e-mail the exhibits.
11      (Deposition concluded at 2:19 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 173

1           CERTIFICATE OF
2       CERTIFIED SHORTHAND REPORTER
3       I, Beth Radtke, a Certified Shorthand
4   Reporter of the State of Illinois, CSR License No.
5   084-004561, do hereby certify:
6       That previous to the commencement of the
7   examination of the aforesaid witness, the witness
8   was duly sworn by me to testify the whole truth
9   concerning the matters herein;
10      That the foregoing deposition transcript was
11  stenographically reported by me and was thereafter
12  reduced to typewriting under my personal direction
13  and constitutes a true and accurate record of the
14  testimony given and the proceedings had at the
15  aforesaid deposition;
16      That I am not a relative or employee or attorney
17  or counsel for any of the parties herein, nor am I
18  interested directly or indirectly in the outcome of
19  this action.
20      IN WITNESS WHEREOF, I do hereunto set my hand at
21  Chicago, Illi                    2021.
22
23
24                Beth Radtke, RPR, CRR
                  License No. 084-004561

44 (Pages 170 - 173)

# Exhibit 1 to Ghanem Deposition





Office of the Provost
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-1330
FAX: 312/362-8874

June 10, 2019



Dear Professor ███████

I am pleased to inform you that, contrary to the recommendation of the University Board on Promotion and Tenure (UBPT), I have decided that you will be promoted to Associate Professor with tenure in the College of Science and Health, Department of Chemistry and Biochemistry, effective July 1, 2019. My decision regarding your application for promotion is based on my review of your dossier, including your responses to the department, college, and UBPT recommendation reports, and my attendance at the UBPT hearing on your case. With this promotion, your base academic year salary will be increased by $10,000; this increase will be reflected in your letter of reappointment for the 2019-2020 academic year.

The UBPT's 1-6 recommendation against tenure and promotion arises from Board member concerns about your teaching and research records during your probationary period. The UBPT's concerns about your research record centered on the quality and impact of your published articles, as well as the extent of your contributions to co-authored work. In this judgment, the Board echoes the evaluations of the College of Science and Health Personnel Committee and half your tenured colleagues in Chemistry, who noted the failure to establish an "active and productive research program" in your area of specialization, per the Chemistry departmental guidelines. Neither your chair nor your dean shared these concerns. Chemistry chair ███████████ recommendation letter systematically and convincingly counters the above concerns.

Furthermore, as you have pointed out in your candidate responses to the above reports, your department colleagues, who were evenly divided in their support of your application for the above reasons, had voted unanimously (8-0) during a formal review less than six months earlier to extend your contract, in full knowledge that you would be applying for tenure the following fall (per your chair, who clarified the timing subsequent to the UBPT hearing). The unit's June 1, 2019 formal review report (which you submitted as an addition to your dossier) includes a vote on contract renewal, but does not, as required by the Handbook, include a vote on whether you were making adequate progress toward tenure. However, the formal review's summary evaluation of your research record clearly indicates that you had met the bar for

Calvente-DePaul 013833

promotion and tenure: "The review committee is pleased to see the progress that Dr. ███ has made since joining the department as an Assistant Professor. The department's guidelines for promotion and tenure suggest that faculty should publish at minimum one peer-reviewed publication every other year, with at least one publication in the area of expertise for which the candidate was hired. Dr. ███ has already clearly satisfied this minimum requirement. The committee encourages him to maintain his research momentum to further strengthen his case for promotion and tenure on the basis of research." There is no indication that your research momentum has flagged, and some probability that the perceived lack of coherence is an effect of the cross-disciplinary nature of your research and scholarship. For all the above reasons, I consider your record of research and publication to have met the standard for promotion and tenure.

The UBPT also expressed concerns that your teaching during your probationary period has not been consistently effective, citing student evaluation complaints regarding communication of subject matter and timeliness of feedback. The department and college reports both also noted some unevenness (as well as more recent improvement) in the evaluations, but both reports rated your teaching highly. The department report summary on teaching noted that "Dr. ███ either meets or exceeds the department's expectations for planning, implementation, development, leadership, and effectiveness in teaching," and the CPC vote summary indicated that four rated him successful and two exceeds expectations. Both reports considered the student evaluations in the context of other evidence of teaching effectiveness. My own reading of your teaching record more closely matches the department and college reports. I have confidence that, given your own focus on science education, you will continue to develop and improve your teaching, as needed.

Please accept my congratulations on your promotion, awarded in recognition of your achievements in scholarship, teaching, and service and in expectation of your continued service to our students, the university, and your field. Throughout the course of your application for promotion, many members of the DePaul university community have evaluated and commended your professional accomplishments during your probationary period. Together with them, I have every confidence that you will continue to make significant contributions to your discipline, our programs and students, and the university community. I look forward to hearing about the progress of your career at DePaul in the coming years.

Sincerely,

Salma Ghanem, Acting Provost

cc: ████████████████████████████

Confidential

# Exhibit 18 to Ghanem Deposition





**University Board on Promotion and Tenure**
1 East Jackson Boulevard,
Chicago, Illinois 60604-2287

**To:** Salma Ghanem, Provost

**From:** University Board on Promotion and Tenure, 2019-2020 (Mojdeh Bayat (College of Education); Elena Boeck (College of Liberal Arts and Social Sciences); Dana Hall (School of Music); Ginger Nila Hofman (College of Liberal Arts and Social Sciences); Xiaoping Jia (College of Computing and Digital Media); Gregory Mark (College of Law); Sandra Shelton (College of Business)

**cc:** Lucy Rinehart, Associate Provost for Academic Planning and Faculty
Scott Paeth, President, Faculty Council

**Date:** September 23, 2020

**Re:** Required end-of-year report

Based on the experiences during the 2019-2020 academic year and as required by the Faculty Handbook 3.5.7.5, the University Board on Promotion and Tenure (UBPT or Board) hereby provides the Provost, the Faculty Council, and units with our suggestions and concerns regarding promotion and tenure processes, practices, and rules. With each suggestion or concern, the Board has identified the entity or entities it understands are in the best position to resolve the issue. In the case of changes to the Faculty Handbook, or in cases where definitive interpretations are suggested, the Faculty Council is the appropriate entity to evaluate and, where agreement exists, to implement, the suggestions, with the assistance and concurrence of the Provost.

The new Faculty Handbook has been in effect for several years. This year the UBPT has also reviewed the year-end letters since the adoption of the new Faculty Handbook and, as the last portion of the letter, will summarize our continuing concerns, even when the particular concerns may not have generated any specific problems in this cycle. Additionally, the Board begins this report with general concerns that several cycles of the promotion and tenure process have generated. Finally, the report has several unit-specific suggestions contained in individual addenda to the report. In each case a practice or policy came to our attention during the review of a candidate or candidates file(s) that either violated provisions of the Faculty Handbook or misinterpreted a provision of the Faculty Handbook (FH). See FH 3.5.6.1, where the UBPT is charged with "applying university-wide standards and criteria" [subsection c] and examining "the application of lower-level guidelines to the candidate" [subsection d]. The UBPT has a growing concern that these errors and misinterpretations redound to the detriment of individual candidates. The UBPT is charged with review of unit policies under FH 3.5.7.5. See also FH

1

**EXHIBIT
18**

3.4.3.  The Board believes that these issues in the "evaluation guidelines, criteria and procedures" of units should not wait on the Board's general reviews of unit policies.  (The Board reviews some, though not all, unit policies annually, ideally in the fall term.)  The Board therefore includes several addenda to the general year-end report.  Each addendum addresses unit-specific concerns and should be forwarded from the Provost's office to the relevant Dean.

**GENERAL CONCERNS**:

*Provost decisions to overturn UBPT recommendations*

The adoption of the new Faculty Handbook, which became effective July 1, 2015, signaled the importance of the faculty's role in the promotion and tenure process.  Consistent with the faculty's understanding of its role as "the primary creators of a vibrant academic community," the "system of faculty evaluation ... relies heavily on the views of the faculty.  Exercising professional judgment, experienced faculty evaluate the work of their colleagues for ... promotion, and tenure" (FH 3.1).  The aim of the process is explicit.  The hurdle is necessarily high, especially for tenure:  "Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications" (FH 3.1).  See also 3.3.1.3 ("The Tenure Review").  It is for these reasons that the Faculty Handbook establishes multiple levels of review, each with the full freedom, indeed the responsibility, to evaluate a candidate anew at each level (FH 3.5.1.1f).  After the first level of review, the review of a file also encompasses consideration of the "method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic units.  Relevant issues include matters of stringency, consistency among candidates, and fairness, as well as the implications the decision may have at the college, school, or university level" (FH 3.5.1.1f).  The Faculty Handbook does not provide for deference to reviews at any level, except one.

The Provost "makes the final decision on tenure or promotion" (FH 3.5.6.3).  Unlike every other level of review, however, the Faculty Handbook provides not just for deference to a lower level of review, but for a very high degree of deference in two respects.  The UBPT recommendation may be overturned only in "rare instances" (FH 3.5.6.3).  Moreover, the reason for overturning the UBPT recommendation must be "compelling" (FH 3.5.6.3).  Neither "rare" nor "compelling" are self-defining.  The language, especially because both conditions are required, powerfully suggests that the decision to overturn may not be made simply because the provost would have voted differently had the Provost been a voting member of the Board.  The language powerfully suggests that the decision to overturn may not be made simply because the Provost interprets part or all of a file differently than the UBPT.  Moreover, when read in conjunction with the "no doubt" language quoted earlier regarding the tenure decision, that language, at least in cases of tenure, powerfully suggests that in order to overturn the recommendation of the Board, the faculty representatives, the Provost should find that the UBPT recommendation was manifestly one that was groundless.  In other words, doubt existed where the Board found none, or where the Board expressed its doubt, the Provost found that the Board's reason(s) for doubt were completely unfounded.  In the case of promotion to full professor, the requirements are even more explicit and particularized.  The requirements for promotion to full professor are unequivocal statements of quality of performance:  recognition by "peers inside and outside the university" of scholarship or creative activities, "notable" service "at the university level," and a

LC0004069

"mandatory" requirement for "effective teaching," thus, the rank "is reserved for those with recognized academic achievement" (FH 3.4.1).

The UBPT recognizes that the Faculty Council is not privy to either the UBPT recommendations or to the Provost's written decisions. At first glance, moreover, the number of decisions to overturn may not appear to be numerous, and, especially in this past cycle, with only about half as many candidates as usual, the year may present an unusual sample. (The Provost's office provided the UBPT with the following numbers of overturns: 2016/2017 5/51; 2017/2018 zero; 2018/2019 3/47; 2019/2020 3/23.) The UBPT notes, however, that the percentage of decisions to overturn suggests something other than that the decisions are rare. The UBPT has also spent hours discussing the rationale(s) embodied in the Provost's decisions. In nearly every case, the rationale(s) are ones the Board has already considered during its initial deliberations. By definition, most members of the UBPT did not find the rationale(s) compelling when made during deliberations. Had the members found the rationale(s) compelling, the vote would have been different. In other words, the rationale(s) might be plausible, even persuasive to some, but not compelling in the sense that the word is usually used in such a context, meaning overwhelming or at least sufficiently powerful to convince even a bare majority of the Board. Had the drafters of the Faculty Handbook, and the faculty approving the Faculty Handbook, understood compelling as meaning simply coming to a different conclusion, then the Faculty Handbook could have provided for simple disagreement as a basis for not accepting the recommendation of the UBPT. Neither the drafters nor the faculty reviewing the draft so provided. Moreover, to reiterate, at no other level of evaluation does the Faculty Handbook embody any level of deference, as noted above, except for the Provost towards the UBPT.

The UBPT understands that the Faculty Council cannot actually review the back-and-forth between the Board members and the provost. Moreover, the Board understands that this concern embodies the Board's perspective as the faculty's representatives. The UBPT is not a policy-making body. After five years under the guidance of the new Faculty Handbook, however, the Board believes a clearer understanding of what "only in rare instances and for compelling reasons" (FH 3.5.6.3) means should be provided, if for no other reason than to provide a continuity of understanding.

*Unit errors that affect a file*

Over the past several years, during review of candidate files, the UBPT has noted that certain academic units have had rules or practices that are not consonant with the Faculty Handbook. They therefore engage in practices that violate the Faculty Handbook, or misinterpret the Faculty Handbook, which supersedes unit rules where they are inconsistent. See FH 3.4.2 and 3.4.3: Unit rules "provide unit- and discipline-specific articulations of university-wide criteria"; unit "guidelines must be consistent with the university's criteria and procedures specified in the Faculty Handbook." These errors, practices, or interpretations are not ones the Board can address unless the Board has reviewed the unit's rules, an annual and on-going process. In the case of misinterpretation, only when the Board sees the file or hears the candidate, the chair, or the dean, can the Board become aware of the difficulty. The Board has regularly mentioned these matters to the chairs and deans who appear before the Board. In many cases, however, upon review of unit policies, the Board discovers that necessary changes have not been made. In

LC0004070

part, for this reason, the UBPT adopts in this cycle the unit-specific addenda mentioned earlier. The Board also suggests that the Faculty Council and the Provost formalize a process to require review of policies and practices before they might have an adverse impact on a candidate's future. At a minimum, units should ensure that if they have any candidates eligible for tenure that they ensure their policies are consistent with the Faculty Handbook long before the candidates begin to prepare their files.

## SCHOLARSHIP AND CREATIVE WORK

1. *Pay to publish*. The UBPT supports the Handbook amendment approved by Faculty Council in the Spring concerning the growing issue of pay-to-publish and pay-to-present. This matter is one best defined in the disciplines each unit encompasses. By way of clarification, the UBPT has never been concerned about questions of paying either membership dues or conference fees in order to be able to participate, and therefore present, at conferences. Such dues or fees would only be of concern if a differential fee applied to those who presented, for example, or if fee payment resulted in more favorable consideration. The concern of the Board has been and continues to be those conferences wherein everyone pays, gets quickly approved, no one is rejected, reviews are pro forma or non-existent, or no audience ever is in a position to listen or view a presentation, especially of concern where few or no records are kept of the method of presentation, the academic or professional audience attending, or any of the other indicia of integrity characteristic of regular proceedings. Similarly, the concern of the Board where publications are at stake centers on publications in journals that have sham editorial boards and processes, charge excessive fees for consideration, review, and publication, those journals where paying for expedited review amounts to paying to get in, or those journals adopting names very similar to respectable journals such that a misimpression can be generated about the quality of an academic record. The Board urges local units to address these matters quickly.

2. *Citation counts*. The Board appreciates that citations are not a definitive, much less the definitive, method to evaluate the quality and impact of academic work. Nonetheless, citation counts are widely recognized and accepted as an important index of a scholar's impact, all the more so if a piece is cited favorably over a long course of time. Therefore, to the extent that citation counts form part of a candidate's record, it is incumbent on the candidate, and the administrative officers, to be able to say what constitutes a good or notable citation record. Indeed, if citation counts are recognized and accepted in a field, that evaluation should be part of the record.

3. *Acceptance rates for journals and conferences, journal ratings, and similar measurements*. As with citation counts, to the extent that such metrics are recognized and accepted, the record should explain what they mean so that those outside of the immediate discipline can better understand them and ask appropriate questions. Simply stating what the rate of acceptance is rarely conveys, by itself, any information about quality or impact.

4. *External letters--substance*. Especially where a candidate is being considered for promotion to full professor, the external evaluations should be written by full professors. In general, external evaluations should be written by full professors who, by definition, have achieved the profession's highest recognition for accomplishment and are therefore well-placed to evaluate the quality and impact of a candidate's work. The Board reiterates its continuing concern that external evaluators should be chosen not because they are in "universities of

4

similar ranking," a phrase the Board has heard on occasion, but rather solely because they are well-suited to evaluate the candidate's work, to discuss the contribution the work makes to the field, to summarize and contextualize the work, and to clarify its strengths and weaknesses. Evaluations that simply state conclusions are of very little utility to the Board's effective functioning, no matter how glowing the conclusion, or conversely, no matter how dismissive the conclusion.

5. *External letters--procedure*. Additionally, again this year the Board was confronted with difficulties in the process of selecting external evaluations in some units. To be specific, units should never allow candidates to strike evaluators from a list. Doing so identifies every possible reviewer and completely compromises confidentiality. At the same time, candidates must be provided with copies of the letters, redacting identifying information about the evaluator and the evaluator's institution. This year the Board noted instances in which candidates had been provided the list of potential evaluators and other instances where they claimed not to have seen the letters of external evaluators. (For articulation of the concerns that have arisen in prior years and have not been addressed, see below.)

## SERVICE

1. *Defining university service*. The Faculty Handbook differentiates service to departments, colleges, and the university in specifying what is expected for different ranks. To become an Associate Professor a candidate "should show significant involvement in university activities at the local academic unit and beyond" (FH 3.4.1). The Board has consistently recognized that service to a department, cross-departmental service as in a domain committee in Liberal Arts, and service at the college level qualifies. Service on university-wide boards, committees, and organizations also clearly qualifies. While service to professional, academic, and other organizations outside the university are important and valued, the Board has consistently understood "university activities" to mean the life and activity within DePaul University.

By contrast, for promotion to Full Professor a candidate must show "notable contributions at the university level" (FH3.4.1). The Board has consistently understood this requirement to encompass university-level boards and committees and service to boards and committees outside one's own college. The Board has also consistently understood "notable" to mean more than attendance on such boards and committees, but rather to reflect the relative importance of some boards and committees to the university's existence and prosperity or the candidate's taking leading roles on university-wide boards and committees. The Board has consistently held the position that local service, even when such service assists the university overall, such as in student recruitment for one's unit, or program development for one's unit, is to be understood as unit and not university service. The Board's rationale is simple. All local service contributes to the functioning of the whole. To conflate the local service with university impact and university service is to efface the difference between unit and university. Moreover, "at the university level" means something different than helping the university. See, for example, FH 3.4.2.3, which distinguishes in the first bullet service to "university and its academic units," and similarly later states the requirement that "faculty members must serve in their local academic unit," as distinct from "[u]niversity service" in prior sentence. Deans, chairs, and candidates should understand these distinctions. In the

LC0004072

past several years candidates have made the claim that local or college service is university service. Some chairs have made similar, albeit less vociferous, claims. Of course, if the Faculty Council and the Provost believe that the Board is in error, then clarification through an interpretive Q&A or an amendment of current Faculty Handbook language would be appropriate.

Similarly, in the past three years, a few candidates have claimed that professional service that enhances the university's reputation is "notable university service." The Board has not accepted that claim. It has not accepted the claim because university service is defined as "contributions to the enhancement of the institution's internal processes and its relationships with external bodies" (FH 3.4.2.3). That service is explicitly distinguished from professional service, which "consists of contributions to the organizations or associations of the faculty member's academic discipline or the professoriate" (FH 3.4.3.2). The Faculty Handbook provides further clarification in the next sentence, "Professional service may have a component of scholarship or creative activities" (FH 3.4.3.2). The Board has understood such activities to include, but not be limited to, manuscript reviews, editorial positions, journal management, and similar activities. The Faculty Handbook thus goes out of its way to distinguish between service to professional external bodies, which is to be considered under scholarship and creative activities, and service to non-academic and non-professional external bodies. Read any other way would also render meaningless the sentence describing to which entities "[s]ervice may be provided," to wit, "the university, the profession, and the community" (FH 3.4.2.3). Because the Faculty Handbook describes service in separate paragraphs discussing "external bodies" and "organizations or associations of the faculty members's academic discipline or the professoriate," the Board has understood "external" to mean governmental entities; non-professional organizations dealing with the application of research to policy, including philanthropic organizations; religious bodies; organizations, activist and volunteer, providing community services; and other organizations, both formal and informal. See also the first bullet of FH 3.4.2.3. As with the Board's understanding of the distinctions the Faculty Handbook makes for intra-university service, the same understanding of extra-university service should be understood by candidates and unit officers. In the case of community service the Faculty Handbook explicitly puts the burden on the candidate "to make the case demonstrating that the activity qualifies as service as the term is used here" (FH 3.4.2.3). The Board, however, also suggests that the Faculty Council and the Provost either provide an interpretation of community service that clarifies how the UBPT, and every other body charged with evaluation of a candidate, should weigh such service or an amendment specifying how the UBPT should weigh "[c]ommunity service activities" and the benefit provided by extra-institutional but non-professional service.

## CONTINUING CONCERNS ARTICULATED IN PRIOR YEARS' LETTERS

1. *Teaching effectiveness*. At least as far back as 2017 the Board has articulated its concern that the meaning of "effective teaching" is opaque and should be better articulated. Specifically, the Board has been concerned that effectiveness is too often assumed when online teaching evaluation (OTE) numbers appear good, and even, perhaps especially, in those instances, "good" is also undefined. Easy cases are clear: response rates are consistently high; absolute numbers on the OTEs are high and outperform others, not just locally but across the

LC0004073

university; the numbers are consistent with thoughtful comments by students and the retrospective understanding of former students embodied in the student reports; and, taken as a whole, the numbers and comments suggest the ongoing value of the content of the courses and the faculty member's capacity to enrich and contextualize student understanding of the content. Also valuable are the honest reflections of faculty members who admit to episodes of ineffective teaching and act to correct such episodes. That reflection, and those efforts, speak as much to effective pedagogy as those faculty members for whom effectiveness appears to be (but is not) effortless. But, only rarely has the Board read such reviews embodied in unit reports. Overwhelmingly those reports simply repeat what the Board members can read, and do read, for themselves. Similarly, with exceptions standing out because they are so rare, those units that engage in peer review of teaching do so without explanation of either evaluative method or the evaluative criteria. The result is predictable: the evaluations are laudatory and perfunctory, and almost never address the issues raised by careful review of the OTEs. To quote the 2017 UBPT report, "useful feedback is notably absent in many peer evaluations, even in cases where a candidate is experiencing challenges ... in several instances, more attention, it seems, is paid to explaining away teaching difficulties ... than to offering insights."

2. *Process concerns*. The UBPT receives large files containing a great deal of data. Unit reports, including those of chairs and deans, that simply repeat what is contained in the file are not helpful. Often, repetition obscures much that could be valuable in the report by leaving unclear what are a candidate's strengths as well as weaknesses. Every UBPT letter has made the point, to one degree or another, that repeating what is in the file, including repeating what is in the reports filed at lower levels, is of no value. What is valuable is when the unit report explains a candidate's trajectory as a teacher, value to the unit because of effectiveness with students, value due to curricular enrichment, and willingness to help other faculty members become more effective; summarizes and evaluates a candidate's contribution to the academy and profession, situates a candidate's work in the work of the appropriate professional and academic communities, explains what academic and professional reputation means in those communities and how it is recognized, and predicts, based on a thoroughgoing understanding of a candidate's work, the pace of that work, and ambitions, what future contributions might be hoped for; explains not that a candidate has served on committees, but what the candidate added in value to that work.

A candidate is not well-served by reports that make assertions and claims without explanation, or that are questionable. Insofar as teaching is concerned, for example, units sometimes assert their own rigor to excuse what appear to be weak OTEs, but rigor is undefined. Moreover, without reference to something that lacks rigor, the assertion of rigor is just that. Especially when asserted with reference to other units, the assertion is problematic. It is problematic because most faculty members are not and have not been in a position to evaluate in any wide, much less comprehensive, manner, teaching quality in other units. The assertion becomes especially problematic when made to the Board, the members of which are treated to thousands of evaluations of dozens of candidates, each with lengthy histories in the classroom, over the widest range of colleges and local units within the university, multiplied in many cases by years of service of the Board. Other claims are often made to, as the 2017 letter suggests, "explain away" weak teaching. Especially troubling is when candidates from the same unit, who have taught the same or similar courses, present

LC0004074

very different sets of evaluations, including OTEs, and no explanation is provided, which to the Board violates the requirement of the Faculty Handbook for "consistency among candidates" (FH 3.5.1.1).

Insofar as scholarly work is concerned, equivalent examples trouble the Board. To reiterate what the Board wrote in 2018, external reviews "that offer only general, summative or conclusory statements about the candidate's work" are "only marginally helpful." A review that has not explained the candidate's work, analyzing it as called for by the Faculty Handbook (FH 3.6.2.2), should not be relied on by the unit or unit officers. The Board notes that when such conclusions are negative and unsupported, the unit has no trouble dismissing them. Doing so raises the question, why should they be relied on when conclusions are positive and dismissed when they are negative? We reiterate the suggestion that the Faculty Council draft a sample letter making clear what it is that is sought in these letters. Similarly, as noted briefly above, this year the Board was troubled by instances in which both the selection of reviewers and the disclosure of the letters was mishandled. Units are free to solicit suggestions, both negative and positive, from candidates and the candidate is free to explain those suggestions. The unit is not permitted, either as a matter of explicit policy nor by practice, to be bound to honor any or all of those suggestions (FH 3.6.2.1, FH 3.6.2.3). Especially troubling this year were the units that prepared lists of external reviewers and then shared that list with the candidate. Doing so violates FH 3.6.2.3, regarding the necessity of protecting "the identity of external reviewers." The UBPT is of the view that a unit violating FH 3.6.2.1 or 3.6.2.3 vitiates the utility of the external reviews, to the detriment of the candidate.

In particular, the UBPT reiterates, without prejudice to the other suggestions remaining to be considered, the first suggestion in the 2016 letter, advice to unit officers and candidates concerning notable university service for candidates for full professor; the 8th suggestion to unit officers and candidates, concerning candidates reading chapter 3 to ensure that their files conform to the Faculty Handbook requirements; and the recommendation to the Provost concerning discussion of these guidelines with the Deans, especially now that the university has hired two new deans who are unfamiliar with DePaul's practices.

From the 2017 letter, the Board reiterates on the same basis the 2nd and 3rd suggestions, concerning peer teaching evaluations; the 6th suggestion, regarding notable service contributions for full professor candidates (which repeats that above from the 2016 letter); the 9th suggestion, concerning unit evaluations of a candidate; the 10th suggestion, concerning a summary of a candidate's relevant DePaul history in the unit report; and the 14th suggestion, concerning peer evaluations and conflicts of interest.

From the 2018 letter, the Board reiterates on the same basis the first suggestion regarding peer evaluations; the 4th and 5th suggestions, regarding external reviewer selection in their entirety; the 6th suggestion, regarding discipline-specific quality metrics; and the first suggestion regarding service standards service, repeating concerns regarding notable service for candidates for Full Professor; and the final suggestion regarding the specification of the candidate's time in rank in unit reports, which itself reiterates suggestion 10 from 2017.

LC0004075

From the 2019 letter, the UBPT notes that important suggestions made in that letter have been acted upon and appreciates the efforts made by the Faculty and the Provost to render the tenure and promotion processes more transparent, clearer to the candidate, and useful to the future of the university.

Unit-specific addenda are provided separately and will be shared by the Provost with the deans of those units.

LC0004076

# Exhibit 27 to Ghanem Deposition





**University Board on Promotion and Tenure**
1 East Jackson Boulevard
Chicago, Illinois 60604-2287

**TO:**     Salma Ghanem, Acting Provost

**FROM:**   University Board on Promotion and Tenure

**DATE:**   May 10, 2019

**Re:**     ▇▇▇▇▇▇▇▇ Application for Promotion to Associate Professor with Tenure

The 2018-2019 University Board for Promotion and Tenure met on Friday, April 12, 2019, to consider ▇▇▇▇▇▇▇ application for promotion to Associate Professor with tenure. Dr. ▇▇▇▇ joined DePaul as a Visiting Assistant Professor in 2012 and was hired as an Assistant Professor in 2014 with one year of credit towards tenure. He holds a Ph.D. from Yale University.

**Board Members Present**: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Board Members Absent**: None

**Vote Summary:**
*Department of Chemistry and Biochemistry tenured faculty*: 4 – 4 (Support – Oppose)
*Department of Chemistry and Biochemistry Chair recommendation*: Supports
*College of Science and Health Personnel Committee*: 2– 4 – 1 (Support – Oppose – Recused)
*College of Science and Health Interim Dean recommendation*: Supports
*University Board*: 1 – 6 (Support – Oppose)

The University Board for Promotion and Tenure concurs with the tenured faculty of the Department of Chemistry and with the College of Science and Health Personnel committee, but does not concur with chair of the Department of Chemistry or with the dean of the College of Science and Health concerning the recommendation to promote Dr. ▇▇▇▇ to associate professor with tenure. While the vote of the departmental faculty was a tie, that vote constitutes a negative recommendation, with which the Board concurs. The Board believes that Dr. ▇▇▇▇ has met the requirements in the category of service, but has consistent concerns about both teaching and scholarship.

**EXHIBIT 27**

The university requires that a candidate for the rank of associate professor with tenure "must demonstrate consistently effective teaching." In the judgment of the Board, Dr. ███ has not so demonstrated. The evaluations of his teaching by students are frequently below 3 on a 5-point scale, and consistently below the departmental means. This case is not one of the occasional negative set of evaluations but rather a pattern that shows itself in his capacity to communicate with a very large portion of his students. Forty to fifty per cent of the students rate his capacity to communicate subject matter content as not adequate. Moreover, the pattern is persistent and the concern has not been relieved over time. His recent evaluations, for example, the 2018 evaluations, contain such comments. In addition, the regular recurrence of student concerns with communicating his expectations for performance, the criteria by which performance is to be evaluated, and the timeliness of his feedback to students, raises questions about the consistent effectiveness of Dr. ███ teaching. The burden is on the candidate to "demonstrate consistently effective teaching." The record does not suffice and the Board believes that Dr. ███ teaching has not met the university criterion.

The Board also has concerns about Dr. ███ scholarship. The Board's concerns extend both to the quantity of the work, and its consistency, as well as its quality, which was difficult to address for lack of definitive evidence of his contributions to multi-authored pieces. In only one piece is he the corresponding author, and that is in a proceedings publication. Understanding the scholarly impact of published proceedings requires a clear statement of the value of particular types of proceedings. Notwithstanding inquiries from members, the Board did not receive information sufficient to enable the Board's members to evaluate either the quality (the particular venue accepts almost seventy-five per cent of submissions, for example) of the work or its effective dissemination to the academic world. The other pieces published are all multi-authored; two pieces – a two-part article – have thirty-one authors. While in those pieces his contributions were made clear – they were methodological – at least some members could not find that the contribution provided "evidence of notable scholarship [or] research." The external evaluators also did not provide information enabling the Board to determine his contributions and their importance. While he is also a contributor to two books, neither the department nor the College considers such works as counting for promotion purposes for lack of clear evidence of peer review.

In sum, the Board has concerns that Dr. ███ meets neither of the university's requirements for teaching or scholarship and thus cannot recommend him for promotion to Associate Professor with tenure.

Calvente-DePaul 037294

This recommendation accurately reflects the University Board on Promotion and Tenure's discussion of ███████████ application for promotion to Associate Professor with tenure.



Calvente-DePaul 037295

# Exhibit 3

Lisa Calvente 02/19/2021

Lisa Calvente 02/19/2021

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4
 5   LISA CALVENTE,          )
 6        Plaintiff,         )
 7   vs.                     ) No. 1:20-CV-03366
 8   SALMA GHANEM and DEPAUL )
 9   UNIVERSITY,             )
10        Defendants.        )
11
12
13        The deposition of LISA CALVENTE, called
14   for examination pursuant to the Rules of Civil
15   Procedure for the United States District Courts
16   pertaining to the taking of depositions via Zoom
17   videoconference, on the 19th day of February,
18   2021, at the hour of 9:18 a.m.
19
20
21
22
23   Reported by:  BRENDA K. DUFEK, CSR
24   License No.:  084-003969
```
1

```
 1              I N D E X
 2   WITNESS                        EXAMINATION
 3   LISA CALVENTE
 4     By Ms. Wermuth                    5
 5
 6
 7
 8
 9
             E X H I B I T S
10   NUMBER                      MARKED FOR ID
     Exhibit No. 1                    10
11   Exhibit No. 10                   25
     Exhibit No. 11                   27
12   Exhibit No. 33                   34
     Exhibit No. 94                   42
13   Exhibit No. 5                    44
     Exhibit No. 143                  55
14   Exhibit No. 153A                 62
     Exhibit No. 210                  65
15   Exhibit No. 141                  68
     Exhibit No. 19                   71
16   Exhibit No. 115                  76
     Exhibit No. 186A                 79
17   Exhibit No. 175                  89
     Exhibit No. 4                   116
18   Exhibit No. 185                 120
     Exhibit No. 193                 121
19   Exhibit No. 196                 126
20
21
22
23
24
```
3

```
 1   APPEARANCES:
 2     LAW OFFICES OF FITZGERALD T. BRAMWELL
 3     BY:  MR. FITZGERALD T. BRAMWELL
 4     225 West Washington Street, Suite 2200
 5     Chicago, Illinois  60606
 6     (312) 924-2884
 7     bramwell@fitzgeraldbramwell.com
 8          On behalf of the Plaintiff;
 9
10     COZEN O'CONNOR
11     BY:  MS. ANNELIESE WERMUTH
12          MS. NANDINI SANE
13     123 North Wacker Drive, Suite 1800
14     Chicago, Illinois  60606
15     (312) 382-3100
16     awermuth@cozen.com
17          On behalf of the Defendants.
18
19
20   ALSO PRESENT:
21     Kathryn Stieber
22     Salma Ghanem
23     Alexandra Murphy
24
```
2

```
 1        THE REPORTER:  This deposition is being taken
 2   by means of videoconferencing.  The attorneys
 3   participating in this deposition acknowledge
 4   that I am not physically present in the
 5   deposition and the oath will be administered
 6   remotely.  The parties and their counsel consent
 7   to this arrangement and waive any objections to
 8   this manner of reporting.
 9            will all counsel present please state
10   your name and indicate your agreement on the
11   record.
12        MR. BRAMWELL:  Fitzgerald Bramwell,
13   B-R-A-M-W-E-L-L, confirm.
14        MS. WERMUTH:  Anneliese Wermuth,
15   W-E-R-M-U-T-H, I agree.
16            (witness sworn.)
17        MR. BRAMWELL:  Before we begin, I just have
18   an objection for the record to Alexandra Murphy
19   participating in this deposition -- or sitting
20   in on this deposition.  She's a witness, and I
21   believe the rule of separation should apply.
22        MS. WERMUTH:  Okay.  And if you want to send
23   me some citation to the rule of separation, I'd
24   be happy to take a look at that at some point
```
4

1    A.   Yes.
2    Q.   That first paragraph, second to last
3  sentence?
4    A.   Yes, adjusted due to faculty leads of
5  absent four years credit toward tenure.
6    Q.   Okay.  And typically the way the
7  process worked then in the college was you would
8  submit those materials that we just talked
9  about, your personal statement, your CV,
10  teaching evaluations and such, scholarship, you
11  would submit that to a SharePoint site; is that
12  right?
13    A.   I am unsure if -- yes, typically, but I
14  am unsure if I used SharePoint the entire time.
15    Q.   Fair enough.
16    A.   I believe it was, yes.
17    Q.   But you had to submit those materials
18  so that they could be reviewed?
19    A.   Yes.
20    Q.   And the way that it worked is that the
21  college convenes a five-person personnel
22  committee; is that right?
23    A.   Yes.
24    Q.   And the personnel committee would

49

1  review those materials, meet with the candidate,
2  yourself, right?
3    A.   Yes.
4    Q.   Okay.  Potentially meet with a student
5  evaluator as well; is that right?
6    A.   Yes.
7    Q.   And then the personnel committee would
8  draft a preliminary report of their
9  recommendations which they would then share with
10  the candidate before it went to the full tenured
11  committee; is that fair?
12    A.   Yes.
13    Q.   And so after it was sent to the
14  candidate, the candidate could review it for
15  accuracy to make suggested changes and send that
16  back to the personnel committee?
17    A.   Yes, except I want to stress that the
18  review for accuracy is only for accuracy, right.
19  So these 20 -- this is where many of the
20  problems that I had occurred.  These formal and
21  informal -- these formal and informal reviews
22  was where my senior colleagues discriminated
23  against me based on my race and retaliated
24  against me after I was outspoken on issues of

50

1  race and racism in the college.
2    Q.   So here's my question, Dr. Calvente.
3  You were provided an advanced copy of the
4  personnel committee report to review and comment
5  on prior to that report going to the full
6  tenured faculty?
7    MR. BRAMWELL:  Objection, asked and answered.
8  BY MS. WERMUTH:
9    Q.   You can answer.
10    A.   I was provided -- which year would you
11  like me to answer this on because one of those
12  years I did not receive a report until after I
13  received a notice that I was recommended for
14  termination.
15    Q.   Let's talk about the process generally.
16    A.   Yes.
17    Q.   The process is, after you -- after the
18  candidate meets with the personnel committee,
19  the personnel committee prepares a report, yes?
20    A.   That is the process, yes.
21    Q.   That's what I'm asking about.
22    A.   Yes.
23    Q.   And so the process would then -- the
24  next step of the process would be that the

51

1  report that the personnel committee prepared
2  goes to the candidate before it goes to the full
3  tenured faculty?
4    A.   For accuracy, not for -- what I was
5  told was not to refute.
6    Q.   And then after the report goes to
7  the -- submitted for accuracy, the report then
8  goes to the full group of tenured faculty in the
9  college for further deliberations?
10    A.   Yes.
11    Q.   Okay.  And then processwise, a final
12  report would include the personnel committee
13  recommendations and also a summary of the
14  deliberations and voting by the full tenured
15  faculty?
16    A.   Yes, except that changed in 2017.  So,
17  again, there's some details that have changed
18  through the years while I was being reviewed,
19  but, yes, overall.
20    Q.   What changed that is material to what
21  we were just discussing?
22    A.   So in 2015, the personnel committee
23  was -- and this also occurred in my first
24  review, provided a vote of the personnel

52



**Page 69**

Lisa Calvente 02/19/2021

1  BY MS. WERMUTH:
2      Q.   Okay.  Can you look at Exhibit 141,
3  batch eight.
4      A.   Yes.
5      Q.   This is an email you sent to an
6  individual at SUNY Press; is that right?
7      A.   Yes.
8      Q.   And SUNY Press is the press associated
9  with the -- oh, gosh, S U -- State University of
10 New York, is that what SUNY stands for?
11     A.   Yes.
12     Q.   Okay.  And you were trying -- you say
13 that you have a proposal whereby you could send
14 two chapters --
15     A.   Yes.
16     Q.   -- of your book, right?
17     A.   Yes.
18     Q.   Okay.  So at this period of time in May
19 of 2015 -- strike that.
20          This was the book that was the work
21 that came out of your dissertation; is that
22 right?
23     A.   Yes, but it's a drastically different
24 book.

**Page 71**

1      Q.   Was this -- this was the first time
2  that you put your book proposal out to press?
3      A.   In 2018?  In 2018, yes, I believe so.
4      Q.   Okay.  So my question is, May of 2018
5  was the first time you sent out a book proposal
6  of this sort, right, to gauge interest from a
7  publisher with respect to your manuscript,
8  your --
9      A.   I believe I sent out two by mail from
10 the college prior to May of 2018.
11     Q.   When you say by mail, you are saying
12 hard copy mail?
13     A.   Yes.
14     Q.   Prior to May of 2018, but in the year
15 2018?
16     A.   Yes.
17     Q.   Okay.  You don't know how much of your
18 work you had completed at this time, right?
19     A.   I do not recall.
20          (whereupon, Deposition Exhibit
21           No. 19 was marked for
22           identification.)
23 BY MS. WERMUTH:
24     Q.   Can you go to Exhibit 19.  I'm assuming

**Page 70**

1      Q.   Okay.  By May of 2018, you have only
2  two chapters of the book ready for review?
3      A.   No.
4      Q.   You had more than two chapters?
5      A.   Yes.
6      Q.   Why did you send only two chapters?
7      A.   Because when you are shopping for a
8  book contract before anyone says, yes, they will
9  review the entire book, you don't send the
10 entire book.
11     Q.   How far along were you on the book?
12     A.   In 2018, I do not recall.
13     Q.   You also indicate to the SUNY Press
14 individual that you would anticipate your full
15 book would be ready by July 1?
16     A.   Okay.
17     Q.   But it wasn't ready by July 1, right?
18     A.   July 1 of 2018, I don't recall.
19     Q.   Well, when you went in for your
20 personnel interview in October of 2018, do you
21 recall telling personnel that you didn't have
22 your full manuscript yet, right?
23     A.   Did I tell them that?  I'm unsure.  I
24 don't recall if I told them or not.

**Page 72**

1  it's batch one.
2      A.   Yes.
3      Q.   Okay.  This is your -- do you recognize
4  this document?
5      A.   Yes.
6      ███████████████████████
7      ████████████████████████████████
8      ████████████████████████████
9      █████████████████
10     █████████████████████████████████
11     ████████████████████████████████
12     ████████████████████████
13
14
15
16     Q.   Okay.  Can you turn to the page that is
17 Bates marked 243.  Are you there?
18     A.   Yes.
19     ████████████████████████████████
20     ███████████████████████
21     █████████████████████████████
22     ██████████████████████████
23     █████████████████████████████



Lisa Calvente 02/19/2021

1  responsible for any kind of negative response
2  from my senior colleagues to myself.
3      Q.  Okay.  So the answer is, no, you did
4  not personally complain outside of the college
5  about that?
6      A.  No.
7      Q.  Okay.  There's another conversation you
8  testified about with Lexa where you told her
9  that you identified as part of the -- I think
10 you said the black diaspora?
11     A.  I agreed she told me.
12     Q.  So hang on a second.  So this
13 conversation, as I understand it, came up
14 because an African American student had
15 complained to her about your use of an epithet,
16 a racial epithet in the classroom and the
17 student wasn't aware that you identified as
18 black; is that right?
19     A.  That's part of the black diaspora, yes.
20 So I was quoting from Malcolm X.  It was a
21 primary document, and I used the N word as
22 Malcolm X did through reading that primary
23 document and the student was upset.
24     Q.  Okay.

109

1      A.  I did not know about it, right.  So I
2  wasn't meeting Lexa Murphy for that incident. ██
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████  Unlike  ██████  I had all of
19 these incidents happen over and over again, and
20 up until my tenure and promotion process, they
21 happened so often that I can only conclude that
22 they're not mistakes; that they are, in fact,
23 because of my race, because I was the only
24 person who was outspoken about the hostile

110

Lisa Calvente 02/19/2021

1  environment, about racism in the college, about
2  retaliation.  I'm the only one that I know of
3  that filed formal complaints and that is why I
4  was exposed to more of that than Sydney.
5      MS. WERMUTH:  Brenda, can you read back my
6  question, please.
7          (Whereupon, the record was read
8           as requested.)
9  BY MS. WERMUTH:
10     Q.  So I think your answer was that wasn't
11 the only purpose of your meeting with Lexa?
12     A.  That wasn't the purpose of my meeting
13 at all.
14     Q.  But during the course of that meeting,
15 she shared with you this concern that a student
16 had raised?
17     A.  Yeah.  So after I complained about
18 personnel, she then raised the issue of the
19 student complaint.
20     Q.  Okay.  ████████████████████████████
████████████████████████████████████████
23     MR. BRAMWELL:  Objection, best evidence.
24 ████████████████████████████████████████

111

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
5  BY MS. WERMUTH:
6      Q.  Okay.  I can show you that it's in the
7  college guidelines since your lawyer wants best
8  evident when I do show you a document and when I
9  don't, so let's show you the document.
10     MR. BRAMWELL:  That's nonsense, Mr. Wermuth.
11 BY MS. WERMUTH:
12     Q.  Exhibit 94.
13     A.  Can you tell me what batch this is in?
14     Q.  Yeah, and I might just recommend that
15 you keep stuff open because I will be going back
16 and forth to stuff, but 94 is in batch four.
17     A.  We did not open batch four yet.
18     Q.  94, we have.  It's the college
19 guidelines.
20     A.  Batch four?  Oh, wow.
21     MR. BRAMWELL:  I may have emailed this to
22 you.  I don't remember.  I know I emailed
23 something to you.  This may have been it.
24     THE WITNESS:  Okay.                       ██

Lisa Calvente 02/19/2021

**Page 129**

```
1    that clear, and I want that on the record.
2        Q.   When you say you were outspoken, you
3    were outspoken on what?
4        A.   On the issues of racism and
5    discrimination in the college, so the hostile
6    environment that two of us faced, right
7    because -- two of us meaning ████████ and
8    myself.  We were the only two there especially
9    in 2018-2017, yes.
10       Q.   Okay.  So we're going to talk about
11   your complaints.  I know you have a long
12   interrogatory answer.  I don't think there was a
13   question pending when you gave your statement
14   just now, but I am going to move to strike it in
15   a moment.  I'm going to shut my door because my
16   dogs.  And I'm sorry.
17                ███████████████████████████
     ███████████████████████████████████
     ███████████████████████████████████████
     ██████████████████████████████████
     ███████████████████████████████████
     █████████████
24       MR. BRAMWELL:  Objection, misstates her
```

**Page 130**

```
1    testimony.
2    BY MS. WERMUTH:
3        Q.   You can answer.
4        A.   Can you rephrase the question, please,
5    or reask?
6        MS. WERMUTH:  So I think you just
7    testified -- do we have two reporters here
8    now?
9                (Whereupon, a discussion was had
10                off the record.)
11               (Whereupon, Brenda Dufek, CSR
12                exited the deposition
13                proceedings and Michelle Barta,
14                CSR entered the deposition
15                proceedings.)
16
17
18
19
20
21
22
23
24
```

**Page 131**

```
1            IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5    LISA CALVENTE,                )
6            Plaintiff,            )
7      vs.                         )  No. 1:20-CV-03366
8    SALMA GHANEM and DEPAUL       )
9    UNIVERSITY,                   )
10           Defendants.           )
11
12      I, LISA CALVENTE, being first duly sworn, on
13   oath say that I am the deponent in the aforesaid
14   deposition taken on the 19th day of
15   February, 2021; that I have read the foregoing
16   transcript of my deposition, consisting of pages
17   1 through 134 inclusive, and affix my signature
18   to same.
19             _____
                      LISA CALVENTE
20
     Subscribed and sworn to
21   before me this _____ day
     of _____, 2021.
22
     _____
23   Notary Public
24
```

**Page 132**

```
1    STATE OF ILLINOIS      )
2                           )  SS:
3    COUNTY OF C O O K      )
4        I, BRENDA K. DUFEK, a Certified Shorthand
5    Reporter within and for the County of Cook and
6    State of Illinois, do hereby certify that
7    heretofore, to-wit, on the 19th day of
8    February, 2021, personally appeared before me
9    via Zoom videoconference, LISA CALVENTE, in a
10   cause now pending and undetermined in the United
11   States District Court, Northern District of
12   Illinois, Eastern Division, wherein Lisa
13   Calvente is the Plaintiff, and Salma Ghanem is
14   the Defendant.
15       I further certify that the said LISA
16   CALVENTE was first duly sworn to testify the
17   truth, the whole truth and nothing but the truth
18   in the cause aforesaid; that the testimony then
19   given by said witness was reported
20   stenographically by me in the presence of the
21   said witness, and afterwards reduced to
22   typewriting by Computer-Aided Transcription, and
23   the foregoing is a true and correct transcript
24   of the testimony so given by said witness as
```

1  aforesaid.

2       I further certify that the signature to

3  the foregoing deposition was reserved by counsel

4  for the respective parties.

5       I further certify that the taking of this

6  deposition was pursuant to notice and that there

7  were present at the deposition the attorneys

8  hereinbefore mentioned.

9       I further certify that I am not counsel

10 for nor in any way related to the parties to

11 this suit, nor am I in any way interested in the

12 outcome thereof.

13      IN TESTIMONY WHEREOF:  I have hereunto

14 set my hand and affixed my signature this 12th

15 day of March, 2021.

16

17

18

19     _Brenda K Dufek_

20     _____

21       BRENDA K. DUFEK, CSR

22       COOK COUNTY, ILLINOIS

23       LICENSE NO. 084-003969

24

                                    133

---

1        McCorkle Litigation Services, Inc.
             200 N. LaSalle Street Suite 2900
2              Chicago, Illinois 60601-1014
3
   DATE:  March 12, 2021
4
   Law Offices of Fitzgerald T. Bramwell
5  Mr. Fitzgerald T. Bramwell
   225 West Washington Street, Suite 2200
6  Chicago, Illinois  60606
7  IN RE:  Calvente vs. Ghanem
   COURT NUMBER:  1:20-cv-03366
8  DATE TAKEN:  February 19, 2021
   DEPONENT:  Lisa Calvente
9
   Dear Mr. Bramwell:
10
   Enclosed is the deposition transcript for the
11 aforementioned deponent in the above-entitled
   cause.  Also enclosed are additional signature
12 pages, if applicable, and errata sheets.
13 Per your agreement to secure signature, please
   submit the transcript to the deponent for review
14 and signature.  All changes or corrections must
   be made on the errata sheets, not on the
15 transcript itself.  All errata sheets should be
   signed and all signature pages need to be signed
16 and notarized.
17 After the deponent has completed the above,
   please return all signature pages and errata
18 sheets to me at the above address, and I will
   handle distribution to the respective parties.
19
   If you have any questions, please call me at the
20 phone number below.
21
   Sincerely,
22
   Cindy Alicea          Court Reporter Present:
23 Signature Department  Brenda K. Dufek
24 cc:  All parties of record.



```
 1       IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4   LISA CALVENTE,            )
 5          Plaintiff,         )
 6   vs.                       ) Case No. 1:20-CV-03366
 7   SALMA GHANEM and          ) (Volume II)
 8   DEPAUL UNIVERSITY,        )
 9          Defendants.        )
10
11       The deposition of LISA CALVENTE, called
12   for examination pursuant to the Rules of
13   Civil Procedure for the United States District
14   Courts pertaining to the taking of depositions,
15   taken before Michelle L. Barta, a certified
16   shorthand reporter in the State of Illinois,
17   via Zoom videoconference on the 19th day of
18   February, 2021, at the hour of 1:36 p.m.
19
20
21
22   Reported by:  Michelle L. Barta, C.S.R., R.P.R.
23   License No:  084-004033
24
                                               135
```

```
                 Lisa Calvente 02/19/2021
 1                    I N D E X
 2   WITNESS                              PAGE
 3   LISA CALVENTE
 4   EXAMINATION BY MS. WERMUTH             138
 5   EXAMINATION BY MR. BRAMWELL            298
 6
 7
 8                 E X H I B I T S
 9   NUMBER                        IDENTIFICATION
10   Exhibit No. 203                       144
11   Exhibit No. 204                       147
     Exhibit No. 215                       155
11   Exhibit No. 217                       168
     Exhibit No. 219                       172
12   Exhibit No. 50                        189
     Exhibit No. 23                        209
13   Exhibit No. 134-A                     214
     Exhibit No. 51                        220
14   Exhibit No. 31                        224
     Exhibit No. 57                        226
15   Exhibit No. 53                        228
     Exhibit No. 78                        231
16   Exhibit No. 85                        236
     Exhibit No. 108                       241
17   Exhibit No. 102                       242
     Exhibit No. 109                       244
18   Exhibit No. 112                       255
     Exhibit No. 123                       258
19   Exhibit No. 132                       265
     Exhibit No. 144                       267
20   Exhibit No. 145                       269
     Exhibit No. 173                       273
21   Exhibit No. 202                       276
     Exhibit No. 211                       278
22   Exhibit No. 95                        284
     Exhibit No. 88                        287
23   Exhibit No. 231                       288
     Exhibit No. 3                         288
24    (Exhibit 53 retained by Ms. Wermuth)
                                               137
```

```
 1   APPEARANCES (via Zoom):
 2
 3       LAW OFFICES OF FITZGERALD T. BRAMWELL, by
 4       MR. FITZGERALD T. BRAMWELL
 5       225 West Washington Street, Suite 2200
 6       Chicago, Illinois  60606
 7       (312) 924-2884
 8       bramwell@fitzgeraldbramwell.com
 9           Representing the Plaintiff;
10
11       COZEN O'CONNOR, by
12       MS. ANNELIESE WERMUTH
13       MS. NANDINI SANE
14       123 North Wacker Drive, Suite 1800
15       Chicago, Illinois  60606
16       (312) 382-3100
17       awermuth@cozen.com
18           Representing the Defendants.
19
20   ALSO PRESENT:
21   Ms. Kathryn Stieber
22   Ms. Salma Ghanem
23   Ms. Alexandra Murphy
24
                                               136
```

```
 1            LISA CALVENTE,
 2   having been first previously duly sworn, was
 3   examined and testified via Zoom videoconference
 4   as follows:
 5                 EXAMINATION
 6   BY MS. WERMUTH:
 7       Q.  Dr. Calvente, and forgive me if I
 8   misunderstood your testimony, but I thought that
 9   you testified that you were being held to
10   different standards as it related to the AAEP
11   guidelines and as it related to the review of
12   your research -- or I am so sorry, the review of
13   your performances as research or as scholarship.
14   Did I understand your testimony correctly?
15       A.  I was -- Well, I believe that
16   Dr. Murphy excluding my performance link and
17   then requiring me to do something that was not
18   required of anyone else was discriminatory and
19   retaliatory, yes.
20       Q.  Okay.  So then it's not your position
21   that contextualizing the performances was
22   discriminatory or retaliatory?
23           MR. BRAMWELL:  Objection, misstates her
24   testimony.
                                               138
```





Lisa Calvente 02/19/2021

**Top-left column (page 219):**

6    A.   Yes.
7    Q.   All right.  Let's just get that into
8  the record.  Exhibit --
9
20    Q.   Are you arguing with me?  What I am
21  trying to --
22         MR. BRAMWELL:  No, she is not.
23  Absolutely -- No, no, no, no, no.  She is -- I
24  object to the characterization of my client

219

**Top-right column (page 221):**

Lisa Calvente 02/19/2021
1  BY MS. WERMUTH:
2
5    A.   Can you tell me which batch number that
6  is?  Oop, I found it.  Sorry.
7    Q.   No worries.
8
23         MR. BRAMWELL:  Objection, best
24  evidence.

221

**Bottom-left column (page 220):**

1  doing any arguing.
2         MS. WERMUTH:  There is no question
3  pending.
4         MR. BRAMWELL:  She has behaved
5  remarkably well.
6         MS. WERMUTH:  There is no question
7  pending.
8         MR. BRAMWELL:  But that is not -- that
9  is not arguing.  The only person that -- Well,
10  let's just leave it at that.  You know,
11  Dr. Calvente, has not been arguing with you.
12  BY MS. WERMUTH:
13
22         (Whereupon, Exhibit No. 51 was
23         marked for identification.)
24

220

**Bottom-right column (page 222):**

1
16         MR. BRAMWELL:  Objection.
17         THE WITNESS:  Yes.
18         MR. BRAMWELL:  Best evidence.
19  BY MS. WERMUTH:
20

222

Lisa Calvente 02/19/2021

**Page 243**

1    it I asked?

2    Q.   I sent it separately?  I don't

3    understand.  I think it's --

4    A.   Oh, okay.  So it's part of the batches.

5    Q.   Yeah.

6    A.   Okay.  Sorry.  I misunderstood.

7    Q.   I am sorry if I was not clear.

8         MR. BRAMWELL:  There is just a lot of

9    paper today, a lot of electronic paper.

10        MS. WERMUTH:  And other.  If you could

11   see, I am telling you.

12        MR. BRAMWELL:  After this is over we

13   can have a competition as to whose space has got

14   more paper piled all over it.

15             (Whereupon, a discussion was had

16              off the record.)

17   BY MS. WERMUTH:

18   Q.   Do you have it Dr. Calvente?

19   A.   Yes.

20   Q.   █████████████████████████████

     ████████████████████████████████████

     ███████████████████████████████████

     █████████████

243

**Page 245**

1         MS. WERMUTH:  I am sorry.  25719.

2         MR. BRAMWELL:  All right.

3         THE WITNESS:  Yes.

4    BY MS. WERMUTH:

5    Q.   █████████████████████████████

     ██████████████████████████████████████

     █████████████████████████████

     ██████████████

     ███████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████

     ████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████

     █████████████████

20        MR. BRAMWELL:  Objection, best

21   evidence.

22        THE WITNESS:  Yes.  I intended --

23        MR. BRAMWELL:  Go ahead.

24        THE WITNESS:  I intended it to be an

245

**Page 244**

1    ███████████████████████████████████

     ██████████████████████████████

     ████████████████████████████████████████

     ██████████████

5         MR. BRAMWELL:  I am again just going to

6    object on best evidence.

7    ████████████████████████████████

9              (Whereupon, Exhibit No. 109 was

10             marked for identification.)

11   BY MS. WERMUTH:

12   Q.   Can you open Exhibit 109?

13   A.   I have it opened.

14   Q.   ███████████████████████████████

     ███████████████████████████████████

     ███████████████████████████████

     ████████████████████████████

     ████████████████████

     ████████████████████████████

     ██████████████████████

23        MR. BRAMWELL:  Which page are you on,

24   Ms. Wermuth?

**Page 246**

1    accurate quantification.

2    BY MS. WERMUTH:

3    █████████████████████████████████

     ██████████████████████████████

     ███████████████████████████████████████

     █████████████████████████████████████

     ███████████████████████████████

10   Q.   Well, why don't we look at that?

11   A.   wonderful.

12   Q.   Did we just already open up -- I am

13   sorry.  I am losing my mind.

14        Did we open up the final report yet or

15   no?  108?  Yeah, 108.

16   A.   I got it.

17   Q.   Let's find -- Okay.  Page 261?

18   A.   I'm on Page 261.

19   ████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████

     ████████████████████████████████████████

246





**Page 247**

1   [redacted]

5   MR. BRAMWELL: Objection, best
6   evidence.
7   BY MS. WERMUTH:

247

**Page 249**

Lisa Calvente 02/19/2021

1   conversation?
2   A. So after I received this report I meet
3   with Salma again. I meet with Salma twice for
4   this 2017 review. I don't know which -- which
5   time I -- I don't know before or after. I don't
6   recall, [redacted]

9   Q. I am sorry. Say that again.
10

21   Q. About retaliation?
22   A. No, no, no, about the corrections of
23   the -- for the document. Then I meet with her
24   again after I receive her letter for the 2017

249

**Page 248**

17   MR. BRAMWELL: Which, by the way, is
18   just, you know, continuing best evidence. The
19   document says what it says.
20   BY MS. WERMUTH:
21   Q. Now, after you got this report you met
22   with Salma again; correct?
23   A. Yes.
24   Q. And what do you recall about that

248

**Page 250**

1   review.
2   Q. Okay. So just so I am clear, Salma
3   helped you prepare Exhibit 109?
4   MR. BRAMWELL: Objection, misstates her
5   testimony.
6   THE WITNESS: This is a line of
7   E-mails, but she does help me prepare some of
8   the wording in my response.
9   BY MS. WERMUTH:
10   Q. And do you recall which part?
11   A. I don't even know if this is the
12   response. Let's see. I don't recall.
13   Q. Okay. She was trying to help you, yes?
14   A. At the time I believe so, yes.
15   Q. Okay. And why do you -- What is your
16   basis for taking the position that the personnel
17   committee in 2017 was retaliating against you?
18   What is your evidence for that?
19   A. [redacted]

250

**Page 255**

1    can't find it.  Oh, 111.
2    A.    111?
3    Q.    Yes.
4    A.    Is that in Batch 6 maybe?
5    Q.    Batch 5.
6    MR. BRAMWELL:  You can use the screen
7    share, too, if you would like.
8    THE WITNESS:  I have it.
9    BY MS. WERMUTH:
10   ████████████████████████████████
     ████████████████████████
     ████████████
13   Q.    And after you got that letter you met
14   with her to express concerns to her that you
15   felt like you were being discriminated and
16   retaliated against, is that right?
17   A.    I expressed concerns in an E-mail and
18   then I absolutely say that in our discussion.
19   Q.    Okay.  And the E-mail where you mention
20   that is Exhibit 112?
21   A.    Yes.
22          (Whereupon, Exhibit No. 112 was
23           marked for identification.)
24

**Page 256**

1    BY MS. WERMUTH:
2    Q.    And that first line says, "Thank you
3    for agreeing to meet with me tomorrow."  Do you
4    see that?
5    A.    Yes.
6    Q.    Okay.  So you met with her on
7    December 16th?
8    A.    Yes.
9    Q.    And during this conversation you told
10   her that you wanted to file again with the
11   Office of Equity?
12   A.    Yes.  I actually already reached out to
13   Barbara Schaffer.
14   Q.    Oh, you had?
15   A.    Yes.
16   Q.    Did you tell Salma that you had done
17   that?
18   A.    I don't recall.  I don't recall.
19   Q.    Now, after that meeting -- Well, strike
20   that.
21          So you indicated that Salma in this
22   meeting told you about a conversation she had
23   with then Provost Marten denBoer?
24   A.    Yes.  So I don't --

**Page 257**

1    Q.    What was that?  Can you tell me about
2    that?
3    A.    Sorry about that.  I cut you off to
4    start explaining.
5          So I go to the meeting.  I sent this
6    E-mail after I make the appointment and I start
7    going through this and I say that, you know, I
8    am going to file with Barbara Schaffer or I am
9    going to file for retaliation and
10   discrimination, and at some point I just -- I
11   just break down.  I start like uncontrollably
12   bawling, crying.  She gives me tissue -- or I
13   think I had tissue and then she gave me tissue,
14   I don't remember.  But I was really shook up and
15   said that you know -- I was like this is time, I
16   am wasting time doing this when I could be doing
17   other things and junior faculty, that's all they
18   have is time and this is eating up my
19   time.  You know, now I have to think about
20   service.  So I am going on and on.  I am crying
21   and she says, you know, for me not to worry,
22   that the provost already knows about my file,
23   about my case, that I should not file a claim
24   and wait until -- No, wait.  She said that

**Page 258**

1    first, that I should not file a claim and wait
2    until after tenure and the provost already knows
3    about my case.
4          (Whereupon, Ms. Stieber enters
5           the proceedings.)
6    BY MS. WERMUTH:
7    Q.    Did she tell you what she meant about
8    that, the provost knows about your case?
9    A.    She did not.
10         (Whereupon, Exhibit No. 123 was
11          marked for identification.)
12   BY MS. WERMUTH:
13   Q.    Can you look at Exhibit 123?  Are you
14   there?
15   A.    Yes.
16   Q.    Oh, I am sorry.  Okay.  Next time just
17   let me know.  I wait for you because I want to
18   make sure that you're there and I don't want to
19   waste my minutes.
20         So looking at this E-mail trail, going
21   to the bottom if you would to Page 8248 --
22   A.    Yes.
23   Q.    -- this is an E-mail from
24   Barbara Schaffer to you on Monday,



Lisa Calvente 02/19/2021

**1** right?

2      MR. BRAMWELL: Objection, calls for
3 speculation and best evidence.

4      THE WITNESS: I -- I do not recall.

5 BY MS. WERMUTH:

**6      Q.   I am just asking you what the E-mail --**
**7 what the communication from Barbara to you**
**8 provides, that she learned about concerns from**
**9 Dean Ghanem.**

10      MR. BRAMWELL: Again, I am going to
11 object on best evidence grounds. The document
12 says what it says. We will stipulate that the
13 document says what it says.

14      MS. WERMUTH: Perfect. Stipulation
15 accepted. I will move on.

16 BY MS. WERMUTH:

17

263

Lisa Calvente 02/19/2021

1

2      (whereupon, Exhibit No. 132 was
3      marked for identification.)

4 BY MS. WERMUTH:

**5      Q.   Okay. So can you look at Exhibit 132?**
6      A.   Yes.

7

13      MR. BRAMWELL: Objection, best
14 evidence.

15 BY MS. WERMUTH:

16

265

14      Q.   Right. Okay. Now, fast forwarding to
15 the spring of 2018, so now you're getting ready
16 for your tenure review and you filed with
17                    an anonymous complaint; is that
18 right?

19

22      Q.   Okay. So were you pursuing a complaint
23 with her or you just read the document because
24  she wanted to complain?

Chicago, Illinois 264 (312) 263-0052
Services, Inc.
266
264
McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052        263..266



**Page 271**

███████████████████

████████████████████████

████████████████████████████

████████████████████████████

7  Q.  And the three of you met together for
8  three hours or so, two or three hours?
9  A.  It was a long meeting.
10  Q.  And Salma listened to you?
11  A.  Salma listened.  She -- I believe
12  that -- especially in the beginning -- If I can
13  recall correctly, like she went over her time
14  slot so she could stay with us and hear our
15  complaints.
16  Q.  And did you accuse Salma directly in
17  that meeting of being discriminatory toward you
18  or --
19  A.  No.
20  Q.  Okay.
21  A.  I did not.
22  Q.  And did you accuse Salma directly of
23  being retaliatory towards you?
24  A.  No.  So in that meeting ███████ brought

271

**Page 272**

1  up ████████████████ name and that's when
2  Salma kind of cut ██████ off and was like she
3  didn't want to hear about ████████████████
4  because then we were questioning her leadership
5  and authority, and then she added that she heard
6  a rumor that she was -- she terminated ████████
7  contract so she can fire women of color, so she
8  could terminate women of color.  That's when I
9  told her that I wrote the letter on ████████
10  behalf.
11  Q.  Okay.  So you acknowledged that that
12  was not a rumor but was something that you had
13  actually suggested to ████████ appeals board?
14  A.  Yes.
15  Q.  Okay.
16  A.  She then says that she -- She called
17  Barbara right in front of us.  So she does
18  report, you know, that we came and we talked
19  about, you know, hostile, race-based environment
20  in the college, that we talked about extreme
21  bullying.  So she reports that to Barbara, but
22  she leaves a recording.  So Barbara didn't
23  answer.  She leaves a recording and then she
24  tells us that she -- You know, we were talking

272

**Page 273**

1  for a long time, that she wants to continue the
2  conversation, it's a very significant
3  conversation, and that we should schedule
4  another meeting.
5  Q.  Okay.
6  A.  And then we -- You know, then we got to
7  go.  She says, you know, the meeting is over.
8  Q.  And then she also E-mails
9  Barbara Schaffer to notify her and copied you on
10  that as well, right?
11  A.  Yes.
12  Q.  Okay.  And where the heck is that?
13  Give me a second.
14          (whereupon, Exhibit No. 173 was
15           marked for identification.)
16  BY MS. WERMUTH:
17  Q.  173.  Can we just get that marked for
18  the record?
19  A.  173?
20  Q.  That would be in Batch --
21  ████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████

273

**Page 274**

1  Q.  All right.  So could you go to
2  Exhibit -- You just said it and now I have to
3  click over -- 173.
4  A.  Okay.  173 is an E-mail to Hai.  Is
5  that it?
6  Q.  No.
7  A.  Am I looking at the wrong thing?
8  Q.  173 is the October --
9  A.  Oh, sorry.  I --
10  ██████████████████████████████
███████████████
12          MS. WERMUTH:  Do you have it,
13  Mr. Bramwell?
14          MR. BRAMWELL:  Yeah, I do.
15          THE WITNESS:  Oh, sorry.  I clicked on
16  173-A.
17          MS. WERMUTH:  Oh.
18          MR. BRAMWELL:  It's Bates labeled 8251,
19  right?
20          THE WITNESS:  Yes, I have it.  8251.
21  BY MS. WERMUTH:
22  ████████████████████████████████
████████████████████████

274



Lisa Calvente 02/19/2021

**Page 275**

```
1       ████████████
3       Q.   Okay.  And in November you and ████
4    were going to meet with Barbara together,
5    correct?
6       A.   Yes.
7       Q.   And ultimately you met with Barbara
8    individually?
9       A.   I showed up as Barbara Schaffer told me
10   that ████ was no longer going to come -- she
11   withdrew her complaint.
12      Q.   That's what Barbara told you?
13      A.   Yeah.  She said she was no longer going
14   to see this through.
15      Q.   Barbara told you that?
16      A.   She said this in front of Isabel Diaz.
17           MR. BRAMWELL:  Objection, asked and
18   answered.
19   BY MS. WERMUTH:
20      Q.   And after you met with Barbara you were
21   asked to provide the supporting materials that
22   you had, right?
23      A.   I came to that meeting with the
24   supporting materials.
```

**Page 277**

```
Lisa Calvente 02/19/2021
1    E-mailed it on --
2       A.   No.
3       Q.   -- is that fair?
4       A.   That is fair, yes.
5       Q.   Let me go back to a quick question
6    about ███ and what you and Salma discussed
7    when it came to █████.  Did you tell her that
8    you were in your letter accusing her of using --
9    you know, ████████████████
                                           This is
11   so not very helpful.  Let me start over.
12           What I am trying to get at is in the
13   conversation with Salma on October 10th of 2018,
14   did you say to her that you believe the
15   personnel committee or your senior colleagues
16   were recommending ████████████████ as a way
17   to avoid claims from you or did you tell her
18   that you believe she was doing that?
19      A.   I did not tell her either one of those
20   things.  She said that she heard a rumor, she
21   explained the rumor and I said I wrote the
22   letter.
23      Q.   Okay.  And tell me -- I am sorry.  Just
24   so I understand what the rumor was that she
```

**Page 276**

```
1       Q.   Oh, you physically handed them to her?
2       A.   Yes.
3       Q.   I see.  And then you also followed up
4    later with some additional information, right?
5       A.   Yes.  So I met with Barbara and Isabel
6    and then I met with Barbara alone on the same
7    day without Isabel, and then I was told to
8    follow up with a formal outline.
9                (Whereupon, Exhibit No. 202 was
10                marked for identification.)
11   BY MS. WERMUTH:
12      Q.   Okay.  And is that formal outline what
13   we see in Exhibit No. 202 which would be in
14   Batch 11?
15      A.   Yes.
16      Q.   And so you provided that outline, is
17   that right?
18      A.   Yes.
19      Q.   And do you know when you provided it?
20      A.   I do not, but I believe that I E-mailed
21   this.  So -- Oh, there it is.  I don't -- I
22   wrote it on November 29th and then I E-mailed
23   it.
24      Q.   You just don't know what day you
```

**Page 278**

```
1    explained.
2       A.   She said I heard a rumor that I
3    terminated ████ so I can terminate women of
4    color.
5       Q.   Okay.  So she was referring to the
6    rumor vis-?-vis her being the discriminator?
7       A.   Yes.
8       Q.   Okay.  And did you tell her that you
9    agreed that it was her conduct that you were
10   worried about or did you just say I wrote the
11   letter?
12      A.   I said exactly I wrote the letter.
13      Q.   That's all you said, okay.
14           And did you give her a copy of the
15   letter?
16      A.   No.
17                (Whereupon, Exhibit No. 211 was
18                marked for identification.)
19   BY MS. WERMUTH:
20      Q.   All right.  So can you look at
21   Exhibit No. 211?
22      A.   Yes.
23   ████████████████████████████
```





**Page 283**

13    MR. BRAMWELL:  Excuse me.  Whoa, whoa,
14  whoa.
15        Dr. Calvente, were you finished with
16  your answer?
17        THE WITNESS:  No.
18  BY MS. WERMUTH:
19    Q.    Okay.
20

**Page 285**

1    A.    Yes.
2

**Page 284**

12    Q.    Thank you for answering the question.
13        MR. BRAMWELL:  That was a little snide
14  there.
15  BY MS. WERMUTH:
16    Q.    All right.  Exhibit -- Can I just --
17  Hang on one second.  I just want to get a couple
18  of other documents authenticated.
19            (Whereupon, Exhibit No. 95 was
20             marked for identification.)
21  BY MS. WERMUTH:
22    Q.    Okay.  Exhibit No. 95 --
23    A.    Can you tell me which batch this is?
24    Q.    Batch 4.

**Page 286**

2        MR. BRAMWELL:  Objection, calls for
3  speculation.
4        MS. WERMUTH:  Well if I put the
5  document in front of her then it speaks for
6  itself.  If I don't, then it calls for
7  speculation.
8        We can look at it.  Why don't we look
9  at it together?
10        THE WITNESS:  Yes, let's look at it.
11  BY MS. WERMUTH:
12    Q.    And I will have to find it, so bear
13  with me.  50.
14        MR. BRAMWELL:  5-0.
15        MS. WERMUTH:  Yes.
16        THE WITNESS:  I see it.
17  BY MS. WERMUTH:
18    Q.    And are you looking at Page 29086?
19    A.    Yes.
20

**Page 299**

1    you wrote the letter.  How did she react when
2    you said that?
3        A.   Her demeanor changed when ▮▮▮▮▮ name
4    was brought up.  So she went from, you know,
5    going through the tenure cases with us to -- to
6    listening to us, actively listening to being
7    flustered and, you know, she was like no, this
8    is what I heard and then that's when our meeting
9    was over.  She basically said -- ushered us out
10   and said that we were going to continue this at
11   another time --
12       Q.   Did you ever have another time -- I am
13   sorry.
14       A.   -- and --
15       Q.   I have going to ask you did you ever
16   have another conversation with Dr. Ghanem?
17       A.   No.
18       Q.   And I am sorry you said and.  Please
19   continue your thought.  I didn't mean to cut you
20   off.  I am sorry.
21       A.   She said that our meeting had already
22   gone for hours and that, yeah, she kind of --
23   she pretty much just ushered ▮▮▮▮ and I out
24   and said that we can continue this another time.

**Page 300**

1        Q.   Okay.  During your career at DePaul did
2    Dr. Ghanem ever offer an opinion to you about
3    your likelihood of success concerning tenure and
4    promotion?
5        A.   So when I met with her in 2015 she said
6    that I was an extraordinary teacher.  When I met
7    with her about the Woodrow Wilson Fellowship she
8    said that that was a huge deal and said if
9    anyone else received this in the college.
10   That's why I began to put in my personal
11   statement that I was only one -- at the time
12   only one of two faculty members in the entire
13   university who received the Woodrow Wilson.  I
14   believe now there is a third.  So that goes --
15   speaks to research.
16            She went through -- Again, in 2017 she
17   went through the three processes, teaching --
18   the three categories, teaching, research and
19   service.  This is when she mentioned the provost
20   knew about my case and she indicated that I
21   would be okay, that I was fine for tenure,
22   right?  And then again when I met with her with
23   ▮▮▮▮▮▮▮ she went through the process of
24   tenure again and went through both ▮▮▮▮ and my

**Page 301**

1    file specifically for teaching and service and
2    listed what we did for service as, you know, on
3    par with tenure.
4        Q.   Okay.  And did she say anything else
5    about whether you were likely to obtain tenure?
6        A.   I said that we -- you know, that I was
7    more concerned about the environment in the
8    college and the discriminatory behavior, the
9    hostile behavior and extreme bullying that we
10   were receiving than with tenure because both
11   ▮▮▮▮▮ and I surpassed the standards for tenure.
12       Q.   And Dr. Ghanem told you that?
13       A.   She didn't disagree.
14            MS. WERMUTH:  Objection, misstates the
15   evidence.
16   BY MR. BRAMWELL:
17       Q.   I am sorry.  I couldn't hear your
18   answer over the objection.  I am sorry.  It's
19   because of my hearing issues.
20       A.   When I said that, she did not disagree.
21       Q.   Okay.  Now, you were asked about the
22   Vincentian Mission.  Do you remember that
23   earlier this morning?
24       A.   Yes.

**Page 302**

1        Q.   Does the Vincentian Mission mean that
2    you need to shield students from uncomfortable
3    information?
4        A.   No.
5        Q.   Would you agree that part of obtaining
6    an education involves being exposed to and
7    wrestling with information that can make you
8    uncomfortable?
9        A.   Absolutely, and as a matter of fact,
10   under academic freedom according to the AAUP
11   they do state that you can you know -- you can
12   incorporate controversial issues into your
13   teaching as long as it is part of that teaching
14   method and as long as it's part of your
15   specialization, so that is more than academic
16   freedom.
17       Q.   Do you recall the material you taught
18   in Communication 103 was more complex than what
19   other teachers taught?
20       A.   In my college?
21       Q.   Yes, in your college.
22       A.   For the most part, yes, except for
23   those that I trained.
24       Q.   Okay.  Yeah, you mentioned training



1  teachers.  What do you mean by that?

2      A.  So I was tasked in 103 with three TAs,

3  two of which actually occurred after the

4  critique in my personnel review.  So two

5  graduate students observed me throughout the

6  quarter.  They trained in 103 with me and then

7  they were tasked with teaching their own section

8  of the course using my syllabus, and I just want

9  to add to that.  One of those graduate students

10 still adjuncts for the college, and the last

11 time I saw him in the year that I went out for

12 2018 he told me that he still uses my syllabus

13 to teach 103.

14     Q.  And who is this teacher?

15     A.  Brent Taylor.

16     Q.  Okay.

17     A.  I believe his name is Brent Taylor.

18 It's been a few years.

19     Q.  Do you believe it's well known in your

20 college that you were outspoken on the issues of

21 race?

22         MS. WERMUTH:  Objection, foundation,

23 argumentative, calls for speculation.

24         MR. BRAMWELL:  I am arguing with my

303

1  meetings in terms of hires as it dealt with

2  race, in terms of hires as it dealt with sex,

3  with gender.  I -- I went and met with

4  interim -- what was he, acting -- interim

5  dean -- I believe it was Interim Dean Teboul on

6  how the college senior -- how the college

7  atmosphere was ignoring the -- the race of some

8  instructors and how they were being dinged for

9  teaching even though there is evidence that, you

10 know, teaching evaluations can be skewed by

11 race.  So I brought this up even before, you

12 know, 2015.

13     Q.  And did you continue to bring it up

14 after 2015?

15     A.  Yes.  So I also highlighted a time

16 where ████  ███ -- I complained about

17 ████████████  I didn't even complain about him.

18 I raised an issue of student complaints over

19 ███████████  in a graduate course to

20 Dean Ghanem.

21     Q.  Okay.

22     A.  So I found it very problematic that

23 ████████  had graduate students including

24 students of color perform stereotypes of people

305

1  own -- Okay.

2          MS. WERMUTH:  I am not -- Argumentative

3  doesn't mean you're arguing with the witness.

4  It means that you're stating arguments and

5  asking the witness to agree with argument.  I am

6  not saying you're arguing with the witness.

7  BY MR. BRAMWELL:

8      Q.  You can answer.

9      A.  I am sorry, Jerry.  Can you repeat that

10 please?

11     Q.  Yeah, sure.  Do you believe that it was

12 well known in your college that you were

13 outspoken on issues of race?

14         MS. WERMUTH:  Same objections.

15         THE WITNESS:  Yes.

16 BY MR. BRAMWELL:

17     Q.  You said yes?

18     A.  Yes.

19     Q.  Why do you believe that?

20     A.  I was -- From the first year even in

21 that -- those incidents that I stated I was very

22 vocal about where I stood and about the

23 anti-black and brown racism that I saw in the

24 college.  I was also outspoken in college

304

1  of color for their course and then a group of

2  students did not want to perform stereotypes of

3  themself and found it problematic and then I

4  believe those students complained.  There was a

5  number of letters, and I believe that they

6  complained also to Lexa Murphy and Jay Baglia

7  who was the director the graduate studies at the

8  time.

9      Q.  Do you know if ████████  has

10 received any dock in pay or any sort of

11 punishment for that?

12         MS. WERMUTH:  Objection to foundation.

13         THE WITNESS:  I can only speak on what

14 Dean Ghanem told me and she said that sometimes

15 students are out to get particular professors

16 because they don't like them, but, you know, we

17 are unsure of these incidents.

18 BY MR. BRAMWELL:

19     Q.  So that would be ████████  being

20 treated better than you?

21     A.  I would believe so since Lexa Murphy

22 highlighted student complaints in my tenure and

23 promotion report which was also brought up, I

24 believe, by the president when he said that she

306



1 that there is nothing else I want to get on and
2 then we can enjoy our weekends.
3        MS. WERMUTH: Okay.
4        MR. BRAMWELL: Come back at 6:03.
5        MS. WERMUTH: Got it.
6              (Whereupon, a break was taken
7                from 5:58 p.m. to 5:59 p.m.)
8        MR. BRAMWELL: All right. Are we back
9 on?
10       THE COURT REPORTER: Yes.
11       MR. BRAMWELL: I have nothing further.
12 We reserve.
13       MS. WERMUTH: Okay. Thank you for your
14 time today, Dr. Calvente.
15       MR. BRAMWELL: Thank you.
16       (FURTHER DEPONENT SAITH NOT.)
17              (Whereupon, the proceedings
18                adjourned at 6:00 p.m.)
19
20
21
22
23
24

311

---

1 STATE OF ILLINOIS      )
2                        ) SS:
3 COUNTY OF C O O K      )
4        I, MICHELLE L. BARTA, a certified
5 shorthand reporter for the State of Illinois, do
6 hereby certify that heretofore, to-wit, on the
7 19th day of February 2021, appeared before me
8 via Zoom videoconference, LISA CALVENTE, in a
9 cause now pending and undetermined in the
10 United States District Court, Northern District
11 of Illinois, Eastern Division, wherein
12 LISA CALVENTE is the Plaintiff, and SALMA GHANEM
13 and DEPAUL UNIVERSITY are the Defendants.
14       I further certify that the said
15 LISA CALVENTE was first duly sworn to testify
16 the truth, the whole truth and nothing but the
17 truth in the cause aforesaid; that the testimony
18 then given by said witness was reported
19 stenographically by me and afterwards reduced to
20 typewriting by Computer-Aided Transcription, and
21 the foregoing is a true and correct transcript
22 of the testimony so given by said witness as
23 aforesaid.
24       I further certify that the signature to

313

---

1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4 LISA CALVENTE,          )
5        Plaintiff,       )
6    vs.                  )  Case No. 1:20-CV-03366
7 SALMA GHANEM and        )  (Volume II)
8 DEPAUL UNIVERSITY,      )
9        Defendants.      )
10
11       I, LISA CALVENTE, being first duly sworn,
12 on oath say that I am the deponent in the
13 aforesaid deposition taken on the 19th day of
14 February 2021; that I have read the foregoing
15 transcript of my deposition, consisting of Pages
16 135 through 312 inclusive, and affix my
17 signature to same.
18
19        _____
                      LISA CALVENTE
20
21 Subscribed and sworn to
before me this        day
22 of            , 2021
23
24 Notary Public

312

---

1 the foregoing deposition was reserved by counsel
2 for the respective parties.
3        I further certify that I am not counsel
4 for nor in any way related to the parties to
5 this suit, nor am I in any way interested in the
6 outcome thereof.
7        IN TESTIMONY WHEREOF: I have hereunto
8 set my verified digital signature this 13th day
9 of March, 2021.
10
11
12
13
14        _Michelle L. Barta_
15        MICHELLE L. BARTA, C.S.R., R.P.R.
16        LIC. NO. 084-004033
17
18
19
20
21
22
23
24

314



# Exhibit 19 to Calvente Deposition



CONFIDENTIAL



CONFIDENTIAL





Calvente-DePaul 0000243



CONFIDENTIAL

# Exhibit 94 to Calvente Deposition



Calvente-DePaul 000798





Calvente-DePaul 000800

Calvente-DePaul 000801



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

Calvente-DePaul 000806



Calvente-DePaul 000807



CONFIDENTIAL                    Calvente-DePaul 000808



CONFIDENTIAL

CONFIDENTIAL

Calvente-DePaul 000810



Calvente-DePaul 000811



Calvente-DePaul 000812



Calvente-DePaul 000813



 Calvente-DePaul 000814



Calvente-DePaul 000815



 Calvente-DePaul 000816



CONFIDENTIAL



Calvente-DePaul 000818



CONFIDENTIAL



Calvente-DePaul 000820



Calvente-DePaul 000821





CONFIDENTIAL



Calvente-DePaul 000824



CONFIDENTIAL



Calvente-DePaul 000826



Calvente-DePaul 000827

# Exhibit 108 to Calvente Deposition



Calvente-DePaul 0000253



CONFIDENTIAL





CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



Calvente-DePaul 0000259



 Calvente-DePaul 0000260



CONFIDENTIAL



Calvente-DePaul 0000262



CONFIDENTIAL



# Exhibit 115 to Calvente Deposition

CONFIDENTIAL

Calvente-DePaul 000876

CONFIDENTIAL

Calvente-DePaul 000877

CONFIDENTIAL

CONFIDENTIAL

Calvente-DePaul 000879



CONFIDENTIAL



Calvente-DePaul 000881



Calvente-DePaul 000882



CONFIDENTIAL

# Exhibit 186A to Calvente Deposition

1

**Lisa B. Y. Calvente, Ph.D.**
**College of Communication**
**DePaul University**

**Tenure and Promotion Review**
**Fall 2018-2019**

My commitment to agency, social justice, and advocacy drew me to DePaul University. This same investment structures my teaching, research and service agenda and aligns it with the University's mission. I am a scholar trained in Communication Studies with concentrations in Cultural Studies and Performance Studies. My research specializes on issues of the Black Diaspora and anti-black and anti-brown racism in the United States. Through my work I focus on the ways in which political identifications of black belonging arise through the historical, material conditions of colonialism and racism. While at DePaul I have concentrated on examining how these identifications are communicated within popular culture and everyday experiences through an interdisciplinary and creative approach to teaching, research, and service.

**Teaching**

While at DePaul University I have contributed to the development of the Intercultural Communication and Communication Studies units at both the undergraduate and graduate levels. I am also an active affiliate of African and Black Diaspora Studies (ABDS), Latin American and Latino Studies (LALS), and Critical Ethnic Studies (CES). My courses have been cross-listed with these departments and programs in addition to Media and Cinema Studies, Health Communication, and Women and Gender Studies (WGS). With over seventeen years of teaching experience, I bring an extensive record of teaching and mentorship to the University and have been distinguished by teaching and mentorship nominations and awards. While at DePaul I have taught fourteen courses, seven of which I developed as new courses to further strengthen our College and unit presence across the university curriculum. Among these classes, I teach the introductory performance course, *Performance: Communication, Creativity, and the Body* (formally *Performance of Literature*), that serves as our College's oral communication requirement, a core for our performance minor, and fulfills the Arts and Literature domain in our University's Liberal Studies Program.

I have contributed to the Liberal Studies Program through additional courses such as *Performance for Social Change* and *Performing Culture*, which fulfill the common core-course requirement in Experiential Learning, Multiculturalism in the U.S., and the Arts and Literature domain. Beyond teaching core and required courses, I have developed a number of upper-level special topics courses that reflect my expertise, are cross-listed between several units, programs, and departments, and have helped strengthen undergraduate minors. For example, I developed *Performance of African American Literature* and *Black Radical Performance* for our undergraduate minor in Performance Studies. When I was asked by my College to help strengthen the Latino Media and Communication minor, I developed *Latinas/os, Raced Representation, and the Media* as an undergraduate course, an independent study, and a seminar in order to meet graduate demands.

My contributions to graduate studies at DePaul have been substantial. I have taught general graduate requirements in the College of Communication as well as developed specific classes for new initiatives; for example, when the college launched its Health Communication graduate program, I developed *Communicating Health, Race and Reproductive Rights*, which has been subsequently taught in Communication Studies, Health Communication, Critical Ethnic Studies,

LC0002195

and Women and Gender Studies. In fact, in 2016, (the second time I taught the course) my enrollment was at twenty-two students, nine of which were enrolled from outside of the college and cross-listed units. This course was highlighted in my last personnel statement as having "scored between 4.5 and 4.9" in the "5 common university measures" (Personnel Statement, p.3).

I have also been active in mentoring many of our graduate students. I have administered eight comprehensive exams to date and have served as Chair of one graduate project and two graduate theses, one of which passed with distinction. This student went on to win one of our College's alumni award for her continued efforts for social justice and her impact on the community. In addition to Communication Studies graduate students, I have worked closely with graduate students in CES and WGS, chairing one CES project, acting as a committee member for two WGS projects and for one CES thesis. Outside of my regular teaching demands, I have developed two graduate-level independent studies entitled, *Classic and Contemporary Cultural Studies*, that I also offer to graduate students from outside of the College. My efforts to cross-list my courses and my work with other programs and departments across the University demonstrates my commitment to our University's goal to build conversations across disciplines and colleges, as well as to creating an enriching, knowledge-inciting and knowledge-producing atmosphere at DePaul.

In my classes, I encourage students to re-theorize learned intersections between theory and everyday life through a critical lens. I employ multiple teaching techniques that are centered on a combination of lecture, discussion, small group work, presentations, and performance. In my non-performance-based courses, students are required to present either throughout the quarter or as a final component of the course. These presentations allow students to bring their own interests, experiences, and knowledge into the classroom and share with their classmates in a formal manner beyond our weekly discussions. The reading inquiries I assign encourage students to think critically about the world around them and reflexively about themselves through applied theory. In my performance-based classes, the students re-theorize these intersections through performance workshops—these are in-class performance exercises that enable them to embody their interpretations. Their staged performances are their primary assignments and the method through which they demonstrate what they have learned.

My goal for every class is to interrogate ways in which marginalized and often silenced voices can talk back to, and act against, social inequality and political oppression. These are goals which align with our University mission and Vincentian values. I aim to inspire all students to feel that they are critical, productive thinkers with access to agency and the ability to make change in the world. I am able to accomplish this through a pedagogical repertoire that values community engagement, student experiences, and the work I have done with university resources such as the Steans Center and the Center for Black Diaspora. For instance, in *Performance for Social Change*, my students are asked to relate all class material on the prison post-industrial complex to their lived experiences, as well as experiences with the Chicago Alliance against Racist and Political Repression (CAARPR) and the activist organization INCITE! (organizations that my students develop relationships with as a result of my community-based, service-learning initiatives.) The coursework concludes in a public performance. In another course, *The Politics of Hip Hop Culture*, students have an opportunity to draw from local Chicago communities in their final presentation; they are asked to highlight the extraordinary aspects of local hip hop culture through Chicago sound, venues, artifacts, food, etc. Both classes have the desired effect of extending the classroom environment into the city, thus making Chicago and its communities a part of the students' learning environment while simultaneously allowing students to give back to

LC0002196

the community.

My 2015 personnel review highlighted that there were comments in my qualitative evaluations that described my classroom environment as hostile or myself as intimidating. These very comments were highlighted again in my 2017 personnel review. As a scholar of race and racism, I understand that racism in the United States is a sensitive, silencing, often misunderstood and ill-defined discourse that makes students uncomfortable.[1] Teaching students to discuss race and racism openly involves confronting their discomfort and pushback. This discomfort often plays out in my classroom and is intensified by the fact that I am a U.S.-born woman of color and the only faculty member in the College of Communication who specializes on race and racism. I rely on honesty and candor to establish trust and respect within the classroom.[2] This pedagogical approach enables students to articulate their own positions on racism and other forms of marginalization freely and early on in the course, thereby also allowing me to identify potential issues and address student concerns early. While students may be initially reticent to discuss their concerns, a majority of my students, including those who initially expressed discomfort at being pushed to think critically, have stated that my classes are "life-changing" and have expanded their perspectives on themselves, their identities, and the roles that their identities play in society; this sentiment is also reinforced by my high quantitative scores as highlighted by the Personnel Committee:

> Quantitatively, teaching evaluations demonstrate Lisa's strong command of the subject matter (from 4.9 to 5), her high level of preparedness (from 4.8 to 5), her ability to stimulate interest in the subject (from 4.6 to 5). Ratings of the overall quality of courses were in the 4.2-4.9 range and overall teaching effectiveness in the 4.1-5.0 range. Lisa consistently received 4 or above on most other measures. (Personnel Statement 2017, pp. 2-3).

I make every effort to produce a classroom environment of critical awareness, dialogue, and action; one that is inclusive for all students. For instance, early in my career at DePaul I attended the *Ethics Across the Curriculum* workshop here at DePaul (2014) and incorporated what I learned in the workshop to further create empathy and agency inside and beyond the classroom. In *Intercultural Communication,* which is a required course and a course that I teach frequently, I use the readings and exercises from the workshop to explain the relationship between

---

[1] Studies on higher education have demonstrated that as faculty, black and Latina women are burdened with racist and sexist expectations that characterize them as nurturing, subordinate, "mammie," and maid-like figures in the classroom. When junior faculty especially demonstrate a mastery over their subjects, they are often described as "hostile," "arrogant," "intimidating," and "silencing" in stark opposition to their white/male counterparts. These studies are now mainstream, publicized on NPR and Inside Higher Ed, and show how student evaluations are unreliable sources for evaluating teaching since students act on significant biases such as gender and race. See Victor Ray's "Is Gender Bias an Intended Feature of Teaching Evaluations" in *Inside Higher Ed.* Feb. 9, 2018; see also Kristina M.W. Mitchell and Jonathan Martin's "Gender Bias in Student Evaluations" in *PS: Political Science & Politics*, vol. 5, issue 3, July 2018, pp. 648-652 and Chavella T. Pittman's "Race and Gender Oppression in the Classroom: The Experiences of Women Faculty of Color in the Classroom with White Male Students." *Teaching Sociology* Vol. 387, No. 3, 183-196. See also Steele, C.M. (1997) "A Threat in the Air: How Stereotypes Shape Intellectual Identity and Performance." *American Psychologist*, Vol. 52, No. 6, 613-629.

[2] This pedagogical approach was highlighted as the most beneficial and productive strategy when dealing with issues of race within the classroom at DePaul's "Fall Forum on Teaching and Learning, Race and Social Identity," by keynote speaker and workshop leader, Terrell Strayhorn. Professor Strayhorn is a higher education scholar that specializes on teaching diversity and race in the college classroom (October 20, 2018). This approach was highlighted again at two College "Brown Bags" on Diversity in the Classroom for faculty pedagogical development, led by Maria De Moya Taveras (Spring 2017 & 2018). Also see "Common Beliefs" from *Teaching Tolerance: A Project in the Southern Poverty Law Center* at www.tolerance.org.

LC0002197

communication and social justice and to discuss how ordinary people can become agents for change. I highlight St. Vincent DePaul as a prime example of an organic intellectual and how praxis can create spaces for change and equality. I use my classroom to instantiate Vincentian values and lessons; I encourage reciprocity, dialogue, and respect between all students and the professor, and have written this guiding tenant into my syllabi since 2011. In addition, I employ a plurality of teaching methods to respond to the diversity of students needs and encourage openness and dialogue in my classroom, as evidenced by my syllabi, assignments, and learning goals. I emphasize the classroom as a space for channeled exchanges of ideas and information, where all participants, the instructor as well as the students, create possibilities of learning and teaching. In this sense, the classroom is a space for the critical production of knowledge, where past and present, theory and practice, come together to create and re-create countless learning possibilities for everyone involved. I have demonstrated this philosophy through the courses I have taught and developed at DePaul.

**Research**

      My research to date reflects my interdisciplinary training and my commitment to social justice against anti-black and anti-brown racism on both a local and global scale. My work relies heavily on the ethnographic methods of cultural studies and performance scholars and draws from critical race scholarship. As such, my publications have been the result of years of ethnographic study in addition to archival research in multiple urban spaces nationally and internationally. When I was first hired at DePaul University, I was working on two book projects. The first was a co-edited volume on visual representations of resistance and the second, which is my solo-authored manuscript, stemmed from my dissertation work (my field is a book-centered field). In my first personnel review, however, I was advised that, rather than focus on my book manuscript, I should focus on shorter works that could be published quickly, and I heeded this advice (the co-edited volume has since been published, and my solo-authored manuscript will be under review on October 15, 2018).

      My publications span several methodological approaches. My first published refereed book chapter (Lexington Books, 2010), centers on performance ethnography, representations of immigration and blackness, and performances of becoming by highlighting a lived experience of crossing the Mexico-U.S. border while being searched by U.S. border patrol.[3] My research has also embraced non-traditional and transformative writing practices. As part of a working group on cultural studies, together we began analyzing neoliberalism, representations of crises and its effects on everyday life. In this group we produced one refereed multi-authored chapter on neoliberalism and the corporatized university (Palgrave MacMillan, forthcoming) and a co-authored article (2017) on crisis subjectivities and neoliberal temporalities in the cultural studies journal, *Social Identities: Journal for the Study of Race, Nation, and Culture*.[4] My co-author, Dr. J. Smicker (Communication, Catawba College), and I are currently expanding this work to further analyze the historical events that have resulted in a normalization of crises and how this affects contemporary politics. This

---

[3] Critical performance ethnography highlights active, engaged listening as a way to communicate with marginalized groups and promotes standing in solidarity with subject groups. This contrasts with traditional ethnographic methods that centered on witnessing and participant observation. See Dwight Conquergood, "Performance Studies: Interventions and Radical Research" in *The Drama Review* 46: 2, 145-156 (Summer 2002) and Dwight Conquergood, "Performing as a Moral Act: ethical dimensions of the ethnography of performance," *Literature in Performance* (1985) vol. 5, no. 2, pp. 1-13. See also D. Soyini Madison, "Co-Performative Witnessing," *Cultural Studies* (2007) 21: 6, 826-831.

[4] All of my multi-authored and co-authored works are collaborative efforts of equal measure and the authors are listed in alphabetical order.

LC0002198

research contributes to a growing body of literature that critiques neoliberal and corporate strategies of knowledge-production and actively seeks to create alternatives.

I have also published a co-authored article (2014) in *Cultural Studies,* the leading journal in the field. This article was the culmination of two years of archival research in Havana, Cuba, an ethnographic stay in Havana funded by the Andrew Mellon Mays Foundation, and a summer of ethnographic work at the J. Paul Getty Museum in Los Angeles, California. In this same year, I was also invited to participate in the Performance Colloquium at Northwestern University on biopolitics, mobility and performance theory (July 2013). This annual colloquium features well-known and rising national and international scholars who engage with the fields of Performance and Communication Studies. The invitation was issued by C. Riley Snorton, a leading scholar in Gender, Transgender and Race Communication, who heard me speak at Northwestern University's Colloquium on Ethnicity and Diaspora (CED) earlier in the year (Winter 2013).

My CED talk was the basis for my single-authored article (2017), which was also the lead article in *Souls: A Critical Journal of Black Politics, Culture, and Society.* Through a detailed analysis of crisis within New York City, this article highlights how the representations and politics of hip hop culture help to foster and disrupt marginalizing processes of neoliberalism. Along similar lines, my second solo publication also centered on New York City, the performative importance of call and response, communicative technology, and black love as resistance (Oxford University Press, 2018). My previous research on hip hop in New York City will be the foundation of my second solo-authored manuscript, which I have planned as an ethnography-based text that explores the relationship between hip hop culture and neoliberalism in the 1990's and early millennium.

I published *Imprints of Revolution* (Rowman & Littlefield, Int., 2016), a co-edited manuscript which was also solicited by Lexington Books and Routledge, and is an interdisciplinary study of visual representations of global revolutionary movements. My co-author, Dr. G. García (History, Tulane University), and I chose Roman & Littlefield, Intl. because they agreed to publish the book in hardcover, electronic, and paperback forms simultaneously. This was appealing to us since we wanted to make the book easily accessible and cost-friendly in order to facilitate course adoption. Also, because of the topic of the volume, it was important that the book have an international audience. The press reviewed the manuscript and, since it was part of the *Disruptions* series for cultural studies, it was also reviewed by members of the series' editorial board. The book was positively reviewed in *The Popular Culture Studies Journal* (2017). My role in this project extended beyond that of co-editor. I authored the Introduction to the book and co-authored a chapter. The former is an analysis of the Haitian Revolution and Pan-African decolonization through the visual significance of flags as transnational building; these are topics not addressed in the collection and the argument is unique to the discourse of revolution.[5] The chapter I contributed analyzes how, after 1959, the Castro administration created an affective understanding of belonging and becoming Cuban that rested on visual imagery and interdependent solidarity.

I have a strong record of research honors and awards that date back to my undergraduate education. While at DePaul, I received DePaul University's URC Paid Leave award, URC Research Grant, and The Woodrow Wilson Career Enhancement Fellowship for Junior Faculty (CEF), a prestigious, nationally competitive fellowship that possesses a stipend and a grant of $31,500. The

---

[5] In my last personnel statement, it was stated that the Introduction would not be counted as a separate publication; however, when I was a junior participant on personnel for two review cases (2013-2014), Introductions were not automatically discounted. Instead, the evaluative criteria for dis/counting introductions was set as the depth of the analysis and its contribution to the collection and scholarship. I am unsure of the evaluative measures used to discount the Introduction of *Imprints.*

LC0002199

CEF award is a testament to the unique contributions my work pushes forth as the fellowship competition is primarily based on research that demonstrates "a commitment to eradicating racial disparities, and breaking down stereotypes and promoting cross-racial understanding in core fields in the arts and sciences" (CEF). I was also invited to participate in a plenary session on the impact of the Stuart Hall's work for the International Association for the Study of Popular Music Conference at the University of Louisville in Kentucky (2015), where I was the most junior scholar on the plenary. I had one interruption in my tenure clock in addition to research leave, during the academic year 2012-2013, following an FMLA leave for the birth of my daughter, which was not accounted for in my second personnel review (2015).[6]

Much of my scholarship comes in the form of publications. However, since my arrival at DePaul, I have also successfully completed three performances (2013, 2015, 2016) and I am scheduled for another public performance this Winter (2019). In these performances, I have drawn on my specialization as a performance scholar to combine service learning with performance pedagogy as a way to inspire social change and advocacy against racial inequality and oppression.[7] The performances have been directed by me and I have scripted each of them with my students outside of class time. These performances have focused on the relationship between race, racism, and mass-incarceration and give back to the Chicago communities as a public event with specific invitations to the people that my students have worked with in their service-learning. These are collaborative efforts that inspire my student-performers to become agents of social change through performance methods. I have explored these performances, the utilized methodologies, and their community impact at the annual conference for the National Communication Association and in a chapter of my solo-authored manuscript.

My solo-authored manuscript is entitled *Moving Blackness: Black Circulation, Racism, and Relations of Homespace*. The manuscript underscores how story-telling becomes the way in which blackness *moves*: both in terms of circulating the experiences of being black and as a form of resisting the physical experience of racism, surveillance, and limited mobility. The book's focus on the function of stories as travel highlights the complex ways in which the bodies of the storytellers are surveilled and contained as well as how black identity is negotiated. Drawing upon performance theory and cultural studies, the book frames the act of story-telling and its circulation as performances rooted in the everyday lives of black peoples of the diaspora. The ethnographic work for this project was completed over the course of five years, beginning with my initial dissertation research in New York City, and continuing through a postdoctoral fellowship that allowed me to include the city of Chicago and the experiences of racism and police brutality found therein. The dual focus of the study allowed me to broaden my connections between race, space, and belonging. In addition to ethnographic research I also conducted archival research at *El Centro: The Center for Puerto Rican Studies* in New York City. My manuscript proposal and sample chapters have been reviewed by multiple university presses, and presses have shown an interest in publishing the manuscript (the University of Illinois Press and the University of Alabama Press, both of which have strengths in Communication Studies and Black Studies). Rutgers University Press is at present committed to sending the manuscript to readers for review and Northwestern University Press has

---

[6] While my tenure clock was officially stopped by the University during the 2012-2013 academic year, my Personnel Review in 2014-2015 does not account for this FMLA leave, instead assessing me during the 2014-2015 in my third academic year as a fourth-year faculty member. While I provided evidence of my leave immediately after becoming aware of the error, neither the report nor the Personnel decision regarding my employment were ever amended to reflect the committee's procedural mistake. See Appendix B.

[7] Much like service-learning, performance pedagogy is a method of teaching that acknowledges that students learn differently and the body can learn experientially through aesthetic activities.

LC0002200

offered an advanced contract. I am scheduled to submit the completed manuscript mid-October 2018.[8]

I have maintained an active research agenda beyond preparing my manuscript for publication, at conferences and events and through paper presentations, responses, and invited lectures. I currently have one co-authored article under review at *Identities: Global Studies in Culture and Power*. This article is the culmination of years of research that began with a conference presentation in Nassau, Bahamas in 2015. Since then, I have conducted numerous sites visits to Louisiana to examine the ways in which slavery and racial terror continue to haunt notions of national belonging. My co-author and I focus on plantation and urban tours as sites to examine visual black absence in the narrative of nation. I am also in the preliminary stages of a project on Havana, Cuba, that analyzes performed blackness, gendered representation, and the revolutionary imaginary. This project analyzes radical performances of female bodies within a modernity-coloniality framework and covers Havana from the colonial period to the present day. I presented part of this research at Crossroads, the Association for Cultural Studies, in August 2018.

My arguments and methods are unique contributions to a body of literature that focuses on social justice and broadens existing understandings of communication, race, space, and belonging. My future research agenda will continue to highlight racism, cultural studies, and the performance of everyday life within the framework of Communication Studies.

**Service**

I have made significant service contributions to my Unit, College, University, and Profession, in addition to the greater Chicago community. The following is a sampling of the activities that I have been involved in (I include an exhaustive list on my C.V.):

For my unit, I was part of the Graduate Program Task Force to brainstorm ideas for the first-year seminar. This initial work has now evolved into our Communication Studies graduate foundation course, where I was a guest speaker for performance and cultural studies in two separate courses. I also participated in two term-faculty searches for Intercultural Communication (one was cancelled) and I helped to review all of the syllabi for non-tenure/tenure track faculty for *Intercultural Communication* to ensure that it met the College's outcome goals. I also helped to collect and analyze counselor-student feedback on the newly created pathways for the Communication Studies undergraduate curriculum and was the faculty representative for our M.A. program at the Graduate School open house.

For the College, I was the Junior Faculty Representative for the College's Personnel Committee in two formal reviews. Although I did not have a vote, my responsibilities required that I be present for all meetings, read the candidate's materials, and participate in the crafting of the formal letter. The following quarter, I was also part of our College's Local Review Board. We were responsible for reporting to the Institutional Review Board and reviewing applicants who work with IRB. I was also the event leader for our College's Symposium, entitled "Making Meaning of Violence." For this event, I created a panel on race, violence, and activism and invited senior scholars and activists who specialize on issues of social justice, youth activism, and violence. I was appointed to the term faculty review committee in Spring 2015. I will begin to serve a second term this year. I was also recently appointed as a faculty advisor for the College's Latino Media & Communication Minor and, though I have formally advised two students thus far, I have informally advised many students within this program since my appointment began.

---

[8] While securing a university press requires more time than commercial or non-profit presses, my field is one that privileges university presses.

LC0002201

8

On the University level, I served on the Liberal Studies Council's Task Force on Personal Transformation and Responsibility and Global and Transnational Programs, where I was charged with analyzing documents and reporting the results to the committee; I was also part of the Liberal Studies Council Survey Review Sub-Committee where I also analyzed the results of college surveys on the Liberal Studies Program and helped to construct a document that reflected these results. In both of these committees I attended all of the meetings necessary to perform my task. Last year, I was approved to be part of the University Council on Community Engagement and I look forward to working on this committee as it mirrors my teaching and research interests. During this same year, I was also chosen as a faculty representative to participate in a project-based learning workshop at the Worcester Polytechnic Institute. I was charged with attending meetings and workshops, and constructing and presenting an action plan with my DePaul colleagues at the Institute on Project-based Learning. Upon our return we continued to meet and revise our plan to consider the possibilities of project-based learning within our university curriculum in ways that are in line with the spirit of our new strategic plan and aim for undergraduate freshman retention.

I am affiliate faculty in LALS, ABDS, and CES, and actively contribute to these programs and departments. As an affiliate of LALS, I have cross-listed my courses and attended faculty meetings. I have advised two senior theses, attended presentations and participated in the senior capstone as a guest lecturer. I also participated in the LALS tenure-track hire (2016-2017). As an affiliate of ABDS, I have attended meetings, cross-listed my courses, advised ABDS students, attended open houses, and lectures. I have been a member of the ABDS Steering Committee since 2015 and have attended these meetings as well. In doing so I have participated in amending ABDS documents and in a writing task force. I became an affiliated faculty member of Critical Ethnic Studies (2016-2017) and have formally and informally advised graduate students. I have also met with potential students for the graduate program and have attended lectures, events, and dinners with invited scholars in the field. In addition to these affiliations I have been active in the Women and Gender Studies Graduate Program. I have participated in the WGS graduate studies panel and have attended many of WGS-sponsored events. I have worked closely with two of their graduate students and just recently began to serve on the advisory board of The Women's Center due to my continued presence in the program.

Besides being an active member of the University, I am also active in my profession. I am on the Editorial Board for the journals, *Text and Performance Quarterly* and *Cultural Studies*, and in that capacity execute manuscript reviews as necessary. I have also served as a reviewer of book chapters in my field for Sage Publications. I am also a visible member of national organizations and I have served in the administration of conferences such as NCA and ICA. I have also participated in annual conferences that center on minority outreach in higher education, conducting workshops, responding to panels, and participating in panels.

In the community, I have volunteered at the Juvenile Justice Program, a branch for troubled youth at the Organization for the North East (ONE) community center. I have also worked with CAARPR, attended their meetings, created a database of potential volunteers and allies, and continue to use my courses and performances to foster interest in community volunteerism and social change. These kinds of projects and commitments help dismantle imagined boundaries between the university and everyday life in the community and make possible the fulfillment of DePaul's Vincentian mission.

My teaching, research and service exemplify the goals of the College of Communication and DePaul University. I will continue on a path of intellectual growth as a member of our community and will remain committed to enriching its educational environment.

LC0002202

**APPENDIX A**

Appendix A addresses specifically the concerns raised in the College Recommendation of Continuation or Termination of Untenured Faculty Contract Report, dated November 17, 2017.

After examining my qualitative teaching evaluations (All Years, All Classes), I have found that only 20 students between the years AY 2011 and 2017 expressed sentiments in accordance with those reflected in my Personnel Report of 2015 and 2017 (i.e. expressing feeling intimidated by the class or the instructor, or feelings of discomfort). I should note that I am not counting in this tally those students who spoke positively of engaging with their feelings of discomfort as feelings of discomfort is an expected and even desired sentiment when teaching race and racism.[1] For example, one student noted that my class "forced me out of the comfortable 'anonymous student zone'" (AY 2012-2013, INTC 367, Student 480377) or that the class "helped me feel much more comfortable discussing race and addressing it through performance" (AY 2011-2012, CMNS 330, Student 307700). My findings contradict my 2017 Personnel Report which stated that "A major theme in qualitative comments throughout Lisa's teaching career at DePaul pertains to students feeling "intimidated" or "uncomfortable" in her classroom." My evaluations, contextualized appropriately, also contradict the statement that that such themes are expressed in over 55 percent of my evaluations (Personnel Statement 2017, p.9).

CMN 103 Intercultural Communication provides the largest cohesive sample of students I have taught while at DePaul (9 sections between Fall 2011 and Spring 2017, with over 310 students enrolled.). This is also one of the courses that has often been singled out by the College as a concerning example of classroom environment. I have thus taken the opportunity to examine the quantitative and qualitative data from this course and using it as an example of my teaching, I have graphed students comments with regards to classroom environment. The following graph illustrates that there is in fact no growing or identifiable pattern or trend of student complaints (Graph A.1). In fact, I found that students' evaluation of my classroom environment (the most serious concern raised by the Personnel Committee and Tenured Faculty), even when students initially expressed discomfort with engaging the course material, actually reveals a pattern of teaching effectiveness, as also evidenced by my high quantitative teaching scores (Table A.2).[2]

---

[1] This was highlighted by Terrell Strayhorn, higher education scholar, cited in my personal statement.

[2] This is especially the case when my quantitative "classroom environment" scores (Question #6 on my Teaching Evaluations) are compared to the aggregated scores of other faculty members in the College of Communication. Those quantitative scores and graphs have already been produced by the University as part of my Teaching Evaluations and are available on Sharepoint.

**Graph A.1**[3]  Between Fall 2011 and Spring 2017, I have taught 13 sections of CMN 103, Intercultural Communication.  Out of a total of 198 responding students, only 11 indicated or otherwise suggested feelings of discomfort.[4] 7 of these respondents are distributed in two classes (AY 2014-2015 Fall, and AY 2017-2018 Winter), contradicting the notion of a growing or alarming pattern of student distress.



---

[3] To compile this graph, I did a word search through my Qualitative Teaching Evaluations for CMN 103, all sections, all years.  I chose this class in particular because it has been signaled out by Personnel as indicative of the overall climate of hostility in my classes.  I searched specifically for terms such as "hostile, intimidating, uncomfortable, afraid, anxious," and their various derivatives, and individually assessed each of the 198 qualitative responses (out of a possible 310 student respondents).

[4] It is important to note that of these 11 students, many referred *not* to how they themselves felt or were made to feel, but rather what they perceived others to be feeling.  Only 1 student indicated that the environment appeared "hostile," stating that "…at times I felt as though the environment became hostile and sensitive when discussing sensitive issues making other classmates uncomfortable."  This same student rated the quality of the course and overall teaching effectiveness at a 4, 4, respectively, further going on to note that Professor Calvente "expanded my awareness of my own identity and how it works in society" (AY 2014-2015 Fall, Student 639463).  Of the 4 students in the same class, who stated that they had felt intimidated, one noted that: "I often think about discussions we had in class in my everyday life" and rated the quality of the course and the instructor's overall teaching effectiveness as "better than average." (AY 2014-2015 Fall, Student 621186).  Another among the same 4 who noted feelings of intimidation also noted that "…this course made me realize my potential when it comes to critical thinking… Out of all my classes this quarter, this is the one that I discussed the most outside of the classroom.  Professor Calvente moves at a pace that works for everyone" and rated the quality of the course and instructor's overall teaching effectiveness as "better than average" and "among the best," respectively (AY 2014-2015 Fall, Student 621696).

While some students may experience genuine distress at the prospect of discussing race or racism, most are like the two students above; while they may note feelings of intimidation at course material or discussions (or the instructor), they also routinely rank highly the quality of the class and the overall teaching effectiveness of the instructor.

LC0002204

**Table A. 2**[5]

**CMN 103 Intercultural Communication**

| Students<br>Reporting Feelings of Discomfort | Overall Quality of Course | Overall Teaching Effectiveness | AY and Term |
|---|---|---|---|
| 550979 | | | 2013-2014 Winter |
| 639463 | 4 | 4 | 2014-2015 Fall |
| 621186 | 4 | 4 | 2014-2015 Fall |
| 621696 | 4 | 5 | 2014-2015 Fall |
| 634942 | 4 | 4 | 2014-2015 Fall |
| 872618 | 4 | 4 | 2016-2017 Fall |
| 964962 | 5 | 5 | 2016-2017 Spring |
| 983203 | ---[6] | --- | 2017-2018 Fall |
| 1026090 | --- | --- | 2017-2018 Winter |
| 1025022 | --- | --- | 2017-2018 Winter |
| 1033663 | --- | --- | 2017-2018 Winter |

---

[5] The data was gathered from the Statistical Report, CMN 103 Teaching Evaluations, All Years, All Terms.
[6] Data not available.

LC0002205

**A.3**

**Response to Personnel Committee Report**

TEACHING

During my formal reviews in 2015 and 2017, Personnel Committee members and tenured faculty have "found pedagogical issues reflected in the qualitative data" and stated that they "would like to see further substantive steps taken by Lisa in responding to problems identified in students' responses to her teaching" (Personnel Statement 2017 pp. 3, 4). I have addressed all of these issues in the order of the outline listed by Personnel:

Personnel stated:

References to students feeling "intimidated" or "uncomfortable" still showed up in this review cycle, though at low frequency… In a careful review of student comments, the Personnel Committee believes that the instances of negative feedback highlighted a communication issue rather than students' discomfort with course content or Lisa's pedagogical approach. Several students appreciated her directness and the way she challenged and pushed them to think critically about difficult topics. Yet, even those who felt "comfortable" took note of Lisa having a "very firm set of ideas" and an "expressive" way of communicating, which can sometimes "thwart conversation" or create "heated tension," thereby making some students less ready to talk in class. A student in her CMN 103 class (Spring 2017) offered an insightful observation: "The course is great but you [Lisa] certainly come on a little strong. I didn't mind it but it's possible some people didn't feel comfortable opening up because of it." Our students are diverse in several ways. Students who possess higher levels of understanding and communicating complexity are more likely to thrive. Meanwhile, this communication style might not invite students who are less outspoken or are still exploring their voice and ideas to grow intellectually… In the classroom, the instructor –regardless of race, gender, or origin– represents authority. The way the instructor communicates conveys power. Unnecessary, strong verbal and non-verbal cues from the instructor can serve to discourage those students who struggle, thereby creating a barrier to students' learning. (Personnel Statement 2017, p. 4)

CMN 103 is one of the most frequent courses I teach for the College of Communication. I have carefully created and continuously revised this course to adjust to the learning needs and styles of all of my students. With a clear understanding that this course is required for all students in the College regardless of their major, I have implemented many safeguards to address and "invite students who are less outspoken or are still exploring their voice and ideas to grow intellectually." (Personnel Statement 2017, p. 4) When we go over the syllabus on the first day of class, for example, I inform the students that the course will go at the pace of the class; I accommodate the course calendar to reflect students' comprehension of the material. I understand that some students might not be inclined to be very vocal about their ideas or concerns, however I assure them –in class and during individual meetings—that they will never be graded on what they believe, but only on how well they critically understand the material and how it applies to the world around them.

Throughout the quarter, I also make it a point to identify any students who are quiet or struggling in the class, and I reach out to them to talk about their reflections of the class. For instance, this past fall I met with a student who strongly opposed McIntosh's "White Privilege Male Privilege;" it was clear from his written response that he did not completely grasp how class and race both intersect and differ when it comes to white privilege. While his initial grade reflected this lack of understanding, I met with him on two separate occasions to facilitate his re-write of this response and urged him to go to the Writing Center to fix his grammar and syntax issues. Since he had one more response required for the

LC0002206

class, I also worked closely with him on his draft – an opportunity I provide to all of my students in addition to allowing them to rewrite responses that prove difficult for them.

With this said, because of race and gender and the sensitivity of the topic, I work harder to make the content relatable and understandable to all my students, and my qualitative evaluations demonstrate this. Students feeling "intimidated" or "uncomfortable" because I am perceived as "strong" or "having a firm set of ideas" does not mean that I do not abide by our Vincentian values; my "firm set of ideas" are always rooted in history and research data, and not in personal or political opinion.[7] This does not, however, mean that I am exempt from raced and sexed perceptions of me. While I respect Personnel's care and concern for student atmosphere in their analysis of the qualitative data, research data on student evaluations continue to reflect that the "communication issue" perceived by students is shaped by race and sex (citations of this are supplied in my personal statement). These studies demonstrate that power is not conveyed equally by all "regardless of race, gender, or origin" (2017, p. 9) even in the classroom.

I do believe that it is "possible to teach challenging coursework related to race and social justice while maintaining an environment of safety for all students" (2017, p. 9) and this is also reflected in my evaluations. The last time I taught CMN 103, during Spring 2017, students rated me at a 4.90 out of 5.0 in response to the statement "The instructor maintained an atmosphere of respect in this course." The College mean was 4.70, and my Department mean was 4.60 (all of my classes routinely rank higher than Department and College mean in this question, and have only dipped slightly below that mean on a handful of occasions, as is noted in my Statistical Reports).

I understand that tenured faculty "noted that many College of Communication faculty members teach courses that critically engage racism, ethnocentrism, sexism, and classism and that the same comments about feeling "intimidated" or "uncomfortable" do not appear in those teaching evaluations." (2017, p. 9) I am the only Latina and 1 of only 2 U.S. women of color in full time positions in the college.[8] My evaluations are about the combination of what I teach (racism, sexism, heteronormativity, etc.), how I teach it (with honesty and candor), and how I am identified (Latinx). This should not, however, be interpreted to mean that there is a communication breakdown in my classes, or an unproductive or discouraging classroom environment; indeed, both the quantitative and qualitative data for CMN 103 (the course most singled out for scrutiny and that I teach frequently), as well as all of my classes, provides ample evidence to the contrary. I want to also assure tenured faculty that, even though I believe, and data suggests, such feedback is reflective of racism, I am not assuming that "only Caucasian students are writing about feeling "intimidated" or "uncomfortable." (p.10) Racism is structural, ideological, and discursive, and applies to all.

-Personnel cites that students were not given teaching materials beyond the syllabi for 4 out of 6 classes in my 2017 review cycle, and then used CMN 103 and CMNS 230 as examples. However, these were the two core courses that they highlighted as having detailed worksheets for assignments (p. 2). The remainder 4 classes were graduate seminars where, given the discussion-based nature of my graduate seminars, it is not typical for faculty to have materials other than the syllabi and prepared notes. While these courses are cross-listed with upper level undergraduate courses, the syllabus informs the undergraduates that the courses will proceed as a graduate seminar. Undergraduates have been open and

---

[7] While personal opinion and political stance can and should be expressed freely in the academy it does not share the same platform as knowledge-based research. The Chronicle of Higher Education has recently published a piece on this; see Jason Stanley, "Fascism and the University," in *The Chronicle of Higher Education*, 2 September 2018, www.chronicle.com/article/Fascismthe-University/244382/. Accessed 14 September 2018.
[8] Peoples of the Latinx community culturally and experientially differ from those who are from Latin America and the Spanish-speaking Caribbean. Experiences of Latinx peoples are specific to the U.S. context and studies demonstrate we are also identified differently especially within the academy. See Gloria Anzaldúa, *Borderlands/La Frontera: The New Mestiza*. San Francisco, CA: Aunt Lute Books, 1987; see also Arlene Dávila, *Latino Spin: Public Image and the Whitewashing of Race* (New York: New York University Press, 2008).

enthusiastic about their experience in a graduate setting and, with more of them exposed to the opportunity of a five-year degree, they welcome the early experience. Having one syllabus with detailed assignments for all also provides a sense of cohesiveness for the class, a strategy that has proven repeatedly successful both in terms of student feedback and enrollment. Furthermore, having instructors provide different syllabi for undergraduate and graduate students, for the same class, is not common practice or a requirement that is enforced in our college; however, I am happy to adhere to this requirement if it is enforced across the college.  I am at a loss as to why Personnel has held me to a standard that is not enforced college or university-wide.

-Personnel highlighted time management as a recurring issue in my classes, citing my peer observation from Jay Baglia (CMNS 230 Spring 2017) and a student from one of my graduate seminars. I have welcomed and implemented the advice I received (across my classes) from both Dr. Baglia and Dr. Bryant, specifically that on signposting in my performance workshops.  I want to highlight however that CMNS 230 changed drastically in focus, once "Performance of Literature" and now a performance course that centers on the body, creativity, and communication; the quarter I was observed was the first quarter I taught CMNS 230 in this new form.  In fact, with the exception of my last peer review from Dr. Foster and Dr. Alvaray, all of my peer reviews have been on courses that were taught for the first time (6 out of 8 in total) and, with this, I have welcomed and tried all of the suggestions I received by my colleagues.

There have, however, been instances when these suggestions did not work, which was also reflected in my evaluations; for instance, students who were quiet, and were not happy when I called upon them to share their thoughts in discussion as an effort to incorporate all students in the discussion as advised by my senior colleagues.  For the graduate seminar that was highlighted by personnel for my lack of "time management," I allotted two course periods for final presentations; however, students felt that it would be more productive for them to work on their presentations and use one of the weeks as a library/study-group session. Students voted on this and it was unanimous, and so the presentations were pushed into one day. I warned the students when we changed the schedule that we would go over at least an hour and a half since there were 22 students in the class (there was an over-load of students as a result of a mistake made by the administration).  We went over less than the predicted time because two students did not present.

As for my performance classes, students have never only had one week to prepare for staged performances—the only performances that are graded as such. The performances that Personnel allude to are workshop performances which are improvisational in nature.  These are timed and often conclude in performance pieces within the same class period or the following class period. The performances in these workshops are not graded; they are meant to help the students with careful, detailed feedback from myself and their peers and center on understanding the techniques and readings learned in class.  The workshops are graded based on student interaction with their peers and their embodied expression of the readings.  They are not expected to be polished performed work.

-Personnel highlighted a seemingly lack of careful selection for books/readings in my courses. I am actually very careful in my selections.  For instance, CMN 103 and CMNS 230 are two core/introductory courses and, because of this, I do not require any book purchases for these courses; for my LSP 200 course I required one novel that is available to students for free on-line and two book chapters from two different books that are also available to them electronically through our library; in contrast, my upper level performance class (CMNS 367) does in fact require 2 books, one of which is available for free online.  My graduate seminars require 1-4 books depending on the class.  For example, my hip hop class previously required only one book, however this book was a reader.  The second time I taught this class students expressed concern over its high cost.  In response, the last time I taught the

course I did not require any books and instead took the time to find article substitutes and online readings to cover the topics. Coming from a working-class background, I am aware of the diversity of backgrounds in my classes and take seriously the potential costs of book purchases. I work with all of my students to make access to knowledge possible.

-Personnel highlighted how I should incorporate more visuals in all of my classes. While I use visuals in courses that I deem necessary (for instance, in CMN 103, in performance classes, and in my hip hop class) I approach my graduate seminars in the traditional form of seminar style. Though I respect the student's perspective of being a "visual learner" (2017, p. 4) I also feel that students, especially graduate students, should be exposed to alternative styles of learning rather than a continuance of the styles they are accustomed to. Active listening is a skill that is typically further developed in graduate programs and in seminar settings, and it is a skill that will serve students well beyond the academy; it is also a skill that is highlighted in performance studies as one that counters seeing and surveillance as western styles of learning and knowing.[9]

All of my performances in performance classes serve as the visuals for the class. In these courses, students are exposed to the function of an audience, witnessing their classmates perform; they learn to appreciate the aesthetics of performance art as a component of the visual. These courses are performance-based courses where students perform; they are not performance courses where students study performance art on the screen. I do not rely on seminar-style discussion in lower-level lecture designated courses, ever, as evidenced by my syllabi.

Personnel listed the issues they wanted to see me address, and I have responded to each bullet point (with Personnel recommendations listed in bold):

- **Foster a welcoming classroom, based upon Vincentian personalism, respect, and acceptance for all types of students.** I have done this in all of my classes and continue to do so; my syllabi present the rules of conduct that students and professor should abide by in discussing sensitive material, and I devote class time to fostering a welcoming environment through ice-breakers and other activities.
- **Refrain from using unnecessary, strong verbal and non-verbal cues that undermine students' learning, create tension, or marginalize those who need support to explore their voice and ideas.** I am unsure what the faculty mean by this; I lecture with authority, as do my colleagues.
- **Use appropriate strategies to manage class participation and to engage less confident students.** I have addressed this above.
- **Adopt the handbook enacted by her unit regarding topics that should be covered in intercultural communication core courses.** As I addressed during my last personnel meeting, Dr. Lu, the course-keeper of intercultural communication, reviewed all of the syllabi from all of the instructors of this course. I was one of three instructors who did not use the textbook and we were all approved as adhering to the criteria set forth by the college by Dr. Lu and the director at the time, Dr. Willard. I am unsure of the reason why I am being required to use a textbook. Other instructors, one of whom was my teaching assistant before he became an adjunct and whose syllabus closely mirrors mine, are not

---

[9] See Dwight Conquergood, "Performance Studies: Interventions and Radical Research" in *The Drama Review* 46: 2, 145-156 (Summer 2002). See also D. Soyini Madison's *Acts of Activism: Human Rights as Radical Performance* (New York: Cambridge University Press, 2010); see Della Pollock's "Beyond Experience" in Cultural Studies←→Critical Methodologies, vol. 9, no. 5, (October 2009), 636-646.

LC0002209

required to use a textbook. Like the separate syllabi, I am happy to adhere to college regulations if these are requirements that all faculty must abide by.

- **Develop separate syllabi for undergraduate and graduate students in cross-listed classes.** I have addressed this above.
- **Develop specific instructions/directions, clear grading rubrics/criteria for all assignments and class activities for all courses.** These directions are all clearly written on my syllabi. I have also provided a grading rubric, attached to my syllabi, since 2011. This grading rubric and explanation of grades is over one single-spaced page in length and I discuss it with students at the beginning of every quarter.
- **Tighten in-class instructional delivery by providing overviews, transitions, summaries.** I have incorporated this based on my peer evaluations.
- **Use signposting and adopt an explicit schedule for discussions and activities in order to make the most out of class time.** I have incorporated this based on my peer evaluations.
- **Assign an appropriate volume of readings and allow reasonable time for students to complete assignments.** I have already done this.
- **Engage students with more varied teaching methods in class in order to accommodate the plurality of students' learning needs and style, including the use of interactive, small group discussions, peer-focused activities, multiple media, lecture slides/outlines and handouts.** In all of my 14 classes I have used all of these teaching strategies in the appropriate context.

Finally, tenured faculty highlighted how similar and recurring issues appeared since my 2013 review. However, after my first review, my director at the time (Associate Dean, Dr. Murphy) commended me for maintaining the integrity of my course in terms of readings and subject matter, while simultaneously improving my evaluations in my annual review (which I received in the Spring of that same year). In fact, all of my annual reviews have been positive and, when I met with Interim Dean, Dr. Teboul, to discuss my first review, and teaching specifically, he stated that my teaching was fine and that I should turn my attention to my research. The attack on my teaching began with my 2015 review, when Personnel erroneously reviewed me as a fourth-year tenure track candidate and ignored my federally protected medical leave. Even after I was asked to produce evidence of my FMLA leave that stopped my tenure clock, my review was never amended to reflect that the assessment of my research output and service contributions were that of a third-year faculty member, and not a fourth-year faculty member.

After carefully reviewing the tenure requirements, I understand that the expectations for a faculty member in her third year are different than those for a fourth-year faculty member; given that this report was the basis of tenured faculty's initial vote to terminate my employment, I believe I was entitled to a reassessment per the tenure guidelines. At the time, I was told on separate occasions by Dean Ghanem, the Ombudsperson (who confirmed the tenure process), and Dr. Murphy, that Personnel would reconsider their assessment and review me according to my proper year; this never occurred, as evidenced in Appendix B. At the same time, a colleague who was hired the same year as me and who took a research leave and di not stop his tenure clock at the time we were reviewed in 2015, did not have any evidence of research derived from his leave and had lower teaching evaluations than I, but was nevertheless recommended for retainment by personnel and tenured faculty. While I understand that many factors go into faculty assessment, I remain at a loss as to why I was unanimously voted against for retention.[10]

---

[10] I was given access to the review documents by this said colleague and can provide them per your request.

## RESEARCH

I was hired as a specialist on race, performance, and cultural studies, in a subfield of Communication Studies that is both field-research and book-driven. I was hired for my work on transnational and intercultural critical ethnography, which required that I not only emphasize the book publication, but that I conduct field and international research. I have adhered to the publication norms of my field and thus far have a co-edited book, and several book chapters and articles already accepted and published.

In my report, some tenured faculty identified problematic "gaps" in my scholarship that I should "make up" for in preparation for tenure (I asked for, but did not receive, clarification on what was expected in order to "make up" these gaps in preparation for tenure). The only lapses in productivity that I can identify in my record are the following 1) my first year of appointment, during which I was recovering from deep, emotional and physical trauma following the death of my child. My director at the time (Dr. Murphy) and the Dean (Dr. Taylor) were aware of this and my ensuing high-risk pregnancy. It is further not unusual for junior faculty to not publish substantial material during their first appointment year as it takes time for publications to appear in print. 2) The time during which I applied for and received our university research leave and grant in addition to the prestigious national Woodrow Wilson Fellowship (for which I was awarded over $60,000 in total). I have been informed that I am only one of two scholars at DePaul to have been awarded this honor, yet this achievement has been dismissed in my evaluations and weighted on par with in-house grants despite the tenure evaluation rubric of the College of Communication that state that in-house grants and national fellowships are separate categories of awards and weighed differently.[11] Furthermore, the fellowship stipulated that my award year should be spent on research, and thus my focus during this year was on conducting field research, and not writing. I have since published a portion of this research 3) A federally protected FMLA leave while I was pregnant (this was the leave that Personnel ignored during my 2015 review, when they evaluated me in my third-year as a fourth-year faculty member, never reassessed or amended my report, and which subsequently spurred the discrimination investigation I filed against Personnel). The latter two are acknowledged by the university as protected time that is *not* to be counted toward tenure.

For this review, I have published an additional chapter (OUP, 2018) and have one co-authored article under review. I additionally submitted my manuscript proposal and sample chapters to several university presses, and have an advanced contract offer and secured interest in sending out the manuscript to readers for review. I will submit the complete manuscript for review on October 15. I have adhered to the research standards set forth within the College and University as well as to the publication recommendations given to me during my first Personnel review. My public performances, as well, count toward my research as stipulated by the College and University; they are public performances that impact the community, are co-created and directed by me, and are original works informed by my areas of specialization; they are not re-presentations of coursework.[12]

## SERVICE

While my service has been acknowledged by tenured faculty, my service to the University specifically, has not been counted towards my progress towards tenure. I am particularly concerned

---

[11] See "Criteria for Tenure and Promotion, College of Communication" (June 5, 2017) which states that "Awards and grants, including dissertation and conference paper awards and research grants, are evaluated by (1) the reputation of the institutions and organizations conferring those honors, if such works and honors have successfully led to the completion and publication of a research project, (2) the variability in award and grant amounts, and (3) whether those grants are in-house, or arose from national or international competition."

[12] See "Criteria for Tenure and Promotion, College of Communication" (June 5, 2017) which states that "Public performances of creative work are evaluated on the basis of their engagement with communities and publics outside the classroom, and are also measured on the basis of scholarly reviews, and grants and awards relating to the work."

LC0002211

about the sudden shift in my service evaluation between 2015 (where the Personnel Committee found that I was making "Fair to Good" progress in service towards tenure)[13] and 2017, where, though by the Personnel Committee's own account, I have taken on additional service obligations, but I have nonetheless been suddenly downgraded to a vote of "Fair" with no accounting for the change.[14] My service on behalf of University programs (such as my service on the African and Black Diaspora Steering Committee prior to and during its transition to Department ), is not being adequately counted as service to the University, thereby enabling the Personnel Committee's lower ranking in my progress towards tenure on service and ignoring the fact that without affiliated faculty service to University programs, these programs are unable to conduct University business.

The Personnel Committee did not fairly account for my service on other University committees. Comparing my service record with that of another colleague who was providing service on the ad hoc Liberal Studies Council along with me, demonstrates that his contributions were highlighted as "notable," despite his own admission that he failed to perform or even show up to any of the meetings. My service, though it far exceeded his, was not similarly acknowledged.[15] Despite this, I have added more service lines on every level of expectation to my repertoire for this review period. These were touched on in personal statement and are as follows: For my unit, I volunteered to be on a task force to review the counselor feedback for the new pathways; I was the faculty representative for the Communication Studies graduate program during the graduate open house; I participated in the end of the year College awards ceremony. For the college, I became an advisor for the Latino Media & Communication minor; I continued my service on the term faculty review committee; I attended a security concerns meeting, and took on the role of moderator for the Communication and Media roundtable "Hip Hop as Resistance: Performance, Artist Activism and Black Politics" at the Annual Interdisciplinary Graduate Student Conference. For the university, I became a member of the advisory board for the Women's Center; and, I became part of the University Council on Community Engagement and served on a Project-Based Learning Task Force.

---

[13] The 2015 evaluation of my service also did not account for my FMLA leave. Yet, in this 2015 review period my service was ranked "Fair to Good" as a *fourth-year faculty member* though I was in actuality a third-year faculty member.
[14] The College of Communication tenure and promotion guidelines changed between 2015 and 2017, with the effect that my 2015 review in service of "Fair to Good" was at the time considered sufficient progress towards tenure. This, along with the unchanged, erroneous year assessment, effectively means that my recent 2017 evaluation of service as "Fair / Unsatisfactory" constitutes a gross and inexplicable decline in ranking.
[15] I was given access to the review documents by this said colleague and can provide them per your request.

**APPENDIX B**

Appendix B includes two Reports from the College of Communication Personnel Committee, one dated March 7, 2015, and the other, the College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract reflecting the Tenured Faculty vote and assessment, dated March 23, 2015.

It is important to note that my first assessment by Personnel ignored my FMLA leave during AY 2014-2015 and assess me as fourth-year faculty member (Appendix B.1)[1].  This was the report that Tenured Faculty initially used in their assessment and which led to the March 23, 2015 report enclosed herein (Appendix B.2).

---

[1] Appendix B.1 is also the draft of the Personnel report that circulates between the Personnel Committee and the faculty member being reviewed.  The draft contains my responses to information that I deemed incorrect, per the College Rules and Regulations that stipulate that the faculty member being reviewed should respond to the report to amend incorrect information.

LC0002213

**COLLEGE OF COMMUNICATION RECOMMENDATION OF CONTINUATION OR TERMINATION OF UNTENURED FACULTY CONTRACT**

TO: Salma Ghanem, Dean, College of Communication

FROM: Personnel Committee, College of Communication

DATE: March 7, 2015

SUBJECT: College Recommendation on Lisa Calvente

**FACULTY MEMBER'S RANK:** ASSISTANT PROFESSOR

**START DATE OF TENURE-TRACK CONTRACT:** 2011-2012

**CREDIT FOR PRIOR TEACHING:** NONE

**PROBATIONARY YEAR AT DEPAUL**: FOURTH[1]

**HIGHEST ACADEMIC DEGREE RECEIVED**: Ph.D

**PERSONNEL COMMITTEE RECOMMENDATION:** TERMINATION
VOTES IN FAVOR OF RETENTION       1
VOTES AGAINST RETENTION       6

PERSONNEL COMMITTEE RECOMMENDATION REGARDING PROGRESS TOWARD TENURE:

| | | |
|---|---|---|
| YES: 0 | NO: 7 | In Teaching |
| YES: 0 | NO: 7 | In Research |
| YES: 5 | NO: 2 | In Service |

**TENURED FACULTY SUPPORT FOR RECOMMENDATION:**
VOTES IN FAVOR
VOTES AGAINST

TENURED FACULTY SUPPORT FOR RECOMMENDATION REGARDING PROGRESS TOWARD TENURE:

**COLLEGE RECOMMENDATION AND RATIONALE:**
Based on a thorough review of her credentials in the areas of teaching, research, and service, the Personnel Committee and the tenured faculty of the College of Communication recommend that Lisa Calvente's contract not be renewed. The Personnel Committee finds that Lisa is making poor progress towards tenure in the area

---

[1] We are awaiting confirmation about whether this is the third or fourth year of Lisa's probationary period.

LC0002214

of teaching, poor progress towards tenure in the area of research, and fair to good progress towards tenure in the area of service.

**TEACHING**

In order to assess the effectiveness of Lisa's teaching, the Personnel Committee examined undergraduate and graduate course materials, peer observation reports and teaching evaluations from the past two years. Additional information about Lisa's teaching was solicited from past course enrollees through the Personnel Committee student representative. Finally, members of the Committee discussed teaching with Lisa in an interview setting.

Since arriving at DePaul, Lisa has taught six graduate level (or undergraduate cross listed) courses and five undergraduate courses, six of which were new offerings for the college. Her courses regularly engage the cross section of cultural studies, race, media, and performance theory, serving a range of needs for the college and university—most directly the Organizational and Multicultural MA program, the undergraduate intercultural major, and the Liberal Studies Sophomore Seminar on multiculturalism.  In her 2013 formal review, Lisa's teaching was evaluated as good/very good, marking several developing strengths, while noting specific concerns about course organization and the reference to students feeling intimidated in the student representative report.

Previous problems identified in teaching have grown more significant since the last review period, eliciting very strong concerns regarding Lisa's approach to general student learning, her commitment to each DePaul student, and the classroom environment she fosters. In terms of quantitative measures, Lisa's evaluations have been consistently strong, routinely keeping in close range to the college's very high numbers. Qualitatively, however, Lisa's course evaluations indicate a range of recurrent and somewhat polarizing themes. Evaluations suggest that a strong number of students appreciate the rigor and demands of her courses, while other students experience the course climate to be intimidating and unwelcoming to diverse opinion and perspective. One student from her Winter 2014 INTC 308 course raved, "I've taken many classes with Dr. Calvente, and if I could, I would load my course schedule with nothing but her classes. She pushes students to think critically in ways that are rarely demanded of undergraduate students. Just when I've thought I completely grasped a concept, Dr. Calvente would reveal that I've just scratched the surface." These types of highly enthusiastic statements make appearances in many of her course evaluations, although there is an additional trend that suggests some students struggle to find their voices and feel diminished in her courses. In the same Winter 2014 INTC 308 course, another student wrote that the "Instructor often made students feel inferior. She rolled her eyes at some questions asked and often misunderstood students concerns. Students eventually became afraid to speak at all in fear of ridicule."

> **Commented [L1]:** This number does not reflect my materials

> **Commented [L2]:** These singled out, one word and incomplete quotes omit the context of the evaluations and our "conversation" pertaining to my teaching style, politics, and perspective.

LC0002215

While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200). As these are required courses for many students, the academic interests of the students in these courses is likely more diverse and varied. In her Fall 2014 CMN 103 course, several students note the helpfulness of the course for encouraging them to see the world from more critical perspectives. However, many students also made reference to the negative classroom climate, suggesting it lacked encouragement, felt intimidating, was experienced as silencing, and was perceived as "hostile." One student commented, "Dr. Calvente was insistent on students dropping the class on the first day and was shocked when student's hadn't the second day." In the personnel interview, Lisa was asked about those students who might feel disenfranchised from the class, and she replied "Most students drop." The committee was deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class, suggesting all DePaul students are not wanted in our classrooms. Lisa disagreed, stating, "Telling them to drop is honest." The personnel committee does not have access to an instructor's drop rates, and so there is not a quantitative number to detail what is meant when she says "most students drop." When asked to clarify this approach in a required college core course, where many of our students have demanding work and course schedules that limit their flexibility and require they enroll in a specific class offered on a particular day or time, she explained, "If it's scary, they should drop. I say go to another class. I have a lot of colleagues you can take this class from." In response to student feedback about intimidation, the committee asked if there were parts of her teaching she felt she needed to work on. She did say she might email students who were not participating in class, but clarified, "Are you asking me, do I want them all in my class? No, not really." Referencing her students in response to questions about how she seeks to support students who are struggling or seem disenfranchised, Lisa replied, "They have to approach me. That is their job. It's not my job."

Students across several of her courses made continual reference to the high standards Dr. Calvente requires of students. Some students found the workload to be manageable and were excited by the challenge. Others firmly believed that the readings were too advanced, and too much in quantity, for the class to process and engage. For example, more than one student in the Qualitative Methods course from Spring 2014 felt the class was constantly behind and was always playing catch-up. It is important to contextualize that some of these responses are likely a product of undergraduate/graduate crosslisted classes.

In his observation of her cross-listed course  (Social) Death, Citizenship and the Media, Associate Professor Daniel Makagon noted "almost every student spoke and approached the discussion with the confidence that they could talk through the issues. Lisa might push them, but she gave them the room to figure out the ideas and their responses to the issues." Both Professors Makagon and Winchatz noted Lisa's strategic use of silence in the classroom. Winchatz explained, "After Lisa asked a question, she was clearly comfortable with sitting in silence until the students had

LC0002216

processed what she was asking and were ready to share. The students seemed to be used to this approach as well. " Both reviewers, however, did note the course was, at points, difficult to follow, and suggested Lisa could better assist the class with more deliberate transitions, paraphrasing of ideas, and clarity of structure throughout the course. In the student report, this opportunity for greater clarity, time management, and structure was also reiterated, along with a reference to previously mentioned concerns about climate—what the student representative called "the pattern of intimidation." When asked to clarify an example of this pattern he mentioned the rolling of eyes and Dr. Calvente's dismissal of a student question with "why don't you know this?" He stated, however, that based on his interpretation of the data, that "if the students survive the atmosphere, they do well."

> **Commented [L3]:** This is not in the student report.

For the vast majority of her courses Lisa did not provide materials beyond the course syllabus. Her syllabi do a very good job setting forth rules, policies and instructor expectations, yet she might take some steps to further distinguish the content of her courses from one another. As an example, her course INTC 230 and her course LSP 200 have a tremendous amount of overlap in assignment structure and design, including the focus on "Bastard Out of Carolina" for several weeks in the course. Additionally, the theoretical readings comprise the majority of the content listed in the course schedule, regardless of course level, and are often used to define the class time (as opposed to a topic, theme, objective, or an activity). By identifying the theme or topic of the day, as well as the objectives, the clarity of structure might be more apparent to help frame student expectations. This is reiterated in the student report and student evaluations, where there was a recurrent theme of suggesting more explicit clarity of goals and content. Furthermore, especially for the 100 and 200 level classes, a more intentional balance between theoretical source texts and disciplinary texts from the field of intercultural communication might help some of the students who are struggling with the density of the readings and an understanding of the course.

After the review of her materials, reports, evaluations, and her interview, the Personnel Committee found that her teaching is fair and that she is making poor progress toward tenure in this area.

**RESEARCH**
Since Lisa's last review, in the Winter of 2013, she has published one co-authored essay (with Guadalupe García), titled "The City Speaks: Dis/articulating Revolutionary Havana, Cuba and Global Belonging" in the journal *Cultural Studies* (Calvente is listed as first author). The essay is a visual exploration and analysis of the city of Havana, examining how the performative notions of revolution are present in the city's landscape. She also presented work at the Critical Ethnic Studies Association Conference in 2013, CUNY-Baruch College in 2014, and Crossroads Association for Cultural Studies Conference in 2014. At the time of her last formal review, Lisa had published one book review. For the current fourth year review, the Personnel Committee evaluated Lisa's total publication record since

> **Commented [L4]:** This is an inaccurate description that does not reflect my materials

LC0002217

arriving at DePaul: one book review and one co-authored peer reviewed journal article.

Looking forward, Lisa reports several projects in various stages of development. Lisa has plans to co-write an introduction and conclusion for a book she is co-editing. In addition, Lisa is the solo author of an essay under review at *Cultural Studies*. Although these materials cannot be considered for this review period, looking toward her future productivity, Lisa has stated that the book contract is signed and the article is currently listed on her CV and in her personal statement as a revise and resubmit. Although the committee requested on two occasions via email prior to the Personnel Committee interview that Lisa provide a signed book contract and an editorial communication (e.g. email or letter from Cultural Studies) formally requesting a revise and resubmit of her article manuscript, the committee was not provided with the requested documentation of the status of either of these projects in time for the review.

In her 2013 review, her research was determined as satisfactory from the faculty, and the personnel committee strongly recommended diversifying her publication strategies alongside the ongoing pursuit of her solo book contract. The book project and proposal is not reported to have made any significant progress (with two completed chapters), yet the successful publication of her co-authored essay and the article under review indicate that she has been more active in moving her previous conference papers towards publication.

Lisa is scheduled for flex time for the current 2014-15 academic year, wherein she is teaching three courses in the fall and winter, in order to focus her time on research in the spring. This is in addition to a year-long leave she has successfully applied for through the URC for the 2015-16 academic year, which will be co-funded through her successful application for a Woodrow Wilson Junior Faculty Grant Award. According to the grant application, "The objective of the fellowship program is to aid the scholarly research and intellectual growth of junior faculty (men and women) and improve their chances for success as tenured university scholars by offering support for twelve months of research and writing." Thus, Lisa has secured substantial time to focus solely on research in the next fifteen months. There is concern about the amount of time invested and the choices made regarding the research projects she is pursuing, as her current research output fails to demonstrate sufficient progress or a successful balance of energies in the move towards tenure. In addition, given the shortage of research she has fostered in publication, devoting time and energies to a co-edited book project is cause for additional concern. It is believed that Lisa has not made the necessary progress needed towards tenure and would be better served by continuing to focus greater time and energies on shepherding her conference presentations and the research from her ongoing book project to peer reviewed journals, preferably diversifying her CV with solo authored works in a greater range of journal outlets.
The Personnel Committee agrees that her research is fair and that she is making poor progress toward tenure in this area.

**Formatted:** Highlight

**Commented [L5]:** This should state "would not" as opposed to "cannot" because according to the faculty handbook I am not required to provide this documentation for consideration of promotion and tenure.

**Commented [L6]:** This is inaccurate and does not reflect my materials and personnel interview.

**Commented [L7]:** The Woodrow Wilson National Fellowship Foundation in one of two Foundations that support this fellowship. It is not a grant to support research though it provides me with a grant and stipend.

**Formatted:** Highlight

**Formatted:** Highlight

**Commented [L8]:** The co-edited volume is a final contract and the book project is complete absent the introduction and conclusion.

**Formatted:** Highlight

**Formatted:** Highlight

LC0002218

**SERVICE**

During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College-wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs. She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of *Cultural Studies* since 2012 and *Text and Performance Quarterly* since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.

The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.

Conclusion

Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal.

**Commented [L9]:** "Will need" should be changed to "should" to mirror college policy.

LC0002219

**COLLEGE OF COMMUNICATION RECOMMENDATION OF
CONTINUATION OR TERMINATION OF UNTENURED FACULTY
CONTRACT**

TO:        Salma Ghanem, Dean, College of Communication

FROM:     Personnel Committee, College of Communication

DATE:      March 23, 2015

SUBJECT:   College Recommendation on Lisa Calvente

FACULTY MEMBER'S RANK:            Assistant Professor

START DATE OF TENURE-TRACK CONTRACT:   2011-2012

CREDIT FOR PRIOR TEACHING:         None

PROBATIONARY YEAR AT DEPAUL:      Third

HIGHEST ACADEMIC DEGREE RECEIVED:   Ph.D

PERSONNEL COMMITTEE RECOMMENDATION:   Termination

                               VOTES IN FAVOR OF RETENTION     1

                               VOTES AGAINST RETENTION      6

PERSONNEL COMMITTEE EVALUATION:     Progress Toward Tenure

YES: 0     NO: 7     In Teaching
YES: 0     NO: 7     In Research
YES: 5     NO: 2     In Service

TENURED FACULTY RECOMMENDATION:     Termination

                               VOTES IN FAVOR OF RETENTION     5

                               VOTES AGAINST RETENTION     13

TENURED FACULTY EVALUATION:     Progress Toward Tenure

YES:  0     NO: 16    ABSTAIN: 2
YES:  4     NO: 14    in Teaching
YES:  5     NO: 13    in Research
YES: 10     NO:  8    in Service

LC0002220

COLLEGE RECOMMENDATION AND RATIONALE:

Based on a thorough review of her credentials in the areas of teaching, research, and service, the Personnel Committee and the tenured faculty of the College of Communication recommend that Lisa Calvente's contract not be renewed. The Personnel Committee finds that Lisa is making unsatisfactory progress towards tenure in the area of teaching, unsatisfactory progress towards tenure in the area of research, and fair to good progress towards tenure in the area of service.

TEACHING

In order to assess the effectiveness of Lisa's teaching, the Personnel Committee examined undergraduate and graduate course materials, peer observation reports and teaching evaluations from the past two years. Additional information about Lisa's teaching was solicited from past course enrollees through the Personnel Committee student representative. Finally, members of the Committee discussed teaching with Lisa in an interview setting.

Since arriving at DePaul, Lisa has taught six graduate level (some cross-listed with undergraduate) courses and six undergraduate courses, six of which were new offerings for the college. Her courses regularly engage the cross section of cultural studies, race, media, and performance theory, serving a range of needs for the college and university— most directly the Organizational and Multicultural MA program, the undergraduate intercultural major, and the Liberal Studies Sophomore Seminar on multiculturalism. In her 2013 formal review, Lisa's teaching was evaluated as good/very good, marking several developing strengths, while noting specific concerns about course organization and the reference to students feeling intimidated in the student representative report.

Previous problems identified in teaching have grown more significant since the last review period, eliciting very strong concerns regarding Lisa's approach to general student learning, her commitment to each DePaul student, and the classroom environment she fosters. In terms of quantitative measures, Lisa's evaluations have been consistently strong, routinely keeping in close range to the college's very high numbers. Qualitatively, however, Lisa's course evaluations indicate a range of recurrent and somewhat polarizing themes. Evaluations suggest that a strong number of students appreciate the rigor and demands of her courses, while other students experience the course climate to be intimidating and unwelcoming to diverse opinion and perspective. One student from her Winter 2014 INTC 308 course states, "I've taken many classes with Dr. Calvente, and if I could, I would load my course schedule with nothing but her classes. She pushes students to think critically in ways that are rarely demanded of undergraduate students. Just when I've thought I completely grasped a concept, Dr. Calvente would reveal that I've just scratched the surface." These types of highly enthusiastic statements make appearances in many of her course evaluations, although there is an additional trend that suggests some students struggle to find their voices and feel diminished in her courses. In the same Winter 2014 INTC 308 course, another student wrote that the "Instructor often made students feel inferior. She rolled her eyes at some questions asked and often misunderstood students concerns. Students eventually became afraid to speak at all in fear of ridicule."

LC0002221

While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200). As these are required courses for many students, the academic interests of the students in these courses is likely more diverse and varied. In her Fall 2014 CMN 103 course, several students note the helpfulness of the course for encouraging them to see the world from more critical perspectives. However, many students also made reference to the negative classroom climate, suggesting it lacked encouragement, felt intimidating, was experienced as silencing, and was perceived as "hostile." One student commented, "Dr. Calvente was insistent on students dropping the class on the first day and was shocked when student's hadn't the second day." In the personnel interview, Lisa was asked about those students who might feel disenfranchised from the class, and she replied "Most students drop. I advise them to drop." The committee was deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class, suggesting all DePaul students are not wanted in our classrooms. Lisa disagreed, stating, "Telling them to drop is honest." The personnel committee does not have access to an instructor's drop rates, and so there is not a quantitative number to detail what is meant when she says "most students drop." When asked to clarify this approach in a required college core course, where many of our students have demanding work and course schedules that limit their flexibility and require they enroll in a specific class offered on a particular day or time, she explained, "If it's scary, they should drop. I say go to another class. I have a lot of colleagues you can take this class from." In response to student feedback about intimidation, the committee asked if there were parts of her teaching she felt she needed to work on. She did say she might email students who were not participating in class, but clarified, "Are you asking me, do I want them all in my class? No, not really." Referencing her students in response to questions about how she seeks to support students who are struggling or seem disenfranchised, Lisa replied, "They have to approach me. That is their job. It's not my job."

Students across several of her courses made continual reference to the high standards Lisa requires of students. Some students found the workload to be manageable and were excited by the challenge. Others firmly believed that the readings were too advanced, and too much in quantity, for the class to process and engage. For example, more than one student in the Qualitative Methods course from Spring 2014 felt the class was constantly behind and was always playing catch-up. It is important to contextualize that some of these responses are likely a product of undergraduate/graduate cross-listed classes.

In his observation of her cross-listed course (Social) Death, Citizenship and the Media, Associate Professor Daniel Makagon noted "almost every student spoke and approached the discussion with the confidence that they could talk through the issues. Lisa might push them, but she gave them the room to figure out the ideas and their responses to the issues." Both Professors Makagon and Winchatz noted Lisa's strategic use of silence in the classroom. Winchatz explained, "After Lisa asked a question, she was clearly comfortable with sitting in silence until the students had processed what she was asking and were ready to share. The students seemed to be used to this approach as well. Both reviewers, however, did note the course was, at points, difficult to follow, and suggested

LC0002222

Lisa could better assist the class with more deliberate transitions, paraphrasing of ideas, and clarity of structure throughout the course. In the student report, this opportunity for greater clarity, time management, and structure was also reiterated, along with a reference to previous mentioned concerns about climate—what the student representative called "the pattern of intimidation." When asked to clarify an example of this pattern he mentioned the rolling of eyes and Lisa's dismissal of a student question with "why don't you know this?" He stated, however, that based on his interpretation of the data, that "if the students survive the atmosphere, they do well."

For the vast majority of her courses Lisa did not provide materials beyond the course syllabus. Her syllabi do a very good job setting forth rules, policies and instructor expectations, yet she might take some steps to further distinguish the content of her courses from one another. As an example, her course INTC 230 and her course LSP 200 have a tremendous amount of overlap in assignment structure and design, including the focus on "Bastard Out of Carolina" for several weeks in the course. Additionally, the theoretical readings comprise the majority of the content listed in the course schedule, regardless of course level, and are often used to define the class time (as opposed to a topic, theme, objective, or an activity). By identifying the theme or topic of the day, as well as the objectives, the clarity of structure might be more apparent to help frame student expectations. This is reiterated in the student report and student evaluations, where there was a recurrent theme of suggesting more explicit clarity of goals and content. Furthermore, especially for the 100 and 200 level classes, a more intentional balance between theoretical source texts and disciplinary texts from the field of intercultural communication might help some of the students who are struggling with the density of the readings and an understanding of the course.

After the review of her materials, reports, evaluations, and her interview, the Personnel Committee found that her teaching is fair and that she is making unsatisfactory progress toward tenure in this area.

RESEARCH
Since Lisa's last review, in the winter of 2013, she has published one co-authored essay (with Guadalupe García), titled "The City Speaks: Dis/articulating Revolutionary Havana, Cuba and Global Belonging" in the journal *Cultural Studies* (Calvente is listed as first author). The essay is a visual exploration and analysis of the city of Havana, examining how the performative notions of revolution are present in the city's landscape. She also presented work at the Critical Ethnic Studies Association Conference in 2013, CUNY-Baruch College in 2014, and Crossroads Association for Cultural Studies Conference in 2014. At the time of her last formal review, Lisa had published one book review. For the current third year review, the Personnel Committee evaluated Lisa's total publication record since arriving at DePaul: one book review and one co-authored peer reviewed journal article.

Looking forward, Lisa reports several projects in various stages of development. Lisa has plans to co-write an introduction and conclusion for a book she is co-editing. In addition, Lisa is the solo author of an essay under review at *Cultural Studies*. Although these

LC0002223

materials cannot be considered for this review period, looking toward her future productivity, Lisa has stated that the book contract is signed and the article is currently listed on her CV and in her personal statement as a revise and resubmit. Although the committee requested on two occasions via email prior to the Personnel Committee interview that Lisa provide a signed book contract and an editorial communication (e.g. email or letter from Cultural Studies) formally requesting a revise and resubmit of her article manuscript, the committee was not provided with the requested documentation of the status of either of these projects in time for the review.

In her 2013 review, her research was determined as satisfactory from the faculty, and the personnel committee strongly recommended diversifying her publication strategies alongside the ongoing pursuit of her solo book contract. The book project and proposal is not reported to have made any significant progress (with two completed chapters), yet the successful publication of her co-authored essay and the article under review indicate that she has been more active in moving her previous conference papers towards publication.

Lisa is scheduled for flex time for the current 2014-15 academic year, wherein she is teaching three courses in the fall and winter, in order to focus her time on research in the spring. This is in addition to a year-long leave she has successfully applied for through the URC for the 2015-16 academic year, which will be co-funded through her successful application for a Woodrow Wilson Foundation Career Enhancement Fellowship for Junior Faculty. According to the grant application, "The objective of the fellowship program is to aid the scholarly research and intellectual growth of junior faculty (men and women) and improve their chances for success as tenured university scholars by offering support for twelve months of research and writing." Thus, Lisa has secured substantial time to focus solely on research in the next fifteen months. There is concern about the amount of time invested and the choices made regarding the research projects she is pursuing, as her current research output fails to demonstrate sufficient progress or a successful balance of energies in the move towards tenure. In addition, given the shortage of research she has fostered to publication, devoting time and energies to a co-edited book project is cause for additional concern. It is believed that Lisa has not made the necessary progress needed towards tenure and would be better served by continuing to focus greater time and energies on shepherding her conference presentations and the research from her ongoing book project to peer reviewed journals, preferably diversifying her CV with solo authored works in a greater range of journal outlets.

The Personnel Committee agrees that her research is fair and that she is making unsatisfactory progress toward tenure in this area.

SERVICE
During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Lisa also served as a junior faculty representative on the College Personnel Committee, volunteering to serve on two cases when we had a shortage of available un-tenured representatives. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino

LC0002224

Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College-wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs. She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of *Cultural Studies* since 2012 and *Text and Performance Quarterly* since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.

The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.

CONCLUSION
Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal.

TENURED FACULTY RECOMMENDATION:
The Tenured Faculty of the College of Communication met on March 15, 2016 and endorsed the Personnel Committee Recommendation. They voted against retention and contract renewal (13 No to 5 Yes). No one thought she was making satisfactory progress toward tenure (0 Yes); however, two people who had voted against retention did not answer this question or identify the areas of weakness. Those who voted for retention voted unanimously that she was not making progress toward tenure in one or more of the three areas. Fourteen tenured faculty determined she was not making satisfactory progress toward tenure in teaching, but four believe that the good outweighs the bad in Lisa's teaching. Thirteen tenured faculty noted she was not making satisfactory progress toward tenure in research, but five believe that Lisa has time to move her ideas to publication prior to tenure. Ten voted that Lisa's service is satisfactory and believe she has time to enhance it before tenure, and eight voted she was not making satisfactory progress toward tenure in service. If Lisa is retained, the tenured faculty strongly recommend that she undergo a formal review again in Spring 2017.

Teaching:
The faculty agreed that there are a significant number of positive student comments about Lisa's teaching and that her quantitative evaluations portray a highly capable professor. However, we have grave concerns about her ability to teach in a Vincentian fashion that

LC0002225

embraces all students, regardless of their beliefs, attitudes, and values. Most of us believe that her positive quantitative and qualitative comments do not outweigh the severity of the problems that have arisen regarding Lisa's teaching style and the manner in which she addresses some students. At year three of her time at DePaul, we now have sufficient data to identify trends and patterns in her teaching that are problematic. These concerns have developed over time as we see a growing record of student complaints and this concern was further instantiated in the way she presented herself and her teaching philosophy during the personnel interview and subsequent written rebuttal to the Personnel Committee Recommendation.

The faculty of the College of Communication readily work with tenure track, junior faculty members to improve any problems that may arise with teaching, and Lisa is no exception. But even when teaching issues were raised in the personnel interview with Lisa, it was clear that she was not willing to make appropriate adjustments. In the interview and in her written rebuttal to the personnel document, she stated that she is unwilling to change her teaching style. In her rebuttal she states, "As long as I continue to offer the courses I was hired by the College to teach, 'hostility and intimidation' (Personnel Report 2015) will be illustrated in my qualitative teaching evaluations." According to her personnel interview and written rebuttal, Lisa believes that student comments regarding her hostility and intimidation in the classroom stem from structural racism that is inherent in our education system. For example, in her rebuttal she states, "The 'hostility' in my evaluations is the result of the structural racism and the normalization of whiteness within the academy that unfairly scrutinizes faculty of color, primarily women, who do not reinforce the standards and norms of white (male) supremacy." The tenured faculty, including faculty of color, in the College of Communication, some of whom teach similar types of courses, believe that student comments indicate that her style is overly antagonistic, confrontational, and unnecessarily challenging. They believe that there can be more invitational ways to challenge students and open them to alternative and just ways of viewing race, class, gender, sexual orientation and other factors relating to identity.

The tenured faculty of the College of Communication agree that the following changes in Lisa's teaching would need to occur before she is capable of receiving tenure at DePaul:
- Create a welcoming classroom, based upon respect, diversity, and acceptance of disagreement.
- Stop encouraging students to drop her class on the first day; (several students noted this practice in the teaching evaluations and she stated in her personnel interview that after the first day, "Most students drop. I advise them to drop.").
- Respect and implement DePaul's teaching philosophy of Vincentian personalism.
- Refrain from belittling students through the display of discourteous and dismissive non-verbal cues (a common theme in student evaluations)
- Refrain from creating an environment of exclusivity among those who disagree with her viewpoint (a common theme in the student evaluations).

LC0002226

- Rethink her tendency to centralize race in more general intercultural communication and performance courses as a determining aspect of identity and consider instead that identity construction occurs across a number of components (e.g., age, sexual orientation, class, ethnicity, etc.).
- Separate her own ideology from the pedagogical strategies she uses to address the needs of her students.
- Teach critical thinking around a number of different ideological components or lenses instead of only isolating one.
- Develop unique courses with course-determined materials, and pedagogical approaches that are designed to the course level and the specific outcomes and topic of the class, particularly at lower level courses such as CMN 103.
- Use a variety of teaching methods and strategies to address the plurality of students' learning needs and styles, rather than consistently using a seminar style.
- Tighten course structure—offer previews at the beginning of each class, integrate PowerPoints, develop more constructive (and finite) questions for students on handouts, etc.

RESEARCH

The tenured faculty acknowledge that there is a co-authored, peer-reviewed journal article published during this review period. And, they acknowledge that Lisa is in her third probationary year with a year leave awarded for next year. At the same time, based on the limited amount of research published since arriving at DePaul, the tenured faculty also expressed grave concerns regarding her ability to produce the necessary peer-reviewed, quality research necessary to achieve tenure at DePaul.

SERVICE

The faculty found that there was "overselling" of the nature of her research and service accomplishments based on what she has actually produced in the three years she has been here. While numerous service contributions were indicated in Lisa's document, overall these do not comprise substantial accomplishments.

LC0002227

# Exhibit 215 to Calvente Deposition



Confidential

Calvente-DePaul 023085





**University Board on Promotion and Tenure**
1 East Jackson Boulevard,
Chicago, Illinois 60604-2287

 Calvente-DePaul 023086



Confidential



Confidential



Confidential

Calvente-DePaul 023089

# Exhibit 4

DocuSign Envelope ID: 3F5DE0C2-6A23-4BE3-99A1-47D9E3E538C5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF LUCY RINEHART

---

1.      My name is Lucy Rinehart.  I am over the age of eighteen (18) years and fully capable of making this Declaration.

2.      The facts in this Declaration are within my personal knowledge and are true and correct, and I am qualified to make the statements in this Declaration.

3.      I am currently employed by DePaul University as the Associate Provost for Academic Planning and Faculty, and I am a custodian of records for certain business records of DePaul University.  The documents attached hereto as Exhibits 1-7 are business records of DePaul University. These documents are kept in the regular course of business, and it was the regular course of business of DePaul University, for an employee or representative, with knowledge of the act, event, condition, or opinion recorded, to make the record or to transmit information thereof to be included in such documents; and the documents were made at or near the time of the act, event, condition or formation of the opinion, or reasonably soon thereafter. These documents are duplicates of the original with the exception of any redactions made for confidentiality purposes.

4.     From May 2021 to present, Dr. Salma Ghanem has been serving as the Provost for DePaul University. Prior to this, Dr. Ghanem served as the Acting Provost from October 2018 to July 2019 and Interim Provost from July 2019 to May 2021.

5.     From July 2017 to present, Dr. Gabriel Esteban has been serving as the President for DePaul University.

6.     DePaul has a Faculty Handbook that sets forth its principles of shared governance with its faculty, and also governs the evaluation of faculty, including the process by which tenure track faculty can be considered for promotion and tenure. The full and complete Faculty Handbook for DePaul University is attached as **Exhibit 1** to this Declaration, and is Bates Stamped Calvente-DePaul 00001-000103.

7.     ██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████

8.     In September 2018, Dr. Calvente timely submitted her tenure application and accompanying materials. The document Bates Stamped DePaul – Calvente 000796-001889, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. Calvente.

9.     The document Bates Stamped DePaul 10073-10373, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ████████. **Exhibit 2** to this Declaration contains documents from ████████ tenure and promotion file.

10.    The document Bates Stamped DePaul 008594-009701, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ████████. **Exhibit 3** to this Declaration contains documents from ████████ tenure and promotion file.

2

11. ████████████ is a Caucasian faculty member in the College of Science and Health who was up for tenure during the academic year 2018-2019. The document Bates Stamped DePaul 36929-37299, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████. **Exhibit 4** to this Declaration contains documents from ████████ tenure and promotion file.

12. Dr. ████████████ is a Latina faculty member in the College of Science and Health, School of Nursing who was up for tenure during the academic year 2019-2020. The document = Bates Stamped DePaul 34653-36928, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. ██████ **Exhibit 5** to this Declaration contains documents from Dr. ████████ tenure and promotion file.

13. ████████████ is a Caucasian faculty member in in the College of Science and Health, Department of Mathematical Science who was up for tenure during the academic year 2019-2020. The document Bates Stamped DePaul 37300-38093, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. █████ **Exhibit 6** to this Declaration contains documents from Dr. ██████ tenure and promotion file.

14. Among the individuals who obtained tenure during the 2018-2019 academic year, are: ████████████████████████████████████████ Dr. Calvente was the sole candidate to be denied tenure in 2019.

15. Dr. ████████████ was a Caucasian tenure-track faculty member in the College of Communication. In 2017, the College of Communication's Personnel Committee and tenured faculty recommended the non-renewal of ████████████ ███████, and Dr. Ghanem accepted the recommendation for non-renewal. A copy of these documents are attached as **Exhibit 7** and **Exhibit 8** to this Declaration, and are Bates Stamped Calvente-DePaul 10006-10016 and 10017-

3

DocuSign Envelope ID: 3F5DE0C2-6A23-4BF3-90A1-47D9E3E538C5

10018, respectively. In January 2018, ███████ appealed this decision to the Faculty Appeals Board, who recommended the decision to terminate him be overturned. In March 2018, then-Provost Marten denBoer rejected the Faculty Appeals Board recommendation, and accepted the decision of the College of Communication for Dr. ███████ non-renewal. I have knowledge of the facts stated herein and I declare under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

11/18/21 | 10:01 AM CST

Executed on this ___ day of November, 2021.

*Lucy Rinehart*

Lucy Rinehart

4

*EXHIBIT 1*

July 1, 2018

1  # CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN
2  # GOVERNANCE
3

4  1.1 Principles of Governance ................................................................................. 2

5  1.2 Governance Structure ..................................................................................... 2

6  1.2.1 Primary Responsibilities of the Faculty ...................................................... 3

7  1.2.2 Participatory Responsibilities...................................................................... 3

8  1.3 The Faculty Council and Its Delegated Authority ........................................... 4

9  1.3.1 Members of the Faculty Council ................................................................. 4

10  1.3.2 Officers of the Faculty Council .................................................................. 5

11  1.3.3 Meetings of the Council ............................................................................. 6

12  1.3.4 Notice to the Faculty of Council Meetings ................................................ 6

13  1.3.5 Conduct of Meetings ................................................................................. 6

14  1.3.6 Communication of Decisions ..................................................................... 6

15  1.3.7 Responsibility to the Faculty ..................................................................... 7

16  1.3.8 Conduct of Meetings of the Council of the Whole .................................... 7

17  1.4 Committees of the Faculty Council ................................................................ 7

18  1.4.1 General Duties of Committees ................................................................... 8

19  1.4.2 Standing Committees of the Faculty Council............................................. 8

20  1.4.3 University Committees with Faculty Representation................................... 9

21  1.5 Amendment of the Faculty Handbook .......................................................... 10

22

1

Calvente-DePaul 000001

July 1, 2018

# CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN GOVERNANCE

## 1.1 Principles of Governance

Within general university norms and specific regulations of the Board of Trustees and the university President, faculty members participate in governance on an institution-wide basis and in the particular academic units with which they are affiliated.

Faculty initiative and participation in governance are a vital part of academic life. Moreover, the general well-being of the university is dependent on the time and talents the faculty contribute in the roles of decision makers and consultants.

Faculty participate in all areas of university governance. They have primary responsibilities over academic and scholarly activities, faculty personnel matters, and education interests and policies. They have participatory or advisory responsibilities in other areas.

Full-time faculty members who are not on special appointment are expected to participate in governance as a normal faculty obligation. Consequently, only for sufficiently serious reasons may they refuse appointments or active service on various committees or in their departments. Part-time faculty members and full-time faculty members on special appointment may be invited to participate in certain governance processes to the extent that their time and other responsibilities permit.

As a general rule, full-time faculty members are entitled to participate and vote in decisions made in the academic departments, schools, and colleges with which they are affiliated. Some matters before a department, school, or college such as promotion and tenure, may be restricted to the deliberation of a limited number of faculty.

## 1.2 Governance Structure

The faculty of DePaul University shall bear its share of responsibility of shared governance according to the following principles.

1. DePaul University is a community sharing a common interest in the welfare of the institution.
2. DePaul is a university community which has adopted this country's tradition of collegial governance. The university's own philosophy encourages faculty and staff to be concerned with university-wide issues, to prevent barriers from separating different divisions of the university, and otherwise to work for a type of unity that the term "community" implies.
3. As a corporation, the university has a formal structure of governance described principally by its Charter and Bylaws. The latter document assigns certain responsibilities and authority to the Board of Trustees and to particular officers of the university, but it assumes that much of the authority will be shared by a process of delegation.

2

Calvente-DePaul 000002

July 1, 2018

4. For the university to be well governed, the diverse interests and perspectives of faculty, staff, students, and administration must be considered and incorporated in a timely fashion in the decision making processes of the institution.

5. By tradition and training, the faculty are expected to make judgments about the academic integrity of the curriculum and the professional requirements of faculty status. Therefore, curriculum, academic programs, and faculty status questions shall be considered primary responsibilities of the faculty. It is understood that in order to carry out these responsibilities, the faculty will work closely with the academic administrators and the officers of the university. They will also seek the advice of students, part-time faculty, and staff. While the President and the Board of Trustees have the authority to reverse the decision of the faculty regarding their primary responsibilities, it is expected that they would do so only in exceptional circumstances and would communicate the reasons to the faculty.

6. Faculty governance regarding academic programs, curriculum, and faculty status regularly takes place through departments, programs, colleges, and schools. Primary governance of those bodies shall reside within the bodies. Some institutional mechanism is required for university faculty to make decisions on all educational matters and policies regarding faculty status which concern more than one college or school or which are otherwise of general interest.

7. Needed, too, is a mechanism for the university faculty to make recommendations to the president and the provost regarding matters outside the primary responsibilities of the faculty.

The Faculty Council has been established to ensure full and equal participation of faculty in university governance.

### 1.2.1 *Primary Responsibilities of the Faculty*

The faculty is vested with primary governance responsibility of academic and scholarly activities and faculty personnel matters within the university, including the following:

1. Curriculum matters, including establishment, dissolution, and substantial changes of degree programs; and reorganization of the general university academic structure.
2. Academic freedom, including rights and responsibilities.
3. Standards and procedures concerning faculty promotion, tenure, appointments, retention, and performance.
4. Adjudication of grievance and disputes in all matters involving a faculty member or members.
5. Standards and procedures concerning instruction.
6. Regulations regarding attendance, examinations, grading, scholastic standing, honors, and general admission and graduation standards.
7. Matters pertaining to research, and to scholarly and creative activities.
8. Academic principles underlying the academic calendar.
9. In general, any educational interests and policies.

### 1.2.2 *Participatory Responsibilities*

The faculty will advise or otherwise participate regularly with the administration and other appropriate bodies in university matters including the following:

3

Calvente-DePaul 000003

July 1, 2018

1. Establishment of university priorities.
2. Formulation of policy with regard to allocation and utilization of the university's human, physical and fiscal resources and the principles underlying the development of the budget.
3. Oversight of administrators, establishment or dissolution of administrative offices, and major changes in administrative structure.
4. Establishment of policies for the regulation of inter-collegiate athletes.
5. Recommendation of candidates for honorary degrees.
6. The establishment or elimination of colleges, schools, or local academic unit.
7. Conducting of commencement exercises and honors convocations.
8. Other matters inseparably associated with traditional faculty responsibilities.
9. Any matters of interest to the faculty or pertaining to the university and its purpose.

## 1.3 The Faculty Council and Its Delegated Authority

The authority of the faculty to carry out its responsibilities for university-wide issues is delegated to the Faculty Council, except when a meeting of the Council of the Whole is held at the call of the university president, the provost, the Faculty Council, or on written petition to the Faculty Council by at least fifty full-time members of the faculty.

For the purposes of this Council's representation, the university's regular full-time faculty consists of all tenure-line and term faculty and excludes the president, the provost, the university's vice presidents, the deans of the colleges or schools, and other faculty members whose roles in the judgment of the President of the Faculty Council, are predominantly administrative.

### *1.3.1 Members of the Faculty Council*

All colleges shall have representation on Faculty Council. The overall size of Faculty Council, the number of seats for members and alternates, and the distribution of those seats by college shall be determined by Faculty Council according to its bylaws.

Members shall be elected by the full-time faculty of the various colleges and schools respectively. The term for a regularly elected member of Faculty Council shall be from September 1st of the calendar year in which he or she is elected until August 31st of the calendar year in which his or her term expires. Each calendar year, unit elections for the regular seats and alternate seats held by members whose terms expire in that year shall take place on or after April 1st and by a date that will allow the results to be reported to the chair of the Committee on Committees for presentation at the June meeting of the Council. Members elected at that time shall begin their terms on September 1st of that year.

Council members shall hold office for three years with staggered terms so that one-third of the membership is eligible for election each year. The office of a Council member shall become vacant on incapacity, resignation, or the absence of said council member from the meeting of the Council for four consecutive months. The college dean shall call a special election to fill an existing vacancy.

4

1 Alternate members shall hold office for one-year terms. In the event of an anticipated absence of a
2 council member from a Council meeting, the council member shall designate an alternate to participate in
3 his/her stead with full rights of a Council member.
4
5 The Faculty Council Committee on Committees shall review the composition of Faculty Council
6 membership by February 29th of every leap year and make a recommendation to Faculty Council during
7 the subsequent March meeting to maintain or adjust the composition of membership to take effect for the
8 coming academic year.
9
### 1.3.2   *Officers of the Faculty Council*
11
12 The Council shall elect a president as presiding officer, a vice president, and a secretary from among its
13 elected members. These officers may be from any school or college. An additional officer shall be the
14 chair of the Committee on Committees, who shall be elected from among the COC members themselves,
15 subject to the approval of Council.
16
17 The Council president shall represent Council in university business that Council deems appropriate. She
18 or he shall call the monthly meetings of Council, preside over Faculty Council Executive Committee
19 meetings, and otherwise organize the business of Council in consultation with the other officers. The
20 Council president does not vote on Council resolutions except to break a tie vote or to create a tie vote. In
21 the case of secret ballot, the president may vote on all matters on the secret ballot.
22
23 The vice president shall represent Council in university business deemed appropriate or in instances in
24 which the president is unable to attend. The vice president shall be the working liaison between Council
25 and specific standing committees as designated by the president and shall organize the Faculty Council
26 Executive Committee meetings.
27
28 The secretary shall keep the minutes at the Council meetings, monitor the website, maintain the archival
29 records of Council, and report findings or decisions of Council to the appropriate administrative bodies
30 for action.
31
32 The chair of the Committee on Committees shall organize the appointment of faculty (subject to
33 Council's approval) to all faculty slots on university and Council committees. She or he shall maintain
34 the records of current and previous faculty appointments, oversee the process of Council elections in the
35 various colleges, and perform other organizational duties as designated by the president and the Faculty
36 Council Executive Committee.
37
38 The duties of Faculty Council officers are further specified in Faculty Council's bylaws.
39
40 The president, vice president and secretary of the Council shall be elected at each June meeting. It is not
41 precluded, but it is also not an assumption, that the vice president will necessarily succeed the president.
42 Terms for all officers are one year, subject to re-election. The president and vice president must
43 collectively represent at least two (2) colleges or schools. Should any officer be unable to fulfill her or his

Calvente-DePaul 000005

term, the Committee on Committees shall determine by next Council meeting a proper process for succession.

### 1.3.3   Meetings of the Council

The Council shall generally meet on the first Wednesday of each month during the academic year (September through June, inclusively), and as needed at the call of the president of the university, the provost, the Faculty Council president, or at the call of the majority of the Council members.  Minutes of each meeting shall be posted promptly on the FC website by the Council secretary.

At least five days before every meeting, the Council secretary shall send to Council members notice of the forthcoming Council meeting, together with documents pertaining to the agenda of the meeting, including the text of any proposed legislation.

### 1.3.4   Notice to the Faculty of Council Meetings

The Council secretary shall post to Council's website and send notice and agenda of each meeting of the Council to all faculty members, together with documents pertaining to the agenda of the meeting, including the text of any proposed legislation.

### 1.3.5   Conduct of Meetings

The presence of 50% or more of the voting eligible members of the Faculty Council shall constitute a quorum of the Council.

Decisions are to be made by majority vote of the Council members present, provided that the votes in favor of a resolution shall number more than one-third of the voting eligible members.

All faculty members may attend meetings of the Council, excluding executive sessions.  Chairs of committees of the Faculty Council may offer motions and speak on behalf of their committees.

The Council may, by decision of the president or a majority of the Council members present, permit other persons not on the Council to speak on agenda items.

An executive session may be called by the president of the Faculty Council at his/her discretion, which may be overruled by a majority of the Faculty Council members present.  Sessions dealing with matters involving the right to privacy of individuals normally shall be executive sessions.  Executive sessions may be used for obtaining information and for deliberation; but final policy decisions shall be made in open Faculty Council meetings.

### 1.3.6   Communication of Decisions

Calvente-DePaul 000006

July 1, 2018

All decisions and recommendations of the Faculty Council shall be forwarded to the president of the university (or the provost as designee) for approval.

In the event the president of the university (or the provost as designee) disapproves any Faculty Council decision or recommendation, the president (or provost as designee) shall communicate the reasons to the Faculty Council.

### 1.3.7   Responsibility to the Faculty

The Council secretary shall regularly send a summary of Council's actions to the provost and post to Council's website all records of actions and responses from the university president (or provost as designee).

At the request of a majority of voting members present at a Faculty Council meeting, but no fewer than one-third of Council's total voting membership, any matter must be submitted to the faculty for consideration.  The Council shall establish the manner by which the faculty shall vote by mail, electronic ballot or otherwise on any such matter.  A vote by the majority of the full-time faculty members of the university shall be binding on the Faculty Council.

### 1.3.8   Conduct of Meetings of the Council of the Whole

Twenty-five (25) percent of full-time faculty members shall constitute a quorum of the Council of the Whole.  Meetings of the Council of the Whole shall be chaired by the president of the Faculty Council. Decisions of the Council of the Whole shall be made by a majority of the full-time faculty members present, subject to ratification by a vote of the majority of all full-time faculty members in a special mail or electronic ballot.

## 1.4 Committees of the Faculty Council

The Faculty Council is empowered to establish committees of the Faculty Council.  The Faculty Council appoints the members of the Committee on Committees from among the members of Faculty Council.

Membership on other Faculty Council committees is not limited to Faculty Council members.  The Faculty Council shall prescribe the terms of office for members of all committees.  In the case of standing committees, the terms of office shall normally be staggered to permit a reasonable degree of continuity.

The Faculty Council shall prescribe the duration of any ad hoc committees. Any standing or ad hoc committee which fails to meet or does not otherwise act or file a report for a period of one year shall be discontinued automatically.

Each committee of the Faculty Council shall select its own chair.  With the approval of the Committee on Committees, each committee may appoint subcommittees from its own members or from among other members of the full time and part time faculty and such members of the administration, staff, and students as shall be helpful in its deliberations.

Calvente-DePaul 000007

July 1, 2018

The standing rules and operating procedures for Faculty Council committees and subcommittees are further specified in Council's bylaws.

### 1.4.1  General Duties of Committees

Committees shall recommend to the Faculty Council new policies and changes in policies in their areas of responsibility.

They shall receive and consider proposals in their areas of responsibility from the Faculty Council, the administration, Student Government Association, staff, and other relevant sources. Committees shall present their recommendations to the Faculty Council.  In their deliberations, committees and subcommittees shall seek advice, information, or materials from other members of the university community.

They shall review annually sections of the Faculty Handbook pertaining to their areas of concern and make recommendations for revision.

They shall meet frequently and maintain liaison with appropriate committees and groups established by the academic units, the Student Government Association, the Staff Council, and other university constituencies.

### 1.4.2  Standing Committees of the Faculty Council

Currently the Faculty Council has fifteen (15) standing committees. Committee charges are detailed in Council's bylaws:

- Committee on Academic Policy (CAP)
- Committee on Committees (COC)
- Committee on Contingent Faculty (CCF)
- Committee on Online Learning (COOL)
- Committee on Curriculum and Programs (CCP)
- Committee on Learning and Teaching (COLT)
- Committee on Research Policy (CORP)
- Committee on the Status of Faculty (SOF)
- Faculty Committee on Appeals (FCA)
- Faculty Council Budget Committee (FCBC)
- Faculty Council Executive Committee (FCEC)
- Faculty Council Handbook Committee (FCHC)
- Liberal Studies Council (LSC)
- Physical Environment Committee (PEC)
- Promotion and Tenure Policy Committee (PTPC)

8

Calvente-DePaul 000008

July 1, 2018

### 1.4.3 *University Committees with Faculty Representation*

University committees dealing with matters in which the faculty have governance responsibility or interest shall have faculty representation. Faculty representatives on such committees shall be responsive to the Faculty Council to the extent appropriate.

To the extent that any boards or committees not under the auspices of the Faculty Council address areas of primary faculty responsibility and report directly to the university president or other university officers, those boards or committees shall be subject to the policies of the Faculty Council and to review by the Faculty Council.

Faculty are represented on the following university committees and boards:

- 403(b) Investment and Plan Administrative Committee
- Academic Advising Award Committee
- Academic Affairs Committee - Board of Trustees
- Academic Integrity Board
- Academic Integrity Student Consultants
- Academic Program Review Committee
- All University Judicial Board
- Campus Recreation Advisory Committee
- Campus Violence Prevention Committee
- Committee on Conflict of Interest in Sponsored Programs
- Comprehensive Internationalization Committee
- Continuing and Professional Education
- Faculty Grievance and Appeals Panel
- Fair Business Practices Committee
- Grade Challenge Review Board
- Institutional Biosafety Committee (IBC)
- Issues Review Board (for staff grievances)
- Library Review Board
- Public Service Council
- Quality of Instruction Council
- Strategic Resource Allocation Committee
- Student Activity Fee Board
- Student Welfare Taskforce
- Teaching Learning and Technology Committee
- Tuition Pricing Committee
- University Athletic Board
- University Benefits and Compensation Committee
- University Board on Faculty Promotion and Tenure
- University Institutional Animal Care and Use Committee

Calvente-DePaul 000009

July 1, 2018

1  • University Institutional Review Board for the Protection of Human Subjects (IRB)
2  • University Research Council
3  • University-wide Honors Program Committee
4

**1.5 Amendment of the Faculty Handbook**

The Faculty Handbook may be amended by the faculty.  Changes to the Faculty Handbook take effect when accepted by the university president.

The Faculty Handbook may be amended in either of two ways:

1.  By the affirmative vote of least sixty percent (60%) of the members of the Faculty Council present at the meeting, provided that those votes represent at least 50% of the total Faculty Council membership; or

2.  By submission of a proposed amendment over the signature of 10% of the regular full-time faculty as a whole for ratification. The Committee on Committees will then task a committee to oversee a referendum within 14 days.  The amendment will be approved if a majority of the full-time faculty cast referendum ballots and if at least two-thirds of the faculty members casting ballots vote in favor of the amendment.

Calvente-DePaul 000010

July 1, 2018

1 **CHAPTER 2. RECRUITMENT, APPOINTMENT, AND**
2 **CATEGORIES OF FACULTY**
3

4 2.1 Recruitment Policies ............................................................................................... 2

5 2.2 Initial Academic Appointments ............................................................................. 3

6    2.2.1 General Criteria and Policies ............................................................................ 3

7    2.2.2 Hiring With Tenure upon Initial Appointment ................................................. 4

8 2.3 Full-Time Faculty Appointments ........................................................................... 5

9    2.3.1 Tenure-line Faculty .......................................................................................... 5

10    2.3.2. Term Faculty .................................................................................................. 6

11       2.3.2.1. Definitions and Scope ............................................................................. 6

12       2.3.2.2 Term Faculty Ranks ................................................................................. 7

13       2.3.2.3 Functional Titles ...................................................................................... 7

14       2.3.2.4 Responsibilities and Participation in Governance ................................... 8

15       2.3.2.5 Hiring and Contracts ................................................................................ 8

16       2.3.2.6 Reappointment and Termination .............................................................. 8

17    2.3.3 Special Appointments ....................................................................................... 9

18    2.3.4 Annual Performance Review .......................................................................... 10

19 2.4 Adjunct Faculty Appointments ............................................................................ 11

20    2.4.1 General Principles .......................................................................................... 11

21    2.4.2 Retired Faculty ............................................................................................... 11

22    2.4.3 Professors Emeriti and Emeritae .................................................................... 12

23 2.5 Other Instruction-Related Positions .................................................................... 12

24    2.5.1 Academic Support Appointments ................................................................... 12

25    2.5.2 Graduate Assistants and Fellows ................................................................... 12

26 2.6 Change of Affiliation or Status ............................................................................ 12

27    2.6.1 Change of Affiliation ..................................................................................... 12

28    2.6.2 Change of Status ............................................................................................. 13

29 2.7 Summer Session Appointments ............................................................................ 13

30 2.8 Orientation of Faculty .......................................................................................... 14

31 2.9 Annual Reporting ................................................................................................. 14

1

July 1, 2018

1 **CHAPTER 2. RECRUITMENT, APPOINTMENT, AND**
2 **CATEGORIES OF FACULTY**
3
4 This chapter defines categories of faculty and sets out DePaul University's policies for
5 recruitment, appointment, and review of faculty members. It also addresses change of faculty
6 affiliation or status and summer session appointments. As stated in Section 1.1 of this Handbook,
7 the faculty as a whole is vested with primary governance responsibility for academic and
8 scholarly activities and faculty personnel matters within the university. As a general rule, full-
9 time faculty members (both tenure-line and term) are entitled to participate and vote in decisions
10 made in the academic programs, departments, schools, and colleges with which they are
11 affiliated. However, some matters including faculty hiring, tenure, promotion, and review are
12 restricted exclusively to tenure-line faculty.

13 **2.1 Recruitment Policies**
14
15 Academic deans, local academic unit officers, and academic program directors have
16 responsibility for initiating the process for faculty appointments, with the exception of the
17 position of dean.
18
19 Consultation with the tenure-line faculty of the local academic unit, as defined by the unit's
20 written policies, is required for the appointment of all full-time faculty and local academic unit
21 officers. Only in rare instances and for compelling reasons will an appointment be made over the
22 expressed opposition of the local academic unit faculty. In such circumstance, the dean shall, in
23 writing, inform the local academic unit of the specific reasons for overturning the judgment of the
24 faculty.
25
26 Faculty involved in the search process are individually accountable for following the university's
27 equal employment opportunity policies.
28
29 DePaul University provides equal employment opportunities to all employees and applicants for
30 employment. As an Equal Opportunity Employer, DePaul does not discriminate or permit
31 discrimination on the basis of race, color, religion, national origin, age, disability, sexual
32 orientation, gender identity, military or veteran status, genetic information, marital status, parental
33 status, ancestry, source of income, or any other classes protected by local, state, and federal law.
34
35 In order to provide for the most diverse and highest quality faculty, DePaul is committed to
36 searches conducted in the broadest possible markets.
37
38 Entry-level hiring for tenure-line positions presumes a national search. A national search is
39 defined by the practices of the disciplinary or interdisciplinary field and generally includes
40 advertisements as customary in the discipline, recruitment at national conventions, and similar
41 wide outreach.
42
43 In limited cases the requirements for a national search may be waived if a scholar of exceptional
44 merit has already been identified as a target of opportunity hire, particularly if that scholar would
45 enhance DePaul's diversity profile or bring difficult to find expertise to the University.
46
47 A local academic unit's written request to waive the search requirement for an
48 academic appointment must be approved by its tenure-line faculty. The request must convince the
49 dean and the provost that the candidate is fully qualified for the position. Evidence of the

Calvente-DePaul 000012

July 1, 2018

candidate's significant accomplishments and a rigorous review of the candidate's qualifications in teaching, research and other creative activities, and service are expected in the subsequent preparation of the appointment recommendation.

## 2.2 Initial Academic Appointments

### 2.2.1 General Criteria and Policies

The faculty has a major responsibility for fulfilling the principal functions of the university: teaching, scholarship, research and other creative activities, and service. DePaul appoints its faculty on the basis of scholarly achievement and the promise of continuing academic growth, competencies directly related to the university's academic goals and programs, and acceptance of the principles as stated in the Employment Policies and Procedures section of this Handbook.

The principal criteria for initial appointment and promotion in academic rank are: quality of teaching; scholarship, research or other creative activities; and service.

General university criteria are subject to further specification standards adopted by colleges, schools and local academic units. Criteria, which are approved by and included in official documents of the academic units, are as binding on the members of those units as are the general university standards for which they provide explication. Should there be a difference between the two sets of criteria, those of the university shall prevail.

Authority to appoint faculty rests with the university president. In practice, this authority is regularly delegated to the provost, who carefully reviews the terms of the proposed faculty contract before it is approved and issued. The review is to assure that the terms of the proposed faculty contract are compatible with university policies, accepted academic standards, and principles of equity with respect to other DePaul faculty members in comparable positions.

The Office of the Provost has overall responsibility for monitoring academic appointments. This office establishes policies and procedures related to faculty employment that are compatible with the general university guidelines. These guidelines assume, however, that most of the initial responsibility for the selection process resides with academic deans, local academic officers, and directors of academic offices.

Initial appointments are in contract form, each including:

1. Salary
2. Length of contractual service
3. Academic rank
4. Tenure status
5. Affiliation with an academic unit, that is, a particular college/school, academic department, or academic program.

The offer letter to the faculty member includes specific terms, which are then incorporated into the formal contract. The initial contract may be for one, two, or three years on the recommendation of the academic dean and with the approval of the provost.

If the initial contract comes with tenure, it must meet the criteria of section 2.2.2 below. An initial contract may not result from a Change of Status (2.6.2).

3

Calvente-DePaul 000013

July 1, 2018

Two or more members of the same family may be given faculty appointments, even in the same college/school or local academic unit. However, such an appointment will not be made in a situation in which one member of the family holds an administrative position that requires a judgment on the other member's qualifications for appointment and salary. Similarly, after the initial appointment, one member of a family is not eligible for an administrative appointment in a unit of the university that would require the above-mentioned judgments on the qualification of another member of the family.

### 2.2.2 Hiring With Tenure upon Initial Appointment

The granting of tenure upon initial appointment shall be at the discretion of the local academic unit officer, the dean, and the provost, after a rigorous peer review by the local academic unit's tenured faculty. The personnel committee of the unit (or equivalent) shall conduct an evaluation of the candidate applying the unit's tenure and promotion guidelines (which themselves must be consistent with the university criteria) and shall report to the tenured faculty prior to the vote. All initial appointments with tenure must include a vote of the local academic unit tenured faculty with a recommendation for or against tenure.

The university hires a candidate with tenure upon initial appointment only if the individual satisfies one or more of the following criteria:

1. Prior academic achievement comparable to incoming rank at DePaul;
2. Extensive, relevant non-academic experience; or
3. Appointment to provost, dean or local academic unit officer positions.

Persons who are already full-time or part-time employees of DePaul University in any capacity (except "Visiting Faculty" as defined in Section 2.3.3) are not eligible for initial appointments with tenure under this section, but must instead be first appointed without tenure to the tenure-line faculty and subsequently evaluated under the tenure process outlined in Chapter 3 of this Faculty Handbook.

Faculty hired with tenure at the rank of Associate Professor or Professor upon initial appointment must have appropriate qualifications and prior experience. Only a candidate with an exceptional record may be appointed with tenure under this section if the candidate has not previously been granted tenure at another institution.

In order to appoint a new faculty member at the rank of full professor who has not previously held that rank at a recognized college or university, there must be an evaluation of the candidate's scholarly or creative record by the local academic unit's tenured faculty and a minimum of three outside experts who have been sent the appropriate materials. Selection of reviewers and the appropriate materials to submit to the reviewers follows the external review procedure described in Chapter 3.

In order to appoint with tenure a candidate whose experience is primarily nonacademic, the tenured faculty of the unit must include in the departmental vote and request for an appointment a written case for the strength of the candidate's non-academic experience.

Individuals under consideration for appointment to provost, dean, or local academic unit officer positions can be appointed with tenure. These candidates must have demonstrated scholarly and

Calvente-DePaul 000014

July 1, 2018

academic credentials or extensive relevant experience.  The administration initiates appointments with tenure to these positions. For dean or local academic unit officer positions, the provost, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure.  When appointing a provost, the president, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure.  When appointing a president, the Board of Trustees, with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will make the initial appointment with tenure. The university would normally provide an additional permanent position and funding to the local academic unit if and when the dean, provost or president returns to a faculty position.

## 2.3 Full-Time Faculty Appointments

All full-time faculty fall into three categories: tenure-line faculty, term faculty and special appointments.

### 2.3.1 Tenure-line Faculty

Tenure-line appointments may be at the rank of instructor awaiting terminal degree conferral, assistant professor, associate professor, or full professor. All tenure-line appointments shall involve an evaluation of the candidate's qualification based on the approved policies and procedures of the local academic unit, as well as a vote of the tenure-line faculty of the unit, except under circumstances stipulated in Section 2.2.2.

**Instructor Awaiting Terminal Degree Conferral**

Candidates who are hired into tenure-line positions but have not successfully completed all requirements for the terminal degree may be appointed to this rank with the stated expectation that, upon conferral of the degree, the faculty member will be appointed to a tenure-line position at the rank of assistant professor. Typically, the period of time as an instructor in this category would be one year, and only under rare and compelling circumstances should it exceed two years. Time in rank as instructor in this category may count towards tenure; the probationary period is determined by an agreement between the dean and the faculty member in the initial contract as assistant professor. The annual performance review process (Section 2.3.4) will be used to determine whether contract renewal for the next academic year is appropriate and desired. The tenure clock would start the September after the university receives confirmation of the candidate's terminal degree.

**Assistant Professor.** The doctorate or other terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and who give promise of continued academic development. The assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing scholarship, research, and/or other creative activities, and for service.

**Associate Professor.** In addition to the requirements for assistant professor, the candidate must demonstrate consistently effective teaching performance. The candidate should also show evidence of notable scholarship, research, and/or other creative activities, and service.  For this rank, the candidate should show significant involvement in university activities at the local academic unit and beyond. This rank is reserved for those with recognized academic achievements.

5

Calvente-DePaul 000015

July 1, 2018

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities, the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

**Tenure-line Joint Appointments**

A faculty member may receive a joint appointment or affiliation in two local academic units. For a joint appointment in two units, a candidate for initial appointment must be evaluated and recommended by the faculty of both local academic units. The criteria for determining eligibility for such a joint appointment are those for the usual initial appointment.

### 2.3.2. Term Faculty

**2.3.2.1. Definitions and Scope**

Term faculty positions are full-time, non-tenure-line, and do not lead to tenure.

The university uses term faculty positions to:
- Retain a cadre of effective and committed teachers who can provide instructional continuity;
- Maintain flexibility in allocating resources for faculty positions;
- Bring in outstanding individuals who will enrich the learning experience through their professional qualifications and experiences from careers outside academia;
- Provide additional time for scholarly pursuits of tenure-line faculty;
- Deal with exigent circumstances, such as replacing faculty on leave, filling vacancies that occur too late to conduct an appropriate search for a tenure-line faculty appointment, filling a vacancy resulting from an unsuccessful search for a tenure-line faculty member, or staffing a new and developing program;
- Teach in and administer programs that would be too time consuming for tenure-line faculty to oversee and/or require specialized skills or knowledge to run.

The university does not use term faculty positions to:

- Permanently replace a tenure-line position;
- Avoid adding new tenure-line positions when merited; or
- Provide a safe harbor for faculty whose tenure status is in jeopardy. (Section 2.6.2)

The percentage of term faculty in a local academic unit should not be more than 30% of the full-time faculty in that unit. Units may exceed 30% if approved by majority votes of the unit's tenure-line faculty and by the Faculty Council. Such exemptions are typically granted to: (i) units with new or developing programs; (ii) units whose primary instructional programs involve clinical and similar professional activities not usually covered by tenure-line faculty, and (iii) units whose primary instructional obligations are not typically met by tenure-line faculty due to extraordinary responsibility for service-level courses.

Term faculty may use the grievance and appeals processes set out in Chapter 5, except as delimited by Section 2.3.2.6.

6

Calvente-DePaul 000016

July 1, 2018

1 **2.3.2.2 Term Faculty Ranks**
2
3 Term faculty may be appointed at the ranks of Instructor, Professional Lecturer, and Senior
4 Professional Lecturer.
5
6 **Instructor:** A term faculty member without a terminal degree is usually hired at the rank
7 of Instructor. Such faculty members are normally hired to satisfy short-term curricular
8 needs and to provide support in staffing skills-oriented areas of the curriculum. The
9 primary responsibility of instructors is teaching, and their duties usually do not involve
10 service to the unit or other professional activities. Instructors may be called upon to carry
11 out minor administrative functions to help support programmatic and teaching-related
12 activities. The College of Law, in keeping with the general practice of law schools, may
13 use the title Visiting Assistant Professor for individuals hired at the rank of Instructor.
14
15 **Professional Lecturer:** This rank is reserved for term faculty who satisfy one or more of the
16 following criteria:
17
18 • Hold a terminal degree in their instruction area;
19 • Have satisfactorily taught at the rank of instructor for three years; or
20 • Possess professional qualifications and achievements equivalent to a terminal degree in
21 the relevant field.
22
23 The primary responsibility of professional lecturers is teaching, and their duties include service to
24 the unit and other professional activities deemed appropriate by the unit and the dean.
25 Professional Lecturers may be called upon to carry out minor administrative functions to help
26 support programmatic and teaching-related activities. An academic unit may also appoint to this
27 rank those who have equivalent professional experience upon initial hiring. After five years of
28 satisfactory service and upon a formal review by the unit, professional lecturers are eligible for
29 promotion to the rank of Senior Professional Lecturer.
30
31 **Senior Professional Lecturer:** This rank recognizes the contributions of term faculty who have
32 served at the rank of professional lecturer and have demonstrated superior performance as a
33 teacher. Senior Professional Lecturers may be called upon to carry out minor administrative
34 functions to help support programmatic and teaching-related activities. An academic unit may
35 also appoint to this rank those who have equivalent professional experience upon initial hiring.
36 After five years of satisfactory service and upon a formal review by the unit, professional
37 lecturers are eligible for promotion to this rank.
38
39 An academic unit may also appoint to this rank an individual who, upon initial appointment, has
40 equivalent professional experience. Senior professional lecturers have the same duties as
41 professional lecturers.
42
43 **2.3.2.3 Functional Titles**
44 Colleges may confer upon term faculty members functional titles to reflect their particular status
45 or role within the unit. The terms "Assistant Professor," "Associate Professor," and "Professor"
46 must only be used with a modifier. Such titles will not affect the person's rank and should be set
47 out explicitly in his or her contract. Functional titles should not be created on an ad hoc basis, but
48 created and defined by each local academic unit to reflect its programs and special needs. The

7

Calvente-DePaul 000017

July 1, 2018

titles themselves, but not individual appointments, shall be approved in writing by the unit faculty, the dean and the provost.

**2.3.2.4 Responsibilities and Participation in Governance**

The primary responsibility of term faculty will be teaching and, as such, term faculty appointments generally carry higher teaching loads than tenure-line appointments. However, term faculty also have a responsibility for continued professional development, for which the units must provide appropriate support. Continued professional development is a criterion for evaluation of term faculty.

Term faculty at the rank of professional lecturer or above may be involved in the typical service activities of faculty in the unit. These activities may include advising and the creation and supervision of the curriculum, based on the unit's written policies. Term faculty have the right to participate in faculty governance except in matters related to hiring, retention, promotion and tenure. The local academic unit officer should ensure a fair balance of the term faculty members' teaching load, service and administrative responsibilities, as well as the unit's expectations for continued professional development.

**2.3.2.5 Hiring and Contract Duration**

Term faculty members are initially hired on one- or two-year contracts.

An evaluation of the candidate's qualifications and input by faculty of the local academic unit, as specified in the unit's personnel policies, must precede the initial hiring of a term faculty member. In the absence of personnel policies regarding faculty input, hiring will require a vote of the unit's tenure-line faculty.

For initial appointment (and any subsequent reappointments), the duties of the term faculty member and evaluation criteria must be specified in writing and approved by the unit or its personnel committee.

Term faculty may be reappointed to one- or two-year terms as described in the following section. The specific peer review and evaluation process for each unit or college will be developed by the faculty and specified as part of the unit's personnel policies. There is no limit to the number of reappointments.

Upon the satisfactory completion of at least three years of service, a term faculty member will be eligible for, and may apply for, a longer-term contract ranging from three to five years, with specific length and duties determined based on the needs of the unit in consultation with unit faculty. The application will be reviewed according to Section 2.3.2.6. Long-term contracts may be renewed, with each renewal following the same formal review process used for the initial appointment to a long-term contract. If the candidate is reappointed without a long-term contract due to the candidate's performance, he or she may reapply after two additional consecutive years of service. If the candidate is reappointed without a long-term contract for any reason other than the candidate's performance, the candidate may reapply the following year.

**2.3.2.6 Reappointment and Termination**

Term faculty appointments carry no right of reappointment at the conclusion of a contract.

8

Calvente-DePaul 000018

July 1, 2018

The dean or local academic unit officer shall give term faculty appropriate notice before a decision is made on reappointment. Term faculty may submit supporting materials for reappointment to the dean or the local academic unit officer, according to the unit's performance review process.

The dean or local academic unit officer shall give term faculty written notice of the decision for reappointment or non-reappointment by April 10. The faculty member may report failure to provide timely notice of the decision to the next level academic officer. That notice shall be provided within ten business days of the report of failure to provide timely notice.

Consideration of a long-term appointment for a term faculty member shall include an evaluation by the unit (based on the unit's written personnel policies), an opportunity for the candidate to submit supporting documentation, a vote of the unit's tenure-line faculty, and review by the dean and provost.

Non-reappointment of an instructor or professional lecturer shall involve input by the faculty of the local academic unit as specified in the unit's personnel policies. In the absence of such personnel policies regarding faculty input or review, the decision rests with the local academic unit officer. Non-reappointment of senior professional lecturers requires a formal review process by the unit.

Term faculty may not grieve the university decision's not to reappoint. Term faculty may appeal the university's decision not to reappoint only on the grounds of academic freedom violation or discriminatory practices prohibited by university policies or applicable federal, state, or local laws. Term faculty appeal procedures are detailed in Chapter 5.

### 2.3.3 Special Appointments

Special appointments may take the form of visiting faculty, research faculty (for example, post-doctoral fellows), and University Professors. These positions are so designated because the appointment has a definite time limitation or is an appointment whose continuation is directly connected to the faculty member's program.

During the period of the visit, the university may consider appointing faculty holding a special appointment for a tenure-line faculty appointment. Consideration for appointment with tenure must follow procedures in Section 2.2.2. Consideration for appointment into a tenure-line but untenured position must follow procedures in Section 2.3.1. The university's requirement for an outside search must be met, unless waived under the waiver standards of Section 2.1.

**University Professor**

The president may make special full-time university appointments. Such appointments are limited to (i) high-level administrative staff, the nature of whose responsibilities include supervision of academic policies or (ii) special honorific appointments in furtherance of the university's goals and mission. Special appointments are made by a formal contract which indicates the scope of responsibilities and limitations attached to the appointment.

Calvente-DePaul 000019

July 1, 2018

Faculty appointed as university professor are not affiliated with any academic unit and may not participate in the governance, service, or educational activities of the unit except with the expressed consent of the tenure line faculty of the unit.

**Visiting Faculty**

Appointment as a visiting faculty member is reserved exclusively for faculty members who are employed by a home institution other than DePaul and retain that employment relationship during a full or part-time appointment at DePaul. The home institution of the visiting faculty member will ordinarily be another institution of higher education, but may be a foundation, a corporation or a government agency or other appropriate body. In rare cases, artists or scholars of national stature who do not have a home academic institution may be considered for visiting faculty positions.

Visiting faculty members may have the titles Visiting Assistant Professor, Visiting Associate Professor, or Visiting Professor. The qualifications for each rank are the same as for initial appointment of tenure-line faculty. Visiting faculty may be offered contracts not to exceed two years, with approval of the tenure-line faculty of the relevant unit and of the dean and provost.

The College of Law, in keeping with the general practice of law schools, may use the title Visiting Assistant Professor for individuals hired at the rank of Instructor.

**Research Faculty**

The university may grant a research faculty position to a person engaged primarily in scholarship or professional activities relevant to the work of the university. The local academic units recommend research faculty appointments and reappointments based on established policies and procedures of the unit, subject to the approval of the dean and the provost. These appointments may be at the rank of research assistant professor, research associate professor, or research professor, provided that the research faculty member possesses the educational and scholarship qualifications appropriate to the particular rank. The local academic unit will specify the nature and extent of the duties research faculty members in consultation with the director of the relevant center, institute, or group with which the research faculty member will be associated. The university will provide the description of duties in a letter of appointment. The research faculty should not expect employment beyond the contract period. These appointments carry no implication of, or credit towards, academic tenure.

Research faculty will normally have sources outside the university to fund their salaries, such as external grants or funds provided through other institutions. Exceptions will require the provost's written approval upon recommendation of the local academic unit. Research faculty receive resources and access to university facilities as determined by the local academic unit officer or the director of the center, institute, or group with which they have affiliated.

### *2.3.4 Annual Performance Review*

All tenure-line and term faculty are reviewed annually. This annual process consists of a review and evaluation of performance during the preceding academic year based on the local academic unit's criteria and responsibilities. The review may serve one or more of the following purposes:

Calvente-DePaul 000020

July 1, 2018

1. to provide an opportunity for feedback on performance during the preceding year, to communicate expectations, and to develop goals for the coming year;
2. to determine salary recommendations;
3. in the instance of term faculty and instructor awaiting terminal degree conferral, to determine whether contract renewal for the next academic year is appropriate and desired.

Reviews of performance are written processes implemented by the local academic unit officer or dean.

Salary recommendations, while part of the annual review process, may use criteria and considerations somewhat different from decisions on contract renewal or promotion and tenure. Salary decisions are made in accordance with university budget guidelines and usually are made at a different time during the academic calendar year. Salary decisions may result in a merit increase when budgets allow. Salary decisions may include increases for such things as equity and market adjustments. The academic dean of the respective college or school makes salary recommendations to the provost.

A faculty member with a formal faculty appointment in more than one academic unit shall be evaluated by the home unit and shall be evaluated independently by the second unit if it so chooses or if requested to do so by either the candidate or by the home unit.

## 2.4 Adjunct Faculty Appointments

An adjunct faculty appointment allows an individual to contribute to the instructional program of a local academic unit, center, or institute. Adjunct faculty are appointed on a course-by-course basis. The appointments are part-time and do not lead to tenure.

### 2.4.1 General Principles

The dean of a college appoints adjunct faculty to provide instruction in specific courses. Appointment of adjunct faculty should involve input by the local academic unit. The university is not obligated to reappoint adjunct faculty.  Adjunct faculty may use the grievance process set out in Chapter 5.

### 2.4.2 Retired Faculty

A retired faculty member may be offered a limited faculty assignment with adjunct status. The usual reasons for offering such an assignment are:

1. the need of the college or local academic unit for the specific and unusual competencies of the retired faculty member and;
2. quality of teaching or other academic endeavors, with reference to current developments in the field.

The decision to offer a limited assignment to a retired faculty member rests principally with the academic dean, following local academic unit consultation. The dean shall submit his or her written decision to the provost for final approval.

11

Calvente-DePaul 000021

July 1, 2018

1    *2.4.3 Professors Emeriti and Emeritae*
2
3    The university may bestow the title of Professor Emeritus or Professor Emerita upon retirement.
4    Those eligible for emeritus status are tenured faculty members who have contributed substantially
5    to the university's mission and who have ordinarily served at least seven years as a faculty
6    member. Exceptions to these criteria must be approved by the provost.
7
8    Prior to the individual's retirement, the tenured members of the local academic unit may
9    recommend the retiring faculty member for the honorary status of Professor Emeritus or
10    Professor Emerita by sending a letter to the dean describing the person's contributions. The dean
11    forwards his or her recommendation to the provost who, in turn, makes a recommendation to the
12    president, who then makes the final appointment.
13

14    **2.5 Other Instruction-Related Positions**

15    *2.5.1 Academic Support Appointments*
16
17    Members of the staff whose duties include teaching are not members of the full-time faculty.

18    *2.5.2 Graduate Assistants and Fellows*
19
20    Graduate assistants and graduate teaching fellows are appointed by the appropriate dean on the
21    recommendation of the local academic unit officer. They do not possess faculty status.
22    The appointment of a graduate assistant or graduate teaching fellow is subject to the approval by
23    the dean.
24

25    **2.6 Change of Affiliation or Status**

26    *2.6.1 Change of Affiliation*
27
28    With the written agreement of the faculty member, the faculty member's affiliation may be
29    changed to a different local academic unit. The contract will reflect the new affiliation.
30
31    Transfer of affiliation may be initiated by the faculty member, by the dean, or by the local
32    academic unit officer to which the transfer is proposed. Eligibility is determined by the same
33    criteria used for an initial faculty appointment.
34
35    The faculty member will normally retain the same rank following the transfer. In special
36    situations, the faculty and local academic unit officer in the accepting unit may require the faculty
37    member to accept a lower rank. In no instance may a faculty member receive a promotion
38    through a change of affiliation.
39
40    A tenured faculty member transferring to another unit retains tenure. An untenured faculty
41    member must complete the same number of probationary years as remained in the former unit.
42    The number of years of probationary service may be extended upon agreement with the faculty
43    member.
44

Calvente-DePaul 000022

July 1, 2018

A member of a local academic unit may request an additional affiliation, resulting in a joint appointment. In such cases, the faculty, the dean, and the local academic unit officer in which the second appointment is to be made are responsible for evaluating and recommending the joint appointment. Joint appointments require the qualifications necessary for appointment at the tenure status and rank according to each unit's standards.

### 2.6.2 Change of Status

Any change in rank or tenure is a change of status. All changes of status must follow established procedures. A change of status does not confer tenure, unless the process meets the tenure procedures in this Handbook.

A change of status occurs if a tenure-line faculty member is not renewed. Such a faculty member is not eligible for a full-time faculty position for a period of five years. Faculty members denied tenure shall never be eligible for any faculty appointment.

A change of status also occurs if a full-time or part-time faculty member who is not a tenure-line faculty member seeks to become a tenure-line faculty member. The change of status from non-tenure-line to tenure-line requires evidence of a national search or a request from the local academic unit's faculty for a waiver from a national search. A waiver request must come from a majority of the local academic unit's tenure-line faculty and be approved by the dean and the provost. The change of status from non-tenure-line to tenure-line also requires participation of the local academic unit's tenure-line faculty, including at least a majority vote of that faculty as determined by procedures laid out in the local academic unit guidelines and the Faculty Handbook.

## 2.7 Summer Session Appointments

The dean, after consultation with the local academic unit officers, and considering the resources and needs of the college, decides which courses, workshops or other programs will be offered in the summer sessions and which faculty members will conduct them. Faculty members with a ten-month contract may accept or decline courses offered to them during the summer. The university does not guarantee summer session appointments.

University policy regarding summer course assignments consists of the following principles:

1. Two courses running concurrently constitute a full load; the dean's explicit approval is required for any overload assignment.
2. Faculty members receiving full summer compensation from an external grant may not be assigned summer courses unless such instruction is among the terms of the grant. Faculty members receiving partial summer compensation from an external grant may have a partial summer course assignment, provided that the combined compensation does not exceed the amount they could receive for a full summer course load.
3. Within the bounds established by principles #1 and #2, assignments should be made on an equitable basis.

Within the standards set by general university policy, each college develops its own policy for determining the programs to be offered over the summer and for making summer session appointments.

13

Calvente-DePaul 000023

July 1, 2018

1
2   For summer students enrolled for semester credit (4.5 quarter hours), faculty are expected to
3   assign additional work commensurate with the additional credit.
4
5   Full-time faculty members with ten-month contracts receive additional salary for teaching in the
6   summer. The rate of summer compensation is subject to periodic review involving the
7   participation of faculty members. Teaching in a summer session may be part of the normal
8   assignment of faculty members who have a 12-month contract, in which case no additional salary
9   is paid. Adjunct faculty members who teach in a summer session will receive the same
10  compensation as for a course offered during the academic year.
11

12  **2.8 Orientation of Faculty**

13
14  The Office of Academic Affairs offers a yearlong series of orientations for new full-time faculty,
15  including an introductory orientation at the beginning of each academic year. The Office of
16  Human Resources also offers frequent workshops describing personnel policies, benefits, and
17  general employee information. Colleges and academic units may offer additional academic
18  orientation.
19
20  Local academic units, colleges, and university offices are encouraged to provide comprehensive
21  orientation and ongoing development support for their term and adjunct faculty in order to
22  welcome and acculturate them to the DePaul community.

23  **2.9 Annual Reporting**

24
25  The provost will annually report to Faculty Council on the composition of the faculty including
26  tenure-line, term, and adjunct faculty; percentages of tenure-line, term, and adjunct faculty
27  appointments by academic units and colleges; current titles in use; and any other pertinent
28  information concerning faculty appointments. Academic deans shall report the same information
29  to their respective faculties annually.

Calvente-DePaul 000024

July 1, 2018

1 **CHAPTER 3.  PROMOTION AND TENURE STANDARDS AND**
2 **PROCEDURES**
3
4 3.1     Overview ...................................................................................................... 4
5 3.2     Probationary Service .................................................................................. 4
6 3.2.1 Length of Probationary Period ..................................................................... 4
7     3.2.1.1 Assistant Professors Credit for Prior Service ....................................... 5
8     3.2.1.2 Associate or Full Professors Credit for Prior Service ........................... 5
9     3.2.1.3 Non-tenure-line Full-Time Appointments ............................................ 5
10 3.2.2 Leaves of Absence ....................................................................................... 5
11 3.3     Types of Review for Tenure-Line Faculty ................................................. 5
12 3.3.1 Probationary Tenure-Line Reviews ............................................................. 6
13     3.3.1.1    Formal Tenure-line Probationary Reviews ....................................... 6
14     3.3.1.2 Informal Tenure-line Probationary Reviews ........................................ 7
15     3.3.1.3    The Tenure Review .......................................................................... 7
16 3.3.2 Promotion in Rank ....................................................................................... 7
17 3.4.     Criteria for Promotion and Tenure ........................................................... 7
18     3.4.1.     Requirements by Rank ....................................................................... 7
19     3.4.2     University-wide Criteria ...................................................................... 8
20         3.4.2.2     Scholarship, Research, or Other Creative Activities .................. 8
21         3.4.2.3     Service .................................................................................... 10
22     3.4.3     Local Academic Unit and College Guidelines ............................. 10
23     3.4.4     Institutional Considerations ............................................................ 11
24 3.5     Process for Tenure and Promotion ......................................................... 11
25 3.5.1 General Principles ...................................................................................... 11
26     3.5.1.1 Common Processes ............................................................................. 11
27     3.5.1.2 Guidelines Specific to Multi-Unit Appointments ............................... 13
28     3.5.1.3 Guidelines for Evaluating Collaborative Work .................................. 14
29     3.5.2     Processes Common to All Evaluation Levels ............................. 14
30     3.5.2.1     Signing Statement ................................................................... 15
31     3.5.2.2     Minority Report ....................................................................... 15
32 3.5.3 Local Academic Unit .................................................................................. 15
33     3.5.4     Local Academic Unit Is College ................................................. 16

1

Calvente-DePaul 000025

July 1, 2018

3.5.4.1 Personnel Committee (optional) ................................................................. 16

3.5.4.2    Tenured Faculty of the College ..................................................... 16

3.5.4.3    Dean ............................................................................................. 16

3.5.4.4    Candidate Response to College Review........................................ 16

3.5.5    Local Academic Unit Is Not College .................................................. 17

3.5.5.1    Local Academic Unit Personnel Committee (Optional) ....................... 17

3.5.5.2    Tenured Faculty of the Local Academic Unit................................ 17

3.5.5.3    Local Unit Academic Officer (Unit Chair or Director)................ 17

3.5.5.4    Candidate Response to Local Academic Unit Review .................... 17

3.5.5.5    College-Level Personnel Committee ....................................... 18

3.5.5.6    Dean ............................................................................................. 18

3.5.5.7 Candidate Response to College Review ..................................... 18

3.5.6    University Review ............................................................................ 18

3.5.6.1 University Board on Promotion and Tenure ..................................... 18

3.5.6.2 Candidate Response to UBPT .................................................... 19

3.5.6.3 Provost Decision ...................................................................... 19

3.5.7 Detailed Procedures ............................................................................. 19

3.5.7.1    Committees........................................................................... 19

3.5.7.2    Local Academic Unit (Not College) Personnel Committees ................ 19

3.5.7.3    Tenured Faculty of the Local Academic Unit........................ 20

3.5.7.4    College Personnel Committees ............................................ 20

3.5.7.5    University Board on Promotion and Tenure .......................... 20

3.6    Materials ............................................................................................... 21

3.6.1 Dossier ............................................................................................... 21

3.6.1.1 Items Supplied By Candidate................................................. 21

3.6.1.2 Items Supplied By Academic Unit and College ..................... 21

3.6.1.3 Additions to the Dossier ........................................................ 22

3.6.2 External Letters ................................................................................... 22

3.6.2.1    Authors of External Letters ................................................. 23

3.6.2.2    External Letter Contents ...................................................... 23

3.6.2.3    Confidentiality of External Letters....................................... 23

3.6.2.4    Suggested Sample Letter ...................................................... 23

3.6.3 Student Input ....................................................................................... 24

3.6.3.1 Student Input Instrument........................................................ 24

2

Calvente-DePaul 000026

July 1, 2018

1          3.6.3.2 Evaluation and Submission of Student Input Data ...................................... 25

2    3.7    Appeal .............................................................................................................. 25

3    3.8 Schedule for Informal and Formal Reviews ............................................................ 26

4    3.9    Schedule for Promotion and Tenure ...................................................................... 27

5

6

3

Calvente-DePaul 000027

July 1, 2018

# CHAPTER 3.  PROMOTION AND TENURE STANDARDS AND PROCEDURES

## 3.1     Overview

Faculty members contribute to DePaul University as the primary creators of a vibrant academic community. The university seeks to foster an environment that provides professors with enriching opportunities to guide students, pursue scholarship and creative activities, and advance the institution's well-being.

DePaul honors and rewards faculty members for their professional achievements. It maintains a system of faculty evaluation that relies heavily on the views of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal, promotion, and tenure.

Tenure is the foundation of academic freedom and the quality of the university.  It is neither an end in itself nor a privilege exempting the individual from the obligation to make future contributions. It is, rather, a status that society recognizes as promoting the common good. Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. Tenure creates the presumption of continuing employment, unless the university, using established procedures and faculty guidance, proves that countervailing circumstances exist.

This chapter sets out DePaul University's standards and procedures for evaluating its tenure-line faculty.

## 3.2     Probationary Service

The probationary period is defined as the candidate's time of continuous service in full-time tenure track at DePaul, at the end of which the tenure decision is made. During the probationary period, a tenure-line faculty member undergoes annual formal or informal evaluations for contract renewal or nonrenewal. In the final year of probationary service, the faculty member may apply for tenure and promotion. An unsuccessful candidate for tenure will not be offered a contract renewal, but will be offered a terminal contract of one year for the academic year following the academic year in which the faculty member applied for tenure.

### 3.2.1 Length of Probationary Period

The maximum probationary period is six years excluding certain types of leaves that suspend the clock as described in Section 3.2.2. The probationary period may be reduced by agreement based on full-time prior academic service. The initial tenure-line contract must state any agreed-upon credit for prior service.

4

July 1, 2018

1  **3.2.1.1 Assistant Professors Credit for Prior Service**
2
3  A prospective faculty member recruited to DePaul as an assistant professor may have previously
4  held a full-time faculty appointment at another college or university. The length of the
5  probationary period at DePaul may be reduced by one, two, or three years, upon agreement of the
6  individual and the university at the time of appointment. The initial faculty contract must state
7  any agreed-upon credit for prior service.
8

9  **3.2.1.2 Associate or Full Professors Credit for Prior Service**
10
11 A prospective faculty member recruited to DePaul as an associate or full professor may receive
12 an appointment without tenure. Upon agreement of the individual and the university at the time of
13 appointment, one, two, three, or four years of prior full-time faculty service at another college or
14 university may be credited to the probationary period at DePaul. The faculty member's initial
15 contract must reflect the agreed-upon amount of credit for prior service and the review schedule.
16 Regardless of the amount of credit, the individual will not be evaluated for tenure without having
17 had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.
18

19 **3.2.1.3 Non-tenure-line Full-Time Appointments**
20
21 As a general norm, the years a faculty member has spent at DePaul University in a non-tenure-
22 line full-time appointment (e.g., instructor or visiting professor) do not count toward the
23 probationary period. If a faculty member's status changes to a tenure-line appointment, the
24 individual and the university may agree to credit one or more years of special appointments
25 toward the probationary period. The faculty member's initial contract for a tenure-line full-time
26 appointment must reflect the agreed-upon amount of credit for the prior service at DePaul.
27 Regardless of the amount of credit, the individual will not be evaluated for tenure without having
28 had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.
29

30 *3.2.2 Leaves of Absence*
31
32 A leave of one quarter or longer may interrupt the faculty member's probationary period.
33
34 If an untenured tenure-line faculty member takes a leave as defined by DePaul policies, including
35 family or medical leave, research leave, teaching leave, or military service leave, the year during
36 which the leave occurs is normally not considered as a year of probationary service, and the leave
37 does not break the required continuity of full-time service. If the candidate, however, wishes for
38 the leave not to affect the length of the probationary period, he or she must notify the dean in
39 writing within six months upon return from the leave.
40 Faculty sometimes request and are granted a personal leave that does not fall into any of the
41 categories covered in the prior paragraph. If a candidate takes such a leave, the provost makes the
42 decision on how the leave affects the probationary period.  (Section 6.7.)
43

44 **3.3      Types of Review for Tenure-Line Faculty**
45

5

Calvente-DePaul 000029

July 1, 2018

1  *3.3.1 Probationary Tenure-Line Reviews*
2
3  During the probationary period, the probationary tenure-line faculty member will be subject to
4  annual probationary reviews conducted by the faculty member's local academic unit. In colleges
5  with departments, the local academic unit is, in colleges with departments, the department or
6  similar body. In other colleges, it is the lowest-level body conducting reviews for tenure and
7  promotion.
8
9  Probationary reviews serve three major purposes:
10
11  1.      To a        ssess the faculty member's progress toward promotion and tenure, measuring the
12  individual against the established criteria
13
14  2.      To provide clear and consistent guidance and develop priorities for the faculty member
15  toward fully satisfying the criteria, and
16
17  3.      To recommend for or against renewal.
18
19  Three types of probationary reviews apply to tenure-line faculty who are untenured: informal,
20  formal, and the tenure review.  Each evaluation leads to a decision for renewal or nonrenewal (see
21  also Section 4.2).
22
23  The dean normally makes a recommendation on annual renewal and nonrenewal. If the dean does
24  not concur in the recommendation of a local academic unit, the dean shares his or her
25  recommendation with the local academic unit. The local academic unit may appeal the dean's
26  recommendation to the provost.  In such cases, the dean and the department or unit provide the
27  provost with written reasons for their respective positions. The provost makes the final decision
28  and reports it to the candidate. A faculty member who is not renewed may file an appeal.
29  (Chapter 5)
30
31  A formal review must precede a decision in year five to issue a terminal contract. In case of
32  nonrenewal, the candidate is not eligible to apply for tenure or promotion.

33  **3.3.1.1  Formal Tenure-line Probationary Reviews**
34
35  A formal probationary review is designed to prepare a faculty member for the tenure process and
36  to document areas that need the faculty member's attention. In a formal review, the local
37  academic unit considers the candidate's personal statement and CV, evidence of scholarship or
38  documentation of creative activity, student evaluations, evidence of service, and other materials
39  specified by policies of the local academic unit or college.
40
41  Each local academic unit or its personnel committee conducts a formal review of untenured
42  tenure-line faculty no less often than every two years. The tenured faculty of the local academic
43  unit then vote by separate secret ballots on (1) adequate progress toward tenure and (2) renewal.
44  The faculty prepare a report that clearly details areas of strength and areas for improvement. The
45  report is explicit about the faculty member's progress towards tenure. Copies of this report are
46  forwarded to the candidate and the dean. The dean writes a separate letter to the provost with a
47  recommendation regarding renewal or nonrenewal. If a formal review raises serious concerns
48  about the candidate's potential for attaining promotion or tenure, the local academic unit faculty,
49  local academic unit officer, or dean may mandate that the next year's annual review be formal.

6

Calvente-DePaul 000030

July 1, 2018

1

### 3.3.1.2 Informal Tenure-line Probationary Reviews

The purpose of an informal review is to recommend for or against contract renewal and to address progress towards tenure in review periods when a formal review is not conducted.

In years in which a formal review is not conducted, the chair, dean, or, where applicable, appropriate committee conducts an informal review of the faculty member, according to processes specified in local academic unit or college policies, that results in a written recommendation to the provost, with a copy to the candidate.

### 3.3.1.3 The Tenure Review

The tenure review is the final review during the probationary period. It begins with the candidate's tenure application and concludes with the provost's decision to grant or deny tenure. It is a formal review involving university-wide consideration under detailed procedures. It includes solicitation of opinions from external reviewers and from students. The tenure review examines the faculty member's accomplishments and assesses the likelihood of future accomplishments.

Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission.

### *3.3.2 Promotion in Rank*

Ordinarily, an assistant professor applies for tenure and promotion simultaneously. The candidate receives either both promotion to associate professor and tenure or neither promotion nor tenure. Only an associate professor may apply for promotion for full professor.

A faculty member ordinarily serves three to six years in a given rank before promotion. See Section 3.5.1.1 (m) for details.

There is no limit to the number of times a faculty member may apply for promotion to full professor. In the event of a denial of promotion, the faculty member may not re-apply for promotion in the year immediately following the denial.

### 3.4.    Criteria for Promotion and Tenure

### *3.4.1.   Requirements by Rank*

**Assistant Professor.** The doctorate or terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and who give promise of continued academic development. The assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing scholarship, research, and/or other creative activities, and for service.

Calvente-DePaul 000031

July 1, 2018

**Associate Professor.** In addition to the requirements for assistant professor, the candidate must demonstrate consistently effective teaching performance. The candidate should also show evidence of notable scholarship, research, and/or other creative activities, and service. For this rank, the candidate should show significant involvement in university activities at the local academic unit and beyond. This rank is reserved for those with recognized academic achievements.

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities – the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

### 3.4.2 University-wide Criteria

DePaul University appoints, retains, promotes, tenures, and rewards faculty who best help the university fulfill its mission, as articulated in the university's Mission Statement and Faculty Handbook. The principal criteria for tenure and advancement in academic rank are: teaching and learning; scholarship, research, or other creative activities; and service. In evaluating faculty for promotion or tenure, local academic units specify more detailed guidelines that provide unit- and discipline-specific articulations of the university-wide criteria (Section 3.4.3.)

#### 3.4.2.1 Teaching and Learning

Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion, and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers. Effective teaching involves:

- Command of material
- Effective communication of subject matter
- Development and articulation of appropriate and thorough learning objectives for each course taught
- Delivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience
- Probing and fair methods of evaluating students
- Success in bringing students to an acceptable level of performance and in challenging them to grow intellectually and morally

Instructional activities outside the classroom, such as course development (individual or collaborative), academic advisement, accessibility to students, supervision of independent study, and contributions to meeting departmental instructional needs, are also relevant.

#### 3.4.2.2 Scholarship, Research, or Other Creative Activities

Throughout their professional lives, all tenure-line faculty members should engage in scholarship, research, or other creative activities. Each requires disseminating the results of completed projects in academic and artistic arenas outside DePaul.

Calvente-DePaul 000032

July 1, 2018

1   The university evaluates untenured tenure-line faculty based on their total output of work.
2
3   Scholarship, while including research, is a broader concept. Research traditionally refers to
4   discovery using the disciplinary methodologies for investigation and production of new
5   knowledge in the humanities, social and natural sciences, and mathematics. Research is usually
6   shared through presentations at professional meetings and academic publications. Scholarship is
7   a broader term encompassing the four separate but overlapping functions of a quality faculty
8   member: discovery, integration, application, and teaching.
9
10      • Original discovery advances knowledge within the context of a disciplinary or
11        multi-disciplinary field and practice, contributing significantly to knowledge and
12        the intellectual life of the university. Research falls into the category of
13        discovery.
14      • Integration develops knowledge through cross- and multi-disciplinary
15        investigations, allowing new fields of inquiry to develop.
16      • The application of knowledge uses research findings in responsible ways to
17        address contemporary societal problems through interaction with the larger
18        community.
19      • The study of teaching experiences leads to the development of better pedagogical
20        methods and tools.
21
22  Creative activities refer to activities other than scholarship. Creative activities result in products
23  in the fine arts, such as the visual arts, the literary arts, and the performing arts, and their
24  combinations and supportive activities. These can also be addressed as objects of scholarship
25  through any of the four functions listed above.
26
27  Evidence of research, scholarship, or creative activities should include, at a minimum:
28      • A current and complete curriculum vitae
29      • Copies of the project results where feasible
30      • If applicable, documentation sufficient to substantiate the candidate's
31        contributions to collaborative projects, as specified in the local academic unit
32        guidelines
33      • Assessment of the contributions by professional peers and other experts in the
34        field
35      • Self-assessment concerning scholarly or creative growth and development
36
37  The University evaluates research, scholarship, and creative activities in light of their:
38      • Originality
39      • Contribution to knowledge
40      • Conceptual or artistic sophistication
41      • Intellectual rigor or artistic skills
42      • Effective application of knowledge to address human problems or needs
43      • Effective communication of knowledge to audiences beyond the classroom
44
45  Scholarship or creative activities that cannot be evaluated by these criteria will not be considered
46  for promotion and tenure. An academic unit may evaluate oral presentations or creative activities
47  by various means including (but not limited to) listening to recordings, examining drafts, or
48  soliciting the views of other scholars (including other members of the DePaul faculty) who were
49  in attendance.
50

9

Calvente-DePaul 000033

July 1, 2018

1  Activities conducted solely within the candidate's classes, or designed merely to keep a candidate
2  abreast of scholarly development in a field, are considered in evaluating the candidate's teaching,
3  not in evaluating his or her contributions in scholarship, research, or other creative activities.
4

5  **3.4.2.3  Service**
6

7  Service consists of documented activities that
8      • Benefit the university and its academic units, professional associations, the
9        community, or the broader public
10     • Are consistent with the university's mission
11     • Clearly benefit from the expertise of the faculty member -- either the specialized
12       expertise of the faculty member's field or the professional skills possessed by all
13       members of the faculty
14

15  Service may be provided to the university, the profession, and the community. The amount and
16  nature of service are correlated with academic rank.
17

18  University service consists of contributions to the enhancement of the institution's internal
19  processes and its relationships with external bodies. All faculty members must serve in their local
20  academic unit (unless assigned to a position such as associate dean that precludes such service).
21

22  Professional service consists of contributions to the organizations or associations of the faculty
23  member's academic discipline or the professoriate. Professional service may have a component of
24  scholarship or creative activities.
25

26  Community service activities contribute to the public welfare outside the institution, consistent
27  with the Vincentian tradition of DePaul University. Activities consistent with a faculty member's
28  expertise but that could be done by someone without that expertise do not qualify as community
29  service. In some instances, it will not be obvious whether an activity counts as community
30  service. In those cases, it is the responsibility of the candidate to make the case demonstrating that
31  the activity qualifies as service as the term is used here.
32

33  ### 3.4.3   Local Academic Unit and College Guidelines
34

35  Local academic units and colleges have the responsibility to adopt written guidelines and policies
36  for tenure-line faculty evaluation. These guidelines have two purposes: (1) they provide unit- or
37  college-specific articulations of university-wide criteria based on the professional discipline,
38  field, or interdisciplinary area, including collaborative work, as applicable; and (2) they describe
39  unit- or college-specific procedures and processes used for promotion and tenure. The guidelines
40  must be consistent with the university's criteria and procedures specified in this Faculty
41  Handbook. In the absence of approved unit or college guidelines, the guidelines of the higher
42  level will apply.
43

44  The faculty of the local academic unit bear the primary responsibility for developing and
45  amending guidelines. Guidelines should include at least these elements:
46      Criteria
47      a) Statement of discipline-specific articulations for university-wide criteria and
48         expectations for teaching, research and creative activities, and service

10

Calvente-DePaul 000034

July 1, 2018

b) Specification of standards for different forms of scholarship within the discipline (or interdisciplinary field)

Process
a) Uniform policies detailing the process used for evaluations
b) Composition of the personnel committee, if any
c) Policies on remote participation in meetings
d) Explanation of participation by, or exclusion of, faculty who are unavailable at the time of the evaluation for reasons such as illness or leaves of absence. (Reviewers allowed to participate must have read the dossier in advance.)
e) Guidance on whether reviewers must have attained at least the rank that the candidate seeks
f) Process for amending guidelines

College guidelines should reflect the input of their constituent academic units, where applicable.

The University Board on Promotion and Tenure reviews changes in the guidelines prepared by local academic units and colleges. The UBPT determines whether the guidelines are clear and consonant with the general university-wide criteria and procedures for promotion and tenure. If the UBPT finds local academic unit or college guidelines to be unclear or inconsistent with university requirements, it will inform the local academic unit or college in writing with the expectation that the guidelines will be revised. In the absence of guidelines or if the guidelines have not been approved by the UBPT, the guidelines of the higher level will be used.

Approved guidelines included in official documents of academic units are binding, as are the university-wide criteria and processes. Should there be inconsistencies in the guidelines and criteria of different evaluation levels, those of the higher level prevail.

### 3.4.4   Institutional Considerations

Merit is not the sole consideration for professional advancement at DePaul University. Institutional need also plays a role in the renewal and tenure of untenured faculty. In planning the number and qualifications of faculty to meet future needs and the resources required to support the faculty, the university may – after consultation with the faculty – limit the number or proportion of tenured positions in the university or in any of its academic units. In such instances, tenure would not be granted regardless of the faculty member's qualifications and length of service. The university will notify affected faculty members promptly upon the adoption of any such limitation.

### 3.5      Process for Tenure and Promotion

### 3.5.1 General Principles

The following general principles guide promotion and tenure reviews:

### 3.5.1.1 Common Processes

11

Calvente-DePaul 000035

July 1, 2018

a) There are normally three levels of evaluation prior to the final decision of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university.

b) An individual faculty member may vote or advocate for or against a candidate only at one level in the review process. Members of UBPT must vote only on the UBPT. In units where the local academic unit is not the college, college policy must specify whether college personnel committee members vote at the college or the local academic unit level. However, members of a local academic unit personnel committee may fully participate and vote in both the personnel committee's evaluation and the local academic unit evaluation.

c) All votes are by secret ballot and the numerical results are recorded. A tie vote will be interpreted as a recommendation against renewal or against an award of tenure or promotion.

d) Candidates receive the written reports and vote counts at each step in the process promptly as those materials become available. Candidates receive external letters with information identifying the reviewer redacted.

e) Candidates receive copies of any additions to a dossier.

f) Each level of evaluation is substantive and judges the candidate on the merits according to the university's criteria and the guidelines of that level of review. In addition to substantive review, reviewers after the initial level consider the method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic unit. Relevant issues include matters of stringency, consistency among candidates, and fairness, as well as the implications the decision may have at the college, school, or university level.

g) All individuals participating in the process at any stage must respect its confidentiality. They must not reveal votes, the names or views of referees, the contents of discussions, or the contents of the dossier to anyone. Intentional or continuing breaches of confidentiality are considered to be serious violations of professional ethics. Local academic units and colleges must take appropriate steps to maintain confidentiality, including during the physical preparation of the dossier and dossier storage. It is unwise to make a broad electronic distribution of the dossier; instead password-protected web sites can be used. All documentation will be retained in accordance with the Records Management policy.

h) Faculty members should always avoid conflicts of interest in evaluating individual faculty members for appointment, renewal, tenure, or promotion. The university expects the provost, deans, local academic unit administrators, and all other internal faculty reviewers to acknowledge such conflicts openly and to abstain from participation whenever conflicts arise.

i) Faculty members receive tenure only upon affirmative award by DePaul University. Each year, eligible tenure-line faculty may apply for tenure and/or promotion. By April 1, the Office of Academic Affairs will notify eligible faculty in writing of the deadline for submitting an application for promotion and tenure or promotion for the

12

Calvente-DePaul 000036

following year. The faculty member must submit his or her request to the local academic unit officer, academic dean, and the Office of Academic Affairs by the stated deadline, typically May 1.

j) Requests for tenure submitted before the year of eligibility will not be accepted. If a faculty member eligible for tenure consideration fails to apply by the application deadline he or she forfeits the opportunity for tenure consideration and receives a terminal contract of no more than one year's duration.

k) Failure to meet the application deadline for promotion to full professor postpones consideration until the next academic year. There is no limit to the number of times a faculty member may apply for promotion to full professor, except that a candidate may not re-apply in the year immediately following a decision denying promotion.

l) The provost will acknowledge receipt of applications for promotion, for tenure, or for promotion and tenure, no later than May 15. For candidates with tenure who are seeking promotion to full professor, the provost will advise all candidates of the right to withdraw an application for promotion at any time, without prejudice to future applications.

m) Faculty members are normally expected to serve a minimum of three to six years, depending on the practice of their college, in a given rank before promotion to the next rank. Exceptions to the norm are allowed only when the dean and, if one exists, college personnel committee, certify that the candidate's extraordinary performance, under departmental, school, and college guidelines, warrants early application for promotion.

n) Candidates may continue through all stages of evaluation, regardless of a negative recommendation at any stage.

**3.5.1.2 Guidelines Specific to Multi-Unit Appointments**

a) If a faculty member has a formal appointment in more than one academic unit, the home academic unit specified in the appointment letter evaluates the candidate. The second unit evaluates the candidate if it so chooses, or if requested to do so by either the candidate or the home unit. The second unit conducts an independent evaluation and makes a recommendation based on the candidate's responsibilities in that unit. The second unit may review the reference letters and student input from the home academic unit. The report of the second unit will be forwarded to the home unit for its consideration and inclusion in the dossier.

b) A faculty member who changes formal appointments during the period under evaluation shall be evaluated by both academic units. Either unit may, upon request, have access to the other unit's documentation. Each academic unit sends the candidate's supporting documents and the unit's evaluation to the next higher level unit.

c) A faculty member with a formal appointment in only one department or local academic unit may have formally assigned duties in one or more other units. In

13

Calvente-DePaul 000037

July 1, 2018

evaluating the faculty member, the home unit shall invite the other units to submit evaluations, which the home unit will include with its evaluation. At each stage in the review process, the evaluations will receive weight in the approximate portion of the workload assignment to each entity. Ultimately, the recommendation to the next level of review rests with the home academic unit.

### 3.5.1.3 Guidelines for Evaluating Collaborative Work

Collaborative activities within and across units are valued at DePaul. If collaborative work is submitted as part of the dossier, it must be evaluated as part of tenure and promotion review. Individual contributions to collaborative work should be described specifically by the candidate and documented by team members. Evaluators should consider that collaborative work may be especially labor-intensive, may be disseminated in non-traditional forms, and may blur the conventional distinctions between research and teaching and service. Local Academic Units should specify in their guidelines the processes and policies governing the evaluation and weight of collaborative work in the tenure and promotion review.

### *3.5.2 Processes Common to All Evaluation Levels*

At all levels of evaluation the following processes must be followed:

a) Additions to the dossier may be made in accordance with the guidelines in this chapter.

b) The reviewing body's numerical vote must be reported to all subsequent levels.

c) All documents considered at each level must be passed on to subsequent levels. The candidate has access to all documents being considered, but the candidate's copies of the external reviewer letters must have the reviewer's identifying information redacted.

d) The local academic unit officer (e.g., department chair) or academic dean, as applicable, informs the candidate of the decision, numerical vote, and all grounds for the decision before transmitting the dossier to the next level.

e) All decisions or recommendations shall be reported promptly to the academic administrator of the prior level, along with the reasons for any recommendations differing from the prior level's recommendation.

f) All tenured faculty members of a candidate's local academic unit, members of the college personnel committee, and members of the UBPT are permitted and expected to vote by a secret ballot at a meeting in which the candidate's application is reviewed and discussed, exempting those faculty who may be unable to participate due to approved leaves of absence. Under no circumstances may a vote be cast through a proxy at any level in the retention, promotion or tenure process. However, faculty in absentia may vote only if they use technology that permits simultaneous participation in the review meeting and conveyance of their secret ballot at the time

14

Calvente-DePaul 000038

July 1, 2018

of the vote. Moreover, faculty who vote in absentia are required to have reviewed a candidate's materials before the academic unit's official vote. Only those faculty having a valid excuse as defined in the unit guidelines may attend and vote using technology. Likewise, no faculty member is permitted to add his or her vote or change his or her vote after the votes have been tallied.

g) The report on a recommendation shall fully discuss both strengths and weaknesses in the record so as to provide an explanation for positive and negative votes. All faculty participating in the decision will read the final report of the unit's recommendation and sign one of two forms. One form indicates that the faculty member agrees that the report accurately describes the discussion of the unit. The other form indicates that the report does not accurately describe the unit's discussion. The faculty member's signature does not reflect his or her vote. Faculty who sign the form indicating inaccuracy of the report must provide a signed statement, known as a signing statement, explaining why they believe the report does not accurately describe the discussion. In the event a faculty member is unwilling or unable to sign one of the two forms, the report will go forward with an explanation from the person responsible for gathering the signatures.

## 3.5.2.1  Signing Statement

A faculty member who believes that an evaluation level report did not accurately reflect the discussion during deliberation for promotion or tenure must prepare a signing statement. The signing statement explains the individual's disagreement with the report's characterization of the meeting. It is restricted to how the evaluating unit or committee report allegedly mischaracterized the discussion. The statement may not present information or opinions about the candidate beyond those offered during the meeting. It need not indicate the author's position on the candidacy.

Signing statements must be shared with both the candidate and all faculty members of the unit or committee who were involved in the discussion at issue.  Signing statements are due five business days after the recommendation goes to the next level.

## 3.5.2.2  Minority Report

An allegation that an evaluating unit violated its guidelines, criteria, or processes, or those of the university, takes the form of a minority report.

A minority report is restricted to how the evaluating unit or committee violated guidelines, process, or criteria. It may not present information or opinion about the candidate beyond that offered during the meeting.

Minority reports must be shared with both the candidate and all faculty members of the unit or committee. The deadline for the minority report is five business days after the recommendation goes to the next level. The evaluating unit or committee has five business days to respond to the minority report. These documents must be added to the dossier for subsequent levels of review.

## *3.5.3 Local Academic Unit*

Calvente-DePaul 000039

July 1, 2018

The local academic unit is the unit that conducts the first level of review in the promotion and tenure process. Some colleges are the local academic unit. In other colleges, the local academic unit might be a school, a department, or a program. A college may have departments that do not function as local academic units. For example, in the 2012-2013 academic year, the following colleges functioned as local academic units: College of Communication, College of Law, School of Music, The Theatre School, and The School for New Learning.

### 3.5.4 Local Academic Unit Is College

When the local academic unit is the college, the two levels of review are the college and the university. The college must follow uniform, written guidelines describing the evaluation process. Participation in the tenure and promotion review process is limited to tenured faculty.

#### 3.5.4.1 Personnel Committee (optional)

A local academic unit may choose to convene a personnel committee consisting of a subset of the tenured faculty of the unit, excluding the dean. The committee must have at least three members. The personnel committee, if one exists, evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The personnel committee vote cannot be used in lieu of any full tenured faculty vote.

#### 3.5.4.2 Tenured Faculty of the College

The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and provides a report for the dossier. This report may adapt or adopt a personnel committee's report, but it must reflect the unit's discussion. Unit guidelines may limit the right to vote on a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's personnel committee vote in the evaluation by the unit's tenured faculty.

#### 3.5.4.3 Dean

The approved procedures of the local academic unit must stipulate whether the dean may attend the meeting of the tenured faculty of the college in the two-level process. If the dean attends, he or she may participate but not advocate or vote. The dean writes a separate report for the dossier expressing his or her evaluation.

#### 3.5.4.4 Candidate Response to College Review

After the dean provides the candidate with all reports from the college review, the candidate has the option to write a response which will be placed in the dossier for review by the UBPT. The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT. The hearing must be scheduled to provide the candidate with at least five business days to respond to the report. A response may address only the candidate's issues or concerns with the college-level reports.

The next evaluation level is the university level.

Calvente-DePaul 000040

July 1, 2018

### 3.5.5   Local Academic Unit Is Not College

If the local academic unit is not the college, it is typically a department, school, or program subordinate to a college.  The three levels of review are: local academic unit, college, and university. Each level of review must follow uniform, written guidelines describing the evaluation process. If there is an insufficient number of tenured faculty available in the local academic unit, the dean may appoint tenured faculty from related academic units to the review process. Participation in the tenure and promotion review process is limited to tenured faculty.

**3.5.5.1  Local Academic Unit Personnel Committee (Optional)**

A local academic unit may choose to convene a personnel committee consisting of a subset of the tenured faculty of the unit. The committee must have at least three members. The local academic unit officer may not be a member but may attend.  The personnel committee, if one exists, evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The personnel committee vote cannot be used in lieu of a vote by the unit's entire tenured faculty.

**3.5.5.2  Tenured Faculty of the Local Academic Unit**

The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and provides a report for the dossier. This report may adapt or adopt a personnel committee's report but must reflect the unit's discussion. Units may establish written procedures limiting the vote on a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's personnel committee vote as part of the evaluation by the unit's tenured faculty. If the local academic unit has fewer than five eligible tenured faculty members, the dean, after consultation with members of the unit, will appoint tenured faculty of the appropriate rank to the evaluation committee from related academic units.

**3.5.5.3  Local Unit Academic Officer (Unit Chair or Director)**

The local unit academic officer may participate in the discussion by tenured faculty of the unit, but will not vote on or advocate for or against the candidate's promotion or tenure. The unit academic officer will write a separate report for the dossier expressing his or her evaluation.

**3.5.5.4  Candidate Response to Local Academic Unit Review**

After the local academic unit officer provides the candidate with all reports from the review, the candidate has the option to write a response which will be places in the dossier for all subsequent levels of review.  The response, if any, must be submitted to the dean and the local academic unit officer at least two business days prior to the prior to the scheduled date of the candidate's hearing by the college personnel committee. The hearing must be scheduled to provide the candidate with at least five business days to respond to the report.  A response may address only the candidate's issues or concerns with the local academic unit's reports.

Calvente-DePaul 000041

July 1, 2018

**3.5.5.5  College-Level Personnel Committee**

In colleges with a college-level personnel committee, this committee conducts a separate evaluation of the candidate, votes by secret ballot, and writes a report for the dossier. The college personnel committee is a subset of the tenured faculty from the college with broad representation from different units within the college. The minimum number of members on any college personnel committee is five. Only tenure-line faculty may vote in membership elections for those committees that are elected. The college-level committee must have representation from tenured faculty at the rank of full professor. Members of the college personnel committee who voted at the local academic unit may not vote at the college level.  If so specified in the college's guidelines, the dean may participate in the meeting of the college personnel committee, but may not vote or advocate for or against a candidate. The report of the college personnel committee is provided to the dean of the college. There is no college-wide tenured faculty vote.

**3.5.5.6  Dean**

The dean provides a separate evaluation of the candidate for the dossier.

**3.5.5.7 Candidate Response to College Review**

After the dean provides the candidate with all reports from the review, the candidate has the option to write a response which will be placed in the dossier for the UBPT.  The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT.  The hearing must be scheduled to provide the candidate at least five business days to respond to the report.  A response may address only the candidate's issues or concerns with the college's reports.

The next evaluation level is the university review.

***3.5.6   University Review***

**3.5.6.1 University Board on Promotion and Tenure**

The University Board on Promotion and Tenure (UBPT) evaluates the candidate, votes by secret ballot on tenure, promotion, or both and provides a written report summarizing the basis of its recommendation, including the vote count. In evaluating the candidate, the UBPT takes the following steps:

      a.  Reviews the full dossier.

      b.  Conducts a hearing, with five of the seven appointed faculty members constituting a quorum. The provost is expected to be present when a candidate is being reviewed. In exceptional circumstances, a designee may attend in the provost's absence.  The candidate, the local academic unit officer (when applicable), and the college dean are expected to appear before the UBPT.

      c.  Conducts a substantive review applying current university-wide standards and criteria for tenure and promotion.

18

     d.   Examines the application of lower-level guidelines to the candidate.

     e.   Prepares its recommendation, which it shares with the candidate and the provost.

**3.5.6.2 Candidate Response to UBPT**

The candidate has the option to write a response to the UBPT evaluation which will be added to the file and sent to the provost for his or her consideration. A response must focus only on issues or concerns the candidate may have with the UBPT report. The deadline for this response appears in the calendar.

**3.5.6.3 Provost Decision**

The provost makes the final decision on tenure or promotion. Only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by the UBPT.

If the provost's decision differs from the UBPT recommendation, the provost must prepare a written explanation of the decision and provide it to the UBPT, the candidate, the dean, and the local unit academic officer (if different from the dean).

*3.5.7 Detailed Procedures*

**3.5.7.1  Committees**

The following rules apply to the various committees conducting reviews for tenure and promotion.

Only tenured faculty may sit on any committee evaluating a faculty member for tenure or promotion at any level of evaluation; only tenure-line faculty may vote in membership elections for those committees that are elected.

Except where otherwise provided in this chapter, a local academic unit or college may adopt written standards for its evaluative committees that address tenure and promotion.  The standards may address, among other topics:
- Committee membership
- Criteria for chairing the committee
- Rank and status of faculty who may elect members of the committee
- Rank of members who may vote on promotion to full professor
- Term length for committee membership
- Process for election of the committee chair

**3.5.7.2  Local Academic Unit (Not College) Personnel Committees**

Members must be tenured and at least associate rank.  The committee must have at least three members. The tenure-line faculty of the local academic unit elect the personnel committee, and the personnel committee elects its chairperson.  The local academic unit academic officer may not

19

Calvente-DePaul 000043

July 1, 2018

be a member of this committee. The officer may participate in committee meetings but shall not advocate for or against the candidate or vote.

### 3.5.7.3 Tenured Faculty of the Local Academic Unit

All and only tenured faculty of at least associate rank are expected to participate in votes for tenure and promotion at the local academic unit level. For promotion to full professor, the local academic unit may limit votes to full professors. If the local academic unit has fewer than five eligible tenured faculty members, the dean, after consultation with members of the unit, will appoint tenured faculty of the appropriate rank to the evaluation committee from related academic units.

The tenured faculty of the local academic unit elect a chair to conduct these promotion and tenure meetings and to organize the reports. The chairperson may not be the local academic unit academic officer. If the local academic unit is not the college, the local academic unit officer may participate at promotion and tenure meetings but shall not vote or advocate for or against the candidate. If the local academic unit is the college, college procedures should stipulate whether the dean may attend the meeting of the tenured faculty. If the dean attends, he or she may participate but not advocate or vote for or against the candidate.

### 3.5.7.4 College Personnel Committees

Only tenured faculty may serve on a college personnel committee. College guidelines may limit the membership to full professors. College guidelines should also address how to convene an adequate number of full professors for deciding promotion to full professor. The minimum number of members on any college personnel committee is five. Terms are three years and are staggered. The committee members elect a chairperson for a one-year term. The chairperson conducts meetings of the committee and organizes the committee's reports. The dean shall not be the chairperson of the committee. The dean may participate in college personnel committee meetings but shall not vote or advocate for or against a candidate.

### 3.5.7.5 University Board on Promotion and Tenure

The UBPT members must be tenured full professors. Associate deans, deans, and local academic unit officers (e.g., department chairs) are ineligible to serve. The seven members of the UBPT serve as representatives of disciplines across the university, not as representatives of their colleges. Members are selected by open nominations and self-nominations across colleges, reviewed by Faculty Council Committee on Committees, and interviewed and elected by Faculty Council. Terms are for three years and are staggered. The UBPT members elect a chairperson annually. The provost or his or her designee is expected to be present at all UBPT meetings where candidates are reviewed; he or she shall not vote or advocate for or against any candidate.

The UBPT has two additional responsibilities. First, it reviews changes to evaluation guidelines, criteria and procedures developed by local academic units, departments, schools, and colleges for clarity and consonance with university-wide criteria. Second, at the conclusion of each year's proceedings, the UBPT shares any recommendations it may have with the provost regarding the board's future functioning.

Calvente-DePaul 000044

July 1, 2018

The provost and the chair of the UBPT refer any policy matter raised by UBPT members to the Faculty Council; the provost also makes available to the full faculty an annual statistical summary of the university's final tenure and promotion decisions.

## 3.6     Materials

### *3.6.1 Dossier*

#### 3.6.1.1 Items Supplied By Candidate

A candidate for promotion and/or tenure supplies the following materials:

- Complete professional curriculum vitae, paginated with the candidate's name on each page
- A statement of up to 3,000 words in which the candidate emphasizes those achievements or qualifications to which evaluators should particularly attend
- Evidence of collaborative work, if applicable
- Evidence of teaching effectiveness beyond course evaluations and peer reviews, including, at a minimum, selected syllabi, course assignments, and exams
- Evidence of service, including, at a minimum, description of individual contributions and supporting documentation such as letters from committee chairs
- Other evidence he or she may wish to submit, e.g., awards and special recognitions
- A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities

#### 3.6.1.2 Items Supplied By Academic Unit and College

The local academic unit and college committee add the following materials to the dossier:

- Local academic unit and college guidelines
- The written recommendation(s) from the reviews conducted at each level, including signature forms
- Signing statements and minority reports, if any
- Candidate responses, if any
- Data obtained by the college through the student input instrument
- Documentation that substantiates according to the local academic unit guidelines, and with sufficient detail, the faculty member's contributions to any collaborative work submitted in the Dossier.
- For tenure, an evaluation of the candidate's scholarship, research, and/or other creative activities by at least two external experts
- For promotion to full professor, an evaluation of the candidate's scholarship, research, and/or other creative activities by a minimum of three external experts
- For tenure decisions, all teaching evaluations for all courses. For promotion, all teaching evaluations while in current rank
- Internal peer reviews of teaching, if any

21

Calvente-DePaul 000045

July 1, 2018

Review is limited to these items, unless the local academic unit approves any additions to the dossier. Unsolicited material will not be added to the dossier.

**3.6.1.3 Additions to the Dossier**

Because of the length of the review process, it is possible that a candidate's record may change significantly or that other information pertinent to a case may come to light during the course of the review.

After the initial submission of the dossier to the local academic unit, the candidate may request the addition of new information to the dossier at any level of the review process prior to the final vote by the UBPT. The request for additions to the dossier must be made to the local unit academic officer and must include supporting documentation to verify the accuracy of the new information. The local academic unit officer must rule on the request within five business days of receiving it.

The local unit academic officer will determine whether the new information should be added to the dossier based on one or more of the following criteria:

- The new information constitutes an update to the status of scholarly or creative work already mentioned in the dossier.
- The new information constitutes a significant development, such as the announcement of a major award or recognition, related to the candidate's work already reported in the dossier.
- The new information is not related to work previously reported in the dossier but, in the judgment of the local unit academic officer, may have significant impact on the outcome of the case.

The local academic unit officer of the originating unit must formally transmit all new material approved for addition to the dossier directly to the level at which the case is currently under review and include with the new material an explanation of the reasons for the addition and at what level of review the new information became available. The entity currently reviewing the case should add these new items to the candidate's dossier, evaluate them along with the rest of the dossier, and provide them to subsequent levels of review.

The local academic unit officer shall also supply copies of the explanatory memorandum to the candidate and to the individual in charge of each level already completed at the time the material is added.

*3.6.2 External Letters*

By June 1, candidates must submit to the local academic unit officers their CV and selected publications/documentation of creative activities for transmittal to external reviewers. Local academic units should identify an initial list of potential external reviewers by June 15. Local academic units will ask external reviewers to prepare letters over the summer for receipt prior to candidate review in the fall.

22

July 1, 2018

**3.6.2.1 Authors of External Letters**

Local academic units should obtain letters from persons whose judgment is respected in the candidate's field of expertise and who can provide an impartial assessment of the candidate's scholarship or creative activities. The candidate may nominate external reviewers. The local academic unit may select from the candidate's nominations or from other sources. When identifying external reviewers, candidates and committees should take into account both the objectivity of the reviewer and the reviewer's rank, reputation, and stature. The local academic unit has full discretion in selecting external reviewers.

If a candidate has done collaborative work, a separate set of letters can be solicited and submitted from collaborators in addition to, but not as a substitute for, the external review letters. The university's letters to collaborators should request that they describe the division of labor and nature of the collaborative effort.

**3.6.2.2 External Letter Contents**

The solicitation letter to a potential reviewer should be neutral, asking only for an objective assessment of the candidate's research or creative activities and requesting that the reviewer eschew advocacy for or against tenure and promotion. The solicitation letter should also ask the reviewer to explain the nature of the reviewer's relationship to the candidate. The letter should ask the evaluator to cover the following general ground:

- the nature of the evaluator's professional interactions with the candidate
- the quality of the candidate's work
- the impact of the candidate's work

Readers will disregard any portions of an external letter advocating for or against tenure and promotion.

**3.6.2.3 Confidentiality of External Letters**

Under Illinois state law, a candidate may see the contents of his or her personnel file, with an exception applicable to external review letters. To ensure that reviewers provide fully candid assessments, the university protects the identity of the external reviewers. Therefore, any citations of the external review letters in department or chair reports and the reports of subsequent reviewing levels must be redacted, eliminating any and all information that would identify the reviewer to the candidate. Local academic units must also ensure that external review letters given to the candidates are redacted to protect the authors' identities.

**3.6.2.4 Suggested Sample Letter**

Dear Dr. AA:

As you are a recognized authority in your field, I am writing to request your assistance. Dr. BB is due to be reviewed for promotion to Associate Professor in academic year YYYY-YYYY. I solicit your evaluation of the research [creative activities] of Dr. BB. Please only evaluate the candidate's research or creative activities and refrain from rendering a judgment on whether the

23

Calvente-DePaul 000047

July 1, 2018

1  candidate should be promoted or tenured.  Your identity will be kept confidential to the extent
2  legally practicable.
3
4  In particular, please address the following:
5
6      • the quality of the publications or creative activities of the candidate
7      • the impact of the candidate's work
8      • the quality of the journals in which the candidate has published
9      • the nature of your professional interaction with the candidate, if applicable, and
10     • comments, should you have any, of the candidate's collaboration with other scholars in
11         the field.
12
13  To assist in your evaluation, I am enclosing the following information: Dr. BB's latest curriculum
14  vitae; the three papers or book manuscript listed below, selected by Dr. BB; and a brief summary
15  of the department's [local academic unit's] promotion criteria.
16
17  Although Illinois state law allows employees to view their personnel files, there is an exception
18  for external review letters.  Any information that would identify you will be redacted from all
19  documents seen by the candidate.
20
21  I realize that this information is rather extensive and will require considerable effort on your part
22  to review.  Your assistance in helping us evaluate Dr. BB's credentials will be greatly appreciated
23  and will constitute an important element in the overall evaluation.  I would be very grateful if you
24  could respond to us in writing no later than [DATE].  If possible, kindly send your reply, along
25  with a copy of your most recent CV, electronically to ........@depaul.edu as an attachment.
26
27
28  Sincerely,
29  DD
30  Chair
31  Personnel Committee
32  [Name of Dept. and Unit]
33  Enclosures: [List the selected works]
34

35  *3.6.3 Student Input*

36
37  Student input must be part of a candidate's dossier. Committees will acquire student input from
38  course evaluations and information collected through an instrument such as a survey. The college
39  will design the instrument with student input. The instrument will generally solicit opinions from
40  one or more of the following groups: alumni, past students who have taken a class from the
41  candidate, student advisees, or students who have been supervised by the candidate in research
42  projects or independent study.
43

44  **3.6.3.1 Student Input Instrument**

45
46  Each college personnel committee, or in the absence of a college-level committee, the local unit
47  personnel committee, shall have an instrument for collecting data from students, a process of
48  gathering data, and a template for reporting the results.  These elements must be created by a

Calvente-DePaul 000048

July 1, 2018

committee of at least two students (preferably including both graduate and undergraduate) and at least two tenured faculty members.

The instrument will be used to gather additional data from students beyond the standard course evaluations. The report should clearly specify:

- the type of methodology used for data collection and analysis
- the targeted groups surveyed, and
- the questions asked of survey participants.

The college personnel committee must approve the instrument, process, report template and any subsequent modifications. Before approval, the college personnel committee should solicit and consider input from the college's local academic units.

### 3.6.3.2 Evaluation and Submission of Student Input Data

The college bears responsibility for data collection. A student review committee then analyzes data collected via this process for each promotion and tenure candidate, as well as aggregate information on course evaluations provided by the unit. The student review committee consists of up to three students, none of whom is currently enrolled in a class with the candidate under review. After analyzing the collected data, the review committee provides a written report, along with all the raw data, to the personnel committee of the local academic unit and to the candidate. The student input data becomes part of the candidate's dossier. The personnel committee may request a meeting with a representative from the student review committee, if the committee deems it necessary.

Once student representatives furnish their report to the local academic unit, they do not appear before subsequent evaluative bodies. The student report will be forwarded with other promotion and tenure materials to each review level.

## 3.7    Appeal

*Appeal procedures for a tenure-line faculty member who has been reviewed for tenure, promotion, or promotion and tenure by the University Board on Promotion and Tenure are found in Chapter 5 Section 5.1.2.3.*

Calvente-DePaul 000049

July 1, 2018

1    **3.8 Schedule for Informal and Formal Reviews**
2
3

| PROBATIONARY REVIEWS FOR TENURE-LINE FACULTY WITH SIX-YEAR PROBATIONARY PERIOD* | | | |
|---|---|---|---|
| **Year at DePaul** | **Timing and Contract Year** | **Type of Review** | **Notice to Faculty Member of Renewal or Nonrenewal** |
| 1st | Winter quarter of first year at DePaul, for Year 2 contract renewal | May be informal or formal | March 1 |
| 2nd | Fall quarter of second year at DePaul, for Year 3 contract renewal | One of these 2 reviews must be formal; the other may be informal or formal. | December 15 |
| | Spring quarter of second year at DePaul, for Year 4 contract renewal | | June 30 |
| 3rd | During third year at DePaul, with timing per college's schedule, for Year 5 contract renewal | May be informal or formal | June 30 |
| 4th | During fourth year at DePaul, with timing per college's schedule, for Year 6 contract renewal | Formal | June 30 |
| 5th | During fifth year at DePaul, with timing per college's schedule, for year 7 contract renewal | May be informal or formal. Must be formal if non-reappointment is realistic possibility. | June 30 |
| 6th | Sixth Year at DePaul, with timing per Faculty Handbook calendar | Promotion and Tenure Review | June 30 |

4    *The contract renewal schedule for tenure-line faculty who come in with years of credit
5    towards tenure is the same as for other tenure-line faculty, but the year of the promotion
6    and tenure review varies. The initial faculty contract stipulates the year of the promotion
7    and tenure review.

Calvente-DePaul 000050

July 1, 2018

1 **3.9 Schedule for Promotion and Tenure**
2
3 *3.9.1 University Promotion and Tenure Schedule*
4
5 The following is the suggested schedule for the university promotion and tenure process.
6 Whenever possible, the university will abide by the proposed timetable. Any changes to this
7 calendar must provide at least the allotted time period for candidate responses, minority reports,
8 and signing statements.
9
10 **April 1**
11 Letter of notification as to the eligibility to apply for promotion and tenure sent to the faculty
12 member from the provost
13
14 **May 1**
15 Letter requesting consideration for promotion and/or tenure submitted by the faculty member to
16 the provost, the academic dean, and the head of the academic unit
17
18 **May 15**
19 Provost acknowledges receipt of applications for promotion, for tenure, or for promotion and
20 tenure.
21
22 **June 1**
23 Candidate provides CV and selected publications/documentation of creative activities to local
24 academic unit officers for submission to external reviewers
25
26 **June 15**
27 Local academic unit identifies an initial list of potential external reviewers
28
29 **First day of fall quarter**
30 Candidate's complete materials due to the local academic unit
31
32 **January 15**
33 Report from the academic unit submitted to the academic dean and to the candidate.
34
35 **January 31**
36 Report from the academic dean and the academic unit of the following colleges and schools
37 submitted to the Office of Academic Affairs and to the candidate
38
39 • College of Communication
40 • College of Computing and Digital Media
41 • College of Law
42 • School of Music
43 • School for New Learning
44 • The Theatre School
45
46 **March 1**
47 Reports from the academic deans of the College of Commerce and the College of Education and
48 all relevant materials submitted to the Office of Academic Affairs and to the candidate
49
50 **March 15**

27

Calvente-DePaul 000051

July 1, 2018

1    Reports from the academic deans of the College of Liberal Arts & Social Sciences and the
2    College of Science and Health and all relevant materials submitted to the Office of Academic
3    Affairs and to the candidate.
4
5    **Winter/Spring Quarter**
6    University Board on Faculty Promotion and Tenure meets with faculty candidates
7
8    **Five business days from the last UBPT meeting but no later than May 15**
9    UBPT reports due to candidates
10
11   **Two weeks from the date UBPT reports are sent to candidates**
12   Optional candidate response due to UBPT
13   UBPT report and all relevant materials for all candidates submitted to provost
14
15   **June 15**
16   Decision of the university provost
17   Notification to candidate of the provost's decision follows in a timely fashion
18
19

28

Calvente-DePaul 000052

July 1, 2018

## CHAPTER 4.  DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

4.1 Overview ................................................................................................ 3

4.2 Nonrenewal of Non-Tenured Tenure Line Faculty ............................... 3

4.3 Tenured Faculty ..................................................................................... 5

4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct ................. 5

    4.4.1 Misconduct ...................................................................................... 5

    4.4.2 Categories of Disciplinary Sanctions: ............................................. 6

    4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty: .. 6

    4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty .................................................................................................. 7

        4.4.4.1 Initiation of a formal hearing ................................................. 7

        4.4.4.2 Rules and procedures for the Hearing Committee .................. 7

    4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major Sanctions Against a Tenure-Line Faculty Member ......................... 9

4.5 Emergency Suspension ......................................................................... 9

4.6 Termination Due to Financial Exigency ............................................. 10

    4.6.1 Financial Exigency ........................................................................ 10

    4.6.2 Provost Statement .......................................................................... 10

    4.6.3 Financial Exigency Committee ..................................................... 11

    4.6.4 Retrenchment Committee .............................................................. 12

    4.6.5 Termination Committee(s) ............................................................ 13

    4.6.6 University Obligations upon Termination of Tenured Faculty ........ 14

    4.6.7 Appeal of Termination .................................................................. 15

4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit or Program ................................................. 15

    4.7.1 Step 1 ............................................................................................ 16

    4.7.2 Step 2 ............................................................................................ 16

    4.7.3 Step 3 ............................................................................................ 16

    4.7.4 Step 4 ............................................................................................ 17

    4.7.5 Step 5 ............................................................................................ 17

    4.7.6 University Obligations upon Termination of Tenured Faculty ........ 18

    4.7.7 Appeal of Termination .................................................................. 19

4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months ...................................................................................... 19

1

Calvente-DePaul 000053

July 1, 2018

1  4.9 Resignation ................................................................................................... 20

2  4.10 Retirement .................................................................................................. 20

3

Calvente-DePaul 000054

July 1, 2018

# CHAPTER 4. DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

## 4.1 Overview

This chapter summarizes the policies and processes to be followed in disciplinary cases involving faculty as well as those governing the termination of faculty members. Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions. Tenured faculty may be dismissed only under provisions set out in this Handbook.

The term "appointment" refers to the initial contract issued to all faculty. The terms "reappointment" and "non-reappointment" apply to full-time non-tenure line faculty (see Chapter 2). The terms "renewal" and "nonrenewal" apply to non-tenured tenure-line faculty.

Reviews and decisions for appointment, reappointment, renewal, promotion, and tenure are separate actions. Appointment does not guarantee reappointment or renewal, nor does appointment at any rank confer tenure, except where specifically provided in the contract. Promotion at any time from any rank to any other rank does not confer tenure.

## 4.2 Nonrenewal of Non-Tenured Tenure Line Faculty

When deciding whether to renew the contract of a non-tenured tenure-line faculty member the university follows two general principles:

1. To select, given available resources, faculty members who will best contribute to its distinctive goals and academic mission. Consequently, the university has the authority and discretion, within the limits of academic freedom, to determine which non-tenured tenure-line faculty members will be retained.

2. To have no reasonable doubt as to the faculty member's qualifications for tenure before it reaches a favorable decision on the renewal that results in tenure. The quality of academic programs and therefore the good of the university require careful selectivity in renewal based on the individual faculty member's qualifications and the needs of the university. Anything that undermines the selective process erodes tenure and quality.

Non-tenured tenure-line faculty members are subject to an annual probationary review (see Chapter 3). Renewal decisions are made in conjunction with the annual probationary review. Although there is no guarantee of renewal, non-tenured tenure line faculty are entitled to consideration for renewal. Nonrenewal decisions must be based on criteria as described in this Faculty Handbook, and selected from those listed below:

1. Teaching and learning;

2. Scholarship, research, or other creative activities;

3. Service;

4. Professional advancement, such as the completion of a terminal degree or certificate. This criterion is especially applicable when there is a particular interest or a previous understanding with the faculty member regarding this advancement;

3

July 1, 2018

5. Responsible participation in university processes and activities that are generally considered faculty responsibilities;

6. Change in academic program, such as:

   o termination or reduction in size of the academic program to which a faculty member is assigned;

   o change in an area of specialization or in emphasis in a program;

7. Financial conditions of the university as a whole or in any particular part, requiring reduction in the size of the faculty;

8. Professional and ethical conduct.

Nonrenewal may rest on a single criterion or a combination of several criteria, reflecting the faculty member's role in the academic unit and the needs of the university. The rationale for the renewal decision must be explained and supported with evidence and with reference to the appropriate criteria.

The dean and the faculty of the local academic unit must follow the procedures specified in Chapter 3 in making renewal recommendations. Every faculty member in an academic unit is entitled to be judged according to consistent criteria and documentation. Conflicts of interest must be avoided in all faculty evaluations. Any judgment based on a faculty member's ideological and political positions is a violation of academic freedom.

As detailed in Chapter 3, the local academic unit normally makes a recommendation on annual renewal and nonrenewal. If the dean does not concur in the recommendation of a local academic unit, the dean shares his or her recommendation with the local academic unit. The local academic unit may appeal the dean's recommendation to the provost. In such cases, the dean and the local academic unit must provide the provost with written reasons for their respective positions. The provost makes the final decision and reports it to the candidate. A faculty member who is not renewed may file an appeal. (See Chapter 5).

The non-tenured tenure-line faculty member is entitled to:

(a) an opportunity to submit materials supporting renewal. The non-tenured tenure-line faculty member will be notified at least 28 calendar days before the local academic unit's review. The candidate must submit supporting materials to the local academic unit officer at least 14 calendar days prior to the local academic unit review;

(b) written notification of the decision on renewal. The notification must include the reasons for the decision. A notification to renew should include an assessment of the faculty member's qualifications, noting those conditions which should be fulfilled for future renewal or tenure. A notification of nonrenewal must include the reasons for the decision, the faculty member's appeal rights, and the procedures for such appeals as described in Chapter 5.

The university follows the AAUP guidelines for notice of renewal. Notice of nonrenewal, or of intention not to recommend renewal, should be given in writing in accordance with the following standards and the calendar specified in Chapter 3.

4

Calvente-DePaul 000056

July 1, 2018

1. On or before March 1 of the first academic year of service, if the appointment expires at the end of that year; or, if a one year appointment terminates during an academic year, at least three (3) months in advance of its termination.
2. On or before December 15 of the second academic year of service, if the appointment expires at the end of that year; or, if an initial two year appointment terminates during an academic year, at least six (6) months in advance of its termination.
3. At least twelve (12) months before the expiration of an appointment after two (2) or more years in the institution. Notices of reappointments and contract renewal are based on the university's annual budget cycle.

Notification by these dates shall constitute sufficient notification for not offering another contract even though appeal and subsequent review might mean that the final decision is rendered less than a year before the end of the final contract.

A non-tenured tenure-line faculty member informed that his or her contract is not to be renewed may appeal the decision not to renew. See Chapter 5, Appeals and Grievances.

## 4.3 Tenured Faculty

Tenure creates the presumption of continuing employment. Tenured faculty may be dismissed only under provisions set out in this handbook. Tenured faculty are not renewed annually.

## 4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct

### *4.4.1 Misconduct*

The university's response to allegations of faculty misconduct may vary according to the nature of the misconduct, its seriousness, its impact on the university's reputation or the well-being of other members of the university community, and any prior record of misconduct by the faculty member. Disciplinary sanctions may apply to any full-time faculty member, including, but not limited to, all tenure-line faculty. Faculty members who hold administrative appointments are subject to these provisions with respect to their role as faculty members.

Misconduct includes, but is not limited to, violations of university policies, including the Faculty Handbook and anti-discrimination and anti-harassment policies; violations of academic or scholarly integrity; a pattern or practice of failing to meet university contractual obligations; or a pattern of extreme intimidation and aggression towards other members of the university community.

Disciplinary proceedings are reserved for situations that warrant the imposition of a major or a minor sanction. Inadequate performance in teaching, scholarship/research/creative activities, or service that does not rise to the level of misconduct must be dealt with during the standard processes for faculty review and/or reappointment/renewal.

All procedures are to be carried out as expeditiously as is reasonably possible. All time guidelines in this section refer only to calendar or business days within regular academic terms — Fall, Winter, and Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums.

5

Calvente-DePaul 000057

July 1, 2018

*4.4.2 Categories of Disciplinary Sanctions:*

- **Minor sanctions**: sanctions short of suspension or dismissal
- **Major sanctions**: suspension or dismissal

*4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty:*

1. The dean initiates an investigation of alleged faculty misconduct, except in situations where initiation of disciplinary action is based on OIDE findings, in which case the dean will work in consultation with OIDE.
2. The dean should attempt to resolve the issue through an informal process resulting in both parties agreeing with the outcome.
3. If informal resolution fails, the dean will present the faculty member with a statement of charges. The faculty member will be provided an opportunity to submit a rebuttal within two weeks of the presentation of the statement of charges. If the faculty member perceives that the dean has a conflict of interest, he or she may simultaneously request in writing that the dean appoint a designee. The dean may deny the request with written reasons.
4. After the statement of charges is presented, either party may invite a DePaul colleague to act as an advisor. The advisor may attend but not participate in any meeting related to the case. Within four weeks of the presentation of the charges, the dean or the designee will conduct a detailed review of the charges and the rebuttal, if any, and prepare a report.
5. The faculty member may examine the report and any evidence referenced in the report and will be given two weeks to provide a final statement before a decision is reached.
6. In all cases, the burden of proof is with the dean and a recommendation for sanctions must be supported by a preponderance of evidence.
7. The dean shall make a decision within eight weeks of the presentation of the charges. This decision may be one of the following: (1) to dismiss the case; (2) to impose a minor sanction; or (3) to refer the case to the provost for major sanctions.

The dean shall file with the office of the provost the statement of charges, the faculty member's rebuttal, the report, the final statement by the faculty member and the dean's own written decision. The office of the provost shall maintain this information

**In cases involving minor sanctions:**
The dean makes the decision on the sanctions to be imposed. The faculty member may grieve the decision according to the grievance procedures of Chapter 5. To the extent possible, the dean and the provost will not release any information about the sanctions.

**In cases involving major sanctions:**
If the dean's written decision includes a recommendation for major sanctions, the provost (or designee) will conduct a detailed review of the charges and any evidence provided by the parties at the college level. The provost (or designee) may interview the parties or consult additional experts and request additional evidence from the parties.

The provost will make a decision within ten weeks of the presentation of the statement of the charges.

The provost's decision will be one of the following:

6

Calvente-DePaul 000058

July 1, 2018

1. dismiss the case; or
2. issue a minor sanction; or
3. (**in the case of term faculty only**) impose a major sanction without a formal hearing (in this case, the term faculty member has the right to appeal to the Faculty Committee on Appeals according to procedures in Chapter 5); or
4. (**in the case of tenure-line of faculty**) refer the case for a formal faculty hearing with a recommendation for a major sanction (see below for detailed procedure).

### *4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty*

#### 4.4.4.1 Initiation of a formal hearing

1. The provost will notify the faculty member of the intent to refer the case for a formal faculty hearing with a recommendation for a major sanction. The faculty member may waive the right to the hearing and choose to have the case decided by the provost. In that case, the provost's decision will be final and may not be appealed or grieved further. Otherwise, the provost will initiate a request for a formal Hearing Committee and appoint a designee to serve as complainant ("university representative") in the disciplinary proceeding. If a conflict of interest is perceived, the faculty member may request, with justification, a different university representative which can be denied by the provost with written reasons.
2. The university representative must file a detailed statement of charges with the Faculty Council President, a copy of which will simultaneously be provided to the faculty member.
3. The faculty member will have four weeks to submit a written response to the charges once they have been filed with Faculty Council.
4. The university representative will forward the following information to the Hearing Committee: (a) the statement of charges; (b) the response; (c) a list of individuals who may have pertinent information about the case; (d) and the records of any earlier investigations or decisions.
5. The burden of proof rests with the university. The charges against the faculty member must be established by a preponderance of evidence.

#### 4.4.4.2 Rules and procedures for the Hearing Committee

1. The Hearing Committee will be comprised of three tenured faculty members selected in the following manner: Faculty Council shall identify a panel of nine tenured faculty members not affiliated with the college or school of the faculty member. Faculty Council, in conjunction with both parties will develop a process for interviewing the nine selected faculty members. In alternating fashion, with the university going first, each party excludes three members from the panel. The remaining members of the panel constitute the Hearing Committee. The committee shall select its own chair.
2. The Hearing Committee shall not disclose the evidentiary record, including deliberations and findings, except to those with a legitimate need to know.
3. The Hearing Committee may attempt an informal resolution of the case before proceeding to a formal hearing. If it cannot resolve the matter informally, then it will schedule a formal hearing.
4. The university will assume all costs directly incurred by the Hearing Committee.
5. The Hearing Committee will conduct a prehearing meeting with the faculty member and the university representative to clarify the issues, stipulate facts, finalize the list of

7

Calvente-DePaul 000059

July 1, 2018

1       individuals who may have information relevant to the hearing, provide for the exchange
2       of documentary or other information, and identify other appropriate objectives to make
3       the hearing fair, effective, and expeditious. The committee will provide both parties with
4       a written record of its decisions.

5  6.  The chair of the Hearing Committee will notify all concerned parties of the time and
6       location of the hearing. Notice of the hearing must be in writing and made at least two
7       weeks prior to the hearing. Time extension or rescheduling requests by the faculty
8       member or the university representative may be granted by the chair for good reason.

9  7.  At any time before the start of the hearing, the faculty member may choose not to
10      participate in person but may choose to submit a written response to the specific charges.
11      In the event the faculty member does not participate in person he or she may still deny
12      the charges or assert that the charges do not support a finding for a major sanction.

13  8.  The hearing will proceed in the absence of either the faculty member or the university
14      representative who fails to appear at the hearing after receiving notification. Only
15      circumstances that are beyond a party's control and that prevent a party's attendance at
16      the hearing will constitute good reason to reschedule the hearing. The Hearing
17      Committee will make the determination as to whether there is good reason for the
18      absence.

19  9.  The Hearing Committee (on its own or at the request of either party) may invite persons
20      from inside or outside the university to give testimony relevant to the matter. University
21      personnel will make every effort to cooperate with the committee in securing witnesses
22      and making evidence available. The parties shall have the right to cross-examine all
23      witnesses.

24  10.  The faculty member may receive the assistance of counsel of her or his choosing and at
25      her or his cost. If the faculty member employs an attorney for the hearing, and the
26      decision is not for a major sanction, the University will reimburse the faculty member for
27      at least one-half of the reasonable legal expenses, the precise proportion to be decided by
28      the Hearing Committee, depending on the degree to which the University case has merit.

29  11.  All hearings are closed to the public. The Hearing Committee, at its sole discretion, may
30      remove participants in the hearing who disrupt the process.

31  12.  The hearing will be transcribed. At the conclusion of the hearing, the parties shall have
32      unrestricted access to the full evidentiary record and a copy of the complete transcript.
33      The parties will be given a reasonable period of time, specified by the committee, to
34      examine this record. After examining the record, the faculty member and the university
35      may file closing statements, copies of which will be provided by the chair to the other
36      parties.

37  13.  Subsequent to filing the closing statements, the Hearing Committee will deliberate in a
38      closed session.

39  14.  The findings of the Hearing Committee may be only one of the following: (1) adequate
40      cause for dismissal, (2) adequate cause for suspension, (3) adequate cause for a minor
41      sanction, or (4) adequate cause has not been established for major or minor sanctions. If
42      the finding is for a sanction other than dismissal, the Hearing Committee shall include in
43      its report recommendations for appropriate sanctions.

44  15.  The findings and the decision of the Hearing Committee on appropriate sanctions must be
45      supported by a majority vote and be specified in a written report. The chair of the
46      Hearing Committee will submit the report to the provost and the faculty member.

47  16.  The provost (or president if the provost has a conflict of interest) may either accept the
48      decision of the Hearing Committee or resubmit this decision to the committee with
49      specific objections. In the latter case, the committee will then reconsider only points to
50      which the provost has objections, receiving new evidence if necessary. After its

Calvente-DePaul 000060

July 1, 2018

1     reconsideration, the Hearing Committee will deliver its final decision to the provost (or
2     president if the provost has a conflict).
3

4 ***4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major***
5 ***Sanctions Against a Tenure-Line Faculty Member***
6
7 In cases involving major sanctions against tenure-line faculty either party (the provost/president
8 on behalf of the university or the faculty member) has the right to appeal a decision by the
9 Hearing Committee to an Appeals Board.
10
11 Grounds for appeal could be one or more of the following:
12     1. Procedural violations that compromised the ability of a party to present arguments or
13        evidence or to do so in a timely manner; procedural violations that compromised the
14        committee's consideration of the evidence and arguments presented;
15     2. Failure of the committee to apply appropriate standards under which the charges were
16        brought and under which the charges should have been considered; failure of the
17        committee to consider relevant evidence actually presented;
18     3. Arbitrary decisions of the committee that could not reasonably follow under the standards
19        applied and given the evidence presented.
20
21 Makeup of the Appeals Board:
22     1. Two deans (excluding the dean involved in the case) selected by the Council of Deans.
23     2. Two faculty members (without a conflict of interest in the case) selected by the Faculty
24        Council from among the twelve members of the Faculty Committee on Appeals.
25     3. One additional member selected jointly by the president of the university and the
26        president of Faculty Council.
27
28 The Appeals Board may take one of the following actions:
29     1. Accept the decision of the Hearing Committee; or
30     2. Send back the matter to the Hearing Committee with specific recommendations for
31        additional actions or changes. This action should be taken if the Appeals Board believes
32        that the decision was influenced by the procedural or standards violations, but those
33        violations can be remedied by the Hearing Committee. In this case the Hearing
34        Committee shall take appropriate action taking into account the Appeals Board's
35        recommendations and issue a revised report with a final decision; or
36     3. Reject the Hearing Committee's decision and conduct a new hearing. This action may
37        only be taken if the Appeals Board can demonstrate that no reasonable decision-maker
38        could have arrived at the conclusion of the Hearing Committee based on the facts
39        presented, or the procedural violations were so egregious that they compromised the
40        integrity of the process. Should the Appeals Board initiate such a rehearing, it must issue
41        a written opinion with its findings regarding the deficiencies in the Hearing Committee
42        decision before commencing its rehearing. In conducting a rehearing the Appeals Board
43        will follow the same operating procedures required of the Hearing Committee.
44
45 In all three cases, there is no further appeal from this decision within the university.
46

47 **4.5 Emergency Suspension**
48

9

Calvente-DePaul 000061

July 1, 2018

1    In an emergency where potentially serious harm must be prevented and immediate action must be
2    taken before initiating the disciplinary procedures set out in this chapter, the provost may suspend
3    a faculty member. The provost shall inform the faculty member in writing of the terms of the
4    suspension. Within a reasonable timeframe of issuing the written notice, the provost shall either
5    lift the suspension or initiate the formal disciplinary procedures. The suspension will not continue
6    beyond the time required to remove the actual or potential harm, ordinarily not beyond the
7    academic year.
8
9    A faculty member may grieve a suspension under this section only if the dean declines to initiate
10   formal disciplinary procedures. SEE CHAPTER 5 APPEALS AND GRIEVANCES.
11
12   The faculty member suspended from active service to the university will receive full
13   compensation during the suspension until the time of justifiable dismissal for misconduct.

14   **4.6 Termination Due to Financial Exigency**

15   *4.6.1 Financial Exigency*
16
17   Termination of an appointment with tenure may occur due to financial exigency of the
18   university.  Financial exigency is a financial crisis that fundamentally compromises the
19   academic integrity of the institution as a whole. The crisis usually results from substantial
20   and recurring financial deficits that cannot be offset by prudent use of the university's
21   reserves.
22
23   Prior to declaring exigency, the university president, provost, and executive vice
24   president will retrench operations in all areas before taking steps that could lead to the
25   termination of tenured faculty. These retrenchments will be made up to the point where
26   there would be a danger of seriously jeopardizing the academic quality or the essential
27   operations of the university.
28
29   With the exception of the work of the identified committees, all of the steps specified
30   below in Subsections 4.6.2 thru 4.6.7 (inclusive) must be initiated, conducted, and
31   completed within the regular academic year calendar – from the opening date of regular
32   day and evening Autumn quarter classes to the date of the last final exam in Spring
33   quarter. Any steps that remain uncompleted at the close of business on the date of the last
34   final exam in Spring quarter shall be suspended until the following autumn quarter
35   commences.
36

37   *4.6.2 Provost Statement*
38
39   The provost shall issue a formal statement to the president of the Faculty Council and the
40   president of the Staff Council, indicating and providing documentary support of the
41   existence of financial exigency.  The statement will address the following points:
42
43   1. Evidence of financial exigency and the need for serious retrenchments involving the
44        termination of tenured faculty;

10

Calvente-DePaul 000062

July 1, 2018

1    2. Evidence in support of assumptions underlying projections of future revenues and
2        costs;
3    3. Dollar amount and distribution of the retrenchments that have been made or can be
4        made in all parts of the university without terminating tenured faculty appointments,
5        including possible administrative salary reductions; and
6    4. Dollar amount of decrease in expenditures to be realized in colleges that will result in
7        the termination of tenured faculty appointment(s).
8

9    *4.6.3 Financial Exigency Committee*
10

11    The statement by the provost shall be reviewed by a Financial Exigency Committee to
12    determine whether there is sufficient evidence to declare financial exigency. The
13    committee shall consist of four tenured faculty members (none of whom hold
14    administrative appointments at the level of Associate Dean or above), one staff member,
15    one student, one representative of the Board of Trustees, the executive vice president and
16    the provost (ex officio). The committee will select one of its members to act as chair.
17    Faculty Council will appoint the faculty members; Staff Council will select the staff
18    member; Student Government Association will select the student member; and the Board
19    of Trustees will select its representative. Members of the committee may be chosen from
20    any area of the university. The executive vice president shall convene the committee
21    within two weeks upon receipt of the statement from the provost.
22

23    Within two weeks of request, the university shall provide the Financial Exigency
24    Committee with all university data necessary to evaluate the provost's statement. This
25    data must include (1) records of current and past operations and financial position, and
26    (2) projections of future operations and financial position. When necessary, the
27    committee may also invite faculty, staff, or other knowledgeable persons to provide
28    information. The committee shall keep a formal record of its deliberations and votes
29    within 30 days of receipt of the requested financial information, the committee will
30    evaluate the financial data, and vote on whether a condition of financial exigency exists
31    that requires the termination of tenured faculty. The committee will issue a report. If the
32    committee finds that financial exigency exists, its report on financial reductions shall
33    consider the university's complete set of financial statements, not simply revenues and
34    costs. The committee shall carefully consider whether and how the university's real
35    estate and other assets might be sold, refinanced or otherwise reallocated.

36    If the committee concludes that such financial exigency exists, the report must include
37    the amount of reduction needed (1) in the areas of academic affairs that are not part of the
38    schools and colleges, and (2) in the colleges and schools. If the committee concludes that
39    no such financial exigency exists, the report must include a rationale for this conclusion.
40
41    The report of this committee will be sent to the Faculty Council, Staff Council, and the
42    Student Government Association for review and comment. All comments are due to the
43    Financial Exigency Committee within 30 days of receipt. The Financial Exigency
44    Committee will send its report and any comments from the councils and SGA to the
45    university president for final decision.

Calvente-DePaul 000063

July 1, 2018

### *4.6.4 Retrenchment Committee*

In the event that the president of the university concludes that financial exigency exists, the provost will prepare a proposal indicating the specific methods for dealing with the financial exigency, including (1) the amount of the financial reductions outside of the schools and colleges, (2) the amount of financial reductions within each school and college, (3) the nature and timing of the retrenchments, and (4) the effects of these retrenchments on specific academic programs.

This proposal will be submitted to a Retrenchment Committee consisting of three tenured faculty members (none of whom hold administrative appointments at the level of Associate Dean or above) appointed directly by the Faculty Council, one college dean chosen by the Dean's Council, and the provost. The committee will select one of its members to act as chair. The three tenured faculty members must be chosen from different colleges within the university.  Members of the committee must understand and agree that they do not represent their academic units. They must take into account the seriousness of the situation and make decisions based on the best long-term interests of the university.

The provost shall also submit the proposal to the dean of each affected school or college who, after consulting with his/her faculty, may present a written recommendation to the Retrenchment Committee as to how the required reduction could be achieved.

Before the Retrenchment Committee reaches any decision, it must provide the affected faculty and staff the recommendations and the opportunity to respond in writing to the provost's and deans' recommendations. The Retrenchment Committee will also convene a meeting open to all tenured faculty, at which it will consult the faculty and respond to their concerns. The provost's recommendation, as well as any dean's recommendation, must be made available to the tenured faculty no less than two weeks before the open meeting.

To achieve the specified amount of financial reduction, the Retrenchment Committee will make a final decision that states:

1.  The dollar amount of reduction required of each school or college, other than by termination of full-time faculty;
2.  The dollar amount of reduction in each college through the termination of full-time faculty; and
3.  A list of academic units financially capable of absorbing faculty transfers/affiliation from other units including an estimate of the number of tenured positions that could be accommodated in each.

12

Calvente-DePaul 000064

July 1, 2018

1   The Retrenchment Committee shall send its final decision to the provost, the deans of
2   affected colleges and schools, the president of Faculty Council, the president of Staff
3   Council, and the president of the Student Government Association.

4   *4.6.5 Termination Committee(s)*
5
6   Based on the decision of the Retrenchment Committee, Faculty Council shall constitute a
7   Termination Committee for each college that must terminate faculty due to the
8   retrenchment. Each Termination Committee shall consist of three tenured faculty
9   members appointed directly by Faculty Council; the members shall be drawn from
10  outside the affected college and shall not be affiliated with the programs or departments
11  in which retrenchments have been mandated. Faculty members who hold administrative
12  appointments at the level of associate dean or above are ineligible to serve. The
13  Committee shall select one of its own members as chair.

14  The chair of each Termination Committee shall call for the dean of the affected college to
15  consult with local academic unit officers and then submit to the Termination Committee a
16  proposal specifying which faculty will be terminated. If a college is to be phased out or if
17  colleges are to be merged, the provost shall submit the proposal after consultation with
18  the local academic unit officers and relevant deans.

19  Faculty from affected units will be given the opportunity to submit written statements,
20  including CVs and other relevant materials that discuss their qualifications and the
21  rationale for their retention.

22  The dean or provost, in making his or her proposals for termination, and the Termination
23  Committee, in evaluating the proposals, are to decide according to the following criteria
24  and in this order of priority:
25
26      1.  Program viability: faculty required for a viable academic program may be
27          retained if the program itself is not to be phased out. Quality of faculty
28          performance may be considered in evaluating whether a faculty member is
29          required for a viable academic program. In extraordinary circumstances, where a
30          serious distortion of the academic program would otherwise result, one or more
31          non-tenured faculty members may be retained.  Materials submitted by the
32          affected faculty member(s) must be considered by the Termination Committee
33          along with other relevant material.
34      2.  Tenure: tenured faculty are to be retained over non-tenured faculty; and
35      3.  Seniority: more senior faculty are to be retained over less senior faculty. Seniority
36          is defined first by rank and second by years in rank.
37
38  In evaluating the proposals and the application of the above criteria, the Termination
39  Committee will comply with the university's equal employment opportunity policies and
40  procedures.
41

Calvente-DePaul 000065

July 1, 2018

1   The Termination Committee(s) will submit their recommendations to the provost, the
2   deans of the affected units, the department chairs or program heads, and the president of
3   the Faculty Council.
4
5   The provost makes the final determination on termination. Only in rare instances and for
6   compelling reasons will the provost overturn a recommendation made by the Termination
7   Committee. If the provost's decision differs from the recommendation, the provost must
8   prepare a written explanation and provide it to the deans of the affected units, the
9   department chairs or program heads, and the president of the Faculty Council.
10

11   *4.6.6 University Obligations upon Termination of Tenured Faculty*
12

13   1.  If a tenured faculty member designated for termination believes he or she is
14       qualified to be transferred, he or she must identify at least one local academic unit
15       or college which was identified by the retrenchment committee as capable of
16       absorbing faculty transfers. The affected faculty member will have the
17       opportunity to submit a written statement regarding his or her fitness to serve as a
18       tenured faculty member in each of the identified units. The faculty member is
19       entitled to attach to his or her written statement any relevant documents or
20       materials. The faculty member may describe any additional training that might be
21       appropriate. The faculty member has the right to access all relevant available
22       information within the university to assist in identifying the units in which he or
23       she would be qualified to serve and to assist in preparing the written statement.
24
25       If the faculty member designated for termination requests a transfer, the local
26       academic unit officer of each of the identified units
27       a)  Must call a meeting of all the eligible faculty of that unit to vote on the
28           transfer of the faculty member to that unit,
29       b)  Must circulate, prior to that meeting, to all such eligible faculty, on a
30           confidential basis, the faculty member's written statement,
31       c)  Must provide an opportunity for the faculty member to make an oral
32           presentation to the eligible faculty of the unit and to answer questions,
33       d)  Must hold a vote of eligible faculty when a quorum is present. A majority vote
34           of the eligible tenured faculty in attendance is necessary and sufficient to
35           accept the faculty member.
36
37       Should more than one unit accept the faculty member, the faculty member must select
38       one. Upon the faculty member's selection of a unit for transfer, the provost will take
39       necessary steps to effectuate the transfer.
40
41   2.  Should no unit accept the faculty member, then the terminated faculty member shall
42       be entitled to no less than twelve months' notice of termination or a payment equal to
43       the faculty member's contract salary and benefits for an equal length of time. A
44       faculty member who has been tenured at the university for fifteen years or more of
45       continuous tenured service shall be entitled to a minimum of twenty-four months'

14

Calvente-DePaul 000066

July 1, 2018

1      notice of termination or a payment equal to the faculty member's contract salary and
2      benefits for an equal length of time.
3

4   3.   The university is obligated not to approve new full-time faculty hires in a terminated
5        faculty member's areas of expertise (defined as courses that the faculty member has
6        either previously taught or is qualified and willing to teach) within a three-year period
7        unless the terminated faculty member has been offered reinstatement with reasonable
8        time in which to accept or decline. Within this three-year period after retrenchment
9        and termination, no more than three additional quarter-length or two semester-length
10       course sections per year may be offered by adjunct or term faculty within the
11       terminated faculty member's areas of expertise. In instances where the University
12       finds compelling need to offer more than three additional quarter-length or two
13       semester-length course sections per year in a terminated faculty member's areas of
14       expertise through the use of adjunct or term faculty, the provost will bring a proposal
15       to Faculty Council for its approval.
16

17   4.   The university is obligated not to approve additional full-time faculty positions
18        outside of terminated faculty members' areas of expertise, including in other
19        academic programs or units of the university over a three-year period except in
20        extraordinary circumstances where such faculty appointments are needed to sustain
21        growth or maintain academic programs. In such instances, the provost will bring a
22        proposal to Faculty Council for its review. Only in rare instances and for compelling
23        reasons will the provost overturn the recommendations of Faculty Council.
24

25   *4.6.7 Appeal of Termination*
26

27   A tenured faculty member notified of termination because of financial exigency has a
28   right to appeal to a faculty committee regarding the selection of the area and type of
29   retrenchment and selection of specific faculty appointments to be terminated. See
30   Chapter 5.

31   **4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial**
32   **Reduction of an Academic Unit or Program**

33

34   The university may discontinue or substantially reduce an academic unit or program. Such
35   decisions must be based on educational concerns and the institution's overall educational mission.
36   If a proposal for discontinuance or substantial reduction involves curricular change but not
37   termination of tenured faculty, it shall be vetted according to Faculty Council's regular policies
38   and procedures. If the proposal does involve termination of tenured faculty, then the following
39   steps must be followed instead.
40

41   All of the specified steps must take place during the normal academic year.
42

15

Calvente-DePaul 000067

July 1, 2018

### 4.7.1 Step 1

The dean of the college responsible for the academic unit in question or the provost shall submit a formal proposal ("the Proposal") to the Faculty Council. The dean or provost shall also share the Proposal with the faculty of the unit(s) affected by the proposed changes.

The Proposal should address the following:

1. The extent and scope of the discontinuance or substantial reduction of the academic unit or program, including the number of faculty to be terminated and the nature of the curricular change, if any;
2. Justification and rationale for the proposed reduction or discontinuance of the academic unit or program (including criteria typically used to evaluate the discontinuance or substantial reduction of programs);
3. Justification and rationale for the termination of faculty as a result of the discontinuance or substantial reduction of the academic unit or program;
4. Explanation of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, aligns with the university's academic priorities and educational mission;
5. Description of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, will affect the academic quality of the institution;
6. Description of the specific steps to be taken in restructuring or phasing out the unit and a proposed timeline (e.g., merging with another unit, shrinking or discontinuing a particular program within or across units).

### 4.7.2 Step 2

Faculty Council shall constitute a Review Committee of five tenured faculty members to evaluate the Proposal and prepare a report and recommendations for the Faculty Council. No member of the Review Committee may be from a unit to be affected by the discontinuance or substantial reduction. The Review Committee shall submit the Proposal and its report to the Faculty Council and to the tenure-line faculty members attached to any unit directly affected by the proposed reductions or eliminations. The tenured faculty members also have a right to submit, individually and/or as a group, a statement to Faculty Council. This statement must be submitted, within twenty calendar days of the receipt of the documents, to Faculty Council.

### 4.7.3 Step 3

Faculty Council, after receiving the report of the Review Committee and statements from tenured faculty members at the Faculty Council meeting, will vote on the Proposal within two months. All votes on discontinuance or substantial reduction must be conducted by secret ballot. If Faculty Council accepts the Proposal from the dean/provost, it will forward its decision to the university president.

If Faculty Council rejects the Proposal, it will provide its reasons and rationale and make specific recommendations for revision to the dean/provost. It may also request a meeting with dean/provost in order to discuss its concerns and make its reservations clear. The dean/provost may then revise the Proposal in light of these recommendations and resubmit the Proposal to Faculty Council for its final vote.

Calvente-DePaul 000068

July 1, 2018

### *4.7.4 Step 4*

If Faculty Council accepts the Proposal, it will forward its decision to the university president and full-time faculty members of all affected units or programs. The tenure-line faculty members attached to any unit directly affected by the proposed reductions or eliminations have a right to the records used in the deliberation process. The tenured faculty members also have a right to submit, individually or as a group, within twenty calendar days of the Faculty Council decision, a statement to the university president explaining a position contrary to that decision.

The university president shall not make a decision without considering the statements submitted by the tenured faculty members affected by proposed discontinuance or substantial reduction. The university president shall either accept the Proposal or, under exceptional circumstances, revise the Proposal and resubmit to Faculty Council for a vote within thirty calendar days of notification of the Faculty Council decision.

Faculty Council will make the final decision on the Proposal.

### *4.7.5 Step 5*

Should the Proposal be accepted by the university president, Faculty Council, within fifteen calendar days, shall constitute a Termination Committee of three tenured faculty members; the members shall be drawn from outside the affected college and shall not be affiliated with the affected academic units or programs. Faculty members who hold administrative appointments at the level of associate dean or above are ineligible to serve. The Termination Committee shall select one of its own members as chair.

Within fifteen calendar days of the president's decision, the dean of the affected college, in consultation with local academic unit officers, will submit to the Termination Committee a proposal ("Termination Proposal") specifying which faculty affiliated with the affected program or unit will be terminated. If a college is to be eliminated or if colleges are to be merged, the provost shall consult with the local academic unit officers and relevant deans and then submit the Termination Proposal to the Termination Committee.

The tenured faculty members from affected units will be given the opportunity to submit written statements, including CVs and other relevant materials that discuss their qualifications and the rationale for their retention to the Termination Committee.

The dean or provost, in making his or her Termination Proposal, and the Termination Committee, in evaluating the Termination Proposal, are to decide according to the following criteria and in this order of priority:

1. Program viability: faculty required for a viable academic program may be retained if the program itself is not to be phased out. Quality of faculty performance may be considered in evaluating whether a faculty member is required for a viable academic program. In extraordinary circumstances, where a serious distortion of the academic program would otherwise result, one or more non-tenured faculty members may be retained. In such circumstances the Termination Committee must explain why a particular faculty member's expertise is no longer needed. Materials submitted by the affected faculty member(s) must be considered by the Termination Committee along with other relevant material.
2. Tenure: tenured faculty are to be retained over non-tenured faculty; and

17

Calvente-DePaul 000069

July 1, 2018

3. Seniority: more senior faculty are to be retained over less senior faculty. Seniority is defined first by rank and second by years in rank.

In evaluating the Termination Proposal and the application of the above criteria, the Termination Committee will comply with the university's equal employment opportunity policies and procedures.

The Termination Committee, within thirty calendar days of receiving the Termination Proposal, will submit its recommendations to the provost, the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

The provost makes the final determination on termination. Only in rare instances and for compelling reasons will the provost overturn a recommendation made by the Termination Committee. If the provost's decision differs from the recommendation, the provost must prepare a written explanation and provide it to the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

### 4.7.6 University Obligations upon Termination of Tenured Faculty

1. If a tenured faculty member designated for termination believes he or she is qualified to be transferred, he or she must identify at least one local academic unit or college. The affected faculty member will have the opportunity to submit a written statement regarding his or her fitness to serve as a tenured faculty member in each of the identified units. The faculty member is entitled to attach to his or her written statement any relevant documents or materials. The faculty member may describe any additional training that might be appropriate. The faculty member has the right to access all relevant available information within the university to assist in identifying the units in which he or she would be qualified to serve and to assist in preparing the written statement. Within thirty calendar days of receipt of the information from the university, the faculty member must submit a request for transfer to each of the identified units.

   If the faculty member designated for termination requests a transfer, the provost must inform the local academic unit officers of each of the identified units. Within forty five calendar days of the provost's notification, the local academic unit officers of the identified units;
   a) Must call a meeting of all the eligible faculty of that unit to vote on the transfer of the faculty member to that unit;
   b) Must circulate, prior to that meeting, to all such eligible faculty, on a confidential basis, the faculty member's written statement;
   c) Must provide an opportunity for the faculty member to make an oral presentation to the eligible faculty of the unit and to answer questions;
   d) Must hold a vote of eligible faculty when a quorum is present. A majority vote of the eligible tenured faculty in attendance is necessary and sufficient to accept the faculty member.

   Should more than one unit accept the faculty member, the faculty member must select one. Upon the faculty member's selection of a unit for transfer, the provost will take necessary steps to effectuate the transfer.

18

July 1, 2018

2. Should no unit accept the faculty member, the university will make every effort to place the faculty member concerned in another suitable university position for which the person is qualified. If placement in another university position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered.

3. If no position is available within the institution, with or without retraining, or if the faculty member chooses not to pursue another position within the university, the tenured faculty member's appointment will be terminated. The terminated tenured faculty member shall be entitled to a severance payment equal to twenty-four months' contract salary and benefits.

4. The university is obligated not to approve new full-time faculty hires in a terminated faculty member's areas of expertise (defined as courses that the faculty member has either previously taught or is qualified and willing to teach in any academic unit) within a three-year period unless the terminated faculty member has been offered reinstatement with reasonable time in which to accept or decline. Within this three-year period, no more than three additional quarter-length or two semester-length course sections per year may be offered by tenured or non-tenured faculty within that faculty member's areas of expertise. In instances where the university finds compelling need to offer more than three additional quarter-length or two semester-length course sections per year in a terminated faculty member's areas of expertise through the use of tenured or non-tenured faculty, the provost will bring a proposal to Faculty Council for its approval.

### 4.7.7 Appeal of Termination

A tenured faculty member notified of termination because of discontinuance or substantial reduction of an academic unit or program has the right to appeal to a faculty committee regarding the selection of his or her specific faculty appointment for termination. See Chapter 5.

### 4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months

If illness or disability prevents a faculty member from performing his or her university obligations and duties, the faculty member may request a medical leave under the university's Family and Medical Leave Act policy and the Sick Pay, Short and Long Term Disability policy. All medical leaves are subject to the policies and procedures of the applicable leave and benefit programs, including physician certification of illness or disability and ability to return to work. Information about university leave and benefit programs are described at the Human Resources website.

A tenured faculty member who goes on approved Long Term Disability leave may resume his or her university position at any time within thirty-six consecutive months of the first day of Short Term Disability leave if the faculty member is able to fulfill his or her university obligations and duties, with or without reasonable accommodation. If, after the thirty-six month period, the tenured faculty member remains unable to fulfill his or her university obligations and duties, with or without a reasonable accommodation, the tenured appointment may be terminated.

If a faculty member's appointment is terminated under this section and he or she thereafter becomes able to return to work and resume the obligations and duties of a tenured faculty member, and the faculty member's former appointment is vacant, he or she will be returned to the

19

July 1, 2018

former appointment at the same rank. If the former appointment is no longer available and there is a vacant faculty appointment for which he or she is qualified, the university will give the former faculty member's application strong consideration. Such a faculty member, if appointed, shall be appointed at his or her prior rank and at the salary associated with the vacant faculty appointment.

A tenured faculty member whose appointment is terminated under this section may appeal the termination. See Chapter 5.

## 4.9 Resignation

A faculty member who wishes to resign shall do so by submitting a written notice of resignation to the dean and local academic unit officer with a proposed effective date.

## 4.10 Retirement

A faculty member who wishes to retire shall do so by submitting a written notice of retirement to the dean and local academic unit officer with a proposed effective date. DePaul University has no mandatory retirement age for faculty.

20

Calvente-DePaul 000072

July 1, 2018

1 # CHAPTER 5. APPEALS AND GRIEVANCES
2
3 5.1 Appeals ............................................................................................................. 2
4    5.1.1 Appeals Committee and General Process ................................................ 2
5       5.1.1.1   Faculty Committee on Appeals .................................................. 2
6       5.1.1.2   Notification of Intent .................................................................. 2
7       5.1.1.3  Preliminary Review ..................................................................... 3
8       5.1.1.4   Investigation and Determination ................................................ 3
9       5.1.1.5 Modified Procedures When Academic Freedom Violation is Alleged (Term
10    Faculty)  3
11       5.1.1.6 Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line
12    Faculty)  4
13    5.1.2  Tenure-Line Faculty Appeals ................................................................ 6
14       5.1.2.1    Nonrenewal of Untenured Tenure-Line Faculty  Prior to the Tenure Decision ..... 6
15       5.1.2.2   Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary
16    Period Contract for Reasons Other than Misconduct ............................................. 7
17       5.1.2.3  Denial of Promotion or Tenure ..................................................... 8
18       5.1.2.4  Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six
19    Months  9
20       5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency .................................. 10
21       5.1.2.6  Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of
22    an Academic Unit .................................................................................. 11
23       5.1.3.2    Non-Reappointment of Term Faculty ................................................ 14
24    5.1.4  Other Faculty .......................................................................... 14
25 5.2  Grievances ............................................................................................. 16
26    5.2.1  Definition ............................................................................... 16
27    5.2.2  Procedures for Faculty Grievances ........................................................ 17
28       5.2.2.1 Administrative Grievance  Process ............................................. 17
29       5.2.2.2  Grievance Board Procedures ...................................................... 18
30    5.3.  Right to Review Personnel Records ....................................................... 19
31

1

Calvente-DePaul 000073

July 1, 2018

# CHAPTER 5.  APPEALS AND GRIEVANCES

Appeal procedures are limited to: dismissal or nonrenewal of contract for tenure-line faculty; denial of tenure and promotion for tenure-line faculty; dismissal during the contract term for term faculty, and non-reappointment of term faculty.

Grievance procedures are available to all faculty for issues other than denial of promotion and tenure, dismissal, nonrenewal and non-reappointment.  A grievance is a written complaint concerning a decision made by a person with authority in the University.  The grievance must be filed by the individual adversely affected by the decision.

## 5.1 Appeals

Appeals are to be conducted in accordance with the procedures specified below.  Each procedure is specific to the type of appeal.

### 5.1.1 Appeals Committee and General Process

The faculty member bears the burden of proof. Failure by the faculty member to submit requested materials within designated deadlines shall constitute a failure to meet the burden of proof. The standard of proof is preponderance of the evidence.

#### 5.1.1.1  Faculty Committee on Appeals

The Faculty Committee on Appeals is a standing committee of the Faculty Council. It comprises twelve tenured faculty members selected by the Faculty Council through the usual committee selection process. If the committee finds that, in a given case, a member has either a conflict of interest or the appearance of one, the committee will exclude the member from participation.   Grounds for recusal include serving in the appellant's local academic unit, participating in evaluation of the appellant, or having a significant personal relationship with the appellant.

The Faculty Committee on Appeals will assign three of its members to serve as an Appeals Board to hear a case.

If the appellant raises an allegation of discrimination, the Appeals Board must refer the discrimination allegation to University EEO Resources which, in coordination with the Appeals Board, will conduct an investigation and submit a report to the Appeals Board in a timely manner.

#### 5.1.1.2  Notification of Intent

A faculty member begins an appeal by filing a written notice of intent to appeal with the president of Faculty Council who will forward the notice to the chair of the Faculty Committee on Appeals. The notice must specify the grounds for appeal. The appellant may not add or change appeal grounds after submitting the notice of intent to appeal.

2

July 1, 2018

### 5.1.1.3  Preliminary Review

When a faculty member appeals, the Appeals Board will conduct a preliminary review to determine whether the allegations as stated in the appeal, if fully substantiated after investigation, could reasonably be found to establish one or more of the grounds for appeal. If one of the grounds is discrimination, the Appeals Board must consult with the Office of Employee Engagement and Equal Employment Opportunity or the Title IX Coordinator, as appropriate ("University EEO Resources")before making a determination on that ground. Each ground appealed requires a separate determination as to whether the appeal will go forward on that ground.  If, after the preliminary review, the Appeals Board determines that an appeal should go forward on one or more grounds, it will then investigate the faculty member's allegations.

If the Appeals Board decides by a majority that an appeal does not satisfy the criteria, the Appeals Board will forward its recommendation to the appropriate academic officer (either the provost or the president), with a copy to the faculty member and the lower-level academic officers. The recommendation must state the reasons for not considering the appeal. The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

The Appeals Board transactions are confidential and not open to persons other than those explicitly invited to participate. Written minutes shall be kept of its meetings which shall be available only to the appropriate academic officer (either the provost or the president).

### 5.1.1.4  Investigation and Determination

If an appeal moves forward, the Appeals Board may request interviews with, and materials from, the faculty member, the dean, and any evaluating committee. The Appeals Board may take any reasonable action that it deems appropriate or helpful to its deliberations.  In every case the Appeals Board must interview the author of any report that recommended against renewal or promotion and tenure and any academic officer who recommended dismissal.  The Appeals Board is charged only with reviewing the basis of the appeal; it does not perform an independent evaluation of the faculty member's qualifications. Each ground appealed requires a separate determination.

### 5.1.1.5  Modified Procedures When Academic Freedom Violation is Alleged (Term Faculty)

A term faculty member's allegation of an academic freedom violation is serious, not to be made or received lightly.

The university has no obligation to reappoint term faculty members beyond the terms of their contracts.

If a term faculty member alleges a violation of academic freedom, the Appeals Board will conduct a preliminary review as described in Section 5.1.1.3. If the Appeals Board concludes that the appeal does not satisfy the criteria for a violation of academic freedom, the faculty member will have the option to submit a written response to the report which must be provided to the provost and the Appeals Board for inclusion in the appeal record. The provost may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

3

Calvente-DePaul 000075

July 1, 2018

1  If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining term
2  faculty member a written statement indicating the basis for the academic freedom allegation.  The
3  Appeals Board shall receive from the faculty member's dean a written statement of the reason(s) for the
4  challenged decision and/or a statement of the procedures followed in reaching the challenged decision.
5  The dean must submit these items to the Appeals Board within ten business days after the chair of the
6  Appeals Board requests them. The Appeals Board will afford the term faculty member and the dean the
7  opportunity to respond in writing and may also request further information.
8
9  For the Appeals Board to conclude that the challenged decision violated the faculty member's academic
10  freedom, a majority of the Board must find that the violation was the causal basis for non-reappointment
11  or termination.
12
13  The Appeals Board will prepare a written analysis and conclusion regarding the allegation of an academic
14  freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the
15  provost for final decision, with copies to the faculty member and dean.
16

17  **5.1.1.6  Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line Faculty)**
18
19  A tenure-line faculty member's allegation of an academic freedom violation is serious, not to be made or
20  received lightly.
21
22  The university has no obligation to renew the contracts of untenured tenure-line faculty members.
23  Tenured faculty have the right to a continuous appointment except as provided in Chapter 4 of the Faculty
24  Handbook.
25
26  If a tenure-line faculty member alleges a violation of academic freedom, the Appeals Board will conduct
27  a preliminary review on this ground. If the Appeals Board decides by a majority that an appeal does not
28  satisfy the criteria for a violation of academic freedom, the Appeals Board will forward its
29  recommendation to the appropriate academic officer (either the provost or the president), with a copy to
30  the faculty member and the lower-level academic officers. The recommendation must state the reasons for
31  not considering the appeal. The faculty member will have the option to submit a written response to the
32  report which must be provided to the appropriate academic officer (either the provost or the president)
33  and the Appeals Board for inclusion in the appeal record.
34  The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's
35  recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the
36  Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to
37  investigate the faculty member's allegations.
38
39  If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining faculty
40  member a written statement indicating the basis for the allegation of an academic freedom violation. The
41  Appeals Board shall receive from the faculty member's dean or provost, where applicable, a written
42  statement of the reason(s) for the challenged decision and/or a statement of the procedures followed in
43  reaching and reviewing the challenged decision. The dean or provost must submit these items to the
44  Appeals Board within ten business days after the request by the chair of the Appeals Board.
45
46  Upon receipt of the written statements, the Appeals Board will conduct a formal hearing in order to make
47  a recommendation on the alleged academic freedom violation.
48
49  The two parties have the following prerogatives in the formal hearing:
50

4

Calvente-DePaul 000076

July 1, 2018

1.       To obtain in advance of the hearing a list of witnesses the other party intends to call;

2.       Upon written request, to inspect before the formal hearing all documents that the Appeals Board in its prehearing meetings has collected and deemed relevant to its deliberations, in a manner determined by the Appeals Board (provided that the Appeals Board shall require both parties to keep the contents in strict confidence);

3.       To select an academic advisor or counsel of their own choosing, provided that advisor or counsel may not participate in the hearing but may be present;

4.       To cross examine witnesses;

5.       To have sufficient time to prepare evidence and to have adjournments upon the valid claim of unforeseen occurrences during the hearing.

The faculty member has the following additional prerogatives in the formal hearing:

1.       To decline to testify, without prejudice, at the hearing without restricting the prerogative of supporting evidence;

2.       To invite a representative of a responsible educational association as an observer to the hearing.

The responsibilities and prerogatives of the hearing Appeals Board in conducting its procedures are:

1.       It has the right to all the information and documents it needs, without being obligated by strict rules of legal evidence and legal procedures, exercising due precaution not to divulge the contents of documents normally considered confidential;

2.       It may conduct prehearing meetings to clarify issues and otherwise provide for an effective and efficient hearing;

3.       It may take whatever time is required for a fair and complete hearing, while avoiding unnecessary delays;

4.       It may formulate its own additional rules of procedure not contrary to the procedures of this document;

5.       It shall keep a verbatim record of the hearings, which shall be available to the parties without cost.

The university will assume all costs directly incurred by the hearing Appeals Board. If the faculty member employs an attorney for the hearing, and the appeal is upheld, the university will reimburse the faculty member for at least one-half of the reasonable legal expenses incurred during the formal hearing, the precise proportion to be decided by the Appeals Board.

During the process of the hearing, neither party may make public statements about the proceedings. The Appeals Board may make public statements regarding the status of the proceedings.

In order for the Appeals Board to come to the conclusion that the challenged decision violated the faculty member's academic freedom, a majority of the Appeals Board must find that the violation was the causal basis for the challenged decision.

Calvente-DePaul 000077

July 1, 2018

The Appeals Board will prepare a written analysis and conclusion regarding the alleged academic freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the provost or president, as appropriate, for final decision, with copies to the faculty member and dean.

### 5.1.2 Tenure-Line Faculty Appeals

Untenured tenure-line faculty may appeal:

1. Nonrenewal prior to the tenure decision (Section 5.1.2.1)

2. Dismissal during the contract period prior to tenure (Section 5.1.2.2)

3. Denial of promotion or tenure (Section 5.1.2.3)

Appeals Board recommendations on appeals for denials of promotion and tenure go to the president for final decision. Appeals Board recommendations on other types of appeals for untenured tenure line faculty go to the provost for final decision.

Tenured faculty may appeal:

1. Termination due to Medical Disability or for Medical Reasons (Section 5.1.2.4)

2. Termination due to Financial Exigency (Section 5.1.2.5)

3. Termination due to Discontinuance or Substantial Reduction of an Academic Unit (Section 5.1.2.6)

4. Denial of Promotion (Section 5.1.2.3)

Tenured faculty may not appeal suspension or termination for misconduct but have the right to pre-dismissal and pre-suspension hearings as described in Chapter 4.

Appeals Board recommendations on appeals go to the provost or president, as specified in the applicable section, for final decision.

### 5.1.2.1 Nonrenewal of Untenured Tenure-Line Faculty Prior to the Tenure Decision

Grounds for Appeal

An untenured tenure-line faculty member may appeal the decision not to renew his or her probationary period contract. The appeal must be based on one or more of the following grounds:

1. The nonrenewal violated the faculty member's academic freedom.

2. The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

3. The nonrenewal was the result of discriminatory practices prohibited by

6

Calvente-DePaul 000078

July 1, 2018

university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to renewing the faculty member's contract. The provost's decision is final.

Calendar for the Appeals Process

By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the president of Faculty Council. By the first day of fall term of the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the provost no later than January 15. The provost must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.2  Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary Period Contract for Reasons Other than Misconduct**

Untenured tenure line faculty have no right of appeal under this section in cases in which they have had a hearing under section 4.4

Grounds for Appeal

An untenured tenure-line faculty member may appeal dismissal during the term of a probationary period contract.  The appeal must be based on one or more of the following grounds:

1.      The dismissal violated the faculty member's academic freedom.

2.       The process by which the decision to dismiss was made applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

7

Calvente-DePaul 000079

July 1, 2018

3.    The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for this  appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review.  The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.3  Denial of Promotion or Tenure**


**Grounds for Appeal**

A faculty member may appeal the decision to deny an application for tenure or promotion. The appeal must be based on one or more of the following grounds:

1.    The decision violated the faculty member's academic freedom.

2.    The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

8

July 1, 2018

3. The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the president. The faculty member will have the option to submit to the president a written response to the report.

**Final Decision**

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member, the provost, and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to awarding tenure or promotion. The president's decision is final.

**Calendar for the Appeals Process**

By June 30, the faculty member must state his or her intent to appeal in writing to the president and the president of Faculty Council. By the first day of fall term of the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the president, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the president no later than January 15. The president must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.4 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months**

Grounds for Appeal

A tenured faculty member may appeal termination under Chapter 4, Section 4.8. The appeal must be based on one or more of the following grounds:

1. The termination violated the faculty member's academic freedom.

2. The process by which the decision to terminate was made applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The termination was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

Calvente-DePaul 000081

July 1, 2018

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At the preliminary review, the Appeals Board must establish a clear timeline for the appeal and distribute it to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the president within 30 business days of the preliminary review. The president must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

## 5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency

Grounds for Appeal

A tenured faculty member notified of termination because of financial exigency has a right to appeal. The appeal must be based on one or more of the following grounds:

1.  The selection of the area and type of retrenchment was not in accordance with the procedures set out in Chapter 4, Section 4.6.

2. The selection of specific faculty appointments to be terminated was not in accordance with the procedures set out in Chapter 4, Section 4.6.

3. The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

Calvente-DePaul 000082

July 1, 2018

4. The university failed to meet its obligations as specified in Section 4.6.6 of the Faculty Handbook. A unit's vote not to accept the faculty member may be appealed only for failure to satisfy one or more of the criteria listed in section 4.6.6 (1)(a-d).

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit his or her supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the president within 30 business days of the preliminary review. The president must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.6  Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit**

Grounds for Appeal

A tenured faculty member notified of termination because of discontinuance or substantial reduction of an academic unit or program has the right to appeal the selection of his or her specific faculty appointment for termination. The appeal must be based on one or more of the following grounds:

11

July 1, 2018

1.    The selection of specific faculty appointments to be terminated was not in accordance with the procedures set out in Chapter 4, Section 4.7.

2.    The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

3.    The university failed to meet its obligations as specified in Section 4.7.6 of the Faculty Handbook. A unit's vote not to accept the faculty member may be appealed only for failure to satisfy one or more of the criteria listed in Section 4.7.6 (1)(a-d).

4.    The termination decision violated the faculty member's academic freedom.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the termination, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

### *5.1.3 Term Faculty Appeals*

Term faculty are limited to appeals of: (1) major sanctions during the contract term, and (2) non-reappointment on the grounds of a violation of academic freedom or discrimination in violation of university policies or federal, state, and local laws.

### **5.1.3.1 Major Sanctions within the Contract Period**

12

Calvente-DePaul 000084

July 1, 2018

**Grounds for Appeal**

The appeal must be based on one or more of the following grounds:

1. The major sanction violated the faculty member's academic freedom.

2. The process by which the major sanction was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the major sanction was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.


Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the term faculty member and the dean. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the term faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review. The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

Calvente-DePaul 000085

July 1, 2018

**5.1.3.2 Non-Reappointment of Term Faculty**

Grounds for Appeal

A term faculty member may appeal the decision not to reappoint him or her. The appeal must be based on one or both of the following grounds:

1. The non-reappointment violated the faculty member's academic freedom.

2. The non-reappointment was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to renewing the faculty member's contract. The provost's decision is final.

Calendar for the Appeals Process

By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the president of Faculty Council. By the first day of fall term in the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for the case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the provost no later than January 15. The provost must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

*5.1.4 Adjunct Faculty Appeals*

Adjunct faculty are limited to appeals of suspension or dismissal during the contract period. The contract period is defined in the adjunct faculty's letter of appointment and is defined on a course by course basis.
.

**5.1.4.1 Suspension or Dismissal During the Contract Period**

14

Calvente-DePaul 000086

July 1, 2018

Grounds for Appeal

The appeal must be based on one or more of the following grounds:

1. The suspension or dismissal violated the faculty member's academic freedom.

2. The process by which the suspension or dismissal was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the suspension or dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

As outlined in Section 5.1.1.1, the Appeals Board will included three tenured faculty members. For an adjunct faculty appeal, the Faculty Committee on Appeals will select an adjunct faculty member who will act as a non-voting consultant to the Appeals Board. The role of the consultant will be to provide expertise on issues that uniquely affect adjunct faculty.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation. The Appeals Board shall submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The preliminary review will follow the process described in the Faculty Handbook Section 5.1.1.3. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the adjunct faculty member and the dean. If the provost grants the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. If the appeal is granted, the adjunct faculty member will be paid the amount due under the original contract appointment. The provost's decision is final.

Calendar for the Appeals Process

Due to the timing of adjunct faculty appointments, which frequently occur on a term-by-term basis, an expedited appeals process is necessary.

Within 5 business days of being informed of the suspension or dismissal, the adjunct faculty member must write to the provost and the president of Faculty Council, stating the adjunct's intent to appeal. Within 10 business days of submitting the written notice of intent to appeal, the adjunct faculty member will submit his or her supporting documentation. Within 5 business days of receipt of this documentation, the chair of the Faculty Committee on Appeals will convene the preliminary review by the Appeals Board.

The written recommendation from the Appeals Board must be completed and sent to the provost within 10 business days of the preliminary review. An allegation of discrimination will follow the timeline used in University EEO Resources. The provost must issue a final decision no later than 5 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously and reasonably as possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above are to be construed as maximums.

Calvente-DePaul 000087

July 1, 2018

A failure by the affected adjunct faculty member to adhere to any time guidelines, except under extraordinary circumstance, shall result in forfeiture of all review rights. A failure by the Appeals Board or provost to adhere to any time guidelines, except under extraordinary circumstances, shall result in the adjunct faculty member being paid the amount due under the original contract appointment.

### 5.1.5 Other Faculty

Faculty with special appointments (as defined in 2.3.3) may not appeal reappointment or dismissal during their contract terms.

## 5.2 Grievances

Grievance procedures are available to all faculty (including all full-time and adjunct faculty) for issues other than denial of promotion and tenure, dismissal, nonrenewal, and non-reappointment. The grievance must be filed by the individual adversely affected by the decision.

Grievances are to be conducted in accordance with the procedures specified below.

### 5.2.1 Definition

A grievance is a written complaint concerning a decision made by a person with authority in the university. Grievances are limited strictly to the questioned decision and are open only to the persons directly and adversely affected by that decision. Grievances may not be used to question or change policy. A decision being grieved remains in effect unless the decision is suspended.

A decision is grievable if it meets all of the three following criteria:

1.  It adversely affects the interests of an individual;
2.  The affected individual is being treated differently from other persons of similar circumstances or the decision violates any policy of the university or the relevant academic unit; and

3.  There is insufficient justification for the different treatment or the failure to comply with policy.

Specifically outside the scope of the grievance process are:

1.  University policies.

2.  Policy crafted by a deliberative faculty body.

3.  Allegations of violations of the university's Anti-discrimination and Anti-harassment policy, which are handled by University EEO Resources.

Persons involved in the grievance process may share information concerning the process and substance of a grievance with other persons having a legitimate need for the information. Wider distribution creates potential risks to fairness and privacy. The grievance process is a key element of the university's shared governance. Deterioration of fairness and privacy, or even the perception of deterioration, would undermine the effectiveness of the university's faculty grievance process.

16

Calvente-DePaul 000088

July 1, 2018

A tenured faculty member has the right to a formal grievance hearing after the fact if suspended by the provost without a prior hearing (Chapter 4, Section 4.4).

### 5.2.2 Procedures for Faculty Grievances

Prior to initiating a formal grievance, a faculty member should seek to resolve complaints with the individual who made the decision in question.

A formal grievance must be filed in writing with the faculty member's dean within 60 days after communication of the decision.

The grievance procedure has two steps:

1. Formal administrative grievance process

2. Faculty Grievance Board process

Faculty grievances begin with formal administrative process. This must be completed before the faculty member proceeds to the Faculty Grievance Board.

If a faculty member alleges discrimination at any point in a grievance, the dean or the Grievance Board must refer the grievance to University EEO Resources which, in consultation with the dean (if raised during the formal administrative process) or Grievance Board (if raised during the Grievance Board), will conduct an investigation and submit a report to the dean or Grievance Board in a timely manner.

### 5.2.2.1 Administrative Grievance  Process

The dean of a college conducts the formal administrative grievance process. If the grievance challenges a decision of the faculty member's dean, the grievance will be heard by another dean selected by the provost with approval of the aggrieved faculty member.

Throughout the formal administrative grievance process, the burden of proof rests on the faculty member.

The faculty member must submit to the dean hearing the grievance a written statement explaining:

1. the precise nature of the grievance

2. information and evidence supporting the faculty member's position

3. a description of all informal attempts to resolve the complaint and the reasons why any proposed resolutions identified during the informal procedures were unsatisfactory to the faculty member, and

4. the remedies that the faculty member would consider satisfactory.

At the same time, the faculty member will provide a copy to the individual whose decision is being challenged.  That individual may submit a written statement to the dean within ten business days of receipt of the faculty member's statement, with a copy to the faculty member.

17

Calvente-DePaul 000089

July 1, 2018

1  The dean hearing the grievance provides a written report to the faculty member and the individual whose
2  decision is being challenged within thirty calendar days after receiving their written statements. In the
3  written report, the dean shall state the decision and what action, if any, is required to implement the
4  decision.
5
6  Either party may appeal the dean's decision to the provost within ten business days of receiving the
7  decision. The appeal must be in writing and supported by reasons for not accepting the dean's decision.
8  The appealing party must provide the other party with a copy of the appeal to the provost.  The provost
9  may conduct another review and. will enter a written decision, within thirty calendar days after receipt of
10 the appeal. The provost must send the written decision to both parties.
11

12 **5.2.2.2  Grievance Board Procedures**
13
14 If the faculty member who filed the grievance is unsatisfied with the provost's decision, he or she may,
15 within ten business days of receiving the provost's decision, refer that decision to the judgment of faculty
16 peers. The faculty member must submit a written request to the president of the Faculty Council to direct
17 the Faculty Council Committee on Committees to select three tenured faculty members to serve as a
18 Grievance Board. For a term or adjunct faculty grievance, the Committee on Committees will select a
19 corresponding term or adjunct faculty member who will act as a non-voting consultant to the Grievance
20 Board.  The role of the consultant will be to provide expertise on issues that uniquely affect adjunct or
21 term faculty.  Faculty chosen for the Grievance Board may not serve in a grievant's local academic unit or
22 have a significant personal relationship with the grievant. In cases brought to a Grievance Board, the
23 burden of proof rests on the faculty member to establish that the administrative decision was unfair.
24

25 Within five business days of the establishment of the Grievance Board, the faculty member must submit
26 to the Grievance Board and the provost a statement indicating the reasons why the decision of the provost
27 is unfair. The provost may submit a response to the faculty member's statement within an additional five
28 business days. The Grievance Board must request, and the provost must provide, the written record of the
29 formal administrative process. New complaints, new evidence, and other new matters not addressed
30 during the formal administrative process may not be introduced for the first time to the Grievance Board.

31 Preliminary Review
32 Upon receipt of the faculty member's grievance submission, the chair of the Grievance Board shall
33 schedule the grievance for a preliminary review by the Grievance Board as soon as practicable.  The
34 Grievance Board has sole and unreviewable discretion whether to schedule the preliminary review
35 meeting during the spring or summer break or wait until the university is back in regular session.
36
37 At the preliminary review meeting, the Grievance Board will determine:
38
39         1.       whether the grievance is timely;
40
41         2.       whether the matter grieved about is grievable under the procedures;
42
43         3.       whether the formal administrative grievance process has been followed; and
44
45         4.       whether the grievance materials submitted to the Grievance Board, if fully
46                  substantiated after investigation, could reasonably be found to satisfy the criteria set forth
47                  in this chapter.
48

18

Calvente-DePaul 000090

July 1, 2018

If the Grievance Board decides by a simple majority that the grievance is not timely, is not grievable, did not follow the formal administrative grievance process, or could not reasonably be found to satisfy the criteria, the Grievance Board will forward its written decision to the provost, with a copy to the faculty member. The decision must state the reasons for not considering the grievance.

Investigation and Review

If, after the preliminary review, the Grievance Board determines that the grievance warrants further consideration, the Grievance Board will conduct a review. If, in the opinion of the Grievance Board, the materials already submitted are not sufficient to make a determination, the Grievance Board may request interviews with, or materials from, the faculty member or other individuals named in the grievance. The Grievance Board may take any other reasonable actions that it deems appropriate or helpful to its deliberations.

The Grievance Board will prepare a written report of its findings and recommendation, including the majority and any minority views. The Grievance Board will forward the report to the president, with copies provided to the faculty member and the provost.

If a tenured faculty member has grieved over a sanction imposed on him or her and if the Grievance Board declines to affirm the grievance, the faculty member may ask the president to make a final determination. Otherwise, the decision of the Grievance Board is final.

If implementing the decision of the Grievance Board requires financial resources beyond what is usually and customarily allocated to similarly situated faculty, the Grievance Board shall seek the approval of the provost. If the provost does not approve the expenditure on the ground that sufficient resources are not immediately available, the provost must provide in writing a reasonable timeline for implementing the Grievance Board's decision or seek mutually agreed upon alternative ways to address the inequity or remedy the unfair decision against the grievant.

## 5.3. Right to Review Personnel Records

Illinois law governs the right of employees to review their own personnel records. University policy establishes the process for requesting such records.

19

Calvente-DePaul 000091

July 1, 2018

1
2 **CHAPTER 6.  FACULTY RIGHTS AND RESPONSIBILITIES**
3

4  6.1  Academic Freedom ............................................................................................................. 3

5  6.2 Diversity Guidelines .......................................................................................................... 3

6  6.3 Academic Support.............................................................................................................. 3

7    6.3.1 Faculty Development and Research............................................................................ 3

8    6.3.2 Memberships.............................................................................................................. 4

9    6.3.3 Travel Expenses ........................................................................................................ 5

10  6.4 Faculty Responsibilities..................................................................................................... 5

11    6.4.1 Members of the Academic Profession ....................................................................... 5

12    6.4.2 Members of DePaul University .................................................................................. 6

13    6.4.3 Teacher of Students.................................................................................................... 6

14    6.4.4 Academic Administrators ........................................................................................... 6

15  6.5  Instructional Responsibilities............................................................................................ 7

16    6.5.1  Class Attendance ....................................................................................................... 7

17    6.5.2 Class Cancellation...................................................................................................... 7

18    6.5.3  Inability to Meet a Class/Substitute Teaching .......................................................... 7

19    6.5.4 Class Hours ................................................................................................................ 8

20    6.5.5 Syllabus Requirements............................................................................................... 8

21    6.5.6  Course Examinations ................................................................................................. 8

22    6.5.7  Time for Submitting Final Grades ............................................................................. 8

23  6.6 Workload............................................................................................................................ 8

24    6.6.1  Faculty Assignments ................................................................................................. 9

25    6.6.2  Responsibility for Assignments ................................................................................ 9

26    6.6.3  Teaching .................................................................................................................... 9

27      6.6.3.1 Full-time and Part-time Faculty ........................................................................... 9

28      6.6.3.2  Administrators..................................................................................................... 9

29      6.6.3.3  Graduate Assistants and Fellows ...................................................................... 10

30      6.6.3.4  Summer Session Assignments .......................................................................... 10

31    6.6.4  Activities Outside the University............................................................................ 10

32  6.7 Leaves of Absence .......................................................................................................... 11

1

Calvente-DePaul 000092

July 1, 2018

1  6.8 Salaries .................................................................................................................. 12

2  6.9 Academic Policies ................................................................................................... 12

3  6.10 Establishing a New University Policy .................................................................... 12

4

Calvente-DePaul 000093

July 1, 2018

# CHAPTER 6.  FACULTY RIGHTS AND RESPONSIBILITIES

DePaul University generally follows AAUP guidelines, except in instances where a policy is otherwise defined in this Handbook.

## 6.1  Academic Freedom

DePaul accords academic freedom a prominent position as an integral part of the university's scholarly and religious heritage. The university attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process. University precept and tradition protect this freedom from infringement. Not only the faculty but also students and other members of the university community enjoy this freedom as they participate in the various forms of open inquiry and debate, as for example, classroom presentation and discussion, research and publication, public statements made as a citizen in one's own name, and other forms of creative expression.

DePaul University is guided by the AAUP 1940 Statement of Principles on Academic Freedom and Tenure (with 1970 Interpretive Comments). However, the university expressly reserves the right to amend, alter, modify, and delete the same with the assent of the Faculty Council.

## 6.2 Diversity Guidelines

DePaul University has a long-standing commitment to ethnic and cultural diversity of its faculty, staff, and student body. As a university with a strong Catholic and Vincentian heritage, this commitment is particularly integral to our mission. It is also recognized that a multicultural experience is an essential part of DePaul.

Consistent with the Catholic and Vincentian heritage, DePaul University is committed to preserving an environment that respects the personal rights and dignity of each member of the community. Therefore, DePaul University does not tolerate harassment or discrimination, as, for example, set forth in the Anti-Discrimination and Anti-Harassment Policy and Procedures.

## 6.3 Academic Support

### 6.3.1 Faculty Development and Research

Since the university's mission statement places "highest priority on programs of instruction and learning." To further this objective, university sponsors a variety of professional development programs and awards recognizing outstanding achievement in teaching, scholarship, and/or creative activities, and service.  Development opportunities and awards include, among others:

- Paid faculty leaves
- University Excellence in Teaching Award
- Spirit of Inquiry Award

3

July 1, 2018

1  • Competitive instructional grants
2  • Summer stipends
3  • Departmental initiative grants
4  • Competitive research grants
5  • Research conference program.
6

7   The Office of Faculty Development & Research seeks to fulfill the university's commitment to
8   academic excellence by developing teacher/scholars at all academic career levels.  The Office has
9   responsibility for programs, resources, and guidelines that support development, promotion, and
10  retention of talented and diverse faculty.  Through the Office of Faculty Development &
11  Research, the provost provides internal grants to support faculty development initiatives and
12  sponsors awards to recognize outstanding faculty achievements.

13  The Office of Faculty Development and Research provides university-wide support for faculty
14  development through the Quality of Instruction Council (QIC), the University Research Council
15  (URC), and the Public Service Council (PSC).   The Associate Vice President for the Office of
16  Faculty Development and Research chairs the three councils, which are composed of faculty and
17  academic administrators.

18  The Office also sponsors other opportunities, including new faculty orientation, tenure and paid-
19  leave workshops, and select international faculty language immersion programs.  All programs
20  are intentionally competitive in nature to ensure the best use of available funds and to encourage
21  the development of proposal-writing skills.  Applications regularly exceed available funding, and
22  applicants are encouraged to submit well-crafted projects that advance their scholarly objectives.

23  Faculty grants, awards, stipends, and leaves are peer reviewed by one of three academic councils.
24  The Associate Vice President for Faculty Development & Research chairs all three academic
25  councils.  Council members are appointed by Faculty Council.  The University Research Council
26  (URC) reviews and awards research grants, leaves, and the Spirit of Inquiry Awards.  The Quality
27  of Instruction Council (QIC) reviews and awards instructional grants and leaves and the
28  Excellence in Teaching Awards.  The Public Service Council (PSC) reviews and awards
29  instructional and research grants related to service learning courses and university-community
30  research projects.  The PSC also reviews Excellence in Public Service Awards.

31  A more complete listing of professional development initiatives and guidelines can be found at
32  the Office of Faculty Development and Research.
33

34  *6.3.2 Memberships*
35

36  Although professional membership fees are the responsibility of individual faculty, the university
37  may reimburse individual a full-time faculty member up to $50.00 per membership for up to three
38  professional organizations per year, provided that the faculty member pays the first $25 of each
39  fee.  The university does not pay for memberships in private clubs except with the president's
40  approval.
41

4

Calvente-DePaul 000095

July 1, 2018

### 6.3.3 Travel Expenses

The university provides each academic unit with a travel budget to support faculty participation in meetings of learned societies. Top priority for travel support belongs to the faculty member who presents a paper, serves on a panel, acts as an officer of the society, represents the university (on the authority or request of the chair or dean) in recruiting faculty, or serves in another official capacity. Travel support is provided only from travel funds within the budget of the academic unit and upon approval of the chair or dean, who is responsible for distributing travel funds among the faculty who travel in an official role. Depending on the amount of money available in the travel budget and the demands for these funds, the faculty members may receive partial or no support.

Travel compensation may be given for national or regional meetings. For meetings in the metropolitan Chicago area, support is limited to incidentals such as registration fees. In all instances, the university reimburses actual expenses for allowable items.

Faculty who attend meetings without taking one of the active roles listed above are usually expected to cover their own expenses. However, if travel funds remain in the budget, the chair or dean may approve support for not more than half of the travel expenses. Faculty members are encouraged to plan travel as far in advance as possible and to keep chairs and deans advised to these plans before budgets are prepared. For specific procedures, forms and guidelines, see the Office of Financial Affairs.

## 6.4 Faculty Responsibilities

Membership in the academic profession, in professional societies and associations of higher education, and in DePaul University entails special responsibilities. The more important of these responsibilities are summarized here as a code of professional ethics. They are subject to amendment from time to time through appropriate university action. Failure to comply with these responsibilities renders a faculty member liable to appropriate sanction within the procedural safeguards and provision for peer judgment.

### 6.4.1 Members of the Academic Profession

As a member of the academic profession, the faculty member has these obligations:

1.  To seek truth; to improve scholarly competencies for this purpose; to engage in productive scholarship, research or other creative activities; and to uphold the scholarly standards of one's academic discipline.
2.  To practice intellectual honesty; to acknowledge academic debts to others; and to exercise impartiality in passing professional judgments on colleagues.
3.  To respect the rights of other persons to hold and express different intellectual positions; and to protect the rights, well-being, and privacy of persons involved in scientific inquiry.
4.  To be accurate in making public statements in one's own name and to be mindful that in making such statements the public may judge the faculty member's profession and institution from these statements.

5

Calvente-DePaul 000096

July 1, 2018

### 6.4.2 Members of DePaul University

As members of DePaul University, the faculty member has these obligations:

1. To respect the religious character of the university and the religious beliefs of persons affiliated with the university.
2. To adhere to non-discriminatory norms in [interacting with other university personnel].
3. To preserve confidentiality in personnel and administrative deliberations when confidentiality is explicitly required.
4. To avoid unauthorized use of university resources or facilities for personal, commercial, or political purposes.
5. To assume a fair share of faculty responsibilities for university governance and to accept and fulfill committee appointments and other responsibilities associated with faculty status.
6. To comply with duly approved regulations and procedures.
7. To attend general university commencements and convocations.

### 6.4.3 Teacher of Students

As a teacher, a faculty member has these obligations:

1. To present to students subject matter compatible with course descriptions appearing in official university bulletins and catalogues; to avoid significant intrusion of material unrelated to the course; and to meet classes and hold examinations as scheduled.
2. To evaluate students only on the basis of academic performance and to evaluate their work without undue or unexcused delay.
3. To hold office hours, to be available to students enrolled in the faculty member's courses, and to serve as a faculty advisor to other students according to the policies of the academic unit.
4. To avoid any exploitation of students for personal advantage or any coercion of the judgment or conscience of students.

### 6.4.4 Academic Administrators

A member of the faculty who holds an administrative position has these obligations:

1. To establish adequate means of communication for matters that materially affect the members of the particular academic unit and to be reasonably available for the faculty and staff of the unit.

6

Calvente-DePaul 000097

July 1, 2018

2. To provide opportunity for joint planning and effort where appropriate and to set up and apply the structures necessary for joint action.
3. To make personnel decisions impartially; to give responses as soon as circumstances allow; and to give reasons for refusing a request if asked to do so by the person refused unless the disclosure of the reason would breach confidentiality.
4. To remain current with developments in higher education related to the sphere of the particular administrative position.

## 6.5 Instructional Responsibilities

At times it is important for faculty to convey messages to students through announcements made in class. Instructors' cooperation in making these announcements is appreciated.

### 6.5.1 Class Attendance

Instructors are expected to take attendance during the first week of class and again after receipt of an "update" roster (approximately the fifth week of class). This helps academic officers to identify and correct errors before grade sheets are printed. Individual faculty have the prerogative to establish course attendance guidelines. These should be stated in the course syllabus.

### 6.5.2 Class Cancellation

It is imperative that instructors meet classes for each scheduled class. In the event that an instructor is unable to attend a class because of illness or unplanned absence, he/she must inform the local academic unit officer at the first opportunity. The local academic unit officer will then make arrangements to provide continued student learning during the instructor's absence.

### 6.5.3 Inability to Meet a Class/Substitute Teaching

A faculty member who is unable to meet a class is responsible for seeing that students are not thereby deprived of learning opportunities. This responsibility may be met by scheduling the necessary number of make-up classes at a time convenient to the students, requesting the assignment of a substitute instructor, or making other appropriate arrangements. In all instances of absence, the faculty member must inform the local academic unit officer of the facts regarding the absence, the reasons for it, and the measures taken to provide the students with the requisite learning experiences. The local academic unit officer may require the faculty member to provide this information in writing.

If a class is to be cancelled, the instructor shall inform the students beforehand, if at all possible. When the students have not been informed, the local academic unit officer will attempt to let the students know that the class has been cancelled, particularly an evening class attended predominantly by part-time students.

Calvente-DePaul 000098

July 1, 2018

*6.5.4 Class Hours*

It is essential that students have a minimum of three hours of contact time per week with their instructor in each four quarter hour course. Faculty members are expected to conduct class for the full period and to begin and end at scheduled times.

*6.5.5 Syllabus Requirements*

All faculty are required to prepare written course syllabi for each course they teach at DePaul. At a minimum, syllabi should contain the following information:

1. A rationale for the course stated in the context of the aims of the local academic unit;
2. A statement on the types of instruction (i.e., lecture; lecture-discussion; lab; etc.);
3. Specific materials required for the course (books, pamphlets, library materials, etc.);
4. Proposed major and minor topics to be covered in the course;
5. Specific required readings, and written and oral assignments (inclusion of tentative dates for such assignments is desirable);
6. Specific descriptions of the criteria and methods to be used by the instructor in evaluating students' academic performance, such as the nature of quizzes and examinations;
7. Statement on plagiarism; and,
8. Instructor's office number and office hours for the term in which the course is being offered.

Each faculty member must, by the first class session, make available to each student a copy of the syllabus that satisfies the guidelines outlined above. A copy must be submitted to the college or school.

*6.5.6 Course Examinations*

In all courses at the midpoint of the quarter, students will be informed of their achievement to date. Normally courses conclude with a final examination. To provide additional flexibility for faculty members, a formal mid-term or final examination is not required if the instructor has other comparable ways of evaluating student achievement.

*6.5.7 Time for Submitting Final Grades*

As a matter of administrative policy, all final grades are to be submitted within five business days of the last examination in all academic units of the university, except for the College of Law, which follows a different calendar.

**6.6 Workload**

8

Calvente-DePaul 000099

July 1, 2018

### 6.6.1 Faculty Assignments

Formal assignments comprise only part of a faculty member's academic life. As professionals, faculty members are expected to engage in many activities that are not official duties, particularly those that contribute to the good of the public and the university, their academic discipline, and their own professional development.

### 6.6.2 Responsibility for Assignments

The local academic unit officer makes faculty assignments, subject to approval by the dean.

### 6.6.3 Teaching

#### 6.6.3.1 Full-time and Part-time Faculty

The primary function of DePaul University is instruction; hence, teaching constitutes the majority of faculty assignments. The normal teaching load is nine full courses per academic year, usually three per quarter. Exceptions may arise if, for example, the established policy of a given academic unit or a particular faculty contract specifies the contrary. This load may be reduced if particular faculty courses place especially extensive demands on faculty time or if faculty members receive formal assignment in other functions. Only in exceptional instances is a faculty member asked to teach more than a normal load. In such instances, the faculty member receives additional compensation not less than the salary paid to a part-time faculty member for teaching a comparable course.

A teaching assignment may include student advisement, which requires that faculty members keep a sufficient number of regularly scheduled office hours at times that are of mutual convenience and appropriate for the needs of the students. A teaching assignment also entails services normally associated with faculty status and responsibilities. Supervision of independent study is entirely voluntary and is not calculated as part of the teaching load. Faculty receive no pay for supervising independent study. However, supervision of independent study is considered as an element of faculty performance in evaluations for salary adjustment, contract renewal, and tenure or promotion.

Faculty assignments to off-campus instruction generally are incorporated into the regular teaching load, warranting no additional compensation. Part-time faculty may be assigned to off-campus instruction on the same basis as on-campus assignments.

#### 6.6.3.2 Administrators

Administrators may have teaching assignments; however, they normally are not entitled to additional compensation for teaching. Administrators or staff personnel whose responsibilities do not include teaching, and who almost invariably do not have faculty status, may, in special instances, be assigned to teach a course. This teaching assignment is normally considered an

Calvente-DePaul 000100

July 1, 2018

integral part of the person's responsibilities for which the university provides no additional compensation.

Should another higher education institution invite an administrator to teach a course, he or she would be under the same restrictions applicable to faculty teaching outside the university.

Administrative personnel who have faculty status may receive a teaching assignment during the summer session. As the university considers the assignment to replace some administrative functions during this period, the administrator is not entitled to additional compensation.

**6.6.3.3  Graduate Assistants and Fellows**

Assignment of full responsibility of teaching a course is limited to persons who have full-time or part-time faculty appointments in the university. In exceptional cases a graduate assistant may be given such an assignment if the graduate assistant is in a doctoral program and has already successfully completed the Master's degree or its equivalent.

**6.6.3.4  Summer Session Assignments**

Faculty members with 10-month contracts may accept or decline courses offered to them during the summer.

*6.6.4  Activities Outside the University*

Faculty members are encouraged to pursue activities outside the university that contribute to DePaul's mission, including social, civic, and religious activities, and service to one's professions and professional associations. However, because a full-time faculty appointment implies a full commitment to DePaul University, outside activities must conform to the following limits:

1. They must not interfere with the faculty member's commitment to the full academic life of the university, including teaching, research, student advisement, governance, and related responsibilities.
2. During the regular academic year, the faculty member must give precedence to university responsibilities.
3. Two additional limits apply to outside activities for which the faculty member receives remuneration:

   - They must be professional activities that contribute to the professional development of the faculty member or provide expertise to the community; and

   - Over the course of a year, they must not exceed the equivalent of one day per work week.

10

Calvente-DePaul 000101

July 1, 2018

4. The faculty member will arrange privately for whatever support services his or her outside activities may require. Only with prior approval of the dean may a faculty member enlist the services of university personnel or employ university supplies and equipment for outside activities.

5. Each January, faculty members must submit an annual report on their work-related activities with any outside firm, agency, or institution if they (i) serve on a continuing basis as a consultant or in a similar role; (ii) are continuing members or officers of the outside entity, or (iii) normally provide services for the outside entity at least once a week, even if for less than a full day. The report goes to the dean, with a copy to the local academic unit officer in colleges organized into departments.

6. The faculty member is primarily responsible for determining whether outside activities are compatible with the responsibilities of a faculty member. Nevertheless, the dean must ultimately decide whether a faculty member's outside activities conform to the limits enumerated above. Deans may place specific restrictions on outside activities in order to satisfy policy requirements.

7. Teaching at another higher education institution while under contract at DePaul is permitted only in those specific instances for which the dean has given written approval.

8. Material violation of this policy is considered a violation of the faculty contract and could be cause for abrogation of contract and termination of tenure in accordance with the policies and procedures in Chapter 4.

## 6.7 Leaves of Absence

Leaves of absence may be granted for advanced study and research, a temporary position elsewhere compatible with one held at DePaul, medical need or disability in accordance with university policy, or personal reasons. The duration of a leave may be a full academic year or one or more terms. Only in exceptional cases will a leave be granted for more than one year.

Non-medical leaves are generally granted without salary. For other types of leave, the salary is reduced by one-third for each quarter of leave; for faculty of the College of Law, salary is reduced by one-half for each semester of leave.

University sponsored paid leaves are available through the Quality of Instruction Council and the University Research Council. These types of leaves have their own unique policies and procedures. For further details, please see the guidelines and applications forms for the Quality of Instruction Council and University Research Council.

A request for a full year of leave should be submitted in writing on or before January 15 of the preceding academic year. A request for leave for an academic term should be submitted in writing no later than the beginning of the term preceding the one for which leave is sought.

The local academic unit officer, the college dean, and the provost must approve a leave. They consider, among other factors, the effect of the faculty member's absence on the department or college and the possibility of finding a qualified replacement on a temporary basis. In granting leaves, the university accords priority to projects that will contribute to the faculty member's

11

July 1, 2018

professional development and to projects for which the faculty member has obtained funding
from external sources. The university does not normally grant simultaneous leaves to more than
one faculty member of an academic unit.

University policies and procedures on renewal and termination apply to faculty on leave.

Information regarding the continuation of employee benefits during a leave is available in the
Office of Human Resources and should be confirmed prior to the start of the leave.

If a college or department sponsors a separate leave program, a faculty member can obtain details
through the college or departmental office.

## 6.8 Salaries

The university makes decisions regarding salary in accordance with its budget guidelines.
Normally, salary decisions result in a merit increase and, when budgets permit, may include
increases for such things as equity and market adjustments. The salary recommendation is made
by the college dean.

Full-time faculty are paid on a biweekly basis in twenty-six payments per fiscal year. Part-time
faculty are paid biweekly during each quarter in which they are teaching (usually five pay periods
per quarter). During summer sessions, faculty are paid in two or three equal payments per
summer session. The Payroll Department determines payroll dates.

## 6.9 Academic Policies

In fulfillment of its governance role as defined in section 1.2.1 of the Faculty Handbook: Primary
Responsibilities of the Faculty, Faculty Council has its own proper guidelines to govern the
creation of academic policies, leading to approval of proposed policies and policy revisions by
the President.

After approval of policies and procedures that fall within Faculty Council's areas of
responsibility, the documents should be integrated into the university's online policy and
procedures manual. While the President and the Board of Trustees have authority to reverse
faculty decisions that fall within areas of primary faculty responsibility, the university expects
that they would do so only in exceptional circumstances and would communicate the reasons to
the faculty.

## 6.10 Establishing a New University Policy

Except with respect to the establishment of academic policies under Faculty Council authority,
the Office of the Secretary coordinates the establishment, archiving, revision, approval, and
publication of all university policies and procedures.

Details on academic policy and process appear on the University Policies and Procedures web
site.

Calvente-DePaul 000103

# Exhibit 5

Page 6

1          ALEXANDRA G. MURPHY,
2 called as a witness herein, having been first duly
3 sworn, was examined upon oral interrogatories and
4 testified as follows:
5              EXAMINATION
6          By Mr. Bramwell:
7    Q   Dr. Murphy, you've just taken an oath to tell
8 the truth. Do you understand that?
9    A   I do.
10    Q   Can you please state your name for the record?
11    A   Alexandra Murphy.
12    Q   And that's -- Can you spell that?
13    A   A-L-E-X-A-N-D-R-A, M-U-R-P-H-Y.
14    Q   And how would you prefer that I address you?
15 Is Dr. Murphy okay?
16    A   That's fine. Lexa is fine.
17    Q   If you give me permission to use your first
18 name, I'll use it.
19          Lexa, what's the month and year of your birth?
20    A   ▇▇▇▇▇▇▇.
21    Q   Okay. I'm also an ▇▇▇▇ baby.
22          Have you ever been deposed before?
23    A   Yes.
24    Q   When were you deposed?
25    A   I don't remember the exact year. Probably

Page 7

1 around 8 years ago.
2    Q   Eight years ago. So while you were at DePaul?
3    A   Yes.
4    Q   What was the nature of the suit in which you
5 were deposed?
6    A   I was a witness in a tenure case.
7    Q   Whose case was that?
8    A   Melissa Bradshaw.
9    Q   Okay. And what was she alleging?
10    MS. WERMUTH: Objection. Relevance.
11    MR. BRAMWELL: Q  You can answer.
12    A   She was alleging -- I don't remember to be
13 honest what the basis of the suit was. I can't recall
14 the exact -- I can't recall the exact language of the
15 suit to be honest.
16    Q   Was it a discrimination claim?
17    A   It was. She did not get tenure so she was
18 suing to -- I don't remember what the basis of her suit
19 was.
20    Q   Okay. Do you know if the case went to trial or
21 if the case settled?
22    A   I don't know.
23    MS. WERMUTH: Objection. Relevance.
24    MR. BRAMWELL: Q  You can answer. I'm sorry, Lexa.
25 Your attorney -- I have a hard time -- You give me your

Page 8

1 answer, please.
2    A   I don't know. Once I was deposed, that was it.
3 That's all I knew of the case.
4    Q   You were never called as a witness at trial?
5    A   No.
6    Q   That's the only time you've been deposed?
7    A   Yes.
8    Q   I'll go over some instructions since it's been
9 a while, and here they are. I'm going to ask you
10 questions, you are going to give me answers that are
11 true, complete, and accurate. Do you understand?
12    A   Yes.
13    Q   The court reporter is writing down everything
14 that we say. We need to take particular care since this
15 is a deposition over Zoom not to talk over each other. I
16 will try to let you complete your answer, I will try not
17 to talk over you. The attorneys sometimes are not as
18 good as -- good at this as we should be, but we'll try
19 not to make objections and talk over your answers. And
20 I'll try not to talk over her. Are we agreed?
21    A   Yes.
22    Q   You're going to need to give answers. Words
23 like uh-huh, uhn-uhn look a lot alike on a transcript.
24 It's a verbal tic. We all do it. I don't think I have
25 read a transcript where I haven't slipped into that once

Page 9

1 or twice, but just keep that in mind. You need to give
2 clear answers because again we have a court reporter.
3      Do you understand?
4    A   Yes.
5    Q   If you don't understand a question, please ask
6 me to clarify. I sometimes don't give the clearest
7 questions. So if you don't understand the question,
8 please ask me to clarify. Are we agreed?
9    A   Yes.
10    Q   If you answer a question, I'm going to assume,
11 and everyone else will assume, that you understood that
12 question. Do you understand that?
13    A   Yes.
14    Q   Okay. Obviously you have counsel -- Are you
15 represented by counsel here this morning?
16    A   Yes.
17    MS. WERMUTH: Yes. Mr. Bramwell, I represent the
18 university and its agents, decision-maker agents, so yes.
19    MR. BRAMWELL: Okay.
20    MS. WERMUTH: I represent the university.
21    MR. BRAMWELL: I'm sorry. Ms. Wermuth, you just
22 broke up at the end there. I'm sorry.
23    MS. WERMUTH: I said I think you know I represent
24 the university.
25    MR. BRAMWELL: Okay. Do you represent Lexa

3 (Pages 6 - 9)

Page 154

1 establishing for that candidate where they -- where they
2 fall.
3    Q    What about for service, how does one measure
4 whether someone is excellent versus just very good?
5    A    Similarly I think they'll book at both the
6 number of activities that someone has done in terms of
7 their service contributions and then also look at how
8 substantive is that in terms of what the contributions
9 are. So is it a one-off committee or is it a particular
10 meeting that someone might be in versus a longer term and
11 a task driven committee.
12    Q    Are there any objective metrics in this
13 respect?
14    A    We don't have that you have to serve on X
15 number of committees, no.
16    Q    The answer is no. There are no quantitative
17 metrics with respect to research?
18    A    No.
19    Q    And no quantitative metrics with respect to
20 service?
21    A    No.
22    Q    How many service hours need to be performed to
23 go -- to be excellent in service?
24    A    We don't go into that kind of detail in terms
25 of legislating a certain number of hours.

Page 155

1    Q    What is service?
2    A    To me I think service to the university is
3 doing something to contribute to the overall life of the
4 university, whether it's the student life, operational
5 life, academic life, and it's doing something that
6 someone else doesn't have to do. So there's tasks and
7 functions that need to happen.
8    Q    Like what?
9    A    So let's say you're on an assessment committee,
10 an assessment committee needs to do program assessment,
11 it's very time intensive, and so you may have four or
12 five people on that committee. So while you're doing
13 that, you're serving the college and making sure that
14 that task is done, and it's something that it's a
15 mandatory kind of thing, it has to happen so you're doing
16 that it means someone else doesn't have to.
17    Q    Yeah. Okay. I understand that. So service is
18 any work -- and it will draw an objection from misstating
19 your testimony -- but the question if I can get you to
20 clarify, service is any work that helps the university,
21 the college, both?
22    A    Service can be broad --
23    MS. WERMUTH: I didn't know if you were done, Jerry.
24 I didn't want to interrupt.
25        I will object to the form of the question. I

Page 156

1 will object insofar as it mischaracterized her testimony
2 and/or assumes facts not of record.
3    MR. BRAMWELL: Q We live with the objection and you
4 can answer.
5    A    Service can occur at local college and
6 university levels and community level.
7    Q    Community level. So that's outside of DePaul?
8    A    Uh-huh.
9    Q    It doesn't show up on the transcript.
10    A    Yes.
11    Q    Working the soup kitchen could qualify as
12 service?
13    A    Not according to our guidelines. Our
14 guidelines specify that you should be -- the service to
15 the community, it is drawn upon your knowledge base as an
16 academic.
17    Q    Okay. So, for example, you know, communicating
18 to minority communities that the COVID vaccine is a good
19 thing to get, that could be service?
20    A    That could be considered service.
21    Q    Okay. How does one obtain service
22 opportunities?
23    A    There's a variety of different ways that people
24 can get service opportunities. Most formally in our
25 college -- every summer we have a comprehensive list of

Page 157

1 the college committees and the different vacancies are
2 highlighted, and then it goes out to a call to the
3 faculty and to the program chairs to say we have these
4 openings so people can step up for them.
5    Q    And are people ever denied service
6 opportunities?
7    A    Not that I'm aware of.
8    Q    Okay. Are you familiar -- you know
9 Dr. Calvente, right, we've been speaking about her for a
10 while. Are you aware of her ever refusing a service
11 opportunity?
12    A    No, I'm not. I believe I said that in the
13 appeal response as well.
14    Q    We'll get into a lot of your statements. Did
15 she ever refuse a service opportunity?
16    MS. WERMUTH: Objection. Asked and answered.
17    MR. BRAMWELL: Q I'm sorry. Did she ever, you
18 know, volunteer for something and somebody just say --
19 Strike that.
20



Page 238

1　THE WITNESS:　You want me to answer now?

2　MR. BRAMWELL:　Q　Please.

3　█　███████████████████████

███████████████████████████████████

6　█　███████████████████████

8　MS. WERMUTH:　Objection.　Assumes facts not of

9　record.

10　MR. BRAMWELL:　Q　You can answer.

11　█　███████████████████████

███████████████████████████████████

███　█　██████████████████

16　MS. WERMUTH:　Hang on one second.　Assumes facts not

17　of record.

18　THE WITNESS:███████████

19　MR. BRAMWELL:　Q　You can answer.　Go ahead.

20　A　████████████████████

███████████████████████████████████

████████████

24　Q　All right.　Now,█████ actually came over from

25　another school, right?

---

Page 239

1　A　Yes.

2　Q　Where had Bree████ before?　Can you refresh my

3　recollection?　Do you remember?

4　A　I believe she was at Western Illinois.

5　Q　And she was tenured though at Western Illinois,

6　right?

7　A　Yes.

8　Q　Why didn't she come over to DePaul with tenure?

9　A　DePaul does not typically provide tenure to

10　faculty that are coming in.　It's fair.

11　Q　Is Western Illinois a peer school?

12　A　I don't know where they are in terms of

13　comprehensive university or what tier they are.

14　MR. BRAMWELL:　I'm going to pass you to Ms. Wermuth.

15　MS. WERMUTH:　We'll just take five minutes.

16　MR. BRAMWELL:　Come back at 4:25.

17　MS. WERMUTH:　Perfect.

18　(Off the record)

19　MS. WERMUTH:　Okay.　We have no questions, and we'll

20　reserve signature.

21　MR. BRAMWELL:　Excellent.

22　(Off the record)

23　　　- - - - - -

24

25

---

Page 240

1　STATE OF ILLINOIS　)

　　　　　　　　　　　) SS:

2　COUNTY OF C O O K　)

3

4　　The within and foregoing deposition of the

5　aforementioned witness was taken before CAROL CONNOLLY,

6　CSR, CRR and Notary Public, at the place, date and time

7　aforementioned.

8　　There were present during the taking of the

9　deposition the previously named counsel.

10　　The said witness was first duly sworn and was

11　then examined upon oral interrogatories; the questions

12　and answers were taken down in shorthand by the

13　undersigned, acting as stenographer and Notary Public;

14　and the within and foregoing is a true, accurate and

15　complete record of all of the questions asked of and

16　answers made by the forementioned witness, at the time

17　and place hereinabove referred to.

18　　The signature of the witness was not waived,

19　and the deposition was submitted, pursuant to Rule 30 (e)

20　and 32 (d) 4 of the Rules of Civil Procedure for the

21　United States District Courts, to the deponent per copy

22　of the attached letter.

23

24

25

---

Page 241

1　　The undersigned is not interested in the within

2　case, nor of kin or counsel to any of the parties.

3　　Witness my official signature and seal as

4　Notary Public in and for Cook County, Illinois on this

5　18th day of March, 2021.

6

7

8　　　*Carol Connolly*

9　　　CAROL CONNOLLY, CSR, CRR

　　　CSR No. 084-003113

10　　Notary Public

　　　One North Franklin Street

11　　Suite 3000

　　　Chicago, Illinois 60606

12　　Phone:　(312) 386-2000

13

14

15

16

17

18

19

20

21

22

23

24

25

---

61 (Pages 238 - 241)

# Exhibit 6

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LISA CALVENTE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.:  1:20-cv-03366 |
| **v.** | ) | |
| | ) | |
| SALMA GHANEM and DEPAUL | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' ANSWERS AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S COMPLAINT AND JURY DEMAND

Defendants, Salma Ghanem ("Dr. Ghanem") and DePaul University ("DePaul" or "University"), by their attorneys, Cozen O'Connor, hereby submit their answers to Plaintiff's Complaint and Jury Demand.

### The Parties

1.     Lisa Calvente ("Dr. Calvente") resides in Cook County, Illinois.  At all times relevant to this complaint, Dr. Calvente was a tenure-track assistant professor of Intercultural Communication and Performance Studies within the College of Communication (the "College") at DePaul University ("DePaul" or the "University").  Dr. Calvente is an American of African, Latinx, and Asian descent.

**ANSWER:**    Defendants admit at all times relevant to her Complaint, Plaintiff was a tenure-track assistant professor of Intercultural Communication and Performance Studies in the College of Communication at DePaul University.  Defendants admit that according to the University's records, Plaintiff is a resident of Cook County, Illinois and Plaintiff self-identified as "Hispanic/Latino."  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 1.

2.      Salma Ghanem ("Dr. Ghanem") is the former dean of the College of Communication at DePaul, the former acting provost of DePaul, and the current interim provost of DePaul.  Dr. Ghanem maintains an office in Cook County, Illinois and, on information and belief, is also a resident of Cook County, Illinois.

**ANSWER:**      Defendants admit the allegations of Paragraph 2.

3.      DePaul is a not-for-profit corporation and is the largest Catholic university in the United States.  At all times relevant to this complaint, DePaul employed over five hundred people and was an employer as defined in 42 U.S.C. §2000e(b).  DePaul's principal place of business is in Chicago, Cook County, Illinois.

**ANSWER:**      The University admits the allegations of Paragraph 3.  The allegations of

Paragraph 3 are not directed to Dr. Ghanem and thus require no answer from Dr. Ghanem.

## Jurisdiction and Venue

4.      This Court has jurisdiction over Dr. Ghanem and DePaul because each of them committed the acts and omissions that are the subject of this litigation in Cook County, Illinois, which is in this district.  Alternatively, this Court has jurisdiction over the defendants because they are (on information and belief) both residents of Cook County, Illinois, which is in this district.

**ANSWER**:      Defendants admit that this Court has jurisdiction over Dr. Ghanem and the

University because the events giving rise to Plaintiff's actionable claims allegedly occurred in this

judicial district and Defendants reside in this District. Except as specifically admitted, Defendants

deny the allegations of Paragraph 4 and further deny that they violated any law or committed any

wrongdoing whatsoever.

5.      Venue is proper in this Court pursuant to U.S.C. §1391(b)(1) because Dr. Ghanem and DePaul are residents of this district.  Alternatively, venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts and omissions giving rise to this litigation occurred in this district.

**ANSWER:** Defendants admit that the venue is proper under 28 U.S.C. 1391(b) because the events giving rise to Plaintiff's actionable claims allegedly occurred in this judicial district and Defendants reside in this District. Except as specifically admitted, Defendants deny the allegations of Paragraph 5 and further deny that they violated any law or committed any wrongdoing whatsoever.

6.     This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331 because Counts I and III allege a violation of 42 U.S.C. §1981 and Counts II and IV allege a violation of 42 U.S.C. §2000e, *et seq.* This Court has jurisdiction over the state law claim alleged in Count V pursuant to 28 U.S.C. §1367 because that claim is so related to the federal claims that it forms the basis for the same case or controversy.

**ANSWER:** Defendants admit the allegations of Paragraph 6, but deny they violated any law or committed any wrongdoing whatsoever.

## Factual Allegations

7.     This litigation seeks redress for significant abuses by Dr. Ghanem and DePaul University that were alternatively (i) in retaliation for Dr. Calvente's complaints about racism within the College of Communication, and (ii) motivated by Dr. Calvente's race, which abuses culminated in the denial of Dr. Calvente's application for tenure and promotion from assistant professor to associate professor.

**ANSWER:** Defendants deny the allegations of Paragraph 7.

8.     Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. She was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States, a topic that scholarly research has described as impossible to teach to undergraduate students without causing discomfort. Dr. Calvente joined DePaul's faculty at the start of the 2011/2012 academic year.

LEGAL\47715392\1

**ANSWER:** Defendants admit that Plaintiff joined DePaul's faculty at the start of the 2011-2012 academic year, and that she has accurately described her areas of research. Except as specifically admitted, Defendants deny the allegations of Paragraph 8.

9. As is the case in many other universities in the United States, the grant of tenure at DePaul "creates the presumption of continuing employment …." (DePaul University Faculty Handbook dated July 1, 2018 (the "Handbook") §3.1, a copy of which is attached as Exhibit 1). Indeed, the Handbook describes the rights and responsibilities of faculty at DePaul and also articulates the terms and conditions of faculty employment. In addition, the Handbook permits local academic units to articulate more specific guidelines with respect to their requirements for tenure and promotion so long as those guidelines are consistent with the Handbook.

**ANSWER:** Defendants admit that Plaintiff has attached to her Complaint a copy of the July 1, 2018 Faculty Handbook. Defendants admit further that Section 3.1 of the Handbook provides, in part, that tenure "creates the presumption of continuing employment," but denies that Plaintiff has restated here either the full import or the full text of the four paragraphs contained in Section 3.1 of the Handbook, including any exceptions to the presumption of continued employment. Defendants admit that the Handbook sets forth the rights, obligations and terms and conditions of employment of faculty at DePaul. Defendants admit that local academic units have the responsibility to adopt written guidelines and policies for tenure-line faculty evaluation, which must be consistent with the University's criteria and procedures in the Handbook. Except as specifically admitted, Defendants deny the allegations of Paragraph 9.

10. Chapter 3 of the Handbook articulates a multi-step process for evaluating a faculty member's application for tenure. As the first step, tenured faculty members of the local academic unit (in Dr. Calvente's case, the College) vote on the candidate's application for tenure. Then, the file is then sent to the University Board of Promotion and Tenure (the "UBPT"), which is comprised of seven tenured faculty members from across the University. The UBPT then makes an independent review of the tenure file and takes an independent vote to grant or deny tenure. However, as a practical matter, the recommendation of the UBPT is rarely different from that of the local academic unit. After the UBPT vote, the tenure file goes to the University provost for a

final decision on the grant or denial of tenure. Because section 3.5.6.3 of the Handbook requires the provost to overturn the decision of the UBPT "[o]nly in rare instances and for compelling reasons," the decision of the UBPT to grant or deny tenure is typically final.

**ANSWER:**    Defendants admit that Chapter 3 of the Handbook explains the multi-step process for evaluating a faculty member's application for tenure, and that each level of review is a substantive one. Defendants admit that the first step of the evaluation is at the local academic unit, which in Plaintiff's case was the College of Communication. Defendants admit that after the local academic unit's evaluation is complete, the next review is completed by a seven-member university-wide committee (UBPT), which conducts a substantive review and takes a vote to grant or deny tenure. Defendants admit that after the UBPT vote, the tenure case goes to the University provost for a final decision. Except as specifically admitted, Defendants deny the allegations of Paragraph 10.


11.    The standards evaluating candidates for tenure and promotion are articulated in Chapter 3 of the Handbook. As section 3.4.2 of the Handbook states, faculty are to be evaluated based on teaching and learning (collectively "teaching") (Handbook §3.4.2.1); scholarship, research, or other creative activities (collectively "research") (*id.* at §3.4.2.2); and service (*id.* at §3.4.2.3). Expressly prohibited in evaluating a candidate's tenure application – both under Chapter 6 of the Handbook and also under state and federal law – are a faculty member's race or her opposition to racism within her academic unit or the broader University.

**ANSWER:**    Defendants admit that Plaintiff has generally identified the University's three criteria for evaluating a candidate for tenure, as set forth in the University's Faculty Handbook. Defendants further admit that the University prohibits making tenure decisions based on race or opposition to unlawful employment practices. Insofar as Paragraph 11 asserts legal conclusions, no answer by Defendants is required. Except as specifically admitted, Defendants deny the allegations of Paragraph 11.

12.     A candidate who is unsuccessful in her application for tenure at DePaul is offered a one-year terminal contract that starts at the beginning of the academic year following the denial. That candidate is then dismissed from faculty at the end of the terminal contract.

**ANSWER:**     Defendants admit that a candidate who is unsuccessful in her tenure application at DePaul is typically offered a one-year terminal contract for the academic year following the tenure denial, upon the expiration of which the candidate's employment at DePaul ends.  Except as specifically admitted, Defendants deny the allegations of Paragraph 12.

13.     Prior to a faculty member's formal application for tenure, that faculty member is periodically and formally reviewed by the tenured faculty, or a subset thereof, in her academic unit.  (Section 3.3.3.1 of the Handbook refers to these as probationary reviews.)  The purpose of these probationary reviews is to report on the faculty member's progress towards tenure and to determine whether the faculty member will be renewed.  Accordingly, the untenured faculty member is reviewed based on her teaching, research, and service to her academic unit and the University.  In the College, the Personnel Committee (a subset of the tenured faculty) conducts these reviews every two years.

**ANSWER:**     Defendants admit that a tenure track faculty member is subject to periodic informal and formal reviews, and that two of the purposes of such reviews are to assess the faculty member's progress toward promotion and/or tenure, measured against the teaching, research and service criteria, and to recommend for or against renewal.  Defendants admit further that formal reviews are to be conducted no less than every two years.   Except as specifically admitted, Defendants deny the allegations of Paragraph 13.

14.     Probationary reviews are among the only methods of terminating the employment of a tenure-line faculty member.  The other methods of terminating a tenure-line faculty member's employment include (i) the denial of tenure following a tenure-line faculty member's application for tenure and promotion, and (ii) the process articulated in Chapter 4 of the Handbook.

ANSWER:     Defendants admit that non-renewal based on a probationary review and denial of tenure are two bases for terminating the employment of a tenure-track faculty member,

as set forth in Chapter 4 of the Handbook. Except as specifically admitted Defendants deny the allegations of Paragraph 14.


15. Dr. Calvente received her probationary reviews in the winter of 2013, in March 2015, and in November 2017. Although the Personnel Committee lodged no objection to Dr. Calvente in 2013, it is extremely rare for a tenure-track professor at DePaul to be recommended for non-renewal after one review recycle. In both 2015 and 2017, following changes in its composition, the Personnel Committee recommended Dr. Calvente's contract not be renewed.

**ANSWER:** Defendants admit that Plaintiff underwent formal probationary reviews culminating in reports dated March 1, 2013, March 23, 2015 and November 17, 2017. Defendants admit further that the Personnel Committee in 2013 recommended renewal by a majority vote and recommended against renewal in 2015 and 2017, by majority votes. Defendants admit that the composition of the Personnel Committee changed between 2013 and 2017. Except as specifically admitted, Defendants deny the allegations of Paragraph 15.


16. The March 7, 2015 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 2.

**ANSWER:** Defendants admit the Personnel Committee recommended termination of Plaintiff's employment on March 23, 2015, but deny Exhibit 2 is a true and correct copy of the final report and recommendation.


17. The Personnel Committee's March 2015 evaluation was problematic for several reasons. First, with respect to Dr. Calvente's teaching, the evaluation (willfully) ignored the (i) supermajority of her qualitative student evaluations, which praised Dr. Calvente's teaching, and (ii) her quantitative scores, which surpassed the average scores for all College faculty in several areas. Indeed, the Personnel Committee's review of Dr. Calvente's teaching was so inconsistent with her file, that a January 15, 2020 report from an independent (*i.e.,* not affiliated with the College) Faculty Appeals Committee opined that it approached "willful distortion." (*See infra* paragraph 31.) The Personnel Committee, however, did not so unfairly evaluate white faculty during their probationary reviews.

**ANSWER:** Defendants deny the allegations of Paragraph 17.


18.     Notwithstanding the Personnel Committee's March 2015 recommendation, the then-dean of the College, Dr. Ghanem, reappointed Dr. Calvente to the College's faculty.

**ANSWER:** Defendants admit the allegations of Paragraph 18.


19.     Following the Personnel Committee's 2015 recommendation of non-renewal, Dr. Calvente filed a complaint with DePaul's Office of Institutional Diversity and Equity ("OIDE") in June 2015.  (As per then-current University policy, OIDE was tasked with investigating claims of discrimination or harassment on the basis of status protected by federal, state, or local law.)  The complaint highlighted, among other issues, that tenured faculty at the College (i) ignored the majority of both Dr. Calvente's qualitative and quantitative teaching evaluations that state that she is an excellent instructor, which evaluations were not ignored for white tenure-track teachers, (ii) ignored her evaluation scores, which surpassed all of the faculty averages in various areas, which it did not do for white tenure-track teachers, (iii) focused on the super minority of qualitative evaluations labeling her as hostile, which it did not do for white tenure-track teachers, and (iv) that her mistreatment was similar to mistreatment suffered by another (former) faculty of color in the College, Lisa Pecot-Hebert, who was ultimately forced out of the College.

**ANSWER:** Defendants admit that in June 2015 Plaintiff made a complaint to OIDE, which was tasked with investigating claims of discrimination or harassment on the basis of status protected by federal, state or local law.  Defendants admit further that the allegations set forth in this Paragraph 19 generally describe the nature of her complaints, except that Defendants deny that Calvente used the phrase "super minority" in her complaint.  Defendants deny having engaged in the conduct set forth in Plaintiff's 2015 complaint to OIDE.


20.     OIDE ultimately closed its investigation into Dr. Calvente's June 2015 complaint on July 6, 2016, finding insufficient evidence of a violation of the University's Anti-Discrimination and Anti-Harassment Policy and Procedures.

**ANSWER:** Defendants admit the allegations of Paragraph 20.

LEGAL\47715392\1

21. On November 17, 2017, the Personnel Committee again recommended that Dr. Calvente's contract not be renewed, again citing alleged deficiencies with Dr. Calvente's teaching and her record of service. With respect to Dr. Calvente's teaching, the Personnel Committee again emphasized the qualitative experience of a super-minority (2.5% during academic year 2017) of students who reported feeling uncomfortable in Dr. Calvente's class due to the manner in which Dr. Calvente taught race and American racism, and it again ignored that (i) Dr. Calvente's quantitative scores were superior to most of her colleagues within the College, and (ii) the supermajority of Dr. Calvente's qualitative scores were very positive.

**ANSWER:** Defendants admit that the Personnel Committee recommended non-renewal of Plaintiff's contract on November 17, 2017 and admit further that in its report the Personnel Committee noted that she was not sufficiently progressing towards tenure in the areas of teaching and service. Except as specifically admitted, Defendants deny the allegations of Paragraph 21.

22. The November 17, 2017 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 3.

**ANSWER:** Defendants admit the allegations of Paragraph 23.

23. Notwithstanding the Personnel Committee's November 2017 recommendation, Dr. Ghanem reappointed Dr. Calvente to the College's faculty.

**ANSWER:** Defendants admit the allegations of Paragraph 23.

24. In the fall of 2018, Dr. Calvente and Dr. Sydney Dillard (an untenured member of the College's faculty and an American of African Descent) presented a joint complaint to Dr. Ghanem concerning patterns of racial harassment, bullying, marginalization, and microaggressions with the College. This fall 2018 meeting was the first claim of racism and racial harassment that Dr. Calvente made directly to Dr. Ghanem.

**ANSWER:** Defendants admit that Plaintiff and Dr. Dillard, who at the time was an untenured faculty member in the College and who is an American of African Descent, met with Ghanem in the fall of 2018, during which meeting Plaintiff and Dr. Dillard raised concerns about

alleged racial harassment, bullying, marginalization and microaggressions within the College.

Except as specifically admitted, Defendants deny the allegations of Paragraph 24.

25.     Consistent with then-current DePaul policy concerning complaints of discrimination, Dr. Ghanem forwarded the concerns raised by Dr. Calvente and Dr. Dillard to DePaul's office of Human Resources ("HR").  On information and belief, it was widely known within the College that (i) Dr. Dillard and Dr. Calvente complained about racism within the College to Dr. Ghanem, and (ii) HR would be investigating these complaints.

**ANSWER:**     Defendants admit that Dr. Ghanem forwarded the concerns raised by

Plaintiff and Dr. Dillard to DePaul's office of Human Resources.  Except as specifically admitted,

Defendants deny the allegations of Paragraph 25.

26.     HR attempted to schedule a meeting with both Dr. Calvente and Dr. Dillard to discuss their concerns.  Dr. Calvente and Dr. Dillard and a representative from HR ultimately set a meeting for November 20, 2018; however, Dr. Dillard never showed up for the meeting as she withdrew her complaint at some unspecified time.

**ANSWER:**     Defendants admit that Human Resources scheduled a meeting for

November 20, 2018 with Plaintiff and Dr. Dillard.  Except as specifically admitted, Defendants

deny the allegations of Paragraph 26.

27.     Both Dr. Calvente and Dr. Dillard applied for tenure and promotion from assistant professor to associate professor during 2018/2019 academic year.  Moreover, Dr. Calvente's tenure dossier was *at least as strong* as Dr. Dillard's in the areas of research and service, and stronger than Dr. Dillard's in the area of teaching.  Nevertheless, the vote by the College faculty on Dr. Calvente's tenure application was 19-2 against the grant of tenure.  (A copy of the dean's summary of the College's vote on Dr. Calvente's application is attached as Exhibit 4.)  With respect to Dr. Dillard's application, the College recommended that she receive tenure.  Dr. Ghanem – who had been since been reappointed to serve as acting provost (*see infra* ¶29) – then tenured Dr. Dillard.

**ANSWER:**     Defendants admit that both Plaintiff and Dr. Dillard applied for tenure and

promotion from Assistant Professor to Associate Professor during the 2018/2019 academic year.

10

Defendants admit further that the College recommended that Dr. Dillard be granted tenure, and admit further that Dr. Ghanem granted Dr. Dillard tenure. Defendants admit further that the vote by the College faculty on Plaintiff's tenure application was 19-2 against the grant of tenure, as set forth in Exhibit 4 to Plaintiff's Complaint. Except as specifically admitted, Defendants deny the allegations of Paragraph 27.

28.     Following the College's vote on Dr. Calvente's tenure application, the UBPT conducted its independent review of the file. And after that review, the UBPT (which, at the time, had one member from the College, Bruno Teboul, on it) recommended that Dr. Calvente receive tenure by a vote of 4-3. On information and belief, had Dr. Teboul abstained from voting, as he would have been required to do at many other universities, the vote would have been 4-2 in Dr. Calvente's favor. (A copy of the UBPT's recommendation is attached as Exhibit 5.)

**ANSWER:**    Defendants admit that the UBPT conducted a substantive review of Plaintiff's tenure case after the College's vote on her case. Defendants admit that Bruno Teboul, a faculty member in the College, was a member of the UBPT in 2019. Defendants admit that the UBPT recommended that Plaintiff be granted tenure by a vote of 4-3, and that Exhibit 5 to the Complaint is a copy of the UBPT's recommendation. Except as specifically admitted, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28.

29.     In October 2018, Dr. Ghanem was elevated to the position of Acting Provost of DePaul. This promotion meant that Dr. Ghanem – who had been dean of the College for much of Dr. Calvente's professional life – would decide whether Dr. Calvente would remain employed at DePaul. Ultimately, Dr. Ghanem sided with her former colleagues and refused to grant tenure to Dr. Calvente *even though* Dr. Calvente's file was at least as strong as that of a professor who complained about discrimination within Dr. Ghanem's academic unit and who then retracted that complaint. Following her decision to deny tenure to Dr. Calvente, Dr. Ghanem wrote that Dr. Calvente would receive a terminal contract and that her last day as faculty member at DePaul would be June 30, 2020. (A copy of Dr. Ghanem's letter denying Dr. Calvente's application for tenure and promotion is attached as Exhibit 6.)

11

**ANSWER:** Defendants admit that Dr. Ghanem was promoted to Acting Provost in or around October 2018. Defendants admit that Dr. Ghanem decided against awarding tenure to Plaintiff, and notified Plaintiff of her decision and the award of a terminal contract that would expire on June 30, 2020. Defendants admit that Exhibit 6 is a copy of Dr. Ghamen's letter to Plaintiff, notifying Plaintiff of Dr. Ghanem's decision on her tenure case. Except as specifically admitted, Defendants deny the allegations of Paragraph 29.

30.     Chapter 5 of the Handbook permits a faculty member to appeal the denial of her tenure application. Accordingly, following Dr. Ghanem's decision to deny her application, Dr. Calvente appealed to the Faculty Committee on Appeals, which appointed three faculty unaffiliated with the College to serve as an Appeals Board.

**ANSWER:** Defendants admit the allegations of Paragraph 30.

31.     After preliminarily investigation, the Appeals Board dismissed two of Dr. Calvente's grounds for appeal and investigated a third ground for appeal. Ultimately, the Appeals Board issued a thirty-four page report to the President of DePaul (copy attached as Exhibit 7) explaining how (i) Dr. Calvente was evaluated unfairly at multiple points in 2015 and 2017, and (ii) these unfair evaluations were material to the ultimate denial of tenure.

**ANSWER:** Defendants admit that the Appeals Board issued a 34-page report to the University's president, which is attached as Exhibit 7. Defendants admit that in its report, the Appeals Board dismissed two grounds of appeal and made a finding on the third ground. Defendants deny that Plaintiff has accurately summarized the finding on the third ground. Except as specifically admitted, Defendants deny the allegations in Paragraph 31.

32.     It is unusual for an Appeals Board at DePaul to recommend the overturning of the provost's decision to deny tenure. However, notwithstanding the Appeals Board's report and recommendation, DePaul ultimately decided against the award of tenure to Dr. Calvente, and her employment at DePaul will end on June 30, 2020.

**ANSWER:**    Defendants admit that the University ultimately decided against the award of tenure to Plaintiff and that her employment ended on June 30, 2020.  Except as specifically admitted, Defendants deny the allegations of Paragraph 32.


## COUNT I
### *(Violation of 42 U.S.C. §1981 – retaliation against DePaul and Dr. Ghanem)*

33.    Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**    Defendants incorporate by reference the answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.


34.    By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

**ANSWER:**    Defendants deny the allegations of Paragraph 34.


35.    Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the "but for" factor that caused Dr. Ghanem and DePaul to terminate her employment.

**ANSWER:**    Defendants deny the allegations of Paragraph 34.


36.    As a result of the denial of tenure and promotion, and as a result of the upcoming termination of her employment, Dr. Calvente has been denied, and will be denied opportunities to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

**ANSWER:**    Defendants deny the allegations of Paragraph 36.

13

37.     In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     Defendants deny the allegations of Paragraph 37.

## COUNT II
### *(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. – retaliation against DePaul)*

38.     Paragraphs 1-32 are realleged and incorporated as if fully set forth herein.

**ANSWER:**     DePaul incorporates by reference answers to each allegations contained in Paragraphs 1-32 as if fully restated herein.

39.     By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

**ANSWER:**     DePaul denies the allegations of paragraph 39.

40.     Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the motivating factor that caused DePaul to terminate her employment.

**ANSWER:**     DePaul denies the allegations of Paragraph 40.

41.     As a result of the denial of tenure and promotion, and as a result of the upcoming termination of employment, Dr. Calvente has been denied, and will be denied opportunities to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 41.

42.     In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 42.

## COUNT III
### *(Violation of 42 U.S.C. §1981 – racial discrimination against DePaul and Dr. Ghanem)*

43.     Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**     Defendants incorporate by reference answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.

44.     By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

**ANSWER:**     Defendants deny the allegations of Paragraph 44.

45.     Dr. Calvente's race was the "but for" cause in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

**ANSWER:**     Defendants deny the allegations of Paragraph 45.

46.     As a result of DePaul's and Dr. Ghanem's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to an award of compensatory damages.

**ANSWER:**     Defendants deny the allegations of Paragraph 46.

47.     In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     Defendants deny the allegations of Paragraph 47.

## COUNT IV
### *(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e – race discrimination against DePaul)*

48.     Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**     DePaul incorporates by reference answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.

49.     By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

**ANSWER:**     DePaul denies the allegations of Paragraph 49.

50.     Dr. Calvente's race was the motivating factor in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

**ANSWER:**     DePaul denies the allegations of Paragraph 50.

51.     As a result of DePaul's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of employment of life because of DePaul's actions, thereby entitling her to an award of compensatory damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 51.

52.     In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 52.


## COUNT V
### *(Breach of contract against DePaul)*

53.     Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**     DePaul incorporates by reference answers to each allegation contained in

Paragraphs 1-32 as if fully restate herein.


54.     Through the Handbook and other documents referenced therein, DePaul defined the procedures and criteria for tenure and promotion, and thereby created the terms and conditions of an employment contract between it and Dr. Calvente.

**ANSWER:**     DePaul denies the allegations of Paragraph 54.


55.     By accepting her appointment as a tenure track faculty member at DePaul, Dr. Calvente and DePaul agreed that her applications for tenure and promotion were to be governed by the Handbook's tenure criteria and procedures.

**ANSWER:**     DePaul admits the allegations of Paragraph 55.


56.     The Handbook requires that a candidate for tenure and promotion be given fair consideration and evaluation in the areas of teaching, research, and service at all levels.

**ANSWER:**     DePaul admits that the Faculty Handbook sets forth a tenure review process

that promotes fairness as a means for avoiding arbitrary decision making.  Except as specifically

admitted, DePaul denies the allegations of Paragraph 56.

57.     The Handbook further requires that tenure and promotion decisions not be based on racial discrimination or based on retaliation for complaining about racial discrimination.

**ANSWER:**     DePaul admits that that the Faculty Handbook restates DePaul's policy prohibiting discrimination and retaliation in making employment decisions.  Except as specifically admitted, DePaul denies the allegations of Paragraph 57.

58.     In denying Dr. Calvente's applications for tenure and promotion, the University failed to evaluate Dr. Calvente fairly by, among other things, (i) willfully distorting her record with respect to her teaching, and (ii) failing to provide clear and consistent guidance concerning expectations for service during formal reviews.

**ANSWER:**     DePaul denies the allegations of Paragraph 58.

59.     Further, in denying Dr. Calvente's applications for tenure and for promotion, the University (i) failed to treat her in the same manner as similarly situated persons who did not complain about racial harassment within the College, and (ii) failed to treat her in the same manner as similarly situated persons who were not of mixed race.

**ANSWER:**     DePaul denies the allegations of Paragraph 59.

60.     DePaul's denial of Dr. Calvente's applications for tenure and promotion breached its contract with her.

**ANSWER:**     DePaul denies the allegations of Paragraph 59.

61.     As a result of DePaul's decision to deny Dr. Calvente's applications for tenure and promotion, Dr. Calvente has suffered damages including lost wages and benefits.

**ANSWER:**     DePaul denies the allegations of Paragraph 61.

**AFFIRMATIVE DEFENSES**

1.      Plaintiff's allegations are barred insofar as they fail to state a claim upon which relief can be granted.

2.      Plaintiff's Title VII claims are barred to the extent that they exceed the scope of her EEOC charge.

3.      Insofar as Plaintiff's Title VII claims are based on actions that occurred outside of the applicable limitations period for filing a charge of discrimination, they are time-barred.

4.      Insofar as Plaintiff's Section 1981 claims are based on actions that occurred outside of the applicable statute of limitations period, they are time-barred.

5.      Plaintiff's Section 1981 claims are barred to the extent she has not alleged a protected status under Section 1981.

6.      At all times pertinent to this case, Defendants made a good faith effort to comply with the law, and, therefore, are not liable for any alleged intentional, malicious, or grossly negligent acts of its agents or employees.

7.      Plaintiff's claim for damages are barred, in whole or in part, by a failure to mitigate damages to the extent required by the law.

8.      Plaintiff's Title VII and Section 1981 claims are barred, either in whole or in part, by the ministerial exemption.

9.      Defendants reserve the right to plead additional defenses as new information and defenses may arise through the course of discovery in this matter.

WHEREFORE, Defendants respectfully requests the Court to enter judgment in its favor on each count of Plaintiff's Complaint, along with any further relief as the Court deems just and proper.

Dated:  August 7, 2020

Respectfully submitted,

By: /s/ Anneliese Wermuth

Attorney for Defendants, Salma Ghanem and
DePaul University

Anneliese Wermuth (#6270970)
Nandini K. Sane
Cozen O'Connor
123 N. Wacker Drive, Ste. 1800
Chicago, IL  60606
Telephone:     312/474-7876
Email: awermuth@cozen.com
Email: nsane@cozen.com

*Attorney for Defendants*

20

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on August 7, 2020, she electronically filed the foregoing **Defendants' Answers and Affirmative Defenses to Plaintiff's Complaint and Jury Demand** with the Clerk of the United States District Court for the Northern District of Illinois using the ECF system, which will send notification of such filing to the following counsel of record:

Fitzgerald T. Bramwell
Law Offices of Fitzgerald Bramwell
225 West Washington Street, Ste. 2200
Chicago, IL 60606
bramwell@fitzgeraldbramwell.com

_s/ Anneliese Wermuth_
Anneliese Wermuth

# Exhibit 6 to complaint





Office of the Provost
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-1330
FAX: 312/362-8874

June 10, 2019

Lisa Calvente
6748 N. Glenwood Ave.
Chicago IL 60626

Dear Professor Calvente,

I regret to inform you that I have decided that you will not be granted tenure and promotion to Associate Professor. This decision is in agreement with a significant majority of your tenured colleagues in Communication, with the Acting Dean of the College of Communication, and with three of the seven members of the University Board on Promotion and Tenure (UBPT). My decision regarding your application for promotion and tenure is based on my review of your dossier (including your response to the college reports) and my attendance at the UBPT hearing on your case.

The College of Communication guidelines indicate that, for tenure and promotion to Associate Professor, the College "expects excellence in at least two areas, with the third being rated at least very good." The College recommendation on your application for tenure and promotion evaluates your record as "very good" in the three areas of teaching, research, and service, and reports a 2-19 vote recommending against your tenure and promotion. The Acting Dean agreed with these evaluations and, accordingly, has also recommended against your promotion. In its turn, and with your response to the college reports in hand, the UBPT evaluated your record, paying particular attention to the issues where there had been disagreement. Although the UBPT recommendation report did not dispute the tenured faculty's and acting dean's evaluation of your record as "very good," it notes that the Board's dissenting members (3 out of 7) did consider the College of Communication's above guidelines in making their decision on the case.

There is every evidence of careful review of this case at all levels. Exercising professional judgment, experienced faculty colleagues have evaluated your work. Per the handbook, before granting tenure, "the university should have *no reasonable doubt* about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission" (emphasis mine). The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised

by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority.

As noted in the college and dean's reports and as acknowledged by you in your response, the concerns that have been raised in this tenure review have been raised in earlier probationary reviews. Given this, I would like to clarify my own earlier role in the consideration of your case, as Dean of the College of Communication during your 2015 and 2017 formal reviews. In the conclusion to your response to the college reports, you referred obliquely to my "assessments" during those earlier reviews. It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure." I had noted some improvement between formal reviews and wanted to give you the opportunity to address the remaining stated areas of concern in all three areas to meet the standards of the college by the time of your tenure review. In my letters of renewal in 2015 and again in 2017, I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation of your colleagues.

This denial of tenure means that the 2019-2020 academic year will constitute your terminal year of employment at DePaul University, with an effective termination date of June 30, 2020. I am grateful for your years of service to DePaul University and the College of Communication. I wish you the best in your future endeavors.

Sincerely,

Salma Ghanem, Acting Provost

cc:     Lexa Murphy, Acting Dean, College of Communication

# Exhibit 7 to complaint

**Faculty Appeals Board Report to the President of DePaul University**

Date: 01/15/20

To: A. Gabriel Esteban [President DePaul University]

From: Faculty Appeals Board [Brian Boeck, Jose Liberti and Bridget Tenner]

CC: Lisa B.Y. Calvente [Appellant].

**Executive Summary**

The Board finds that the Appellant was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion.

Regarding ground (2) for appeal *"The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision"* the board unanimously decided that the documentation meets the criteria for a successful appeal.

Regarding ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws"* the board unanimously decided that the documentation does not meet the criteria for a successful appeal.

Though the majority of allegations advanced in the Appellant's appeal could not be substantiated by our investigation, three avenues of investigation were central to our determination. The Board considers two serious allegations to be both substantiated and material to the decision to deny tenure and promotion: 1. deviations from procedures in the evaluation of teaching, 2. deviations from procedures by failing to provide clear and consistent guidance regarding service in formal reviews (as mandated in FH 3.3.1). Regarding a third serious allegation, the Board could not substantiate a conflict of interest with respect to the Provost's final decision. Though it believes that the Provost acted in good faith, serious concerns remain about how the 2015 and 2017 formal reviews were weighted in the Provost's final decision. The Board finds that both reviews contain

misrepresentations related to teaching that were never corrected or addressed in spite of multiple attempts by the Appellant to draw attention to them.

**Summary of Board Investigation**

In accordance with Chapter 5 of the Faculty Handbook (FH) The Faculty Committee on Appeals (FCA) received the appeal of Lisa Calvente (hereafter the Appellant) who was denied tenure and promotion. The FCA selected a three member board (hereafter the Board) consisting of the above-named faculty members to hear the appeal and make its recommendation to the president.

Before the Board even received the Appellant's appeal documentation, it began receiving communications from concerned individuals from outside of DePaul University. The Board considers the Appellant's disclosing of the names of the Board members to individuals outside the university to be a serious breach of confidentiality under Faculty Handbook 6.4.2.

Section 5.1.2.3 of the Faculty Handbook states "*A faculty member may appeal the decision to deny an application for tenure and promotion. The appeal must be based on one or more of the following grounds:*
1. *The decision violated the faculty member's academic freedom.*
2. *The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.*
3. *The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.*"

The Appellant argued in "Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" [hereafter the Appeal] that all three grounds for appeal existed and were material to the Interim Provost's decision to deny tenure. The Board met for three hours to discuss this documentation on 9/27/19 and engaged in additional consultations in subsequent weeks.

In *Memorandum: Preliminary Review of Dr. Lisa B.Y. Calvente Appeal of Tenure and Promotion* dated 9/27/19 the Board outlined to A. Gabriel Esteban [President of DePaul University] its determination that the Memorandum of Appeal and Supporting Documentation did not satisfy the criteria for ground (1) violation of academic freedom. The vote was 3-0 in favor of not proceeding with investigation of this ground for appeal. The memorandum also outlined a timeline for investigating ground (2) for appeal "*The evaluation of the*

*candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision,"* and ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws."*

The Board conducted a thorough investigation as mandated by Faculty Handbook 5.1.1.4. This investigation commenced with a careful and extensive review of the documentation submitted by the appellant ("Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" consisting of 17 pages and attachment "Supplementary Documentation" consisting of 133 pages of documentation) as well as documentation from the University EEO office.

The Board consulted with Stephanie Smith, Chief Human Resources Officer regarding claims of discrimination/retaliation, solicited information from three faculty members with knowledge of the case, questioned the authors of reports that recommended against renewal or promotion, and reviewed clarifications and additional documentation from both the appellant and the College of Communication [hereafter the College]. The Board sent the Appellant, Lisa Calvente, a dozen initial questions and three additional requests for documentation or clarification. The Board sent Alexandra (Lexa) Murphy, Acting Dean, College of Communication [hereafter Dean], 11 initial questions, 23 follow-up questions and two requests for additional documentation. The Board sent Interim Provost, Salma Ghanem [hereafter Provost], 3 initial questions and 28 follow up questions. It received timely and helpful responses to all of its queries.

The Board also solicited and carefully scrutinized three groups of additional evidence. It reviewed the Appellant's Student Evaluations of Teaching, both quantitative/statistical and open-ended student comments and responses, for all classes offered at DePaul through the 2017 formal review. It reviewed all letters from the Appellant's tenure dossier documenting her service. It reviewed anonymized (all faculty names removed) copies of the service sections of the CVs of all candidates for tenure from the College of Communication who were ranked by the College Personnel Committee as "excellent" in service within the previous ten years.

This evidence and documentation was comprehensively discussed by the Board on November 7, 2019 and subsequent occasions.

NOTE: Italics will be used when quoting directly from the documentation reviewed by the Board.

**Ground for Appeal II. Procedural Violations**

Appellant's Allegations Regarding the Provost

In section one of the appeal the Appellant advances three major allegations regarding procedural violations by the Provost.    (Discrimination/Retaliation allegations interspersed on pages 1-15 of the appeal will be addressed below in the section devoted to ground for appeal three).

1 (A, page 2 of appeal) the Appellant alleges that the tenure decision by the Provost failed to provide a "compelling reason" for overturning the recommendation of the UBPT.

2 (B, page 5 of appeal) the Appellant alleges that the tenure decision by the Provost, violated the University's conflict of interest policies.

3. (a, page 3 of appeal) the Appellant alleges that the tenure decision by the Provost relied upon concerns articulated by the College during formal and informal reviews, and violates the University's criteria with regard to tenure and promotion procedures by failing to allow for university-wide consideration of her tenure case.

The Board's Findings

Regarding allegation one, the Board finds that the Provost (in the decision letter to the Appellant dated June 10, 2019) did provide multiple reasons for overturning the recommendation of the UBPT.

In discussions about whether those reasons were compelling, the Board devoted particular attention to Dr. Ghanem's statement in the letter to the Appellant dated June 10, 2019:

*"The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority."*

This statement appears to imply that there exists a specific proportion of positive votes by the UBPT which would have sufficiently answered the concerns raised by faculty members in the College.  Dr. Ghanem's response to the Board, however, reiterated her agreement with the evaluation of the UBPT board members who did not assess the Appellant's work as excellent in teaching and research.  The UBPT recommendation dated May 10, 2019 clearly conveys the reasons advanced by the dissenting minority.

The Board discussed whether or not the reasons provided by the Provost for tenure denial meet the Faculty Handbook's [3.5.6.3] threshold for providing compelling reasons in a written explanation. The Board also focused its investigation on determining the extent to which student comments about 'intimidating and dismissive' behaviors (discussed below) influenced the Provost's tenure decision. The results of that investigation inform the Board's findings regarding other allegations discussed below. The Board does not find that the Provost violated Section 3.5.6.3 of the Faculty Handbook, though it does find that flawed personnel documentation informed the Provost's reasoning. The Appellant's case was one of only 3 (out of 47) in which earlier formal or probationary reviews conducted at the unit or college level were specifically referred to or cited in the Provost's letter of decision regarding tenure/promotion.

Regarding allegation two, the Board finds that the tenure decision by the Provost did not violate the University's conflict of interest policies. The Board notes that the appeal did not provide sufficient, specific evidence to substantiate the claim of a conflict of interest. Nor did the Appellant refer to relevant sections of the University Code of Conduct, which explain or define 'conflict of interest.'

The Appellant asserts that Dr. Ghanem should have recused herself from consideration of her tenure case. On Page 6 of the appeal the appellant states: "*Dr. Ghanem's decision not to recuse herself from my case constitutes a clear conflict of interest*." The Board disagrees and notes, for reasons further outlined below, that the specific facts of this case would not mandate a recusal according to Faculty Handbook [3.5.1.1.h] or university policy. Moreover, a recusal would potentially have made an unprecedented case even more procedurally complicated, since Faculty Handbook Chapter 5 provides no clear guidance for handling an appeal in such circumstances.

The preponderance of evidence submitted to the Board demonstrates that the Provost acted in good faith and objectively evaluated the Appellant's performance based on the evidence provided by the Appellant and the College.

Regarding allegation three, the Board finds that the Provost did assign undue weight to concerns, particularly those about teaching, articulated by the College during earlier, pre-tenure formal and informal reviews.

In its deliberations regarding allegation three, the Board was particularly concerned by the unique aspects of this particular case. It finds that Provost Ghanem formally occupied two distinct roles in the handling of the Appellant's tenure case within the same academic year [as a result of the fact that the Provost started the academic year as Dean of the College of Communication]. Dr. Ghanem states that she did not occupy two distinct roles because she "*did not weigh in at all as dean on Dr. Calvente's tenure and promotion review or*

*that of any of her Communication colleagues who went up in AY 2018-2019.*" However, in the opinion of the Board, the sudden transition of Dr. Ghanem to a new leadership role in the university created a situation which was unprecedented in recent university practice. In her newly assumed role as Acting Provost, Dr. Ghanem was significantly more familiar with Dr. Calvente's case, as presented through the problematic lens of College personnel documentation, than with other tenure cases she considered as Provost in AY 2018-2019. The undue weight assigned to concerns articulated in College personnel documentation was therefore material to the Provost's decision.

In its consideration of evidence regarding allegation three, the Board found that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal. Faculty Handbook Section 3.3.1.3 clearly specifies that the tenure review is a university-wide consideration.

On page 4 of the appeal the Appellant alleges that the College had a disproportionate say in her tenure process, in violation of university-wide consideration. She states: "*Dr. Salma Ghanem, in her role as Interim Provost (then Acting Provost) of the University articulates concerns that would have been appropriate to her previous role as Dean of the College of Communication. In the position of Interim Provost, and by privileging College concerns, Dr. Salma Ghanem violates the requirements of university-wide consideration.*"

The Board finds that the UBPT conducted a substantive review applying current university-wide standards and criteria as stipulated by Faculty Handbook Section 3.5.6.1.c.

The preponderance of evidence examined by the Board substantiates the Appellant's allegation that the Provost's reasons for overturning the recommendation of the UBPT assigned greater weight to college concerns than university-wide criteria.

Appellant's Allegations Regarding Bruno Teboul, faculty of College of Communication and member of the UBPT.

In section one of the appeal the Appellant advances an allegation regarding procedural violations by a member of the College who served on the UBPT.

On page 6, marked as 'b.' , the Appellant alleges a violation of conflict of interest policies by a member of the College during her formal and informal reviews and during her UBPT review.

The Appellant states:

*"The composition of the UBPT also included a faculty member of the College, Dr. Bruno Teboul. While the UBPT voted to recommend tenure, the Interim Provost's letter overturning the UBPT recommendation cited the "slim majority" of the vote as a reason for the negative outcome. This further suggests a conflict of interest that should have been explicitly acknowledged per the Faculty Handbook."*

The Board's Findings

The Board questioned Dr. Teboul. It deems his response, which outlined his adherence to the requirements of the Faculty Handbook Section 3.5.1.1.b, to be credible.

Regarding this allegation, the Board finds that the evidence does not substantiate the claim of conflict of interest.

Appellant's Allegations Regarding Contract Year In College Pre-Tenure Review

In section one of the appeal the Appellant advances two allegations regarding procedural violations with respect to determining contract year in College pre-tenure reviews.

1 (C, Page 6 of the appeal) The Appellant alleges that the College failed to follow University policies and procedures in the evaluation of scholarship, teaching and service appropriate to Contract Year.

2 (a, Page 7 of the appeal) The Appellant alleges a violation of Section 3.2.2 of the Faculty Handbook with regards to leaves of absence.

The Board's Findings

Regarding allegation one, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Regarding allegation two, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Based on a careful evaluation of the evidence, the Board determined that any minor, unintentional errors or procedural uncertainties about contract year resulting from leave(s) of absence would not have required a reassessment of the entire file during pre-

tenure reviews.

<u>Appellant's Allegations that the College Violated Policies in the Evaluation of Scholarship.</u>

In section one of the appeal the Appellant advances two major allegations that the College violated policies for the evaluation of scholarship.

1 (on page 9, 11) the Appellant alleges that the College violated Faculty Handbook Section 3.5.2.c, which reads: *"All documents considered at each level must be passed on to subsequent levels,"* by failing to send out all of her public performances to external reviewers for evaluation.

2 (on page 9, 11) the Appellant alleges that the College violated its own criteria for evaluating scholarship and university policies by not counting her public performances as scholarship.

The Board focused its investigation on two particular statements in the appeal.

On page 9 of the appeal, the Appellant states: "*It came to my attention **after** my external letters had been submitted to the College, that in fact the **College had violated University procedure and failed to transmit my dossier to external reviewers.** [emphasis in bold Appellant's] The College did not notify me of this occurrence; rather, one of my external letter writers noted the omissions of the materials in their letter, and this came to my attention after Acting Dean of the College Alexandra Murphy sent me copies of the letters*."

The Board notes that there is a major difference between failing to transmit an entire dossier and failing to transmit or reclassifying individual items.

On page 11 of the appeal, the Appellant states: "*The College's failure to acknowledge my public performances, which involved community partners and students, and were not restricted to the classroom, violates both University policy and College criteria where the evaluation of scholarship is concerned. Moreover, I was hired in the College as a race and performance scholar. The College's failure to send out my performances for evaluation and its discounting constitutes a violation of College and University Guidelines. Furthermore, Section 3.5.2 of the Faculty Handbook provides that "At all levels of evaluation the following processes must be followed...c) **All documents considered at each level must be passed on to subsequent levels**"* [emphasis in bold Appellant's]. *The College's failure to send out my performances to the*

*external reviewers for evaluation is also in direct violation of this aspect of the University's policies. It's impact, given that the Interim Provost used the College's ranking of "very good" for my scholarship in order to substantiate her decision to overturn the UBPT recommendation, had a direct and negative effect in the outcome of my tenure application."*

To investigate the Appellant's claims, the Board requested additional clarification from the Appellant about how the performances were documented.

Faculty Handbook Section 3.6.1.1. includes among 'Items Supplied by the Candidate' the following statement: "*A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities*." Faculty Handbook Section 3.5.1.3 provides guidelines for evaluating collaborative work. Therefore the Board determined that it was the candidate's responsibility to record and properly document her contributions to any performances that would be included in the tenure dossier. It also determined that the format in which the performances were documented would be crucial to its investigation.

<u>Additional Information Uncovered During Investigation</u>

**Extract** from the Appellant's response to the Board dated September 22, 2019.

**Board question:** Pages 10-11 discusses how public performances were evaluated. Please provide a specific description of how each performance was documented at the time of the performance and the specific formats in which a record of each performance was preserved.

**Appellant's response:** *As part of my pedagogical approach that comes from participatory performance/theater, I require all aspects of the documenting and advertising the public performance to come from the students. Each time one of these performances are held the students are responsible for recording it because part of the agenda is for the students to find agency and accountability in these performances. As such each performance was recorded differently. In 2013, the performance was recorded by the now defunct technology services team in the college. In 2015, a friend of a student in the performance recorded it, and provided a Youtube link to the performance. In 2016, the performance was not digitally recorded so in lieu of the actual performance, I provided a letter from Rubén Álvarez Silva, who attended the event and was my advisory contact from the Steans Center for that particular course. I also provided the advertisement from the students for the performance. In 2019, a student asked her co-worker from the College of Computing and Digital Media to film the performance. Helen Damon Moore, who attended the event, from the Steans Center also had a photographer archive the performance.*

**Board question:** How was each performance documented in the dossier?

**Appellant's response:** *During each review period that followed a performance, I provided the College with documentation of the performance based on the method of documentation specific to that particular piece. In my tenure dossier, this took the form of 1) web links to the performances 2) letters from those who attended and screened the performances 3) any relevant advertisements. Because each performance has both a scholarly as well as pedagogical component, the method of documentation and advertising changes according to the will of the student participants and community partners with whom I collaborate to stage these performances. Some performances were filmed, while others were not. All, however, were documented in my dossier according to College and University guidelines.*

**End of Extract.**


The Board also questioned Dean Murphy about the submission of the Dossier.

Extract from Dean's response dated September 23, 2019.

**Board question:** Who sent out Lisa Calvente's dossier? On what date was the dossier transmitted to external reviewers? Were any items in the dossier not transmitted to external reviewers?

**Dean's response:** *I sent out the dossier to the selected external reviewers. Two dossiers were sent on 6/25/18 and a third was sent on 7/10/18. A YouTube link to a class-based performance was not included.*

**Board question:** If any dossier items were not transmitted to external reviews, what were those items, who made the decision not to transmit items, and what was the rationale for this decision?

**Dean's response:** *As noted above, a link to a class-based performance was not included in the dossier sent to the external reviewers. The link was embedded in the list of the citations of the articles being sent out and was missed in the compilation of the items.*

**Board question:** Regarding the transmission of Lisa Calvente's dossier to external reviewers, on what date did you become aware of allegations that the complete dossier was not sent out to external reviewers? Is it correct that according to College guidelines the complete dossier should be transmitted to external reviewers? Please provide all

documentation and correspondence relating to this issue. [Board note: such documentation was provided and reviewed].

**Dean's response:** *On October 18th, Lisa Calvente let us (me and Hai Tran, the chair of the personnel committee) know of her concern that the performance link was not sent out. There is nothing in the college guidelines that designates that the entire dossier must be sent to the external reviewers. I have included the email correspondence related to this conversation. You will see in these exchanges, that since there was still time in the review process, I offered to rectify the situation by sending out the performance link to the reviewers. However, in looking at the link, I realized that it was a YouTube video with no context or explanation for the performance. Therefore, I asked Lisa to provide information about the performance that could be sent to the reviewers. My rationale was that there would be no way for the reviewers to make any assessment of her work on this without knowing how much she contributed to the scripting and staging of the performance (versus her students), when and where it was performed, and how many times. These are part of the norms established by the National Communication Association Performance Studies Division (NCAPSD) to help with the evaluation of creative performances as scholarship. None of this was provided by Lisa Calvente for this (or any of the) performances.*

**End of Extract.**

Dean Murphy also provided to the Board copies of email correspondence with the appellant regarding the performances and dossier dated October 18, 23, and 24, 2018.

The Board's Findings

Regarding allegation one, the Board finds that a minor procedural error occurred, but also finds that this error was not material to the outcome of the tenure case. Dean Murphy acknowledged that one YouTube video was not provided to external reviewers and sought to rectify the situation by proposing to transmit it to reviewers in late October 2018. The College's email correspondence with the Appellant demonstrates that the Appellant elected not to send the YouTube video or additional contextual explanation to external reviewers in late October 2018.

Regarding allegation one, the Board finds that if the Appellant intended to rely on the public performances as key examples of scholarship/creative activities in her tenure dossier, the Appellant should have taken more proactive steps to document those activities and solicit timely evaluations of them from other scholars and DePaul faculty members as suggested by Faculty Handbook Section 3.4.2.2, which states: "*An academic unit may evaluate oral presentations or creative activities by various means including (but not limited to) listening to recordings, examining drafts, or soliciting the views of other scholars*

*(including other members of the DePaul faculty) who were in attendance*."

Regarding allegation two, the Board finds that the College did not violate its own criteria for scholarship by not counting public performances, which involved students and were documented by students, primarily as scholarship.

Regarding allegation two, the claim that the Appellant was "*hired in the College as a race and performance scholar*" could not be substantiated by the Board. The original job advertisement for the College position in 'Intercultural Communication and Performance Studies' did not specify any explicit expectations for giving public performances.

Regarding allegation two, the Board finds that since the UBPT recommendation dated May 10, 2019 did not dispute the College's evaluation of the public performances, any claim regarding violation of policies or Faculty Handbook Section 3.4.2.2 cannot be substantiated.

Allegations Relating to the 2015 Formal Review

In section one (page 12, 13) and section three (page 17) of the appeal, the Appellant advances an allegation that starting in 2015 the College violated the Faculty Handbook Section 3.4.2.1 by engaging in unfair and unsystematic evaluation of her teaching.

The Appellant alleges on pages 2, 6, 8, 15, and 17 that the 2015 formal review initiated a pattern of misrepresentation of student comments in assessment of her teaching.

Faculty Handbook Section 3.4.2.1 states: "*Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers.*"

Faculty Handbook Section 4.1 states: "*Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions.*"

In support of her argument that a pattern of misrepresentation began in 2015 and was material to the outcome of the tenure case, the Appellant demonstrates through citation that the Provost (page 3) referenced the 2015 formal review in her tenure decision. The Appellant also demonstrates through citation (page 12) that a prominent reference to "intimidating or dismissive" classroom behaviors also appears in the Dean's

recommendation.

<u>Additional Information Uncovered During Investigation</u>

The Board investigated whether or not a pattern of misrepresentation could be traced backed to the 2015 formal review.  It notes that the 2015 formal review introduced phrasing about 'intimidating' classroom behaviors that recurs in subsequent personnel documentation (including College tenure deliberations).

The Board compared the College 2015 formal review's claims about patterns in student comments to the underlying evidence.  The Board was disturbed to discover that the 2015 formal review provided a highly selective, negative presentation of patterns in student comments, the review downplayed (almost to the point of willful distortion) positive aspects of the candidate's teaching, and several statements in the review did not provide a fully accurate representation of actual proportions and patterns in the evidence.  In fact a major summary claim of the review – "*While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200).*"– could not be substantiated by examining the underlying evidence. The personnel committee seems to have cherry-picked negative comments (often unrepresentative ones) and made no serious effort to correlate the negative comments with negative comments qualified in a positive way in question 22 (how the class could be improved) and positive comments in question 21 (how the class was helpful).  Many more students had an overall positive experience of intellectual growth than are reflected in this selective representation.  Frequent student comments about the Appellant's courses promoting critical thinking and/or being challenging in a good way were either downplayed or ignored.  Upon reviewing all of the student evaluations considered in the 2015 formal review, the Board discovered that although there are small numbers of explicit student comments in teaching evaluations conducted over several quarters mentioning an intimidating or uncomfortable classroom environment, the College did to some extent misrepresent the patterns and proportions of such comments.

The Board also notes that a long discussion of "*Concerns of students feeling intimidated and/or uncomfortable*" preceded the College's negative tenure vote.  The earlier formal reviews were considered a main reason for discounting the positive improvements noted in the 2018 Personnel Committee report because it "*did not adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable in Lisa's classroom.*" The College recommendation regarding tenure states: "*Nevertheless, the tenured faculty expressed an overarching concern that the narrative* [Board Note: in the Personnel

committee report] *underplayed the shortcomings in Lisa's teaching record that warranted the Very Good rating, and by focusing mainly on recent evaluations, it did not fully reflect the history of the case."*

<u>The Board's Findings</u>

The preponderance of evidence demonstrates that the 2015 formal review initiated a pattern of College misrepresentation of student comments in teaching evaluations.

The preponderance of evidence makes it probable that the College violated the Faculty Handbook's provisions on fair and systematic evaluation.

The Board finds that misrepresentations in the flawed 2015 formal review were material to the outcome of the tenure case, because the College elected to emphasize the history of the case as a major rationale for its vote to deny tenure in fall 2018.

<u>Allegations Relating to the Evaluation of Teaching in the 2017 Formal Review</u>

In Section I.D of the appeal, the Appellant advances the allegation that "*the Provost and College failed to follow University and College Policies and Procedures with respect to the evaluation of Scholarship, Teaching and Service*."

2 (b, page 11 of the appeal) the Appellant charges that the evaluation of her teaching violated University and College policies and procedures.

<u>Additional Information Uncovered During Investigation</u>

Regarding the teaching allegation related to the 2017 formal review, the Board finds that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal.

The Appellant attributes College concerns about her teaching to her chosen methods of "challenging" the students in her courses. The College, on the other hand, characterizes particular, alleged incidents as "intimidating" to students, which would likely fall

outside of the University's policy describing "*challenging [students] to grow intellectually and morally*" as part of effective teaching [Faculty Handbook Section 3.4.2.1].

The Appellant also references a 2016 Faculty Council proposal to phase out the use of Student Evaluations in faculty personnel decisions. A detailed review of Faculty Council Minutes did not indicate that this resolution was ever passed or implemented.

The Appellant argues that the Dean's statement that "*at least one comment that referenced intimidating or dismissive behavior was seen in 55% of her course evaluations,*" citing a statistic that appeared in the Appellant's 2017 Formal Review, is incorrect and was used inappropriately.

In email correspondence between the Appellant and Hai Long Tran, Dr. Tran explained the 55% calculation in her 2017 Formal Review:

*Here is the full sentence: "In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." In the "Appendixes to Tenure and Promotion Review Statement," you used a different method of quantification with a different time frame. Therefore, if your findings were not consistent with the percentage in the personnel document, it doesn't mean that the number in the review report was incorrect. Anyway, this is not part of your T&P review and we just wanted to mention it here to clarify.)*

Email from Hai Long Tran to Lisa Calvente
Friday, November 02, 2018 12:22 PM

*"In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." The sentence is self-explanatory. We followed the college T&P guideline and identified pertinent mentions in each course evaluation to see if they were recurring across course evaluations.*

Email from Hai Long Tran to Lisa Calvente
Monday, November 05, 2018 1:59 PM

In contrast, the College's promotion and tenure recommendation submitted to the Dean characterized a notably different atmosphere.

*References to an intimidating, harsh, uncomfortable atmosphere for students' ability to speak their mind was reduced to one isolated class among five sets of OTEs in the past year available for review. Both peer observers assessed Lisa's classroom environment to be open and safe. "It was instructive to witness how Dr. Calvente corrects students' misperceptions unambiguously while*

*maintaining an atmosphere of safety," Dr. Foster noted after her visit to Lisa's Spring 2018 Intercultural Communication class.*

College of Communication Recommendation for Tenure and Promotion to Associate
Professor
November 16, 2018

Despite this 2018 observation, and despite Dr. Tran's claim that the 2017 Formal Review "*is not part of your T&P review,*" the 55% statistic was cited in the Appellant's promotion and tenure recommendation letter written by the Dean to the University Board on Promotion and Tenure.

*In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations.*

Letter from Alexandra Murphy to the University Board on Promotion and Tenure
January 9, 2019

The Board questioned the Dean for specific information about this citation and statistic, and received the following response.

*I relied on the [2017 Formal Review] personnel committee's assessment of these comments. I asked the author of that report to provide the original analysis (attached to this response).*

Email from Alexandra Murphy to the Board
Tuesday, November 5, 2019 7:10 PM

The Board reviewed the relevant course evaluations, together with the analysis used in the 2017 Formal Review calculation, as provided by the College. Of 218 total comments in the evaluations of these nine courses, seven comments had been flagged in the 2017 Formal Review. These seven were spread across five of the Appellant's nine courses, and it was from this five and nine that the statistic "*more than 55 percent (5 out of 9)*" was obtained. Moreover, two of the seven comments did not express negativity on behalf of the respondent, but were instead written in a sort of hearsay or observational perspective about the experiences of others. The inclusion of these two comments in the analysis is open to question, since anyone directly impacted would have had their own opportunity to provide feedback about the course. Those two comments are included below, with emphasis added by the Board in bold.

**I personally do not feel this way**, *but other students conveyed to me that they were often uncomfortable with Calvente's teaching style. One student remarked that the "looks" she would give in class were "revealing," and made some students uncomfortable to share. In addition, similar to a lot of students in this class, I do believe Dr. Calvente has a very firm set of ideals. I do*

*not think introduction of new material or theory would necessarily change them. Therefore, there was often a lot of heated tension that went unnoticed between some students and the professor. Perhaps a less "expressive" way of articulating what Dr. Calvente thought may have eased some of the tension.* **I however am only conveying opinions from other students.**

*Fall 2016 CMNS 509/CMNS 308/HTHC 523: Topic in Intercultural Communication*

*The course is great but you certainly come on a little strong.* **I didn't mind it but it's possible some people didn't feel comfortable** *opening up because of it.*

*Spring 2017 CMN 103: Intercultural Communication*

While reading through the 218 comments, the Board was struck by the preponderance of praise and appreciation for the Appellant and for the courses that she taught. These appeared in evaluations of all nine courses under consideration.

The 2017 Formal Review's selective reading of these course evaluations gives a misrepresentative characterization of the Appellant's teaching effectiveness, and does not account for the full range of qualitative comments that she received. Moreover, this is a crucial issue in the Appellant's tenure case because the statistic from that Review was cited in her promotion and tenure documentation.

The Board notes that the 2017 College Tenured Faculty Recommendation, resulting from a meeting held on November 17, 2017, called qualitative comments pertaining to students feeling 'intimidated' or 'uncomfortable' a 'major theme in her teaching' and cited the 55 percent statistic in support of this conclusion. This clearly indicates that undue weight was assigned to the flawed statistical conclusion. In addition, the report includes the following statement: "*For the faculty members who find such comments to be a major reason for non-renewal, there is a point at which the student responses reflect a problematic pattern that should have been addressed through forms of pedagogy that can invite students to critically examine a range of social injustices*." Crucially, this is the only specific reference to non-renewal in the 2017 College discussion.

The Board's Findings

The preponderance of evidence demonstrates that the College placed undue weight upon the flawed 2017 formal review in its tenure evaluation.

The board finds that misrepresentations in the flawed 2017 formal review were material to the outcome of the tenure case, because the College and Dean elected to emphasize

the history of the case as a major rationale for the College vote to deny tenure in fall 2018.

Appellant's Allegations Regarding Evaluation of Service

1 (c, page 14 appeal) alleges that the College violated university policy in the evaluation of her service.

Section 3.5.1.1 of the Faculty Handbook states: "*There are normally three levels of evaluation prior to the final decisions of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university*."

The Appellant states: "*The College, in its argument that my service was deficient in providing service to my unit in the College, violates University policy that states that in the absence of departmental or school structures the local academic unit is the College. Therefore, the assessment of my service as not meeting the requirements for "excellence" is not in accordance with University policy.*

*Furthermore, because it is always difficult to ascertain, assign, and weigh the value of Service, I have compared my record of service to the dossiers of colleagues in the College who have shared their information with me. Dr. Maria DeMoya, Dr. Sydney Dillard, and before his departure from the College, Dr. Lou Rutigliano, have consistently fared better in their rankings. During my reviews, I have been told to exercise more in-unit service; the University, however, makes no distinction between service in the College of Communication and Service in the College's specific units.*"

The Board's Investigation

The Board's conducted its own investigation and requested additional materials for review in addition to the items in the Appellant's original dossier and supporting documentation.  To analyze the service expectations and contributions to the home unit and university, the Board questioned the Appellant, Dean Murphy and Provost Ghanem.  The University Board Promotion and Tenure report dated May 10, 2019 provides only limited insights about its discussions of service.

"*In terms of service, some of the Board members shared the concerns of the faculty that a large portion of Dr. Calvente's service was outside her home unit. However, the Board agreed that Dr. Calvente's overall service contribution was sufficiently strong to meet the criteria for service in*

*the Faculty Handbook. The Board encourages Dr. Calvente to continue to build on her service record, in her home unit, as well as at the college and university levels.*" [UBPT Report p. 3]

The Board found the statement of the UBPT not quite precise as to the service contribution of the Appellant, so the Board decided to provide more extensive documentation and juxtaposed it with the Board's discussions of that evidence.

The material in both formal reviews that took place in 2015 and 2017 and an informal review from a letter of recommendation of Dr. Alexandra Murphy in 2016 provides support to the Board's finding that the Appellant received unclear guidelines about making progress towards tenure and promotion.

<u>2015 Formal Review and Board Discussion</u>

The following is a complete excerpt of the Service section of the College formal review dated March 7, 2015, with incorrect contract year noted [page 6] in the dossier of the Appellant:

*"During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs.*

*She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of Cultural Studies since 2012 and Text and Performance Quarterly since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.*

*The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.*

*Conclusion*
*Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal."*

The Board discussed that in this document the Appellant's service is considered fair to good and that she is making fair to good progress towards tenure in the area of service. The service contribution appears to have been in good standing, since the recommendation of termination of the contract is based in teaching and research, and not on service.

The Board notes that there is no mention in this report that the Appellant should increase visibility in serving in the home unit. The report mentions that two personnel committee members indicated that the Appellant was not making satisfactory progress toward tenure in service, but there is no guidance about specific roles or committees which would provide constructive feedback to provide the Appellant a service path moving forward, to achieve tenure.

## 2017 Formal Review and Board Discussion

The following is a complete excerpt from the *Service* section of College's Recommendation of Continuation or Termination of Untenured Faculty Contract, dated November 2017, page 7 and 8:

*"In the previous review period, Lisa's contributions within the College of Communication were linked to her work as a member of the Contingent Faculty Review Board and the Local Review Board, an event leader of the symposium on violence, a thesis committee chair/undergraduate senior thesis advisor, and a comprehensive exam writer. At the university level, she served as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program and contributed to the Office of Multicultural Student Success in the Men of Color Initiative, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/Global and Transnational Programs. In her service to the academy, Lisa reviewed manuscripts for 2 journals as part of their editorial board (Cultural Studies, Text and Performance Quarterly) and papers for her national organization's conferences. In the current review, Lisa continued several of her existing services and took on some others.*

At the college level, Lisa has joined the Term Faculty Review Committee since Spring 2015 (and has begun her actual service since the 2016-2017 academic year due to her research leave). Associate Dean Alexandra Murphy appreciated her valuable, hard work as well as her insights into the candidate's strengths and areas for improvement. She continued her role as part of the Local Review Board until Fall 2016, when this service was terminated due to new IRB procedures. Under this service, Lisa reviewed 2 IRB applications. Since 2015, she has chaired 2 graduate thesis and project committees, advised a master's project, and administered comprehensive exam questions. In Fall 2016, Lisa volunteered to help Dr. Lucy Lu in reviewing the syllabi for CMN 103 that non-tenure/tenure track faculty used for Intercultural Communication to ensure quality control. She also participated in some faculty searches and attended the graduation foundation course, college meetings and other events, such as award ceremonies and alumni receptions.

At the university level, Lisa has collaborated actively across programs at DePaul. She has both expertise and passion for interdisciplinary work across colleges. Lisa has been an affiliated faculty of the African and Black Diaspora Studies Program (ABD) since 2012 and a member of the ADB Advisory Committee since 2015. According to ADB Program Director, Amor Kohli, she has served actively and thoughtfully and been invested in the broader culture and activity of ABD. Since 2016, Lisa has become an affiliate to the Critical Ethnic Studies MA program (CES) in the College of Liberal Arts and Social Sciences. CES Director Laura Kina expressed her appreciation for Lisa's commitment as an invaluable member, who has impacted CES students in a number of ways. Lisa has continued her existing role as an affiliate to the Latino Studies Program (LALS) and has been part of Liberal Studies Council Survey Review Subcommittee, which (according to Director of Liberal Studies John Shanahan) drafted recommendations based on the General Education Task Force report and feedback from colleges in spring 2017. LALS Chair, Lourdes Torres, acknowledged Lisa's contributions over the past 5 years, including her participation in a tenure-track hire in the past year. In addition, Lisa has reached out to the Women and Gender Studies Graduate Program to offer her service in mentoring their students.

Lisa's service record extends to the academy and the community. As part of the editorial board of 2 journals (Text & Performance Quarterly and Cultural Studies), she has reviewed approximately one manuscript per year for each journal. In 2016, Lisa reviewed the 7th edition of James Neuliep's Intercultural communication: A contextual approach (Sage). She has also been active at conferences as a paper reviewer, panelist, respondent/discussant, and a member of the Welcome Team. Lisa's community service includes her commitment to the Chicago Alliance against Racist and Political Repression (CAARPR), where she has also created community-based service learning for her students. In addition, Lisa has volunteered at the Juvenile Justice Program to help troubled youths at the Organization for the North East (ONE) community center.

*At the interview, Lisa spoke of her willingness to take on committee work and her decision to engage in cross-college outreach efforts as part of the Vincentian mission. While we commend Lisa's dedicated service, there is room for improvement. The Personnel Committee emphasized to Lisa the need to take a more visible and significant role within her unit and at the college. **Her service record at this advanced stage of her probationary period remains quite modest, considering the typical load for her peers.** [bold emphasis is this Board's]*

*At the university level, there are several opportunities where Lisa could make even greater impacts by serving on university teams, committees, or task forces. The documentation of her service, as well as the construction of her vita and personal statement, would benefit from a clearer organization. According to the college's tenure and promotion guidelines, candidates use the AAUP's format for the c.v. to maintain college uniformity. The committee suggests Lisa attend tenure review workshops, which will continue to reinforce expectations and best practices in drafting personal statements, and preparing and organizing review and promotion materials.*

***In sum, the Personnel Committee finds that Lisa's service record to be very good over this review period, and she is making fair progress toward tenure in the area of service."*** [bold emphasis is the Board's]

In this same report, the tenured faculty recommendation regarding the Appellant's service is the following: [p.12]

*"The majority of the tenured faculty found Lisa's progress toward tenure in the area of service **unsatisfactory**. [Emphasis in the document] Voting members recounted instances where service contributions listed in Lisa's document do not reflect substantial accomplishments. In addition, Lisa has been noticeably absent as a college representative at several required, university-wide events such as graduation and convocation. The tenured faculty endorsed the Personnel Committee's assessment that her service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers. It was emphasized at the discussion that, according to the College Tenure and Promotion Criteria, faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college. If Lisa is retained, the tenured faculty would need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul."*

The Board discussed the fact that there is inconsistency and a lack of guidelines provided to the Appellant in this report. For example, the Personal Committee mentions that the Appellant's service record was very good over this review period and adds that the

Appellant is making fair progress towards tenure in the areas of service. Additionally, the College Recommendation and Rationale section in page 1 of the same report states: *"Lisa's service record to be **very good** over this review period and she is making fair progress toward tenure in the area of service."* Nevertheless, the tenured faculty assessment is unsatisfactory regarding progress towards service. The Board finds that there is not a clear elucidation of how in page 1, 7 and 8 the Appellant's review is very good but in page 12 becomes unsatisfactory. One member of the Board noted that this often occurs in local unit personnel deliberations, but noted a problem of incongruity between inconsistencies in this document and then-Dean Ghanem's recommendation to the appellant. In a letter dated December 13, 2017 regarding 2017 formal review, then-Dean Ghanem wrote: *"In order to be considered for promotion and tenure in the College of Communication, I stress that you follow all the recommendations of both the Personnel Committee and the tenured faculty outlined in the formal review document dated November 17, 2017 regarding teaching, research and service."*

The Board discussed guidance by senior colleagues, as demonstrated in documentation provided by the Appellant, with members unable to clearly determine what is weighted more or less or what is considered as 'meaningful' for local unit level service. The insertion of attending graduation and convocation into the document was also discussed with some members finding it strange that the tenured faculty mention those alongside time-intensive Personnel Committee work. To some members of the Board this insertion seemed to be a pretextual, insertion into the record of a minor example of the Appellant's alleged non-compliance with the Faculty Handbook.

The Board noted that in this second formal review, the Appellant is recommended to concentrate her efforts in service at the local-home unit level according to the College Tenure and Promotion Criteria. Surprisingly to some on the Board, the Appellant is simultaneously recommended to expand her service record at the university level where the Appellant could have greater impacts by serving on university teams. On this point the senior colleagues also recommended greater volunteering for university committees. The report mentions in two places in the excerpts quoted *"the typical load of her peers."* This provides expectations that the Appellant is compared to an optimal or typical level of service rather than College Criteria. The Board does not find this argument compelling for a Personnel Committee assessment. The formal review should have noted exactly what is missing in the Appellant's service dossier, rather than vaguely refer to a typical load.

<u>Documents Created by the Dean and Board Discussion</u>

The Board engaged in discussion of what some members considered the contradictory and inconsistent documentation presented to the Board: a letter the Dean documenting service, dated August 14, 2016 which starkly differs from the recommendation she wrote as Dean, as discussed below.

This is an extract from the 2016 letter:

*"I want to thank you for the service that you have provided over the past several year within the College of Communication and for DePaul University. Since your hire in Fall of 2011, you have contributed to the service life of the college in a number of ways. During your first year, you participated in the Graduate Program Task Force to brainstorm ideas for the first-year seminar. This initial work evolved into the creation of the Foundations in Graduate Studies course, a new required course for all Communication and Media Studies students. You spoke with the students as a guest speaker within this course in Fall of 2014. You were an event leader for our College's Symposium entitled, "Making Meaning of Violence." For this event, you created a panel on race, violence, and activism and facilitated a fascinating roundtable session with senior scholars and activists who specialize on issues of social justice, youth activism and violence.*

*The following year, when I was serving as your program chair, I needed to find someone to serve on the Liberal Studies Council task force on Personal Transformation and Responsibility and Global and Transnational Programs. I thought you were a perfect fit and was very happy you took on this role. You also served on the College level Local Review Board for two year where you reviewed applications for Institutional Review Board approval for research from College of Communication faculty.*

*You have stepped up to aid the college in a number of ways involving personnel including serving on a faculty search committee for a term faculty member in intercultural communication in Spring 2012 and a junior faculty representative on the personnel committee for two formal reviews in January 2014. The personnel committee is a time-intensive committee that requires a detailed read of candidate materials, participating in meetings, and crafting and reviewing recommendation letters. Most recently, in terms of personnel, you have been a member of the Term Faculty Review Committee from (appointed in Spring 2015, but due to research leave, active member from Fall 2016 to present). Again, this is a very time-intensive committee that involves peer reviews of all term faculty.*

*Again, thank you for the valuable contributions you have provided in terms of service for the past several years as an assistant professor."*

The Board discussed the tenor of this letter, which is thankful for the Appellant's involvement at both the Department and College, home academic unit level, and praises the Appellant's work on a time-intensive committee like a Personnel Committee. The Board questioned the Dean about this and compared the responses provided by the Dean to the two earlier documents.

In her letter to the UBPT, dated January 9, 2019, the Dean seems in certain places to be contradicting the 2016 informal assessment and rationalizing after the fact the decision of colleagues. This is an excerpt of that recommendation:

*"In the area of service, Dr. Calvente is also ranked as "very good" by her peers. Dr. Calvente has participated in service obligations at the program, college, and university levels. Most of the service that Dr. Calvente has provided at the program and college levels has been in ad hoc, short-term capacities. For example, she helped review syllabi for CMN 103, helped solicit feedback from college advisors on proposed curricular "pathways" for communication studies, and has been a representative at student open houses and presented student awards. Also, of note is her participation on a term faculty hiring committee and her work advising students in the Latino Media and Communication program. Dr. Calvente also lists other smaller activities such as guest speaking in the graduate foundations course and participating in various meetings as service. The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee. The committee reviews term faculty on a two-year rotation including peer observations and writing and editing documents. Dr. Calvente has been an active and valuable member of this committee for the past two years. To receive an "excellent" rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period.*

*Dr. Calvente has provided other college-level service outside of the College of Communication where she has served as an affiliate faculty member for several different programs in the College of Liberal Arts and Social Sciences including the African and Black Diaspora Studies Program, the Latino Studies Program (where she also served on a tenure-track hiring committee), and the Critical Ethnic Studies MA program. She is a member of the Women's Center Advisory Board. Her service in these areas is described as conscientious, invaluable, and collaborative. Dr. Calvente has started building a record of service at the university level. In the past year, she has been a member of the General Education Task Force Report Review, the Council on Community Engagement, and participated in the WPI Project-Based Learning workshop.*

*The College of Communication is a small college that must spread service obligations across a fewer number of tenure-track faculty than many other colleges. Therefore, in the College of Communication, candidates ranked as "excellent" in service have provided much more ongoing,*

*substantial committee work, particularly within the College of Communication and at the university level where we have requirements for representation on a number of committees. The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review. This is not to say that the service contributions provided by Dr. Calvente have not been valuable; she is aptly rated as "very good."*

The Board discussed contradictory and imprecise statements in this part of the letter. Dean Murphy mentions that the Appellant was advised to significantly increase her service to the College in more 'meaningful' ways in each prior formal review. A careful review of the 2015 formal review shows that there is no recommendation about **'meaningful'** service. In fact, the report mentions that the Appellant is making a good contribution towards tenure in the area of services. The Board concurs that such statements occur in the 2017 review.

The Board discussed whether the Appellant was informed in any of the 2015 and 2017 formal reviews what is 'relevant' or 'substantial' or 'meaningful' committee work. The Board could not determine from any of the documentation provided in the original dossier, investigation and supporting documentation regarding what is defined to be meaningful or less meaningful committee work. The Appellant was never guided as to which were the committees she should be participating in order to achieve tenure.

More concerning is the informal review assessment from Murphy in March 2016 praising the Appellant's substantive and time-intensive Personnel Committee work, which sent the signal that expectations were being met.

In its investigation, the Board questioned the Appellant, Dr. Lisa Calvente, Dean Murphy and Provost Ghanem regarding the service contributions. The Board requested that the Appellant provide additional documentation referred to in a letter to Isabel Diaz dated November 29, 2018.

In that letter the Appellant stated on page 8:

*"Personnel has specifically pointed out that my in-unit service is lacking; however, I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition. I can provide email documentation to that effect."*

The appellant provided that documentation. The Board also requested any additional evidence that could substantiate the following statement that appeared in the November 29, 2018 letter:

*"I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition."*

The Board received the following additional documentation from the Appellant:

- Email between Dr. Willard, Dr. Baglia, and the Appellant for the cancelled search
- Email between Dr. Willard and the appellant to volunteer for search committee
- Email between Dr. Lu, Dr. Willard and the appellant
- Standard for Chair election process sent by Acting Dean Murphy, Monday, October 21, 2019
- Email from Acting Dean Murphy

From the analysis of this additional documentation the Board concludes that:

1. The Appellant has volunteered for in-unit service that has been available to her. An example of this statement is that the Appellant volunteered to help Dr. Lucy Lu, in being the course-keeper for the core course of their unit.

2. The Appellant served on committees that were suggested by the Dean Murphy when she was the Chair of the Department. These committees are highlighted in the the 2016 general service letter.

3. The Appellant volunteered to participate as member of a faculty search committee in the Fall of 2014, which was cancelled due to the lack of a line for the appellant's unit.

4. In academic year 2016-2017, the Appellant volunteered to participate in a Faculty Search Committee in the Fall of 2016, but the Chair at time, Dr. Willard did not choose the appellant.

The Board also discussed whether the Appellant received enough opportunities during her probationary period to increase her in-unit service exposure. The discussion emphasized that the Board's investigation uncovered additional evidence which suggests that the Appellant volunteered for additional in-unit services but was not selected.

The Board also questioned the Dean about the Appellant's service activities. The Dean explained this particular case to the Board.

**Board question:** Would it be correct to state that on more than one occasion Dr. Calvente volunteered for in-unit service obligations but was not chosen to serve by senior colleagues?

**Dean's response:** *"I am only aware of one occasion when Dr. Calvente reached out to her program chair, Daniel Makagon to volunteer for college and university committee assignments in the 2017. She sent her request after the call for committees had been out for **a while** [Board's emphasis in bold] and the college level committees had already been filled. Dr. Makagon suggested she contact the faculty council representative on the committee on committees to see if there were any remaining openings."*

The Dean did not provide any College documentation to show that the Appellant refused to participate in any service assignment recommended or requested of her by the unit.

After comparing the service records of faculty from the past 10 years in the College who were rated as "excellent," the Board cannot find any clear and compelling substantive delineation of "meaningful" and "relevant" service. If a faculty member is expected to participate in a specific standing College committee (e.g. curriculum, assessment, program review, summer research committee.) during the probationary period, it should clearly be communicated in the formal reviews.

The Board also questioned the Dean about guidance to the Appellant in terms of her progress towards promotion and tenure under service:

**Board question:** Your recommendation to the UBPT dated January 9, 2019 states: "The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review." What did you mean precisely by "more meaningful ways"? Were specific assignments ever proposed?

**Dean's response:** *"The personnel committee and the tenured faculty consistently recommended in prior formal reviews that Dr. Calvente increase her service contributions. While there may be many lines under service on the vita, the personnel committee and the tenured faculty recognized that much of what is listed are smaller, ad hoc presentations in classes or attending the annual award brunch and presenting a student with an award (expectations for all our faculty). In another example, the Security Concerns Group listed on Dr. Calvente's CV consisted of one meeting when interested faculty were invited to come discuss security concerns in the building. Looking at her CV at the time of her 2018 tenure and promotion review, under the heading of College of Communication, the only substantive committee on which she served is the Non-Tenure Track Review Committee (now called the Term Faculty Review Committee)."*

The Dean uses the word "consistently," but the 2015 formal review does not consistently recommend that the Appellant increase her service contributions. The Board also finds contradicting evidence by unequally weighting services in an ad-hoc or unsystematic way.

The Board sought to understand why the Dean commended the Appellant's services to the unit and College in August 2016, not expressing concerns she may have had and would express in early 2019.

**Board question:** Why did not you express those same concerns in the letter you wrote in August 2016 commending Dr. Calvente's services to the unit and college?

**Dean's response: "***Dr. Calvente asked me to write a letter of support that detailed the service that she had done up to that point. I did not see my role at that time to position this service against that of her peers. As I note in my tenure recommendation, I appreciate the work that she has done. But, in context and in comparison, with what is typical across the college, and given the consistent feedback she was given in formal reviews, I agreed it was not enough to be rated as "excellent" in service*."

The Board discussed this response. Some members found this response insufficient for understanding the reasons why Dr. Alexandra Murphy provided two diverging assessments in different documents. One Board member found that the statement "*I did not see my role at that time to position this service against that of her peers."* creates false expectations. Another Board member emphasized the different purposes of the two documents and differing guidelines about expectations for them in the Faculty Handbook. The Board discussed the possible reasons for not positioning the appellant's service against that of her peers at that time when Dr. Murphy was commending the appellant.

One Board member concluded that Dr. Murphy did not give precise signals in her 2016 letter and should have raised the issues she raised in the 2019 letter. Another Board member found that the 2016 letter conformed to what that member would expect from a letter documenting service rather than a recommendation evaluating service.

Overall, the Board is uncertain as to whether the home academic unit provided enough support for the Appellant to excel in the area of service at the home level. Given the other problems with the local unit formal reviews discussed in other sections, the Appellant's pursuit of opportunities outside the College which would result in letters from individuals who had not voted against her case seems justified.

The Board determined that the Appellant received inconsistent guidance in informal reviews

<u>The Board's Findings</u>

The Board finds that the Appellant's service was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion to the Associate Professor rank on the grounds of 'unsatisfactory' service to both the home academic unit and university.

The Board finds that there were considerable and material deviations from procedures by the home unit (i.e., the College of Communication) in failing to provide the Appellant with clear and consistent guidance regarding service in formal reviews as mandated in the Faculty Handbook Section 3.3.1.

The preponderance of evidence supports the claim that the Appellant did volunteer for additional service assignments in the College, but that these substantive service assignments did not materialize due to factors beyond her control, as outlined in points 1-4 above.

**Ground for Appeal III. Discriminatory Practice/Retaliation**

<u>Discrimination/Retaliation</u>

Because the appeal links reporting and contacts with Isabel Diaz of the EEO office to claims of retaliation, the Board requested that a different member of HR staff be assigned to review claims of discrimination and retaliation.  Starting on September 16, 2019, the board engaged in ongoing consultations with Dr. Stephanie Smith, Vice President for HR, about the appeal as required by Faculty Handbook Section 5.1.1.1.  The results of Dr. Smith's investigation – it discovered nothing material that supports claims of discrimination or retaliation – were communicated to the Board on December 19, 2019.

<u>Appellant's Allegations Regarding Discrimination</u>

In section three of the appeal the Appellant advances two major allegations regarding

discrimination.

1 (A, Page 12, 17 in the appeal) the Appellant alleges that College personnel documentation contains 'racially insensitive caricatures and stereotypes.'

2 (page 17) the Appellant alleges a pattern of discriminatory practices in the evaluation of her teaching that violates federal policies regarding non-discrimination against members of protected classes.

The Board's Findings

Regarding allegation one, the Board finds that the College did not include racially insensitive caricatures and stereotypes in personnel documentation. The Board notes that the appeal did not provide any specific references to racially insensitive terms, caricatures, or stereotypes. The Board's careful review of College personnel documentation and student evaluations did not uncover any statements that would substantiate a claim of racial discrimination.

Regarding allegation two, the Board finds that allegations that the College violated federal policies regarding non-discrimination could not be substantiated. The appeal did not provide specific information, evidence or statements to substantiate the claim of discrimination on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability or genetic information.

Appellant's Allegations Regarding Retaliation by Provost.

In section three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the Provost engaged in retaliation against her for filing EEO claims against the College.

The Appellant states on page 17 "*In Section I.B.a., I enumerate the University violations that also constitute retaliatory acts, including by Interest [sic] Provost Dr. Salam Ghanem. These acts should be investigated as retaliatory and therefore discriminatory practices*."

The Appellant makes her own contacts with DePaul EEO officials key to the claim of retaliation, writing on pages 5-6:

*"By the time I submitted my tenure application to the College, however, then-Dean Ghanem had become aware that I had asked that the Office of Institutional Diversity and Equity (OIED) investigate my claims against the College, and specifically members of the Personnel Committee, of violating DePaul University's Anti-Discrimination and Anti-Harassment Policy and Procedures. In November of 2018, I wrote a letter detailing the retaliatory actions against me by the College and members of the senior faculty (attached). I also reported these retaliatory practices to the Equal Employment Opportunity Commission (EEOC), and I have since met with the EEOC.*

*I submitted my application for tenure and promotion after Dr. Ghanem had overturned the previous contract nonrenewal recommendations of the College. By the time I submitted my tenure and promotion application, I had also reached out to various non-tenured members of the faculty in the College, as well as reached out and met with several members of the tenured University faculty, in order to discuss my path towards tenure and to compare our respective dossiers. Dr. Ghanem was aware that these meetings were taking place. Not only did I never lie about these occurrences, I openly discussed my experiences in the College and looked to Dr. Ghanem as the Dean of the College to help address these growing concerns. These discussions also included other, tenure-track, junior women of color faculty from the College, who shared similar experiences as my own and similar concerns around the manner in which the College evaluated faculty of color in formal and informal reviews. These included Dr. Maria DeMoya and Dr. Sydney Dillard. I should also note the Diversity Advocate of the College's, Dr. Maria DeMoya, has substantiated my concerns formally.*

*During one particular meeting with Dr. Ghanem to discuss my tenure dossier and the conflict that surrounded my case in the College (which took place after then-Dean Ghanem had overturned the recommendation for contract nonrenewal from the College but before I filed my application for tenure), Dr. Ghanmen commented on Dr.* ▮▮▮▮▮▮▮▮ *contract nonrenewal decision by the College. Dr. Ghanem implied that I was responsible for rumors circulating in the University that suggested that Dr.* ▮▮▮▮▮▮ *had been terminated in order that Dean Ghanem would have just cause for later terminating women faculty of color. I admitted to Dr. Ghanem that I had written in support of* ▮▮▮▮▮▮▮▮ *appeals case, and I verbally disclosed the content of my letter."*

In view of the serious nature of this allegation, the Board in coordination with Dr. Smith investigated these claims by questioning the Provost and other witnesses. It also closely examined extensive documentation related to EEO claims, including the Appellant's email communications with the Employee Engagement and EEO Unit, with Dr. Ghanem, and the Appellant's letter to the Board regarding Dr. Cichirrillo's appeal.

The Board's Findings.

The Board's investigation did not substantiate the claim that the Provost engaged in retaliation against the appellant for filing EEO claims against the College.

The Board's investigation also uncovered several imprecise or misleading statements on pages 5-6 of the appeal cited above.

The Board finds that the Appellant's allegations were never "substantiated formally" by Dr. Maria DeMoya, Diversity Advocate for the College of Communication.

The Board finds that the Appellant never followed up with a request for additional information from Isabel Diaz and that the case was closed in early 2019 due to the Appellant's failure to respond to EEO requests.

The Board finds that the Appellant's characterizations of her meetings with Dr. Ghanem in the appeal document cannot be substantiated by the recollections of Dr. Ghanem or the Appellant's EEO correspondence in the days/weeks after the meeting which took place on October 10, 2018.

The Board finds that phrases such as "Dean Ghanem had become aware" and "Dr. Ghanem was aware" are not fully consistent with the facts contained in the email correspondence between the Appellant and Dr. Ghanem, and the Appellant and Barbara Schaffer. The preponderance of evidence demonstrates that then-Dean Ghanem acted appropriately in referring the Appellant's concerns to appropriate university officials.


Allegations of Retaliation by the College of Communication

In sections three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the College took no action to address retaliatory actions reported to Isabel Diaz.

On page 6, the Appellant states: "*These reviews by the College, since 2015, have included members of the Personnel Committee that OIDE investigated for violating University policies with respect to discriminatory practices. I later reported retaliatory actions by my senior colleagues in the College to Isabel Diaz, currently the Director of Employment Engagement and Equal Opportunity at DePaul. In the College, no actions were taken to address this situation.*"

<u>The Board's Finding</u>

The Board finds that the preponderance of evidence does not substantiate the Appellant's claim.