IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
|     Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20-cv-3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
|     Defendants. | ) | |
| _____ | ) | |

**<u>Memorandum of Law In Support of Lisa Calvente's Motion For Partial Summary Judgment</u>**

Lisa Calvente ("Dr. Calvente") submits the following memorandum of law in support of her motion for partial summary judgment:

<u>Executive Summary</u>

This is a case about Salma Ghanem's ("Dr. Ghanem") retaliatory refusal to grant tenure to Dr. Calvente *despite* the fact that the DePaul University Board of Promotion and Tenure's (the "UBPT") recommended that Dr. Calvente receive this status. (SOF ¶¶47-52, 39-42, 53-66.) Why is the UBPT so important? Because it is an independent, university-wide board that conducts an independent review of a candidate's dossier. (SOF ¶¶17-27.) The UBPT speaks for the faculty of DePaul University ("DePaul" or the "University") in an area where the faculty has primary governance responsibility at DePaul: the award of tenure. (SOF ¶19.) Accordingly, the UBPT acts as a cooling saucer and permits the review of a candidate's file (i) by members of the University as a whole, and (ii) in a manner that is untainted by any passions that may exist within a candidate's particular unit. (*See* SOF ¶24-27.)

Although DePaul permits the provost to have the final word as to who should receive tenure, the rules are clear that the provost should reject the UBPT's recommendation *only* in rare in-

stances and for compelling reasons. (SOF ¶¶25-26.) What does this mean? It means that the provost may not simply reject the UBPT's recommendation because she disagrees with it. (SOF ¶26.) Rather, to reject the recommendation of the UBPT—which represents the voice of the faculty—the Provost should find that the UBPT's recommendation was groundless. (SOF ¶26.) In other words, to reject the UBPT, the provost must find that (i) doubt existed where the Board found none, or (ii) where the Board expressed its doubt, the provost found that the Board's reasons for doubt were completely unfounded. (SOF ¶26.) Thus, the standard for a provost to reject a UBPT's recommendation is akin to abuse of discretion. *See Nestorovic v. Metro. Water Reclamation Dist. of Greater Chi.*, 926 F.3d 427, 431-32 (7th Cir. 2019) ("A court abuses its discretion when the record contains no evidence on which it could have rationally based its decision or when the decision rests on an erroneous view of the law").

Why does Dr. Calvente believe she was the victim of retaliation at the hands of Dr. Ghanem? Because (among other oppositional activity) the very year she went up for tenure, Dr. Calvente told Dr. Ghanem that she had accused her (then the dean of her academic unit) of playing racial politics in connection with another professor's career, and she made this accusation in writing. (SOF ¶¶39-44.) Dr. Calvente and Dr. Ghanem never had another conversation after Dr. Calvente advised Dr. Ghanem of what she had written. (SOF ¶44.) However, shortly afterwards, Dr. Ghanem became the interim provost of DePaul. (SOF ¶10.) She then rejected the UBPT's recommendation and denied Dr. Calvente's application for tenure. (SOF ¶51.)

Dr. Ghanem's rejection of the UBPT's recommendation was bad enough. However, the very next cycle, Dr. Ghanem granted tenure to two other professors who the UBPT recommended not to receive tenure by a vote of 6-1. (SOF ¶¶55, 58-61, 63-65.) These professors had no record

2

of complaining about discrimination, let alone accusing Dr. Ghanem of playing racial politics with another professor's career. (SOF ¶ 53, 62.) Moreover, the standard that a professor has to meet to earn tenure is the same across the university: before granting tenure, the University must have "no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (SOF ¶¶27, 60, 64.)

So why reject Dr. Calvente's application when Dr. Calvente had the support of the UBPT and accept the applications of these two other professors who did not have the support of the UBPT by such a large margin? Neither DePaul nor Dr. Ghanem have ever provided a legitimate answer to this question. (SOF ¶60.) Accordingly, on the record developed during discovery, a jury could come to one conclusion with respect to what occurred in connection with the denial of Dr. Calvente's application for tenure—Dr. Ghanem violated the civil rights laws.

### Facts

Dr. Calvente incorporates her contemporaneously filed Statement of Material Facts Pursuant To Local Rule 56.1(a)(2) as if set forth fully herein.

### Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A motion for "summary judgment is the 'put up or shut up' moment in a lawsuit" when the nonmoving party must show its evidence and demonstrate that there is a dispute that can only be resolved at trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Summary judgment is appropriate in cases, such as this one, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party [and, therefore,] there is no 'genuine issue for trial.'" *Scott v. Harris*,

550 U.S. 372, 380 (2007) *citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 586-87 (1986).

## Argument

The civil rights laws apply to employment in the academy on the same terms that they apply to employment in any other sector of the economy. *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 864-65 (D.C. Cir. 2019) (university not entitled to special deference where in a case where the fundamental question is whether it acted in good faith); *Haynes v. Indiana Univ.*, 902 F.3d 724, 733 (7th Cir. 2018) (question in tenure denial case is whether plaintiff can demonstrate her race caused adverse action) *citing Ortiz v. Werner Enters. , Inc.*, 834 F.3d at 765. *See also Blasdel v. Nw. Univ.*, 687 F.3d 813, 817 (7th Cir. 2012) (evidence of animus by decision maker sufficient to state a claim).

In the typical denial-of-tenure case, it can be difficult to prove a violation of the civil rights laws because tenure decisions often involve several independent layers of review and the tenure decision is often made by committee. *Cf. Haynes*, 834 F.3d at 734. In this case, however, DePaul vests one person with ultimate power as to who receives tenure—the provost, Dr. Ghanem. Thus, this is not a case where Dr. Calvente is focused merely on "allegations of chicanery during the University's review of [her] tenure application" (although the record reveals that chicanery occurred). *Cf. Haynes* 834 F.3d at 734. Rather, Dr. Calvente's case focuses on Dr. Ghanem's reasons for overruling the UBPT, a University-committee that speaks for the faculty and whose judgment should only be rejected in rare instances and for compelling reasons. In other words, given the manner in which DePaul structures its tenure process, and given Dr. Ghanem's outsized role in it, this is a garden-variety retaliation case.

4

A plaintiff-employee may prove retaliation by showing (1) she engaged in protected activity, (2) a materially adverse action taken by her employer, and (3) a causal connection between the two. *Humphries v. COBCS West, Inc.*, 474 F. 3d 387, 404 (7th Cir. 2007). A plaintiff-employee may demonstrate a causal connection between her protected activity and the adverse employment action solely through circumstantial evidence. An employee may demonstrate a causal connection between her protected activity and the adverse employment action solely through circumstantial evidence. *Coleman v. Donahue*, 667 F.3d 835, 859 (7th Cir. 2012) (reversing motion for summary judgment). *See also Joll v. Valparasio Community Schools*, 953 F.3d. 923, 929-30 (7th Cir. 2020) ("[e]mployers long ago taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written"); *Ortiz*, 834 F.3d at 765 (recognizing that few people admit firing someone in violation of the civil rights laws).

Circumstantial evidence sufficient to prove a causal connection can include (i) disparate treatment of similarly situated employees, (ii) an employer's failure to follow its own policies and procedures, including a marked deviation from standard practice, and (iii) explanations for conduct that are so suspicious that they give rise to an inference of discrimination or retaliation. *Coleman*, 667 F.3d at 858, 860 (selective enforcement of company policy can establish pretext); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) (reversing summary judgment as jury could "find the explanation [for the termination] to be so ludicrous that [the employer] is not to be believed"); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) (reversing order granting summary judgment and explaining that "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext"); *Joll v. Valparasio Community Schools*, 953 F.3d. 923, 931 (7th Cir. 2020) (reversing summary judgment, explaining that deviation from

5

standard practices can establish pretext) (collecting cases); *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (reversing motion for summary judgment, explaining that departure from established policy can establish pretext).

A.  **Dr. Calvente suffered an adverse job action.**

There is no legitimate dispute that Dr. Ghanem's and DePaul's decision to deny Dr. Calvente's application for tenure and to offer her a terminal contract is an adverse employment action. *E.g. Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) (civil rights laws cover adverse actions including termination of employment and the failure to promote). Thus, Dr. Calvente has proven the first element of her retaliation claim.

B.  **Dr. Calvente engaged in protected activity.**

There is also no legitimate dispute that Dr. Calvente engaged in protected activity by both (i) advocating for Dr. ▬▬▬ by stating that Dr. Ghanem did not renew his contract for reasons of racial politics (SOF ¶41), (ii) complaining about discrimination in the College (SOF ¶¶28-29, 31, 35, 38, 40, 52), and (iii) continuing to complain about discrimination in the College after Dr. Ghanem told her not to (SOF ¶40). *See* 42 U.S.C. §2000e-3 (it is "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter . . . ."); *Humphries*, 474 F. 3d at 403 ("a plaintiff may maintain a cause of action under section 1981, where the plaintiff has suffered retaliation for advocating the rights of those protected under section 1981"); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (protected activity includes complaining about harassment).

Dr. Calvente's record of oppositional activity is so strong that the defendants have never attempted to contest it. Indeed, they conceded this issue in their own motion for summary judg-

6

ment. (*See* Docket No. 46 at page 24 ("There is no dispute that [Dr. Calvente] engaged in protected activity, but she cannot causally connect those complaints to her tenure denial because she cannot show that her complaints were the 'but for' cause of the decision").) Thus, Dr. Calvente has proven the second element of her retaliation claim.

C. **The record evidence demonstrates a causal connection between both Dr. Calvente's advocacy for Dr. ▇▇▇ and her continued complaints about discrimination on the one hand and Dr. Ghanem's decision to deny her application for tenure on the other hand.**

Dr. ▇▇▇ and Dr. Calvente were required to meet the same standard for obtaining tenure—before granting tenure, the University must have "no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (SOF ¶27.) Thus, Dr. ▇▇▇ and Dr. Calvente are similarly situated for purposes of the civil rights laws, and Dr. Calvente may prove her case by demonstrating Dr. Ghanem treated her and Dr. ▇▇▇ differently for no legitimate reason. *See Coleman*, 667 F.3d at 841 (the critical issue in determining whether employees are similarly situated is whether they were subject to the same employment policies). Dr. ▇▇▇ file, however, was objectively worse than Dr. Calvente's file in that the UBPT thoroughly rejected his file while the UBPT recommended Dr. Calvente receive tenure.

Given that Dr. ▇▇▇ file was objectively worse than Dr. Calvente's, what accounts for the difference in Dr. Ghanem's treatment of them? Dr. Ghanem claims only that there were procedural issues with Dr. ▇▇▇ file in that Dr. ▇▇▇ was recommended for renewal by his colleagues in the College of Arts and Sciences a short time before he went up for tenure. (SOF ¶¶59–60.) This argument is problematic for at least four reasons:

7

First, even though Dr. ▇▇▇ was recommended for renewal by his colleagues in his academic unit, the UBPT never evaluated his application until he applied for tenure. (SOF ¶61.) And as Dr. Ghanem concedes, it is the UBPT's recommendation that matters, not whatever occurred down below. (SOF ¶23.) Therefore, in the context of this case, the suggestion that Dr. ▇▇▇ did not receive a fair hearing is a red-herring.[1]

Second, the Handbook does not allow Dr. Ghanem to reject the UBPT's recommendation for alleged procedural violations. (SOF ¶¶ 26, 70.) Rather, that power belongs solely to the University President. (SOF ¶70.) Thus, by usurping the President's power, Dr. Ghanem violated DePaul's rules, which is another hallmark of pretext. *Joll*, 953 F.3d. at 931.

Third, Dr. Ghanem did not state that she tenured Dr. ▇▇▇ because of alleged procedural violations. (SOF ¶59.) She said that she tenured him due to his alleged "achievements in scholarship, teaching, and service, and in expectation of [his] continued service to [DePaul's] students, the university, and [his] field." (SOF ¶59.) Dr. Ghanem's inconsistent explanation for her behavior also demonstrates that the reasons she articulated (for the first time) in her deposition for granting tenure to Dr. ▇▇▇ were pretextual. *Id.* at 942 ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision") *quoting Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (collecting cases).

Fourth—and most importantly—the standard for tenure is the same no matter the faculty member's local academic unit. (SOF ¶27.) Before granting tenure, DePaul must have "no reasona-

---

[1] It is anticipated that the defendants will argue that Dr. Calvente, too, complained about the process she received in her local unit. Therefore, it is anticipated that the defendants will attempt to paint Dr. Calvente as a hypocrite. The difference between Dr. Calvente and Dr. ▇▇▇ however, continues to be the fair and independent hearing that Dr. Calvente (finally) received before the UBPT. When the UBPT conducted an *independent* evaluation of Dr. Calvente's file, it found her to be worthy. When the UBPT conducted an *independent* evaluation of Dr. ▇▇▇ file, it found him to be unworthy. Thus, this case is about Dr. Ghanem's disparate treatment as opposed to what an appeals committee subsequently found.

ble doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." (SOF ¶27.) On the record assembled during the tenure process with respect to Dr. ████ including a lopsided vote by the UBPT, how can anyone claim that there was no reasonable doubt about Dr. ████ demonstrated qualifications?[2]

Having already had an opportunity to articulate a legitimate and non-pretextual reason for treating Drs. ████ and Calvente differently (*see* Docket No. 46), Dr. Ghanem has failed do so. Nor will she be able to offer a legitimate and non-pretextual reason for her conduct when she responds to this instant brief. Thus, the only explanation for the disparate treatment is the ugly one—Dr. Ghanem retaliates against those who (i) continue to complain about racism after she told them to stop, and (ii) accuse her of playing racial politics. On the record developed during discovery, there is simply *no* other reason for Dr. Ghanem (i) granting tenure to two candidates who were rejected by the UBPT by the extreme margin of 6-1 when the standard for tenure requires the University to have no reasonable doubt as to the candidate's qualifications, while at the same time (ii) refusing to grant tenure to Dr. Calvente when the UBPT actually recommended she receive tenure.[3] Thus, the only issue left to try on counts I and II of Dr. Calvente's complaint are her damages.

---

[2] And while the parties did not explore Dr. ████ qualifications during discovery, Dr. Ghanem has not attempted to explain why she overturned an equally lopsided UBPT recommendation concerning this candidate.

[3] In the event that the Court denies Dr. Calvente's motion for partial summary judgment, she reserves the right to present her claim of discrimination to the jury.

9

## Conclusion

It is unusual for a plaintiff in a retaliation case to file a motion for summary judgment; however, the rules of procedure apply equally to a defendant-employer as they do to a plaintiff-employee. Thus, given Dr. Calvente's affirmative motion under Rule 56 of the Federal Rules of Civil Procedure, Dr. Ghanem has an obligation to point to *something* in the record from which a jury could find that she had legitimate reason for denying Dr. Calvente's application for tenure. Dr. Ghanem has failed to meet this minimal burden.

Dr. Calvente hurt Dr. Ghanem. So like Captain Ahab when confronted with the white whale who hurt him, Dr. Ghanem vented her rage upon her former colleague by rejecting her application for tenure. But vengeance of this type is illegal under the civil rights laws. Having had the opportunity to explain herself and her actions, Dr. Ghanem either could not or would not. Thus, there is no need for a trial on the question of liability for Dr. Ghanem's (and, by extension, DePaul's) retaliation. What is left to decide—at least with respect to retaliation—are the damages that Dr. Calvente suffered, including the wages she lost, the anger and humiliation she suffered, and the punitive damages that Dr. Ghanem ought to pay for her malicious assault on Dr. Calvente's dignity.

Respectfully submitted,
December 23, 2021

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com

**Certificate of Service**

The undersigned, an attorney, certifies that on December 23, 2021, he caused the foregoing Memorandum of Law In Support of Lisa Calvente's Motion For Partial Summary Judgment to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Anneliese Wermuth, Esq.
Cozen O'Connor, P.C.
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
awermuth@cozen.com
*Counsel for Defendants*

        */s/ Fitzgerald T. Bramwell*
        Fitzgerald T. Bramwell
        **LAW OFFICES OF FITZGERALD BRAMWELL**
        77 West Wacker, Suite 4500
        Chicago, Illinois 60601
        312-924-2884 (voice)
        bramwell@fitzgeraldbramwell.com