## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## (EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
|       Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
|       Defendants. | ) | |
| _____ | ) | |

**Lisa Calvente's Statement of Material Facts Pursuant to Local Rule 56.1**
**of the United States District Court for the Northern District of Illinois**

Lisa Calvente ("Dr. Calvente") submits the following statement of material facts as to which she states that (i) there is no genuine issue, and (ii) entitle her to a judgment as a matter of law:

### Facts

*About Dr. Calvente and Dr. Ghanem.*

1.      Dr. Calvente is an American of African, Latinx, and Asian descent. (Calvente Dec. ¶1, copy attached as Exhibit A.)

2.      Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. (Answer at ¶8, copy attached as Exhibit B.)

3.      Dr. Calvente is a former tenure–track professor at DePaul University ("DePaul" or the "University") in the College of Communication (the "College"). (Calvente Dec. ¶¶4,6; Answer at 1.)

4. Dr. Calvente's employment at DePaul ended at the end of the 2019/2020 academic year, following the denial of her application for tenure during the 2018/2019 academic year and the conclusion of her terminal contract. (Calvente Dec. ¶4.)

5. Between August 1, 2020 and June 30, 2021, Dr. Calvente was unemployed. (Calvente Dec ¶5.)

6. Dr. Calvente is currently a tenure-track assistant professor at the University of North Carolina at Chapel Hill ("UNC"). (Calvente Dec ¶2.)

7. Members of the academy see UNC as more prestigious than DePaul University ("DePaul" or the "University"), and UNC is a Research 1 University as opposed to DePaul, which is a Research 2 University. (Zaeske Dep. 66:10-14, 70:4-71:11, 93:14-95:4, 186:6-13, 207:10-12, copy attached as Exhibit G; Calvente Dep. 307:4-310:11, copy attached as Exhibit C.)

8. In order to get hired into a tenure track position at a Research 1 University like the UNC, you must show that your chances of earning tenure are very high. (Zaeske Dep. 82:17-83:3, 83:14-84:1, 186:14-190:8, 192:1-193:14.)

9. That Dr. Calvente could earn a tenure-track position at UNC after being denied tenure at DePaul makes DePaul's decision to deny tenure to Dr. Calvente highly questionable. (Zaekse Dep. 71:2-22.)

10. Salma Ghanem ("Dr Ghanem") was the Dean of the College from August 2014 thgouth October 2018, when she was appointed acting provost. (Ghanem Dep. at 16:16-18, 29:9-10, copy attached as Exhibit D.)

*The tenure and promotion process at DePaul.*

11.     Tenure track faculty cannot be terminated at will; rather, they can only be terminated in accordance with the DePaul Faculty Handbook (the "Handbook"). (Ghanem Dep. 11:24–12:21.)

12.     In the case of tenure-track but untenured faculty they may be involuntarily terminated for failing to (i) demonstrate that they are making adequate progress towards tenure following a pre-tenure review, or (ii) earn tenure. (First Rinehart Dec. ¶¶3, 6, copy attached as Exhibit E, and Exhibit 1 to the First Rinehart Declaration at §§3.2, §3.3.1.1 (Bates labeled Calvente-DePaul 000028, 30).)[1]

13.     A candidate may be evaluated as not making adequate progress towards tenure during a formal or informal pre-tenure review, with informal reviews occurring yearly and formal reviews occurring every two years. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.3.1.1, 3.3.1.2 (Bates labeled Calvente-DePaul 000030–31).)

14.     At DePaul, the process for obtaining tenure differs slightly depending on the structure of a candidate's local academic unit. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente-DePaul 000036–36, 39–43).)

15.     In the College, which does not have separate departments, the first step in the tenure process is an evaluation of the candidate's file by the personnel committee (to which the candidate may respond) and then the tenured faculty. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3,

---

[1]     Dr. Calvente does not attach all of the exhibits to Dr. Rinehart's declaration to this statement of facts as they are not necessary to the disposition of the defendants' motion for summary judgment.

3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) After the tenured faculty vote, the dean makes a separate recommendation as to whether the candidate should receive tenure. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) After the faculty votes and the dean makes her recommendation, the candidate's file—including her complete dossier, the vote of the tenured faculty, the response by the candidate, and the recommendation of the dean—is sent to the University Board on Promotion and Tenure (the "UBPT"). (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).)

16. In an academic unit that has separate departments (for example, the College of Science and Health), the tenured faculty of the department first evaluates the candidate's file and the candidate may respond to this evaluation. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) Following the department's evaluation, the department chair makes a recommendation as to whether the candidate should receive tenure. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) Next, the tenured faculty of the college (or a separate committee thereof) evaluates the file and the candidate may respond to this evaluation. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declara-

tion at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) The dean of the college then makes a recommendation as to whether the candidate should receive tenure. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).) After these processes, the candidate's file—including his complete dossier, the votes of the faculty, and the recommendation of both the department chair and of the dean—go to the UBPT. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43).)

***About the UBPT.***

17.     Members of the UBPT are appointed by Faculty Council, which is the unit that represents the voice of faculty at DePaul with respect to shared governance. (Ghanem Dep. 58:18–60:5.)

18.     Shared governance is a process where faculty input is taken in terms of different decisions at the University. (Ghanem Dep. 60:6–10.)

19.     Principles of shared governance acknowledge that faculty has a significant role, together with the administration, in the operation of the University, including the appointment, tenuring, and promotion of faculty. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §1.2.1(3) (Bates labeled Calvente–DePaul 000003).)

20.     DePaul's system of faculty evaluation "relies heavily on the view of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal,

promotion, and tenure." (First Rinehart Dec. ¶¶3,6 and Exhibit 1 to the First Rinehart Declaration at §3.1 (Bates labeled Calvente–DePaul 000028).)

21.     While the provost has a faculty appointment, she is not considered to be faculty for purposes of shared governance. (Ghanem Dep. 60:11–14.)

22.     Dr. Ghanem has never lost confidence in any of the members of the UBPT. (Ghanem Dep. 55:23–56:8.)

23.     The UBPT's recommendation is entitled to more weight than any recommendation that comes out of a local academic unit, and Dr. Ghanem has acknowledged this fact. (Ghanem Dep. 50:9–51:3.)

24.     The UBPT only evaluates a candidate for tenure once. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §3.5.6.1 (Bates labeled Calvente–DePaul 000042–43).) This is in contrast to pre-tenure reviews at tenure-track faculty member's local academic unit, which occur multiple times before a candidate is evaluated for tenure. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.3.1.1, 3.3.1.2 (Bates labeled Calvente–DePaul 000030–31).)

25.     DePaul's policies are very clear that the provost should overturn the UBPT's recommendation only in rare instances and for compelling reasons. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §3.5.6.3 (Bates labeled Calvente–DePaul 000043); Answer at ¶10; Ghanem Dep. 48:20–50:18.)

26.     That the provost should overturn the UBPT's recommendation only in rare instances and for compelling reasons means that the provost may not simply reject the UBPT's recommendation because she disagrees with it. (Ghanem Dep. 57:2–58:8 and Exhibit 18 to Ghanem

Dep. at page 2 (Bates labeled LC004069).) Rather, to overturn the recommendation of the UBPT—which represents voice of the faculty—the Provost should find that the UBPT recommendation was manifestly one that was groundless. (*Id.*) In other words, to overturn the UBPT, the provost must find that (i) doubt existed where the Board found none, or (ii) where the Board expressed its doubt, the Provost found that the Board's reasons for doubt were completely unfounded. (*Id.*)

27.     Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. (Ghanem Dep. 44:4–45:18; First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.1, 3.3.1.3, 4.2 (Bates labeled Calvente–DePaul 000028, 31, 55).) Dr. Ghanem testified that she interpreted this language to mean that there should be no question about the faculty member's demonstrated qualifications and continued capacity. (Ghanem Dep. 45:20–46:2.)

***Dr. Calvente's prior complaints of discrimination and her relationship with Dr. Ghanem.***

28.     After Dr. Calvente was hired at the College, tenured faculty member ████████ directed a so-called joke at Dr. Calvente where the punchline was the word "nigger." (Calvente Dep. 267:21–268:23.)

29.     After Dr. Calvente was hired at the College, tenured faculty member ████ ████ made a racist comment about communities of color in the south and west side of Chicago. (Calvente Dep. at 91:9–93:24, 108:10–19.) Notwithstanding the foregoing, Dr. ████ was identified as a peer reviewer for Dr. Calvente. (Calvente Dep. at 91:9–93:24, 108:10–19.)

30.     The College is small based on the size of its faculty. (Murphy Dep. at 40:20–41:1, copy attached as Exhibit K.) The faculty within the College are also generally collegial with each other. (Murphy Dep. 82:12–22.)

7

31.     In 2015, after the personnel committee in the College recommended that Dr. Calvente's contract not be renewed, but before the tenured faculty in the College voted on whether to recommend Dr. Calvente's contract be renewed, Dr. Calvente wrote a rebuttal to the personnel committee that stated that ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ (Exhibit No. 50 to Calvente Dep. at Bates label Calvente–DePaul 029085.)

32.     The tenured faculty at the College twice recommended that Dr. Calvente's contract not be renewed before Dr. Calvente applied for tenure: the tenured faculty recommended that Dr. Calvente's contract not be renewed in 2015 and the tenured faculty recommended that Dr. Calvente's contract not be renewed in 2017. (Exhibit No. 50 to Calvente Dep. at Bates label Calvente–DePaul 029086; Calvente Dep. 240:11–14.)

33.     After each occasion that the tenured faculty at the College recommended that Dr. Calvente's contract not be renewed, Dr. Ghanem renewed Dr. Calvente's contract. (Calvente Dep. 255:10–14, Ghanem Dep. 127:21–128:2.)

34.     After the first occasion where Dr. Ghanem renewed Dr. Calvente's contract, she said that Dr. Calvente was an extraordinary teacher, and she said that Dr. Calvente's receipt of a Woodrow Wilson fellowship was "a huge deal." (Calvente Dep. 221:14–222:10, 300:1–301:3.)

35.     In 2015, after the tenured faculty at the College recommended that Dr. Calvente's contract not be renewed, Dr. Calvente called DePaul's Office of Institutional Diversity and Equity ("OIDE") and raised an internal complaint of discrimination. (*E.g.*, Calvente Dep. at 225:7–15, 230:9–12.)

8

36.     OIDE is the organization tasked with investigating internal complaints of discrimination at DePaul. (Ghanem Dep. 72:24–73:4.)

37.     In investigating Dr. Calvente's internal complaint of discrimination, OIDE interviewed fifteen individuals, including ten members of the faculty of the College and each member of the personnel committee who recommended Dr. Calvente's contract not be renewed in calendar year 2015. (Diaz Declaration at Exhibit 1 (Bates labeled Calvente–DePaul 0006968), copy attached as Exhibit G.)

38.     After the second occasion where Dr. Ghanem renewed Dr. Calvente's contract, Dr. Calvente told Dr. Ghanem that she wanted to present another claim of discrimination with OIDE. (Calvente Dec. ¶8.) Ghanem told Dr. Calvente not to follow through with a complaint of discrimination to OIDE, that she should wait until after her tenure vote, and that the then-provost knew about her case. (Calvente Dep. 256:19–258:3, 262:7–20; Calvente Dec. ¶8.) Dr. Ghanem also told Dr. Calvente that she would be fine for tenure. (Calvente Dep. 300:1–22.)

*An October 10, 2018 conversation between Dr. Calvente, Dr. Dillard, and Dr. Ghanem.*

39.     ███████████████ was a white tenure track professor in the College who was recommended for non-renewal in calendar year 2017, and whose contract Dr. Ghanem decided not to renew before Dr. ██████ applied for tenure. (Ghanem Dep. 143:22–144:2, 163:1–3; Calvente Dec. ¶7.)

40.     On or around October 10, 2018, Dr. Calvente and ███████████ met with Dr. Ghanem in her office to discuss discrimination within the College. (Calvente Dep. 270:21–271:6; Ghanem Dep. 152:4–8.)

41.     During the meeting Dr. ██████████ name came up. (Calvente Dep. 271:22–272:14.) Dr. Ghanem said that she did not want to discuss Dr. ██████ situation because she

9

felt that complaints about Dr. ███████ were a challenge to her authority as dean; however, Dr. Ghanem did let slip that she heard a rumor that she terminated Dr. ███████ so that she could later fire women of color with impunity. (*Id.*) In response, Dr. Calvente told Dr. Ghanem that she wrote the letter on Dr. ███████ behalf that made this accusation. (Calvente Dep. 271:22–272:14, 277:5–278:7.) And the record reveals that Dr. Calvente indeed wrote a letter on Dr. ███████ behalf stating that Dr. ███████ was caught "in the crossfire" so that the College can show that it terminates white junior faculty so as to avoid a charge that it unfairly targets faculty of color. (Calvente Dep. 265:5–266:13 and Exhibit 132 (Bates labeled Calvente–DePaul 0007095).)

42. After Dr. Calvente told Dr. Ghanem that she wrote the letter on Dr. ███████ behalf, Dr. Ghanem called Ms. Schaffer at OIDE and left a voice mail stating that Dr. ███████ and Dr. Calvente believed themselves to be victims of discrimination. (Calvente Dep. 272:15–273:4.) Then Dr. Ghanem ended the meeting. (Calvente Dep. 273:5–273:7.)

43. Dr. Ghanem called OIDE because, as a person in a supervisory position at the College, had a duty to report any complaints of discrimination brought to her by faculty to OIDE. (Ghanem Dep. 73:9–74:4.)

44. After the October 10, 2018 meeting, Dr. Calvente and Dr. Ghanem never again had a meaningful conversation. (Calvente Dec. ¶9.)

**Dr. Calvente's application for tenure.**

45. During the year that Dr. Calvente applied for tenure, the tenured faculty at the College recommended that she not receive tenure by a vote of 19–2. (Calvente Dep. 145:13–16.)

46. ███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

47.　After reviewing Dr. Calvente's file, the UBPT recommended that Dr. Calvente receive tenure by a vote of 4–3. (Answer at ¶28.)

48.　In recommending Dr. Calvente receive tenure, the UBPT found that "Dr. Calvente's teaching, as evidenced by consistently high student evaluations, a strong student report, and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at pages 1–2.)

49.　In recommending that Dr. Calvente receive tenure, the UBPT also examined Dr. Calvente's research and scholarly contributions and found that her "total body of work consists of, at minimum, 3 peer–reviewed articles and 3 peer–reviewed book chapters during the probationary period, in additional to 6 papers in international conferences and 10 presentations in national conferences," and that the "significance and quality of her work were praised by [her] external reviewers and echoed by the faculty in the unit report." (Answer at ¶28 and Exhibit 5 to Complaint at pages 2–3.) Thus, the UBPT found "scholarship to have met the minimum standard of notable in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at page 3.)

50.　In recommending that Dr. Calvente receive tenure, the UBPT found Dr. Calvente's overall service contributions to be "sufficiently strong to meet the criteria for service in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at page 3.)

51.　Notwithstanding the UBPT's recommendation that Dr. Calvente receive tenure, Dr. Ghanem rejected the recommendation. (Answer at ¶29 and Exhibit 6 to Complaint.) In so doing, Dr. Ghanem wrote that Dr. Calvente received a careful review at all levels and that experi-

enced faculty had evaluated her work. (*Id.*) She also wrote that she did not consider the UBPT's 4–3 vote to outweigh the alleged significant concerns raised at the College level, which voted 2–19 against Dr. Calvente. (*Id.*)

52. Dr. Ghanem is aware of Dr. Calvente complaining about discrimination. (72:2–76:24; Calvente Dep. 271:22–272:14, 277:5–278:7.)

███████████ **application for tenure.**

53. ███████████ is a white professor at DePaul with no record of complaining about discrimination and who was evaluated for tenure during the 2019/2020 academic year. (Ghanem Dep. 67:18–21; Diaz Dec. ¶7.)

54. Before granting tenure to Dr. ████ the University was required to have reasonable doubt about Dr. ████ demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. (Ghanem Dep. 44:4–45:18; First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.1, 3.3.1.3, 4.2 (Bates labeled Calvente-DePaul 000028, 31, 55).)

55. In evaluating Dr. ████ application and rejecting it by a vote of 6–1, the UBPT identified significant concerns with Dr. ████ teaching, including that (i) Dr. ████ teaching evaluations are frequently below three on a five-point scale, (ii) there was a pattern in Dr. ████ evaluations that showed an inability to communicate with the majority of his students, (iii) forty to fifty percent of Dr. ████ students rated Dr. ████ ability to communicate subject matter as inadequate, and (iv) the regular recurrence of student concerns with communicating his expectations for performance, the criteria by which performance is to be evaluated, and the timeliness of his feedback to students, raises questions about the consistent effectiveness of Dr. ████ teaching. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente-DePaul 037293–95).)

56.     In continuing to evaluate Dr. ███ application for promotion, the UBPT next noted significant concerns about Dr. ███ scholarship, including the quantity of the work, the consistency of the work, and the quality of the work. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).) More specifically, the UBPT noted that Dr. ███ scholarship appeared limited to multi–authored pieces and that the UBPT was not provided (despite its requests) information concerning Dr. ███ contributions to those multi–authored pieces. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).)

57.     Dr. Ghanem agrees that Dr. ███ received a careful review at all levels, that experienced faculty evaluated Dr. ███ work, and that the UBPT voted overwhelmingly against Dr. ███ application for tenure. (Ghanem Dep. 105:16–106:1.) Dr. Ghanem also read the entirety of the UBPT's report recommending that Dr. ███ not receive tenure before she granted tenure to Dr. ███ (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).)

58.     Prior to overturning the UBPT's recommendation that Dr. ███ not receive tenure, Dr. Ghanem read the entire UBPT's report, including the following sentences: "[t]he evaluations of his teaching by students are frequently below three on a five point scale and consistently below the departmental mean," "[t]his case is not one of the occasional negative set of evaluations, but rather a pattern that shows itself in his capacity to communicate with a very large portion of his students," "40 to 50 percent of the students rate his capacity to communicate subject matter content as not adequate," "[m]oreover the pattern is persistent and the concern has not been relieved over time," "[h]is recent evaluations, for example, the 2018 evaluations, contain such com-

ments," and "[i]n addition, the regular recurrence of student concerns with communicating his expectations for performance, the criteria by which performance is to be evaluated, and the timeliness of his feedback to students raises questions about the consistent effectiveness of Dr. ███ teaching." (Ghanem Dep. 102:19–105:15.)

59.     Dr. Ghanem wrote that she awarded tenure to Dr. ███ in recognition of his "achievements in scholarship, teaching, and service, and in expectation of [his] continued service to [DePaul's] students, the university, and [his] field." (Ghanem Dep. 66:13–67:16 and Exhibit 1 (Bates labeled DePaul–Calvente 013833–34.) Dr. Ghanem *did not* write that she awarded tenure to Dr. ███ because she believed that he failed to receive a fair process. (*Id.*)

60.     Dr. Ghanem was asked how, in light of the fact that Dr. ███ received a careful review at all levels, that experienced faculty evaluated Dr. ███ work, and that the UBPT voted overwhelming against him, that anyone could say that "the university has no reasonable doubt as to Dr. ███ demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals of academic mission when he received a six–to–one no vote at the UBPT." (Ghanem Dep. 105:16–13.) Dr. Ghanem was unable to provide a substantive answer to this question and, instead, relied on alleged procedural defects in Dr. ███ process to support her decision. (*Id.*)

61.     Dr. ███ had never before been evaluated by the UBPT before the UBPT rejected his application by a vote of 6–1. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §3.5.6.1 (Bates labeled Calvente–DePaul 000042–43).)

**Dr. ███ application for tenure.**

62.     Philip ███ is a white professor at DePaul with no record of complaining about discrimination. (Diaz Dec. ¶7; Ghanem Dep. 69:9–12.)

63.     During the 2019/2020 academic year, the UBPT recommended that Dr. ██ not receive tenure by a vote of 6–1. (Ghanem Dep. 67:22–69:11; Second Rinehart Declaration, copy attached as Exhibit I, and document Bates labeled Calvente–DePaul 03806–87.)

64.     Before granting tenure to Dr. ██ the university was required to have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. (Ghanem Dep. 44:4–45:18; First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §§3.1, 3.3.1.3, 4.2 (Bates labeled Calvente–DePaul 000028, 31, 55).)

65.     Notwithstanding the UBPT's recommendation, Dr. Ghanem granted tenure to Dr. ██ (Ghanem Dep. 68:11–69:8 and Exhibit 24 (Bates labeled Calvente–DePaul 38092–93).)

66.     Dr. Calvente's case is the only case where Dr. Ghanem has rejected the UBPT recommendation that a candidate should receive tenure. (Ghanem Dep. 71:4–13.) In all other cases where Dr. Ghanem has rejected the UBPT's recommendation, the candidate had been recommended not to receive tenure. (*See id.*)

**Dr. ██ application for tenure.**

67.     Dr. ██ applied for tenure the same year that Dr. Calvente applied for tenure.

68.     Dr. ██ actively attempted to avoid attaching her name to any complaints of discrimination until October 2018, when Dr. ██ and Dr. Calvente met with Dr. Ghanem to complain about discrimination within the College. (Dillard Dep. 64:8–70:2, 74:12, 89:6–94:5.)

69.     Dr. ██ never accused Dr. Ghanem of playing racial politics with Dr. ██ ██ career.

**A limit on the provost's power.**

70. The Handbook does not allow Dr. Ghanem to reject the UBPT's recommendation for alleged procedural violations. Rather, that power belongs solely to the University President. (First Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the First Rinehart Declaration at §5.1.2.3 (Bates labeled Calvente–DePaul 000080–81).)

Respectfully submitted,
December 23, 2021

/s/ Fitzgerald T. Bramwell
Fitzgerald T. Bramwell
**LAW OFFICES OF FITZGERALD BRAMWELL**
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
312–924–2884 (voice)
bramwell@fitzgeraldbramwell.com

**Certificate of Service**

The undersigned, an attorney, certifies that on December 23, 2021, he caused the foregoing Lisa Calvente's Statement of Material Facts Pursuant to Local Rule 56.1 to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. Accordingly, service will be accomplished through CM/ECF on the following counsel of record:

Anneliese Wermuth, Esq.
Cozen O'Connor, P.C.
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
awermuth@cozen.com
*Counsel for defendants*

*/s/ Fitzgerald T. Bramwell*
Fitzgerald T. Bramwell
LAW OFFICES OF FITZGERALD BRAMWELL
77 West Wacker, Suite 4500
Chicago, Illinois 60601
312-924-2884 (voice)
bramwell@fitzgeraldbramwell.com

# Index of Exhibits to Lisa Calvente's Statement of Material Facts Pursuant to Local Rule 56.1 of the United States District Court for the Northern District of Illinois

Exhibit A ................................................................................. Declaration of Lisa Calvente

Exhibit B ..................................................................................................................................
.......... Defendants' Answers And Affirmative Defenses To Plaintiff's Complaint And Jury Demand

Exhibit C ...................................................................... Transcript of Calvente deposition

Exhibit D ....................................................................... Transcript of Ghanem deposition

Exhibit E....................................................................... First Declaration of Lucy Rinehart

Exhibit F......................................................................... Declaration of Isabel Diaz

Exhibit G ......................................................................Transcript of Zaseke deposition

Exhibit H................................................................ Transcript of portion of ██████ deposition

Exhibit I.................................................................Second declaration of Lucy Rinerhart

Exhibit J..................................................................Transcript of Dillard deposition

Exhibit K ................................................................ Transcript of portion of Murphy desposition

# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)

| | | |
|---|---|---|
| Lisa Calvente | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | No. 20–cv–3366 |
| Salma Ghanem, and | ) | |
| DePaul University | ) | |
| Defendants. | ) | |
| _____ | ) | |

### Declaration of Lisa Calvente

I, Lisa Calvente, being first duly sworn upon oath, depose and state that this declaration is made on personal knowledge. If sworn as a witness I could testify competently to the facts articulated herein:

1. I am an American of African, Latinix, and Asian descent, and I identify as such.

2. I am currently a tenure–track assistant professor in the Department of Communication in the College of Arts and Sciences at the University of North Carolina at Chapel Hill. I have been in this position since July 1, 2021.

3. My areas of research are the black diaspora, performance studies, and cultural studieswith a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice.

4. I am a former tenure–track professor at DePaul, and I was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States. My employment at DePaul ended at the end of the 2019/2020 academic year, following the denial of my application for tenure and the conclusion of my terminal contract.

5.      After the termination of my employment at DePaul, I was unemployed from August 1, 2020 through June 30, 2021.

6.      I increased my service to DePaul University and to my local academic unit, the College of Communication, between March 2015 and November 2017 review. In addition to my continued service as affiliated faculty in Latin American & Latino Studies, African and Black Diaspora Studies, and the African and Black Diaspora Studies Steering Committee, I became affiliated faculty of DePaul University's new graduate program in Critical Ethnic Studies and also became one of the College of Communication representatives for the Liberal Studies Council Survey Review Subcommittee. For the local unit, I was part of the Communication 103 Syllabi Review Task Force and was the faculty discussant in performance and cultural studies for Communication Studies 500: *Foundations in Graduate Communication Studies* taught by Professor Jay Baglia. I was also an active participant in determining awards for our unit for the Communication Graduation Ceremony where I presented our graduate studies award to Abigail Escatel, who worked under my supervision. These additions do not include the various professional and community service that I did during this time period as a representative of DePaul University.

7.      I know a former tenure-track professor at DePaul named ███████████ ████, and I wrote a letter in support of ███████████ appeal of Dr. Salma Ghanem's decision not to renew his faculty contract at DePaul. I know ███████████ race to be white.

8.      During a meeting with Dr. Ghanem that occurred on or about December 16, 2017, I told Dr. Ghanem that I wanted to contact Barbara Schaffer in DePaul's Office of Institutional Diversity and Equity to file a complaint of discrimination in response to the non-renewal recommendation. Dr. Ghanem called Barbara Schaffer at my request, left her a message, and we

continued our meeting. Dr. Ghanem advised me during this meeting not to file another complaint with OIDE until after my tenure review.

9.     I never had another meaningful conversation with Dr. Ghanem after October 10, 2018.

10.     When I taught CMN103 at DePaul, I did not use a text book but instead used a series of materials from texts, articles, chapters, and film. No one ever disapproved of my use of these materials or my syllabus in this core course.

11.     During the 2015/2016 academic year, I took leave to focus on my research; however, this did not extend my tenure clock.

12.     I am aware of a situation where, during the week ending October 19, 2018, two students lodged a complaint with Alexandra Murphy against me, and that one of those students dropped my class while the other stayed in my class. Dr. Murphy never asked me to reach out to schedule a meeting with the student who stayed in my class.

FURTHER DECLARANT SAYETH NAUGHT

**Certification Pursuant to 28 U.S.C. §1746**

I have read the foregoing Declaration of Lisa Calvente and declare under penalty of perjury that the foregoing is true and correct.

Lisa Calvente
December 18, 2021

# Exhibit B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LISA CALVENTE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.:  1:20-cv-03366 |
| **v.** | ) | |
| | ) | |
| SALMA GHANEM and DEPAUL | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' ANSWERS AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S COMPLAINT AND JURY DEMAND

Defendants, Salma Ghanem ("Dr. Ghanem") and DePaul University ("DePaul" or "University"), by their attorneys, Cozen O'Connor, hereby submit their answers to Plaintiff's Complaint and Jury Demand.

### The Parties

1.  Lisa Calvente ("Dr. Calvente") resides in Cook County, Illinois.  At all times relevant to this complaint, Dr. Calvente was a tenure-track assistant professor of Intercultural Communication and Performance Studies within the College of Communication (the "College") at DePaul University ("DePaul" or the "University").  Dr. Calvente is an American of African, Latinx, and Asian descent.

**ANSWER:**  Defendants admit at all times relevant to her Complaint, Plaintiff was a tenure-track assistant professor of Intercultural Communication and Performance Studies in the College of Communication at DePaul University.  Defendants admit that according to the University's records, Plaintiff is a resident of Cook County, Illinois and Plaintiff self-identified as "Hispanic/Latino."  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 1.

2.    Salma Ghanem ("Dr. Ghanem") is the former dean of the College of Communication at DePaul, the former acting provost of DePaul, and the current interim provost of DePaul.  Dr. Ghanem maintains an office in Cook County, Illinois and, on information and belief, is also a resident of Cook County, Illinois.

**ANSWER:**    Defendants admit the allegations of Paragraph 2.

3.    DePaul is a not-for-profit corporation and is the largest Catholic university in the United States.  At all times relevant to this complaint, DePaul employed over five hundred people and was an employer as defined in 42 U.S.C. §2000e(b).  DePaul's principal place of business is in Chicago, Cook County, Illinois.

**ANSWER:**    The University admits the allegations of Paragraph 3.  The allegations of

Paragraph 3 are not directed to Dr. Ghanem and thus require no answer from Dr. Ghanem.

## Jurisdiction and Venue

4.    This Court has jurisdiction over Dr. Ghanem and DePaul because each of them committed the acts and omissions that are the subject of this litigation in Cook County, Illinois, which is in this district.  Alternatively, this Court has jurisdiction over the defendants because they are (on information and belief) both residents of Cook County, Illinois, which is in this district.

**ANSWER**:    Defendants admit that this Court has jurisdiction over Dr. Ghanem and the

University because the events giving rise to Plaintiff's actionable claims allegedly occurred in this

judicial district and Defendants reside in this District. Except as specifically admitted, Defendants

deny the allegations of Paragraph 4 and further deny that they violated any law or committed any

wrongdoing whatsoever.

5.    Venue is proper in this Court pursuant to U.S.C. §1391(b)(1) because Dr. Ghanem and DePaul are residents of this district.  Alternatively, venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the acts and omissions giving rise to this litigation occurred in this district.

**ANSWER:**    Defendants admit that the venue is proper under 28 U.S.C. 1391(b) because the events giving rise to Plaintiff's actionable claims allegedly occurred in this judicial district and Defendants reside in this District. Except as specifically admitted, Defendants deny the allegations of Paragraph 5 and further deny that they violated any law or committed any wrongdoing whatsoever.

6.    This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331 because Counts I and III allege a violation of 42 U.S.C. §1981 and Counts II and IV allege a violation of 42 U.S.C. §2000e, *et seq.* This Court has jurisdiction over the state law claim alleged in Count V pursuant to 28 U.S.C. §1367 because that claim is so related to the federal claims that it forms the basis for the same case or controversy.

**ANSWER:**    Defendants admit the allegations of Paragraph 6, but deny they violated any law or committed any wrongdoing whatsoever.

### Factual Allegations

7.    This litigation seeks redress for significant abuses by Dr. Ghanem and DePaul University that were alternatively (i) in retaliation for Dr. Calvente's complaints about racism within the College of Communication, and (ii) motivated by Dr. Calvente's race, which abuses culminated in the denial of Dr. Calvente's application for tenure and promotion from assistant professor to associate professor.

**ANSWER:**    Defendants deny the allegations of Paragraph 7.

8.    Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. She was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States, a topic that scholarly research has described as impossible to teach to undergraduate students without causing discomfort. Dr. Calvente joined DePaul's faculty at the start of the 2011/2012 academic year.

3

**ANSWER:** Defendants admit that Plaintiff joined DePaul's faculty at the start of the 2011-2012 academic year, and that she has accurately described her areas of research. Except as specifically admitted, Defendants deny the allegations of Paragraph 8.

9. As is the case in many other universities in the United States, the grant of tenure at DePaul "creates the presumption of continuing employment …." (DePaul University Faculty Handbook dated July 1, 2018 (the "Handbook") §3.1, a copy of which is attached as Exhibit 1). Indeed, the Handbook describes the rights and responsibilities of faculty at DePaul and also articulates the terms and conditions of faculty employment. In addition, the Handbook permits local academic units to articulate more specific guidelines with respect to their requirements for tenure and promotion so long as those guidelines are consistent with the Handbook.

**ANSWER:** Defendants admit that Plaintiff has attached to her Complaint a copy of the July 1, 2018 Faculty Handbook. Defendants admit further that Section 3.1 of the Handbook provides, in part, that tenure "creates the presumption of continuing employment," but denies that Plaintiff has restated here either the full import or the full text of the four paragraphs contained in Section 3.1 of the Handbook, including any exceptions to the presumption of continued employment. Defendants admit that the Handbook sets forth the rights, obligations and terms and conditions of employment of faculty at DePaul. Defendants admit that local academic units have the responsibility to adopt written guidelines and policies for tenure-line faculty evaluation, which must be consistent with the University's criteria and procedures in the Handbook. Except as specifically admitted, Defendants deny the allegations of Paragraph 9.

10. Chapter 3 of the Handbook articulates a multi-step process for evaluating a faculty member's application for tenure. As the first step, tenured faculty members of the local academic unit (in Dr. Calvente's case, the College) vote on the candidate's application for tenure. Then, the file is then sent to the University Board of Promotion and Tenure (the "UBPT"), which is comprised of seven tenured faculty members from across the University. The UBPT then makes an independent review of the tenure file and takes an independent vote to grant or deny tenure. However, as a practical matter, the recommendation of the UBPT is rarely different from that of the local academic unit. After the UBPT vote, the tenure file goes to the University provost for a

final decision on the grant or denial of tenure. Because section 3.5.6.3 of the Handbook requires the provost to overturn the decision of the UBPT "[o]nly in rare instances and for compelling reasons," the decision of the UBPT to grant or deny tenure is typically final.

**ANSWER:** Defendants admit that Chapter 3 of the Handbook explains the multi-step process for evaluating a faculty member's application for tenure, and that each level of review is a substantive one. Defendants admit that the first step of the evaluation is at the local academic unit, which in Plaintiff's case was the College of Communication. Defendants admit that after the local academic unit's evaluation is complete, the next review is completed by a seven-member university-wide committee (UBPT), which conducts a substantive review and takes a vote to grant or deny tenure. Defendants admit that after the UBPT vote, the tenure case goes to the University provost for a final decision. Except as specifically admitted, Defendants deny the allegations of Paragraph 10.

11. The standards evaluating candidates for tenure and promotion are articulated in Chapter 3 of the Handbook. As section 3.4.2 of the Handbook states, faculty are to be evaluated based on teaching and learning (collectively "teaching") (Handbook §3.4.2.1); scholarship, research, or other creative activities (collectively "research") (*id.* at §3.4.2.2); and service (*id.* at §3.4.2.3). Expressly prohibited in evaluating a candidate's tenure application – both under Chapter 6 of the Handbook and also under state and federal law – are a faculty member's race or her opposition to racism within her academic unit or the broader University.

**ANSWER:** Defendants admit that Plaintiff has generally identified the University's three criteria for evaluating a candidate for tenure, as set forth in the University's Faculty Handbook. Defendants further admit that the University prohibits making tenure decisions based on race or opposition to unlawful employment practices. Insofar as Paragraph 11 asserts legal conclusions, no answer by Defendants is required. Except as specifically admitted, Defendants deny the allegations of Paragraph 11.

12.     A candidate who is unsuccessful in her application for tenure at DePaul is offered a one-year terminal contract that starts at the beginning of the academic year following the denial. That candidate is then dismissed from faculty at the end of the terminal contract.

**ANSWER:**     Defendants admit that a candidate who is unsuccessful in her tenure application at DePaul is typically offered a one-year terminal contract for the academic year following the tenure denial, upon the expiration of which the candidate's employment at DePaul ends.  Except as specifically admitted, Defendants deny the allegations of Paragraph 12.

13.     Prior to a faculty member's formal application for tenure, that faculty member is periodically and formally reviewed by the tenured faculty, or a subset thereof, in her academic unit.  (Section 3.3.3.1 of the Handbook refers to these as probationary reviews.)  The purpose of these probationary reviews is to report on the faculty member's progress towards tenure and to determine whether the faculty member will be renewed.  Accordingly, the untenured faculty member is reviewed based on her teaching, research, and service to her academic unit and the University.  In the College, the Personnel Committee (a subset of the tenured faculty) conducts these reviews every two years.

**ANSWER:**     Defendants admit that a tenure track faculty member is subject to periodic informal and formal reviews, and that two of the purposes of such reviews are to assess the faculty member's progress toward promotion and/or tenure, measured against the teaching, research and service criteria, and to recommend for or against renewal.  Defendants admit further that formal reviews are to be conducted no less than every two years.  Except as specifically admitted, Defendants deny the allegations of Paragraph 13.

14.     Probationary reviews are among the only methods of terminating the employment of a tenure-line faculty member.  The other methods of terminating a tenure-line faculty member's employment include (i) the denial of tenure following a tenure-line faculty member's application for tenure and promotion, and (ii) the process articulated in Chapter 4 of the Handbook.

ANSWER:     Defendants admit that non-renewal based on a probationary review and denial of tenure are two bases for terminating the employment of a tenure-track faculty member,

as set forth in Chapter 4 of the Handbook. Except as specifically admitted Defendants deny the allegations of Paragraph 14.

15. Dr. Calvente received her probationary reviews in the winter of 2013, in March 2015, and in November 2017. Although the Personnel Committee lodged no objection to Dr. Calvente in 2013, it is extremely rare for a tenure-track professor at DePaul to be recommended for non-renewal after one review recycle. In both 2015 and 2017, following changes in its composition, the Personnel Committee recommended Dr. Calvente's contract not be renewed.

**ANSWER:** Defendants admit that Plaintiff underwent formal probationary reviews culminating in reports dated March 1, 2013, March 23, 2015 and November 17, 2017. Defendants admit further that the Personnel Committee in 2013 recommended renewal by a majority vote and recommended against renewal in 2015 and 2017, by majority votes. Defendants admit that the composition of the Personnel Committee changed between 2013 and 2017. Except as specifically admitted, Defendants deny the allegations of Paragraph 15.

16. The March 7, 2015 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 2.

**ANSWER:** Defendants admit the Personnel Committee recommended termination of Plaintiff's employment on March 23, 2015, but deny Exhibit 2 is a true and correct copy of the final report and recommendation.

17. The Personnel Committee's March 2015 evaluation was problematic for several reasons. First, with respect to Dr. Calvente's teaching, the evaluation (willfully) ignored the (i) supermajority of her qualitative student evaluations, which praised Dr. Calvente's teaching, and (ii) her quantitative scores, which surpassed the average scores for all College faculty in several areas. Indeed, the Personnel Committee's review of Dr. Calvente's teaching was so inconsistent with her file, that a January 15, 2020 report from an independent (*i.e.,* not affiliated with the College) Faculty Appeals Committee opined that it approached "willful distortion." (*See infra* paragraph 31.) The Personnel Committee, however, did not so unfairly evaluate white faculty during their probationary reviews.

**ANSWER:** Defendants deny the allegations of Paragraph 17.

18.     Notwithstanding the Personnel Committee's March 2015 recommendation, the then-dean of the College, Dr. Ghanem, reappointed Dr. Calvente to the College's faculty.

**ANSWER:** Defendants admit the allegations of Paragraph 18.

19.     Following the Personnel Committee's 2015 recommendation of non-renewal, Dr. Calvente filed a complaint with DePaul's Office of Institutional Diversity and Equity ("OIDE") in June 2015.  (As per then-current University policy, OIDE was tasked with investigating claims of discrimination or harassment on the basis of status protected by federal, state, or local law.)  The complaint highlighted, among other issues, that tenured faculty at the College (i) ignored the majority of both Dr. Calvente's qualitative and quantitative teaching evaluations that state that she is an excellent instructor, which evaluations were not ignored for white tenure-track teachers, (ii) ignored her evaluation scores, which surpassed all of the faculty averages in various areas, which it did not do for white tenure-track teachers, (iii) focused on the super minority of qualitative evaluations labeling her as hostile, which it did not do for white tenure-track teachers, and (iv) that her mistreatment was similar to mistreatment suffered by another (former) faculty of color in the College, Lisa Pecot-Hebert, who was ultimately forced out of the College.

**ANSWER:** Defendants admit that in June 2015 Plaintiff made a complaint to OIDE, which was tasked with investigating claims of discrimination or harassment on the basis of status protected by federal, state or local law.  Defendants admit further that the allegations set forth in this Paragraph 19 generally describe the nature of her complaints, except that Defendants deny that Calvente used the phrase "super minority" in her complaint.  Defendants deny having engaged in the conduct set forth in Plaintiff's 2015 complaint to OIDE.

20.     OIDE ultimately closed its investigation into Dr. Calvente's June 2015 complaint on July 6, 2016, finding insufficient evidence of a violation of the University's Anti-Discrimination and Anti-Harassment Policy and Procedures.

**ANSWER:** Defendants admit the allegations of Paragraph 20.

21.     On November 17, 2017, the Personnel Committee again recommended that Dr. Calvente's contract not be renewed, again citing alleged deficiencies with Dr. Calvente's teaching and her record of service.  With respect to Dr. Calvente's teaching, the Personnel Committee again emphasized the qualitative experience of a super-minority (2.5% during academic year 2017) of students who reported feeling uncomfortable in Dr. Calvente's class due to the manner in which Dr. Calvente taught race and American racism, and it again ignored that (i) Dr. Calvente's quantitative scores were superior to most of her colleagues within the College, and (ii) the supermajority of Dr. Calvente's qualitative scores were very positive.

**ANSWER:**     Defendants admit that the Personnel Committee recommended non-renewal of Plaintiff's contract on November 17, 2017 and admit further that in its report the Personnel Committee noted that she was not sufficiently progressing towards tenure in the areas of teaching and service.  Except as specifically admitted, Defendants deny the allegations of Paragraph 21.

22.     The November 17, 2017 report from the Personnel Committee recommending Dr. Calvente's termination is attached as Exhibit 3.

**ANSWER:**     Defendants admit the allegations of Paragraph 23.

23.     Notwithstanding the Personnel Committee's November 2017 recommendation, Dr. Ghanem reappointed Dr. Calvente to the College's faculty.

**ANSWER:**     Defendants admit the allegations of Paragraph 23.

24.     In the fall of 2018, Dr. Calvente and Dr. Sydney Dillard (an untenured member of the College's faculty and an American of African Descent) presented a joint complaint to Dr. Ghanem concerning patterns of racial harassment, bullying, marginalization, and microaggressions with the College.  This fall 2018 meeting was the first claim of racism and racial harassment that Dr. Calvente made directly to Dr. Ghanem.

**ANSWER:**     Defendants admit that Plaintiff and Dr. Dillard, who at the time was an untenured faculty member in the College and who is an American of African Descent, met with Ghanem in the fall of 2018, during which meeting Plaintiff and Dr. Dillard raised concerns about

alleged racial harassment, bullying, marginalization and microaggressions within the College.

Except as specifically admitted, Defendants deny the allegations of Paragraph 24.

25.     Consistent with then-current DePaul policy concerning complaints of discrimination, Dr. Ghanem forwarded the concerns raised by Dr. Calvente and Dr. Dillard to DePaul's office of Human Resources ("HR").  On information and belief, it was widely known within the College that (i) Dr. Dillard and Dr. Calvente complained about racism within the College to Dr. Ghanem, and (ii) HR would be investigating these complaints.

**ANSWER:**     Defendants admit that Dr. Ghanem forwarded the concerns raised by

Plaintiff and Dr. Dillard to DePaul's office of Human Resources.  Except as specifically admitted,

Defendants deny the allegations of Paragraph 25.

26.     HR attempted to schedule a meeting with both Dr. Calvente and Dr. Dillard to discuss their concerns.  Dr. Calvente and Dr. Dillard and a representative from HR ultimately set a meeting for November 20, 2018; however, Dr. Dillard never showed up for the meeting as she withdrew her complaint at some unspecified time.

**ANSWER:**     Defendants admit that Human Resources scheduled a meeting for

November 20, 2018 with Plaintiff and Dr. Dillard.  Except as specifically admitted, Defendants

deny the allegations of Paragraph 26.

27.     Both Dr. Calvente and Dr. Dillard applied for tenure and promotion from assistant professor to associate professor during 2018/2019 academic year.  Moreover, Dr. Calvente's tenure dossier was *at least as strong* as Dr. Dillard's in the areas of research and service, and stronger than Dr. Dillard's in the area of teaching.  Nevertheless, the vote by the College faculty on Dr. Calvente's tenure application was 19-2 against the grant of tenure.  (A copy of the dean's summary of the College's vote on Dr. Calvente's application is attached as Exhibit 4.)  With respect to Dr. Dillard's application, the College recommended that she receive tenure.  Dr. Ghanem – who had been since been reappointed to serve as acting provost (*see infra* ¶29) – then tenured Dr. Dillard.

**ANSWER:**     Defendants admit that both Plaintiff and Dr. Dillard applied for tenure and

promotion from Assistant Professor to Associate Professor during the 2018/2019 academic year.

10

Defendants admit further that the College recommended that Dr. Dillard be granted tenure, and admit further that Dr. Ghanem granted Dr. Dillard tenure. Defendants admit further that the vote by the College faculty on Plaintiff's tenure application was 19-2 against the grant of tenure, as set forth in Exhibit 4 to Plaintiff's Complaint. Except as specifically admitted, Defendants deny the allegations of Paragraph 27.

28.     Following the College's vote on Dr. Calvente's tenure application, the UBPT conducted its independent review of the file. And after that review, the UBPT (which, at the time, had one member from the College, Bruno Teboul, on it) recommended that Dr. Calvente receive tenure by a vote of 4-3. On information and belief, had Dr. Teboul abstained from voting, as he would have been required to do at many other universities, the vote would have been 4-2 in Dr. Calvente's favor. (A copy of the UBPT's recommendation is attached as Exhibit 5.)

**ANSWER:**     Defendants admit that the UBPT conducted a substantive review of Plaintiff's tenure case after the College's vote on her case. Defendants admit that Bruno Teboul, a faculty member in the College, was a member of the UBPT in 2019. Defendants admit that the UBPT recommended that Plaintiff be granted tenure by a vote of 4-3, and that Exhibit 5 to the Complaint is a copy of the UBPT's recommendation. Except as specifically admitted, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28.

29.     In October 2018, Dr. Ghanem was elevated to the position of Acting Provost of DePaul. This promotion meant that Dr. Ghanem – who had been dean of the College for much of Dr. Calvente's professional life – would decide whether Dr. Calvente would remain employed at DePaul. Ultimately, Dr. Ghanem sided with her former colleagues and refused to grant tenure to Dr. Calvente *even though* Dr. Calvente's file was at least as strong as that of a professor who complained about discrimination within Dr. Ghanem's academic unit and who then retracted that complaint. Following her decision to deny tenure to Dr. Calvente, Dr. Ghanem wrote that Dr. Calvente would receive a terminal contract and that her last day as faculty member at DePaul would be June 30, 2020. (A copy of Dr. Ghanem's letter denying Dr. Calvente's application for tenure and promotion is attached as Exhibit 6.)

LEGAL\47715392\1

**ANSWER:** Defendants admit that Dr. Ghanem was promoted to Acting Provost in or around October 2018. Defendants admit that Dr. Ghanem decided against awarding tenure to Plaintiff, and notified Plaintiff of her decision and the award of a terminal contract that would expire on June 30, 2020. Defendants admit that Exhibit 6 is a copy of Dr. Ghamen's letter to Plaintiff, notifying Plaintiff of Dr. Ghanem's decision on her tenure case. Except as specifically admitted, Defendants deny the allegations of Paragraph 29.

30. Chapter 5 of the Handbook permits a faculty member to appeal the denial of her tenure application. Accordingly, following Dr. Ghanem's decision to deny her application, Dr. Calvente appealed to the Faculty Committee on Appeals, which appointed three faculty unaffiliated with the College to serve as an Appeals Board.

**ANSWER:** Defendants admit the allegations of Paragraph 30.

31. After preliminarily investigation, the Appeals Board dismissed two of Dr. Calvente's grounds for appeal and investigated a third ground for appeal. Ultimately, the Appeals Board issued a thirty-four page report to the President of DePaul (copy attached as Exhibit 7) explaining how (i) Dr. Calvente was evaluated unfairly at multiple points in 2015 and 2017, and (ii) these unfair evaluations were material to the ultimate denial of tenure.

**ANSWER:** Defendants admit that the Appeals Board issued a 34-page report to the University's president, which is attached as Exhibit 7. Defendants admit that in its report, the Appeals Board dismissed two grounds of appeal and made a finding on the third ground. Defendants deny that Plaintiff has accurately summarized the finding on the third ground. Except as specifically admitted, Defendants deny the allegations in Paragraph 31.

32. It is unusual for an Appeals Board at DePaul to recommend the overturning of the provost's decision to deny tenure. However, notwithstanding the Appeals Board's report and recommendation, DePaul ultimately decided against the award of tenure to Dr. Calvente, and her employment at DePaul will end on June 30, 2020.

12

**ANSWER:** Defendants admit that the University ultimately decided against the award of tenure to Plaintiff and that her employment ended on June 30, 2020. Except as specifically admitted, Defendants deny the allegations of Paragraph 32.

## COUNT I
### *(Violation of 42 U.S.C. §1981 – retaliation against DePaul and Dr. Ghanem)*

33. Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference the answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.

34. By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

**ANSWER:** Defendants deny the allegations of Paragraph 34.

35. Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the "but for" factor that caused Dr. Ghanem and DePaul to terminate her employment.

**ANSWER:** Defendants deny the allegations of Paragraph 34.

36. As a result of the denial of tenure and promotion, and as a result of the upcoming termination of her employment, Dr. Calvente has been denied, and will be denied opportunities to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

**ANSWER:** Defendants deny the allegations of Paragraph 36.

13

37.     In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     Defendants deny the allegations of Paragraph 37.


## COUNT II
### *(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. – retaliation against DePaul)*

38.     Paragraphs 1-32 are realleged and incorporated as if fully set forth herein.

**ANSWER:**     DePaul incorporates by reference answers to each allegations contained in Paragraphs 1-32 as if fully restated herein.


39.     By refusing to grant her applications for tenure and promotion, and through the soon to occur termination of her employment, DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her colleagues who never complained about racial discrimination, harassment, or marginalization.

**ANSWER:**     DePaul denies the allegations of paragraph 39.


40.     Dr. Calvente's complaints about racial discrimination, harassment, and marginalization within the College were the motivating factor that caused DePaul to terminate her employment.

**ANSWER:**     DePaul denies the allegations of Paragraph 40.


41.     As a result of the denial of tenure and promotion, and as a result of the upcoming termination of employment, Dr. Calvente has been denied, and will be denied opportunities to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to compensatory damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 41.

42.     In refusing to tenure and promote her, and through the upcoming termination of her employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to the rights of Dr. Calvente, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 42.


## COUNT III
### *(Violation of 42 U.S.C. §1981 – racial discrimination against DePaul and Dr. Ghanem)*

43.     Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**     Defendants incorporate by reference answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.


44.     By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

**ANSWER:**     Defendants deny the allegations of Paragraph 44.


45.     Dr. Calvente's race was the "but for" cause in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

**ANSWER:**     Defendants deny the allegations of Paragraph 45.


46.     As a result of DePaul's and Dr. Ghanem's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits.  Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of enjoyment of life because of Dr. Ghanem's and DePaul's actions, thereby entitling her to an award of compensatory damages.

**ANSWER:**     Defendants deny the allegations of Paragraph 46.

LEGAL\47715392\1

47.    In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**    Defendants deny the allegations of Paragraph 47.


## COUNT IV
### *(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e – race discrimination against DePaul)*

48.    Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**    DePaul incorporates by reference answers to each allegation contained in Paragraphs 1-32 as if fully restated herein.


49.    By refusing to tenure and promote her, and through the upcoming termination of Dr. Calvente, Dr. Ghanem and DePaul deprived Dr. Calvente of the same rights and privileges enjoyed by her non-mixed race colleagues as to the performance, enjoyment, and all of the benefits and privileges of her contractual employment relationship with it.

**ANSWER:**    DePaul denies the allegations of Paragraph 49.


50.    Dr. Calvente's race was the motivating factor in DePaul's and Dr. Ghanem's decision with respect to the refusal to tenure and promote her, and with respect to the upcoming termination of her employment.

**ANSWER:**    DePaul denies the allegations of Paragraph 50.


51.    As a result of DePaul's discrimination, Dr. Calvente has been denied employment opportunities and the opportunity to earn substantial compensation and benefits. Moreover, Dr. Calvente has suffered anguish, humiliation, distress, inconvenience, and loss of employment of life because of DePaul's actions, thereby entitling her to an award of compensatory damages.

**ANSWER:**    DePaul denies the allegations of Paragraph 51.

52.     In refusing to tenure and promote her, and through the forthcoming termination of Dr. Calvente's employment, Dr. Ghanem and DePaul acted with malice and/or reckless indifference to her rights, thereby entitling Dr. Calvente to an award of punitive damages.

**ANSWER:**     DePaul denies the allegations of Paragraph 52.


## COUNT V
### *(Breach of contract against DePaul)*

53.     Paragraphs 1-32 are re-alleged and incorporated as if fully set forth herein.

**ANSWER:**     DePaul incorporates by reference answers to each allegation contained in Paragraphs 1-32 as if fully restate herein.


54.     Through the Handbook and other documents referenced therein, DePaul defined the procedures and criteria for tenure and promotion, and thereby created the terms and conditions of an employment contract between it and Dr. Calvente.

**ANSWER:**     DePaul denies the allegations of Paragraph 54.


55.     By accepting her appointment as a tenure track faculty member at DePaul, Dr. Calvente and DePaul agreed that her applications for tenure and promotion were to be governed by the Handbook's tenure criteria and procedures.

**ANSWER:**     DePaul admits the allegations of Paragraph 55.


56.     The Handbook requires that a candidate for tenure and promotion be given fair consideration and evaluation in the areas of teaching, research, and service at all levels.

**ANSWER:**     DePaul admits that the Faculty Handbook sets forth a tenure review process that promotes fairness as a means for avoiding arbitrary decision making.  Except as specifically admitted, DePaul denies the allegations of Paragraph 56.

57.     The Handbook further requires that tenure and promotion decisions not be based on racial discrimination or based on retaliation for complaining about racial discrimination.

**ANSWER:**     DePaul admits that that the Faculty Handbook restates DePaul's policy prohibiting discrimination and retaliation in making employment decisions.  Except as specifically admitted, DePaul denies the allegations of Paragraph 57.

58.     In denying Dr. Calvente's applications for tenure and promotion, the University failed to evaluate Dr. Calvente fairly by, among other things, (i) willfully distorting her record with respect to her teaching, and (ii) failing to provide clear and consistent guidance concerning expectations for service during formal reviews.

**ANSWER:**     DePaul denies the allegations of Paragraph 58.

59.     Further, in denying Dr. Calvente's applications for tenure and for promotion, the University (i) failed to treat her in the same manner as similarly situated persons who did not complain about racial harassment within the College, and (ii) failed to treat her in the same manner as similarly situated persons who were not of mixed race.

**ANSWER:**     DePaul denies the allegations of Paragraph 59.

60.     DePaul's denial of Dr. Calvente's applications for tenure and promotion breached its contract with her.

**ANSWER:**     DePaul denies the allegations of Paragraph 59.

61.     As a result of DePaul's decision to deny Dr. Calvente's applications for tenure and promotion, Dr. Calvente has suffered damages including lost wages and benefits.

**ANSWER:**     DePaul denies the allegations of Paragraph 61.

LEGAL\47715392\1

## **AFFIRMATIVE DEFENSES**

1.  Plaintiff's allegations are barred insofar as they fail to state a claim upon which relief can be granted.

2.  Plaintiff's Title VII claims are barred to the extent that they exceed the scope of her EEOC charge.

3.  Insofar as Plaintiff's Title VII claims are based on actions that occurred outside of the applicable limitations period for filing a charge of discrimination, they are time-barred.

4.  Insofar as Plaintiff's Section 1981 claims are based on actions that occurred outside of the applicable statute of limitations period, they are time-barred.

5.  Plaintiff's Section 1981 claims are barred to the extent she has not alleged a protected status under Section 1981.

6.  At all times pertinent to this case, Defendants made a good faith effort to comply with the law, and, therefore, are not liable for any alleged intentional, malicious, or grossly negligent acts of its agents or employees.

7.  Plaintiff's claim for damages are barred, in whole or in part, by a failure to mitigate damages to the extent required by the law.

8.  Plaintiff's Title VII and Section 1981 claims are barred, either in whole or in part, by the ministerial exemption.

9.  Defendants reserve the right to plead additional defenses as new information and defenses may arise through the course of discovery in this matter.

WHEREFORE, Defendants respectfully requests the Court to enter judgment in its favor on each count of Plaintiff's Complaint, along with any further relief as the Court deems just and proper.

Dated:  August 7, 2020

Respectfully submitted,


By: /s/ Anneliese Wermuth
        Attorney for Defendants, Salma Ghanem and
        DePaul University

Anneliese Wermuth (#6270970)
Nandini K. Sane
Cozen O'Connor
123 N. Wacker Drive, Ste. 1800
Chicago, IL  60606
Telephone:     312/474-7876
Email: awermuth@cozen.com
Email: nsane@cozen.com

*Attorney for Defendants*

20

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 7, 2020, she electronically filed the foregoing **Defendants' Answers and Affirmative Defenses to Plaintiff's Complaint and Jury Demand** with the Clerk of the United States District Court for the Northern District of Illinois using the ECF system, which will send notification of such filing to the following counsel of record:

> Fitzgerald T. Bramwell
> Law Offices of Fitzgerald Bramwell
> 225 West Washington Street, Ste. 2200
> Chicago, IL  60606
> bramwell@fitzgeraldbramwell.com

*s/ Anneliese Wermuth*
Anneliese Wermuth

# Exhibit 5 to complaint





**University Board on Promotion and Tenure**
1 East Jackson Boulevard,
Chicago, Illinois  60604-2287

TO:     Salma Ghanem, Acting Provost

FROM:   University Board on Promotion and Tenure

DATE:   May 10, 2019

Re:     Lisa Calvente's Application for Promotion to Associate Professor with Tenure

---

The 2018-2019 University Board on Promotion and Tenure met on Friday, March 8, 2019, to consider Lisa Calvente's application for promotion to Associate Professor with tenure.  Dr. Calvente joined DePaul as an Assistant Professor in 2011; her tenure application was deferred two years due to an approved leave during AY 2012-13 and a URC research leave during AY 2015-16.  Professor Calvente holds a PhD from University of North Carolina at Chapel Hill.

**Board Members Present**:  Ruth Gannon Cook (School for New Learning); Nila Hofman (College of Liberal Arts and Social Sciences); Xiaoping Jia (College of Computing and Digital Media); Gregory Mark (College of Law); Thomas Miller (School of Music); Sandra Shelton (College of Business); Bruno Teboul (College of Communication)

**Board Members Absent**:  None

**Vote Summary:**
*College of Communication tenured faculty*:  2 – 19 (Support – Oppose)
*College of Communication Acting Dean recommendation*:  Does not support
*University Board*:  4 – 3 (Support – Oppose)

A majority of the University Board on Promotion and Tenure disagreed with the majority of the tenured faculty of the College of Communication and the Acting Dean of the College of Communication, and found that Dr. Calvente has met the criteria for promotion to Associate Professor with tenure.

In terms of teaching, the Board agreed with the unit's largely positive assessment of Dr. Calvente's overall teaching performance, with a majority of the Board finding that Dr. Calvente's teaching, as evidenced by consistently high student evaluations, a strong student

report, and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook.

The Board considered each of the principal teaching concerns raised in the unit level review.

*Concerns that Dr. Calvente created a 'harsh, uncomfortable atmosphere for her students', and that her students felt intimidated in her classroom.* A majority of the Board recognized that while these are serious concerns, the negative responses to Dr. Calvente's teaching represented a very small minority of her students. The Board was encouraged to notice a significant improvement in the recent years, although negative feelings have still been occasionally expressed by a small number of students. The Board encourages Dr. Calvente to experiment and innovate with different and/or mixed pedagogy to accommodate students with different learning styles, to be open to different perspectives, and to attempt to reach all of her student audience in the future.

*Concerns that Dr. Calvente's CMN 103 was not meeting the needs of the College by not following curriculum guidelines.* The faculty report indicated that Dr. Calvente ignored the curriculum guidelines of CMN 103 agreed upon by the faculty. However, the additional documents provided by Dr. Calvente in her response to the College's decision included an email from a senior faculty member confirming that the syllabus of CMN 103 designed by Dr. Calvente was appropriate. A majority of the Board believed that this evidence suggested that the concerns with not following the curriculum guidelines could very well result from a misunderstanding between parties regarding the expectations. The Board encourages Dr. Calvente to recognize the importance of incorporating the feedback and suggestions from her colleagues into her core courses, and to align CMN 103 with applicable guidelines. The Board was pleased to learn from Dr. Calvente in the interview with the Board that she would be more than happy to meet with area faculty to ensure that the content in CMN 103 conforms to the course guidelines and learning goals.

A minority of the Board members shared the degree of concern expressed by the faculty and the Dean that some of Dr. Calvente's students felt intimidated and/or uncomfortable in her classroom. These Board members felt that while the number of students with negative feelings represented a small minority, negative responses are still evident and an important part of the record, with the impact on some of the students being severe. To Board members, these negative responses cannot be entirely attributed to the subject matter of the courses Dr. Calvente has taught, since there are other instructors who have taught similarly challenging subject matter without the volume and severity of negative responses we have seen in Dr. Calvente's case. Further, these concerns are indications that there is room for improvement in Dr. Calvente's teaching, and the unit's assessment of Dr. Calvente's teaching being short of *excellent* is justified. The Board encourages Dr. Calvente to learn from her peers who successfully teach similarly challenging classes and to continue to explore ways to make all students feel welcome and respected in her classroom regardless of their individual ideology and viewpoints.

In terms of scholarship, the Board recognized that in the categories valued most by the unit, Dr. Calvente's total body of work consists of, at minimum, 3 peer-reviewed articles and 3 peer-reviewed book chapters during the probationary period, in additional to 6 papers in international conferences and 10 presentations in national conferences. A majority of Board members

considered these works alone, without counting Dr. Calvente's editorial role in her co-edited book and the public performances by her students, represent a sufficient volume to warrant promotion and tenure.  The significance and quality of her work were praised by the external reviewers and echoed by the faculty in the unit report.  Based on this evidence, a majority of the Board found Dr. Calvente's scholarship to have met the minimum standard of *notable* in the Faculty Handbook.  The Board encourages Dr. Calvente to continue her research trajectory with more quantity and quality in peer-reviewed articles, and to establish a sustained research stream with notable contributions to her field.

Some members of the Board shared the concerns by one of the external reviewers that the total volume of scholarly work completed by Dr. Calvente is "slim" and that Dr. Calvente failed to meet the unit's expectation to complete her book project following 2 pre-tenure research leaves (URC and Woodrow Wilson Career Enhancement Fellowship for Junior Faculty). With these concerns, a minority of the Board considered that the unit's assessment of Dr. Calvente's scholarship being short of *excellent* was justified.

In terms of service, some of the Board members shared the concerns of the faculty that a large portion of Dr. Calvente's service was outside her home unit.  However, the Board agreed that Dr. Calvente's overall service contribution was sufficiently strong to meet the criteria for service in the Faculty Handbook.  The Board encourages Dr. Calvente to continue to build on her service record, in her home unit, as well as at the college and university levels.

The Board recognizes that a local unit may define local standards at a greater level of specificity and higher expectations in quantity and quality than what is stipulated in the Faculty Handbook. The unit's aspiration to excellence by requiring two of the three areas to be excellent is appropriate and indeed commendable.  Given the unit's aspiration to excellence and the concerns in teaching and scholarship in Dr. Calvente's case, the dissenting members of the Board were not convinced that Dr. Calvente has met the aspiration for *excellence* set by the unit in either teaching or scholarship, nor do they find sufficient ground to overturn the judgement of an overwhelming majority of the faculty and the Dean.

The Board congratulates Dr. Calvente on her accomplishments during her probationary period and looks forward to a record of sustained excellence in teaching, research, and service in the years to come.

This recommendation accurately reflects the University Board on Promotion and Tenure's discussion of Lisa Calvente's application for promotion to Associate Professor with tenure.



*Professor of Law*
*College of Law*



Ruth Gannon Cook
*Professor*
*Learning*

Ginger Hofman
*Professor of Anthropology*
*College of Liberal Arts and Social Sciences*



Xiaoping Jia
*Professor of Computer Science and Software Engineering*
*College of Computing and Digital Media*



Th
*Professor of Sound Recording Technology*
*School of Music*



*Professor of Accountancy*
*Driehaus College of Business*

J. C. Bruno Teboul
*Professor of Organizational and Multicultural Communication*
*College of Communication*

# Exhibit 6 to complaint





Office of the Provost
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-1330
FAX: 312/362-8874

June 10, 2019

Lisa Calvente
6748 N. Glenwood Ave.
Chicago IL 60626

Dear Professor Calvente,

I regret to inform you that I have decided that you will not be granted tenure and promotion to Associate Professor.  This decision is in agreement with a significant majority of your tenured colleagues in Communication, with the Acting Dean of the College of Communication, and with three of the seven members of the University Board on Promotion and Tenure (UBPT).   My decision regarding your application for promotion and tenure is based on my review of your dossier (including your response to the college reports) and my attendance at the UBPT hearing on your case.

The College of Communication guidelines indicate that, for tenure and promotion to Associate Professor, the College "expects excellence in at least two areas, with the third being rated at least very good."  The College recommendation on your application for tenure and promotion evaluates your record as "very good" in the three areas of teaching, research, and service, and reports a 2-19 vote recommending against your tenure and promotion.  The Acting Dean agreed with these evaluations and, accordingly, has also recommended against your promotion.  In its turn, and with your response to the college reports in hand, the UBPT evaluated your record, paying particular attention to the issues where there had been disagreement.  Although the UBPT recommendation report did not dispute the tenured faculty's and acting dean's evaluation of your record as "very good," it notes that the Board's dissenting members (3 out of 7) did consider the College of Communication's above guidelines in making their decision on the case.

There is every evidence of careful review of this case at all levels.  Exercising professional judgment, experienced faculty colleagues have evaluated your work.  Per the handbook, before granting tenure, "the university should have *no reasonable doubt* about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission" (emphasis mine).  The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised

by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority.

As noted in the college and dean's reports and as acknowledged by you in your response, the concerns that have been raised in this tenure review have been raised in earlier probationary reviews. Given this, I would like to clarify my own earlier role in the consideration of your case, as Dean of the College of Communication during your 2015 and 2017 formal reviews. In the conclusion to your response to the college reports, you referred obliquely to my "assessments" during those earlier reviews. It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure." I had noted some improvement between formal reviews and wanted to give you the opportunity to address the remaining stated areas of concern in all three areas to meet the standards of the college by the time of your tenure review. In my letters of renewal in 2015 and again in 2017, I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation of your colleagues.

This denial of tenure means that the 2019-2020 academic year will constitute your terminal year of employment at DePaul University, with an effective termination date of June 30, 2020. I am grateful for your years of service to DePaul University and the College of Communication. I wish you the best in your future endeavors.

Sincerely,

Salma Ghanem, Acting Provost

cc:      Lexa Murphy, Acting Dean, College of Communication

# Exhibit 7 to complaint

**Faculty Appeals Board Report to the President of DePaul University**

Date: 01/15/20

To: A. Gabriel Esteban [President DePaul University]

From: Faculty Appeals Board [Brian Boeck, Jose Liberti and Bridget Tenner]

CC: Lisa B.Y. Calvente [Appellant].

**Executive Summary**

The Board finds that the Appellant was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion.

Regarding ground (2) for appeal *"The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision"* the board unanimously decided that the documentation meets the criteria for a successful appeal.

Regarding ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws"* the board unanimously decided that the documentation does not meet the criteria for a successful appeal.

Though the majority of allegations advanced in the Appellant's appeal could not be substantiated by our investigation, three avenues of investigation were central to our determination. The Board considers two serious allegations to be both substantiated and material to the decision to deny tenure and promotion: 1. deviations from procedures in the evaluation of teaching, 2. deviations from procedures by failing to provide clear and consistent guidance regarding service in formal reviews (as mandated in FH 3.3.1). Regarding a third serious allegation, the Board could not substantiate a conflict of interest with respect to the Provost's final decision. Though it believes that the Provost acted in good faith, serious concerns remain about how the 2015 and 2017 formal reviews were weighted in the Provost's final decision. The Board finds that both reviews contain

misrepresentations related to teaching that were never corrected or addressed in spite of multiple attempts by the Appellant to draw attention to them.

**Summary of Board Investigation**

In accordance with Chapter 5 of the Faculty Handbook (FH) The Faculty Committee on Appeals (FCA) received the appeal of Lisa Calvente (hereafter the Appellant) who was denied tenure and promotion. The FCA selected a three member board (hereafter the Board) consisting of the above-named faculty members to hear the appeal and make its recommendation to the president.

Before the Board even received the Appellant's appeal documentation, it began receiving communications from concerned individuals from outside of DePaul University. The Board considers the Appellant's disclosing of the names of the Board members to individuals outside the university to be a serious breach of confidentiality under Faculty Handbook 6.4.2.

Section 5.1.2.3 of the Faculty Handbook states "*A faculty member may appeal the decision to deny an application for tenure and promotion. The appeal must be based on one or more of the following grounds:*
1. *The decision violated the faculty member's academic freedom.*
2. *The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.*
3. *The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.*"

The Appellant argued in "Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" [hereafter the Appeal] that all three grounds for appeal existed and were material to the Interim Provost's decision to deny tenure. The Board met for three hours to discuss this documentation on 9/27/19 and engaged in additional consultations in subsequent weeks.

In *Memorandum: Preliminary Review of Dr. Lisa B.Y. Calvente Appeal of Tenure and Promotion* dated 9/27/19 the Board outlined to A. Gabriel Esteban [President of DePaul University] its determination that the Memorandum of Appeal and Supporting Documentation did not satisfy the criteria for ground (1) violation of academic freedom. The vote was 3-0 in favor of not proceeding with investigation of this ground for appeal. The memorandum also outlined a timeline for investigating ground (2) for appeal "*The evaluation of the*

*candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision,"* and ground (3) for appeal *"The decision was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws."*

The Board conducted a thorough investigation as mandated by Faculty Handbook 5.1.1.4. This investigation commenced with a careful and extensive review of the documentation submitted by the appellant ("Memorandum of Lisa B.Y. Calvente to the Tenure Appeals Board" consisting of 17 pages and attachment "Supplementary Documentation" consisting of 133 pages of documentation) as well as documentation from the University EEO office.

The Board consulted with Stephanie Smith, Chief Human Resources Officer regarding claims of discrimination/retaliation, solicited information from three faculty members with knowledge of the case, questioned the authors of reports that recommended against renewal or promotion, and reviewed clarifications and additional documentation from both the appellant and the College of Communication [hereafter the College]. The Board sent the Appellant, Lisa Calvente, a dozen initial questions and three additional requests for documentation or clarification. The Board sent Alexandra (Lexa) Murphy, Acting Dean, College of Communication [hereafter Dean], 11 initial questions, 23 follow-up questions and two requests for additional documentation. The Board sent Interim Provost, Salma Ghanem [hereafter Provost], 3 initial questions and 28 follow up questions. It received timely and helpful responses to all of its queries.

The Board also solicited and carefully scrutinized three groups of additional evidence. It reviewed the Appellant's Student Evaluations of Teaching, both quantitative/statistical and open-ended student comments and responses, for all classes offered at DePaul through the 2017 formal review. It reviewed all letters from the Appellant's tenure dossier documenting her service. It reviewed anonymized (all faculty names removed) copies of the service sections of the CVs of all candidates for tenure from the College of Communication who were ranked by the College Personnel Committee as "excellent" in service within the previous ten years.

This evidence and documentation was comprehensively discussed by the Board on November 7, 2019 and subsequent occasions.

NOTE: Italics will be used when quoting directly from the documentation reviewed by the Board.

**Ground for Appeal II. Procedural Violations**

Appellant's Allegations Regarding the Provost

In section one of the appeal the Appellant advances three major allegations regarding procedural violations by the Provost. (Discrimination/Retaliation allegations interspersed on pages 1-15 of the appeal will be addressed below in the section devoted to ground for appeal three).

1 (A, page 2 of appeal) the Appellant alleges that the tenure decision by the Provost failed to provide a "compelling reason" for overturning the recommendation of the UBPT.

2 (B, page 5 of appeal) the Appellant alleges that the tenure decision by the Provost, violated the University's conflict of interest policies.

3. (a, page 3 of appeal) the Appellant alleges that the tenure decision by the Provost relied upon concerns articulated by the College during formal and informal reviews, and violates the University's criteria with regard to tenure and promotion procedures by failing to allow for university-wide consideration of her tenure case.

The Board's Findings

Regarding allegation one, the Board finds that the Provost (in the decision letter to the Appellant dated June 10, 2019) did provide multiple reasons for overturning the recommendation of the UBPT.

In discussions about whether those reasons were compelling, the Board devoted particular attention to Dr. Ghanem's statement in the letter to the Appellant dated June 10, 2019:

*"The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues in Communication, concerns which led them to vote against promotion and tenure by an overwhelming majority."*

This statement appears to imply that there exists a specific proportion of positive votes by the UBPT which would have sufficiently answered the concerns raised by faculty members in the College. Dr. Ghanem's response to the Board, however, reiterated her agreement with the evaluation of the UBPT board members who did not assess the Appellant's work as excellent in teaching and research. The UBPT recommendation dated May 10, 2019 clearly conveys the reasons advanced by the dissenting minority.

The Board discussed whether or not the reasons provided by the Provost for tenure denial meet the Faculty Handbook's [3.5.6.3] threshold for providing compelling reasons in a written explanation. The Board also focused its investigation on determining the extent to which student comments about 'intimidating and dismissive' behaviors (discussed below) influenced the Provost's tenure decision. The results of that investigation inform the Board's findings regarding other allegations discussed below. The Board does not find that the Provost violated Section 3.5.6.3 of the Faculty Handbook, though it does find that flawed personnel documentation informed the Provost's reasoning. The Appellant's case was one of only 3 (out of 47) in which earlier formal or probationary reviews conducted at the unit or college level were specifically referred to or cited in the Provost's letter of decision regarding tenure/promotion.

Regarding allegation two, the Board finds that the tenure decision by the Provost did not violate the University's conflict of interest policies. The Board notes that the appeal did not provide sufficient, specific evidence to substantiate the claim of a conflict of interest. Nor did the Appellant refer to relevant sections of the University Code of Conduct, which explain or define 'conflict of interest.'

The Appellant asserts that Dr. Ghanem should have recused herself from consideration of her tenure case. On Page 6 of the appeal the appellant states: "*Dr. Ghanem's decision not to recuse herself from my case constitutes a clear conflict of interest*." The Board disagrees and notes, for reasons further outlined below, that the specific facts of this case would not mandate a recusal according to Faculty Handbook [3.5.1.1.h] or university policy. Moreover, a recusal would potentially have made an unprecedented case even more procedurally complicated, since Faculty Handbook Chapter 5 provides no clear guidance for handling an appeal in such circumstances.

The preponderance of evidence submitted to the Board demonstrates that the Provost acted in good faith and objectively evaluated the Appellant's performance based on the evidence provided by the Appellant and the College.

Regarding allegation three, the Board finds that the Provost did assign undue weight to concerns, particularly those about teaching, articulated by the College during earlier, pre-tenure formal and informal reviews.

In its deliberations regarding allegation three, the Board was particularly concerned by the unique aspects of this particular case. It finds that Provost Ghanem formally occupied two distinct roles in the handling of the Appellant's tenure case within the same academic year [as a result of the fact that the Provost started the academic year as Dean of the College of Communication]. Dr. Ghanem states that she did not occupy two distinct roles because she "*did not weigh in at all as dean on Dr. Calvente's tenure and promotion review or*

*that of any of her Communication colleagues who went up in AY 2018-2019.*" However, in the opinion of the Board, the sudden transition of Dr. Ghanem to a new leadership role in the university created a situation which was unprecedented in recent university practice. In her newly assumed role as Acting Provost, Dr. Ghanem was significantly more familiar with Dr. Calvente's case, as presented through the problematic lens of College personnel documentation, than with other tenure cases she considered as Provost in AY 2018-2019. The undue weight assigned to concerns articulated in College personnel documentation was therefore material to the Provost's decision.

In its consideration of evidence regarding allegation three, the Board found that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal. Faculty Handbook Section 3.3.1.3 clearly specifies that the tenure review is a university-wide consideration.

On page 4 of the appeal the Appellant alleges that the College had a disproportionate say in her tenure process, in violation of university-wide consideration. She states: "*Dr. Salma Ghanem, in her role as Interim Provost (then Acting Provost) of the University articulates concerns that would have been appropriate to her previous role as Dean of the College of Communication. In the position of Interim Provost, and by privileging College concerns, Dr. Salma Ghanem violates the requirements of university-wide consideration.*"

The Board finds that the UBPT conducted a substantive review applying current university-wide standards and criteria as stipulated by Faculty Handbook Section 3.5.6.1.c.

The preponderance of evidence examined by the Board substantiates the Appellant's allegation that the Provost's reasons for overturning the recommendation of the UBPT assigned greater weight to college concerns than university-wide criteria.

Appellant's Allegations Regarding Bruno Teboul, faculty of College of Communication and member of the UBPT.

In section one of the appeal the Appellant advances an allegation regarding procedural violations by a member of the College who served on the UBPT.

On page 6, marked as 'b.' , the Appellant alleges a violation of conflict of interest policies by a member of the College during her formal and informal reviews and during her UBPT review.

The Appellant states:

"*The composition of the UBPT also included a faculty member of the College, Dr. Bruno Teboul. While the UBPT voted to recommend tenure, the Interim Provost's letter overturning the UBPT recommendation cited the "slim majority" of the vote as a reason for the negative outcome. This further suggests a conflict of interest that should have been explicitly acknowledged per the Faculty Handbook.*"

The Board's Findings

The Board questioned Dr. Teboul. It deems his response, which outlined his adherence to the requirements of the Faculty Handbook Section 3.5.1.1.b, to be credible.

Regarding this allegation, the Board finds that the evidence does not substantiate the claim of conflict of interest.

Appellant's Allegations Regarding Contract Year In College Pre-Tenure Review

In section one of the appeal the Appellant advances two allegations regarding procedural violations with respect to determining contract year in College pre-tenure reviews.

1 (C, Page 6 of the appeal) The Appellant alleges that the College failed to follow University policies and procedures in the evaluation of scholarship, teaching and service appropriate to Contract Year.

2 (a, Page 7 of the appeal) The Appellant alleges a violation of Section 3.2.2 of the Faculty Handbook with regards to leaves of absence.

The Board's Findings

Regarding allegation one, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Regarding allegation two, the Board finds it probable that minor procedural errors occurred, but also finds that these were not material to the outcome of the tenure case.

Based on a careful evaluation of the evidence, the Board determined that any minor, unintentional errors or procedural uncertainties about contract year resulting from leave(s) of absence would not have required a reassessment of the entire file during pre-

tenure reviews.

<u>Appellant's Allegations that the College Violated Policies in the Evaluation of
Scholarship.</u>

In section one of the appeal the Appellant advances two major allegations that the College
violated policies for the evaluation of scholarship.

1 (on page 9, 11) the Appellant alleges that the College violated Faculty Handbook Section
3.5.2.c, which reads: *"All documents considered at each level must be passed on to subsequent
levels,"* by failing to send out all of her public performances to external reviewers for
evaluation.

2 (on page 9, 11) the Appellant alleges that the College violated its own criteria for
evaluating scholarship and university policies by not counting her public performances
as scholarship.

The Board focused its investigation on two particular statements in the appeal.

On page 9 of the appeal, the Appellant states: "*It came to my attention **after** my external
letters had been submitted to the College, that in fact the **College had violated University
procedure and failed to transmit my dossier to external reviewers.** [emphasis in bold
Appellant's] The College did not notify me of this occurrence; rather, one of my external letter
writers noted the omissions of the materials in their letter, and this came to my attention after
Acting Dean of the College Alexandra Murphy sent me copies of the letters*."

The Board notes that there is a major difference between failing to transmit an entire
dossier and failing to transmit or reclassifying individual items.

On page 11 of the appeal, the Appellant states: "*The College's failure to acknowledge my
public performances, which involved community partners and students, and were not restricted
to the classroom, violates both University policy and College criteria where the evaluation of
scholarship is concerned. Moreover, I was hired in the College as a race and performance scholar.
The College's failure to send out my performances for evaluation and its discounting constitutes
a violation of College and University Guidelines. Furthermore, Section 3.5.2 of the Faculty
Handbook provides that "At all levels of evaluation the following processes must be followed...c)
**All documents considered at each level must be passed on to subsequent levels**"
[emphasis in bold Appellant's]. The College's failure to send out my performances to the*

*external reviewers for evaluation is also in direct violation of this aspect of the University's policies. It's impact, given that the Interim Provost used the College's ranking of "very good" for my scholarship in order to substantiate her decision to overturn the UBPT recommendation, had a direct and negative effect in the outcome of my tenure application."*

To investigate the Appellant's claims, the Board requested additional clarification from the Appellant about how the performances were documented.

Faculty Handbook Section 3.6.1.1. includes among 'Items Supplied by the Candidate' the following statement: "*A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities.*" Faculty Handbook Section 3.5.1.3 provides guidelines for evaluating collaborative work. Therefore the Board determined that it was the candidate's responsibility to record and properly document her contributions to any performances that would be included in the tenure dossier. It also determined that the format in which the performances were documented would be crucial to its investigation.

<u>Additional Information Uncovered During Investigation</u>

**Extract** from the Appellant's response to the Board dated September 22, 2019.

**Board question:** Pages 10-11 discusses how public performances were evaluated. Please provide a specific description of how each performance was documented at the time of the performance and the specific formats in which a record of each performance was preserved.

**Appellant's response:** *As part of my pedagogical approach that comes from participatory performance/theater, I require all aspects of the documenting and advertising the public performance to come from the students. Each time one of these performances are held the students are responsible for recording it because part of the agenda is for the students to find agency and accountability in these performances. As such each performance was recorded differently. In 2013, the performance was recorded by the now defunct technology services team in the college. In 2015, a friend of a student in the performance recorded it, and provided a Youtube link to the performance. In 2016, the performance was not digitally recorded so in lieu of the actual performance, I provided a letter from Rubén Álvarez Silva, who attended the event and was my advisory contact from the Steans Center for that particular course. I also provided the advertisement from the students for the performance. In 2019, a student asked her co-worker from the College of Computing and Digital Media to film the performance. Helen Damon Moore, who attended the event, from the Steans Center also had a photographer archive the performance.*

**Board question:** How was each performance documented in the dossier?

**Appellant's response:** *During each review period that followed a performance, I provided the College with documentation of the performance based on the method of documentation specific to that particular piece. In my tenure dossier, this took the form of 1) web links to the performances 2) letters from those who attended and screened the performances 3) any relevant advertisements. Because each performance has both a scholarly as well as pedagogical component, the method of documentation and advertising changes according to the will of the student participants and community partners with whom I collaborate to stage these performances. Some performances were filmed, while others were not. All, however, were documented in my dossier according to College and University guidelines.*

**End of Extract.**


The Board also questioned Dean Murphy about the submission of the Dossier.

Extract from Dean's response dated September 23, 2019.

**Board question:** Who sent out Lisa Calvente's dossier? On what date was the dossier transmitted to external reviewers? Were any items in the dossier not transmitted to external reviewers?

**Dean's response:** *I sent out the dossier to the selected external reviewers. Two dossiers were sent on 6/25/18 and a third was sent on 7/10/18. A YouTube link to a class-based performance was not included.*

**Board question:** If any dossier items were not transmitted to external reviews, what were those items, who made the decision not to transmit items, and what was the rationale for this decision?

**Dean's response:** *As noted above, a link to a class-based performance was not included in the dossier sent to the external reviewers. The link was embedded in the list of the citations of the articles being sent out and was missed in the compilation of the items.*

**Board question:** Regarding the transmission of Lisa Calvente's dossier to external reviewers, on what date did you become aware of allegations that the complete dossier was not sent out to external reviewers? Is it correct that according to College guidelines the complete dossier should be transmitted to external reviewers? Please provide all

documentation and correspondence relating to this issue. [Board note: such documentation was provided and reviewed].

**Dean's response:** *On October 18th, Lisa Calvente let us (me and Hai Tran, the chair of the personnel committee) know of her concern that the performance link was not sent out. There is nothing in the college guidelines that designates that the entire dossier must be sent to the external reviewers. I have included the email correspondence related to this conversation. You will see in these exchanges, that since there was still time in the review process, I offered to rectify the situation by sending out the performance link to the reviewers. However, in looking at the link, I realized that it was a YouTube video with no context or explanation for the performance. Therefore, I asked Lisa to provide information about the performance that could be sent to the reviewers. My rationale was that there would be no way for the reviewers to make any assessment of her work on this without knowing how much she contributed to the scripting and staging of the performance (versus her students), when and where it was performed, and how many times. These are part of the norms established by the National Communication Association Performance Studies Division (NCAPSD) to help with the evaluation of creative performances as scholarship. None of this was provided by Lisa Calvente for this (or any of the) performances.*

**End of Extract.**

Dean Murphy also provided to the Board copies of email correspondence with the appellant regarding the performances and dossier dated October 18, 23, and 24, 2018.

The Board's Findings

Regarding allegation one, the Board finds that a minor procedural error occurred, but also finds that this error was not material to the outcome of the tenure case. Dean Murphy acknowledged that one YouTube video was not provided to external reviewers and sought to rectify the situation by proposing to transmit it to reviewers in late October 2018. The College's email correspondence with the Appellant demonstrates that the Appellant elected not to send the YouTube video or additional contextual explanation to external reviewers in late October 2018.

Regarding allegation one, the Board finds that if the Appellant intended to rely on the public performances as key examples of scholarship/creative activities in her tenure dossier, the Appellant should have taken more proactive steps to document those activities and solicit timely evaluations of them from other scholars and DePaul faculty members as suggested by Faculty Handbook Section 3.4.2.2, which states: "*An academic unit may evaluate oral presentations or creative activities by various means including (but not limited to) listening to recordings, examining drafts, or soliciting the views of other scholars*

*(including other members of the DePaul faculty) who were in attendance*."

Regarding allegation two, the Board finds that the College did not violate its own criteria for scholarship by not counting public performances, which involved students and were documented by students, primarily as scholarship.

Regarding allegation two, the claim that the Appellant was "*hired in the College as a race and performance scholar*" could not be substantiated by the Board. The original job advertisement for the College position in 'Intercultural Communication and Performance Studies' did not specify any explicit expectations for giving public performances.

Regarding allegation two, the Board finds that since the UBPT recommendation dated May 10, 2019 did not dispute the College's evaluation of the public performances, any claim regarding violation of policies or Faculty Handbook Section 3.4.2.2 cannot be substantiated.

Allegations Relating to the 2015 Formal Review

In section one (page 12, 13) and section three (page 17) of the appeal, the Appellant advances an allegation that starting in 2015 the College violated the Faculty Handbook Section 3.4.2.1 by engaging in unfair and unsystematic evaluation of her teaching.

The Appellant alleges on pages 2, 6, 8, 15, and 17 that the 2015 formal review initiated a pattern of misrepresentation of student comments in assessment of her teaching.

Faculty Handbook Section 3.4.2.1 states: "*Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers.*"

Faculty Handbook Section 4.1 states: "*Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions.*"

In support of her argument that a pattern of misrepresentation began in 2015 and was material to the outcome of the tenure case, the Appellant demonstrates through citation that the Provost (page 3) referenced the 2015 formal review in her tenure decision. The Appellant also demonstrates through citation (page 12) that a prominent reference to "intimidating or dismissive" classroom behaviors also appears in the Dean's

recommendation.

<u>Additional Information Uncovered During Investigation</u>

The Board investigated whether or not a pattern of misrepresentation could be traced backed to the 2015 formal review.  It notes that the 2015 formal review introduced phrasing about 'intimidating' classroom behaviors that recurs in subsequent personnel documentation (including College tenure deliberations).

The Board compared the College 2015 formal review's claims about patterns in student comments to the underlying evidence.  The Board was disturbed to discover that the 2015 formal review provided a highly selective, negative presentation of patterns in student comments, the review downplayed (almost to the point of willful distortion) positive aspects of the candidate's teaching, and several statements in the review did not provide a fully accurate representation of actual proportions and patterns in the evidence.  In fact a major summary claim of the review – "*While the majority of Lisa's course evaluations repeat both themes of adamant support/appreciation with feelings of intimidation and dismissal, this tension is elevated in her lower level core classes (CMN 103, INTC 230, LSP 200).*"– could not be substantiated by examining the underlying evidence. The personnel committee seems to have cherry-picked negative comments (often unrepresentative ones) and made no serious effort to correlate the negative comments with negative comments qualified in a positive way in question 22 (how the class could be improved) and positive comments in question 21 (how the class was helpful).  Many more students had an overall positive experience of intellectual growth than are reflected in this selective representation.  Frequent student comments about the Appellant's courses promoting critical thinking and/or being challenging in a good way were either downplayed or ignored.  Upon reviewing all of the student evaluations considered in the 2015 formal review, the Board discovered that although there are small numbers of explicit student comments in teaching evaluations conducted over several quarters mentioning an intimidating or uncomfortable classroom environment, the College did to some extent misrepresent the patterns and proportions of such comments.

The Board also notes that a long discussion of "*Concerns of students feeling intimidated and/or uncomfortable*" preceded the College's negative tenure vote.  The earlier formal reviews were considered a main reason for discounting the positive improvements noted in the 2018 Personnel Committee report because it "*did not adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable in Lisa's classroom.*" The College recommendation regarding tenure states: "*Nevertheless, the tenured faculty expressed an overarching concern that the narrative* [Board Note: in the Personnel

committee report] *underplayed the shortcomings in Lisa's teaching record that warranted the Very Good rating, and by focusing mainly on recent evaluations, it did not fully reflect the history of the case."*

<u>The Board's Findings</u>

The preponderance of evidence demonstrates that the 2015 formal review initiated a pattern of College misrepresentation of student comments in teaching evaluations.

The preponderance of evidence makes it probable that the College violated the Faculty Handbook's provisions on fair and systematic evaluation.

The Board finds that misrepresentations in the flawed 2015 formal review were material to the outcome of the tenure case, because the College elected to emphasize the history of the case as a major rationale for its vote to deny tenure in fall 2018.

<u>Allegations Relating to the Evaluation of Teaching in the 2017 Formal Review</u>

In Section I.D of the appeal, the Appellant advances the allegation that "*the Provost and College failed to follow University and College Policies and Procedures with respect to the evaluation of Scholarship, Teaching and Service*."

2 (b, page 11 of the appeal) the Appellant charges that the evaluation of her teaching violated University and College policies and procedures.

<u>Additional Information Uncovered During Investigation</u>

Regarding the teaching allegation related to the 2017 formal review, the Board finds that a specific aspect of the Appellant's argumentation satisfies the criteria for a successful appeal.

The Appellant attributes College concerns about her teaching to her chosen methods of "challenging" the students in her courses. The College, on the other hand, characterizes particular, alleged incidents as "intimidating" to students, which would likely fall

outside of the University's policy describing "*challenging [students] to grow intellectually and morally*" as part of effective teaching [Faculty Handbook Section 3.4.2.1].

The Appellant also references a 2016 Faculty Council proposal to phase out the use of Student Evaluations in faculty personnel decisions. A detailed review of Faculty Council Minutes did not indicate that this resolution was ever passed or implemented.

The Appellant argues that the Dean's statement that "*at least one comment that referenced intimidating or dismissive behavior was seen in 55% of her course evaluations,*" citing a statistic that appeared in the Appellant's 2017 Formal Review, is incorrect and was used inappropriately.

In email correspondence between the Appellant and Hai Long Tran, Dr. Tran explained the 55% calculation in her 2017 Formal Review:

*Here is the full sentence: "In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." In the "Appendixes to Tenure and Promotion Review Statement," you used a different method of quantification with a different time frame. Therefore, if your findings were not consistent with the percentage in the personnel document, it doesn't mean that the number in the review report was incorrect. Anyway, this is not part of your T&P review and we just wanted to mention it here to clarify.)*

Email from Hai Long Tran to Lisa Calvente
Friday, November 02, 2018 12:22 PM

*"In the current review period, such sentiments were visible every quarter and mentioned explicitly and implicitly in more than 55 percent (5 out of 9) of Lisa's course evaluations." The sentence is self-explanatory. We followed the college T&P guideline and identified pertinent mentions in each course evaluation to see if they were recurring across course evaluations.*

Email from Hai Long Tran to Lisa Calvente
Monday, November 05, 2018 1:59 PM

In contrast, the College's promotion and tenure recommendation submitted to the Dean characterized a notably different atmosphere.

*References to an intimidating, harsh, uncomfortable atmosphere for students' ability to speak their mind was reduced to one isolated class among five sets of OTEs in the past year available for review. Both peer observers assessed Lisa's classroom environment to be open and safe. "It was instructive to witness how Dr. Calvente corrects students' misperceptions unambiguously while*

*maintaining an atmosphere of safety," Dr. Foster noted after her visit to Lisa's Spring 2018 Intercultural Communication class.*

> College of Communication Recommendation for Tenure and Promotion to Associate
> Professor
> November 16, 2018

Despite this 2018 observation, and despite Dr. Tran's claim that the 2017 Formal Review "*is not part of your T&P review*," the 55% statistic was cited in the Appellant's promotion and tenure recommendation letter written by the Dean to the University Board on Promotion and Tenure.

*In the 2017 formal review, the personnel committee claimed that at least one comment that referenced intimidating and dismissive behavior was seen in 55% of her course evaluations.*

> Letter from Alexandra Murphy to the University Board on Promotion and Tenure
> January 9, 2019

The Board questioned the Dean for specific information about this citation and statistic, and received the following response.

*I relied on the [2017 Formal Review] personnel committee's assessment of these comments. I asked the author of that report to provide the original analysis (attached to this response).*

> Email from Alexandra Murphy to the Board
> Tuesday, November 5, 2019 7:10 PM

The Board reviewed the relevant course evaluations, together with the analysis used in the 2017 Formal Review calculation, as provided by the College. Of 218 total comments in the evaluations of these nine courses, seven comments had been flagged in the 2017 Formal Review. These seven were spread across five of the Appellant's nine courses, and it was from this five and nine that the statistic "*more than 55 percent (5 out of 9)*" was obtained. Moreover, two of the seven comments did not express negativity on behalf of the respondent, but were instead written in a sort of hearsay or observational perspective about the experiences of others. The inclusion of these two comments in the analysis is open to question, since anyone directly impacted would have had their own opportunity to provide feedback about the course. Those two comments are included below, with emphasis added by the Board in bold.

**I personally do not feel this way***, but other students conveyed to me that they were often uncomfortable with Calvente's teaching style. One student remarked that the "looks" she would give in class were "revealing," and made some students uncomfortable to share. In addition, similar to a lot of students in this class, I do believe Dr. Calvente has a very firm set of ideals. I do*

*not think introduction of new material or theory would necessarily change them. Therefore, there was often a lot of heated tension that went unnoticed between some students and the professor. Perhaps a less "expressive" way of articulating what Dr. Calvente thought may have eased some of the tension.* **I however am only conveying opinions from other students.**

      *Fall 2016 CMNS 509/CMNS 308/HTHC 523: Topic in Intercultural Communication*

*The course is great but you certainly come on a little strong*. **I didn't mind it but it's possible some people didn't feel comfortable** *opening up because of it.*

      *Spring 2017 CMN 103: Intercultural Communication*

While reading through the 218 comments, the Board was struck by the preponderance of praise and appreciation for the Appellant and for the courses that she taught. These appeared in evaluations of all nine courses under consideration.

The 2017 Formal Review's selective reading of these course evaluations gives a misrepresentative characterization of the Appellant's teaching effectiveness, and does not account for the full range of qualitative comments that she received. Moreover, this is a crucial issue in the Appellant's tenure case because the statistic from that Review was cited in her promotion and tenure documentation.

The Board notes that the 2017 College Tenured Faculty Recommendation, resulting from a meeting held on November 17, 2017, called qualitative comments pertaining to students feeling 'intimidated' or 'uncomfortable' a 'major theme in her teaching' and cited the 55 percent statistic in support of this conclusion. This clearly indicates that undue weight was assigned to the flawed statistical conclusion. In addition, the report includes the following statement: "*For the faculty members who find such comments to be a major reason for non-renewal, there is a point at which the student responses reflect a problematic pattern that should have been addressed through forms of pedagogy that can invite students to critically examine a range of social injustices*." Crucially, this is the only specific reference to non-renewal in the 2017 College discussion.

The Board's Findings

The preponderance of evidence demonstrates that the College placed undue weight upon the flawed 2017 formal review in its tenure evaluation.

The board finds that misrepresentations in the flawed 2017 formal review were material to the outcome of the tenure case, because the College and Dean elected to emphasize

the history of the case as a major rationale for the College vote to deny tenure in fall 2018.

Appellant's Allegations Regarding Evaluation of Service

1 (c, page 14 appeal) alleges that the College violated university policy in the evaluation of her service.

Section 3.5.1.1 of the Faculty Handbook states: "*There are normally three levels of evaluation prior to the final decisions of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university*."

The Appellant states: "*The College, in its argument that my service was deficient in providing service to my unit in the College, violates University policy that states that in the absence of departmental or school structures the local academic unit is the College. Therefore, the assessment of my service as not meeting the requirements for "excellence" is not in accordance with University policy.*

*Furthermore, because it is always difficult to ascertain, assign, and weigh the value of Service, I have compared my record of service to the dossiers of colleagues in the College who have shared their information with me. Dr. Maria DeMoya, Dr. Sydney Dillard, and before his departure from the College, Dr. Lou Rutigliano, have consistently fared better in their rankings. During my reviews, I have been told to exercise more in-unit service; the University, however, makes no distinction between service in the College of Communication and Service in the College's specific units.*"

The Board's Investigation

The Board's conducted its own investigation and requested additional materials for review in addition to the items in the Appellant's original dossier and supporting documentation. To analyze the service expectations and contributions to the home unit and university, the Board questioned the Appellant, Dean Murphy and Provost Ghanem. The University Board Promotion and Tenure report dated May 10, 2019 provides only limited insights about its discussions of service.

"*In terms of service, some of the Board members shared the concerns of the faculty that a large portion of Dr. Calvente's service was outside her home unit. However, the Board agreed that Dr. Calvente's overall service contribution was sufficiently strong to meet the criteria for service in*"

the Faculty Handbook. The Board encourages Dr. Calvente to continue to build on her service record, in her home unit, as well as at the college and university levels." [UBPT Report p. 3]

The Board found the statement of the UBPT not quite precise as to the service contribution of the Appellant, so the Board decided to provide more extensive documentation and juxtaposed it with the Board's discussions of that evidence.

The material in both formal reviews that took place in 2015 and 2017 and an informal review from a letter of recommendation of Dr. Alexandra Murphy in 2016 provides support to the Board's finding that the Appellant received unclear guidelines about making progress towards tenure and promotion.


<u>2015 Formal Review and Board Discussion</u>

The following is a complete excerpt of the Service section of the College formal review dated March 7, 2015, with incorrect contract year noted [page 6] in the dossier of the Appellant:

*"During her second year review in 2013, the faculty evaluated Lisa's service contributions to be very good, marking her work on a one-year search committee, a college task force, and a university task force. Since her previous review, Lisa continues as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program. Lisa serves on the College Non-Tenure Track Review Board and the Local Review Board of the College of Communication. As part of the College wide symposium on violence in 2014, DePaul Talks, Lisa was one of the eight event leaders, and she organized one of the spotlight panel discussions, bringing together a panel of scholars and activists for one of the two evening programs. She works with the Office of Multicultural Student Success in the Men of Color Initiative for student retention and success, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/ Global and Transnational Programs.*

*She has successfully chaired a college thesis committee, and is currently working as chair of a second thesis. She has written three comprehensive exam questions (2 more currently), and has served as undergraduate senior thesis advisor on two student projects. She has served on the editorial board of Cultural Studies since 2012 and Text and Performance Quarterly since 2013. Lisa reviews for these journals and also reviews papers for her division in her national organization. In the personnel meeting, it was reiterated that she will need to obtain letters from committee chairs to describe and detail specific committee work for review processes, as per college policy.*

*The Personnel Committee agrees that her service is fair to good and that she is making fair to good progress toward tenure in this area, although two personnel committee members indicated she was not making satisfactory progress toward tenure in service.*

*Conclusion*
*Based on the Personnel Committee's unanimous evaluation that Lisa is not making progress toward tenure in teaching or research, we do not recommend retention and contract renewal."*

The Board discussed that in this document the Appellant's service is considered fair to good and that she is making fair to good progress towards tenure in the area of service. The service contribution appears to have been in good standing, since the recommendation of termination of the contract is based in teaching and research, and not on service.

The Board notes that there is no mention in this report that the Appellant should increase visibility in serving in the home unit. The report mentions that two personnel committee members indicated that the Appellant was not making satisfactory progress toward tenure in service, but there is no guidance about specific roles or committees which would provide constructive feedback to provide the Appellant a service path moving forward, to achieve tenure.

<u>2017 Formal Review and Board Discussion</u>

The following is a complete excerpt from the *Service* section of College's Recommendation of Continuation or Termination of Untenured Faculty Contract, dated November 2017, page 7 and 8:

*"In the previous review period, Lisa's contributions within the College of Communication were linked to her work as a member of the Contingent Faculty Review Board and the Local Review Board, an event leader of the symposium on violence, a thesis committee chair/undergraduate senior thesis advisor, and a comprehensive exam writer. At the university level, she served as an affiliate to the African Black Diaspora Studies Program and the Latino Studies Program and contributed to the Office of Multicultural Student Success in the Men of Color Initiative, as well as the Liberal Studies Council's Task Force on Personal Transformation and Responsibility/Global and Transnational Programs. In her service to the academy, Lisa reviewed manuscripts for 2 journals as part of their editorial board (Cultural Studies, Text and Performance Quarterly) and papers for her national organization's conferences. In the current review, Lisa continued several of her existing services and took on some others.*

At the college level, Lisa has joined the Term Faculty Review Committee since Spring 2015 (and has begun her actual service since the 2016-2017 academic year due to her research leave). Associate Dean Alexandra Murphy appreciated her valuable, hard work as well as her insights into the candidate's strengths and areas for improvement. She continued her role as part of the Local Review Board until Fall 2016, when this service was terminated due to new IRB procedures. Under this service, Lisa reviewed 2 IRB applications. Since 2015, she has chaired 2 graduate thesis and project committees, advised a master's project, and administered comprehensive exam questions. In Fall 2016, Lisa volunteered to help Dr. Lucy Lu in reviewing the syllabi for CMN 103 that non-tenure/tenure track faculty used for Intercultural Communication to ensure quality control. She also participated in some faculty searches and attended the graduation foundation course, college meetings and other events, such as award ceremonies and alumni receptions.

At the university level, Lisa has collaborated actively across programs at DePaul. She has both expertise and passion for interdisciplinary work across colleges. Lisa has been an affiliated faculty of the African and Black Diaspora Studies Program (ABD) since 2012 and a member of the ADB Advisory Committee since 2015. According to ADB Program Director, Amor Kohli, she has served actively and thoughtfully and been invested in the broader culture and activity of ABD. Since 2016, Lisa has become an affiliate to the Critical Ethnic Studies MA program (CES) in the College of Liberal Arts and Social Sciences. CES Director Laura Kina expressed her appreciation for Lisa's commitment as an invaluable member, who has impacted CES students in a number of ways. Lisa has continued her existing role as an affiliate to the Latino Studies Program (LALS) and has been part of Liberal Studies Council Survey Review Subcommittee, which (according to Director of Liberal Studies John Shanahan) drafted recommendations based on the General Education Task Force report and feedback from colleges in spring 2017. LALS Chair, Lourdes Torres, acknowledged Lisa's contributions over the past 5 years, including her participation in a tenure-track hire in the past year. In addition, Lisa has reached out to the Women and Gender Studies Graduate Program to offer her service in mentoring their students.

Lisa's service record extends to the academy and the community. As part of the editorial board of 2 journals (Text & Performance Quarterly and Cultural Studies), she has reviewed approximately one manuscript per year for each journal. In 2016, Lisa reviewed the 7th edition of James Neuliep's Intercultural communication: A contextual approach (Sage). She has also been active at conferences as a paper reviewer, panelist, respondent/discussant, and a member of the Welcome Team. Lisa's community service includes her commitment to the Chicago Alliance against Racist and Political Repression (CAARPR), where she has also created community-based service learning for her students. In addition, Lisa has volunteered at the Juvenile Justice Program to help troubled youths at the Organization for the North East (ONE) community center.

At the interview, Lisa spoke of her willingness to take on committee work and her decision to engage in cross-college outreach efforts as part of the Vincentian mission. While we commend Lisa's dedicated service, there is room for improvement. The Personnel Committee emphasized to Lisa the need to take a more visible and significant role within her unit and at the college. **Her service record at this advanced stage of her probationary period remains quite modest, considering the typical load for her peers.** [bold emphasis is this Board's]

At the university level, there are several opportunities where Lisa could make even greater impacts by serving on university teams, committees, or task forces. The documentation of her service, as well as the construction of her vita and personal statement, would benefit from a clearer organization. According to the college's tenure and promotion guidelines, candidates use the AAUP's format for the c.v. to maintain college uniformity. The committee suggests Lisa attend tenure review workshops, which will continue to reinforce expectations and best practices in drafting personal statements, and preparing and organizing review and promotion materials.

**In sum, the Personnel Committee finds that Lisa's service record to be very good over this review period, and she is making fair progress toward tenure in the area of service.**" [bold emphasis is the Board's]

In this same report, the tenured faculty recommendation regarding the Appellant's service is the following: [p.12]

"The majority of the tenured faculty found Lisa's progress toward tenure in the area of service **unsatisfactory**. [Emphasis in the document] Voting members recounted instances where service contributions listed in Lisa's document do not reflect substantial accomplishments. In addition, Lisa has been noticeably absent as a college representative at several required, university-wide events such as graduation and convocation. The tenured faculty endorsed the Personnel Committee's assessment that her service record at this advanced stage of her probationary period was inadequate as compared with the typical load for her peers. It was emphasized at the discussion that, according to the College Tenure and Promotion Criteria, faculty members who apply for tenure and promotion to associate professor should have their service focused primarily in their track/program and in the college. If Lisa is retained, the tenured faculty would need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level. Greater volunteering for university committee service is recommended. Such changes should occur before she applies to the tenured faculty of the college for a tenure recommendation at DePaul."

The Board discussed the fact that there is inconsistency and a lack of guidelines provided to the Appellant in this report. For example, the Personal Committee mentions that the Appellant's service record was very good over this review period and adds that the

Appellant is making fair progress towards tenure in the areas of service. Additionally, the College Recommendation and Rationale section in page 1 of the same report states: *"Lisa's service record to be **very good** over this review period and she is making fair progress toward tenure in the area of service."* Nevertheless, the tenured faculty assessment is unsatisfactory regarding progress towards service. The Board finds that there is not a clear elucidation of how in page 1, 7 and 8 the Appellant's review is very good but in page 12 becomes unsatisfactory. One member of the Board noted that this often occurs in local unit personnel deliberations, but noted a problem of incongruity between inconsistencies in this document and then-Dean Ghanem's recommendation to the appellant. In a letter dated December 13, 2017 regarding 2017 formal review, then-Dean Ghanem wrote: *"In order to be considered for promotion and tenure in the College of Communication, I stress that you follow all the recommendations of both the Personnel Committee and the tenured faculty outlined in the formal review document dated November 17, 2017 regarding teaching, research and service."*

The Board discussed guidance by senior colleagues, as demonstrated in documentation provided by the Appellant, with members unable to clearly determine what is weighted more or less or what is considered as 'meaningful' for local unit level service. The insertion of attending graduation and convocation into the document was also discussed with some members finding it strange that the tenured faculty mention those alongside time-intensive Personnel Committee work. To some members of the Board this insertion seemed to be a pretextual, insertion into the record of a minor example of the Appellant's alleged non-compliance with the Faculty Handbook.

The Board noted that in this second formal review, the Appellant is recommended to concentrate her efforts in service at the local-home unit level according to the College Tenure and Promotion Criteria. Surprisingly to some on the Board, the Appellant is simultaneously recommended to expand her service record at the university level where the Appellant could have greater impacts by serving on university teams. On this point the senior colleagues also recommended greater volunteering for university committees. The report mentions in two places in the excerpts quoted *"the typical load of her peers."* This provides expectations that the Appellant is compared to an optimal or typical level of service rather than College Criteria. The Board does not find this argument compelling for a Personnel Committee assessment. The formal review should have noted exactly what is missing in the Appellant's service dossier, rather than vaguely refer to a typical load.

<u>Documents Created by the Dean and Board Discussion</u>

The Board engaged in discussion of what some members considered the contradictory and inconsistent documentation presented to the Board: a letter the Dean documenting service, dated August 14, 2016 which starkly differs from the recommendation she wrote as Dean, as discussed below.

This is an extract from the 2016 letter:

*"I want to thank you for the service that you have provided over the past several year within the College of Communication and for DePaul University. Since your hire in Fall of 2011, you have contributed to the service life of the college in a number of ways. During your first year, you participated in the Graduate Program Task Force to brainstorm ideas for the first-year seminar. This initial work evolved into the creation of the Foundations in Graduate Studies course, a new required course for all Communication and Media Studies students. You spoke with the students as a guest speaker within this course in Fall of 2014. You were an event leader for our College's Symposium entitled, "Making Meaning of Violence." For this event, you created a panel on race, violence, and activism and facilitated a fascinating roundtable session with senior scholars and activists who specialize on issues of social justice, youth activism and violence.*

*The following year, when I was serving as your program chair, I needed to find someone to serve on the Liberal Studies Council task force on Personal Transformation and Responsibility and Global and Transnational Programs. I thought you were a perfect fit and was very happy you took on this role. You also served on the College level Local Review Board for two year where you reviewed applications for Institutional Review Board approval for research from College of Communication faculty.*

*You have stepped up to aid the college in a number of ways involving personnel including serving on a faculty search committee for a term faculty member in intercultural communication in Spring 2012 and a junior faculty representative on the personnel committee for two formal reviews in January 2014. The personnel committee is a time-intensive committee that requires a detailed read of candidate materials, participating in meetings, and crafting and reviewing recommendation letters. Most recently, in terms of personnel, you have been a member of the Term Faculty Review Committee from (appointed in Spring 2015, but due to research leave, active member from Fall 2016 to present). Again, this is a very time-intensive committee that involves peer reviews of all term faculty.*

*Again, thank you for the valuable contributions you have provided in terms of service for the past several years as an assistant professor."*

The Board discussed the tenor of this letter, which is thankful for the Appellant's involvement at both the Department and College, home academic unit level, and praises the Appellant's work on a time-intensive committee like a Personnel Committee. The Board questioned the Dean about this and compared the responses provided by the Dean to the two earlier documents.

In her letter to the UBPT, dated January 9, 2019, the Dean seems in certain places to be contradicting the 2016 informal assessment and rationalizing after the fact the decision of colleagues. This is an excerpt of that recommendation:

*"In the area of service, Dr. Calvente is also ranked as "very good" by her peers. Dr. Calvente has participated in service obligations at the program, college, and university levels. Most of the service that Dr. Calvente has provided at the program and college levels has been in ad hoc, short-term capacities. For example, she helped review syllabi for CMN 103, helped solicit feedback from college advisors on proposed curricular "pathways" for communication studies, and has been a representative at student open houses and presented student awards. Also, of note is her participation on a term faculty hiring committee and her work advising students in the Latino Media and Communication program. Dr. Calvente also lists other smaller activities such as guest speaking in the graduate foundations course and participating in various meetings as service. The one substantive committee that Dr. Calvente has served on in the College of Communication is the Term Faculty Review Committee. The committee reviews term faculty on a two-year rotation including peer observations and writing and editing documents. Dr. Calvente has been an active and valuable member of this committee for the past two years. To receive an "excellent" rating in service at the time of tenure of promotion, would require that Dr. Calvente would have participated on more of these kinds of substantive committees in the College of Communication during her probationary period.*

*Dr. Calvente has provided other college-level service outside of the College of Communication where she has served as an affiliate faculty member for several different programs in the College of Liberal Arts and Social Sciences including the African and Black Diaspora Studies Program, the Latino Studies Program (where she also served on a tenure-track hiring committee), and the Critical Ethnic Studies MA program. She is a member of the Women's Center Advisory Board. Her service in these areas is described as conscientious, invaluable, and collaborative. Dr. Calvente has started building a record of service at the university level. In the past year, she has been a member of the General Education Task Force Report Review, the Council on Community Engagement, and participated in the WPI Project-Based Learning workshop.*

*The College of Communication is a small college that must spread service obligations across a fewer number of tenure-track faculty than many other colleges. Therefore, in the College of Communication, candidates ranked as "excellent" in service have provided much more ongoing,*

*substantial committee work, particularly within the College of Communication and at the university level where we have requirements for representation on a number of committees. The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review. This is not to say that the service contributions provided by Dr. Calvente have not been valuable; she is aptly rated as "very good."*

The Board discussed contradictory and imprecise statements in this part of the letter. Dean Murphy mentions that the Appellant was advised to significantly increase her service to the College in more 'meaningful' ways in each prior formal review. A careful review of the 2015 formal review shows that there is no recommendation about **'meaningful'** service. In fact, the report mentions that the Appellant is making a good contribution towards tenure in the area of services. The Board concurs that such statements occur in the 2017 review.

The Board discussed whether the Appellant was informed in any of the 2015 and 2017 formal reviews what is 'relevant' or 'substantial' or 'meaningful' committee work. The Board could not determine from any of the documentation provided in the original dossier, investigation and supporting documentation regarding what is defined to be meaningful or less meaningful committee work. The Appellant was never guided as to which were the committees she should be participating in order to achieve tenure.

More concerning is the informal review assessment from Murphy in March 2016 praising the Appellant's substantive and time-intensive Personnel Committee work, which sent the signal that expectations were being met.

In its investigation, the Board questioned the Appellant, Dr. Lisa Calvente, Dean Murphy and Provost Ghanem regarding the service contributions. The Board requested that the Appellant provide additional documentation referred to in a letter to Isabel Diaz dated November 29, 2018.

In that letter the Appellant stated on page 8:

*"Personnel has specifically pointed out that my in-unit service is lacking; however, I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition. I can provide email documentation to that effect."*

The appellant provided that documentation. The Board also requested any additional evidence that could substantiate the following statement that appeared in the November 29, 2018 letter:

"*I often volunteer for in-unit service obligations where I am either not chosen to serve by my senior colleagues, or else the project for which I volunteered has not come into fruition.*"

The Board received the following additional documentation from the Appellant:

- Email between Dr. Willard, Dr. Baglia, and the Appellant for the cancelled search
- Email between Dr. Willard and the appellant to volunteer for search committee
- Email between Dr. Lu, Dr. Willard and the appellant
- Standard for Chair election process sent by Acting Dean Murphy, Monday, October 21, 2019
- Email from Acting Dean Murphy

From the analysis of this additional documentation the Board concludes that:

1. The Appellant has volunteered for in-unit service that has been available to her. An example of this statement is that the Appellant volunteered to help Dr. Lucy Lu, in being the course-keeper for the core course of their unit.

2. The Appellant served on committees that were suggested by the Dean Murphy when she was the Chair of the Department. These committees are highlighted in the the 2016 general service letter.

3. The Appellant volunteered to participate as member of a faculty search committee in the Fall of 2014, which was cancelled due to the lack of a line for the appellant's unit.

4. In academic year 2016-2017, the Appellant volunteered to participate in a Faculty Search Committee in the Fall of 2016, but the Chair at time, Dr. Willard did not choose the appellant.

The Board also discussed whether the Appellant received enough opportunities during her probationary period to increase her in-unit service exposure. The discussion emphasized that the Board's investigation uncovered additional evidence which suggests that the Appellant volunteered for additional in-unit services but was not selected.

The Board also questioned the Dean about the Appellant's service activities. The Dean explained this particular case to the Board.

**Board question:** Would it be correct to state that on more than one occasion Dr. Calvente volunteered for in-unit service obligations but was not chosen to serve by senior colleagues?

**Dean's response:** *"I am only aware of one occasion when Dr. Calvente reached out to her program chair, Daniel Makagon to volunteer for college and university committee assignments in the 2017. She sent her request after the call for committees had been out for **a while** [Board's emphasis in bold] and the college level committees had already been filled. Dr. Makagon suggested she contact the faculty council representative on the committee on committees to see if there were any remaining openings."*

The Dean did not provide any College documentation to show that the Appellant refused to participate in any service assignment recommended or requested of her by the unit.

After comparing the service records of faculty from the past 10 years in the College who were rated as "excellent," the Board cannot find any clear and compelling substantive delineation of "meaningful" and "relevant" service. If a faculty member is expected to participate in a specific standing College committee (e.g. curriculum, assessment, program review, summer research committee.) during the probationary period, it should clearly be communicated in the formal reviews.

The Board also questioned the Dean about guidance to the Appellant in terms of her progress towards promotion and tenure under service:

**Board question:** Your recommendation to the UBPT dated January 9, 2019 states: "The need to significantly increase her service to the College in more meaningful ways was communicated to Dr. Calvente in each prior formal review." What did you mean precisely by "more meaningful ways"? Were specific assignments ever proposed?

**Dean's response:** *"The personnel committee and the tenured faculty consistently recommended in prior formal reviews that Dr. Calvente increase her service contributions. While there may be many lines under service on the vita, the personnel committee and the tenured faculty recognized that much of what is listed are smaller, ad hoc presentations in classes or attending the annual award brunch and presenting a student with an award (expectations for all our faculty). In another example, the Security Concerns Group listed on Dr. Calvente's CV consisted of one meeting when interested faculty were invited to come discuss security concerns in the building. Looking at her CV at the time of her 2018 tenure and promotion review, under the heading of College of Communication, the only substantive committee on which she served is the Non-Tenure Track Review Committee (now called the Term Faculty Review Committee)."*

The Dean uses the word "consistently," but the 2015 formal review does not consistently recommend that the Appellant increase her service contributions. The Board also finds contradicting evidence by unequally weighting services in an ad-hoc or unsystematic way.

The Board sought to understand why the Dean commended the Appellant's services to the unit and College in August 2016, not expressing concerns she may have had and would express in early 2019.

**Board question:** Why did not you express those same concerns in the letter you wrote in August 2016 commending Dr. Calvente's services to the unit and college?

**Dean's response: "***Dr. Calvente asked me to write a letter of support that detailed the service that she had done up to that point. I did not see my role at that time to position this service against that of her peers. As I note in my tenure recommendation, I appreciate the work that she has done. But, in context and in comparison, with what is typical across the college, and given the consistent feedback she was given in formal reviews, I agreed it was not enough to be rated as "excellent" in service.*"

The Board discussed this response. Some members found this response insufficient for understanding the reasons why Dr. Alexandra Murphy provided two diverging assessments in different documents. One Board member found that the statement "*I did not see my role at that time to position this service against that of her peers.*" creates false expectations. Another Board member emphasized the different purposes of the two documents and differing guidelines about expectations for them in the Faculty Handbook. The Board discussed the possible reasons for not positioning the appellant's service against that of her peers at that time when Dr. Murphy was commending the appellant.

One Board member concluded that Dr. Murphy did not give precise signals in her 2016 letter and should have raised the issues she raised in the 2019 letter. Another Board member found that the 2016 letter conformed to what that member would expect from a letter documenting service rather than a recommendation evaluating service.

Overall, the Board is uncertain as to whether the home academic unit provided enough support for the Appellant to excel in the area of service at the home level. Given the other problems with the local unit formal reviews discussed in other sections, the Appellant's pursuit of opportunities outside the College which would result in letters from individuals who had not voted against her case seems justified.

The Board determined that the Appellant received inconsistent guidance in informal reviews

The Board's Findings

The Board finds that the Appellant's service was unfairly evaluated at multiple points during her probationary period and that procedural deviations were material to the final decision to deny tenure and promotion to the Associate Professor rank on the grounds of 'unsatisfactory' service to both the home academic unit and university.

The Board finds that there were considerable and material deviations from procedures by the home unit (i.e., the College of Communication) in failing to provide the Appellant with clear and consistent guidance regarding service in formal reviews as mandated in the Faculty Handbook Section 3.3.1.

The preponderance of evidence supports the claim that the Appellant did volunteer for additional service assignments in the College, but that these substantive service assignments did not materialize due to factors beyond her control, as outlined in points 1-4 above.

**Ground for Appeal III. Discriminatory Practice/Retaliation**

Discrimination/Retaliation

Because the appeal links reporting and contacts with Isabel Diaz of the EEO office to claims of retaliation, the Board requested that a different member of HR staff be assigned to review claims of discrimination and retaliation.  Starting on September 16, 2019, the board engaged in ongoing consultations with Dr. Stephanie Smith, Vice President for HR, about the appeal as required by Faculty Handbook Section 5.1.1.1.  The results of Dr. Smith's investigation – it discovered nothing material that supports claims of discrimination or retaliation – were communicated to the Board on December 19, 2019.

Appellant's Allegations Regarding Discrimination

In section three of the appeal the Appellant advances two major allegations regarding

discrimination.

1 (A, Page 12, 17 in the appeal) the Appellant alleges that College personnel documentation contains 'racially insensitive caricatures and stereotypes.'

2 (page 17) the Appellant alleges a pattern of discriminatory practices in the evaluation of her teaching that violates federal policies regarding non-discrimination against members of protected classes.

The Board's Findings

Regarding allegation one, the Board finds that the College did not include racially insensitive caricatures and stereotypes in personnel documentation.  The Board notes that the appeal did not provide any specific references to racially insensitive terms, caricatures, or stereotypes.  The Board's careful review of College personnel documentation and student evaluations did not uncover any statements that would substantiate a claim of racial discrimination.

Regarding allegation two, the Board finds that allegations that the College violated federal policies regarding non-discrimination could not be substantiated.  The appeal did not provide specific information, evidence or statements to substantiate the claim of discrimination on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability or genetic information.

Appellant's Allegations Regarding Retaliation by Provost.

In section three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the Provost engaged in retaliation against her for filing EEO claims against the College.

The Appellant states on page 17 "*In Section I.B.a., I enumerate the University violations that also constitute retaliatory acts, including by Interest [sic] Provost Dr. Salam Ghanem. These acts should be investigated as retaliatory and therefore discriminatory practices*."

The Appellant makes her own contacts with DePaul EEO officials key to the claim of retaliation, writing on pages 5-6:

"By the time I submitted my tenure application to the College, however, then-Dean Ghanem had become aware that I had asked that the Office of Institutional Diversity and Equity (OIED) investigate my claims against the College, and specifically members of the Personnel Committee, of violating DePaul University's Anti-Discrimination and Anti-Harassment Policy and Procedures. In November of 2018, I wrote a letter detailing the retaliatory actions against me by the College and members of the senior faculty (attached). I also reported these retaliatory practices to the Equal Employment Opportunity Commission (EEOC), and I have since met with the EEOC.

I submitted my application for tenure and promotion after Dr. Ghanem had overturned the previous contract nonrenewal recommendations of the College. By the time I submitted my tenure and promotion application, I had also reached out to various non-tenured members of the faculty in the College, as well as reached out and met with several members of the tenured University faculty, in order to discuss my path towards tenure and to compare our respective dossiers. Dr. Ghanem was aware that these meetings were taking place. Not only did I never lie about these occurrences, I openly discussed my experiences in the College and looked to Dr. Ghanem as the Dean of the College to help address these growing concerns. These discussions also included other, tenure-track, junior women of color faculty from the College, who shared similar experiences as my own and similar concerns around the manner in which the College evaluated faculty of color in formal and informal reviews. These included Dr. Maria DeMoya and Dr. Sydney Dillard. I should also note the Diversity Advocate of the College's, Dr. Maria DeMoya, has substantiated my concerns formally.

During one particular meeting with Dr. Ghanem to discuss my tenure dossier and the conflict that surrounded my case in the College (which took place after then-Dean Ghanem had overturned the recommendation for contract nonrenewal from the College but before I filed my application for tenure), Dr. Ghanmen commented on Dr. Vincent Cicchirillo's contract nonrenewal decision by the College. Dr. Ghanem implied that I was responsible for rumors circulating in the University that suggested that Dr. Cicchirillo had been terminated in order that Dean Ghanem would have just cause for later terminating women faculty of color. I admitted to Dr. Ghanem that I had written in support of Vincent Cicchirillo's appeals case, and I verbally disclosed the content of my letter."

In view of the serious nature of this allegation, the Board in coordination with Dr. Smith investigated these claims by questioning the Provost and other witnesses. It also closely examined extensive documentation related to EEO claims, including the Appellant's email communications with the Employee Engagement and EEO Unit, with Dr. Ghanem, and the Appellant's letter to the Board regarding Dr. Cichirrillo's appeal.

The Board's Findings.

The Board's investigation did not substantiate the claim that the Provost engaged in retaliation against the appellant for filing EEO claims against the College.

The Board's investigation also uncovered several imprecise or misleading statements on pages 5-6 of the appeal cited above.

The Board finds that the Appellant's allegations were never "substantiated formally" by Dr. Maria DeMoya, Diversity Advocate for the College of Communication.

The Board finds that the Appellant never followed up with a request for additional information from Isabel Diaz and that the case was closed in early 2019 due to the Appellant's failure to respond to EEO requests.

The Board finds that the Appellant's characterizations of her meetings with Dr. Ghanem in the appeal document cannot be substantiated by the recollections of Dr. Ghanem or the Appellant's EEO correspondence in the days/weeks after the meeting which took place on October 10, 2018.

The Board finds that phrases such as "Dean Ghanem had become aware" and "Dr. Ghanem was aware" are not fully consistent with the facts contained in the email correspondence between the Appellant and Dr. Ghanem, and the Appellant and Barbara Schaffer. The preponderance of evidence demonstrates that then-Dean Ghanem acted appropriately in referring the Appellant's concerns to appropriate university officials.


Allegations of Retaliation by the College of Communication

In sections three of the appeal, the Appellant alleges (page 17 with reference to matters introduced and discussed on pages 5-6) that the College took no action to address retaliatory actions reported to Isabel Diaz.

On page 6, the Appellant states: "*These reviews by the College, since 2015, have included members of the Personnel Committee that OIDE investigated for violating University policies with respect to discriminatory practices. I later reported retaliatory actions by my senior colleagues in the College to Isabel Diaz, currently the Director of Employment Engagement and Equal Opportunity at DePaul. In the College, no actions were taken to address this situation.*"

## The Board's Finding

The Board finds that the preponderance of evidence does not substantiate the Appellant's claim.

# Exhibit C

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
 5   LISA CALVENTE,            )
 6        Plaintiff,           )
 7   vs.                       )  No. 1:20-CV-03366
 8   SALMA GHANEM and DEPAUL   )
 9   UNIVERSITY,               )
10        Defendants.          )
11
12
13        The deposition of LISA CALVENTE, called
14   for examination pursuant to the Rules of Civil
15   Procedure for the United States District Courts
16   pertaining to the taking of depositions via Zoom
17   videoconference, on the 19th day of February,
18   2021, at the hour of 9:18 a.m.
19
20
21
22
23   Reported by:  BRENDA K. DUFEK, CSR
24   License No.:  084-003969
```

**Page 2**

```
 1   APPEARANCES:
 2        LAW OFFICES OF FITZGERALD T. BRAMWELL
 3        BY:  MR. FITZGERALD T. BRAMWELL
 4        225 West Washington Street, Suite 2200
 5        Chicago, Illinois  60606
 6        (312) 924-2884
 7        bramwell@fitzgeraldbramwell.com
 8             On behalf of the Plaintiff;
 9
10        COZEN O'CONNOR
11        BY:  MS. ANNELIESE WERMUTH
12             MS. NANDINI SANE
13        123 North Wacker Drive, Suite 1800
14        Chicago, Illinois  60606
15        (312) 382-3100
16        awermuth@cozen.com
17             On behalf of the Defendants.
18
19
20   ALSO PRESENT:
21        Kathryn Stieber
22        Salma Ghanem
23        Alexandra Murphy
24
```

**Page 3**

```
 1                  I N D E X
 2   WITNESS                            EXAMINATION
 3   LISA CALVENTE
 4     By Ms. Wermuth                        5
 5
 6
 7
 8
 9
                  E X H I B I T S
10   NUMBER                        MARKED FOR ID
     Exhibit No. 1                      10
11   Exhibit No. 10                     25
     Exhibit No. 11                     27
12   Exhibit No. 33                     34
     Exhibit No. 94                     42
13   Exhibit No. 5                      44
     Exhibit No. 143                    55
14   Exhibit No. 153A                   62
     Exhibit No. 210                    65
15   Exhibit No. 141                    68
     Exhibit No. 19                     71
16   Exhibit No. 115                    76
     Exhibit No. 186A                   79
17   Exhibit No. 175                    89
     Exhibit No. 4                     116
18   Exhibit No. 185                   120
     Exhibit No. 193                   121
19   Exhibit No. 196                   126
20
21
22
23
24
```

**Page 4**

```
 1        THE REPORTER:  This deposition is being taken
 2   by means of videoconferencing.  The attorneys
 3   participating in this deposition acknowledge
 4   that I am not physically present in the
 5   deposition and the oath will be administered
 6   remotely.  The parties and their counsel consent
 7   to this arrangement and waive any objections to
 8   this manner of reporting.
 9        Will all counsel present please state
10   your name and indicate your agreement on the
11   record.
12        MR. BRAMWELL:  Fitzgerald Bramwell,
13   B-R-A-M-W-E-L-L, confirm.
14        MS. WERMUTH:  Anneliese Wermuth,
15   W-E-R-M-U-T-H, I agree.
16             (Witness sworn.)
17        MR. BRAMWELL:  Before we begin, I just have
18   an objection for the record to Alexandra Murphy
19   participating in this deposition -- or sitting
20   in on this deposition.  She's a witness, and I
21   believe the rule of separation should apply.
22        MS. WERMUTH:  Okay.  And if you want to send
23   me some citation to the rule of separation, I'd
24   be happy to take a look at that at some point
```

Lisa Calvente 02/19/2021

Lisa Calvente 02/19/2021

1  today.
2          LISA CALVENTE,
3  called as a witness herein, having been first
4  duly sworn, was examined and testified as follows:
5          DIRECT EXAMINATION
6  BY MS. WERMUTH:
7      Q.  Dr. Calvente, is there anything that
8  would prevent you from testifying truthfully or
9  accurately today?
10     A.  No.
11     Q.  Okay.  I'm just going to do a couple of
12 quick rules because I know we have a long day
13 ahead of us and already we're facing our
14 difficulties today.  So very quickly, if at any
15 point in time you need a break, let me know, and
16 I will try to accommodate you as best as I can.
17 If at any point in time you don't understand one
18 of my questions and I don't proclaim to be a
19 model of clarity, let me know, and I will do my
20 best to clarify the question for you.
21         Also, I think you've heard this by now
22 in the couple of depositions that you sat in,
23 it's important for us to not talk over one
24 another.  I will do my best to allow you to

5

1  should we just use those index numbers as
2  exhibit numbers or should we mark them as they
3  come in in sequential order.  I'm just worried
4  if we have an index number and a separate
5  exhibit number, we're going to be confused
6  during the day.  Do you have a preference?
7          (whereupon, a discussion was had
8          off the record.)
9  BY MS. WERMUTH:
10     Q.  All right.  So with that said,
11 Dr. Calvente, I have sent to you what has been
12 marked as index number one.  Have you received
13 that document?
14     A.  Yes, I have received that.
15     Q.  So I would like to -- this is -- can
16 you identify this document?
17     A.  Yes, it is the case complaint.
18     Q.  Right, it's the complaint that you
19 filed --
20     A.  Yes.
21     Q.  -- in connection with this matter,
22 correct?
23     A.  Yes.
24     Q.  Thank you.

7

1  finish your answers.  If for some reason you
2  haven't finished because you paused, which I do
3  all the time, let me know.  I'd rather you
4  finish your answer than not.  Okay.  Likewise, I
5  will hope that you will also allow me to finish
6  my answers -- or my questions, excuse me.  Like
7  I said, I pause sometimes so there are going to
8  be times when we talk over each other.  Believe
9  me, the court reporter will let us know that she
10 can't take a good record if we're doing that.
11 So hopefully there will be times during the day
12 where I'm sure we'll do it.  Hopefully it will
13 be minimal.  Okay?
14     A.  Yes.
15     Q.  Great.
16     MS. WERMUTH:  So let me ask you this, I'm
17 going to ask you to look at -- let me say this
18 at the beginning of the record too.  I have sent
19 or tried to send at least to your lawyer I sent
20 a file of documents that I might use in this
21 deposition.  Those documents are indexed
22 according to an internal indexing system that my
23 paralegal set up for me.  So I am asking a
24 little bit too of the court reporter here,

8

1          And you reviewed this complaint before
2  it was filed to make sure it was accurate?
3      A.  Yes.
4      Q.  Okay.  I would like to direct your
5  attention to page 9, Count I.  I just want to
6  make sure I understand the nature of the claims
7  you are asserting.  Okay.  So as I understand
8  it, in Count I and Count II, you are alleging
9  that DePaul University and Dr. Ghanem retaliated
10 against you by denying your application for
11 promotion and tenure and terminating you.  Do I
12 understand those counts correctly?
13     MR. BRAMWELL:  I'm just going to object on
14 best evidence grounds.
15         Go ahead.
16     THE WITNESS:  I'm sorry.  Can you repeat
17 that?
18 BY MS. WERMUTH:
19     Q.  So in Count I, you are alleged that
20 DePaul University and Dr. Ghanem retaliated
21 against you by denying your application for
22 tenure and promotion and terminating your
23 employment?
24     A.  Yes.

8

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052
McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

5..8

Lisa Calvente 02/19/2021

1  things can be worked out, just apply and let's
2  see how it goes, so I did.
3      Q.   Dusty Goltz encouraged you to apply for
4  the position?
5      A.   Yes.
6      Q.   And the two of you were familiar with
7  one another at that point in time?
8      A.   Yes.
9      Q.   So you were -- had some familiarity
10  with his area of specialty?
11      A.   We shared the same umbrella
12  concentration performance at the time when I met
13  with -- I met him in graduate school at this,
14  like, performance conference at Northwestern.
15  He was doing -- he said he was doing performance
16  and cultural studies, same as me.
17      Q.   Okay.  So you -- he had some
18  familiarity with your area of expertise as well
19  then?
20      A.   Two of them.
21      Q.   Okay.  With your areas of expertise?
22      A.   Yes.
23      Q.   Okay.  And so he encouraged you to
24  apply?

21

1  don't remember how many people came, but it was
2  definitely not that many people.  It's probably
3  maybe a fourth of the college, if that.  At the
4  time, they were recording everything.  So, you
5  know, you had the option to go in person or
6  watch the recordings.
7      Q.   Was Dusty Goltz there in person for
8  your job talk, do you recall?
9      A.   Yes.
10      Q.   And during that job talk was Hai Tran
11  or Tron there in person?
12      A.   I do not believe he was there, but,
13  again, I don't remember.
14      Q.   Okay.  And in your job talk, you spent
15  time discussing your areas of expertise in
16  research and scholarship?
17      A.   I did more traditional formats, so I
18  gave them a theoretical framework of my research
19  trajectory, and then I centered on the specifics
20  of my research.  So ethnographic work based on
21  race, racism, and coloniality.
22      Q.   So there was no confusion about your
23  research area?
24      A.   Absolutely not.

23

1      A.   Yes.
2      Q.   And so you did?
3      A.   Yes.
4      Q.   And when you applied, I assume you had
5  to give like a job talk or some sort of
6  presentation to a search committee or group
7  of --
8      A.   Yes, because DePaul is a teaching
9  university I was required to do not only a job
10  talk but also teaching session.  So I did a
11  performance teaching workshop, both of which
12  centered on the black diaspora race and racism.
13      Q.   And who participated from DePaul in the
14  job talk?
15      A.   Well, there was the search committee,
16  so I met Dr. Murphy.  I actually don't remember
17  if she was on the search committee or I met with
18  her because she was the chair of -- the director
19  of the communication concentration, but I met
20  with Kimberly Perez, and I met with Dustin
21  Goltz.  So that was basically the one-on-one
22  meeting.  I also met with Bruno Teboul, Barbara
23  Spiker.  So those were the two people I met on a
24  one-on-one basis.  And then in my job talk -- I

22

1      Q.   Okay.  And you were then offered the
2  job on a tenure track basis; is that right?
3      A.   Yes.
4      Q.   So to Dusty's earlier point that
5  something could potentially be worked out, there
6  was enough enthusiasm among the faculty to bring
7  you on in a tenure track basis?
8      A.   Yes.  I forgot to mention that I met
9  with Jean Taylor, and I informed her that, you
10  know, I wasn't interested in a one year, yes.
11      Q.   Okay.  Do you have any of the documents
12  yet that my paralegal sent to you?
13      A.   Yes, I believe I received batch one and
14  batch two.
15      Q.   That's good.
16           Can you -- looks like there is a batch
17  three that came through.  You don't have that
18  yet?
19      A.   I have batch one, batch two, and batch
20  three.
21      Q.   Okay.
22      A.   Yes.
23      Q.   In our next break, I will confirm that
24  those are the only batches.  Can you take a

24



**Page 89**

1   MR. BRAMWELL:  Objection, calls for
2   speculation.
3       THE WITNESS:  Yes.
4   BY MS. WERMUTH:
5       Q.  ████████████████████████
    ████████████████████
    ████████████████████████
    ████████████████████████
10                  (whereupon, Deposition Exhibit
11                  No. 175 was marked for
12                  identification.)
13  BY MS. WERMUTH:
14      Q.  And can you look at Exhibit 175, which
15  I guess is in batch nine.
16      A.  Yes, I have it.
17  ████████████████████████
    ████████████████████
    ████████████████████████
    ████████████████████
23      MR. BRAMWELL:  Objection, best evidence.
24      THE WITNESS:  Yes.

**Page 91**

1   else was receiving.
2       Q.  So my question is, with respect to the
3   link not being sent, what leads you to believe
4   that Lexa purposefully did that as a means for
5   retaliating against you?
6       MR. BRAMWELL:  Objection, asked and answered.
7   BY MS. WERMUTH:
8       Q.  You can answer.
9       A.  So when I received -- when I provided
10  Lexa, Dr. Murphy, with my dossier to be sent to
11  the external reviewers -- and this was prior to
12  my actual dossier for a tenure, there was
13  already to me a sign that Lexa was
14  discriminating against me as opposed to other
15  people that have gone up to -- for tenure.  So
16  an example of that would be my reviews, my peer
17  observations which occurred in the spring
18  of 20 -- what is that?  The spring quarter
19  before that fall, so the spring of 2018.  And so
20  typically, the way the college worked is you
21  provided a list of interviewers, peer
22  observation colleagues, right, you provide a
23  list of colleagues for your peer observation,
24  and two people that never reviewed you before

**Page 90**

1   BY MS. WERMUTH:
2       ████████████████████████
    ████████████████████████
    ████████████████████
5       MR. BRAMWELL:  Objection, best evidence.
6       THE WITNESS:  Yes.
7   BY MS. WERMUTH:
8       Q.  Okay.  Is it your contention that her
9   failure to send the link was racially motivated?
10      A.  I think that it was retaliatory.
11      Q.  So you think she intentionally failed
12  to include it so that -- as a means of
13  retaliating against you for complaining of
14  discrimination within the college?
15      A.  Yes.
16      Q.  And what's your evidence that it was
17  intentional and retaliatory?  What's the reason
18  for your belief?
19      A.  There were a series of incidents that
20  during my tenure process and during my formal
21  reviews that indicated to me that I was being
22  held to a different standard than my other
23  colleagues.  It also indicated to me that I was
24  not receiving the same assessments that everyone

**Page 92**

1   would review you in one of your courses.
2       I provided Lexa a list, and Lexa did
3   not include anyone on that list.  Well, she
4   included one person, but not the other, and then
5   she included -- she included one person, so it
6   was████████████who never reviewed me, and
7   then she included an additional person who was
8   ████████████I was not very
9   happy with this inclusion, but I did not raise
10  an issue because I already had a reputation for
11  raising issues in the college, and I did not
12  want to continue this.
13      So I -- quite frankly, I was tired.  I
14  said okay.  And then when I heard from ███████
    ████████████████████ said that she didn't
16  want to review me, to make sure that I wasn't
17  conducting any performance workshops on the days
18  that she reviewed me.  However, it was a
19  performance class, and the way my performance
20  class are set up, it would be very difficult to
21  navigate around performance workshops.  So I
22  raised that issue with Dr. Murphy.
23      Now, I asked her why she even -- why
24  she even included████████████████ when she

Lisa Calvente 02/19/2021



**Page 93**

1 understood that ▮▮▮▮▮ and I had an
2 incident early on while I was there where ▮▮▮
3 ▮▮▮▮▮ wrote some racist writing, was called
4 out on it. Lexa was there. And she directed
5 all her anger and emotions towards me rather
6 than towards everyone who highlighted it, her
7 racist depictions of the south side and the west
8 side.
9     So we already had that issue with the
10 peer observation for my tenure and promotion. I
11 asked other people because Lexa told me that the
12 reason why she included ▮▮▮▮▮ was because
13 the other people on my list were already tied up
14 with reviews for newer people. I found it very
15 strange that if I'm going up for tenure, you
16 instead are, you know, safeguarding more junior
17 people than the junior people that are going up
18 for tenure.
19     So ultimately she changed ▮▮▮▮▮
20 and then changed the course that they were
21 supposed to observe because I said that I --
22 well, I don't know why she changed that, but I
23 said I didn't mind which course they observed.
24 So I already had issues is my answer.

93

**Page 94**

1     Q.  Okay.  So just so I understand your
2 answer because it was very lengthy, you are
3 saying that based on the process of selecting
4 peer reviewers in early 2018, that's your basis
5 for why you believe Lexa intentionally left your
6 link out of the submission to the external
7 reviewers, yes?
8     MR. BRAMWELL:  Objection --
9     THE WITNESS:  For my tenure promotion
10 process.
11 BY MS. WERMUTH:
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
19     Q.  That's not my question.
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

94

**Page 95**

6     Q.  Okay.  Now, when you talk about -- you
7 said previously that when you gave Lexa the
8 tenure dossier to go to the external reviewers,
9 external reviewers do not get your full dossier,
10 correct?
11     A.  Correct.
12     Q.  Okay.  So you are talking about the
13 materials that you selected and asked Lexa to
14 send -- that when you sent your dossier, that's
15 what you're referring to?
16     A.  Yes.
17     Q.  Okay.  Now, let's go back to the issue
18 of the performance link because we were looking
19 at Exhibit 175. ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
21     I'm sorry.  Are you on medication or is
22 that just, like, over-the-counter vitamins?  Did
23 you just take medication?
24     A.  No, I have tea.

95

**Page 96**

1     Q.  I'm sorry.  I thought I saw you take
2 medication.  Forgive me.  I was just going to
3 ask about any medications if they would impact
4 your ability to testify?
5     A.  I'm not taking any medication.
6     Q.  Thank you.
7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

96

Lisa Calvente 02/19/2021

1    Q.   And when you look at 3.6.1.1 and
2  3.6.1.2 it doesn't say anything about formal
3  probationary reviews, correct?
4       MR. BRAMWELL:  Objection, best evidence.
5       THE WITNESS:  That is correct.
6  BY MS. WERMUTH:
7       Q.   Now, could you also look at -- I'm
8  going to take you way down to chapter six, page
9  hashtag 109.  Let me know when you are there.
10      A.   I'm there.  109, yes.
11      Q.   So it's the very beginning of chapter
12  six.  Are you there?
13      A.   Yes.
14      Q.   So in Section 6.1, you will see that
15  there is some discussion about the religious
16  heritage of the University in connection with
17  academic freedom.  Do you see that?
18      A.   Yes.  So this is the -- this is
19  academic freedom, not the Vincentian -- it's
20  under academic freedom contributing to the
21  God-given dignity of individual persons, yes.
22      Q.   Yeah.  Yeah, there's reference to the
23  notion of God-given dignity in this provision of
24  the handbook, right?

105

1       MR. BRAMWELL:  Objection.
2       THE WITNESS:  Yes, for academic freedom.
3  BY MS. WERMUTH:
4       Q.   Okay.  Now, let me go back -- let me
5  ask you real quick about that verbal offer of a
6  contract you got on your book in 2018.  Who did
7  you have that conversation with, do you recall?
8       A.   I don't recall her name.  It was a --
9       Q.   It was a woman from the press?
10      A.   Excuse me?
11      Q.   It was a woman from the University
12  Press?
13      A.   Yes, she has since left there.  I
14  believe she is now at Vanderbilt, but I'm not
15  quite sure anymore.
16      Q.   Okay.  And what were the terms of the
17  advanced contract that she offered you?
18      A.   It was -- she verbally said that it was
19  a standard advanced contract; that, you know,
20  upon positive reviews of the book, I will then
21  be contracted with Northwestern.
22      Q.   Did you ask her to put the terms in
23  writing and send you --
24      A.   I was not interested in an advanced

106

1  contract.  I told her that I would think about
2  it, and I would get back to her.
3       Q.   Well, weren't you interested in
4  accepting the contract?
5       A.   So with advanced contracts and
6  university presses, they are basically in
7  control of your manuscript.  So they can hold on
8  to it, review it, and decide to publish it and
9  also include in the clause that your next book
10  would be -- they would get first dibs on your
11  next book.  And so it was advised to me by my
12  senior colleagues, not at DePaul, that I should
13  finish the book first and then shop it around
14  again to see what kind of better offers I might
15  receive.
16      Q.   Did you finish the book before you left
17  DePaul?
18      A.   I finished a draft of the book.  So
19  basically, I mean, is it the draft that I have
20  now, no.  But would this draft be the draft
21  that's going to be published, no.
22      Q.   Okay.  I guess my question is, does --
23  it's more simple.
24           Did you have a full draft before you

107

1  left DePaul?
2       A.   Could I have complete -- could I have
3  submitted an entire book when I left DePaul to a
4  publisher, yes.
5       Q.   Okay.  And what about in 2019, by the
6  end of 2019, could you have done that?
7       A.   Yes.
8       Q.   Yes?
9       A.   Yes.
10      Q.   Okay.  Let me ask you quickly:  You
11  testified earlier today about a couple of
12  different conversations.  One was with ███████
13  ███████████ where she said something offensive about
14  communities on the south and west side I think
15  you said; is that right?
16      A.   Yes.
17      Q.   When did that occur?  Was that in your
18  first year at DePaul?
19      A.   Yes.
20      Q.   Okay.  And did you ever complain
21  outside of the college about that to anyone,
22  like to human resources or the office of equity?
23      A.   No.  I -- this occurred in front of my
24  chair, so I assumed that my chair would be

108



Lisa Calvente 02/19/2021

**Page 125**

```
 1   answer.
 2
 6        MR. BRAMWELL:  Objection, best evidence.
 7
 9   BY MS. WERMUTH:
10
14        Q.   Okay.  Now, you don't meet with the
15   full tenured faculty for an interview, correct?
16        A.   Correct.
17
24        Q.   Okay.
```

125

**Page 127**

Lisa Calvente 02/19/2021

```
 1
 6        MR. BRAMWELL:  Objection, best evidence.
 7
 9   BY MS. WERMUTH:
10        Q.   I don't see that in --
11        A.   In the comments, yes.
12
```

127

**Page 126**

```
 1
 3             (Whereupon, Deposition Exhibit
 4              No. 196 was marked for
 5              identification.)
 6   BY MS. WERMUTH:
 7        Q.   So we're looking at Exhibit 196 in case
 8   that's not clear to the court reporter.
 9
```

**Page 128**

```
 7             (Whereupon, there were technical
 8              issues and a break was had.)
 9   BY MS. WERMUTH:
10        Q.   So, Dr. Calvente, we had just finished
11   up with Exhibit 196, and I was just going to go
12   to Exhibit 203 and I think we were all kind of
13   fishing for it.  So do you want to go to
14   Exhibit 203 now.  Tell me when you get there.
15        A.   I'm not sure if the court reporter -- I
16   don't remember which part was recorded and which
17   wasn't, so I want to make clear that, you know,
18   these performance links, these mistakes with
19   AAUP, even if it's on the regulation, I was the
20   only person in our college that was exposed to
21   these kind of extra rules, these additional
22   rules, and it's because I believe that it's
23   discrimination and retaliation because of my
24   race because I was outspoken.  I want to make
```

128

1 that clear, and I want that on the record.

2     Q.   When you say you were outspoken, you

3 were outspoken on what?

4     A.   On the issues of racism and

5 discrimination in the college, so the hostile

6 environment that two of us faced, right

7 because -- two of us meaning ████████████ and

8 myself.  We were the only two there especially

9 in 2018-2017, yes.

10     Q.   Okay.  So we're going to talk about

11 your complaints.  I know you have a long

12 interrogatory answer.  I don't think there was a

13 question pending when you gave your statement

14 just now, but I am going to move to strike it in

15 a moment.  I'm going to shut my door because my

16 dogs.  And I'm sorry.

17     ████████████████████████████████████

████████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████████

██████████

24     MR. BRAMWELL:  Objection, misstates her

129

1 testimony.

2 BY MS. WERMUTH:

3     Q.   You can answer.

4     A.   Can you rephrase the question, please,

5 or reask?

6     MS. WERMUTH:  So I think you just

7 testified -- do we have two reporters here

8 now?

9              (Whereupon, a discussion was had

10              off the record.)

11              (Whereupon, Brenda Dufek, CSR

12              exited the deposition

13              proceedings and Michelle Barta,

14              CSR entered the deposition

15              proceedings.)

16

17

18

19

20

21

22

23

24

1          IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4

5 LISA CALVENTE,              )

6       Plaintiff,            )

7   vs.                       ) No. 1:20-CV-03366

8 SALMA GHANEM and DEPAUL     )

9 UNIVERSITY,                 )

10       Defendants.          )

11

12   I, LISA CALVENTE, being first duly sworn, on

13 oath say that I am the deponent in the aforesaid

14 deposition taken on the 19th day of

15 February, 2021; that I have read the foregoing

16 transcript of my deposition, consisting of pages

17 1 through 134 inclusive, and affix my signature

18 to same.

19          _____

                    LISA CALVENTE

20

Subscribed and sworn to

21 before me this _____ day

of _____, 2021.

22

   _____

23 Notary Public

24

131

1 STATE OF ILLINOIS      )

2                        )  SS:

3 COUNTY OF C O O K      )

4     I, BRENDA K. DUFEK, a Certified Shorthand

5 Reporter within and for the County of Cook and

6 State of Illinois, do hereby certify that

7 heretofore, to-wit, on the 19th day of

8 February, 2021, personally appeared before me

9 via Zoom videoconference, LISA CALVENTE, in a

10 cause now pending and undetermined in the United

11 States District Court, Northern District of

12 Illinois, Eastern Division, wherein Lisa

13 Calvente is the Plaintiff, and Salma Ghanem is

14 the Defendant.

15     I further certify that the said LISA

16 CALVENTE was first duly sworn to testify the

17 truth, the whole truth and nothing but the truth

18 in the cause aforesaid; that the testimony then

19 given by said witness was reported

20 stenographically by me in the presence of the

21 said witness, and afterwards reduced to

22 typewriting by Computer-Aided Transcription, and

23 the foregoing is a true and correct transcript

24 of the testimony so given by said witness as

132

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3            EASTERN DIVISION
 4  LISA CALVENTE,          )
 5        Plaintiff,        )
 6  vs.                     ) Case No. 1:20-CV-03366
 7  SALMA GHANEM and        ) (Volume II)
 8  DEPAUL UNIVERSITY,      )
 9        Defendants.       )
10
11        The deposition of LISA CALVENTE, called
12  for examination pursuant to the Rules of
13  Civil Procedure for the United States District
14  Courts pertaining to the taking of depositions,
15  taken before Michelle L. Barta, a certified
16  shorthand reporter in the State of Illinois,
17  via Zoom videoconference on the 19th day of
18  February, 2021, at the hour of 1:36 p.m.
19
20
21
22  Reported by:  Michelle L. Barta, C.S.R., R.P.R.
23  License No:  084-004033
24
                                           135
```

Lisa Calvente 02/19/2021

```
 1               I N D E X
 2  WITNESS                            PAGE
 3  LISA CALVENTE
 4  EXAMINATION BY MS. WERMUTH          138
 5  EXAMINATION BY MR. BRAMWELL         298
 6
 7
 8            E X H I B I T S
 9  NUMBER                     IDENTIFICATION
10  Exhibit No. 203                   144
    Exhibit No. 204                   147
11  Exhibit No. 215                   155
    Exhibit No. 217                   168
12  Exhibit No. 219                   172
    Exhibit No. 50                    189
13  Exhibit No. 23                    209
    Exhibit No. 134-A                 214
14  Exhibit No. 51                    220
    Exhibit No. 31                    224
15  Exhibit No. 57                    226
    Exhibit No. 53                    228
16  Exhibit No. 78                    231
    Exhibit No. 85                    236
17  Exhibit No. 108                   241
    Exhibit No. 102                   242
18  Exhibit No. 109                   244
    Exhibit No. 112                   255
19  Exhibit No. 123                   258
    Exhibit No. 132                   265
20  Exhibit No. 144                   267
    Exhibit No. 145                   269
21  Exhibit No. 173                   273
    Exhibit No. 202                   276
22  Exhibit No. 211                   278
    Exhibit No. 95                    284
23  Exhibit No. 88                    287
    Exhibit No. 231                   288
24  Exhibit No. 3                     288
    (Exhibit 53 retained by Ms. Wermuth)
                                           137
```

```
 1  APPEARANCES (via Zoom):
 2
 3      LAW OFFICES OF FITZGERALD T. BRAMWELL, by
 4      MR. FITZGERALD T. BRAMWELL
 5      225 West Washington Street, Suite 2200
 6      Chicago, Illinois  60606
 7      (312) 924-2884
 8      bramwell@fitzgeraldbramwell.com
 9          Representing the Plaintiff;
10
11      COZEN O'CONNOR, by
12      MS. ANNELIESE WERMUTH
13      MS. NANDINI SANE
14      123 North Wacker Drive, Suite 1800
15      Chicago, Illinois  60606
16      (312) 382-3100
17      awermuth@cozen.com
18          Representing the Defendants.
19
20  ALSO PRESENT:
21  Ms. Kathryn Stieber
22  Ms. Salma Ghanem
23  Ms. Alexandra Murphy
24
                                           136
```

```
 1              LISA CALVENTE,
 2  having been first previously duly sworn, was
 3  examined and testified via Zoom videoconference
 4  as follows:
 5              EXAMINATION
 6  BY MS. WERMUTH:
 7      Q.  Dr. Calvente, and forgive me if I
 8  misunderstood your testimony, but I thought that
 9  you testified that you were being held to
10  different standards as it related to the AAEP
11  guidelines and as it related to the review of
12  your research -- or I am so sorry, the review of
13  your performances as research or as scholarship.
14  Did I understand your testimony correctly?
15      A.  I was -- Well, I believe that
16  Dr. Murphy excluding my performance link and
17  then requiring me to do something that was not
18  required of anyone else was discriminatory and
19  retaliatory, yes.
20      Q.  Okay.  So then it's not your position
21  that contextualizing the performances was
22  discriminatory or retaliatory?
23          MR. BRAMWELL:  Objection, misstates her
24  testimony.
                                           138
```

1    THE WITNESS:  I disagree with how you
2  are reading that -- that last section and are
3  also measured on the basis of scholarly reviews
4  and grants and awards relating to the work.
5  That doesn't say that they are not counted.
6  That just says that they are measured in a
7  particular way based on these outside reviews.
8  That is correct.
9  BY MS. WERMUTH:
10   Q.   But if you don't have the outside
11  reviews it can't be -- it can't be evaluated,
12  right?
13       MR. BRAMWELL:  Objection.
14       THE WITNESS:  I couldn't agree that.
15  BY MS. WERMUTH:
16   Q.   Okay.  So you have a different
17  interpretation of the college guidelines?
18   A.   I have a different interpretation of
19  how you are using are also measured.  So an
20  example of that is, you know, in other -- in the
21  College of Liberal Arts and Sciences they
22  measure performances and creative work based on
23  exactly this.  Right?
24       So if you weren't -- If you didn't have
                                                    143

Lisa Calvente 02/19/2021
1  about this.  You received a copy of the final
2  college report on your tenure case on
3  December 14th of 2018, right?
4   A.   Yes.
5  ███████████████████████████████████████
   ████████████████████████████████████████████
   ███████████████████████████
8   Q.   And in order under college guidelines
9  to be qualified for tenure you needed to have
10  two of those categories rated as excellent, is
11  that right?
12   A.   Yes.
13  ████████████████████████████████████████████
    ███████████████████████████████
    ██████████████████████
    ███████████████████████
17   Q.   Now, in the -- in the first several
18  pages that's the personnel committee's write-up,
19  is that right?
20       MR. BRAMWELL:  Objection, best
21  evidence.
22  BY MS. WERMUTH:
23   Q.   That's a bad question.  Let me start
24  over.
                                                    145

1  performances that were reviewed or that had
2  grants and awards, they still counted.  They
3  just weren't measured as heavy or as weighted as
4  the other performances.  So that's how I
5  understand measure.
6   Q.   Okay.  By looking at how another
7  college at the university interprets that
8  language?
9   A.   Yes.
10   Q.   Did you ever ask anybody in the college
11  about hey, you know, is this sufficient to just
12  send you these links or should I -- is there
13  something else I should be doing?  Did you have
14  conversations with anybody about that?
15   A.   I assumed because they were already
16  under research prior to that they were submitted
17  as such, that they were going to be evaluated as
18  such.
19           (Whereupon, Exhibit No. 203 was
20            marked for identification.)
21  BY MS. WERMUTH:
22   Q.   Okay.  Can we go to Exhibit No. 203?
23   A.   I am there.
24   Q.   Okay.  So we were starting to talk.
                                                    144

1  ████████████████████████████████████████████
   ██████████████████████████████████████
3       MR. BRAMWELL:  Is there a question
4  pending?
5  BY MS. WERMUTH:
6  ██████████████████████████
7       MR. BRAMWELL:  Objection, best
8  evidence.
9       THE WITNESS:  What was that last page?
10  I am sorry.
11  BY MS. WERMUTH:
    ████████████████████████████████████████████
    ██████████████████████████
    █████████████████████████████████████
    ██████████████████████████████
    ███████████████████
    ████████████████████████████████████████████
19  Hang on here.
20       MR. BRAMWELL:  We didn't lose Anna, did
21  we?
22       MS. WERMUTH:  No.  I am sorry.  I lost
23  my thought for a moment, so just bear with me.
24  It's a very long document.  I am sorry.  Just
                                                    146





Lisa Calvente 02/19/2021

**Page 219 (left column):**

```
6      A.  Yes.
7      Q.  All right.  Let's just get that into
8   the record.  Exhibit --
9
20      Q.  Are you arguing with me?  What I am
21   trying to --
22      MR. BRAMWELL:  No, she is not.
23   Absolutely -- No, no, no, no, no.  She is -- I
24   object to the characterization of my client
```
219

**Page 221 (right column):**

Lisa Calvente 02/19/2021

```
1   BY MS. WERMUTH:
2
5      A.  Can you tell me which batch number that
6   is?  Oop, I found it.  Sorry.
7      Q.  No worries.
8
23      MR. BRAMWELL:  Objection, best
24   evidence.
```
221

**Page 220 (bottom left column):**

```
1   doing any arguing.
2      MS. WERMUTH:  There is no question
3   pending.
4      MR. BRAMWELL:  She has behaved
5   remarkably well.
6      MS. WERMUTH:  There is no question
7   pending.
8      MR. BRAMWELL:  But that is not -- that
9   is not arguing.  The only person that -- Well,
10   let's just leave it at that.  You know,
11   Dr. Calvente, has not been arguing with you.
12   BY MS. WERMUTH:
13
22      (Whereupon, Exhibit No. 51 was
23       marked for identification.)
24
```
220

**Page 222 (bottom right column):**

```
1
16      MR. BRAMWELL:  Objection.
17      THE WITNESS:  Yes.
18      MR. BRAMWELL:  Best evidence.
19   BY MS. WERMUTH:
20
```
222



**Page 223**

1 [redacted]
2          MR. BRAMWELL:  Objection, best
3 evidence.
4 [redacted]

[redacted]

[redacted]

[redacted]

9          MR. BRAMWELL:  Objection, best
10 evidence.
11 BY MS. WERMUTH:
12     Q.   Okay.
13 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Page 225**

1 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] talk about your -- Now, after
8 you -- after you got your 2015 performance -- I
9 am sorry, probationary -- formal probationary
10 value and after you got Salma's letter extending
11 your contract you filed a discrimination charge
12 against the personnel committee with the
13 Internal Office of Equity at DePaul, is that
14 right?
15     A.   Yes.
16     Q.   And you told Salma you were going to do
17 that, right?
18     A.   Yes.
19     Q.   So Salma knew at the time that you were
20 filing that complaint?
21     A.   Yes.
22          MR. BRAMWELL:  Objection, asked and
23 answered.
24

**Page 224**

1 [redacted]

[redacted]

3              (Whereupon, Exhibit No. 31 was
4              marked for identification.)
5 BY MS. WERMUTH:
6     Q.   All right.  So speaking of personal
7 statements, let's take a quick look at your 2015
8 personal statement.  I am sorry, I didn't give
9 the number.  31.  Let me know when you're there
10 please.
11     A.   I am there.
12 [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Page 226**

1 BY MS. WERMUTH:
2     Q.   And shortly after you filed that
3 complaint -- That was in the summer of 2015 that
4 you filed that complaint, right?
5     A.   I don't recall.  I thought it was the
6 spring, but it could have been the beginning of
7 summer.  I believe it was the spring.
8     Q.   Okay.  So let's -- and I guess it's
9 relative.
10              (Whereupon, Exhibit No. 57 was
11              marked for identification.)
12 BY MS. WERMUTH:
13     Q.   So can you look at Exhibit 57?  That
14 would be in Batch 2, the very last one.
15     A.   Yes.
16     Q.   Let me know when you're there.
17     A.   Oh, I am here.
18     Q.   Okay.  So it looks like at least your
19 allegations were reduced to writing between you
20 and Barbara Schaffer in early June of 2015.
21 Does that sound right?
22     A.   Yes.  There was -- So there was a
23 meeting prior to that --
24     Q.   Okay.

Page 227

```
 1      A.  -- yeah, which was why I say this
 2   reflects exactly what we have discussed, and
 3   prior to that that were phone calls, and this is
 4   all in the spring quarter, the end of the spring
 5   quarter.
 6      Q.   Understood.  Okay.  But after you got
 7   your letter from Salma?
 8      A.   Yes.
 9      Q.   Okay.  Got it.  And when did you start
10   your leave then?  Like the spring quarter, is it
11   done right around early June?
12      A.   Well, that's why I couldn't really
13   remember because I wasn't teaching in that
14   spring quarter.
15      Q.   Okay.
16      A.   Right.  So I front-loaded my courses
17   and I actually contacted I believe it was
18   Liz Ortiz at the time and then it was referred
19   to Barbara Schaffer after the meeting with
20   Salma.  When I told Dr. Ghanem that I was going
21   to file it was immediately after.  I left her
22   office and then went to my office --
23      Q.   Okay.
24      A.   -- and called.
```
227

Page 229

```
 1   take a minute, let me switch gears for just a
 2   quick moment.  In your -- When you responded to
 3   your Answers to Interrogatories last fall you
 4   had indicated that you had applied for two jobs
 5   or, you know, jobs at two different
 6   institutions.
 7           Have you applied to more jobs since
 8   then, Dr. Calvente?
 9      A.   I am sorry.  I am doing two things at
10   once.  So should I open this E-mail from you
11   first or answer your question?
12      Q.   Did you get it?  Did you get the
13   E-mail?
14      A.   Yes.  ███████████████████████
15   █████████████████
16      Q.   Nope.
17      A.   Sorry.
18           MR. BRAMWELL:  I just got it.
19   BY MS. WERMUTH:
20      Q.   Okay.  Let's just stick with the E-mail
21   then.  Let me know when you get it.
22      A.   Okay.  Got it.  I am opening it now.
23      Q.   Okay.  And if you scroll all the way
24   down there is a transcription of what appears to
```
229

Page 228

```
 1      Q.   Got it.
 2      A.   So I didn't receive her letter yet.
 3      Q.   Oh, I see.  So you're saying it was
 4   March 30th, like the same day that you met with
 5   Salma that you --
 6      A.   I began to call.  I believe so.  I went
 7   to my office.  I told her that I was going to
 8   file.
 9      Q.   Okay.  Here, this is going to clarify
10   it for us.  Can you look at Exhibit 53?  Did I
11   include that in your packet?
12      A.   Excuse me?
13           MR. BRAMWELL:  I do not have 53.
14           MS. WERMUTH:  You don't have it?
15           MR. BRAMWELL:  No, I don't.
16           MS. WERMUTH:  Okay.  Here.  Let me send
17   you 53.
18           THE WITNESS:  I do not have it, yeah.
19           MS. WERMUTH:  Okay.  I will send it to
20   you.
21                (Whereupon, Exhibit No. 53 was
22                marked for identification.)
23   BY MS. WERMUTH:
24      Q.   While that's coming because it always
```
228

Page 230

```
 1   be your first voice message to Barbara Schaffer?
 2      A.   Yes.
 3      Q.   Okay.  And it looks like you called
 4   her --
 5      A.   Equal.  So it wasn't immediately after.
 6   I am sorry.
 7      Q.   No, that's okay.
 8      A.   I am remembering falsely.
 9      Q.   So the letter from Salma was April 2nd
10   and then this -- you called Barbara on
11   April 16th, right?
12      A.   Yes.
13      Q.   Okay.
14      A.   Yes.
15      Q.   Got it.  All right.  Now, you were on
16   leave for that year, but Barbara did investigate
17   your concern; right?
18      A.   Yes.
19           MR. BRAMWELL:  Objection, calls for
20   speculations as to what Barbara did.
21   BY MS. WERMUTH:
22      Q.   And you received a closing letter the
23   following summer I think.  Let's get that into
24   the record.
```
230





**Page 239**

1    evidence.
2         THE WITNESS:  Yes.
3    BY MS. WERMUTH:
4    ████████████████████████████
     ████████████████████████████████
     ██████████
     ██████████████████████████████
     ████████████████████████████████████
     ████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ██████████████████████
16        Q.   Okay.
17            MR. BRAMWELL:  Objection, best
18   evidence.
19   BY MS. WERMUTH:
20   ████████████████████████████
     ████████████████████████████████████
     ██████████████████████████
     ████████████████
     239

**Page 241**

Lisa Calvente 02/19/2021
1         (whereupon, Exhibit No. 108 was
2         marked for identification.)
3    BY MS. WERMUTH:
4         Q.   So 108 which should be in Batch 5, the
5    first
6    one --
7         A.   Yes, I am there.
8         Q.   Okay.  Thank you.
9    ████████████████████████████████████
     ██████████████████████
     ████████████████████████████████████████
     ██████████████████████████████
15            MR. BRAMWELL:  Objection, best
16   evidence.
17   ████████████████████████████
18   BY MS. WERMUTH:
19        Q.   By the way, did you ever go to any of
20   the tenure workshops that were being hosted by
21   the college?
22        A.   Yes.
23        Q.   How many did you go to?
24        A.   I believe I went to -- For the college?
     241

**Page 240**

████████████████████████████████
██████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████
████████████████
████████████████████████████████
████████████████████████████
████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████████
██████████████████
██████████████████████████
21        Q.   Right.  Thank you.
22            Okay.  So let's just get that stuff in
23   the record.  I won't spend all our time on it.
24

**Page 242**

1         Q.   Um-hum, yes.
2         A.   I can recall -- I don't know if this
3    was the exact number, but I can recall going to
4    two.
5         Q.   And when was the last one that you went
6    to?  Do you remember?
7         A.   No.
8         Q.   Had you ever asked anybody for like a
9    sample personnel statement or a sample CV?
10        A.   Yes.  So I had -- I asked the diversity
11   rep for her personnel statement.  I also had
12   Sydney's personnel statement.  I also took the
13   advice of Barb Willard for my 2015 personnel
14   statement.
15        Q.   Okay.  Did I send Exhibit 102 to you
16   for example?
17            MR. BRAMWELL:  Yeah, I have it.
18            (whereupon, Exhibit No. 102 was
19            marked for identification.)
20   BY MS. WERMUTH:
21        Q.   Okay.  Can you open that up?
22        A.   I am sorry.  Which is Exhibit 102?
23        Q.   Correct.
24        A.   You sent it separately?  Which one is
     242

Lisa Calvente 02/19/2021

1  can't find it.  Oh, 111.

2  A.  111?

3  Q.  Yes.

4  A.  Is that in Batch 6 maybe?

5  Q.  Batch 5.

6  MR. BRAMWELL:  You can use the screen

7  share, too, if you would like.

8  THE WITNESS:  I have it.

9  BY MS. WERMUTH:

10  ████████████████████████████████

   ████████████████████████

   ████████████

13  Q.  And after you got that letter you met

14  with her to express concerns to her that you

15  felt like you were being discriminated and

16  retaliated against, is that right?

17  A.  I expressed concerns in an E-mail and

18  then I absolutely say that in our discussion.

19  Q.  Okay.  And the E-mail where you mention

20  that is Exhibit 112?

21  A.  Yes.

22  (Whereupon, Exhibit No. 112 was

23  marked for identification.)

24

255

1  BY MS. WERMUTH:

2  Q.  And that first line says, "Thank you

3  for agreeing to meet with me tomorrow."  Do you

4  see that?

5  A.  Yes.

6  Q.  Okay.  So you met with her on

7  December 16th?

8  A.  Yes.

9  Q.  And during this conversation you told

10  her that you wanted to file again with the

11  Office of Equity?

12  A.  Yes.  I actually already reached out to

13  Barbara Schaffer.

14  Q.  Oh, you had?

15  A.  Yes.

16  Q.  Did you tell Salma that you had done

17  that?

18  A.  I don't recall.  I don't recall.

19  Q.  Now, after that meeting -- Well, strike

20  that.

21  So you indicated that Salma in this

22  meeting told you about a conversation she had

23  with then Provost Marten denBoer?

24  A.  Yes.  So I don't --

256

1  Q.  What was that?  Can you tell me about

2  that?

3  A.  Sorry about that.  I cut you off to

4  start explaining.

5  So I go to the meeting.  I sent this

6  E-mail after I make the appointment and I start

7  going through this and I say that, you know, I

8  am going to file with Barbara Schaffer or I am

9  going to file for retaliation and

10  discrimination, and at some point I just -- I

11  just break down.  I start like uncontrollably

12  bawling, crying.  She gives me tissue -- or I

13  think I had tissue and then she gave me tissue,

14  I don't remember.  But I was really shook up and

15  said that you know -- I was like this is time, I

16  am wasting time doing this when I could be doing

17  other things and junior faculty, that's all they

18  have is time and this is really eating up my

19  time.  You know, now I have to think about

20  service.  So I am goin on and on.  I am crying

21  and she says, you know, for me not to worry,

22  that the provost already knows about my file,

23  about my case, that I should not file a claim

24  and wait until -- No, wait.  She said that

257

1  first, that I should not file a claim and wait

2  until after tenure and the provost already knows

3  about my case.

4  (Whereupon, Ms. Stieber enters

5  the proceedings.)

6  BY MS. WERMUTH:

7  Q.  Did she tell you what she meant about

8  that, the provost knows about your case?

9  A.  She did not.

10  (Whereupon, Exhibit No. 123 was

11  marked for identification.)

12  BY MS. WERMUTH:

13  Q.  Can you look at Exhibit 123?  Are you

14  there?

15  A.  Yes.

16  Q.  Oh, I am sorry.  Okay.  Next time just

17  let me know.  I wait for you because I want to

18  make sure that you're there and I don't want to

19  waste my minutes.

20  So looking at this E-mail trail, going

21  to the bottom if you would to Page 8248 --

22  A.  Yes.

23  Q.  -- this is an E-mail from

24  Barbara Schaffer to you on Monday,

258



Lisa Calvente 02/19/2021

1  December 18th.  Do you see that?
2    A.  Yes.
3    Q.  So you had met with Salma, I guess, on
4  the 16th which was a Saturday; is that right?
5    A.  Yes.
6    Q.  Okay.
7    A.  Wait.  Did I meet with her on a
8  Saturday?  That doesn't seem right.
9    Q.  Well, the E-mail that you sent that we
10 just looked at was sent on December 15th and it
11 said, "I look forward to meeting you tomorrow."
12 Do you recall?
13   A.  Yeah, but that might have -- why would
14 I go to school on a Saturday?
15   Q.  Okay.  Well, let me ask you this
16 question whether it was -- You met with her
17 either that Friday the 15th or the Saturday the
18 16th?
19   A.  I don't believe that we would have met
20 on a Saturday because it was a weekend.  I
21 don't -- Yeah.  But I could be wrong.  I don't
22 recall.
23   Q.  This is the -- Monday the 18th is the
24 first business day after your meeting with

259

1  Salma, right?
2       MR. BRAMWELL:  And I am sorry, my
3  screen kicked me out of my PDF viewer.  Can you
4  give me not the previous exhibit but the
5  previous one?  Was it 117?
6       MS. WERMUTH:  No.  The previous one
7  being the E-mail with Salma?
8       MR. BRAMWELL:  Yeah.
9       MS. WERMUTH:  Let me dig up old stuff
10 and waste my precious time here that you won't
11 give me.
12      MR. BRAMWELL:  Well, we can talk about
13 all the -- all the best evidence documents
14 but --
15      MS. WERMUTH:  I like to lay foundation,
16 Jerry.  I like to make sure that the witness it
17 actually going to tell me she received a
18 document or authored a document.
19      MR. BRAMWELL:  Yeah, it's Mr. Bramwell
20 and -- on the record, and we could have
21 stipulated to a lot of it.
22 BY MS. WERMUTH:
23   Q.  So, Dr. Calvente, going back to
24 Exhibit 123 which is where we were,

260

Lisa Calvente 02/19/2021

1  Barbara Schaffer reaches out to you on
2  December 18th of 2017; right?
3    A.  Yes, but I went back to that first
4  document with the E-mail with Salma to see if it
5  was -- if we met on a Saturday and we did not.
6    Q.  What are you looking at to determine
7  that?
8    A.  The E-mail -- The document that you --
9  Let's see.  25975.
10   Q.  Okay.  Right.  It says I can meet
11 Friday at 9:00 or 12:30, right?
12   A.  Yes.
13   Q.  But then you E-mail her on Friday
14 saying, "Thank you for agreeing to meet me
15 tomorrow."  That's where the confusion comes in.
16 Do you see?
17   A.  It's weird.
18   Q.  Okay.  So you met with her either the
19 15th or the 16th?
20   A.  Yeah.  It wasn't a Saturday.  That I
21 know.
22   Q.  Okay.  So let's look at Exhibit 123.
23   A.  Okay.
24   Q.  Look at the first E-mail on Page 8248

261

1  from Barbara Schaffer.  According to this E-mail
2  Barbara Schaffer learned from Dean Ghanem that
3  you had -- that you had expressed concerns to
4  Dean Ghanem about discrimination and
5  retaliation, right?
6    A.  Yes.
7    Q.  Okay.  So according to this E-mail
8  Dean Ghanem after the meeting with you reached
9  out to Barbara Schaffer?
10   A.  I -- I -- If I recall correctly and
11 obviously, I mean, I thought I E-mailed
12 Barbara Schaffer, but she called -- I say yes, I
13 want to file.  Then we talk about the provost.
14 I have that breakdown.  I still say I want to
15 file and then she explains the tenure process to
16 me.  She explains that the provost knows my case
17 and then she says, you know, you talk about
18 time, do not file now, wait until you go up for
19 tenure.  I agree and then I tell Barbara that I
20 do not want to meet.
21   Q.  Okay.  But according to this E-mail
22 from Barbara to you, despite Dean Ghanem at the
23 time telling you not to file she filed on your
24 behalf or she notified Barbara Schaffer anyway;

262

Lisa Calvente 02/19/2021



**Page 263:**

```
 1  right?
 2        MR. BRAMWELL:  Objection, calls for
 3  speculation and best evidence.
 4        THE WITNESS:  I -- I do not recall.
 5  BY MS. WERMUTH:
 6     Q.  I am just asking you what the E-mail --
 7  what the communication from Barbara to you
 8  provides, that she learned about concerns from
 9  Dean Ghanem.
10        MR. BRAMWELL:  Again, I am going to
11  object on best evidence grounds.  The document
12  says what it says.  We will stipulate that the
13  document says what it says.
14        MS. WERMUTH:  Perfect.  Stipulation
15  accepted.  I will move on.
16  BY MS. WERMUTH:
17
```

263

**Page 265:**

Lisa Calvente 02/19/2021

```
 1
 2              (whereupon, Exhibit No. 132 was
 3              marked for identification.)
 4  BY MS. WERMUTH:
 5     Q.  Okay.  So can you look at Exhibit 132?
 6     A.  Yes.
 7
13        MR. BRAMWELL:  Objection, best
14  evidence.
15  BY MS. WERMUTH:
16
```

265

**Page 264:**

264

**Page 266:**

```
14     Q.  Right.  Okay.  Now, fast forwarding to
15  the spring of 2018, so now you're getting ready
16  for your tenure review and you filed with
17            an anonymous complaint; is that
18  right?
19
22     Q.  Okay.  So were you pursuing a complaint
23  with her or you just read the document because
24  she wanted to complain?
```

266

Lisa Calvente 02/19/2021

**Page 267**

1    A.   NO.  I agreed that I would do it with
2    her.
3                  (Whereupon, Exhibit No. 144 was
4                  marked for identification.)
5    BY MS. WERMUTH:
6    Q.   Okay.  ████████████████████
     ████████████████████████████
     ████████████████████████████
9    Q.   And that's Exhibit 144?
10   A.   Can you tell me what batch that is?
11   Q.   Batch 8.
12   A.   Yes.
13   ████████████████████████████████
     ██████████████████████████
     ██████████████████████████████
     ██████████████████████
     ████████████
     ██████████████████████████████
     ██████████████████████████
     ████████████████████████████████
     ██████████████████████████
     ██████████████

267

**Page 269**

Lisa Calvente 02/19/2021
1    BY MS. WERMUTH:
2    Q.   It was just that word, okay.
3         All right.  Now, there was an E-mail
4    follow up -- By the way, does DePaul -- well,
5    strike that.
6                  (Whereupon, Exhibit No. 145 was
7                  marked for identification.)
8    BY MS. WERMUTH:
9    Q.   Can you look at Exhibit 145?
10   A.   I am sorry.  Can you give me the batch
11   please?
12   Q.   It should be that same batch I think.
13   Hang on.  We were just at 144.  Batch 8.
14   A.   Okay.  I am sorry, Ms. Wermuth.
15   Q.   Call me Anna.  I have got no pride in
16   that.  I have enough pride that I didn't change
17   my last name when I married, but I don't need to
18   be titular.
19   A.   Okay.
20   Q.   Do you have 145 open?
21   A.   Yes.
22   Q.   ██████████████████████████████
     ███████████████████████████████████
     ███████████████████████████████████

269

**Page 268**

1    Q.   Any other racial epithets that you
2    haven't told us about?
3    A.   No.
4    Q.   And was that joke directed to you?
5    A.   Directed to me?  Yes.  He told it
6    directly to me.
7    Q.   Okay.  Do you remember what the joke
8    was?
9    A.   I do not remember the joke.  I remember
10   the punch line.
11   Q.   And what was the punch line?
12        MR. BRAMWELL:  Okay.  Asked and
13   answered.
14        Do we need it in the record again?
15        MS. WERMUTH:  I haven't asked her the
16   punch line before.
17        MR. BRAMWELL:  Yes, you did.  She told
18   you early in the deposition, but go ahead --
19        MS. WERMUTH:  I know it involved the
20   racial slur, but I don't know if it was like a
21   whole sentence or if it was just that word.
22        THE WITNESS:  The punch line was
23   nigger.
24

268

**Page 270**

███████████████████████████
██████████████████████████████
████████████████████████████████
██████████████████████████████
████████████
██████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████
████████████████████████████████
████████████████████████████
████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████
████████████████████████████
████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████

270



Lisa Calvente 02/19/2021

Lisa Calvente 02/19/2021

**Left column (page 271):**

7  Q.  And the three of you met together for
8  three hours or so, two or three hours?
9  A.  It was a long meeting.
10  Q.  And Salma listened to you?
11  A.  Salma listened.  She -- I believe
12  that -- especially in the beginning -- If I can
13  recall correctly, like she went over her time
14  slot so she could stay with us and hear our
15  complaints.
16  Q.  And did you accuse Salma directly in
17  that meeting of being discriminatory toward you
18  or --
19  A.  No.
20  Q.  Okay.
21  A.  I did not.
22  Q.  And did you accuse Salma directly of
23  being retaliatory towards you?
24  A.  No.  So in that meeting ▓▓▓ brought

271

**Right column (page 273):**

1  for a long time, that she wants to continue the
2  conversation, it's a very significant
3  conversation, and that we should schedule
4  another meeting.
5  Q.  Okay.
6  A.  And then we -- You know, then we got to
7  go.  She says, you know, the meeting is over.
8  Q.  And then she also E-mails
9  Barbara Schaffer to notify her and copied you on
10  that as well, right?
11  A.  Yes.
12  Q.  Okay.  And where the heck is that?
13  Give me a second.
14       (whereupon, Exhibit No. 173 was
15        marked for identification.)
16  BY MS. WERMUTH:
17  Q.  173.  Can we just get that marked for
18  the record?
19  A.  173?
20  Q.  That would be in Batch --
21  A.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

273

**Lower-left column (page 272):**

1  up ▓▓▓▓▓▓▓▓▓▓▓▓▓ name and that's when
2  Salma kind of cut ▓▓▓▓ off and was like she
3  didn't want to hear about ▓▓▓▓▓▓▓▓▓▓▓
4  because then we were questioning her leadership
5  and authority, and then she added that she heard
6  a rumor that she was -- she terminated ▓▓▓▓▓▓
7  contract so she can fire women of color, so she
8  could terminate women of color.  That's when I
9  told her that I wrote the letter on ▓▓▓▓▓▓
10  behalf.
11  Q.  Okay.  So you acknowledged that that
12  was not a rumor but was something that you had
13  actually suggested to ▓▓▓▓▓ appeals board?
14  A.  Yes.
15  Q.  Okay.
16  A.  She then says that she -- She called
17  Barbara right in front of us.  So she does
18  report, you know, that we came and we talked
19  about, you know, hostile, race-based environment
20  in the college, that we talked about extreme
21  bullying.  So she reports that to Barbara, but
22  she leaves a recording.  So Barbara didn't
23  answer.  She leaves a recording and then she
24  tells us that she -- You know, we were talking

272

**Lower-right column (page 274):**

1  Q.  All right.  So could you go to
2  Exhibit -- You just said it and now I have to
3  click over -- 173.
4  A.  Okay.  173 is an E-mail to Hai.  Is
5  that it?
6  Q.  No.
7  A.  Am I looking at the wrong thing?
8  Q.  173 is the October --
9  A.  Oh, sorry.  I --
10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12  MS. WERMUTH:  Do you have it,
13  Mr. Bramwell?
14  MR. BRAMWELL:  Yeah, I do.
15  THE WITNESS:  Oh, sorry.  I clicked on
16  173-A.
17  MS. WERMUTH:  Oh.
18  MR. BRAMWELL:  It's Bates labeled 8251,
19  right?
20  THE WITNESS:  Yes, I have it.  8251.
21  BY MS. WERMUTH:
22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

274



Lisa Calvente 02/19/2021

1    ███████████

3    Q.   Okay. And in November you and ████
4 were going to meet with Barbara together,
5 correct?
6    A.   Yes.
7    Q.   And ultimately you met with Barbara
8 individually?
9    A.   I showed up as Barbara Schaffer told me
10 that ████ was no longer going to come -- she
11 withdrew her complaint.
12    Q.   That's what Barbara told you?
13    A.   Yeah. She said she was no longer going
14 to see this through.
15    Q.   Barbara told you that?
16    A.   She said this in front of Isabel Diaz.
17    MR. BRAMWELL: Objection, asked and
18 answered.
19 BY MS. WERMUTH:
20    Q.   And after you met with Barbara you were
21 asked to provide the supporting materials that
22 you had, right?
23    A.   I came to that meeting with the
24 supporting materials.

275

1    Q.   Oh, you physically handed them to her?
2    A.   Yes.
3    Q.   I see. And then you also followed up
4 later with some additional information, right?
5    A.   Yes. So I met with Barbara and Isabel
6 and then I met with Barbara alone on the same
7 day without Isabel, and then I was told to
8 follow up with a formal outline.
9    (Whereupon, Exhibit No. 202 was
10    marked for identification.)
11 BY MS. WERMUTH:
12    Q.   Okay. And is that formal outline what
13 we see in Exhibit No. 202 which would be in
14 Batch 11?
15    A.   Yes.
16    Q.   And so you provided that outline, is
17 that right?
18    A.   Yes.
19    Q.   And do you know when you provided it?
20    A.   I do not, but I believe that I E-mailed
21 this. So -- Oh, there it is. I don't -- I
22 wrote it on November 29th and then I E-mailed
23 it.
24    Q.   You just don't know what day you

276

Lisa Calvente 02/19/2021
1 E-mailed it on --
2    A.   No.
3    Q.   -- is that fair?
4    A.   That is fair, yes.
5    Q.   Let me go back to a quick question
6 about ████ and what you and Salma discussed
7 when it came to ██████. Did you tell her that
8 you were in your letter accusing her of using --
9 you know, ██████████████
10    ████████████████ This is
11 so not very helpful. Let me start over.
12    What I am trying to get at is in the
13 conversation with Salma on October 10th of 2018,
14 did you say to her that you believe the
15 personnel committee or your senior colleagues
16 were recommending ██████████████ as a way
17 to avoid claims from you or did you tell her
18 that you believe she was doing that?
19    A.   I did not tell her either one of those
20 things. She said that she heard a rumor, she
21 explained the rumor and I said I wrote the
22 letter.
23    Q.   Okay. And tell me -- I am sorry. Just
24 so I understand what the rumor was that she

277

1 explained.
2    A.   She said I heard a rumor that I
3 terminated ████ so I can terminate women of
4 color.
5    Q.   Okay. So she was referring to the
6 rumor vis-?-vis her being the discriminator?
7    A.   Yes.
8    Q.   Okay. And did you tell her that you
9 agreed that it was her conduct that you were
10 worried about or did you just say I wrote the
11 letter?
12    A.   I said exactly I wrote the letter.
13    Q.   That's all you said, okay.
14    And did you give her a copy of the
15 letter?
16    A.   No.
17    (Whereupon, Exhibit No. 211 was
18    marked for identification.)
19 BY MS. WERMUTH:
20    Q.   All right. So can you look at
21 Exhibit No. 211?
22    A.   Yes.
23    ████████████████████████████

278



1 you wrote the letter. How did she react when
2 you said that?
3    A.   Her demeanor changed when ▌▌▌▌ name
4 was brought up. So she went from, you know,
5 going through the tenure cases with us to -- to
6 listening to us, actively listening to being
7 flustered and, you know, she was like no, this
8 is what I heard and then that's when our meeting
9 was over. She basically said -- ushered us out
10 and said that we were going to continue this at
11 another time --
12    Q.   Did you ever have another time -- I am
13 sorry.
14    A.   -- and --
15    Q.   I have going to ask you did you ever
16 have another conversation with Dr. Ghanem?
17    A.   No.
18    Q.   And I am sorry you said and. Please
19 continue your thought. I didn't mean to cut you
20 off. I am sorry.
21    A.   She said that our meeting had already
22 gone for hours and that, yeah, she kind of --
23 she pretty much just ushered ▌▌▌▌ and I out
24 and said that we can continue this another time.

299

1    Q.   Okay. During your career at DePaul did
2 Dr. Ghanem ever offer an opinion to you about
3 your likelihood of success concerning tenure and
4 promotion?
5    A.   So when I met with her in 2015 she said
6 that I was an extraordinary teacher. When I met
7 with her about the Woodrow Wilson Fellowship she
8 said that that was a huge deal and asked if
9 anyone else received this in the college.
10 That's why I began to put in my personal
11 statement that I was only one -- at the time
12 only one of two faculty members in the entire
13 university who received the Woodrow Wilson. I
14 believe now there is a third. So that goes --
15 speaks to research.
16        She went through -- Again, in 2017 she
17 went through the three processes, teaching --
18 the three categories, teaching, research and
19 service. This is when she mentioned the provost
20 knew about my case and she indicated that I
21 would be okay, that I was fine for tenure,
22 right? And then again when I met with her with
23 ▌▌▌▌▌▌ she went through the process of
24 tenure again and went through both ▌▌▌ and my

300

1 file specifically for teaching and service and
2 listed what we did for service as, you know, on
3 par with tenure.
4    Q.   Okay. And did she say anything else
5 about whether you were likely to obtain tenure?
6    A.   I said that we -- you know, that I was
7 more concerned about the environment in the
8 college and the discriminatory behavior, the
9 hostile behavior and extreme bullying that we
10 were receiving than with tenure because both
11 ▌▌▌▌ and I surpassed the standards for tenure.
12    Q.   And Dr. Ghanem told you that?
13    A.   She didn't disagree.
14        MS. WERMUTH:  Objection, misstates the
15 evidence.
16 BY MR. BRAMWELL:
17    Q.   I am sorry. I couldn't hear your
18 answer over the objection. I am sorry. It's
19 because of my hearing issues.
20    A.   When I said that, she did not disagree.
21    Q.   Okay. Now, you were asked about the
22 Vincentian Mission. Do you remember that
23 earlier this morning?
24    A.   Yes.

301

1    Q.   Does the Vincentian Mission mean that
2 you need to shield students from uncomfortable
3 information?
4    A.   No.
5    Q.   Would you agree that part of obtaining
6 an education involves being exposed to and
7 wrestling with information that can make you
8 uncomfortable?
9    A.   Absolutely, and as a matter of fact,
10 under academic freedom according to the AAUP
11 they do state that you can you know -- you can
12 incorporate controversial issues into your
13 teaching as long as it is part of that teaching
14 method and as long as it's part of your
15 specialization, so that is more than academic
16 freedom.
17    Q.   Do you recall the material you taught
18 in Communication 103 was more complex than what
19 other teachers taught?
20    A.   In my college?
21    Q.   Yes, in your college.
22    A.   For the most part, yes, except for
23 those that I trained.
24    Q.   Okay. Yeah, you mentioned training

302



Lisa Calvente 02/19/2021

1 highlighted specific student complaints.
2    Q.    ████████ is -- what is his race?
3    A.    He is white.
4    Q.    Okay.  Now, you mentioned earlier that
5 the UNC was not a peer school of DePaul?
6    A.    No.
7    Q.    You sort of chuckled a little bit when
8 you answered that.  Can you explain why you
9 chuckled a little bit?
10    A.    If you look at the U.S. rankings, UNC
11 is, I believe, this year ranked at No. 28 and
12 DePaul University is ranked at 124.  If you
13 divide the schools because one is private and
14 one is public, UNC comes in the Wall Street
15 Journal as No. 3 in U.S. rankings and it comes
16 in, I believe, at No. 8 in the U.S. rankings.
17    Q.    What about in your field?  Does UNC
18 enjoy a superior reputation?
19        MS. WERMUTH:  Objection, relevance.
20        THE WITNESS:  Absolutely.
21        MR. BRAMWELL:  Oh, we will get there.
22 BY MR. BRAMWELL:
23    Q.    Now, see now my train of thought has
24 been derailed.

307

1        All right.  So if you were to obtain --
2 You remember you were asked about why you
3 believe there was discrimination and retaliation
4 and you got that question, I don't know, maybe
5 100 times in the last 7 hours?  You recall those
6 lines of questioning?
7    A.    Yes.
8    Q.    Now, do you reserve, of course, the
9 right to use any evidence as it may be continued
10 to be developed in discovery and to make any
11 argument supported by that evidence?
12    A.    Yes.
13        MS. WERMUTH:  Objection, total pure
14 argument.  That has no place in a deposition.
15        MR. BRAMWELL:  Ms. Wermuth --
16        MS. WERMUTH:  You reserve the right
17 to --
18        MR. BRAMWELL:  Ms. Wermuth?
19 Ms. Wermuth mouth I am asking questions to my --
20 to this witness now.
21        MS. WERMUTH:  Improper questions.
22 Objection.
23        MR. BRAMWELL:  Well, you know, we will
24 trade this one off for all your improper

308

Lisa Calvente 02/19/2021

1 objections with best -- or all improper
2 questions concerning the best evidence.
3 BY MR. BRAMWELL:
4    Q.    Anyway, Dr. Calvente, do you reserve
5 that right?
6    A.    Yes.
7    Q.    Okay.  Now, if you have a tenure track
8 position at a superior institution and you could
9 not obtain tenure at an inferior institution,
10 does that suggest to you that discrimination or
11 retaliation may be at play?
12    A.    Yes.
13        MS. WERMUTH:  I am going to -- Hang on.
14        I am sorry, Dr. Calvente.  I have to
15 get my objection in before you answer, so
16 forgive me.
17        I object because it calls for
18 speculation particularly insofar as you have not
19 been awarded tenure at UNC.
20        MR. BRAMWELL:  Nobody said she had
21 been.
22 BY MR. BRAMWELL:
23    Q.    Now you can answer the question please.
24    A.    I am sorry.  I -- Can you please repeat

309

1 the question?
2    Q.    Yeah.  Maybe we have the court reporter
3 read it back.  This way I don't have -- we don't
4 have another objection that comes flying
5 through.
6        (whereupon, the record was read
7         as requested.)
8        THE WITNESS:  Yes, that solidifies my
9 belief that I was discriminated against and
10 retaliated against.  It solidifies that my -- my
11 packet is as strong as I believed it to be.
12 BY MR. BRAMWELL:
13    Q.    And if your packet is that strong and
14 you're outspoken on issues of discrimination,
15 then that suggests that you're retaliated
16 against; right?
17        MS. WERMUTH:  Objection, argument.
18 BY MR. BRAMWELL:
19    Q.    You can answer.
20        Now, remember that Ms. Wermuth asked
21 you lots and lots of questions about why you
22 believed that -- Actually, strike that.
23        MR. BRAMWELL:  Why don't we take five
24 minutes?  I just want to review and make sure

310



Lisa Calvente 02/19/2021

**Page 311**

```
1    that there is nothing else I want to get on and
2    then we can enjoy our weekends.
3              MS. WERMUTH:  Okay.
4              MR. BRAMWELL:  Come back at 6:03.
5              MS. WERMUTH:  Got it.
6              (Whereupon, a break was taken
7                 from 5:58 p.m. to 5:59 p.m.)
8              MR. BRAMWELL:  All right.  Are we back
9    on?
10             THE COURT REPORTER:  Yes.
11             MR. BRAMWELL:  I have nothing further.
12   We reserve.
13             MS. WERMUTH:  Okay.  Thank you for your
14   time today, Dr. Calvente.
15             MR. BRAMWELL:  Thank you.
16             (FURTHER DEPONENT SAITH NOT.)
17             (Whereupon, the proceedings
18                 adjourned at 6:00 p.m.)
19
20
21
22
23
24
```

**Page 312**

```
1         IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4    LISA CALVENTE,          )
5         Plaintiff,         )
6         vs.                )  Case No. 1:20-CV-03366
7    SALMA GHANEM and        )  (Volume II)
8    DEPAUL UNIVERSITY,      )
9         Defendants.        )
10
11        I, LISA CALVENTE, being first duly sworn,
12   on oath say that I am the deponent in the
13   aforesaid deposition taken on the 19th day of
14   February 2021; that I have read the foregoing
15   transcript of my deposition, consisting of Pages
16   135 through 312 inclusive, and affix my
17   signature to same.
18
19        _____
20                LISA CALVENTE
21   Subscribed and sworn to
     before me this        day
22   of            , 2021
23
24   Notary Public
```

**Page 313**

```
1    STATE OF ILLINOIS    )
2                         )  SS:
3    COUNTY OF C O O K    )
4         I, MICHELLE L. BARTA, a certified
5    shorthand reporter for the State of Illinois, do
6    hereby certify that heretofore, to-wit, on the
7    19th day of February 2021, appeared before me
8    via Zoom videoconference, LISA CALVENTE, in a
9    cause now pending and undetermined in the
10   United States District Court, Northern District
11   of Illinois, Eastern Division, wherein
12   LISA CALVENTE is the Plaintiff, and SALMA GHANEM
13   and DEPAUL UNIVERSITY are the Defendants.
14        I further certify that the said
15   LISA CALVENTE was first duly sworn to testify
16   the truth, the whole truth and nothing but the
17   truth in the cause aforesaid; that the testimony
18   then given by said witness was reported
19   stenographically by me and afterwards reduced to
20   typewriting by Computer-Aided Transcription, and
21   the foregoing is a true and correct transcript
22   of the testimony so given by said witness as
23   aforesaid.
24        I further certify that the signature to
```

**Page 314**

```
1    the foregoing deposition was reserved by counsel
2    for the respective parties.
3         I further certify that I am not counsel
4    for nor in any way related to the parties to
5    this suit, nor am I in any way interested in the
6    outcome thereof.
7         IN TESTIMONY WHEREOF:  I have hereunto
8    set my verified digital signature this 13th day
9    of March, 2021.
10
11
12
13
14
15        MICHELLE L. BARTA, C.S.R., R.P.R.
16        LIC. NO. 084-004033
17
18
19
20
21
22
23
24
```



# Exhibit 50 to Calvente Deposition





Confidential



Confidential

Calvente-DePaul 029080



Confidential



Calvente-DePaul 029082



Confidential

Calvente-DePaul 029083

Confidential

Calvente-DePaul 029084

Confidential

Calvente-DePaul 029085



Confidential

Calvente-DePaul 029086

# Exhibit 132 to Calvente Deposition



CONFIDENTIAL



CONFIDENTIAL



Calvente-DePaul 0007095



4

CONFIDENTIAL



5

CONFIDENTIAL



6

CONFIDENTIAL

Calvente-DePaul 0007098



CONFIDENTIAL

Calvente-DePaul 0007099



CONFIDENTIAL                    Calvente-DePaul 0007100

# Exhibit D

Page 1

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4     LISA CALVENTE,                    )
                      Plaintiff;        )
5                                       )
                                        )
6                                       )
      -v-                               )No. 20 CV 3366
7                                       )
                                        )
8                                       )
                                        )
9     SALMA GHANEM and DEPAUL           )
      UNIVERSITY,                       )
10                    Defendants.       )

11

12        The Discovery Deposition of SALMA GHANEM, having

13    been called by the Plaintiff for examination, taken

14    before Beth Radtke, RPR, CRR, within and for the

15    State of Illinois, pursuant to the Federal Rules of

16    Civil Procedure, conducted via Zoom virtual

17    videoconference, commencing at the hour of 9:00 a.m.

18    on the 24th day of March, 2021.

19

20

21

22

23    Reported By Beth Radtke, RPR, CRR

24    License No. 084-004561

Page 2

```
1            APPEARANCES
2
3   LAW OFFICE OF FITZGERALD BRAMWELL
    By Mr. Fitzgerald T. Bramwell
4     225 West Washington Street
      Suite 2200
5     Chicago, Illinois 60606
      bramwell@fitzgeraldbramwell.com
6     (312)924-2884
      Appeared on behalf of the Plaintiff;
7
8   COZEN O'CONNOR, P.C.
    By Ms. Anna Wermuth
9   Ms. Nandini Sane
      123 North Wacker Drive
10    Suite 1800
    Chicago, Illinois 60606
11    awermuth@cozen.com
      nsane@cozen.com
12    Appeared on behalf of the Defendants.
13
    ALSO PRESENT:
14
    Ms. Kathryn Stieber, General counsel, DePaul
15  University
16  Ms. Lisa Calvente
17
                *****
18
19
20
21
22
23
24
```

Page 3

```
1              INDEX
2
3   WITNESS                    PAGE
4   SALMA GHANEM
      Examination By Mr. Bramwell      4
5
6   EXHIBITS
```

```
20  CERTIFIED QUESTION
21  Page 93  Line 15-18
22
                *****
23
24
```

Page 4

```
1       (Witness sworn.)
2           SALMA GHANEM,
3   having been first duly sworn, was examined and
4   testified as follows:
5           EXAMINATION
6   BY MR. BRAMWELL:
7     Q.  Can you please introduce yourself for the
8   court reporter?
9     A.  My name is Salma Ghanem G-H-A-N-E-M.
10    Q.  So it's pronounced Ghanem?
11    A.  Yes.
12    Q.  Dr. Ghanem, I have a little bit of hearing
13  problems, so can I just ask you to keep your voice
14  up?
15    A.  I will try my best.
16    Q.  Okay, thank you.
17        So it's Salma, S-A-L-M-A?
18    A.  Correct.
19    Q.  Ghanem, G-H-A-N-E-M?
20    A.  Correct.
21    Q.  Dr. Ghanem, you've just taken an oath to
22  tell the truth, do you understand that?
23    A.  Yes, I do.
24    Q.  Have you ever been deposed before?
```

Page 5

```
1     A.  No, I have not.
2     Q.  I'll give you some ground rules then.
3         I'll ask you questions, you'll give me
4   answers that are true, complete, and accurate.  The
5   court reporter is taking down everything that we say,
6   therefore, we have to be careful not to talk over
7   each other.
8         Do you understand that?
9     A.  Yes, I do.
10    Q.  Okay.  That just means that when I ask a
11  question, please let me get my question out.  There
12  may or may not be an objection to the question.  Let
13  those objections come out, and then, you know, you
14  have to answer the question.
15        Is that understood?
16    A.  Yes, it is.
17    Q.  Okay.  I will try not to talk over your
18  answer.  If -- sometimes I do that; it's just because
19  I think you might be finished.  If you're not
20  finished, please let me know, say, hey, I'm not
21  finished, let me finish.
22        Are we agreed?
23    A.  Yes.  Yes.
24    Q.  Okay, good.
```

2 (Pages 2 - 5)

Page 6

1    You need to give clear answers because we
2 have a court reporter transcribing this; we're not
3 doing it via video, because video is obscenely
4 expensive. That means that words like "uh-huh" and
5 "uh-uh," they look a lot alike on a transcript, so if
6 I tell you that you need to give a clear answer or
7 that doesn't show up on the transcript, I'm not doing
8 that to be a jerk, I just want a good clean record.
9    Do you understand that?
10   A. I do.
11   Q. If you do not understand a question, please
12 ask me to clarify it, and I will try to rephrase it.
13   Are we agreed?
14   A. Yes.
15   Q. If you answer a question, I'm going to
16 assume, and it will be assumed that you understood
17 that question.
18   Are we agreed?
19   A. Yes.
20   Q. Okay. Obviously counsel is here this
21 morning. I'm sure she's going to choose to object to
22 certain questions I ask you. If she chooses to
23 object to a question, we're going to let her get that
24 objection on the record, but unless she instructs you

Page 7

1 not to answer, do you understand that you still need
2 to answer the question?
3   A. Yes, I do.
4   Q. Some of the documents I'm going to show you
5 today are marked confidential pursuant to a
6 protective order entered by the Court.
7     If you receive such a document, do you
8 understand that you have to delete and destroy it
9 following the deposition?
10   A. Will do.
11   Q. Okay. Is there anything preventing you from
12 testifying truthfully, completely, and accurately
13 here today?
14   A. No.
15   Q. Okay. Are you taking any medication or any
16 other drug that affects your ability to testify
17 truthfully, completely, and accurately?
18   A. No.
19   Q. Have you had anything alcoholic to drink in
20 the past eight hours?
21   A. No.
22   Q. Are you sick at all today?
23   A. No.
24   Q. What did you do to prepare for today's

Page 8

1 deposition?
2   A. I met with counsel on Monday.
3   Q. And counsel being outside counsel for DePaul
4 and inside counsel for DePaul?
5   A. Yes.
6   Q. Was anybody there other than your counsel?
7   A. No.
8   Q. And you're being represented by counsel here
9 today?
10   A. Yes, I am.
11   Q. Both in your personal capacity and your
12 individual capacity -- sorry, that doesn't make any
13 sense. Let's try that question again.
14     Both in your personal capacity and your
15 official capacity?
16   A. Yes.
17   Q. Other than counsel, have you spoken with
18 anybody else at DePaul about your testimony?
19   A. No, I have not.
20   Q. Other than counsel, have you spoken with
21 anyone at DePaul about Dr. Calvente's lawsuit?
22   A. No, I have not.
23   Q. You have not spoken with Alexa Murphy about
24 it?

Page 9

1   A. No, I have not.
2   Q. You have not spoken with the president about
3 it?
4   A. No, I have not.
5   Q. And by the president, I mean the president
6 of DePaul.
7     You haven't spoken with any members of the
8 faculty of the College of Communication?
9   A. No, I have not.
10   Q. Has anyone promised anything for your
11 testimony here today?
12   A. No.
13   Q. Have you ever been arrested?
14   A. No.
15   Q. You are currently the provost of DePaul
16 University?
17   A. I'm currently the interim provost at DePaul
18 University.
19   Q. What's the difference between being interim
20 provost and provost?
21   A. The interim provost is usually an
22 appointment that was done without a search until they
23 decide on a permanent provost.
24   Q. Does the fact that you're interim provost

3 (Pages 6 - 9)

Page 10

1 limit your powers or abilities in any way, shape, or
2 form?
3    A.  No, they do not.
4    Q.  Okay.  For the sake of just brevity, can we
5 say that you are the provost, just between ourselves?
6 We'll understand that your actual title is interim
7 provost, but it will save a little bit of time.
8       Can we agree on that?
9    A.  Yes.
10    Q.  Okay, good.
11       So, Dr. Ghanem, what are your
12 responsibilities as provost?
13    A.  I oversee the entire academic enterprise.
14    Q.  Okay.  What does that involve?
15    A.  That involves overseeing all the colleges,
16 the associate provosts, as well as the vice president
17 for enrollment and for student affairs.
18    Q.  What are your -- okay.  What are your
19 day-to-day responsibilities?
20    A.  Everything that I just mentioned.  I oversee
21 what is happening in the various colleges, work with
22 enrollment, and work with student affairs to advance
23 the academic portion of the university.
24    Q.  How many colleges are there at DePaul?

Page 11

1    A.  Ten.  They are colleges and schools.
2    Q.  Colleges and schools?  What's the difference
3 between a college and a school?
4    A.  Not much.  Just a difference in the name.
5 So it's the school of theater, but it's the College
6 of Communication, for example.
7    Q.  Okay.
8    A.  But they are standalone units.
9    Q.  And there's no difference really in the
10 hierarchy or administration of those standalone
11 units?
12    A.  No, there isn't.
13    Q.  Okay.  Are you an officer of DePaul?
14    A.  Yes, I am.
15    Q.  You have the ability to sign contracts?
16    A.  Yes, I do.
17    Q.  And you have the ability to speak to the --
18 I'm sorry, you have the ability to speak for the
19 university on matters of policy?
20       MS. WERMUTH:  Objection, vague, overbroad.
21 BY MR. BRAMWELL:
22    Q.  You can answer.
23    A.  I assume so, yes.
24    Q.  Okay.  Do you have the ability to terminate

Page 12

1 staff?
2    A.  Yes, I do.
3    Q.  What about to terminate nontenure line
4 faculty?
5    A.  Following the processes, yes, I do.
6    Q.  And the processes are the processes in the
7 university handbook?
8    A.  Depending if it is a faculty or a staff.
9    Q.  I'm sorry, I was asking about faculty, but I
10 appreciate you asking for the clarification.
11    A.  Yes.
12    Q.  Okay.  So you can terminate both -- let's
13 just make sure we have this very clean.
14       You can terminate -- I'm sorry.  You can
15 terminate nontenure line faculty, provided you follow
16 the processes in the faculty handbook?
17    A.  That is correct.
18    Q.  And can you terminate -- or rather can you
19 terminate tenure line faculty provided that you
20 follow the processes in the handbook?
21    A.  Yes, I can.
22    Q.  I have just sent both you and Ms. Wermuth an
23 exhibit that I have marked Exhibit 23.  Please let me
24 know when it arrives.

Page 13

1    A.  I just received it.
2    Q.  Okay.
3       MS. WERMUTH:  Give me just a moment, please.
4 I haven't received it yet.
5       MR. BRAMWELL:  I'll just identify the
6 exhibit, and let me know when it comes.
7       This is a document that is -- was attached
8 to our complaint.  It has got a caption up top, and
9 it's page 16 through 118 of Dr. Calvente's complaint
10 in this case.
11 BY MR. BRAMWELL:
12    Q.  Dr. Ghanem, are you familiar with this
13 document?
14    A.  Yes, I am.
15    Q.  What is this document?
16    A.  Let me just check it.
17    Q.  Yeah, take your time.
18    A.  It is the faculty handbook.
19    Q.  And is this the -- when is this faculty
20 handbook operative?
21    A.  At all times.
22    Q.  Okay.  When did this faculty handbook become
23 effective?
24    A.  Well, according to this document, it says

4 (Pages 10 - 13)

Page 14

1 July 1, 2018.
2    Q. Okay. So would you agree that's when it
3 became effective?
4    A. Yes.
5    Q. Okay. Now as provost, you have a role in
6 the tenure process, correct?
7    A. I do.
8    Q. And that role is prescribed by the faculty
9 handbook?
10     MS. WERMUTH: Salma, you are muted for some
11 reason.
12     THE WITNESS: Oh, I'm sorry, I don't know
13 how that happened.
14 BY THE WITNESS:
15    A. Yes, I do.
16 BY MR. BRAMWELL:
17    Q. And I'm sorry, Dr. Ghanem, I didn't get your
18 answer.
19    A. Can you repeat the question?
20    Q. Sure. Actually, I'll just ask the court
21 reporter to read it back.
22     (Record read as follows: And that role is
23     prescribed by the faculty handbook?)
24

Page 15

1 BY THE WITNESS:
2    A. Yes, it is.
3 BY MR. BRAMWELL:
4    Q. Do you have any role in the tenure process
5 that is not prescribed by the faculty handbook?
6    A. No, I do not.
7    Q. I'm sorry, I missed your answer.
8    A. No, I do not.
9    Q. Now is this your first provost job?
10    A. Yes, it is.
11    Q. Dr. Ghanem, you just went mute.
12    A. I did, sorry, it was the dog.
13    Q. Oh, okay.
14     Dr. Ghanem, how did you prepare to be the
15 provost of DePaul University?
16    A. I did not really prepare to be the provost
17 of DePaul University, I was appointed to serve as
18 acting provost when our then-provost had to go on
19 medical leave.
20    Q. The then-provost was Marten denBoer?
21    A. That is correct.
22    Q. Why were you appointed as -- try that again.
23     Why were you appointed at acting provost?
24     MS. WERMUTH: Objection, foundation.

Page 16

1 BY THE WITNESS:
2    A. ████████████████████
3 BY MR. BRAMWELL:
4    Q. Well, ████████████████ but I
5 guess of all the people in all the world that DePaul
6 could have appointed to that position, how was it
7 you?
8     MS. WERMUTH: Objection, foundation.
9 BY THE WITNESS:
10    A. The president talked to me and I believe he
11 talked to a few other people and asked me if I would
12 serve in that role.
13 BY MR. BRAMWELL:
14    Q. And that president was Dr. Esteban?
15    A. That is correct.
16    Q. Okay. And how long have you been in the
17 role as provost, either as acting or interim?
18    A. Since October of 2018.
19    Q. Okay. And, Dr. Ghanem, what is the month
20 and year of your birth?
21    A. ████████████
22    Q. I'm also an ████████ baby.
23     All right. So, Dr. Ghanem, as provost, do
24 deans of the various colleges and schools ever lobby

Page 17

1 you on behalf of junior faculty outside of the formal
2 tenure process?
3     MS. WERMUTH: Objection, vague, ambiguous.
4 BY THE WITNESS:
5    A. Can you clarify what you mean by "lobby"?
6 BY MR. BRAMWELL:
7    Q. Sure. So we've established that you have a
8 role in the tenure process, correct?
9    A. That is correct.
10    Q. According to Section 3.5.6.3 of the faculty
11 handbook, you make the final decision on tenure and
12 promotion; is that correct?
13    A. That is correct.
14    Q. Now do -- I imagine -- strike that.
15     Has a dean of a college or a school ever
16 come to you outside of the formal tenure process to
17 advocate on behalf of a junior tenure line but
18 untenured faculty member?
19     MS. WERMUTH: Objection, vague.
20 BY THE WITNESS:
21    A. I would have to ask you again, what do you
22 mean by advocate? Advocate in terms of the tenure
23 process or advocate for what?
24

5 (Pages 14 - 17)

Page 18

1  BY MR. BRAMWELL:
2     Q.  Advocate for their tenure promotion.
3     A.  Not -- not that I recall, no.
4     Q.  What about -- I asked you about deans.  What
5  about associate deans?
6     A.  No.
7     Q.  What about assistant deans?
8     A.  No.
9     Q.  So you never have lunch or coffee or
10  meetings or other conversations, by way of example,
11  with a member of the administration at an academic
12  unit where this member of administration talks to you
13  about a particular candidate's tenure case?
14     A.  Not that I recall, no.
15     Q.  Okay.  Do you know Alexa Murphy?
16     A.  I do.
17     Q.  How do you know Alexa Murphy?
18     A.  She served as associate dean when I was dean
19  of the College of Communications.
20     Q.  Do you know what she's doing now?
21     A.  She is currently serving as acting dean of
22  the College of Communication.
23     Q.  Okay.  Is she a friend of yours?
24     A.  I would say yes.

Page 19

1     Q.  Okay.  I understand that you had lunch with
2  Dr. Murphy on May 15, 2019.
3        Do you recall that?
4     A.  No, I do not.
5     Q.  Okay.  So you don't remember what you talked
6  about?
7     A.  No, I really do not.
8     Q.  Okay.  Do you have lunch with her often?
9     A.  Not very often, no.
10     Q.  Okay.  Do you deny having lunch with her on
11  May 15, 2019?
12     A.  I do not deny it, but I do not recall it.
13     Q.  Okay.  Did you ever speak with Dr. Murphy
14  outside of the formal process about Dr. Calvente's --
15  actually, let's strike that.
16        You know Lisa Calvente?
17     A.  Yes.
18     Q.  How do you know Dr. Calvente?
19     A.  She was a faculty member in the College of
20  Communication when I served there as dean.
21     Q.  And also when you were acting provost?
22     A.  Well, I knew her back then, so I did know
23  her as acting provost as well.
24     Q.  Okay.  When did your title go from acting

Page 20

1  provost to interim provost?
2     A.  I believe it was July 1, 2019.
3     Q.  Do you ever remember talking with Dr. Murphy
4  about Dr. Calvente's tenure case outside of the
5  formal tenure process?
6     A.  No, I do not.
7     Q.  You mentioned previously that you were the
8  dean of the College of Communications?
9     A.  That is correct.
10     Q.  Prior to being dean of the College of
11  Communications, were you on faculty at the College of
12  Communications?
13     A.  No, I was not.
14     Q.  How did you become -- all right.  So you
15  just came to DePaul as dean of the College of
16  Communications from outside?
17     A.  That is correct.
18     Q.  From where did you come?
19     A.  From Central Michigan University.
20     Q.  Is Central Michigan University a research
21  one?
22     A.  No, it is not.
23     Q.  What is it?
24     A.  It is a regional university.

Page 21

1     Q.  What does that mean, to be a regional
2  university?
3     A.  That means it is not the flagship university
4  of that particular state.
5     Q.  How does it compare to DePaul?
6        MS. WERMUTH:  Objection, vague, relevance.
7  BY THE WITNESS:
8     A.  It depends on what kind of comparison we're
9  looking at.
10  BY MR. BRAMWELL:
11     Q.  On what does it depend?
12     A.  Could be size of the university, it could be
13  the type of programs that are offered at that
14  university, and so on.
15     Q.  All right.  So size, how does it compare?
16     A.  Size I would say is very similar.
17     Q.  Programs, how does it compare?
18     A.  It was -- they had more in the health
19  sciences, and they were in the process of starting a
20  medical school, which DePaul does not have.
21     Q.  Okay.  When did you --
22     A.  Sorry.
23     Q.  I'm sorry, go ahead.  I'm sorry.  See we
24  already had our first -- I thought you were done, and

6 (Pages 18 - 21)

Page 22

1  I kept going.
2      Please continue your answer. I'm sorry.
3      A. They had an engineering school also, which
4  DePaul does not.
5      Q. Is there anything else?
6      A. It was a public institution, and DePaul is a
7  private institution.
8      Q. Anything else?
9      A. No.
10     Q. What about the academic reputations of those
11 two schools?
12     MS. WERMUTH: Objection, vague, foundation.
13 BY THE WITNESS:
14     A. When you say "academic reputation" that's
15 very vague.
16 BY MR. BRAMWELL:
17     Q. Why is it vague?
18     A. Because there are so many different criteria
19 by which you evaluate universities. You evaluate it
20 depending on size, you evaluate it depending on
21 endowment, you evaluate it depending on admission
22 rates, and so on.
23     Q. What else do you evaluate it based on?
24     A. Again, it could be about certain programs

Page 23

1  being top ranked, it could be in terms of diversity
2  of the student body, it could be in terms of number
3  of faculty. There is a whole bunch of ways of
4  looking at different universities.
5      Q. You mentioned top ranked. What do you mean
6  by top ranked?
7      A. Sometimes you will have programs that are
8  top ranked in particular areas by specific
9  associations or organizations that rank them.
10     Q. What organizations or associations rank
11 communications programs?
12     A. I don't believe there is one that ranks all
13 of the communication programs. There is -- for
14 example, PR Week ranks public relations programs.
15 But there isn't one for all communication programs
16 that I am aware of.
17     Q. Are there other -- you said PR Week. Are
18 there other associations or organizations that rank
19 various segments of communication programs?
20     A. There might be, but nothing that I can
21 recall.
22     Q. Would anything refresh your recollection?
23     A. I -- perhaps.
24     Q. What would that thing be?

Page 24

1      A. Whatever you decide to show me.
2      Q. Well, I'm asking what would refresh your
3  recollection.
4      A. If I see a ranking by an association, I can
5  tell you if I've seen it before or not.
6      Q. Okay. What association should I be looking
7  at?
8      A. There are multiple associations in
9  communication. There is the Association for
10 Education in Journalism and Mass Communication, there
11 is International Communication Association, there's
12 the National Communication Association. There are
13 multiple associations.
14     Q. Okay. Any other associations?
15     A. Not that I recall at this moment.
16     Q. Okay. Would anything refresh your
17 recollection?
18     A. If you mention some other names, maybe it
19 will refresh my recollection.
20     Q. Okay. With respect to top ranked, what
21 about general rankings with respect to the
22 university?
23     A. U.S. News and World Report does give
24 national rankings.

Page 25

1      Q. Okay. Are the U.S. News and World Report
2  rankings a valid metric to evaluate the prestige of a
3  university?
4      MS. WERMUTH: Objection, vague, assumes
5  facts not of record.
6  BY THE WITNESS:
7      A. They are debatable. Some people look at
8  them, some people don't.
9  BY MR. BRAMWELL:
10     Q. Okay. Do you look at them?
11     A. I might pay attention to them just to know,
12 but I don't worry about the rankings.
13     Q. If you don't worry about the rankings, why
14 would you pay attention to them just to know?
15     A. Just out of curiosity to see where an
16 institution might fall.
17     Q. Any other reasons?
18     A. No.
19     Q. You mentioned U.S. News and World Report.
20 Are there any other places that rank universities?
21     A. I think there is one called the Princeton
22 Review, if I am not mistaken.
23     Q. Okay. Anything else?
24     A. But I'm -- those are the ones that come to

7 (Pages 22 - 25)

Page 26

1  mind.
2      Q.  Okay.  Now you mentioned that you were
3  previously the dean of the College of Communications.
4  What was your job as the dean?
5      A.  To oversee the various programs within the
6  College of Communications.
7      Q.  Is that it?
8      A.  Yeah, I basically oversee the college.
9      Q.  What does overseeing the college entail?
10     A.  It entails overseeing that we are adhering
11 to the curriculum needs of the students to faculty
12 evaluations to addressing issues of the college with
13 upper administration to fundraising to overseeing
14 processes and policies within the college and over --
15 as well as overseeing the staff in the college.
16     Q.  Do you -- is part of your job to manage
17 faculty?
18     A.  Are you referring to when I was dean?
19     Q.  As dean, correct.
20     A.  Okay.  Can you please clarify, what do you
21 mean by "manage"?
22     Q.  What does the word "manage" mean to you?
23     A.  Manage means oversee the processes.
24     Q.  Okay.  We'll just pull up the trusty

Page 27

1  dictionary here.  Webster's New World College
2  Dictionary here.  I think I had it college, actually,
3  so it's a little old.
4      MR. BRAMWELL:  Ms. Wermuth, you just went
5  dark.
6      MS. WERMUTH:  Yes, I'm still here.  I just
7  need to let my dog out of the room.
8      MR. BRAMWELL:  Okay.
9  BY MR. BRAMWELL:
10     Q.  So "manage" means to handle, it means to
11 have charge of, to direct, to administer.
12     So using those definitions, was one of your
13 jobs as dean to manage the faculty?
14     A.  I administer different aspects of the
15 college that would affect the faculty, yes.
16     Q.  Okay.  And you are responsible for helping
17 faculty members get along with each other?
18     A.  I'm sorry, but I really don't understand
19 your question.
20     Q.  Okay.  Are you -- do faculty members always
21 get along?
22     A.  Not necessarily, no.
23     Q.  So when faculty members are not getting
24 along, do you help mediate the disputes?

Page 28

1      A.  If it is work related, yes.
2      Q.  Okay.  And faculty, I imagine, when you were
3  dean, came to you with work-related grievances?
4      A.  Sorry, I did not hear you.
5      Q.  That's okay.  I'll try again.
6      Faculty, while you were dean, came to you
7  with work-related grievances?
8      A.  Can you, again, define what you mean by
9  "grievance"?
10     Q.  Sure.  What does the word "grievance" mean
11 to you?
12     A.  Grievance usually refers, to me, as a
13 complaint.
14     Q.  Okay, good.  We have the same definition.
15     A.  Yeah, faculty could come to me to talk about
16 complaints of things that might be happening in the
17 college.
18     Q.  And you would help try to fix those
19 complaints or solve those complaints?
20     A.  If it's within my purview, yes.
21     Q.  Do you help junior faculty -- again, while
22 you were dean, did you help junior faculty navigate
23 the tenure process?
24     MS. WERMUTH:  Objection, vague.

Page 29

1  BY THE WITNESS:
2      A.  I -- I had always an open-door policy if any
3  of them had any questions about the process, yes.
4  BY MR. BRAMWELL:
5      Q.  And did that include -- well, strike that.
6      You were dean, and I don't remember if I
7  asked this or not, so I hope I'll get a little
8  latitude here.
9      You were dean from when to when?
10     A.  I believe August 2014 until October 2018.
11     Q.  Okay.  And are you -- were you reading
12 anything there?
13     A.  No.
14     Q.  While you were dean, did the College of
15 Communications have a formal mentoring program?
16     A.  It didn't have a formal mentoring program,
17 but it did hold, like, a symposium or a panel
18 discussion on how to prepare for tenure.
19     Q.  Okay.  What about how -- what about other
20 sort of mentoring activities?
21     MS. WERMUTH:  Objection, vague.
22 BY THE WITNESS:
23     A.  There wasn't an official mentoring system
24 within the college, so faculty were not paired with

8 (Pages 26 - 29)

Page 30

1  another faculty member, no.
2  BY MR. BRAMWELL:
3      Q.  Okay.  What about -- so I guess then it is
4  fair to say that you were not anyone's formal mentor
5  when you were the dean?
6      A.  That is correct.
7      Q.  I imagine if the College of Communication is
8  like most workplaces that informal mentorship --
9  strike that.  Let me try again.
10         I imagine, if the College of Communication
11  is like most workplaces, that informal mentoring
12  relationships formed?
13         MS. WERMUTH:  Objection to the narrative.
14  BY THE WITNESS:
15      A.  I would believe so, yes.
16  BY MR. BRAMWELL:
17      Q.  Did you have any informal mentoring
18  relationships with junior faculty while you were
19  dean?
20      A.  I have talked with several junior faculty
21  about the tenure process, yes.
22      Q.  Who do those faculty include?
23      A.  Lisa Calvente.  I believe Kendra Knight.
24  Trying to think who else.  Lou Rutigliano.  Those are

Page 31

1  a few names that come to mind.
2      Q.  Okay.  Now I asked you if you had a
3  mentoring relationship with them.  You mentioned that
4  you had spoken to certain junior faculty, but I'll
5  put the question to you again.
6         Did you consider that relationship to be a
7  mentoring relationship?
8      A.  I would say I was there to offer guidance
9  and direction.
10      Q.  And you helped them to -- you provided
11  guidance and direction into the sorts of things that
12  one needs to do to obtain tenure?
13      A.  Depending on the situation, yes.
14      Q.  Did do you that -- you mentioned Kendra
15  Knight, Lou Rutigliano, and Lisa Calvente.  Did you
16  have conversations with each of them about the sorts
17  of things they would need to do to obtain tenure?
18      A.  We talked about the -- the three areas,
19  research, teaching, and service.
20      Q.  Did you talk about other areas in which --
21  did you talk about other things they would need to do
22  to obtain tenure?
23      A.  No.  I'm not sure what you mean, but no.
24      Q.  So while we're on it, and because we have a

Page 32

1  court reporter, and I'm sure she will remind us
2  later, do you know how to spell Rutigliano?
3      A.  I think Lou is L-O-U.  Rutigliano, I think
4  it's -- I'm not sure, but R-U-T-I-G-L-I-A-N-O.
5  That's as close as I can get.
6      Q.  Now with respect to your interactions with
7  Dr. Calvente, did you ever help -- did you ever offer
8  to help her with her -- actually, let's strike that.
9  I'm sorry.
10         When somebody goes through the tenure
11  process, I understand there are multiple steps, even
12  at the local academic unit level; is that right?
13      A.  That is correct.
14      Q.  And one of those steps involves meeting with
15  the personnel committee?
16      A.  That is correct.
17      Q.  Okay.  And prior to that meeting with
18  personnel, the candidate would prepare a statement?
19      A.  That is correct.
20      Q.  A written statement?
21      A.  That is correct.
22      Q.  Would the candidate prepare that written
23  statement for each of their meetings with personnel?
24         MS. WERMUTH:  Objection, vague.

Page 33

1  BY THE WITNESS:
2      A.  Every time they have a formal review, they
3  prepare a narrative, yes.
4  BY MR. BRAMWELL:
5      Q.  Okay.  And just again, so the record is
6  clear, that narrative is a written narrative?
7      A.  Yes.
8      Q.  Okay.  Did you ever help Dr. Calvente with
9  her written narrative?
10      A.  Yes.
11      Q.  When did you help Dr. Calvente with her
12  written narrative?
13      A.  I believe it was in her second formal review
14  since I became dean.  So it might have been her third
15  formal review.
16      Q.  Okay.  What help did you give her?
17      A.  I offered to read it and to have a -- to
18  tell her whether it was -- and to provide feedback to
19  that narrative.
20      Q.  Why did you do that?
21      A.  ██████████████████████████
██  ████████████████████████████████
██  ███████████████████████████████
   ████████████████████████.

9 (Pages 30 - 33)

Page 34

1  Q.  Okay.  I'm sorry, I have a frog in my
2  throat.
3      I guess my question is, why did you do that?
4  A.  To provide her with support and possible
5  guidance.
6  Q.  Okay.  And this is not a trick question.  I
7  assume that you did your very best for her to help
8  her with her personnel statement?
9  A.  I looked at it, I read it, and I told her
10  that it sounded okay.
11  Q.  Okay.  How much time did you spend with her
12  on it?
13  A.  We had a meeting.  I do not recall how long
14  the meeting was.
15  Q.  Was it more than an hour?
16  A.  I really do not recall.
17  Q.  More than two hours?
18  A.  I don't believe so.  It would have been
19  probably less than two hours, but I do not recall.
20  Q.  Did you ever offer to help Dr. Calvente
21  prepare for her interviews with the personnel
22  committee?
23  A.  No, I did not.
24  Q.  Is this advice that you gave Dr. Calvente,

Page 35

1  is this something you would have offered to any
2  junior faculty member?
3  A.  Yes, I would have.
4
20  Q.  Okay.  Did you ever try to mentor Sydney
21  Dillard?
22  A.  I met multiple times with Sydney Dillard,
23  but I don't believe there was a mentorship issue
24  there.

Page 36

1  Q.  Okay.  What about Bree McEwan?
2  A.  No, I was not.
3  Q.  I'm going to send you now a document that I
4  have marked as Exhibit No. 19.  This document is
5  Bates labeled Calvente-DePaul-0038241
6  through 0038260.
7      Please let me know when it arrives.
8  A.  Okay, I received an e-mail from you.
9      MS. WERMUTH:  I don't yet have it.
10      MR. BRAMWELL:  All right.  Well, I've given
11  the Bates numbers, and Dr. Ghanem, just open it up
12  and I'll wait until Ms. Wermuth gets it before I
13  start asking questions.
14      MS. WERMUTH:  So I have it now.  So it's
15  038241 through 038260?
16      MR. BRAMWELL:  Correct.
17      MS. WERMUTH:  Okay.
18      THE WITNESS:  Could you repeat the numbers
19  again?  038241 to what?
20  BY MR. BRAMWELL:
21  Q.  Sure.  Through 38260.
22      Do you have it in front of you, Dr. Ghanem?
23  A.  I do, but I'm scrolling -- yeah, 38260.
24  Yes, I do.

Page 37

1  Q.  Okay.  Are you familiar with this document?
2  A.  Let me look at it.  I do not recall this
3  document.
4  Q.  Okay.  So you've never seen this document
5  before?
6  A.  I do not recall it.
7  Q.  Okay.  I'm sending you now a document that I
8  have marked as Exhibit 22.
9      Please let me know when you receive it.
10  It's document Calvente-DePaul-0007152 through 7159.
11  A.  I just received an e-mail.
12  Q.  All right.
13      MS. WERMUTH:  I don't yet have it.
14      Okay, Exhibit 22 just came, and let me check
15  the numbers.  7152 through 7159.
16  BY MR. BRAMWELL:
17  Q.  All right.  Dr. Ghanem, I'd like you to
18  ignore the first page of this exhibit and look at
19  pages 2 through 8.
20      MS. WERMUTH:  You want her to ignore a page,
21  is that what you said?
22      MR. BRAMWELL:  Madam Court Reporter, can you
23  please read back my last statement?
24      (Record read as requested.)

10 (Pages 34 - 37)

Page 38

1  BY MR. BRAMWELL:
2     Q.  Dr. Ghanem, have you seen pages 2 through 8
3  of this exhibit?
4     A.  Yes, I have.
5     Q.  What are pages 2 through 8 of this exhibit?
6  ███████████████████████████████████████
7  ██ ███████████████████████████████████████
8  ██ ███████
9     Q.  Okay.  And again, looking at pages 2
10 through 8, is this document true, complete, and
11 accurate in all respects?
12    MS. WERMUTH:  I'm going to object to the
13 question.  I don't -- foundation.
14 BY MR. BRAMWELL:
15    Q.  You can answer.
16    A.  As far as I can tell -- oh, sorry, could you
17 repeat the question?  I want to make sure I'm
18 answering it correctly.
19    MR. BRAMWELL:  Sure.  Madam Court Reporter,
20 can I ask to you please repeat the question?
21    (Record read as requested.)
22 BY THE WITNESS:
23    A.  As far as I can tell, yes.
24

Page 39

1  BY MR. BRAMWELL:
2     Q.  Did you write the answers to the questions
3  again listed in -- on pages 2 through 8?
4     A.  Yes, I did.
5     Q.  When did you prepare them?
6     A.  I do not recall.  Whenever the appeals
7  committee sent me that e-mail asking for those
8  responses.  I do not recall the date.
9     Q.  Okay.  How long did it take you to answer
10 the questions?
11    A.  I do not recall how long it took.
12    Q.  Would it have been half a day?
13    A.  I really do not recall.
14    Q.  Would it have been a full day?
15    A.  I really do not recall.
16    Q.  Would anything refresh your recollection?
17    A.  I don't believe so.
18    Q.  Did you answer the questions in one sitting,
19 or did you space it out over multiple sittings?
20    A.  I believe over multiple sittings.
21    Q.  Did anybody help you write your answers?
22    A.  I might have reached out to Lucy Reinhart,
23 as well as Kathy Stieber.
24    Q.  I'm very interested in your conversations

Page 40

1  with both, but I'll only ask you about your
2  conversations with Ms. Reinhart.
3     What did you say to Ms. Reinhart and she to
4  you?
5     MS. WERMUTH:  Before you answer, Salma, let
6  me just object to the extent your conversations with
7  Lucy also involved Kathy, I would direct you not to
8  answer, if they were together.
9  BY THE WITNESS:
10 ██ ████████████████████████████████████████████
11 ██ ██████████████████████████
12
13 BY MR. BRAMWELL:
14    Q.  Okay.  Do you stand by the answers that you
15 have given in this document, again on pages 2
16 through 8?
17    A.  Is there a specific question you want me to
18 look at?  It's a long document.
19    Q.  All of them.  Do you stand by the answers
20 that you gave?
21    A.  I would have to go through each of the
22 questions.  Would you --
23    Q.  Sure.
24    A.  I will need some time to do that.

Page 41

1     Q.  Sure.  Do you want to take five minutes?
2  You can go through them, and we can come back, let's
3  say at 9:55, so six minutes?
4     A.  That would be fine.  Can I turn off the
5  video at that time?
6     MR. BRAMWELL:  Sure, you can turn off the
7  video right now, and we'll come back at 9:55.
8     THE WITNESS:  Sounds good.
9     (A short break was taken.)
10 BY MR. BRAMWELL:
11    Q.  Dr. Ghanem, you've now had an opportunity to
12 review for, by my clock, six minutes, Exhibit No. 22.
13    I asked you before we went off if you stood
14 by your answers.  Do you stand by your answers to
15 that -- to those?
16    A.  Yes, I do.
17    Q.  Okay.  Nothing you would change?
18    A.  I don't believe so, no.
19 ██ ████████████████████████████████
20 ██ ███████████████████████
21 ██ ██████████████████████████████
22 ██ ████████████████████████
23 ██ ████████████████████████████

11 (Pages 38 - 41)

Page 42

1 ████████████

████████████████████

████ ████████████████████

████ ████████████

████ ████████████████████

████ ████████████████

████ ████████████████

10    Q. Okay. Dr. Ghanem, what is the -- let me try

11 that again.

12       What is the University Board on Promotion

13 and Tenure?

14    A. It is a committee made of full professors

15 representing different disciplines of the university.

16    Q. What is the University Board on Promotion

17 and Tenure's purpose?

18    A. It is another level of review of tenure and

19 promotion cases.

20    Q. Okay. Now can we call the University Board

21 on Promotion and Tenure, can we call that the UBPT?

22    A. That's fine.

23    Q. The UBPT is sanctioned by the faculty

24 handbook?

Page 43

1    A. Yes, it is.

2    Q. All right. I asked you earlier about the

3 faculty handbook. That's Exhibit No. 23.

4       Do you recall when I asked you about that?

5    A. Yes, I do.

6    Q. Okay. And you're familiar with the faculty

7 handbook?

8    A. Yes, I am.

9    Q. How are you familiar with it?

10    A. I refer to it a lot, and I look at it for

11 different aspects -- for different processes at the

12 university.

13    Q. You said you refer to it a lot. What do you

14 mean by "a lot"?

15    A. Whenever there is a question that comes up

16 that I -- or a process that I need to clarify, I will

17 go look in the faculty handbook.

18    Q. Would you say you consult it daily?

19    A. No.

20    Q. Weekly?

21    A. I've been at DePaul six, seven years. No, I

22 do not consult it weekly.

23    Q. How often do you consult it?

24    A. It depends on -- on the time. There might

Page 44

1 be times when I would consult it weekly, and then

2 there might be times that I wouldn't consult it for

3 several weeks.

4    Q. And the faculty handbook spells out the

5 terms and conditions for employment for faculty at

6 DePaul?

7    A. Yes.

8    Q. And chapter 3 of the handbook articulates

9 the process for obtaining tenure at DePaul?

10    A. Let me review if that's in chapter 3. I

11 don't remember the chapter names. I'm looking at the

12 handbook. Chapter 3 deals with promotion and tenure

13 standards and procedures.

14    Q. Okay. Now section 3.1 of the faculty

15 handbook, I'd like to direct your attention there, if

16 I may.

17       Please let me know when you're there. It's

18 page 28 of 103 of Exhibit No. 23.

19    A. Page, can you say the page number again?

20    Q. Sure. It's page 28 of 103, and that's the

21 big PDF.

22    A. Because I have it here. The overview is

23 page 43 of 188. Am I looking at --

24    Q. Oh, okay, yeah, that will also work if

Page 45

1 you're looking at 43 of 188 at the top.

2    A. Yes.

3    Q. Then we're at the same place.

4       I'm going to do something that I still think

5 is really cool and share my screen with you.

6    A. Okay.

7    Q. Do you see -- first of all, have I

8 successfully shared my screen?

9    A. Yes, you have.

10    Q. Okay. Now I've highlighted some language

11 here on section 3.1, lines 19 through 21. I've

12 highlighted one sentence. That sentence I've

13 highlighted is: Before granting tenure, the

14 university should have no reasonable doubt about the

15 faculty member's demonstrated qualifications and

16 continued capacity to contribute to DePaul's

17 distinctive goals and academic mission.

18       Do you see that there?

19    A. Yes, I do.

20    Q. What does it mean to you that the university

21 should have no reasonable doubt about the faculty

22 member's demonstrated qualifications and continued

23 capacity?

24    A. That there should be no question about the

12 (Pages 42 - 45)

Page 46

1  faculty member's demonstrated qualifications and
2  continued capacity.
3      Q. How does one make this determination?
4      A. It is based on the dossier of the faculty
5  member as well as the guidelines in the local
6  academic unit and the faculty handbook.
7      Q. So the college review and the UBPT review?
8      A. And the dossier.
9      Q. And the dossier. But the dossier is what
10 the college and the UBPT review, correct?
11     A. That is correct.
12     Q. What's more important, the college or the
13 UBPT?
14         MS. WERMUTH: Objection, assumes facts not
15 of record.
16 BY THE WITNESS:
17     A. I believe they are all important.
18 BY MR. BRAMWELL:
19     Q. Well, okay, they're all important, but is
20 one of them more important than the other?
21     A. I don't believe so.
22     Q. No? I'd like to talk a little bit then
23 about the tenure process.
24         If I understand correctly, the first thing

Page 47

1  you do is that the college -- or sorry, let's strike
2  that.
3         I understand the first thing you have is the
4  local academic unit votes and makes a recommendation,
5  correct?
6      A. Correct.
7      Q. All right. And then after the local
8  academic unit makes its recommendation, then the dean
9  weighs in and makes a recommendation?
10     A. It depends on the college. There are
11 colleges with departments and there are several other
12 reviews. So it will be -- could be the personnel
13 committee, then the faculty within the department,
14 and then it could be the chair of the department, and
15 then it could be a college-wide committee, and then
16 it could be the dean and then UBPT.
17     Q. Okay. So you have a bunch of
18 recommendations then at the local academic unit,
19 right?
20     A. If there is -- again, if the local academic
21 unit is the department or is the college, it makes a
22 difference.
23     Q. Okay. So there could be at least two and as
24 many as five in the local academic unit?

Page 48

1      A. At least two and as many as four, I believe.
2      Q. Okay. So there will be between two and four
3  recommendations at the local academic unit for
4  tenure, is that correct?
5      A. Correct.
6      Q. I'm sorry --
7      A. Correct.
8      Q. Okay, good.
9         And then all of that information would go to
10 the UBPT?
11     A. Correct.
12     Q. And the UBPT would evaluate all of that
13 information and then make a recommendation?
14     A. That is correct.
15     Q. Okay. Now if I understood you correctly,
16 you believe that what goes on in the college is just
17 as important as what goes on in the UBPT?
18     A. Technically, according to the handbook, the
19 UBPT carries a little bit more weight.
20     Q. That's right, because in section 3.5.6.3 of
21 the handbook, it says that only in rare instances and
22 for compelling reasons will the provost overturn a
23 promotion or tenure recommendation made by the UBPT,
24 right?

Page 49

1         MS. WERMUTH: What page, Mr. Bramwell, were
2  you reading from?
3         MR. BRAMWELL: Madam Court Reporter, would
4  you please read back my question?
5         (Record read as follows: That's right,
6         because in section 3.5.6.3 of the handbook,
7         it says that only in rare instances and for
8         compelling reasons will the provost overturn
9         a promotion or tenure recommendation made by
10        the UBPT, right?)
11        MS. WERMUTH: Right, and Mr. Bramwell, I was
12 just asking what page you were referring to.
13 BY MR. BRAMWELL:
14     Q. Dr. Ghanem, you can answer.
15        MS. WERMUTH: You're not going to provide
16 that information, Mr. Bramwell? You're not going to
17 answer my question?
18        I would suggest that the witness be
19 permitted to review the material that you are asking
20 her about.
21        MR. BRAMWELL: Nobody stopped her from doing
22 that.
23        MS. WERMUTH: So I will provide the page
24 number. It is page 58 of 188, if you look at the

13 (Pages 46 - 49)

Page 50

1 blue marking on the top.
2     THE WITNESS: Okay, I just got to it. Thank
3 you.
4     And to Mr. Bramwell, could you tell me which
5 section you were looking at again?
6 BY MR. BRAMWELL:
7   Q. Sure. 3.5.6.3.
8   A. I found it. What was the question?
9     MR. BRAMWELL: Can I ask the court reporter
10 to read it back one more time?
11     (Record read as follows: That's right,
12     because in section 3.5.6.3 of the handbook,
13     it says that only in rare instances and for
14     compelling reasons will the provost overturn
15     a promotion or tenure recommendation made by
16     the UBPT, right?)
17 BY THE WITNESS:
18   A. That is correct.
19 BY MR. BRAMWELL:
20   Q. Okay. So if this is what the handbook says,
21 can you please explain -- or does that -- let's
22 strike that.
23     If this is what the handbook says, do you
24 still believe that the college is just as important

Page 51

1 as the UBPT?
2   A. The college is important, but according to
3 this, the UBPT is -- has more weight.
4   Q. Okay. Now I think we would all agree that,
5 as provost, you have the right to overturn the UBPT's
6 recommendation, right?
7   A. Yes, I do.
8   Q. But you can only do it in rare instances and
9 for compelling reasons?
10   A. That is correct.
11   Q. Okay. Can you give me some examples of what
12 might be a compelling reason to overturn a UBPT
13 recommendation?
14   A. It could be if I differ with them in terms
15 of my assessment of the dossier.
16   Q. So if you believe the UBPT just got it
17 wrong, you can overturn them?
18   A. If my assessment of the dossier is different
19 than UBPT, yes, I can overturn them.
20   Q. Okay, but that's not the question I asked.
21 I asked a yes or no question.
22     MR. BRAMWELL: Could I ask the court
23 reporter to read it back, please?
24     (Record read as requested.)

Page 52

1     MS. WERMUTH: Objection, asked and answered.
2 BY THE WITNESS:
3   A. I can overturn UBPT if my reading of the
4 dossier is different than their reading. I am not
5 saying that they're wrong, I'm saying that I read it
6 and evaluated it differently than they did.
7 BY MR. BRAMWELL:
8   Q. So if you disagree with them for any reason,
9 you can overturn them?
10     MS. WERMUTH: Objection, misstates and
11 mischaracterizes her testimony.
12 BY THE WITNESS:
13   A. It would be -- have to be based on the
14 merits of the dossier.
15 BY MR. BRAMWELL:
16   Q. During your time as provost, have you ever
17 lost faith in the UBPT as a whole -- or actually,
18 strike that.
19     Before you answer that, are there any other
20 compelling reasons for overturning a UBPT
21 recommendation?
22     MS. WERMUTH: Objection, calls for
23 speculation.
24

Page 53

1 BY THE WITNESS:
2   A. Again, it depends on what is in the dossier.
3 BY MR. BRAMWELL:
4   Q. So -- and I'm not sure I understand your
5 answer, so I'm going to try to unpack it a little
6 bit, or probe a little bit more.
7     Is it just if you disagree with the UBPT's
8 reading of the dossier, or are there other compelling
9 reasons that would permit you to overturn a UBPT
10 recommendation?
11     MS. WERMUTH: Objection, asked and answered,
12 calls for speculation.
13 BY THE WITNESS:
14   A. I'm really having difficulty understanding
15 your question.
16     We look -- I look at the dossier of the
17 candidate, the different levels of review, as well as
18 the review of UBPT, and based on all of that, I make
19 a decision.
20 BY MR. BRAMWELL:
21   Q. Okay. But I'm trying to understand your
22 understanding of what a compelling reason is. I may
23 have gotten this wrong, right? I'm human; I make
24 mistakes too.

14 (Pages 50 - 53)



Page 54

1        But from your testimony so far, I understand
2  that the only reason -- the only compelling reason is
3  if you disagree with the UBPT's assessment of the
4  dossier. Are there other compelling reasons that
5  would lead you to overturn a UBPT recommendation?
6     A.  There was one instance --
7     MS. WERMUTH: Hang on. Let me object.
8  Asked and answered, calls for speculation.
9  BY MR. BRAMWELL:
10    Q.  Go ahead.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 55

1
2
3
4
5    Q.  Okay. Are there any other cases or any
6  other situations you can think of that might
7  constitute compelling reasons for overturning a UBPT
8  recommendation?
9     MS. WERMUTH: Calls for speculation.
10     Go ahead.
11  BY THE WITNESS:
12
13
14
15
16
17
18  BY MR. BRAMWELL:
19    Q.  Okay. So if you think somebody did not
20  receive proper procedure or if you disagree with the
21  reading of the dossier. Anything else?
22    A.  No.
23    Q.  Okay. During your time as provost, have you
24  ever lost faith in the UBPT as a whole?

Page 56

1     MS. WERMUTH: Objection, vague, relevance.
2  BY THE WITNESS:
3    A.  No, I have not.
4  BY MR. BRAMWELL:
5    Q.  What about any of its members?
6     MS. WERMUTH: Same objections.
7  BY THE WITNESS:
8    A.  No, I have not.
9  BY MR. BRAMWELL:
10    Q.  Okay. Could you ask a member of the UBPT to
11  resign?
12    A.  I don't know. I've never confronted that.
13     THE WITNESS: Mr. Bramwell, could I have a
14  humanity break?
15     MR. BRAMWELL: Absolutely. 10:25 come back?
16     THE WITNESS: I don't need that long.
17     MR. BRAMWELL: That's just a nice round
18  number.
19     MS. WERMUTH: That's fine. Thank you.
20     THE WITNESS: Okay, thank you.
21     (A short break was taken.)
22  BY MR. BRAMWELL:
23    Q.  All right. So Dr. Ghanem -- did I pronounce
24  that correctly?

Page 57

1    A.  Yes.
2    Q.  Okay, good. I apologize, it's one of my
3  quirks, for whatever issues that exist, I always want
4  to make sure I get people's names correct.
5     I have e-mailed you a document that's Bates
6  labeled LC-0004068 through 4076. Please let me know
7  when it arrives. This is Exhibit No. 18.
8    A.  Can you repeat the numbers again?
9    Q.  Sure, it's LC, as in Lima, Charlie, 0004068
10  through 4076.
11    A.  I received it.
12     MR. BRAMWELL: Ms. Wermuth, have you
13  received it?
14     MS. WERMUTH: Yes.
15     MR. BRAMWELL: Okay, good.
16  BY MR. BRAMWELL:
17    Q.  Dr. Ghanem, what is this document?
18    A.  This is the required end-of-year report from
19  UBPT to me.
20    Q.  All right. Is it true, complete, and
21  accurate in all respects?
22    A.  Yes, with the exception of one thing that
23  they don't mention.
24    Q.  Okay. What is inaccurate about this

15 (Pages 54 - 57)

Page 58

1  document?
2      A.  They do not mention that the candidate can
3  write a rebuttal to the UBPT recommendation, which I
4  also look at when I'm making my deliberations.
5      Q.  Okay.  So you believe the document should
6  contain more information, but you don't disagree that
7  the document is what it purports to be?
8      A.  That is correct.
9      Q.  Okay.  When did ████████ join the UBPT,
10  if you know?
11     A.  █████████████████████████████
12  ██.
13     Q.  Did you have in role in Dr. ███ becoming a
14  member of the UBPT?
15     A.  No, I did not.
16     Q.  Let's take a look at page 2 of Exhibit
17  No. 18.
18         Before we do that, though, do you know how
19  one gets on the UBPT?
20     MS. WERMUTH:  Let me -- hang on just a
21  minute.  I'm going to object to examination on this
22  record, or on this Exhibit 18 insofar as it was
23  improperly obtained outside of the formal discovery
24  procedures.

Page 59

1  BY MR. BRAMWELL:
2      Q.  Dr. Ghanem, I await your answer.
3      A.  Sorry, can you repeat the question?
4      MR. BRAMWELL:  Sure.  Madam Court Reporter,
5  could you please repeat it?
6         (Record read as follows:  Before we do that,
7         though, do you know how one gets on the
8         UBPT?)
9  BY THE WITNESS:
10     A.  It is through the faculty council.
11  BY MR. BRAMWELL:
12     Q.  Okay.  And what is faculty council?
13     A.  Faculty council is a body of faculty
14  composed of faculty from different colleges and
15  schools at the university.
16     Q.  What is faculty council's purpose?
17     A.  To ensure faculty governance and to review
18  -- there are certain aspects where faculty have
19  primary responsibility.
20     Q.  Okay.
21     A.  As outlined in the faculty handbook.
22     Q.  All right.  So faculty council -- is it fair
23  to say that faculty council is the unit that
24  represents faculty's voice with respect to shared

Page 60

1  governance at DePaul?
2      A.  Yes.
3      Q.  Okay.  And faculty council appoints members
4  of the UBPT?
5      A.  Yes.
6      Q.  And now shared governance, what is shared
7  governance?
8      A.  Shared governance is where faculty input is
9  taken in terms of different decisions at the
10  university.
11     Q.  Okay.  Now as the provost, are you
12  considered faculty?
13     A.  I have a faculty appointment, but no, I am
14  not considered faculty.
15     Q.  Okay.  So then the UBPT is appointed by
16  faculty council.  Did we get that correct?
17     A.  That is correct.
18     Q.  And the UBPT, then, is faculty's voice with
19  respect to who should be tenured and who should not
20  be tenured?
21     A.  Based on that committee, yes, but there are
22  also other committees where faculty voices are
23  included, such as the local academic unit.
24     Q.  Okay.  So you have committees at the local

Page 61

1  academic unit, and the only university-level unit is
2  the UBPT; is that right?
3      A.  That is correct.
4      Q.  Okay.  Now let's take a look at Exhibit
5  No. 18, please, the second page of this exhibit, if
6  we may.
7      A.  Is that number 4069?
8      Q.  Correct, Bates label 4069.
9      A.  Okay.
10     Q.  And I'm going to share my screen, in part
11  because it's easier, and in part because I still
12  think it's cool.
13         Have I shared my screen successfully?
14     A.  Yes, you have.
15     Q.  Okay.  I'm going to highlight a sentence
16  that's in the middle of the last paragraph.  The
17  sentence is as follows:  ███████████████████
18  ███████████████████████████████████
19  ███████████████████████████████████
20  ███████████████████████████████████
21  ███████████████████████████████████
22  █████████████
23         Do you see that sentence?
24     A.  I do.

16 (Pages 58 - 61)

Page 62

1  Q. Do you agree with that sentence?
2  A. I find that sentence to be kind of vague.
3  Q. How is it vague?
4  A. ███████████████████████████
█ ███████████████████████████████
███████████████.
7  Q. I'm not sure I follow. Can you please
8  unpack that for me?
9      MS. WERMUTH: Objection, vague.
10 BY THE WITNESS:
11 A. ████████████████████████████
█ █████████████████████████████████████
█ ███████████████████████████████████
█ ███████████████████████████████████
█ ██████████████████████
16 BY MR. BRAMWELL:
17 Q. That's right, you are not a voting member of
18 the board as the provost.
19 A. That's correct.
20 Q. In fact, when the UBPT is deliberating,
21 you're not even supposed to comment on the
22 deliberation, correct?
23 A. That is correct.
24 Q. So would you agree, then, with the -- I

Page 63

1  guess it would be just a phrase, or just a part of
2  the sentence. Would you agree that the decision to
3  overturn may not be based -- sorry, let's try that
4  again.
5      Would you agree that the decision to
6  overturn may not be made simply because the provost
7  would have voted differently had the provost been a
8  voting member of the board? Would you agree or
9  disagree with that?
10     MS. WERMUTH: Objection, asked and answered.
11 BY THE WITNESS:
12 A. As I said, the sentence does not make sense
13 to me.
14 BY MR. BRAMWELL:
15 Q. Is English your first language?
16 A. Yes, it is.
17 Q. Okay. And you speak, read, and write it
18 fluently?
19 A. Yes, I do.
20 Q. Okay. And it's your testimony that you just
21 don't understand that sentence?
22 A. The sentence -- yes, I do not understand
23 this sentence.
24 Q. Okay. Going to the next sentence, I'm going

Page 64

1  to highlight it here.
2  ███████████████████████████████████
█ ██████████████████████████████████████████
█ ████████████████████████████████████
6      Do you see that sentence that I've
7  highlighted there?
8  A. I do.
9  Q. Do you agree or disagree with that sentence?
10 A. I disagree with that sentence.
11 Q. Why?
12 A ██████████████████████████████████
█ ████████████████████████████████████████
█ █████████████████████████████
17 Q. Okay. I asked you about a professor in the
18 College of Communications earlier; her name was ███
█ ████████
20     Do you know her?
21 A. Yes, I do.
22 Q. How do you know her?
23 A. As a faculty member in the College of
24 Communications.

Page 65

1  Q. Do you know her race?
2  A. I believe she's ██████
3  Q. Okay. ██████████████████████
█ █████████████████████████████████
█ ████████████████████████████████████████
█ ███████████████████████████
█ ████████████████████
10 Q. And do you know a gentleman by the name of
11 ████████████████████████
12 A. I do not know him. ████████████████.
13 Q. Okay. █████████████████████████?
14 A. Yes.
15 Q. What does that mean?
16 A ██████████████████████████████
█ ███████████████
19 Q. Okay. Did you have any other interactions
20 with ███████ -- strike that.
21 ████████████████████████████████████
█ ██████████████████████████████████████████
█ ████████████████████████████



17 (Pages 62 - 65)



Page 66

1    A.  No, I did not.
2    Q.  Did you ever have any telephone
3  conversations with him?
4    A.  No, I did not.
5    Q.  And by the way, I mean in the same time
6  period.
7        Same time period, ever exchange e-mail with
8  him?
9    A.  Not that I recall, no.
10    Q.  Okay.  Ever communicate with somebody on his
11  behalf?
12    A.  Not that I recall, no.
13    Q.  Okay.  I'm going to send you a document that
14  I have marked as Exhibit No. 1.  Please let me know
15  when it arrives.  It's Bates labeled
16  Calvente-DePaul-013833 through 013834.
17        Please let me know when it arrives.
18    A.  I just received the e-mail.
19        MR. BRAMWELL:  Ms. Wermuth?
20        MS. WERMUTH:  Actually, now I have it.
21        MR. BRAMWELL:  Okay, fantastic.
22        THE WITNESS:  Can you repeat the number
23  again?
24

Page 67

1  BY MR. BRAMWELL:
2    Q.  Sure.  It's Calvente-DePaul-01383 through
3  013834.
4    A.  I have it.
5    Q.  Okay.  Did you write -- are you familiar
6  with this document?
7    A.  Yes, I am.
8    Q.  Did you write it?
9    A.  Yes, I did.
10    Q.  Is it true, complete, and accurate in all
11  respects?
12    A.  Yes, it is.
13    Q.  As you sit here today, do you agree with its
14  content?
15    A.  Yes, I do.
16    Q.  Would you change anything about it?
17    A.  No, I would not.

Page 68

4    Q.  The following year so, that would be
5  academic year '19/'20?
6    A.  I believe so, yes.
7    Q.  And I realize that was kind of an odd way to
8  phrase it.  It would be academic year 2019/2020,
9  correct?
10    A.  That is correct.
11    Q.  All right.  I'm sending you Exhibit No. 24.
12  Please let me know when it arrives.  It is Bates
13  labeled Calvente-DePaul-38092 through 38093.
14    A.  I just received Exhibit 24.
15    Q.  Okay.
16        MR. BRAMWELL:  Ms. Wermuth?
17        MS. WERMUTH:  I have it.
18  BY MR. BRAMWELL:
19    Q.  Okay.  Dr. Ghanem, are you familiar with
20  Exhibit No. 24?
21    A.  Let me review it real quickly.
22    Q.  Mm-hmm, take your time.
23    A.  Yes, I am.
24    Q.  How are you familiar with it?

Page 69

3    Q.  And is it true, complete, and accurate in
4  all respects?
5    A.  Yes.
6    Q.  As you sit here today, do you agree with its
7  content?
8    A.  Yes, I do.
13    Q.  Okay.  I'm sending you a document that I've
14  labeled as Exhibit No. 2.  This is a document that's
15  Bates labeled Calvente-DePaul-013836 through 013837.
16        Please let me know when it arrives.
17    A.  I just received an e-mail titled Exhibit 2.
18        MR. BRAMWELL:  Ms. Wermuth?
19        MS. WERMUTH:  Yes.
20  BY MR. BRAMWELL:
21    Q.  Okay.  Dr. Ghanem, are you familiar with
22  Exhibit No. 2?
23    A.  Let me review.
24        Yes, I am.

18 (Pages 66 - 69)



Page 70

1    Q.  Is it true, complete, and accurate in all
2  respects?
3    A.  Yes, it is.
4    Q.  You wrote this letter?
5    A.  Yes, I did.
6    Q.  When did you write it?
7    ███████████████████████.
8    Q.  I didn't ask when it was dated, I asked when
9  you wrote it.
10    A.  I do not recall if it was a few days before
11  that when I was preparing all the letters.
12  ████████████████████████████████████
  ██████████████████████████
  ███████████████████████████████
  █████████████████████████
18    Q.  The letter that you wrote to ████████ as
19  Exhibit No. 1, did you run that by counsel?
20    A.  No, I did not.
21    Q.  What about the letter at Exhibit No. 24, did
22  you run that by counsel?
23    A.  Was that the ████ one?
24    Q.  That was.

Page 71

1    A.  No, I did not.
2    Q.  Is Dr. Calvente the only letter that -- I'm
3  sorry, let's strike that.
4  ██████████████████████████████
  ████████████████████████████████████
  ███████████████████████████████████
  █████████████████████
  ████████████████████████████████
  ████████████████████████████████████
  ██████████████████████
14    Q.  Okay.  Now going back to Exhibit No. 2,
15  ████████████████████████████, and I just
16  don't remember if I asked this, so I apologize.
17      As you sit here today, you agree with the
18  content of Exhibit No. 2?
19    A.  Yes, I did.
20    Q.  Yes, you did sounds like --
21    A.  Sorry.  Yes, I do.
22    Q.  Okay, that's fine.
23  ████████████████████████████████████

Page 72

1  ████████████████
2    Q.  Are you aware of Dr. Calvente ever lodging a
3  complaint internally or externally about racial
4  discrimination?
5    A.  Yes, I am.
6    Q.  What -- when did she do this?
7  ████████████████████████████████████
  ███████████████████████████████████████
  ████████████████████████████████████████
  ███████████████████████████████████
  ██████████████████████
14    Q.  Okay.  How were you familiar with that?
15    A.  I believe I might have been interviewed
16  about that one.  It was a -- if I recall, it was
17  lodged against the personnel committee.
18    Q.  Who would have interviewed you about it?
19    A.  Most likely -- well, I do believe it was
20  Barbara Schaffer.
21    Q.  At OIDE?
22    A.  Yes.
23    Q.  And what is OIDE?
24    A.  Office of Institutional Diversity and

Page 73

1  Equity.
2    Q.  Is that the organization that's tasked with
3  investigating complaints of discrimination at DePaul?
4    A.  That is correct.
5    Q.  Now did you hear about Dr. Calvente's OIDE
6  complaint in 2015/2016, did you hear about that from
7  any other sources?
8    A.  No, I did not.
9    Q.  Okay.  Are you familiar with -- I'm sorry,
10  let's try this again.
11      Are you aware of any other occasions where
12  Dr. Calvente lodged any complaints about racial
13  discrimination?
14    A.  Following the second formal review, I
15  reached out to OIDE on behalf of Dr. Calvente.
16    Q.  Why did you reach out to OIDE after the
17  second formal review?
18    A.  Because Dr. Calvente met with me and
19  indicated that she believed that she was subject to
20  discrimination, and I have an obligation to report
21  that.
22    Q.  What obligation do you have to report -- or
23  sorry.
24      What is the source of your obligation to

19 (Pages 70 - 73)

Page 74

1  report allegations of discrimination?
2      A.  As the dean of the college, or in a
3  supervisory position, I have to report any case that
4  comes to me alleging discrimination.
5      Q.  Okay.  So you reported that -- all right.
6  I'm sorry, I've gotten a little bit discombobulated.
7  Forgive me if I mess up here.
8          So this was after the second formal review.
9  That would have been when, December of '17?
10     A.  Most likely.
11     Q.  Okay.  And Dr. Calvente came to you and told
12  you she believed she was a victim of discrimination?
13     A.  Yes, she did.
14     Q.  When was this?
15     A.  I don't recall the exact date.  Maybe around
16  December sometime.  I don't recall.
17     Q.  Do you remember if it was before or after
18  Christmas?
19     A.  No, I -- well, probably before, because
20  we're closed for Christmas.
21     Q.  Okay.  And where did this meeting occur?
22     A.  I believe it was in my office.
23     Q.  Okay.  And how long did this meeting last?
24     A.  Meetings are usually scheduled for about an

Page 75

1  hour, but I don't recall.
2      Q.  Was this a scheduled meeting or was this a
3  pop-in?
4      A.  I don't recall.
5      Q.  What did you say to Dr. Calvente and she to
6  you that made you believe you had an obligation to
7  report to OIDE?
8          MS. WERMUTH:  Asked and answered.
9  BY MR. BRAMWELL:
10     Q.  You can answer.
11     A.  I believe she indicated that she felt
12  discriminated against by the recommendation of the
13  personnel committee and that's why I reported it.
14     Q.  All right.  She indicated.  What did she say
15  to indicate?
16     A.  I don't remember the specifics.
17     Q.  Okay.  How did you respond when -- I'm
18  sorry, I don't think I asked -- started that question
19  off right.  Let me try it again.
20          How did you, Dr. Ghanem, respond when
21  Dr. Calvente indicated she was the victim of
22  discrimination?
23     A.  I really don't recall my -- what my response
24  was.

Page 76

1      Q.  Okay.  Do you recall anything else about
2  that meeting?
3      A.  I believe that's the meeting when she was
4  very upset and she was crying.
5      Q.  Okay.  She was very upset and she was
6  crying.  What else do you recall?
7      A.  Nothing specific comes to mind.
8      Q.  Does anything generally come to mind?
9      A.  I'm trying to visualize.  I think we were
10  sitting around the -- I had a round table in my
11  office, and I think we were sitting around there and
12  she was very upset, and I was mainly listening to
13  what she had to say.
14     Q.  Did you take notes?
15     A.  No, I did not.
16     Q.  Do you believe that her allegations of
17  discrimination were valid?
18     A.  I did not have an opinion on whether they
19  were valid or not.  I would -- I was listening to
20  what she had to say.
21     Q.  Did you ever do any investigation?
22     A.  No, I did not.
23     Q.  What about with the 2015/2016 complaint, did
24  you ever do any investigation?

Page 77

1      A.  No.
2      Q.  Going back to the December 2017, do you know
3  whether Dr. Calvente ever followed through on her --
4  or do you know whether Dr. Calvente ever followed
5  through with OIDE?
6      A.  That I do not know.
7      Q.  Were you ever interviewed by OIDE?
8      A.  I don't recall being interviewed for that
9  one.
10     Q.  Okay.  Did you ever discourage Dr. Calvente
11  from filing -- or from making another claim of
12  discrimination?
13     A.  I didn't discourage her.  I told her it was
14  up to her.  But -- and she had indicated to me that
15  it was taking up a lot of her time, and I told her is
16  this how she wants to spend her time.  But it's up to
17  her whether she wants to file or not.
18     Q.  Okay.  You told her it was up to her.  Did
19  you offer any other advice as to whether she should
20  file?
21     A.  I might have said is it worth filing now, or
22  is it better to file once she goes up for tenure, if
23  it doesn't go her way.
24     Q.  Okay.  That's what you told her?

20 (Pages 74 - 77)

Page 78

1    A.  I believe so.
2    Q.  Okay.  You didn't tell her anything else?
3    A.  Not that I recall.
4    Q.  Okay.  Now did Dr. Calvente, after this
5  December '17 event, did she make any other complaints
6  about discrimination?
7    A.  She met with me as well as with ███████
█  ███████ I think it was October 2018, but it was not
9  in reference to her tenure, it was in reference to a
10  college meeting.
11    Q.  Okay.  And -- all right.  How long did that
12  meeting last?
13    A.  That one was a long meeting.  That I
14  remember.
15    Q.  Okay.
16    A.  But how long exactly, I don't know.  But it
17  was quite long.
18    Q.  Two hours?
19    A.  I would say about two hours.
20    Q.  Okay.  And it was just Dr. Calvente,
21  ███████, and you?
22    A.  That is correct.
23    Q.  Going back to -- and I'm sorry to keep
24  jumping around, but going back to the December '17

Page 79

1  meeting that was just you and ███████
2    A.  No, me and Dr. Calvente.
3    Q.  I'm sorry.  I'm sorry, you're right.  Maybe
4  I need more coffee.
5      You and Dr. Calvente in December '17, right?
6    A.  Yes.
7    Q.  No one else?
8    A.  Not that I recall, no.
9    Q.  Okay.  Did Dr. Calvente make any other
10  complaints about discrimination at DePaul?
11    A.  Not that I'm aware of.
12    Q.  Are you aware of Dr. Calvente ever telling
13  the personnel committee in 2018 that retaliation was
14  illegal?
15    A.  I was not at the personnel committee.  I
16  don't attend the personnel committee.
17    Q.  Were you aware of any rumors or did anybody
18  tell you that she said that?
19    A.  I do not recall.
20    Q.  Would anything refresh your recollection?
21    A.  Perhaps, but I don't know what that would
22  be.
23    Q.  And I used the specific phrase "retaliation
24  is illegal."  Were you aware of anything regarding

Page 80

1  what Dr. Calvente told personnel in 2018?
█  ████████████████████████████
█  ██████████████████████████████████████
█  ███████████████████████
█  ██████████████████████████████████
█  ████████████
7    Q.  Okay.  Now are you aware of any other
8  occasions where Dr. Calvente made complaints of
9  discrimination prior to her going up for tenure?
10    A.  No, I am not.
11    Q.  Okay.  I want to talk a little bit -- I want
12  to shift gears a little bit and talk about the tenure
13  process and the UBPT's work.  Can we do that?
14    A.  Yes.
15    Q.  Okay.  We mentioned earlier that there will
16  be between two and four different groups that vote at
17  a local academic unit, right?
18    A.  That is correct.
19    Q.  Okay.  And then afterwards, those
20  recommendations and the dossier go up to the UBPT?
21    A.  That is correct.
22    Q.  And the UBPT interviews both the dean of the
23  college and the candidate?
24    A.  And in the case of colleges that have

Page 81

1  department chairs, they will interview the department
2  chair as well.
3    Q.  Okay.  The College of Communications does
4  not have a department -- or sorry, let's strike that.
5      The College of Communications does not have
6  department chairs, correct?
7    A.  That is correct.
8    Q.  So for Dr. Calvente's case, it would have
9  been interview Lisa Calvente and interview Alexa
10  Murphy?
11    A.  That is correct.
12    Q.  And you're sitting in the room as well?
13    A.  That is correct.
14    Q.  So I want to take you back in time to the
15  interview -- strike that.
16      Did you normally interview the dean first
17  and then the candidate or the candidate and then the
18  dean?
19    A.  The candidate, then the chair, if there is
20  one, then the dean.
█  ████████████████████████████████████
█  ████████████████████████████████
█  ███████████
█  ████████████

21 (Pages 78 - 81)



Page 82

14    BY THE WITNESS:

                                    vague.

21        MS. WERMUTH:  Objection, vague.
22    BY MR. BRAMWELL:
23

Page 83

Page 84

9        Q.  Okay.  All right.  So after the UBPT makes a
10    recommendation on the file, what do you do?
11        A.  I get all the recommendations of UBPT, I go
12    back and I review the files again, and then I start
13    writing my letters.
14        Q.  All right.  So you said you get all the
15    recommendations, review the file again, and start
16    writing the letters.
17            Did I get that right?
18        A.  That is correct.
19        Q.  So get all recommendations, that means the
20    UBPT and any college level recommendations?
21        A.  No, I'm talking about the UBPT
22    recommendation.  The college recommendations and
23    everything else is in a SharePoint file, kind of a
24    SharePoint system where I can go back and look.

Page 85

1        Q.  And so that's an electronic system where you
2    can just log on from anywhere and review documents?
3        A.  Yes.
4        Q.  Is the UBPT recommendation uploaded to the
5    SharePoint file?
6        A.  Yes.
7        Q.  Now the -- all right.  So you review the
8    UBPT recommendation, but -- and you review the file
9    again.  What does review the file again mean?
10        A.  Just I look at the letter from UBPT and if
11    there is any questions that I might have, I go back
12    and look into the file again.
13            And I want to clarify something.  SharePoint
14    site was the first year and then the second year we
15    used something called Interfolio.
16        Q.  Sorry, go ahead.  I'm sorry, I cut you off.
17        A.  So there was a SharePoint site for, I think
18    it was '18/'19.  For '19/'20 we used a different
19    system called Interfolio.
20        Q.  Is there any material difference between
21    Interfolio and SharePoint?
22        A.  No.
23        Q.  So you review -- if I understand correctly,
24    you review the UBPT recommendation and then if you

22 (Pages 82 - 85)

Page 86

1  have questions, you go back and review the rest of
2  the file?
3      A.  I go back again, yes.
4      MS. WERMUTH:  Hang on.  Sorry, let me just
5  object.  Misstates her testimony.
6      MR. BRAMWELL:  I'm sorry, I missed your
7  answer, Dr. Ghanem.
8      THE WITNESS:  Can you repeat the question?
9      MR. BRAMWELL:  Sure, Madam Court Reporter?
10  (Record read as follows:  If I understand
11      correctly, you review the UBPT
12      recommendation and then if you have
13      questions, you go back and review the rest
14      of the file?
15      Answer:  I go back again, yes.)
16  BY MR. BRAMWELL:
17      Q.  Here's where I'm having a little bit of a
18  hard time.  Are you saying that you treat files
19  differently, different files differently?
20      A.  No, I don't believe I treat different files
21  differently.  If there might be something that I
22  don't recall, then I might want to go back in and
23  look at it again.
24      Q.  I guess here's the question:  What would

Page 87

1  constitute you wanting to go back and look at the
2  file again?
3      MS. WERMUTH:  Objection, asked and answered.
4      MR. BRAMWELL:  Actually, strike that.  That
5  was -- I did not ask that question correctly.
6  BY MR. BRAMWELL:
7      Q.  What would cause you to go back and look at
8  the file again?
9      MS. WERMUTH:  Same objection.
10  BY THE WITNESS:
11      A.  I have -- I looked at 47 files that year, so
12  sometimes I would need to refresh my recollection
13  about something and I would go back in.
14  BY MR. BRAMWELL:
15      Q.  So are you telling me that you review the
16  dossier first, come up with your own sort of
17  thoughts, and then review the UBPT's recommendation
18  and then try to reconcile those?
19      MS. WERMUTH:  Objection to the form.
20  BY THE WITNESS:
21      A.  No, you're outlining a process that might
22  not be the case.
23      I review the files, I listen to what UBPT
24  has to say, regardless of the recommendation of UBPT,

Page 88

1  and then I will go back and review the files again at
2  times.  So I'm not sure -- your question is not
3  making sense to me.
4  BY MR. BRAMWELL:
5      Q.  Okay, you're right, and I'm having -- just
6  because I'm having a very hard time understanding the
7  process, so forgive me, please.
8      All right.  Maybe I should start from ground
9  zero, because I think I might have made some
10  assumptions that are not warranted.
11      So why don't you do this:  Why don't you
12  walk me through your process for evaluating a file
13  for tenure.
14      A.  The -- usually the meetings with UBPT take
15  place on Fridays.  I try to carve out time before
16  each meeting of UBPT where I go through and review
17  the files and look at the faculty member's record.
18      Then I take notes, and I -- about the --
19  about the dossier.  Then I sit in UBPT and take notes
20  based on the discussion that is happening.
21      Then I do that for the following week and
22  the following week, and it's usually over -- I don't
23  remember how many Fridays; it depends on the number
24  of cases that we have for that year.  It's a

Page 89

1  whole-day process.
2      Then I wait for the letters from UBPT.  I
3  look at the letters from UBPT and what their
4  recommendations are, and I draft my recommendations
5  and send the letters to the candidates.
6      Q.  Is it fair to say you have a decent idea how
7  you're going to vote -- strike that.
8      I understand the UBPT has a straw poll?
9      A.  Yes, they do.
10      Q.  What is a straw poll?
11      A.  Usually after they look at the -- after they
12  conduct the interviews with each candidate, they do
13  an anonymous straw poll, and based on the straw poll,
14  they will decide whether in their -- at the end of
15  the UBPT meetings if they will have a deliberation to
16  discuss the cases that were not unanimous in favor.
17      Q.  Okay.  And do you have something similar for
18  yourself?  Do you have sort of your own personal
19  straw poll?
20      MS. WERMUTH:  Objection to form.
21  BY THE WITNESS:
22      A.  No, I don't.  I would have -- if, when I'm
23  reading the dossier I'm having questions about
24  certain things in the dossier, I might make a note

23 (Pages 86 - 89)

Page 90

1  about it in my notes.
2  BY MR. BRAMWELL:
3      Q.  When do you decide how you are going to --
4  when do you make your decision on a candidate's file?
5      A.  After I've received all the documents,
6  including the UBPT recommendations and any letters --
7  I have to wait for letters from the candidate, if
8  there are any, that they might have added in rebuttal
9  of the UBPT recommendation.
10     Q.  And so you receive -- you receive all of
11 that and then you read all of it and then you make a
12 decision?
13     A.  Yes.
14     Q.  Okay.  You don't come to a decision before
15 then?
16     A.  No.
17     Q.  What about a -- you know, sort of a
18 preliminary decision?  Do you have any preliminary
19 leanings?
20         MS. WERMUTH:  Objection, vague, calls for
21 speculation.
22 BY THE WITNESS:
23     A.  I -- I don't make a decision.  I really try
24 to be as receptive to all the information that comes

Page 91

1  in, including the candidate's letter, which it
2  happens even after the UBPT deliberations.
3  BY MR. BRAMWELL:
4      Q.  Okay.  I don't know that that answers my
5  question, though.  I asked if you had any leanings
6  one way or another.
7      A.  There are -- the leanings would be there are
8  some cases that would be more clear-cut than others.
9      Q.  And those would be cases where the college
10 level voted overwhelmingly one way or another?
11     A.  It will depend, again, on the dossier as
12 well as all the levels of review, including UBPT.
13         MR. BRAMWELL:  Can you, Madam Court
14 Reporter, please read back my question?
15         (Record read as requested.)
16 BY MR. BRAMWELL:
17     Q.  It's a yes or no question.
18         MS. WERMUTH:  She answered the question.
19 Objection, asked and answered.
20 BY THE WITNESS:
21     A.  Mr. Bramwell, I'm not sure at what point you
22 want me to address.  Am I looking at this after I get
23 the UBPT results or before the UBPT results?  I'm not
24 sure I understand.

Page 92

1  BY MR. BRAMWELL:
2      Q.  Before you get the UBPT results, let's say.
3      A.  I will make a note if it was -- what the
4  local academic unit's votes are, whether it's in
5  favor, not in favor, split, and so on.
6      Q.  Okay.  Will you do anything else with that
7  information?
8      A.  No.
9      Q.  Do you weigh the college more heavily than
10 you weigh the UBPT?
11     A.  No, I do not.
12     Q.  Do you weigh the UBPT more heavily than the
13 college?
14     A.  I look at the entire dossier and all the
15 votes holistically.  I wouldn't say I have one area
16 where I weigh more than the other.  I look at it all
17 holistically.
18     Q.  Okay.  So the answer to the question then is
19 no, you do not weigh the UBPT more heavily than the
20 college?
21         MS. WERMUTH:  Objection, misstates her
22 testimony, asked and answered.
23 BY THE WITNESS:
24     A.  I weigh the entire dossier.

Page 93

1  BY MR. BRAMWELL:
2      Q.  Okay.  I know you said you weigh the entire
3  dossier.  I'm asking how you weigh various components
4  of the dossier, and I'd like an answer to that
5  question, please.
6         MS. WERMUTH:  Asked and answered.
7  BY THE WITNESS:
8      A.  As I said, I've already answered that
9  question.  I can't say how do I take one area and
10 give it an extra point here or an extra point there.
11 I don't do it that way.  I look at it all
12 holistically, as well as the arguments presented in
13 all the levels.
14 BY MR. BRAMWELL:
15     Q.  If the handbook says you should only
16 overturn the UBPT decision in rare and compelling
17 circumstances, why don't you weigh the UBPT more
18 heavily than the college?
19     A.  I did not say that I don't weigh the UBPT
20 more heavily than the college.  I read very carefully
21 what the UBPT says and based on the overall
22 evaluation of everything, I make a decision.
23     Q.  Yeah, I know you've said that now a few
24 times, and I appreciate that information, but I've

24 (Pages 90 - 93)

Page 94

1  asked a different question.
2      MR. BRAMWELL: Can I ask the court reporter
3  to read it back, please, and then you can answer it.
4      (Record read as follows: If the handbook
5      says you should only overturn the UBPT
6      decision in rare and compelling
7      circumstances, why don't you weigh the UBPT
8      more heavily than the college?)
9      MS. WERMUTH: Asked and answered.
10 BY THE WITNESS:
11     A. I believe I have answered your question.
12     MR. BRAMWELL: Please certify that question.
13 BY MR. BRAMWELL:
14     Q. I asked you earlier about a woman named Lucy
15 Reinhart. Do you know her?
16     A. Yes, I do.
17     Q. How long have you known Dr. Reinhart?
18     A. I believe I've known Dr. Reinhart the entire
19 time I've been at DePaul.
20     Q. Are you familiar with her signature?
21     A. I'm not sure I am.
22     Q. Okay.
23     THE WITNESS: Mr. Bramwell, I'm going to
24 need a three-minute break.

Page 95

1      MR. BRAMWELL: Oh, sure. Let's come back
2  then at 11:21. Is that all right?
3      THE WITNESS: Sounds good. Thank you.
4      MR. BRAMWELL: Thank you.
5      (A short break was taken.)
6      MR. BRAMWELL: You know, I should have sent
7  this before the break. I apologize for wasting a
8  little bit of time.
9  BY MR. BRAMWELL:
10     Q. I'm sending you, Dr. Ghanem, a document that
11 is -- I've marked as Exhibit No. 28.
12     MS. WERMUTH: Sorry, 20 or 28?
13     MR. BRAMWELL: 28. This is Bates labeled
14 Calvente-DePaul-010073 through 01373.
15 BY MR. BRAMWELL:
16     Q. Let me know when it's arrived, please.
17     A. Will do.
18     Q. Has it arrived yet?
19     A. No, it has not.
20     Q. Okay. It's a large file.
21     MS. WERMUTH: I just got it.
22     THE WITNESS: I have not.
23     MR. BRAMWELL: Consider checking your spam
24 folder?

Page 96

1      THE WITNESS: It's not there.
2      MS. WERMUTH: Gosh, I hope I sent it to the
3  right place.
4      THE WITNESS: Okay, I just received it.
5      MR. BRAMWELL: All right, excellent.
6      THE WITNESS: The attachment -- there it is.
7  That's Bree McEwan?
8  BY MR. BRAMWELL:
9      Q. That's right. This is her tenure file.
10     Now really, I guess what I should have done
11 is broken out a piece of this, but I guess as I was
12 preparing for this deposition, it was easier just to
13 grab the entire file.
14     I'm interested, really, in two pages of this
15 file. If you can move, please, to Bates number 10340
16 to 10341.
17     A. That's -- it's 300 pages.
18     Q. 301 pages, yes.
19     A. Okay, hold on. It's page 268 of 301 and 269
20 of 301. Could you tell me the number again?
21     Q. Sure.
22     A. What page number on the bottom? I'm looking
23 at the bottom.
24     Q. Sure. The Bates numbers are 10340 to 10341.

Page 97

1      A. Okay.
2      Q. Okay. So are you familiar with these two
3  pages of ███████████ file?
4      A. Yes, I am.
5      Q. How are you familiar with it?
6      A. They were part of her tenure and promotion
7  dossier.
8      Q. And you reviewed this?
9      A. Yes, I have.
10     Q. When did you review it?
11     A. When I was reviewing her file.





Page 98

17    Q.   I have sent you also Exhibit No. 26.  This
18  is Bates labeled Calvente-DePaul-001046 through
19  001047.
20        Please let me know when that's arrived.
21    A.   I have it.
22    Q.   Okay.  Now are you familiar with that
23  document?
24    A.   I haven't been able to open it.  Hold on.

Page 99

1    Yes.
2    Q.   How are you familiar with it?
3
4    Q.   Okay.  And you are familiar with it?
5    A.   Yes, I am.

18    Q.   I'm sorry, not only in the numerical scores
19  on what?
20    A.   OTEs.
21    Q.   And what does OTE stand for?
22    A.   Online teaching evaluations.
23    Q.   Okay.  What else is it based on?
24    A.   It is based on the qualitative comments that

Page 100

1  come through, it is based on the student report, it
2  is based on the peer observations of classes, and it
3  is based on the syllabus, as well as any other
4  materials that the faculty member includes in their
5  dossier to document their teaching.

9        MS. WERMUTH:  Objection to the form of the
10  question.
11  BY THE WITNESS:

15  BY MR. BRAMWELL:
16    Q.   Are there other parts of it?
17    A.   The report that is written by the student,
18  there is a report that's done by students after -- of
19  students who had already taken her classes as well,
20  as well as materials in terms of syllabi and class
21  assignments and that kind of stuff.
22    Q.   Okay.  Anything else?
23    A.   That is what I recall.
24    Q.   Okay.  I'm sending you a document that I

Page 101

1  have Bates labeled as Exhibit No. 27.  Please do not
2  open it yet.  But just so that we have a record of
3  it, Exhibit 27 is Bates labeled Calvente-DePaul-37293
4  through 37295, but please don't open it yet.

7        MS. WERMUTH:  Objection, vague.
8  BY THE WITNESS:
9

11  BY MR. BRAMWELL:

15        MS. WERMUTH:  Objection to form.
16  BY THE WITNESS:

20  BY MR. BRAMWELL:

26 (Pages 98 - 101)



Page 102

3    Q.  Okay.  Let's take a look now at Exhibit
4    No. 27, if we may.
5    A.  You want me to open it?
6    Q.  Please.
7    A.  Okay.
8    Q.  Now are you familiar with this document?
9    A.  Yes, I am.
10   Q.  Okay.

14   Q.  So looking at -- I'd like you to go to
15   page 2, and I'll share my screen with you too.  That
16   might be easy.
17
18

Page 103

1    Q.  Okay.  And Exhibit No. 27, is it true,
2    complete, and accurate in all respects?
3    A.  Yes, I believe so.
4

Page 104

Page 105

27 (Pages 102 - 105)



Page 106

Page 108

1    A.  No, I do not know how she reacted.
2  BY MR. BRAMWELL:
3    Q.  No?  Did you ever have a conversation with
4  her about this?
5    A.  I do not recall if we had a conversation
6  about this one.
7    Q.  Okay.  But you know that Dr. Calvente filed
8  a complaint with OIDE?
9    A.  I do.
10   Q.  Okay.  Do you believe Dr. Calvente should
11  have reacted differently after receiving this
12  recommendation?
13     MS. WERMUTH:  Objection to the form.
14     Go ahead.
15  BY THE WITNESS:
16   A.  I do not have an opinion in terms of how she
17  should have or not have reacted.
18  BY MR. BRAMWELL:
19   Q.  No?  No opinion at all?
20   A.  No, I think it is up to her to react the way
21  she deems fit.
22   Q.  If you were in Dr. Calvente's place as a
23  junior tenure track but untenured faculty and you
24  believed that personnel had recommended your

Page 107

3    Q.  I'm sending you a document that's been
4  marked as Exhibit No. 4.
5    Please let me know when it arrives, and you
6  may open it.  This is a document Bates labeled
7  Calvente-DePaul-013346 through 013443.
8    Has it arrived yet?
9    A.  I just got it.  Exhibit No. 4 you said?
10   Q.  That's correct.
11   A.  And you said it's okay to open it?
12   Q.  Please.
13   A.  Okay.
14   Q.  Are you familiar with this document?
15   A.  Let me review it.
16     Yes, I am.
17   Q.  Is it true, complete, and accurate in all
18  respects?
19   A.  Yes, it is.
20   Q.  Do you know how Dr. Calvente reacted when
21  she received word of the nonrenewal?
22     MS. WERMUTH:  Objection.
23
24  BY THE WITNESS:

Page 109

1  nonrenewal for racially discriminatory reasons, would
2  you have responded by filing with OIDE?
3      MS. WERMUTH:  Objection, improper
4  hypothetical, calls for speculation.
5  BY THE WITNESS:
6    A.  Again, you're asking me to put myself in her
7  shoes, which is kind of impossible to do.  But if I
8  believed I was the recipient of discrimination, yes,
9  I would file.
10  BY MR. BRAMWELL:
11   Q.  Okay.
12   A.  That is her right to do so.
13   Q.  Okay.  Do you know if Dr. Calvente's
14  complaint was the subject of conversation by or among
15  members of the faculty?
16   A.  I do not know.
17   Q.  And so I just want to understand your
18  testimony correctly.  You don't recall whether you
19  had a conversation with Dr. Calvente -- I'm sorry, go
20  ahead.
21   A.  No, go ahead.
22   Q.  It looked like you were leaning in and about
23  to say --
24   A.  No, go ahead.

28 (Pages 106 - 109)



Page 110

1    Q. You don't recall whether you had a
2 conversation with Dr. Calvente vis-à-vis the
3 nonrenewal in 2015?
4    A. I really don't recall if we had a meeting or
5 not about this one.
6    Q. Okay. I'm sending you that document that's
7 been marked as Exhibit No. 8. Please feel free to
8 open it when you get a shot -- or please feel free to
9 open it when it arrives. I'm sorry.
10     This is a document Bates labeled --
11    A. Sorry, say it again?
12    Q. Sure, not at all. Do you need a minute?
13    A. No, I'm fine.
14    Q. This is a document Bates labeled
15 Calvente-DePaul-013855 through 013856.
16    MS. WERMUTH: Sorry, I don't have it yet.
17    THE WITNESS: Yeah, I don't have it either.
18 Mr. Bramwell, could you tell me the numbers once I
19 receive it, because I can't remember the number when
20 I get it to go back in.
21    MR. BRAMWELL: I can corroborate them, but
22 I'm doing it so that we're making a little bit better
23 use of time for the court reporter.
24    THE WITNESS: Okay. So it's Exhibit No. 8?

Page 111

1    MR. BRAMWELL: Correct.
2    THE WITNESS: Can you repeat the number?
3    MR. BRAMWELL: Sure, 013855 through 013856.
4    THE WITNESS: Got it.
5 BY MR. BRAMWELL:
6    Q. Okay. Are you familiar with this document?
7    A. Let me review it.
8    Yes, I am.
9    Q. Is it true, complete, and accurate in all
10 respects?
11    A. Yes, it is.
12    Q. What is it?
[REDACTED]
19    Do you see that?
20    A. Yes, I do.
21    Q. Okay. Does that refresh your recollection
22 as to whether you discussed the --
23    A. Yes, it does.
24    Q. Okay. So again I'll ask you what you

Page 112

1 discussed with Dr. Calvente?
[REDACTED]
10    Q. And did members of the faculty communicate
11 this to you in any way, other than the letter at
12 Exhibit No. 4?
13    A. I sat on the committee -- on the tenured
14 faculty committee when they discussed her case.
15    Q. Okay. Did you participate in those
16 discussions, or were you just an observer?
17    A. Just an observer.
18    Q. Okay. Dr. Ghanem, what is your race?
19    A. I am half Egyptian and half Dutch.
20    Q. Okay. And were you born in this country?
21    A. No, I was not.
22    Q. Where were you born?
23    A. I was born in Egypt.
24    Q. Okay. I'm the grandchild of immigrants.

Page 113

1 When did you immigrate?
2    A. I came to the United States in 1981.
3    Q. Okay. For school?
4    A. No. I came at that time with my daughter
5 and followed by my then-husband.
6    Q. Okay. Did you, during this 2015 meeting,
7 this March 15, 2015 meeting with Dr. Calvente, did
8 you -- did you ever tell her that you had once been
9 called intimidating?
10    A. I do not recall.
11    Q. Okay. Did you tell her about speaking out
12 against that accusation by writing a letter to the
13 provost?
14    A. I'm not following you. About what
15 accusation?
16    Q. Let's do this: I normally do this earlier,
17 but I have not done this in this case.
18    You came to the U.S. in 1981 you said?
19    A. Correct.
20    Q. You would have been approximately 21?
21    A. 20.
22    Q. 20, okay.
23    Had you completed your education by that
24 point in time?

29 (Pages 110 - 113)

Page 114

1    A. No, I had not.
2    Q. When did you earn your undergraduate degree?
3    A. I think in 1987.
4    Q. Okay. Where did you earn -- from where did
5 you earn your undergraduate degree?
6    A. From the University of Texas Pan American.
7    Q. Where is UT Pan American located?
8    A. Edinburg, Texas. It doesn't exist anymore.
9 They changed the name.
10    Q. What's the name now?
11    A. UT Rio Grande Valley.
12    Q. What was your undergraduate degree in?
13    A. I made -- when I finally got my degree, it
14 was in communication.
15    Q. Okay.
16    A. I had several majors prior to that.
17    Q. And that's a BA?
18    A. Yes.
19    Q. Then did you go right to graduate school?
20    A. No, I don't think it was immediately after.
21 There might have been a gap of a couple of years.
22    Q. Okay. What did you do during that gap of a
23 couple of years?
24    A. I think that's when I had my second child.

Page 115

1    Q. Okay.
2    A. And then we moved to Temple, Texas, and I
3 worked for a while at Scott & White Hospital.
4    Q. And then when did you start your graduate
5 work?
6    A. You know, I really don't remember the exact
7 year. Maybe 1990.
8    Q. Okay. So 1990, approximately, you start
9 your graduate work. Do you go straight through?
10    A. Yes, I got my master's and my Ph.D.
11    Q. From where?
12    A. UT Austin.
13    Q. I love Austin. It's a really nice down.
14       When did you earn these degrees?
15    A. I got my Ph.D. in '96, and I think my MA in
16 '92, but I would have to check my resume. It's a
17 long time ago.
18    Q. Okay. And what's your Ph.D. in?
19    A. In journalism.
20    Q. In journalism, okay.
21       Is that a subfield within the field of
22 communications?
23    A. Yes, it is.
24    Q. Okay. And then after you earned your Ph.D.,

Page 116

1 what did you do?
2    A. Actually, before I finished my Ph.D., I
3 moved back to south Texas and started teaching at the
4 University of Texas Pan American.
5    Q. Okay. As a member of the faculty there?
6    A. As a term faculty member, or what they would
7 refer to as a lecturer, a nontenure track position.
8    Q. Okay. And how long were you in that role?
9    A. About two years.
10    Q. Okay. So from approximately '95 to '97?
11    A. '94 to '96, I believe.
12    Q. '94 to '96, all right.
13       What did you do after that?
14    A. I was able to get a tenure track position.
15    Q. Where was that?
16    A. Also at the University of Texas Pan
17 American.
18    Q. Okay. And did you earn tenure there?
19    A. Yes, I did.
20    Q. Okay. When did you earn tenure?
21    A. I can send you my CV, because that's when I
22 became associate professor. I think it was '97.
23    Q. Okay. If Ms. Wermuth will not object, we
24 can just -- you can send me the CV and we can mark it

Page 117

1 as an exhibit. If she does object, we can just
2 continue going through.
3       MS. WERMUTH: We produced to you, Jerry.
4       MR. BRAMWELL: Mr. Bramwell.
5       MS. WERMUTH: I'm sorry, Mr. Bramwell.
6       MR. BRAMWELL: All right. So then we'll
7 just continue going through.
8 BY MR. BRAMWELL:
9    Q. So you earned tenure at Pan American, and
10 when did you leave Pan American?
11    A. It's when I went to Central Michigan
12 University. I think I was at Pan American for about
13 15 years.
14    Q. Okay. So then when did you start at Central
15 Michigan?
16    A. I think 2009.
17    Q. Okay. And were you a tenured faculty member
18 there, or did you start as an administrator?
19    A. I was an administrator, but I was tenured
20 with the rank of full professor there.
21    Q. Okay. When did you become an administrator?
22    A. I started being a program chair and then
23 department chair at the University of Texas Pan
24 American, and then dean when I moved to Central

30 (Pages 114 - 117)

Page 118

1  Michigan University.
2     Q.  Okay.  So Central Michigan was your first
3  deanship?
4     A.  That is correct.
5     Q.  Do you recall, while you were at Pan
6  American, ever being called too intimidating?
7     A.  Yes.
8     Q.  What was the -- what was that in connection
9  with?
10    A.  I think it was in connection to my
11 requirements in the class.
12    Q.  Were you tenured at that point in time or
13 nontenured?
14    A.  I don't recall.
15    Q.  Do you remember when you were called too
16 intimidating?
17    A.  I remember once there was a -- a gathering
18 of students and faculty and they gave us each
19 different certificates, and mine was called The
20 Intimidator.
21    Q.  Who is "they"?
22    A.  Students.
23    Q.  And students called you The Intimidator?
24    A.  Mm-hmm.

Page 119

1     Q.  "Mm-hmm" doesn't show up on the transcript.
2     A.  I'm sorry, I was getting a drink of water.
3  Yes.
4     Q.  Okay.  No worries, we all do it.  I just
5  want a clear record because it doesn't show up.
6        And how did you respond to that accusation
7  of being calling The Intimidator?
8     A.  As I said, it was done at a party, so there
9  was no need for me to respond.
10    Q.  Okay.
11    A.  But it was never part of my evaluative
12 processes.
13    Q.  Going back to the conversation you had with
14 Dr. Calvente on March 30, 2015, do you remember how
15 long the conversation lasted?
16    A.  No, I do not.
17    Q.  Do you remember where it occurred?
18    A.  Most likely in my office.
19    Q.  What did you -- who else would have been
20 there?
21    A.  I believe it would have been just the two of
22 us.
23    Q.  Just you and Dr. Calvente?
24    A.  That is correct.

Page 120

1     Q.  What did you say to Dr. Calvente and she to
2  you?
3     A.  I --
4        MS. WERMUTH:  Objection, asked and answered.
5  BY THE WITNESS:
6  [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 BY MR. BRAMWELL:
12    Q.  And what did Dr. Calvente say to you?
13    A.  Dr. Calvente indicated that she will work on
14 making it a more welcoming environment to students.
15    Q.  Did she say how she was going to do that?
16    A.  I do not recall.
17    Q.  Do you believe Dr. Calvente did make it a
18 more welcoming environment to students?
19    A.  Can you repeat that?
20    Q.  Sure.  Do you believe Dr. Calvente did make
21 it a more welcoming environment to students?
22    A.  I believe in her following formal review,
23 there was an indication that the number of
24 qualitative comments had decreased.

Page 121

1     Q.  I'm sorry, can you please repeat that?
2     A.  I believe that in the following formal
3  review, there was an indication that the number of
4  intimidating -- of negative qualitative comments had
5  decreased.
6     Q.  Okay.  Did Dr. Calvente, during that
7  March 2015 meeting, also tell you that she treats all
8  of her students equally?
9     A.  I do not recall that.
10    Q.  Did she tell you that personnel lied?
11    A.  I do not recall that.
12    Q.  Did Dr. Calvente cry during that meeting?
13    A.  I don't believe she did.
14    Q.  Did you make any comments to Dr. Calvente
15 about her skills as a teacher?
16    A.  I did indicate that her quantitative scores
17 were excellent.
18    Q.  Did you make any other comments?
19    A.  I do not recall.
20    Q.  You look like you're looking down and
21 reading something.  Are you looking down and reading
22 something?
23    A.  I'm reading the exhibit that you had given
24 me about the March -- where it says based on our

31 (Pages 118 - 121)

Page 122

1  discussion on March 30, 2015. It's exhibit...
2      Q.  Exhibit No. 8?
3      A.  It doesn't show.  It just has a little --
4  oh, yeah, Exhibit No. 8.
5      Q.  Okay.  Did Dr. Calvente tell you she was
6  going to file with OIDE during that meeting?
7      A.  I think she might have.  I believe she did.
8      Q.  Did she tell you that she had spoken to an
9  attorney?
10      A.  No, I do not recall that.
11      Q.  Did she tell you that she went to the
12  ombudsman?
13      A.  I do not recall that.
14      Q.  Did you tell Dr. Calvente -- did you make
15  any other comments to Dr. Calvente about her
16  teaching?
17          MS. WERMUTH:  Asked and answered.
18  BY THE WITNESS:
19      A.  I do not recall anything else.
20  BY MR. BRAMWELL:
21      Q.  Did you tell Dr. Calvente she was an
22  extraordinary teacher?
23      A.  I don't remember necessarily saying the word
24  "extraordinary."  I do remember commenting very

Page 123

1  positively about her quantitative scores.
2      Q.  Did you make any comments to Dr. Calvente
3  about her research?
4      A.  I do not recall.
5      Q.  What about her service?
6      A.  I do not recall.
7      Q.  Would anything refresh your recollection?
8      A.  Perhaps if you can remind me of things that
9  might have been said, that might refresh my memory.
10      Q.  During that March 30, 2015 meeting, did you
11  offer to help review Dr. Calvente's personnel
12  statement prior to her next review?
13          MS. WERMUTH:  Objection, asked and answered.
14  BY THE WITNESS:
15      A.  I believe I did, yes.
16  BY MR. BRAMWELL:
17      Q.  Why did you make that offer?
18          MS. WERMUTH:  Asked and answered.  We're
19  covering old ground.
20  BY THE WITNESS:
21      A.  To make sure that she addressed the concerns
22  brought up by her colleagues.
23  BY MR. BRAMWELL:
24      Q.  Why did she need your help to do that?

Page 124

5      Q.  Have I sent you Exhibit 5?  I don't know
6  that I have.  I have not.
7          I'm going to send you a document that I've
8  marked Exhibit No. 5.  This is a document Bates
9  labeled Calvente-DePaul-13444 through 13455.
10          But before we get to that document, I have a
11  few more questions about Exhibit No. 4 and 8 and the
12  reappointment.
13      A.  I'm sorry, I have Exhibit 8.  I don't know
14  where I can find Exhibit 4.
15      Q.  Exhibit No. 4 was Bates labeled --
16      A.  There's just so many.  26 -- hold on.  It
17  might be easier to find it via my e-mail.
18      Q.  Probably.
19      A.  Okay.  You said -- which exhibits?  4 and 8?
20      Q.  No. 4 and 8, yes.
21      A.  Okay, I have both e-mails.
22      Q.  Okay.  Both documents, right?
23      A.  They're e-mails from you with an attached
24  document, yes.

Page 125

1      Q.  The e-mails are not exhibits, the documents
2  are exhibits.  I just want to make sure that's clear.
3      A.  Okay.
4      Q.  Why did you reappoint Dr. Calvente to the
5  faculty after the 2015 nonrenewal recommendation?
6      A.  I felt that Dr. Calvente had potential, and
7  with modifications to her teaching and if she were --
8  that she would have a good chance of progressing the
9  way she should be.
10      Q.  When you say she has potential, what do you
11  mean by that?
12      A.  Well, as I mentioned, her quantitative
13  scores were good.  She was a passionate teacher, and
14  while there were areas she needed to address, I
15  believed that, with time, she could address them.
16      Q.  What areas did she need to address?
17      A.  Can I go back and look at Exhibit 4?
18      Q.  If you would like to.
19      A.  Thank you.
20      Q.  If that will help you answer the question.
21      A.  Okay.  In terms of research, she had several
22  projects underway.  She would have needed to continue
23  on those projects.  Then I need to look at my letter.
24  Is that Exhibit No. 5 or was that Exhibit No. 8?

32 (Pages 122 - 125)

Page 126

1   Q.  No. 8.
2   A.  Yeah, so there was a -- I did address the
3   research that, at that time, she had -- since the
4   last review, she had published one co-authored essay
5   and presented at three conferences, and that she
6   would need peer-reviewed material, and to also
7   increase her service activities on the program,
8   college, and university levels.
9   Q.  Okay.  I've just sent you Exhibits No. 5 and
10  7; we might as well mark them together.
11  A.  Okay.
12  Q.  Exhibit No. 5 is Calvente-DePaul-13444
13  through 13455, and Exhibit No. 7 is
14  Calvente-DePaul-13853 through 13854.
15      They both should have arrived by now.
16  A.  I do have them both.
17  Q.  Okay.  With -- both with respect to Exhibit
18  No. 5 and Exhibit No. 7, are you familiar with each
19  of these documents?
20  A.  I will need to review them.
21  Q.  Take your time.
22  A.  Exhibit No. 7 is my decision on her -- on
23  the formal tenure process review, and Exhibit No. 5
24  is the college's formal review evaluation.

Page 127

1   Q.  Okay.  Are both Exhibit No. 5 and Exhibit
2   No. 7 true, complete, and accurate in all respects?
3   A.  I believe so, yes.
4   Q.  Did I ask whether Exhibit No. 4 and Exhibit
5   No. 8 were true, complete, and accurate in all
6   respects?
7   A.  Are you asking me, or are you asking the
8   court reporter?
9   Q.  Well, you're right.  Let's just do it this
10  way, and I apologize.  If you could go back to
11  Exhibit No. 4 and Exhibit No. 8, are both of those
12  true, complete, and accurate in all respects?
13  A.  I'm reviewing them.
14      Yes, they are.
15  Q.  And you're familiar with both documents?
16  A.  Yes, I am.



Page 128

10  Q.  Okay.  This is not a trick question.  Did
11  you like Lisa?
12  A.  I did.  I do.
13  Q.  You did and you do?
14  A.  I did and I do.
15
17      MS. WERMUTH:  Objection, vague.
18  BY THE WITNESS:
19  A.  Personal reasons in terms of...
20  BY MR. BRAMWELL:
21  Q.  Just the fact that you like her.
22  A.  No, no.  I -- it has nothing to do with
23  liking or not liking.
24      MS. WERMUTH:  Mr. Bramwell, can I propose

Page 129

1   that we break for lunch relatively soon?
2       MR. BRAMWELL:  Yes, you can.  We'll break
3   for lunch probably in another five or six minutes, if
4   that's okay.
5       MS. WERMUTH:  That's perfect.  Thank you.
6       MR. BRAMWELL:  Actually, you know what?  We
7   should probably break now, that way we won't have to
8   -- yeah, let's break now.  We'll come back at 1:00.
9   Is that enough time?
10      MS. WERMUTH:  That's fine.  Thank you.
11      (A lunch break was taken.)
12  BY MR. BRAMWELL:
13  Q.  Dr. Ghanem, thank you for coming back.  I
14  hope you enjoyed lunch.
15      I'm going to be sending you a document that
16  I have marked as Exhibit No. 14.  Please don't open
17  it.  Actually, yeah, you might as well open it.
18      MS. WERMUTH:  Mr. Bramwell, while we're
19  waiting, I'll give notice to the court reporter that
20  Kathy Stieber will not be able to join again until
21  like 2:00 or so.  She may be knocking in an hour.
22      THE COURT REPORTER:  Very good.
23      MR. BRAMWELL:  Sounds good to me.
24

33 (Pages 126 - 129)

Page 130

1  BY MR. BRAMWELL:
2      Q.  While we're waiting for the internet to
3  work, the document labeled Exhibit 14 is
4  Calvente-DePaul-025974 through 025976.
5      Please let me know when it arrives and you
6  can feel free to open it when you get it.
7      A.  I just received it.
8      MS. WERMUTH:  I don't yet have it.
9      MR. BRAMWELL:  Has it arrived yet?
10     MS. WERMUTH:  No.  Is it a big one or no?
11     MR. BRAMWELL:  It's three pages.  Check your
12 spam folder, please.
13     MS. WERMUTH:  I don't know that I can do
14 that.  I think my firm does that, so they collect
15 anything that shouldn't come through and then they
16 send me a report at the end of the day.
17     Maybe if Dr. Ghanem wants to send it to me,
18 maybe I'll get it that way.
19     THE WITNESS:  I can forward it to you.  Do
20 you want me to do that?
21     MS. WERMUTH:  Mr. Bramwell, are you
22 comfortable with that, or would you rather not?
23     MR. BRAMWELL:  I'm fine with her doing that.
24     MS. WERMUTH:  Why don't you copy

Page 131

1  Mr. Bramwell on it just so...
2      THE WITNESS:  Okay, let me see.
3      Okay, I just sent it to both of you.
4      MS. WERMUTH:  Thank you.
5      The other option is if you can give me a
6  sense of what the document is, I bet Nandini can pull
7  it for me.
8      MR. BRAMWELL:  I've given you the Bates
9  range.  It's Calvente-DePaul-025974 through 025976.
10     MS. WERMUTH:  But if you can tell me -- oh,
11 it just came from you, Mr. Bramwell.  I have it now.
12     MR. BRAMWELL:  I'm glad your firm hasn't
13 locked me out completely.  I'm glad somebody
14 appreciated that joke.
15 BY MR. BRAMWELL:
16     Q.  Okay.  Dr. Ghanem, I've sent you a document
17 marked as Exhibit No. 14.  I think I've read the
18 Bates label a few times, so we should be good there.
19     Are you familiar with this document?
20     A.  Yes, I am.
21     Q.  Is it true, complete, and accurate in all
22 respects?
23     A.  It is true that this is the e-mail I
24 received from Dr. Calvente.

Page 132

1      Q.  Okay.  Is there -- I asked if it was true,
2  complete, and accurate.  Is there anything missing
3  from this e-mail?  I'm not asking if you agree with
4  the e-mail, I'm asking if the e-mail is true,
5  complete, and accurate?
6      A.  I believe so, yes.
7      Q.  Okay.  I asked you earlier about a meeting
8  that you had with Dr. Calvente in December of 2017.
9      Do you recall that line of questioning?
10     A.  I do.
11     Q.  And you, if I understood correctly, you said
12 you did not recall when you met with Dr. Calvente; is
13 that right?
14     A.  That is correct.
15     Q.  Does this Exhibit No. 14 refresh your
16 recollection as to when you met with Dr. Calvente?
17     A.  I assume, based on this e-mail, that I met
18 with her on the 15th.
19     Q.  The 15th of December?
20     A.  Correct.
21     Q.  Okay.  Now how did this meeting come to be
22 arranged?
23     A.  She must have contacted me to meet with me.
24 I do not recall.

Page 133

1      Q.  Would she have e-mailed you or would she
2  have called you or would she have run into you in the
3  hall?
4      A.  Lisa usually -- Dr. Calvente usually
5  e-mailed me.
6      Q.  Okay.  And so you two set up a time to meet
7  for December -- it looks like it would have been
8  December 16th, right?
9      A.  No, if you notice, she sent the e-mail at
10 1:42 a.m.
11     Q.  Okay.
12     A.  So I'm assuming she meant tomorrow but it
13 was really today.
14     Q.  Okay, that makes sense.
15     All right.  So you met with her on
16 December 15th.  Do you know -- all right.
17     And this is an e-mail where Dr. Calvente
18 asks you some questions concerning -- or she's
19 requesting feedback from you, right?
20     A.  During the meeting, correct.
21     Q.  Did you read this e-mail before the meeting?
22     A.  I believe I did.
23     Q.  Okay.  And did you have sufficient time to
24 reflect on Dr. Calvente's questions before the

34 (Pages 130 - 133)

Page 134

1 meeting?
2 A. Probably not, because we met on the same day
3 as she sent me the e-mail.
4 Q. Do you remember when the meeting was?
5 A. No, I don't.
6 Q. Do you remember if it was the morning or the
7 afternoon?
8 A. No, I do not.
9 Q. Do you have your calendar handy?
10 A. I do.
11 Q. Can you check for December 15, 2017?
12 A. I can. Let me check. I have to go back
13 month by month.
14 Q. I understand. Take your time.
15 A. According to the calendar, I met with her at
16 12:30.
17 Q. Okay. And how long did the meeting last?
18 A. It is scheduled for, I think, 45 minutes
19 because I have a meeting at 1:45.
20 Q. Okay. Did the meeting with Dr. Calvente
21 last 45 minutes or was it longer, shorter?
22 A. I do not recall.
23 Q. So at the top of this Exhibit 14, I guess,
24 is an e-mail chain. So at the very top of the chain,

Page 135

1 that's the last e-mail in the chain from Dr. Calvente
2 to you, she asks questions regarding her research
3 evaluation, her teaching evaluation, and her service
4 evaluation.
5 Do you see those?
6 A. Yes, I do.
7 Q. What did you discuss vis-à-vis her research
8 evaluation?
9 A. If I recall, that was the meeting when
10 Dr. Calvente was crying quite a bit and was very
11 upset. I don't believe we addressed the contents of
12 this e-mail.
13 Q. Okay. Did you ever address the contents of
14 this e-mail at any other time?
15 A. I don't believe we did.
16 Q. Okay. What do you recall then about that
17 meeting?
18 MS. WERMUTH: Objection, asked and answered.
19 BY MR. BRAMWELL:
20 You can answer.
21 A. That was of the meeting, I believe, when she
22 was very upset, and -- ████████████████████
   ██ ████████████████████████████████████████
   ██ ████████████

Page 136

1 Q. What else -- so you remember she was very
2 upset. What else do you remember?
3 A. I remember -- this might have been the
4 meeting when she suggested that she might file again.
5 Q. Okay. And remind me how you responded.
6 MS. WERMUTH: Asked and answered.
7 BY MR. BRAMWELL:
8 Q. Go ahead.
9 MS. WERMUTH: We've been through this, just
10 for the record.
11 BY MR. BRAMWELL:
12 Q. Go ahead.
13 A. I remember her telling me how much time
14 filing -- filing a complaint takes, and I told her
15 whether it would be a good idea for her to be
16 spending her time on that or whether she should focus
17 on strengthening her dossier.
18 Q. Okay. So it's your recollection that you
19 did not go through each point in this e-mail in
20 Exhibit 14 at the beginning of the meeting?
21 A. No, I do not believe I did.
22 Q. So you never provided her any advice about
23 -- well, here, let's -- maybe it's easier to do it
24 this way.

Page 137

1 I've shared my screen so you can now see --
2 I hope I've done it correctly.
3 A. I see it.
4 Q. Okay, good.
5 So you are now looking at Exhibit No. 14?
6 A. Yes.
7 Q. So let's just jump down to service.
8 Did you print out this e-mail, Exhibit
9 No. 14, prior to meeting with Dr. Calvente?
10 A. I do not recall if I did or not.
11 Q. Okay. Upon review -- upon reading the
12 review of my service, I'm concerned that I haven't
13 been given any clear guidelines on what constitutes
14 an excellent ranking.
15 Do you see where I've highlighted that?
16 A. I do.
17 Q. Did you provide any of that information to
18 Dr. Calvente?
19 A. I do not believe we went through this, no.
20 Q. Okay. Dr. Calvente then goes through a
21 litany of service that she performed at the college.
22 Do you see how I've highlighted that?
23 And then she asks: Was this counted as
24 service to the college?

35 (Pages 134 - 137)

Page 138

1 Did you discuss that at all?
2 A. No, I don't believe we did.
3 Q. Looking at the teaching evaluation section,
4 I've highlighted a piece: For example, is the goal
5 improved quantitative scores (which would then be
6 akin to me -- sorry, let's try that again.
7 For example, is goal improved quantitative
8 scores (which would then be akin to asking me to
9 perform far beyond what is required of other faculty,
10 since I tend to score above the college average)? Or
11 making every student comfortable with discussing the
12 uncomfortable subject of racism?
13 Did you discuss these issues with
14 Dr. Calvente?
15 A. No, we did not.
16 Q. Did you discuss them at any other point in
17 the -- this December 15, 2017 meeting?
18 A. Not that I recall.
19 Q. Do you recall discussing any of the topics
20 raised in Exhibit 14 at any time with Dr. Calvente?
21 A. No, I do not.
22 Q. During the December 14th -- I'm sorry,
23 December 15, 2017 meeting, did you ever offer an
24 opinion about Dr. Calvente's skills as a teacher?

Page 139

1 A. I do not recall.
2 Q. What about her research?
3 A. I do not recall.
4 Q. What about her service?
5 A. I do not recall.
6 Q. Do you know an individual by the name of
7 Marten denBoer?
8 A. Yes.
9 Q. And that's D-E-N-B-O-E-R?
10 A. That is correct. I don't know if there is a
11 space between the Den and the Boer or not.
12 Q. Well, we don't need to get into that now.
13 ████████████████████████
14 ████ ████████████
15 A. That is correct. That is correct.
16 Q. Did you ever speak with Dr. denBoer about
17 Dr. Calvente's tenure file?
18 A. I did.
19 Q. When did you speak with Dr. denBoer?
20 A. Actually, right before my meeting that day
21 with Dr. Calvente, I had a meeting with Dr. denBoer,
22 a scheduled meeting.
23 Q. Why did you bring up Dr. Calvente to
24 Dr. denBoer?

Page 140

1 A. I usually alert the provost when there are
2 issues coming up in tenure -- tenure folders. So I
3 talked to him about two cases.
4 Q. What was the other case?
5 ████████████████████████
6 ████ ████████████████████████████████
7 ████ ████████████████████████
8 ████ ████████████████████████████████
9 ████ ████████████████
10 Q. Okay. What do you recall with respect to
11 your conversation about -- I'm sorry, let's try this
12 again.
13 What do you recall about your conversation
14 with Dr. denBoer on the morning of December 15th?
15 A. I recall mentioning that there are two cases
16 that are of issue in the college.
17 Q. Okay. And those were ████████ and
18 Calvente?
19 A. That is correct.
20 Q. Okay. What did you tell Dr. denBoer about
21 Dr. Calvente?
22 A. I believe I alerted him to what the college
23 vote was and the negative recommendation.
24 Q. And what did Dr. denBoer say to you?

Page 141

1 A. He listened. I don't believe he said
2 anything in particular.
3 Q. Why did you alert him to these issues then?
4 A. Because I believe, as my supervisor, he
5 needs to know about potential difficult cases that
6 are happening in the college.
7 Q. Did you make this a practice to alert
8 Dr. denBoer about difficult cases in your college?
9 ████████████████████████████████████████
10 ████ ████████████████████████████████
11 Q. Ever during your time as dean?
12 A. I believe so.
13 Q. Did you tell Dr. denBoer anything else about
14 Dr. Calvente's case?
15 A. Not that I recall.
16 Q. Did you tell Dr. denBoer that you wanted his
17 support for Dr. Calvente's case?
18 A. I don't believe that that is -- was an issue
19 where I needed to bring up with him whether I would
20 have his support or not. I'm not sure I understand
21 the question.
22 Q. Well, I'm curious, and here's one of the
23 reasons I'm curious.
24 I asked you early in this deposition whether

36 (Pages 138 - 141)

Page 142

1  you, in your role as provost, had conversations about
2  a candidate's tenure -- I'm sorry.
3      I asked you earlier in this deposition
4  whether you, currently as provost, entertained
5  conversations from administrators about particular
6  cases. I thought the answer was no.
7      A.  That is correct.
8      MS. WERMUTH:  I'm going to object because
9  the question actually misstates the prior question
10  and the responsive answer.
11  BY MR. BRAMWELL:
12      Q.  So if you didn't have -- if you don't
13  currently have those conversations with
14  administrators in your -- if you don't currently have
15  those conversations with administrators, why are you
16  having this conversation as dean with Dr. denBoer?
17      MS. WERMUTH:  Well, hang on. I'm going to
18  object. Your prior questions were about advocating
19  and lobbying cases. That's -- you're asking a
20  different question now, and so your facts
21  mischaracterize your prior question and her prior
22  answer.
23  BY MR. BRAMWELL:
24      Q.  Do you need the question read back to you?

Page 143

1      A.  Yes, please.
2      MR. BRAMWELL:  Madam Court Reporter?
3      (Record read as follows:  So if you didn't
4      have -- if you don't currently have those
5      conversations with administrators in your --
6      if you don't currently have those
7      conversations with administrators, why are
8      you having this conversation as dean with
9      Dr. denBoer?)
10  BY THE WITNESS:
11      A.  I think we have to realize the timing. The
12  timing is reversed. This conversation with
13  Dr. denBoer was before I became provost.
14      When I became provost, the deans present me
15  with an agenda, and I don't recall in any of the
16  agendas were there any cases that were discussed with
17  me. So I do not know, I did not know what the
18  practice is from other deans when they met with the
19  previous provost if they discussed such cases with
20  him or not.
21  BY MR. BRAMWELL:

Page 144

1  [redacted]
2  [redacted]
3  [redacted] e and Lisa's cases on
5  December 15th of '17?
6      MS. WERMUTH:  Asked and answered.
7  BY THE WITNESS:
8  [redacted]
9  [redacted]
10  [redacted]
11  BY MR. BRAMWELL:
12      Q.  Okay. What else?
13      MS. WERMUTH:  Asked and answered.
14  BY THE WITNESS:
15      A.  I don't recall specific details.
16  BY MR. BRAMWELL:
17      Q.  Did you ever tell Dr. denBoer that there was
18  a rumor that you failed to renew [redacted] as a
19  -- to give you cover to terminate faculty of color?
20      A.  I don't believe I ever said that to
21  Dr. denBoer.
22      Q.  Did you ever use words to that effect, even
23  if you didn't use that exact language?
24      A.  No, I never had such a conversation with

Page 145

1  Dr. denBoer.
2      Q.  Did you ever talk to Dr. denBoer about [redacted]
3  [redacted]
4      A.  No, I don't believe I did.
5      Q.  Why not?
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10      Q.  Did Dr. denBoer advise you with respect to
11  the nonrenewal issues on Dr. [redacted] or
12  Dr. Calvente?
13      A.  No, he did not.
14      Q.  All he did was listen to you?
15      A.  Yes.
16      Q.  How long did that meeting last?
17      A.  Usually when I met with the provost, it's
18  usually about -- it's scheduled for about an hour,
19  and there are other items on the agenda that we would
20  be discussing.
21      Q.  What else did you discuss with Dr. denBoer
22  that morning?
23      A.  I do not recall.
24      Q.  Did you have standing meetings with the



37 (Pages 142 - 145)

Page 146

1   provost?
2       A.  I did.
3       Q.  Did you tell the provost that Dr. Calvente
4   had previously filed complaints with OIDE?
5       A.  I don't know if I told him or not.  I do not
6   recall.
7       Q.  During the December 15th meeting with
8   Dr. Calvente, did she tell you she was planning on
9   going back to OIDE?
10      A.  I believe she --
11          MS. WERMUTH:  Asked and answered.
12          THE WITNESS:  Sorry, go ahead.
13          MS. WERMUTH:  Asked and answered.
14          We've been through this this morning, but
15  you can answer again.
16  BY THE WITNESS:
17      A.  Okay.  I believe she said she was thinking
18  about it.
19  BY MR. BRAMWELL:
20      Q.  Okay.  Did you discourage her from doing
21  that?
22          MS. WERMUTH:  Asked and answered.
23  BY THE WITNESS:
24      A.  I didn't --

Page 147

1   BY MR. BRAMWELL:
2       Q.  I'm sorry?
3       A.  I didn't discourage her.  She was indicating
4   to me that it was taking up a lot of her time, and I
5   told her whether that's the best use of her time.
6       Q.  Did you tell Dr. Calvente that you had
7   spoken to Dr. denBoer about her case?
8       A.  Yes, I did.
9       Q.  Why did you tell her that?
10      A.  It had just happened that I spoke to him
11  about the case, so I just informed her that the
12  provost is aware of this case.
13      Q.  Now I understand that you had a meeting with
14  Dr. Calvente and ████████ on October 10, 2018?
15      A.  Yes, I did.
16      Q.  We discussed that a little bit this morning,
17  but you mentioned that was a long meeting?
18      A.  Yes, it was.
19      Q.  Approximately two hours?
20      A.  Yes.
21      Q.  And there were only three people there:
22  You, Dr. Calvente, and ████████?
23      A.  Yes.
24      Q.  Did you take notes?

Page 148

1       A.  No, I did not.
2       Q.  Do you recall who said what to whom?
3       A.  I recall that they were upset about a
4   college meeting that took place earlier in that
5   academic year, that -- I believe that ████ did a
6   lot of the talking in that meeting regarding
7   microaggressions that they experienced and that
8   Sydney experienced in particular in that college
9   meeting.
10      Q.  What else do you recall?
11  █ ████████████████████████████████
██  █ ████████████████████████████████████
██  █ ████████████████████████████████████
██  █ █████
██  █ ██████████████████████████████████
██  █ ██████████████
██  █ ████████████████████████████████████
██  █ ███████████████████
██  █ ███████████████████████████████████
██  █ ██████████████████████████████████

Page 149

█ ████████████████████
█ ████████
3       Q.  Okay.  What else do you recall about the
4   October 10, 2018 meeting?
5       A.  There was also Dr. Dillard mentioned there
6   was a PowerPoint where we said, you know, who are the
7   new members of our college and members of the college
8   who had left, and ████ made reference that there was a
9   faculty member who was not mentioned as having left
10  the college.
11      Q.  Okay.  Why did she mention that faculty
12  member?
13          MS. WERMUTH:  Objection, calls for
14  speculation.
15          Go ahead.
16  BY THE WITNESS:
17      A.  Because that faculty member was a faculty of
18  color.
19  BY MR. BRAMWELL:
20      Q.  And how did you respond to that?
21      A.  I apologized that it was an omission, but I
22  did not share with her the -- the potential reasons
23  why that person might not have been mentioned.
24      Q.  What else do you recall about that

38 (Pages 146 - 149)

Page 150

1  December 10, 2018 meeting?
2      A.  It was -- both ███████ and Dr. Calvente
3  were very upset, and there was a sense that every
4  action that was happening in the college had a
5  discriminatory explanation to it.  And I was trying
6  to explain to them that not everything is necessarily
7  discriminatory the way they were perceiving it, but
8  they -- they were doing most of the talking.
9      Q.  Not everything is discriminatory in the way
10  that they were perceiving it.  How were they
11  perceiving it?
12      A.  For example, that the faculty member who was
13  omitted from the PowerPoint slide about faculty who
14  left was not a result of discrimination, for example.
15      Q.  Okay.  Were there other -- other examples?
16      A.  I believe ███████ might have talked
17  about how she had to go -- undergo several -- or
18  additional formal review that she believed it was
19  required of her and not of other people.
20      Q.  What else?
21      A.  I recall it was -- they were very upset.  I
22  was very saddened by their perception of -- of the
23  college.  I was sad for them.
24      Q.  Do you think that their perception of the

Page 151

1  college was accurate?
2      A.  No, I don't.
3          THE WITNESS:  Sorry about that.
4          MR. BRAMWELL:  I love cats, actually.
5          MS. WERMUTH:  That's pretty cat.
6          THE WITNESS:  He is a COVID cat.
7          MR. BRAMWELL:  Off the record briefly, if we
8  may.
9          (A brief discussion was had off the record.)
10  BY MR. BRAMWELL:
11      Q.  You mentioned that Dr. Dillard did most of
12  the talking.  What, if anything, did Dr. Calvente
13  say?
14      A.  I don't recall.
15      Q.  Now you mentioned, and I don't remember if I
16  asked this or not before I got distracted by the cat.
17          You mentioned, and I'll paraphrase, that you
18  believe during the October 10, 2018 meeting that
19  ███████ and Dr. Calvente expressed that the
20  College of Communication was -- had a race problem.
21  Am I expressing that correctly?
22          MS. WERMUTH:  I'm sorry, I couldn't hear you
23  for a minute.
24          THE WITNESS:  You were going in and out.

Page 152

1          MR. BRAMWELL:  Oh, I'm sorry.  Hopefully
2  that's just a blip.
3  BY MR. BRAMWELL:
4      Q.  If I understand correctly, during the
5  October 10th meeting, ███████ and Dr. Calvente
6  were both expressing that the college is racist; is
7  that correct?
8      A.  I would say so, yes.
9      Q.  Okay.
10      A.  And -- yeah, I do recall something else.
11          They did mention other faculty of color who
12  either were not tenured or who had left the college.
13      Q.  Okay.  And they said also that that was a
14  demonstration of how and why the College of
15  Communication was racist?
16      A.  In their opinion, yes.
17      Q.  Do you agree at all with them?
18      A.  No, I don't agree with them, because for the
19  cases that they were bringing up, there was a good
20  reason why a particular faculty member had left the
21  college.  I did not share some of those reasons as
22  they were confidential for the faculty member
23  involved.
24      Q.  Did you tell them, though, that there were

Page 153

1  good reasons, or did you just leave it lie?
2      A.  I believe I tried to say there were reasons.
3      Q.  Okay.  Dr. Ghanem, do you consider yourself
4  a person of color?
5      A.  I definitely do not see myself as Caucasian,
6  no.
7      Q.  What do you see yourself as?
8      A.  I see myself as Middle Eastern,
9  predominantly.
10      Q.  Okay.  In the October 10, 2018 meeting, did
11  anybody mention ███████?
12      A.  I think I did.
13      Q.  You did?
14      A.  I -- yes.  I was trying to explain that not
15  every action needs to be seen through this
16  discriminatory lens.
17          For example, I heard a rumor that the reason
18  that his -- █ was not recommended for reappointment
19  was to be able to make a case later on against
20  Dr. Calvente, and I was trying to explain that that
21  is absurd.
22      Q.  Okay.  How did Dr. Calvente respond?
23      A.  You know, I do not recall a response by
24  Dr. Calvente on that.

39 (Pages 150 - 153)

Page 154

1  Q.  So she just sat there, stone-faced?

2  A.  That's what I believe, yes.

3  Q.  ███████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

8  A.  I am totally fine with that, because I would

9  not be able to spell it.

10  Q.  Okay.

11  MS. WERMUTH:  This is Anna.  For the record,

12  I don't think there is an E in there, it's an I, but

13  there are records that will demonstrate the correct

14  spelling and we can be sure --

15  THE WITNESS:  I think you're correct, and I

16  don't think there is an E.

17  MR. BRAMWELL:  Okay.

18  THE WITNESS:  Mr. Bramwell, the cat is

19  showing up again, so I apologize.

20  MR. BRAMWELL:  Don't apologize at all.  I

21  like him.  It brings warmth -- it brings true warmth

22  to me.  I love cats, I really do.

23  THE WITNESS:  And off the record, but he

24  will do this more and more as the afternoon

Page 155

1  progresses.

2  MR. BRAMWELL:  Of course he will.  When my

3  cat was around, he would jump on my desk and help me

4  write my briefs.

5  BY MR. BRAMWELL:

6  Q.  You mentioned a rumor that -- that you

7  non-renewed ██████  so that you could

8  terminate faculty -- so that you could terminate

9  Lisa?  Was that the rumor?

10  A.  Well, I'm not sure that the rumor was about

11  me, that the rumor was more that the college did that

12  to justify their recommendation, their negative

13  recommendation of -- of Lisa.  I don't believe the

14  rumor was that I am the one who did that.

15  Q.  Okay.  Who else in the college -- I'm sorry.

16  Who else in the college would do that?

17  A.  That it was the tenured faculty.  The rumor

18  was that the tenured faculty recommendation was

19  negative for ██████  to make a case against

20  Calvente.

21  Q.  Okay, I see.

22  Did -- you're familiar with ███████

████████

24  A.  Vaguely.  Not well.

Page 156

1  Q.  Only vaguely?

2  A.  Yes.  I mean, I have never really had a

3  one-on-one meeting with them.  I have seen them at

4  faculty council.

5  Q.  You were familiar with -- ██████ was

6  brought up on charges under chapter 4 of the faculty

7  handbook?

8  MS. WERMUTH:  Objection, relevance.

9  BY MR. BRAMWELL:

10  Q.  You can answer.

11  A.  Yes, I was, because -- not at the time when

12  she was brought up, but I believe that the case

13  extended into when I was acting or interim provost.

14  Q.  And you actually had some negotiations

15  during -- well, I think you said the case extended

16  while you were interim provost, Dr. ████ case did?

17  A.  Yes, it did.

18  Q.  And did -- during the October 10, 2018

19  meeting -- or actually, strike that.

20  ████████████████████████████

22  MS. WERMUTH:  Objection.  This is totally

23  irrelevant.

24  BY THE WITNESS:

Page 157

1  ███████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████

5  BY MR. BRAMWELL:

6  ████████████████████████████████

███████████████████

███████

███████████

███████████████

███████

███████████

███████

████████████████

███████

█████████████

17  MS. WERMUTH:  I'm going to object to this

18  entire line of questioning.  There's nothing about

19  ████████  employment or litigation or internal

20  proceedings that have any relevance to this case.

21  MR. BRAMWELL:  I'll wait until you finish

22  your drink before I continue.  Seriously, take your

23  time.

24  THE WITNESS:  No, I'm good.

40 (Pages 154 - 157)

Page 158

1  BY MR. BRAMWELL:
2  Q. Okay, good.
3  During the October 10, 2018 meeting, did
4  Dr. Calvente or ▮▮▮▮ mention ▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮?
6  A. I do not recall, and if they did, I did not
7  comment on anything. I do not recall it.
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮ ▮▮▮▮▮
12 A. Can you repeat the question? I'm not sure I
13 understand it.
14 MR. BRAMWELL: Sure. Madam Court Reporter,
15 could I ask you to...
16 (Record read as requested.)
17 BY THE WITNESS:
18 A. No, I do not recall them asking that.
19 Did you hear my answer?
20 BY MR. BRAMWELL:
21 Q. Yes, I did. I'm sorry, I'm looking at
22 another screen, because that's the joy of doing a
23 deposition via Zoom, right?
24 Now we were mentioning, talking earlier

Page 159

1  about this rumor about ▮▮▮▮▮▮▮▮ and the
2  fact he was not renewed to give cover for ultimately
3  denying tenure to Dr. Calvente.
4  MS. WERMUTH: Object to form, argumentative.
5  BY THE WITNESS:
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮ ▮▮▮▮▮▮▮▮▮▮
11 BY MR. BRAMWELL:
12 Q. Okay.
13 A. She was not up for tenure at that time.
14 Q. Did that rumor upset you at all?
15 A. It didn't upset me, I was using it to show
16 both Dr. Calvente and ▮▮▮▮▮▮ that not every
17 action can be interpreted as discriminatory against
18 faculty of color.
19 Q. I'm going to send you a document that I have
20 labeled as Exhibit No. 20. This is labeled
21 Calvente-DePaul-25709 through 25714.
22 Please let me know when you receive it.
23 A. I just received it.
24 MS. WERMUTH: I don't yet have it.

Page 160

1  THE WITNESS: May I open it?
2  MR. BRAMWELL: Please.
3  MS. WERMUTH: I have it now.
4  MR. BRAMWELL: Okay. Why don't we do this.
5  Why don't we come back at 1:50.
6  Dr. Ghanem, if you can, during the break,
7  just read through it and I'll have some questions for
8  you.
9  THE WITNESS: Actually, during the break,
10 I'm going to take a humanity break. I'll read it
11 when I come back.
12 MS. WERMUTH: Jerry, I don't think it's
13 appropriate to have the witness -- I mean if you want
14 to ask her questions about an exhibit, I think that
15 she's entitled to --
16 MR. BRAMWELL: I don't --
17 MS. WERMUTH: -- on the record, read the
18 exhibit.
19 MR. BRAMWELL: -- address me as Jerry.
20 Do you want to come back at 1:55?
21 MS. WERMUTH: We can come back at 1:55, but
22 she's going to read this on the record, because
23 you're going to be asking her questions on the
24 record, Mr. Bramwell.

Page 161

1  MR. BRAMWELL: That's fine. Then let's just
2  take five minutes and we'll come back and she can
3  read it on the record.
4  THE WITNESS: Okay, so 1:50?
5  MR. BRAMWELL: Yes, please.
6  MS. WERMUTH: Yeah, 1:50.
7  (A short break was taken.)
8  BY MR. BRAMWELL:
9  Q. Dr. Calvente -- I'm sorry. I did not mean
10 to address you by the wrong name.
11 Dr. Ghanem, I sent you before the break a
12 document that I have marked as Exhibit 20.
13 Have you ever seen that document before?
14 A. Let me have a look at it.
15 Q. Take your time. It's a long document.
16 A. No, I have not seen this document before.
17 Q. I hear a lot of banging in the background.
18 Who is that?
19 A. It's my husband in the other room. I
20 apologize.
21 Q. Oh, that's quite all right. Is he able to
22 hear these proceedings?
23 A. No, not with this going on.
24 Q. Okay. And just for the record, you pointed

41 (Pages 158 - 161)

Page 162

1   to earbuds?
2      A.  That's correct.
3      Q.  Okay.  What was that?
4      A.  That's now my dog.
5      Q.  All right.
6      A.  The joys of Zoom.
7      Q.  Absolutely.
8      A.  If you don't mind, I'm going put a collar on
9   him that keeps him quiet.  I'll be right back.
10     Q.  Absolutely.
11        (Brief pause.)
12        THE WITNESS:  I apologize.
13        MR. BRAMWELL:  Our animals make our lives
14  richer, but they don't understand our commitments, do
15  they.
16  BY MR. BRAMWELL:
17     Q.  Let's see.  Let me see if I can fix this.
18        I'm going to send you a document that I've
19  marked Exhibit No. 29.  Please don't open it yet.
20        With respect to Exhibit No. 20 I just sent
21  you, does that -- after reviewing it, does that cause
22  you to change your answer at all with respect to the
23  rumor about███████████?
24     A.  I'm not sure I understand your question.

Page 163

1      Q.  You're right, it was not a very good
2   question.
3   
4   
5   
6   
7   
8   
9   
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22     Q.  Now as the dean of the College of
23  Communication, you obviously had the power to
24  override a recommendation to renew or not renew

Page 164

1   faculty, right?
2      A.  That is correct.
3      Q.  So even if the rest of the faculty said we
4   should renew, you could say no?
5      A.  That is correct.
6      Q.  And even if -- and if the faculty said no,
7   you can say yes?
8      A.  That is correct.
9      Q.  You don't have to consider, at all, their
10  opinions?
11     A.  It is definitely part of my deliberation.
12  That's why they make a recommendation to me.
13     Q.  Okay.  But you can do -- you have unfettered
14  access as dean; this is not one where you can only
15  overturn --
16        (Reporter clarification.)
17        MR. BRAMWELL:  Oh, I'm sorry.  Let me ask it
18  again.
19  BY MR. BRAMWELL:
20     Q.  As dean, you do not need to demonstrate rare
21  or compelling circumstances to overturn the
22  recommendation of faculty on a nonrenewal, correct?
23     A.  It does not go to UBPT, that is correct.
24     Q.  I didn't ask whether it went to UBPT.  I

Page 165

1   asked whether you need to demonstrate rare or
2   compelling circumstances.
3      A.  I don't believe there's anything in the
4   handbook that says so.
5   
6   
7   
8   
9   
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23     Q.  Okay.  Now I understand that faculty have
24  three obligations at -- within their college, right?



42 (Pages 162 - 165)

Page 166

1 They have the obligation to teach, to do research,
2 and to perform service; is that correct?
3    A. That is correct.
4    Q. Do they have other obligations?
5    A. I would say all of their obligations would
6 fall under those categories.
7    Q. Teaching, research, and service?
8    A. Correct.
9    Q. Okay. How many class hours are junior
10 faculty expected to teach?
11   A. Tenure track faculty are expected to teach
12 two classes every quarter.
13   Q. Two classes every quarter, and that's what,
14 two hours per class?
15   A. I think it is three hours per week.
16   Q. Okay.
17   A. Per class.
18   Q. So they're supposed to teach six hours a
19 week then?
20   A. That is correct.
21   Q. Okay. And that's in the College of Comm,
22 right?
23   A. It is also in -- that is the standard for
24 all colleges, usually.

Page 167

1    Q. Only six hours a week of teaching?
2    A. Six hours a week of teaching does not mean
3 six hours a week of work. There is a lot of work
4 that happens outside of the classroom.
5    Q. Okay. And that goes to teaching?
6    A. A lot of it is prepping for the classes,
7 grading for the classes, as well as the work that
8 they spend on research and service.
9    Q. Okay. Well, I'm just asking about teaching
10 right now, and I'll get into research and service.
11      But on teaching, it's six hours of teaching,
12 so then -- or rather six hours actually in the
13 classroom. About how much additional time, then, is
14 spent preparing and all those other things that go
15 into teaching?
16   A. It depends on the classes that they're
17 teaching. If it's the same class, if they're
18 different classes, how large the classes are, if it's
19 a new prep, if it's an old prep, if they're revamping
20 their classes. That varies from faculty to faculty.
21   Q. If there is a 40-hour workweek,
22 approximately how much time is a faculty member
23 supposed to be devoting to teaching?
24   A. We do not have --

Page 168

1      MS. WERMUTH: Hang on.
2      Objection, assumes facts not of record.
3 BY THE WITNESS:
4    A. We do not have a formula that says how many
5 hours should be devoted to teaching.
6 BY MR. BRAMWELL:
7    Q. Okay. I assume, then, there's no formula
8 for research or service either?
9    A. In terms of number of hours, no.
10   Q. How does one differentiate between excellent
11 and merely very good in the area of service?
12   A. It is a combination of quantity and quality
13 of work. There are committees that don't require
14 that much work and there are committees that require
15 a lot of work, and it is -- so it varies in that
16 sense.
17   Q. Are there any quantitative metrics with
18 respect to service?
19   A. Not in the sense that it would have to be so
20 many committees or so many hours, no.
21   Q. Are there quantitative metrics in other
22 senses?
23   A. Can you repeat the question, please?
24      MR. BRAMWELL: Madam Court Reporter?

Page 169

1      (Record read as follows: Are there
2      quantitative metrics in other senses?)
3 BY THE WITNESS:
4    A. No, there is not.
5 BY MR. BRAMWELL:
6    Q. How does one obtain service opportunities?
7    A. They can be in a variety of ways, either if
8 it is a college committee, there could be a call for
9 people to serve on different committees. If there is
10 a university-wide committee, it would be a call by
11 faculty council to serve on committees, as well as
12 volunteering to participate in various events that
13 take place in the college.
14   Q. Are there quantitative metrics with respect
15 to research?
16   A. Again, it is a holistic approach, and it's a
17 combination of both quantity and quality.
18   Q. Okay. So how do I know if I'm excellent
19 versus merely very good?
20   A. A lot of it will be through the formal
21 reviews would be one way of calibrating and knowing
22 where you are in terms of your progress.
23   Q. Okay. Formal review, that would be the
24 reviews with personnel?

43 (Pages 166 - 169)

Page 170

1    A.  With personnel and the -- the report by the
2  tenured faculty, correct.
3    Q.  Would you agree that the purpose of the
4  reviews by personnel, the reports by tenured faculty,
5  that the purpose of those --
6    A.  I cannot hear you.  I lost you for a moment.
7    Q.  Oh, I'm sorry.  I'm sorry, can you hear me
8  now?
9    A.  Yes, I can.
10    Q.  Okay.  I'm sorry.  I'll try to speak up a
11  little bit.
12       Would you agree that the purpose of the
13  interviews with personnel and the report of the
14  tenured faculty during the probationary reviews are
15  to tell the candidate what she needs to do to
16  successfully make a case for tenure?
17    A.  It has two parts:  One is exactly as you
18  outlined, and another one is an actual vote where
19  they believe if that candidate is making adequate
20  progress towards tenure.
21    Q.  Okay.
22    A.  And that is the recommendation for
23  reappointment or non-reappointment.  So it's both.
24    Q.  Okay.  Has anyone ever accused you of making

Page 171

1  an employment decision for discriminatory reasons?
2    A.  Not that I recall, no.
3    Q.  ██████████ never did that?
4    A.  No.
5    Q.  Has anyone ever accused you of making an
6  employment decision for retaliatory reasons?
7    A.  No.
8    Q.  ██████████ never did that?
9    A.  No.
10    Q.  Did anyone at Central Michigan ever accuse
11  you of discrimination or retaliation?
12    A.  No.
13    Q.  Have you ever been accused of academic
14  dishonesty?
15    A.  No, I have not.
16       MR. BRAMWELL:  I'd like a few minutes to
17  collect my thoughts, if you don't mind.  We can come
18  back, let's say, at 2:11.
19       MS. WERMUTH:  Okay.
20       (A short break was taken.)
21       MR. BRAMWELL:  I have nothing further at
22  this point, and I'll pass you to Ms. Wermuth.
23       MS. WERMUTH:  Oh, terrific, okay.  You know
24  what then?  I'm going to just request a very short

Page 172

1  break, so if we could come back at, like, 2:20, we
2  can hopefully finish up pretty quickly after that,
3  okay?
4       THE WITNESS:  Thank you.
5       (A short break was taken.)
6       MS. WERMUTH:  We have no -- we have no
7  questions.
8       We will reserve signature, Ms. Radtke.
9       MR. BRAMWELL:  We'll order regular delivery,
10  and I will e-mail the exhibits.
11       (Deposition concluded at 2:19 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 173

1       CERTIFICATE OF
2     CERTIFIED SHORTHAND REPORTER
3    I, Beth Radtke, a Certified Shorthand
4  Reporter of the State of Illinois, CSR License No.
5  084-004561, do hereby certify:
6    That previous to the commencement of the
7  examination of the aforesaid witness, the witness
8  was duly sworn by me to testify the whole truth
9  concerning the matters herein;
10    That the foregoing deposition transcript was
11  stenographically reported by me and was thereafter
12  reduced to typewriting under my personal direction
13  and constitutes a true and accurate record of the
14  testimony given and the proceedings had at the
15  aforesaid deposition;
16    That I am not a relative or employee or attorney
17  or counsel for any of the parties herein, nor am I
18  interested directly or indirectly in the outcome of
19  this action.
20    IN WITNESS WHEREOF, I do hereunto set my hand at
21  Chicago, Illi          2021.
22
23
                Beth Radtke, RPR, CRR
24              License No. 084-004561

44 (Pages 170 - 173)

Page 174

```
1              Veritext Legal Solutions
                 1100 Superior Ave
2                   Suite 1820
                 Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
    April 7, 2021
5
    To: Anna Wermuth, Esq.
6
    Case Name: Calvente, Lisa v. Ghanem, Salma, et al.
7
    Veritext Reference Number: 4510632
8
    Witness:  Salma Ghanem      Deposition Date:  3/24/2021
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24  NO NOTARY REQUIRED IN CA
```

Page 176

```
1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4510632
3   CASE NAME: Calvente, Lisa v. Ghanem, Salma, et al.
    DATE OF DEPOSITION: 3/24/2021
4   WITNESS' NAME: Salma Ghanem
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9       I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____   _____
    Date          Salma Ghanem
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18        in the appended Errata Sheet;
        They signed the foregoing Sworn
19        Statement; and
        Their execution of this Statement is of
20        their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
        Notary Public
24
        _____
25      Commission Expiration Date
```

Page 175

```
1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4510632
3   CASE NAME: Calvente, Lisa v. Ghanem, Salma, et al.
    DATE OF DEPOSITION: 3/24/2021
4   WITNESS' NAME: Salma Ghanem
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7       I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____   _____
9   Date          Salma Ghanem
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
          Statement; and
14      Their execution of this Statement is of
          their free act and deed.
15
    I have affixed my name and official seal
16  this _____ day of_____, 20____.
17
18      Notary Public
19
        _____
20      Commission Expiration Date
21
22
23
24
25
```

Page 177

```
1          ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 4510632
3   PAGE/LINE(S) /       CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____   _____
20  Date          Salma Ghanem
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date
```

45 (Pages 174 - 177)

# Exhibit 1 to Ghanem Deposition





Office of the Provost
1 East Jackson Boulevard
Chicago, Illinois 60604-2287
312/362-1330
FAX: 312/362-8874

June 10, 2019



Dear Professor ▮▮▮▮

I am pleased to inform you that, contrary to the recommendation of the University Board on Promotion and Tenure (UBPT), I have decided that you will be promoted to Associate Professor with tenure in the College of Science and Health, Department of Chemistry and Biochemistry, effective July 1, 2019. My decision regarding your application for promotion is based on my review of your dossier, including your responses to the department, college, and UBPT recommendation reports, and my attendance at the UBPT hearing on your case. With this promotion, your base academic year salary will be increased by $10,000; this increase will be reflected in your letter of reappointment for the 2019-2020 academic year.

The UBPT's 1-6 recommendation against tenure and promotion arises from Board member concerns about your teaching and research records during your probationary period. The UBPT's concerns about your research record centered on the quality and impact of your published articles, as well as the extent of your contributions to co-authored work. In this judgment, the Board echoes the evaluations of the College of Science and Health Personnel Committee and half your tenured colleagues in Chemistry, who noted the failure to establish an "active and productive research program" in your area of specialization, per the Chemistry departmental guidelines. Neither your chair nor your dean shared these concerns. Chemistry chair Quinetta Shelby's recommendation letter systematically and convincingly counters the above concerns.

Furthermore, as you have pointed out in your candidate responses to the above reports, your department colleagues, who were evenly divided in their support of your application for the above reasons, had voted unanimously (8-0) during a formal review less than six months earlier to extend your contract, in full knowledge that you would be applying for tenure the following fall (per your chair, who clarified the timing subsequent to the UBPT hearing). The unit's June 1, 2019 formal review report (which you submitted as an addition to your dossier) includes a vote on contract renewal, but does not, as required by the Handbook, include a vote on whether you were making adequate progress toward tenure. However, the formal review's summary evaluation of your research record clearly indicates that you had met the bar for

promotion and tenure: "The review committee is pleased to see the progress that Dr. French has made since joining the department as an Assistant Professor. The department's guidelines for promotion and tenure suggest that faculty should publish at minimum one peer-reviewed publication every other year, with at least one publication in the area of expertise for which the candidate was hired. Dr. French has already clearly satisfied this minimum requirement. The committee encourages him to maintain his research momentum to further strengthen his case for promotion and tenure on the basis of research." There is no indication that your research momentum has flagged, and some probability that the perceived lack of coherence is an effect of the cross-disciplinary nature of your research and scholarship. For all the above reasons, I consider your record of research and publication to have met the standard for promotion and tenure.

The UBPT also expressed concerns that your teaching during your probationary period has not been consistently effective, citing student evaluation complaints regarding communication of subject matter and timeliness of feedback. The department and college reports both also noted some unevenness (as well as more recent improvement) in the evaluations, but both reports rated your teaching highly. The department report summary on teaching noted that "Dr. French either meets or exceeds the department's expectations for planning, implementation, development, leadership, and effectiveness in teaching," and the CPC vote summary indicated that four rated him successful and two exceeds expectations. Both reports considered the student evaluations in the context of other evidence of teaching effectiveness. My own reading of your teaching record more closely matches the department and college reports. I have confidence that, given your own focus on science education, you will continue to develop and improve your teaching, as needed.

Please accept my congratulations on your promotion, awarded in recognition of your achievements in scholarship, teaching, and service and in expectation of your continued service to our students, the university, and your field. Throughout the course of your application for promotion, many members of the DePaul university community have evaluated and commended your professional accomplishments during your probationary period. Together with them, I have every confidence that you will continue to make significant contributions to your discipline, our programs and students, and the university community. I look forward to hearing about the progress of your career at DePaul in the coming years.

Sincerely,

Salma Ghanem, Acting Provost

# Exhibit 18 to Ghanem Deposition





**University Board on Promotion and Tenure**
1 East Jackson Boulevard,
Chicago, Illinois  60604-2287

**To:**       Salma Ghanem, Provost

**From:**    University Board on Promotion and Tenure, 2019-2020 (Mojdeh Bayat (College
of Education); Elena Boeck (College of Liberal Arts and Social Sciences); Dana
Hall (School of Music); Ginger Nila Hofman (College of Liberal Arts and Social
Sciences);  Xiaoping Jia (College of Computing and Digital Media); Gregory
Mark (College of Law); Sandra Shelton (College of Business)

**cc:**       Lucy Rinehart, Associate Provost for Academic Planning and Faculty
Scott Paeth, President, Faculty Council

**Date:**    September 23, 2020

**Re:**       Required end-of-year report

Based on the experiences during the 2019-2020 academic year and as required by the Faculty
Handbook 3.5.7.5, the University Board on Promotion and Tenure (UBPT or Board) hereby
provides the Provost, the Faculty Council, and units with our suggestions and concerns regarding
promotion and tenure processes, practices, and rules.  With each suggestion or concern, the
Board has identified the entity or entities it understands are in the best position to resolve the
issue.   In the case of changes to the Faculty Handbook, or in cases where definitive
interpretations are suggested, the Faculty Council is the appropriate entity to evaluate and, where
agreement exists, to implement, the suggestions, with the assistance and concurrence of the
Provost.

The new Faculty Handbook has been in effect for several years.   This year the UBPT has also
reviewed the year-end letters since the adoption of the new Faculty Handbook and, as the last
portion of the letter, will summarize our continuing concerns, even when the particular concerns
may not have generated any specific problems in this cycle.  Additionally, the Board begins this
report with general concerns that several cycles of the promotion and tenure process have
generated.  Finally, the report has several unit-specific suggestions contained in individual
addenda to the report.   In each case a practice or policy came to our attention during the review
of a candidate or candidates file(s) that either violated provisions of the Faculty Handbook or
misinterpreted a provision of the Faculty Handbook (FH).  See FH 3.5.6.1, where the UBPT is
charged with "applying university-wide standards and criteria" [subsection c] and examining
"the application of lower-level guidelines to the candidate" [subsection d].  The UBPT has a
growing concern that these errors and misinterpretations redound to the detriment of individual
candidates.  The UBPT is charged with review of unit policies under FH 3.5.7.5.  See also FH

1

3.4.3. The Board believes that these issues in the "evaluation guidelines, criteria and procedures" of units should not wait on the Board's general reviews of unit policies. (The Board reviews some, though not all, unit policies annually, ideally in the fall term.) The Board therefore includes several addenda to the general year-end report. Each addendum addresses unit-specific concerns and should be forwarded from the Provost's office to the relevant Dean.

## GENERAL CONCERNS:

*Provost decisions to overturn UBPT recommendations*

The adoption of the new Faculty Handbook, which became effective July 1, 2015, signaled the importance of the faculty's role in the promotion and tenure process. Consistent with the faculty's understanding of its role as "the primary creators of a vibrant academic community," the "system of faculty evaluation ... relies heavily on the views of the faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for ... promotion, and tenure" (FH 3.1). The aim of the process is explicit. The hurdle is necessarily high, especially for tenure: "Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications" (FH 3.1). See also 3.3.1.3 ("The Tenure Review"). It is for these reasons that the Faculty Handbook establishes multiple levels of review, each with the full freedom, indeed the responsibility, to evaluate a candidate anew at each level (FH 3.5.1.1f). After the first level of review, the review of a file also encompasses consideration of the "method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic units. Relevant issues include matters of stringency, consistency among candidates, and fairness, as well as the implications the decision may have at the college, school, or university level" (FH 3.5.1.1f). The Faculty Handbook does not provide for deference to reviews at any level, except one.

The Provost "makes the final decision on tenure or promotion" (FH 3.5.6.3). Unlike every other level of review, however, the Faculty Handbook provides not just for deference to a lower level of review, but for a very high degree of deference in two respects. The UBPT recommendation may be overturned only in "rare instances" (FH 3.5.6.3). Moreover, the reason for overturning the UBPT recommendation must be "compelling" (FH 3.5.6.3). Neither "rare" nor "compelling" are self-defining. The language, especially because both conditions are required, powerfully suggests that the decision to overturn may not be made simply because the provost would have voted differently had the Provost been a voting member of the Board. The language powerfully suggests that the decision to overturn may not be made simply because the Provost interprets part or all of a file differently than the UBPT. Moreover, when read in conjunction with the "no doubt" language quoted earlier regarding the tenure decision, that language, at least in cases of tenure, powerfully suggests that in order to overturn the recommendation of the Board, the faculty representatives, the Provost should find that the UBPT recommendation was manifestly one that was groundless. In other words, doubt existed where the Board found none, or where the Board expressed its doubt, the Provost found that the Board's reason(s) for doubt were completely unfounded. In the case of promotion to full professor, the requirements are even more explicit and particularized. The requirements for promotion to full professor are unequivocal statements of quality of performance: recognition by "peers inside and outside the university" of scholarship or creative activities, "notable" service "at the university level," and a

LC0004069

"mandatory" requirement for "effective teaching," thus, the rank "is reserved for those with recognized academic achievement" (FH 3.4.1).

The UBPT recognizes that the Faculty Council is not privy to either the UBPT recommendations or to the Provost's written decisions. At first glance, moreover, the number of decisions to overturn may not appear to be numerous, and, especially in this past cycle, with only about half as many candidates as usual, the year may present an unusual sample. (The Provost's office provided the UBPT with the following numbers of overturns: 2016/2017 5/51; 2017/2018 zero; 2018/2019 3/47; 2019/2020 3/23.) The UBPT notes, however, that the percentage of decisions to overturn suggests something other than that the decisions are rare. The UBPT has also spent hours discussing the rationale(s) embodied in the Provost's decisions. In nearly every case, the rationale(s) are ones the Board has already considered during its initial deliberations. By definition, most members of the UBPT did not find the rationale(s) compelling when made during deliberations. Had the members found the rationale(s) compelling, the vote would have been different. In other words, the rationale(s) might be plausible, even persuasive to some, but not compelling in the sense that the word is usually used in such a context, meaning overwhelming or at least sufficiently powerful to convince even a bare majority of the Board. Had the drafters of the Faculty Handbook, and the faculty approving the Faculty Handbook, understood compelling as meaning simply coming to a different conclusion, then the Faculty Handbook could have provided for simple disagreement as a basis for not accepting the recommendation of the UBPT. Neither the drafters nor the faculty reviewing the draft so provided. Moreover, to reiterate, at no other level of evaluation does the Faculty Handbook embody any level of deference, as noted above, except for the Provost towards the UBPT.

The UBPT understands that the Faculty Council cannot actually review the back-and-forth between the Board members and the provost. Moreover, the Board understands that this concern embodies the Board's perspective as the faculty's representatives. The UBPT is not a policy-making body. After five years under the guidance of the new Faculty Handbook, however, the Board believes a clearer understanding of what "only in rare instances and for compelling reasons" (FH 3.5.6.3) means should be provided, if for no other reason than to provide a continuity of understanding.

*Unit errors that affect a file*

Over the past several years, during review of candidate files, the UBPT has noted that certain academic units have had rules or practices that are not consonant with the Faculty Handbook. They therefore engage in practices that violate the Faculty Handbook, or misinterpret the Faculty Handbook, which supersedes unit rules where they are inconsistent. See FH 3.4.2 and 3.4.3: Unit rules "provide unit- and discipline-specific articulations of university-wide criteria"; unit "guidelines must be consistent with the university's criteria and procedures specified in the Faculty Handbook." These errors, practices, or interpretations are not ones the Board can address unless the Board has reviewed the unit's rules, an annual and on-going process. In the case of misinterpretation, only when the Board sees the file or hears the candidate, the chair, or the dean, can the Board become aware of the difficulty. The Board has regularly mentioned these matters to the chairs and deans who appear before the Board. In many cases, however, upon review of unit policies, the Board discovers that necessary changes have not been made. In

3

LC0004070

part, for this reason, the UBPT adopts in this cycle the unit-specific addenda mentioned earlier. The Board also suggests that the Faculty Council and the Provost formalize a process to require review of policies and practices before they might have an adverse impact on a candidate's future. At a minimum, units should ensure that if they have any candidates eligible for tenure that they ensure their policies are consistent with the Faculty Handbook long before the candidates begin to prepare their files.

## SCHOLARSHIP AND CREATIVE WORK

1. *Pay to publish*. The UBPT supports the Handbook amendment approved by Faculty Council in the Spring concerning the growing issue of pay-to-publish and pay-to-present. This matter is one best defined in the disciplines each unit encompasses. By way of clarification, the UBPT has never been concerned about questions of paying either membership dues or conference fees in order to be able to participate, and therefore present, at conferences. Such dues or fees would only be of concern if a differential fee applied to those who presented, for example, or if fee payment resulted in more favorable consideration. The concern of the Board has been and continues to be those conferences wherein everyone pays, gets quickly approved, no one is rejected, reviews are pro forma or non-existent, or no audience ever is in a position to listen or view a presentation, especially of concern where few or no records are kept of the method of presentation, the academic or professional audience attending, or any of the other indicia of integrity characteristic of regular proceedings. Similarly, the concern of the Board where publications are at stake centers on publications in journals that have sham editorial boards and processes, charge excessive fees for consideration, review, and publication, those journals where paying for expedited review amounts to paying to get in, or those journals adopting names very similar to respectable journals such that a misimpression can be generated about the quality of an academic record. The Board urges local units to address these matters quickly.

2. *Citation counts*. The Board appreciates that citations are not a definitive, much less the definitive, method to evaluate the quality and impact of academic work. Nonetheless, citation counts are widely recognized and accepted as an important index of a scholar's impact, all the more so if a piece is cited favorably over a long course of time. Therefore, to the extent that citation counts form part of a candidate's record, it is incumbent on the candidate, and the administrative officers, to be able to say what constitutes a good or notable citation record. Indeed, if citation counts are recognized and accepted in a field, that evaluation should be part of the record.

3. *Acceptance rates for journals and conferences, journal ratings, and similar measurements*. As with citation counts, to the extent that such metrics are recognized and accepted, the record should explain what they mean so that those outside of the immediate discipline can better understand them and ask appropriate questions. Simply stating what the rate of acceptance is rarely conveys, by itself, any information about quality or impact.

4. *External letters--substance*. Especially where a candidate is being considered for promotion to full professor, the external evaluations should be written by full professors. In general, external evaluations should be written by full professors who, by definition, have achieved the profession's highest recognition for accomplishment and are therefore well-placed to evaluate the quality and impact of a candidate's work. The Board reiterates its continuing concern that external evaluators should be chosen not because they are in "universities of

4

similar ranking," a phrase the Board has heard on occasion, but rather solely because they are well-suited to evaluate the candidate's work, to discuss the contribution the work makes to the field, to summarize and contextualize the work, and to clarify its strengths and weaknesses. Evaluations that simply state conclusions are of very little utility to the Board's effective functioning, no matter how glowing the conclusion, or conversely, no matter how dismissive the conclusion.

5. *External letters--procedure*. Additionally, again this year the Board was confronted with difficulties in the process of selecting external evaluations in some units. To be specific, units should never allow candidates to strike evaluators from a list. Doing so identifies every possible reviewer and completely compromises confidentiality. At the same time, candidates must be provided with copies of the letters, redacting identifying information about the evaluator and the evaluator's institution. This year the Board noted instances in which candidates had been provided the list of potential evaluators and other instances where they claimed not to have seen the letters of external evaluators. (For articulation of the concerns that have arisen in prior years and have not been addressed, see below.)

## SERVICE

1. *Defining university service*. The Faculty Handbook differentiates service to departments, colleges, and the university in specifying what is expected for different ranks. To become an Associate Professor a candidate "should show significant involvement in university activities at the local academic unit and beyond" (FH 3.4.1). The Board has consistently recognized that service to a department, cross-departmental service as in a domain committee in Liberal Arts, and service at the college level qualifies. Service on university-wide boards, committees, and organizations also clearly qualifies. While service to professional, academic, and other organizations outside the university are important and valued, the Board has consistently understood "university activities" to mean the life and activity within DePaul University.

By contrast, for promotion to Full Professor a candidate must show "notable contributions at the university level" (FH3.4.1). The Board has consistently understood this requirement to encompass university-level boards and committees and service to boards and committees outside one's own college. The Board has also consistently understood "notable" to mean more than attendance on such boards and committees, but rather to reflect the relative importance of some boards and committees to the university's existence and prosperity or the candidate's taking leading roles on university-wide boards and committees. The Board has consistently held the position that local service, even when such service assists the university overall, such as in student recruitment for one's unit, or program development for one's unit, is to be understood as unit and not university service. The Board's rationale is simple. All local service contributes to the functioning of the whole. To conflate the local service with university impact and university service is to efface the difference between unit and university. Moreover, "at the university level" means something different than helping the university. See, for example, FH 3.4.2.3, which distinguishes in the first bullet service to "university and its academic units," and similarly later states the requirement that "faculty members must serve in their local academic unit," as distinct from "[u]niversity service" in prior sentence. Deans, chairs, and candidates should understand these distinctions. In the

LC0004072

past several years candidates have made the claim that local or college service is university service. Some chairs have made similar, albeit less vociferous, claims. Of course, if the Faculty Council and the Provost believe that the Board is in error, then clarification through an interpretive Q&A or an amendment of current Faculty Handbook language would be appropriate.

Similarly, in the past three years, a few candidates have claimed that professional service that enhances the university's reputation is "notable university service." The Board has not accepted that claim. It has not accepted the claim because university service is defined as "contributions to the enhancement of the institution's internal processes and its relationships with external bodies" (FH 3.4.2.3). That service is explicitly distinguished from professional service, which "consists of contributions to the organizations or associations of the faculty member's academic discipline or the professoriate" (FH 3.4.3.2). The Faculty Handbook provides further clarification in the next sentence, "Professional service may have a component of scholarship or creative activities" (FH 3.4.3.2). The Board has understood such activities to include, but not be limited to, manuscript reviews, editorial positions, journal management, and similar activities. The Faculty Handbook thus goes out of its way to distinguish between service to professional external bodies, which is to be considered under scholarship and creative activities, and service to non-academic and non-professional external bodies. Read any other way would also render meaningless the sentence describing to which entities "[s]ervice may be provided," to wit, "the university, the profession, and the community" (FH 3.4.2.3). Because the Faculty Handbook describes service in separate paragraphs discussing "external bodies" and "organizations or associations of the faculty members's academic discipline or the professoriate," the Board has understood "external" to mean governmental entities; non-professional organizations dealing with the application of research to policy, including philanthropic organizations; religious bodies; organizations, activist and volunteer, providing community services; and other organizations, both formal and informal. See also the first bullet of FH 3.4.2.3. As with the Board's understanding of the distinctions the Faculty Handbook makes for intra-university service, the same understanding of extra-university service should be understood by candidates and unit officers. In the case of community service the Faculty Handbook explicitly puts the burden on the candidate "to make the case demonstrating that the activity qualifies as service as the term is used here" (FH 3.4.2.3). The Board, however, also suggests that the Faculty Council and the Provost either provide an interpretation of community service that clarifies how the UBPT, and every other body charged with evaluation of a candidate, should weigh such service or an amendment specifying how the UBPT should weigh "[c]ommunity service activities" and the benefit provided by extra-institutional but non-professional service.

## CONTINUING CONCERNS ARTICULATED IN PRIOR YEARS' LETTERS

1. *Teaching effectiveness*. At least as far back as 2017 the Board has articulated its concern that the meaning of "effective teaching" is opaque and should be better articulated. Specifically, the Board has been concerned that effectiveness is too often assumed when online teaching evaluation (OTE) numbers appear good, and even, perhaps especially, in those instances, "good" is also undefined. Easy cases are clear: response rates are consistently high; absolute numbers on the OTEs are high and outperform others, not just locally but across the

LC0004073

university; the numbers are consistent with thoughtful comments by students and the retrospective understanding of former students embodied in the student reports; and, taken as a whole, the numbers and comments suggest the ongoing value of the content of the courses and the faculty member's capacity to enrich and contextualize student understanding of the content. Also valuable are the honest reflections of faculty members who admit to episodes of ineffective teaching and act to correct such episodes. That reflection, and those efforts, speak as much to effective pedagogy as those faculty members for whom effectiveness appears to be (but is not) effortless. But, only rarely has the Board read such reviews embodied in unit reports. Overwhelmingly those reports simply repeat what the Board members can read, and do read, for themselves. Similarly, with exceptions standing out because they are so rare, those units that engage in peer review of teaching do so without explanation of either evaluative method or the evaluative criteria. The result is predictable: the evaluations are laudatory and perfunctory, and almost never address the issues raised by careful review of the OTEs. To quote the 2017 UBPT report, "useful feedback is notably absent in many peer evaluations, even in cases where a candidate is experiencing challenges ... in several instances, more attention, it seems, is paid to explaining away teaching difficulties ... than to offering insights."

2. *Process concerns*. The UBPT receives large files containing a great deal of data. Unit reports, including those of chairs and deans, that simply repeat what is contained in the file are not helpful. Often, repetition obscures much that could be valuable in the report by leaving unclear what are a candidate's strengths as well as weaknesses. Every UBPT letter has made the point, to one degree or another, that repeating what is in the file, including repeating what is in the reports filed at lower levels, is of no value. What is valuable is when the unit report explains a candidate's trajectory as a teacher, value to the unit because of effectiveness with students, value due to curricular enrichment, and willingness to help other faculty members become more effective; summarizes and evaluates a candidate's contribution to the academy and profession, situates a candidate's work in the work of the appropriate professional and academic communities, explains what academic and professional reputation means in those communities and how it is recognized, and predicts, based on a thoroughgoing understanding of a candidate's work, the pace of that work, and ambitions, what future contributions might be hoped for; explains not that a candidate has served on committees, but what the candidate added in value to that work.

A candidate is not well-served by reports that make assertions and claims without explanation, or that are questionable. Insofar as teaching is concerned, for example, units sometimes assert their own rigor to excuse what appear to be weak OTEs, but rigor is undefined. Moreover, without reference to something that lacks rigor, the assertion of rigor is just that. Especially when asserted with reference to other units, the assertion is problematic. It is problematic because most faculty members are not and have not been in a position to evaluate in any wide, much less comprehensive, manner, teaching quality in other units. The assertion becomes especially problematic when made to the Board, the members of which are treated to thousands of evaluations of dozens of candidates, each with lengthy histories in the classroom, over the widest range of colleges and local units within the university, multiplied in many cases by years of service of the Board. Other claims are often made to, as the 2017 letter suggests, "explain away" weak teaching. Especially troubling is when candidates from the same unit, who have taught the same or similar courses, present

LC0004074

very different sets of evaluations, including OTEs, and no explanation is provided, which to the Board violates the requirement of the Faculty Handbook for "consistency among candidates" (FH 3.5.1.1).

Insofar as scholarly work is concerned, equivalent examples trouble the Board. To reiterate what the Board wrote in 2018, external reviews "that offer only general, summative or conclusory statements about the candidate's work" are "only marginally helpful." A review that has not explained the candidate's work, analyzing it as called for by the Faculty Handbook (FH 3.6.2.2), should not be relied on by the unit or unit officers. The Board notes that when such conclusions are negative and unsupported, the unit has no trouble dismissing them. Doing so raises the question, why should they be relied on when conclusions are positive and dismissed when they are negative? We reiterate the suggestion that the Faculty Council draft a sample letter making clear what it is that is sought in these letters. Similarly, as noted briefly above, this year the Board was troubled by instances in which both the selection of reviewers and the disclosure of the letters was mishandled. Units are free to solicit suggestions, both negative and positive, from candidates and the candidate is free to explain those suggestions. The unit is not permitted, either as a matter of explicit policy nor by practice, to be bound to honor any or all of those suggestions (FH 3.6.2.1, FH 3.6.2.3). Especially troubling this year were the units that prepared lists of external reviewers and then shared that list with the candidate. Doing so violates FH 3.6.2.3, regarding the necessity of protecting "the identity of external reviewers." The UBPT is of the view that a unit violating FH 3.6.2.1 or 3.6.2.3 vitiates the utility of the external reviews, to the detriment of the candidate.

In particular, the UBPT reiterates, without prejudice to the other suggestions remaining to be considered, the first suggestion in the 2016 letter, advice to unit officers and candidates concerning notable university service for candidates for full professor; the 8th suggestion to unit officers and candidates, concerning candidates reading chapter 3 to ensure that their files conform to the Faculty Handbook requirements; and the recommendation to the Provost concerning discussion of these guidelines with the Deans, especially now that the university has hired two new deans who are unfamiliar with DePaul's practices.

From the 2017 letter, the Board reiterates on the same basis the 2nd and 3rd suggestions, concerning peer teaching evaluations; the 6th suggestion, regarding notable service contributions for full professor candidates (which repeats that above from the 2016 letter); the 9th suggestion, concerning unit evaluations of a candidate; the 10th suggestion, concerning a summary of a candidate's relevant DePaul history in the unit report; and the 14th suggestion, concerning peer evaluations and conflicts of interest.

From the 2018 letter, the Board reiterates on the same basis the first suggestion regarding peer evaluations; the 4th and 5th suggestions, regarding external reviewer selection in their entirety; the 6th suggestion, regarding discipline-specific quality metrics; and the first suggestion regarding service standards service, repeating concerns regarding notable service for candidates for Full Professor; and the final suggestion regarding the specification of the candidate's time in rank in unit reports, which itself reiterates suggestion 10 from 2017.

LC0004075

From the 2019 letter, the UBPT notes that important suggestions made in that letter have been acted upon and appreciates the efforts made by the Faculty and the Provost to render the tenure and promotion processes more transparent, clearer to the candidate, and useful to the future of the university.

Unit-specific addenda are provided separately and will be shared by the Provost with the deans of those units.

LC0004076

# Exhibit 27 to Ghanem Deposition





**University Board on Promotion and Tenure**
1 East Jackson Boulevard
Chicago, Illinois 60604-2287

**TO:**     Salma Ghanem, Acting Provost

**FROM:**   University Board on Promotion and Tenure

**DATE:**   May 10, 2019

**Re:**     ██████████ Application for Promotion to Associate Professor with Tenure

---

The 2018-2019 University Board for Promotion and Tenure met on Friday, April 12, 2019, to consider Timothy ██████ application for promotion to Associate Professor with tenure. Dr. ██████ joined DePaul as a Visiting Assistant Professor in 2012 and was hired as an Assistant Professor in 2014 with one year of credit towards tenure. He holds a Ph.D. from Yale University.

**Board Members Present**: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Board Members Absent**: None

**Vote Summary:**
*Department of Chemistry and Biochemistry tenured faculty*:  4 – 4 (Support – Oppose)
*Department of Chemistry and Biochemistry Chair recommendation*:  Supports
*College of Science and Health Personnel Committee*:  2– 4 – 1 (Support – Oppose  – Recused)
*College of Science and Health Interim Dean recommendation*:  Supports
*University Board*:  1 – 6 (Support – Oppose)

The University Board for Promotion and Tenure concurs with the tenured faculty of the Department of Chemistry and with the College of Science and Health Personnel committee, but does not concur with chair of the Department of Chemistry or with the dean of the College of Science and Health concerning the recommendation to promote Dr. ██████ to associate professor with tenure. While the vote of the departmental faculty was a tie, that vote constitutes a negative recommendation, with which the Board concurs. The Board believes that Dr. ██████ has met the requirements in the category of service, but has consistent concerns about both teaching and scholarship.

CONFIDENTIAL                                                 Calvente-DePaul 037293

The university requires that a candidate for the rank of associate professor with tenure "must demonstrate consistently effective teaching."  In the judgment of the Board, Dr. ███ has not so demonstrated.  The evaluations of his teaching by students are frequently below 3 on a 5-point scale, and consistently below the departmental means.  This case is not one of the occasional negative set of evaluations but rather a pattern that shows itself in his capacity to communicate with a very large portion of his students.  Forty to fifty per cent of the students rate his capacity to communicate subject matter content as not adequate.  Moreover, the pattern is persistent and the concern has not been relieved over time.  His recent evaluations, for example, the 2018 evaluations, contain such comments.  In addition, the regular recurrence of student concerns with communicating his expectations for performance, the criteria by which performance is to be evaluated, and the timeliness of his feedback to students, raises questions about the consistent effectiveness of Dr. ███ teaching.  The burden is on the candidate to "demonstrate consistently effective teaching."  The record does not suffice and the Board believes that Dr. ███ teaching has not met the university criterion.

The Board also has concerns about Dr. ███ scholarship.  The Board's concerns extend both to the quantity of the work, and its consistency, as well as its quality, which was difficult to address for lack of definitive evidence of his contributions to multi-authored pieces.  In only one piece is he the corresponding author, and that is in a proceedings publication.  Understanding the scholarly impact of published proceedings requires a clear statement of the value of particular types of proceedings.  Notwithstanding inquiries from members, the Board did not receive information sufficient to enable the Board's members to evaluate either the quality (the particular venue accepts almost seventy-five per cent of submissions, for example) of the work or its effective dissemination to the academic world.  The other pieces published are all multi-authored; two pieces – a two-part article – have thirty-one authors.  While in those pieces his contributions were made clear – they were methodological – at least some members could not find that the contribution provided "evidence of notable scholarship [or] research."  The external evaluators also did not provide information enabling the Board to determine his contributions and their importance.  While he is also a contributor to two books, neither the department nor the College considers such works as counting for promotion purposes for lack of clear evidence of peer review.

In sum, the Board has concerns that Dr. ███ meets neither of the university's requirements for teaching or scholarship and thus cannot recommend him for promotion to Associate Professor with tenure.

Calvente-DePaul 037294

This recommendation accurately reflects the University Board on Promotion and Tenure's discussion of ███████████ application for promotion to Associate Professor with tenure.

Calvente-DePaul 037295

# Exhibit E

DocuSign Envelope ID: 3F5DE0C2-6A23-4BF3-90A1-47D9E3E538C5

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **LISA CALVENTE,** )<br>)<br>   **Plaintiff,** )<br>) | |

LISA CALVENTE,    )
          )
    **Plaintiff,**  )
          )  Case No.: 1:20-cv-03366
  **v.**       )
          )
**SALMA GHANEM and DEPAUL** )
**UNIVERSITY,**     )
          )
    **Defendants.**  )

---

## DECLARATION OF LUCY RINEHART

---

  1.  My name is Lucy Rinehart.  I am over the age of eighteen (18) years and fully capable of making this Declaration.

  2.  The facts in this Declaration are within my personal knowledge and are true and correct, and I am qualified to make the statements in this Declaration.

  3.  I am currently employed by DePaul University as the Associate Provost for Academic Planning and Faculty, and I am a custodian of records for certain business records of DePaul University.  The documents attached hereto as Exhibits 1-7 are business records of DePaul University. These documents are kept in the regular course of business, and it was the regular course of business of DePaul University, for an employee or representative, with knowledge of the act, event, condition, or opinion recorded, to make the record or to transmit information thereof to be included in such documents; and the documents were made at or near the time of the act, event, condition or formation of the opinion, or reasonably soon thereafter. These documents are duplicates of the original with the exception of any redactions made for confidentiality purposes.

4. From May 2021 to present, Dr. Salma Ghanem has been serving as the Provost for DePaul University. Prior to this, Dr. Ghanem served as the Acting Provost from October 2018 to July 2019 and Interim Provost from July 2019 to May 2021.

5. From July 2017 to present, Dr. Gabriel Esteban has been serving as the President for DePaul University.

6. DePaul has a Faculty Handbook that sets forth its principles of shared governance with its faculty, and also governs the evaluation of faculty, including the process by which tenure track faculty can be considered for promotion and tenure. The full and complete Faculty Handbook for DePaul University is attached as **Exhibit 1** to this Declaration, and is Bates Stamped Calvente-DePaul 00001-000103.

7. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

8. In September 2018, Dr. Calvente timely submitted her tenure application and accompanying materials. The document Bates Stamped DePaul – Calvente 000796-001889, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. Calvente.

9. The document Bates Stamped DePaul 10073-10373, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ███████. **Exhibit 2** to this Declaration contains documents from ███████ tenure and promotion file.

10. The document Bates Stamped DePaul 008594-009701, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ███████. **Exhibit 3** to this Declaration contains documents from ███████ tenure and promotion file.

2

DocuSign Envelope ID: 3F5DE0C2-6A23-4BE3-90A1-47D9E3E538C5

11.  ███████████ is a Caucasian faculty member in the College of Science and Health who was up for tenure during the academic year 2018-2019. The document Bates Stamped DePaul 36929-37299, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ███████. **Exhibit 4** to this Declaration contains documents from ███████ tenure and promotion file.

12.  Dr. ███████████ is a Latina faculty member in the College of Science and Health, School of Nursing who was up for tenure during the academic year 2019-2020. The document = Bates Stamped DePaul 34653-36928, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. ███████ **Exhibit 5** to this Declaration contains documents from Dr. ███████ tenure and promotion file.

13.  ███████████ is a Caucasian faculty member in in the College of Science and Health, Department of Mathematical Science who was up for tenure during the academic year 2019-2020. The document Bates Stamped DePaul 37300-38093, is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Dr. ██████ **Exhibit 6** to this Declaration contains documents from Dr. ██████ tenure and promotion file.

14.  Among the individuals who obtained tenure during the 2018-2019 academic year, are: ████████████████████████████████ Dr. Calvente was the sole candidate to be denied tenure in 2019.

15.  Dr. ███████████ was a Caucasian tenure-track faculty member in the College of Communication. In 2017, the College of Communication's Personnel Committee and tenured faculty recommended the non-renewal of ████████████████, and Dr. Ghanem accepted the recommendation for non-renewal. A copy of these documents are attached as **Exhibit 7** and **Exhibit 8** to this Declaration, and are Bates Stamped Calvente-DePaul 10006-10016 and 10017-

3

10018, respectively. In January 2018, ███████ appealed this decision to the Faculty Appeals Board, who recommended the decision to terminate him be overturned. In March 2018, then-Provost Marten denBoer rejected the Faculty Appeals Board recommendation, and accepted the decision of the College of Communication for Dr. ██████ non-renewal. I have knowledge of the facts stated herein and I declare under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

11/18/21 | 10:01 AM CST
Executed on this ___ day of November, 2021.

*Lucy Rinehart*

Lucy Rinehart

*EXHIBIT 1*

July 1, 2018

1 **CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN**
2 **GOVERNANCE**
3

4 1.1 Principles of Governance ..................................................................... 2

5 1.2 Governance Structure ........................................................................... 2

6    1.2.1 Primary Responsibilities of the Faculty ......................................... 3

7    1.2.2 Participatory Responsibilities ........................................................ 3

8 1.3 The Faculty Council and Its Delegated Authority ................................ 4

9    1.3.1 Members of the Faculty Council .................................................... 4

10    1.3.2 Officers of the Faculty Council ...................................................... 5

11    1.3.3 Meetings of the Council .................................................................. 6

12    1.3.4 Notice to the Faculty of Council Meetings .................................... 6

13    1.3.5 Conduct of Meetings ...................................................................... 6

14    1.3.6 Communication of Decisions ......................................................... 6

15    1.3.7 Responsibility to the Faculty ......................................................... 7

16    1.3.8 Conduct of Meetings of the Council of the Whole ......................... 7

17 1.4 Committees of the Faculty Council ...................................................... 7

18    1.4.1 General Duties of Committees ........................................................ 8

19    1.4.2 Standing Committees of the Faculty Council ................................. 8

20    1.4.3 University Committees with Faculty Representation ...................... 9

21 1.5 Amendment of the Faculty Handbook ................................................ 10

22

Calvente-DePaul 000001

July 1, 2018

1 **CHAPTER 1. FACULTY GOVERNANCE AND PARTICIPATION IN**
2 **GOVERNANCE**

3
4 **1.1 Principles of Governance**
5
6 Within general university norms and specific regulations of the Board of Trustees and the university
7 President, faculty members participate in governance on an institution-wide basis and in the particular
8 academic units with which they are affiliated.
9
10 Faculty initiative and participation in governance are a vital part of academic life. Moreover, the general
11 well-being of the university is dependent on the time and talents the faculty contribute in the roles of
12 decision makers and consultants.
13
14 Faculty participate in all areas of university governance. They have primary responsibilities over
15 academic and scholarly activities, faculty personnel matters, and education interests and policies. They
16 have participatory or advisory responsibilities in other areas.
17
18 Full-time faculty members who are not on special appointment are expected to participate in governance
19 as a normal faculty obligation. Consequently, only for sufficiently serious reasons may they refuse
20 appointments or active service on various committees or in their departments. Part-time faculty members
21 and full-time faculty members on special appointment may be invited to participate in certain governance
22 processes to the extent that their time and other responsibilities permit.
23
24 As a general rule, full-time faculty members are entitled to participate and vote in decisions made in the
25 academic departments, schools, and colleges with which they are affiliated. Some matters before a
26 department, school, or college such as promotion and tenure, may be restricted to the deliberation of a
27 limited number of faculty.
28
29 **1.2 Governance Structure**
30
31 The faculty of DePaul University shall bear its share of responsibility of shared governance according to
32 the following principles.
33
34    1. DePaul University is a community sharing a common interest in the welfare of the institution.
35    2. DePaul is a university community which has adopted this country's tradition of collegial
36       governance. The university's own philosophy encourages faculty and staff to be concerned with
37       university-wide issues, to prevent barriers from separating different divisions of the university,
38       and otherwise to work for a type of unity that the term "community" implies.
39    3. As a corporation, the university has a formal structure of governance described principally by its
40       Charter and Bylaws. The latter document assigns certain responsibilities and authority to the
41       Board of Trustees and to particular officers of the university, but it assumes that much of the
42       authority will be shared by a process of delegation.

Calvente-DePaul 000002

July 1, 2018

4. For the university to be well governed, the diverse interests and perspectives of faculty, staff, students, and administration must be considered and incorporated in a timely fashion in the decision making processes of the institution.
5. By tradition and training, the faculty are expected to make judgments about the academic integrity of the curriculum and the professional requirements of faculty status. Therefore, curriculum, academic programs, and faculty status questions shall be considered primary responsibilities of the faculty. It is understood that in order to carry out these responsibilities, the faculty will work closely with the academic administrators and the officers of the university. They will also seek the advice of students, part-time faculty, and staff. While the President and the Board of Trustees have the authority to reverse the decision of the faculty regarding their primary responsibilities, it is expected that they would do so only in exceptional circumstances and would communicate the reasons to the faculty.
6. Faculty governance regarding academic programs, curriculum, and faculty status regularly takes place through departments, programs, colleges, and schools. Primary governance of those bodies shall reside within the bodies. Some institutional mechanism is required for university faculty to make decisions on all educational matters and policies regarding faculty status which concern more than one college or school or which are otherwise of general interest.
7. Needed, too, is a mechanism for the university faculty to make recommendations to the president and the provost regarding matters outside the primary responsibilities of the faculty.

The Faculty Council has been established to ensure full and equal participation of faculty in university governance.

### 1.2.1 *Primary Responsibilities of the Faculty*

The faculty is vested with primary governance responsibility of academic and scholarly activities and faculty personnel matters within the university, including the following:

1. Curriculum matters, including establishment, dissolution, and substantial changes of degree programs; and reorganization of the general university academic structure.
2. Academic freedom, including rights and responsibilities.
3. Standards and procedures concerning faculty promotion, tenure, appointments, retention, and performance.
4. Adjudication of grievance and disputes in all matters involving a faculty member or members.
5. Standards and procedures concerning instruction.
6. Regulations regarding attendance, examinations, grading, scholastic standing, honors, and general admission and graduation standards.
7. Matters pertaining to research, and to scholarly and creative activities.
8. Academic principles underlying the academic calendar.
9. In general, any educational interests and policies.

### 1.2.2 *Participatory Responsibilities*

The faculty will advise or otherwise participate regularly with the administration and other appropriate bodies in university matters including the following:

3

Calvente-DePaul 000003

July 1, 2018

1. Establishment of university priorities.
2. Formulation of policy with regard to allocation and utilization of the university's human, physical and fiscal resources and the principles underlying the development of the budget.
3. Oversight of administrators, establishment or dissolution of administrative offices, and major changes in administrative structure.
4. Establishment of policies for the regulation of inter-collegiate athletes.
5. Recommendation of candidates for honorary degrees.
6. The establishment or elimination of colleges, schools, or local academic unit.
7. Conducting of commencement exercises and honors convocations.
8. Other matters inseparably associated with traditional faculty responsibilities.
9. Any matters of interest to the faculty or pertaining to the university and its purpose.

**1.3 The Faculty Council and Its Delegated Authority**

The authority of the faculty to carry out its responsibilities for university-wide issues is delegated to the Faculty Council, except when a meeting of the Council of the Whole is held at the call of the university president, the provost, the Faculty Council, or on written petition to the Faculty Council by at least fifty full-time members of the faculty.

For the purposes of this Council's representation, the university's regular full-time faculty consists of all tenure-line and term faculty and excludes the president, the provost, the university's vice presidents, the deans of the colleges or schools, and other faculty members whose roles in the judgment of the President of the Faculty Council, are predominantly administrative.

*1.3.1   Members of the Faculty Council*

All colleges shall have representation on Faculty Council. The overall size of Faculty Council, the number of seats for members and alternates, and the distribution of those seats by college shall be determined by Faculty Council according to its bylaws.

Members shall be elected by the full-time faculty of the various colleges and schools respectively.  The term for a regularly elected member of Faculty Council shall be from September 1st of the calendar year in which he or she is elected until August 31st of the calendar year in which his or her term expires.  Each calendar year, unit elections for the regular seats and alternate seats held by members whose terms expire in that year shall take place on or after April 1st and by a date that will allow the results to be reported to the chair of the Committee on Committees for presentation at the June meeting of the Council.  Members elected at that time shall begin their terms on September 1st of that year.

Council members shall hold office for three years with staggered terms so that one-third of the membership is eligible for election each year.  The office of a Council member shall become vacant on incapacity, resignation, or the absence of said council member from the meeting of the Council for four consecutive months.  The college dean shall call a special election to fill an existing vacancy.

Calvente-DePaul 000004

July 1, 2018

1 Alternate members shall hold office for one-year terms.  In the event of an anticipated absence of a
2 council member from a Council meeting, the council member shall designate an alternate to participate in
3 his/her stead with full rights of a Council member.
4
5 The Faculty Council Committee on Committees shall review the composition of Faculty Council
6 membership by February 29th of every leap year and make a recommendation to Faculty Council during
7 the subsequent March meeting to maintain or adjust the composition of membership to take effect for the
8 coming academic year.
9
10 ### 1.3.2   Officers of the Faculty Council
11
12 The Council shall elect a president as presiding officer, a vice president, and a secretary from among its
13 elected members. These officers may be from any school or college.  An additional officer shall be the
14 chair of the Committee on Committees, who shall be elected from among the COC members themselves,
15 subject to the approval of Council.
16
17 The Council president shall represent Council in university business that Council deems appropriate.  She
18 or he shall call the monthly meetings of Council, preside over Faculty Council Executive Committee
19 meetings, and otherwise organize the business of Council in consultation with the other officers.  The
20 Council president does not vote on Council resolutions except to break a tie vote or to create a tie vote.  In
21 the case of secret ballot, the president may vote on all matters on the secret ballot.
22
23 The vice president shall represent Council in university business deemed appropriate or in instances in
24 which the president is unable to attend.  The vice president shall be the working liaison between Council
25 and specific standing committees as designated by the president and shall organize the Faculty Council
26 Executive Committee meetings.
27
28 The secretary shall keep the minutes at the Council meetings, monitor the website, maintain the archival
29 records of Council, and report findings or decisions of Council to the appropriate administrative bodies
30 for action.
31
32 The chair of the Committee on Committees shall organize the appointment of faculty (subject to
33 Council's approval) to all faculty slots on university and Council committees.  She or he shall maintain
34 the records of current and previous faculty appointments, oversee the process of Council elections in the
35 various colleges, and perform other organizational duties as designated by the president and the Faculty
36 Council Executive Committee.
37
38 The duties of Faculty Council officers are further specified in Faculty Council's bylaws.
39
40 The president, vice president and secretary of the Council shall be elected at each June meeting.  It is not
41 precluded, but it is also not an assumption, that the vice president will necessarily succeed the president.
42 Terms for all officers are one year, subject to re-election.  The president and vice president must
43 collectively represent at least two (2) colleges or schools.  Should any officer be unable to fulfill her or his

Calvente-DePaul 000005

July 1, 2018

term, the Committee on Committees shall determine by next Council meeting a proper process for succession.

### 1.3.3    Meetings of the Council

The Council shall generally meet on the first Wednesday of each month during the academic year (September through June, inclusively), and as needed at the call of the president of the university, the provost, the Faculty Council president, or at the call of the majority of the Council members.  Minutes of each meeting shall be posted promptly on the FC website by the Council secretary.

At least five days before every meeting, the Council secretary shall send to Council members notice of the forthcoming Council meeting, together with documents pertaining to the agenda of the meeting, including the text of any proposed legislation.

### 1.3.4    Notice to the Faculty of Council Meetings

The Council secretary shall post to Council's website and send notice and agenda of each meeting of the Council to all faculty members, together with documents pertaining to the agenda of the meeting, including the text of any proposed legislation.

### 1.3.5    Conduct of Meetings

The presence of 50% or more of the voting eligible members of the Faculty Council shall constitute a quorum of the Council.

Decisions are to be made by majority vote of the Council members present, provided that the votes in favor of a resolution shall number more than one-third of the voting eligible members.

All faculty members may attend meetings of the Council, excluding executive sessions.  Chairs of committees of the Faculty Council may offer motions and speak on behalf of their committees.

The Council may, by decision of the president or a majority of the Council members present, permit other persons not on the Council to speak on agenda items.

An executive session may be called by the president of the Faculty Council at his/her discretion, which may be overruled by a majority of the Faculty Council members present.  Sessions dealing with matters involving the right to privacy of individuals normally shall be executive sessions.  Executive sessions may be used for obtaining information and for deliberation; but final policy decisions shall be made in open Faculty Council meetings.

### 1.3.6    Communication of Decisions

Calvente-DePaul 000006

All decisions and recommendations of the Faculty Council shall be forwarded to the president of the university (or the provost as designee) for approval.

In the event the president of the university (or the provost as designee) disapproves any Faculty Council decision or recommendation, the president (or provost as designee) shall communicate the reasons to the Faculty Council.

### 1.3.7   Responsibility to the Faculty

The Council secretary shall regularly send a summary of Council's actions to the provost and post to Council's website all records of actions and responses from the university president (or provost as designee).

At the request of a majority of voting members present at a Faculty Council meeting, but no fewer than one-third of Council's total voting membership, any matter must be submitted to the faculty for consideration.  The Council shall establish the manner by which the faculty shall vote by mail, electronic ballot or otherwise on any such matter.  A vote by the majority of the full-time faculty members of the university shall be binding on the Faculty Council.

### 1.3.8   Conduct of Meetings of the Council of the Whole

Twenty-five (25) percent of full-time faculty members shall constitute a quorum of the Council of the Whole.  Meetings of the Council of the Whole shall be chaired by the president of the Faculty Council. Decisions of the Council of the Whole shall be made by a majority of the full-time faculty members present, subject to ratification by a vote of the majority of all full-time faculty members in a special mail or electronic ballot.

### 1.4 Committees of the Faculty Council

The Faculty Council is empowered to establish committees of the Faculty Council.  The Faculty Council appoints the members of the Committee on Committees from among the members of Faculty Council.

Membership on other Faculty Council committees is not limited to Faculty Council members.  The Faculty Council shall prescribe the terms of office for members of all committees.  In the case of standing committees, the terms of office shall normally be staggered to permit a reasonable degree of continuity.

The Faculty Council shall prescribe the duration of any ad hoc committees. Any standing or ad hoc committee which fails to meet or does not otherwise act or file a report for a period of one year shall be discontinued automatically.

Each committee of the Faculty Council shall select its own chair.  With the approval of the Committee on Committees, each committee may appoint subcommittees from its own members or from among other members of the full time and part time faculty and such members of the administration, staff, and students as shall be helpful in its deliberations.

Calvente-DePaul 000007

July 1, 2018

The standing rules and operating procedures for Faculty Council committees and subcommittees are further specified in Council's bylaws.

### 1.4.1    General Duties of Committees

Committees shall recommend to the Faculty Council new policies and changes in policies in their areas of responsibility.

They shall receive and consider proposals in their areas of responsibility from the Faculty Council, the administration, Student Government Association, staff, and other relevant sources. Committees shall present their recommendations to the Faculty Council.  In their deliberations, committees and subcommittees shall seek advice, information, or materials from other members of the university community.

They shall review annually sections of the Faculty Handbook pertaining to their areas of concern and make recommendations for revision.

They shall meet frequently and maintain liaison with appropriate committees and groups established by the academic units, the Student Government Association, the Staff Council, and other university constituencies.

### 1.4.2    Standing Committees of the Faculty Council

Currently the Faculty Council has fifteen (15) standing committees. Committee charges are detailed in Council's bylaws:

- Committee on Academic Policy (CAP)
- Committee on Committees (COC)
- Committee on Contingent Faculty (CCF)
- Committee on Online Learning (COOL)
- Committee on Curriculum and Programs (CCP)
- Committee on Learning and Teaching (COLT)
- Committee on Research Policy (CORP)
- Committee on the Status of Faculty (SOF)
- Faculty Committee on Appeals (FCA)
- Faculty Council Budget Committee (FCBC)
- Faculty Council Executive Committee (FCEC)
- Faculty Council Handbook Committee (FCHC)
- Liberal Studies Council (LSC)
- Physical Environment Committee (PEC)
- Promotion and Tenure Policy Committee (PTPC)

8

Calvente-DePaul 000008

July 1, 2018

1     *1.4.3*    ***University Committees with Faculty Representation***
2

3     University committees dealing with matters in which the faculty have governance responsibility or
4     interest shall have faculty representation. Faculty representatives on such committees shall be responsive
5     to the Faculty Council to the extent appropriate.
6

7     To the extent that any boards or committees not under the auspices of the Faculty Council address areas
8     of primary faculty responsibility and report directly to the university president or other university officers,
9     those boards or committees shall be subject to the policies of the Faculty Council and to review by the
10    Faculty Council.
11

12    Faculty are represented on the following university committees and boards:
13

14    •   403(b) Investment and Plan Administrative Committee
15    •   Academic Advising Award Committee
16    •   Academic Affairs Committee - Board of Trustees
17    •   Academic Integrity Board
18    •   Academic Integrity Student Consultants
19    •   Academic Program Review Committee
20    •   All University Judicial Board
21    •   Campus Recreation Advisory Committee
22    •   Campus Violence Prevention Committee
23    •   Committee on Conflict of Interest in Sponsored Programs
24    •   Comprehensive Internationalization Committee
25    •   Continuing and Professional Education
26    •   Faculty Grievance and Appeals Panel
27    •   Fair Business Practices Committee
28    •   Grade Challenge Review Board
29    •   Institutional Biosafety Committee (IBC)
30    •   Issues Review Board (for staff grievances)
31    •   Library Review Board
32    •   Public Service Council
33    •   Quality of Instruction Council
34    •   Strategic Resource Allocation Committee
35    •   Student Activity Fee Board
36    •   Student Welfare Taskforce
37    •   Teaching Learning and Technology Committee
38    •   Tuition Pricing Committee
39    •   University Athletic Board
40    •   University Benefits and Compensation Committee
41    •   University Board on Faculty Promotion and Tenure
42    •   University Institutional Animal Care and Use Committee

Calvente-DePaul 000009

July 1, 2018

1 • University Institutional Review Board for the Protection of Human Subjects (IRB)
2 • University Research Council
3 • University-wide Honors Program Committee
4

**1.5 Amendment of the Faculty Handbook**

6

7 The Faculty Handbook may be amended by the faculty.  Changes to the Faculty Handbook take effect
8 when accepted by the university president.
9

10 The Faculty Handbook may be amended in either of two ways:
11

12 1. By the affirmative vote of least sixty percent (60%) of the members of the Faculty Council
13      present at the meeting, provided that those votes represent at least 50% of the total Faculty
14      Council membership; or
15 2. By submission of a proposed amendment over the signature of 10% of the regular full-time
16      faculty as a whole for ratification. The Committee on Committees will then task a committee to
17      oversee a referendum within 14 days.  The amendment will be approved if a majority of the full-
18      time faculty cast referendum ballots and if at least two-thirds of the faculty members casting
19      ballots vote in favor of the amendment.

Calvente-DePaul 000010

July 1, 2018

1  **CHAPTER 2.  RECRUITMENT, APPOINTMENT, AND**
2  **CATEGORIES OF FACULTY**
3

4  2.1 Recruitment Policies ................................................................. 2

5  2.2 Initial Academic Appointments ..................................................... 3

6      2.2.1 General Criteria and Policies .................................................. 3

7      2.2.2 Hiring With Tenure upon Initial Appointment ............................. 4

8  2.3 Full-Time Faculty Appointments ................................................... 5

9      2.3.1 Tenure-line Faculty ............................................................. 5

10     2.3.2. Term Faculty .................................................................. 6

11         2.3.2.1. Definitions and Scope ................................................ 6

12         2.3.2.2 Term Faculty Ranks .................................................... 7

13         2.3.2.3 Functional Titles ....................................................... 7

14         2.3.2.4 Responsibilities and Participation in Governance ................. 8

15         2.3.2.5 Hiring and Contracts ................................................... 8

16         2.3.2.6 Reappointment and Termination ..................................... 8

17     2.3.3 Special Appointments .......................................................... 9

18     2.3.4 Annual Performance Review ................................................. 10

19  2.4 Adjunct Faculty Appointments ................................................... 11

20     2.4.1 General Principles ............................................................. 11

21     2.4.2 Retired Faculty ................................................................. 11

22     2.4.3 Professors Emeriti and Emeritae ............................................ 12

23  2.5 Other Instruction-Related Positions .............................................. 12

24     2.5.1 Academic Support Appointments ........................................... 12

25     2.5.2 Graduate Assistants and Fellows ........................................... 12

26  2.6 Change of Affiliation or Status .................................................... 12

27     2.6.1 Change of Affiliation .......................................................... 12

28     2.6.2 Change of Status ............................................................... 13

29  2.7 Summer Session Appointments ................................................... 13

30  2.8 Orientation of Faculty .............................................................. 14

31  2.9 Annual Reporting ................................................................... 14

1

Calvente-DePaul 000011

July 1, 2018

## CHAPTER 2.  RECRUITMENT, APPOINTMENT, AND CATEGORIES OF FACULTY

This chapter defines categories of faculty and sets out DePaul University's policies for recruitment, appointment, and review of faculty members. It also addresses change of faculty affiliation or status and summer session appointments. As stated in Section 1.1 of this Handbook, the faculty as a whole is vested with primary governance responsibility for academic and scholarly activities and faculty personnel matters within the university. As a general rule, full-time faculty members (both tenure-line and term) are entitled to participate and vote in decisions made in the academic programs, departments, schools, and colleges with which they are affiliated. However, some matters including faculty hiring, tenure, promotion, and review are restricted exclusively to tenure-line faculty.

### 2.1 Recruitment Policies

Academic deans, local academic unit officers, and academic program directors have responsibility for initiating the process for faculty appointments, with the exception of the position of dean.

Consultation with the tenure-line faculty of the local academic unit, as defined by the unit's written policies, is required for the appointment of all full-time faculty and local academic unit officers. Only in rare instances and for compelling reasons will an appointment be made over the expressed opposition of the local academic unit faculty. In such circumstance, the dean shall, in writing, inform the local academic unit of the specific reasons for overturning the judgment of the faculty.

Faculty involved in the search process are individually accountable for following the university's equal employment opportunity policies.

DePaul University provides equal employment opportunities to all employees and applicants for employment.  As an Equal Opportunity Employer, DePaul does not discriminate or permit discrimination on the basis of race, color, religion, national origin, age, disability, sexual orientation, gender identity, military or veteran status, genetic information, marital status, parental status, ancestry, source of income, or any other classes protected by local, state, and federal law.

In order to provide for the most diverse and highest quality faculty, DePaul is committed to searches conducted in the broadest possible markets.

Entry-level hiring for tenure-line positions presumes a national search. A national search is defined by the practices of the disciplinary or interdisciplinary field and generally includes advertisements as customary in the discipline, recruitment at national conventions, and similar wide outreach.

In limited cases the requirements for a national search may be waived if a scholar of exceptional merit has already been identified as a target of opportunity hire, particularly if that scholar would enhance DePaul's diversity profile or bring difficult to find expertise to the University.

A local academic unit's written request to waive the search requirement for an academic appointment must be approved by its tenure-line faculty. The request must convince the dean and the provost that the candidate is fully qualified for the position. Evidence of the

2

Calvente-DePaul 000012

July 1, 2018

1  candidate's significant accomplishments and a rigorous review of the candidate's qualifications in
2  teaching, research and other creative activities, and service are expected in the subsequent
3  preparation of the appointment recommendation.

4  **2.2 Initial Academic Appointments**

5  *2.2.1 General Criteria and Policies*

6
7  The faculty has a major responsibility for fulfilling the principal functions of the university:
8  teaching, scholarship, research and other creative activities, and service. DePaul appoints its
9  faculty on the basis of scholarly achievement and the promise of continuing academic growth,
10  competencies directly related to the university's academic goals and programs, and acceptance of
11  the principles as stated in the Employment Policies and Procedures section of this Handbook.

12
13  The principal criteria for initial appointment and promotion in academic rank are: quality of
14  teaching; scholarship, research or other creative activities; and service.

15
16  General university criteria are subject to further specification standards adopted by colleges,
17  schools and local academic units. Criteria, which are approved by and included in official
18  documents of the academic units, are as binding on the members of those units as are the general
19  university standards for which they provide explication. Should there be a difference between the
20  two sets of criteria, those of the university shall prevail.

21
22  Authority to appoint faculty rests with the university president. In practice, this authority is
23  regularly delegated to the provost, who carefully reviews the terms of the proposed faculty
24  contract before it is approved and issued. The review is to assure that the terms of the proposed
25  faculty contract are compatible with university policies, accepted academic standards, and
26  principles of equity with respect to other DePaul faculty members in comparable positions.

27
28  The Office of the Provost has overall responsibility for monitoring academic appointments. This
29  office establishes policies and procedures related to faculty employment that are compatible with
30  the general university guidelines. These guidelines assume, however, that most of the initial
31  responsibility for the selection process resides with academic deans, local academic officers, and
32  directors of academic offices.

33
34  Initial appointments are in contract form, each including:

35
36  1. Salary
37  2. Length of contractual service
38  3. Academic rank
39  4. Tenure status
40  5. Affiliation with an academic unit, that is, a particular college/school, academic department, or
41  academic program.

42
43  The offer letter to the faculty member includes specific terms, which are then incorporated into
44  the formal contract. The initial contract may be for one, two, or three years on the
45  recommendation of the academic dean and with the approval of the provost.

46
47  If the initial contract comes with tenure, it must meet the criteria of section 2.2.2 below. An initial
48  contract may not result from a Change of Status (2.6.2).

3

Calvente-DePaul 000013

July 1, 2018

Two or more members of the same family may be given faculty appointments, even in the same college/school or local academic unit. However, such an appointment will not be made in a situation in which one member of the family holds an administrative position that requires a judgment on the other member's qualifications for appointment and salary. Similarly, after the initial appointment, one member of a family is not eligible for an administrative appointment in a unit of the university that would require the above-mentioned judgments on the qualification of another member of the family.

### 2.2.2 Hiring With Tenure upon Initial Appointment

The granting of tenure upon initial appointment shall be at the discretion of the local academic unit officer, the dean, and the provost, after a rigorous peer review by the local academic unit's tenured faculty. The personnel committee of the unit (or equivalent) shall conduct an evaluation of the candidate applying the unit's tenure and promotion guidelines (which themselves must be consistent with the university criteria) and shall report to the tenured faculty prior to the vote. All initial appointments with tenure must include a vote of the local academic unit tenured faculty with a recommendation for or against tenure.

The university hires a candidate with tenure upon initial appointment only if the individual satisfies one or more of the following criteria:

1. Prior academic achievement comparable to incoming rank at DePaul;
2. Extensive, relevant non-academic experience; or
3. Appointment to provost, dean or local academic unit officer positions.

Persons who are already full-time or part-time employees of DePaul University in any capacity (except "Visiting Faculty" as defined in Section 2.3.3) are not eligible for initial appointments with tenure under this section, but must instead be first appointed without tenure to the tenure-line faculty and subsequently evaluated under the tenure process outlined in Chapter 3 of this Faculty Handbook.

Faculty hired with tenure at the rank of Associate Professor or Professor upon initial appointment must have appropriate qualifications and prior experience. Only a candidate with an exceptional record may be appointed with tenure under this section if the candidate has not previously been granted tenure at another institution.

In order to appoint a new faculty member at the rank of full professor who has not previously held that rank at a recognized college or university, there must be an evaluation of the candidate's scholarly or creative record by the local academic unit's tenured faculty and a minimum of three outside experts who have been sent the appropriate materials. Selection of reviewers and the appropriate materials to submit to the reviewers follows the external review procedure described in Chapter 3.

In order to appoint with tenure a candidate whose experience is primarily nonacademic, the tenured faculty of the unit must include in the departmental vote and request for an appointment a written case for the strength of the candidate's non-academic experience.

Individuals under consideration for appointment to provost, dean, or local academic unit officer positions can be appointed with tenure. These candidates must have demonstrated scholarly and

4

July 1, 2018

1   academic credentials or extensive relevant experience.  The administration initiates appointments
2   with tenure to these positions. For dean or local academic unit officer positions, the provost, with
3   a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will
4   make the initial appointment with tenure.  When appointing a provost, the president, with a
5   consultative vote of the tenured faculty on the issue of tenure within the appropriate unit, will
6   make the initial appointment with tenure.  When appointing a president, the Board of Trustees,
7   with a consultative vote of the tenured faculty on the issue of tenure within the appropriate unit,
8   will make the initial appointment with tenure. The university would normally provide an
9   additional permanent position and funding to the local academic unit if and when the dean,
10  provost or president returns to a faculty position.

11  **2.3 Full-Time Faculty Appointments**

12
13  All full-time faculty fall into three categories: tenure-line faculty, term faculty and special
14  appointments.

15  ***2.3.1 Tenure-line Faculty***

16
17  Tenure-line appointments may be at the rank of instructor awaiting terminal degree conferral,
18  assistant professor, associate professor, or full professor. All tenure-line appointments shall
19  involve an evaluation of the candidate's qualification based on the approved policies and
20  procedures of the local academic unit, as well as a vote of the tenure-line faculty of the unit,
21  except under circumstances stipulated in Section 2.2.2.
22
23  **Instructor Awaiting Terminal Degree Conferral**
24
25  Candidates who are hired into tenure-line positions but have not successfully completed all
26  requirements for the terminal degree may be appointed to this rank with the stated expectation
27  that, upon conferral of the degree, the faculty member will be appointed to a tenure-line position
28  at the rank of assistant professor. Typically, the period of time as an instructor in this category
29  would be one year, and only under rare and compelling circumstances should it exceed two years.
30  Time in rank as instructor in this category may count towards tenure; the probationary period is
31  determined by an agreement between the dean and the faculty member in the initial contract as
32  assistant professor. The annual performance review process (Section 2.3.4) will be used to
33  determine whether contract renewal for the next academic year is appropriate and desired. The
34  tenure clock would start the September after the university receives confirmation of the
35  candidate's terminal degree.
36
37  **Assistant Professor.** The doctorate or other terminal degree is required for this rank. Exceptions
38  are made for candidates who have already attained recognition for scholarly or other relevant
39  professional achievements and who give promise of continued academic development. The
40  assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing
41  scholarship, research, and/or other creative activities, and for service.
42
43  **Associate Professor.** In addition to the requirements for assistant professor, the candidate must
44  demonstrate consistently effective teaching performance. The candidate should also show
45  evidence of notable scholarship, research, and/or other creative activities, and service.  For this
46  rank, the candidate should show significant involvement in university activities at the local
47  academic unit and beyond. This rank is reserved for those with recognized academic
48  achievements.

5

Calvente-DePaul 000015

July 1, 2018

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities, the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

**Tenure-line Joint Appointments**

A faculty member may receive a joint appointment or affiliation in two local academic units. For a joint appointment in two units, a candidate for initial appointment must be evaluated and recommended by the faculty of both local academic units. The criteria for determining eligibility for such a joint appointment are those for the usual initial appointment.

### 2.3.2. Term Faculty

#### 2.3.2.1. Definitions and Scope

Term faculty positions are full-time, non-tenure-line, and do not lead to tenure.

The university uses term faculty positions to:
- Retain a cadre of effective and committed teachers who can provide instructional continuity;
- Maintain flexibility in allocating resources for faculty positions;
- Bring in outstanding individuals who will enrich the learning experience through their professional qualifications and experiences from careers outside academia;
- Provide additional time for scholarly pursuits of tenure-line faculty;
- Deal with exigent circumstances, such as replacing faculty on leave, filling vacancies that occur too late to conduct an appropriate search for a tenure-line faculty appointment, filling a vacancy resulting from an unsuccessful search for a tenure-line faculty member, or staffing a new and developing program;
- Teach in and administer programs that would be too time consuming for tenure-line faculty to oversee and/or require specialized skills or knowledge to run.

The university does not use term faculty positions to:

- Permanently replace a tenure-line position;
- Avoid adding new tenure-line positions when merited; or
- Provide a safe harbor for faculty whose tenure status is in jeopardy. (Section 2.6.2)

The percentage of term faculty in a local academic unit should not be more than 30% of the full-time faculty in that unit. Units may exceed 30% if approved by majority votes of the unit's tenure-line faculty and by the Faculty Council. Such exemptions are typically granted to: (i) units with new or developing programs; (ii) units whose primary instructional programs involve clinical and similar professional activities not usually covered by tenure-line faculty, and (iii) units whose primary instructional obligations are not typically met by tenure-line faculty due to extraordinary responsibility for service-level courses.

Term faculty may use the grievance and appeals processes set out in Chapter 5, except as delimited by Section 2.3.2.6.

6

Calvente-DePaul 000016

July 1, 2018

1 **2.3.2.2 Term Faculty Ranks**
2
3 Term faculty may be appointed at the ranks of Instructor, Professional Lecturer, and Senior
4 Professional Lecturer.
5
6 **Instructor:** A term faculty member without a terminal degree is usually hired at the rank
7 of Instructor. Such faculty members are normally hired to satisfy short-term curricular
8 needs and to provide support in staffing skills-oriented areas of the curriculum. The
9 primary responsibility of instructors is teaching, and their duties usually do not involve
10 service to the unit or other professional activities. Instructors may be called upon to carry
11 out minor administrative functions to help support programmatic and teaching-related
12 activities. The College of Law, in keeping with the general practice of law schools, may
13 use the title Visiting Assistant Professor for individuals hired at the rank of Instructor.
14
15 **Professional Lecturer:** This rank is reserved for term faculty who satisfy one or more of the
16 following criteria:
17
18 • Hold a terminal degree in their instruction area;
19 • Have satisfactorily taught at the rank of instructor for three years; or
20 • Possess professional qualifications and achievements equivalent to a terminal degree in
21   the relevant field.
22
23 The primary responsibility of professional lecturers is teaching, and their duties include service to
24 the unit and other professional activities deemed appropriate by the unit and the dean.
25 Professional Lecturers may be called upon to carry out minor administrative functions to help
26 support programmatic and teaching-related activities. An academic unit may also appoint to this
27 rank those who have equivalent professional experience upon initial hiring. After five years of
28 satisfactory service and upon a formal review by the unit, professional lecturers are eligible for
29 promotion to the rank of Senior Professional Lecturer.
30
31 **Senior Professional Lecturer:** This rank recognizes the contributions of term faculty who have
32 served at the rank of professional lecturer and have demonstrated superior performance as a
33 teacher. Senior Professional Lecturers may be called upon to carry out minor administrative
34 functions to help support programmatic and teaching-related activities.  An academic unit may
35 also appoint to this rank those who have equivalent professional experience upon initial hiring.
36 After five years of satisfactory service and upon a formal review by the unit, professional
37 lecturers are eligible for promotion to this rank.
38
39 An academic unit may also appoint to this rank an individual who, upon initial appointment, has
40 equivalent professional experience. Senior professional lecturers have the same duties as
41 professional lecturers.
42 **2.3.2.3 Functional Titles**
43
44 Colleges may confer upon term faculty members functional titles to reflect their particular status
45 or role within the unit. The terms "Assistant Professor," "Associate Professor," and "Professor"
46 must only be used with a modifier.  Such titles will not affect the person's rank and should be set
47 out explicitly in his or her contract.  Functional titles should not be created on an ad hoc basis, but
48 created and defined by each local academic unit to reflect its programs and special needs.  The

7

July 1, 2018

1 titles themselves, but not individual appointments, shall be approved in writing by the unit
2 faculty, the dean and the provost.

3 **2.3.2.4 Responsibilities and Participation in Governance**
4
5 The primary responsibility of term faculty will be teaching and, as such, term faculty
6 appointments generally carry higher teaching loads than tenure-line appointments. However, term
7 faculty also have a responsibility for continued professional development, for which the units
8 must provide appropriate support. Continued professional development is a criterion for
9 evaluation of term faculty.
10
11 Term faculty at the rank of professional lecturer or above may be involved in the typical service
12 activities of faculty in the unit. These activities may include advising and the creation and
13 supervision of the curriculum, based on the unit's written policies. Term faculty have the right to
14 participate in faculty governance except in matters related to hiring, retention, promotion and
15 tenure. The local academic unit officer should ensure a fair balance of the term faculty members'
16 teaching load, service and administrative responsibilities, as well as the unit's expectations for
17 continued professional development.
18

19 **2.3.2.5 Hiring and Contract Duration**
20
21 Term faculty members are initially hired on one- or two-year contracts.
22
23 An evaluation of the candidate's qualifications and input by faculty of the local academic unit, as
24 specified in the unit's personnel policies, must precede the initial hiring of a term faculty
25 member. In the absence of personnel policies regarding faculty input, hiring will require a vote of
26 the unit's tenure-line faculty.
27
28 For initial appointment (and any subsequent reappointments), the duties of the term faculty
29 member and evaluation criteria must be specified in writing and approved by the unit or its
30 personnel committee.
31
32 Term faculty may be reappointed to one- or two-year terms as described in the following section.
33 The specific peer review and evaluation process for each unit or college will be developed by the
34 faculty and specified as part of the unit's personnel policies. There is no limit to the number of
35 reappointments.
36
37 Upon the satisfactory completion of at least three years of service, a term faculty member will be
38 eligible for, and may apply for, a longer-term contract ranging from three to five years, with
39 specific length and duties determined based on the needs of the unit in consultation with unit
40 faculty. The application will be reviewed according to Section 2.3.2.6. Long-term contracts may
41 be renewed, with each renewal following the same formal review process used for the initial
42 appointment to a long-term contract. If the candidate is reappointed without a long-term contract
43 due to the candidate's performance, he or she may reapply after two additional consecutive years
44 of service. If the candidate is reappointed without a long-term contract for any reason other than
45 the candidate's performance, the candidate may reapply the following year.

46 **2.3.2.6 Reappointment and Termination**
47
48 Term faculty appointments carry no right of reappointment at the conclusion of a contract.

8

Calvente-DePaul 000018

July 1, 2018

The dean or local academic unit officer shall give term faculty appropriate notice before a decision is made on reappointment. Term faculty may submit supporting materials for reappointment to the dean or the local academic unit officer, according to the unit's performance review process.

The dean or local academic unit officer shall give term faculty written notice of the decision for reappointment or non-reappointment by April 10. The faculty member may report failure to provide timely notice of the decision to the next level academic officer. That notice shall be provided within ten business days of the report of failure to provide timely notice.

Consideration of a long-term appointment for a term faculty member shall include an evaluation by the unit (based on the unit's written personnel policies), an opportunity for the candidate to submit supporting documentation, a vote of the unit's tenure-line faculty, and review by the dean and provost.

Non-reappointment of an instructor or professional lecturer shall involve input by the faculty of the local academic unit as specified in the unit's personnel policies. In the absence of such personnel policies regarding faculty input or review, the decision rests with the local academic unit officer. Non-reappointment of senior professional lecturers requires a formal review process by the unit.

Term faculty may not grieve the university decision's not to reappoint. Term faculty may appeal the university's decision not to reappoint only on the grounds of academic freedom violation or discriminatory practices prohibited by university policies or applicable federal, state, or local laws. Term faculty appeal procedures are detailed in Chapter 5.

### *2.3.3 Special Appointments*

Special appointments may take the form of visiting faculty, research faculty (for example, post-doctoral fellows), and University Professors. These positions are so designated because the appointment has a definite time limitation or is an appointment whose continuation is directly connected to the faculty member's program.

During the period of the visit, the university may consider appointing faculty holding a special appointment for a tenure-line faculty appointment. Consideration for appointment with tenure must follow procedures in Section 2.2.2. Consideration for appointment into a tenure-line but untenured position must follow procedures in Section 2.3.1. The university's requirement for an outside search must be met, unless waived under the waiver standards of Section 2.1.

**University Professor**

The president may make special full-time university appointments. Such appointments are limited to (i) high-level administrative staff, the nature of whose responsibilities include supervision of academic policies or (ii) special honorific appointments in furtherance of the university's goals and mission. Special appointments are made by a formal contract which indicates the scope of responsibilities and limitations attached to the appointment.

9

Calvente-DePaul 000019

July 1, 2018

1   Faculty appointed as university professor are not affiliated with any academic unit and may not
2   participate in the governance, service, or educational activities of the unit except with the
3   expressed consent of the tenure line faculty of the unit.
4
5   **Visiting Faculty**
6
7   Appointment as a visiting faculty member is reserved exclusively for faculty members who are
8   employed by a home institution other than DePaul and retain that employment relationship during
9   a full or part-time appointment at DePaul. The home institution of the visiting faculty member
10  will ordinarily be another institution of higher education, but may be a foundation, a corporation
11  or a government agency or other appropriate body. In rare cases, artists or scholars of national
12  stature who do not have a home academic institution may be considered for visiting faculty
13  positions.
14
15  Visiting faculty members may have the titles Visiting Assistant Professor, Visiting Associate
16  Professor, or Visiting Professor. The qualifications for each rank are the same as for initial
17  appointment of tenure-line faculty. Visiting faculty may be offered contracts not to exceed two
18  years, with approval of the tenure-line faculty of the relevant unit and of the dean and provost.
19
20  The College of Law, in keeping with the general practice of law schools, may use the title
21  Visiting Assistant Professor for individuals hired at the rank of Instructor.
22
23  **Research Faculty**
24
25  The university may grant a research faculty position to a person engaged primarily in scholarship
26  or professional activities relevant to the work of the university. The local academic units
27  recommend research faculty appointments and reappointments based on established policies and
28  procedures of the unit, subject to the approval of the dean and the provost. These appointments
29  may be at the rank of research assistant professor, research associate professor, or research
30  professor, provided that the research faculty member possesses the educational and scholarship
31  qualifications appropriate to the particular rank. The local academic unit will specify the nature
32  and extent of the duties research faculty members in consultation with the director of the relevant
33  center, institute, or group with which the research faculty member will be associated. The
34  university will provide the description of duties in a letter of appointment. The research faculty
35  should not expect employment beyond the contract period. These appointments carry no
36  implication of, or credit towards, academic tenure.
37
38  Research faculty will normally have sources outside the university to fund their salaries, such as
39  external grants or funds provided through other institutions. Exceptions will require the provost's
40  written approval upon recommendation of the local academic unit. Research faculty receive
41  resources and access to university facilities as determined by the local academic unit officer or
42  the director of the center, institute, or group with which they have affiliated.

43  *2.3.4 Annual Performance Review*
44
45  All tenure-line and term faculty are reviewed annually. This annual process consists of a review
46  and evaluation of performance during the preceding academic year based on the local academic
47  unit's criteria and responsibilities. The review may serve one or more of the following purposes:
48

10

Calvente-DePaul 000020

July 1, 2018

1  1. to provide an opportunity for feedback on performance during the preceding year, to
2  communicate expectations, and to develop goals for the coming year;
3  2. to determine salary recommendations;
4  3. in the instance of term faculty and instructor awaiting terminal degree conferral, to determine
5  whether contract renewal for the next academic year is appropriate and desired.
6
7  Reviews of performance are written processes implemented by the local academic unit officer or
8  dean.

9  Salary recommendations, while part of the annual review process, may use criteria and
10 considerations somewhat different from decisions on contract renewal or promotion and tenure.
11 Salary decisions are made in accordance with university budget guidelines and usually are made
12 at a different time during the academic calendar year. Salary decisions may result in a merit
13 increase when budgets allow. Salary decisions may include increases for such things as equity
14 and market adjustments. The academic dean of the respective college or school makes salary
15 recommendations to the provost.

16 A faculty member with a formal faculty appointment in more than one academic unit shall be
17 evaluated by the home unit and shall be evaluated independently by the second unit if it so
18 chooses or if requested to do so by either the candidate or by the home unit.
19

20 **2.4 Adjunct Faculty Appointments**
21
22 An adjunct faculty appointment allows an individual to contribute to the instructional program of
23 a local academic unit, center, or institute. Adjunct faculty are appointed on a course-by-course
24 basis. The appointments are part-time and do not lead to tenure.

25 *2.4.1 General Principles*
26
27 The dean of a college appoints adjunct faculty to provide instruction in specific courses.
28 Appointment of adjunct faculty should involve input by the local academic unit. The university is
29 not obligated to reappoint adjunct faculty.  Adjunct faculty may use the grievance process set out
30 in Chapter 5.

31 *2.4.2 Retired Faculty*
32
33 A retired faculty member may be offered a limited faculty assignment with adjunct status.
34 The usual reasons for offering such an assignment are:
35
36 1. the need of the college or local academic unit for the specific and unusual competencies of the
37 retired faculty member and;
38 2. quality of teaching or other academic endeavors, with reference to current developments in the
39 field.
40
41
42 The decision to offer a limited assignment to a retired faculty member rests principally with the
43 academic dean, following local academic unit consultation. The dean shall submit his or her
44 written decision to the provost for final approval.

Calvente-DePaul 000021

July 1, 2018

1  *2.4.3 Professors Emeriti and Emeritae*
2
3  The university may bestow the title of Professor Emeritus or Professor Emerita upon retirement.
4  Those eligible for emeritus status are tenured faculty members who have contributed substantially
5  to the university's mission and who have ordinarily served at least seven years as a faculty
6  member. Exceptions to these criteria must be approved by the provost.
7
8  Prior to the individual's retirement, the tenured members of the local academic unit may
9  recommend the retiring faculty member for the honorary status of Professor Emeritus or
10 Professor Emerita by sending a letter to the dean describing the person's contributions. The dean
11 forwards his or her recommendation to the provost who, in turn, makes a recommendation to the
12 president, who then makes the final appointment.
13

14 **2.5 Other Instruction-Related Positions**

15 *2.5.1 Academic Support Appointments*
16
17 Members of the staff whose duties include teaching are not members of the full-time faculty.

18 *2.5.2 Graduate Assistants and Fellows*
19
20 Graduate assistants and graduate teaching fellows are appointed by the appropriate dean on the
21 recommendation of the local academic unit officer. They do not possess faculty status.
22 The appointment of a graduate assistant or graduate teaching fellow is subject to the approval by
23 the dean.
24

25 **2.6 Change of Affiliation or Status**

26 *2.6.1 Change of Affiliation*
27
28 With the written agreement of the faculty member, the faculty member's affiliation may be
29 changed to a different local academic unit. The contract will reflect the new affiliation.
30
31 Transfer of affiliation may be initiated by the faculty member, by the dean, or by the local
32 academic unit officer to which the transfer is proposed. Eligibility is determined by the same
33 criteria used for an initial faculty appointment.
34
35 The faculty member will normally retain the same rank following the transfer. In special
36 situations, the faculty and local academic unit officer in the accepting unit may require the faculty
37 member to accept a lower rank. In no instance may a faculty member receive a promotion
38 through a change of affiliation.
39
40 A tenured faculty member transferring to another unit retains tenure. An untenured faculty
41 member must complete the same number of probationary years as remained in the former unit.
42 The number of years of probationary service may be extended upon agreement with the faculty
43 member.
44

Calvente-DePaul 000022

July 1, 2018

1   A member of a local academic unit may request an additional affiliation, resulting in a joint
2   appointment. In such cases, the faculty, the dean, and the local academic unit officer in which the
3   second appointment is to be made are responsible for evaluating and recommending the joint
4   appointment. Joint appointments require the qualifications necessary for appointment at the
5   tenure status and rank according to each unit's standards.

6   **2.6.2 Change of Status**

7
8   Any change in rank or tenure is a change of status. All changes of status must follow established
9   procedures. A change of status does not confer tenure, unless the process meets the tenure
10  procedures in this Handbook.
11
12  A change of status occurs if a tenure-line faculty member is not renewed. Such a faculty member
13  is not eligible for a full-time faculty position for a period of five years. Faculty members denied
14  tenure shall never be eligible for any faculty appointment.
15
16  A change of status also occurs if a full-time or part-time faculty member who is not a tenure-line
17  faculty member seeks to become a tenure-line faculty member. The change of status from non-
18  tenure-line to tenure-line requires evidence of a national search or a request from the local
19  academic unit's faculty for a waiver from a national search. A waiver request must come from a
20  majority of the local academic unit's tenure-line faculty and be approved by the dean and the
21  provost. The change of status from non-tenure-line to tenure-line also requires participation of the
22  local academic unit's tenure-line faculty, including at least a majority vote of that faculty as
23  determined by procedures laid out in the local academic unit guidelines and the Faculty
24  Handbook.
25

26  **2.7 Summer Session Appointments**

27
28  The dean, after consultation with the local academic unit officers, and considering the resources
29  and needs of the college, decides which courses, workshops or other programs will be offered in
30  the summer sessions and which faculty members will conduct them. Faculty members with a ten-
31  month contract may accept or decline courses offered to them during the summer. The university
32  does not guarantee summer session appointments.
33
34  University policy regarding summer course assignments consists of the following principles:
35
36  1. Two courses running concurrently constitute a full load; the dean's explicit approval is
37  required for any overload assignment.
38  2. Faculty members receiving full summer compensation from an external grant may not be
39  assigned summer courses unless such instruction is among the terms of the grant. Faculty
40  members receiving partial summer compensation from an external grant may have a
41  partial summer course assignment, provided that the combined compensation does not exceed the
42  amount they could receive for a full summer course load.
43  3. Within the bounds established by principles #1 and #2, assignments should be made on an
44  equitable basis.
45
46  Within the standards set by general university policy, each college develops its own policy for
47  determining the programs to be offered over the summer and for making summer session
48  appointments.

13

Calvente-DePaul 000023

July 1, 2018

For summer students enrolled for semester credit (4.5 quarter hours), faculty are expected to assign additional work commensurate with the additional credit.

Full-time faculty members with ten-month contracts receive additional salary for teaching in the summer. The rate of summer compensation is subject to periodic review involving the participation of faculty members. Teaching in a summer session may be part of the normal assignment of faculty members who have a 12-month contract, in which case no additional salary is paid. Adjunct faculty members who teach in a summer session will receive the same compensation as for a course offered during the academic year.

## 2.8 Orientation of Faculty

The Office of Academic Affairs offers a yearlong series of orientations for new full-time faculty, including an introductory orientation at the beginning of each academic year. The Office of Human Resources also offers frequent workshops describing personnel policies, benefits, and general employee information. Colleges and academic units may offer additional academic orientation.

Local academic units, colleges, and university offices are encouraged to provide comprehensive orientation and ongoing development support for their term and adjunct faculty in order to welcome and acculturate them to the DePaul community.

## 2.9 Annual Reporting

The provost will annually report to Faculty Council on the composition of the faculty including tenure-line, term, and adjunct faculty; percentages of tenure-line, term, and adjunct faculty appointments by academic units and colleges; current titles in use; and any other pertinent information concerning faculty appointments. Academic deans shall report the same information to their respective faculties annually.

Calvente-DePaul 000024

July 1, 2018

1  # CHAPTER 3.  PROMOTION AND TENURE STANDARDS AND
2  # PROCEDURES
3

4   3.1     Overview .................................................................................................. 4

5   3.2     Probationary Service ................................................................................ 4

6   3.2.1 Length of Probationary Period ................................................................... 4

7       3.2.1.1 Assistant Professors Credit for Prior Service ................................... 5

8       3.2.1.2 Associate or Full Professors Credit for Prior Service ....................... 5

9       3.2.1.3 Non-tenure-line Full-Time Appointments ........................................ 5

10  3.2.2 Leaves of Absence .................................................................................... 5

11  3.3     Types of Review for Tenure-Line Faculty ................................................ 5

12  3.3.1 Probationary Tenure-Line Reviews ............................................................ 6

13      3.3.1.1     Formal Tenure-line Probationary Reviews ................................. 6

14      3.3.1.2 Informal Tenure-line Probationary Reviews ..................................... 7

15      3.3.1.3     The Tenure Review ................................................................... 7

16  3.3.2 Promotion in Rank ...................................................................................... 7

17  3.4.    Criteria for Promotion and Tenure ........................................................... 7

18  3.4.1.  Requirements by Rank.............................................................................. 7

19  3.4.2   University-wide Criteria ............................................................................ 8

20      3.4.2.2     Scholarship, Research, or Other Creative Activities.................. 8

21      3.4.2.3     Service ................................................................................... 10

22  3.4.3   Local Academic Unit and College Guidelines ........................................ 10

23  3.4.4   Institutional Considerations .................................................................... 11

24  3.5     Process for Tenure and Promotion .......................................................... 11

25  3.5.1 General Principles ..................................................................................... 11

26      3.5.1.1 Common Processes ....................................................................... 11

27      3.5.1.2 Guidelines Specific to Multi-Unit Appointments ........................... 13

28      3.5.1.3 Guidelines for Evaluating Collaborative Work ................................ 14

29  3.5.2   Processes Common to All Evaluation Levels............................................ 14

30      3.5.2.1     Signing Statement .................................................................. 15

31      3.5.2.2     Minority Report ..................................................................... 15

32  3.5.3 Local Academic Unit ................................................................................ 15

33  3.5.4   Local Academic Unit Is College ............................................................. 16

Calvente-DePaul 000025

July 1, 2018

1  3.5.4.1 Personnel Committee (optional) ................................................................ 16

2  3.5.4.2    Tenured Faculty of the College ................................................................ 16

3  3.5.4.3    Dean ......................................................................................................... 16

4  3.5.4.4    Candidate Response to College Review.................................................. 16

5  3.5.5    Local Academic Unit Is Not College ............................................................. 17

6  3.5.5.1    Local Academic Unit Personnel Committee (Optional) ........................ 17

7  3.5.5.2    Tenured Faculty of the Local Academic Unit ........................................ 17

8  3.5.5.3    Local Unit Academic Officer (Unit Chair or Director)........................... 17

9  3.5.5.4    Candidate Response to Local Academic Unit Review ........................... 17

10  3.5.5.5    College-Level Personnel Committee ...................................................... 18

11  3.5.5.6    Dean ......................................................................................................... 18

12  3.5.5.7 Candidate Response to College Review ..................................................... 18

13  3.5.6    University Review .......................................................................................... 18

14  3.5.6.1 University Board on Promotion and Tenure ................................................ 18

15  3.5.6.2 Candidate Response to UBPT ..................................................................... 19

16  3.5.6.3 Provost Decision .......................................................................................... 19

17  3.5.7 Detailed Procedures ........................................................................................ 19

18  3.5.7.1    Committees................................................................................................ 19

19  3.5.7.2    Local Academic Unit (Not College) Personnel Committees ................. 19

20  3.5.7.3    Tenured Faculty of the Local Academic Unit ........................................ 20

21  3.5.7.4    College Personnel Committees ............................................................... 20

22  3.5.7.5    University Board on Promotion and Tenure ........................................... 20

23  3.6    Materials ........................................................................................................... 21

24  3.6.1 Dossier ............................................................................................................ 21

25  3.6.1.1 Items Supplied By Candidate...................................................................... 21

26  3.6.1.2 Items Supplied By Academic Unit and College .......................................... 21

27  3.6.1.3 Additions to the Dossier .............................................................................. 22

28  3.6.2 External Letters ............................................................................................... 22

29  3.6.2.1    Authors of External Letters ..................................................................... 23

30  3.6.2.2    External Letter Contents .......................................................................... 23

31  3.6.2.3    Confidentiality of External Letters.......................................................... 23

32  3.6.2.4    Suggested Sample Letter .......................................................................... 23

33  3.6.3 Student Input ................................................................................................... 24

34  3.6.3.1 Student Input Instrument.............................................................................. 24

Calvente-DePaul 000026

July 1, 2018

1        3.6.3.2 Evaluation and Submission of Student Input Data ...................................... 25

2    3.7    Appeal ............................................................................................................ 25

3    3.8 Schedule for Informal and Formal Reviews ............................................................ 26

4    3.9    Schedule for Promotion and Tenure .................................................................... 27

5

6

3

Calvente-DePaul 000027

July 1, 2018

# CHAPTER 3.  PROMOTION AND TENURE STANDARDS AND PROCEDURES

## 3.1    Overview

Faculty members contribute to DePaul University as the primary creators of a vibrant academic community. The university seeks to foster an environment that provides professors with enriching opportunities to guide students, pursue scholarship and creative activities, and advance the institution's well-being.

DePaul honors and rewards faculty members for their professional achievements. It maintains a system of faculty evaluation that relies heavily on the views of faculty. Exercising professional judgment, experienced faculty evaluate the work of their colleagues for renewal, promotion, and tenure.

Tenure is the foundation of academic freedom and the quality of the university.  It is neither an end in itself nor a privilege exempting the individual from the obligation to make future contributions. It is, rather, a status that society recognizes as promoting the common good. Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. Tenure creates the presumption of continuing employment, unless the university, using established procedures and faculty guidance, proves that countervailing circumstances exist.

This chapter sets out DePaul University's standards and procedures for evaluating its tenure-line faculty.

## 3.2    Probationary Service

The probationary period is defined as the candidate's time of continuous service in full-time tenure track at DePaul, at the end of which the tenure decision is made. During the probationary period, a tenure-line faculty member undergoes annual formal or informal evaluations for contract renewal or nonrenewal. In the final year of probationary service, the faculty member may apply for tenure and promotion. An unsuccessful candidate for tenure will not be offered a contract renewal, but will be offered a terminal contract of one year for the academic year following the academic year in which the faculty member applied for tenure.

### 3.2.1 Length of Probationary Period

The maximum probationary period is six years excluding certain types of leaves that suspend the clock as described in Section 3.2.2. The probationary period may be reduced by agreement based on full-time prior academic service. The initial tenure-line contract must state any agreed-upon credit for prior service.

4

Calvente-DePaul 000028

July 1, 2018

**3.2.1.1 Assistant Professors Credit for Prior Service**

A prospective faculty member recruited to DePaul as an assistant professor may have previously held a full-time faculty appointment at another college or university. The length of the probationary period at DePaul may be reduced by one, two, or three years, upon agreement of the individual and the university at the time of appointment. The initial faculty contract must state any agreed-upon credit for prior service.

**3.2.1.2 Associate or Full Professors Credit for Prior Service**

A prospective faculty member recruited to DePaul as an associate or full professor may receive an appointment without tenure. Upon agreement of the individual and the university at the time of appointment, one, two, three, or four years of prior full-time faculty service at another college or university may be credited to the probationary period at DePaul. The faculty member's initial contract must reflect the agreed-upon amount of credit for prior service and the review schedule. Regardless of the amount of credit, the individual will not be evaluated for tenure without having had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.

**3.2.1.3 Non-tenure-line Full-Time Appointments**

As a general norm, the years a faculty member has spent at DePaul University in a non-tenure-line full-time appointment (e.g., instructor or visiting professor) do not count toward the probationary period. If a faculty member's status changes to a tenure-line appointment, the individual and the university may agree to credit one or more years of special appointments toward the probationary period. The faculty member's initial contract for a tenure-line full-time appointment must reflect the agreed-upon amount of credit for the prior service at DePaul. Regardless of the amount of credit, the individual will not be evaluated for tenure without having had at least one formal probationary evaluation at DePaul prior to the tenure evaluation.

*3.2.2 Leaves of Absence*

A leave of one quarter or longer may interrupt the faculty member's probationary period.

If an untenured tenure-line faculty member takes a leave as defined by DePaul policies, including family or medical leave, research leave, teaching leave, or military service leave, the year during which the leave occurs is normally not considered as a year of probationary service, and the leave does not break the required continuity of full-time service. If the candidate, however, wishes for the leave not to affect the length of the probationary period, he or she must notify the dean in writing within six months upon return from the leave.
Faculty sometimes request and are granted a personal leave that does not fall into any of the categories covered in the prior paragraph. If a candidate takes such a leave, the provost makes the decision on how the leave affects the probationary period. (Section 6.7.)

**3.3    Types of Review for Tenure-Line Faculty**

Calvente-DePaul 000029

July 1, 2018

1    *3.3.1 Probationary Tenure-Line Reviews*

2

3    During the probationary period, the probationary tenure-line faculty member will be subject to
4    annual probationary reviews conducted by the faculty member's local academic unit. In colleges
5    with departments, the local academic unit is, in colleges with departments, the department or
6    similar body. In other colleges, it is the lowest-level body conducting reviews for tenure and
7    promotion.

8

9    Probationary reviews serve three major purposes:

10

11    1.      To assess the faculty member's progress toward promotion and/or tenure, measuring the
12    individual against the established criteria

13

14    2.      To provide clear and consistent guidance and develop priorities for the faculty member
15    toward fully satisfying the criteria, and

16

17    3.      To recommend for or against renewal.

18

19    Three types of probationary reviews apply to tenure-line faculty who are untenured: informal,
20    formal, and the tenure review.  Each evaluation leads to a decision for renewal or nonrenewal (see
21    also Section 4.2).

22

23    The dean normally makes a recommendation on annual renewal and nonrenewal. If the dean does
24    not concur in the recommendation of a local academic unit, the dean shares his or her
25    recommendation with the local academic unit. The local academic unit may appeal the dean's
26    recommendation to the provost.  In such cases, the dean and the department or unit provide the
27    provost with written reasons for their respective positions. The provost makes the final decision
28    and reports it to the candidate. A faculty member who is not renewed may file an appeal.
29    (Chapter 5)

30

31    A formal review must precede a decision in year five to issue a terminal contract. In case of
32    nonrenewal, the candidate is not eligible to apply for tenure or promotion.

33    **3.3.1.1 Formal Tenure-line Probationary Reviews**

34

35    A formal probationary review is designed to prepare a faculty member for the tenure process and
36    to document areas that need the faculty member's attention. In a formal review, the local
37    academic unit considers the candidate's personal statement and CV, evidence of scholarship or
38    documentation of creative activity, student evaluations, evidence of service, and other materials
39    specified by policies of the local academic unit or college.

40

41    Each local academic unit or its personnel committee conducts a formal review of untenured
42    tenure-line faculty no less often than every two years. The tenured faculty of the local academic
43    unit then vote by separate secret ballots on (1) adequate progress toward tenure and (2) renewal.
44    The faculty prepare a report that clearly details areas of strength and areas for improvement. The
45    report is explicit about the faculty member's progress towards tenure. Copies of this report are
46    forwarded to the candidate and the dean. The dean writes a separate letter to the provost with a
47    recommendation regarding renewal or nonrenewal. If a formal review raises serious concerns
48    about the candidate's potential for attaining promotion or tenure, the local academic unit faculty,
49    local academic unit officer, or dean may mandate that the next year's annual review be formal.

Calvente-DePaul 000030

July 1, 2018

**3.3.1.2 Informal Tenure-line Probationary Reviews**

The purpose of an informal review is to recommend for or against contract renewal and to address progress towards tenure in review periods when a formal review is not conducted.

In years in which a formal review is not conducted, the chair, dean, or, where applicable, appropriate committee conducts an informal review of the faculty member, according to processes specified in local academic unit or college policies, that results in a written recommendation to the provost, with a copy to the candidate.

**3.3.1.3 The Tenure Review**

The tenure review is the final review during the probationary period. It begins with the candidate's tenure application and concludes with the provost's decision to grant or deny tenure. It is a formal review involving university-wide consideration under detailed procedures. It includes solicitation of opinions from external reviewers and from students. The tenure review examines the faculty member's accomplishments and assesses the likelihood of future accomplishments.

Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission.

***3.3.2 Promotion in Rank***

Ordinarily, an assistant professor applies for tenure and promotion simultaneously. The candidate receives either both promotion to associate professor and tenure or neither promotion nor tenure. Only an associate professor may apply for promotion for full professor.

A faculty member ordinarily serves three to six years in a given rank before promotion. See Section 3.5.1.1 (m) for details.

There is no limit to the number of times a faculty member may apply for promotion to full professor. In the event of a denial of promotion, the faculty member may not re-apply for promotion in the year immediately following the denial.

**3.4.     Criteria for Promotion and Tenure**

***3.4.1.   Requirements by Rank***

**Assistant Professor.** The doctorate or terminal degree is required for this rank. Exceptions are made for candidates who have already attained recognition for scholarly or other relevant professional achievements and who give promise of continued academic development. The assistant professor should demonstrate a potential for becoming an effective teacher, for pursuing scholarship, research, and/or other creative activities, and for service.

7

July 1, 2018

**Associate Professor.** In addition to the requirements for assistant professor, the candidate must demonstrate consistently effective teaching performance. The candidate should also show evidence of notable scholarship, research, and/or other creative activities, and service. For this rank, the candidate should show significant involvement in university activities at the local academic unit and beyond. This rank is reserved for those with recognized academic achievements.

**Professor.** In addition to the requirements for associate professor, candidates must give evidence of continued scholarship, research, and/or other creative activities – the quality of which is recognized by their peers inside and outside the university. Candidates for this rank must also show a record of notable service contributions at the university level. Effective teaching remains mandatory for this rank. This rank is reserved for those with recognized academic achievements.

### 3.4.2    University-wide Criteria

DePaul University appoints, retains, promotes, tenures, and rewards faculty who best help the university fulfill its mission, as articulated in the university's Mission Statement and Faculty Handbook. The principal criteria for tenure and advancement in academic rank are: teaching and learning; scholarship, research, or other creative activities; and service. In evaluating faculty for promotion or tenure, local academic units specify more detailed guidelines that provide unit- and discipline-specific articulations of the university-wide criteria (Section 3.4.3.)

**3.4.2.1  Teaching and Learning**

Effective teaching is the first requirement in decisions at all levels on appointment, retention, promotion, and tenure. Teaching evaluation must be done in a systematic, documented manner, including contributions from the candidate's students and peers. Effective teaching involves:

- Command of material
- Effective communication of subject matter
- Development and articulation of appropriate and thorough learning objectives for each course taught
- Delivery of course content that is appropriate to the level of the course, its description in the course catalog, and its student audience
- Probing and fair methods of evaluating students
- Success in bringing students to an acceptable level of performance and in challenging them to grow intellectually and morally

Instructional activities outside the classroom, such as course development (individual or collaborative), academic advisement, accessibility to students, supervision of independent study, and contributions to meeting departmental instructional needs, are also relevant.

**3.4.2.2  Scholarship, Research, or Other Creative Activities**

Throughout their professional lives, all tenure-line faculty members should engage in scholarship, research, or other creative activities. Each requires disseminating the results of completed projects in academic and artistic arenas outside DePaul.

Calvente-DePaul 000032

July 1, 2018

1   The university evaluates untenured tenure-line faculty based on their total output of work.
2
3   Scholarship, while including research, is a broader concept. Research traditionally refers to
4   discovery using the disciplinary methodologies for investigation and production of new
5   knowledge in the humanities, social and natural sciences, and mathematics. Research is usually
6   shared through presentations at professional meetings and academic publications.  Scholarship is
7   a broader term encompassing the four separate but overlapping functions of a quality faculty
8   member: discovery, integration, application, and teaching.
9
10      • Original discovery advances knowledge within the context of a disciplinary or
11        multi-disciplinary field and practice, contributing significantly to knowledge and
12        the intellectual life of the university. Research falls into the category of
13        discovery.
14      • Integration develops knowledge through cross- and multi-disciplinary
15        investigations, allowing new fields of inquiry to develop.
16      • The application of knowledge uses research findings in responsible ways to
17        address contemporary societal problems through interaction with the larger
18        community.
19      • The study of teaching experiences leads to the development of better pedagogical
20        methods and tools.
21
22   Creative activities refer to activities other than scholarship. Creative activities result in products
23   in the fine arts, such as the visual arts, the literary arts, and the performing arts, and their
24   combinations and supportive activities.  These can also be addressed as objects of scholarship
25   through any of the four functions listed above.
26
27   Evidence of research, scholarship, or creative activities should include, at a minimum:
28      • A current and complete curriculum vitae
29      • Copies of the project results where feasible
30      • If applicable, documentation sufficient to substantiate the candidate's
31        contributions to collaborative projects, as specified in the local academic unit
32        guidelines
33      • Assessment of the contributions by professional peers and other experts in the
34        field
35      • Self-assessment concerning scholarly or creative growth and development
36
37   The University evaluates research, scholarship, and creative activities in light of their:
38      • Originality
39      • Contribution to knowledge
40      • Conceptual or artistic sophistication
41      • Intellectual rigor or artistic skills
42      • Effective application of knowledge to address human problems or needs
43      • Effective communication of knowledge to audiences beyond the classroom
44
45   Scholarship or creative activities that cannot be evaluated by these criteria will not be considered
46   for promotion and tenure. An academic unit may evaluate oral presentations or creative activities
47   by various means including (but not limited to) listening to recordings, examining drafts, or
48   soliciting the views of other scholars (including other members of the DePaul faculty) who were
49   in attendance.
50

9

Calvente-DePaul 000033

July 1, 2018

Activities conducted solely within the candidate's classes, or designed merely to keep a candidate abreast of scholarly development in a field, are considered in evaluating the candidate's teaching, not in evaluating his or her contributions in scholarship, research, or other creative activities.

### 3.4.2.3  Service

Service consists of documented activities that

- Benefit the university and its academic units, professional associations, the community, or the broader public
- Are consistent with the university's mission
- Clearly benefit from the expertise of the faculty member -- either the specialized expertise of the faculty member's field or the professional skills possessed by all members of the faculty

Service may be provided to the university, the profession, and the community. The amount and nature of service are correlated with academic rank.

University service consists of contributions to the enhancement of the institution's internal processes and its relationships with external bodies. All faculty members must serve in their local academic unit (unless assigned to a position such as associate dean that precludes such service).

Professional service consists of contributions to the organizations or associations of the faculty member's academic discipline or the professoriate. Professional service may have a component of scholarship or creative activities.

Community service activities contribute to the public welfare outside the institution, consistent with the Vincentian tradition of DePaul University. Activities consistent with a faculty member's expertise but that could be done by someone without that expertise do not qualify as community service. In some instances, it will not be obvious whether an activity counts as community service. In those cases, it is the responsibility of the candidate to make the case demonstrating that the activity qualifies as service as the term is used here.

### 3.4.3   Local Academic Unit and College Guidelines

Local academic units and colleges have the responsibility to adopt written guidelines and policies for tenure-line faculty evaluation. These guidelines have two purposes: (1) they provide unit- or college-specific articulations of university-wide criteria based on the professional discipline, field, or interdisciplinary area, including collaborative work, as applicable; and (2) they describe unit- or college-specific procedures and processes used for promotion and tenure. The guidelines must be consistent with the university's criteria and procedures specified in this Faculty Handbook. In the absence of approved unit or college guidelines, the guidelines of the higher level will apply.

The faculty of the local academic unit bear the primary responsibility for developing and amending guidelines. Guidelines should include at least these elements:

Criteria
a) Statement of discipline-specific articulations for university-wide criteria and expectations for teaching, research and creative activities, and service

10

July 1, 2018

      b)  Specification of standards for different forms of scholarship within the discipline (or interdisciplinary field)

Process
a) Uniform policies detailing the process used for evaluations
b) Composition of the personnel committee, if any
c) Policies on remote participation in meetings
d) Explanation of participation by, or exclusion of, faculty who are unavailable at the time of the evaluation for reasons such as illness or leaves of absence. (Reviewers allowed to participate must have read the dossier in advance.)
e) Guidance on whether reviewers must have attained at least the rank that the candidate seeks
f) Process for amending guidelines

College guidelines should reflect the input of their constituent academic units, where applicable.

The University Board on Promotion and Tenure reviews changes in the guidelines prepared by local academic units and colleges. The UBPT determines whether the guidelines are clear and consonant with the general university-wide criteria and procedures for promotion and tenure. If the UBPT finds local academic unit or college guidelines to be unclear or inconsistent with university requirements, it will inform the local academic unit or college in writing with the expectation that the guidelines will be revised. In the absence of guidelines or if the guidelines have not been approved by the UBPT, the guidelines of the higher level will be used.

Approved guidelines included in official documents of academic units are binding, as are the university-wide criteria and processes. Should there be inconsistencies in the guidelines and criteria of different evaluation levels, those of the higher level prevail.

### *3.4.4   Institutional Considerations*

Merit is not the sole consideration for professional advancement at DePaul University. Institutional need also plays a role in the renewal and tenure of untenured faculty. In planning the number and qualifications of faculty to meet future needs and the resources required to support the faculty, the university may – after consultation with the faculty – limit the number or proportion of tenured positions in the university or in any of its academic units. In such instances, tenure would not be granted regardless of the faculty member's qualifications and length of service. The university will notify affected faculty members promptly upon the adoption of any such limitation.

## 3.5      Process for Tenure and Promotion

### *3.5.1 General Principles*

The following general principles guide promotion and tenure reviews:

### 3.5.1.1 Common Processes

11

Calvente-DePaul 000035

July 1, 2018

a) There are normally three levels of evaluation prior to the final decision of the provost: the local academic unit, the college, and the university. In the absence of departmental or school structures, the local academic unit is the college and thus there are only two levels: the local academic unit and the university.

b) An individual faculty member may vote or advocate for or against a candidate only at one level in the review process. Members of UBPT must vote only on the UBPT. In units where the local academic unit is not the college, college policy must specify whether college personnel committee members vote at the college or the local academic unit level. However, members of a local academic unit personnel committee may fully participate and vote in both the personnel committee's evaluation and the local academic unit evaluation.

c) All votes are by secret ballot and the numerical results are recorded. A tie vote will be interpreted as a recommendation against renewal or against an award of tenure or promotion.

d) Candidates receive the written reports and vote counts at each step in the process promptly as those materials become available. Candidates receive external letters with information identifying the reviewer redacted.

e) Candidates receive copies of any additions to a dossier.

f) Each level of evaluation is substantive and judges the candidate on the merits according to the university's criteria and the guidelines of that level of review. In addition to substantive review, reviewers after the initial level consider the method and care of application of the approved guidelines by lower-level unit(s) and the disciplinary expertise of the local academic unit. Relevant issues include matters of stringency, consistency among candidates, and fairness, as well as the implications the decision may have at the college, school, or university level.

g) All individuals participating in the process at any stage must respect its confidentiality. They must not reveal votes, the names or views of referees, the contents of discussions, or the contents of the dossier to anyone. Intentional or continuing breaches of confidentiality are considered to be serious violations of professional ethics. Local academic units and colleges must take appropriate steps to maintain confidentiality, including during the physical preparation of the dossier and dossier storage. It is unwise to make a broad electronic distribution of the dossier; instead password-protected web sites can be used. All documentation will be retained in accordance with the Records Management policy.

h) Faculty members should always avoid conflicts of interest in evaluating individual faculty members for appointment, renewal, tenure, or promotion. The university expects the provost, deans, local academic unit administrators, and all other internal faculty reviewers to acknowledge such conflicts openly and to abstain from participation whenever conflicts arise.

i) Faculty members receive tenure only upon affirmative award by DePaul University. Each year, eligible tenure-line faculty may apply for tenure and/or promotion. By April 1, the Office of Academic Affairs will notify eligible faculty in writing of the deadline for submitting an application for promotion and tenure or promotion for the

12

Calvente-DePaul 000036

July 1, 2018

following year. The faculty member must submit his or her request to the local academic unit officer, academic dean, and the Office of Academic Affairs by the stated deadline, typically May 1.

j) Requests for tenure submitted before the year of eligibility will not be accepted. If a faculty member eligible for tenure consideration fails to apply by the application deadline he or she forfeits the opportunity for tenure consideration and receives a terminal contract of no more than one year's duration.

k) Failure to meet the application deadline for promotion to full professor postpones consideration until the next academic year. There is no limit to the number of times a faculty member may apply for promotion to full professor, except that a candidate may not re-apply in the year immediately following a decision denying promotion.

l) The provost will acknowledge receipt of applications for promotion, for tenure, or for promotion and tenure, no later than May 15. For candidates with tenure who are seeking promotion to full professor, the provost will advise all candidates of the right to withdraw an application for promotion at any time, without prejudice to future applications.

m) Faculty members are normally expected to serve a minimum of three to six years, depending on the practice of their college, in a given rank before promotion to the next rank.  Exceptions to the norm are allowed only when the dean and, if one exists, college personnel committee, certify that the candidate's extraordinary performance, under departmental, school, and college guidelines, warrants early application for promotion.

n) Candidates may continue through all stages of evaluation, regardless of a negative recommendation at any stage.

## 3.5.1.2 Guidelines Specific to Multi-Unit Appointments

a) If a faculty member has a formal appointment in more than one academic unit, the home academic unit specified in the appointment letter evaluates the candidate.  The second unit evaluates the candidate if it so chooses, or if requested to do so by either the candidate or the home unit. The second unit conducts an independent evaluation and makes a recommendation based on the candidate's responsibilities in that unit. The second unit may review the reference letters and student input from the home academic unit. The report of the second unit will be forwarded to the home unit for its consideration and inclusion in the dossier.

b) A faculty member who changes formal appointments during the period under evaluation shall be evaluated by both academic units. Either unit may, upon request, have access to the other unit's documentation. Each academic unit sends the candidate's supporting documents and the unit's evaluation to the next higher level unit.

c) A faculty member with a formal appointment in only one department or local academic unit may have formally assigned duties in one or more other units. In

13

July 1, 2018

evaluating the faculty member, the home unit shall invite the other units to submit evaluations, which the home unit will include with its evaluation. At each stage in the review process, the evaluations will receive weight in the approximate portion of the workload assignment to each entity. Ultimately, the recommendation to the next level of review rests with the home academic unit.

### 3.5.1.3 Guidelines for Evaluating Collaborative Work

Collaborative activities within and across units are valued at DePaul. If collaborative work is submitted as part of the dossier, it must be evaluated as part of tenure and promotion review. Individual contributions to collaborative work should be described specifically by the candidate and documented by team members. Evaluators should consider that collaborative work may be especially labor-intensive, may be disseminated in non-traditional forms, and may blur the conventional distinctions between research and teaching and service. Local Academic Units should specify in their guidelines the processes and policies governing the evaluation and weight of collaborative work in the tenure and promotion review.

### *3.5.2 Processes Common to All Evaluation Levels*

At all levels of evaluation the following processes must be followed:

a) Additions to the dossier may be made in accordance with the guidelines in this chapter.

b) The reviewing body's numerical vote must be reported to all subsequent levels.

c) All documents considered at each level must be passed on to subsequent levels. The candidate has access to all documents being considered, but the candidate's copies of the external reviewer letters must have the reviewer's identifying information redacted.

d) The local academic unit officer (e.g., department chair) or academic dean, as applicable, informs the candidate of the decision, numerical vote, and all grounds for the decision before transmitting the dossier to the next level.

e) All decisions or recommendations shall be reported promptly to the academic administrator of the prior level, along with the reasons for any recommendations differing from the prior level's recommendation.

f) All tenured faculty members of a candidate's local academic unit, members of the college personnel committee, and members of the UBPT are permitted and expected to vote by a secret ballot at a meeting in which the candidate's application is reviewed and discussed, exempting those faculty who may be unable to participate due to approved leaves of absence. Under no circumstances may a vote be cast through a proxy at any level in the retention, promotion or tenure process. However, faculty in absentia may vote only if they use technology that permits simultaneous participation in the review meeting and conveyance of their secret ballot at the time

14

Calvente-DePaul 000038

July 1, 2018

of the vote. Moreover, faculty who vote in absentia are required to have reviewed a candidate's materials before the academic unit's official vote. Only those faculty having a valid excuse as defined in the unit guidelines may attend and vote using technology. Likewise, no faculty member is permitted to add his or her vote or change his or her vote after the votes have been tallied.

g) The report on a recommendation shall fully discuss both strengths and weaknesses in the record so as to provide an explanation for positive and negative votes. All faculty participating in the decision will read the final report of the unit's recommendation and sign one of two forms. One form indicates that the faculty member agrees that the report accurately describes the discussion of the unit. The other form indicates that the report does not accurately describe the unit's discussion. The faculty member's signature does not reflect his or her vote. Faculty who sign the form indicating inaccuracy of the report must provide a signed statement, known as a signing statement, explaining why they believe the report does not accurately describe the discussion. In the event a faculty member is unwilling or unable to sign one of the two forms, the report will go forward with an explanation from the person responsible for gathering the signatures.

## 3.5.2.1  Signing Statement

A faculty member who believes that an evaluation level report did not accurately reflect the discussion during deliberation for promotion or tenure must prepare a signing statement. The signing statement explains the individual's disagreement with the report's characterization of the meeting. It is restricted to how the evaluating unit or committee report allegedly mischaracterized the discussion. The statement may not present information or opinions about the candidate beyond those offered during the meeting. It need not indicate the author's position on the candidacy.

Signing statements must be shared with both the candidate and all faculty members of the unit or committee who were involved in the discussion at issue.  Signing statements are due five business days after the recommendation goes to the next level.

## 3.5.2.2  Minority Report

An allegation that an evaluating unit violated its guidelines, criteria, or processes, or those of the university, takes the form of a minority report.

A minority report is restricted to how the evaluating unit or committee violated guidelines, process, or criteria. It may not present information or opinion about the candidate beyond that offered during the meeting.

Minority reports must be shared with both the candidate and all faculty members of the unit or committee. The deadline for the minority report is five business days after the recommendation goes to the next level. The evaluating unit or committee has five business days to respond to the minority report. These documents must be added to the dossier for subsequent levels of review.

### *3.5.3 Local Academic Unit*

15

July 1, 2018

The local academic unit is the unit that conducts the first level of review in the promotion and tenure process. Some colleges are the local academic unit. In other colleges, the local academic unit might be a school, a department, or a program. A college may have departments that do not function as local academic units. For example, in the 2012-2013 academic year, the following colleges functioned as local academic units: College of Communication, College of Law, School of Music, The Theatre School, and The School for New Learning.

### 3.5.4    Local Academic Unit Is College

When the local academic unit is the college, the two levels of review are the college and the university. The college must follow uniform, written guidelines describing the evaluation process. Participation in the tenure and promotion review process is limited to tenured faculty.

**3.5.4.1 Personnel Committee (optional)**

A local academic unit may choose to convene a personnel committee consisting of a subset of the tenured faculty of the unit, excluding the dean. The committee must have at least three members. The personnel committee, if one exists, evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The personnel committee vote cannot be used in lieu of any full tenured faculty vote.

**3.5.4.2 Tenured Faculty of the College**

The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and provides a report for the dossier. This report may adapt or adopt a personnel committee's report, but it must reflect the unit's discussion. Unit guidelines may limit the right to vote on a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's personnel committee vote in the evaluation by the unit's tenured faculty.

**3.5.4.3 Dean**

The approved procedures of the local academic unit must stipulate whether the dean may attend the meeting of the tenured faculty of the college in the two-level process. If the dean attends, he or she may participate but not advocate or vote. The dean writes a separate report for the dossier expressing his or her evaluation.

**3.5.4.4 Candidate Response to College Review**

After the dean provides the candidate with all reports from the college review, the candidate has the option to write a response which will be placed in the dossier for review by the UBPT. The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT. The hearing must be scheduled to provide the candidate with at least five business days to respond to the report. A response may address only the candidate's issues or concerns with the college-level reports.

The next evaluation level is the university level.

16

July 1, 2018

### *3.5.5   Local Academic Unit Is Not College*

If the local academic unit is not the college, it is typically a department, school, or program subordinate to a college.  The three levels of review are: local academic unit, college, and university. Each level of review must follow uniform, written guidelines describing the evaluation process. If there is an insufficient number of tenured faculty available in the local academic unit, the dean may appoint tenured faculty from related academic units to the review process. Participation in the tenure and promotion review process is limited to tenured faculty.

**3.5.5.1  Local Academic Unit Personnel Committee (Optional)**

A local academic unit may choose to convene a personnel committee consisting of a subset of the tenured faculty of the unit. The committee must have at least three members. The local academic unit officer may not be a member but may attend.  The personnel committee, if one exists, evaluates the candidate, votes by secret ballot, and submits a signed report for the dossier. The personnel committee vote cannot be used in lieu of a vote by the unit's entire tenured faculty.

**3.5.5.2  Tenured Faculty of the Local Academic Unit**

The tenured faculty of the local academic unit evaluates the candidate, votes by secret ballot, and provides a report for the dossier. This report may adapt or adopt a personnel committee's report but must reflect the unit's discussion. Units may establish written procedures limiting the vote on a candidate to tenured faculty who hold a higher rank than the candidate. Members of the unit's personnel committee vote as part of the evaluation by the unit's tenured faculty. If the local academic unit has fewer than five eligible tenured faculty members, the dean, after consultation with members of the unit, will appoint tenured faculty of the appropriate rank to the evaluation committee from related academic units.

**3.5.5.3  Local Unit Academic Officer (Unit Chair or Director)**

The local unit academic officer may participate in the discussion by tenured faculty of the unit, but will not vote on or advocate for or against the candidate's promotion or tenure. The unit academic officer will write a separate report for the dossier expressing his or her evaluation.

**3.5.5.4  Candidate Response to Local Academic Unit Review**

After the local academic unit officer provides the candidate with all reports from the review, the candidate has the option to write a response which will be places in the dossier for all subsequent levels of review.  The response, if any, must be submitted to the dean and the local academic unit officer at least two business days prior to the prior to the scheduled date of the candidate's hearing by the college personnel committee. The hearing must be scheduled to provide the candidate with at least five business days to respond to the report.  A response may address only the candidate's issues or concerns with the local academic unit's reports.

17

Calvente-DePaul 000041

July 1, 2018

**3.5.5.5  College-Level Personnel Committee**

In colleges with a college-level personnel committee, this committee conducts a separate evaluation of the candidate, votes by secret ballot, and writes a report for the dossier. The college personnel committee is a subset of the tenured faculty from the college with broad representation from different units within the college. The minimum number of members on any college personnel committee is five. Only tenure-line faculty may vote in membership elections for those committees that are elected. The college-level committee must have representation from tenured faculty at the rank of full professor. Members of the college personnel committee who voted at the local academic unit may not vote at the college level.  If so specified in the college's guidelines, the dean may participate in the meeting of the college personnel committee, but may not vote or advocate for or against a candidate. The report of the college personnel committee is provided to the dean of the college. There is no college-wide tenured faculty vote.

**3.5.5.6  Dean**

The dean provides a separate evaluation of the candidate for the dossier.

**3.5.5.7 Candidate Response to College Review**

After the dean provides the candidate with all reports from the review, the candidate has the option to write a response which will be placed in the dossier for the UBPT.  The response, if any, must be submitted to the Office of Academic Affairs and the dean at least two business days prior to the scheduled date of the candidate's hearing by the UBPT.  The hearing must be scheduled to provide the candidate at least five business days to respond to the report.  A response may address only the candidate's issues or concerns with the college's reports.

The next evaluation level is the university review.

**3.5.6    University Review**

**3.5.6.1 University Board on Promotion and Tenure**

The University Board on Promotion and Tenure (UBPT) evaluates the candidate, votes by secret ballot on tenure, promotion, or both and provides a written report summarizing the basis of its recommendation, including the vote count. In evaluating the candidate, the UBPT takes the following steps:

     a.  Reviews the full dossier.

     b.  Conducts a hearing, with five of the seven appointed faculty members constituting a quorum. The provost is expected to be present when a candidate is being reviewed. In exceptional circumstances, a designee may attend in the provost's absence.  The candidate, the local academic unit officer (when applicable), and the college dean are expected to appear before the UBPT.

     c.  Conducts a substantive review applying current university-wide standards and criteria for tenure and promotion.

18

Calvente-DePaul 000042

1        d.  Examines the application of lower-level guidelines to the candidate.

2

3        e.  Prepares its recommendation, which it shares with the candidate and the provost.

4  **3.5.6.2 Candidate Response to UBPT**

5

6  The candidate has the option to write a response to the UBPT evaluation which will be added to
7  the file and sent to the provost for his or her consideration. A response must focus only on issues
8  or concerns the candidate may have with the UBPT report. The deadline for this response appears
9  in the calendar.

10

11  **3.5.6.3 Provost Decision**

12

13  The provost makes the final decision on tenure or promotion. Only in rare instances and for
14  compelling reasons will the provost overturn a promotion or tenure recommendation made by the
15  UBPT.

16

17  If the provost's decision differs from the UBPT recommendation, the provost must prepare a
18  written explanation of the decision and provide it to the UBPT, the candidate, the dean, and the
19  local unit academic officer (if different from the dean).

20  *3.5.7 Detailed Procedures*

21  **3.5.7.1 Committees**

22

23  The following rules apply to the various committees conducting reviews for tenure and
24  promotion.

25

26  Only tenured faculty may sit on any committee evaluating a faculty member for tenure or
27  promotion at any level of evaluation; only tenure-line faculty may vote in membership elections
28  for those committees that are elected.

29

30  Except where otherwise provided in this chapter, a local academic unit or college may adopt
31  written standards for its evaluative committees that address tenure and promotion.  The standards
32  may address, among other topics:

33      • Committee membership
34      • Criteria for chairing the committee
35      • Rank and status of faculty who may elect members of the committee
36      • Rank of members who may vote on promotion to full professor
37      • Term length for committee membership
38      • Process for election of the committee chair

39

40  **3.5.7.2 Local Academic Unit (Not College) Personnel Committees**

41

42  Members must be tenured and at least associate rank.  The committee must have at least three
43  members. The tenure-line faculty of the local academic unit elect the personnel committee, and
44  the personnel committee elects its chairperson.  The local academic unit academic officer may not

Calvente-DePaul 000043

July 1, 2018

1  be a member of this committee. The officer may participate in committee meetings but shall not
2  advocate for or against the candidate or vote.
3

### 3.5.7.3  Tenured Faculty of the Local Academic Unit

6  All and only tenured faculty of at least associate rank are expected to participate in votes for
7  tenure and promotion at the local academic unit level.  For promotion to full professor, the local
8  academic unit may limit votes to full professors. If the local academic unit has fewer than five
9  eligible tenured faculty members, the dean, after consultation with members of the unit, will
10  appoint tenured faculty of the appropriate rank to the evaluation committee from related academic
11  units.
12
13  The tenured faculty of the local academic unit elect a chair to conduct these promotion and tenure
14  meetings and to organize the reports.  The chairperson may not be the local academic unit
15  academic officer.  If the local academic unit is not the college, the local academic unit officer
16  may participate at promotion and tenure meetings but shall not vote or advocate for or against the
17  candidate.  If the local academic unit is the college, college procedures should stipulate whether
18  the dean may attend the meeting of the tenured faculty.  If the dean attends, he or she may
19  participate but not advocate or vote for or against the candidate.
20

### 3.5.7.4  College Personnel Committees

23  Only tenured faculty may serve on a college personnel committee. College guidelines may limit
24  the membership to full professors.  College guidelines should also address how to convene an
25  adequate number of full professors for deciding promotion to full professor.  The minimum
26  number of members on any college personnel committee is five.  Terms are three years and are
27  staggered.  The committee members elect a chairperson for a one-year term.  The chairperson
28  conducts meetings of the committee and organizes the committee's reports.  The dean shall not be
29  the chairperson of the committee.  The dean may participate in college personnel committee
30  meetings but shall not vote or advocate for or against a candidate.
31

### 3.5.7.5  University Board on Promotion and Tenure

34  The UBPT members must be tenured full professors.  Associate deans, deans, and local academic
35  unit officers (e.g., department chairs) are ineligible to serve.  The seven members of the UBPT
36  serve as representatives of disciplines across the university, not as representatives of their
37  colleges.  Members are selected by open nominations and self-nominations across colleges,
38  reviewed by Faculty Council Committee on Committees, and interviewed and elected by Faculty
39  Council.  Terms are for three years and are staggered.  The UBPT members elect a chairperson
40  annually. The provost or his or her designee is expected to be present at all UBPT meetings where
41  candidates are reviewed; he or she shall not vote or advocate for or against any candidate.
42
43  The UBPT has two additional responsibilities. First, it reviews changes to evaluation guidelines,
44  criteria and procedures developed by local academic units, departments, schools, and colleges for
45  clarity and consonance with university-wide criteria. Second, at the conclusion of each year's
46  proceedings, the UBPT shares any recommendations it may have with the provost regarding the
47  board's future functioning.
48

Calvente-DePaul 000044

July 1, 2018

The provost and the chair of the UBPT refer any policy matter raised by UBPT members to the Faculty Council; the provost also makes available to the full faculty an annual statistical summary of the university's final tenure and promotion decisions.

## 3.6     Materials

### *3.6.1 Dossier*

#### 3.6.1.1 Items Supplied By Candidate

A candidate for promotion and/or tenure supplies the following materials:

- Complete professional curriculum vitae, paginated with the candidate's name on each page
- A statement of up to 3,000 words in which the candidate emphasizes those achievements or qualifications to which evaluators should particularly attend
- Evidence of collaborative work, if applicable
- Evidence of teaching effectiveness beyond course evaluations and peer reviews, including, at a minimum, selected syllabi, course assignments, and exams
- Evidence of service, including, at a minimum, description of individual contributions and supporting documentation such as letters from committee chairs
- Other evidence he or she may wish to submit, e.g., awards and special recognitions
- A single copy of articles, papers, published manuscripts, video and audio recordings, and other examples of scholarship and creative activities

#### 3.6.1.2 Items Supplied By Academic Unit and College

The local academic unit and college committee add the following materials to the dossier:

- Local academic unit and college guidelines
- The written recommendation(s) from the reviews conducted at each level, including signature forms
- Signing statements and minority reports, if any
- Candidate responses, if any
- Data obtained by the college through the student input instrument
- Documentation that substantiates according to the local academic unit guidelines, and with sufficient detail, the faculty member's contributions to any collaborative work submitted in the Dossier.
- For tenure, an evaluation of the candidate's scholarship, research, and/or other creative activities by at least two external experts
- For promotion to full professor, an evaluation of the candidate's scholarship, research, and/or other creative activities by a minimum of three external experts
- For tenure decisions, all teaching evaluations for all courses. For promotion, all teaching evaluations while in current rank
- Internal peer reviews of teaching, if any

21

Calvente-DePaul 000045

July 1, 2018

Review is limited to these items, unless the local academic unit approves any additions to the dossier. Unsolicited material will not be added to the dossier.

### 3.6.1.3 Additions to the Dossier

Because of the length of the review process, it is possible that a candidate's record may change significantly or that other information pertinent to a case may come to light during the course of the review.

After the initial submission of the dossier to the local academic unit, the candidate may request the addition of new information to the dossier at any level of the review process prior to the final vote by the UBPT. The request for additions to the dossier must be made to the local unit academic officer and must include supporting documentation to verify the accuracy of the new information. The local academic unit officer must rule on the request within five business days of receiving it.

The local unit academic officer will determine whether the new information should be added to the dossier based on one or more of the following criteria:

- The new information constitutes an update to the status of scholarly or creative work already mentioned in the dossier.
- The new information constitutes a significant development, such as the announcement of a major award or recognition, related to the candidate's work already reported in the dossier.
- The new information is not related to work previously reported in the dossier but, in the judgment of the local unit academic officer, may have significant impact on the outcome of the case.

The local academic unit officer of the originating unit must formally transmit all new material approved for addition to the dossier directly to the level at which the case is currently under review and include with the new material an explanation of the reasons for the addition and at what level of review the new information became available. The entity currently reviewing the case should add these new items to the candidate's dossier, evaluate them along with the rest of the dossier, and provide them to subsequent levels of review.

The local academic unit officer shall also supply copies of the explanatory memorandum to the candidate and to the individual in charge of each level already completed at the time the material is added.

### *3.6.2 External Letters*

By June 1, candidates must submit to the local academic unit officers their CV and selected publications/documentation of creative activities for transmittal to external reviewers. Local academic units should identify an initial list of potential external reviewers by June 15. Local academic units will ask external reviewers to prepare letters over the summer for receipt prior to candidate review in the fall.

22

July 1, 2018

### 3.6.2.1 Authors of External Letters

Local academic units should obtain letters from persons whose judgment is respected in the candidate's field of expertise and who can provide an impartial assessment of the candidate's scholarship or creative activities. The candidate may nominate external reviewers. The local academic unit may select from the candidate's nominations or from other sources. When identifying external reviewers, candidates and committees should take into account both the objectivity of the reviewer and the reviewer's rank, reputation, and stature. The local academic unit has full discretion in selecting external reviewers.

If a candidate has done collaborative work, a separate set of letters can be solicited and submitted from collaborators in addition to, but not as a substitute for, the external review letters. The university's letters to collaborators should request that they describe the division of labor and nature of the collaborative effort.

### 3.6.2.2 External Letter Contents

The solicitation letter to a potential reviewer should be neutral, asking only for an objective assessment of the candidate's research or creative activities and requesting that the reviewer eschew advocacy for or against tenure and promotion. The solicitation letter should also ask the reviewer to explain the nature of the reviewer's relationship to the candidate. The letter should ask the evaluator to cover the following general ground:

- the nature of the evaluator's professional interactions with the candidate
- the quality of the candidate's work
- the impact of the candidate's work

Readers will disregard any portions of an external letter advocating for or against tenure and promotion.

### 3.6.2.3 Confidentiality of External Letters

Under Illinois state law, a candidate may see the contents of his or her personnel file, with an exception applicable to external review letters. To ensure that reviewers provide fully candid assessments, the university protects the identity of the external reviewers. Therefore, any citations of the external review letters in department or chair reports and the reports of subsequent reviewing levels must be redacted, eliminating any and all information that would identify the reviewer to the candidate. Local academic units must also ensure that external review letters given to the candidates are redacted to protect the authors' identities.

### 3.6.2.4 Suggested Sample Letter

Dear Dr. AA:

As you are a recognized authority in your field, I am writing to request your assistance. Dr. BB is due to be reviewed for promotion to Associate Professor in academic year YYYY-YYYY. I solicit your evaluation of the research [creative activities] of Dr. BB. Please only evaluate the candidate's research or creative activities and refrain from rendering a judgment on whether the

Calvente-DePaul 000047

July 1, 2018

1  candidate should be promoted or tenured.  Your identity will be kept confidential to the extent
2  legally practicable.
3
4  In particular, please address the following:
5
6  •  the quality of the publications or creative activities of the candidate
7  •  the impact of the candidate's work
8  •  the quality of the journals in which the candidate has published
9  •  the nature of your professional interaction with the candidate, if applicable, and
10  •  comments, should you have any, of the candidate's collaboration with other scholars in
11      the field.
12
13  To assist in your evaluation, I am enclosing the following information: Dr. BB's latest curriculum
14  vitae; the three papers or book manuscript listed below, selected by Dr. BB; and a brief summary
15  of the department's [local academic unit's] promotion criteria.
16
17  Although Illinois state law allows employees to view their personnel files, there is an exception
18  for external review letters.  Any information that would identify you will be redacted from all
19  documents seen by the candidate.
20
21  I realize that this information is rather extensive and will require considerable effort on your part
22  to review.  Your assistance in helping us evaluate Dr. BB's credentials will be greatly appreciated
23  and will constitute an important element in the overall evaluation.  I would be very grateful if you
24  could respond to us in writing no later than [DATE].  If possible, kindly send your reply, along
25  with a copy of your most recent CV, electronically to ........@depaul.edu as an attachment.
26
27
28  Sincerely,
29  DD
30  Chair
31  Personnel Committee
32  [Name of Dept. and Unit]
33  Enclosures: [List the selected works]
34

35  *3.6.3 Student Input*

36
37  Student input must be part of a candidate's dossier. Committees will acquire student input from
38  course evaluations and information collected through an instrument such as a survey. The college
39  will design the instrument with student input. The instrument will generally solicit opinions from
40  one or more of the following groups: alumni, past students who have taken a class from the
41  candidate, student advisees, or students who have been supervised by the candidate in research
42  projects or independent study.
43

44  **3.6.3.1 Student Input Instrument**

45
46  Each college personnel committee, or in the absence of a college-level committee, the local unit
47  personnel committee, shall have an instrument for collecting data from students, a process of
48  gathering data, and a template for reporting the results.  These elements must be created by a

24

Calvente-DePaul 000048

July 1, 2018

committee of at least two students (preferably including both graduate and undergraduate) and at least two tenured faculty members.

The instrument will be used to gather additional data from students beyond the standard course evaluations. The report should clearly specify:

- the type of methodology used for data collection and analysis
- the targeted groups  surveyed, and
- the questions asked of survey participants.

The college personnel committee must approve the instrument, process, report template and any subsequent modifications. Before approval, the college personnel committee should solicit and consider input from the college's local academic units.

### 3.6.3.2 Evaluation and Submission of Student Input Data

The college bears responsibility for data collection. A student review committee then analyzes data collected via this process for each promotion and tenure candidate, as well as aggregate information on course evaluations provided by the unit. The student review committee consists of up to three students, none of whom is currently enrolled in a class with the candidate under review. After analyzing the collected data, the review committee provides a written report, along with all the raw data, to the personnel committee of the local academic unit and to the candidate. The student input data becomes part of the candidate's dossier. The personnel committee may request a meeting with a representative from the student review committee, if the committee deems it necessary.

Once student representatives furnish their report to the local academic unit, they do not appear before subsequent evaluative bodies. The student report will be forwarded with other promotion and tenure materials to each review level.

### 3.7     Appeal

*Appeal procedures for a tenure-line faculty member who has been reviewed for tenure, promotion, or promotion and tenure by the University Board on Promotion and Tenure are found in Chapter 5 Section 5.1.2.3.*

25

Calvente-DePaul 000049

July 1, 2018

1    **3.8 Schedule for Informal and Formal Reviews**
2
3

| PROBATIONARY REVIEWS FOR TENURE-LINE FACULTY WITH SIX-YEAR PROBATIONARY PERIOD* | | | |
|---|---|---|---|
| **Year at DePaul** | **Timing and Contract Year** | **Type of Review** | **Notice to Faculty Member of Renewal or Nonrenewal** |
| 1st | Winter quarter of first year at DePaul, for Year 2 contract renewal | May be informal or formal | March 1 |
| 2nd | Fall quarter of second year at DePaul, for Year 3 contract renewal | One of these 2 reviews must be formal; the other may be informal or formal. | December 15 |
| | Spring quarter of second year at DePaul, for Year 4 contract renewal | | June 30 |
| 3rd | During third year at DePaul, with timing per college's schedule, for Year 5 contract renewal | May be informal or formal | June 30 |
| 4th | During fourth year at DePaul, with timing per college's schedule, for Year 6 contract renewal | Formal | June 30 |
| 5th | During fifth year at DePaul, with timing per college's schedule, for year 7 contract renewal | May be informal or formal. Must be formal if non-reappointment is realistic possibility. | June 30 |
| 6th | Sixth Year at DePaul, with timing per Faculty Handbook calendar | Promotion and Tenure Review | June 30 |

4    *The contract renewal schedule for tenure-line faculty who come in with years of credit
5    towards tenure is the same as for other tenure-line faculty, but the year of the promotion
6    and tenure review varies. The initial faculty contract stipulates the year of the promotion
7    and tenure review.

26

Calvente-DePaul 000050

July 1, 2018

**3.9    Schedule for Promotion and Tenure**

*3.9.1 University Promotion and Tenure Schedule*

The following is the suggested schedule for the university promotion and tenure process. Whenever possible, the university will abide by the proposed timetable.  Any changes to this calendar must provide at least the allotted time period for candidate responses, minority reports, and signing statements.

**April 1**
Letter of notification as to the eligibility to apply for promotion and tenure sent to the faculty member from the provost

**May 1**
Letter requesting consideration for promotion and/or tenure submitted by the faculty member to the provost, the academic dean, and the head of the academic unit

**May 15**
Provost acknowledges receipt of applications for promotion, for tenure, or for promotion and tenure.

**June 1**
Candidate provides CV and selected publications/documentation of creative activities to local academic unit officers for submission to external reviewers

**June 15**
Local academic unit identifies an initial list of potential external reviewers

**First day of fall quarter**
Candidate's complete materials due to the local academic unit

**January 15**
Report from the academic unit submitted to the academic dean and to the candidate.

**January 31**
Report from the academic dean and the academic unit of the following colleges and schools submitted to the Office of Academic Affairs and to the candidate

• College of Communication
• College of Computing and Digital Media
• College of Law
• School of Music
• School for New Learning
• The Theatre School

**March 1**
Reports from the academic deans of the College of Commerce and the College of Education and all relevant materials submitted to the Office of Academic Affairs and to the candidate

**March 15**

Calvente-DePaul 000051

July 1, 2018

1  Reports from the academic deans of the College of Liberal Arts & Social Sciences and the
2  College of Science and Health and all relevant materials submitted to the Office of Academic
3  Affairs and to the candidate.
4
5  **Winter/Spring Quarter**
6  University Board on Faculty Promotion and Tenure meets with faculty candidates
7
8  **Five business days from the last UBPT meeting but no later than May 15**
9  UBPT reports due to candidates
10
11 **Two weeks from the date UBPT reports are sent to candidates**
12 Optional candidate response due to UBPT
13 UBPT report and all relevant materials for all candidates submitted to provost
14
15 **June 15**
16 Decision of the university provost
17 Notification to candidate of the provost's decision follows in a timely fashion
18
19

Calvente-DePaul 000052

July 1, 2018

# CHAPTER 4. DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

4.1 Overview ................................................................................................... 3

4.2 Nonrenewal of Non-Tenured Tenure Line Faculty ................................... 3

4.3 Tenured Faculty ......................................................................................... 5

4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct ................. 5

    4.4.1 Misconduct ......................................................................................... 5

    4.4.2 Categories of Disciplinary Sanctions: ............................................... 6

    4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty: .. 6

    4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty ................ 7

        4.4.4.1 Initiation of a formal hearing ..................................................... 7

        4.4.4.2 Rules and procedures for the Hearing Committee ...................... 7

    4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major Sanctions Against a Tenure-Line Faculty Member ................... 9

4.5 Emergency Suspension ............................................................................. 9

4.6 Termination Due to Financial Exigency ................................................. 10

    4.6.1 Financial Exigency ........................................................................... 10

    4.6.2 Provost Statement ............................................................................ 10

    4.6.3 Financial Exigency Committee ........................................................ 11

    4.6.4 Retrenchment Committee ................................................................ 12

    4.6.5 Termination Committee(s) ............................................................... 13

    4.6.6 University Obligations upon Termination of Tenured Faculty ......... 14

    4.6.7 Appeal of Termination .................................................................... 15

4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit or Program ................... 15

    4.7.1 Step 1 ............................................................................................... 16

    4.7.2 Step 2 ............................................................................................... 16

    4.7.3 Step 3 ............................................................................................... 16

    4.7.4 Step 4 ............................................................................................... 17

    4.7.5 Step 5 ............................................................................................... 17

    4.7.6 University Obligations upon Termination of Tenured Faculty ......... 18

    4.7.7 Appeal of Termination .................................................................... 19

4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months ................... 19

1

Calvente-DePaul 000053

July 1, 2018

1    4.9 Resignation ........................................................................................... 20

2    4.10 Retirement .......................................................................................... 20

3

2

Calvente-DePaul 000054

July 1, 2018

# CHAPTER 4.  DISCIPLINARY ACTION, SUSPENSION, TERMINATION, RESIGNATION, AND RETIREMENT

## 4.1 Overview

This chapter summarizes the policies and processes to be followed in disciplinary cases involving faculty as well as those governing the termination of faculty members. Every faculty member is entitled to fair and consistent decision-making procedures as a protection against violations of academic freedom or arbitrary adverse decisions. Tenured faculty may be dismissed only under provisions set out in this Handbook.

The term "appointment" refers to the initial contract issued to all faculty. The terms "reappointment" and "non-reappointment" apply to full-time non-tenure line faculty (see Chapter 2). The terms "renewal" and "nonrenewal" apply to non-tenured tenure-line faculty.

Reviews and decisions for appointment, reappointment, renewal, promotion, and tenure are separate actions. Appointment does not guarantee reappointment or renewal, nor does appointment at any rank confer tenure, except where specifically provided in the contract. Promotion at any time from any rank to any other rank does not confer tenure.

## 4.2 Nonrenewal of Non-Tenured Tenure Line Faculty

When deciding whether to renew the contract of a non-tenured tenure-line faculty member the university follows two general principles:

1.  To select, given available resources, faculty members who will best contribute to its distinctive goals and academic mission. Consequently, the university has the authority and discretion, within the limits of academic freedom, to determine which non-tenured tenure-line faculty members will be retained.

2.  To have no reasonable doubt as to the faculty member's qualifications for tenure before it reaches a favorable decision on the renewal that results in tenure. The quality of academic programs and therefore the good of the university require careful selectivity in renewal based on the individual faculty member's qualifications and the needs of the university. Anything that undermines the selective process erodes tenure and quality.

Non-tenured tenure-line faculty members are subject to an annual probationary review (see Chapter 3). Renewal decisions are made in conjunction with the annual probationary review. Although there is no guarantee of renewal, non-tenured tenure line faculty are entitled to consideration for renewal. Nonrenewal decisions must be based on criteria as described in this Faculty Handbook, and selected from those listed below:

1.  Teaching and learning;

2.  Scholarship, research, or other creative activities;

3.  Service;

4.  Professional advancement, such as the completion of a terminal degree or certificate. This criterion is especially applicable when there is a particular interest or a previous understanding with the faculty member regarding this advancement;

3

Calvente-DePaul 000055

July 1, 2018

5. Responsible participation in university processes and activities that are generally considered faculty responsibilities;

6. Change in academic program, such as:

   o termination or reduction in size of the academic program to which a faculty member is assigned;

   o change in an area of specialization or in emphasis in a program;

7. Financial conditions of the university as a whole or in any particular part, requiring reduction in the size of the faculty;

8. Professional and ethical conduct.

Nonrenewal may rest on a single criterion or a combination of several criteria, reflecting the faculty member's role in the academic unit and the needs of the university. The rationale for the renewal decision must be explained and supported with evidence and with reference to the appropriate criteria.

The dean and the faculty of the local academic unit must follow the procedures specified in Chapter 3 in making renewal recommendations. Every faculty member in an academic unit is entitled to be judged according to consistent criteria and documentation. Conflicts of interest must be avoided in all faculty evaluations. Any judgment based on a faculty member's ideological and political positions is a violation of academic freedom.

As detailed in Chapter 3, the local academic unit normally makes a recommendation on annual renewal and nonrenewal. If the dean does not concur in the recommendation of a local academic unit, the dean shares his or her recommendation with the local academic unit. The local academic unit may appeal the dean's recommendation to the provost. In such cases, the dean and the local academic unit must provide the provost with written reasons for their respective positions. The provost makes the final decision and reports it to the candidate. A faculty member who is not renewed may file an appeal. (See Chapter 5.)

The non-tenured tenure-line faculty member is entitled to:

(a) an opportunity to submit materials supporting renewal. The non-tenured tenure-line faculty member will be notified at least 28 calendar days before the local academic unit's review. The candidate must submit supporting materials to the local academic unit officer at least 14 calendar days prior to the local academic unit review;

(b) written notification of the decision on renewal. The notification must include the reasons for the decision. A notification to renew should include an assessment of the faculty member's qualifications, noting those conditions which should be fulfilled for future renewal or tenure. A notification of nonrenewal must include the reasons for the decision, the faculty member's appeal rights, and the procedures for such appeals as described in Chapter 5.

The university follows the AAUP guidelines for notice of renewal. Notice of nonrenewal, or of intention not to recommend renewal, should be given in writing in accordance with the following standards and the calendar specified in Chapter 3.

4

Calvente-DePaul 000056

July 1, 2018

1.  On or before March 1 of the first academic year of service, if the appointment expires at the end of that year; or, if a one year appointment terminates during an academic year, at least three (3) months in advance of its termination.
2.  On or before December 15 of the second academic year of service, if the appointment expires at the end of that year; or, if an initial two year appointment terminates during an academic year, at least six (6) months in advance of its termination.
3.  At least twelve (12) months before the expiration of an appointment after two (2) or more years in the institution. Notices of reappointments and contract renewal are based on the university's annual budget cycle.

Notification by these dates shall constitute sufficient notification for not offering another contract even though appeal and subsequent review might mean that the final decision is rendered less than a year before the end of the final contract.

A non-tenured tenure-line faculty member informed that his or her contract is not to be renewed may appeal the decision not to renew.  See Chapter 5, Appeals and Grievances.

## 4.3 Tenured Faculty

Tenure creates the presumption of continuing employment. Tenured faculty may be dismissed only under provisions set out in this handbook. Tenured faculty are not renewed annually.

## 4.4 Disciplinary Actions Including Dismissal or Suspension for Misconduct

### 4.4.1 Misconduct

The university's response to allegations of faculty misconduct may vary according to the nature of the misconduct, its seriousness, its impact on the university's reputation or the well-being of other members of the university community, and any prior record of misconduct by the faculty member. Disciplinary sanctions may apply to any full-time faculty member, including, but not limited to, all tenure-line faculty.  Faculty members who hold administrative appointments are subject to these provisions with respect to their role as faculty members.

Misconduct includes, but is not limited to, violations of university policies, including the Faculty Handbook and anti-discrimination and anti-harassment policies; violations of academic or scholarly integrity; a pattern or practice of failing to meet university contractual obligations; or a pattern of extreme intimidation and aggression towards other members of the university community.

Disciplinary proceedings are reserved for situations that warrant the imposition of a major or a minor sanction. Inadequate performance in teaching, scholarship/research/creative activities, or service that does not rise to the level of misconduct must be dealt with during the standard processes for faculty review and/or reappointment/renewal.

All procedures are to be carried out as expeditiously as is reasonably possible. All time guidelines in this section refer only to calendar or business days within regular academic terms — Fall, Winter, and Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums.

5

Calvente-DePaul 000057

July 1, 2018

*4.4.2 Categories of Disciplinary Sanctions:*

- **Minor sanctions**: sanctions short of suspension or dismissal
- **Major sanctions**: suspension or dismissal

*4.4.3 Initiation of Disciplinary Actions in All Disciplinary Cases Involving Faculty:*

1. The dean initiates an investigation of alleged faculty misconduct, except in situations where initiation of disciplinary action is based on OIDE findings, in which case the dean will work in consultation with OIDE.
2. The dean should attempt to resolve the issue through an informal process resulting in both parties agreeing with the outcome.
3. If informal resolution fails, the dean will present the faculty member with a statement of charges. The faculty member will be provided an opportunity to submit a rebuttal within two weeks of the presentation of the statement of charges. If the faculty member perceives that the dean has a conflict of interest, he or she may simultaneously request in writing that the dean appoint a designee. The dean may deny the request with written reasons.
4. After the statement of charges is presented, either party may invite a DePaul colleague to act as an advisor. The advisor may attend but not participate in any meeting related to the case. Within four weeks of the presentation of the charges, the dean or the designee will conduct a detailed review of the charges and the rebuttal, if any, and prepare a report.
5. The faculty member may examine the report and any evidence referenced in the report and will be given two weeks to provide a final statement before a decision is reached.
6. In all cases, the burden of proof is with the dean and a recommendation for sanctions must be supported by a preponderance of evidence.
7. The dean shall make a decision within eight weeks of the presentation of the charges. This decision may be one of the following: (1) to dismiss the case; (2) to impose a minor sanction; or (3) to refer the case to the provost for major sanctions.

The dean shall file with the office of the provost the statement of charges, the faculty member's rebuttal, the report, the final statement by the faculty member and the dean's own written decision. The office of the provost shall maintain this information

**In cases involving minor sanctions:**
The dean makes the decision on the sanctions to be imposed. The faculty member may grieve the decision according to the grievance procedures of Chapter 5. To the extent possible, the dean and the provost will not release any information about the sanctions.

**In cases involving major sanctions:**
If the dean's written decision includes a recommendation for major sanctions, the provost (or designee) will conduct a detailed review of the charges and any evidence provided by the parties at the college level. The provost (or designee) may interview the parties or consult additional experts and request additional evidence from the parties.

The provost will make a decision within ten weeks of the presentation of the statement of the charges.

The provost's decision will be one of the following:

Calvente-DePaul 000058

July 1, 2018

1. dismiss the case; or
2. issue a minor sanction; or
3. (**in the case of term faculty only**) impose a major sanction without a formal hearing (in this case, the term faculty member has the right to appeal to the Faculty Committee on Appeals according to procedures in Chapter 5); or
4. (**in the case of tenure-line of faculty**) refer the case for a formal faculty hearing with a recommendation for a major sanction (see below for detailed procedure).

### 4.4.4 Formal Hearing in Cases Involving Major Sanctions Against Tenure-Line Faculty

**4.4.4.1 Initiation of a formal hearing**
1. The provost will notify the faculty member of the intent to refer the case for a formal faculty hearing with a recommendation for a major sanction. The faculty member may waive the right to the hearing and choose to have the case decided by the provost. In that case, the provost's decision will be final and may not be appealed or grieved further. Otherwise, the provost will initiate a request for a formal Hearing Committee and appoint a designee to serve as complainant ("university representative") in the disciplinary proceeding. If a conflict of interest is perceived, the faculty member may request, with justification, a different university representative which can be denied by the provost with written reasons.
2. The university representative must file a detailed statement of charges with the Faculty Council President, a copy of which will simultaneously be provided to the faculty member.
3. The faculty member will have four weeks to submit a written response to the charges once they have been filed with Faculty Council.
4. The university representative will forward the following information to the Hearing Committee: (a) the statement of charges; (b) the response; (c) a list of individuals who may have pertinent information about the case; (d) and the records of any earlier investigations or decisions.
5. The burden of proof rests with the university. The charges against the faculty member must be established by a preponderance of evidence.

**4.4.4.2 Rules and procedures for the Hearing Committee**
1. The Hearing Committee will be comprised of three tenured faculty members selected in the following manner: Faculty Council shall identify a panel of nine tenured faculty members not affiliated with the college or school of the faculty member. Faculty Council, in conjunction with both parties will develop a process for interviewing the nine selected faculty members. In alternating fashion, with the university going first, each party excludes three members from the panel. The remaining members of the panel constitute the Hearing Committee. The committee shall select its own chair.
2. The Hearing Committee shall not disclose the evidentiary record, including deliberations and findings, except to those with a legitimate need to know.
3. The Hearing Committee may attempt an informal resolution of the case before proceeding to a formal hearing. If it cannot resolve the matter informally, then it will schedule a formal hearing.
4. The university will assume all costs directly incurred by the Hearing Committee.
5. The Hearing Committee will conduct a prehearing meeting with the faculty member and the university representative to clarify the issues, stipulate facts, finalize the list of

7

July 1, 2018

1     individuals who may have information relevant to the hearing, provide for the exchange
2     of documentary or other information, and identify other appropriate objectives to make
3     the hearing fair, effective, and expeditious. The committee will provide both parties with
4     a written record of its decisions.

5    6.  The chair of the Hearing Committee will notify all concerned parties of the time and
6       location of the hearing. Notice of the hearing must be in writing and made at least two
7       weeks prior to the hearing. Time extension or rescheduling requests by the faculty
8       member or the university representative may be granted by the chair for good reason.

9    7.  At any time before the start of the hearing, the faculty member may choose not to
10      participate in person but may choose to submit a written response to the specific charges.
11      In the event the faculty member does not participate in person he or she may still deny
12      the charges or assert that the charges do not support a finding for a major sanction.

13   8.  The hearing will proceed in the absence of either the faculty member or the university
14      representative who fails to appear at the hearing after receiving notification. Only
15      circumstances that are beyond a party's control and that prevent a party's attendance at
16      the hearing will constitute good reason to reschedule the hearing. The Hearing
17      Committee will make the determination as to whether there is good reason for the
18      absence.

19   9.  The Hearing Committee (on its own or at the request of either party) may invite persons
20      from inside or outside the university to give testimony relevant to the matter. University
21      personnel will make every effort to cooperate with the committee in securing witnesses
22      and making evidence available. The parties shall have the right to cross-examine all
23      witnesses.

24  10.  The faculty member may receive the assistance of counsel of her or his choosing and at
25       her or his cost. If the faculty member employs an attorney for the hearing, and the
26       decision is not for a major sanction, the University will reimburse the faculty member for
27       at least one-half of the reasonable legal expenses, the precise proportion to be decided by
28       the Hearing Committee, depending on the degree to which the University case has merit.

29  11.  All hearings are closed to the public. The Hearing Committee, at its sole discretion, may
30       remove participants in the hearing who disrupt the process.

31  12.  The hearing will be transcribed. At the conclusion of the hearing, the parties shall have
32       unrestricted access to the full evidentiary record and a copy of the complete transcript.
33       The parties will be given a reasonable period of time, specified by the committee, to
34       examine this record. After examining the record, the faculty member and the university
35       may file closing statements, copies of which will be provided by the chair to the other
36       parties.

37  13.  Subsequent to filing the closing statements, the Hearing Committee will deliberate in a
38       closed session.

39  14.  The findings of the Hearing Committee may be only one of the following: (1) adequate
40       cause for dismissal, (2) adequate cause for suspension, (3) adequate cause for a minor
41       sanction, or (4) adequate cause has not been established for major or minor sanctions. If
42       the finding is for a sanction other than dismissal, the Hearing Committee shall include in
43       its report recommendations for appropriate sanctions.

44  15.  The findings and the decision of the Hearing Committee on appropriate sanctions must be
45       supported by a majority vote and be specified in a written report. The chair of the
46       Hearing Committee will submit the report to the provost and the faculty member.

47  16.  The provost (or president if the provost has a conflict of interest) may either accept the
48       decision of the Hearing Committee or resubmit this decision to the committee with
49       specific objections. In the latter case, the committee will then reconsider only points to
50       which the provost has objections, receiving new evidence if necessary. After its

8

Calvente-DePaul 000060

July 1, 2018

1      reconsideration, the Hearing Committee will deliver its final decision to the provost (or
2      president if the provost has a conflict).
3

### 4 *4.4.5 Appealing the Decision of the Hearing Committee in Cases Involving Major*
### 5 *Sanctions Against a Tenure-Line Faculty Member*

6
7 In cases involving major sanctions against tenure-line faculty either party (the provost/president
8 on behalf of the university or the faculty member) has the right to appeal a decision by the
9 Hearing Committee to an Appeals Board.
10
11 Grounds for appeal could be one or more of the following:
12      1. Procedural violations that compromised the ability of a party to present arguments or
13         evidence or to do so in a timely manner; procedural violations that compromised the
14         committee's consideration of the evidence and arguments presented;
15      2. Failure of the committee to apply appropriate standards under which the charges were
16         brought and under which the charges should have been considered; failure of the
17         committee to consider relevant evidence actually presented;
18      3. Arbitrary decisions of the committee that could not reasonably follow under the standards
19         applied and given the evidence presented.
20
21 Makeup of the Appeals Board:
22      1. Two deans (excluding the dean involved in the case) selected by the Council of Deans.
23      2. Two faculty members (without a conflict of interest in the case) selected by the Faculty
24         Council from among the twelve members of the Faculty Committee on Appeals.
25      3. One additional member selected jointly by the president of the university and the
26         president of Faculty Council.
27
28 The Appeals Board may take one of the following actions:
29      1. Accept the decision of the Hearing Committee; or
30      2. Send back the matter to the Hearing Committee with specific recommendations for
31         additional actions or changes. This action should be taken if the Appeals Board believes
32         that the decision was influenced by the procedural or standards violations, but those
33         violations can be remedied by the Hearing Committee. In this case the Hearing
34         Committee shall take appropriate action taking into account the Appeals Board's
35         recommendations and issue a revised report with a final decision; or
36      3. Reject the Hearing Committee's decision and conduct a new hearing. This action may
37         only be taken if the Appeals Board can demonstrate that no reasonable decision-maker
38         could have arrived at the conclusion of the Hearing Committee based on the facts
39         presented, or the procedural violations were so egregious that they compromised the
40         integrity of the process. Should the Appeals Board initiate such a rehearing, it must issue
41         a written opinion with its findings regarding the deficiencies in the Hearing Committee
42         decision before commencing its rehearing. In conducting a rehearing the Appeals Board
43         will follow the same operating procedures required of the Hearing Committee.
44
45 In all three cases, there is no further appeal from this decision within the university.
46

### 47 **4.5 Emergency Suspension**

48

9

Calvente-DePaul 000061

July 1, 2018

1 In an emergency where potentially serious harm must be prevented and immediate action must be
2 taken before initiating the disciplinary procedures set out in this chapter, the provost may suspend
3 a faculty member. The provost shall inform the faculty member in writing of the terms of the
4 suspension. Within a reasonable timeframe of issuing the written notice, the provost shall either
5 lift the suspension or initiate the formal disciplinary procedures. The suspension will not continue
6 beyond the time required to remove the actual or potential harm, ordinarily not beyond the
7 academic year.
8
9 A faculty member may grieve a suspension under this section only if the dean declines to initiate
10 formal disciplinary procedures. SEE CHAPTER 5 APPEALS AND GRIEVANCES.
11
12 The faculty member suspended from active service to the university will receive full
13 compensation during the suspension until the time of justifiable dismissal for misconduct.

14 **4.6 Termination Due to Financial Exigency**

15 *4.6.1 Financial Exigency*
16
17 Termination of an appointment with tenure may occur due to financial exigency of the
18 university.  Financial exigency is a financial crisis that fundamentally compromises the
19 academic integrity of the institution as a whole. The crisis usually results from substantial
20 and recurring financial deficits that cannot be offset by prudent use of the university's
21 reserves.
22
23 Prior to declaring exigency, the university president, provost, and executive vice
24 president will retrench operations in all areas before taking steps that could lead to the
25 termination of tenured faculty. These retrenchments will be made up to the point where
26 there would be a danger of seriously jeopardizing the academic quality or the essential
27 operations of the university.
28
29 With the exception of the work of the identified committees, all of the steps specified
30 below in Subsections 4.6.2 thru 4.6.7 (inclusive) must be initiated, conducted, and
31 completed within the regular academic year calendar – from the opening date of regular
32 day and evening Autumn quarter classes to the date of the last final exam in Spring
33 quarter. Any steps that remain uncompleted at the close of business on the date of the last
34 final exam in Spring quarter shall be suspended until the following autumn quarter
35 commences.
36

37 *4.6.2 Provost Statement*
38
39 The provost shall issue a formal statement to the president of the Faculty Council and the
40 president of the Staff Council, indicating and providing documentary support of the
41 existence of financial exigency.  The statement will address the following points:
42
43 1. Evidence of financial exigency and the need for serious retrenchments involving the
44 termination of tenured faculty;

10

Calvente-DePaul 000062

July 1, 2018

1   2. Evidence in support of assumptions underlying projections of future revenues and
2       costs;
3   3. Dollar amount and distribution of the retrenchments that have been made or can be
4       made in all parts of the university without terminating tenured faculty appointments,
5       including possible administrative salary reductions; and
6   4. Dollar amount of decrease in expenditures to be realized in colleges that will result in
7       the termination of tenured faculty appointment(s).
8

9   *4.6.3 Financial Exigency Committee*
10

11  The statement by the provost shall be reviewed by a Financial Exigency Committee to
12  determine whether there is sufficient evidence to declare financial exigency. The
13  committee shall consist of four tenured faculty members (none of whom hold
14  administrative appointments at the level of Associate Dean or above), one staff member,
15  one student, one representative of the Board of Trustees, the executive vice president and
16  the provost (ex officio). The committee will select one of its members to act as chair.
17  Faculty Council will appoint the faculty members; Staff Council will select the staff
18  member; Student Government Association will select the student member; and the Board
19  of Trustees will select its representative. Members of the committee may be chosen from
20  any area of the university. The executive vice president shall convene the committee
21  within two weeks upon receipt of the statement from the provost.
22

23  Within two weeks of request, the university shall provide the Financial Exigency
24  Committee with all university data necessary to evaluate the provost's statement. This
25  data must include (1) records of current and past operations and financial position, and
26  (2) projections of future operations and financial position.  When necessary, the
27  committee may also invite faculty, staff, or other knowledgeable persons to provide
28  information. The committee shall keep a formal record of its deliberations and votes
29  within 30 days of receipt of the requested financial information, the committee will
30  evaluate the financial data, and vote on whether a condition of financial exigency exists
31  that requires the termination of tenured faculty. The committee will issue a report. If the
32  committee finds that financial exigency exists, its report on financial reductions shall
33  consider the university's complete set of financial statements, not simply revenues and
34  costs.  The committee shall carefully consider whether and how the university's real
35  estate and other assets might be sold, refinanced or otherwise reallocated.

36  If the committee concludes that such financial exigency exists, the report must include
37  the amount of reduction needed (1) in the areas of academic affairs that are not part of the
38  schools and colleges, and (2) in the colleges and schools. If the committee concludes that
39  no such financial exigency exists, the report must include a rationale for this conclusion.
40

41  The report of this committee will be sent to the Faculty Council, Staff Council, and the
42  Student Government Association for review and comment. All comments are due to the
43  Financial Exigency Committee within 30 days of receipt.  The Financial Exigency
44  Committee will send its report and any comments from the councils and SGA to the
45  university president for final decision.

11

Calvente-DePaul 000063

July 1, 2018

### 4.6.4 Retrenchment Committee

In the event that the president of the university concludes that financial exigency exists, the provost will prepare a proposal indicating the specific methods for dealing with the financial exigency, including (1) the amount of the financial reductions outside of the schools and colleges, (2) the amount of financial reductions within each school and college, (3) the nature and timing of the retrenchments, and (4) the effects of these retrenchments on specific academic programs.

This proposal will be submitted to a Retrenchment Committee consisting of three tenured faculty members (none of whom hold administrative appointments at the level of Associate Dean or above) appointed directly by the Faculty Council, one college dean chosen by the Dean's Council, and the provost. The committee will select one of its members to act as chair. The three tenured faculty members must be chosen from different colleges within the university. Members of the committee must understand and agree that they do not represent their academic units. They must take into account the seriousness of the situation and make decisions based on the best long-term interests of the university.

The provost shall also submit the proposal to the dean of each affected school or college who, after consulting with his/her faculty, may present a written recommendation to the Retrenchment Committee as to how the required reduction could be achieved.

Before the Retrenchment Committee reaches any decision, it must provide the affected faculty and staff the recommendations and the opportunity to respond in writing to the provost's and deans' recommendations. The Retrenchment Committee will also convene a meeting open to all tenured faculty, at which it will consult the faculty and respond to their concerns. The provost's recommendation, as well as any dean's recommendation, must be made available to the tenured faculty no less than two weeks before the open meeting.

To achieve the specified amount of financial reduction, the Retrenchment Committee will make a final decision that states:

1. The dollar amount of reduction required of each school or college, other than by termination of full-time faculty;
2. The dollar amount of reduction in each college through the termination of full-time faculty; and
3. A list of academic units financially capable of absorbing faculty transfers/affiliation from other units including an estimate of the number of tenured positions that could be accommodated in each.

12

Calvente-DePaul 000064

July 1, 2018

1  The Retrenchment Committee shall send its final decision to the provost, the deans of
2  affected colleges and schools, the president of Faculty Council, the president of Staff
3  Council, and the president of the Student Government Association.

4  ***4.6.5 Termination Committee(s)***
5
6  Based on the decision of the Retrenchment Committee, Faculty Council shall constitute a
7  Termination Committee for each college that must terminate faculty due to the
8  retrenchment. Each Termination Committee shall consist of three tenured faculty
9  members appointed directly by Faculty Council; the members shall be drawn from
10  outside the affected college and shall not be affiliated with the programs or departments
11  in which retrenchments have been mandated. Faculty members who hold administrative
12  appointments at the level of associate dean or above are ineligible to serve. The
13  Committee shall select one of its own members as chair.

14  The chair of each Termination Committee shall call for the dean of the affected college to
15  consult with local academic unit officers and then submit to the Termination Committee a
16  proposal specifying which faculty will be terminated. If a college is to be phased out or if
17  colleges are to be merged, the provost shall submit the proposal after consultation with
18  the local academic unit officers and relevant deans.

19  Faculty from affected units will be given the opportunity to submit written statements,
20  including CVs and other relevant materials that discuss their qualifications and the
21  rationale for their retention.

22  The dean or provost, in making his or her proposals for termination, and the Termination
23  Committee, in evaluating the proposals, are to decide according to the following criteria
24  and in this order of priority:
25
26  1.  Program viability: faculty required for a viable academic program may be
27      retained if the program itself is not to be phased out. Quality of faculty
28      performance may be considered in evaluating whether a faculty member is
29      required for a viable academic program. In extraordinary circumstances, where a
30      serious distortion of the academic program would otherwise result, one or more
31      non-tenured faculty members may be retained.  Materials submitted by the
32      affected faculty member(s) must be considered by the Termination Committee
33      along with other relevant material.
34  2.  Tenure: tenured faculty are to be retained over non-tenured faculty; and
35  3.  Seniority: more senior faculty are to be retained over less senior faculty. Seniority
36      is defined first by rank and second by years in rank.
37
38  In evaluating the proposals and the application of the above criteria, the Termination
39  Committee will comply with the university's equal employment opportunity policies and
40  procedures.
41

13

July 1, 2018

1   The Termination Committee(s) will submit their recommendations to the provost, the
2   deans of the affected units, the department chairs or program heads, and the president of
3   the Faculty Council.
4
5   The provost makes the final determination on termination. Only in rare instances and for
6   compelling reasons will the provost overturn a recommendation made by the Termination
7   Committee. If the provost's decision differs from the recommendation, the provost must
8   prepare a written explanation and provide it to the deans of the affected units, the
9   department chairs or program heads, and the president of the Faculty Council.
10

11  ***4.6.6 University Obligations upon Termination of Tenured Faculty***
12

13    1.  If a tenured faculty member designated for termination believes he or she is
14        qualified to be transferred, he or she must identify at least one local academic unit
15        or college which was identified by the retrenchment committee as capable of
16        absorbing faculty transfers. The affected faculty member will have the
17        opportunity to submit a written statement regarding his or her fitness to serve as a
18        tenured faculty member in each of the identified units. The faculty member is
19        entitled to attach to his or her written statement any relevant documents or
20        materials. The faculty member may describe any additional training that might be
21        appropriate. The faculty member has the right to access all relevant available
22        information within the university to assist in identifying the units in which he or
23        she would be qualified to serve and to assist in preparing the written statement.
24
25        If the faculty member designated for termination requests a transfer, the local
26        academic unit officer of each of the identified units
27        a)  Must call a meeting of all the eligible faculty of that unit to vote on the
28            transfer of the faculty member to that unit,
29        b)  Must circulate, prior to that meeting, to all such eligible faculty, on a
30            confidential basis, the faculty member's written statement,
31        c)  Must provide an opportunity for the faculty member to make an oral
32            presentation to the eligible faculty of the unit and to answer questions,
33        d)  Must hold a vote of eligible faculty when a quorum is present. A majority vote
34            of the eligible tenured faculty in attendance is necessary and sufficient to
35            accept the faculty member.
36
37        Should more than one unit accept the faculty member, the faculty member must select
38        one. Upon the faculty member's selection of a unit for transfer, the provost will take
39        necessary steps to effectuate the transfer.
40
41    2.  Should no unit accept the faculty member, then the terminated faculty member shall
42        be entitled to no less than twelve months' notice of termination or a payment equal to
43        the faculty member's contract salary and benefits for an equal length of time. A
44        faculty member who has been tenured at the university for fifteen years or more of
45        continuous tenured service shall be entitled to a minimum of twenty-four months'

14

July 1, 2018

1   notice of termination or a payment equal to the faculty member's contract salary and
2   benefits for an equal length of time.
3
4   3.   The university is obligated not to approve new full-time faculty hires in a terminated
5        faculty member's areas of expertise (defined as courses that the faculty member has
6        either previously taught or is qualified and willing to teach) within a three-year period
7        unless the terminated faculty member has been offered reinstatement with reasonable
8        time in which to accept or decline. Within this three-year period after retrenchment
9        and termination, no more than three additional quarter-length or two semester-length
10       course sections per year may be offered by adjunct or term faculty within the
11       terminated faculty member's areas of expertise. In instances where the University
12       finds compelling need to offer more than three additional quarter-length or two
13       semester-length course sections per year in a terminated faculty member's areas of
14       expertise through the use of adjunct or term faculty, the provost will bring a proposal
15       to Faculty Council for its approval.
16
17  4.   The university is obligated not to approve additional full-time faculty positions
18       outside of terminated faculty members' areas of expertise, including in other
19       academic programs or units of the university over a three-year period except in
20       extraordinary circumstances where such faculty appointments are needed to sustain
21       growth or maintain academic programs. In such instances, the provost will bring a
22       proposal to Faculty Council for its review. Only in rare instances and for compelling
23       reasons will the provost overturn the recommendations of Faculty Council.
24

25  *4.6.7 Appeal of Termination*
26
27  A tenured faculty member notified of termination because of financial exigency has a
28  right to appeal to a faculty committee regarding the selection of the area and type of
29  retrenchment and selection of specific faculty appointments to be terminated.  See
30  Chapter 5.

31  **4.7 Termination of Tenured Faculty Due to Discontinuance or Substantial**
32  **Reduction of an Academic Unit or Program**
33
34  The university may discontinue or substantially reduce an academic unit or program. Such
35  decisions must be based on educational concerns and the institution's overall educational mission.
36  If a proposal for discontinuance or substantial reduction involves curricular change but not
37  termination of tenured faculty, it shall be vetted according to Faculty Council's regular policies
38  and procedures. If the proposal does involve termination of tenured faculty, then the following
39  steps must be followed instead.
40
41  All of the specified steps must take place during the normal academic year.
42

15

Calvente-DePaul 000067

July 1, 2018

### *4.7.1 Step 1*

The dean of the college responsible for the academic unit in question or the provost shall submit a formal proposal ("the Proposal") to the Faculty Council. The dean or provost shall also share the Proposal with the faculty of the unit(s) affected by the proposed changes.

The Proposal should address the following:

1. The extent and scope of the discontinuance or substantial reduction of the academic unit or program, including the number of faculty to be terminated and the nature of the curricular change, if any;
2. Justification and rationale for the proposed reduction or discontinuance of the academic unit or program (including criteria typically used to evaluate the discontinuance or substantial reduction of programs);
3. Justification and rationale for the termination of faculty as a result of the discontinuance or substantial reduction of the academic unit or program;
4. Explanation of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, aligns with the university's academic priorities and educational mission;
5. Description of how the discontinuance or substantial reduction of the academic unit or program, including the termination of faculty, will affect the academic quality of the institution;
6. Description of the specific steps to be taken in restructuring or phasing out the unit and a proposed timeline (e.g., merging with another unit, shrinking or discontinuing a particular program within or across units).

### *4.7.2 Step 2*

Faculty Council shall constitute a Review Committee of five tenured faculty members to evaluate the Proposal and prepare a report and recommendations for the Faculty Council. No member of the Review Committee may be from a unit to be affected by the discontinuance or substantial reduction. The Review Committee shall submit the Proposal and its report to the Faculty Council and to the tenure-line faculty members attached to any unit directly affected by the proposed reductions or eliminations. The tenured faculty members also have a right to submit, individually and/or as a group, a statement to Faculty Council. This statement must be submitted, within twenty calendar days of the receipt of the documents, to Faculty Council.

### *4.7.3 Step 3*

Faculty Council, after receiving the report of the Review Committee and statements from tenured faculty members at the Faculty Council meeting, will vote on the Proposal within two months. All votes on discontinuance or substantial reduction must be conducted by secret ballot. If Faculty Council accepts the Proposal from the dean/provost, it will forward its decision to the university president.

If Faculty Council rejects the Proposal, it will provide its reasons and rationale and make specific recommendations for revision to the dean/provost. It may also request a meeting with dean/provost in order to discuss its concerns and make its reservations clear. The dean/provost may then revise the Proposal in light of these recommendations and resubmit the Proposal to Faculty Council for its final vote.

16

Calvente-DePaul 000068

July 1, 2018

### 4.7.4 Step 4

If Faculty Council accepts the Proposal, it will forward its decision to the university president and full-time faculty members of all affected units or programs. The tenure-line faculty members attached to any unit directly affected by the proposed reductions or eliminations have a right to the records used in the deliberation process. The tenured faculty members also have a right to submit, individually or as a group, within twenty calendar days of the Faculty Council decision, a statement to the university president explaining a position contrary to that decision.

The university president shall not make a decision without considering the statements submitted by the tenured faculty members affected by proposed discontinuance or substantial reduction. The university president shall either accept the Proposal or, under exceptional circumstances, revise the Proposal and resubmit to Faculty Council for a vote within thirty calendar days of notification of the Faculty Council decision.

Faculty Council will make the final decision on the Proposal.

### 4.7.5 Step 5

Should the Proposal be accepted by the university president, Faculty Council, within fifteen calendar days, shall constitute a Termination Committee of three tenured faculty members; the members shall be drawn from outside the affected college and shall not be affiliated with the affected academic units or programs. Faculty members who hold administrative appointments at the level of associate dean or above are ineligible to serve. The Termination Committee shall select one of its own members as chair.

Within fifteen calendar days of the president's decision, the dean of the affected college, in consultation with local academic unit officers, will submit to the Termination Committee a proposal ("Termination Proposal") specifying which faculty affiliated with the affected program or unit will be terminated. If a college is to be eliminated or if colleges are to be merged, the provost shall consult with the local academic unit officers and relevant deans and then submit the Termination Proposal to the Termination Committee.

The tenured faculty members from affected units will be given the opportunity to submit written statements, including CVs and other relevant materials that discuss their qualifications and the rationale for their retention to the Termination Committee.

The dean or provost, in making his or her Termination Proposal, and the Termination Committee, in evaluating the Termination Proposal, are to decide according to the following criteria and in this order of priority:

1. Program viability: faculty required for a viable academic program may be retained if the program itself is not to be phased out. Quality of faculty performance may be considered in evaluating whether a faculty member is required for a viable academic program. In extraordinary circumstances, where a serious distortion of the academic program would otherwise result, one or more non-tenured faculty members may be retained. In such circumstances the Termination Committee must explain why a particular faculty member's expertise is no longer needed. Materials submitted by the affected faculty member(s) must be considered by the Termination Committee along with other relevant material.
2. Tenure: tenured faculty are to be retained over non-tenured faculty; and

Calvente-DePaul 000069

July 1, 2018

3.  Seniority: more senior faculty are to be retained over less senior faculty. Seniority is defined first by rank and second by years in rank.

In evaluating the Termination Proposal and the application of the above criteria, the Termination Committee will comply with the university's equal employment opportunity policies and procedures.

The Termination Committee, within thirty calendar days of receiving the Termination Proposal, will submit its recommendations to the provost, the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

The provost makes the final determination on termination. Only in rare instances and for compelling reasons will the provost overturn a recommendation made by the Termination Committee. If the provost's decision differs from the recommendation, the provost must prepare a written explanation and provide it to the deans of the affected units, the department chairs or program heads, and the president of the Faculty Council.

### 4.7.6 University Obligations upon Termination of Tenured Faculty

1.  If a tenured faculty member designated for termination believes he or she is qualified to be transferred, he or she must identify at least one local academic unit or college. The affected faculty member will have the opportunity to submit a written statement regarding his or her fitness to serve as a tenured faculty member in each of the identified units. The faculty member is entitled to attach to his or her written statement any relevant documents or materials. The faculty member may describe any additional training that might be appropriate. The faculty member has the right to access all relevant available information within the university to assist in identifying the units in which he or she would be qualified to serve and to assist in preparing the written statement. Within thirty calendar days of receipt of the information from the university, the faculty member must submit a request for transfer to each of the identified units.

    If the faculty member designated for termination requests a transfer, the provost must inform the local academic unit officers of each of the identified units. Within forty five calendar days of the provost's notification, the local academic unit officers of the identified units;
    a) Must call a meeting of all the eligible faculty of that unit to vote on the transfer of the faculty member to that unit;
    b) Must circulate, prior to that meeting, to all such eligible faculty, on a confidential basis, the faculty member's written statement;
    c) Must provide an opportunity for the faculty member to make an oral presentation to the eligible faculty of the unit and to answer questions;
    d) Must hold a vote of eligible faculty when a quorum is present. A majority vote of the eligible tenured faculty in attendance is necessary and sufficient to accept the faculty member.

    Should more than one unit accept the faculty member, the faculty member must select one. Upon the faculty member's selection of a unit for transfer, the provost will take necessary steps to effectuate the transfer.

18

July 1, 2018

2. Should no unit accept the faculty member, the university will make every effort to place the faculty member concerned in another suitable university position for which the person is qualified. If placement in another university position would be facilitated by a reasonable period of training, financial and other support for such training will be proffered.

3. If no position is available within the institution, with or without retraining, or if the faculty member chooses not to pursue another position within the university, the tenured faculty member's appointment will be terminated. The terminated tenured faculty member shall be entitled to a severance payment equal to twenty-four months' contract salary and benefits.

4. The university is obligated not to approve new full-time faculty hires in a terminated faculty member's areas of expertise (defined as courses that the faculty member has either previously taught or is qualified and willing to teach in any academic unit) within a three-year period unless the terminated faculty member has been offered reinstatement with reasonable time in which to accept or decline. Within this three-year period, no more than three additional quarter-length or two semester-length course sections per year may be offered by tenured or non-tenured faculty within that faculty member's areas of expertise. In instances where the university finds compelling need to offer more than three additional quarter-length or two semester-length course sections per year in a terminated faculty member's areas of expertise through the use of tenured or non-tenured faculty, the provost will bring a proposal to Faculty Council for its approval.

### 4.7.7 Appeal of Termination

A tenured faculty member notified of termination because of discontinuance or substantial reduction of an academic unit or program has the right to appeal to a faculty committee regarding the selection of his or her specific faculty appointment for termination. See Chapter 5.

### 4.8 Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months

If illness or disability prevents a faculty member from performing his or her university obligations and duties, the faculty member may request a medical leave under the university's Family and Medical Leave Act policy and the Sick Pay, Short and Long Term Disability policy. All medical leaves are subject to the policies and procedures of the applicable leave and benefit programs, including physician certification of illness or disability and ability to return to work. Information about university leave and benefit programs are described at the Human Resources website.

A tenured faculty member who goes on approved Long Term Disability leave may resume his or her university position at any time within thirty-six consecutive months of the first day of Short Term Disability leave if the faculty member is able to fulfill his or her university obligations and duties, with or without reasonable accommodation. If, after the thirty-six month period, the tenured faculty member remains unable to fulfill his or her university obligations and duties, with or without a reasonable accommodation, the tenured appointment may be terminated.

If a faculty member's appointment is terminated under this section and he or she thereafter becomes able to return to work and resume the obligations and duties of a tenured faculty member, and the faculty member's former appointment is vacant, he or she will be returned to the

19

Calvente-DePaul 000071

July 1, 2018

1   former appointment at the same rank.  If the former appointment is no longer available and there
2   is a vacant faculty appointment for which he or she is qualified, the university will give the
3   former faculty member's application strong consideration.  Such a faculty member, if appointed,
4   shall be appointed at his or her prior rank and at the salary associated with the vacant faculty
5   appointment.
6
7   A tenured faculty member whose appointment is terminated under this section may appeal the
8   termination. See Chapter 5.
9

10  **4.9 Resignation**
11
12  A faculty member who wishes to resign shall do so by submitting a written notice of resignation
13  to the dean and local academic unit officer with a proposed effective date.
14

15  **4.10 Retirement**
16
17  A faculty member who wishes to retire shall do so by submitting a written notice of retirement to
18  the dean and local academic unit officer with a proposed effective date. DePaul University has no
19  mandatory retirement age for faculty.

20

Calvente-DePaul 000072

July 1, 2018

# CHAPTER 5.  APPEALS AND GRIEVANCES

5.1 Appeals ............................................................................................................ 2

5.1.1 Appeals Committee and General Process ................................................ 2

5.1.1.1   Faculty Committee on Appeals ............................................................ 2

5.1.1.2   Notification of Intent ........................................................................... 2

5.1.1.3   Preliminary Review ............................................................................. 3

5.1.1.4   Investigation and Determination .......................................................... 3

5.1.1.5   Modified Procedures When Academic Freedom Violation is Alleged (Term Faculty)  3

5.1.1.6   Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line Faculty)  4

5.1.2   Tenure-Line Faculty Appeals ................................................................. 6

5.1.2.1   Nonrenewal of Untenured Tenure-Line Faculty  Prior to the Tenure Decision ..... 6

5.1.2.2   Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary Period Contract for Reasons Other than Misconduct ............................................ 7

5.1.2.3  Denial of Promotion or Tenure ............................................................. 8

5.1.2.4  Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months  9

5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency ................................. 10

5.1.2.6  Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an Academic Unit ................................................................................... 11

5.1.3.2   Non-Reappointment of Term Faculty .................................................... 14

5.1.4  Other Faculty ........................................................................................ 14

5.2  Grievances ..................................................................................................... 16

5.2.1  Definition ............................................................................................. 16

5.2.2  Procedures for Faculty Grievances ......................................................... 17

5.2.2.1 Administrative Grievance  Process ......................................................... 17

5.2.2.2  Grievance Board Procedures ................................................................. 18

5.3.  Right to Review Personnel Records ................................................................ 19

1

July 1, 2018

# CHAPTER 5.  APPEALS AND GRIEVANCES

Appeal procedures are limited to: dismissal or nonrenewal of contract for tenure-line faculty; denial of tenure and promotion for tenure-line faculty; dismissal during the contract term for term faculty, and non-reappointment of term faculty.

Grievance procedures are available to all faculty for issues other than denial of promotion and tenure, dismissal, nonrenewal and non-reappointment.  A grievance is a written complaint concerning a decision made by a person with authority in the University.  The grievance must be filed by the individual adversely affected by the decision.

## 5.1 Appeals

Appeals are to be conducted in accordance with the procedures specified below.  Each procedure is specific to the type of appeal.

### 5.1.1 Appeals Committee and General Process

The faculty member bears the burden of proof. Failure by the faculty member to submit requested materials within designated deadlines shall constitute a failure to meet the burden of proof. The standard of proof is preponderance of the evidence.

#### 5.1.1.1  Faculty Committee on Appeals

The Faculty Committee on Appeals is a standing committee of the Faculty Council. It comprises twelve tenured faculty members selected by the Faculty Council through the usual committee selection process. If the committee finds that, in a given case, a member has either a conflict of interest or the appearance of one, the committee will exclude the member from participation.   Grounds for recusal include serving in the appellant's local academic unit, participating in evaluation of the appellant, or having a significant personal relationship with the appellant.

The Faculty Committee on Appeals will assign three of its members to serve as an Appeals Board to hear a case.

If the appellant raises an allegation of discrimination, the Appeals Board must refer the discrimination allegation to University EEO Resources which, in coordination with the Appeals Board, will conduct an investigation and submit a report to the Appeals Board in a timely manner.

#### 5.1.1.2  Notification of Intent

A faculty member begins an appeal by filing a written notice of intent to appeal with the president of Faculty Council who will forward the notice to the chair of the Faculty Committee on Appeals. The notice must specify the grounds for appeal. The appellant may not add or change appeal grounds after submitting the notice of intent to appeal.

Calvente-DePaul 000074

July 1, 2018

### 5.1.1.3 Preliminary Review

When a faculty member appeals, the Appeals Board will conduct a preliminary review to determine whether the allegations as stated in the appeal, if fully substantiated after investigation, could reasonably be found to establish one or more of the grounds for appeal. If one of the grounds is discrimination, the Appeals Board must consult with the Office of Employee Engagement and Equal Employment Opportunity or the Title IX Coordinator, as appropriate ("University EEO Resources")before making a determination on that ground. Each ground appealed requires a separate determination as to whether the appeal will go forward on that ground. If, after the preliminary review, the Appeals Board determines that an appeal should go forward on one or more grounds, it will then investigate the faculty member's allegations.

If the Appeals Board decides by a majority that an appeal does not satisfy the criteria, the Appeals Board will forward its recommendation to the appropriate academic officer (either the provost or the president), with a copy to the faculty member and the lower-level academic officers. The recommendation must state the reasons for not considering the appeal. The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

The Appeals Board transactions are confidential and not open to persons other than those explicitly invited to participate. Written minutes shall be kept of its meetings which shall be available only to the appropriate academic officer (either the provost or the president).

### 5.1.1.4 Investigation and Determination

If an appeal moves forward, the Appeals Board may request interviews with, and materials from, the faculty member, the dean, and any evaluating committee. The Appeals Board may take any reasonable action that it deems appropriate or helpful to its deliberations. In every case the Appeals Board must interview the author of any report that recommended against renewal or promotion and tenure and any academic officer who recommended dismissal. The Appeals Board is charged only with reviewing the basis of the appeal; it does not perform an independent evaluation of the faculty member's qualifications. Each ground appealed requires a separate determination.

### 5.1.1.5 Modified Procedures When Academic Freedom Violation is Alleged (Term Faculty)

A term faculty member's allegation of an academic freedom violation is serious, not to be made or received lightly.

The university has no obligation to reappoint term faculty members beyond the terms of their contracts.

If a term faculty member alleges a violation of academic freedom, the Appeals Board will conduct a preliminary review as described in Section 5.1.1.3. If the Appeals Board concludes that the appeal does not satisfy the criteria for a violation of academic freedom, the faculty member will have the option to submit a written response to the report which must be provided to the provost and the Appeals Board for inclusion in the appeal record. The provost may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

Calvente-DePaul 000075

July 1, 2018

If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining term faculty member a written statement indicating the basis for the academic freedom allegation. The Appeals Board shall receive from the faculty member's dean a written statement of the reason(s) for the challenged decision and/or a statement of the procedures followed in reaching the challenged decision. The dean must submit these items to the Appeals Board within ten business days after the chair of the Appeals Board requests them. The Appeals Board will afford the term faculty member and the dean the opportunity to respond in writing and may also request further information.

For the Appeals Board to conclude that the challenged decision violated the faculty member's academic freedom, a majority of the Board must find that the violation was the causal basis for non-reappointment or termination.

The Appeals Board will prepare a written analysis and conclusion regarding the allegation of an academic freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the provost for final decision, with copies to the faculty member and dean.

### 5.1.1.6  Modified Procedures When Academic Freedom Violation is Alleged (Tenure-Line Faculty)

A tenure-line faculty member's allegation of an academic freedom violation is serious, not to be made or received lightly.

The university has no obligation to renew the contracts of untenured tenure-line faculty members. Tenured faculty have the right to a continuous appointment except as provided in Chapter 4 of the Faculty Handbook.

If a tenure-line faculty member alleges a violation of academic freedom, the Appeals Board will conduct a preliminary review on this ground. If the Appeals Board decides by a majority that an appeal does not satisfy the criteria for a violation of academic freedom, the Appeals Board will forward its recommendation to the appropriate academic officer (either the provost or the president), with a copy to the faculty member and the lower-level academic officers. The recommendation must state the reasons for not considering the appeal. The faculty member will have the option to submit a written response to the report which must be provided to the appropriate academic officer (either the provost or the president) and the Appeals Board for inclusion in the appeal record.
The appropriate academic officer (either the provost or the president) may affirm the Appeals Board's recommendation or remand the case to the Faculty Committee on Appeals. If the case is remanded, the Faculty Committee on Appeals will assemble an alternate Appeals Board from the remaining members to investigate the faculty member's allegations.

If an appeal moves forward on this ground, the Appeals Board shall receive from the complaining faculty member a written statement indicating the basis for the allegation of an academic freedom violation. The Appeals Board shall receive from the faculty member's dean or provost, where applicable, a written statement of the reason(s) for the challenged decision and/or a statement of the procedures followed in reaching and reviewing the challenged decision. The dean or provost must submit these items to the Appeals Board within ten business days after the request by the chair of the Appeals Board.

Upon receipt of the written statements, the Appeals Board will conduct a formal hearing in order to make a recommendation on the alleged academic freedom violation.

The two parties have the following prerogatives in the formal hearing:

4

July 1, 2018

1.    To obtain in advance of the hearing a list of witnesses the other party intends to call;

2.    Upon written request, to inspect before the formal hearing all documents that the Appeals Board in its prehearing meetings has collected and deemed relevant to its deliberations, in a manner determined by the Appeals Board (provided that the Appeals Board shall require both parties to keep the contents in strict confidence);

3.    To select an academic advisor or counsel of their own choosing, provided that advisor or counsel may not participate in the hearing but may be present;

4.    To cross examine witnesses;

5.    To have sufficient time to prepare evidence and to have adjournments upon the valid claim of unforeseen occurrences during the hearing.

The faculty member has the following additional prerogatives in the formal hearing:

1.    To decline to testify, without prejudice, at the hearing without restricting the prerogative of supporting evidence;

2.    To invite a representative of a responsible educational association as an observer to the hearing.

The responsibilities and prerogatives of the hearing Appeals Board in conducting its procedures are:

1.    It has the right to all the information and documents it needs, without being obligated by strict rules of legal evidence and legal procedures, exercising due precaution not to divulge the contents of documents normally considered confidential;

2.    It may conduct prehearing meetings to clarify issues and otherwise provide for an effective and efficient hearing;

3.    It may take whatever time is required for a fair and complete hearing, while avoiding unnecessary delays;

4.    It may formulate its own additional rules of procedure not contrary to the procedures of this document;

5.    It shall keep a verbatim record of the hearings, which shall be available to the parties without cost.

The university will assume all costs directly incurred by the hearing Appeals Board. If the faculty member employs an attorney for the hearing, and the appeal is upheld, the university will reimburse the faculty member for at least one-half of the reasonable legal expenses incurred during the formal hearing, the precise proportion to be decided by the Appeals Board.

During the process of the hearing, neither party may make public statements about the proceedings. The Appeals Board may make public statements regarding the status of the proceedings.

In order for the Appeals Board to come to the conclusion that the challenged decision violated the faculty member's academic freedom, a majority of the Appeals Board must find that the violation was the causal basis for the challenged decision.

5

Calvente-DePaul 000077

July 1, 2018

The Appeals Board will prepare a written analysis and conclusion regarding the alleged academic freedom violation. This written analysis and conclusion and all relevant documentation will be sent to the provost or president, as appropriate, for final decision, with copies to the faculty member and dean.

### 5.1.2  Tenure-Line Faculty Appeals

Untenured tenure-line faculty may appeal:

1.  Nonrenewal prior to the tenure decision (Section 5.1.2.1)

2.  Dismissal during the contract period prior to tenure (Section 5.1.2.2)

3.  Denial of promotion or tenure (Section 5.1.2.3)

Appeals Board recommendations on appeals for denials of promotion and tenure go to the president for final decision. Appeals Board recommendations on other types of appeals for untenured tenure line faculty go to the provost for final decision.

Tenured faculty may appeal:

1.  Termination due to Medical Disability or for Medical Reasons (Section 5.1.2.4)

2.  Termination due to Financial Exigency (Section 5.1.2.5)

3.  Termination due to Discontinuance or Substantial Reduction of an Academic Unit (Section 5.1.2.6)

4.  Denial of Promotion (Section 5.1.2.3)

Tenured faculty may not appeal suspension or termination for misconduct but have the right to pre-dismissal and pre-suspension hearings as described in Chapter 4.

Appeals Board recommendations on appeals go to the provost or president, as specified in the applicable section, for final decision.

### 5.1.2.1  Nonrenewal of Untenured Tenure-Line Faculty  Prior to the Tenure Decision

Grounds for Appeal

An untenured tenure-line faculty member may appeal the decision not to renew his or her probationary period contract. The appeal must be based on one or more of the following grounds:

1.  The nonrenewal violated the faculty member's academic freedom.

2.  The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

3.  The nonrenewal was the result of discriminatory practices prohibited by

6

July 1, 2018

1    university policies or applicable federal, state, or local laws.
2
3    The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its
4    findings in a report to the faculty member, the dean, and the provost that includes the majority and any
5    minority views. The faculty member will have the option to submit to the provost and dean a written
6    response to the report.

7    Final Decision
8    The final decision on the appeal rests with the provost. The provost must state the grounds for his or her
9    decision in writing to the faculty member and the relevant lower-level academic officers. If the provost
10   affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and
11   circumstances presented by the appeal, including but not limited to renewing the faculty member's
12   contract. The provost's decision is final.

13   Calendar for the Appeals Process
14   By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the
15   president of Faculty Council. By the first day of fall term of the following academic year, the faculty
16   member must submit the written appeal and all supporting documentation to the Faculty Council
17   President who will then forward it to the Appeals Board.
18
19   By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute
20   to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council
21   president, and when appropriate, University EEO Resources.
22
23   The Appeals Board must send its final written recommendation to the provost no later than January 15.
24   The provost must issue a final decision by January 31.
25
26   All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with
27   obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above
28   refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or
29   Fall and Spring semesters— and are to be construed as recommended maximums.  However, a failure by
30   the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances,
31   shall result in forfeiture of all review rights.

32   **5.1.2.2   Dismissal of Untenured Tenure-Line Faculty During the Term of a Probationary Period**
33   **Contract for Reasons Other than Misconduct**

34   Untenured tenure line faculty have no right of appeal under this section in cases in which they have had a
35   hearing under section 4.4

36   Grounds for Appeal
37   An untenured tenure-line faculty member may appeal dismissal during the term of a probationary period
38   contract.  The appeal must be based on one or more of the following grounds:
39
40       1.      The dismissal violated the faculty member's academic freedom.
41
42       2.       The process by which the decision to dismiss was made applied inappropriate standards,
43               applied appropriate standards unfairly, or failed to meet reasonable standards of
44               thoroughness.
45

7

Calvente-DePaul 000079

July 1, 2018

3.    The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for this  appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review.  The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.3  Denial of Promotion or Tenure**

**Grounds for Appeal**

A faculty member may appeal the decision to deny an application for tenure or promotion. The appeal must be based on one or more of the following grounds:

1.    The decision violated the faculty member's academic freedom.

2.    The evaluation of the candidate deviated from procedures in the Faculty Handbook or in college or local academic unit guidelines, and the deviation was material to the final decision.

8

Calvente-DePaul 000080

July 1, 2018

3.     The decision was the result of discriminatory practices prohibited by
       university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the president. The faculty member will have the option to submit to the president a written response to the report.

**Final Decision**

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member, the provost, and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to awarding tenure or promotion. The president's decision is final.

**Calendar for the Appeals Process**

By June 30, the faculty member must state his or her intent to appeal in writing to the president and the president of Faculty Council. By the first day of fall term of the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for each case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the president, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the president no later than January 15. The president must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

**5.1.2.4  Termination of Tenured Faculty Due to Medical Leave Exceeding Thirty-Six Months**

Grounds for Appeal

A tenured faculty member may appeal termination under Chapter 4, Section 4.8. The appeal must be based on one or more of the following grounds:

1.     The termination violated the faculty member's academic freedom.

2.     The process by which the decision to terminate was made applied inappropriate
       standards, applied appropriate standards unfairly, or failed to meet reasonable standards
       of thoroughness.

3.     The termination was the result of discriminatory practices prohibited by university
       policies or applicable federal, state, or local laws.

9

July 1, 2018

1    The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit
2    its findings in a report to the faculty member, the provost, and the president that includes the majority and
3    any minority views. The faculty member will have the option to submit to the president, provost and dean
4    a written response to the report.

5    Final Decision

6    The final decision on the appeal rests with the president. The president must state the grounds for his or
7    her decision in writing to the faculty member and the relevant lower-level academic officers. If the
8    president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the
9    facts and circumstances presented by the appeal. The president's decision is final.

10    Calendar for the Appeals Process

11    Within 10 business days of being informed in writing of the dismissal, the faculty member must state his
12    or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business
13    days of submitting the written notice of intent to appeal, the candidate will submit their supporting
14    documentation. Within 10 business days upon receipt of this documentation, the chair will commence the
15    preliminary review by the Appeals Board.
16

17    At the preliminary review, the Appeals Board  must establish a clear timeline for the  appeal and
18    distribute it to the faculty member, the local academic unit officer, the dean, the provost, the Faculty
19    Council president, and when appropriate, University EEO Resources.
20

21    The written recommendation from the Appeals Board must be sent to the president within 30 business
22    days of the preliminary review.  The president must issue a final decision no later than 10 business days
23    after receipt of the Appeals Board's written recommendation.
24

25    All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with
26    obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above
27    refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or
28    Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by
29    the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances,
30    shall result in forfeiture of all review rights.
31

32    **5.1.2.5  Termination of Tenured Faculty Due to Financial Exigency**

33    Grounds for Appeal

34    A tenured faculty member notified of termination because of financial exigency has a right to appeal. The
35    appeal must be based on one or more of the following grounds:
36

37        1.  The selection of the area and type of retrenchment was not in accordance with the
38            procedures set out in Chapter 4, Section 4.6.

39        2. The selection of specific faculty appointments to be terminated was not in accordance with
40        the procedures set out in Chapter 4, Section 4.6.

41        3. The dismissal was the result of discriminatory practices prohibited by university policies
42        or applicable federal, state, or local laws.

10

Calvente-DePaul 000082

July 1, 2018

1     4. The university failed to meet its obligations as specified in Section 4.6.6 of the Faculty
2     Handbook. A unit's vote not to accept the faculty member may be appealed only for failure
3     to satisfy one or more of the criteria listed in section 4.6.6 (1)(a-d).

4
5 The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit
6 its findings in a report to the faculty member, the provost, and the president that includes the majority and
7 any minority views. The faculty member will have the option to submit to the president, provost and dean
8 a written response to the report.
9

10 Final Decision
11 The final decision on the appeal rests with the president. The president must state the grounds for his or
12 her decision in writing to the faculty member and the relevant lower-level academic officers. If the
13 president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the
14 facts and circumstances presented by the appeal. The president's decision is final.

15 Calendar for the Appeals Process
16 Within 10 business days of being informed in writing of the dismissal, the faculty member must state his
17 or her intent to appeal in writing to the provost, and the president of Faculty Council. Within 20 business
18 days of submitting the written notice of intent to appeal, the candidate will submit his or her supporting
19 documentation. Within 10 business days upon receipt of this documentation, the chair will commence the
20 preliminary review by the Appeals Board.
21
22 At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it
23 will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty
24 Council president, and when appropriate, University EEO Resources.
25
26 The written recommendation from the Appeals Board must be sent to the president within 30 business
27 days of the preliminary review. The president must issue a final decision no later than 10 business days
28 after receipt of the Appeals Board's written recommendation.
29
30 All review procedures are to be carried out as expeditiously as reasonably possible, consistent with
31 obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above
32 refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or
33 Fall and Spring semesters — and are to be construed as recommended maximums. However, a failure by
34 the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances,
35 shall result in forfeiture of all review rights.
36

37 **5.1.2.6 Termination of Tenured Faculty Due to Discontinuance or Substantial Reduction of an**
38 **Academic Unit**

39 Grounds for Appeal
40 A tenured faculty member notified of termination because of discontinuance or substantial reduction of an
41 academic unit or program has the right to appeal the selection of his or her specific faculty appointment
42 for termination. The appeal must be based on one or more of the following grounds:
43
44
45

11

Calvente-DePaul 000083

July 1, 2018

1.    The selection of specific faculty appointments to be terminated was not in accordance with the procedures set out in Chapter 4, Section 4.7.

2.    The dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

3.    The university failed to meet its obligations as specified in Section 4.7.6 of the Faculty Handbook.  A unit's vote not to accept the faculty member may be appealed only for failure to satisfy one or more of the criteria listed in Section 4.7.6 (1)(a-d).

4.    The termination decision violated the faculty member's academic freedom.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and will submit its findings in a report to the faculty member, the provost, and the president that includes the majority and any minority views. The faculty member will have the option to submit to the president, provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the president. The president must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the president affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. The president's decision is final.

Calendar for the Appeals Process

Within 10 business days of being informed in writing of the termination, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit supporting documentation. Within 10 business days upon receipt of this documentation, the chair will commence the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate,  University EEO Resources.

All review procedures are to be carried out as expeditiously as is reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

### 5.1.3 Term Faculty Appeals

Term faculty are limited to appeals of: (1) major sanctions during the contract term, and (2) non-reappointment on the grounds of a violation of academic freedom or discrimination in violation of university policies or federal, state, and local laws.

**5.1.3.1  Major Sanctions within the Contract Period**

12

July 1, 2018

**Grounds for Appeal**

The appeal must be based on one or more of the following grounds:

1. The major sanction violated the faculty member's academic freedom.

2. The process by which the major sanction was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the major sanction was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.


Final Decision
The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the term faculty member and the dean. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to reinstating the term faculty member for the remainder of the contract term. The provost's decision is final.

Calendar for the Appeals Process
Within 10 business days of being informed in writing of the dismissal, the faculty member must state his or her intent to appeal in writing to the provost, and the president of Faculty Council.  Within 20 business days of submitting the written notice of intent to appeal, the candidate will submit their supporting documentation. Within 10 business days upon receipt of this documentation, the chair will convene the preliminary review by the Appeals Board.

At this preliminary review, the Appeals Board  must establish a clear timeline for the appeal, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate,  University EEO Resources.

The written recommendation from the Appeals Board must be sent to the provost within 30 business days of the preliminary review.  The provost must issue a final decision no later than 10 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels.  All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters — and are to be construed as recommended maximums.  However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

13

Calvente-DePaul 000085

July 1, 2018

**5.1.3.2 Non-Reappointment of Term Faculty**

Grounds for Appeal

A term faculty member may appeal the decision not to reappoint him or her. The appeal must be based on one or both of the following grounds:

1.   The non-reappointment violated the faculty member's academic freedom.

2.   The non-reappointment was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation and submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the faculty member and the relevant lower-level academic officers. If the provost affirms the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal, including but not limited to renewing the faculty member's contract. The provost's decision is final.

Calendar for the Appeals Process

By June 30, the faculty member must state his or her intent to appeal in writing to the provost and the president of Faculty Council. By the first day of fall term in the following academic year, the faculty member must submit the written appeal and all supporting documentation to the Faculty Council President who will then forward it to the Appeals Board.

By September 30, the Appeals Board must establish a clear timeline for the case, which it will distribute to the faculty member, the local academic unit officer, the dean, the provost, the Faculty Council president, and when appropriate, University EEO Resources.

The Appeals Board must send its final written recommendation to the provost no later than January 15. The provost must issue a final decision by January 31.

All review procedures are to be carried out as expeditiously as reasonably possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above refer only to calendar or business days within regular academic terms — Fall, Winter, Spring quarters or Fall and Spring semesters— and are to be construed as recommended maximums. However, a failure by the affected faculty member to adhere to any time guidelines, except under extraordinary circumstances, shall result in forfeiture of all review rights.

*5.1.4  Adjunct Faculty Appeals*

Adjunct faculty are limited to appeals of suspension or dismissal during the contract period. The contract period is defined in the adjunct faculty's letter of appointment and is defined on a course by course basis.
.

**5.1.4.1 Suspension or Dismissal During the Contract Period**

14

Calvente-DePaul 000086

July 1, 2018

Grounds for Appeal

The appeal must be based on one or more of the following grounds:

1. The suspension or dismissal violated the faculty member's academic freedom.

2. The process by which the suspension or dismissal was imposed applied inappropriate standards, applied appropriate standards unfairly, or failed to meet reasonable standards of thoroughness.

3. The imposition of the suspension or dismissal was the result of discriminatory practices prohibited by university policies or applicable federal, state, or local laws.

As outlined in Section 5.1.1.1, the Appeals Board will included three tenured faculty members. For an adjunct faculty appeal, the Faculty Committee on Appeals will select an adjunct faculty member who will act as a non-voting consultant to the Appeals Board. The role of the consultant will be to provide expertise on issues that uniquely affect adjunct faculty.

The Appeals Board will conduct a preliminary review, and if appropriate, an investigation. The Appeals Board shall submit its findings in a report to the faculty member, the dean, and the provost that includes the majority and any minority views. The preliminary review will follow the process described in the Faculty Handbook Section 5.1.1.3. The faculty member will have the option to submit to the provost and dean a written response to the report.

Final Decision

The final decision on the appeal rests with the provost. The provost must state the grounds for his or her decision in writing to the adjunct faculty member and the dean. If the provost grants the appeal, he or she may determine the appropriate remedy for the matter based on the facts and circumstances presented by the appeal. If the appeal is granted, the adjunct faculty member will be paid the amount due under the original contract appointment. The provost's decision is final.

Calendar for the Appeals Process

Due to the timing of adjunct faculty appointments, which frequently occur on a term-by-term basis, an expedited appeals process is necessary.

Within 5 business days of being informed of the suspension or dismissal, the adjunct faculty member must write to the provost and the president of Faculty Council, stating the adjunct's intent to appeal. Within 10 business days of submitting the written notice of intent to appeal, the adjunct faculty member will submit his or her supporting documentation. Within 5 business days of receipt of this documentation, the chair of the Faculty Committee on Appeals will convene the preliminary review by the Appeals Board.

The written recommendation from the Appeals Board must be completed and sent to the provost within 10 business days of the preliminary review. An allegation of discrimination will follow the timeline used in University EEO Resources. The provost must issue a final decision no later than 5 business days after receipt of the Appeals Board's written recommendation.

All review procedures are to be carried out as expeditiously and reasonably as possible, consistent with obtaining sound judgments and qualified, balanced review panels. All time guidelines set forth above are to be construed as maximums.

Calvente-DePaul 000087

July 1, 2018

A failure by the affected adjunct faculty member to adhere to any time guidelines, except under extraordinary circumstance, shall result in forfeiture of all review rights. A failure by the Appeals Board or provost to adhere to any time guidelines, except under extraordinary circumstances, shall result in the adjunct faculty member being paid the amount due under the original contract appointment.

### 5.1.5 Other Faculty

Faculty with special appointments (as defined in 2.3.3) may not appeal reappointment or dismissal during their contract terms.

## 5.2 Grievances

Grievance procedures are available to all faculty (including all full-time and adjunct faculty) for issues other than denial of promotion and tenure, dismissal, nonrenewal, and non-reappointment. The grievance must be filed by the individual adversely affected by the decision.

Grievances are to be conducted in accordance with the procedures specified below.

### 5.2.1 Definition

A grievance is a written complaint concerning a decision made by a person with authority in the university. Grievances are limited strictly to the questioned decision and are open only to the persons directly and adversely affected by that decision. Grievances may not be used to question or change policy. A decision being grieved remains in effect unless the decision is suspended.

A decision is grievable if it meets all of the three following criteria:

1.  It adversely affects the interests of an individual;
2.  The affected individual is being treated differently from other persons of similar circumstances or the decision violates any policy of the university or the relevant academic unit; and

3.  There is insufficient justification for the different treatment or the failure to comply with policy.

Specifically outside the scope of the grievance process are:

1.  University policies.

2.  Policy crafted by a deliberative faculty body.

3.  Allegations of violations of the university's Anti-discrimination and Anti-harassment policy, which are handled by University EEO Resources.

Persons involved in the grievance process may share information concerning the process and substance of a grievance with other persons having a legitimate need for the information. Wider distribution creates potential risks to fairness and privacy. The grievance process is a key element of the university's shared governance. Deterioration of fairness and privacy, or even the perception of deterioration, would undermine the effectiveness of the university's faculty grievance process.

16

Calvente-DePaul 000088

July 1, 2018

A tenured faculty member has the right to a formal grievance hearing after the fact if suspended by the provost without a prior hearing (Chapter 4, Section 4.4).

### 5.2.2 Procedures for Faculty Grievances

Prior to initiating a formal grievance, a faculty member should seek to resolve complaints with the individual who made the decision in question.

A formal grievance must be filed in writing with the faculty member's dean within 60 days after communication of the decision.

The grievance procedure has two steps:

1.  Formal administrative grievance process

2.  Faculty Grievance Board process

Faculty grievances begin with formal administrative process. This must be completed before the faculty member proceeds to the Faculty Grievance Board.

If a faculty member alleges discrimination at any point in a grievance, the dean or the Grievance Board must refer the grievance to University EEO Resources which, in consultation with the dean (if raised during the formal administrative process) or Grievance Board (if raised during the Grievance Board), will conduct an investigation and submit a report to the dean or Grievance Board in a timely manner.

### 5.2.2.1 Administrative Grievance  Process

The dean of a college conducts the formal administrative grievance process. If the grievance challenges a decision of the faculty member's dean, the grievance will be heard by another dean selected by the provost with approval of the aggrieved faculty member.

Throughout the formal administrative grievance process, the burden of proof rests on the faculty member.

The faculty member must submit to the dean hearing the grievance a written statement explaining:

1.  the precise nature of the grievance

2.  information and evidence supporting the faculty member's position

3.  a description of all informal attempts to resolve the complaint and the reasons why any proposed resolutions identified during the informal procedures were unsatisfactory to the faculty member, and

4.  the remedies that the faculty member would consider satisfactory.

At the same time, the faculty member will provide a copy to the individual whose decision is being challenged.  That individual may submit a written statement to the dean within ten business days of receipt of the faculty member's statement, with a copy to the faculty member.

Calvente-DePaul 000089

July 1, 2018

The dean hearing the grievance provides a written report to the faculty member and the individual whose decision is being challenged within thirty calendar days after receiving their written statements. In the written report, the dean shall state the decision and what action, if any, is required to implement the decision.

Either party may appeal the dean's decision to the provost within ten business days of receiving the decision. The appeal must be in writing and supported by reasons for not accepting the dean's decision. The appealing party must provide the other party with a copy of the appeal to the provost.  The provost may conduct another review and. will enter a written decision, within thirty calendar days after receipt of the appeal. The provost must send the written decision to both parties.

### 5.2.2.2  Grievance Board Procedures

If the faculty member who filed the grievance is unsatisfied with the provost's decision, he or she may, within ten business days of receiving the provost's decision, refer that decision to the judgment of faculty peers. The faculty member must submit a written request to the president of the Faculty Council to direct the Faculty Council Committee on Committees to select three tenured faculty members to serve as a Grievance Board. For a term or adjunct faculty grievance, the Committee on Committees will select a corresponding term or adjunct faculty member who will act as a non-voting consultant to the Grievance Board.  The role of the consultant will be to provide expertise on issues that uniquely affect adjunct or term faculty.  Faculty chosen for the Grievance Board may not serve in a grievant's local academic unit or have a significant personal relationship with the grievant. In cases brought to a Grievance Board, the burden of proof rests on the faculty member to establish that the administrative decision was unfair.

Within five business days of the establishment of the Grievance Board, the faculty member must submit to the Grievance Board and the provost a statement indicating the reasons why the decision of the provost is unfair. The provost may submit a response to the faculty member's statement within an additional five business days. The Grievance Board must request, and the provost must provide, the written record of the formal administrative process. New complaints, new evidence, and other new matters not addressed during the formal administrative process may not be introduced for the first time to the Grievance Board.

Preliminary Review

Upon receipt of the faculty member's grievance submission, the chair of the Grievance Board shall schedule the grievance for a preliminary review by the Grievance Board as soon as practicable.  The Grievance Board has sole and unreviewable discretion whether to schedule the preliminary review meeting during the spring or summer break or wait until the university is back in regular session.

At the preliminary review meeting, the Grievance Board will determine:

1.  whether the grievance is timely;

2.  whether the matter grieved about is grievable under the procedures;

3.  whether the formal administrative grievance process has been followed; and

4.  whether the grievance materials submitted to the Grievance Board, if fully substantiated after investigation, could reasonably be found to satisfy the criteria set forth in this chapter.

Calvente-DePaul 000090

July 1, 2018

1    If the Grievance Board decides by a simple majority that the grievance is not timely, is not grievable, did
2    not follow the formal administrative grievance process, or could not reasonably be found to satisfy the
3    criteria, the Grievance Board will forward its written decision to the provost, with a copy to the faculty
4    member. The decision must state the reasons for not considering the grievance.

5    Investigation and Review
6    If, after the preliminary review, the Grievance Board determines that the grievance warrants further
7    consideration, the Grievance Board will conduct a review. If, in the opinion of the Grievance Board, the
8    materials already submitted are not sufficient to make a determination, the Grievance Board may request
9    interviews with, or materials from, the faculty member or other individuals named in the grievance. The
10    Grievance Board may take any other reasonable actions that it deems appropriate or helpful to its
11    deliberations.
12
13
14    The Grievance Board will prepare a written report of its findings and recommendation, including the
15    majority and any minority views.  The Grievance Board will forward the report to the president, with
16    copies provided to the faculty member and the provost.
17
18    If a tenured faculty member has grieved over a sanction imposed on him or her and if the Grievance
19    Board declines to affirm the grievance, the faculty member may ask the president to make a final
20    determination. Otherwise, the decision of the Grievance Board is final.
21
22    If implementing the decision of the Grievance Board requires financial resources beyond what is usually
23    and customarily allocated to similarly situated faculty, the Grievance Board shall seek the approval of the
24    provost. If the provost does not approve the expenditure on the ground that sufficient resources are not
25    immediately available, the provost must provide in writing a reasonable timeline for implementing the
26    Grievance Board's decision or seek mutually agreed upon alternative ways to address the inequity or
27    remedy the unfair decision against the grievant.
28

29    **5.3.  Right to Review Personnel Records**
30
31    Illinois law governs the right of employees to review their own personnel records. University policy
32    establishes the process for requesting such records.

19

Calvente-DePaul 000091

July 1, 2018

**CHAPTER 6.  FACULTY RIGHTS AND RESPONSIBILITIES**

6.1  Academic Freedom ................................................................................................. 3

6.2 Diversity Guidelines ............................................................................................... 3

6.3 Academic Support ................................................................................................... 3

    6.3.1 Faculty Development and Research.................................................................. 3

    6.3.2 Memberships................................................................................................... 4

    6.3.3 Travel Expenses .............................................................................................. 5

6.4 Faculty Responsibilities .......................................................................................... 5

    6.4.1 Members of the Academic Profession ............................................................. 5

    6.4.2 Members of DePaul University ....................................................................... 6

    6.4.3 Teacher of Students......................................................................................... 6

    6.4.4 Academic Administrators ................................................................................ 6

6.5  Instructional Responsibilities ................................................................................. 7

    6.5.1  Class Attendance ........................................................................................... 7

    6.5.2 Class Cancellation .......................................................................................... 7

    6.5.3  Inability to Meet a Class/Substitute Teaching ............................................... 7

    6.5.4 Class Hours .................................................................................................... 8

    6.5.5 Syllabus Requirements.................................................................................... 8

    6.5.6  Course Examinations ..................................................................................... 8

    6.5.7  Time for Submitting Final Grades .................................................................. 8

6.6 Workload................................................................................................................ 8

    6.6.1  Faculty Assignments ...................................................................................... 9

    6.6.2  Responsibility for Assignments ..................................................................... 9

    6.6.3  Teaching ........................................................................................................ 9

        6.6.3.1 Full-time and Part-time Faculty ................................................................ 9

        6.6.3.2  Administrators........................................................................................... 9

        6.6.3.3  Graduate Assistants and Fellows ............................................................ 10

        6.6.3.4  Summer Session Assignments ................................................................ 10

    6.6.4  Activities Outside the University.................................................................. 10

6.7 Leaves of Absence ............................................................................................... 11

1

Calvente-DePaul 000092

July 1, 2018

1   6.8 Salaries ......................................................................................... 12

2   6.9 Academic Policies ......................................................................... 12

3   6.10 Establishing a New University Policy ....................................... 12

4

2

Calvente-DePaul 000093

July 1, 2018

# CHAPTER 6. FACULTY RIGHTS AND RESPONSIBILITIES

DePaul University generally follows AAUP guidelines, except in instances where a policy is otherwise defined in this Handbook.

## 6.1 Academic Freedom

DePaul accords academic freedom a prominent position as an integral part of the university's scholarly and religious heritage. The university attempts to create an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process. University precept and tradition protect this freedom from infringement. Not only the faculty but also students and other members of the university community enjoy this freedom as they participate in the various forms of open inquiry and debate, as for example, classroom presentation and discussion, research and publication, public statements made as a citizen in one's own name, and other forms of creative expression.

DePaul University is guided by the AAUP 1940 Statement of Principles on Academic Freedom and Tenure (with 1970 Interpretive Comments). However, the university expressly reserves the right to amend, alter, modify, and delete the same with the assent of the Faculty Council.

## 6.2 Diversity Guidelines

DePaul University has a long-standing commitment to ethnic and cultural diversity of its faculty, staff, and student body. As a university with a strong Catholic and Vincentian heritage, this commitment is particularly integral to our mission. It is also recognized that a multicultural experience is an essential part of DePaul.

Consistent with the Catholic and Vincentian heritage, DePaul University is committed to preserving an environment that respects the personal rights and dignity of each member of the community. Therefore, DePaul University does not tolerate harassment or discrimination, as, for example, set forth in the Anti-Discrimination and Anti-Harassment Policy and Procedures.

## 6.3 Academic Support

### 6.3.1 Faculty Development and Research

Since the university's mission statement places "highest priority on programs of instruction and learning." To further this objective, university sponsors a variety of professional development programs and awards recognizing outstanding achievement in teaching, scholarship, and/or creative activities, and service. Development opportunities and awards include, among others:

- Paid faculty leaves
- University Excellence in Teaching Award
- Spirit of Inquiry Award

3

Calvente-DePaul 000094

July 1, 2018

- Competitive instructional grants
- Summer stipends
- Departmental initiative grants
- Competitive research grants
- Research conference program.

The Office of Faculty Development & Research seeks to fulfill the university's commitment to academic excellence by developing teacher/scholars at all academic career levels. The Office has responsibility for programs, resources, and guidelines that support development, promotion, and retention of talented and diverse faculty. Through the Office of Faculty Development & Research, the provost provides internal grants to support faculty development initiatives and sponsors awards to recognize outstanding faculty achievements.

The Office of Faculty Development and Research provides university-wide support for faculty development through the Quality of Instruction Council (QIC), the University Research Council (URC), and the Public Service Council (PSC). The Associate Vice President for the Office of Faculty Development and Research chairs the three councils, which are composed of faculty and academic administrators.

The Office also sponsors other opportunities, including new faculty orientation, tenure and paid-leave workshops, and select international faculty language immersion programs. All programs are intentionally competitive in nature to ensure the best use of available funds and to encourage the development of proposal-writing skills. Applications regularly exceed available funding, and applicants are encouraged to submit well-crafted projects that advance their scholarly objectives.

Faculty grants, awards, stipends, and leaves are peer reviewed by one of three academic councils. The Associate Vice President for Faculty Development & Research chairs all three academic councils. Council members are appointed by Faculty Council. The University Research Council (URC) reviews and awards research grants, leaves, and the Spirit of Inquiry Awards. The Quality of Instruction Council (QIC) reviews and awards instructional grants and leaves and the Excellence in Teaching Awards. The Public Service Council (PSC) reviews and awards instructional and research grants related to service learning courses and university-community research projects. The PSC also reviews Excellence in Public Service Awards.

A more complete listing of professional development initiatives and guidelines can be found at the Office of Faculty Development and Research.

### *6.3.2 Memberships*

Although professional membership fees are the responsibility of individual faculty, the university may reimburse individual a full-time faculty member up to $50.00 per membership for up to three professional organizations per year, provided that the faculty member pays the first $25 of each fee. The university does not pay for memberships in private clubs except with the president's approval.

4

Calvente-DePaul 000095

July 1, 2018

1    *6.3.3 Travel Expenses*
2
3    The university provides each academic unit with a travel budget to support faculty participation in
4    meetings of learned societies. Top priority for travel support belongs to the faculty member who
5    presents a paper, serves on a panel, acts as an officer of the society, represents the university (on
6    the authority or request of the chair or dean) in recruiting faculty, or serves in another official
7    capacity. Travel support is provided only from travel funds within the budget of the academic unit
8    and upon approval of the chair or dean, who is responsible for distributing travel funds among the
9    faculty who travel in an official role. Depending on the amount of money available in the travel
10   budget and the demands for these funds, the faculty members may receive partial or no support.
11
12   Travel compensation may be given for national or regional meetings. For meetings in the
13   metropolitan Chicago area, support is limited to incidentals such as registration fees. In all
14   instances, the university reimburses actual expenses for allowable items.

15   Faculty who attend meetings without taking one of the active roles listed above are usually
16   expected to cover their own expenses. However, if travel funds remain in the budget, the chair or
17   dean may approve support for not more than half of the travel expenses. Faculty members are
18   encouraged to plan travel as far in advance as possible and to keep chairs and deans advised to
19   these plans before budgets are prepared. For specific procedures, forms and guidelines, see the
20   Office of Financial Affairs.
21

22   **6.4 Faculty Responsibilities**
23
24   Membership in the academic profession, in professional societies and associations of higher
25   education, and in DePaul University entails special responsibilities. The more important of these
26   responsibilities are summarized here as a code of professional ethics. They are subject to
27   amendment from time to time through appropriate university action. Failure to comply with these
28   responsibilities renders a faculty member liable to appropriate sanction within the procedural
29   safeguards and provision for peer judgment.
30

31   *6.4.1 Members of the Academic Profession*
32
33   As a member of the academic profession, the faculty member has these obligations:
34
35       1.  To seek truth; to improve scholarly competencies for this purpose; to engage in
36           productive scholarship, research or other creative activities; and to uphold the scholarly
37           standards of one's academic discipline.
38       2.  To practice intellectual honesty; to acknowledge academic debts to others; and to
39           exercise impartiality in passing professional judgments on colleagues.
40       3.  To respect the rights of other persons to hold and express different intellectual positions;
41           and to protect the rights, well-being, and privacy of persons involved in scientific inquiry.
42       4.  To be accurate in making public statements in one's own name and to be mindful that in
43           making such statements the public may judge the faculty member's profession and
44           institution from these statements.

5

Calvente-DePaul 000096

July 1, 2018

1

### 6.4.2 Members of DePaul University

As members of DePaul University, the faculty member has these obligations:

1. To respect the religious character of the university and the religious beliefs of persons affiliated with the university.
2. To adhere to non-discriminatory norms in [interacting with other university personnel].
3. To preserve confidentiality in personnel and administrative deliberations when confidentiality is explicitly required.
4. To avoid unauthorized use of university resources or facilities for personal, commercial, or political purposes.
5. To assume a fair share of faculty responsibilities for university governance and to accept and fulfill committee appointments and other responsibilities associated with faculty status.
6. To comply with duly approved regulations and procedures.
7. To attend general university commencements and convocations.

### 6.4.3 Teacher of Students

As a teacher, a faculty member has these obligations:

1. To present to students subject matter compatible with course descriptions appearing in official university bulletins and catalogues; to avoid significant intrusion of material unrelated to the course; and to meet classes and hold examinations as scheduled.
2. To evaluate students only on the basis of academic performance and to evaluate their work without undue or unexcused delay.
3. To hold office hours, to be available to students enrolled in the faculty member's courses, and to serve as a faculty advisor to other students according to the policies of the academic unit.
4. To avoid any exploitation of students for personal advantage or any coercion of the judgment or conscience of students.

### 6.4.4 Academic Administrators

A member of the faculty who holds an administrative position has these obligations:

1. To establish adequate means of communication for matters that materially affect the members of the particular academic unit and to be reasonably available for the faculty and staff of the unit.

6

Calvente-DePaul 000097

July 1, 2018

2. To provide opportunity for joint planning and effort where appropriate and to set up and apply the structures necessary for joint action.
3. To make personnel decisions impartially; to give responses as soon as circumstances allow; and to give reasons for refusing a request if asked to do so by the person refused unless the disclosure of the reason would breach confidentiality.
4. To remain current with developments in higher education related to the sphere of the particular administrative position.

## 6.5 Instructional Responsibilities

At times it is important for faculty to convey messages to students through announcements made in class. Instructors' cooperation in making these announcements is appreciated.

### 6.5.1 Class Attendance

Instructors are expected to take attendance during the first week of class and again after receipt of an "update" roster (approximately the fifth week of class). This helps academic officers to identify and correct errors before grade sheets are printed. Individual faculty have the prerogative to establish course attendance guidelines. These should be stated in the course syllabus.

### 6.5.2 Class Cancellation

It is imperative that instructors meet classes for each scheduled class. In the event that an instructor is unable to attend a class because of illness or unplanned absence, he/she must inform the local academic unit officer at the first opportunity. The local academic unit officer will then make arrangements to provide continued student learning during the instructor's absence.

### 6.5.3 Inability to Meet a Class/Substitute Teaching

A faculty member who is unable to meet a class is responsible for seeing that students are not thereby deprived of learning opportunities. This responsibility may be met by scheduling the necessary number of make-up classes at a time convenient to the students, requesting the assignment of a substitute instructor, or making other appropriate arrangements. In all instances of absence, the faculty member must inform the local academic unit officer of the facts regarding the absence, the reasons for it, and the measures taken to provide the students with the requisite learning experiences. The local academic unit officer may require the faculty member to provide this information in writing.

If a class is to be cancelled, the instructor shall inform the students beforehand, if at all possible. When the students have not been informed, the local academic unit officer will attempt to let the students know that the class has been cancelled, particularly an evening class attended predominantly by part-time students.

7

Calvente-DePaul 000098

July 1, 2018

1    *6.5.4 Class Hours*
2
3    It is essential that students have a minimum of three hours of contact time per week with their
4    instructor in each four quarter hour course. Faculty members are expected to conduct class for the
5    full period and to begin and end at scheduled times.
6

7    *6.5.5 Syllabus Requirements*
8
9    All faculty are required to prepare written course syllabi for each course they teach at DePaul. At
10   a minimum, syllabi should contain the following information:
11
12       1.  A rationale for the course stated in the context of the aims of the local academic unit;
13       2.  A statement on the types of instruction (i.e., lecture; lecture-discussion; lab; etc.);
14       3.  Specific materials required for the course (books, pamphlets, library materials, etc.);
15       4.  Proposed major and minor topics to be covered in the course;
16       5.  Specific required readings, and written and oral assignments (inclusion of tentative dates
17           for such assignments is desirable);
18       6.  Specific descriptions of the criteria and methods  to be used by the instructor in
19           evaluating students' academic performance, such as the nature of quizzes and
20           examinations;
21       7.  Statement on plagiarism; and,
22       8.  Instructor's office number and office hours for the term in which the course is being
23           offered.

24   Each faculty member must, by the first class session, make available to each student a copy of the
25   syllabus that satisfies the guidelines outlined above. A copy must be submitted to the college or
26   school.
27

28   *6.5.6  Course Examinations*
29
30   In all courses at the midpoint of the quarter, students will be informed of their achievement to
31   date. Normally courses conclude with a final examination. To provide additional flexibility for
32   faculty members, a formal mid-term or final examination is not required if the instructor has other
33   comparable ways of evaluating student achievement.
34

35   *6.5.7  Time for Submitting Final Grades*
36
37   As a matter of administrative policy, all final grades are to be submitted within five business days
38   of the last examination in all academic units of the university, except for the College of Law,
39   which follows a different calendar.
40

41   **6.6 Workload**
42

8

Calvente-DePaul 000099

July 1, 2018

1    *6.6.1  Faculty Assignments*
2
3    Formal assignments comprise only part of a faculty member's academic life. As professionals,
4    faculty members are expected to engage in many activities that are not official duties, particularly
5    those that contribute to the good of the public and the university, their academic discipline, and
6    their own professional development.
7

8    *6.6.2  Responsibility for Assignments*
9
10   The local academic unit officer makes faculty assignments, subject to approval by the dean.
11

12   *6.6.3  Teaching*
13

14   **6.6.3.1 Full-time and Part-time Faculty**
15
16   The primary function of DePaul University is instruction; hence, teaching constitutes the majority
17   of faculty assignments.  The normal teaching load is nine full courses per academic year, usually
18   three per quarter. Exceptions may arise if, for example, the established policy of a given academic
19   unit or a particular faculty contract specifies the contrary. This load may be reduced if particular
20   faculty courses place especially extensive demands on faculty time or if faculty members receive
21   formal assignment in other functions.  Only in exceptional instances is a faculty member asked to
22   teach more than a normal load. In such instances, the faculty member receives additional
23   compensation not less than the salary paid to a part-time faculty member for teaching a
24   comparable course.
25
26   A teaching assignment may include student advisement, which requires that faculty members
27   keep a sufficient number of regularly scheduled office hours at times that are of mutual
28   convenience and appropriate for the needs of the students. A teaching assignment also entails
29   services normally associated with faculty status and responsibilities. Supervision of independent
30   study is entirely voluntary and is not calculated as part of the teaching load. Faculty receive no
31   pay for supervising independent study.  However, supervision of independent study is considered
32   as an element of faculty performance in evaluations for salary adjustment, contract renewal, and
33   tenure or promotion.
34
35   Faculty assignments to off-campus instruction generally are incorporated into the regular teaching
36   load, warranting no additional compensation. Part-time faculty may be assigned to off-campus
37   instruction on the same basis as on-campus assignments.
38

39   **6.6.3.2 Administrators**
40
41   Administrators may have teaching assignments; however, they normally are not entitled to
42   additional compensation for teaching. Administrators or staff personnel whose responsibilities do
43   not include teaching, and who almost invariably do not have faculty status, may, in special
44   instances, be assigned to teach a course. This teaching assignment is normally considered an

9

Calvente-DePaul 000100

July 1, 2018

integral part of the person's responsibilities for which the university provides no additional compensation.

Should another higher education institution invite an administrator to teach a course, he or she would be under the same restrictions applicable to faculty teaching outside the university.

Administrative personnel who have faculty status may receive a teaching assignment during the summer session. As the university considers the assignment to replace some administrative functions during this period, the administrator is not entitled to additional compensation.

### 6.6.3.3 Graduate Assistants and Fellows

Assignment of full responsibility of teaching a course is limited to persons who have full-time or part-time faculty appointments in the university. In exceptional cases a graduate assistant may be given such an assignment if the graduate assistant is in a doctoral program and has already successfully completed the Master's degree or its equivalent.

### 6.6.3.4 Summer Session Assignments

Faculty members with 10-month contracts may accept or decline courses offered to them during the summer.

### *6.6.4 Activities Outside the University*

Faculty members are encouraged to pursue activities outside the university that contribute to DePaul's mission, including social, civic, and religious activities, and service to one's professions and professional associations. However, because a full-time faculty appointment implies a full commitment to DePaul University, outside activities must conform to the following limits:

1. They must not interfere with the faculty member's commitment to the full academic life of the university, including teaching, research, student advisement, governance, and related responsibilities.

2. During the regular academic year, the faculty member must give precedence to university responsibilities.

3. Two additional limits apply to outside activities for which the faculty member receives remuneration:

   - They must be professional activities that contribute to the professional development of the faculty member or provide expertise to the community; and

   - Over the course of a year, they must not exceed the equivalent of one day per work week.

10

Calvente-DePaul 000101

July 1, 2018

4. The faculty member will arrange privately for whatever support services his or her outside activities may require. Only with prior approval of the dean may a faculty member enlist the services of university personnel or employ university supplies and equipment for outside activities.

5. Each January, faculty members must submit an annual report on their work-related activities with any outside firm, agency, or institution if they (i) serve on a continuing basis as a consultant or in a similar role; (ii) are continuing members or officers of the outside entity, or (iii) normally provide services for the outside entity at least once a week, even if for less than a full day. The report goes to the dean, with a copy to the local academic unit officer in colleges organized into departments.

6. The faculty member is primarily responsible for determining whether outside activities are compatible with the responsibilities of a faculty member. Nevertheless, the dean must ultimately decide whether a faculty member's outside activities conform to the limits enumerated above. Deans may place specific restrictions on outside activities in order to satisfy policy requirements.

7. Teaching at another higher education institution while under contract at DePaul is permitted only in those specific instances for which the dean has given written approval.

8. Material violation of this policy is considered a violation of the faculty contract and could be cause for abrogation of contract and termination of tenure in accordance with the policies and procedures in Chapter 4.

## 6.7 Leaves of Absence

Leaves of absence may be granted for advanced study and research, a temporary position elsewhere compatible with one held at DePaul, medical need or disability in accordance with university policy, or personal reasons. The duration of a leave may be a full academic year or one or more terms.  Only in exceptional cases will a leave be granted for more than one year.

Non-medical leaves are generally granted without salary. For other types of leave, the salary  is reduced by one-third for each quarter of leave; for faculty of the College of Law, salary is reduced by one-half for each semester of leave.

University sponsored paid leaves are available through the Quality of Instruction Council and the University Research Council. These types of leaves have their own unique policies and procedures. For further details, please see the guidelines and applications forms for the Quality of Instruction Council and University Research Council.

A request for a full year of leave should be submitted in writing on or before January 15 of the preceding academic year. A request for leave for an academic term should be submitted in writing no later than the beginning of the term preceding the one for which leave is sought.

The local academic unit officer, the college dean, and the provost must approve a leave. They consider, among other factors, the effect of the faculty member's absence on the department or college and the possibility of finding a qualified replacement on a temporary basis. In granting leaves, the university accords priority to projects that will contribute to the faculty member's

11

Calvente-DePaul 000102

July 1, 2018

1   professional development and to projects for which the faculty member has obtained funding
2   from external sources. The university does not normally grant simultaneous leaves to more than
3   one faculty member of an academic unit.

4
5   University policies and procedures on renewal and termination apply to faculty on leave.

6   Information regarding the continuation of employee benefits during a leave is available in the
7   Office of Human Resources and should be confirmed prior to the start of the leave.

8   If a college or department sponsors a separate leave program, a faculty member can obtain details
9   through the college or departmental office.

10   **6.8 Salaries**

11
12   The university makes decisions regarding salary in accordance with its budget guidelines.
13   Normally, salary decisions result in a merit increase and, when budgets permit, may include
14   increases for such things as equity and market adjustments. The salary recommendation is made
15   by the college dean.

16
17   Full-time faculty are paid on a biweekly basis in twenty-six payments per fiscal year. Part-time
18   faculty are paid biweekly during each quarter in which they are teaching (usually five pay periods
19   per quarter). During summer sessions, faculty are paid in two or three equal payments per
20   summer session. The Payroll Department determines payroll dates.

21

22   **6.9 Academic Policies**

23

24   In fulfillment of its governance role as defined in section 1.2.1 of the Faculty Handbook: Primary
25   Responsibilities of the Faculty, Faculty Council has its own proper guidelines to govern the
26   creation of academic policies, leading to approval of proposed policies and policy revisions by
27   the President.

28   After approval of policies and procedures that fall within Faculty Council's areas of
29   responsibility, the documents should be integrated into the university's online policy and
30   procedures manual. While the President and the Board of Trustees have authority to reverse
31   faculty decisions that fall within areas of primary faculty responsibility, the university expects
32   that they would do so only in exceptional circumstances and would communicate the reasons to
33   the faculty.

34   **6.10 Establishing a New University Policy**

35   Except with respect to the establishment of academic policies under Faculty Council authority,
36   the Office of the Secretary coordinates the establishment, archiving, revision, approval, and
37   publication of all university policies and procedures.

38   Details on academic policy and process appear on the University Policies and Procedures web
39   site.
40

Calvente-DePaul 000103

# Exhibit F

DocuSign Envelope ID: 71GCDF2A-45DB-4FC6-96A9-877FCAB9940B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF ISABEL DIAZ

---

1.      My name is Isabel Diaz.  I am over the age of eighteen (18) years and fully capable of making this Declaration.

2.      The facts in this Declaration are within my personal knowledge and are true and correct, and I am qualified to make the statements in this Declaration.

3.      I am currently employed by DePaul University as an HR Employee Relations & EEO Director, and I am a custodian of records for certain business records of DePaul University. The document attached hereto as Exhibit 1 is a business record of DePaul University. This document was kept in the regular course of business, and it was the regular course of business for an employee or representative, with knowledge of the act, event, condition, or opinion recorded, to make a record or to transmit information thereof to be included in such documents; and the document was made at or near the time of the act, event, condition or formation of the opinion, or reasonably soon thereafter. This document is a duplicate of the original with the exception of any redactions made for confidentiality purposes.

4.　　　While Dr. Calvente was on research leave during the 2015-2016 academic year, OIDE conducted a full investigation into Dr. Lisa Calvente's complaints of discrimination and harassment and found no evidence of discrimination or harassment. Barbara Schaffer, former Associate Vice President of OIDE prepared a memorandum summarizing the investigation, and a true and complete copy of that memorandum is attached to this Declaration as Exhibit 1.

5.　　　DePaul University has no record of an internal complaint of discrimination filed by Dr. ▆▆▆▆▆▆.

6.　　　On July 5, 2019, OIDE closed its investigation of Dr. ▆▆▆▆ internal complaint of race discrimination.

7.　　　The individuals listed below have the following races, according to DePaul's records:



- Xiaoping Jia (Asian);
- 

8.     I have knowledge of the facts stated herein and I declare under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

11/17/21 | 1:27 PM EST

Executed on this ___ day of November, 2021.

Isabel Diaz
Isabel Diaz

LEGAL\55162937\1

*EXHIBIT 1*

TO:           Salma Ghanem, Dean, College of Communication

FROM:        Barbara Schaffer, Associate Vice President, OIDE

CC:           Dr. Elizabeth Ortiz, Vice President, OIDE

Date:         July 4, 2016

RE:           Calvente.Personnel Committee Case #00965

**OIDE does not find the members of the Personnel Committee reviewing Dr. Calvente in violation of the *Anti-Discrimination and Anti-Harassment Policy*. There is insufficient evidence to support Dr. Calvente's allegations that she has been discriminated and harassed on the basis of race and gender, or that the Personnel Committee had discriminatory intent when reviewing Dr. Calvente.**

**Background**
On May 5, 2015 Dr. Liz Ortiz received an email from Dr. Lisa Calvente alleging discrimination on the basis of her race and gender by the Personnel Committee in the College of Communication.  Barbara Schaffer met with the complainant on Tuesday, May 12, 2016.  The procedures for opening an investigation require that the complainant approve all allegations brought to the respondent(s), and after approval, notification letters were sent to members of the Personnel Committee on September 29, 2015. Calvente indicated that she would be on leave for the entire 2015-2016 school year.

At Calvente's second formal review the Personnel Committee voted 6-1 to terminate Calvente's contract and they did not recommend retention or contract renewal  "[b]ased on the Personnel Committee's unanimous evaluation that Lisa is not making progress towards tenure in teaching… or… research…." They further concluded that Calvente was making "poor to fair progress towards tenure in service."(*College of Communication Recommendation of continuation or termination of Untenured Faculty Contract, March 7, 2015)*.  As per COC procedures, the college then voted on the retention and renewal of Calvente; 13 tenured faculty voted in favor of termination, 5 in favor off continuation, and 2 abstentions.  The Dean overturned the recommendation and renewed Calvente's contract, based upon her conversation with Calvente on March 30, 2015, in which the Dean was assured that she would address the issues brought up in her teaching, scholarship and service. Calvente was given specific measures to address the issues brought up in the report.

**Complaint**
Dr. Calvente alleges that the Personnel committee discriminated and harassed her on the basis of her gender and race during her formal review, February, 2015.  She further alleges that the committee has treated her differently from other faculty members, and that these discriminatory behaviors are consistent with the mistreatment of a previous faculty member of color seeking tenure.  She also alleges that the committee has ignored her accomplishments as a DePaul University faculty member and exhibited hostility in her 3rd. year faculty evaluations.
Specifically, she alleges that:
1. She is the only brown American woman in the college who specializes in black/brown politics in the U.S. and that the Personnel Committee takes issue with the political approaches and teaching practices, labeling her as "hostile" and "intimidating" as a result of her color;
2. No women of color have been tenured in the college;
3. The Committee ignored the majority of both qualitative and quantitative evaluations, which state that she is "an excellent instructor" (Student Report 2014), which were not ignored for white instructors seeking tenure;

4. The Committee ignored her evaluation scores, which surpass <u>all</u> of the faculty averages in the following categories: overall quality of the course, overall teaching effectiveness, the increase of knowledge, and command of the subject;

5. By your choosing to focus on the minority of evaluations labeling her as "hostile", the committee has engaged in behaviors that unfairly scrutinize faculty of color who are primarily women;

6. The Committee blatantly violated procedure by reviewing her as a 4th year faculty member, ignoring her FMLA personal leave between 2012-2013, which cannot be counted and was not a research leave, while ████████, a white male who was hired the same year as she and was reviewed at the same time, was reviewed by the Personnel Committee, and was told by the Committee at this review to be sure to stop his clock for his research leave the year before.

7. The Committee included "conversations" in the "College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract" Report of March 7, 2015, that were not documented and are not included as evidence, as per College and University policy. The conversation that occurred during the interview with Dr. Calvente was out of context, inaccurate, or both and the statements from the student reporter were not from the student report but allegedly stated by the student during his conversation with Personnel before Dr. Calvente's interview. The student reporter's quoted statements contradict the Student Report.

**METHODOLOGY**
Interviews and email exchanges:



<u>Documents reviewed:</u>
- Emails
- Calvente formal review SharePoint documents, to include:
  1. "Student Assessment  of Faculty Performance" report
  2. Personnel Committee's *College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract*
  3. Calvente response document to the Personnel committee's document
  4. Dean's letter of reappointment
  5. College vote document
  6. Teaching evaluations
- *Faculty Handbook*
- *College of Communication Criteria for Promotion and Tenure*
- ████████ Personnel Committee's *COC Recommendation of Continuation or Termination of Untenured Faculty Contract*
- Dean's tenure review letter of named comparator,  Rutigliano, and subsequent letter of non-renewal
- ████████ Personnel Committee's *COC Recommendation of Continuation or Termination of Untenured Faculty Contract*
- Historical List of Faculty of tenure status of faculty of color in the College of Communication
- College Committee Service & University Committee Service list, College of Communication

2

**FINDINGS**

As noted above, OIDE does not find the Personnel Committee, either individually or as a group, in violation of the University's *Anti-Discrimination and Anti-Harassment Policy*. The evidence does not support that the decision not to renew was made with discriminatory intent nor had she been subject to different treatment from white faculty members in making their decision. The crux of the decision by the faculty rested upon Lisa's attitudes and responses towards the committee's attempts to address what they perceived as weaknesses in her tenure case and her refusal to listen to or take constructive criticism in both her interview with the Personnel Committee and her written response to the tenure document, her poor progress in scholarship, and her fair to good service.

***Allegation 1:  She is the only brown American woman in the college who specializes in black/brown politics in the U.S. and that the Personnel Committee takes issue with the political approaches and teaching practices, labeling her as "hostile" and "intimidating" as a result of her color.*  NO FINDING**

Calvente contends that not only does the subject matter in and of itself leads to hostility, but that she, as a black woman, has experienced "structural racism," which has resulted in disparate treatment of her by the personnel committee and their labeling her as *hostile* and *intimidating*. All members of the Personnel Committee denied this allegation. Two committee members indicated that the words*, hostile* and *intimidating* were words that students used to describe her class, not words that the committee ascribed to her, and these words were confirmed to have come from the evaluations themselves.

While the investigation did confirm that Calvente is the only black/brown American woman in the college whose research specializes in black/brown politics, two members of the committee pointed out that faculty members in the College (and in the academy, in general) have their own particular research specialty, which is not duplicated by others, to maintain breadth in both subject area and research agenda. In addition, multiple members of the committee indicated that they, as well as other faculty members within the college, including faculty of color, include race, racism and white privilege in their courses, and that they, too, discuss critical race theory, which is identified as the "political" premise to which Calvente identifies. The Chair stated that some of the faculty of color were offended when Calvente stated to them that she was the only faculty of color to teach what she teaches. The difference, every member agreed, was her attitude towards her teaching of students, not the subject itself.

Every committee member confirmed in interview that they were taken aback by Calvente's personnel interview required for tenure and her subsequent response in writing to the formal review document. One member described the interview as "the worst formal review in which they had ever participated" and another was "appalled" by it. One member described being shell-shocked after the meeting, and every member interviewed said that they had never experienced a meeting where the candidate was as argumentative and obstructionist regarding the questions being asked or requests for information that is the norm for formal reviews in the college. Rather than address the questions, some members felt that she affirmed the thread of negative comments: that she created an environment that was *hostile* and *intimidating* to the committee members, and that Calvente was not willing to engage in constructive dialogue.

They stated that the practices in the department for these types of meetings is to ask for responses to the weaknesses in their portfolio, and they asked Calvente about a thread of comments that labeled her as

3

hostile.  In reviewing the evaluations, I was able to support the committee's contention that a thread of negative comments did exist in the evaluations.  Teaching effectiveness, as defined in the T & P Guidelines, is "working to foster a classroom that reinforces values inherent in the University mission."  Each member of the committee referred to Calvente as lacking a Vincentian approach to teaching, stating more than once that she asked students to drop, did not want certain students in her class, and did not feel that it was her obligation to engage all students or make all students welcome.  While it is true that much in her pedagogy is uncomfortable for many students, in reviewing the evaluations, it was clear that it was not the subject matter that made students uncomfortable, but her teaching methods of that subject matter.   As one committee member stated, "It wasn't about her politics, but [about] pedagogy."

More than one member of the committee reiterated that the purpose of these interviews is to address perceived weaknesses in the areas judged for tenure.  The Chair indicated that CoC is the only unit to "let people go" if the issues brought up by the committee are not addressed.  In fact, the issues they felt were weak in ███████ tenure case, his research, led to his renewal of his contract only upon addressing the this issue, and placed upon him the requirement that he have another review prior to his tenure contract.  Subsequently, he was told that he would not renewed.

 The personnel committee also felt her teaching practices were inconsistent with the Vincentian Mission, as well as inconsistent with the values of the department.  When reviewing the other formal review documents of both █████████████████, both referenced in Calvente's complaint, references to the Vincentian mission are also found and it is clear that adherence to Vincentian values and the mission figured greatly in their discussion of these candidates, as well, indicating the importance of the incorporation of these values into the pedagogy of the candidate. In fact, the opening sentence of Picot-Herbert's section of teaching in her *Recommendation*…report is: "Lisa's remarkable teaching is informed by the Vincentian mission of our university."

In addition, this focus by the Personnel Committee members on the weaknesses of the portfolio was exhibited in ██████s documents as well, although the subject of his weaknesses—his research record—was different from the weaknesses in Calvente's tenure portfolio.  That the committee focused upon weaknesses in both candidates' files supports the conclusion that there was no discriminatory intent or discrimination in the review of the candidate.

The committee felt that another issue with Calvente's tenure review was her obstructionist and combative view towards the process and the committee.  Calvente refused to upload her documents prior to the interview meeting, and in interview, some committee members stated that they were frustrated, annoyed, and confused by this.  Committee members stated that she said that she had no obligation to upload her documents.  While the personnel committee is reconstituted every three (?) years, many of the members stated that they had previously sat on other personnel committees and were upset that they did not have the complete dossier to review at the time of the interview. ██████████ confirmed dates that documents were uploaded, and some of those documents were uploaded after the interview.

**There is no evidence to support that race or systemic racism was a factor in the decision of the faculty not to retain Calvente.**

4

***Allegation 2: No women of color have been tenured in the college:*** **NO FINDING**

A list of the faculty indicates that as of the 2014-2015 school year, 10 faculty members are women of color. Of these 10 faculty members, 4 are tenured, and 6 are untenured. Two women identify their race/ethnicity as *unknown*. Of these two women, one was tenured. During the 2014-2015 year, one of the tenured women faculty members took a position at another institution. Some women of color of the faculty were upset at the notion that they were not considered women of color. Calvente was referring to "black/brown" women of color, and is not including Asians as women of color in her allegations. She is correct that there are few black/brown women of color in CoC, but in one case a faculty member resigned to take another position at another university, and ███████████, and comparator of Calvente's states that her problem was with the University board and her research, and she did not believe it was a "color issue." ███████ is teaching an online course for the college now. It is the suggestion of OIDE that CoC make a concerted effort to hire and retain women of color, mentoring them, once hired, through the tenure process. Two females of Asian descent are currently tenured, and one of Hipsanic/Latino descent (See Appendix I).

***Allegation 3: The Committee ignored the majority of both qualitative and quantitative evaluations, which state that she is "an excellent instructor" (Student Report 2014), which were not ignored for white instructors seeking tenure.*** **NO FINDING**

In a review of the *College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract* it is clear that the college did not ignore the high praise Calvente received from students, and acknowledged her "consistently strong" evaluations. In reviewing the evaluations themselves, I concur with their assessment that quantitatively the evaluations are "routinely keeping in close range to the college's very high numbers…" but that "qualitatively… [Lisa's] course evaluations indicate a range of recurrent and somewhat polarizing themes…." In interview, the Chair of the committee indicated that most complaints of teaching of previous faculty—white faculty or faculty of color—center around topics like organization of the course, but never, could she remember, issues of climate to such an extent having been raised. In addition, ███████ course evaluations focused upon his passion for his subject and did not contain any negative climate issues. There is no evidence to suggest that the committee applied different standards to ████████ for as mentioned above, a reference to Vincentian values constitute a major standard when reviewing teaching. Again, this standard was used in ████████ evaluation of her teaching.

In addition, the investigation uncovered that in 2014 a white faculty member ████████████) had his first formal review in 2014 and his evaluations indicated that his teaching was so concerning that they required that he be reviewed again in spring 2015. He acknowledged that there was something to be fixed and he listened to the feedback, indicating that all instructors—white and of color—are required to meet the same teaching standards.

***Allegation 4: The Committee ignored her evaluation scores, which surpass*** <u>***all***</u> ***of the faculty averages in the following categories: overall quality of the course, overall teaching effectiveness, the increase of knowledge, and command of the subject.*** **NO FINDING**

This allegation cannot be substantiated. While many students found Calvente an excellent teacher, a review of the evaluations used for her tenure review reveal that she did not surpass **all** of the faculty averages in the four categories she alleges (See Appendix II for a summary of findings).

5

***Allegation 5: By [your] choosing to focus on the minority of evaluations labeling her as "hostile", the committee has engaged in behaviors that unfairly scrutinize faculty of color who are primarily women of color.*** **NO FINDING**

There is no evidence to support Calvente's contention that different standards apply to faculty women of color. As noted in the discussion of Allegation 3, similar standards were applied to ████████ ██ ██████████ did not receive tenure as a result of her research agenda, and all three candidates were judged on the same criteria and there is no evidence to support that she was unfairly scrutinized as a faculty of color.

***Allegation 6: The Committee blatantly violated procedure by reviewing her as a 4th year faculty member, ignoring her FMLA personal leave between 2012-2013, which cannot be counted and was not a research leave, while Lou Rutigliano, a white male who was hired the same year as she and was reviewed at the same time, was reviewed by the Personnel Committee, and was told by the Committee at this review to be sure to stop his clock for his research leave the year before.*** **NO FINDING**

Emails and interviews confirm that there was a great deal of confusion surrounding what review year this was for Calvente, and at first the committee did have the incorrect year—4th year review instead of 3rd year review. However, this confusion stemmed from a procedural miscommunication and a mistake, and was not a result of any racial bias. Calvente's time clock coincided with many changes in the College. When Calvente began her employment with DePaul, Jackie Taylor was Dean of the College. ████ ██████ was the Associate Dean and head of Personnel. These positions were combined and he kept track of all faculty and where they were in the tenure process. Unfortunately, there were multiple changes during the time after Taylor left, and the tracking of where individuals were in the process were not updated.

 When Taylor was Dean she had a practice of granting a faculty member fall quarter off if they had a baby in the summer. Typically, faculty are on a 10-month contract, and so when an individual has a baby in summer, it does not interfere with an academic appointment, and so technically, one is not eligible for a leave. Taylor would extend an "off record" leave, and she would give the faculty member the quarter off from teaching. Because this could not be considered a formal leave, it did not involve "stopping the clock" for tenure. Two faculty members before Calvente-- ██████████████ (who let before she went for tenure) — did not stop their tenure clocks. If Calvente had not taken a formal leave, she would have been in her 4th year. So, while the committee did know that Calvente was out, they took it for granted that they were given the correct information when informed that it was her fourth year review. Calvente requested a leave and requested to "stop her clock," which is confirmed in an email. She was granted the leave through the Reed Group. However, this information never reached the personnel committee.

To compound this confusion, ██████████, in Academic Affairs, mistakenly sends two separate emails confirming two different years. One email states that Calvente is in her fourth year and another, her third year.

Therefore, there is no evidence to support that the confusion surrounding Calvente's review year was a result of her race.

6

Calvente-DePaul 0006972

***Allegation 7: The Committee included "conversations" in the "College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract" Report of March 7, 2015, that were not documented and are not included as evidence, as per College and University policy. The conversation that occurred during the interview with Dr. Calvente was out of context, inaccurate, or both and the statements from the student reporter were not from the student report but allegedly stated by the student during his conversation with Personnel before Dr. Calvente's interview. The student reporter's quoted statements contradict the Student Report.*** **NO FINDING**

The process for choosing the student representatives is handled by ▮▮▮▮▮▮▮, Assistant Dean of the College. ▮▮▮▮ sends an Email explaining the process for the volunteer position. If a student responds, ▮▮▮▮ meets with them regarding the report. Ten students were recruited and matched to a case. The students did not know who they would be assigned to until meeting with Ramsey. Ramsey held an informal meeting with the students following the case meeting.

The student representative, ▮▮▮▮▮▮▮▮▮, wrote a report and met with the personnel Committee. Calvente is correct that the student did not mention any negative comments in the report, and when interviewed, could not remember many specifics about the meeting. He recalled saying that "she was a tough teacher with a unique teaching style, but they appreciated her." He could not recall specifics about what the committee asked him, but he does remember using vague words like "intimidating" and "nice." The committee asked him to expound on these terms, and in the interview with the Investigator, he pointed out some of the comments he remembered mentioning. He also mentioned an incident regarding a harsh response she gave to a student, but while searching for that comment in the interview with the Investigator, he could not find it. When asked why he didn't include any negative comments in his report, he didn't have an answer.

The new faculty handbook states that materials submitted from the college consists of "data supplied by the college through the student input instrument." The CoC did update their policies to comply with the new handbook, but there were no changes to the section regarding student interviews. It has been the practice to include comments during the student interview in the *College of Communication Recommendation of Continuation or Termination of Untenured Faculty Contract* document. The Dean confirms that there has never been a policy explicitly forbidding information from the interview with the student representative in the review.

7

**Appendix I**

| Faculty Name | Rank | Tenure Track Status | Ethnicity | Disposition |
|---|---|---|---|---|
|  |  |  |  |  |
| **2009-2010** |  |  |  |  |
|  |  |  |  |  |
|  | Associate Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Asian Pacific | Resigned |
|  | Professor | T | Asian Pacific |  |
|  | Associate Professor | T | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Instructor ABD | UT | Unknown |  |
|  | Assistant Professor | UT | Asian Pacific | Resigned |
|  | Assistant Professor | UT | Unknown |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  |  |  |  |  |
| **2010-2011** |  |  |  |  |
|  |  |  |  |  |
|  | Assistant Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  | Professor | T | Asian Pacific |  |
|  | Associate Professor | T | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Instructor ABD | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  |  |  |  |  |
| **2011-2012** |  |  |  |  |
|  |  |  |  |  |
|  | Assistant Professor | UT | Hispanic |  |
|  | Assistant Professor | UT | Hispanic |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  | Instructor ABD | UT | Foreign |  |
|  | Professor | T | Asian Pacific |  |
|  | Associate Professor | T | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Instructor ABD | UT | Hispanic | Resigned ABD |

8

CONFIDENTIAL

Calvente-DePaul 0006974

|  | Assistant Professor | UT | Asian Pacific |  |
|--|--|--|--|--|
|  | Assistant Professor | UT | Asian Pacific |  |
|  |  |  |  |  |
| **2012-2013** |  |  |  |  |
|  |  |  |  |  |
|  | Assistant Professor | UT | Hispanic |  |
|  | Assistant Professor | UT | Hispanic |  |
|  | Assistant Professor | UT | Asian Pacific |  |
|  | Assistant Professor | UT | Unknown |  |
|  | Associate Professor | UT | Unknown |  |
|  | Assistant Professor | UT | Asian |  |
|  | Instructor ABD | UT | Foreign |  |
|  | Professor | T | Asian |  |
|  | Associate Professor | T | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | Foreign |  |
|  | Assistant Professor | UT | Asian |  |
|  |  |  |  |  |
| **2013-2014** |  |  |  |  |
|  |  |  |  |  |
|  | Assistant Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Asian |  |
|  | Assistant Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Unknown |  |
|  | Associate Professor | UT | Unknown |  |
|  | Assistant Professor | UT | Asian |  |
|  | Assistant Professor | UT | Foreign | Ph.D. |
|  | Professor | T | Asian |  |
|  | Professor | T | African American | Promotion |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | African American |  |
|  | Assistant Professor | UT | Foreign |  |
|  | Associate Professor | T | Asian | Tenure/Promotion |
|  |  |  |  |  |
| **2014-2015** |  |  |  |  |
|  |  |  |  |  |
|  | Associate Professor | T | Hispanic/Latino | Tenure/Promotion |
|  | Assistant Professor | UT | Hispanic/Latino |  |
|  | Assistant Professor | UT | Asian |  |

9

Calvente-DePaul 0006975

| | | | | |
|---|---|---|---|---|
| | Assistant Professor | UT | Hispanic/Latino | |
| | Assistant Professor | UT | Unknown | |
| | Associate Professor | UT | Unknown | |
| | Assistant Professor | UT | Asian | |
| | Assistant Professor | UT | Foreign | |
| | Professor | T | Asian | |
| | Professor | T | African American | Resigned |
| | Assistant Professor | UT | African American | |
| | Assistant Professor | UT | African American | Denied Tenure/Resigned |
| | Assistant Professor | UT | Foreign | Resigned |
| | Associate Professor | T | Asian | |
| | | | | |
| **2015-2016** | | | | |
| | | | | |
| | Associate Professor | T | Hispanic/Latino | |
| | Assistant Professor | UT | Hispanic/Latino | |
| | Assistant Professor | UT | Asian | |
| | Assistant Professor | UT | Hispanic/Latino | |
| | Assistant Professor | UT | Unknown | |
| | Associate Professor | T | Unknown | Tenure |
| | Assistant Professor | UT | Asian | |
| | Assistant Professor | UT | Foreign | |
| | Professor | T | Asian | |
| | Assistant Professor | UT | African American | |
| | Associate Professor | T | Asian | |

10

CONFIDENTIAL

Calvente-DePaul 0006976

**Appendix II**

**Calvente Teaching Evaluations: Student Report Analysis**

## CLASSES BELOW DEPARTMENT AVERAGE ON QUESTIONS 1, 2, 3, or 6
Question 1: Given your experience at DePaul, rate the overall quality of the course
Question 2: Given your experience at DePaul, rate the instructor's overall teaching effectiveness
Question 3: This course increased my knowledge and skills
Question 6: The instructor demonstrated a command of the subject matter

**ABD 290, Section: 401 [African & Black Diaspora Studies]**
Questions: 1, 2, & 3

**CMNS 330, Section: 401 [Communication Studies]**
Questions: 2

"The instructor at times puts people down unknowingly I think. She would be really grumpy some days and other days really happy and you never knew which but her mood would affect how she ran the class"

**LSP 200, Section: 402 [Sophomore Seminar]**
Questions: 1, 2, 3, & 6

"One thing that always made me uneasy was the feeling that if I said the wrong thing, I would look stupid in front of the class"

**CMN 103, Section: 403 [Communication]**
Questions: 1, 2, 3, & 6

**INTC 230, Section: 501 [Intercultural Communication]**
Questions: 1, 2, & 3

**CMN 103, Section: 502 [Communication]**
Questions: 1 & 2

"If your opinion did not match the teachers, she did not want to hear what you had to say. Because of this, I know that I attempted to cater my opinion, paper, projects, to her opinion because I feared for my grade"

"I found it very difficult to participate in class because I was afraid of the condescending remarks she made about other students' ideas. I wouldn't raise my hand because even if I understood the theory because I didn't know if the parallel I had drawn in my mind would be acceptable to share. I overall was very discouraged in this class and felt I had no way to succeed"

"I think it great how passionate the professor is on this subject however, I think she needs to let the students get their point across and without coming across as somewhat "attacking" a student for their opinion"

11

"The teacher is very knowledgeable on this subject but if you do not agree with her, she tends to make you feel like you're an idiot. She will listen to your differing views but doesn't encourage them"

**COMMENTS IN COURSES ABOVE DEPARTMENT AVERAGE EVALUATIONS**

**CMN 103, Section: 401**
"I don't think there is a way to make social theories on ethnicity or gender any more depressing"

**CMN 103, Section: 402**
"I think that a lot of students (myself included) thought that she should slow down but were intimidated to ask her. She is a very nice woman and a great professor, but can be slightly intimidating which affects students' approach to her"

"Even though I really enjoyed the course and learned a lot, I felt nervous about speaking up at times. I participate a lot in my courses; however I felt that in this course I was intimidated to speak up in fear of being wrong. I felt that the classroom environment could be a bit depressing at times. I felt very anxious about the course at times and I think this could be changed by a more positive atmosphere. I think the course could benefit from more encouragement from the instructor and letting us know when we are doing well instead of intimidating us or reminding us how challenging the course is"

"It was challenging for some students to freely state their opinion without Dr. Calvente immediately shutting them down or making a face indicating how wrong they were"
"At times I felt as though the environment became hostile and sensitive when discussing issues making other classmates feel uncomfortable"

"I think the professor really needs to work on her arrogance and her attitude which made her very unapproachable"

"Dr. Calvente was insistent on students dropping the class on the first day and was shocked when students hadn't the second day. A little more encouragement from her about what she expected from us would have been nice"

**INTC 230, Section: 601**
"The instructor seemed to favor certain students among others, which grew tiresome. I feel that some of the feedback offered regarding performance workshops was based on personal preference, rather than being constructive. The professor displayed a hostile attitude during some of the in class debates, which discouraged the facilitation of ideas"

**CMN 290, Section: 501**
"Instructor often made students feel inferior. She rolled her eyes at some questions asked and often misunderstood students concern. Students eventually became afraid to speak at all in fear of ridicule"

12

Calvente-DePaul 0006978

"I would have like to interact with some of my classmates in smaller groups because I believe sometimes people were afraid to speak in front of such a large group"

**INTC 308, Section: 801**
"I got the strong impression that Dr. Calvente was trying to prove something with this class. Her syllabus and her formal introduction during the first couple of the course came off overly ambitious and aggressive"

**STUDENT ASSESSMENT OF FACULTY PERFORMANCE**
Opportunities
>    "There is room to create a more positive class environment"
>    "Criticism can sometimes be intimidating and abrasive; need for diplomacy"

13

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


LISA CALVENTE,                        )
                                      )
     PLAINTIFF,                       )
                                      )
VS.                                   ) NO. 1:20-CV-03366
                                      )
SALMA GHANEM AND DEPAUL               )
UNIVERSITY,                           )
                                      )
     DEFENDANTS.                      )


          The Zoom webconference discovery

deposition of DOCTOR SUSAN ZAESKE taken by Gina

Marie Zangara, C.S.R., on July 8th, 2021, at the

hour of 10:02 a.m.

Page 2

```
 1   APPEARANCES REMOTELY VIA ZOOM:
 2
          LAW OFFICES OF FITZGERALD BRAMWELL
 3        BY MR. FITZGERALD T. BRAMWELL
          225 West Washington Street
 4        Chicago, Illinois 60606
          (312) 924-2884
 5        bramwell@fitzgeraldbramwell.com
          appeared on behalf of the Plaintiff;
 6
 7        COZEN O'CONNOR
          BY MR. ANNELIESE WERMUTH
 8        123 North Wacker Drive, Suite 1800
          Chicago, Illinois 60606
 9        (312) 474-7900
          Awermuth@cozen.com
10        Appeared on behalf of the Defendants.
11
12   ALSO PRESENT:  KATHRYN STIEBER
                    LISA CALVENTE
13
14                I N D E X
15
16   WITNESS:                        PAGE:
17   DOCTOR SUSAN ZAESKE
18       Examination by Ms. Wermuth      5, 206
         Examination by Mr. Bramwell    181, 207
19
20
21
22
23
24
```

Page 3

```
 1
 2
      EXHIBITS MARKED:                  PAGE:
 3
 4   EXHIBIT 1      SUBPOENA              12
 5   EXHIBIT 2      ZAESKE CV            32
 6   EXHIBIT 3      ZAESKE REPORT        66
 7   EXHIBIT 3.1    CARNEGIE            107
 8   EXHIBIT 3.2    DEPAUL CRITERIA     143
 9   EXHIBIT 3.3    UNC CRITERIA         73
10   EXHIBIT 4      CALVENTE OFFER LETTER 60
11   EXHIBIT 5      LC4086-90            61
12   EXHIBIT 7      CARNEGIE            100
13   EXHIBIT 11     CARNEGIE            114
14   EXHIBIT 14     WASHINGTON POST     115
15   EXHIBIT 15     JOBS AFTER DENIAL   135
16   EXHIBIT 16     LIFE AFTER DENIAL   132
17   EXHIBIT 21     TEMPLATE            140
18   EXHIBIT 22     INSIDE HIGHER ED    118
19   EXHIBIT 23     CHRONICLE OF HIGHER ED 130
20
21
22
23
24
```

Page 4

1    COURT REPORTER:  All parties are
2  aware that the witness will be sworn in remotely.
3  The parties agree not to challenge the validity
4  of any oath administered by the court reporter,
5  even if the court reporter is not physically
6  present with the witness and not a notary public
7  in the state where the witness resides.
8         Here begins the webconference
9  deposition of Doctor Susan Zaeske in the matter
10  of Lisa Calvente versus Salma Ghanem and DePaul
11  University.
12         Today's date is July 8th, 2021
13  and the time is 10:02 a.m.  My name is Gina
14  Zangara of Thompson Court Reporters.  Beginning
15  with the noticing party, will the parties
16  introduce themselves, state whom they represent
17  and stipulate to the swearing in of the witness
18  remotely.
19     MS. WERMUTH:  This is Anna Wermuth.
20  I represent DePaul University and Doctor Ghanem.
21     MR. BRAMWELL:  Good morning.  This
22  is Jerry Bramwell, B R A M W E L L, representing
23  Doctor Calvente.
24         (Witness so sworn)

Page 5

1    DOCTOR SUSAN ZAESKE:
2  CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST
3  DULY SWORN, WAS EXAMINED UNDER OATH AND TESTIFIED
4  AS FOLLOWS:
5         EXAMINATION
6     BY MS. WERMUTH:
7     Q.  Good morning, Doctor Zaeske.  I had the
8  presence of mind to ask Mr. Bramwell how to
9  pronounce your name, so hopefully I am doing that
10  correctly.
11     A.  Wonderful.  Thank you.
12     Q.  Okay, good.  Do you prefer that I refer
13  to you as Doctor Zaeske then throughout this
14  deposition?
15     A.  That would be great.
16     Q.  Okay, terrific.  I will do that.  You
17  are welcome to call me Anna if you need to refer
18  to me, okay?
19     A.  Thank you.
20     Q.  Can you please, as we are getting
21  started here, state your full name for the
22  record?
23     A.  My full name is Susan Zaeske.
24     Q.  Can you spell your last name for us?

1    A.   Spelled Z as in zebra, A, E as in
2    elephant, S as in Sam, K, E as in elephant.
3    Q.   Doctor Zaeske, have you ever had your
4    deposition taken before?
5    A.   No, I have not.
6    Q.   Okay.  So I'm going to go over just a
7    couple of what I'm going to call groundrules, and
8    you know, this is not intended to be a marathon
9    today.  So number one, if you need a break, just
10   let me know, okay, and I'll try to accommodate
11   that.  We are human.  We need water.  We need
12   food.  We need bathroom breaks.  So feel free to
13   let me know when you need to take a break.  Okay?
14   A.   Thank you.
15   Q.   And I'll try to accommodate your request
16   as quickly as possible.  One of the really
17   important things about today is that we get a
18   clean record, which means it is important that we
19   don't speak over one another.  I personally tend
20   to be slow in my presentation, and I pause, so it
21   will -- it is conceivable that you will start
22   answering before I am done asking a question.
23   That's also human.  It is what we do when we are
24   communicating with one another.

1            And so I will just let you
2    know if I'm not done with my question, okay?  And
3    that helps the court reporter because it's hard
4    for her to take down what I am saying if you are
5    also talking at the same time.  Is that fair?
6    A.   Absolutely.
7    Q.   Okay.  And in the reverse, I'm going to
8    do my best to allow you to fully finish your
9    answer before I start talking, okay?  And if you
10   have not finished your answer, will you please
11   let me know?
12   A.   Certainly.
13   Q.   Thank you.  It is also, I think in terms
14   of getting a clear record, it is important that
15   your answers are verbal.  So we often communicate
16   as someone who is a scholar in communication
17   probably knows through verbal cues.  Because we
18   are going to have a black and white transcript,
19   the court reporter can't take down uh-huhs or
20   nods of the head, okay?  So it will be important
21   for your answers to be verbal.  Does that make
22   sense to you?
23   A.   Yes.
24   Q.   Okay.  Terrific.  And then the last

1    thing I'll add here is I do not pretend to be a
2    paragon of clarity.  I'm just an employment
3    lawyer.  So if there is something I ask you that
4    you don't understand, please let me know that,
5    and I'll do my best to ask a question that you
6    can answer and that you do understand.  Is that
7    fair?
8    A.   Thank you.  Yes, I'll do that.
9    Q.   Okay.  Terrific, good.  So we are just
10   going to jump in now.  I'm going to start asking
11   you some questions.  As you know, I represent
12   DePaul University.  So Doctor Zaeske, I hate to
13   ask these questions, but I need to do so.  Are
14   you on any medication today that could impair
15   your ability to testify accurately and honestly?
16   A.   No, I am not.
17   Q.   Thank you.  Have you consumed any drugs
18   or alcohol in the last 24 hours?
19   A.   No, I have not.
20   Q.   Thank you.  Where are you physically
21   sitting today, Doctor Zaeske?
22   A.   I'm sitting in my home office.  Do you
23   want my address in Madison?
24   Q.   No, that's okay.  I'm just trying to

1    understand if you were on campus, if you were at
2    home today.  We are in this new world of doing
3    things remotely, so I just needed to know where
4    you were.
5    A.   Yes.
6    Q.   Is there anyone in the room with you?
7    A.   No, there is not.
8    Q.   Will you let us know if someone enters
9    the room?
10   A.   Certainly, yes.
11   Q.   Thank you.  And do you have any
12   documents or materials with you today?
13   A.   No.
14   Q.   Okay.  Did Mr. Bramwell send to you
15   yesterday a packet of potential exhibits for
16   today's deposition?
17   A.   I think he sent them yesterday.  I
18   checked my Gmail this morning.  So I don't know
19   what time they arrived.
20   Q.   Okay.  Would you be able to access those
21   exhibits today if I ask you to?
22   A.   Yes.
23   Q.   Okay.  Thank you.  Other than the screen
24   that you are using to sort of make eye contact

Page 10

1  with all of us, do you have other screens with
2  materials up that you are looking at?
3      A.  None.  There is a computer sitting
4  behind me, but it is closed.
5      Q.  Fair enough, fair enough.  So you are
6  not in a position right now to be able to be
7  looking at any materials on your computer?
8      A.  No.
9      Q.  Do you have a cell phone with you?
10      A.  I do have a cell phone.
11      Q.  Okay.  Do you agree that you will not
12  use it to communicate or review materials during
13  the course of the deposition?
14      A.  Yes.  I can agree to that, certainly.
15      Q.  Thank you.  Did you do anything to
16  prepare for your deposition today, Doctor Zaeske?
17      A.  I reread the report that I sent to the
18  Court, I guess, or to all of you to remember, you
19  know, what I had said.  And I also reviewed some
20  of the -- Jerry gave me some ideas of what
21  happens like at this moment, in this setting.  So
22  I looked at those notes too.
23      Q.  Okay.  When you say notes, are those
24  like handwritten notes?

Page 11

1      A.  They were -- yeah.  They were notes that
2  I took about what a deposition is about.
3      Q.  I understand.  So you had a meeting with
4  Mr. Bramwell during which time you took some
5  notes?
6      A.  Yep.
7      Q.  Okay.  And when did that meeting take
8  place?
9      A.  That meeting took place about 2 weeks
10  ago.
11      Q.  And that was the last time you met with
12  Mr. Bramwell?
13      A.  Yep.  I think both of us have been on
14  respective vacations since then.
15      Q.  Understood, understood.  And did that
16  meeting take place in person?
17      A.  No.  Via Zoom.
18      Q.  Thank you.  And how long did the 2 of
19  you meet?
20      A.  I think about 30 minutes.
21      Q.  Did you -- let me ask you this.  If you
22  could please open the file with the exhibits.
23  Are you able to look at that and look at the
24  camera at the same time?

Page 12

1      A.  Yeah.
2      Q.  Okay.
3      A.  So this is a message I got yesterday.
4  It came from Jerry yesterday.
5      Q.  Okay.  I have tried to have these
6  premarked with numbers.  So if you could please
7  look at Exhibit Number 1?
8      A.  I'll get there.  Here it is.  Subpoena?
9      Q.  Correct.  And by the way, forgive me.
10  My camera is in front of me, but my exhibits are
11  to the right of me, so I am occasionally going to
12  be turning my head.  I apologize for that.  Yes,
13  so Exhibit 1, you recognize that document?
14      A.  Yes.  Hold on.  There it is.  Yes.
15      Q.  Okay.  And you recognize that as the
16  subpoena that was served on you for documents?
17  Is that your understanding?
18      A.  Correct, right.
19      Q.  And you did receive a copy of the
20  subpoena?
21      A.  Yes.
22      Q.  Can you turn to the last page, the
23  Exhibit A to the subpoena?
24      A.  Yes.

Page 13

1      Q.  Did you provide Mr. Bramwell with
2  documents that were responsive to every single
3  category listed on Exhibit A?
4      A.  Yes.
5      Q.  So all of the materials that you sent to
6  Mr. Bramwell, you have no reason to believe they
7  were not sent to me?
8      A.  Yes.
9      Q.  Okay.  So you were mentioning as we were
10  talking about your preparation that you reviewed
11  the report.  So you did prepare a report in
12  connection with this matter, correct?
13      A.  Correct.
14      Q.  When were you first contacted about a
15  possible engagement as an expert in this case?
16      A.  It was in -- I just remember it was in
17  the Spring.  I don't know what month.  March,
18  April.
19      Q.  Okay.  Who contacted you?
20      A.  Jerry did.
21      Q.  Did Mr. Bramwell provide you -- strike
22  that.  Did you talk to Doctor Calvente about this
23  engagement?
24      A.  I first heard from Jerry, and he

Page 14

1  contacted me several times, and I gave it some
2  thought about whether I wanted to do this, and
3  then I decided that I would. And then after that
4  I think I was then -- then I was introduced to
5  Doctor Calvente on a Zoom call.
6      Q.  Okay. So you have met with Doctor
7  Calvente?
8      A.  Yeah, at that one time.
9      Q.  Okay. Do you recall when that meeting
10  was?
11      A.  Again, it was probably in I think maybe
12  April.
13      Q.  Was Mr. Bramwell on that -- in that
14  meeting with you and Doctor Calvente?
15      A.  Yes. He was in that meeting with us.
16      Q.  Thank you. Now, did Mr. Bramwell or
17  Doctor Calvente provide you with any facts, data,
18  documents that you considered in forming your
19  opinion in your report?
20      A.  What I was provided was sort of a
21  timeline of what had happened.
22      Q.  Verbal timeline or written timeline?
23      A.  A verbal, like a verbal explanation
24  of -- I don't know if timeline is the right word,

Page 15

1  but a sequence of events.
2      Q.  Who provided that timeline to you?
3      A.  Jerry provided me in requesting my --
4  you know, to consider the idea of serving as an
5  expert witness, Jerry explained what had occurred
6  or you know the -- like a tenure denial and then
7  some -- I guess some appeals, and then that was
8  reiterated when we met with Calvente.
9      Q.  How long was the meeting where Doctor
10  Calvente attended?
11      A.  I think probably about 45 minutes.
12      Q.  Did you take notes from the meetings
13  with Mr. Bramwell and/or Doctor Calvente?
14      A.  I took notes from the meetings with Mr.
15  Bramwell because I needed to know what this
16  involved. Not from -- I don't think I took notes
17  from -- I didn't take notes. I mean there wasn't
18  really much more to learn with Calvente.
19      Q.  Okay. And did you provide those notes
20  to Mr. Bramwell in connection with the subpoena?
21      A.  I did not.
22      Q.  All right. So I will make a request
23  here for those notes, and we can address that at
24  the conclusion of the deposition. Okay. Other

Page 16

1  than a timeline or sort of factual summary,
2  Doctor Zaeske, did Mr. Bramwell or Doctor
3  Calvente provide you with any other documents or
4  facts related to the issues involved in the
5  litigation?
6          MR. BRAMWELL: I'm sorry. I had a
7  hiccup. Can I ask the court reporter to read
8  back that question?
9          (Question read)
10          THE WITNESS: No.
11  BY MS. WERMUTH:
12      Q.  You received no documents from Mr.
13  Bramwell or Doctor Calvente?
14      A.  I did not, no.
15      Q.  How did you happen to obtain a copy of
16  the DePaul College of Communication Tenure and
17  Promotion Guidelines?
18      A.  So I asked for that subsequent to the
19  meeting. I thought your last question was about
20  during the meeting that we had together. I did
21  not receive any documents from him at that time.
22  But once I did agree to serve as an expert
23  witness, then I asked for a copy of the DePaul
24  standards or criteria for tenure.

Page 17

1      Q.  Okay. So -- okay. And if my question
2  wasn't clear, let me just -- I'll ask the
3  question this way. In connection with your
4  engagement as an expert in this litigation, were
5  you provided with any facts or documents from
6  Doctor Calvente or Mr. Bramwell?
7          MR. BRAMWELL: I'm just going to
8  object to the grounds that the expert witness
9  report that was prepared is the best evidence of
10  this. Go ahead.
11          THE WITNESS: So am I to answer
12  this question?
13  BY MS. WERMUTH:
14      Q.  Yes.
15          MR. BRAMWELL: Yes.
16          THE WITNESS: I received no
17  documents from Calvente. I requested the
18  document -- in order to make a comparison of the
19  UNC guidelines for tenure with the DePaul
20  guidelines for tenure, I requested through Jerry
21  a copy of the DePaul guidelines for tenure, and I
22  was provided with a copy of them. And that is
23  the only document besides the subpoena, and I
24  think a -- I had to sign a confidentiality

Page 18

1  statement. I think that was another document.
2  That was the other document. But those would
3  have been the only 2.
4  BY MS. WERMUTH:
5     Q.  Okay. And let me just ask you with
6  respect to what you have described as the DePaul
7  standards or guidelines, is it your understanding
8  that what you received were the standards or
9  guidelines published by the College of
10  Communication at DePaul?
11    A.  Yes.
12    Q.  Now, your report -- strike that. In
13  connection with the subpoena response, I also
14  received from Mr. Bramwell documents related to
15  the offer that Doctor Calvente received from the
16  University of North Carolina. Did you review
17  those offer letter documents in connection with
18  preparing your report?
19    A.  I know that she was sent a letter of
20  offer, and I knew the date of the offer, but I
21  didn't review the offer.
22    Q.  Okay. So you were not provided with a
23  copy of the offer?
24    A.  I was not provided a copy of the offer.

Page 19

1     Q.  Okay. Any other documents that you were
2  provided by Mr. Bramwell in connection with your
3  engagement?
4     A.  None.
5     Q.  Did Mr. Bramwell provide you with any
6  assumptions that you relied upon in making your
7  opinion or forming your opinion?
8     A.  No. I mean my -- my -- I have been
9  asked to do something that is very narrow and
10  there was really no exchange about anything other
11  than essentially a comparison between UNC and
12  DePaul.
13    Q.  Okay. Do you know Doctor Calvente?
14    A.  The first time I ever learned her name
15  was when I got a message from Attorney Bramwell.
16  And the first time I ever met her was in that
17  Zoom meeting. So I didn't know her at all.
18    Q.  You were not familiar with her as a
19  scholar prior to this?
20    A.  Not at all.
21    Q.  Okay. Have you reviewed the lawsuit or
22  what we call the complaint in this matter?
23    A.  I don't think I -- I don't know that I
24  have seen the whole complaint. I think maybe I

Page 20

1  did -- Jerry -- I don't know. I don't know that
2  I have seen that.
3     Q.  Okay.
4     A.  I would have to check, to be honest, to
5  check the email if I saw that early on when I
6  first agreed to do this.
7     Q.  Okay. So at some point it will be
8  helpful for you to check to see if you did
9  receive other documents including legal pleadings
10  and the like. That would be helpful for us to
11  know if you received those documents and reviewed
12  them in forming your opinion, okay?
13    A.  Yes.
14    Q.  Thank you. Did you review the
15  protective order that was entered in this case?
16    A.  I don't even know what a protective
17  order is, so I'm sure I didn't review that, that
18  I know.
19    Q.  Thank you. Are you aware generally of
20  the nature of the claims asserted by Doctor
21  Calvente?
22    A.  I'm not -- well, I suspect she is not
23  happy that she was denied tenure. I have no real
24  understanding of what the reasons were for the

Page 21

1  tenure denial or what the arguments against it
2  are.
3     Q.  Okay. So just to be clear, you don't
4  know the nature of the legal claims that Doctor
5  Calvente is asserting against DePaul University?
6     A.  I do not.
7     Q.  Do you know Doctor Calvente's race?
8     A.  I have no idea.
9     Q.  Okay. Do you know her ethnicity?
10    A.  I have no idea.
11    Q.  Did you review her CV in connection with
12  preparing your report?
13    A.  I have never seen her CV.
14    Q.  Did you -- I know you had a meeting with
15  her. Did you interview her and take notes of
16  that meeting with her in connection with that
17  event?
18    A.  No. I didn't talk to her about the --
19  in connection with which event? With the tenure
20  denial or --
21    Q.  I'm sorry. In connection with your
22  engagement as an expert, did you interview her or
23  take notes of your meeting with her?
24    A.  No, I did not. I didn't interview her.

Page 22

1  I think the idea was just so she would know who I
2  am. I wasn't even, to be honest, exactly sure --
3  I was surprised that she was at the meeting.
4      Q.  Understood. Do you know how you were
5  identified by Doctor Calvente or Mr. Bramwell as
6  a potential expert?
7      A.  No, I really don't. I mean I have a
8  sense that because -- and this happens to me a
9  lot, is that, you know, I'm at a top ranked
10 research institution, and I have an
11 administrative title and a lot of experience in
12 administration. So I get called in a lot to do
13 -- this is my first expert witness, but I do a
14 lot of tenure case writing for institutions in
15 the field because they need letterhead. They
16 need a letterhead like UW Madison. They need an
17 experienced administrator, and I am. And they
18 need someone who is an accomplished scholar.
19          So I'm sort of -- I don't
20 want to say a target, but I get called on to do
21 stuff like that. So I'm visible in the field.
22 So that's sort of what I thought, but I don't
23 know. I don't really know.
24     Q.  That's fair. Thank you. So -- and we

Page 23

1  are going to come back to your experience in a
2  minute. We are going to take a look at your CV.
3  But can you tell me when you just said that you
4  do a lot of, I think what you said was tenure
5  case writing where somebody needs a letterhead?
6      A.  Right.
7      Q.  What do you mean by that? What is
8  tenure case writing?
9      A.  So when -- I'll give you an example. So
10 the University of Illinois, let's say, is putting
11 someone up for tenure, okay, and they have to
12 make sure that as an R1 institution, as a strong
13 research institution, that they have external
14 reviewers because all tenure cases have to be
15 sent out for review by external referees, and
16 they have to be referees that are from equally or
17 more prestigious institutions with equal or
18 better records of publication, research awards,
19 teaching awards, and so on.
20          So a lot of times
21 institutions, particularly if they need someone
22 with a strong letterhead like UW Madison, and if
23 they need a woman to write for them, will ask me
24 to be a writer, because there are only so many

Page 24

1  people with strong letterhead in the field of
2  communications with many years of experience,
3  with strong research records. And it helps to
4  have an administrative record. There is a dearth
5  of people like that.
6          So I'm asked to do that
7  by, you know, Penn State, Indiana, UNC, and other
8  particularly Big 10 institutions, which is where
9  communication has its strongest foothold as a
10 field.
11     Q.  Okay. So when you referred to tenure
12 case writing, you are talking about serving as an
13 external referee on tenure cases at other
14 institutions?
15     A.  That's right.
16     Q.  Okay. Thank you. Do you know when
17 Doctor Calvente obtained her PhD?
18     A.  No. I have no idea.
19     Q.  Do you know which institution conferred
20 her doctoral degree?
21     A.  I think it was UNC.
22     Q.  How did you come to learn that?
23     A.  When -- well, in the course of -- what I
24 did was I looked at UNC, the website for UNC when

Page 25

1  I was looking for the tenure guidelines, and I
2  could see the -- I could see records of folks who
3  had graduated from there, and it was mentioned
4  there.
5      Q.  Is that material that you relied on in
6  forming your opinion?
7      A.  Actually the only reason -- let's see.
8  Well, it was interesting to me that UNC would
9  hire one of its own because that's really
10 unusual. So that would have been the only
11 impact.
12     Q.  Okay. So do you still have the web page
13 that you looked at that showed her as being a
14 graduate of the institution?
15     A.  I don't know if I have it anywhere, but
16 I can look for it.
17     Q.  You can obtain it? Okay.
18         MR. BRAMWELL: Ms. Wermuth, if it
19 will help, we will stipulate to the fact that
20 Doctor Calvente obtained her PhD from UNC.
21         MS. WERMUTH: That's not what I'm
22 asking. I'm trying to understand what Doctor
23 Zaeske reviewed.
24         MR. BRAMWELL: Never mind. I'll

Page 26

1  shut up. Never mind. Sorry. I was trying to
2  help. Never mind.
3       MS. WERMUTH: I'm trying to
4  understand what Doctor Zaeske knows, how she
5  learned it, and what material she relied on.
6       MR. BRAMWELL: I get it. I'm not
7  trying to interfere. I thought that was the
8  direction you were going. Never mind.
9  BY MS. WERMUTH:
10     Q. Do you know, Doctor Zaeske, about any
11 academic positions that Doctor Calvente held
12 prior to being hired into a tenure track job at
13 DePaul?
14     A. No, I do not.
15     Q. Did you know when she was hired at
16 DePaul?
17     A. I don't, though I can imagine it has --
18 it must have been in the last 7 years.
19     Q. And you say that because of the timing
20 for a case for tenure to be up for review?
21     A. Right.
22     Q. Okay. Do you know anything about the
23 nature of the search that DePaul undertook at the
24 time of Doctor Calvente's hire?

Page 27

1      A. No.
2      Q. Do you know anything about the position
3  that was posted that she responded to at DePaul
4  University?
5      A. No.
6      Q. Are you familiar with her research
7  concentration?
8      A. No.
9      Q. Did you review her tenure dossier?
10     A. No.
11     Q. Are you familiar with her publication
12 record as it existed in academic year 2018, 2019?
13     A. No.
14     Q. Are you familiar with her service record
15 at DePaul?
16     A. No.
17     Q. Are you familiar with her teaching
18 record at DePaul?
19     A. No.
20     Q. Did you review the College of
21 Communications' recommendation on her tenure
22 case?
23     A. No.
24     Q. Did you review DePaul University's --

Page 28

1  the Dean of DePaul University's College of
2  Communication, did you review her recommendation?
3      A. No.
4      Q. On her tenure case?
5      A. No.
6      Q. Did you review the University Board on
7  Promotion and Tenure, that recommendation?
8      A. No.
9      Q. Did you review the Provost's decision?
10     A. No.
11     Q. Did you review the Appeal Board's
12 recommendation?
13     A. No.
14     Q. Did you review the President's decision?
15     A. No.
16     Q. You were aware, however, that she
17 appealed her tenure denial?
18     A. Yes.
19     Q. And those were facts that were supplied
20 to you by Mr. Bramwell?
21     A. Yes.
22     Q. Okay. And you were aware that the
23 President then weighed in on her case?
24     A. Yes.

Page 29

1      Q. Okay. And that was a fact that Mr.
2  Bramwell provided to you?
3      A. Yes.
4      Q. Okay. And do you know prior to her
5  appeal at what level in the tenure review she was
6  -- at what levels -- I'm sorry. I'm going to
7  strike that whole question. Do you know at any
8  level what the recommendation was for Doctor
9  Calvente for or against tenure?
10     A. No. I really don't -- yeah. I don't
11 really know -- I just know there were appeals and
12 she was at the end denied.
13     Q. Have you reviewed any media, newspaper
14 articles, social media, petitions related to
15 Doctor Calvente's tenure denial?
16     A. No.
17     Q. Now, after you were engaged and in
18 connection with preparing your report, did you
19 review Federal Rule of Civil Procedure 26A2?
20     A. I did not.
21     Q. Do you understand that under the federal
22 rules your report must contain a complete
23 statement of all opinions you intend to express
24 in this case?

Page 30

1    A.  Could you please restate the question?
2    Q.  Sure.  There are rules that govern civil
3  practice in federal courts.  Do you understand,
4  Doctor Zaeske, that your written report under
5  those rules must contain a complete statement of
6  all opinions you intend to express?
7    A.  Yes.
8    Q.  Okay.  So you understand that any
9  opinion that you intend to make in this case is
10 to be contained in your written report?
11    A.  Right.
12    Q.  Okay.  Thank you.  And do you also
13 understand that your written report must contain
14 all the facts and the data that you considered in
15 forming your opinion?
16    A.  Yes.
17    Q.  And you understand that any exhibits
18 that would be used to summarize your opinion are
19 also to be included in your report?
20    A.  Yes.
21        MR. BRAMWELL:  Objection, vague.
22 BY MS. WERMUTH:
23    Q.  Now, I notice that in the materials
24 served on us in connection with the disclosure of

Page 31

1  you as an expert that you indicated you're not
2  being compensated for your opinion; is that
3  correct?
4    A.  That's correct.
5    Q.  So you received no compensation for the
6  preparation of the report?
7    A.  Correct.
8    Q.  Are you being compensated for your time
9  today appearing at this deposition?
10    A.  I am not.
11    Q.  Okay.  Okay.  And will you be
12 compensated for your testimony at trial if this
13 case proceeds to trial?
14    A.  I will not.
15    Q.  Okay.  And why is it that you decided
16 not to charge for your services as an expert?
17    A.  I saw it as similar to the work that I
18 mentioned earlier as, you know, a tenure
19 reviewer, so a service to the discipline.  That's
20 basically the reason.  And frankly, I was kind of
21 interested.  I never have gone through this
22 process before.  I just wanted to see what it
23 involves as an expert witness.
24    Q.  Are you charging for costs incurred?

Page 32

1    A.  I thought we were going to be meeting in
2  person in Chicago, and I would have wanted to be
3  compensated for mileage and hotel or something
4  like that.  But since that's not -- since we are
5  on Zoom, I am not.
6    Q.  Okay.  So you have not incurred any
7  costs to date?
8    A.  None.
9    Q.  All right.  So if you would, Doctor
10 Zaeske, pull up your CV, I would like to talk to
11 you about your background.
12    A.  Certainly.  Is that one of the exhibits?
13    Q.  Exhibit 2 in the packet.
14    A.  Okay.  Alrighty.
15    Q.  Okay.  I would like to start with your
16 education, which is at the bottom of page 1 and
17 top of page 2.  It looks to me as though you
18 received your Bachelor's, your Master's, and your
19 PhD from the University of Wisconsin Madison?
20    A.  Yes.
21    Q.  Okay.  And the Master's, is that like a
22 -- was that a required terminal degree, or were
23 you not thinking about being in a PhD program at
24 the time, or tell me about the Master's?

Page 33

1    A.  It is simply required to go into the --
2  to finish the PhD.  It wasn't terminal.  It was a
3  -- you know, you had to fulfill it to continue on
4  to the doctoral program.
5    Q.  Understood.  Okay.  So when were you
6  accepted into the doctoral program?
7    A.  It would have been in Spring of '89 when
8  I graduated as a Bachelor's -- with my Bachelor's
9  degree.
10    Q.  So you then entered the PhD program in
11 the Fall of 1989?
12    A.  That's right.
13    Q.  Thank you.  And then the Master's was
14 just part of what you had to do towards
15 completion of the doctoral program?
16    A.  Right.
17    Q.  So you had to take qualifying exams at
18 that point?
19    A.  That's right, yes.
20    Q.  And then you very quickly, I guess even
21 before your PhD was conferred, you were hired by
22 UW Madison in a tenure line position; is that
23 correct?
24    A.  That's right.

Page 34

1    Q.  How did that come to be given that you
2  had not yet obtained the PhD?
3    A.  So a number of things happened.  One was
4  that the rhetoric area of my department, we had a
5  number of unexpected retirements in the
6  department.  And then actually 2 of the -- 2 of
7  the faculty were non-renewed in their fourth
8  year.  So then they -- then they left.
9              I had gone on the job
10  market, and I had received offers from 2 other R1
11  institutions, as well as Wisconsin.  So I proved
12  that I could -- that I was marketable because I
13  had a number of things published, and I won
14  awards and things like that.  So my -- because
15  there was a lack of faculty in the department, I
16  had a heavier load even as a grad student, but
17  especially as a beginning professor, which
18  delayed my time in completing my dissertation.  I
19  didn't end up defending my dissertation until
20  Spring of 1997, even though I had -- my tenure
21  clock began ticking in the Fall of 1996.
22    Q.  I see.  And it appears that you were
23  promoted to associate professor 6 years later in
24  2002?

Page 35

1    A.  Right.
2    Q.  And so -- and was that a promotion that
3  came with tenure?
4    A.  Yes.
5    Q.  So you were promoted and tenured in
6  2002?
7    A.  Right.
8    Q.  So did you go up early for promotion and
9  tenure?
10    A.  Yeah, I ended up going early even though
11  I -- even though my tenure clock was ticking.
12    Q.  Okay.  And you became full professor
13  then in 2007; is that correct?
14    A.  Yes.
15    Q.  And the Department of Communication Arts
16  sits in what academic unit?
17    A.  It is in the College of Letters and
18  Science.
19    Q.  And the College of Letters and Science,
20  is that part of a division, part of just the
21  greater academic environment?  Can you explain to
22  me sort of the hierarchy?
23    A.  Sure, certainly.  So the University of
24  Wisconsin Madison has 13 schools and colleges,

Page 36

1  and then there are a number of other divisions.
2  But there are 13 schools and colleges.  The
3  College of Letters and Science by far the
4  largest, taking up half the faculty on campus,
5  and you know, it is about half the campus and
6  half the departments and majors and so on.  So it
7  has got about 45 departments in it.
8              And the College of Letters
9  and Science -- excuse me.  The Department of
10  Communication Arts is one of the roughly 45
11  departments in the College of Letters and
12  Science.  And the Department of Communication
13  Arts has 4 areas of graduate study and 2 areas of
14  undergraduate study.  I'm happy to say what those
15  are if you want.
16    Q.  No, that's fine.  I appreciate that.
17  Thank you.  I'm trying to get a sense of the
18  structure of the university.
19    A.  Right.
20    Q.  Because I see reference to division of
21  the arts, arts and humanities, and I'm trying to
22  understand what those units are and how they are
23  related or not to the College of Letters and
24  Science which houses the Department of

Page 37

1  Communications?
2    A.  Right.  All right.  So the -- so we have
3  the whole university, 13 schools of college --
4  all the university.  This is like a funnel,
5  right?  So there are 13 schools and colleges.  L
6  and S is one of those schools and colleges, but
7  it is a huge one.  Comm Arts is one of the
8  roughly 45 departments.  But the college for
9  administrative purposes is divided into 4
10  sections.  I'll just say sections, okay.
11              So there is the Arts and
12  Humanities -- it's actually a division.  The Arts
13  and Humanities Division.  I'm the Associate Dean
14  of the Arts and Humanities Division.  I have 16
15  departments and about 25 centers and institutes
16  that I administer in my job as Associate Dean for
17  Arts and Humanities.  Comm Arts is not one of
18  those ironically.  Even though I was the chair of
19  that department, I'm not the Associate Dean for
20  that unit.  It is not in my portfolio.
21              Another division is the
22  Social Science division.  That's Political
23  Science, Sociology, Comm Arts, so on.  There is
24  the Mathematical, Natural and Biological Sciences

Page 38

1  Division, Physics, Math, Biology, so on. And
2  then there is the Computer Data Information
3  Sciences Division. So there are 4 divisions of
4  the college. So that's L and S.
5              And then to make things
6  even more complicated, I'm sorry to say, Anna, is
7  the Division of the Arts. And I was called in to
8  be an Interim Director of the Division of the
9  Arts for the last 2 and a half years. And that
10  is a division -- it doesn't have tenure lines or
11  curriculum in it. It's a part of the university
12  that provides an umbrella organization for the
13  arts because the arts are siloed in 3 separate
14  schools and colleges.
15    Q.  Got it. Okay. I think I have it. So
16  let me ask a couple of follow-up questions. So
17  the College of, is it called Letters and
18  Sciences?
19    A.  It is just Letters and Science.
20    Q.  So you have the College of Letters and
21  Science which has divisions underneath it, which
22  then has departments underneath the divisions or
23  housed within? Do I have that sort of shell game
24  --

Page 39

1    A.  Right.
2    Q.  And separately there is this Division of
3  the Arts where it doesn't sit in one of the
4  colleges. It is sort of its own unit. And it
5  doesn't offer a course of study or curriculum or
6  degrees?
7    A.  Correct, right.
8    Q.  Okay. Thank you. That's super helpful.
9  So it looks like you were -- had leadership roles
10  in the Department of Communication Arts from 2006
11  to 2011 being Associate Chair and then Department
12  Chair?
13    A.  Yes.
14    Q.  Okay. And then after that you became
15  Associate Dean for Advancement in the College of
16  Letters and Science; is that right?
17    A.  That's right. But I just want to
18  explain that I became -- I assumed 2 Associate
19  Dean roles in the College of Letters and Science
20  at the same time.
21    Q.  I see that.
22    A.  And then one has continued, and then one
23  has -- I built this office of communication and
24  development and fundraising. Then it has got too

Page 40

1  big, and then I stepped off of that Associate
2  Dean role. So I had those concurrently for a
3  while until 2018.
4    Q.  I see. So the Associate Dean for
5  Advancement is a fundraising sort of type of a
6  role, right?
7    A.  Yeah, fundraising communications.
8    Q.  And then Associate Dean for Arts and
9  Humanities was the sort of academic position?
10    A.  Is, yes.
11    Q.  So you still have that position now?
12    A.  That's correct.
13    Q.  Are you still currently among the
14  faculty in the communication -- or Department of
15  Communication Arts?
16    A.  I am still -- I still hold a
17  professorship in that department, but I have not
18  been participating in departmental governance
19  since 2011. So I don't sit on the executive
20  committee, and I don't vote, you know. I don't
21  vote. I really don't know what is going on in
22  terms of departmental politics. I do not have an
23  office. I haven't had an office there since
24  2011.

Page 41

1    Q.  So let me ask you that question.
2  Beginning in 2011, you then no longer
3  participated in governance in the Department of
4  Communication Arts?
5    A.  Yes, correct.
6    Q.  So that would include participation in
7  tenure cases?
8    A.  Right.
9    Q.  Okay. And that would include
10  participation in hiring decisions as well?
11    A.  Correct.
12    Q.  Okay. And so did you in your role as
13  Associate Dean for Arts and Humanities in the
14  College of Letters and Science have any role in
15  tenure cases at a different level?
16    A.  Yes. So my role -- I have a lot of
17  roles in tenure cases and in hiring. So every
18  single person who is brought in for a campus
19  interview in Arts and Humanities, or if it is
20  Social Sciences, if there is some Humanities,
21  they are related to Humanities, or their work is
22  in Humanities, I meet with them and interview
23  them. I have to actually approve requests for
24  campus interviews before they are even allowed to

Page 42

1 interview.
2          So then I interview -- I
3 interview them.  Departments make their hiring
4 requests to me, and then I have to decide whether
5 I want to advance it.  And then I advance it to
6 the Dean and to what is called the Senior Staff
7 of the college.  And every Monday, we discuss
8 hiring during the hiring season.  And then all of
9 the Associate Deans weigh in on hiring.  So I
10 weigh in on hiring biologists and computer
11 scientists and mathematicians, political
12 scientists, as well as English professors, and
13 Comm Arts professors, and history and so on.
14          And then I'm responsible
15 for overseeing the annual review process for all
16 of the Humanities and Arts faculty, and sometimes
17 this crosses over into the Social Sciences.  That
18 means reviewing all of their annual reviews and
19 making a recommendation to the Dean as to whether
20 they should be reappointed or not.  And then I'm
21 also responsible for overseeing and mentoring of
22 our probationary faculty.
23     Q.  I would imagine in connection with the
24 annual review process that you do not uniformly

Page 43

1 recommend or approve renewals?
2     A.  I have non-renewed 2 faculty in the last
3 3 months.
4     Q.  Tenure line?
5     A.  Correct.  We only have -- we only have
6 -- if you're faculty, you're tenure staff.  We do
7 not -- it is not tenure.
8     Q.  Okay.  So you don't have like a
9 nontenure cadre of teachers?
10     A.  Yes, we have a nontenure cadre of
11 teachers, but they are not called faculty or
12 professor.
13     Q.  I understand.  Okay.  So in this -- just
14 in this past review cycle, you non-renewed 2
15 faculty members?
16     A.  Right.
17     Q.  Meaning that in your estimation, they
18 were not ultimately going to be capable of
19 contributing to the academic environment at the
20 university at the level that the university
21 expected?
22     A.  Correct.
23     Q.  So these were 2 probationary faculty
24 pre-tenure?

Page 44

1     A.  Yes.
2     Q.  Okay.  Were you involved in the hire of
3 those 2 individuals that you just non-renewed?
4     A.  I was involved in the one, in one of
5 them.  It was during a time when I was Associate
6 Dean.  The other was hired before I became
7 Associate Dean.
8     Q.  Okay.  And I'm assuming that at the time
9 that you were involved in the hiring of the one,
10 that you did anticipate that that individual
11 would meet the criteria ultimately for tenure?
12     A.  Right.  That was -- I mean the whole
13 purpose when I meet with candidates is to assess
14 their tenurability.  That's my job.
15     Q.  And sometimes you get that right and
16 sometimes you don't get that right?
17     A.  Yes.
18     Q.  Okay.  And then how are you involved in
19 tenure decisions in your role as Associate Dean
20 for Arts and Humanities?
21     A.  So UW Madison is a very -- sorry.  There
22 is a giant garbage truck going by.
23     Q.  I can't hear it, but I understand why it
24 is distracting.  I have a lot of noise outside my

Page 45

1 window.
2     A.  Okay.  It is gone.  UW Madison has a
3 strong shared governance ethic, practice.  So we
4 have what is called the divisional committees,
5 and those are committees of faculty who review
6 the tenure dossiers and they make decisions.  So
7 major decisions about tenure are made in
8 departmental executive committees and divisional
9 committees.
10          Deans and Associate Deans,
11 and even the Provost tend to be involved in --
12 only when there is like a tie, you know, a tie or
13 there is not a clear decision made.  And there is
14 rarely major intervention, right?  But you know,
15 like in these cases that I mentioned, you know, I
16 made it clear in my review of the annual review
17 letters that the department was not strict enough
18 in its warnings to the faculty member, and that
19 they were not meeting expectations, the
20 expectations of the college.
21          So my -- as an Associate
22 Dean and then in conjunction with the Dean, the
23 interventions come at those annual review times,
24 right?  But it is very difficult -- the major

Page 46

1 decisions again are made by the executive
2 committee and the divisional committee.
3    Q.  Okay.  And so then is there an approval
4 process for the Dean and the Provost, or does the
5 decision stop with the divisional committee
6 unless there is something unusual about the case?
7    A.  It goes -- so the divisional committee,
8 technically it is a recommendation to the Dean,
9 but the Dean rarely overturns the divisional
10 committee recommendation, but he or she can.  And
11 then the Dean makes a recommendation to either
12 the -- I think the Provost.  It is either the
13 Provost or the Chancellor.  And then it goes to
14 the Board of Regents.
15    Q.  Right, as a public institution?
16    A.  Right.
17    Q.  Okay.  So when you say the divisional
18 committee's recommendation goes to the Dean,
19 that's not you, correct?
20    A.  Correct.  It is the overall Dean of the
21 College.  So I'm the Associate Dean of one of the
22 divisions of the college, but there is the Dean
23 that is, you know, over the whole college.
24    Q.  I understand.  Okay.  I understand.  So

Page 47

1 it sounds to me, you can tell me if I'm wrong,
2 that your involvement in connection with the
3 advancement of probationary faculty really takes
4 place at the review -- the probationary review
5 period; is that right?
6    A.  Right.
7    Q.  Okay.  Okay.  Now, it sounds to me that
8 you are a proponent of faculty governance?
9    A.  Yes.
10    Q.  Okay.  And you would probably then agree
11 with me that the peer review process that is
12 attendant to tenure is an important process?
13    A.  Yes.
14    Q.  Okay.  And that -- I'm assuming that you
15 understand that that review is largely
16 qualitative?
17    A.  I think it is qualitative, but there are
18 clear criteria and clear expectations.
19    Q.  Okay.  But you would agree that the
20 decisionmaking process involves the exercise of
21 academic judgment?
22    A.  Absolutely.
23    Q.  By peers?
24    A.  Yes.

Page 48

1    Q.  And that -- and it sounds to me like at
2 least at your process, your institution, where
3 you have been your entire academic career, that
4 many faculty participate in the decisionmaking
5 process?
6    A.  Yes.
7    Q.  And because there are so many individual
8 assessments involved, it is at least conceivable
9 that there will be different opinions along the
10 review process?
11    A.  Yes.
12    Q.  I'm assuming you would also agree that
13 the grant of tenure is a privilege?
14    A.  Absolutely.
15    Q.  Not a right or an entitlement?
16    A.  Exactly.
17    Q.  Okay.  And you would probably agree with
18 me that is probably among the most important
19 decisions that a college or university makes?
20    A.  Yes.
21    Q.  And because it's a critical decision,
22 the institution should be absolutely sure that
23 the case warrants tenure?
24        MR. BRAMWELL:  Objection to the

Page 49

1 extent that you are asking about -- you're
2 deviating from the criteria.  Go ahead.
3 BY MS. WERMUTH:
4    Q.  You can answer.
5    A.  I'm sorry.  Now I lost what the question
6 was.
7        MS. WERMUTH:  I'm sorry.  Gina, can
8 you read that back for Doctor Zaeske, please?
9        (Question read).
10        THE WITNESS:  Yes, absolutely.
11 BY MS. WERMUTH:
12    Q.  So another way to say that would be if
13 there is any doubt about a case, tenure should be
14 denied?
15        MR. BRAMWELL:  Objection to the
16 extent that it is vague and best evidence.  Go
17 ahead.
18        THE WITNESS:  If there is any
19 doubt?  It makes it sound like a murder case.  I
20 think yes.
21 BY MS. WERMUTH:
22    Q.  Have you ever voted to deny tenure?
23    A.  Yes.
24    Q.  To a probationary faculty member?

Page 50

1    A.  Yes.
2    Q.  More than once?
3    A.  Well, so I was the -- another thing that
4  is on my CV is I was the chair of the divisional
5  committee.  I served on it for 3 years, and I
6  chaired it.  So during that time I voted against
7  tenuring people.  And I also, as I mentioned, you
8  know, just in the last -- so I didn't have a vote
9  in these 2 non-renewals.  One was a non-tenure,
10  one was a non-renewal just this last year.  I
11  essentially drove the non-tenuring and
12  non-renewing of at least 4 other faculty members
13  in the last 5 years.
14    Q.  How many?  Did you say 4 in addition to
15  the 2 you already mentioned?
16    A.  Let me just -- let me think.  Let's say
17  3 for sure.
18    Q.  In addition to the 2 you already
19  mentioned?
20    A.  Right.  So a total of 5.
21    Q.  Thank you.  Have you ever in connection
22  with your hiring responsibilities been presented
23  with a candidate who has been denied tenure at
24  another institution?

Page 51

1    A.  Yes.  Just in the last 3 years, we hired
2  a philosopher who had been denied tenure at Yale.
3    Q.  Any others you can think of?
4    A.  I'm trying to think of any.  I'm sure
5  there are some.  I can't think of any right at
6  the moment.
7    Q.  Okay.
8    A.  Oh, yeah.  Actually I can think of
9  another one.  Also Yale.
10    Q.  So you can think of 2 candidates that UW
11  Wisconsin hired who had been denied tenure at
12  Yale?
13    A.  Right.
14    Q.  Okay.  Yale is an R1 school?
15    A.  Well, not only is Yale an R1, but it is
16  an Ivy.  And Ivy's routinely -- you know, you are
17  kind of like -- you know that if you accept an
18  assistant professorship at an Ivy that your
19  chances of actually being tenured there are slim,
20  and that you are going to have to likely go
21  elsewhere, but it happens -- it happens over and
22  over.  So it is not actually that unusual.
23             It would be unusual for
24  another Ivy to hire someone who was not tenured

Page 52

1  by a Ivy, but it is not unusual for a public
2  institution to hire someone who was not tenured
3  by an Ivy.
4    Q.  Can you think of any candidates that at
5  least disclosed to you, any candidates from a
6  non-Ivy school, that disclosed in the hiring
7  process that they had been denied tenure?
8    A.  No.
9    Q.  Okay.  So the only 2 you can think of
10  were the 2 from Yale?
11    A.  Yes.
12    Q.  Are you familiar with the concept of
13  credit for years?
14    A.  Sure.
15    Q.  Okay.  And what do you understand that
16  to be?
17    A.  So what I think you mean by credit for
18  years would be if someone -- this is how it goes
19  at UW Madison.  If you have served in a tenure
20  track position at another institution for a
21  number of years, then when you begin your
22  appointment here, you can be given credit on your
23  tenure clock for those years served.  And that
24  has to be an agreement with the individual, the

Page 53

1  department chair, and the Associate Dean, and the
2  Dean for that credit.
3             It does not -- if you are
4  just serving as a post-doc or something like
5  that, it doesn't warrant that kind of credit.  It
6  has to be in the tenure track.
7    Q.  Understood.  And that would mean that
8  the individual would be eligible for tenure -- so
9  if UW Madison were to hire someone who was in a
10  tenure line position at another institution and
11  credit them for some number of years of service,
12  they can go up for tenure earlier than the
13  unusual timeline?
14    A.  Yes.
15    Q.  You see that as a job benefit?
16    A.  Well, it cuts both ways, and, you know,
17  people negotiate it differently.  Some people,
18  and again I especially expect this in the
19  post-pandemic, are anxious about meeting the
20  tenure requirements.  They want the longest
21  tenure clock possible, and they do not want
22  credit for -- it is not considered credit.  It is
23  actually considered debit.  And so they don't ask
24  for that.

Page 54

1    And some are so confident
2 that they are going to get tenure, and what they
3 are most anxious about is not being tenured and
4 promoted and getting a salary increase and
5 getting a title change because they are confident
6 that they are going to get their -- usually it's
7 their book out, and then they want to be
8 promoted. So they look for credit and a shorter
9 clock. So it goes both ways.
10    Q. Okay. Understood. And has -- so UW
11 Madison does in fact engage in this practice of
12 occasionally awarding years of credit?
13    A. Right. But again, it has to be
14 negotiated and agreed upon by sort of all
15 parties, because sometimes people have, you know,
16 maybe more ambitious or positive assessments of
17 their ability to get tenured than their
18 department -- you know, they just don't know how
19 hard it can be. So they might want to have 3
20 years, and it is only a maximum of 3 years, but
21 we say no, we want you to take the full tenure
22 clock, and if you are able to, we will put you up
23 earlier.
24    I mean that can be -- it

Page 55

1 can break the negotiations when you are trying to
2 recruit someone. But we wouldn't want to bring
3 someone in on a short clock, and then they not
4 get tenure, because that's a waste of investment.
5    Q. Understood. Okay. Can we go back to
6 Exhibit 2? Do you still have that in front of
7 you, Doctor Zaeske?
8    A. Yes.
9    Q. So I would like to look at your
10 research?
11    A. Sure.
12    Q. Which I think begins on page 2; is that
13 right?
14    A. Yes.
15    Q. Okay. So it appears to me that you have
16 one book, one manuscript, right?
17    A. Yes.
18    Q. And that was published just after you
19 obtained tenure it appears to me?
20    A. Right.
21    Q. It was probably forthcoming at the time
22 of your tenure?
23    A. Yes, yeah.
24    Q. And then what follows are articles, book

Page 56

1 chapters, and reference work entries?
2    A. Yes.
3    Q. And it looks like your most current --
4 these are all peer reviewed?
5    A. Yes. Well, yeah. Well, I don't know
6 that anything I have done is not peer reviewed.
7 Right.
8    Q. Okay. So it looks like your most recent
9 peer reviewed publication then was from 2014?
10    A. That's right.
11    Q. Okay. You do have some works in
12 progress I see?
13    A. Yes.
14    Q. Understood. Okay. So tell me what your
15 area of research is?
16    A. So in the field of -- so I'm in the --
17 I'm in the field of communication, but I am also
18 -- you know, my book was published basically in a
19 history series, and I have a number of reprints
20 in history. So I operate in history to a certain
21 degree. I operate in political science. Some of
22 those publications, particularly about
23 petitioning, are in -- and also conference papers
24 that I have given are in political science.

Page 57

1    But in the area of -- in
2 the communication field, I'm known at a
3 rhetorician, the field of rhetoric, or rhetoric
4 and public culture. And I tend to do very
5 historical -- very historical work in the 19th
6 century. So I don't know if you want more than
7 that.
8    Q. No, that's helpful. I appreciate that.
9 So let me just ask you some questions about -- I
10 mean obviously you have been in administration
11 for some period of time. You have been involved
12 as you described for us in hiring practices, in
13 tenure practices. But just to be clear, you have
14 not published in the area of good or bad tenure
15 processes?
16    A. I have not published papers on good or
17 bad tenure processes, no.
18    Q. Okay. And you have not published any
19 peer reviewed papers on the topic of academic
20 governance?
21    A. No.
22    Q. Okay. And you have not -- well, let me
23 ask you this. You don't cite any literature in
24 your report that is peer reviewed publications on

Page 58

1  the topics of tenure or faculty governance; is
2  that fair?
3      A.  Yes.  That is fair.  No, I did not.
4      Q.  Okay.  Thank you.  And with respect to
5  studying or researching the topic of tenure
6  denial and where faculty go once they have been
7  denied tenure, you have not performed personally
8  any studies on that topic; is that right?
9      A.  No, I have not.
10     Q.  Okay.  And you don't cite any peer
11  reviewed literature in your report on that topic;
12  is that right?
13     A.  That's correct.
14     Q.  Okay.  Are you familiar with any peer
15  reviewed studies on any of the topics we just
16  discussed?  Tenure processes, faculty governance,
17  tenure denial cases?
18     A.  You know, I think I have read some in
19  passing in the past, but I did not delve deeply
20  into those.  I mean I have more than a decade of
21  experience of doing this stuff at a huge
22  university, so I don't really think it is
23  necessary.
24     Q.  Okay.  And I'm just asking for purposes

Page 59

1  of your report preparation.  You didn't -- to the
2  extent you were aware of any peer reviewed
3  literature on those topics, you did not rely on
4  that literature in forming your opinion?
5      A.  No, no.
6          MS. WERMUTH:  By the way I just
7  noticed that Kathy Stieber joined us.  She is the
8  General Counsel of DePaul University.  I just
9  wanted folks to know who that was and why she was
10  here.
11     Q.  Okay.  So when I received materials from
12  Mr. Bramwell in connection with the response to
13  the subpoena, I received a copy of Doctor
14  Calvente's offer letter from the University of
15  North Carolina.  So when I received that, I had
16  understood that that was something you relied on.
17  But I just want to be clear, you did not review
18  her physical offer letter from the University of
19  North Carolina?
20     A.  What I remember is seeing the date of
21  the offer letter because I asked whether she
22  truly had -- because I went to the website for
23  UNC, and there was -- she wasn't on the website.
24  So I said is she really -- does she really have

Page 60

1  an offer?
2          And I believe that I saw
3  the -- just that there was a letter and there was
4  a -- that it was dated.  I don't remember that I
5  -- I mean maybe I received the letter.  I have to
6  say I don't remember.
7      Q.  Okay.  Let me go back to the concept of
8  credit, years credit for service.  When would you
9  typically see something like that?  Where there
10  was a long period of service in a tenure line
11  position, is that where you would typically see
12  credit for service?
13     A.  So you would get credit for service if
14  there is a period of time on the tenure clock at
15  a comparable institution.  So where you have
16  students who are -- you know, similar in the
17  teaching experience that is going to be similar,
18  and, you know, similar research expectations.
19     Q.  Okay.  And you don't know how much time
20  Doctor Calvente spent at DePaul University?  Do I
21  understand that correctly?
22     A.  No.  Yeah.
23     Q.  So I'm going to ask you to look at
24  Exhibit 4 from the documents that we sent to Mr.

Page 61

1  Bramwell yesterday.
2      A.  Okay.
3      Q.  So does this refresh your memory as to
4  whether or not you actually received a copy of
5  this letter in connection with the materials
6  provided to you for purposes of preparing your
7  report?
8      A.  I have to -- I just simply don't -- I
9  simply don't remember because my goal was to know
10  whether or not she had received the offer, and
11  you know, what -- I didn't even remember the date
12  here.  March 8th.
13     Q.  Okay.  So you just don't recall one way
14  or the other?
15     A.  I honestly don't.  I'm sorry.
16     Q.  Okay.  So can I have you look at Exhibit
17  5 from the packet of materials that was sent?
18     A.  Certainly.  Okay.
19     Q.  In looking at that, does that refresh
20  your memory as to whether or not you saw these
21  materials?
22     A.  So this is an email.  No.  I have never
23  seen this.
24     Q.  Okay.  So if you scroll down to the

Page 62

1 bottom where there is an attachment, is that
2 something you recall reviewing in connection with
3 preparing your report?
4    A.  No.
5    Q.  Okay.  And I'm looking at the last 2
6 pages.  So the pages -- do you see there is a
7 little marking in the lower right where it starts
8 with LC?
9    A.  Yes.
10    Q.  I'm looking at 4089 and 4090.
11    A.  I have not --
12    Q.  Okay.
13    A.  I have not seen this.
14    Q.  Okay.  Did you make assumptions, any
15 assumptions about the nature of the offer that
16 Doctor Calvente received?
17    A.  None.  Again, I just wanted to know
18 whether she had truly been offered a position or
19 not, and the specifics of it, you know.  I didn't
20 think about or know about it.
21    Q.  Okay.  So you didn't think about whether
22 the offer was for the position of assistant
23 professor?
24    A.  Well, I asked whether it was a tenure

Page 63

1 track position, and it was confirmed to me that
2 she received an appointment for a tenure track
3 position.  I just can't remember whether Jerry
4 confirmed that -- that a letter of offer had been
5 sent, and if he did that verbally, or if I was
6 sent a copy of the letter, because I have no -- I
7 honestly just don't remember anything beyond the
8 fact that she received an offer for a tenure
9 track position.
10    Q.  Okay.
11    A.  I don't even know when she is starting.
12    Q.  Okay.  And you also then don't know what
13 the term of her appointment is, the length of it
14 for example?
15    A.  No.
16    Q.  Okay.
17    A.  Well, if it is a tenure track position,
18 it is a -- she has the opportunity to get tenure,
19 and it would be an ongoing position, if that's
20 what you mean by term of it.  If it is only a 2
21 year position or something like that, it is not a
22 tenure track position.  Then it would be an
23 adjunct position.
24    Q.  Well, let me ask you this.  We will look

Page 64

1 at the UNC guidelines about terms for
2 probationary faculty in a moment, because that is
3 something you reviewed, right, the UNC guidelines
4 on promotion?
5    A.  Yes.
6    Q.  Okay.  So do you know -- were you
7 provided with any information about whether UNC
8 had advertised or posted for the position that
9 Doctor Calvente was offered?
10    A.  No.  I don't know how they did their
11 hiring process.
12    Q.  Okay.  And so you don't know, for
13 example, whether there were multiple positions
14 open in the Department of Communications?
15    A.  No, I don't.
16    Q.  Okay.  And you don't know for example if
17 the position was created specifically for Doctor
18 Calvente?
19    A.  I don't know.
20    Q.  Okay.  And you don't know whether there
21 was a competitive search for the position?
22    A.  I don't know.
23    Q.  And you don't know how many candidates,
24 if it were a competitive search, how many

Page 65

1 candidates may have also applied for the
2 position?
3    A.  No.  I have no idea.  And I think -- I
4 don't even know if that's public knowledge.
5    Q.  Okay.  But that's not something that you
6 investigated, correct?
7    A.  No, I don't know.
8    Q.  Okay.  So you didn't interview anyone at
9 the University of North Carolina I'm assuming?
10    A.  No.
11    Q.  And did you review any materials that
12 Doctor Calvente submitted to the University of
13 North Carolina in connection with the potential
14 for hire there?
15    A.  No.
16    Q.  Do you know whether she notified the
17 University of North Carolina that she had been
18 denied tenure?
19    A.  I have no idea.
20    Q.  Do you know whether she was credited for
21 any years of service at the University of North
22 Carolina?
23    A.  I don't know.
24    Q.  Do you know if Doctor Calvente was

Page 66

1   provided with the opportunity to have her case
2   reviewed for tenure upon hire at the University
3   of North Carolina?
4       A.  I don't know.
5       Q.  You would imagine that the University of
6   North Carolina can do that, correct?
7       A.  That they -- an institution would --
8   yes, they would have the prerogative to hire with
9   tenure.
10      Q.  Okay.  And does the absence of that
11  process here mean that they did not view her file
12  as being tenurable in the moment?
13      A.  I would imagine that would be the case
14  because she is not at a peer institution.
15      Q.  All right.  Let's take a look at your
16  report, which is Exhibit 3 in the packet that was
17  sent to you?
18      A.  Okay.
19      Q.  Do you recognize that document, Doctor
20  Zaeske?
21      A.  Yes.
22      Q.  And what do you recognize it to be?
23      A.  The expert witness report that I
24  prepared for this case.

Page 67

1       Q.  And on the final page, that is your
2   signature?
3       A.  Yes.
4       Q.  Give me just a moment.  I'm sorry.  I'm
5   having a little technical difficulty in this
6   moment.  Can we take a super quick break so I can
7   try to resolve this technical difficulty?
8       MR. BRAMWELL:  Sure.
9       THE WITNESS:  Certainly.
10      MS. WERMUTH:  Jerry, what do you
11  want?  5 minutes, 10 minutes?
12      MR. BRAMWELL:  5 minutes is fine.
13  Come back at 11:24?
14      MS. WERMUTH:  Perfect.  Thank you.
15      (Off the record at 11:21 to 11:26)
16      MS. WERMUTH:  Gina, we will go back
17  on the record.
18      Q.  Doctor Zaeske, we were talking a little
19  bit about the search process at UNC in connection
20  with the offer made to Doctor Calvente.  And I
21  would like to point you to the second page of
22  your report, the second full paragraph, the big
23  one.  About 4 lines down you say -- well, 3 lines
24  down, "Calvente's record was of such excellence

Page 68

1   that it rose to the top of the application pool
2   in the fierce competition for a tenure track job
3   at an R1 university."  Do you see that?
4       A.  Uh-huh.
5       MR. BRAMWELL:  I'm going to object
6   because that misstates the entire sentence.
7   BY MS. WERMUTH:
8       Q.  Did the portion of the sentence I read,
9   is that consistent with what you wrote, Doctor
10  Zaeske?
11      A.  Let me just make sure I see it in the
12  context of the overall paragraph.
13      Q.  Sure.
14      A.  So Calvente's -- my understanding is
15  this is your question.  Did I write "Calvente's
16  record was of such excellence that it rose to the
17  top of the application pool in a fierce
18  competition for a tenure track job at an R1
19  university"?  Yes.  That is what I wrote.
20      Q.  And what is the basis for that
21  statement?
22      A.  That is -- so search processes at
23  universities, whether they are -- I mean the
24  usual process is that there is a -- you know, a

Page 69

1   posting.  Applications come in, and they are
2   reviewed.  And getting a position at an R1
3   university, there are very few because of --
4   there is a lot -- especially the past few years
5   because there have been hiring freezes.  So there
6   is a fierce competition for positions.
7       And this is true whether
8   you are doing a full and open search or even if
9   you are doing -- I mean there are many ways of
10  doing searches.  One is the open and posted
11  search, and then there is also targeted searches.
12  Institutions can do targeted searches.  But there
13  is a fierce competition to be the target of a
14  targeted search.  You have to rise to the top to
15  be recruited in that way.
16      Q.  But to be clear, you do not know
17  anything about the search process for the
18  position that was offered to Doctor Calvente in
19  March of this year?
20      A.  No.  But I know how search processes are
21  conducted.
22      Q.  Right.  But you don't know how it was
23  conducted in this particular instance?
24      A.  I do not, no.

Page 70

1          MR. BRAMWELL:  Objection, asked and
2  answered.
3  BY MS. WERMUTH:
4      Q.  And you don't know what the applicant
5  pool looked like in connection with the job that
6  was offered to Doctor Calvente?
7      A.  Not per se.  But again, to be hired at
8  an institution like UNC, it would have to be a
9  strong -- it would have to be a strong pool.
10      Q.  Can you identify the opinion that you
11  are offering in this case?
12      A.  Yes.  So the -- so the opinion that I'm
13  offering is that for an individual to be denied
14  tenure at an R2 institution and to be hired at an
15  R1 institution is highly irregular, and that the
16  irregularity of it points to something having
17  gone astray in the process by which the
18  individual would be non-renewed at an institution
19  with lesser standards and then hired at an
20  institution with higher standards.
21      Q.  So the underpinnings of your opinion
22  then are -- well, strike that.  Let me just
23  clarify your opinion.  On page 1 of your report,
24  the first paragraph is your statement of opinion?

Page 71

1      A.  That's right.
2      Q.  And the last sentence provides "that a
3  more prestigious institution with higher tenure
4  expectations than DePaul has invested in hiring
5  Calvente because they assess her as tenurable
6  renders DePaul's decision to deny her tenure
7  highly questionable."
8      A.  Correct.
9      Q.  Would you say that's the summation of
10  your opinion?
11      A.  Yes.
12      Q.  When you use the phrase highly
13  questionable, or I think on page 5 you say calls
14  into question, what do you mean by that?
15      A.  It seems that the -- the justification
16  for doing that is unclear.  It is questionable.
17  Again, where a higher, more prestigious
18  institution with higher tenure expectations would
19  assess the record as strong, and that a lesser
20  institution or less prestigious institution with
21  less stringent tenure practices would assess it
22  as weak, it makes no sense.
23      Q.  Now, you testified a moment ago that in
24  your view, something went astray in the tenure

Page 72

1  process at DePaul University.  Did I fairly
2  summarize what you testified to a moment ago?
3      A.  Yes.  The conclusion -- yes, because the
4  conclusion makes no sense.  Something happened.
5      Q.  Okay.  But you are not opining in your
6  report on what that something is, correct?
7      A.  Yes.  I have no idea what it is.
8      Q.  Okay.  And are you familiar with Title 7
9  of the Civil Rights Act of 1964?
10      A.  In passing.  Not you know -- I haven't
11  read it recently.
12      Q.  Okay.  You don't have any specialized
13  training or expertise in that law?
14      A.  No.
15      Q.  Okay.  And same question with respect to
16  Section 1981 of the Civil Rights Act?
17      A.  No.
18      Q.  No specialized training or experience or
19  expertise?
20      A.  No.
21      Q.  Okay.  So you understand that Doctor
22  Calvente was appointed to the rank of assistant
23  professor at UNC?
24      A.  The tenure track position, right.

Page 73

1      Q.  Right.  At the rank of assistant
2  professor?
3      A.  I don't know what -- I don't know what
4  rank she was appointed at.
5      Q.  Okay.  You do understand it is an
6  initial appointment though, correct?
7      A.  Yes.
8      Q.  So now you had attached to your report
9  as Exhibit 3 to your report UNC -- hang on one
10  second.  Let me make sure I have the title right.
11  UNC College of Arts and Sciences Department of
12  Communication Policies on Faculty Personnel
13  Actions.  Do you see that?
14      A.  Yes.
15      Q.  It is attached as Exhibit 3 to your
16  report.  I think it has like a number 3.3 on it
17  or some such?
18      A.  Yes.
19      Q.  Okay.  How did you obtain this document?
20      A.  I Googled it.
21      Q.  So you didn't reach out to anyone at
22  UNC's Department of Communication?
23      A.  No.  I found it online so I didn't have
24  to contact them.

Page 74

1    Q.  Okay.
2    A.  I was delighted to see that it was dated
3  March of 2021.
4    Q.  Right.  Do you know -- you were
5  delighted to see that because of why?
6    A.  Because otherwise I would have to either
7  ask Jerry to ask them, I guess, or I would have
8  to ask them.  So I didn't have to contact them.
9    Q.  And do you know like the exact date in
10 March that this was published?
11   A.  No, I do not.
12   Q.  Okay.  So you don't know if it comes
13 before or after the offer made to Doctor
14 Calvente?
15   A.  I do not.
16   Q.  Okay.  Now, I see on pages 1 and 2 of
17 this document that there are reference to a
18 variety of other university publications that
19 Exhibit 3.3 is subject to, and those publications
20 are lettered A through G.  Do you see that?
21   A.  Right, yes.
22   Q.  Okay.  And just above that list of
23 publications the policy reads "the department's
24 policies are subject to those set forth in the

Page 75

1  following university publications".  Do you see
2  that?
3    A.  Yep.
4    Q.  Okay.  Did you then -- it looks like
5  these are hyperlinks.  Did you go and obtain
6  copies of all these other documents?
7    A.  Yes.  So I read those because it is very
8  common and the same at UW Madison.  You have --
9  you have overall university tenure expectations
10 that govern all the divisions of knowledge, again
11 whether it is neuroscience or classics.  So
12 that's to make sure there is consistency at the
13 highest level of the institution.  And then you
14 have them usually by the division of knowledge.
15 And then you have them specific to a given
16 department or a college of, you know, let's say
17 in terms of the -- something smaller like our --
18 like a smaller college, like the communications
19 at DePaul or human ecology at UW Madison.
20              So it makes sense that the
21 departmental level, the departmental level has to
22 reflect the overall standards of the institution
23 so it all floats down.  But you also have to look
24 up to make sure there is consistency.  So knowing

Page 76

1  that, that's what I did.
2    Q.  So to answer my question, you did in
3  fact pull all of those?
4    A.  Yes.
5    Q.  Is there any reason you didn't provide
6  those to Mr. Bramwell in connection with the
7  subpoena?
8    A.  Because they are hyperlinked in the
9  document.
10   Q.  So is it your position that anything
11 hyperlinked in any of the documents you provided
12 to me or to Mr. Bramwell to provide to me are
13 documents that you reviewed?
14   A.  Yeah, especially in this situation.  I
15 mean it is part of the document -- what the
16 College of Arts and Sciences and the Department
17 of Communication are relying on, and what they
18 are saying are their procedures are the
19 procedures of the institution, which are
20 hyperlinked in this document.  So those
21 hyperlinks are part of this document, and then
22 this document itself.
23   Q.  So my question is this.  There are a
24 number of documents that were provided to me by

Page 77

1  Mr. Bramwell in connection with the subpoena.
2  Many of those documents, some are articles, some
3  are publications from universities, have
4  hyperlinks in them.  My question is to you, in
5  every single document that was provided to me by
6  Mr. Bramwell that has a hyperlink in it, am I to
7  assume that you then clicked on all those
8  hyperlinks?
9              And whether it was from
10 the U.S. News and World Report or whether it was
11 from the Chronicle of Higher Education, or
12 whether it was from one of these policy
13 documents, am I to assume that everywhere there
14 has been a hyperlink in a document provided to
15 me, that you reviewed and relied on that
16 information in forming your opinion?
17              MR. BRAMWELL:  I'm going to object
18 to that question as vague and compound.  If you
19 have questions about a specific document, please
20 ask that.  But the way you have asked your
21 question is unanswerable by anyone.
22              MS. WERMUTH:  Okay.  You're
23 coaching the witness.
24              MR. BRAMWELL:  I'm not coaching the

Page 78

1  witness. Absolutely not.
2  BY MS. WERMUTH:
3      Q.  Okay. You can answer.
4      A.  I would assume that you clicked on these
5  links. That you know that I clicked on these
6  links in this document because the policy of the
7  department incorporates the policy of the
8  institution. I don't know about the other
9  documents -- I can't remember about the other
10  documents. I can't -- I don't know. I mean I
11  can't remember every little link in the -- you
12  know, in the various articles.
13      Q.  Do you have a file that you created in
14  connection with your preparation of this report,
15  whether it's an electronic file or physical file
16  or both?
17      A.  Just the downloads of the -- actually I
18  think I just sent the links. I just sent the
19  links. And then I think Jerry forwarded them on
20  to you.
21      Q.  So my question is do you have a physical
22  or electronic file that you have maintained in
23  connection with your engagement as an expert in
24  this case?

Page 79

1      A.  Yes. I mean I have downloaded the
2  various documents that were sent to me and the
3  report. So yes.
4      Q.  So your file contains what? Just so I'm
5  clear.
6      A.  Well, it contains my report. It
7  contains the subpoena. Probably some of the
8  articles that I downloaded. I don't know. I
9  would have to look.
10      Q.  Is there anything in this document,
11  Exhibit 3.3, that you -- strike that. Is there
12  anything in your report that relies upon the
13  hyperlinks at A, B, C, D, E, F, or G, on pages 2
14  -- 1 and 2 of Exhibit 3 to your report?
15      A.  I do not think so. The only -- let me
16  just -- no. All the quotations and all the
17  assessments of what the standards were for --
18  for tenure are from this document itself.
19      Q.  I'm going to ask you to look at Exhibit
20  4 again, please?
21      A.  Okay.
22      Q.  So this is the offer letter that Mr.
23  Bramwell sent to me in connection with the
24  subpoena response. So I'm going to point you to

Page 80

1  just a couple of pieces of information on here.
2  In the first paragraph, I think you will note
3  that she was being recommended for appointment as
4  assistant professor. Do you see that?
5      A.  Yes.
6      Q.  And then if you look at the second
7  paragraph, she -- Doctor Calvente is notified
8  that the tenure track assistant professor
9  appointment will be for a term of 4 years. Do
10  you see that?
11      A.  Yes.
12      Q.  With the possibility of reappointment
13  for 3 more years. Do you see that?
14      A.  Yes.
15      Q.  All right. So please go back to Exhibit
16  3.3 which are the UNC guidelines, if you would?
17      A.  Okay.
18      Q.  All right. And if you would go with me
19  please to page 7. Let me know when you are
20  there.
21      A.  Yes.
22      Q.  Okay. There is a section roman numeral
23  3, entitled criteria for specific personnel
24  actions. Do you see that?

Page 81

1      A.  Yes.
2      Q.  And so for example, if you scroll down
3  to the next page, item C is associate professor
4  personnel actions, right?
5      A.  Right.
6      Q.  And then if you scroll back up to B, you
7  have assistant professor personnel actions?
8      A.  Right.
9      Q.  When you look at section 3B, it says
10  that the rank of assistant professor denotes a
11  tenure track position. Do you see that?
12      A.  Yes.
13      Q.  And it says like we saw in the letter
14  with an initial appointment for 4 years. Do you
15  see that?
16      A.  Yes.
17      Q.  Along with the possibility of
18  reappointment for 3 additional years. Do you see
19  that?
20      A.  Yes.
21      Q.  And along with a review for the
22  conferral of tenure and promotion?
23      A.  Yes.
24      Q.  So at the time -- well, then if you go

Page 82

1  on to B-1, so we are now at roman numeral 3, B-1,
2  the college sets forth the standards for an
3  initial appointment to assistant professor,
4  right?
5      A.  Yes.
6      Q.  Which is what Doctor Calvente received
7  an offer of right?
8      A.  Right.
9      Q.  Okay.  So she didn't receive an offer of
10  reappointment, right?
11     A.  Yes.
12     Q.  Okay.  And so the standard at this point
13  in time for initial appointment is the clear
14  promise of excellence in teaching and
15  scholarship.  Do you see that?
16     A.  Yes.
17     Q.  So at the point of time of an initial
18  appointment to assistant professor, the
19  individual need not yet have established a record
20  of excellence or achievement of excellent, right?
21     A.  In order to get hired as an institution
22  like UNC or UW Madison or Indiana or whatever,
23  you have to pretty much show that your chances of
24  tenure are very, very high, and that you have a

Page 83

1  strong record of publication that is going to be
2  tenurable.  Otherwise you are not going to be
3  hired.
4      Q.  Okay.  But here is my question, right?
5  You relied on the UNC College of Communication
6  Guidelines in forming your opinion, correct?
7      A.  Right.
8      Q.  Okay.
9      A.  Well -- yes, right.
10     Q.  Okay.  In fact you do a comparison of
11  those guidelines against DePaul's guidelines,
12  right?
13     A.  Right.
14     Q.  According to UNC's own guidelines, the
15  individual who is being appointed as an assistant
16  professor in connection with an initial
17  appointment has to show promise of excellence,
18  right?  That's what the guidelines state?
19         MR. BRAMWELL:  Objection, asked and
20  answered.
21  BY MS. WERMUTH:
22     Q.  I'm sorry.  What was your answer?
23     A.  They have to show -- they have to
24  demonstrate tenurability, that they are

Page 84

1  tenurable.
2      Q.  Here is what the guideline states --
3         MR. BRAMWELL:  The best evidence --
4  I'm just going to object.
5         MS. WERMUTH:  You are interrupting.
6  I didn't even finish my question, Jerry.
7         MR. BRAMWELL:  I can't hear
8  anything when you address me as Jerry.  The best
9  evidence of the guidelines is the guidelines.  So
10  go ahead.
11        MS. WERMUTH:  Okay.  It is clear on
12  the record that Mr. Bramwell interrupted me
13  before my question was finished.  It is clear on
14  the record that he is coaching the witness by
15  providing answers.  And I'm going to ask the
16  question, and i expect that I'll get an answer to
17  the question.
18     Q.  I'm talking now, Doctor Zaeske, just
19  about what the guidelines provide, right?  So
20  according to UNC's College of Communication
21  Guidelines, as written in the document attached
22  to your report, the initial appointment of
23  assistant professor requires the promise of
24  excellence in teaching and scholarship, correct?

Page 85

1         MR. BRAMWELL:  Objection, best
2  evidence.
3  BY MS. WERMUTH:
4      Q.  You can answer.
5      A.  So what you look for is that the --
6  there is a record of accomplishment in research
7  and teaching and to some degree outreach that is
8  going to project into tenurability, to getting
9  tenure.
10     Q.  I'm asking you what the guidelines
11  provide in writing --
12     A.  Right.
13     Q.  -- to a newly appointed assistant
14  professor, that the standards are such that there
15  is -- that the appointment requires the promise
16  of excellence in teaching and scholarship.  Is
17  that correct or is that not correct?
18        MR. BRAMWELL:  Objection, best
19  evidence.  Best evidence.  Ms. Wermuth, we have
20  been through this now 3 times.  You have asked
21  the question 3 times.  The best evidence is the
22  document.  Nobody is arguing as to what the
23  document says.  The document is the document.
24  Please move along.

Page 86

1        MS. WERMUTH: I'm not -- I am
2  entitled to an answer to the question. I
3  continue to object to your coaching the witness
4  on how to answer the question --
5        MR. BRAMWELL: I am not coaching
6  the witness.
7        MS. WERMUTH: Let me finish. I
8  allowed you. I have not yet received an answer
9  as to whether or not this is what the guidelines
10 that Doctor Zaeske relied on in her report
11 actually provide. What she keeps telling me is
12 what the institution would do. I'm not asking
13 that question. I'm asking what the guidelines
14 that she relied on provide. That's my question.
15       MR. BRAMWELL: I'm not coaching the
16 witness -- are you finished?
17       MS. WERMUTH: Yes.
18       MR. BRAMWELL: Okay. I am not
19 coaching the witness. I object to that
20 characterization. I find it offensive. If you
21 believe I'm coaching the witness, I'll invite you
22 to call the Judge. His telephone number is
23 312-435-6054, at least according to his website.
24 I'm not coaching the witness. You have asked the

Page 87

1  question multiple times. The witness has
2  answered to the best of her ability.
3            Nobody is arguing as to
4  what -- you have the document in front of you.
5  She is answering your question. If you don't
6  like the answer, ask another question, ask it
7  another way. But you are now at the point where
8  you are starting to badger.
9        MS. WERMUTH: I'm entitled to an
10 answer to a very specific question.
11     Q. Let me ask you this, Doctor Zaeske. You
12 relied on the UNC College of Communication
13 Guidelines in forming your opinion, did you not?
14     A. Yes.
15     Q. And in fact, you quote several sections
16 of the guidelines specifically in your report,
17 correct?
18     A. Yes.
19     Q. You do not quote from the Section 3-B-1.
20 Am I right about that?
21     A. I don't know because I would have to
22 look through my whole report to see if I quoted
23 from that section or not.
24     Q. Okay. So you're -- am I incorrect when

Page 88

1  I state that the guidelines that you relied on in
2  your report from UNC provide that an initial
3  appointment of assistant professor requires the
4  clear promise of excellence in teaching and
5  research?
6        MR. BRAMWELL: Objection, asked and
7  answered, and objection, best evidence.
8  BY MS. WERMUTH:
9     Q. You can answer.
10     A. The document itself states "the
11 standards for initial appointment are the clear
12 promise of excellence in teaching and
13 scholarship," and etcetera. I think the key
14 thing to understand is what is meant by clear
15 promise and what that -- of excellence, and what
16 that looks like in practice.
17     Q. Okay. But you don't refer to that --
18 well, strike that. You didn't interview anybody
19 at the University of North Carolina, correct?
20     A. No.
21     Q. Okay. And looking at Section 3-B, again
22 the tenure track position of assistant professor
23 comes with the possibility of reappointment,
24 correct?

Page 89

1     A. Yes. That's a standard -- that's
2  standard.
3     Q. Okay. Meaning that it is not guaranteed
4  that you will be reappointed, correct?
5     A. Correct.
6     Q. And it is not guaranteed that you will
7  achieve tenure either, correct?
8     A. Correct.
9     Q. In fact, you testified earlier today
10 that just in the last couple of months, you
11 non-renewed probationary faculty -- 2
12 probationary faculty because even though you
13 believed they had the promise of excellence at
14 the time of their hire, they did not achieve the
15 standards of the University of Wisconsin,
16 correct?
17     A. That's correct.
18     Q. All right. Now, if you go to page 8?
19     A. Page 8?
20     Q. Yes. Scroll to the next page.
21       MR. BRAMWELL: Page 8 of what, Ms.
22 Wermuth?
23       MS. WERMUTH: I'm sorry. Thank you
24 for asking that question. The UNC Department of

Page 90

1 Communication Promotion and Tenure Guidelines,
2 3.3.
3          MR. BRAMWELL:  Okay, thanks.
4 BY MS. WERMUTH:
5    Q.  So the same document we were looking at,
6 just the following page, Doctor.  Are you with
7 me?
8    A.  Yep.
9    Q.  Okay.  So at UNC, a faculty member could
10 come in from another institution with an initial
11 appointment at the rank of associate professor;
12 is that right?
13          MR. BRAMWELL:  Objection, best
14 evidence.
15          THE WITNESS:  It is true at any
16 institution.
17 BY MS. WERMUTH:
18    Q.  Okay.  But these guidelines provide
19 that, correct?
20    A.  Yes.
21          MR. BRAMWELL:  Asked and answered.
22 Best evidence.
23 BY MS. WERMUTH:
24    Q.  So -- and that could come without

Page 91

1 tenure, right?  You could be appointed to
2 initially at UNC to associate professor without
3 tenure, according to these guidelines?
4    A.  I don't know that to be the case.  It
5 certainly -- that's not the case at my
6 institution, and at most strong research
7 institutions, because tenure and rank are not
8 desegregated.
9    Q.  But let's look at what --
10          MR. BRAMWELL:  I'm sorry.  Were you
11 finished with your answer?
12          THE WITNESS:  Yes.
13 BY MS. WERMUTH:
14    Q.  So looking at Exhibit 3.3, section C,
15 the first sentence says "initial appointment to a
16 rank of associate professor may be with or
17 without tenure."  Do you see that?
18    A.  Right.
19    Q.  So according to UNC's College of
20 Communication, they can bring in and appoint a
21 faculty member at the rank of associate professor
22 without tenure?
23          MR. BRAMWELL:  Objection, best
24 evidence.

Page 92

1          THE WITNESS:  Correct.
2 BY MS. WERMUTH:
3    Q.  And that was not what was offered to
4 Doctor Calvente, correct?
5    A.  Apparently based on the letter that you
6 showed me.
7    Q.  And in that same section, that first
8 paragraph under Subsection C, the last sentence
9 of the first paragraph indicates this.  "A
10 recommendation for promotion and/or tenure by the
11 department chair requires a careful assessment
12 informed by outside references about the
13 qualifications of the candidate and the
14 professional judgment of the assembled full
15 professors.  The professional judgment of the
16 tenured associate professors is also considered."
17 Do you see that?
18    A.  Yes.
19    Q.  So even in the College of Communication
20 at the University of North Carolina, there is a
21 peer review process for tenure, correct?
22    A.  Yes.
23    Q.  Okay.  And that peer review process
24 requires careful assessment, correct?

Page 93

1    A.  Yes.
2    Q.  By people within and outside of the
3 institution, correct?
4    A.  Yes.
5    Q.  So there is no guarantee at the time of
6 hire that an individual will in fact be tenured
7 at the University of North Carolina, correct?
8    A.  That's correct.
9    Q.  Okay.  Okay.  Now, at several points in
10 your report, Doctor Zaeske, you make assertions
11 about the job prospects of faculty denied tenure
12 at what you refer to at R2 schools?
13    A.  R2 schools, yes.
14    Q.  So we have been talking about R1 and R2
15 today, but I don't think for the record we have
16 clarified what that means.  So let's take a
17 moment to do that, okay?  What is -- when you say
18 R1 and R2, what are you referring to?
19    A.  Actually I think in the report I do
20 pretty clearly explain what that is -- what those
21 are and how those categories are determined, and
22 then I provided an exhibit that provides a
23 listing, as I recall.  So I think those are
24 pretty clearly defined.  But R1 --

Page 94

1    Q.  But --
2         MR. BRAMWELL:  I'm sorry, Ms.
3    Wermuth.  Do not cut my expert off as she is
4    speaking.
5         MS. WERMUTH:  I'm sorry, Jerry.
6         MR. BRAMWELL:  I'm sorry.  I can't
7    hear anything when you address me by my first
8    name.
9    BY MS. WERMUTH:
10    Q.  Please finish your answer, Doctor
11    Zaeske.
12    A.  So Exhibit 1 is R1 and R2 Carnegie
13    Classifications.  I'm just looking at my report.
14    So those were provided.  And then there is a
15    section in the report where I explain the
16    difference.  But the bottomline is that R1
17    institutions have higher expectations and higher
18    -- for research, and also really for teaching
19    standards, though there is usually less teaching.
20    And then they have more research expenditures and
21    tend to be more prestigious institutions in the
22    United States.
23              R2 institutions have
24    lesser research expectations, generally have

Page 95

1    higher teaching loads, and tend to be less
2    prestigious institutions in the United States.
3    And then I provided a list of those from the --
4    this is the Carnegie Classifications.
5    Q.  So here is my question.  You and I have
6    been using R1 and R2 throughout the course of the
7    deposition.  So my question was for purposes of
8    the deposition, we need to clarify what we are --
9    what we mean when we use those classifications or
10    when we use those terms, R1 and R2.
11              So let me ask you this.
12    You just said R2 institutions are less
13    prestigious than R1 institutions.  Are you
14    telling me that you think Dartmouth is a less
15    prestigious university than the University of
16    North Carolina?
17    A.  Well, Dartmouth has been reclassified in
18    the R1, if that's what you're getting at.  It was
19    demoted to an R2.  It was considered a loss of
20    prestige by Dartmouth.  Then they increased their
21    research expenditures, and they are back in the
22    R1 classification.  So it was absolutely
23    considered a loss of prestige for Dartmouth.
24    Q.  My question is when Dartmouth was an R2

Page 96

1    classification, did you understand that to be a
2    less prestigious institution than the University
3    of North Carolina?
4    A.  Yes.
5    Q.  Okay.  So the Carnegie Classifications,
6    that's what we are talking about when we refer to
7    R1 and R2?
8    A.  Correct.
9    Q.  Who administers the Carnegie
10    Classifications?
11    A.  They had been administered in the past
12    by Carnegie, but now they are administered
13    through the university of -- through a part of
14    the education school at the University of
15    Indiana.
16    Q.  And what is the methodology that the
17    University of Indiana uses -- I think it is
18    actually Indiana University, uses to classify
19    schools under the Carnegie Classifications?
20    A.  They have a number of criteria, but the
21    major one has to do with research expenditures,
22    or in other words, the amount of money generated
23    by research, by research grants, and spent on
24    research.  That's the major -- that's the major

Page 97

1    metric that's used.
2    Q.  Okay.  So one of the metrics is how much
3    the institution actually spends on research,
4    right?
5    A.  Right.
6    Q.  Another metric is how many research
7    doctorates are conferred?
8    A.  Right.
9    Q.  Another metric is the number of
10    non-faculty research staff at the institution,
11    correct?
12    A.  Right.
13    Q.  Those are the metrics that are used; is
14    that right?
15    A.  Right.
16    Q.  Okay.  So Carnegie does not measure
17    volume of scholarly output, correct?
18    A.  I don't think they -- no.  No.  They
19    don't do that per se like academic analytics or a
20    product like that.
21    Q.  So they don't measure the quality of the
22    scholarly output either?
23    A.  I would say not directly, but indirectly
24    once -- the ability to get particularly Federal

Page 98

1  grants is a measure of the quality of the
2  research.
3     Q.  Okay.  But we are talking about R1 and
4  R2 classifications, right?  So when Indiana
5  University is pulling data every 3 years to come
6  up with who -- which institution is ranking
7  where, it is not looking at the quality of
8  scholarly output, correct?
9        MR. BRAMWELL:  Objection, asked and
10  answered.
11        THE WITNESS:  Yes.  As I said,
12  there is an indirect measure by -- in order to
13  get an NIH, NSF, ACLS grant, you have to have
14  high quality scholarship, and they are peer
15  reviewed, and it is competitive, and quality is
16  assessed in that way.  So those are measures of
17  quality.
18  BY MS. WERMUTH:
19     Q.  Are the researchers at Indiana
20  University who compute the data for purposes of
21  the Carnegie Classifications looking at the
22  content and substance of grants, grant awards, or
23  scholarly output?
24        MR. BRAMWELL:  Objection,

Page 99

1  foundation, and objection, asked and answered.
2        THE WITNESS:  So they are not
3  looking directly, but they are looking at the
4  success of these grants in generating dollars.
5  BY MS. WERMUTH:
6     Q.  Okay.  Carnegie does not measure
7  educational outcomes for students, correct?
8     A.  Correct.
9     Q.  All right.  So I would like to look at
10  your report again, not the exhibit, but going to
11  page 1 of your report, and the paragraph that
12  reads basis for opinion as a header.  Tell me
13  when you are there.
14        MR. BRAMWELL:  I'm sorry.  Can you
15  help me with the page, Ms. Wermuth?
16        MS. WERMUTH:  Page 1
17        MR. BRAMWELL:  Page 1.  Thank you.
18        THE WITNESS:  Okay.
19  BY MS. WERMUTH:
20     Q.  Are you there?
21     A.  Yes.
22     Q.  Okay.  Great.  So that big paragraph at
23  the bottom of the second half of the page.  About
24  halfway down, there is a sentence that begins "R2

Page 100

1  universities have high research activity."  Do
2  you see that?
3     A.  Page 2 --
4     Q.  No.  Page 1.
5     A.  Page 1.  Sorry.
6     Q.  Second paragraph, halfway down that
7  second paragraph, the sentence --
8     A.  Right, okay.  Yeah, yeah.
9     Q.  You are with me?
10     A.  Yes, yes.
11     Q.  So it says "R2 universities have high
12  research activity, but they expect professors to
13  be teachers first."  Do you see that?
14     A.  Yes.
15     Q.  What is the source -- well, strike that.
16  Would you look please at Exhibit 7 in the -- let
17  me just make sure I have the right exhibit.
18  Yeah.  Exhibit 7 in the packet that was sent
19  yesterday.
20     A.  Yes.
21     Q.  Okay.  This was material that was
22  produced to me in connection with the subpoena
23  served on you, okay?  So this is something that
24  you looked at in preparing the report?

Page 101

1     A.  Yes.
2     Q.  Is there anything in here that says R2
3  universities expect their professors to be
4  teachers first?
5     A.  Well, I don't know about this article
6  per se -- well, first of all, look, these
7  articles are, you know, I wanted you to see that
8  my professional knowledge is not -- it's not just
9  me.  So there are other sources that are saying
10  this.
11        But either in this article
12  or others that I have provided, it is clear that,
13  and it is stated directly that at R2
14  institutions, the teaching load -- what we mean
15  when we say here expected to be a teacher first,
16  your teaching load might be 4-4, 4 courses a
17  semester in the Fall and Spring, or sometimes
18  they are on quarter systems, or whatever, or 3-3.
19  Whereas at an R1 institution, you are considered
20  and you are asked to be a researcher first.  So
21  your teaching load is going to be something like
22  2-2 or even 2-1 or 1-1 because teaching --
23  because research is first.  That's what is meant.
24     Q.  So I have a couple of follow-up

Page 102

1 questions. First of all, do you know what Doctor
2 Calvente's expected teaching load will be at the
3 University of North Carolina?
4    A.  No, I don't.
5    Q.  Do you know what her teaching load was
6 at DePaul University?
7    A.  No.
8    Q.  So you referred to Exhibit 7 as an
9 article, but let me just clarify for the record
10 what I think this is.  This is a download from
11 the website where the Carnegie Classifications
12 are described.  Am I right about that?
13    A.  That's right.
14    Q.  So this is a publication from the folks
15 who do the Carnegie Classifications, correct?
16    A.  Correct.
17    Q.  So it is not really an article?
18    A.  Right.
19    Q.  Okay.  Fair enough.  And am I correct
20 though that there is nothing in how Carnegie
21 describes their descriptions of classifications
22 or methodology that indicates that an R2 school
23 requires -- I'm sorry, expects professors to be
24 teachers first?

Page 103

1    A.  No.  They are not focused on that.
2    Q.  Okay.  And then if you would look at
3 Exhibit 8 in the packet sent to you last night?
4    A.  Yes.
5    Q.  Okay.  Can you tell me what this is?
6    A.  It looks like the Carnegie
7 Classification for DePaul.
8    Q.  And this is something that you looked at
9 in preparing your opinion?
10    A.  Probably I did, yes.  I don't remember.
11    Q.  Okay.  I'll just represent that it was
12 produced to me by Mr. Bramwell in connection with
13 the subpoena served on you, okay?
14    A.  Okay.
15    Q.  So in looking at this document, I see
16 that it is -- I'm looking at the second page of
17 it.
18    A.  Uh-huh.
19    Q.  And there is like a chart that says
20 classification and then category with 2 columns.
21 Do you see that?
22    A.  Right.
23    Q.  Okay.  And so under the column that says
24 classification, there is a line for basic.  Do

Page 104

1 you see that?
2    A.  Yes.
3    Q.  And it says doctoral -- category is
4 doctoral universities high research activity?
5    A.  Yes.
6    Q.  So high research activity is R2?
7    A.  Right.
8    Q.  Very high is R1?
9    A.  Yes.
10    Q.  But nevertheless, high research
11 activity, correct?
12    A.  Yes, but -- yes.  The differences are
13 significant.
14    Q.  Okay.  There doesn't -- I don't see
15 anything in here that suggests that this is an
16 institution that expects professors to be
17 teachers first.  Do you see anything in here that
18 says that?
19        MR. BRAMWELL:  Objection, best
20 evidence.  Go ahead.
21        THE WITNESS:  I don't know how it
22 compares to the other -- well, the Carnegie
23 classifications, the IU classifications, again,
24 they are about research.

Page 105

1 BY MS. WERMUTH:
2    Q.  Right.  Thank you.  And then when you
3 look at the undergraduate profile on this page,
4 do you see that?
5    A.  Yes.
6    Q.  It says 4 year, full-time, selective,
7 higher transfer-in.  Do you see that?
8    A.  Yes.
9    Q.  So it is categorized as a selective
10 undergraduate profile, right?
11    A.  Yes.
12    Q.  Meaning the students are high quality?
13 It is a selective institution?
14        MR. BRAMWELL:  Objection, form.
15 Objection, foundation.  Objection, assumes facts
16 not in evidence.
17 BY MS. WERMUTH:
18    Q.  You can answer.
19    A.  So I don't know how the other
20 institutions -- I mean it might be the same
21 arguably as the research where there is high
22 research activity and very high research
23 activity.  It might be selective or very
24 selective.  So I don't know.

Page 106

1    Q.  You don't know.  Okay.  Can you look at
2  Exhibit 6, please?
3    A.  Do we know how many doctorates DePaul
4  produces every year?
5    Q.  Do you know the answer to that question?
6    A.  I don't know, but I think that's a good
7  question.
8    Q.  It is not something you looked up for
9  purposes of forming your opinion, correct?
10    A.  Yeah, but you are making me think that
11  it would have been a good thing.  You want me to
12  look at number 9?
13    Q.  No.  Number 6, please.
14    A.  News and announcements?
15    Q.  Yes.  This is another download from the
16  Carnegie Classifications website?
17    A.  Right.
18    Q.  This was produced to me by Mr. Bramwell
19  in connection with the response to the subpoena.
20  I'm just curious how did this document -- how did
21  you rely on this in forming your opinion?
22    A.  I think I wanted to know the -- how
23  recent the classifications had been updated and
24  also to establish that, you know, I thought the

Page 107

1  statement that said the Carnegie classification
2  has been the leading framework, so on, was
3  explanatory and helpful.
4    Q.  Well, it says "it has been the leading
5  framework for recognizing and describing
6  institutional diversity in the U.S. higher
7  education for the past 4 and a half decades."  So
8  what about that sentence helped you form the
9  basis of your opinion?
10          MR. BRAMWELL:  Objection as to
11  form.  Objection as to format.  Objection as to
12  misstates her testimony.  Objection, assumes
13  facts not in evidence.
14          THE WITNESS:  So the bottomline is
15  I wanted to show that I was looking at updated
16  information.
17  BY MS. WERMUTH:
18    Q.  Okay.  So let's take a look then, you
19  said that -- so this is Exhibit 3.1.  You said
20  that you attached to your report the listing of
21  R1 and R2 research classifications.  Is that
22  right?
23    A.  Right.  Correct.
24    Q.  Are you with me there?

Page 108

1    A.  Yes, correct.  Yes.
2    Q.  So where -- so this was produced to me
3  as -- it was attached to your report as a Word
4  document.  So is this a document that you
5  personally created?
6    A.  I think I might have just block copied
7  it and dropped it into a Word doc, because I
8  couldn't figure out otherwise how to get it
9  preserved in a document form.
10    Q.  Where did you find this?
11    A.  I think -- isn't the URL right on there?
12    Q.  I don't see it.  Can you tell me where
13  you see it?
14    A.  Exhibit 3?
15    Q.  Point 1.
16    A.  Okay.  I guess I did not include the
17  URL, but I think I took it from the website of
18  the -- the IU website.
19    Q.  Okay.  Can you confirm for me that
20  everything in the left column is an R1 school and
21  everything in the right column is an R2 school?
22    A.  I trust the source that I have used, so
23  yes.
24    Q.  Okay.  And that would follow through all

Page 109

1  of the pages?  So page 2, page 3, page 4,
2  everything on the left side of the sheet is R1
3  and everything on the right side of the sheet is
4  R2, correct?
5    A.  Yes.
6    Q.  Now, earlier we had talked about Yale
7  being an R1 school.  I don't see Yale -- oh,
8  wait.  I see it as an R2 school on page 3.  Is
9  that consistent with your knowledge of --
10    A.  Actually earlier you said Yale was an R1
11  school, and I said no, Yale is an Ivy League
12  school.
13    Q.  Okay.  So you -- it is your
14  understanding that Yale is not an R1 school?
15    A.  I find that surprising, but apparently.
16    Q.  What about are you familiar with the
17  University of Chicago?
18    A.  Yes.
19    Q.  And according to the document that you
20  produced, the University of Chicago also is an R2
21  school?
22    A.  Surprising.
23          MR. BRAMWELL:  I'm sorry, Ms.
24  Wermuth.  I apologize.  What page?

Page 110

1    MS. WERMUTH: 2. It is not
2  numbered. It is at the very top of the right
3  column.
4    MR. BRAMWELL: I'm sorry. I see
5  it.
6  BY MS. WERMUTH:
7    Q. Do you think that's accurate, Doctor
8  Zaeske?
9    A. I think it is surprising, but I don't
10  know why it would be wrong on this list. I don't
11  see Chicago.
12    Q. Page 2?
13    A. Is it under University of Chicago?
14    Q. Correct.
15    MR. BRAMWELL: It may be easier to
16  share your screen.
17  BY MS. WERMUTH:
18    Q. Go to the second page of the document.
19  Don't look alphabetically. For whatever reason
20  these are not in alphabetical order.
21    A. Okay. That's probably why. Oh yes,
22  yes, I do see it. That is strange.
23    Q. Are you familiar with Northwestern
24  University?

Page 111

1    A. Certainly.
2    Q. Do you see Northwestern appearing under
3  the R1 or R2 list on that document that you
4  provided?
5    A. I do not.
6    Q. So according then to your theory since
7  Northwestern is not an R1 nor an R2 school, it
8  would be less prestigious than DePaul University
9  which is an R2 school? Is that fair?
10    A. I would not agree with that.
11    Q. And okay. Isn't your theory premised on
12  R2 schools being less prestigious than R1
13  schools?
14    A. Well, you are making a leap in logic
15  here from the inclusivity of a list to what my
16  argument is. You know, there is -- I'm surprised
17  that Northwestern is not on this list, and I
18  don't know -- I don't know why, and I can't
19  explain that. But that doesn't mean that I
20  wouldn't -- I mean if we looked at the research
21  expenditures of Northwestern and the number of
22  doctorates produced and compared that to DePaul,
23  I think we would have data to indicate that there
24  is a prestige difference there.

Page 112

1    Q. Based on research dollars?
2    A. Based on research dollars.
3    Q. Even though Northwestern doesn't show up
4  on your list of R1 or R2 schools?
5    MR. BRAMWELL: Objection to the
6  characterization of it as her list.
7    THE WITNESS: Yeah. It is this
8  list.
9  BY MS. WERMUTH:
10    Q. Well, this is a list that you said that
11  you cut and pasted, right?
12    A. From a website, yeah. I will find out
13  what the source was.
14    Q. Yeah. I'm going to ask for that URL
15  because I'm not sure that this is an accurate
16  document.
17    MR. BRAMWELL: Are you accusing my
18  client -- not my client. Are you accusing my
19  expert of producing inaccurate information, Ms.
20  Wermuth?
21    MS. WERMUTH: With Yale and
22  University of Chicago being listed as R2 and
23  Northwestern being excluded, I think if I went on
24  the Carnegie Classification website and looked at

Page 113

1  their data spreadsheets, I think I would see
2  something different. That's what I'm saying.
3  I'm not saying it is intentional. I don't know
4  the source of this document. That's why I'm
5  asking these questions. I'm not accusing anyone
6  of anything. I'm trying to ask questions about
7  documents that were produced to me in response to
8  a subpoena that were allegedly relied upon by the
9  expert in preparing her opinion. That's what I'm
10  asking, Jerry.
11    MR. BRAMWELL: I'm sorry, Anna. I
12  have asked you multiple times to give me the
13  courtesy --
14    MS. WERMUTH: Mr. Bramwell.
15    MR. BRAMWELL: Thank you.
16    MS. WERMUTH: You can call me Anna
17  any time. I'm not offended.
18    Q. Go ahead, Doctor.
19    A. So this listing really was just to
20  provide a sense of what these -- what R1 and R2,
21  you know, classifications look like. They did
22  not I would say inform my decision. I mean it is
23  really about the general understanding of an R1
24  and R2 institution as opposed to the overall

Page 114

1  inclusivity of a list.
2      Q.  But you did attach it to your report,
3  Doctor?
4      A.  Yes.
5      Q.  All right.  I just want to finish out
6  some discussion about the Carnegie
7  Classifications.  So if you would please look at
8  Exhibit 11?
9      A.  Okay.
10     Q.  Okay.  This is the publication that you
11  list among the facts and data considered in
12  forming your opinion in your report.  Okay?
13     A.  Right.
14     Q.  What is this publication?  I can't
15  really tell from what was provided to me.
16     A.  It is a center that -- you know, a lot
17  of institutions have centers that focus on
18  educational -- educational studies and
19  educational politics and educational policies, I
20  should say.  And this is a publication by an
21  expert in higher ed about the Carnegie.
22     Q.  Okay.  And do you know what school the
23  James G. Martin Center for Academic Renewal is
24  associated with?

Page 115

1      A.  I cannot recall.
2      Q.  This is not a peer reviewed paper,
3  correct?
4      A.  No.  It is in an industry journal or an
5  industry, you may call it a magazine as opposed
6  to a journal.
7      Q.  You would agree with me that this author
8  actually points out the problems with relying on
9  the Carnegie Classifications?
10     A.  Yes.
11     Q.  And then Exhibit 14, if you can look at
12  that with me, please?
13     A.  Okay.
14     Q.  This is another article that was listed
15  among the facts and data considered by you in
16  preparing your report.  Are you familiar with
17  this article?
18     A.  Yes.
19     Q.  And this is an article from the
20  Washington Post, right?  So that's a newspaper?
21     A.  Correct.
22     Q.  So this is a news article about
23  Dartmouth falling out of the R1 classification?
24     A.  Right.  It is excellent evidence of the

Page 116

1  importance of the Carnegie Classifications in the
2  prestige of an institution.
3      Q.  You call a newspaper article excellent
4  evidence of what?  I'm sorry.
5      A.  So the prestige of an institution which
6  drives the -- so there is multiple ways that
7  there is prestige of institutions.  There is
8  prestige within the academic community itself,
9  and there is also the prestige with potential --
10  with alumni and also with potential applicants to
11  an institution, right?  And when Dartmouth fell
12  out of the Carnegie R1's, there was, you know,
13  ripples.  There were ripples in the academic
14  community.  There were ripples among alumni.
15  There were concerns in the institution about
16  enrollments.  There were concerns about whether
17  or not a Dartmouth degree was as worthwhile as it
18  has been in the past.
19          So this is an article that
20  just illustrates that even in public, in the
21  lighter public opinion, that this change in the
22  Carnegie ranking was -- it is a big deal.
23     Q.  Are you familiar with Kevin Kinser?
24     A.  No I'm not.

Page 117

1      Q.  Well, according to Kevin Kinser who is
2  quoted in this article in the first page, and
3  according to the article, which, again, is a news
4  article, "he is an associate professor of
5  Educational Administration and Policy Studies at
6  the State University of New York at Albany.  He
7  is on the advisory board of the Carnegie
8  Initiative.  He is quoted as saying "the label
9  should not be viewed as ranking or rating, but
10  merely a description based on data."  Yes?
11     A.  Well, he said it should not be viewed,
12  but that's because it is viewed.
13     Q.  He goes on to say that "For Dartmouth or
14  any other school to fall out of R1 category
15  shouldn't be considered some deficiency in the
16  institution."  Do you see that?
17     A.  Right.  He needed to say that.
18     Q.  The basis for your statement?
19     A.  Well, I can tell you right now I am
20  hiring a professor away from Dartmouth who
21  doesn't want to be there because it doesn't have
22  graduate education, and it is really focused on
23  undergraduate education, and it is not a strong
24  research institution.  It is back in the R1, but

Page 118

1  it is on the edge.
2      Q.  Do you know where Dartmouth ranks under
3  U.S. News World and Report as compared to
4  University of North Carolina?
5      A.  They are different -- well, there are
6  many different rankings in U.S. News and World
7  Report. Dartmouth is known as a very -- as a
8  very good undergraduate school. It is not a
9  great place if you are a researcher.
10     Q.  But you did rely on U.S. News World and
11 Report general rankings, right, for purposes of
12 forming your opinion? In those general rankings,
13 do you know where Dartmouth falls as compared to
14 UNC?
15     A.  I do not.
16     Q.  So I think just to make sure this is
17 clear on the record, the Washington Post article
18 is not a peer reviewed publication, right?
19     A.  It is not, which I think is irrelevant.
20     Q.  Okay. Okay. Exhibit 22, please?
21     A.  Exhibit 22?
22     Q.  Yes.
23     A.  Okay.
24     Q.  All right. So this article is from

Page 119

1  Inside Higher Ed. Do you see that?
2      A.  Yes.
3      Q.  Which again is just sort of like an
4  industry magazine type, right? It is not a peer
5  reviewed publication?
6      A.  Right.
7      Q.  Okay. And this article seems to be
8  explaining that there is a new sort of
9  professional doctoral categorization that
10 Carnegie will be using, correct?
11     A.  Right.
12     Q.  Okay. And according to this article,
13 this new category will mean that a small handful
14 of universities will move up to R1 designation?
15     A.  Right.
16     Q.  All right. So let's go back to Exhibit
17 3, your report. And by the way, I know it is
18 12:30. I'm happy to keep going, but I'm happy to
19 break if folks need 15, 20, 30 minutes. Gina, I
20 know your fingers are working hard. So if folks
21 need a break, I'm happy to take a break. Just
22 tell me if now is the right time and how much
23 time people would like.
24         THE WITNESS:  I'm doing fine. It

Page 120

1  depends on what others say.
2          MS. WERMUTH:  Gina, do you need a
3  break?
4          COURT REPORTER:  If I could have
5  like 15 minutes, that would be perfect.
6          MR. BRAMWELL:  Since we are at the
7  noon hour, and the court reporter obviously is
8  the most important person in the room, did you
9  want to take a half hour for lunch? Is that
10 enough time, Doctor Zaeske?
11         THE WITNESS:  Yes, that's fine.
12 (Break taken from 12:32 to 1:03)
13 BY MS. WERMUTH:
14     Q.  So Doctor Zaeske, I'll just remind you
15 that even though we broke, you are still under
16 oath. You understand that?
17     A.  Thank you, yes.
18     Q.  Okay. So we were going to start or
19 return to your report. So if you would go to
20 Exhibit 3 with me for a moment, I would
21 appreciate that.
22     A.  Yes.
23     Q.  Couple of things I just wanted to ask
24 you about on page 1 in the second paragraph, near

Page 121

1  the end. So there is a sentence about a third of
2  the way up from the bottom that begins with
3  "moreover, as a member of the advisory board of
4  the Carnegie Initiative." Do you see that?
5      A.  Yes.
6      Q.  And then you go on to say that this
7  person explained that R1 institutions are
8  considered to be, and then there is quotation
9  marks, "the pinnacle of higher education". So it
10 looks like that is a quote, but I don't see
11 attribution here. So I don't know who this
12 person is and where this statement was made. Do
13 you have that information?
14     A.  Right. So it is a quote, and it is in
15 one of the articles that I cited in the -- in the
16 list of documents and data considered here. I an
17 could back and let you know if it is in the
18 Mendenhall or the Anderson. It is probably one
19 or the other of those.
20     Q.  Or perhaps in the Washington Post
21 article?
22     A.  Or perhaps in that one, yeah.
23     Q.  All right. And then you go on to talk
24 about rankings by College Factual and rankings by

Page 122

1 U.S. News and World Report. Do you see that?
2     A.  Yes.
3     Q.  So what is College Factual?
4     A.  So these -- okay.  So these are commonly
5 -- both U.S. News and World Report and College
6 Factual are rankings of institutions that are
7 highly available to the public, as opposed to
8 let's say the NRC rankings, which are rankings of
9 doctoral institutions and doctoral programs, or
10 academic analytics, which are more available to
11 academic administrators and academics.
12              So I provided these
13 frankly because I thought they would be more
14 accessible to the court.
15     Q.  Okay.  So you chose to use the
16 publically available ones as opposed to the
17 sources that are used in the academic community?
18     A.  Right.
19     Q.  Okay.
20     A.  Well, also DePaul doesn't have a
21 doctoral program in communications, so it
22 wouldn't even be considered.  It wouldn't even be
23 included, so it is not possible to use that.
24     Q.  Okay.  And so as you testified earlier,

Page 123

1 U.S. News and World Report has a variety of
2 different types of rankings, right?
3     A.  Yes.
4     Q.  For your proposition here, UNC is ranked
5 28 as compared to DePaul's 124, what ranking
6 group were you looking at?
7     A.  So I was looking at the rankings of --
8 well, as it says "U.S. News and World Report
9 ranking of colleges offering a communications
10 major".  So I'm not looking at the overall
11 ranking of DePaul and the overall ranking of UNC.
12 I'm looking at the ranking of them within
13 institutions that offer a communication major.
14     Q.  Okay.  And do you know the methodology
15 that U.S. News and World Report uses to make the
16 rankings it makes or publishes the rankings it
17 makes?
18     A.  So it makes a number of different
19 rankings as I mentioned.  So its overall
20 institutional rankings, there are many things
21 included in overall rankings of institutions.  It
22 has to do with number of -- it has to do with
23 number of applications to attend the institution
24 and number of students admitted.  It has to do

Page 124

1 with -- it does have to do with research and
2 ranking of research programs.  It also includes
3 things such as number of living alumni who have
4 made contributions to an institution.  You know,
5 so there are a lot of different factors that U.S.
6 News and World Report include in their
7 assessment.
8              And you know, it's largely
9 reputational, as opposed to again, like the NRC,
10 or academic analytics, which is -- these really
11 look at the number of articles and books
12 published and the venues in which they are
13 published and the number of awards that are
14 garnered through research and so on.  So it is a
15 very different kind of ranking.
16     Q.  Right.  So there is a fair amount of
17 subjectivity, you call it reputational, but
18 subjectivity that goes into that particular
19 ranking?
20     A.  I would disagree with that.  It is not
21 about subjectivity.  It is about using different
22 metrics for making an assessment.  They are
23 measuring different things.
24     Q.  Okay.  Including things like feedback

Page 125

1 from folks who use the service, right?
2     A.  Feedback from folks who use which
3 service?
4     Q.  The ranking service.
5     A.  You mean the U.S. News and World Report
6 rankings?  Oh, you mean feedback about the
7 institutions themselves?
8     Q.  Well, when I -- so do you know whether
9 or not the U.S. News and World Report uses -- I
10 should say employs user feedback in its ranking
11 methodology?
12     A.  I don't know.
13     Q.  Okay.  Do you know whether it uses
14 discussions with schools in its ranking
15 methodology?
16     A.  I'm not aware.
17     Q.  Okay.  Now, there are a number, Doctor
18 Zaeske, a number of places in your report where
19 you talk about the job prospects for faculty
20 denied tenure from Carnegie Classification R2
21 schools, correct?
22     A.  Yes.
23     Q.  Okay.  So for example, on page 1 in the
24 first paragraph, you say "professors who are

Page 126

1 denied tenure at R2 universities such as DePaul
2 almost never are hired at R1 universities such as
3 UNC because their record has been assessed as
4 untenurable." Do you see that?
5    A.  Yes.
6    Q.  You go on to say "faculty denied tenure
7 at R2 universities typically find employment at
8 institutions with less rigorous tenure standards
9 such as community colleges, technical schools,
10 and high schools, or they leave the academy". So
11 for those 2 sentences that I just read, can you
12 tell me the source of your data here?
13    A.  Sure.  So I am speaking from
14 professional experience and a number of examples
15 that I know from both R2 and R1s.  But then I
16 also, you know, provided -- I thought it would be
17 helpful to see that it is not just me talking
18 from my experience, so provided a number of
19 articles that backed up that claim that talked
20 about experience of individuals who were denied
21 tenure at R2 and R1 universities.
22    Q.  Okay.  So you are talking about some of
23 the feature stories that you attached to your
24 report or referenced in your report; is that

Page 127

1 right?
2    A.  Right.
3    Q.  Which are primarily anecdotal stories
4 from individuals who actually experienced tenure
5 denial, right?
6    A.  Right.
7    Q.  Some of those articles don't say whether
8 or not the individual was denied tenure at an R2
9 school.  Would you agree with that?
10    A.  Right.
11    Q.  And many say that tenure denial helped
12 them actually find the career that they
13 preferred, right?
14    A.  Right, right, which was not at an R1
15 institution.
16    Q.  Okay.  Although for those who went to
17 other institutions into tenure track positions,
18 in those articles, I didn't see one article where
19 that happened and the individual identified
20 whether the school they were denied tenure at or
21 the school where they landed was an R1 or an R2;
22 am I correct on --
23        MR. BRAMWELL:  Objection.
24        MS. WERMUTH:  I didn't finish the

Page 128

1 question.
2    Q.  Or am I misreading those?
3        MR. BRAMWELL:  Objection as to
4 vague, and objection, Counsel was testifying.
5 BY MS. WERMUTH:
6    Q.  Did I misread any of those articles?
7    A.  So all the articles that I provided, and
8 all the articles that I found, were examples of
9 individuals who had been denied tenure at R1 or
10 R2 institutions, and they were unable to be hired
11 at an R1 institution, and I think none of them,
12 as I recall, were hired into tenure track
13 positions.
14        And yes, there was the one
15 article by -- her last name -- either her first
16 name or last name was Grace, talked about finding
17 out that she was happier at a non -- in a
18 non-tenure track job, though she was continuing
19 to strive for a tenure job position.  But I can
20 -- you know, I have at least a handful if not
21 more examples of individuals who were denied
22 tenure even at an R1 institution and have not
23 been able to find tenure track positions at R2s
24 or anywhere.

Page 129

1        I mean tenure denial or
2 non-renewal is kind of a kiss of death.  It is
3 very, very hard to be hired at another
4 institution much less a higher one than the --
5 higher ranked and higher in prestige and higher
6 in publishing expectations than one has been
7 denied tenure at.
8    Q.  So I just want to be clear then because
9 you make some assertions that say things like
10 "almost never", "almost never are hired at R1
11 universities".  "They typically find employment
12 at institutions with less rigorous tenure".  Very
13 rarely able to land".  Generally move to lower
14 ranked universities".
15        I just want to make clear
16 that those assertions are not based on any
17 statistics or data that you have either compiled
18 or reviewed in connection with preparing your
19 report?
20    A.  So first of all, the conclusion is based
21 on my experience and the examples I have seen,
22 and then examples I was available to find.  And
23 these happen to be anecdotal because I could find
24 no data on post-employment after tenure denial.

Page 130

1  So you know, I certainly looked for statistics on
2  that, but it is not out there.
3      Q.  Okay.  So I would like to look at the
4  articles that you cited though because I'm
5  struggling -- well, let me ask you this.  Can you
6  look at Exhibit 23, please?
7      A.  Okay.
8      Q.  Can you tell me if there is anything in
9  this -- well, strike that.  This is an article
10  that comes from the Chronicle of Higher
11  Education, right?
12      A.  Yes.
13      Q.  Which again is not a peer reviewed
14  publication, correct?
15      A.  That is correct.
16      Q.  Okay.  And I don't see anything -- so if
17  I'm wrong, please tell me, because I would like
18  to know.  Is there anything in here that talks
19  about what is the fate of an individual -- or I'm
20  sorry, what is the fate of a faculty member who
21  is denied tenure at an R2 school?
22      A.  I would have to take a moment to, you
23  know, look at it conclusively.  And this, you
24  know, goes back to your question about, you know,

Page 131

1  the language -- you know, I'm careful in what I'm
2  going to say yes or no to.  So I'm not going to
3  make a sweeping statement in my report like in
4  all cases, someone who is denied tenure is going
5  to do this or that.  I'm going to say typically
6  or almost always or whatever.
7          So I think that's
8  responsible because we don't -- it is not helpful
9  to speak in universals.  I can't know every
10  single case.  But in most cases, or typically
11  that is what has happened.  And you just asked me
12  to, you know, make a very precise statement about
13  something that I would have to look at closely,
14  which I'm happy to do, but I would need a little
15  time here to read it through.
16          MR. BRAMWELL:  And we will count
17  that against your time.
18  BY MS. WERMUTH:
19      Q.  Well, look, we can -- you can take the
20  opportunity -- I just want to make sure I
21  understand.  I mean I know that you read this.
22  You cite this article as something you relied on
23  or considered in forming your opinion.  And so
24  your opinion is that it is very rare for folks,

Page 132

1  for faculty denied tenure at an R2 to get hired
2  at an R1.  And I want to make sure I understand
3  where -- what your source data is.  And I don't
4  know if this article is source data for that
5  specific proposition.
6      A.  All right.  So this is an article about
7  -- so the mindset and moving on from, appealing,
8  and doing the next thing, and what a person might
9  do after getting tenure denial.  So there aren't
10  a lot of articles or data out there about what
11  people do after tenure denial, so I looked at
12  what I could find.  I was asked to provide you
13  with information or documentation of what I
14  looked at, and I looked at this, so I have
15  provided it.
16      Q.  Would you agree that this Exhibit 23 is
17  really more of like an advice column?
18      A.  I think it is about sharing experiences
19  and yeah, and some guidance.
20      Q.  Okay.  Can you look at Exhibit 16?
21          MR. BRAMWELL:  I'm sorry.  1, 5 or
22  1, 6?
23          MS. WERMUTH:  1, 6.
24          THE WITNESS:  Okay.

Page 133

1  BY MS. WERMUTH:
2      Q.  This is another article that you relied
3  on in forming your opinion.  Do I understand that
4  correctly?
5      A.  Yes.
6      Q.  Okay.  And this is also from the
7  Chronicle of Higher Education, correct?
8      A.  Correct.
9      Q.  And as I understand it, Peter Ellenbogen
10  is a pseudonym of someone that doesn't otherwise
11  want to be identified.  Do you understand that as
12  well?
13      A.  Yes.
14      Q.  According to Peter's story, he was
15  denied tenure at a private institution and then
16  did find a tenure line job at a public
17  institution, right?
18      A.  You know, again, I would have to look at
19  it for a minute here because there were a lot of
20  articles.  Well, I don't think it is a tenure
21  track position.  "I now work at a public
22  university."  I'm not sure it is a tenure track
23  position.
24      Q.  Okay.  So it is not clear one way or the

Page 134

1  other if he obtained a tenure track position,
2  right?
3      A.  Right.  It is not clear.  And in fact, I
4  think a key thing here is that he indicates "I
5  had no illusion that the administration would
6  rubberstamp the decision to hire a faculty member
7  who had been denied tenure by a university that
8  rarely does so".
9      Q.  That's his personal experience, right?
10     A.  Right.
11     Q.  And we don't know if his tenure denial
12  was from an R2 school, correct?
13     A.  Right.  And if it was from an R1 school,
14  even more so the case.
15     Q.  But from this article, we can't tell
16  what type of institution he was denied tenure
17  from, correct?
18     A.  Correct.
19     Q.  And we can't tell what type of
20  institution he found subsequent employment with,
21  correct?
22     A.  Right.  But the point is that whether
23  one is denied tenure from an R1 or an R2
24  institution, it carries a taint, and it makes it

Page 135

1  very hard to get hired.  So again, in the absence
2  of, you know, like statistical data, what I'm
3  providing is first of all, I have 11 years of
4  experience or more than that even, if I include
5  being a department chair, with cases like this.
6  And we are looking at available anecdotal
7  information, a number of case studies that have
8  been provided.
9          You see basically a
10  restatement of my assessment that once you are
11  denied tenure whether it is by an R1 or R2
12  institution, it is very difficult to get a job.
13  You carry that, like this guy said.  He was
14  afraid that he would not get hired.  And even,
15  you know, spoke it out loud to the dean that he
16  was a hiring risk, because he was.
17         MS. WERMUTH:  Gina, can you read my
18  question back, please?
19         (Previous question read).
20         THE WITNESS:  Correct.
21  BY MS. WERMUTH:
22     Q.  Okay.  That was my question.  Thank you.
23  Exhibit 15, please?
24     A.  15, right?

Page 136

1      Q.  Yes.  1, 5.  Thank you.
2      A.  All right.  Thank you.  All right.
3      Q.  What is this article?
4      A.  What is this article?
5      Q.  Yeah.  What is Chron?
6      A.  Again, it is a higher ed -- it is a
7  higher ed publication.  It is like -- it is not
8  the same as the Chronicle, but it is similar to
9  the Chronicle.  It is an industry publication.
10     Q.  Are you sure?
11         MR. BRAMWELL:  I'm sorry.  What?
12         MS. WERMUTH:  I'm just asking if
13  she is sure.
14         THE WITNESS:  It is an industry
15  publication.
16  BY MS. WERMUTH:
17     Q.  It is not the Houston Chronicle
18  newspaper?
19     A.  Well, the Houston Chronicle newspaper
20  does a section like many newspapers about hiring
21  and college, and it usually coincides with the
22  applications cycle for undergraduate students.
23  But it's a report, it is a higher ed report, that
24  is specific to, you know, to universities.

Page 137

1      Q.  And what is the name of this report that
2  the Houston Chronicle publishes?
3         MR. BRAMWELL:  I'm sorry,
4  objection.  It has not been identified as an
5  article published by the Houston Chronicle.
6  BY MS. WERMUTH:
7      Q.  You can answer.
8      A.  So it is an article about higher
9  education in a section, like the New York Times
10  does a section about higher education usually in,
11  I think it is in the Spring.  The Post does one.
12  The Houston Chronicle does one.  The LA Times
13  does one.
14         So it is -- usually they
15  have reporters who have expertise in higher
16  education put together these sections.
17     Q.  Okay.  So is this from the Houston
18  Chronicle?
19     A.  It is a higher education section, and it
20  is published by the Chronicle.
21     Q.  The Houston Chronicle?
22     A.  It is a publication that is devoted to
23  higher education.
24     Q.  I'm sorry.  When you say it is the

Page 138

1  Chronicle, the Houston Chronicle?  Are we talking
2  about the same publication?
3      A.  Yes.
4      Q.  And do you know this author, Robin
5  Elizabeth Margolis?
6      A.  I do not.
7      Q.  Do you know if she is a specialist in
8  higher education reporting?
9      A.  I do not.
10     Q.  Now, you also referred in your report to
11  a manuscript Presumed Incompetent.  Mr. Bramwell
12  was gracious enough to send me a copy of the
13  book, but it is a book, and so I'm curious about
14  what portions of the book you relied upon in
15  reaching your conclusions?
16     A.  So there is one -- so you can see these
17  articles, what I'm trying to do is share with you
18  a number of cases and case studies.  And it is
19  fine that they are -- they are individual
20  anecdotes, some of them published in the
21  Chronicle of Higher Ed, some of them published in
22  other publications, in which people tell their
23  individual stories about what has -- what
24  happened to them after they were denied tenure.

Page 139

1  So there is a chapter in that, I think the editor
2  is Neiman (phonetic) I think.
3                 Okay.  So there is a
4  chapter in that book that I just mentioned by, I
5  think it is Grace Park, and it is about like what
6  I -- what happened after my tenure denial.  So
7  because I was looking for, you know, information,
8  whether it is statistical data or individual case
9  studies of people who had been denied tenure and
10  what they did, the chapter on my tenure denial
11  came up in my search.
12                 So that is the -- so then
13  I used that book, but I used just the my tenure
14  denial chapter because that is what was germane
15  to the -- to what I was looking at.  I believe
16  that's the one in which the individual said that
17  after tenure denial, she was -- she had a really
18  hard time -- and I think even at the time of the
19  publication of that book, was still trying to get
20  a stable job, a tenure track job, or even an
21  adjunct job that lasted more than a year or more
22  than a short term period.
23                 But she did say that even
24  though she did not have job stability and many of

Page 140

1  the things that she had as a tenure track faculty
2  member, so felt like in many ways better.  She
3  felt better about what she was doing.
4      Q.  Okay.  So I'm looking at the book and
5  there is a chapter in Section 5, Chapter 26,
6  called My Tenure Denial by Grace Park.  Is that
7  the chapter you are referring to?
8      A.  Yes.
9      Q.  So that's another anecdotal story about
10  her tenure denial and moving on from that?
11     A.  Right, correct.
12     Q.  Okay.  I would like to turn to Exhibit
13  3.3.  We have looked at this before.  We are
14  coming back to it.  These are the UNC College of
15  Communication guidelines?
16     A.  Okay.
17     Q.  And interestingly, and I have to ask
18  this question.  So I got that copy in connection
19  with your report.  So it was attached as an
20  exhibit to your report.  In response to the
21  subpoena I sent to you, Mr. Bramwell also sent me
22  Exhibit 21.  Will you take a look at that?
23     A.  Okay.
24     Q.  And this document has the title -- I'm

Page 141

1  sorry.  Let me start over.  This PDF file has a
2  title that says Template Task Force Personnel
3  Procedures Corrected 4.26
4  (00058788-3).docs-communication 1-1.  Do you see
5  that?
6          MR. BRAMWELL:  I'm sorry, I don't.
7  I apologize.  We are looking at 22?
8          MS. WERMUTH:  21.
9          MR. BRAMWELL:  Oh, I'm sorry.  That
10  would explain my confusion.
11         THE WITNESS:  Yes.
12  BY MS. WERMUTH:
13     Q.  So that is the title of the PDF file as
14  it looked when it was sent to me by Mr. Bramwell.
15  Do you understand what that document title is?
16  Is that something that -- let me just strike
17  that.  Did you title this particular document
18  with that title?
19     A.  I did not.
20     Q.  Okay.
21     A.  I don't even know what those numbers --
22  I don't know what those numbers are.
23     Q.  Okay, okay.  So you don't know what this
24  reference to corrected 4.26 is?

Page 142

1     A.  No.
2     Q.  So this is not the document that you
3  relied on in forming your opinion?
4     A.  So what you are trying to do is point
5  out a difference between 21 and 3.3?  Is that it?
6     Q.  I'm not trying to do that.  I'm trying
7  to find out -- both of these documents were
8  produced to me in connection with the subpoena.
9     A.  Right.
10     Q.  So I don't understand -- I'm trying to
11  understand what the 2 documents are.  One was
12  attached to your report.  So I'm assuming you
13  relied on the one attached to your report,
14  correct?
15     A.  Yes.  I mean I don't know that there is
16  a difference between the 2.  So it's hard for me
17  to know without looking at them closely.
18     Q.  Yeah.  I haven't asked that question.
19  I'm just wondering like if you know what this
20  document with this title Template Task Force
21  Personnel Procedures -- like is that a document
22  you ever seen before?
23     A.  I have not seen that document title
24  before.

Page 143

1     Q.  Okay.  So would it be safe to use
2  Exhibit 3.3, which was attached to your report as
3  the UNC College of Communication -- I'm sorry,
4  Department of Communication Promotion Guidelines?
5     A.  Yes.
6     Q.  Okay.  Thank you.  I won't look at 21
7  anymore.
8     A.  Okay.
9     Q.  Okay.  So we are going to go back to
10  Exhibit 3.3 then.  I just needed clarification on
11  what that other document was because I don't
12  think we know.  Okay.  Actually let me go quickly
13  -- I'm sorry to do this to you, to Exhibit 3.2
14  which are the DePaul guidelines?
15     A.  Okay.
16     Q.  I'm sorry.  I should say the DePaul
17  College of Communication Guidelines?
18     A.  Alrighty.
19     Q.  And to be clear, these were -- these
20  were not guidelines that you sourced on your own
21  on the internet like you did with UNC?
22     A.  Correct.
23     Q.  These were provided to you by Mr.
24  Bramwell?

Page 144

1     A.  Yes.
2     Q.  And I see that there is like bates
3  labeling confidential at the bottom of the page,
4  and then there is this other labeling that says
5  Calvente-DePaul with some numbers that follow.
6  Do you see that?
7     A.  Yes.
8     Q.  And you said you signed a
9  confidentiality order?
10     A.  Yes.
11     Q.  Or I'm sorry, a confidentiality
12  agreement?
13     A.  Yes.
14     Q.  And can you tell me what that requires
15  of you?
16     A.  That I don't talk about this case with
17  anyone.  I can talk about it with Jerry -- well,
18  you.
19     Q.  Understood.  Thank you.  Okay.  Now, I
20  see here on Exhibit 3.2 in the first paragraph,
21  in the middle of it, it says "the standards set
22  forth are consistent with the current university
23  faculty handbook in making tenure and promotion
24  recommendations."  Do you see that?

Page 145

1     A.  Yes.
2     Q.  Did you, like you did with the UNC
3  guidelines, did you reference DePaul University's
4  faculty handbook?
5     A.  I don't know that I was able to find the
6  DePaul faculty handbook.  So it wasn't right in
7  the document, so I did not.
8     Q.  Okay.  All right.  And I'm sorry because
9  we are going to be -- and I will leave it to you
10  to figure out how you want to manage this, but we
11  are going to be looking at your report, DePaul
12  College of Communication Guidelines, and UNC
13  Guidelines sort of variously.  I am going to be
14  jumping from document to document.  It is going
15  to be a little clunky.  Bear with me.  I only can
16  get one up at a time myself.  I just wanted to
17  give you fair warning.
18         I would like you to go
19  back to your report for the moment.
20     A.  Okay.
21     Q.  And to look at page 3.
22     A.  Okay.
23     Q.  So in the first half of this page, tell
24  me if I'm wrong, you compare what you refer to as

Page 146

1  2 parallel provisions or sections of UNC's
2  College of -- Department of Communication
3  Guidelines and DePaul's College of Communication
4  Guidelines?
5     A.  Yes.
6     Q.  And you say, it is your premise, I
7  believe, that UNC's Department of Communication
8  tenure expectations are more demanding than
9  DePaul's.  Is that right?
10    A.  Yes.
11    Q.  You say that that is apparent just on
12 the face of the 2 documents, the 2 policy
13 guidances, right?
14    A.  Yes.
15    Q.  And you refer specifically to a
16 provision in the DePaul guidelines on page 4
17 where the criteria of scholarship is elaborated
18 upon, right?
19    A.  Uh-huh.
20    Q.  Yes?
21    A.  Yes.
22    Q.  Okay.  And you point specifically to
23 this -- these 2 sentences, "scholarship, research
24 and/or creative activities are expected of each

Page 147

1  faculty member within the College of
2  Communication.  Faculty members should be able to
3  demonstrate success at completing projects and
4  disseminating the results of these projects in
5  academic and artistic arenas beyond DePaul."  Do
6  you see that?
7     A.  Yes.
8     Q.  You would agree with me that completing
9  and disseminating projects beyond DePaul is a way
10 of saying getting published or producing
11 scholarship?  You would agree with that?
12    A.  It is a way -- it is a base minimum of
13 completing, yes, completing scholarship -- you
14 could be -- they could be published in the
15 Washington Post or the Houston Chronicle.  It
16 doesn't talk about excellence, or, you know, like
17 the UNC talks about a programmatic, for example,
18 and it uses the expectation of excellence, which
19 is absent in the DePaul criteria.
20    Q.  Okay.  So hang on.  So my first question
21 was would you agree that completing projects and
22 disseminating them beyond DePaul is another way
23 of saying producing scholarship?  That's my only
24 question.  I didn't ask you about excellence.  I

Page 148

1  just want to know would you say that completing
2  and disseminating outside of DePaul is another
3  way of saying producing scholarship?
4         MR. BRAMWELL:  Objection, beyond
5  the scope of the expert retention.  Go ahead.
6         THE WITNESS:  So as I said before,
7  one could complete a project and disseminate it
8  outside of DePaul, but it could be a pamphlet
9  that is thrown into the lake.  I mean
10 disseminating it beyond DePaul, it's a very --
11 frankly it was very unusual, but it doesn't
12 necessarily mean it is scholarly.  It just means
13 it is done and it appears somewhere other than in
14 internal communications.
15 BY MS. WERMUTH:
16    Q.  Well, except that the guidelines do go
17 on to identify the types of acceptable
18 production, correct?
19    A.  That's true.
20    Q.  It doesn't say that you can get tenure
21 if you complete a pamphlet and throw it in the
22 lake, does it?
23    A.  It does not.
24    Q.  Right.  It doesn't say you can get

Page 149

1  tenured if you write an article for the
2  Washington Post, right?
3         MR. BRAMWELL:  I'm going to object
4  to this line of questioning on best evidence
5  grounds.
6  BY MS. WERMUTH:
7     Q.  You can answer.
8     A.  That's a very -- that's a very freighted
9  question given recent developments in higher ed
10 about publication in newspaper and so on.  But it
11 does not say that.
12    Q.  You again say there is no reference to
13 excellence in this particular provision.  Is that
14 right?  In DePaul's guidelines, right?
15    A.  Correct.
16    Q.  Okay.  Now, I would like for you to look
17 at UNC's guidelines, which is 3.3?
18    A.  Yes.
19    Q.  Go to page 4.  This is the part that you
20 cite regarding expectations for research for
21 tenure and promotion, right?
22    A.  Correct.
23    Q.  All right.  And so when you look at page
24 4, the general standards, which precedes that

Page 150

1  same -- precedes the section on research, right?
2      A.  Yes.
3      Q.  Are you with me?  Okay.  According to
4  the general standards, there is basically 3
5  categories of criteria that are considered,
6  right?
7      A.  Yes.
8      Q.  The first being research or scholarship,
9  yes?
10     A.  Yes.
11     Q.  The second being teaching, correct?
12     A.  Yes.
13     Q.  And the third being service, right?
14     A.  Yes.
15     Q.  And so with respect to these 3
16  categories, UNC requires excellence in 2 of them,
17  right, research and teaching?
18     A.  Right.
19     Q.  And not necessarily excellence in
20  service, right?
21     A.  Well, they say service is not a
22  substitute for excellence in research and
23  excellence in teaching, but you know, service to
24  the department, the university committee, and

Page 151

1  state, it is not going to be the thing that an
2  individual does not get tenure, based on that if
3  they are strong in the other 2 areas.  But
4  strength in service, you know, whether UNC or
5  other R1 institutions is certainly an
6  expectation.
7      Q.  So here is my question.  You point to
8  the absence of the word excellence in the one
9  piece of DePaul's criteria that you quote in your
10  report, right, as meaning they don't require
11  excellence, right?  Yes?
12     A.  No.  I think there is an overall lack of
13  expectation of excellence articulated in the
14  DePaul criteria.
15     Q.  We will come back to that.  You mention
16  on page 3 of your report the provision of
17  DePaul's guidelines, College of Communication
18  Guidelines, right, and say -- and you point --
19  you quote that because there is an absence of a
20  requirement of excellence articulated in that
21  provision, right?
22     A.  In research.
23     Q.  In research, right, okay.  So would you
24  agree with me that there is no specific reference

Page 152

1  to excellence in section C on page 4 of UNC's
2  guidelines under general standards?
3      A.  I would not agree.  The word appears
4  twice.  Excellence appears twice.  And what it
5  says, what it says is, you know, this is again
6  standard at research institutions, your work
7  effort and the way you're assessed in your tenure
8  is basically 60 percent on your research, 40
9  percent, 30 or 40 percent on your teaching, and
10  then like 10 percent on your service.
11             So what it says is you
12  can't be just excellent on service because it is
13  not the key thing.  They expect excellence in
14  research and teaching.  And service, you know,
15  excellence is important or it is key, but it
16  doesn't count as much.  It is not going to carry
17  the day.  And that's why it mentions excellence
18  twice in that point.
19     Q.  So okay.  I have a couple of questions
20  here.  So what this provision C in the first
21  sentence says is that service is a further
22  additional consideration in the overall
23  assessment, right?
24     A.  Yes.

Page 153

1      Q.  But is not a substitute for excellence
2  in the other 2 areas?
3      A.  Right.
4      Q.  Okay.  And by the way, when you just
5  gave me this breakdown of 60, 30, 10, there is
6  nothing in these guidelines that provide for that
7  sort of waiting.  Would you agree with me?
8      A.  They are not -- well, I think that there
9  are -- the percentages aren't baked in there, but
10  it is how it is basically understood because it
11  has to do with your teaching load and the amount
12  of time that you have available for research, and
13  therefore you have only, you know, 2-2 or a 2-1.
14  And sometimes letter of appointment include those
15  percentages.  Sometimes tenure documents at R1
16  institutions actually tell the tenure reviewer
17  what the breakdown is.  It's usually again, it's
18  like 60 percent research, 60, 30, 10.  It is a
19  very common breakdown.
20     Q.  UNC's guidelines do not provide that
21  breakdown, correct?
22     A.  They do not.
23     Q.  All right.  Can you go to Exhibit 3.2
24  which is the DePaul College of Communication

Page 154

1 Tenure and Promotion Guidelines?
2     A.  Okay.
3     Q.  And could you go to page 16, please --
4 well, strike that.  Go to page -- first, let's go
5 to page 4.
6     A.  Okay.
7     Q.  Okay.  And so page 4, under the piece
8 that says criteria for scholarship research
9 and/or creative activities, do you see that
10 section?
11     A.  Right.
12     Q.  And that first paragraph is what you
13 quote from for purposes of your report, correct?
14     A.  Yes.
15     Q.  Okay.  And then you will see that the
16 section actually goes on for 6 pages or so,
17 correct?
18     A.  Right.
19     Q.  So it goes on to identify, for example,
20 on page 5, that scholarship is original
21 discovery.  It is integration of the development
22 of knowledge.  It is the application of
23 knowledge.  Do you see that?
24     A.  Yes.

Page 155

1     Q.  And it goes on to say that scholarship
2 is going to be evaluated on its originality,
3 right?
4     A.  Uh-huh.
5     Q.  It's contribution to knowledge, right?
6     A.  Yes.
7     Q.  Its conceptual sophistication, right?
8 Its intellectual river, correct?
9     A.  Right.
10         MR. BRAMWELL:  Objection, best
11 evidence.
12 BY MS. WERMUTH:
13     Q.  Its application of knowledge to address
14 world problems or human problems, yes?
15     A.  Yes.
16     Q.  And then it goes on to identify the
17 types of scholarship that is considered, correct?
18     A.  Yes.
19     Q.  And so the section on research goes on
20 for 6 pages?
21     A.  Yes.
22     Q.  Okay.  Now, if you would go to page 16
23 with me for a moment.  So this section -- I'm
24 sorry.  I'm going to take you to page 14 so we

Page 156

1 know what section we are in.  So this is the
2 section of the guidelines relating to formal
3 review, personnel committee reports, and voting.
4 Do you see that?
5     A.  Yes.
6     Q.  So now we are in a portion of that
7 guidelines that puts some meat on the bones with
8 respect to process.  Would you agree?
9     A.  Yes.
10         MR. BRAMWELL:  Objection to the
11 characterization of meat on the bones.
12 BY MS. WERMUTH:
13     Q.  That was a yes?
14     A.  This section is about formal review.
15     Q.  Well, it goes beyond formal review.
16 Let's look at page 16.
17     A.  I'm at 16.
18     Q.  Okay.  And the last sentence on that
19 page, could you read that, please?
20     A.  The last sentence, "no ranking should be
21 below very good during this review, but the
22 tenure review -- by the tenure review of faculty
23 members performance should be excellent in at
24 least 2 of these areas, and very good in the

Page 157

1 third.
2     Q.  So there is a requirement of excellence
3 in at least 2 categories at the of tenure under
4 DePaul's guidelines, yes?
5     A.  "No ranking should be below very good.
6     Q.  So --
7         MR. BRAMWELL:  I'm sorry.  My
8 witness is still speaking, Ms. Wermuth.
9         MS. WERMUTH:  I'm just asking about
10 the last sentence.
11         MR. BRAMWELL:  She is still
12 speaking.
13 BY MS. WERMUTH:
14     Q.  Please proceed.
15     A.  The last sentence says by the tenure
16 review.  So by the end of the tenure review,
17 there is an expectation of excellence.  That's
18 still -- okay.  So yes, at the end of the tenure
19 whereas at UNC there is an expectation in hiring
20 that there is evidence of excellence.  Clear
21 promise which means clear evidence of excellence
22 throughout.
23         So you know, you are
24 asking these very precise questions, but the main

Page 158

1  point still stands. That there is a much higher
2  expectation of excellence throughout the hiring
3  and annual review and tenure process at UNC. It
4  also -- there is a requirement for a programmatic
5  -- a program of research that interrogates
6  enduring and significant questions.
7      Q.  I don't see anything in the UNC
8  guidelines that talks about interrogation of
9  enduring and significant questions. Can you
10  point me to that, please?
11     A.  Yeah. It is right at the beginning. It
12  talks about the -- it is on page 4. You see
13  general standards is at the top of the page.
14  Standards of Research. "The Department of
15  Communications expects its faculty to be actively
16  involved throughout their careers in achieving
17  scholarly research excellence and/or its
18  equivalent form in creative artistic activity.
19  The Department of Communications requires
20  sustained, programmatic, that is scholarship that
21  coheres around and investigates thematically one
22  or more clearly defined research problematics,
23  production of scholarship." And then so on.
24          So it is about -- so

Page 159

1  that's a big thing that you look at when you are
2  hiring someone and then when you are coaching
3  them to -- when you are mentoring them toward
4  tenure and in the tenure process is whether they
5  have a programmatic coherent program of research,
6  or whether it is just a bunch of articles on
7  different topics, boutique topics of their
8  interests scattered around.
9          So that's why it is really
10  important.
11          MS. WERMUTH: Gina, can you read my
12  question back, please?
13          THE WITNESS: Your question was
14  does --
15          MS. WERMUTH: Hang on one second.
16          MR. BRAMWELL: Do not cut my
17  witness off.
18          MS. WERMUTH: When the court
19  reporter has received an instruction, she cannot
20  take down the record. I wanted the witness to
21  stop talking so we can get what she had to say on
22  the record. Because I had asked Gina a question,
23  we needed to all stop talking because Gina cannot
24  go back and read my question if somebody is

Page 160

1  talking.
2      Q.  Doctor Zaeske, I do want to hear what
3  you have to say. In this moment though, I need
4  the court reporter to read my question back.
5      (Question read back)
6  BY MS. WERMUTH:
7      Q.  I was asking you whether there was a
8  reference to enduring and significant questions
9  being interrogated in the guidelines. Do I
10  understand you are pointing me to this language
11  on page 4 in response?
12     A.  Right. The language I pointed to was
13  sustained and programmatic.
14     Q.  Okay. Returning to page 3 of your
15  report, Doctor Zaeske.
16     A.  Okay.
17     Q.  I think what you're saying at the bottom
18  of page 3 -- well, strike that. Why don't you
19  tell me what distinction you are trying to make
20  where you start with "another important point of
21  comparison," through the bottom of the page?
22          MR. BRAMWELL: I'm sorry. Where
23  are you? Oh, I'm looking at the wrong document.
24  My apologies.

Page 161

1          MS. WERMUTH: Page 3 of the report.
2  Actually strike that question.
3      Q.  So at the top of page 4, so your
4  analysis which follows the quoted sections, let
5  me take you there.
6      A.  Okay.
7      Q.  So you -- at the bottom of page 3, you
8  quote distinct sections from each of the
9  guidelines, right?
10     A.  Yes.
11     Q.  Okay. And then at the top of page 4,
12  you provide that "DePaul expects only teaching
13  effectiveness where UNC expects proven
14  excellence, right?
15     A.  Yes.
16     Q.  And again, this is at the tenure review
17  stage that UNC expects proven excellence in
18  teaching?
19     A.  Yes.
20     Q.  Okay. Now, you will agree with me that
21  UNC also though in its guidelines describes the
22  teaching requirement as teaching effectiveness?
23     A.  UNC uses language about teaching
24  effectiveness, yes.

Page 162

1    Q.  Right.  Okay.  And as we pointed out,
2  DePaul at the time of tenure review requires
3  excellence in 2 of the 3 criteria, right?
4    A.  Right.
5    Q.  And one of that criteria is teaching,
6  right?
7    A.  Right.
8    Q.  Okay.  One of those criterion I should
9  have said.  That's singular.
10    A.  Yes.
11    Q.  So let's look at page 5 of 3.3, which
12  are the UNC guidelines.
13    A.  Page 5 of the UNC guidelines, right?
14    Q.  Yes.  I think that's the right page.
15  Give me a minute.
16    A.  That's standards of teaching is point B.
17    Q.  Yeah, hang on.  Let me make sure that's
18  where I want to take you.  No.  I'm sorry.  Page
19  9.
20    A.  I'm there.
21    Q.  This is specifically in connection with
22  the guidelines for promotion -- with promotion to
23  associate professor with tenure, right?
24    A.  I believe so, yes.

Page 163

1    Q.  Okay.  So if you look at page 8, you
2  would see that.  It is Subsection C, associate
3  professor.
4    A.  Okay.
5    Q.  So on page 9, so I guess we are at
6  Subsection big C, little b, on page 9.
7    A.  "Demonstrated commitment to"?
8    Q.  Correct.  So this is the requirement of
9  -- "demonstrated commitment to and achievement of
10  teaching excellence at the time of tenure,"
11  right?
12    A.  Right.
13    Q.  And then it goes on in this paragraph to
14  explain what a demonstration of teaching
15  excellence includes, right?
16    A.  Right.
17    Q.  Okay.  So according to this document,
18  "teaching excellence includes the development and
19  teaching of a range of courses at the
20  undergraduate and graduate levels," right?
21    A.  Uh-huh.
22    Q.  Yes?
23    A.  Yes.
24    Q.  Okay.  Sorry.  We need verbal answers.

Page 164

1    A.  Yeah.  I understand.  Sorry.
2    Q.  "Strong instructor evaluations from both
3  students and peer observers"?
4    A.  Yes.
5    Q.  "And where appropriate, the publication
6  of pedagogical material"?
7    A.  Yes.
8    Q.  So that's how UNC defines teaching
9  excellence, right?
10    A.  I would say that those are some
11  examples.  You know, when it says includes, you
12  know, it would probably be like includes but is
13  not limited to.  There are other ways of
14  demonstrating pedagogical excellence.
15    Q.  But these are the ones that get
16  published?
17    A.  You mean in the guidelines?
18    Q.  Yeah.
19    A.  Right.
20    Q.  So in the document that the up and
21  coming probationary faculty member sees and is
22  going to rely on, right, those are the criteria
23  set forth?  Those are the examples of how to
24  achieve teaching excellence?

Page 165

1    A.  Those are -- they are examples.
2    Q.  Okay.  All right.  So now, if we go to
3  DePaul's guidelines, Exhibit 2.2?
4        MR. BRAMWELL:  3.2?
5        MS. WERMUTH:  I'm sorry.  3.2.
6  Thank you.
7        MR. BRAMWELL:  No worries.
8        MS. WERMUTH:  Let me figure out
9  what page.  Oh, page 1, look at that.
10    Q.  So on page 1, there is a section called
11  Criteria for Teaching.  Do you see that?
12    A.  Oh, sorry, yes.  I see it.
13    Q.  All right.  And then there is a -- there
14  is the first sentence, and then there is the
15  second sentence which gives examples of what
16  teaching effectiveness is at DePaul, right?
17    A.  Right.
18    Q.  Okay.  And there is a variety of
19  examples given, but I would like to direct your
20  attention to the sentence that begins with
21  "additionally".  So it is 3 lines up from the
22  bottom of the page?
23    A.  Uh-huh.
24    Q.  Okay.  So it says "additionally,

Page 166

1 teaching is assessed by considering the range of
2 courses taught by the faculty member," right?
3    A. Uh-huh.
4         MR. BRAMWELL: Objection, best
5 evidence.
6 BY MS. WERMUTH:
7    Q. I'm sorry. Your answer was? Because we
8 need verbal.
9    A. You asked me if I see what you are
10 referring to, and yes, I do.
11    Q. And that's similar to at least one of
12 the examples that UNC gives for excellence?
13    A. No. Again, I don't see these as -- I
14 don't see these as similar. First, I note as you
15 did that teaching is listed first, which is a
16 confirmation that R2 institutions place teaching
17 first and not research. And that's a difference
18 in the standards of -- for tenure standards.
19         So that's one thing. And
20 then, you know, the list of things here that are
21 considered, I think a number of them are assumed
22 that the person wouldn't be in a classroom in a
23 place like UNC. Like command of materials. Why
24 would you put someone in a classroom if they are

Page 167

1 not in command of materials.
2         So I see a different, you
3 know, there is -- it's a different level. There
4 is a different level here. And the other thing
5 is that there are -- the graduate -- there is a
6 very strong -- there are multiple graduate
7 programs at UNC, and I'm not aware of -- I don't
8 think there are graduate programs or strong
9 graduate programs at DePaul.
10         So the faculty members at
11 DePaul are not engaging in graduate education and
12 growing doctorally trained communication
13 scholars.
14    Q. Well, there is reference in this very
15 paragraph to the very last 2 words,
16 "supervision", and on to the next page, "of
17 graduate thesis projects and graduate student
18 teaching", right?
19    A. Yes. But I said a doctoral program. I
20 don't think it is a doctoral program. It may be
21 a professional program at DePaul in a Master's,
22 but I don't think that they have a PhD in
23 communication.
24    Q. Did you in doing your analysis here,

Page 168

1 looking at one document from the College of
2 Communications at DePaul and looking at a variety
3 of documents from the University of North
4 Carolina, did you look at all at like DePaul's
5 mission statement? Did you give any
6 consideration to DePaul's mission?
7    A. I think I looked on the website, but I
8 don't see how that is relevant, because the point
9 is to compare the criteria by which someone would
10 be hired, you know, and what the expectations
11 were, and if -- I mean DePaul has more of a, as I
12 understand it, sort of a mission that is sort of
13 like a teaching mission and serving a community.
14 That is different from the research mission of an
15 R1 institution.
16    Q. So going back to your report, page 4 of
17 Exhibit 3?
18    A. Yes.
19    Q. Okay. The second full paragraph which
20 begins with "there are also significant
21 differences." Do you see that?
22    A. Yes.
23    Q. And then the second sentence there says
24 "the DePaul policy document on tenure and

Page 169

1 promotion provides no explanation of what an
2 assistant professor is expected to do in terms of
3 research in order to gain tenure."
4    A. Yes.
5    Q. Okay. And you stand by that statement?
6    A. Yes.
7    Q. So when I take you back to Exhibit 3.2,
8 and I take you to page 5?
9    A. Uh-huh.
10    Q. Are you there?
11    A. Yes.
12    Q. Do you then take the position that
13 telling faculty in the College of Communication
14 at DePaul that their scholarship must be
15 original, must contribute to knowledge, must be
16 conceptually sophisticated, must be
17 intellectually rigorous, that that provides no
18 guidance to the faculty member as to what they
19 need to do in terms of research? Is that your
20 position?
21         MR. BRAMWELL: Objection, misstates
22 the report. Go ahead.
23         THE WITNESS: Yes, that is my
24 position. It is not clear what the faculty

Page 170

1 member is supposed to do. By contrast, the UNC
2 document provides like, you know, depending on
3 the subdiscipline of each -- you know, they have
4 multiple subdisciplines in their department.
5 It's a department, not a whole college.
6         So what is it that DePaul
7 wants the probationary faculty member to do?
8 Like this is the core of mentoring individuals to
9 tenure. They want to know what is it that you
10 want me to do? So originality, what does that
11 mean? Or contributing to knowledge? Or having
12 intellectual rigor? Or applying a theory or
13 something? So do you want me to write a book?
14 Do you want me to write 16 articles? Do you want
15 me to do a play or multiple plays, or you know,
16 make a feature length film, short films?
17         So usually tenure
18 requirements actually have some articulation of
19 like the actual product or products that are
20 expected by the faculty member, the probationary
21 faculty member, in order to obtain tenure. And
22 my point is simply that UNC says what is expected
23 for research and teaching, but particularly
24 focusing on research. I could not find that. I

Page 171

1 could not find that in the DePaul criteria.
2    Q.  When you look at page 6 of the document
3 that we are looking at where it lists at length
4 for 2 pages the types of outlets and where --
5 what people should do, publish a book, publish
6 peer review journal articles, publish edited
7 books, and so on. So you're saying that this
8 doesn't give -- that this is the absence of
9 articulation of what sort of products the scholar
10 is expected to produce?
11    A.  Yes, I'm saying that. Because what this
12 page says is if books are produced, they are
13 evaluated in this way. If peer reviewed articles
14 are produced, they are evaluated this way. If
15 edited books are produced -- that's different
16 from saying what is it that you're expected to
17 produce to get tenure at DePaul.
18    Q.  So in looking then at page 4 of your
19 report, back to Exhibit 3?
20    A.  I'm there.
21    Q.  Sorry to go back and forth.
22    A.  That's okay. I'm there.
23    Q.  You quote from the UNC guidelines, page
24 8 of the UNC guidelines, the publication of a

Page 172

1 single authored monograph. Do you see that.
2    A.  Yep.
3    Q.  And just above that you say "most
4 relevant to this case is the following
5 enumeration of publication expectations for
6 probationary faculty in communication at UNC."
7 Do you see that?
8    A.  Yes.
9    Q.  Why do you say that this particular
10 passage is most relevant to this case?
11         MR. BRAMWELL: Objection, misstates
12 the report.
13         THE WITNESS: So in the paragraph
14 above, I say "there are also significant
15 differences in the specific criteria," and then I
16 mention something. And then I just -- you know,
17 there are a number of things that I mention. But
18 what I wanted to point out specifically was just
19 specifically was this lack of publication
20 expectations.
21         To me, that seemed like a
22 huge difference between the level of like
23 excellence in research and the -- I mean, and
24 this is common. It's a common difference between

Page 173

1 R1 and R2 institutions. At R1 institutions, you
2 are expected to publish a single authored
3 monograph with a highly respective academic press
4 and at least 3 substantial articles in peer
5 reviewed journals and to have significant
6 progress on a second monograph for tenure.
7         That is sort of the basic
8 thing across the board, whether it is UNC,
9 Wisconsin, Indiana, Minnesota, or wherever. And
10 that is very different than most, if not all R2
11 institutions, where you can be tenured without
12 writing a book. That's the big difference. You
13 can be tenured without writing a book, or writing
14 a book that is published by like a trade press or
15 a much lesser press, or having articles in
16 journals that are not highly cited, that don't
17 have a high citation, or don't have a high
18 rejection rate.
19 BY MS. WERMUTH:
20    Q.  So here was my question. On page 4 of
21 your report you write this sentence. "Most
22 relevant to this case is the following
23 enumeration of publication expectations for
24 probationary faculty in communication at UNC."

Page 174

1  And then you quote a passage. Why is that
2  particular passage most relevant to this case?
3      A.  Again, because the significant
4  difference between an R1 institution and how you
5  hire, and who you are going to hire, and how you
6  tenure people, is the ability to produce a single
7  authored monograph that is -- as well as the peer
8  reviewed essays. That is really very different
9  from how you hire folks at R2 institutions and
10 how they are tenured at R2 institutions.
11             That expectation of, you
12 know, publishing at -- publishing with a major
13 academic press a single authored book and then
14 having another one well underway just doesn't
15 exist at R2s.
16     Q.  You do see from the DePaul guidelines
17 that the greatest weight is given to a single
18 authored monograph at tenure review, right?
19     A.  I don't think it said that.
20     Q.  Okay.
21     A.  That was -- it had a list of all the
22 different -- like different ways one could
23 disseminate research, and then it said how it was
24 evaluated. But again, as you see here with UNC,

Page 175

1  and again this is a really standard way of R1
2  saying it, it is a single authored book, at least
3  3 peer reviewed articles of substantial length in
4  a prestigious journal, and then evidence of
5  progress on a second book.
6             It is a mantra. It is
7  like practically tattooed on the forehead of a
8  probationary faculty member.
9      Q.  But the UNC guidelines don't say at
10 least 3 articles of substantial length in
11 addition to the book. In fact, the UNC
12 guidelines say this is not a quantitative --
13 there is no quantitative algorithm that we apply
14 to tenure cases?
15        MR. BRAMWELL: Objection to best
16 evidence, and objection, Counsel is testifying.
17        THE WITNESS: But as I quoted in my
18 report, "the publication of a single authored
19 monograph with a highly regarded university or
20 academic press is required. The monograph stands
21 at the centerpiece of the candidate's tenure and
22 promotion file, accompanied by a number of peer
23 reviewed essays and/or book chapters." And then
24 it says the monograph has to be original and has

Page 176

1  to be different from the dissertation.
2             So that is what I said.
3  So you know, a number of peer reviewed essays or
4  book chapters. 3 is usually the number that is
5  expected if it's of substantial length, peer
6  reviewed. And that can be sort of nuanced if you
7  book chapters that may be even longer than
8  articles. So it goes back and forth. And that's
9  why it is not a clear algorithm.
10 BY MS. WERMUTH:
11     Q.  You had one book that came after your
12 tenure review, right?
13     A.  My -- the book that was published was
14 fully under contract and forthcoming before I
15 went up for tenure.
16     Q.  But you didn't have a second one in the
17 works at that time?
18     A.  No. I did. And it formed the basis of
19 one of the articles that I published that was
20 included in my tenure dossier, and I included a
21 full outline of the book. And then I was awarded
22 a year-long fellowship at Harvard to work on the
23 book.
24     Q.  A second book?

Page 177

1      A.  Yes, a second book.
2      Q.  What is your second book? I didn't see
3  it in your CV.
4      A.  I didn't publish the book because I got
5  sucked into administration.
6      Q.  I see. Fair enough. Was your book work
7  from your dissertation?
8      A.  The book that was the basis of my tenure
9  dossier?
10     Q.  Yes.
11     A.  So it was -- my dissertation was the
12 basis of that -- of that book. What you
13 typically need to do -- not typically. It's
14 absolutely required. You can't get credit, like
15 double credit for the same thing, right? So you
16 get the PhD based on one piece of work, the
17 dissertation. And then tenure committees
18 particularly at the -- beyond the department,
19 they look very carefully to see how much
20 difference there is between the dissertation and
21 the book manuscript.
22             So I did a tremendous
23 amount of additional research and wrote
24 additional chapters, which again, you know, I

Page 178

1 certainly had to report the differences in
2 percentages, like how many new chapters do you
3 have, and what percentage difference is each
4 chapter than the dissertation, so you don't get
5 credit twice for the same piece of work.
6    Q. Understood. Understood. And you then
7 completed that book in the 5 or 6 years post
8 conferral of the PhD?
9    A. That's right.
10    Q. Which is would you say about what you
11 would expect a faculty member to do for a single
12 authored monograph?
13    A. Absolutely, especially for the first
14 book. You know, sometimes the second book, if it
15 is more ambitious, and it involves a lot of
16 international travel, that might take more than 5
17 years, and you are not under the tenure gun.
18    Q. Now, the last point I think you make in
19 your report in terms of comparison of the 2 sets
20 of guidelines is that UNC expects continuing
21 achievements and DePaul does not, right?
22    A. Yes.
23    Q. Now, if you look at the DePaul
24 guidelines, Exhibit 3.2?

Page 179

1    A. Okay.
2    Q. Page 20. In the paragraph, Tenure and
3 Promotion to Associate Professor. Are you with
4 me?
5    A. Yes.
6    Q. The middle of that paragraph, there is a
7 sentence that begins "the candidate must
8 demonstrate." Do you see that?
9    A. Yep.
10       MR. BRAMWELL: I'm sorry. Can you
11 help me out here?
12       MS. WERMUTH: Sure. Page 20, first
13 paragraph, which is a big one. Right in the
14 middle --
15       MR. BRAMWELL: Got it. Got it.
16 BY MS. WERMUTH:
17    Q. "Continued capacity to contribute to
18 DePaul's mission of academic excellence." Do you
19 see that?
20    A. Yes.
21    Q. So there is an expectation at DePaul for
22 continued excellent contributions, yes?
23       MR. BRAMWELL: Objection.
24       THE WITNESS: Again, it is not

Page 180

1 foregrounded in a way that UNC is, and again,
2 research institutions, they hire -- they hire
3 fast racehorses. They are supposed to continue
4 to race and race and race and to be productive.
5 I mean -- I mean it is interesting that it says
6 continued capacity to contribute. That's very
7 sort of back off, back off, in a way that you see
8 at, you know, in UNC and in other R1s,
9 expectation of productivity throughout the
10 career.
11    Q. So when you say racehorses, you are
12 talking about faculty who demonstrate capacity to
13 churn out a high level of high quality
14 scholarship? Is that what you mean by racehorse?
15    A. Yeah.
16    Q. Would you say that working -- like
17 working on a book, but not having it published
18 within the first 10 years, is that person a
19 racehorse?
20    A. It depends on -- again, like what the --
21 if someone is doing a study that, you know,
22 involves multiple languages, or you know, has
23 just a tremendous number of archives, and has,
24 let's say, run into difficulties, that would --

Page 181

1 so that could be a qualification. But you would
2 expect research productivity, yeah, a book to be
3 published within 7 years.
4       MS. WERMUTH: Okay. All right. If
5 we can take a quick break, I may have just a
6 couple of follow-up questions. Can we do that?
7       MR. BRAMWELL: Sure. Come back at
8 what time? 2:27, 2:28?
9       MS. WERMUTH: How about 2:30?
10       MR. BRAMWELL: 2:30, okay.
11    (Off the record at 2:24 to 2:33)
12       MS. WERMUTH: So back on the
13 record. At this point in time, I have no further
14 questions for you.
15       MR. BRAMWELL: I have a few. And
16 first of all, I just received a text that you
17 might not be able to see me. Is my video on?
18       THE WITNESS: I can see.
19          EXAMINATION
20       BY MR. BRAMWELL:
21    Q. Doctor Zaeske, just a few questions
22 based on the questions that Ms. Wermuth asked
23 you. I understand before we went on break, Ms.
24 Wermuth, and I won't get the question exactly

Page 182

1  right, but she asked you something like if you
2  would be expected to publish a book within 10
3  years. Am I understanding that question
4  correctly?
5      A. I think the question was is it
6  reasonable to expect publication of a book within
7  10 years I think of -- well, I answered it both
8  in terms of being an assistant professor and
9  being a post-tenure. But publishing a book,
10  let's say the first book on the tenure track, R1
11  institutions, you know, balance the research,
12  teaching obligation to give lesser teaching in
13  order that faculty can focus on publication.
14              So it is the expectation
15  that a book would be published within, you know,
16  the -- within the tenure window, certainly within
17  10 years. If someone has a higher teaching load,
18  which is often and usually the case at R1s --
19  excuse me, at R2 universities, then they would
20  have less time available for doing research
21  because the focus is on teaching. And then
22  taking more than, you know, 10 years or more to
23  publish a book would be reasonable because you
24  don't -- you have a much heavier teaching load

Page 183

1  and you don't have as much time for research.
2      Q. All right. Remember that Ms. Wermuth
3  asked you some questions about various schools
4  and where they fell in the Carnegie
5  Classifications?
6      A. Yes.
7      Q. I'm going to share my screen, or at
8  least I'm going to try to share my screen. I'm
9  sorry. Let me just turn this phone off. Doctor
10  Zaeske, I hope I have done this correctly. I
11  have pulled up a website called
12  Carnegieclassifications.IU.EDU/lookup/lookup.PHP.
13  Is that what is showing up on your screen?
14      A. Yes.
15      Q. Are you familiar with this website?
16      A. Yes.
17      Q. How are you familiar with it?
18      A. Well, I looked at it when I was, you
19  know, trying to explain what Carnegie -- explain
20  to others in a more general sense what the
21  Carnegie Classifications are, for the report, for
22  the report for this proceeding.
23      Q. Now, does this website permit you to
24  enter in an institution's name and determine

Page 184

1  whether they are R1s or R2s?
2      A. Yes, that's what it does.
3      Q. This is a website that is easy to
4  access?
5      A. Yes.
6      Q. And you as an academic would rely on
7  this website in determining what is an R1 and
8  what is not an R1 -- strike that. You as an
9  academic would use this website to determine what
10  is an R1 and what is an R2?
11      A. Right, yes, correct.
12      Q. I think that Ms. Wermuth asked you about
13  Yale being an R1?
14      A. Yes.
15      Q. I search -- I put Yale into a search by
16  institution name. Is that how you would
17  determine --
18      A. Yes.
19      Q. So if I put Yale in, I see now a web
20  page that goes -- shows me an institution Yale
21  University with a hyperlink?
22      A. Yes.
23      Q. If I click on that hyperlink, would this
24  give me -- would this take me to a page that

Page 185

1  shows me the Carnegie Classification for Yale?
2      A. Right. This is similar to another one
3  that was in my report.
4      Q. Now, this shows Yale as an R1. Would
5  you agree that Yale is an R1?
6      A. Yes.
7      Q. Let's start over. Ms. Wermuth asked you
8  about Northwestern University; is that right?
9      A. Yes.
10      Q. If I type Northwestern, there is a bunch
11  of things that pop up. One of them is
12  Northwestern University in Evanston, Illinois?
13      A. Yes.
14      Q. If I click on that hyperlink, what does
15  it say its Carnegie Classification is?
16      A. Very high, R1.
17      Q. That means it is an R1?
18      A. Yes.
19      Q. Let's start over again. We also have
20  the University of Chicago?
21      A. Yes.
22      Q. We got the University of Chicago, a
23  private not-for-profit institution in Chicago,
24  Illinois?

Page 186

1    A.  Yes.
2    Q.  Click on the hyperlink.  Does that say
3  what its Carnegie Classification is?
4    A.  Yes, very high, R1.  That makes it an
5  R1.
6    Q.  If we were to use this website that I
7  pulled up earlier that I just showed you, would
8  that tell you what is an R1 and R2?
9    A.  Yes, it would.
10   Q.  Just for fun, let's click on DePaul.
11  When I type DePaul in, I see DePaul University.
12  And I click on that, what does it show?
13   A.  High research activity, so that's R2.
14   Q.  Okay.  Ms. Wermuth asked you some
15  questions, which at least I interpreted as
16  suggesting that she may believe that UNC hired
17  Doctor Calvente as a favor to her.  Now, she
18  doesn't need to say whether she believes that or
19  not.  That's how I interpreted those questions.
20  Do you have an opinion as to whether UNC hired
21  Doctor Calvente as a favor to her?
22       MS. WERMUTH:  Objection to the form
23  of the question.  The narrative portion in
24  particular that preceded the question ought to be

Page 187

1  stricken as narrative and argument.  And I object
2  to form.
3       MR. BRAMWELL:  You can file any
4  motion you want to strike.
5    Q.  Doctor Zaeske, feel free to answer.
6    A.  So I -- you know, I won't opine -- I
7  really try not to -- I'm not opining on anything
8  on the tenure denial or the hiring.  But what I
9  can say is general -- how things work, how things
10  work in higher ed.  All right.  It is right now
11  because, and really always, and certainly in the
12  last 10 years, budgets are so tight that
13  institutions cannot make mistakes in hiring
14  because if you do not -- if someone does not get
15  tenure or is not tenured or non-renewed, then a
16  department will lose its chance, probably lose
17  its chance to hire again for a long time.
18       Also a tremendous amount
19  of money is invested in getting research programs
20  started up, even in the humanities, you know,
21  much less like in the lab sciences.  And also it
22  affects morale.  It takes a tremendous amount of
23  time to mentor.  So other than those Ivy's that I
24  mentioned in my report, like Harvard, Yale, and

Page 188

1  Princeton, all 3 of them in particular, they hire
2  not to tenure.
3       `The R1s, and certainly the
4  public schools like UNC, and even Northwestern,
5  it isn't public, but even at Northwestern, they
6  hire to tenure.  They would not take -- they
7  would not just do someone a favor.  They have to
8  hire people that have a clear record of
9  productivity established that shows that they
10  will -- that they will be able to gain tenure.
11  And again, that's the key thing that you look at
12  when you are -- as a department when you are
13  interviewing people before you extend them an
14  over, the deans look at it.
15       And you know, I'll just
16  also add this as personal experience.  You know,
17  when I was asked about my CV, again, you said it
18  is okay to call you Anna.
19       MS. WERMUTH:  Of course.
20       THE WITNESS:  When Anna asked me
21  about my CV, you noted my degrees are from UW
22  Madison.  It was very unusual that I was hired at
23  the institution where I earned by PhD, and I had
24  to pass a higher bar to be hired, and I had to

Page 189

1  meet higher expectations to be hired.  So for
2  example, I had to have offers from 2 other R1
3  institutions on the table to show the dean when I
4  was hired at Wisconsin to convince them that my
5  department wasn't just trying to hire me because
6  I was one of their own.
7       They also -- 2 of my
8  faculty had been non-renewed and then 2 retired,
9  so there was no fear of duplicating, you know,
10  like I was duplicating my existing faculty.  So
11  you know, there had to be other circumstances.
12  And finally the dean said you have to go
13  somewhere else at some point, you know, fairly
14  early in your career, which drove me to go to
15  Harvard.  You know, it is one of the reasons to
16  get an idea of what another school was like.
17       So I'm saying that
18  institutions that end up hiring their own don't
19  do it lightly.  The other thing is it is also
20  different if you hire someone who has been away
21  for a number of years.  So this year, I have an
22  example, we are hiring a historian who has been
23  at the University of Iowa for 5 or 6 years, and
24  we felt that it was okay to hire him at UW

Page 190

1  Madison.  But the thing was he had put some space
2  between his time as a graduate student here and
3  the time he would be a faculty member.
4                So those are all
5  considerations, but it is not done lightly.  It
6  is not considered an ideal practice.  So it would
7  have to be -- there would have to be good reason.
8  But beyond that, I will not opine.
9  BY MR. BRAMWELL:
10     Q.  All right.  Ms. Wermuth spoke a little
11  bit about years of credit.  Do you recall that
12  line of questioning?
13     A.  Yes.
14     Q.  Okay.  Would you give years of credit at
15  the University of Wisconsin if the faculty member
16  that you were seeking to hire came from DePaul?
17     A.  No.  We do not -- if someone has tenure
18  service -- years of tenure at an institution of,
19  you know, like an R1, because we are an R1, we
20  would give them -- we would give them years of
21  credit.  We would not give years of credit for an
22  R2, and especially not, you know, we certainly
23  wouldn't give 3 years.  Maybe one, but maybe not.
24                So no.  And I'll tell you

Page 191

1  right now, faculty members are asking for more
2  years, and we have automatic -- on their tenure
3  clock.  And during the pandemic, we have an
4  across the board if someone asks for a year or
5  even 2 years extension on the tenure clock, we
6  have been granting it.  So institutions are
7  lengthening the tenure clock right now.  They are
8  not shortening the tenure clock.
9                And again, we don't -- we
10  also would not really give a lot of credence to
11  teaching evaluations at an institution that is so
12  different from UW Madison.  Like if someone were
13  teaching at Carlton College, small liberal arts
14  school, it is so different.  It is so different
15  than teaching at UW Madison.  So the teaching
16  evaluations that they brought in would only be so
17  predictive, and we would expect a lot more data
18  to be gathered, you know, with our students.
19     Q.  All right.  Who are University of
20  Wisconsin's peer schools?  Would you consider
21  North Carolina a peer school?
22         MS. WERMUTH:  Objection, relevance.
23         THE WITNESS:  I mean it's an R1.
24  BY MR. BRAMWELL:

Page 192

1     Q.  You touched on this a little bit, but
2  can you provide a little more color as to why you
3  need to be able to demonstrate tenurability to be
4  hired at an R1?
5     A.  You just don't hire people that you
6  don't think are going to make it through the
7  process.  You have to be convinced that they are
8  -- that they are going to meet the criteria for
9  tenure.  And that means there has to be a strong
10  body of publication, and it's usually like -- you
11  know, it is much easier to see and to assess
12  publication -- publication record and the
13  likelihood of continuing a publication record
14  than it is to assess teaching, unless it is at a
15  peer institution.
16                So if I'm hiring someone
17  away from Iowa like we just did.  We hired this
18  fellow away from Iowa.  He won teaching awards at
19  Iowa.  There is not that much difference down the
20  road, at the R1 down the road.  But the key thing
21  is that we have to see indicators of things that
22  have already been accomplished.  You know, we
23  hire graduate students who already have book
24  manuscripts that are finished, right, and who

Page 193

1  have, you know, multiple articles published.  So
2  there has to be -- and that's because it is so
3  difficult to get jobs at R1 institutions.  It is
4  so competitive.
5                And that's another reason
6  why -- you know, the institutions like UNC, they
7  have a huge pool of people to hire from because
8  hiring particularly in the humanities, and you
9  know, communication sort of sits between
10  humanities and social sciences, but really both,
11  there has been so little hiring.  So it is a very
12  competitive, a very competitive pool.  It is very
13  hard to get hired.  That's why you have to stand
14  out with your record.
15     Q.  Okay.  I believe Ms. Wermuth asked you
16  if there was a qualitative aspect to the tenure
17  process, and I think your answer was yes.  Am I
18  remembering that correctly?
19     A.  Yes.
20     Q.  Is there also a quantitative element?
21     A.  Yes.  Even again in humanities and
22  certainly in the social sciences and the
23  biological and mathematical and physical
24  sciences, there are qualitative.  So most tenure

Page 194

1  cases in humanities, and I think, you know,
2  Calvente is in humanities. I haven't seen the
3  CV. It is the one book by a prestigious press
4  and then evidence of, you know, significant work
5  on, and a concept for the second book. And then
6  they look at articles, all right.
7           So one of the first things
8  is you look at the number of articles. So that's
9  a quantitative. So then the next thing you look
10  at after the number of articles is how long are
11  the articles. Are they 3 pages long? 5 pages
12  long? That's kind of nothing frankly unless you
13  are a philosopher. Are they more substantial
14  like 20 pages long or even 40 pages long?
15           Then the next thing you
16  look at is the rejection rate of the journals.
17  These are included in the tenure dossier, in the
18  report written up by the department. So does
19  everyone get published in the journal that the
20  prospective -- that the probationary faculty
21  member has published in, or is it really hard to
22  get published? You know, what you want to do is
23  you want to publish in journals, peer reviewed
24  journals that are really, really hard to get,

Page 195

1  that the acceptance rate is 1 percent, 1 or 2
2  percent. Those are the most prestigious. So we
3  check those.
4           The other thing they will
5  check is the citation -- the citation rating of
6  an individual faculty member. That's how many
7  times the book or articles that they have in
8  publication has been cited by other scholars. So
9  that's data. Sometimes institutions use a thing,
10  it is a product, it has a vendor, it is called
11  academic analytics. That records all the
12  publications of a faculty member and also their
13  awards, the awards they get, whether they are
14  like a book award or a grant award or a
15  fellowship award.
16           So those are all, you
17  know, in answer to your question, that's data,
18  numerical data, quantitative data.
19      Q. And that's for generally obtaining
20  tenure at an R1?
21      A. That's correct.
22      Q. Okay. You would expect an institution
23  in all of your years in academia and
24  administration, you would expect an institution

Page 196

1  to follow its own, abide by its own policies and
2  procedures, correct?
3      A. Yes.
4           MS. WERMUTH: Objection to the
5  question on relevance grounds. This goes beyond
6  her opinion, which she has clearly identified her
7  sole opinion in the report.
8  BY MR. BRAMWELL:
9      Q. And when you evaluate a -- you have
10  obviously evaluated would you say hundreds of
11  files for people looking to be hired and looking
12  to obtain tenure?
13      A. Yes.
14           MS. WERMUTH: Objection, relevance.
15  BY MR. BRAMWELL:
16      Q. And do you ever deviate from your
17  institution's policies and procedures?
18           MS. WERMUTH: Objection, relevance.
19           THE WITNESS: No, I would be in a
20  world of hurt if I did that. I do not.
21  BY MR. BRAMWELL:
22      Q. Why would you be in a world of hurt?
23      A. Because shared governance is so strong
24  here. Another thing is if I were to do that,

Page 197

1  let's say when I was on an executive committee in
2  my department, other people would argue against
3  it, and probably call me out for violating
4  faculty policies and procedures. So that would
5  have been at that level.
6           On the divisional
7  committee, we would have other members of the
8  committee would be sort of policing -- policing
9  one another. And then as an Associate Dean,
10  there would be oversight by the Dean and the
11  other Associate Deans, and also the other faculty
12  members, like if there -- I have been grieved. I
13  have been grieved several times, and I have had
14  these cases appealed, you know. We have gone
15  through appeals that go out to many levels.
16           I think it is much better
17  to stick to the faculty policies and procedures
18  than to violate them and end up having to go
19  through a very lengthy appeal process, and also
20  to lose the confidence of colleagues because
21  you're violating faculty policies and procedures.
22      Q. Ms. Wermuth asked you some questions
23  about some journals that you referenced. I just
24  want to go through them fairly quickly. You are

Page 198

1  an academic and administrator, correct?
2     A.  Correct.
3     Q.  Do academics and administrators pay
4  attention to the Carnegie rankings?
5     A.  Yes.
6        MS. WERMUTH:  Objection, vague.
7  BY MR. BRAMWELL:
8     Q.  Same question with respect to the U.S.
9  News and World Report rankings?
10        MS. WERMUTH:  Objection,
11  foundation, vague.
12        THE WITNESS:  So I can tell you
13  that routinely the Chancellor and the Provost,
14  Department Chairs, and Deans, University
15  Communications, and Alumni Publications, and
16  local newspapers publish the various rankings,
17  including, you know, of the -- how UW Madison and
18  its programs fair in those rankings, you know, in
19  world rankings as well as U.S. News.
20  BY MR. BRAMWELL:
21     Q.  Do you ever have discussions with
22  colleagues of other universities about U.S. News
23  and World Report rankings?
24     A.  I think I have had -- yeah, I think, you

Page 199

1  know, in general.  But actually to be honest we
2  talk about NRC rankings more because that's the
3  hard core -- but those are just for graduate
4  programs, doctoral programs.
5     Q.  What about the Chronicle of Higher
6  Education?  What is that and do faculty and
7  administrators generally care about it?
8        MS. WERMUTH:  Objection, relevance,
9  foundation.
10  BY MR. BRAMWELL:
11     Q.  You can answer.
12     A.  So the Chronicle of Higher Education is
13  the most well read publication of the, you know,
14  higher ed as an industry.  It is the most well
15  read industry publication.  I can tell you in the
16  Dean's reception area it sits right there.  It
17  sits in the Provost's reception area.  I haven't
18  been in the Chancellor's that much recently, but
19  it is highly read by academic administrators and
20  faculty too.
21     Q.  Ms. Wermuth asked you about anecdotal
22  evidence.  Is that another way of saying a case
23  study?
24        MS. WERMUTH:  Objection to the form

Page 200

1  of the question.  Misstates my question and is
2  argumentative.
3  BY MR. BRAMWELL:
4     Q.  You can answer.
5     A.  Okay.  So what I -- I did rephrase the
6  anecdotal evidence into case studies because as I
7  mentioned, I did try to find statistical data on,
8  you know, how many faculty are non-renewed or
9  non-tenured and what happens to them after that,
10  and I did not find that.  So what I tried to do
11  is find examples of what happens.
12        So I know -- I have a
13  number of cases, you know.  I can give you some
14  examples if you wish of people who have not been
15  tenured at this R1 institution and what they
16  ended up doing.  But I also wanted to find case
17  studies and examples of people that tell their
18  story and say what they have been doing and
19  consequences for their employability and what
20  happened after they were denied tenure.  And I
21  think that that's hopeful for folks to see those
22  case studies, in addition to the, you know, years
23  of experience that I bring in in all the cases
24  that I'm aware of.

Page 201

1     Q.  Ms. Wermuth asked you, she spent a lot
2  of time on Exhibit 3.2, if you remember?
3     A.  Yes.
4        MS. WERMUTH:  Objection to the
5  narrative of the question.
6  BY MR. BRAMWELL:
7     Q.  I'm just going to pull it up here to
8  page 16.  I'm going to highlight the last
9  sentence.  You see that up there?
10     A.  Yes.
11     Q.  And the last sentence reads "by the
12  tenure review, a faculty member's performance
13  should be excellent in at least 2 of 3 areas and
14  very good in a third."  Do you see that there?
15     A.  Yes.
16     Q.  And the 3 areas are teaching, research,
17  and service?
18     A.  Yes.
19     Q.  So I would have thought this would have
20  been obvious, but since you got a lot of
21  questions on it, maybe I'll just delve into it a
22  little bit.  This tells you that you can receive
23  tenure at DePaul without excellence in research,
24  correct?

Page 202

1      MS. WERMUTH: I'm going to object
2  to the form of the question, and I really object
3  to the way Counsel is characterizing my
4  examination which is uncivil and unprofessional
5  and argumentative.
6  BY MR. BRAMWELL:
7    Q.  You can answer.
8    A.  I'm going to just answer based on what I
9  have seen here. This sentence says that you can
10  get tenure if 2 areas are excellent and a third
11  is very good.
12    Q.  Right. So you don't need to demonstrate
13  excellence -- you don't need to demonstrate
14  excellence in research to obtain tenure at
15  DePaul?
16    A.  It does not say that you do.
17    Q.  You don't need to demonstrate excellence
18  in teaching to obtain tenure at DePaul?
19      MS. WERMUTH: Objection, misstates
20  the record of evidence.
21  BY MR. BRAMWELL:
22    Q.  You can answer.
23    A.  So this sentence just says you have to
24  be excellent in 2 of 3 areas. So one you don't

Page 203

1  have to be excellent in. It could be teaching,
2  it could be research, it could be service, based
3  on what is said here.
4    Q.  And at North Carolina, you need to
5  demonstrate excellence in both teaching and
6  research, right?
7    A.  Right. And then it says that service
8  won't get you there. Service won't get you
9  tenure.
10    Q.  Looking at -- let's see if I can find it
11  here. Here it is. Remember when Ms. Wermuth
12  showed you on page 7 of Exhibit 3.3, I think
13  there was a lot of time spent discussing the
14  clear promise of excellence in teaching and
15  scholarship and/or equivalent creative artistic
16  activity and completion of all requirements for
17  the doctorate or other terminal degree.
18      MS. WERMUTH: I'm going to object
19  to the form the question, especially insofar as
20  it mischaracterizes the examination and
21  improperly characterizes the examination.
22  BY MR. BRAMWELL:
23    Q.  So Doctor Zaeske, what does this
24  sentence mean to you with respect to what it

Page 204

1  takes to be hired at UNC?
2    A.  And I said this a few minutes ago, and
3  that is, you know, clear promise means there is a
4  record, a clear record of publication and
5  scholarly productivity that shows that the person
6  is tenurable, and they are not going to be hired
7  at a place like Wisconsin or UNC without showing
8  that they are highly productive because they are
9  not going to get tenure.
10      And also as I said, right
11  now there is so much competition for positions
12  that in order to stand out, you have to be highly
13  productive. You have to show that you -- that
14  you're going to generate a lot of articles and
15  enough articles for sure to get tenure, and that
16  you have strong promise of finishing that book.
17  You are turning the dissertation into a book and
18  getting it published, and that you even have --
19  usually when I'm talking to people I'm
20  interviewing, I ask them where do you think --
21  what are their presses that they want to get
22  published with? If they tell me they are going
23  to get published at Rutledge or something like
24  that, I'm going to think no, this is not a good

Page 205

1  candidate. I want to see them getting published
2  at a university press, a prestigious university
3  press.
4      Then I ask them what they
5  are going to be -- what they are likely to work
6  on as their second project. This is even as they
7  are interviewing, you know, for an assistant
8  professorship. So they have to clearly
9  demonstrate that they have -- that they know what
10  it takes, that they have progressed
11  significantly, they have stuff in the pipeline,
12  and that they are tenurable. That's what is
13  meant by clear promise.
14    Q.  Okay. Anything else you would like to
15  share with us this afternoon?
16      MS. WERMUTH: Objection to the form
17  of the question.
18  BY MR. BRAMWELL:
19    Q.  You can answer.
20    A.  I think that's it.
21      MR. BRAMWELL: All right. I'll
22  pass you back to Ms. Wermuth and see if she has
23  anything else.
24      MS. WERMUTH: I do.

Page 206

1    FURTHER EXAMINATION
2       BY MS. WERMUTH:
3    Q.  Doctor Zaeske, Mr. Bramwell took you
4  through the website at the Indiana University
5  Carnegie Classification?
6    A.  Right.
7    Q.  In that exercise, the 2 of you
8  demonstrated that Yale is in fact an R1
9  institution, right?
10    A.  Right.
11    Q.  And the 2 of you demonstrated that
12  University of Chicago is in fact an R1
13  institution, right?
14    A.  Right.
15    Q.  And the 2 of you demonstrated that
16  Northwestern University is in fact an R1
17  institution, right?
18    A.  Correct.
19    Q.  Okay.  So that would then tell us that
20  the exhibit that you attached as Exhibit 1 to
21  your report, Exhibit 3.1, is an inaccurate
22  listing; is that fair?
23    A.  It is, yes.
24    Q.  Thank you.  Just to close this out, you

Page 207

1  have not reviewed Doctor Calvente's record of
2  scholarship, correct?
3    A.  No.
4        MS. WERMUTH:  I have nothing
5  further.
6        MR. BRAMWELL:  Just one other
7  thing.
8        FURTHER EXAMINATION
9       BY MR. BRAMWELL:
10    Q.  You know that University of North
11  Carolina Chapel Hill is an R1?
12    A.  Yes.
13        MR. BRAMWELL:  Okay.  That's it.
14  We will reserve signature.
15
16  (Off the record at 3:07 p.m.)
17
18
19
20
21
22
23
24

Page 208

1  STATE OF ILLINOIS  )
                       )  SS.
2  COUNTY OF McHENRY  )
3
4
5      I, GINA MARIE ZANGARA, C.S.R., do hereby
   certify that DOCTOR SUSAN ZAESKE was by me first
6  duly sworn, to testify the truth, the whole
   truth, and nothing but the truth, and that the
7  above deposition, pages 4 through 207, inclusive,
   was recorded by me and reduced to typewriting by
8  me.
9      I FURTHER CERTIFY that the foregoing
   transcript of the said deposition is a true and
10 correct transcript of the testimony given by the
   said witness at the time and place specified
11 hereinbefore.
12     I FURTHER CERTIFY that I am not a relative
   or employee or attorney for counsel of any of the
13 parties, nor a relative or employee of such
   attorney or counsel, or financially interested
14 directly or indirectly in this action.
15     IN WITNESS WHEREOF, I have hereunto set my
   hand at Crystal Lake, Illinois, this 20th day of
16 July, 2021.
17
18
19   Gina Marie Zangara
     Certified Shorthand Reporter
20   McHenry County, IL
     CSR License No. 084-003242.
21
22
23
24

Page 209

1          ERRATA SHEET
2  Deposition of DOCTOR SUSAN ZAESKE on 7-8-21
3    Page        Line        Correction
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

# Exhibit H

Page 2

1  There were present at the taking of this
2  deposition via videoconference the following
3  counsel:
4
   LAW OFFICES OF FITZGERALD BRAMWELL by
5  MR. FITZGERALD T. BRAMWELL
   225 West Washington, Suite 2200
6  Chicago, Illinois 60606
   312.924.2884
7  bramwell@fitzgeraldbramwell.com
8  on behalf of the Plaintiff;
9  COZEN O'CONNOR by
   MS. ANNA WERMUTH and
10 MS. NANDINI SANE
   123 North Wacker Drive, Suite 1800
11 Chicago, IL 60606
   312.474.7876 | 312.878.2023 (fax)
12 awermuth@cozen.com
   nsane@cozen.com
13
   on behalf of the Defendants.
14
15 ALSO PRESENT:

16 DR. LISA CALVENTE
   MS. KATHRYN STIEBER
17
18
19
20
21
22
23
24

Page 3

1         I N D E X
2  Witness:                          Page
3  JEAN-CLAUDE BRUNO████
4  Direct Examination by Mr. Bramwell    4
5
6         E X H I B I T S



23 NOTE: Exhibits were provided for inclusion with
        deposition transcripts.
24

Page 4

1      (Whereupon the witness was
2       duly sworn.)
3  ████████████████████████████
4  witness herein, called for examination, having been
5  first duly sworn via videoconference, was examined
6  and testified as follows:
7          DIRECT EXAMINATION
8  BY MR. BRAMWELL:
9    Q   Good morning. Is it Dr. ████
10   A   Yes.
11   Q   Did I pronounce it correctly?
12   A   Yeah, thank you. Yeah.
13   Q   Okay; good. Can you please state your
14 name and spell it for the record?
15   A   Sure. ████████████████████
   ████████████████████████████
17   Q   All right. And, Dr. █████ you've just
18 taken an oath to tell the truth. Do you understand
19 that?
20   A   Uh-huh. Yes, I do.
21   Q   Okay; good. Have you ever been deposed
22 before?
23   A   Never.
24   Q   Okay. Well, then I'll just go over some

Page 5

1  ground rules.
2      I'm going to ask you questions and I'm
3  going to ask you to give me answers that are true,
4  complete, and accurate. Do you understand that?
5    A   I do.
6    Q   Okay; good. The court reporter is, I
7  guess, in my upper left-hand corner of the screen.
8  She's going to be taking down everything that we
9  say. To that end, we need to take care not to talk
10 over each other. So if I ask a question let me
11 finish the question, then, you know, wait for any
12 objections, then please give an answer. That way
13 we'll have a good, clean record.
14     Is that understood?
15   A   Yes.
16   Q   Okay; good. You need to give clear
17 answers, and we all do this, right, words like
18 "uh-huh," "um-hum," you know, they're natural,
19 we've been speaking that way since we were -- you
20 know, since we first learned the English language,
21 but you just need to give clear answers because
22 "um-hum," "uh-uh," "uh-huh" don't show up well in a
23 transcript. So yes is good, yeah, no.
24     If I ask you to give a clear answer,

2 (Pages 2 - 5)

Page 10

1        You spoke to Alexa Murphy about this?
2    A   No.
3    Q   Okay.  And nobody has promised you
4  anything for your testimony here today, right?
5    A   No.
6        (Document was marked ▓▓▓▓
7        Exhibit 1 for identification.)
8  BY MR. BRAMWELL:
9    Q   Okay.  Dr.▓▓▓▓  Ms. Wermuth has given
10 me permission to e-mail documents directly to you,
11 and obviously she will be copied on these mails.
12       I'm going to send you a document that
13 I have marked as Exhibit No. 1.  This is a document
14 Bates label -- I'm sorry.  This is a document that
15 is attached as an exhibit to Dr. Calvente's
16 complaint.  It is page number 147 through 150 of
17 her 188-page complaint.
18       Please let me know when the document's
19 arrived, and then you can open it.
20   A   Okay.  I'm still waiting for it.
21   Q   Okay.  Sometimes the Internets are slow.
22   A   Okay.
23   Q   Has it arrived?
24   A   It's arrived.  I will open it.

Page 11

1    Q   Okay.
2        MS. WERMUTH:  I do not have it so -- but
3  you can go ahead and open it, Professor, and I will
4  let you know as soon as I have it.
5        THE WITNESS:  Okay.
6        MS. WERMUTH:  Okay.
7        THE WITNESS:  So what I have here is a
8  four-page document that is the University Board on
9  Promotion and Tenure document in Lisa's case.  Is
10 that --
11 BY MR. BRAMWELL:
12   Q   Okay.  And when you say -- I'm sorry.  I
13 just broke one of my rules.  Please continue.
14   A   Is that what you sent me?  That's --
15 that's what you want me to open?
16   Q   Yes, please.
17   A   Okay.
18   Q   All right.  And when we say "Lisa," are
19 you talking about Lisa Calvente?
20   A   Yes.
21   Q   And she's one of your former colleagues?
22   A   Yes.
23   Q   And the document that I have marked as
24 Exhibit 1, are you familiar with it?

Page 12

1    A   I am.
2    Q   How are you familiar with it?
3    A   Well, the document was written by the
4  Board and I had, I think, a hand in framing the
5  document the way -- if this is the final document,
6  I had a hand in framing the document so that it
7  would be more balanced.
8    Q   Do you have any belief -- do you have any
9  reason to believe this is not the final document?
10   A   I haven't had a chance to look through
11 it.
12   Q   Oh, please look through it.  Please look
13 through it.
14   A   So I -- I'd have to read through it just
15 because ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 but I'd have to read through it.
23   Q   Please read through it.  Take your time.
24   A   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Page 13

1  document.
2    Q   It's true, complete, and accurate in all
3  respects?
4    ▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓  ▓▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓  ▓▓  ▓▓▓▓▓  ▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15   A   That's correct.
16   Q   Okay.  Now I have a series of questions,
17 and it's in part due to my own ignorance so I hope
18 that you will illuminate me.  I'm curious how the
19 UBPT works, and by "UBPT" that's the University
20 Board on Promotion and Tenure?
21   A   Sure.
22   Q   Okay.  I'm curious how it works.  I'm a
23 tenure-track professor at DePaul.  I'm going up for
24 tenure.  I assemble my dossier.  The college -- my

4 (Pages 10 - 13)



Page 14

1  local unit, rather, takes a vote.  The head of my
2  college sends a report, you know, prepares a
3  report.  Then what happens?
4      A    So once the local unit, once the college
5  level review takes place, the local unit and the
6  reports, the chair writes a document, then the --
7  if it goes to that level.  If there's another level
8  at the college then the college does a report, then
9  the dean does a report.  And so once the entire
10  dossier is complete, that gets uploaded to a
11  particular platform or server and it's available
12  for the University Board to review.
13          The associate provost at the
14  University schedules all of the tenure and
15  promotion cases and does so in accordance with, you
16  know, trying to group the cases by college so you
17  minimize probably the wear and tear on chairs and
18  deans having to move through for interviews, but
19  over the course of the season, so to speak, maybe
20  eight weeks, all of the tenure and promotion cases
21  are scheduled.
22          The Board meets typically on the first
23  day of the tenure and review cycle to review the
24  cases for that day, and we typically have between

Page 15

1  six and eight cases to review on a particular day.
2

9          And so when the candidate first comes
10  into the room, and they come in before the chair or
11  the dean, the Board members ask the individual
12  questions to get clarification on points that they
13  had when they reviewed the case.  They take notes
14  in -- on the particular case.  Then the chair and
15  the dean come in and other questions are asked.
16  Usually those questions are lengthier or there are
17  more questions depending on really how strong or
18  weak the case is.
19          Once the individual -- once the
20  individuals who are being interviewed have left,
21  typically there are about 15 minutes, sometimes
22  more time is taken just because the case warrants
23  it,

Page 16

1

Page 17

1

5 (Pages 14 - 17)



Page 18

19  Q  I'm sorry. Can you repeat that, please?
20 There was a little hiccup.
21

Page 20

1
2          I think they need to go to the
3 provost by a certain date. I don't have the exact
4 dates committed to memory. And that's it really.
5          And then once it's out of the Board's
6 hands it's out of the Board's hands, and any
7 further decision-making really belongs to the
8 provost.
9     Q  Okay. Thank you.
10         So a few questions on that. Does the
11 provost participate at all at the UBPT level?
12    A  The provost is present in the back of the
13 room but does not participate.
14    Q  So when you say she's present in the back
15 of the room, is this just for interviews or is this
16 for the entire process?
17    A  For the entire -- when you say "entire
18 process," what do you mean by entire process?
19    Q  Okay. Good question. Let's ask it this
20 way. So I'll just break it up.
21         She's there for the interviews of both
22 the faculty member and the dean?
23    A  Yes, correct.
24

Page 19

Page 21

1
2
3
4     Q  Okay.
5     A  Yes.
6     Q  Does she take notes or does she just sit
7 and observe?
8     A  She's behind me. I assume she takes
9 notes. I don't know what she's doing.
10    Q  Okay.

15    Q  I'm curious as to -- I'm curious. It
16 will draw an objection, but I'm curious. Please.
17    A  I --
18        MS. WERMUTH: Objection -- let me object,
19 Bruno, please, if I may.
20        Objection; foundation.
21 BY MR. BRAMWELL:
22    Q  Go ahead.
23    A  So let me ask you again, do you want me
24 to speculate then? Because I don't know --



Page 34

1

13  Q   Did they affect -- Strike that.
14      With respect to Dr. Calvente's --
15 rather, let's strike that again.
16      Earlier you testified as to what
17 normally occurs during the UBPT process.  Did
18 Dr. Calvente's process follow that general
19 trajectory?
20  A   It did.
21  Q   Okay.  So that means that there was an
22 interview with Dr. Calvente and an interview with
23 Dr. Alexa Murphy, right?
24  A   That's correct.

Page 35

Page 36

1

5       I think the -- whoops.  I think I lost
6 you.  Hello?
7  Q   Hello?  Can you hear me?  I can see you.
8 I can hear you.
9  A   Let me see if I can -- oh, sorry.
10

Page 37

10 (Pages 34 - 37)

**Page 86**

1 within case, nor of kin or counsel to any of the
2 parties.
3      Witness my official signature and seal as
4 Notary Public in and for Kane County, Illinois, on
5 the 2

6

7      JUNE M. FUNKHOUSER, CSR, RMR
       Notary Public
8      License No. 084-003024
       One North Franklin Street, Suite 3000
9      Chicago, Illinois  60606
       Phone:  (312) 442-9087

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 87**

1           Veritext Legal Solutions
               1100 Superior Ave
2                 Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   March 30, 2021
5
   To: MS. WERMUTH
6
   Case Name: Calvente, Lisa v. Ghanem, Salma, Et Al.
7
   Veritext Reference Number: 4493471
8
                         Deposition Date:  3/15/2021
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA

**Page 88**

1          DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 4493471
   CASE NAME: Calvente, Lisa v. Ghanem, Salma, Et Al.
   DATE OF DEPOSITION: 3/15/2021
4  WITNESS' NAME:
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8

10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
           Statement; and
14     Their execution of this Statement is of
           their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of _____, 20____.
17
        _____
18      Notary Public
19
        _____
20      Commission Expiration Date
21
22
23
24
25

**Page 89**

1          DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 4493471
   CASE NAME: Calvente, Lisa v. Ghanem, Salma, Et Al.
   DATE OF DEPOSITION: 3/15/2021
4  WITNESS' NAME: Jean-Claude Bruno
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date      Jean-Claude Bruno
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18        in the appended Errata Sheet;
       They signed the foregoing Sworn
19        Statement; and
       Their execution of this Statement is of
20        their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
        Notary Public
24
        _____
25      Commission Expiration Date

23 (Pages 86 - 89)

# Exhibit I

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>DECLARATION</u>

1.     My name is Lucy Rinehart.  I am over the age of eighteen (18) years and fully capable of making this declaration.

2.     I am employed by DePaul University as the Associate Provost for Academic Planning and Faculty, and I am authorized to make this declaration on DePaul University's behalf.

3.     The documents bates stamped DePaul 34653-36928 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████████

4.     The documents bates stamped DePaul 36929-37299 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████████

5.     The documents bates stamped DePaul 37300-38093 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████████

6.     The documents bates stamped DePaul 008594-009701 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████████

7.     The documents bates stamped DePaul 10073-10373 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for ██████████

8.      The documents bates stamped DePaul 000796-001889 is the full and complete tenure and promotion file maintained by the Academic Affairs Office for Lisa Calvente.

9.      I have knowledge of the facts stated herein and I declare under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 2nd day of March, 2020.

*Lucy Rinehart*

Lucy Rinehart




University Board on Promotion and Tenure



CONFIDENTIAL



Calvente-DePaul 038088

# Exhibit J

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4   LISA CALVENTE,              )

5         Plaintiff,            )

6            vs                 )  No. 20-cv-3366

7   SALMA GHANEM and DePAUL     )

8   UNIVERSITY,                 )

9         Defendants.           )

10

11         The deposition of SYDNEY DILLARD called

12  for examination pursuant to Notice and the Rules

13  of Civil Procedure for the United States

14  District Courts pertaining to the taking of

15  depositions, taken before DENISE A. JOHNSON, a

16  certified shorthand reporter within and for the

17  State of Illinois, via video conference per

18  Executive Order 2020-14, on the 1st day of

19  December, 2020, at the hour of 9:03 a.m.

20

21  Reported By:   DENISE A. JOHNSON, C.S.R.

22  License No.:   084-004004

23

24

Page 2

```
 1  APPEARANCES:
 2     FITZGERALD BRAMWELL LAW OFFICES, by
        MR. FITZGERALD BRAMWELL,
 3     225 West Washington Street, Suite 2200
        Chicago, Illinois  60606
 4     (312)  924-2884
        bramwell@fitzgeraldbramwell.com
 5        Representing the Plaintiff;
 6
        COZEN O'CONNOR, by
 7     MS. ANNA WERMUTH,
        MS. NANDINI SANE,
 8     123 North Wacker Drive, Suite 1800
        Chicago, Illinois  60606
 9     (312)  382-3100
        awermith@cozen.com
10     nsane@cozen.com
          Representing the Defendants.
11
12
13  Also Present: Ms. Lisa Calvente
                   Ms. Salma Ghanem
14                 Ms. Kathryn Stieber
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1               I N D E X
 2  WITNESS                    EXAMINATION
 3  SYDNEY DILLARD
 4  By Mr. Bramwell (direct)          4
 5  By Ms. Wermuth (cross)          124
 6  By Mr. Bramwell (redirect)      174
 7
 8
 9
10
11
12
13           E X H I B I T S
14  NUMBER              MARKED FOR ID
15      (EXHIBITS PREVIOUSLY MARKED.)
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              (Witness sworn.)
 2              SYDNEY DILLARD,
 3  having been first duly sworn, was examined and
 4  testified as follows:
 5            DIRECT EXAMINATION
 6  BY MR. BRAMWELL:
 7     Q.  Thank you very much.  Dr. Dillard,
 8  thank you for being here.  Now that we're on the
 9  record, my name is Jerry Bramwell, J-e-r-r-y,
10  B-r-a-m-w-e-l-l.  Dr. Dillard, you have just
11  taken an oath to tell the truth.  Do you
12  understand that?
13     A.  Yes, I do.
14     Q.  All right.  Excellent.  Have you ever
15  been deposed before?
16     A.  No.
17     Q.  Then I will go over some instructions
18  briefly.  I'm going to ask you questions.  And I
19  need you to give me answers that are true,
20  complete, and accurate.  Do you understand that?
21     A.  Yes, I do.
22     Q.  Excellent.  The court reporter is
23  writing down everything we say.  This is not a
24  video deposition, so no video is being recorded
```

Page 5

```
 1  that I know of, but the court reporter is
 2  writing down everything that we say.  And
 3  because of that, we need to take care not to
 4  talk over each other.  Do you understand that?
 5     A.  Yes.
 6     Q.  We also need to make sure that we give
 7  clear answers.  So words like uh-huh and huh-huh
 8  look a lot alike on a transcript, so clear
 9  answers, yes, no, just to make sure the record
10  is clear.  Do you understand that?
11     A.  Yes, I do.
12     Q.  If you don't understand a question,
13  please ask me to clarify it and I will try to
14  rephrase it.  Are we agreed?
15     A.  Okay.
16     Q.  If you answer a question, I'm going to
17  assume that you understood that question.  Are
18  we agreed?
19     A.  I'm sorry.  I didn't hear the last
20  part.  You said something are we agreed.  Is
21  that what you just said?
22     Q.  No, no.  Let me repeat it.  If you
23  answer a question, I'm going to assume that you
24  understood the question.  Is that agreed?
```

2 (Pages 2 - 5)

Page 62

1  want the court reporter to read it back.  We can
2  do either.
3      A.  No.  I just want to get a refresher
4  because I kind went on a tangent.  Go ahead.
5  [REDACTED]

Page 63

[REDACTED]
2      Q.  Why did you --
3      A.  Seeing their case and then trying to,
4  you know, see what are different ways to have
5  these conversations -- these uncomfortable
6  conversations because they were open about
7  their -- much more vocal about their concerns
8  and what happened to them ended up having an
9  impact on their careers thinking that, you know,
10  maybe I can use the same venues that those who
11  were in opposition to them as a way to have
12  these conversations and still nothing came
13  about.
14         So essentially seeing them applying it
15  to my own situations and actually Lisa's, too,
16  because I included information about Lisa's
17  mistreatment in there and nothing happening then
18  kind of starts to build a picture of what's
19  important.  We investigate the people of color
20  when complaints are made about them, but we
21  don't investigate the people that are not of
22  color, you know, U.S. minorities or however you
23  want to place it when complaints are anonymous
24  about them.

Page 64

1      Q.  I'm going to be -- I'm going to be
2  sending right now an exhibit that I have marked
3  as Exhibit D as in delta.
4      A.  Okay.
5      MR. BRAMWELL:  Ms. Wermuth, you should have
6  it.  Madam Court Reporter, you should have it.
7  BY MR. BRAMWELL:
8      Q.  Dr. Dillard, you should have it, too.
9  This is one of the confidential documents.  So
10  we will ask that you delete it and destroy it
11  after the deposition is over.  It's Bates
12  labeled Calvente-DePaul 0009774 through 9776.
13  Do you have that in front of you?
14      A.  You're asking me?
15      Q.  Yes, Dr. Dillard.
16      A.  No, I don't have it.
17      MS. WERMUTH:  Mr. Bramwell, I also do not
18  have the exhibit you are referencing.
19      MR. BRAMWELL:  I just E-mailed it because I
20  have a 30-second delay on my E-mail to catch
21  anything that should be --
22      MS. WERMUTH:  I have it.
23  BY MR. BRAMWELL:
[REDACTED]

Page 65

[REDACTED]





Veritext Legal Solutions

www.veritext.com                                     888-391-3376

Page 70

```
1    ████████████████████████████
     ██████████████████
3    Q.  We've been at this for now, I think, a
4  little -- almost an hour and a half.  Can we
5  take five minutes to, you know, attempt any
6  bodily necessities and come back, let's say, at
7  10:30?
8    A.  Sounds good.
9         (A short break was taken.)
10 BY MR. BRAMWELL:
11   Q.  So, Dr. Dillard, the next line of
12 questions that I'm intending on asking might be
13 a little sensitive.  And I apologize for that in
14 advance.  I'm not trying to upset or offend or
15 otherwise make life harder for you.
16   A.  Um-hum.
17 ████████████████████████████████████
   ██████████████████████████████████████
   ████████████████████████
20   MS. WERMUTH:  Objection, conclusory --
21 ████████████████████████████████████
22   MS. WERMUTH:  -- calls for a legal
23 conclusion, calls for speculation.
24 ██████████████████████████████████
```

Page 71

```
1    ██████████████████████████
     ████████████████████████████
     ████████████████████████████████
     ████████████████████
     ██████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████████
9    Q.  I'm going to send you and Ms. Wermuth
10 as well as the court reporter a document that I
11 have marked as Exhibit A.  I will try to get it
12 to you a little faster.  I will turn off my
13 30-second delay here.  So that should be on its
14 way right now.  Please tell me when it arrives.
15   A.  Okay.
16   Q.  Has it arrived?
17   A.  I have to refresh.  Give me a second.
18 No, I still haven't gotten it.  What is it
19 titled?
20   Q.  It's a 12-page document, and it's the
21 materials that Jemelle Cunningham sent to me.
22   A.  Okay.  Yes.  Now, I have it.
23   Q.  Now, I am going to make this a little
24 bit easier --
```

Page 72

```
1    MS. WERMUTH:  I'm sorry.  Mr. Bramwell, I do
2  not yet have those.  What is it that you are
3  describing?  I'm sorry.  Here it is.
4    MR. BRAMWELL:  It's arrived now?  If you will
5  deal with a little bit of political humor, it's
6  almost like the people who slid down the mail
7  and are now doing it with the Internet.
8    MS. WERMUTH:  Mr. Bramwell, real quick,
9  these are documents that you received from
10 Ms. Cunningham.  Did you Bates label these and
11 send them to me or what -- I'm trying to --
12   MR. BRAMWELL:  They were not Bates labeled.
13 They were sent to you, and I can pull up the
14 date off line if you would like.
15   MS. WERMUTH:  Okay.
16   MR. BRAMWELL:  But they were sent to you in
17 advance.
18   MS. WERMUTH:  And you received them on or
19 around August 5th of 2019?
20   MR. BRAMWELL:  I don't remember when I
21 received them, but they were sent to you -- I
22 did not receive them in 2019.  This litigation
23 wasn't even filed in 2019.
24   MS. WERMUTH:  I'm just looking at the first
```

Page 73

```
1  cover letter, which says it was sent to you by
2  facsimile on that date.
3    MR. BRAMWELL:  No, it does not --
4    MS. WERMUTH:  I'm sorry.  You're right.  It
5  doesn't.  This is to the EEOC.  I'm sorry.
6    MR. BRAMWELL:  That's quite all right.
7  Ms. Wermuth, these materials were forwarded to
8  you on Thursday, November 12th at 3:56 p.m.  You
9  responded on Friday, November 13th, at 1:32 p.m.,
10 "Thank you.  We have received this."
11 BY MR. BRAMWELL:
12 ████████████████████████████████████
   ████████████████████
   █████████████████████████████████████
   ███████████████████████████████████████
   █████████████████████████████████████████
   ██████████████████████████████
   ████████████████
   █████████████████████████████████████
   ██████████████████████████████
   ██████████████████████████████████████████
   █████████████████████████████████████████████.
```

19 (Pages 70 - 73)



Veritext Legal Solutions

www.veritext.com                                   888-391-3376



Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 82

Page 84

10 BY MR. BRAMWELL:
11    Q.   So to summarize -- and I will draw an
12 objection, but we'll just have to work through
13 it -- you would agree that the college of
14 communications at DePaul is a racially hostile
15 environment?
16    A.   I would agree, yes.
17    Q.   I have E-mailed you as well as
18 Ms. Wermuth a document that I have marked as
19 Exhibit B.  It should be sitting in your in-box
20 now.  It's a confidential document, so it's got
21 to be destroyed after this deposition.  And it's
22 Bates labeled Calvente-DePaul 9765 to 9769.  Do
23 you see that there?
24    A.   What is the -- you said what exhibit

Page 83

Page 85

1 letter is it?
2    Q.   Sure, B as in bravo.
3    A.   B, okay.  Yes, I do see it.



Page 86

Page 88

1　A.　I do.
2

14　Q.　No worries.  It's always weird taking a
15　deposition -- this is just an aside.  It's
16　always weird because you want to have a good
17　transcript, but some of the ways that we
18　communicate don't always come through on the
19　transcript.
20　　A.　It only happens when I'm reading.  I'm
21　sorry.  But, yes, I do remember this interaction
22　with Barbara Schaffer.
23

Page 87

Page 89

14　Q.　Now, I just sent you as well as
15　Ms. Wermuth and the court reporter a document
16　that I labeled as Exhibit C.  I'm sorry.  Can
17　you hear me okay?  I've been told that I'm
18　a little bit quiet.
19　　A.　Yes, I can hear you.
20　　Q.　I have sent you a document, Exhibit C.
21　And it's Bates labeled Calvente-DePaul 9760
22　through 9761.  This is another confidential
23　document.  Do you have that document now in
24　front of you?

23 (Pages 86 - 89)



Page 90

Page 91

Page 92

Page 93

. Earlier you asked
14 me about the environment -- how is it a hostile
15 environment, how is it intimidating, how is it
16 ostracizing. These are examples of how it is
17 ostracizing.
18        And that's just -- again, just the
19 general space where you know you are a part of a
20 protected class, but you don't feel like you are
21 protected. In fact, you feel like if you speak
22 up like a person, say, like Lisa Calvente you
23 get retaliated against.
24        Not to mention when you try to use the

24 (Pages 90 - 93)

Page 94

1 policies and procedures that are in place to
2 protect you, you get either no results; or you
3 get a response that, like you said, is like a
4 rattlesnake's shaking of the tail, a warning --
5 undertone of a warning.
6    Q.  I'm going to transmit in a minute when
7 I can remove my work product from it -- I think
8 I've got that done now -- a document that I have
9 marked as Exhibit R as in Romeo.  It should be
10 coming through the Internet right now.
11        I will share my screen while it is --
12 that is happening so that we can keep this
13 moving.  This is a document also marked
14 confidential, but it's Calvente-DePaul 11079
15 to 11082.
16    MS. WERMUTH:  I'm sorry, Jerry.  It's not in
17 my E-mail box yet.  What's the number -- it's R.
18 I see it now.  And can I just -- I'm sorry.  I
19 called you Jerry again, Mr. Bramwell.
20        Can I just make sure I understand that
21 you're marking your exhibits with letters?  And
22 so I'm assuming that that's how they'll be
23 marked in the deposition transcript.  And so at
24 some point, I will have to figure out if I also

Page 95

1 enter exhibits how to sort of pick up because
2 you've got at least up to U at this point.  So
3 we'll have to figure that out, Mr. Bramwell.
4    MR. BRAMWELL:  I'm using letters.  And, yes,
5 you will choose whatever marking -- I imagine
6 you will use numbers, but you mark however you
7 mark and --
8    MS. WERMUTH:  I mean, normally I would
9 sequence after where you left off.  But if you
10 are at U, I don't know that I will have the
11 ability to do that.  So in any event -- okay.
12    MR. BRAMWELL:  It's the challenges of our
13 Zoom deposition world.
14    MS. WERMUTH:  Yes, that's for sure.  We'll
15 get through it.
16    MR. BRAMWELL:  Yes.  Okay.
17 BY MR. BRAMWELL:
18    Q.  So, Dr. Dillard, I'm sorry.
19    A.  You're fine.  I'm trying to read the
20 document so I can refresh my memory.  Go ahead.
21    Q.  That's quite all right.  I had a
22 different name on the tip of my tongue, and
23 that's not who she is.  I'm terrible with names.
24 I really am.



Page 96

Page 97

25 (Pages 94 - 97)

Page 182

1 aforesaid.

2    I further certify that the signature to
3 the foregoing deposition was not waived by
4 counsel for the respective parties.

5    I further certify that the taking of this
6 deposition was pursuant to Notice and that there
7 were present at the deposition the attorneys
8 hereinbefore mentioned.

9    I further certify that I am not counsel
10 for nor in any way related to the parties to
11 this suit, nor am I in any way interested in the
12 outcome thereof.

13    IN TESTIMONY WHEREOF: I have hereunto
14 set my hand and affixed my notarial seal this
15 14th day of December, 2020.

16

17

18

19

20    DENISE A. JOHNSON
21    CERTIFIED SHORTHAND REPORTER

22

23

24

---

Page 183

1    Veritext Legal Solutions
2    1100 Superior Ave
    Suite 1820
3    Cleveland, Ohio 44114
    Phone: 216-523-1313
4 December 17, 2020
5 Sydney Dillard
    syndeyjd@gmail.com
6
    Case Name: Calvente, Lisa v. Ghanem, Salma, Et al.
7
    Veritext Reference Number: 4332875
8
    Deposition Date: 12/1/2020
9
    Dear Sir/Madam:
10
    Enclosed you will find a transcript of your deposition.
11
    As the reading and signing have not been expressly
12
    waived, please review the transcript and note any
13
    changes or corrections on the errata sheet
14
    included, indicating the page, line number, change and
15
    reason for the change. Sign at the bottom of the sheet
16
    in the presence of a notary and forward the errata sheet
17
    back to us at the address shown above or email to
18
    production-midwest@veritext.com.
19
    If the errata is not returned within thirty days of your receipt of
20
    this letter, the reading and signing will be deemed waived.
21
    Sincerely,
22
    Production Department
23
24 NO NOTARY REQUIRED IN CA

---

Page 184

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4332875
3    CASE NAME: Calvente, Lisa v. Ghanem, Salma, Et Al.
    DATE OF DEPOSITION: 12/1/2020
4    WITNESS' NAME: Sydney Dillard
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9 Date        Sydney Dillard
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11 the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13    They signed the foregoing Sworn
        Statement; and
14    Their execution of this Statement is of
        their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
    _____
18    Notary Public
19
    _____
20    Commission Expiration Date
21
22
23
24
25

---

Page 185

1    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4332875
3    CASE NAME: Calvente, Lisa v. Ghanem, Salma, Et Al.
    DATE OF DEPOSITION: 12/1/2020
4    WITNESS' NAME: Sydney Dillard
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8 well as the reason(s) for the change(s).
9    I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
    that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 Date        Sydney Dillard
14
    Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
    the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18        in the appended Errata Sheet;
    They signed the foregoing Sworn
19        Statement; and
    Their execution of this Statement is of
20        their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
    _____
    Notary Public
24
    _____
25    Commission Expiration Date

---

47 (Pages 182 - 185)

# Exhibit K

Page 1

1       IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    LISA CALVENTE,                    )
                                       )
5                         Plaintiff,   )
                                       )
6            -vs-                      )
                                       )
7    SALMA GHANEM and DePAUL           )
     UNIVERSITY,                       )
8                                      )
                          Defendants.  )
9

10

11

12          Remotely held deposition of ALEXANDRA G.
13   MURPHY taken before CAROL CONNOLLY, CSR, CRR, and Notary
14   Public, pursuant to the Federal Rules of Civil Procedure
15   for the United States District Courts pertaining to the
16   taking of depositions, commencing at 9:00 a.m. on the 4th
17   day of March, A.D., 2021.

18

19

20

21

22

23

24

25

Page 2

1      There were present at the taking of this
2  deposition the following counsel:
3      LAW OFFICES OF FITZGERALD & BRAMWELL by
       MR. FITZGERALD T. BRAMWELL (via Zoom)
4      225 West Washington Street
       Suite 2200
5      Chicago, Illinois  60606
       (312) 942-2884
6      bramwell@fitzgeraldbramwell.com
7
           appeared on behalf of the Plaintiff;
8
9      COZEN O'CONNOR, P.C. by
       MS. ANNA WERMUTH (via Zoom)
10     123 North Wacker Drive
       Suite 1800
11     Chicago, Illinois  60606
       (312) 382-3100
12     awermuth@cozen.com
13
           appeared on behalf of the Defendants.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                I N D E X
2     DEPOSITION OF ALEXANDRA G. MURPHY
3        TAKEN March 4, 2021
4
5  EXAMINATION BY                        PAGE
6  Mr. Bramwell                    6
7      - - - - - - - -
8         EXHIBITS MARKED
9                            PAGE
10 Exhibit 1     January 9, 2019 letter     18
       from Alexandra Murphy to
11     Members of the University
       Board on Promotion and Tenure
12
   Exhibit 2     February 21, 2019 email     111
13     from Lea Palmeno to Alexandra
       Murphy, et al., etc.
14
   Exhibit 3     April 17, 2019 email     111
15     from Alexandra Murphy
       to Sydney Dillard, etc.
16
   Exhibit 4     February 9, 2018 email     124
17     from Taveras DeMoya to
       Tim Cole, et al., etc.
18
   Exhibit 5     March 30, 2018 email     234
19     from Alexandra Murphy
       to Salma Ghanem, etc.
20
   Exhibit 6     November 16, 2018 email     138
21     from Alexandra Murphy to
       Hai Train, etc.
22
   Exhibit 7     October 20, 2018 email     183
23     from Alexandra Murphy
       to Lisa Calvente, etc.
24
   Exhibit 8     December 3, 2019 email     230
25     from Stephanie Smith
       to Alexandra Murphy, etc.

Page 4

1  Exhibit 9     December 3, 2019 email     230
       from Stephanie Smith
2      to Alexandra Murphy, etc.
3  Exhibit 11     Questions Prepared by the     136
       Appeals Board for Alexandra
4      Murphy
5  Exhibit 12     October 18, 2018 email     222
       from Lisa Calvente to
6      Salma Ghanem, etc.
7  Exhibit 13     October 19, 2018 email     222
       from Lisa Calvente to
8      Alexandra Murphy, etc.
9  Exhibit 14     July 30, 2019 email from     110
       Barbara Willard to
10     Alexandra Murphy and
       attachments, etc.
11
   Exhibit 16     October 18, 2018 email     228
12     from Hai Train to
       Alexandra Murphy, etc.
13
   Exhibit 17     Lists of External     222
14     Reviewers and Research
       for Review, June 1, 2018
15     email
16 Exhibit 18     Student Assessment of     159
       Faculty Performance
17
   Exhibit 20     August 14, 2016 letter     201
18     from Alexandra Murphy
       to Lisa
19
   Exhibit 21     August 29, 2018 letter     201
20     from Alexandra Murphy
       to Lisa
21
   Exhibit 22     July 31, 2017 letter     201
22     from Alexandra Murphy
       to Lisa
23
   Exhibit 23     Criteria for Tenure and     16
24     Promotion, College of
       Communication, June 5, 2017
25

Page 5

1  Exhibit 24     DePaul University     161
       OTE Faculty Historical
2      Report, Calvente
3  Exhibit 25     DePaul University     161
       OTE Faculty Historical
4      Report, Dillard
5  Exhibit 26     DePaul University     161
       OTE Faculty Historical
6      Report, McEwan
7  Exhibit 27     DePaul University,     166
       Teaching Evaluations,
8      Breanna McEwan
9  Exhibit 28     College of Communication     166
       Recommendation For Tenure
10     and Promotion to Associate
       Professor
11
   Exhibit 29     DePaul University,     166
12     Teaching Evaluations,
       Breanna McEwan
13
   Exhibit 30     January 9, 2019 letter from     169
14     Alexandra Murphy to
       Members of the University
15     Board on Promotion and Tenure
16
17
18         CERTIFIED QUESTIONS
19
20 No. 1                    141
21 No. 2                    212
22
23
24
25

2 (Pages 2 - 5)

Page 6

1       ALEXANDRA G. MURPHY,
2 called as a witness herein, having been first duly
3 sworn, was examined upon oral interrogatories and
4 testified as follows:
5               EXAMINATION
6        By Mr. Bramwell:
7    Q   Dr. Murphy, you've just taken an oath to tell
8 the truth.  Do you understand that?
9    A   I do.
10   Q   Can you please state your name for the record?
11   A   Alexandra Murphy.
12   Q   And that's -- Can you spell that?
13   A   A-L-E-X-A-N-D-R-A, M-U-R-P-H-Y.
14   Q   And how would you prefer that I address you?
15 Is Dr. Murphy okay?
16   A   That's fine.  Lexa is fine.
17   Q   If you give me permission to use your first
18 name, I'll use it.
19       Lexa, what's the month and year of your birth?
20   A   ██████████████
21   Q   Okay.  I'm also an ███████ baby.
22       Have you ever been deposed before?
23   A   Yes.
24   Q   When were you deposed?
25   A   I don't remember the exact year.  Probably

Page 7

1 around 8 years ago.
2    Q   Eight years ago.  So while you were at DePaul?
3    A   Yes.
4    Q   What was the nature of the suit in which you
5 were deposed?
6    A   I was a witness in a tenure case.
7    Q   Whose case was that?
8    A   Melissa Bradshaw.
9    Q   Okay.  And what was she alleging?
10   MS. WERMUTH:  Objection.  Relevance.
11   MR. BRAMWELL:  Q   You can answer.
12   A   She was alleging -- I don't remember to be
13 honest what the basis of the suit was.  I can't recall
14 the exact -- I can't recall the exact language of the
15 suit to be honest.
16   Q   Was it a discrimination claim?
17   A   It was.  She did not get tenure so she was
18 suing to -- I don't remember what the basis of her suit
19 was.
20   Q   Okay.  Do you know if the case went to trial or
21 if the case settled?
22   A   I don't know.
23   MS. WERMUTH:  Objection.  Relevance.
24   MR. BRAMWELL:  Q   You can answer.  I'm sorry, Lexa.
25 Your attorney -- I have a hard time -- You give me your

Page 8

1 answer, please.
2    A   I don't know.  Once I was deposed, that was it.
3 That's all I knew of the case.
4    Q   You were never called as a witness at trial?
5    A   No.
6    Q   That's the only time you've been deposed?
7    A   Yes.
8    Q   I'll go over some instructions since it's been
9 a while, and here they are.  I'm going to ask you
10 questions, you are going to give me answers that are
11 true, complete, and accurate.  Do you understand?
12   A   Yes.
13   Q   The court reporter is writing down everything
14 that we say.  We need to take particular care since this
15 is a deposition over Zoom not to talk over each other.  I
16 will try to let you complete your answer, I will try not
17 to talk over you.  The attorneys sometimes are not as
18 good as -- good at this as we should be, but we'll try
19 not to make objections and talk over your answers.  And
20 I'll try not to talk over her.  Are we agreed?
21   A   Yes.
22   Q   You're going to need to give answers.  Words
23 like uh-huh, uhn-uhn look a lot alike on a transcript.
24 It's a verbal tic.  We all do it.  I don't think I have
25 read a transcript where I haven't slipped into that once

Page 9

1 or twice, but just keep that in mind.  You need to give
2 clear answers because again we have a court reporter.
3       Do you understand?
4    A   Yes.
5    Q   If you don't understand a question, please ask
6 me to clarify.  I sometimes don't give the clearest
7 questions.  So if you don't understand the question,
8 please ask me to clarify.  Are we agreed?
9    A   Yes.
10   Q   If you answer a question, I'm going to assume,
11 and everyone else will assume, that you understood that
12 question.  Do you understand that?
13   A   Yes.
14   Q   Okay.  Obviously you have counsel -- Are you
15 represented by counsel here this morning?
16   A   Yes.
17   MS. WERMUTH:  Yes.  Mr. Bramwell, I represent the
18 university and its agents, decision-maker agents, so yes.
19   MR. BRAMWELL:  Okay.
20   MS. WERMUTH:  I represent the university.
21   MR. BRAMWELL:  I'm sorry.  Ms. Wermuth, you just
22 broke up at the end there.  I'm sorry.
23   MS. WERMUTH:  I said I think you know I represent
24 the university.
25   MR. BRAMWELL:  Okay.  Do you represent Lexa

3 (Pages 6 - 9)

Page 38

1 MR. BRAMWELL: Q The area of study has grown very
2 quickly. Can you help unpack that, please?
3 A When I started in 1998 I believe we had about
4 400 majors, 500 majors, and we had only one degree that
5 we offered, that was a general communications degree that
6 only had like maybe one journalism class, that type of
7 thing.
8 We fast forward to today, we have about 1300
9 majors, and we offer about 8 undergraduate degrees, and
10 so the amount of students that were interested in the
11 studies grew very quickly during that time.
12 Q And when you say we have 1300 majors, you're
13 talking about DePaul?
14 A The College of Communications at DePaul.
15 Q No. You -- now I'm wholly -- help me -- again,
16 I'm chuckling a little bit, not derisively. I'm laughing
17 at my own confusion here.
18 If I understood, earlier I think you mentioned
19 the college -- that communication became its own college
20 during your -- during the time of your employment.
21 You need to speak up.
22 A Right.
23 Q That was in 2011 approximately?
24 A I believe so. Yes. 2010.
25 Q The exact date isn't critical for purposes of

Page 39

1 this communication. I'm just trying to understand. So
2 there were four different majors within the College of
3 Communications or 400 majors at DePaul University?
4 A 4 --
5 MS. WERMUTH: One quick second. Objection. Vague.
6 Confusing. Compound.
7 Go ahead, Lexa.
8 MR. BRAMWELL: Q Lexa, only you need to understand
9 the question.
10 A There were about 400 when I started in the
11 communication program. There were probably about 600 to
12 800 by the time we became a college. Once we were a
13 college we had about 2,000 graduate majors. We're now
14 covering 1400.
15 Q 1400 majors just out of communication alone?
16 A Yes.
17 Q Wow. And does the College of Communication
18 offer courses that you have to take if you want to
19 graduate from DePaul? And -- that question actually
20 probably should draw an objection. That was not a
21 well-done question.
22 Let's say I want to major in chemistry at
23 DePaul. Okay?
24 A Uh-huh.
25 Q Do I have to take any courses at -- within your

Page 40

1 college?
2 A No.
3 Q So I only have to take courses in your college
4 if I want to get a degree within some sort of
5 communication field?
6 A If you want to get a degree in our college,
7 then you have to take our core courses and the
8 requirements they have.
9 Q So if I want to graduate with a degree in
10 economics, I don't ever have to set foot in the College
11 of Communications?
12 A It depends, because I believe there are some
13 programs that require within their program to take a
14 communication course. I think computer and digital
15 media, some of their programs require students to take
16 our business and professional communication course. I
17 believe accounting has it as an option, but maybe not a
18 requirement, but it would depend on their degree. It
19 wouldn't be us deciding that.
20 Q Would you characterize the College of
21 Communications as a small college?
22 A Yes.
23 Q And -- why?
24 A Just based on size.
25 Q Size of what?

Page 41

1 A Size of faculty and size of students.
2 Q Okay. Approximately how many students are in
3 the College of Communications year to year?
4 A Right now again we're hovering at about 1400.
5 Q And how many faculty?
6 A We have 52 full-time positions.
7 Q Okay. And those are all tenure positions or
8 tenure track positions?
9 A No.
10 Q Okay. How many tenure or tenure track faculty
11 do you have?
12 A I'm giving bit of an estimate because I don't
13 have the numbers in front of me, but I believe 34,
14 something like that.
15 Q Okay. And what constitutes the rest?
16 A Term faculty.
17 Q Those are what, adjuncts, lecturers? Help me
18 out. I know every school does it -- every university
19 every university does it differently -- every college
20 does it differently. Help me out. How do you do it?
21 A We do it the way the university does it which
22 is the term faculty line is a nontenured track but
23 full-time position.
24 Q Okay. There are lecturers, there are adjunct,
25 what are they?

11 (Pages 38 - 41)

Page 42

1    A    Adjunct are part-time so they are lecturers.
2    Q    Okay.  Any other title of faculty that exists
3  in the College of Communication?
4    A    No.
5    Q    Okay.  What -- and again forgive me because I
6  don't know this stuff.  What's a lecturer?  What do they
7  do?  What are their expectations?
8    A    They teach more.  So they instead of being on a
9  six-course load -- tenure track is actually on a
10  six-course load with expectation they're doing research.
11  Term faculty are a nine-course load, and they do less
12  research -- they aren't expected to do research.  They
13  are supposed to just keep up with their professional
14  development.
15    Q    What do you mean by professional development,
16  keep up with their professional development?
17    A    Most of our lecturers are people that are
18  coming from professional careers, so in journalism or
19  advertising or public relations, and so they are teaching
20  courses that are relevant to that, and so rather than
21  doing research, which is what is meant to keep you
22  relevant in terms of your classroom instruction, they
23  need to stay up to date on the professional expectations
24  and relevancy of what they're teaching.
25    Q    Okay.  I should have asked this earlier.  Do

Page 43

1  you have any -- Lexa, do you have any professional
2  certifications?
3    A    No.
4    Q    Do you have any licenses other than a driver's
5  license?
6    A    No.
7    Q    So you've got the college of communications,
8  independent college, approximately 52 faculty,
9  approximately 34 tenure track faculty.  Do I have that
10  right?
11    A    Approximately, yes.
12    Q    Approximately.  Is the college broken down into
13  any divisions or departments?
14    A    We don't have -- we don't have departments, but
15  we have program areas.
16    Q    Okay.  What are these program areas?
17    A    Communication studies.
18    Q    Okay.
19    A    Public relation and advertising, journalism,
20  and media and cinema studies.
21    Q    Is public relations and advertising sometimes
22  called PRAD?
23    A    It's called PRAD also.
24    Q    Also written PRAD, but pronounced differently.
25  Did I get that right, Lexa?

Page 44

1    A    That's right.
2    Q    Excellent.  What is communication studies?
3    A    Communication studies covers as I was
4  mentioning before looking at -- we create the same
5  meaning in the context of interaction.  So the emphasis
6  is on relational communication, communication language
7  and meaning, rhetoric, intercultural communication,
8  environmental communication, kind of cuts across some of
9  these areas, organizational communication.  I think I
10  touched on the main ones.
11    Q    It seems like I did not ask a good question or
12  I did not understand one of your prior answers.  So I
13  understand that the College of Communications is broken
14  down into four subject areas, is that right?
15    A    Program areas really more, yeah.
16    Q    Program areas.  I'm sorry.  That's
17  communication studies, PRAD, journalism and media and
18  cinema studies, right?
19    A    Right.
20    Q    Okay.  So communication studies, okay.  I just
21  want to make sure I got that.  What is PRAD?
22    A    Public relations and advertising.
23    Q    How does that differ from communication
24  studies?
25    A    You typically are looking at the extension of

Page 45

1  meaning to a broader public.  They would be looking at
2  more mass communication models of communication.
3    Q    What journalism?
4    A    Journalism again would be more to a broader
5  public, so they would be still looking at how they craft
6  stories, tell stories, report, but they're presenting to
7  a broader public.
8    Q    Okay.  And the faculty advisor of DePaulia is
9  out of journalism?
10    A    Yes, she is.
11    Q    Who is the faculty advisor of the DePaulia
12  again?
13    A    Marla Krause.
14    Q    Then media and cinema studies, what's that?
15    A    They explore a variety of different mediated
16  communications.  So they'll look at television, film,
17  more popular culture, radio, that kind of thing.
18    Q    What's your area?  What's your program area?
19    A    Communication studies.
20    Q    Okay.  What about Dr. Calvente, what was hers?
21  What is hers?
22    A    Communication studies.
23    Q    Is communication studies the largest area of
24  the College of Communications?
25    A    No.

12 (Pages 42 - 45)

Page 82

1 we speak about her case? Her case was submitted to the
2 UBPT by January 30th.
3    Q   Right. I'm having -- I'm trying to understand
4 what would prompt this volunteered statement that you
5 wished her well. I don't remember if that's exactly what
6 you said, but what would prompt this volunteered
7 statement at that point in time as opposed to any other
8 point in time?
9    A   I think because I ran into her and we had just
10 both been -- had gone through the UBPT process that was
11 very present.
12    Q   Is it fair to say that the faculty at the
13 College of Communications is a fairly collegial group?
14    MS. WERMUTH: I'm sorry. I didn't hear you
15 Mr. Bramwell.
16    MR. BRAMWELL: That's fine. I'll speak up.
17    Q   Is it fair to say that the faculty at the
18 College of Communications is a fairly collegial group?
19    MS. WERMUTH: Object to form.
20       Go ahead.
21    MR. BRAMWELL: Q   You can answer.
22    A   I believe so.
23    Q   Why do you -- why do you say that?
24    A   I'm sorry. Why do I say I believe so or why do
25 I think they're collegial?

Page 83

1    Q   Both.
2    A   I think that in my experience people are
3 professional and friendly and there's, you know, some
4 socializing.
5    Q   All right. So let's take a look at that a
6 little bit. So you say professional, collegial. Is it
7 fair to say that amongst your 34 tenure and tenure track
8 faculty that they're generally aware of what everybody is
9 doing professionally?
10    MS. WERMUTH: Objection. Foundation. I'll object
11 to the narrative portion of the questioning.
12    MR. BRAMWELL: Q   You can answer.
13    A   I don't know. I can't speak for everyone, if
14 they know what everybody is doing work-wise. Is that
15 what you're asking?
16    Q   In part, but let me see if I can ask the
17 question a better way.
18       You got 34 -- approximately tenure track and
19 tenure faculty, right?
20    A   Yes.
21    Q   For the rest of this deposition, if I say
22 tenure -- if I say -- actually no, I'm not going to go
23 that way. Never mind. Scratch that.
24       Okay. So how does the fact -- how does the
25 faculty keep abreast, if at all, as to what other members

Page 84

1 of the faculty are doing professionally?
2    MS. WERMUTH: Object to form. Foundation.
3    MR. BRAMWELL: Q   You can answer.
4    A   When you say professionally, are you talking
5 about research, are you talking about teaching, are you
6 talking about service?
7    Q   Let's go with teaching and research.
8    A   So in terms of research, some people will be
9 aware, some won't. It kind of depends. We do some
10 publicizing of maybe articles that might have come out or
11 books that have come out. In terms of -- we do some
12 examples where people faculty come in and talk about the
13 research they're doing.
14       In terms of teaching, those would be just in
15 their own -- sometimes we've done teaching workshops
16 where we've had different -- again lecturers or things
17 that are focused on teaching and some people will talk
18 about their teaching in that context.
19    Q   Do you do e-mail blasts and sort of spotlights
20 and things like that?
21    A   Some. Usually if it's a big thing like a book
22 coming out, then we might do an e-mail blast.
23    Q   Okay. Is part of your job as dean to -- I'll
24 draw some objections, but just have to work through
25 them -- understand the relationships amongst the faculty,

Page 85

1 help manage egos and things like that?
2    MS. WERMUTH: Object to the form.
3    MR. BRAMWELL: Q   You can answer.
4    A   I think it's an explicit part of being a dean
5 but, you know, I think if issues come to me, then I would
6 have to try to address them.
7    Q   Okay. Actually -- I want to jump back in time.
8 I'm sorry for jumping around. I'm maybe not as organized
9 or smart as other people.
10       You mentioned that you had applied to UC
11 Boulder at one point, correct?
12    A   Yes.
13    Q   And UC Boulder is a research school, right?
14    A   Yes.
15    Q   Whereas DePaul is a teaching college?
16    A   Yes. Well, DePaul is a teaching -- I see it as
17 a balance between the two.
18    Q   What do you mean there's a balance between the
19 two?
20    A   I think, for example, the Westchester position
21 that I was offered was semesters where they taught four
22 classes each semester, and if you did a different paper,
23 that was great. I see that as a full teaching college.
24 I think DePaul -- and one of the things I liked about it
25 is it was a balance so they expect a balance between the

22 (Pages 82 - 85)

Page 238

1   THE WITNESS:  You want me to answer now?
2   MR. BRAMWELL:  Q  Please.
3   ▮ ▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬ ▮ ▬▬▬▬▬▬▬▬▬▬▬
8   MS. WERMUTH:  Objection.  Assumes facts not of
9   record.
10  MR. BRAMWELL:  Q  You can answer.
11  ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▮ ▮ ▬▬▬▬▬▬▬▬▬▬▬▬
16  MS. WERMUTH:  Hang on one second.  Assumes facts not
17  of record.
▮ ▬▬▬▬▬▬▬▬▬▬
▮ ▮ ▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬
24  Q  All right.  Now, ▮ actually came over from
25  another school, right?

Page 239

1   A  Yes.
2   Q  Where had ▮ been before?  Can you refresh my
3   recollection?  Do you remember?
4   A  I believe she was at Western Illinois.
5   Q  And she was tenured though at Western Illinois,
6   right?
7   A  Yes.
8   Q  Why didn't she come over to DePaul with tenure?
9   A  DePaul does not typically provide tenure to
10  faculty that are coming in.  It's fair.
11  Q  Is Western Illinois a peer school?
12  A  I don't know where they are in terms of
13  comprehensive university or what tier they are.
14  MR. BRAMWELL:  I'm going to pass you to Ms. Wermuth.
15  MS. WERMUTH:  We'll just take five minutes.
16  MR. BRAMWELL:  Come back at 4:25.
17  MS. WERMUTH:  Perfect.
18  (Off the record)
19  MS. WERMUTH:  Okay.  We have no questions, and we'll
20  reserve signature.
21  MR. BRAMWELL:  Excellent.
22  (Off the record)
23        - - - - - -
24
25

Page 240

1  STATE OF ILLINOIS  )
                       )  SS:
2  COUNTY OF C O O K   )
3
4        The within and foregoing deposition of the
5   aforementioned witness was taken before CAROL CONNOLLY,
6   CSR, CRR and Notary Public, at the place, date and time
7   aforementioned.
8        There were present during the taking of the
9   deposition the previously named counsel.
10       The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the forementioned witness, at the time
17  and place hereinabove referred to.
18       The signature of the witness was not waived,
19  and the deposition was submitted, pursuant to Rule 30 (e)
20  and 32 (d) 4 of the Rules of Civil Procedure for the
21  United States District Courts, to the deponent per copy
22  of the attached letter.
23
24
25

Page 241

1        The undersigned is not interested in the within
2   case, nor of kin or counsel to any of the parties.
3        Witness my official signature and seal as
4   Notary Public in and for Cook County, Illinois on this
5   18th day of March, 2021.
6
7
8        *Carol Connolly*
9   CAROL CONNOLLY, CSR, CRR
    CSR No. 084-003113
10  Notary Public
    One North Franklin Street
11  Suite 3000
    Chicago, Illinois 60606
12  Phone:  (312) 386-2000
13
14
15
16
17
18
19
20
21
22
23
24
25

61 (Pages 238 - 241)