**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA CALVENTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 1:20-cv-03366 |
| **v.** | ) | |
| | ) | Judge John Robert Blakey |
| **SALMA GHANEM and DEPAUL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S  STATEMENT OF ADDITIONAL
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.2(b)(3)**

## I.     PRELIMINARY STATEMENT

In Section II of this pleading, Defendants Salma Ghanem ("Dr. Ghanem") and DePaul

University ("DePaul" or "University") submit their Response to Dkt. No. 82, Plaintiff's Statement

of Additional Undisputed Material Facts (hereinafter "PSAF")[1] pursuant to Local Rule 56.1(a)(3).

In this Section I, Defendants submit the following brief reply to Dkt. No. 84, Plaintiff's Local Rule

56.1(b)(3)(B) Response to Defendants' Statement of Undisputed Material Facts in Support of

Their Motion for Summary Judgment (hereinafter "Plaintiff's RSOF").

Failure to abide by the Local Rules is grounds for the Court to strike briefs, disregard

statements of fact and deem statements of fact admitted. *See Cracco v. Vitran Exp., Inc*., 559 F.3d

---

[1] For ease of reference, Defendants cite to the various Local Rule 56.1 statements filed by the parties as follows:
- Dkt. No. 47, Defendants' Combined Rule 56.1(a)(3) Statement of Undisputed Material Fact in support of their Combined Motion for Summary Judgment ("Defendants' SOF")
- Dkt. No. 84, Plaintiff's Response to Defendants' Statement of Material Fact Pursuant to Local Rule 56.1(b)(2) ("Plaintiff's RSOF")
- Dkt. No. 82, Plaintiff's Statement of Additional Material Fact Pursuant to Local Rule 56.1(b)(3) ("PSAF")

625, 632 (7th Cir. 2009); *see also Spitz v. Proven Winners North America, LLC*, 969 F.Supp.2d 994 (N.D. Ill. 2013) ("[N]othing in Local Rule 56.1 prohibits the movant from also responding to the nonmovant's Rule 56.1(b)(3)(B) statement and this bench's experience is that parties often so respond.").

Plaintiff admits most of Dkt. No. 47, Defendants' Statements of Undisputed Material Facts (hereinafter "SOF"). However, where Plaintiff does attempt to dispute certain statements, those attempts should be disregarded, and those facts should be deemed admitted, because Plaintiff's RSOF fails to comply with Rule 56.1. *See De v. City of Chicago*, 912 F.Supp.2d 709, 716 (N.D. Ill. 2012) (disregarding plaintiff's responses to the defendant's statements of fact that do not comply with Local Rule 56.1). In particular, Plaintiff's RSOF ¶¶ 28, 35, 53, 68, 69, 75, 82, 85, 88, 86, 92, 125 154 are not supported by or misrepresent the evidence cited in the Plaintiff's RSOF. *See De*, 912 F.Supp.2d at 712; *see also, Morissette v. Ghosh*, No. 08 C 2545, 2010 WL 1251443 at *1 (N.D. Ill. Mar. 23, 2010) (citing to a document that does not support the fact asserted is inadequate under Local Rule 56.1).

Additionally, some of Plaintiff's purported disputes of fact are based on argumentative and/or conclusory statements (e.g., Plaintiff's RSOF ¶¶ 48; 54; 56; 60; 66; 70; 72; 103; 106; 107; 108/ 112; 116; 117; 119; 120; 130; 142; 143; 144), or impermissibly assert a subjective disagreement with the fact (e.g., Plaintiff's RSOF ¶¶ 48; 54; 56; 60; 66; 70; 72; 103; 106; 107; 108; 112; 116; 117; 119; 120; 130; 142; 143; 144) and should be disregarded. *See Bagwe v. Sedgwick Claims Management Services, Inc.*, 2014 WL 4413768, at *1 (N.D. Ill. Sept. 5, 2015) ("[A]rguing over the possible inferences stemming from an otherwise undisputed fact does not render that fact in dispute."); *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016) ("a plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact.").

In some instances, Plaintiff contradicts her prior sworn deposition testimony with a new declaration (e.g., Plaintiff's RSOF ¶¶ 4; 35; 75; 83 and Ex. 1 to Plaintiff's RSOF (hereinafter "Plainitff's Dec.") ¶4, 8, 10.) These facts should be disregarded for purposes of summary judgment. *See Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2012 WL 13048975, at *1 (N.D. Ill. Sept. 29, 2012) ("A party cannot create a genuine issue of material fact by contradicting prior sworn testimony.").

Additionally, Plaintiff's efforts to rely upon documents and information which were improperly obtained outside of the discovery process should be disregarded. (Plaintiff's RSOF ¶ 18.) *See Glynn v. EDO Corp.*, 2010 WL 3294347 at *5 (D. Md., Aug. 20, 2010) (holding that it is "an improper litigation tactic" to obtain non-public internal business documents from an employee of an opposing party, and sanctioning plaintiff for acquiring such information from a current employee of defendant rather than through normal discovery channels); *Chamberlain Group, Inc. v. Lear Corp.*, 270 F.R.D. 392 (N.D. Ill. 2010) (citing *Glynn* at *5).

Accordingly, the following paragraphs should be disregarded under Local Rule 56.1: Plaintiff's RSOF ¶¶ 4; 18; 28; 35; 48; 53; 54; 56; 60; 66; 68; 69; 70; 72; 75; 82; 85; 88; 86; 92; 103; 106; 107; 108; 112; 116; 117; 119; 120; 125; 130; 142; 143; 144.

## II. DEFENDANTS RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACT

1. Dr. Calvente is an American of African, Latinx, and Asian descent. (Calvente Dec. ¶1, copy attached as Exhibit A.) Dr. Calvente's areas of research are the black diaspora, performance studies, and cultural studies with a particular interest in how performance and media ethnography can be used to interrogate discursive formations of racism, classism, and hetero/sexism in order to generate possibilities of belonging and social justice. (Answer at ¶8, copy attached as Exhibit B.) She was hired to teach and to research, principally, the uncomfortable

subjects of race and racism in the United States. (Calvente Dec ¶4.) Dr. Calvente's employment at

DePaul ended at the end of the 2019/2020 academic year, following the denial of her application

for tenure and the conclusion of her terminal contract. (*Id*.)

**RESPONSE: Defendants do not dispute the first two sentences of PSAF ¶1. Although immaterial, Defendants dispute Plaintiff "was hired to teach and to research, principally, the uncomfortable subjects of race and racism in the United States." Specifically, during her deposition, Plaintiff testified she applied for a position in intercultural and educational studies which was she claims was seeking someone who specialized in African American performance or Latina performance. (Dkt. No. 47-2, Defendants' SOF at Tab B, Calvente Dep. 19-20.) Plaintiff's declaration at paragraph 4 should be disregarded for this reason. *Von Holdt*, 2012 WL 13048975, at \*1 (N.D. Ill. Sept. 29, 2012) ("It is well settled in this Circuit that litigants may not manufacture issues of fact by submitting affidavits that contradict the substance of their prior deposition testimony.") Defendants do not dispute the fourth sentence of PSAF ¶1.**

2.     Between August 1, 2020 and June 30, 2021, Dr. Calvente was unemployed.

(Calvente Dec ¶5.)

**RESPONSE: Defendants do not dispute PSAF ¶2.**

3.     Dr. Calvente is currently a tenure–track assistant professor at the University of

North Carolina at Chapel Hill ("UNC"). (Calvente Dec ¶2.) Members of the academy see UNC as

more prestigious than DePaul University ("DePaul" or the "University"), and UNC is a Research

1 University as opposed to DePaul, which is a Research 2 University. (Zaeske Dep. 66:10–14,

70:4–71:11, 93:14–95:4, 186:6–13, 207:10–12, copy attached as Exhibit C; Calvente Dep. 307:4–

310:11, copy attached as Exhibit D.) UNC also has more rigorous standards for obtaining tenure

than DePaul. (Zaeske Dep. 201:1–203:9, 203:23–205:13.)

**RESPONSE: Although immaterial, Defendants do not dispute the first sentence of PSAF ¶3. Defendants do not dispute that "UNC is a Research 1 University and that DePaul is a Research 2 University" according to Carnegie Classifications, which are based on research expenditures, the number of research Ph.D.'s conferred, and the number of non-faculty research staff.  (Dkt No. 60-2, Zaeske Dep. at 97.) However, these facts are immaterial.  The remaining statements in PSAF ¶ 3 should be disregarded as improper under Local Rule 56.1 because they are immaterial, conclusory, vague, and improper argument *See De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012) (collecting cases)**

(disregarding statements that are vague, argumentative, immaterial, or conclusory for failing to comply with Local Rule 56.1), and because these statements are impermissibly speculative, unreliable, and not relevant under FRE 702 for the reasons set forth in Dkt. No. 60, Defendants' Motion to Strike Dr. Zaeske's Report and Testimony.

4.      In order to get hired into a tenure track position at a Research 1 University like the UNC, you must show that your chances of earning tenure are very high. (Zaeske Dep. 82:17–83:3, 83:14–84:1, 186:14–190:8, 192:1–193:14.)

**RESPONSE: PSAF ¶4 should be disregarded as improper under Local Rule 56.1 because it is immaterial, conclusory, vague, and improper argument. *See De*, 912 F. Supp. 2d at 714, and because these statements are impermissibly speculative, unreliable, and not relevant under FRE 702 for the reasons set forth in Dkt. No. 60, Defendants' Motion to Strike Dr. Zaeske's Report and Testimony.**

5.      That Dr. Calvente could earn a tenure–track position at UNC after being denied tenure at DePaul makes DePaul's decision to deny tenure to Dr. Calvente highly questionable. (Zaekse Dep. 71:2–22.)

**RESPONSE: PSAF ¶5 should be disregarded as improper under Local Rule 56.1 because it is immaterial, conclusory, vague, and improper argument. *See De*, 912 F. Supp. 2d at 714, and because these statements are impermissibly speculative, unreliable, and not relevant under FRE 702 for the reasons set forth in Dkt. No. 60, Defendants' Motion to Strike Dr. Zaeske's Report and Testimony.**

6.      Tenure track faculty cannot be terminated at will; rather, they can only be terminated in accordance with the Handbook. (Ghanem Dep. 11:24–12:21, copy attached as Exhibit E.) In the case of tenure–track but untenured faculty they may be involuntarily terminated for failing to (i) demonstrate that they are making adequate progress towards tenure following a pre–tenure review, or (ii) earn tenure. (Rinehart Dec. ¶¶3, 6, copy attached as Exhibit F, and Exhibit 1 to the Rinehart Declaration at §§3.2, §3.3.1.1 (Bates labeled Calvente–DePaul 000028, 30).)

**RESPONSE: Although the cited evidence does not support the first clause of the first sentence in PSAF ¶6, Defendants do not dispute that tenure track faculty are not at-will employees, and further do not dispute that tenure track faculty can be terminated in accordance with the DePaul Faculty Handbook.  Although the cited evidence does not**

precisely support the second sentence in PSAF ¶6, Defendants do not dispute that two grounds for not renewing a tenure-track but untenured faculty member's contract include failing to demonstrate that they are making adequate progress towards tenure following a faculty vote conducted in connection with a pre-tenure review, or failing to earn tenure. (*See also* **Plaintiff's RSOF at ¶12) (admitting that the pre-tenure review process results in a vote regarding progress toward tenure and renewal); and Defendants' Response to PSAF ¶ 1, above (admitting Plaintiff was terminated following tenure denial).)**

7.      At DePaul, the process for obtaining tenure differs slightly depending on the structure of a candidate's local academic unit. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) In the College, which does not have separate departments, the first step in the tenure process is an evaluation of the candidate's file by the personnel committee, to which the candidate may respond, and then the tenure faculty. (*Id.*; Murphy Dep. 43:7–15, copy attached as Exhibit G.) After the tenured faculty vote, the dean makes a separate recommendation as to whether the candidate should receive tenure. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) After the faculty votes and the dean makes her recommendation, the candidate's file—including her complete dossier, the vote of the tenured faculty, the response by the candidate, and the recommendation of the dean—is sent to the University Board on Promotion and Tenure (the "UBPT"). (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.)

**RESPONSE: Defendants do not dispute that the process for obtaining tenure may involve more or fewer levels of review depending upon the structure of a candidates local academic structure, but disputes the characterization "differs slightly." (*See also***, **Plaintiff's RSOF at ¶16) (admitting to the levels of review in units without departments); and**

**(Plaintiff's RSOF at ¶154) (admitting sentences 1-6 which describe the levels of review in a unit with departments).) Defendants further do not dispute that Plaintiff has described some of the components of the review process for obtaining tenure in the College. (*See also* Plaintiff's RSOF at ¶¶14-17, the first sentence of ¶18, and ¶¶21-22) (admitting to fuller description of tenure process).)**

8.      In an academic unit that has separate departments (for example, the College of Science and Health), the tenured faculty of the department first evaluates the candidate's file and the candidate may respond to this evaluation. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) Following the department's evaluation, the department chair makes a recommendation as to whether the candidate should receive tenure. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) Next, the tenured faculty of the college (or a separate committee thereof) evaluates the file and the candidate may respond to this evaluation. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) The dean of the college then makes a recommendation as to whether the candidate should receive tenure. (Rinehart Dec. ¶¶3, 6, copy attached as Exhibit E, and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3, 3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.) After these processes, the candidate's file—including his complete dossier, the votes of the faculty, and the recommendation of both the department chair and of the dean—go to the UBPT. (Rinehart Dec. ¶¶3, 6, copy attached as Exhibit E, and Exhibit 1 to the Rinehart Declaration at §§3.5.1.1(a), §3.5.3,

3.5.4, 3.5.4.2, 3.5.4.3, 3.5.5, 3.5.5.2, 3.5.5.3, 3.5.5.4, 3.5.5.5, 3.5.5.6, 3.5.6.1, 3.5.6.3 (Bates labeled Calvente–DePaul 000036–36, 39–43); Answer at ¶10.)

**RESPONSE: Defendants do not dispute that Plaintiff has identified some of the levels of review involved in the tenure process in local academic units with departments.**

9.      The UBPT's recommendation is entitled to more weight than any recommendation that comes out of a local academic unit and Dr. Ghanem has acknowledged this fact. (Ghanem Dep. 50:9–51:3.)

**RESPONSE: Defendants do not dispute that Dr. Ghanem testified that the UBPT "has more weight" or that it "carries a little bit more weight" "because" the Handbook states "that only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by UBPT."  (Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 48:15-51:10.)**

10.      DePaul's rules are very clear that the provost should overturn the UBPT's recommendation only in rare instances and for compelling reasons. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §3.5.6.3 (Bates labeled Calvente–DePaul 000043); Answer at ¶10; Ghanem Dep. 48:20–50:18.) This means that the provost may not simply reject the UBPT's recommendation because she disagrees with it. (Ghanem Dep. 57:2–58:8 and Exhibit 18 to Ghanem Dep. at page 2 (Bates labeled LC004069).) Rather, to overturn the recommendation of the UBPT—which represents voice of the faculty—the Provost should find that the UBPT recommendation was manifestly one that was groundless. (*Id.*) In other words, to overturn the UBPT, the provost must find that (i) doubt existed where the Board found none, or (ii) where the Board expressed its doubt, the Provost found that the Board's reasons for doubt were completely unfounded. (*Id.*)

**RESPONSE: Defendants do not dispute that Section 3.5.6.2 of the Faculty Handbook provides that the Provost may overturn the UBPT's recommendation only in rare instances and for compelling reasons.  Defendants state further that phrase "are very clear," is improper argument for inclusion in a 56.1 statement. *See De*, 912 F. Supp. 2d at 714. The second, third, and fourth sentences of PSAF ¶10 should be disregarded as improper under**

Local Rule 56.1 because these statements are immaterial, unsupported by the record, conclusory, vague, and improper argument. *See De*, 912 F. Supp. 2d at 714. Specifically, LC0004069 is an end-of year-report from members of the 2019-2020 UBPT dated September 23, 2020 (Plaintiff's RSOF at pp. 100-108, also marked LC004068-4076 (hereinafter "2020 Memo"). This 2020 Memo was authored by a UBPT distinct in composition from the 2018-2019 UBPT that reviewed Plaintiff's tenure case and was issued after Plaintiff had already left DePaul. (*Id.*) The 2020 Memo addressed among other things, the 2019-2020 UBPT members' interpretation of the Faculty Handbook provision regarding the Provost's authority to reject a UBPT's recommendations on tenure "in rare circumstances and for compelling reasons." (*Id.* at pp. LC004069-4070.) There is no record evidence that any portion of this report was ever adopted, and in fact, Dr. Ghanem testified to her disagreement with it. (Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 61:4-64:16.) Even so, the document itself describes its interpretation of "manifestly groundless" as circumstances where "doubt existed where the Board found none, or where the Board expressed its doubt, the Provost found the Board's reasons(s) for doubt were completely unfounded." (2020 Memo at p. LC004069.) Notably, here, Dr. Ghanem stated in her letter denying Plaintiff tenure that "before granting tenure, the university should have *no reasonable doubt* about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals," and that doubt existed for Dr. Ghanem because the "slim majority voting in favor of [her] application at the University level, [did] not, in [Dr. Ghanem's] view, sufficiently answer the significant concerns raised by Plaintiff's colleagues in Communication." (*See* Plaintiff's RSOF at ¶ 130) (admitting to contents of Dr. Ghanem's tenure denial letter).)

Separately, however, these statements and the document should be disregarded because Plaintiff improperly obtained the document outside of the discovery process.[2] *See Glynn v. EDO Corp.*, 2010 WL 3294347 at *5 (D. Md., Aug. 20, 2010) (holding that it is "an improper litigation tactic" to obtain non-public internal business documents from an employee of an opposing party, and sanctioning plaintiff for acquiring such information from a current employee of defendant rather than through normal discovery channels); *Chamberlain Group, Inc. v. Lear Corp.*, 270 F.R.D. 392 (N.D. Ill. 2010) (citing *Glynn* at *5). PSAF ¶ 26 should be stricken for this independent reason.

11.    Dr. Ghanem testified that she did not understand the sentence "[t]his language,

especially because both conditions are required, powerfully suggests that the decision to overturn

may not be made simply because the provost would have voted differently had the provost been a

voting member of the board" on page 2 of the document identified as Exhibit 18 to her deposition.

(Ghanem Dep. 61:4–63:13.)

---

[2]    Defendants put Plaintiff on notice of this improper litigation tactic at the time it became known to Defendants that Plaintiff had obtained the document. (Attached herein as Tab 1, Emails between counsel for Defendants and counsel for Plaintiff regarding 2020 Memo.)

**RESPONSE: Although immaterial, PSAF ¶11 should be disregarded as improper under Local Rule 56.1 because it is immaterial conclusory, vague, and improper argument.** *See De*, **912 F. Supp. 2d at 714. As noted above, Plaintiff's reliance on the 2020 Memo should be disregarded because this document is immaterial. Specifically, the 2020 Memo is an end-of-year-report from members of the 2019-2020 UBPT dated September 23, 2020. (2020 Memo at p. LC004068.) This 2020 Memo was authored by a UBPT distinct in composition from the 2018-2019 UBPT that reviewed Plaintiff's tenure case and the report was issued after Plaintiff had already left DePaul. (*Id.*; Plaintiff's RSOF ¶122.) The 2020 Memo addressed among other things, the 2019-2020 UBPT members' interpretation of the Faculty Handbook provisions. (2020 Memo.) There is no record evidence that any portion of this report was ever adopted, and in fact, Dr. Ghanem testified to her disagreement with it. (Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 61:4-64:16.) In addition, these statements and the document should be disregarded because Plaintiff improperly obtained the document outside of the discovery process.[3]** *See Glynn v. EDO Corp*., **2010 WL 3294347 at \*5 (D. Md., Aug. 20, 2010) (holding that it is "an improper litigation tactic" to obtain non-public internal business documents from an employee of an opposing party, and sanctioning plaintiff for acquiring such information from a current employee of defendant rather than through normal discovery channels);** *Chamberlain Group, Inc. v. Lear Corp.*, **270 F.R.D. 392 (N.D. Ill. 2010) (citing** *Glynn* **at \*5).**

12.    Members of the UBPT are appointed by Faculty Council, which is the unit that represents the voice of faculty at DePaul with respect to shared governance. (Ghanem Dep. 58:18–60:5.) Dr. Ghanem has never lost confidence in any of the members of the UBPT. (Ghanem Dep. 55:23–56:8.)

**RESPONSE: Defendants do not dispute PSAF ¶12.**

13.    Shared governance is a process where faculty input is taken in terms of different decisions at the University. (Ghanem Dep. 60:6–10.) Principles of shared governance acknowledge that faculty has a significant role, together with the administration, in the operation of the University, including the appointment, tenuring, and promotion of faculty. (Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §1.2.1(3) (Bates labeled Calvente–DePaul

---

[3]    Defendants put Plaintiff on notice of this improper litigation tactic at the time it became known to Defendants that Plaintiff had obtained the document. (Attached herein as Tab 1, Emails between counsel for Defendants and counsel for Plaintiff regarding 2020 Memo.)

000003).) While the provost has a faculty appointment, she is not considered to be faculty for

purposes of shared governance. (Ghanem Dep. 60:11–14.)

**RESPONSE: Defendants do not dispute the first sentence of PSAF ¶13. Although the cited evidence does not precisely support the second sentence in PSAF ¶14, Defendants do not dispute that Section 1.2.1(3) of the Faculty Handbook, which is cited by Plaintiff, states that "faculty is vested with primary governance responsibility of academic and scholarly activities and faculty personnel matter within the University, including . . . standards and procedures concerning faculty promotion, tenure, appointments, retention, and performance," and that Section 1.2 states that "in order to carry out these responsibilities, the faculty will work closely with the academic administrators and the officers of the University." (Dkt. No. 50-2, Defendants' SOF at Tab D, Ex. 1, p. 00003 at ¶1.2.)**

14.    As a practical matter, few faculty take advantage of the appeals process, with the

current University president having only heard one or two appeals from a provost's decision to

deny tenure. (Esteban Dep. 69:11–70:5, copy attached as Exhibit H.)

**RESPONSE: Defendants do not dispute Dr. Esteban testified he heard one or two appeals during his time as University President. Defendants dispute the clause, "As a practical matter, few faculty take advantage of the appeals process,"  and it should be disregarded as improper under Local Rule 56.1 because it is immaterial, conclusory, vague, assumes facts not of record, is unsupported by the cited authority, and improper argument. *See De*, 912 F. Supp. 2d at 714.**

15.    By its plain language, DePaul's Handbook permits an appeals committee (*i.e.,* not

the provost) to recommend a tenure denial be overturned because "the evaluation of the candidate

[during the tenure or promotion process] deviated from procedures in the Faculty Handbook or in

college or local academic unit guidelines, and the deviation was material to the final decision."

The decision as to whether procedures were violated belongs to the University President, who has

discretion to award an appropriate remedy, which is not necessarily tenure. (Rinehart Dec. ¶¶3, 6

and Exhibit 1 to the Rinehart Declaration at §5.1.2.3 (Bates labeled Calvente–DePaul 000080–

81).)

**RESPONSE: Defendants do not dispute the first sentence of PSAF ¶15, except the phrase "(i.e., not the provost)," which is unsupported by the cited authority and should be disregarded as improper argument. Specifically, the Faculty Handbook allows the provost to overturn a UBPT recommendation "only in rare instances and for compelling reasons,"**

**and Dr. Ghanem explained compelling reasons could include procedural grounds. (Dkt. No. 11, Answer at ¶ 10; Dkt. No. 50-2, Defendants' SOF at Tab D, Ex. 1, p. 000043 at ¶ 3.5.6.3; Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 51:8–54:18, 55:5-17.) The second sentence of PSAF ¶15 should be disregarded as improper under Local Rule 56.1 because the cited evidence does not support the statement and it is improper argument. *See De*, 912 F. Supp. 2d at 714. Defendants do not dispute, however, that on an appeal from a tenure denial alleging procedural violations, the President is the ultimate decisionmaker, who can implement an appropriate remedy. (Dkt. No. 50-2, Defendants' SOF at Tab D, Ex. 1, p. 000043 at ¶ 5.1.2.3.)**

16.     It is a violation of the Handbook to making tenure decisions based on a candidate's race or her opposition to unlawful employment practices. (Answer at ¶11.)

**RESPONSE: Defendants do not dispute PSAF ¶16.**

17.     Before granting tenure, the university should have no reasonable doubt about the faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission. (Ghanem Dep. 44:4–45:18; Rinehart Dec. ¶¶3, 6 and Exhibit 1 to the Rinehart Declaration at §§3.1, 3.3.1.3, 4.2 (Bates labeled Calvente–DePaul 000028, 31, 55).) Dr. Ghanem testified that she interpreted this language to mean that there should be no question about the faculty member's demonstrated qualifications and continued capacity. (Ghanem Dep. 45:20–46:2.)

**RESPONSE: Defendants do not dispute PSAF ¶17.**

18.     During her March 2015 formal review, the tenured faculty at the College found that Dr. Calvente was making adequate progress towards tenure with respect to her service, but not with respect to her teaching or her research. (Calvente Dep. 188:9–189:13 and Exhibit 50 (Bates labeled Calvente–DePaul 29079–29086).)

**RESPONSE: Defendants do not dispute PSAF ¶18.**

19.     Following the March 2015 formal review, Dr. Calvente met with Dr. Ghanem. During this meeting, Dr. Ghanem said that Dr. Calvente was an extraordinary teacher and that her Woodrow Wilson Fellowship was "a huge deal." (Calvente Dep. 221:14–222:10, 300:1–301:3.)

**RESPONSE: Defendants do not dispute PSAF ¶19.**

20.     During her November 2017 formal review, the faculty found that Dr. Calvente was making adequate progress towards tenure in the area of research, but inadequate progress towards tenure in the areas of teaching and service. (Calvente Dep. 240:11–11 and Exhibit 108 (Bates labeled Calvente–DePaul 0000253–264).)

**RESPONSE:  Defendants do not dispute PSAF ¶20.**

21.     Dr. Calvente increased her service between her March 2015 review and her November 2017 review. (Calvente Dec. ¶6.)

**RESPONSE: PSAF ¶21 should be disregarded as improper under Local Rule 56.1 because it is immaterial and the phrase "increased her service" is conclusory, vague, and improper argument. Even if the Court accepts the assertion in Paragraph 6 of Plaintiff's declaration, Plaintiff was informed that the additional service she identifies therein was not the sort of "substantial commitments" that she needed to obtain tenure.  (*See* Plaintiff's RSOF at ¶¶ 56, 66) (admitting that in 2017 "the only substantive College-level committee on which Plaintiff was participating was the Term Faculty Review Committee");( Plaintiff's RSOF at ¶72) (admitting that her 2017 review informed her that the tenured faculty would "need to see significant changes in her service as evidenced through a track record of substantial contributions to her unit and meaningful committee work at the college level … [and g]reater volunteering for university committee service[.]"); (Plaintiff's RSOF at ¶87) (admitting she sought out university and college service in January 2018, after her 2017 probationary review).)**

***Additional facts concerning Dr. Calvente's meeting with Salma Ghanem in December 2017.***

22.     On or about December 16, 2017, Dr. Calvente met with Dr. Ghanem to discuss (among other things) her recent review by the College of Communication's personnel committee and a vote by the tenured faculty of the College of Communications (the "College") that Dr. Calvente's contract not be renewed. (Calvente Dep. 256:6–258:3.) During that meeting, Dr. Calvente asked Dr. Ghanem to call DePaul's Office of Institutional Diversity and Equity ("OIDE")

in connection with the faculty's recommendation that her contract not be renewed. (Calvente Dep. 261:24–262:5; Calvente Dec. ¶8.) Dr. Ghanem made the call as Dr. Calvente requested; however, Dr. Ghanem told Dr. Calvente not to follow through with her complaint to OIDE, that she should wait until after her tenure vote, and that the then–provost knew about her case. (Calvente Dep. 256:19–258:3, 262:7–20; Calvente Dec. ¶8.) Dr. Ghanem also told Dr. Calvente that she would be fine for tenure. (Calvente Dep. 300:1–22.)

**RESPONSE: Defendants do not dispute the first sentence of PSAF¶22. Although immaterial, the second sentence of PSAF ¶22 should be disregarded because it contradicts her prior sworn testimony, which was that Plaintiff had told Dr. Ghanem she was going to file with OIDE, not that she asked Dr. Ghanem to make the call. (Dkt. No. 47-2, Defendants' SOF at Tab B, Calvente Dep. at 255:6–263:9.); *see also Von Holdt*, 2012 WL 13048975, at \*1 (N.D. Ill. Sept. 29, 2012) ("It is well settled in this Circuit that litigants may not manufacture issues of fact by submitting affidavits that contradict the substance of their prior deposition testimony."). Defendants do not dispute the third sentence of PSAF¶22, except the phrase "as Dr. Calvente requested," which is not supported by the cited authority. Defendants dispute that Dr. Ghanem told Plaintiff she would be fine for tenure. Rather, Plaintiff testified that she told Dr. Ghanem she "surpassed the standards for tenure," and Dr. Ghanem did not disagree. (Dkt. No 47-2, Defendants' SOF at Tab B, Calvente Dep. 300:1-301:13.)**

23.     Following her December 16, 2017 meeting with Dr. Ghanem, Dr. Calvente contacted Ms. Schaffer and told her that she did not want to proceed with her complaint of discrimination. (Calvente Dep. 262:7–20.)

**RESPONSE: Defendants do not dispute PSAF ¶23, except the phrase "following her December 16, 2017 meeting," which is not supported by the record and which mischaracterizes the record. *De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012) Specifically, after Dr. Ghanem reported Plaintiff's complaint to Ms. Schaffer, OIDE reached out to Plaintiff, and asked to set up a meeting, but Plaintiff chose not to take any further action at the time. (Dkt. No 47-2, Defendants' SOF at Tab B, Calvente Dep. at 262:7–266:13); (Plaintiff's RSOF at ¶75) (noting only basis for denial is ¶8 of her declaration.)**

24.     ▇▇▇▇▇▇▇▇▇ was a white tenure track professor in the College who was recommended for non–renewal in calendar year 2017, and whose contract Dr. Ghanem decided not to renew before Dr. ▇▇▇▇▇ applied for tenure. (Ghanem Dep. 143:22–144:2, 163:1–3; Calvente Dec. ¶7.)

**RESPONSE: Defendants do not dispute PSAF ¶24.**

25. On or around October 10, 2018, Dr. Calvente and Dr. ██████ met with Dr. Ghanem in her office to discuss discrimination within the College. (Calvente Dep. 270:21–271:6; Ghanem Dep. 152:4–8.) During that meeting Dr. ████████'s name came up. (Calvente Dep. 271:22–272:14.) Dr. Ghanem said that she did not want to discuss Dr. ████████'s situation; however, Dr. Ghanem did let slip that she heard a rumor that she terminated Dr. ██████ so that she could later fire women of color with impunity. (*Id.*) In response, Dr. Calvente told Dr. Ghanem that she wrote the letter on Dr. ██████'s behalf that made this accusation. (Calvente Dep. 271:22–272:14, 277:5–278:7.) And the record reveals that Dr. Calvente indeed wrote a letter in support of Dr. ██████'s appeal stating that Dr. ██████ was caught "in the crossfire" so that the College can show that it terminates white junior faculty so as to avoid a charge that it unfairly targets faculty of color. (Calvente Dep. 265:5–266:13 and Exhibit 132 (Bates labeled Calvente–DePaul 0007095).)

**RESPONSE: Defendants do not dispute the first sentence of PSAF ¶25. Defendants admit Dr. ██████o's name came up during the meeting because Dr. ██████ brought up his name. (Plaintiff's RSOF at ¶82.) The first clause of the third sentence should be disregarded because it is not supported by the cited materials. The second clause of the second sentence contains improper argument with the statement that Dr. Ghanem "let it slip" and she could terminate women of color "with impunity." *See De*, 912 F. Supp. 2d at 714. However, Defendants do not dispute that Plaintiff testified that Dr. Ghanem stated "she didn't want to hear about ████████████ because then we were questioning her leadership and authority, and then she added that she heard a rumor that she was -- she terminated ██████'s contract so she can fire women of color, so she could terminate women of color. " (Dkt. No. 47-2, Defendants' SOF at Tab B, Calvente Dep. at 272.) Defendants do not dispute the fourth sentence of PSF ¶41, except for the clause "in response" and "that made this accusation," which is not supported by the cited authority. Defendants do not dispute Plaintiff wrote a letter on Dr. ██████'s behalf, but she did not testify that she told Dr. Ghanem in that meeting that her letter "made this accusation." And in fact, Plaintiff testified that during the meeting with Dr. Ghanem she did not accuse her of discriminatory or retaliatory conduct and her letter did not accuse Dr. Ghanem of any improper conduct. (Dkt. No. 47-2, Defendants' SOF at Tab B, Calvente Dep. 298:24-299:11; Dkt. No. 48-18, Defendants' SOF at Tab B, Ex. 132 at pp. 7094-7097); (Plaintiff's RSOF at ¶79, 82) (admitting that Plaintiff did not complain about Dr. Ghanem's conduct in her letter.) Although immaterial,**

**Defendants dispute Plaintiff wrote in her letter that "Dr. ███████ was caught 'in the crossfire'" so that the College can show it "terminates white junior faculty so as to avoid a charge that it unfairly targets faculty of color." These statements are not supported by the cited authority, as they are not contained in her letter and should therefore be disregarded as improper under Local Rule 56.1.**

26.     After Dr. Calvente told Dr. Ghanem that she wrote the letter on Dr. ███████'s behalf, Dr. Ghanem called Ms. Schaffer at OIDE and left a voice mail stating that Dr. ████ and Dr. Calvente believed themselves to be victims of discrimination. (Calvente Dep. 272:15–273:4.) Then Dr. Ghanem ended the meeting. (Calvente Dep. 273:5–273:7.)

**RESPONSE: Defendants do not dispute PSAF ¶26.**

27.     Dr. Ghanem, as a person in a supervisory position at the College, had a duty to report any complaints of discrimination brought to her by faculty to OIDE. (Ghanem Dep. 73:9–74:4.)

**RESPONSE: Defendants do not dispute PSAF ¶27.**

28.     After the October 10, 2018 meeting, Dr. Calvente and Dr. Ghanem never again had a meaningful conversation. (Calvente Dec. ¶9.)

**RESPONSE: PSAF ¶28 should be disregarded as improper under Local Rule 56.1 because it is immaterial and the phrase "meaningful conversation" is conclusory, vague, and improper argument. Additionally, Plaintiff's declaration regarding this statement should be disregarded because it is not consistent with Plaintiff's deposition testimony which was that Dr. Ghanem told them that she wanted to continue the conversation, and that they should schedule another meeting with her. (Plaintiff's RSOF at ¶83; Dkt. No. 47-2, Defendants' SOF at Tab B, Calvente Dep. at 272:16–273:4.); *see also Von Holdt*, 2012 WL 13048975, at \*1 (N.D. Ill. Sept. 29, 2012) ("It is well settled in this Circuit that litigants may not manufacture issues of fact by submitting affidavits that contradict the substance of their prior deposition testimony.")**

29.     In recommending that Dr. Calvente receive tenure, the UBPT found that "Dr. Calvente's teaching, as evidenced by consistently high student evaluations, a strong student report,

and positive peer evaluations, met the standard of consistent effectiveness established in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at pages 1–2.)

**RESPONSE: Defendants do not dispute PSAF ¶29, but note that the quoted language reflects the findings made by the 4-member UBPT majority, not the full 7-member UBPT. (Dkt. No. 48-34, Defendants' SOF at Tab B, Exhibit 215 at pp. 23086-23087.)**

30. In recommending that Dr. Calvente receive tenure, the UBPT also examined Dr. Calvente's research and scholarly contributions and found that her "total body of work consists of, at minimum, 3 peer–reviewed articles and 3 peer–reviewed book chapters during the probationary period, in additional [sic] to 6 papers in international conferences and 10 presentations in national conferences," and that the "significance and quality of her work were praised by [her] external reviewers and echoed by the faculty in the unit report." (Answer at ¶28 and Exhibit 5 to Complaint at pages 2–3.) Thus, the UBPT found "scholarship to have met the minimum standard of notable in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at page 3.)

**RESPONSE: Defendants do not dispute PSAF ¶30, but note that the second and third quoted sections reflect the findings made by the 4-member UBPT majority, not the full 7-member UBPT. (Dkt. No. 48-34, Defendants' SOF at Tab B, Exhibit 215 at p. 23088.)**

31. In recommending that Dr. Calvente receive tenure, the UBPT found Dr. Calvente's overall service contributions to be "sufficiently strong to meet the criteria for service in the Faculty Handbook." (Answer at ¶28 and Exhibit 5 to Complaint at page 3.)

**RESPONSE: Defendants do not dispute PSAF ¶31, but note that the quoted language reflects the findings made by the 4-member UBPT majority, not the full 7-member UBPT. (Dkt. No. 48-34, Defendants' SOF at Tab B, Exhibit 215 at p. 23088.)**

32. Notwithstanding the UBPT's recommendation that Dr. Calvente receive tenure, Dr. Ghanem rejected the recommendation. (Answer at ¶29 and Exhibit 6 to Complaint.) In so doing, Dr. Ghanem wrote that Dr. Calvente received a careful review at all levels and that experienced faculty had evaluated her work. (*Id.*) She also wrote that she did not consider the UBPT's 4–3 vote

to outweigh the alleged significant concerns raised at the College level, which voted 2–19 against

Dr. Calvente. (*Id.*)

**RESPONSE: Defendants do not dispute PSAF ¶32.**

33. An appeals committee found that Dr. Calvente was unfairly evaluated at multiple

points during her probationary period and that procedural deviations were material to the final

decision to deny tenure and promotion. (Answer at ¶31 and Exhibit 7 to the Complaint.)

**RESPONSE: Although immaterial, Defendants do not dispute the appeals committee dismissed two grounds of appeal, including the ground of discrimination, and made a finding on the third ground, and that Plaintiff has accurately summarized the finding on the third ground of appeal in PSAF ¶33.**

34. According to Dr. Ghanem, Dr. ███ had no record of complaining about

discrimination within his academic unit or the broader University. (Ghanem Dep. 67:18–21.)

**RESPONSE: Defendants do not dispute PSAF ¶34.**

35. In evaluating Dr. ███'s application and rejecting it by a vote of 6–1, the UBPT

identified significant concerns with Dr. ███'s teaching, including that (i) Dr. ███'s teaching

evaluations are frequently below three on a five–point scale, (ii) there was a pattern in Dr. ███h's

evaluations that showed an inability to communicate with the majority of his students, (iii) forty

to fifty percent of Dr. ███'s students rated Dr. ███'s ability to communicate subject matter

as inadequate, and (iv) the regular recurrence of student concerns with communicating his

expectations for performance, the criteria by which performance is to be evaluated, and the

timeliness of his feedback to students, raises questions about the consistent effectiveness of Dr.

███'s teaching. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul

037293–95).)

**RESPONSE: Although immaterial, Defendants do not dispute PSAF ¶35, except that the terms "significant concerns" and "with the majority of his students" are not supported by the evidence cited and are improper argument. *See De*, 912 F. Supp. 2d at 714.**

36.     In continuing to evaluate Dr. ██████'s application for promotion, the UBPT next noted significant concerns about Dr. ██████'s scholarship, including the quantity of the work, the consistency of the work, and the quality of the work. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).) More specifically, the UBPT noted that Dr. ██████'s scholarship appeared limited to multi–authored pieces and that the UBPT was not provided (despite its requests) information concerning Dr. ██████'s contributions to those multi–authored pieces. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).)

**RESPONSE: Although immaterial, Defendants do not dispute PSAF ¶36, except that the term "significant concerns" is not supported by the evidence cited and is therefore, improper argument.** *See De*, **912 F. Supp. 2d at 714.**

37.     Dr. Ghanem agrees that Dr. ██████ received a careful review at all levels, that experienced faculty evaluated Dr. ██████'s work, and that the UBPT voted overwhelmingly against Dr. ██████'s application for tenure. (Ghanem Dep. 105:16–106:1.) Dr. Ghanem also read the entirety of the UBPT's report recommending that Dr. ██████ not receive tenure before she granted tenure to Dr. ██████. (Ghanem Dep. 102:3–103:9 and Exhibit 27 (Bates labeled Calvente–DePaul 037293–95).)

**RESPONSE: Defendants do not dispute PSAF ¶37.**

38.     Dr. Ghanem wrote that she awarded tenure to Dr. ██████ in recognition of his "achievements in scholarship, teaching, and service, and in expectation of [his] continued service to [DePaul's] students, the university, and [his] field." (Ghanem Dep. 66:13–67:16 and Exhibit 1 (Bates labeled DePaul–Calvente 013833–34.) Dr. Ghanem *did not* write that she awarded tenure to Dr. ██████ because she believed that he failed to receive a fair process. (*Id.*)

**RESPONSE: Defendants do not dispute the first sentence of PSAF ¶38. Although immaterial, the second sentence of PSF ¶59 misrepresents the evidence and should therefore be disregarded.** *See Boyd v. City of Chicago*, **225 F.Supp.3d 708, 715 (N.D. Ill. 2016). Specifically, Dr. Ghanem testified that her "compelling reason [for awarding Dr. ███ tenure] was a procedural issue based on the informal review that he had received six months before he was going up for tenure where he had a unanimous endorsement by his department." (Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 106.) Although Defendants admit Dr. Ghanem did not use the term "fair process" in her letter, Dr. Ghanem wrote that "[his] department colleagues . . . had voted unanimously (8-0) during a formal review less than six months earlier to extend [his] contract, in full knowledge that [he] would be applying for tenure the following fall" and that although the formal review "include[d] a vote on contract renewal, [it did not], as required by the Handbook, include a vote on whether [he was] making adequate progress toward tenure." (Dkt. No. 55-2, Defendants' SOF at Tab F, Exhibit 1 at pp. 013833-013834.)**

39.    Dr. Ghanem was asked how, in light of the fact that Dr. ███ received a careful review at all levels, that experienced faculty evaluated Dr. ███'s work, and that the UBPT voted overwhelming against him, that anyone could say that "the university has no reasonable doubt as to Dr. ███'s demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals of academic mission when he received a six–to–one no vote at the UBPT." (Ghanem Dep. 105:16–13.) Dr. Ghanem was unable to provide a substantive answer to this question and, instead, relied on alleged procedural defects in Dr. ███'s process to support her decision. (*Id.*)

**RESPONSE: Although immaterial, Defendants do not dispute Plaintiff's counsel asked Dr. Ghanem some form of the question stated in the first sentence of PSAF ¶39.**

**Although immaterial, Defendants dispute the first clause of the second sentence, which states "Dr. Ghanem was unable to provide a substantive answer to this question." This clause does not comply with Local Rule 56.1 and should be disregarded because it is conclusory and improper argument and is unsupported by the record.** *See De*, **912 F. Supp. 2d at 714. It is also unsupported by the record evidence, which demonstrates she did answer counsel's question and in any event, Dr. Ghanem provided a "substantive" explanation for her decision to award tenure to Dr. ███, based on the merits of his case in her letter to him. (Dkt. No. 55-2, Defendants' SOF at Tab F, Exhibit 1 at pp. 013833-013834.) Specifically, she explained that the Chemistry Chair's letter "systematically and convincingly" countered concerns about his teaching effectiveness and research agenda; that he "clearly satisfied" the Chemistry Department's guidelines that require faculty to publish at minimum one peer-reviewed publication every other year, with at least one in the area of**

expertise for which he was hired; and that her "own reading" of his teaching record more closely matched the Department and College reports.[4] (*Id*. at 013833) In awarding tenure, based on her review of his dossier, including Dr. ███████'s responses to the department, college, and UBPT recommendation reports, and her attendance at the UBPT hearing, she wrote that her decision was in "recognition of [his] achievements in scholarship, teaching, and service." (*Id*. at 013834.) Dr. Ghanem also addressed the UBPT's substantive concerns about Dr. ███████'s teaching and research record during his probationary period. (*Id*. at 013833-013834.) Specifically, with respect to research, Dr. Ghanem wrote:

> [T]he formal review summary evaluation of your research record clearly indicates that you had met the bar for promotion and tenure: "The review committee is pleased to see the progress that Dr. ███████ has made since joining the department as an Assistant Professor. for promotion and tenure suggest that faculty should publish at minimum one peer-reviewed publication every other year, with at least one publication in the area of expertise for which the candidate was hired. Dr. ███████ has already clearly satisfied this minimum requirement. The committee encourages him to maintain his research momentum to further strengthen his case for promotion and tenure on the basis of research." There is no indication that your research momentum has flagged since this evaluation, and some probability that the perceived lack of coherence in your research agenda is an effect of the cross-disciplinary nature of your research and scholarship. For all the above reasons, I consider your record of research and publication to have met the standard for promotion and tenure.

(*Id*.) With respect to teaching, Dr. Ghanem wrote:

> My own reading of your teaching record more closely matches the department and college reports. I am sure that, given your own focus on science education, you will continue to develop and improve your teaching, as needed.

(*Id*. at 013834.) Additionally, Dr. Ghanem further stated that she rejected the UBPT's recommendation against tenure because less than six months prior to the commencement of his tenure case, Dr. ███████ had received a performance review that had unanimously indicated everything was excellent and his department's tenure review report referenced that he "either meets or exceeds" the department's teaching expectations, and that while the faculty unanimously voted to extend his contract in that review they failed to vote on his progress toward tenure as required by the Handbook, and Dr. Ghanem felt that reversal of the UBPT's recommendation was warranted on procedural grounds. (*Id*. at 013833-013834;

---

[4] *See also* Dkt No. 50-5, Tab D, Exhibit 4 at p. 36971-76 ( the Chair of the Department of Chemistry and Biochemistry stating she "strongly" recommended Dr. ███████ for promotion and tenure, noting her disagreement with the Department's Personnel Committee); *Id*. at pp. 36984-36986 (The Dean writing "[g]iven that Dr.███████ has met the teaching criterial, exceeded the service criteria and objectively met the scholarship criteria, I recommend favorable action on Dr. ███████ candidacy to associate professor with tenure.")

*see also* **Dkt. No. 55-1, Defendants' SOF at Tab F, Ghanem Dep. at 54–55, 106.) Specifically, Dr. Ghanem stated in her letter:**

> **[Y]our department colleagues, who were evenly divided in their evaluation of your application for the above reasons, had voted unanimously (8-0) during a formal review less than six months earlier to extend your contract, in full knowledge that you would be applying for tenure the following fall (per your chair, who clarified the timing subsequent to the UBPT hearing). The Unit's . . . formal review report[5] (which you submitted as an addition to your dossier) includes a vote on contract renewal, but does not, as required by the Handbook, include a vote on whether you were making adequate progress toward tenure.**

**(*Id*. at p. 013833.) Defendants do not dispute that Dr. Ghanem "relied on alleged procedural defects in Dr. ██████ process to support her decision."**

40.    Although Dr. ██████ suffered race–based aggressions within the College, she did not publicly complain about discrimination at DePaul or within the College until after she received tenure because she was afraid of retaliation. (██████ Dep. 64:8–70:2, 74:12, 89:6–94:5.)

**RESPONSE: Defendants dispute PSAF¶40.  As Plaintiff admitted, Dr. ██████ complained of race discrimination to Dr. Ghanem in October 2018, and pursued that complaint for some period of time.  ((*See* Plaintiff's RSOF ¶ 82) (admitting the first sentence that "on October 10, 2018, Plaintiff and Dr. ██████ met with Dr. Ghanem in person to discuss their concerns about their perceived racially hostile environment in the College"); (Plaintiff's RSOF ¶ 84) (admitting that Dr. ██████ testified that she decided to pursue that complaint with OIDE).)**

Respectfully submitted,

By: */s/ Anneliese Wermuth*
Attorney for Defendants, Salma Ghanem and
DePaul University

Anneliese Wermuth (#6270970)
Nandini K. Sane
Cozen O'Connor
123 N. Wacker Drive, Ste. 1800

---

[5] *See also* **Dkt No. 50-5, Tab D, Exhibit 4 at p. 37272-37286 (the Departmental Personnel Committee noting that Dr. ██████ research record had "already clearly satisfied the minimum requirement" for promotion and tenure (p. 3728), and stating, "Dr. ██████ has contributed notable service at all levels of the university and to the profession/community," (p. 37285), and that "[c]lose examination of the materials submitted by Dr. ██████ made clear that, overall, he exhibits a number of characteristics typical of an effective teacher" (p. 37273).)**

Chicago, IL 60606
Telephone:     312/474-7876
Email: awermuth@cozen.com
Email: nsane@cozen.com

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on January 31, 2022 she electronically filed

the foregoing with the Clerk of the United States District Court for the Northern District of Illinois

using the ECF system, which will send notification of such filing to the following counsel of

record:

> Fitzgerald T. Bramwell
> Law Offices of Fitzgerald Bramwell
> 77 West Wacker Drive, Suite 4500
> Chicago, IL 60601
> bramwell@fitzgeraldbramwell.com

> s/ *Anneliese Wermuth*
> Anneliese Wermuth