## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LISA CALVENTE , | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-CV-03366 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| SALMA GHANEM and DEPAUL | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Professor Lisa Calvente sues her former employer, DePaul University, and its Acting Provost, Dr. Salma Ghanem, for denying her tenure in 2019, alleging that they racially discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981; and breached contractual duties under DePaul's Faculty Handbook. [1]. Defendants now move for summary judgment [45] and to strike the expert report and testimony of Plaintiff's proffered expert, Dr. Susan Zaeske [60]. Plaintiff also moves for partial summary judgment as to her retaliation claims only. [86]. For the reasons set out below, the Court grants in part, and denies in part, Defendants' motion for summary judgment [45]; grants Defendants' motion to strike [60]; and denies Plaintiff's motion for partial summary judgment [86].

1

## I.     Background[1]

In 2011, DePaul hired Plaintiff Lisa Calvente as a tenure-track assistant professor in its College of Communications ("the College").  [85] ¶ 33.  Her research focuses on the black diaspora, and cultural studies with a focus on using performance and media ethnography to "interrogate discursive formations of racism, classism, and hetero/sexism" to "generate possibilities of belonging and social justice."  [100] ¶ 1.  Born in the United States, Plaintiff self-identifies as Vietnamese and Puerto Rican, ethnically Latinx, and racially Black and Asian.  [85] ¶ 4.

### A.     DePaul's Tenure Process

Like many universities, DePaul has a years-long rigorous and multi-step process to tenure.  [85] ¶ 9.  Tenure-track professors spend up to six years on probation during which they undergo periodic formal and informal evaluations.  *Id.* ¶¶ 10–11.  DePaul's Faculty Handbook sets out the general process for formal

---

[1] The Court draws the facts from the parties' Rule 56.1 Statements of Facts ("SOF") and responses, thereto.  *See* [85], [100], [102].  In their SOF responses, the parties attack the others' compliance with local rule 56.1.  [100] at 1–3; [104] at 6–7.  Defendants allege that forty-three of Plaintiff's responses: (1) misrepresent facts; (2) rely on conclusory or argumentative statements; and/or (3) attempt to contradict her own deposition testimony with a new declaration.  [100] at 1–2.  The record does not contain violations of Rule 56.1 sufficient to warrant the wholesale rejection of Plaintiff's responses, but this Court will address specific deficiencies or inconsistencies as needed, and if material to the ruling.  Plaintiff also argues that Defendants violated Rule 56.1 in responding to her SOF in support of partial summary judgment, faulting them for citing to previously filed exhibits in their own summary judgment pleadings rather than re-attaching them to their response.  [104] at 6–7.  Rule 56.1(b)(3), however, permits an opposing party to cite to "parts of the record" and does not require Defendants to re-attach previously filed exhibits.  Plaintiff also faults Defendants for relying on her factual admissions relating to Defendants' motion for summary judgment.  Plaintiff argues that "rather than spend time and energy responding to" some of Defendants' "irrelevant allegations" in support of their summary judgment motion, "she chose to admit and move on."  [104] at 6 n.5.  She insists, without legal support, that those admissions do not bind her for purposes of her own summary judgment motion or at trial.  *Id.*  The law disagrees.  Formal concessions in pleadings, or stipulations by a party or its counsel, may constitute judicial admissions "that are binding upon the party making them"; they "may not be controverted at trial or on appeal"; and "a judicial admission is conclusive, unless the court allows it to be withdrawn."  *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).

evaluations and tenure reviews, but the levels of review may vary among local academic units.  [100] ¶ 7.

At the College, formal evaluations occur at least bi-annually, during which tenured faculty evaluate a professor on three criteria: (1) teaching; (2) scholarship, research, and other creative activities; and (3) service to DePaul.  [85] ¶ 15.  First, a Personnel Committee ("Committee") made up of a subset of the College's tenured faculty interviews the professor and considers his or her personal statement, resume, examples of scholarship, student evaluations and teaching criteria, among other things.  [85] ¶¶ 12–13.  Then the Committee prepares a written report and, for each criterion, grades the tenure-track professor as "excellent", "very good", "fair", or "unsatisfactory" and indicates whether the professor has made "very good", "good", "fair", or "unsatisfactory" progress towards tenure.  *Id.* ¶ 22.  Second, the College's tenured faculty reviews the Committee's report and votes on whether: (1) the professor has made adequate progress toward tenure on each criterion; and (2) to renew the employment contract.  *Id.*  Third, the College's dean writes a letter to the provost independently recommending whether to renew a contract.  *Id.*; [100] ¶ 7.

Tenure-track professors may apply for tenure in their final year of probation. The Faculty Handbook states that, before granting tenure, "the university should have no reasonable doubt about a faculty member's demonstrated qualifications and continued capacity to contribute to DePaul's distinctive goals and academic mission." *Id.* ¶ 15.  The tenure review also focuses on the three core criteria and the College's

written guidelines require "excellence in at least two areas, with the third being rated at least very good." [85] ¶ 22.

The tenure-review process includes even more levels of review than the formal reviews. First, the College's Committee reviews the tenure-track professor's file (known as a "dossier"), interviews the candidate, and prepares a written report. Second, the College's tenured faculty votes on whether to promote and prepares an addendum to the Committee's report. Third, the College's dean makes an independent recommendation. Fourth, the University Board on Promotion and Tenure (the "UBPT")—a committee of seven tenured facility from across DePaul— makes a recommendation. [85] ¶ 17. Fifth, and finally, DePaul's provost makes the final tenure decision. *Id.* ¶ 18. The Faculty Handbooks states that "only in rare instances and for compelling reasons will the provost overturn a promotion or tenure recommendation made by the UBPT." *Id.* If DePaul denies tenure, then a candidate may appeal to the Faculty Committee on Appeals and DePaul's President makes the final decision on the appeal. *Id.* ¶¶ 19–20.

### B. Plaintiff's Tenure Process Experience

DePaul hired Plaintiff in 2011 and she had three formal reviews in 2013, 2015, and 2017. *Id.* ¶¶ 33–34, 39. She became eligible for tenure in 2018–2019. *Id.*

#### 1. 2013 Formal Review

In her 2013 review, the Committee's report noted "numerous strengths" in her teaching but remarked on some issues in a required undergraduate course, Intercultural Communications ("CMN 103"), where several students reported

4

confusion from unclear, lengthy lectures that did not provide enough interactive discussion-based learning. [85] ¶ 41. The Committee noted, however, that Plaintiff showed an "impressive" and "quick response" to these critiques; they rated her as "making good/very good progress" toward tenure in teaching. *Id.*

As to research, when DePaul hired her in 2011, Plaintiff had reported plans to turn her PhD dissertation into a book manuscript. *Id.* ¶ 32. By her 2013 formal review, she had finished two chapters of her manuscript, published one book review, and presented a co-authored paper and solo-authored paper at a conference. *Id.* ¶ 42. Yet the Committee noted some concern that Plaintiff had only completed two chapters of her manuscript despite completing her dissertation in 2008. *Id.* Overall, it found "satisfactory" progress toward research but that she would "need to devote more attention to diversifying strategies for seeing her work published." *Id.* Finally, as to service, the Committee rated her "very good." *Id.* ¶ 43. The Committee unanimously recommended contract renewal, finding her tenure progress "good/very good" in teaching; "satisfactory" in research; and "very good" in service. *Id.* ¶ 44.

### 2. 2015 Formal Review

Plaintiff did not fare as well in her 2015 formal review. This time, the Committee found that Plaintiff had made "poor" progress in teaching and research and "fair to good" progress in service and voted 6 to 1 against retention. *Id.* ¶ 52; [48] (Tab B, Ex. 186A). With respect to teaching, the Committee found that while students gave her "consistently strong" quantitative ratings, qualitative ratings showed "a range of recurrent and somewhat polarizing themes." [85] ¶ 48. While many students

appreciated her courses' rigor and enthusiastically endorsed Plaintiff's teaching, others reported a climate "intimidating and unwelcoming to diverse opinion and perspective." *Id.* The report stated that, when the Committee interviewed Plaintiff and told her it was "deeply troubled about our students experiencing this level of hostility and intimidation on the first day of class," Plaintiff responded that "Most students drop. I advise them to drop", "telling them to drop is honest", and "are you asking me, do I want them all in my class? No, not really." *Id.* Aside from this issue, the report also suggested that she distinguish the content of some of her courses and, particularly for entry-level courses, create a better balance between theoretical source and disciplinary texts. *Id.* ¶ 49.

With respect to research, the report found Plaintiff had not made progress on her manuscript but saw some progress "in moving her previous conference papers towards publication." *Id.* ¶ 50. The report noted a "concern about the amount of time invested and the choices made regarding the research projects she is pursuing" and found she had "not made the necessary progress needed towards tenure" in research. *Id.* It acknowledged, however, that she had been awarded a prestigious Woodrow Wilson Fellowship and given a year-long leave for research. Overall, it found her service record "fair to good." *Id.* ¶ 51; [48] (Tab B, Ex. 186A).

Next, the tenured faculty reviewed her. [85] ¶ 54. In addition to the Committee's report, the tenured faculty received a letter from Plaintiff objecting to the Committee's report. On her mixed student evaluations, Plaintiff wrote: "The 'hostility' in my evaluations is the result of the structural racism and the

6

normalization of whiteness within the academy that unfairly scrutinizes faculty of color, primarily women, who do not reinforce the standards and norms of white (male) supremacy." [85] ¶ 53; [102] ¶ 31. After review of the record, the tenured faculty recommended non-retention by a 13–5 vote. [85] ¶ 56. It issued a written addendum to the Committees' report stating that "most of us believe that" Plaintiff's "positive quantitative and qualitative comments do not outweigh the severity of the problems that have arisen regarding" her "teaching style and the manner in which she addresses some students." *Id*. ¶ 54. The addendum identified aspects of Plaintiff's teaching that she must address before she would meet tenure expectations. *Id*. As to research, it acknowledged her research fellowship and that she was early in her probationary period, but some faculty had "grave concerns regarding her ability to produce the necessary peer-reviewed, quality research necessary to achieve tenure at DePaul." *Id*. ¶ 55. As to service, the addendum stated Plaintiff did not show "substantial accomplishments" and faculty members thought Plaintiff was "overselling" her service. *Id*. ¶ 56.

Defendant Dr. Ghanem, who was dean of the College at the time, rejected the tenured faculty's non-retention recommendation and gave her another chance after she met with Plaintiff. *Id*. ¶¶ 6, 58. According to Plaintiff, Dr. Ghanem allegedly told Plaintiff during their meeting that she "was an extraordinary teacher" and her research fellowship was "a huge deal." [102] ¶ 34. In a follow-up letter to Plaintiff, Dr. Ghanem wrote:

> Based on our discussion on March 30, 2015 in which you explained your teaching philosophy and the efforts you make and will continue to make

to be inclusive and welcoming to the students, I do not accept the College's recommendation for non–renewal. . . .You have a lot of work ahead of you and I wish you success in your next review.

*Id.*

On April 16, 2015, Plaintiff formally complained to DePaul's Office of Institutional Diversity and Equity ("OIDE") about race and gender discrimination based upon the Committee and faculty's vote against retention. [85] ¶ 59. OIDE investigated and rejected her allegations finding no evidence of discrimination. *Id.* ¶ 60.

### 3.    2017 Formal Review

In 2017, the Committee formally reviewed Plaintiff again. *Id.* ¶¶ 45, 62. This time, the Committee found that Plaintiff had made "very good/fair" progress in teaching and research and "fair" progress in service. *Id.* ¶ 67.

The Committee's report found continued strong quantitative scores but that some students still reported "feeling intimidated or 'uncomfortable'" albeit "at low frequency." *Id.* ¶ 66. The report did not quantify the "low frequency" but stated: "it is problematic that" Plaintiff "has ignored these long-standing issues and" has "at least partially dismissed" the "developmental recommendations shared in previous reports." *Id.* As to research, the report stated it was "impressed" with Plaintiff's "research productivity in the last two years" and acknowledged the fellowship she previously received. *Id.* It also instructed her to "further push her publication rate, particularly with more journal articles, to make up for slower output in prior years."

8

*Id.* As to service, it acknowledged some achievements, but "emphasized" "the need to take a more visible and significant role within her unit and at the college." *Id.*[2]

On November 17, 2017, the College's tenured faculty voted 13–8 to terminate Plaintiff's contract. *Id.* ¶ 72. Its written addendum to the Committee report questioned whether Plaintiff's teaching style adhered to the University's Vincentian tradition[3] and stated that, if she remained, "the tenured faculty would need to see significant changes and improvements in her teaching practices" that "would need to be apparent in teaching materials, student reports, and peer observations." *Id.* As to research, the addendum noted a divide among the tenured faculty on her progress but took issue with how Plaintiff described some of her research progress. Finally, as to service, the addendum found Plaintiff's "service record at this advanced stage of her probationary period was inadequate as compared with the typical load of her peers" and that they "would need to see significant changes in her service." *Id.*

Dr. Ghanem, still Dean of the College, again rejected the tenured faculty's recommendation. In a letter to Plaintiff, Dr. Ghanem noted some "improvement" over the last review period but, as this was Plaintiff's last formal review before Plaintiff would apply for tenure, Dr. Ghanem warned: "I stress that you follow all of the recommendations of both the Personnel Committee and the tenured faculty outlined" in their 2017 formal review report. *Id.* ¶ 73.

---

[2] The formal review procedures changed between 2015 and 2017 and the Committee no longer voted on whether to retain a tenure-tracked colleague. [85] ¶¶ 67, 72.

[3] DePaul, a Catholic University founded by the Vincentians, expects its faculty to teach in the "Vincentian tradition", which its Faculty Handbook describes as "an environment in which persons engaged in learning and research exercise this freedom and respect it in others as contributing to the God-given dignity of individual persons and enhancing the academic process." [85] ¶¶ 3, 23

Afterward, Plaintiff met with Dr. Ghanem. According to Plaintiff, Dr. Ghanem told her that the provost knew about Plaintiff's case and that Plaintiff "was fine for tenure." [102] ¶ 38.[4] Plaintiff also told Dr. Ghanem that she believed that the Committee and tenured faculty had retaliated and/or discriminated against her[5] again and she wanted to file another OIDE complaint but complained that it was "time-consuming." [85] ¶ 74. According to Plaintiff, Dr. Ghanem told her not to file a complaint. *Id.* Dr. Ghanem remembers this exchange quite differently, recalling that, after Plaintiff began to cry, she asked Plaintiff whether it was "worth filing now, or is it better to file" after she "goes up for tenure, if it doesn't go her way." *Id.* Nevertheless, after the meeting, Dr. Ghanem notified OIDE about Plaintiff's complaints. *Id.* ¶ 75; [85] at 84–85 (Calvente Decl. ¶ 8). In response, OIDE asked to meet with Plaintiff, but she told OIDE that "at this time I have decided not to pursue any further action." [85], Tab B at 261:22–263:15, Ex. 123.

### 4. Events Between Plaintiff's 2017 Review and 2018 Tenure Review

Soon after her poor 2017 Formal Review, Plaintiff began inquiring about possible University and College service opportunities. [85] ¶ 87. She also sent out proposals to publishers to gauge interest in her manuscript. *Id.* ¶ 88. Further, in

---

[4] Defendants argue that Plaintiff's deposition transcript does not support this alleged fact. [102] ¶ 38 (response). Plaintiff's deposition transcript, however, supports Plaintiff's account of the 2017 meeting at this point in the proceedings. [85] (Ex. B) at 300:16–301:13. The comment that Defendants cite in their response relates to a different meeting in October 2018. *Id.*

[5] It remains unclear whether Plaintiff told Dr. Ghanem at this meeting that she believed she had been retaliated against, discriminated against, or both. *Compare* [85] ¶ 75 (noting "retaliation" only), and Tab B, Ex. 123 (letter from OIDE to Plaintiff stating that Dean Ghanem reported Plaintiff believed she "may have been retaliated against" in her annual review "as a result of having filed a complaint in our office.") *with* Tab B at 261:24–262:6 (Plaintiff stated in her deposition that she "expressed concerns to Dean Ghanem about discrimination and retaliation").

August 2018 she asked a professor to submit a letter on her behalf discussing the impact her students' performances had on students and the public. *Id.* ¶ 89. Later she asked for a similar letter from a Northwestern University professor. *Id.* ¶ 100. In Spring 2018, she notified the Office of Academic Affairs that she intended to apply for tenure in Fall 2018. *Id.* ¶ 90.

During this period, Plaintiff also continued to complain about alleged discrimination and retaliation. First, the College terminated the contract of Professor A[6], another tenure-track professor. Professor A appealed to the Faculty Appeals Board and Plaintiff submitted a letter on his behalf. In it, she stated that she did not believe that anyone had discriminated against him, but she believed that the College only terminated him, a white male, so that it could discriminate with impunity against her and another female minority tenure-track professor at the College, Dr. Dillard.[7] *Id.* ¶ 79. The Faculty Appeal Board reported Plaintiff's comments to OIDE but Plaintiff refused to meet with them. *Id.*

Next, in June 2018, Plaintiff and Dr. Dillard sent an anonymous email complaint to OIDE expressing concerns about "discrimination toward several members of the College of Communication's tenure-track faculty" who "are women, of color, and of US origin." [85] ¶ 81. The letter noted that "the most disturbing component is the use of subjective performance evaluative criteria that has caused

---

[6] Consistent with this case's Confidentiality Order [1], the Court uses placeholders to refer to non-party individuals involved in Plaintiff's tenure process or whose own tenure experience Plaintiff raises in support of her claim.

[7] The publicly-available Complaint [1] refers to Dr. Dillard by name.

11

harm to the women who are tenure-track Latina and/or African-American faculty, of US origin" and these criteria "have become a method of intimidation and, in many ways, reinforces the prejudices, unconscious or not, which Congress in Title VII sought to eradicate as a basis for employment and misuse." *Id.* OIDE responded to the anonymous email with follow-up questions, but it remains unclear from the current record what investigation may have occurred. *Id.*

Then, in October 2018, Plaintiff and Dr. Dillard met with Dr. Ghanem to discuss their allegations of a racially hostile environment at the College. *Id.* ¶ 82. The meeting lasted several hours during which Dr. Ghanem called OIDE to report that Plaintiff and Dr. Dillard believed they were victims of discrimination. [100] ¶ 26; [85] ¶ 83. Toward the end of the meeting, Professor A's termination came up. [85] ¶ 83. Dr. Ghanem commented that someone had claimed that she terminated Professor A "so that she could terminate women of color." *Id.* Plaintiff told Dr. Ghanem that she had made this allegation. *Id.* According to Plaintiff, Dr. Ghanem's demeanor abruptly changed when Plaintiff said this and she quickly "ushered" them out; Dr. Ghanem agrees that she ended the meeting soon after, but claims she had to because of scheduling conflicts. [85] ¶ 82. Although Dr. Ghanem told Plaintiff and Dr. Dillard that they would continue the discussion later, *id.* ¶ 83, Dr. Ghanem and Plaintiff "never again had a meaningful conversation," [102] ¶¶ 44.

Also in October 2018, Dr. Ghanem was promoted from the College's dean to Acting Provost of the University. *Id.* ¶ 6. Dr. Murphy took her place as Acting Dean of the College. *Id.* ¶ 7. Soon after this change in leadership, two male students in

Plaintiff's Communications 103 course complained to Dean Murphy about a heated exchange with Plaintiff during class following which Plaintiff emailed the entire class, calling the students' behavior "examples of misogynist acts that play out in local and familiar settings like the classroom." *Id.* ¶ 86. Dean Murphy stated that in her 20 years with DePaul, "she had never experienced the level of intense emotion as she did" from these students. *Id.*

### C. Plaintiff's 2018 Tenure Review

In October 2018, the College and University began its review of Plaintiff's tenure application. The Committee issued a report and rated Plaintiff "very good" in all three core criteria. *Id.* ¶ 103. By a vote of 19–2, however, the College's tenured faculty voted against granting tenure. *Id.* ¶ 113. As to teaching, the tenured faculty's addendum noted Plaintiff's ongoing abuse of students commenting that the Committee's report failed to "adequately address a pattern of student concerns about feeling intimidated and/or uncomfortable" in Plaintiff's classes and "a long history of sustained negative feedback, which appears in every review period." *Id.* ¶ 106. It also stated that some faculty thought Plaintiff showed "unwillingness to meet the needs of the College." *Id.* ¶ 107. As to research, some faculty believed Plaintiff did not "accurately represent the volume of her research" and criticized her for failing to complete her manuscript. *Id.* ¶¶ 109–10. The faculty also rejected Plaintiff's efforts to classify her student performances among her own research achievements. *Id.* ¶ 111. As to service, some of the tenured faculty thought Plaintiff continued to "oversell" her service accomplishments. *Id.* ¶ 112.

13

The College's new Dean, Dr, Murphy, also recommended against tenure. *Id.* ¶ 114. Her report to the UBPT acknowledged certain strengths Plaintiff had as a teacher and that Plaintiff's courses address topics that "can lead to challenging class conversations that can be emotionally difficult." *Id.* ¶ 115. But Dean Murphy stated that, while Plaintiff's teaching style works for many students, others "have voiced strong concerns" that Plaintiff "is intimidating and dismissive." *Id.* Dean Murphy also highlighted the two students who had complained, commenting that she "typically wouldn't go into detail on a student complaint for a tenure and promotion case" but "it provides a window into the type of polarizing comments that have shown up in Dr. Calvente's teaching evaluations." *Id.* ¶ 116. Dean Murphy concluded that the teaching critique "is less about the existence of the negative comments, and more about how Dr. Calvente has chosen to respond (or not respond) to them." *Id.* As to research, Dean Murphy wrote that Plaintiff's scholarship had some commendable qualities, but she had not produced sufficient volume. *Id.* ¶ 118. She also agreed that Plaintiff had not done enough to warrant an "excellent" rating in service. *Id.* ¶ 119.

The UBPT then reviewed Plaintiff's file and a lengthy response from Plaintiff in which she alleged that the reviewers' reports: (1) misrepresent student evaluations; (2) incorrectly discount her research particularly as to student performances and her co-edited book; (3) incorrectly discount her service; (4) exhibit "bias" as it relates to parental leave she took; and (5) reflect "bullying and discriminatory behavior" in reaction to Dr. Ghanem's decision to override their prior

votes. *Id.* ¶¶ 121, 123. Ultimately, a majority of the UPBT disagreed with the College and Dean Murphy and voted 4–3 in favor of granting tenure to Plaintiff. *Id.* ¶ 124.

Nevertheless, in June 2019, Dr. Ghanem, now Acting Provost, rejected the UPBT's recommendation and denied Plaintiff tenure. *Id.* ¶ 129. In her letter to Plaintiff on her decision, Dr. Ghanem wrote:

> The slim majority voting in favor of your application at the University level does not, in my view, sufficiently answer the significant concerns raised by your colleagues, concerns which led them to vote against promotion and tenure by an overwhelming majority….It is true that I twice overturned recommendations by significant tenured faculty majorities for contract nonrenewal. I did not do so because I disagreed with the substantive concerns of your colleagues but because I recognized, as do the College of Communication guidelines, "that faculty members must have the opportunity to develop strengths and skills as they progress toward tenure."…In my letters of renewal in 2015 and again in 2017 I encouraged you to heed the developmental recommendations of your colleagues. Unfortunately, you have not done so to a sufficient degree to change the evaluation of your colleagues.

*Id.* ¶ 130.

Plaintiff appealed the decision to the Faculty Appeal Board. *Id.* ¶¶ 131–34. The Faculty Appeal Board investigated and found no evidence of retaliation, discrimination, or violation of academic freedom, but it found: (1) some issues with how the College described her student evaluations; (2) that the College had given her "inconsistent" guidance on the service criterion; and (3) that Dr. Ghanem assigned undue weight to the College's concerns compared to University-wide criteria. *Id.* ¶ 139. It recommended that the University President, Gabriel Estaban, re-review Plaintiff's tenure application. *Id.* ¶ 140. President Estaban, consistent with his role, did not re-evaluate the merits of Plaintiff's tenure application but only examined it

for procedural flaws. *Id.* ¶ 141. He found no material procedural irregularities to warrant reversal of Dr. Ghanem's tenure denial. *Id.* ¶¶ 140–42.

## II.   Motion to Strike Dr. Susan Zaeske

Before the Court takes up the parties' motions for summary judgment, it considers Defendants' motion to strike the expert report and testimony of Plaintiff's proffered expert Dr. Susan Zaeske. [60]. Dr. Zaeske is the Associate Dean for Arts and Humanities in the University of Wisconsin-Madison's ("UW-M") College of Letters & Sciences and a Professor of Rhetoric and Public Culture in UW-M's Department of Communication Arts. [60-3] at 1. Plaintiff offers Dr. Zaeske to opine about a new tenure-track position that Plaintiff obtained at University of North Carolina ("UNC"). In summary, Dr. Zaeske opines:

> That a more prestigious institution with higher tenure expectations than DePaul has invested in hiring Calvente because they assess her as tenurable renders DePaul's decision to deny her tenure highly questionable.

[60-1] at 1.

To support this opinion, Dr. Zaeske states that she looked at UNC and DePaul's respective research rankings according to Indiana University Carnegie Classifications and concluded that UNC, as a Research 1 school, is more prestigious that DePaul, as a Research 2 school. *Id.* She opines that "Professors who are denied tenure at R2 universities such as De Paul [*sic*] almost never are hired at R1 universities such as UNC because their record has been assessed as untenurable." *Id.* She also cites anecdotal accounts of other professors who struggled to find university positions after being denied tenure. [60-1] at 3, 6–7. Further, based on

16

her experience at UW-M, she opines about what the "vast majority of universities" look for when making hiring decisions, *id.* She also compares UNC's Communication Department's written tenure policies to those at DePaul's Communication Department and asserts that UNC has more stringent requirements than DePaul. *Id.* at 4–6. From this, she opines that Plaintiff "needed a record that convinced" UNC "that she is capable of earning tenure under their standards, which are more demanding than those of DePaul" and UNC's decision to hire her "calls in to question how it could be true that her record was judged as failing to meet the standard of excellence at DePaul, an institution with less demanding tenure and promotion expectations." *Id.* at 3–6.

Defendants move to strike Dr. Zaeske's report and testimony pursuant to Federal Rule of Evidence 702, arguing that Dr. Zaeske lacks the qualifications to offer such opinions and that the opinions are otherwise speculative, unreliable and irrelevant. [60] at 2.

### A. Legal Standard

Rule 702 permits expert testimony if the expert has the requisite "knowledge, skill, experience, training, or education" to support the opinion offered and (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The party who seeks to admit the expert

testimony bears the burden to establish admissibility under Rule 702. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

For the reliability prong, courts consider multiple factors, including whether the methodology has been tested, subject to peer review, and generally accepted in the relevant community. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). Further, even if an expert is qualified to offer opinions on a subject, the "expert's ultimate opinion must be grounded in the scientific process and may not be merely a subjective belief or unsupported conjecture." *Lewis*, 561 F.3d at 705. Under the relevance prong, a court must ensure that the proposed expert testimony "logically advances a material aspect of the proposing party's case." *Daubert*, 43 F.3d at 1315.

### B. Analysis

First, Defendants take issue with Dr. Zaeske's qualifications to render the opinion she offers. [60] at 10–11. They argue that she has spent her entire academic career at UW-M and, although she has been involved in some hiring and tenure decisions at UW-M and its Humanities and Arts Division, she has not studied academic policy or decision-making, does not know "anything about UNC's hiring practices," and has no particular knowledge, skill, experience, training or education that qualifies her to opine on some "industry-wide" standard for university hiring practices. *Id.* In response, Plaintiff insists that Dr. Zaeske is qualified to opine "about hiring practices in the academy" given her roles at UW-M where she "easily reviewed the files of hundreds of people looking to be hired at UW." [79] at 6.

The record supports the Defendants' objections. First, although Dr. Zaeske's experience at UW-M may qualify her to opine about UW-M's hiring and tenure policies, Plaintiff fails to demonstrate how this experience somehow qualifies her to testify regarding an industry-wide standard, to the extent such a standard may exist. *Zenith Elecs. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."). Plaintiff merely insists that an industry-wide standard exists because Dr. Zaeske says that one does. Such a circular argument does not carry Plaintiff's burden.

Second, even if an industry-wide standard exists and even if Dr. Zaeske is qualified to opine about it (which she is not), Plaintiff does not offer Dr. Zaeske to opine on general university hiring practices. Instead, she offers Dr. Zaeske to opine that UNC has more stringent tenure expectations than DePaul and, therefore, "DePaul's decision to deny" Plaintiff tenure was, in her view, "highly questionable." Notably, the Seventh Circuit emphasizes that even if tenure "qualification depends on objective measures—the terminal degree, the number of publications"—receiving tenure "requires something more; it requires that the department believe that the candidate have a certain amount of promise." *Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1242 (7th Cir. 1985). Here, Plaintiff has utterly failed to establish that Dr. Zaeske is qualified to opine on UNC's and DePaul's individual standards for evaluating a candidate's "amount of promise." *Id*.

Second, Defendants argue that Dr. Zaeske offers no reliable basis to opine that UNC is more prestigious than DePaul; misconstrues the tenure and promotion policies of the universities and the respective colleges; did not rely on any peer-review studies or data to support her opinions; did not consider records regarding Plaintiff's tenure denial at DePaul or the terms of UNC's employment offer; and has no knowledge as to UNC's hiring process with respect to Plaintiff or why DePaul denied Plaintiff tenure. *Id.* at 7–15.

Once again, the record supports Defendants' objections. Anecdotes from a few professors who struggled to find a tenure-track job after tenure denial do not sufficiently support Dr. Zaeske's opinion that professors who are denied tenure "at R2 universities such as DePaul very rarely are able to win tenure-track positions at R1 institutions." [60-1] at 3. On this issue, Plaintiff insists that industry-wide data and studies "simply do not exist." [79] at 7. Even if true, that does not give Dr. Zaeske carte blanche to offer an unsupported opinion. *See Wendler & Ezra, P.C. v. Am. Intern. Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) ("We have said over and over that an expert's *ipse dixit* is inadmissible.")

Next, even if Dr. Zaeske is qualified to opine about UNC's objective qualification requirements for tenure, that does not support her conclusory opinion that Plaintiff met those requirements. Dr. Zaeske simply assumes that she does so because UNC hired Plaintiff. As Defendants point out, however, UNC did not hire Plaintiff as a tenured professor; it hired her for a tenure-track position. Thus, at most, UNC may believe that Plaintiff will be qualified for tenure *in the future*. It is

speculative and misleading to suggest, as Dr. Zaeske's opinion does, that Plaintiff is currently qualified for tenure at UNC or that Plaintiff was qualified for tenure at DePaul in 2019 when DePaul denied her tenure.

Finally, Dr. Zaeske's opinion assumes—based on her experience at UW-M and because UNC, like UW-M, is an R1 public university—that UNC would not hire a professor unless the professor can meet tenure expectations. [60-1] at 20. Even if there exists an industry-wide standard for R1 universities (which is not apparent), Dr. Zaeske cites nothing to show that every university follows it with every candidate that it might hire. Nor does she cite any data or evidence regarding the rate of tenure-approval at R1 universities. To the contrary, she acknowledges that some R1 universities, especially those in the Ivy League, more readily hire professors who may never qualify for tenure. *Id.* at 20. In the end, she failed to ever examine exactly why UNC chose to hire Plaintiff. Thus, she can only offer speculation as to why it chose to hire her.

Each of these issues undermine the reliability and admissibility of Dr. Zaeske's opinion. But even putting these aside, Plaintiff also fails to establish the relevance of Dr. Zaeske's opinion. In deciding if an employer made a tenure decision for discriminatory or retaliatory reasons, a plaintiff "must show more than he was a qualified tenure candidate or even that the defendants' reasons for denying him tenure was mistaken, ill-considered, or foolish. He must show that the defendants' reason was a lie." *Gupta v. Bd. of Regents of Univ. of Wisc. Sys.*, 63 F. App'x 925, 928 (7th Cir. 2003). Dr. Zaeske's opinion and reasoning suggests, at most, that DePaul's

tenure decision "was mistaken, ill-considered, or foolish." It does nothing to establish that Defendants' "reason was a lie;" thus her testimony would not aid the jury but could serve to mislead or confuse them. *See Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) ("[A] plaintiff must show that her employer is *lying*, not merely that her employer is wrong."). Overall, Plaintiff has not met her burden to establish admissibility of Dr. Zaeske's opinions.

Further, to the extent her opinions have any probative value, it also creates a substantial risk of misleading a jury about the relevant evidentiary issues as to Defendants' motive. This risk far outweighs any possible probative value and exclusion is also warranted pursuant to Federal Rule of Evidence 403. Accordingly, the Court grants Defendants' motion [60] to exclude Dr, Zaeske's opinions and testimony pursuant to Rule 702 and, in the alternative, Rule 403.

## III. Motions for Summary Judgment [45], [86]

### A. Legal Standard

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Cosmano v. Lottery*, No. 17 C 569, 2021 WL 5050283, at *3 (N.D. Ill. Nov. 1, 2021). In resolving a motion for summary judgment, the court "has one task and one task only: to decide, based on the evidence of record, whether there is any material

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

To withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The Court must construe the record "in the light most favorable to the nonmovant and avoid" the "temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative," *Liberty Lobby*, 477 U.S. at 249 (citations omitted), or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.    Analysis**

Plaintiff alleges that DePaul and Dr. Ghanem denied her tenure in retaliation for her complaints about discrimination and on account of her race and ethnicity. [1]. She sues DePaul under Title VII and § 1981, and sues Dr. Ghanem under § 1981 only, since an employee may not bring Title VII claims against individual defendants. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (holding that, under § 1981, an employee may sue an individual defendant who "instituted a (specified) adverse employment action" on an impermissible basis)). Courts "use the same standard to review discrimination and retaliation claims under § 1981 and Title VII," *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017), and the Court does so below in evaluating the parties' summary judgment motions.

23

### 1.    Retaliation

Although DePaul's tenure process involves "numerous layers of independent review" typical in tenure decisions, *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007), Plaintiff's current theory of retaliation abandons any reliance on potential retaliation in lower-level decisions and instead "focuses on Dr. Ghanem's reasons for overruling the UBPT" and denying her tenure. [88] at 4. She argues that, while Dr. Ghanem previously supported Plaintiff, she changed her position without a legitimate basis in overruling the UBPT's vote in favor of tenure. Dr. Ghanem did so, Plaintiff argues, in retaliation after: (1) she learned that Plaintiff accused her of terminating Professor A so the College could fire with impunity minority female professors; and (2) Plaintiff continued to complain about racism after Dr. Ghanem allegedly told Plaintiff to stop. *Id.* at 9.

To prove retaliation in violation of either § 1981 or Title VII, a plaintiff must establish "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).  Both statutes require proof that an employer's desire to retaliate was the "but for" cause of the materially adverse action.  *See* 42 U.S.C. § 2000-3(a); 42 U.S.C. §§ 2000-2(a); *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.");

*Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (applying "but for" causation requirement to § 1981 retaliation claim).

A court should evaluate "the evidence as a whole" to determine if a reasonable factfinder could conclude a "but for" retaliatory motive. *See Lewis v. Wilke*, 909 F.3d 858, 866–67 (7th Cir. 2018) (discussing *Ortiz v. Werner Enters*, 834 F.3d 760, 763 (7th Cir. 2016)). One way the plaintiff may establish retaliation is through the long-established burden-shifting method from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[8]

Here, the parties do not dispute that Plaintiff engaged in numerous statutorily protected activities and her tenure denial constitutes an adverse employment action. As to qualifications, Plaintiff insists that the UBPT's decision in favor of tenure establishes that she was qualified for tenure. To further illustrate her qualifications and the illegitimacy of Dr. Ghanem's decision, she points to a white male professor, Professor B, from a different college within the University who went up for tenure the same time as her and had no history of engaging in statutorily protected activity. [81] 30; [88] at 7. The tenured faculty in Professor B's department and the UBPT recommended against tenure, yet Dr. Ghanem rejected these recommendations and awarded him tenure. *Id*. According to Plaintiff, Professor B's "file was objectively worse" than hers and Dr. Ghanem had no legitimate basis to treat them differently,

---

[8] Under the *McDonnell-Douglas* framework, Plaintiff must establish a *prima facie* case that: (1) she engaged in a protected activity; (2) she performed her job duties according to DePaul's legitimate expectations; (3) she suffered an adverse action; and (4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Lewis*, 909 F.3d at 866–67 (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)). If Plaintiff makes this *prima facie* showing, then the burden would shift the Defendants to provide a legitimate reason for the adverse action. *Id*. The burden then shifts back to Plaintiff to prove that Defendants' "stated reason is mere pretext." *Id*.

thus retaliation provides the only explanation for Dr. Ghanem's less favorable treatment of Plaintiff. [88] at 7. In fact, Plaintiff argues that the undisputed facts establish as a matter of law that Dr. Ghanem retaliated against her, [86].

Defendants disagree, arguing that Plaintiff lacked the qualifications for tenure and that she cannot causally connect any of her statutorily protected activity to the decision to deny her tenure. [65] at 31–34. Defendants also argue that Professor B's experience remains irrelevant to Plaintiff's claims and that he does not qualify as similarly situated for purposes of *McDonnell-Douglas* because: (1) he was a member of a different college and thus evaluated by different faculty and under different guidelines; (2) at a formal review six months prior, Professor B's college had unanimously found that he met expectations for progress toward tenure; and (3) Professor B's department chair and dean of his college both recommended him for tenure. *Id*. at 25. According to Defendants, Professor B's case "is quite distinct from Plaintiff's case where she was told for years leading up to her tenure review that she was not progressing satisfactorily in the area of teaching and needed to improve." *Id*. at 25–26.

Given the parties' disputes over Plaintiff's and Professor B's respective qualifications, the prima facie and pretext inquiries remain inextricably intertwined here. The Seventh Circuit has acknowledged that this often happens, particularly in tenure cases, and in such scenarios, if a defendant offers a legitimate "reason for its actions," then the court "can proceed directly to the pretext inquiry." *Barnes v. Bd. of Trustees of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020); *see also Sun v. Bd. of*

*Trs. of Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007) (holding that disputes about tenure qualifications are often "inextricably intertwined with the pretext analysis"). This makes good sense since the *McDonell-Douglas* framework remains "just a means to consider whether one fact caused another." *Lewis*, 909 F.3d at 867 (discussing and quoting *Ortiz*, 834 F.3d at 764 and *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017)).

### a) Defendants Offer a Nondiscriminatory Reason for Denying Tenure

As the Seventh Circuit has emphasized, "tenure cases require something more than mere qualifications; the department must believe she has a certain amount of promise." *Sun*, 473 F.3d at 815; *see also Kuhn v. Ball State Univ.*, 78 F.3d 330, 331 (7th Cir. 1996) ("Universities prune the ranks—sometimes ruthlessly, so that only the best rise.").

Here, Defendants put forth a sound and legitimate reason for Dr. Ghanem's decision to deny Plaintiff tenure: her College believed that she failed "to achieve the requisite excellence for lifetime employment." [65] at 26, 31. They also point to Dr. Ghanem's tenure denial letter to Plaintiff in which Dr. Ghanem states that she never disagreed with the College tenured faculty's concerns about Plaintiff; she nonetheless gave Plaintiff additional opportunities and encouraged Plaintiff to "heed the development recommendations" of the College tenured faculty; yet Plaintiff failed to do "so to a sufficient degree," [102] ¶ 103. Based upon the record, these facts

constitute legitimate nonretaliatory reasons for the decision.[9] Thus, the Court may proceed to the pretext inquiry, for which Plaintiff bears the burden of proof. *Barnes*, 946 F.3d at 389.

###    b)    Pretext

Pretext is more than "just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of Chi.*, 937 F.3d 729, 743–44 (7th Cir. 2011). If there exists "a question of fact as to the believability of an employer's purported reasons for an employment decision," however, then this suffices to defeat an employer's summary judgment motion. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005).

To show pretext, Plaintiff first argues that she was "unquestionably qualified" while Professor B was "unquestionably *not* qualified," [85] at 7. This argument fails. The Seventh Circuit has repeatedly emphasized that "scholars are in the best position to make the highly subjective judgments related with review of scholarship and university service" and courts are "reluctant" to second-guess them "in the absence of clear discrimination." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005). Accordingly, "evidence of the applicants' competing qualifications does not constitute evidence of pretext 'unless those differences are so favorable to the plaintiff that there

---

[9] Plaintiff argues that Defendants failed to articulate a legitimate reason because they fail to justify why Dr. Ghanem treated Plaintiff and Professor B differently. [88] at 7–10. But Defendants need only present a legitimate nonretaliatory reason for their decision regarding *Plaintiff*, not a legitimate basis for treating her differently than someone else. Plaintiff's argument really goes to pretext. *Klein v. Trustees of Ind. Univ.*, 766 F.2d 275, 280 (7th Cir. 1985) ("The defendant's burden in presenting a legitimate, non-discriminatory reason for its actions is only a burden of production; the burden of persuasion rests at all times on the plaintiff.").

can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified.'" *Id.* at 615 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)).

Plaintiff also insists that she was qualified because "the UBPT told us so." [81] at 14. But that conclusion ignores the record and DePaul's multi-level tenure review process, as well as the UBPT minority that concurred with denying her tenure. More accurately, the record shows that, for both Plaintiff and Professor B, their colleagues and superiors remained divided on their qualifications for tenure. For Plaintiff, nineteen of her tenured colleagues and the College's dean found her unqualified for tenure, while only two tenured colleagues found her qualified; among UBPT members, four found her qualified, while three did not. For Professor B, reviewers in his department split 4–4 on whether he was qualified, while reviewers in his college voted 4–2–1 (recusal) against tenure; but his department's Chair and his college's Dean found him qualified; among UBPT members, only one found him qualified, while six did not.

In a similar vein, Plaintiff argues that Professor B's "file was objectively worse" than hers because she was a better or more productive scholar than Professor B; had fewer (or less serious) student complaints; and was a more effective teacher. [81] at 21. Here, Plaintiff has not presented any evidentiary or theoretical basis for the Court to second-guess the divided opinions of many scholars who evaluated Plaintiff's and Professor B's scholarship. *See Namenwirth v. Bd. of Regents of Univ. of Wisc. Sys.*, 769 F.2d 1235, 1242 (7th Cir. 1985) ("It is not our role, as federal courts have

29

acknowledged, to consider merely the hard evidence of research output and hours spent on committee work, and reach tenure determinations *de novo*."). Thus, the Court cannot and will not engage in a comparative analysis of Plaintiff's and Professor B's academic dossier.

Next, Plaintiff points to the timing of Dr. Ghanem's decision. Plaintiff argues that she lost Dr. Ghanem's support when: (1) Plaintiff continued to complain of discrimination after Dr. Ghanem allegedly told her to stop during their meeting in late 2017; and (2) Dr. Ghanem learned during the October 2018 meeting with Dr. Dillard that Plaintiff had accused Dr. Ghanem of "playing racial politics" by terminating Professor A's contract so that the College could fire with impunity Plaintiff and Dr. Dillard.[10] [81] at 21–22, 25; [88] at 2. Plaintiff argues that prior to these two meetings, Dr. Ghanem was her strongest supporter, had told her that she would be fine for tenure and praised her as an "extraordinary teacher." She also argues that Dr. Ghanem used inconsistent (and shifting) reasons and standards when she denied Plaintiff tenure compared to when she granted tenure to Professor B. *See* [81] at 21–27; [88] at 7–9. At the summary judgment stage, these arguments fare better.

While timing alone usually fails to create a genuine issue of material fact for trial, it may suffice if the adverse decision comes "so close on the heels of a protected act that an inference of causation is sensible," *Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 665–66 (7th Cir. 2011), or if there exists "other evidence that supports

---

[10] Defendants do not dispute that Plaintiff's letter regarding Professor A constitutes protected activity.

the inference of a causal link," *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (internal citations omitted).

The timing between Plaintiff's meetings with Dr. Ghanem (late 2017 and October 2018) and Dr. Ghanem's decision to deny her tenure (June 2019) remains too remote to infer a causal link without something more. But here, the record contains some other evidence sufficient to create a material issue of fact for a jury to resolve.

First, although the parties dispute what happened at the 2017 and 2018 meetings, a reasonable jury might find that Dr. Ghanem tried to dissuade Plaintiff from complaining about discrimination. Overall, the issue comes down to one of credibility. Defendants point out that Plaintiff's account of the 2017 meeting remains incredible, because Dr. Ghanem called OIDE to report Plaintiff's concerns after this meeting. [101] at 4. But Dr. Ghanem admits that DePaul's rules obligated her to report it. Even though Plaintiff's case is not a strong one, it does not defy logic to believe that Dr. Ghanem complied with her reporting obligations, while also telling Plaintiff to stop complaining, and allegedly resenting Plaintiff when she continued to do so.

Second, based upon Plaintiff's account of the October 2018 meeting, a reasonable jury might find that Dr. Ghanem believed Plaintiff had personally accused her of "playing racial politics" with respect to Professor A. Although Dr. Ghanem already knew that someone had made such allegations, she did not know it was Plaintiff. And, according to Plaintiff version of the facts, Dr. Ghanem's demeanor changed when she learned this and abruptly ended the meeting. A factfinder who

credits Plaintiff's account could reasonably believe that this accusation upset Dr. Ghanem and motivated her to act. Defendants insist that Dr. Ghanem never believed Plaintiff had accused Dr. Ghanem, specifically, of "playing racial politics" and argue that Dr. Ghanem believed Plaintiff's discrimination complaints were against others or the College and University, generally. [101] at 4–5. But the resolution of such factual disputes is a job for a jury.

Defendants also argue that Dr. Ghanem could not have retaliated against Plaintiff because Dr. Dillard also complained of discrimination, yet Dr. Ghanem granted tenure to her. [85] at 33–34. Certainly, this fact undermines Plaintiff's pretext theory, but it does not eviscerate pretext at summary judgment. First, Dr. Dillard did not make the accusations regarding Professor A's termination. Second, the record suggests that Plaintiff had a longer history of making discrimination complaints than Dr. Dillard. Third, Dr. Dillard received unanimous support at every level of the tenure process [85] ¶ 149—thus, it may have been effectively impossible for Dr. Ghanem to override a unanimous tenure recommendation.

Finally, Dr. Ghanem's prior support for Plaintiff also provides some evidence of pretext. As discussed above, some of Plaintiff's tenured colleagues voiced concerns for years over Plaintiff, including among other things, her unfair treatment of students in class, how Plaintiff responded to teaching critiques, and weaknesses in her scholarship record. Yet, at each stage, Dr. Ghanem overrode recommendations to terminate Plaintiff's contract, including in 2017 when she knew that Plaintiff planned to apply for tenure the following year. According to Plaintiff, Dr. Ghanem

also told Plaintiff that she was an "extraordinary teacher" and, after her 2017 formal review, assured Plaintiff that she "would be fine" for tenure. Despite this, when Dr. Ghanem denied her tenure, she stated that Plaintiff failed to show sufficient improvement. This was the first opportunity Dr. Ghanem had to formally evaluate Plaintiff after the 2017 and 2018 meetings. And it was the first time she took this position and sided with the College's tenured faculty. It remains possible that Dr. Ghanem finally decided that Plaintiff's critics were right, and Plaintiff had run out of second and third chances. Yet, based upon Dr. Ghanem's prior support for Plaintiff in the face of these enduring critiques, a reasonable jury might infer that Dr. Ghanem's stated reasons for rejecting the UBPT's vote constitute pretext.

Finally, Dr. Ghanem's reasons for denying Plaintiff tenure compared to her reasons for granting Professor B tenure also provides some evidence of pretext. This does not mean that Plaintiff may establish retaliation by comparing her substantive qualifications to Professor B's—this remains an inappropriate way to show pretext here. But Dr. Ghanem's decision with respect to Professor B's calls into question whether Dr. Ghanem applied a harsher standard to Plaintiff, which could suggest pretext. *See, e.g., Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 931 (7th Cir. 2020) ("deviation from standard procedures" can indicate pretext); *Coleman*, 667 F.3d at 858 (reversing summary judgment and explaining that selective enforcement of company policy can establish pretext). Specifically, for Professor B, Dr. Ghanem downplayed critiques about him and votes against tenure, writing that his department colleagues had voted unanimously in his prior review to extend his

contract knowing that he "would be applying for tenure in the fall." *Id.* ¶ 38 (response). Yet, for Plaintiff, Dr. Ghanam emphasized critiques and downplayed support (particularly from the UBPT). Moreover, for Professor B, in his prior review, his department failed to vote on whether he had made "adequate progress toward tenure." *Id.* Dr. Ghanem, in her deposition in this case, stated that this procedural error coupled with the department's unanimous vote at the last formal review provided a "compelling reason" to award tenure to Professor B. *Id.* Yet, the Faculty Appeal Board found evidence of procedural unfairness with Plaintiff's case, too (*i.e.,* the College's inconsistent feedback on her service requirements, and misstatement of the volume of critical student evaluations) and Dr. Ghanem does not grant tenure to Plaintiff based on these procedural failures.

Overall, the reviewers' votes for both Plaintiff and Professor B indicate disagreement on whether either should receive tenure. Yet, Dr. Ghanem found "no reasonable doubt about" whether Professor B should receive tenure but found doubt for Plaintiff. Her stated doubt as to Plaintiff becomes more noteworthy given her prior support during Plaintiff's formal reviews.

This evidence, taken together, certainly does not "compel the conclusion" that Dr. Ghanem retaliated against Plaintiff when she denied her tenure (indeed, Plaintiff's case is weak); but "at a bare minimum it suffices to defeat" Defendants' summary judgment motion on the retaliation claims. *Rudin*, 420 F.3d at 726. Accordingly, neither Plaintiff nor Defendants are entitled to summary judgment on the retaliation claims.

### 2. Discrimination

Plaintiff also alleges that Defendants denied her tenure on account of her race in violation of 42 U.S.C. § 1981 and Title VII. To survive a summary judgment motion on a § 1981 or Title VII discrimination claim, a plaintiff must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused" the "discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765–66; *see also Fields v. Bd. of Ed. Of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) ("We apply the same standard to discrimination claims" whether under § 1981 or Title VII).

Section 1981 and Title VII discrimination claims, however, have different causal requirements. For a discrimination claim pursuant to § 1981, a plaintiff must establish that the proscribed factor was the "but for" cause of the adverse action. *Comcast Corp. v. Nat'l Assoc. of African Am.-Owned Media*, 140 S.Ct. 1009, 1014 (2020) (holding that "§ 1981 follows the general rule" that "a plaintiff bears the burden of showing that race was a but-for cause of its injury."). In contrast, a Title VII race discrimination claim only requires proof that race was a "motivating factor." 42 U.S.C. §§ 2000-2(m); *see also Univ. of Tex. SW Med. Ctr.*, 570 U.S. at 348–49.

Like her retaliation claims, Plaintiff seeks to prove discrimination through the *McDonnell-Douglas* framework, arguing that Dr. Ghanem's treatment of Professor B—a white male—establishes a prima facie case of discrimination. [81] at 28–32. Just as with a retaliation claim, the *McDonnell-Douglas* framework remains a viable part of this Court's overall analysis in reviewing a prima facie case of discrimination

under § 1981 and Title VII. *See Fields v. Bd. of Ed. Of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). Under this framework, Plaintiff must establish that: (1) she belongs to a protected class; (2) she met her employers' legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Id.* And, as with a retaliation claim, when the legitimate expectation inquiry remains in dispute, then the *prima facie* analysis "merges with the pretext analysis." *Smiley*, 714 F.3d at 1002.

Here, Plaintiff fails to present evidence from which a reasonable jury could find that Defendants' stated reasons for denying her tenure were mere pretext for a *discriminatory* purpose. Plaintiff points to Professor B's race, arguing that one should infer a discriminatory motive because Professor B is a white male. Not so. Even if Dr. Ghanem treated Plaintiff differently than Professor B (and that remains a hotly disputed issue as discussed above), this alone does not mean that Dr. Ghanem did so for discriminatory reasons, particularly considering Dr. Ghanem's support for Plaintiff prior to the 2018 tenure review.

Plaintiff also argues that the teaching criticism that she faced constitutes "a manifestation of structural racism at DePaul." [81] at 12. This conclusory argument lacks any factual support in the record. First, the teaching criticisms originated from her students, and thus, her claims of "structural racism" suggest, at the very worst, that her students were somehow racist. But she must establish that Defendants discriminated against her, and Plaintiff cites no legal authority that discrimination by students can be imputed to the student's school. Second, to the extent that

Plaintiff argues that her colleagues and Dr. Ghanem discriminated against her by focusing on her students' critiques, she offers no evidence for this theory beyond her own speculation. In short, Plaintiff's personal suspicions about "structural racism" in academia cannot create an issue of fact for a jury.

Finally, Plaintiff insists that one can infer a discriminatory motive based upon their 2017 meeting wherein Dr. Ghanem's allegedly told her to stop complaining about discrimination. According to Plaintiff's version of the facts, Dr. Ghanem's comment effectively told her that "good minorities accept racial harassment and microaggressions, and that Dr. Calvente should comport herself accordingly." [81] at 31. Even if one believes that Dr. Ghanem told her to stop filing discrimination complaints, however, nothing in the record suggests that Dr. Ghanem effectively told Plaintiff that "good minorities accept racial harassment and microaggressions"—once again, Plaintiff's suspicions are not evidence.

Overall, even although Plaintiff presented sufficient evidence to proceed to trial on her retaliation claims, she fails to present evidence to show that Defendants' stated reasons for denying her tenure were "a cover-up for discrimination." *Koski v. Standex Intern. Corp.*, 307 F.3d 672, 677 (7th Cir. 2002). Accordingly, Defendants are entitled to summary judgment on Plaintiff's discrimination claims.

### 3. Breach of Contract

Finally, the Court turns to Plaintiff's contract claim. Plaintiff alleges that DePaul's Faculty Handbook constitutes a binding contract that Defendants breached when they denied her tenure. [1] (Count V).

Under Illinois contract law, which the parties agree governs Plaintiff's contract claim, a plaintiff must establish that: (1) a valid contract exists; (2) plaintiff performed under the contract; (3) defendant breached it; and (4) plaintiff suffered damages as a result. *See Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004). For purposes of summary judgment, Defendants do not dispute that the Faculty Handbook constitutes a contract but argue that Plaintiff cannot establish a breach. [65] at 34–37.

Plaintiff's complaint does not specify which Faculty Handbook provisions Defendants allegedly breached, [1], but Plaintiff's summary judgment response posits two breaches: (1) § 6.2, which states that "DePaul University does not tolerate harassment or discrimination"; and (2) § 3.5.6.3, which provides that the Provost may overturn the UBPT's recommendation in "rare instances" and for "compelling reasons." [81] at 33; [100] ¶¶ 10, 16.

Plaintiff's breach of contract claim fails to the extent it relies on § 6.2. This provision merely states a general policy against discrimination and, as Defendants correctly note, a general anti-racial discrimination provision in a contract does not create an independent contractual obligation under Illinois law. *See Harris v. Adler Sch. Of Prof. Psych.*, 723 N.E.2d 717, 722 (Ill. App. Ct. 1999) ("The Adler School's nondiscrimination policy was a statement of adherence to existing law and does not constitute, and was not, an independent contractual obligation."). Further, even if it did, Plaintiff's discrimination claims do not survive summary judgment for the

38

reasons discussed above. Thus, any breach of contract claim based upon alleged discrimination also fails.

As to § 3.5.6.3, Defendants only argue that the record establishes that Dr. Ghanem had "compelling reasons" to overturn the UBPT's recommendation. [101] at 14. They insist that Plaintiff merely disagrees with Dr. Ghanem's stated reasons, which does not establish a breach. *Id.* As set out above, however, there exists a material issue of fact regarding whether Dr. Ghanem believed the reasons she gave or whether she, in fact, lied and overruled the UBPT for retaliatory reasons. Although the parties disagree on what constitutes a "compelling reason," Defendants do not argue that retaliation qualifies.[11] Accordingly, Plaintiff's breach of contract claim may proceed but only to the extent it remains based on § 3.5.6.3.

---

[11] Plaintiff argues that "compelling reason" requires the provost to find the UBPT's recommendation "was manifestly groundless." [81] at 33. In support, she cites a September 23, 2020 internal memorandum from the UBPT to Dr. Ghanem. *Id.* Defendants attack Plaintiff's use of this memo, arguing that she improperly obtained it from a third-party outside of the discovery process and asks the Court to bar Plaintiff from using it as a sanction for alleged abuse of discovery. [100] at 2. In response, Plaintiff accuses Defendants of improperly withholding it from her. [104] at 4 & n.3. The parties' arguments indicate that this document has been a point of contention since March 14, 2021, yet neither party previously raised the issue with the Court or otherwise brought a Rule 11 sanctions motion. Without details on this document, where it came from and what discovery requests may have called for it, the Court cannot resolve whether one side (or both) engaged in improper discovery tactics. The Court also will not consider Defendants' request for sanctions without a properly raised Rule 11 motion. Regardless, the Court's decision here does not rely on this internal memorandum. To the extent the parties dispute the use of it at trial, they may raise the issue in a pre-trial motion consistent with their Rule 11(b) obligations and this Court's orders.

## IV. Conclusion

For the reasons set out above, the Court grants Defendants' motion to strike Dr. Zaeske's report and testimony [60]; grants in part, and denies in part, Defendants' Motion for Summary Judgment [45]; and denies Plaintiff's Motion for Partial Summary Judgment, [86]. Namely, it grants summary judgment to Defendants on Plaintiff's claims for § 1981 discrimination (Count III), Title VII discrimination (Count IV), and breach of contract (Count V) as to § 6.2 of the Faculty Handbook, only. Plaintiff may proceed to trial against Defendants on her § 1981 and Title VII retaliation claims (Count I and II) and on her breach of contract claim (Count V) as to § 3.5.6.3 of the DePaul Faculty Handbook.

Dated: September 15, 2022          Entered:

John Robert Blakey
United States District Judge